**Ashley Kittrell**

| | |
|---|---|
| **From:** | Tatyana Drevaleva <tdrevaleva@gmail.com> |
| **Sent:** | Wednesday, September 15, 2021 9:19 PM |
| **To:** | NMDdb_Proposed Text Johnson; Lyman, Christine (USANM) |
| **Subject:** | Case No. 1:21-cv-00761-WJ-JFR. Second Correspondence with the Court. |

<mark>CAUTION - EXTERNAL:</mark>

Mr. Johnson,

My elderly client developed today the following conditions:

1)  Severe allergy in a form of a skin rash all over her body with severe itching. The skin rush was so severe that I wanted to go to Emergency room together with my client

2)  Constipation

3)  Diarrhea. My client was dirty, and I needed to wash her and to changer her clothe.

Ask yourself a question – what if all these conditions occurred yesterday when I was absent from home for 6-7 hours in order to print out the paper copies of my documents and to mail them to the U.S. District Court for the District of New Mexico because you criminally denied my access to the Electronic Case Filing? You would be liable for abusing my elderly client and for coercing me to leave my client alone for an extended period of time.

Similarly, you will be liable for abusing my elderly client because you criminally denied my Motion to Appoint a Counsel. You criminally ignored the California Government Code Section 68651 that imposed a mandatory obligation on you to appoint a Counsel. for my basic needs. As a result, I will have to leave my client alone for extended periods of time in order to serve Defendants with my Discovery requests.

Also, you literally jeopardized my job because I will have to spend significant amounts of time:

1)  preparing my legal papers myself instead of a Counsel

2)  conducting Discovery myself not knowing how to do it

3)  not to sleep at night because I will have to write my legal papers at night while my client is sleeping

4) to abandon my client for extended periods of time because I would need to write my papers, to print them out, and to mail them to the U.S. District Court for the District of new Mexico

5) my client will not be able to timely have her lunch and dinner

6) my client is at risk of falls and body injuries

7) I will spend all my small salary for printing out my legal papers and for mailing expenses

8) I will not have any money left for my own needs.

If my client fires me like three previous clients did in 2019, you will be liable for putting me to the street along with other homeless people whom you and Judges like you are made homeless.

Be aware that:

1) I am the only family member in the United States

2) I don't have a permanent place of living in the United States

3) I don't have a car

4) I was defamed about the reasons of the termination of my employment from the New Mexico VA Health Care System in 2017

5) As a result of defamation, I can't obtain a job in my professional field as a Monitor Technician

6) Asa a result of your September 14, 2021 Order that denied my access to the electronic case filing and that denied my Motion to Appoint a Counsel, I will have to spend all my time litigating my lawsuit No. 1:21-cv-00761-WJ-JFR myself, and it will deprive me of an opportunity to get an additional job and to earn additional money. Therefore, you intentionally and maliciously put me into financial misery

7) I am almost 55 yo, I don't have children, and you and judges like you are criminally deprived me of an opportunity to continue a treatment of my infertility.

In your September 14, 2021 Order, you stated that my lawsuit No. 1:21-cv-00761-WJ-JFR:

1) is just another employment discrimination case

2) that I am just a vexatious litigant that consistently files meritless Motions and moves to disqualify everybody

3) that I have a history of an abusive litigation behavior

4)  that the criminals who crossed the Mexican board and who are currently detained are more important to you than I am

5)  that you currently don't have two Judges in your Court, and therefore you will take care of the criminals first because their Liberty is jeopardized, and I don't deserve your attention because I am just a vexatious litigant in an employment discrimination case

6)  that I harassed you because I communicated Ex Parte with you and I asked you to give me the time frame when you will finally rule on my **most important** Motion for Permission for Electronic Case Filing. I am emphasizing that for me this Motion was more important than my Motion for Partial Summary Judgment. Please, see my explanations about my elderly client above

7)  that you will make rulings in my case only when you have time to do it and only after you take care of the criminals, and that my needs are not important at all.

Who cares that I've been deprived of an opportunity to continue a treatment of my infertility for 4.5 years and that my age is almost 55 yo? Nobody.

Are my age and my health condition important for a busy Chief Judge who is concerned about the people who crossed the Mexican border (and who will do it over and over again if you release them from jail)? Of course, no.

Is a Russian immigrant woman at the age of 55 who was fired from her job for her attempt to have a child important for the Chief Judge of the District Court in New Mexico? Of course, no.

In your September 14, 2021 Order, you stated that:

1)  I am capable of litigating my lawsuit myself

2)  that I already asked the District Court in California twice to appoint a Counsel, and  my Motions were denied

3)  that I already communicated with 25 lawyers in New Mexico, and nobody agreed to accept my lawsuit. If no one lawyer already agreed to accept my lawsuit in New Mexico, why should the Chief Judge bother to appoint a Counsel to me? Criminals are more important because they have a Constitutional right for a Counsel. A fired Russian woman doesn't have this right. She has already waited for 4.5 years (unlike the criminals whose lawsuits are decided instantly), so

she can wait for another several years until a busy Chief Judge finds some time to pay attention to this Russian woman's basic needs.

Please, read 18 U.S. Code § 1091 – Genocide,

(a) Basic Offense.—Whoever, whether in time of peace or in time of war and with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group as such—

(1) kills members of that group;

(2) **causes serious bodily injury** to members of that group;

(3) causes the permanent impairment of the mental faculties of members of the group through drugs, torture, or similar techniques;

(4) **subjects the group to conditions of life that are intended to cause the physical destruction** of the group in whole or in part;

(5) **imposes measures intended to prevent births within the group**; or

(6) transfers by force children of the group to another group;

shall be punished as provided in subsection (b).

(b) Punishment for Basic Offense.—The punishment for an offense under subsection (a) is—

(1) in the case of an offense under subsection (a)(1), where death results, by death or imprisonment for life and a fine of not more than $1,000,000, or both; and

(2) a fine of not more than $1,000,000 or imprisonment for not more than twenty years, or both, in any other case.

(c) Incitement Offense.—

Whoever directly and publicly incites another to violate subsection (a) shall be fined not more than $500,000 or imprisoned not more than five years, or both.

(d) Attempt and Conspiracy.—

Any person who attempts or conspires to commit an offense under this section shall be punished in the same manner as a person who completes the offense.

(e) Jurisdiction.—There is jurisdiction over the offenses described in subsections (a), (c), and (d) if—

(1) the offense is committed in whole or in part within the United States; or

(2) regardless of where the offense is committed, the alleged offender is—

> (A) a national of the United States (as that term is defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101));

> (B) an alien lawfully admitted for permanent residence in the United States (as that term is defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101));

> (C) a stateless person whose habitual residence is in the United States; or

> (D) present in the United States.

(f) Nonapplicability of Certain Limitations.—

Notwithstanding section 3282, in the case of an offense under this section, an indictment may be found, or information instituted, at any time without limitation.

(Added Pub. L. 100–606, § 2(a), Nov. 4, 1988, 102 Stat. 3045; amended Pub. L. 103–322, title VI, § 60003(a)(13), Sept. 13, 1994, 108 Stat. 1970; Pub. L. 107–273, div. B, title IV, § 4002(a)(4), (b)(7), Nov. 2, 2002, 116 Stat. 1806, 1808; Pub. L. 110–151, § 2, Dec. 21, 2007, 121 Stat. 1821; Pub. L. 111–122, § 3(a), Dec. 22, 2009, 123 Stat. 3481.)

I am asking you to reconsider your September 14, 2021 Order and do all of the following:

1) To give me access to the Electronic Case Filing in your Court

2) To appoint a Counsel to assist me with my legal needs

3) To do everything possible to expedite my lawsuit. My Liberty is at stake because the Federal Government defamed me about the reasons of the termination of my employment, because I can't get a job in my professional field, and because I am deprived of an access to my fertility treatment. The criminals who crossed the border can wait. I can't wait. I have already waited for 4.5 years

4) To immediately schedule an Expedited Jury Trial and to give me permanent injunction in a form of getting reinstated back to work at any VAMC and being awarded with my lost salary and benefits as a result of discrimination and unlawful termination of my employment that was committed by the New Mexico VA Health Care System in 2017

5)  To grant my First Motion for Partial Summary Judgment despite this Motion exceeds page limits

6)  If you are so busy that you can't give priority to my lawsuit, I am asking you to recuse yourself from judging my case and to assign this case to another Judge who will pay attention to me and not to the criminals who crossed the Mexican border.

Tatyana.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**Ashley Kittrell**

| | |
|---|---|
| **From:** | Tatyana Drevaleva <tdrevaleva@gmail.com> |
| **Sent:** | Wednesday, September 15, 2021 11:58 AM |
| **To:** | NMDdb_Proposed Text Johnson; Lyman, Christine (USANM) |
| **Subject:** | Case No. 1:21-cv-00761-WJ-JFR. Correspondence with the Court. |

**CAUTION - EXTERNAL:**

Mr. Johnson,

I read your Order that you issued yesterday. I want to clarify some issues that you currently don't understand.

**Issue No. 1**. You stayed the lawsuit, and you prohibited me to submit any filings. However, yesterday, before I had an opportunity to read your order, I mailed to the U.S. District Court for the District of New Mexico the following filings:

1) REPLY TO LYMAN'S CRIMINAL, FRIVOLOUS, AND MALICIOUS OPPOSITION TO MY FIRST MOTION TO DISQUALIFY ASSISTANT U.S. ATTORNEY MS. CHRISTINE LYMAN FROM FALSELY REPRESENTING DEFENDANTS THE U.S. DEPARTMENT OF VETERANS AFFAIRS AND MR. DENIS McDONOUGH IN THE LAWSUIT No. 1:21-cv-00761-WJ-JFR

2) FIRST MOTION FOR PERMISSION TO EXCEED PAGE LIMITATIONS, The Civil Local Rules of the U.S. District Court for the District of New Mexico, Rules 7.5 and 10.5

3) FIRST MOTION FOR PERMISSION TO FILE MORE MOTIONS FOR SUMMARY JUDGMENT OR, AS AN ALTERNATIVE, TO FILE A SUPPLEMENTAL BRIEF IN SUPPORT TO MY FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT.

I mailed these documents yesterday that was September 14, 2021 at approximately 6.30 PM. Afterwards, I went to my elderly client's home, turned my computer on, and read your Order that prohibited me to submit any filings and that stated the lawsuit.

Because currently I can't submit any filings, I am sending you an email, and I am informing you that, before I had an opportunity to read your Order, I already mailed three documents to the U.S. District Court for the District of New Mexico. The Clerk will receive these documents in a few

days. If the Clerk files these documents, I don't want you to find me in contempt of the Court, and I don't want you to think that I disobeyed your Order. I am repeating the third time that I mailed three documents to the court yesterday <u>before I learned</u> that you stayed the case and <u>before I learned</u> that you prohibited me to submit any filings in my lawsuit.

<u>**Issue No. 2**</u>. I called your Secretary twice, and I asked only one question – to bring to your attention that I don't have electronic case filing privileges. I didn't ask about anything else. In your September 14, 2021 Order, you accused me in Ex Parte communication with the Court. You are incorrect. My phone calls to your Secretary were made only for the purpose to remind you that my Motion for Permission for Electronic Case Filing was pending. In my phone calls, I didn't explicitly ask you to <u>grant</u> my Motion. I only asked <u>to rule</u> on my Motion. If I knew how to include AUSA Lyman into my phone calls, I would have included her. However, I didn't know how to technically include AUSA Lyman into my phone calls, and therefore I didn't include her. However, I included AUSA Lyman into my email that I sent you on September 09, 2021. In that email, I very respectfully asked you to rule on my Motion for Permission for Electronic Case Filing. You ignored that email. On September 13, 2021, I sent you another email, and I also included AUSA Lyman into my correspondence with you. I informed you that, if I don't hear from you until the end of the week, I will petition to the 10th Circuit with a demand to disqualify you from judging my lawsuit No. 1:21-cv-00761-WJ-JFR, and I will file a Petition for Writ of Mandate with the 10th Circuit to compel you to rule on my Motion for Permission for Electronic Case Filing, my Motion to Appoint a Counsel, and on my Motion for an Expedited Jury Trial that is consolidated with a hearing of my Motion for Permanent Injunction.

Next day which was September 14, 2021, you accused me in an Ex Parte communication with the Court. I am repeating that:

1) I didn't know how to technically include AUSA Lyman into my phone calls because I am in California, and Lyman is who knows where. She is in a different State. She can't personally come to my home in California, and she can't participate in my phone conversation with your secretary. Likewise, I don't know where she is, she never disclosed her real address, and I can't personally come to her place and to include her into my phone conversation with your secretary

2) In my phone conversation with your Secretary, I asked to rule on my Motion for Permission for Electronic Case Filing, and I didn't ask about anything else

3)  I included AUSA Lyman into two emails that I sent you on September 09 and 13, 2021 where I asked you to rule on my Motion for Permission for Electronic Case filing. Therefore, AUSA Lyman was aware that I contacted with you and I asked you to rule on my Motion for Permission for Electronic Case Filing. Therefore, you can't accuse me in an Ex Parte communication with the Court.

**Issue No. 3**. As you know, I don't have electronic case filing privileges at the U.S. District Court for the District of New Mexico. In order for me to submit any document to the Court in New Mexico, I must do all of the following:

1)  I must prepare the electronic version of the document in my computer

2)  I must put this electronic version on my flash drive

3)  I must go to a different city Oakland to print out my documents at 7 cents per page instead of printing our for 15 cents per page at the FedEx in Downtown San Francisco

4)  Because I don't have a car, I must spend significant amounts of time waiting for the bus, going on the bus to Downtown San Francisco from 3015 Clement Street (approximately 50 minutes on the bus plus 10-15 minutes waiting for the bus)

5)  From Downtown San Francisco,, I must go on the BART from the Embarcadero BART station to MacArthur BART station in Oakland, CA – approximately 20 minutes plus 10-15 minutes waiting for the train

6)  After I get to the MacArthur BART station, I have to wait for another 10-15 minutes until I get on the Kaiser Permanente shuttle because it is the only transportation that goes to the printing place that I need. I need to get on the Kaiser Shuttle, and I need to go on this bus for approximately 7-10 minutes, and I need to get off at the top of the hill

7)  From the top of the hill, I need to walk for approximately 10 minutes to the printing place

8)  I need to spend my time printing out the paper documents, and I must pay money 7 cents per one page plus tax. It is cheaper than to print out my documents at the FedEx Office that charges 15 cents per page

9)  I need to walk again from the printing place to the Fabiola Building of Kaiser Permanente – another 15 minutes

10) I need to wait for the Kaiser Shuttle for another 10-15 minutes

11) I need to get on the Kaiser Shuttle and I need to go to the MacArthur BART station – another 10 minutes

12) I need to wait for the BART train that goes to San Francisco – another 5-25 minutes

13) I need to get on the train and to go back to the Embarcadero BART station – another 20 minutes

14) From the Embarcadero BART station, I need to walk to the Bus No. 1 – another 10 minutes

15) I need to wait the Bus No. 1 – another 5-10 minutes

16) I need to go to the cross of Van Ness and Post to the FedEx Office that works until 8.00 PM – another 15 minutes plus walking another 10 minutes

17) I need to pay money for shipping my paper documents to New Mexico – another 12 dollars plus approximately 20 minutes of my time at the FedEx Office

18) I need to walk back to the bus stop, and I need to wait for the bus No. 38 for another 10-15 minutes

19) I need to get on the bus No. 38 and to go to my elderly client – another 50-60 minutes plus 10 minutes of walking from the bus stop to my client's home.

In summary, in order for me to print out the paper documents and to mail them to the U.S. District Court for the District of New Mexico, I literally must:

1) spend 6-7 hours of my time

2) leave my elderly client alone in her home for 6-7 hours

3) jeopardize her health because during these 6-7 hours she may need my assistance. She may:

    a) Fall down at home, and nobody will assist her to get up

    b) Her blood pressure may decrease, and nobody will give her a cup of coffee

    c) Leave her hungry because she can't use a microwave herself to warm the food up

    d) She will not be able to walk in the street without my assistance

    e) In case of emergency, nobody will assist her

4) Spend significant amounts of my salary to pay for printing out the paper copies of my documents and to pay for shipping these documents to the U.S. District Court for the District of New Mexico.

This is what you literally did yesterday when you denied my access to the Electronic Case Filing:

1) You jeopardized the health of my elderly client

2) You compelled me to leave my client alone at her home for 6-7 hours

3)  You compelled me to spend my salary that is already miserable (approximately $1500 per month) for printing out the paper copies and for mailing them to New Mexico.

When I came home yesterday after my trip to Oakland, I found out that:

1)  My client's blood pressure dropped, and she called her daughter for assistance because I was not at home at that time
2)  Her daughter left her job and came to my client's place to give her a cup of coffee
3)  The daughter also fed my client because my client was unable to eat herself.

When I returned home yesterday, I read your Order where you accused me in filing "harassing" Supplemental Briefs, and you denied my access to the Electronic Case Filing.

I am informing you that in 2019 I lost my job three times because I was compelled to leave three elderly clients alone at home while I was printing out the paper copies during the litigations of my lawsuits against the California Department of Industrial relations and against the Alameda Health System at the State Court. I am informing you that in 2019 three elderly clients fired me because they couldn't tolerate that I left them alone at home.

Now, you put me in jeopardy to lose my current job because, Denying my access to the electronic case filing, you literally jeopardize the health and the life of my elderly client. She may fall down at home, and she may hit her head. She has a history of falling down at home and hitting her head. If I am at home, I will assist her to get up. If you deny my access to the electronic case filing, and if you compel me to leave my client alone at home for 6-7 hours (maybe more depending on circumstances), you literally commit elder abuse, and you will be liable for that.

Also, if you deny my access to the electronic case filing, and if you compel me to spend literally all my salary for printing out the paper copies of the documents and for mailing them to the District Court of New Mexico, you will be liable for compelling me to spend my last money for unnecessary expenses that you have a power to prevent.

I am asking you to reconsider your Order that denied my access to the electronic case filing.

I will present more objections to your September 14, 2021 Order in my next email.

Right now, I need to go to a pharmacy to get a medicine for my client.

I am a live-in Caregiver, and I live together with my elderly client.

Tatyana.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** Tatyana Drevaleva <tdrevaleva@gmail.com>
**Sent:** Thursday, September 16, 2021 1:30 PM
**To:** NMDml_Magistrate Judge Robbenhaar's Chambers <RobbenhaarChambers@nmd.uscourts.gov>; Lyman, Christine (USANM) <Christine.Lyman@usdoj.gov>
**Subject:** Case No. 1:21-cv-00761-WJ-JFR. Correspondence with the Court.

<mark>**CAUTION - EXTERNAL:**</mark>

Good afternoon Mr. Robbenhaar!

My name is Tatyana Drevaleva. I am a Plaintiff in case No. 1:21-cv-00761-WJ-JFR.

On September 14, 2021, Judge Johnson entered an Order (Doc. No. 491) where he referred the matter to you, and he asked you to schedule a Case Management Conference.

I am respectfully asking you, please, to schedule the Case Management Conference as soon as you can, and I am respectfully asking you, please, to issue your Order as fast as you can.

I've been suffering from discrimination and unlawful termination of my employment for over four years. It is very difficult. Please, help me as soon as you can.

Thank you,

Respectfully,

Tatyana Drevaleva.

<mark>**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.</mark>

**Ashley Kittrell**

| | |
|---|---|
| **From:** | Phyllis Amato |
| **Sent:** | Thursday, September 16, 2021 4:19 PM |
| **To:** | Ashley Kittrell |
| **Subject:** | FW: Case No. 1:21-cv-00761-WJ-JFR. Correspondence with the Court. |

FYI – to put in your folder, please.

**From:** Karen Chase <Karen_Chase@nmd.uscourts.gov>
**Sent:** Thursday, September 16, 2021 3:46 PM
**To:** Phyllis Amato <Phyllis_Amato@nmd.uscourts.gov>
**Subject:** FW: Case No. 1:21-cv-00761-WJ-JFR. Correspondence with the Court.

See below.

Karen

**From:** Tatyana Drevaleva <tdrevaleva@gmail.com>
**Sent:** Thursday, September 16, 2021 1:30 PM
**To:** NMDml_Magistrate Judge Robbenhaar's Chambers <RobbenhaarChambers@nmd.uscourts.gov>; Lyman, Christine (USANM) <Christine.Lyman@usdoj.gov>
**Subject:** Case No. 1:21-cv-00761-WJ-JFR. Correspondence with the Court.

**CAUTION - EXTERNAL:**

Good afternoon Mr. Robbenhaar!

My name is Tatyana Drevaleva. I am a Plaintiff in case No. 1:21-cv-00761-WJ-JFR.

On September 14, 2021, Judge Johnson entered an Order (Doc. No. 491) where he referred the matter to you, and he asked you to schedule a Case Management Conference.

I am respectfully asking you, please, to schedule the Case Management Conference as soon as you can, and I am respectfully asking you, please, to issue your Order as fast as you can.

I've been suffering from discrimination and unlawful termination of my employment for over four years. It is very difficult. Please, help me as soon as you can.

Thank you,

Respectfully,

Tatyana Drevaleva.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**Ashley Kittrell**

| | |
|---|---|
| **From:** | Tatyana Drevaleva <tdrevaleva@gmail.com> |
| **Sent:** | Saturday, September 18, 2021 11:28 AM |
| **To:** | NMDdb_Proposed Text Johnson; NMDml_Magistrate Judge Robbenhaar's Chambers; Lyman, Christine (USANM) |
| **Subject:** | Case No. 1:21-cv-00761-WJ-JFR. Correspondence with the Court. |

**CAUTION - EXTERNAL:**

To the Hon. Judge John Robbenhaar from Plaintiff Tatyana Drevaleva.

Also, to Judge Johnson.

I am extremely grateful to Hon. Judge John Robbenhaar for promptly issuing an Order that scheduled the Initial Case Management Conference. Thank you so much!

I have an objection to Judge Johnson's September 14, 2021 Order. Please, read page 7, "… no case management hearing was held following remand from the Ninth Circuit Court of Appeals ..."

Here, Judge Johnson is simply incorrect. The Initial Case Management Conference in case No. 3:18-cv-03748-JCS after remand occurred at the U.S. District Court for the Northern District of California on April 30, 2021 before Magistrate Judge Mr. Joseph C Spero.

Please, read the April 05, 2021 Order of Judge Spero (Doc. No, 345), page 1, lines 24-25, "A case management conference will occur on April 30, 2021 at 2:00 PM via Zoom webinar. The parties shall file separate case management statements no later than April 23, 2021."

Please, also see Docket No. 372 entered on May 03, 2021 that confirmed that the Initial Case Management Conference actually occurred on April 30, 2021.

"FTR Time: Zoom Webinar Time: 2:04-2:39.

Plaintiff Attorney: Tatyana Drevaleva, pro se. NOTE: Ms. Drevaleva left the Zoom Webinar at 2:30 PM.

Defendant Attorney: Kimberly Robinson."


During the Initial Case Management Conference on April 30, 2021, Judge Spero verbally allowed the Parties to conduct Discovery. Therefore, the Discovery in case No. 1:21-cv-00761-WJ-JFR **has already been open since April 30, 2021**.

I didn't propound any Discovery request because at that time I was writing 10 Appeals at the 9th Circuit after the termination of my employment from both the Alameda Health System in 2013 and after the termination of my employment from the New Mexico VA Health Care System in 2017. Therefore, I simply didn't have both time and strength to propound a Discovery request. Moreover, I had no idea how to propound a Discovery request, therefore, I didn't propound it. However, I contacted with the Legal Help Center at the U.S. District Court for the Northern District of

California, and they emailed me the Discovery forms of that Court. Still, I simply didn't have time, strength to propound a Discovery request. Currently, I am learning how to do it.

Please, notice a material fact of the case that, after Judge Spero allowed Discovery in case No. 3:18-cv-03748-JCS, Assistant U.S.  Attorney Robinson disqualified herself from representing the U.S. Department of VA and its Secretary, and AUSA Ms. Adrienne Zack entered a Notice of Substitution of Counsel (Doc. No. 382.)

Please, notice a material fact of the case that, despite the Discovery in case No. 3:18-cv-03748-JCS was open since April 30, 2021, AUSA Zack **didn't propound any Discovery request at all**.

Now, please, take a Judicial Notice of a fraudulent statement of AUSA Lyman that claimed that a Discovery in this case should occur. See Lyman's Opposition to my Motion for an Expedited Jury Trial that is Consolidated with my Motion for Permanent Injunction (Doc. No. 467), page 3, " "Conducting a hearing—in essence, a trial—on Plaintiff's request for a permanent injunction at this stage of the proceedings would prejudice the Defendants, be impracticable, **and undermine a central benefit of the discovery rules, allowing 'parties to obtain the fullest possible knowledge of the issues and facts before trial**.'" "

Here, Lyman knowingly committed fraud because she **knew** that the Initial Case Management Conference in this case occurred on April 30, 2021, and the Discovery in this case has already been open since April 30, 2021, and that AUSA Zack didn't propound any Discovery request.

See the same Lyman's Opposition, page 2, "The case management conference scheduled in the Northern District of California was vacated. See Doc. 436 (continuing case management conference to August 20, 2021); Doc. 451 at 7 (vacating all dates and deadlines)."

Here, Lyman committed another fraud because she knowingly withheld from the Court a material fact of the case that she **knew** that the Initial Case Management Conference in this case **occurred** on April 30, 2021, and the Discovery in this case has already been open since April 30, 2021, and that AUSA Zack didn't propound any Discovery request.

Therefore, following Judge Johnson's statement in his September 14, 2021 Order, Lyman's behavior warrants sanctions because she knowingly lied to the Court that the Initial Case Management Conference in this case hadn't occurred.

See Judge Johnson's September 14, 2021 Order, pages 14-15, " ("Flippant, unfounded accusations of misconduct and fraud by opposing counsel and court officials demean the profession and impair the orderly operation of the judicial system." At worst, the Court would be inclined to consider the appropriateness of sanctions for making such baseless accusations. Id. ("Such behavior warrants punishment.")"

However, I just demonstrated by the preponderance of the evidence that Attorney Lyman actually committed fraud because she **knowingly** withheld from the Court that the Discovery in case No. 1;21-cv-00761-WJ-JFR has been open since April 30, 2021, and she withheld the material fact of the case that AUSA Zack **never propounded any Discovery request** because Defendants have nothing to discover.

I will present more thoughts in my next email to the Court.

Tatyana.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

Tatyana Evgenievna Drevaleva

    *Plaintiff*                        Case No. 1:21-cv-00761-WJ-JFR

            v.

1) The U.S. Department of Veterans Affairs

2) Mr. Denis Richard McDonough as a Secretary of

  the U.S. Department of Veterans Affairs

    *Defendants*

## DEFENDANTS' OBJECTIONS TO PLAINTIFF'S STATEMENT OF FACTS. <u>Part 1.</u>

    <u>**Fact No. 1.**</u> Agree/Disagree

    Defendants' Objections:

    <u>**Fact No. 2.**</u> Agree/Disagree

    Defendants' Objections:

**Fact No. 3**. Agree/Disagree

Defendants' Objections:

**Fact No. 4.** Agree/Disagree

Defendants' Objections:

**Fact No. 5.** Agree/Disagree

Defendants' Objections:

**Fact No. 6**. Agree/Disagree

Defendants' Objections:

**Fact No. 7**. Agree/Disagree

Defendants' Objections:

**Fact No. 8**. Agree/Disagree

Defendants' Objections:

**Fact No. 9**. Agree/Disagree

Defendants' Objections:

**Fact No. 10**. Agree/Disagree

Defendants' Objections:

**Fact No. 11**. Agree/Disagree

Defendants' Objections:

**Fact No. 12**. Agree/Disagree

Defendants' Objections:

**Fact No. 13**. Agree/Disagree

Defendants' Objections:

**Fact No. 14**. Agree/Disagree

Defendants' Objections:

**Fact No. 15** Agree/Disagree

Defendants' Objections:

**Fact No. 16**. Agree/Disagree

Defendants' Objections:

**Fact No. 17**. Agree/Disagree

Defendants' Objections:

**Fact No. 18**. Agree/Disagree

Defendants' Objections:

**Fact No. 19**. Agree/Disagree

Defendants' Objections:

**Fact No. 20**. Agree/Disagree

Defendants' Objections:

**Fact No. 21**. Agree/Disagree

Defendants' Objections:

**Fact No. 22**. Agree/Disagree

Defendants' Objections:

**Fact No. 23**. Agree/Disagree

Defendants' Objections:

**Fact No. 24**. Agree/Disagree

Defendants' Objections:

**Fact No. 25**. Agree/Disagree

Defendants' Objections:

**Fact No. 26**. Agree/Disagree

Defendants' Objections:

**Fact No. 27**. Agree/Disagree

Defendants' Objections:

**Fact No. 28**. Agree/Disagree

Defendants' Objections:

**Fact No. 29**. Agree/Disagree

Defendants' Objections:

**Fact No. 30**. Agree/Disagree

Defendants' Objections:

**Fact No. 31**. Agree/Disagree

Defendants' Objections:

**Fact No. 32**. Agree/Disagree

Defendants' Objections:

**Fact No. 33**. Agree/Disagree

Defendants' Objections:

**Fact No. 34**. Agree/Disagree

Defendants' Objections:

**Fact No. 35**. Agree/Disagree

Defendants' Objections:

**Fact No. 36**. Agree/Disagree

Defendants' Objections:

**Fact No. 37**. Agree/Disagree

Defendants' Objections:

**Fact No. 38**. Agree/Disagree

Defendants' Objections:

**Fact No. 39**. Agree/Disagree

Defendants' Objections:

**Fact No. 40**. Agree/Disagree

Defendants' Objections:

**<u>Fact No. 41</u>**. Agree/Disagree

Defendants' Objections:

**<u>Fact No. 42</u>**. Agree/Disagree

Defendants' Objections:

**<u>Fact No. 43</u>**. Agree/Disagree

Defendants' Objections:

**<u>Fact No. 44</u>**. Agree/Disagree

Defendants' Objections:

**<u>Fact No. 45</u>**. Agree/Disagree

Defendants' Objections:

**<u>Fact No. 46</u>**. Agree/Disagree

Defendants' Objections:

**<u>Fact No. 47</u>**. Agree/Disagree

Defendants' Objections:

**Fact No. 48**. Agree/Disagree

Defendants' Objections:

**Fact No. 49**. Agree/Disagree

Defendants' Objections:

**Fact No. 50**. Agree/Disagree

Defendants' Objections:

**Fact No. 51**. Agree/Disagree

Defendants' Objections:

**Fact No. 52**. Agree/Disagree

Defendants' Objections:

**Fact No. 53**. Agree/Disagree

Defendants' Objections:

**Fact No. 54**. Agree/Disagree

Defendants' Objections:

**Fact No. 55**. Agree/Disagree

Defendants' Objections:

**<u>Fact No. 56</u>**. Agree/Disagree

Defendants' Objections:

**<u>Fact No. 57</u>**. Agree/Disagree

Defendants' Objections:

**<u>Fact No. 58</u>**. Agree/Disagree

Defendants' Objections:

**<u>Fact No. 59</u>**. Agree/Disagree

Defendants' Objections:

**<u>Fact No. 60</u>**. Agree/Disagree

Defendants' Objections:

**<u>Fact No. 61</u>**. Agree/Disagree

Defendants' Objections:

**<u>Fact No. 62</u>**. Agree/Disagree

Defendants' Objections:

**Fact No. 63**. Agree/Disagree

Defendants' Objections:

**Fact No. 64**. Agree/Disagree

Defendants' Objections:

**Fact No. 65**. Agree/Disagree

Defendants' Objections:

**Fact No. 66**. Agree/Disagree

Defendants' Objections:

**Fact No. 67**. Agree/Disagree

Defendants' Objections:

**Fact No. 68**. Agree/Disagree

Defendants' Objections:

**Fact No. 69**. Agree/Disagree

Defendants' Objections:

**Fact No. 70**. Agree/Disagree

Defendants' Objections:

**Fact No. 71**. Agree/Disagree

Defendants' Objections:

**Fact No. 72**. Agree/Disagree

Defendants' Objections:

**Fact No. 73**. Agree/Disagree

Defendants' Objections:

**Fact No. 74**. Agree/Disagree

Defendants' Objections:

**Fact No. 75**. Agree/Disagree

Defendants' Objections:

**Fact No. 76**. Agree/Disagree

Defendants' Objections:

**Fact No. 77**. Agree/Disagree

Defendants' Objections:

**Fact No. 78**. Agree/Disagree

Defendants' Objections:

**Fact No. 79**. Agree/Disagree

Defendants' Objections:

**Fact No. 80**. Agree/Disagree

Defendants' Objections:

**Fact No. 81**. Agree/Disagree

Defendants' Objections:

**Fact No. 82**. Agree/Disagree

Defendants' Objections:

**Fact No. 83**. Agree/Disagree

Defendants' Objections:

**Fact No. 84**. Agree/Disagree

Defendants' Objections:

**Fact No. 85**. Agree/Disagree

Defendants' Objections:

**Fact No. 86**. Agree/Disagree

Defendants' Objections:

**Fact No. 87**. Agree/Disagree

Defendants' Objections:

**Fact No. 88**. Agree/Disagree

Defendants' Objections:

**Fact No. 89**. Agree/Disagree

Defendants' Objections:

**Fact No. 90**. Agree/Disagree

Defendants' Objections:

**Fact No. 91**. Agree/Disagree

Defendants' Objections:

**Fact No. 92**. Agree/Disagree

Defendants' Objections:

**Fact No. 93**. Agree/Disagree

Defendants' Objections:

**Fact No. 94**. Agree/Disagree

Defendants' Objections:

**Fact No. 95**. Agree/Disagree

Defendants' Objections:

**Fact No. 96**. Agree/Disagree

Defendants' Objections:

**Fact No. 97**. Agree/Disagree

Defendants' Objections:

**Fact No. 98**. Agree/Disagree

Defendants' Objections:

**Fact No. 99**. Agree/Disagree

Defendants' Objections:

**Fact No. 100**. Agree/Disagree

Defendants' Objections:

**Fact No. 101**. Agree/Disagree

Defendants' Objections:

**Fact No. 102**. Agree/Disagree

Defendants' Objections:

**Fact No. 103**. Agree/Disagree

Defendants' Objections:

**Fact No. 104**. Agree/Disagree

Defendants' Objections:

**Fact No. 105**. Agree/Disagree

Defendants' Objections:

**Fact No. 106**. Agree/Disagree

Defendants' Objections:

**Fact No. 107**. Agree/Disagree

Defendants' Objections:

**Fact No. 108**. Agree/Disagree

Defendants' Objections:

**Fact No. 109**. Agree/Disagree

Defendants' Objections:

**Fact No. 110**. Agree/Disagree

Defendants' Objections:

**Fact No. 111**. Agree/Disagree

Defendants' Objections:

**Fact No. 112**. Agree/Disagree

Defendants' Objections:

**Fact No. 113**. Agree/Disagree

Defendants' Objections:

**Fact No. 114**. Agree/Disagree

Defendants' Objections:

**Fact No. 115**. Agree/Disagree

Defendants' Objections:

**Fact No. 116**. Agree/Disagree

Defendants' Objections:

**Fact No. 117**. Agree/Disagree

Defendants' Objections:

**Fact No. 118**. Agree/Disagree

Defendants' Objections:

**Fact No. 119**. Agree/Disagree

Defendants' Objections:

**Fact No. 120**. Agree/Disagree

Defendants' Objections:

**Fact No. 121**. Agree/Disagree

Defendants' Objections:

**Fact No. 122**. Agree/Disagree

Defendants' Objections:

**Fact No. 123**. Agree/Disagree

Defendants' Objections:

**Fact No. 124**. Agree/Disagree

Defendants' Objections:

**Fact No. 125**. Agree/Disagree

Defendants' Objections:

**Fact No. 126**. Agree/Disagree

Defendants' Objections:

**Fact No. 127**. Agree/Disagree

Defendants' Objections:

**Fact No. 128**. Agree/Disagree

Defendants' Objections:

**Fact No. 129**. Agree/Disagree

Defendants' Objections:

**Fact No. 130**. Agree/Disagree

Defendants' Objections:

**Fact No. 131**. Agree/Disagree

Defendants' Objections:

**Fact No. 132**. Agree/Disagree

Defendants' Objections:

**Fact No. 133**. Agree/Disagree

Defendants' Objections:

**Fact No. 134**. Agree/Disagree

Defendants' Objections:

**Fact No. 135**. Agree/Disagree

Defendants' Objections:

**Fact No. 136**. Agree/Disagree

Defendants' Objections:

**Fact No. 137**. Agree/Disagree

Defendants' Objections:

**Fact No. 138**. Agree/Disagree

Defendants' Objections:

**Fact No. 139**. Agree/Disagree

Defendants' Objections:

**Fact No. 140**. Agree/Disagree

Defendants' Objections:

**Fact No. 141**. Agree/Disagree

Defendants' Objections:

**Fact No. 142**. Agree/Disagree

Defendants' Objections:

**Fact No. 143**. Agree/Disagree

Defendants' Objections:

**Fact No. 144**. Agree/Disagree

Defendants' Objections:

**Fact No. 145**. Agree/Disagree

Defendants' Objections:

**Fact No. 146**. Agree/Disagree

Defendants' Objections:

**Fact No. 147**. Agree/Disagree

Defendants' Objections:

**Fact No. 148**. Agree/Disagree

Defendants' Objections:

**Fact No. 149**. Agree/Disagree

Defendants' Objections:

**Fact No. 150**. Agree/Disagree

Defendants' Objections:

**Fact No. 151**. Agree/Disagree

Defendants' Objections:

**Fact No. 152**. Agree/Disagree

Defendants' Objections:

**Fact No. 153**. Agree/Disagree

Defendants' Objections:

**Fact No. 154**. Agree/Disagree

Defendants' Objections:

**Fact No. 155**. Agree/Disagree

Defendants' Objections:

**Fact No. 156**. Agree/Disagree

Defendants' Objections:

**Fact No. 157**. Agree/Disagree

Defendants' Objections:

**Fact No. 158**. Agree/Disagree

Defendants' Objections:

**Fact No. 159**. Agree/Disagree

Defendants' Objections:

**Fact No. 160**. Agree/Disagree

Defendants' Objections:

**Fact No. 161**. Agree/Disagree

Defendants' Objections:

**Fact No. 162**. Agree/Disagree

Defendants' Objections:

**Fact No. 163**. Agree/Disagree

Defendants' Objections:

**Fact No. 164**. Agree/Disagree

Defendants' Objections:

**Fact No. 165**. Agree/Disagree

Defendants' Objections:

**Fact No. 166**. Agree/Disagree

Defendants' Objections:

**Fact No. 167**. Agree/Disagree

Defendants' Objections:

**Fact No. 168**. Agree/Disagree

Defendants' Objections:

**Fact No. 169**. Agree/Disagree

Defendants' Objections:

**Fact No. 170**. Agree/Disagree

Defendants' Objections:

**Fact No. 171**. Agree/Disagree

Defendants' Objections:

**Fact No. 172**. Agree/Disagree

Defendants' Objections:

**Fact No. 173**. Agree/Disagree

Defendants' Objections:

**Fact No. 174**. Agree/Disagree

Defendants' Objections:

**Fact No. 175**. Agree/Disagree

Defendants' Objections:

**Fact No. 176**. Agree/Disagree

Defendants' Objections:

**Fact No. 177**. Agree/Disagree

Defendants' Objections:

**Fact No. 178**. Agree/Disagree

Defendants' Objections:

**Fact No. 179**. Agree/Disagree

Defendants' Objections:

**Fact No. 180**. Agree/Disagree

Defendants' Objections:

**Fact No. 181**. Agree/Disagree

Defendants' Objections:

**Fact No. 182**. Agree/Disagree

Defendants' Objections:

**Fact No. 183**. Agree/Disagree

Defendants' Objections:

**Fact No. 184**. Agree/Disagree

Defendants' Objections:

**Fact No. 185**. Agree/Disagree

Defendants' Objections:

**Fact No. 186**. Agree/Disagree

Defendants' Objections:

**Fact No. 187**. Agree/Disagree

Defendants' Objections:

**Fact No. 188**. Agree/Disagree

Defendants' Objections:

**Fact No. 189**. Agree/Disagree

Defendants' Objections:

**Fact No. 190**. Agree/Disagree

Defendants' Objections:

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

Tatyana Evgenievna Drevaleva

     *Plaintiff*                                  Case No. 1:21-cv-00761-WJ-JFR

               v.

1) The U.S. Department of Veterans Affairs

2) Mr. Denis Richard McDonough as a Secretary of

  the U.S. Department of Veterans Affairs

     *Defendants*

# PLAINTIFF'S STATEMENT OF FACTS. <u>Part 1</u>.

**<u>Fact No. 1.</u>** In approximately November 2016, the New Mexico VA Healthcare System in Albuquerque, NM announced about its job opening for a full[1] time job as a Title 38[2] Hybrid[3]

---

[1] See the Appointment Letter (**ER 03748 Vol. 2, page 502**.)

[2] 38 U.S.C. §7401(3) "… medical instrument technicians…"

[3] Public Law 108-170, December 06, 2003, Title III, Section 301(a)(1)(B)(3), "…medical instrument technicians…"

Excepted[4] Service Medical Instrument Technician (MIT) Electrocardiograph (EKG.)[5] on the web-site ~~www.usajobs.gov~~ . I applied for this job through the web-site ~~www.usajobs.gov~~ . The job application included the questions about my date of birth, about my place of birth, about my citizenship, about my qualifications for this job, and about the Letters of Reference from my previous employers. With my job application, I submitted a Standard Form 10-2850c (Exhibit 341 to Doc. No. 408) where I answered these questions:

6. Date of Birth. 10.13.1966

7. Place of Birth (City.) Novosibirsk

8. Country. Russia

9A. Citizenship. Naturalized U.S. Citizen.

9B. Country of Which you are a Citizen. USA, Russia.



---

[4] See the Appointment Letter (**ER 03748 Vol. 2, page 502**) and (**ER Vol. 1, page 280.**)

[5] See the description of the job at (**ER Vol. 1, page 279**) and (**ER Vol. 1, pages 268-270.**)

~~**Fact No. 2.**~~ Also, I filed my Resume[6] that described my education, qualifications, and job experience (**ER 03748 Vol. 2, pages 504-505.**) Please, also notice that I possessed the certifications of **an EKG Technician** and the Basic Life Support for Health Care Providers (the BLS HCP), and I listed these certifications in the SF 10-2850c.

14A.   BLS HCP              07140260697          10.2018


**EKG Technician**     N/A                  N/A

| 14. LIST ALL STATES/TERRITORIES IN WHICH YOU ARE NOW OR HAVE EVER BEEN LICENSED (If not held now explain on separate sheet) | 14B. LICENSE NO. | 14C. CURRENT REGISTRATION (If "NO" explain on separate sheet) | | | 14D. EXPIRATION DATE |
|---|---|---|---|---|---|
| | | YES | NO | NOT REQUIRED | |
| BLS HCP | 07140260697 | ☐ | ☐ | ☒ | 10.2018 |
| EKG TECHNICIAN | N/A | ☐ | ☐ | ☒ | N/A |

Please, notice that in my Resume I described my education as an **EKG Technician** at City College of San Francisco and Internship as an EKG Technician at the Kanbar Cardiac Center in San Francisco (**ER 03748 Vol. 2, page 505**.)

**Education:**

- City College of San Francisco. Address: 50 Phelan Ave, San Francisco, CA 94112. Certificate of an EKG Technician. 2009; Anatomy 25 in 2009; GPA 4.0 (Dean's list)
- 108 hours of passed Internship as an EKG Technician at California Pacific Medical Center. Kanbar Cardiac Center in 2009. Address: 2333 Buchanan St. San Francisco, CA 94115.

505

---

[6] This Resume could **not** be the exact version of the Resume that I filed on the web-site www.usajobs.gov at the time when I submitted my job application. However, this Resume correctly describes my education, qualifications, and job experience.

**Fact No. 3**. Please, also notice that I listed the following job experience in my Resume (**ER 03748 Vol. 2, pages 504-505**),

1) Alameda Health System, **Monitor Technician**, 36 hours per week, April 2013 – September 2013

2) "Maxim Staffing Solutions", the San Francisco VAMC, **EKG technician**, 40 hours per week, May 2012- March 2013

3) Kaiser Permanente Medical Center in Oakland, **Monitor Technician**, 40-72 hours per week, September 2011 – March 2012

4) "On Assignment" Staffing Agency, Kaiser Permanente Medical Center in Walnut Creek, **EKG Technician**, 40 hours per week, August 2011 – September 2011

5) "Maxim Staffing Solutions" agency, LifeWatch Services, Inc., **Monitor Technician**, 40 hours per week, April 2011 - July 2011

6) University of California San Francisco Medical Center, Patient Care Assistant, 40 hours per week, August 2010 - February 2011

7) University of California Davis Medical Center, **EKG Technician**, 40 hours per week, December 2009 - April 2010.

Therefore, as you see, my primary qualification was **an EKG and Monitor Technician**. Please, also see good Letters of Reference from my previous employers (**ER 03748 Vol. 2, pages 608-624**) and a good Performance Evaluation from the San Francisco VAMC (outstanding and exceptional) (**ER 03748 Vol. 2, pages 626-637**.)

**Fact No. 4.** Please, read the description of the job of an MIT (EKG) (**ER 03748 Vol. 1, page 279**), "**Nursing Service is seeking 5 Medical Instrument Technician (MIT) (EKG) to join the team!** The MIT position is located in the Telemetry Unit within the Nursing Service Line at the New Mexico VA Health Care System. The MIT's functions are to monitor the patient's electrocardiogram (EKG) waveforms in a centralized station and notify the appropriate clinical staff as directed. The employee must be willing to work cooperatively as a member of the inpatient team and demonstrate customer service principles in all aspects of work. The MIT will perform job duties independently and in accordance with established departmental and hospital procedures, including telemetry monitoring and patient care related tasks. The MIT reports to the Telemetry Unit Nurse Manager, but must work in collaboration with all members of the patient care team."

**Fact No. 5.** Please, read about the basic requirements of the job of an MIT (EKG) (**ER 03748 Vol. 1 page 280**),

"**Basic Requirements**

- **Citizenship**: Be a citizen of the United States.

- **English Language Proficiency**: Medical Instrument Technicians must be proficient in spoken and written English.

- **Education**: There are no specific educational requirements for this occupation. Education may be substituted for experience only at the GS-4 and GS-5 levels.

**Experience** refers to paid and unpaid experience, including volunteer work done through National Service programs (e.g., Peace Corps, AmeriCorps) and other organizations (e.g., professional; philanthropic; religions; spiritual; community; student; social). Volunteer work helps build critical competencies, knowledge, and skills and can provide valuable training and experience that translates directly to paid employment. You will receive credit for all qualifying experience, including volunteer experience."

**Fact No. 6**. Please, read about the requirements for the GS-7 grade (**ER 03748 Vol. 1, page 280**),

"**Grade determinations**:

**GS-7 Experience**. At least 1 year of experience comparable to the next lower grade level which demonstrates the knowledge, skills, abilities, and other characteristics related to the duties of the positions to be filled. This would be experience which provided knowledge of the equipment, standard tests and procedures, and typical readings including arrhythmias and abnormalities. In addition, the candidate must demonstrate the following KSAs: (No Education Substitute)

1. Knowledge of typical patient reactions and signs of distress including the ability to recognize, report and treat potentially lethal arrhythmias.

2. Knowledge of common equipment settings and standardized procedures plus knowledge of common errors and corrective measures.

3. Ability to modify procedures/positions to obtain the correct results with patients with complicating conditions such as amputations, Parkinson's disease, structural defects, and scar tissue.

4. Ability to act as a mentor or preceptor to lower graded technicians.

5. Ability to conduct in-service training on the EKG equipment and related instrumentation.

References: VA Handbook 5005/15, Part II, Appendix G27, Medical Instrument Technician Qualification Standards. This can be found in the local Human Resources Office."


**Fact No. 7.** The job opening of an MIT (EKG) announced that this position was in the Excepted service, see (**ER 03748 Vol. 1, page 280**), "This position is **in the Excepted Service** and does not confer competitive status."

**Fact No. 8**. Also, see the New Mexico VA Health Care System's Medical Instrument Technician (Electrocardiograph Technician), GS-0649-07 Functional Statement (**ER 03748 Vol. 1, pages 268-273**) with a description of the duties of the Medical Instrument Technicians.

Please, read (**ER Vol. 1, pages 268-270**),

"The technician provides continuous cardiac rhythm interpretation and reporting of monitor tracing of patients to appropriate clinical staff. The technician performs cardiac monitoring activities that include initiating, monitoring, recording, interpreting, documenting, and discontinuing telemetry. Other MIT duties include, but are not limited to the following:

• Continuously monitors electrocardiogram (EKG) tracings.

• Be skilled in interpreting a variety of normal and abnormal EKG tracings and communicates the information to appropriate clinical staff

• Recognizes changes in patients' condition and is astute in identifying the need for intervention

• Performs 12-Lead EKGs

• Has practical knowledge of treatment procedures

• Has knowledge of medical terminology, cardiac conditions, effects of medical and nursing therapies

• Operates and monitor EKG equipment

- 8 -

• Has knowledge of equipment, materials, and supplies, used to perform telemetry

• Maintains patient cardiac rhythm tracing record and other accompanying documentation

• Edits and selects appropriate sample portions of tracing for review by provider

• Sets alarm parameters established by the provider

• Follows emergency procedures

• Routinely evaluates the integrity of equipment both prior to placement on patient and during the patient's telemetry monitoring

• Maintains and keeps track of telemetry equipment as patients are discharged and transferred

• Evaluates patients for discharge from telemetry in collaboration with providers

• Performs supplemental downtime duties which may include additional patient care tasks."

**Fact No. 9**. Prior to being appointed to my full time job, I was fully qualified to work as a Monitor Technician and an EKG Technician (**ER 03748 Vol. 2, pages 504-505**.) I was certified as an EKG Technician in California (**ER 03748 Vol. 2, page 505**.), I possessed a BLS HCP certificate (Basic Life Support for Health Care Providers), I had a few years of experience

working as both an EKG and a Monitor Technician, and I had good Letters of Reference from my previous employers (**ER 03748 Vol. 2, pages 608-625**.) Prior to being appointed to a full time job at the Raymond G. Murphy VAMC, I worked as an EKG Technician contractor for 10.5 months at the San Francisco VAMC in 2012 – 2013 where my performance was rated as outstanding and exceptional **(ER 03748 Vol. 2, pages 626-637.)** During my Orientation at the Raymond G. Murphy VAMC, I passed an EKG Test with a score of 100%.

Therefore, I was a Qualified Individual or the person who was able to perform the Essential Functions of the Job as defined in the ADA or 42 U.S.C. §12111(8.) As an alternative, pursuant to 38 CFR § 15.103, I was a Qualified individual with handicaps and a Qualified handicapped person.

**Fact No. 10**. In their June 04, 2021 Answer (Doc. No. 396), Assistant U.S. Attorney Ms. Zack confirmed that I was qualified for this job, see page 2, lines 26-27, "Defendants **admit** that Plaintiff was qualified for the position to which she was appointed and **that she had multiple previous years of experience**." However, please, notice that Zack criminally concealed a material fact of the case that, besides having "multiple previous years of experience", I also had a formal education as an Electrocardiography and a Monitor Technician that was evidenced by the **Certificate of an EKG Technician** that I earned at City College of San Francisco in 2009 (Exhibit 367.)

- 10 -

**Fact No. 11**. At approximately the same time when I submitted my job application, Mr. David E. Williams, Jr. also submitted his application for the same job of an MIT (EKG.) Please, read Mr. William's SF 10-2850c (Exhibit 368.)

6. Date of Birth. **01.1987**

14A. BLS

ACLS (Advanced Cardiac Life Support)

**CNA** (Certified Nursing Assistant) Pennsylvania

**CNA** Maryland

**CNA** New Mexico

| II - LICENSURE, DEA CERTIFICATION, REGISTRATION AND CLINICAL PRIVILEGES (As applicable) | | | | | | |
|---|---|---|---|---|---|---|
| 14A. LIST ALL STATES/TERRITORIES IN WHICH YOU ARE NOW OR HAVE EVER BEEN LICENSED (If not here now, explain on separate sheet) | 14B. LICENSE NO. | 14C. CURRENT REGISTRATION (If "NO" explain on separate sheet) | | | 14D. EXPIRATION DATE | |
| | | YES | NO | NOT REQUIRED | | |
| BLS | | ☒ | ☐ | ☐ | 06/2010 | |
| ACLS ( passed class/ test in 08/2017) | waiting on | ☒ | ☐ | ☐ | | |
| CNA-pa | | ☐ | ☒ | ☐ | 11/14 | |
| CNA-MD | -- | ☐ | ☒ | ☐ | 01/17 | |
| CNA-NM | | ☐ | ☒ | ☐ | 11/16 | |

**Fact No. 12**. Please, notice a material fact of the case that Mr. David Williams **didn't** possess a formal education as an Electrocardiography and/or a Monitor Technician, and he **didn't** possess a Certificate of an EKG and/or a Monitor Technician. Please, notice that Mr. Williams possessed a certificate of a CNA – a Certified Nursing Assistant.

Please, notice that the Certified Nursing Assistant (CNA) is **inferior** to the EKG Technician. The Certified Nursing Assistant program does **not** require the knowledge about the Electrocardiography. The CNA program teaches students about how to take care of patients (repositioning the patient in bed, assisting in feeding the patient, etc.)

Please, read Mr. William's Resume (Exhibit 368),

Salary: **36,759**, **GS 6**-1.        Salary: 36,759, GS6-1 40 hours' a week

Supervisor: ███████████

Please, compare with my salary **$40,790** per annum for a grade **GS-7** (**ER 03748 Vol. 2, page 502**.)        Series, Grade, & Salary:        GS-0649- 7, Step 1, $40,790 per annum

Please, notice the following facts that are listed in Mr. Williams' Resume:

**Education**: Chester County High School

Community College of Philadelphia

Central New Mexico Community College

**Skills**: CPR[7] (BLS) and ACLS (please, notice that Mr. Williams **didn't** possess certification of an EKG Technician)

**Job experience**:

1) University of North Carolina, **Health Unit Coordinator**.3/2006 – 9/2007

---

[7] Cardiopulmonary Resuscitation

2) Alamance Regional Hospital, Burlington, North Carolina, **Certified Nursing Assistant**, 36 hours per week

3) University of North Carolina Healthcare, Chapel Hills, North Carolina, **Certified Nursing Assistant** Per Diem, 36+ hours a week

4) Central Regional Hospital (mental health), Butner, North Carolina, **Healthcare Technician and Certified Nursing Assistant**, 40 hours per week, 4/2009 – 5/2010

5) Temple University Hospital, St. Phila, Pennsylvania., Patient Care Assistant and Certified Nursing Assistant, 40+ hours per week, 5/2010-8/2012

6) Lovelace Medical Center, **Albuquerque, NM**, **Patient Care Assistant and Certified Nursing Assistant**, 36 hours per week, 03/01/2013 – 08/2014

7) Presbyterian Hospital, **Albuquerque, NM**, **Patient Care Assistant and Secretary**, 20 hours per week, 02/15/2014 – 07/06/2016

8) University of New Mexico Hospitals, **Albuquerque, NM**, **Patient Care Assistant and Telemetry Monitor Technician**, 36 hours per week, 09/IS/2014 -02/22/2016

9) **Raymond G. Murphy VAMC**, **Albuquerque, NM**, **Certified Nursing Assistant**, salary **32,219** per annum, grade **GS-5**, intermittent (more than 24 hours a pay period), **04/19/2015 – 07/11/2016**

> CERTIFIED NURSING ASSISTANT
> Raymond G. Murphy Va: 04/19/2015 -07/11/2016
> 1501 San Pedro Dr. SE, Albuquerque, NM 87108
> Salary: 32,219, GS5-1 intermittent (more than 24 hours a pay period)
> Supervisor: ███████

10) **Pittsburgh VA Healthcare System**, Pittsburgh, Pennsylvania, **Healthcare Technician and Monitor Technician**, Salary **36,759** per annum, grade **GS-6**, 40 hours per week, **07/11/2016-04/16/2017**.

Therefore, I can demonstrate by the preponderance of the evidence that:

1) Mr. Williams was **substantially younger** that I was. Specifically, I was 50 yo, and Mr.. Williams was 30 yo. The age difference was **twenty years**.

2) Mr. Williams had **inferior qualifications**. Specifically, Mr. Williams didn't possess the certificate of an Electrocardiography Technician, and I possessed this certificate

3) Most of the time, Mr. Williams worked as a Certified Nursing Assistant. Please, compare with my Resume that indicated that most of the time I worked as an EKG and Monitor Technician

4) Despite Mr. Williams didn't have a formal training in Electrocardiography, **he possessed experience observing cardiac monitors** at the University of New Mexico Hospitals and the Pittsburgh VA Healthcare System. I believe that Mr. Williams was trained on the job to observe cardiac monitors

5) Mr. Williams possessed **experience working for the Federal Government** at both the Raymond G. Murphy VAMC 04/19/2015 – 07/11/2016 and the Pittsburgh VA Healthcare System 07/11/2016-04/16/2017

11) In the beginning of 2017, Mr. Williams was working at the **Pittsburgh VA Healthcare System**, Pittsburgh, Pennsylvania, Healthcare Technician and Monitor

Technician, Salary **36,759** per annum, grade **GS-6**. 40 hours per week. Mr. Williams'

employment at the Pittsburgh VA Healthcare System ended on **04/16/2017**.

**Fact No. 13**. The April 03, 2017 was a reporting date to my excepted **appointment** as a

full time Medical Instrument Technician at the New Mexico VA Health Care System with a

grade GS-0649 – 7[8], Step 1, and with a salary $40,790 per annum (**ER 03748 Vol. 2, page 502**.)

Series, Grade, & Salary:          GS-0649- 7, Step 1, $40,790 per annum

**Fact No. 14.** On April 03, 2017, I was appointed (rather than "hired") by the New

Mexico VA Health Care System as a Medical Instrument Technician (MIT) Electrocardiograph

(EKG) pursuant to 38 U.S.C. §7401(3.)

Please, see 38 U.S.C. § 7401 - Appointments in Veterans Health Administration.

"There may be **appointed** by the Secretary such personnel as the Secretary may find

necessary for the health care of veterans (in addition to those in the Office of the Under Secretary

for Health appointed under section 7306 of this title), as follows:

(3) …medical instrument technicians…"

In their June 04, 2021 Answer (Doc. No. 396), Defendants admitted that I was appointed

as a Medical Instrument Technician on April 02, 2017, see page 2, lines 18-19, "Defendants

---

[8] See the requirements for the GS-7 grade at (**ER Vol. 1, page 280.**)

**admit** that Plaintiff was appointed (rather than "hired") as a Medical Instrument Technician at the Albuquerque VAMC with an entry date of April 2[9], 2017…"

 

      **Fact No. 15**. I was appointed to the Excepted Service (**ER 03647 Vol. 2, page 502**.) Therefore, I was a subject to the following statutes:

    1)  5 U.S. Code § 2103 - The excepted service

        "(a) For the purpose of this title, the "excepted service" consists of those civil service positions which are **not in the competitive service or the Senior Executive Service**.

        (b) As used in other Acts of Congress, "unclassified civil service" or "unclassified service" means the "excepted service".

        (Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 408; Pub. L. 95–454, title IV, § 401(c), Oct. 13, 1978, 92 Stat. 1154.)"

    2)  5 CFR Part 302 - EMPLOYMENT IN THE EXCEPTED SERVICE

    3)  5 CFR Part 213 - EXCEPTED SERVICE.

      Also, my position was in an Excepted Service, and therefore it was **not** a covered position within the meaning of 5 CFR § 731.101 - Purpose.

      "**(b) Definitions.** In this part:

---

[9] April 02, 2017 was an Effective Date, see (**ER 03748 Vol. 2, page 502.**)

*Covered position* means a position in the competitive service, a position in the excepted service where the incumbent can be noncompetitively converted to the competitive service, and a career appointment to a position in the Senior Executive Service."

**Fact No. 16**. I was a **Title 38 Hybrid** appointee pursuant to the Public Law 108-170, December 06, 2003, Title III, Section 301(a)(1)(B)(3), "…medical instrument technicians…"

**Fact No. 17**. The plain language of the Appointment Letter (**ER 03748 Vol. 2, page 502**) did **not** specifically state that I was a **probationary** Medical Instrument Technician. However, for the purpose of the Joint Statement of Undisputed Facts, I assume that I could have been a probationary appointee.  See 5 CFR § 315.801 - Probationary period; when required, and see 5 CFR § 315.802 - Length of probationary period; crediting service.

**Fact No. 18.** The **Title 38 Hybrids Probationers** are covered by the following provisions of the A.F.G.E. Master Agreement:

1) ARTICLE 33 – TEMPORARY, PART-TIME, AND **PROBATIONARY** EMPLOYEES (**ER 03748 Vol. 4, pages 849-855**), Section 2 - Title 5 and **Hybrid**

- 17 -

Employees; Subdivision B. **Probationary** Employees (**ER 03748 Vol. 3, pages 849-851**) (also see my Separate Brief, Part 1)

2)   ARTICLE 56 - TITLE 38 HYBRIDS[10] (**ER 03748 Vol. 4, pages 945-953**)

3)   ARTICLE 49 - RIGHTS AND RESPONSIBILITIES,

Section 4 - Notification of Changes in Conditions of Employment (**ER 03748 Vol. 4, pages 922-923**)

4)   ARTICLE 60 - TITLE 38 REPRESENTATION AT BOARDS OR HEARINGS (**ER 03748 Vol. 4, page 959.**)

**Fact No. 19**. The April 03, 2017 appointment to a full time job at the Raymond G. Murphy VAMC was my first experience being directly employed by the Federal Government. When I started to work at the Raymond G. Murphy VAMC, I didn't know about the VAMC's policies and procedures, I didn't know about the provisions of the AFGE Master Agreement, and I didn't know about my rights pursuant to the Federal laws.

**Fact No. 20**. After reporting to my new job at the New Mexico VA Health Care System on April 03, 2017, I was undergoing initially a New Employee Orientation (the NEO) in a classroom with a group of other new hires for approximately two weeks. Afterwards, I was

---

[10] My intention is to discuss Article 56 of the A.F.G.E. Master Agreement in a separate Brief.

undergoing an individual Orientation at the 5D (Telemetry) Unit of the Raymond G. Murphy VAMC. My Manager was Ms. Carla Dunkelberger, and the Assistant Manager was Mr. Phil Johnson.

In her June 04, 2021 Answer (Doc. No. 396) to my Original June 25, 2018 Complaint, Attorney Zack admitted that Ms. Dunkelberger and Mr. Johnson were my Supervisors, see page 2, lines 21-22 of the Answer, "Defendants admit that the manager of 5D was Ms. Dunkelberger and the assistant manager was Mr. Johnson."

21 | monitors in 5D  Defendants admit that the manager of 5D was Ms  Dunkelberger and the assistant
22 | manager was Mr  Johnson  Defendants deny each and every other factual allegation in this paragraph

**Fact No. 21.** During the New Employee Orientation (the NEO), a representative of the American Federation of Government Employees (A.F.G.E.) came to our NEO and offered all new hires to sign an agreement to be represented by the A.F.G.E. I signed this agreement (I don't remember the exact day when I signed this agreement), and I started to pay the Union fees that were withdrawn from my salary each pay period. Because the Union withdrew its fees from my salary, it means that I was represented by the Union, and the Union was obligated to represent my interests before the New Mexico VA Health Care System. It also means that I was a subject to the A.F.G.E. Master Agreement.

**Fact No. 22**. On April 18, 2017, I approached Manager of 5D (Telemetry) Unit Ms.
Dunkelberger **the first time** (**ER 03748 Vol. 1, page 286**) and told her that I was 50 yo, I didn't
have children, I was married twice but my ex-husbands refused to give me children, that I dated
other guys who also didn't want to give me children, that I underwent approximately eight In-
Utero Inseminations with donor's sperm at Kaiser Permanente in California but unsuccessfully,
that I spent 2.5 years in Russia from 2014 to 2016 for the purpose of undergoing a complete
medical examination and undergoing In-Vitro Fertilization (IVF) procedures, that I was in the
Registry of the patients of the Ministry of Health of the Novosibirsk Region of the Russian
Federation who were eligible for free of charge IVF procedures, that I was waiting for
approximately 8 months in order for me to be eligible to undergo another free of charge IVF
procedure, that I just relocated from California, that I didn't have relatives in the United States,
that I even didn't have a car, and that I would possibly need to request a time off for my trip to
Russia to perform another IVF procedure.

**Fact No. 23**. A citizen of the Russian Federation, I was eligible for **multiple free of
charge** In-Vitro Fertilization attempts at the expense of the Russian Government. In order for me
to obtain the next free of charge IVF attempt in Russia, I needed to wait in line for approximately
8-10 months.

However, during the litigation of my lawsuit No. 3:18-cv-03748-JCS at the U.S. District
Court for the Northern District of California, Attorney Zack heavily speculated by the fact that,

- 20 -

as a citizen of the Russian Federation, I was eligible for multiple free of charge IVF attempts. In her June 04, 2021 Answer (Doc. No. 396) to my Original June 25, 2018 Complaint, Attorney Zack wrote, page 3, lines 12-13, "Defendants admit that Plaintiff informed Ms. Dunkelberger that Russia offers **a free one-time in vitro fertilization attempt** to Russian citizens."

12 | 3-24-4-3: Defendants admit that Plaintiff informed Ms. Dunkelberger that Russia offers a free
13 | one-time in vitro fertilization attempt to Russian citizens  Defendants admit that on May 15, 2017,

In fact, I was eligible for **multiple free of charge** IVF attempts in Russia.

**Fact No. 24**. On April 18, 2017, I also notified Ms. Dunkelberger that I was taking the medication named "Jeanine" that was in aid of the IVF procedure, that my Russian physician prescribed to me, that was in aid of the IVF procedure, that I brought from Russia, and that was not available in the United States. Please, see the information about the medicine Jeanine at https://www.drugs.com/international/jeanine.html

Please, see a list of countries where Jeanine is officially available:

- Bulgaria

- Czech Republic

- Estonia

- Georgia

- Latvia

- Lithuania

- Poland

- **Russian Federation**

- Serbia

- Slovakia

- Switzerland

Please, take a Judicial Notice that Jeanine could **not** be legally obtained in the United States because it was not FDA[11]-approved, and therefore Jeanine was not allowed to be officially sold in the United States.

<u>Fact No. 25</u>. On April 18, 2017, I said to Ms. Dunkelberger that I had the supply of my medication Jeanine for a few **months**.

<u>Fact No. 26</u>. Ms. Dunkelberger recorded our conversation into the April 18, 2017 Report of Contact (**ER 03748 Vol. 1, page 286**), "Tatyana Drevaleva told me that she needs to go to Russia in a few months for 4-6 weeks to "make an embryo." **She stated she only had a few months worth of medication** she needed to be on to help her to be able to "make an embryo." Then, after she has saved up enough money she would need to go back to Russia as she would be

---

[11] The U.S. Food and Drug Administration.

hiring a surrogate to have a child for her. At this time I explained to her that I would not be able to approve her request at my level of authority due to the length of time she was requesting and that Dr. Prince, Associate Director of Patient Care Services would be the one to approve or deny her request. I explained to her that she does not qualify for FMLA at this time because she has less than 1 year of service. In order to request leave she would need to complete an OPM 71 and provide supporting medical documentation. She stated her doctor was in Russia and that she could ask him to write a letter for her but it would be in Russian. I explained to her that the documentation would need to either written in English or be translated from Russian to English. I also talked to her about possibly finding a doctor in town that may be able to provide her with medical documentation and medication in the event she was not able to get an approved leave of absence until later. Ms. Drevaleva verbalized understanding of the proper procedure to request leave."

**Fact No. 27**. After I said to Mr. Dunkelberger about my previous attempts to have a child, Ms. Dunkelberger's face immediately became very unpleased. The first phrase that she said to me was, "I can't pay you while you are not working." She said to me that, because didn't work at the VAMC for 12 months, I was ineligible for a Leave Without Pay (a LWOP) pursuant to the FMLA. She never notified me about my entitlement to apply for a Sick Leave, see the AFGE Master Agreement, Article 35, Section 4, Subdivision (D), "… **hybrid employees** are entitled to sick leave when the employee:

1. Receives medical, dental or optical examination or treatment;

2. Is incapacitated for the performance of duties by … **pregnancy**, or childbirth."

Ms. Dunkelberger never notified me that, even if I didn't accrue enough time to request a Sick Leave, I was eligible for an Advanced Sick Leave. She never notified me about other alternative types of the leave such as the Voluntary Leave Transfer Program. She never notified me about the opportunity to perform a Telework. She never notified me about my rights pursuant to Section 504 and Section 508 of the Rehabilitation Act of 1973 and the Rehabilitation Act Amendments of 1992. She never notified me about the Office of Diversity and Inclusion, about the both the VA Directive 5975 and about the subsequent Handbooks, and she never provided me with any VA forms to request a reasonable accommodation in a form of a leave (whether paid or unpaid) or to request other types of the reasonable accommodations (Telework, etc.) She never notified me about the procedures for obtaining the reasonable accommodations that were described in 38 C.F.R. Part 15 – ENFORCEMENT OF NONDISCRIMINATION ON THE BASIS OF HANDICAP IN PROGRAMS OR ACTIVITIES CONDUCTED BY THE DEPARTMENT OF VETERANS AFFAIRS. She never referred me to the Section 504 and the Section 508 coordinators, she never consulted with the Office of the Inspector General, and she never attempted to think how she can accommodate my needs on a short term basis and on a long term basis.

**Fact No. 28**. Both Ms. Dunkelberger and Mr. Johnson[12] never informed me about my entitlement for a paid Advanced Sick Leave, Advanced Annual Leave, or any other paid types of the leave for the purpose of pregnancy. She never informed me about my rights pursuant to the Handbook on Leave and Workplace Flexibilities for Childbirth, Adoption, and Foster Care (**ER 03748 Vol. 4, pages 990-1063**) such as:

1) Sick Leave, 5 U.S. Code § 6307, 5 CFR Subpart D - Sick Leave

2) Advanced Sick Leave, 5 U.S. Code § 6307(d), 5 CFR § 630.402 - Advanced sick leave; 5 CFR Subpart E - Recredit of Leave; 5 CFR § 630.502 - Sick leave recredit

3) Annual Leave, 5 U.S. Code § 6303, 5 U.S. Code § 6304; 5 CFR Subpart C - Annual Leave

4) Advanced Annual Leave, 5 U.S. Code § 6302(d), 5 CFR § 630.301(h)(1)(ii);

5) Family and Medical Leave, 5 U.S. Code SUBCHAPTER V— FAMILY AND MEDICAL LEAVE; 5 CFR Subpart L - Family and Medical Leave

6) Leave Sharing Programs

   a) Voluntary Leave Transfer Program, 5 U.S. Code SUBCHAPTER III— VOLUNTARY TRANSFERS OF LEAVE; 5 CFR Subpart I - Voluntary Leave Transfer Program

   b) Voluntary Leave Bank Program, 5 U.S. Code SUBCHAPTER IV— VOLUNTARY LEAVE BANK PROGRAM; 5 CFR Subpart J - Voluntary Leave Bank Program

---

[12] My conversation with Mr. Johnson occurred on May 17, 2017.

    c) Emergency Leave Transfer Program, 5 U.S. Code SUBCHAPTER VI— LEAVE TRANSFER IN DISASTERS AND EMERGENCIES;  5 CFR Subpart K - Emergency Leave Transfer Program

    d) Retroactive Substitution of Donated Annual Leave, 5 U.S. Code § 6306; 5 CFR § 630.306 - Time limit for use of restored annual leave, 5 CFR § 630.307 - Time limit for use of restored annual leave - former missing employees; 5 CFR Subpart E - Recredit of Leave; 5 CFR § 630.501 - Annual leave recredit

    e) Set-Aside Accounts

7) Leave Without Pay, 5 U.S. Code § 6382. Leave requirement;  5 CFR § 630.1202 – Definitions (Leave Without Pay)

8) Compensatory Time Off, 5 U.S. Code § 5543. Compensatory time off; see 5 CFR 550.114(e) and 551.531(e) for special rules regarding the administration of compensatory time off to an employee's credit as of May 14, 2007

    a) Compensatory time off in lieu of overtime pay, 5 CFR § 532.504 - Compensatory time off

    b) Compensatory time off for travel, 5 CFR Subpart N - Compensatory Time Off for Travel

9) Alternative Work Schedules, 5 U.S. Code SUBCHAPTER II— FLEXIBLE AND COMPRESSED WORK SCHEDULES; 5 CFR Subpart D - Flexible and Compressed Work Schedules

a) Compressed Work Schedules,  5 U.S. Code §§6127- 6128; 5 CFR § 610.406 - Holiday for employees on compressed work schedules

b) Flexible Work Schedules, 5 U.S. Code §§6122- 6126; 5 CFR § 610.405 - Holiday for part-time employees on flexible work schedules

- **Flexitour** – employees elect start/stop times, which then become fixed

- **Gliding** – employees may vary start/stop times daily

- **Variable Day** – employees may vary the length of the workday

- **Variable Week** – employees may vary the number of hours worked each week

- **Maxiflex** – employees may work less than 10 workdays biweekly

c) Credit Hours, 5 U.S. Code § 6126. Flexible schedules; credit hours; accumulation and compensation,  5 CFR § 610.408 - Use of credit hours

10) Telework, 5 U.S. Code CHAPTER 65— TELEWORK; 5 CFR § 630.1605 - Telework and emergency employees

11) Part-time Employment and Job Sharing Arrangements

a) Part-time between 16 and 32 hours each week (or between 32 and 64 hours a pay period) on a prearranged schedule, and is eligible for benefits, 5 USC Ch. 34: PART-TIME CAREER EMPLOYMENT OPPORTUNITIES or the Federal Employees Part-Time Career Employment Act of 1978; 5 CFR Part 340 - OTHER THAN FULL-TIME CAREER EMPLOYMENT (PART-TIME, SEASONAL, ON-CALL, AND INTERMITTENT)

b) Job Sharing – a form of part-time employment in which the schedules of two or more part-time employees are arranged to cover the duties of a single full-time position, 5 U.S. Code § 3402(b)(2)(B). Establishment of part-time career employment programs; 5 USC 6120: Purpose; 5 CFR § 340.101 - Principal statutory requirements.

Also, please, see the November 18, 2020 Memorandum of the 9th Circuit in Appeal No. 19-16395, page 3, "Drevaleva alleged that her supervisors **fraudulently concealed available leave options** when she requested time off to travel to Russia to continue her in vitro fertilization procedures in Russia,.."

Also, it is undisputed that Assistant U.S. Attorney Ms. Kimberly Robinson never filed any Petition for Rehearing of the November 18, 2020 Memorandum of the 9th Circuit in Appeal No. 19-16395.

**Fact No. 29.** Obviously, Ms. Dunkelberger **knew** about the available leave options for the purpose of pregnancy because:

1) She underwent EEO trainings twice 11/24/2016 and 7/30/2015 (**ER 03748 Vol. 1, page 227**)

   32. Have you received training on EEO policy and procedure? *Yes*

   33. If yes, when? *11/24/2016 and 7/30/2015 (see supporting documentation).*

2) She mentioned the Voluntary Leave Transfer Program in her June 12, 2017 letter that she mailed to my home postal address in Albuquerque, NM (**ER 03748 Vol. 1, page 290**),

2. "I am enclosing an OPM 71, Request for Leave or Approved Absence, for your use. In addition, I am enclosing Medical Center Memorandum (MCM) 05-11, Title 5 Leave Policy; MCM 05-24, **Voluntary Leave Transfer Program**; MCM 05-36, and MCM 05-8 Tours of Duty."

2.  I am enclosing an OPM 71, Request for Leave or Approved Absence, for your use.  In addition, I am enclosing Medical Center Memorandum (MCM) 05-11, Title 5 Leave Policy; MCM 05-24, Voluntary Leave Transfer Program; MCM 05-36, and MCM 05-8, Tours of Duty.

**Fact No. 30**. On April 18, 2017, Ms. Dunkelberger only expressed her deep dissatisfaction by the fact that I would request a time off for the purpose of undergoing an IVF procedure. She asked me whether I would request another time off in the future. I answered that I didn't know whether I would request another time off in the future. I am repeating again that at that time I was a very new employee who worked at the VAMC for only 2.5 weeks, and I didn't know my rights. On April 18, 2017, Ms. Dunkelberger said that, in order for me to request a LWOP, I needed to provide my medical documentation on English language. I responded that the only way for me to do it would be to request my Russian physician to give me this documentation but it would be on Russian language. Ms. Dunkelberger said that the medical documentation should be only on English language, and she said that she would not be able to

make a decision on my request for a leave. She also said that I didn't have a right to translate my medical documentation from Russian into English myself. She said that only a certified translator had a right to translate the medical documentation. She said that she would transfer my request for a leave to Director of Nursing Dr. Tina Prince who would make an ultimate decision about whether to grant me with a Leave Without Pay or not. Ms. Dunkelberger said that I needed to obtain the medical documentation on English language and the approval of Dr. Prince prior to the actual leave.

**Fact No. 31**. On April 18, 2017, Ms. Dunkelberger introduced me to the VAMC's leave policies and gave me the phone numbers of different Supervisors that I needed to call in order to request an urgent leave. She asked me to sign a Memorandum (unnumbered) (**ER 03748 Vol. 2, pages 463-464**.) Read the plain language of the Memorandum, "Effective 15 November 2015, the following procedures must be adhered to when the need for <u>unplanned leave</u> arises and it is necessary for you to call of for a shift. **Requests for leave must be communicated directly with your Nurse Manager** or Assistant Nurse Manager during regular hours." Further, the Memorandum contained variable phone numbers of different officials that I needed to call if I couldn't reach the Nurse Manager.

Further, the plain text of the Memorandum said,

"3. Leave Without Pay (LWOP) is an approved temporary non-pay status and absence from duty. Requests must be submitted using form OPM-71, and must be approved by the Service Chief. …Failure to submit a written request for LWOP, from the employee to the Service Chief, will result in AWOL.

4. Upon discovery that a leave request cannot be supported by the employee's leave balance, the request will be annotated as AWOL until an appropriate request is entered by the employee, subject to approval by **unit management** and/or the Service Chief."

On April 18, 2017, I signed the Memorandum (**ER 03748 Vol. 2, page 464**) thus acknowledging that I understood the leave policies and that I agreed to follow them. I am emphasizing that the plain language of the Memorandum said that an emergency request for a leave is subject for approval by 1) **the unit management**, and/or 2) the Service Chief.

**Fact No. 32**. In the beginning of May 2017, I discovered that I was wrong, and I had only **ten** pills of my medication Jeanine which was **for 10 days**. I couldn't afford to miss a pill. I attempted to find this medication in the United States but I couldn't. I found a Russian pharmacy in New York that advertised this medication on its web-site. When I attempted to contact with this pharmacy over the phone, they didn't return my multiple phone calls. I didn't know whether this pharmacy is real or not. There was no reason for me to enter the numbers of my credit card on the pharmacy's web-site because this pharmacy could be a scam. For me, the only way was to

- 31 -

immediately go to Russia and to purchase this medication. Moreover, in the beginning of May 2017, I called my Russian OB/GYN, and I found out that my turn in line for a free IVF attempt had come. Therefore, I needed to go to Russia for two reasons:

1)  To refill a prescription of my hormonal pills

2)  To perform an IVF attempt.


**Fact No. 33**. On **May 10**, 2017, I contacted Ms. Dunkelberger, and I explained to her that I had made a mistake, and I had only **ten** hormonal pills left that were for ten calendar days. I was taking one pill a day, and I couldn't afford to miss a pill. The May 10, 2017 communication with Ms. Dunkelberger was my **second** contact with her when I explained about a history of my fight with infertility in both the United States and in Russia. When I contacted with Ms. Dunkelberger the first time on April 18, 2017, I said to her that I was taking hormonal pills named Jeanine that I brought from Russia, that were prescribed by my Russian OB/GYN, that were in aid of the IVF procedure, and that I couldn't obtain in the United States because they were not approved by the Food and Drug Administration of the United states, and they were approved for sale in the United States. On May 18, 2017, I explained to Ms. Dunkelberger that I was taking one pill a day every day and that I couldn't afford to miss a pill because I would be bleeding. During my first contact with Ms. Dunkelberger on April 18, 2017, I thought that I had a supply of Jeanine enough for a few months. However, on **May 10, 2017**, I incidentally discovered that I had only **ten** hormonal pills left that were for ten calendar days. On May 10,

2017, I explained to Ms. Dunkelberger that I **urgently** needed to go to Russia **to refill a prescription of my hormonal pills**. Therefore, the **first urgent reason** for me to go to Russia in May 2017 was to refill a prescription of my hormonal pills that I couldn't obtain in the United States and that I couldn't miss.

Additionally, on approximately **May 10**, 2017 I called my Russian OB/GYN, and I found out that my turn in line to perform a free of charge In-Vitro Fertilization procedure had just come up. Therefore, the **second urgent reason** for me to urgently go to Russia was to perform an In-Vitro Fertilization procedure.

Therefore, my **second** contact with Ms. Dunkelberger regarding my need to go to Russia to refill a prescription of my hormonal pills and to perform an IVF attempt was **May 10**, 2017. During the EEO Investigation, the New Mexico VA Health Care System intentionally did not include the **May 10**, 2017 Report of Contact of Ms. Dunkelberger into the EEO Investigative File.

Please, notice the material difference between my April 18, 2017 contact with Ms. Dunkelberger and my May 10, 2017 contact with her.

On April 18, 2017, I informed Ms. Dunkelberger **in general** that I needed to go to Russia **to perform an IVF procedure**. On April 18, 2017, I did not have a medical emergency. On April 18, 2017, I thought that I had enough hormonal pills for a few months.

On May 10, 2017, I reported to Ms. Dunkelberger that I had a medical emergency (even though I didn't expressly use the words "medical emergency" or "disability.") On May 10, 2017, I reported to Ms. Dunkelberger that the scope of my urgent trip to Russia was:

1) To refill a prescription of my hormonal pills

2) To perform an In-Vitro Fertilization procedure.

The first reason (to refill a prescription of my hormonal pills) was **the most important** reason because I couldn't obtain these pills in the United States, and I couldn't miss a pill.


**Fact No. 34.** On May 10, 2017, Ms. Dunkelberger reiterated her request for medical documentation on English language. On May 10, 2017, I explained to Ms. Dunkelberger and later to Mr. Johnson[13] that:

1) I was eligible to obtain this documentation only from my Russian OB/GYN because all IVF attempts were performed in Russia and not in the United States

2) I was not eligible to obtain this documentation from my American doctor because:

   a) in April and May 2017 I didn't have any health insurance

   b) I had just relocated to New Mexico from California

   c) I had no any doctor in Albuquerque, NM

   d) my previous OB/GYN was at Kaiser Permanente in California in 2012 – 2013

---

[13] I had a verbal conversation with Mr. Johnson on May 17, 2017.

e) the medical records at Kaiser didn't contain any evidence regarding the actual IVF procedures because there were no actual IVF procedures at Kaiser

3) That this medical documentation would be on Russian language

4) That I had no control to present this documentation immediately, and that I needed some time to request my Russian OB/GYN to actually issue this medical documentation. I requested this documentation from my Russian OB/GYN after my verbal conversation with Ms. Dunkelberger on May 10, 2017. It took seven days for my doctor to process my request and to actually issue the medical documentation.

**Fact No. 35**. On May 10, 2017, I said to Dunkelberger that:

1) I didn't have control about the processing time during which my Russian doctor would issue the medical documentation

2) I urgently needed to go to Russia to refill a prescription of my hormonal pills that I couldn't obtain in the United States, and therefore I didn't have time to stay longer in the United States to find a certified translator who will officially translate my medical documentation from Russian into English

3) I found an online Russian pharmacy in New York that advertised the medicine Jeanine for sale in the United States. However, I knew that Jeanine could not be officially sold in the U.S.A. because it was not FDA approved. On May 10, 2017, I said to Ms. Dunkelberger that I would attempt to contact this Russian pharmacy and

to see if I can purchase Jeanine in the United States. However, I called this pharmacy many times, and I left many voice messages. Nobody ever returned my phone calls. Therefore, this pharmacy was an Internet scam.

4) I will find a certified translator in Russia who will translate the document, and I will email the officially translated document from Russia

5) I authorized my Russian co-worker Ms. Das to informally translate my medical documentation from Russian into English while I would be looking for an official translator in Russia.

**Fact No. 36**. On approximately May 15 or 16, 2017, I approached Ms. Dunkelberger **the third time**, and I said to her about my urgent need to go to Russia to refill a prescription of my hormonal pills and to perform an IVF attempt. Ms. Dunkelberger recorded our conversation into her Report of Contact that she dated May 16, 2017 (**ER 03748 Vol. 1, page 289**.)  Please, notice that in this Report of Contact Ms. Dunkelberer stated that I had come to her Office on May 25, 2017. It was a typo (**ER 03748 Vol. 1, page 460, lines 23-25**, "The Report of Contact includes a typographical error. The date of the conversation was May 15, not May 25, 2017.") Please, read the May 16, 2017 Report of Contact (**ER 03748 Vol. 1, page 289**), "Tatyana Drevaleva came to my office on 5/25/17 to speak about her need to go to Russia. She stated that since Russia offers a Free one time invitro fertilization (1VF) she wanted to try this before she made "an embryo" as previously discussed. She went on to explain that **she made a mistake and only has 5 pills left (**that are required to help with IVF) and that **she thought she had more**. These pills were

- 36 -

prescribed by her doctor in Russia and **can only be obtained in Russia**. She had found one pharmacy in New York that advertised on the internet they could get this medication. She stated she was planning to contact the pharmacy in New York to see if she could obtain the medication before she ran out and would let me know on May 16th if she was able to get the pills. I reminded her at this time she would need to complete an OPM 71, provide supporting medical documentation to request any time off, and that it had to be approved by by Dr. Prince, Associate Director of Patient Care Services prior to leaving; that I could not approve her request. Ms. Dreveleva verbalized understanding.

Ms. Dreveleva did not contact me on 5/16/17 to let me know if she had obtained the medication from New York."

**Fact No. 37**. Therefore, in her May 16, 2017 Report of Contact, Ms. Dunkelberger fully acknowledged and understood that I had an **emergency** need to go to Russia to refill a prescription of my hormonal pills that I couldn't obtain in the United States and to perform am IVF procedure. Pursuant to the plain language of the Memorandum (unnumbered) (**ER 03748 Vol. 2, pages 463-464**), Ms. Dunkelberger, **as a Unit Manager**, had an authority to approve my **emergency** request for a leave for the purpose of going to Russia to refill a prescription of my hormonal pills and to perform an IVF procedure, see (**ER 03748 Vol. 2, pages 464**), "4. Upon discovery that a leave request cannot be supported by the employee's leave balance, the request

will be annotated as AWOL until an appropriate request is entered by the employee, ~~subject to approval by~~ **unit management** ~~and/or the Service Chief.~~"

4.   Upon discovery that a leave request cannot be supported by the employee's leave balance, the request will be annotated as AWOL until an appropriate request is entered by the employee, subject to approval by unit management and/or the Service Chief. It is an employee responsibility to be aware of their current leave balance.

subject to approval by unit management and/or the Service Chief.

 See the analogous provision at the A.F.G.E. Master Agreement, Article 35, Section 2 – Annual Leave, Subdivision C (**ER 03748 Vol. 3, page 859**),

"C. Employees should submit requests for annual leave as far in advance as possible. The Department will render timely decisions on employees' leave requests. The Department will make every effort **to accommodate** the employees' requests, consistent with valid operational needs.

2. **Unplanned Leave** - When needs arise and the employee requests annual leave, employees must contact their supervisor or designee to request the leave. During operational hours of the facility/service, there will always be someone available who is authorized to receive and act on the request. The procedures for unplanned annual leave other than vacation leave will be appropriate for local negotiations; where current practices are acceptable to the local parties, such negotiations need not occur.

3. **Serious Personal Needs Situations** - **If the leave is requested to begin immediately**, employees **must contact their supervisor** or designee to request the leave. The employee will be informed whether leave is approved or disapproved **at the time it is requested**. During operational hours of the facility/service, **there will always be someone available who is authorized to receive and act on the request**."

Also, in her May 16, 2017 Report of Contact, Ms. Dunkelberger acknowledged the fact that I had 5 hormonal pills left and that these pills were not available in the United States, see (**ER 03748 Vol. 1, page 289**), "She went on to explain that **she made a mistake and only has 5 pills left (**that are required to help with IVF) and that **she thought she had more**. These pills were prescribed by her doctor in Russia and **can only be obtained in Russia**."

free one time in vitro fertilization (IVF) she wanted to try this before she made "an embryo" as previously discussed. She went on to explain that she made a mistake and only has 5 pills left (that are required to help with IVF) and that she thought she had more. These pills were prescribed by her doctor in Russia and can only be obtained in Russia. She had found one pharmacy in

Therefore, in her May 16, 2017 Report of Contact (**ER 03748 Vol. 1, page 289**), Ms. Dunkelberger:

1) fully acknowledged my emergency need to go to Russia to refill a prescription of my hormonal pills

2) fully acknowledged the fact that as of May 15-16, 2017 I had five hormonal pills left

3) fully acknowledged the fact that these pills were not available in the United States

4) fully acknowledged that, as of May 10, 2017, I had **a temporary disability**, and I was unable **to communicate with others** and **to work** at the VAMC within the meaning of the ADAAA or 42 U.S.C. § 12102(2)(A), "… communicating, and working" because I had an emergency need to go to Russia to refill a prescription of my hormonal pills that were not available in the United States

5) Ms. Dunkelberger was a Unit Manager, and therefore she had a full authority to immediately approve my emergency request for a leave for a serious medical condition pursuant to the Memorandum (unnumbered) and pursuant to the A.F.G.E. Master Agreement, Article 35, Section 2 – Annual Leave, Subdivision C(2) and (3) **at the time when I submitted this request to her** on May 10 and May 15-16, 2017.

**Fact No. 38**. In the June 04, 2021 Answer (Doc. No. 396), Attorney Zack confirmed that Ms. Dunkelberger **knew** that I had less than 10 pills left (page 3, lines 7-8), "Defendants admit that on May 15, 2017, Plaintiff stated that she had less than ten pills left."

7 | of medication left. Defendants admit that on May 15, 2017, Plaintiff stated that she had less than ten
8 | pills left. Defendants aver that Plaintiff informed Ms. Dunkelberger that she located a pharmacy in New

However, Attorney Zack criminally misled the Court because she stated that on **May 15, 2017** I said to Ms. Dunkelberger that I had less than ten pills left. In fact, my second verbal

conversation with Ms. Dunkelberger occurred **on May 10, 2017**, and on that day I said to Ms.

Dunkelberger that I had ten hormonal pills left that were for ten calendar days.

 

**Fact No. 39**. Both Supervisors Dunkelberger and Johnson[14] improperly requested me to

present the medical documentation regarding my intention to undergo an In-Vitro Fertilization

(IVF) procedure. See Dunkelberger's April 18, 2017 Report of Contact **(ER 03748 Vol. 1, page**

**286)**, "In order to request leave she would need to complete an OPM 71 and **provide supporting**

**medical documentation**."

> xplained to her that she does not qualify for FMLA at this time because she has less than 1 year of service. In order to request
> eave she would need to complete an OPM 71 and provide supporting medical documentation. She stated her doctor was in

See Dunkelberger's May 16, 2017 Report of Contact (**ER 03748 Vol. 1, page 289**), "I

reminded her at this time she would need to complete an OPM 71, **provide supporting medical**

**documentation** to request any time off…"

> get the pills. I reminded her at this time she would need to complete an OPM 71, provide supporting medical documentation to
> request any time off, and that it had to be approved by Dr. Prince, Associate Director of Patient Care Services prior to

See Johnson's May 18, 2017 letter to Dr. Prince (**ER 03748 Vol. 1, page 288**), "Tatyana

was also told that **medical documentation**, in English, **would be needed**…"

> six week absence. Tatyana was also told that medical documentation, in English, would be needed prior

---

[14] My verbal conversation with Mr. Johnson occurred on May 17, 2017.

See the so-called "Declaration of Carla Dunkelberger" (**ER 03748 Vol. 2, page 460, lines 20-21**), "I reminded her that she would need to … **provide supporting medical documentation**…"

**Fact No, 40**. The nature of the medical documentation that both Dunkelberger and Johnson requested (regarding my intention to take a time off to undergo an In-Vitro Fertilization procedure) was **not** related to performing the essential functions of the job that was observing cardiac monitors (**ER 03748 Vol. 1, pages 268-270**), and it was **not** consistent with business necessity because in April and May 2017 I was still undergoing an orientation at the 5D (Telemetry) Unit, and I was not allowed to independently observe cardiac monitors. See Mr. Johnson's EEO Interrogatory (**ER 03748 Vol. 1, page 217**), "29. Was the complainant able to perform the essential duties of her position? *Complainant did not complete orientation and, therefore, was unable to perform independently in the Medical Instrument Technician role.*"

29. Was the complainant able to perform the essential duties of her position?
Complainant did not complete orientation and, therefore, was unable to perform independently in the Medical Instrument Technician role.

See Ms. Dunkelberger's EEO Interrogatory (**ER 03748 Vol. 1, page 227**),

- 42 -

"29.  Was  the  complainant  able  to  perform  the  essential  duties  of  her  position?

*Complainant did not complete orientation*

30. If not, please identify the duty or duties the complainant was unable to perform. *The complainant was unable to perform independently in the Medical Instrument Technician role due to not completing orientation*."

29. **Was  the  complainant  able  to  perform  the  essential  duties  of  her  position?**
*Complainant did not complete orientation.*

30. **If not, please identify the duty or duties the complainant was unable to perform.** *The complainant  was  unable  to  perform  independently  in  the  Medical  Instrument Technician role due to not completing orientation.*

Moreover,  even  if  I  completed  the  orientation,  and  even  if  I  were  allowed  to independently  perform  the  essential  functions  of  the  job  (observing  cardiac  monitors),  the Raymond  G.  Murphy  VAMC  had  a  wide  variety  of  opportunities  to  substitute  me  by  multiple Registered  Nurses  from  other  Units  (for  example,  from  the  Intensive  Care  Unit)  who traditionally observed cardiac monitors prior to the date of my hire. For example, Nurse Melanie was frequently invited by Dunkelberger from the Intensive Care Unit to the 5D (Telemetry) Unit to observe cardiac monitors.

**Fact No. 41**. Both Ms. Dunkelberger and Mr. Johnson[15] improperly demanded me to submit my medical documentation **on English language**.

Read Dunkelberger's April 18, 2017 Report of Contact (**ER 03748 Vol. 1, page 286**), "I explained to her that the documentation would need to either written in English or **be translated from Russian to English**."

Russia and that she could ask him to write a letter for her but it would be in Russian. I explained to her that the documentation would need to either written in English or be translated from Russian to English. I also talked to her about possibly finding a

Read Mr. Johnson's May 18, 2017 letter to Dr. Prince (**ER 03748 Vol. 1, page 288**), " Tatyana was also told that **medical documentation, in English**, would be needed prior to approval of Leave Without Pay."

six week absence. Tatyana was also told that medical documentation, in English, would be needed prior to approval of Leave Without Pay. On the morning of May 17, 2017 Tatyana informed the SD

See Dunkelberger's June 12, 2017 letter to me (**ER 03748 Vol. 1, page 290**), "You did not submit the required medical documentation, **in English**, prior to your departure to Russia. As a result of the disapproval, you are required to submit medical documentation, **in English**, to support your absence."

July 7, 2017.  However, your request was disapproved (see attached).  You did not submit the required medical documentation, in English, prior to your departure to Russia.  As a result of the disapproval, you are required to submit medical documentation, in English, to support your absences.  This time period must be covered to avoid being placed in Absent Without Leave

---

[15] My verbal conversation with Mr. Johnson occurred on May 17, 2017.

**Fact No. 42**. After Ms. Dunkelberger directed me to give her my medical documentation, I immediately contacted with my Russian OB/GYN, and I requested my medical documentation. I believe that I contacted my Russian OB/GYN on approximately May 10, 2017. It took approximately seven days for my doctor to issue a medical documentation. My doctor notified me that she would email me the document on approximately May 17, 2017. Please, also take into your consideration the time difference between Novosibirsk, Russia and Albuquerque, NM that is 13 hours.

**Fact No. 43**. On May 17, 2017, Ms. Dunkelberger was out of her office. On that evening, I worked a night shift together with my Russian speaking co-worker Ms. Nadya Das. I and Ms. Das observed cardiac monitors together in the cardiac monitoring room for the entire night shift from May 17 to May 18, 2017. Prior to May 17, 2017, we also worked a few night shifts together with Ms. Das observing cardiac monitors. She was orienting me for the position of a Medical Instrument Technician Electrocardiograph at the 5D (Telemetry) Unit. During the night shifts prior to May 17, 2017, I told Ms. Das a story about my long time efforts to have a child including my two unsuccessful marriages, my history of sleeping with other guys, my In0Utero Inseminations attempts at Kaiser Permanente in California, my 2.5 stay in Russia from 2014 to 2016 for the purpose of a complete medical examination, and a history of my IVF attempts in Russia. I also said to Ms. Das that I was taking a hormonal medication Jeanine that was in aid of the IVF procedure, that I brought from Russia, and that I was unable to obtain in the United

States. I also said to Ms. Das that, as a citizen of the Russian federation, I was eligible for free of charge IVF attempts at the expense of the Russian Government, that I already performed a few free of charge IVF attempts in Novosibirsk, Russia, and that I needed to wait for 8-10 months until I am eligible to get the next IVF attempt in Russia free of charge.

Please, notice that Ms. Das was originally not from Russia. She was from Belarus. Therefore, I explained to her the laws of the Russian Government that provided its citizens with free of charge IVF attempts. I don't know if the Belorussian Government does the same.

In May 2017, I said to Ms. Das that I was running out of my hormonal medication, and that I needed to take an urgent trip to Russia to refill a prescription of my hormonal pills and to perform an IVF attempt. Therefore, prior to May 17, 2017, Ms. Das was aware about my IVF attempts in Russia, she was aware that I was running out of my hormonal medication that I couldn't obtain in the United States, and she was aware that my turn in line to perform the next free of charge IVF procedure in Russia had come up.

**Fact No. 44**. During one of the night shifts that we wormed together with Ms. Das prior to May 17, 2017, we also worked together with one of the male Registered Nurses who worked at the 5D at that time. I don't remember the name of this Registered Nurse. I remember that he was a heavy smoker, and there was a heavy smell of the cigarettes from him. This gentleman told me and Ms. Das that he was married and he had two children but his wife had used donor's eggs

- 46 -

and this gentleman's sperm. Therefore, I and Nadya Das discussed with this gentleman that he literally had children with somebody else. The gentleman agreed that yes, despite he was married to his beloved wife, he had two children with somebody else. After the gentleman left the telemetry room (probably, to smoke), we discussed with Ms. Das his situation, and we compared it with my situation. We also discussed with Ms. Das her marriage to an Indian gentleman who was also a VA employee and who worked in the same New Mexico VA Health Care System. Ms. Das had one son. We also discussed with Ms. Das about her desire to get her nursing degree, and she told me that she was undergoing prerequisites at the college to become a Registered Nurse. I believe that we worked together with Ms. Das for two or three night shifts prior to working together our night shift on May 17, 2017.

Ms. Das drove me home after my night shift in the morning on May 18, 2017. She wished me a good luck to go to Russia to refill a prescription of my hormonal pills and to perform an IVF attempt.

**Fact No. 45**. Before May 17, 2017, I worked in the Telemetry Room together with Registered Nurse of the Intensive Care Unit Ms. Melanie. I don't know Melanie's last name. She was a young lady. To the best of my knowledge, she was not married, and she didn't have children. I believe that we worked with Melanie for two or three night shifts. I never told her about the history of my IVF attempts in Russia. However, I asked Melanie how she became a Registered Nurse. Melanie told me that, prior to becoming a Registered Nurse, she worked as a

Monitor Technician[16] at the 5D (telemetry) Unit under the supervision of both Ms. Dunkelberger and Mr. Johnson.  When Melanie entered to the Nursing School, she needed to spend a lot of time going to school and doing her homework. For all time when Melanie was attending the Nursing School (for probably two years), Ms. Dunkelberger allowed Melanie to work at the 5D (Telemetry) Unit observing cardiac monitors **only one time per month**. At that time, Melanie was not pregnant. Contrary, when I requested six weeks off to go to Russia to refill a prescription of my hormonal pills and to perform an IVF attempt, Ms. Dunkelberger immediately fired me and defamed me about the reasons of the termination of my employment.

**Fact No. 46**. During the New Employee Orientation, we got acquainted with Registered Nurse Ms. Chelsea Casey who was also hired at the 5D (Telemetry) Unit together with me. Ms. Casey was married with two little daughters. Ms. Casey got her Bachelor's degree in Nursing from the University of New Mexico (the UNM.) Ms. Casey was married the second time, and her husband was a military man. Prior to getting her Bachelor's degree and while attending the Nursing School, Ms. Casey worked at the hospital of the University of New Mexico as a Monitor Technician observing cardiac monitors for a few years. Ms. Casey graduated from the Nursing School in 2017, and on the same year she was hired by Ms. Dunkelberger for a full time job as a Registered Nurse at the 5D (Telemetry) Unit of the New Mexico VA Health Care System. Ms. Casey knew that I didn't have a car, and that it was very difficult for me to get to work in the

---

[16] A Monitor Technician is the same as a Medical Instrument Technician Electrocardiograph.

morning. Therefore, Ms. Casey frequently drove me to work in her car. Ms. Casey told me that, when Ms. Dunkelberger wanted to hire her to work as a Registered Nurse at the 5D (Telemetry) Unit of the New Mexico VA Health Care System, Ms. Dunkelberger called her five times and eventually convinced Ms. Casey to submit a job application for the position of a Registered Nurse. Contrary, when Ms. Dunkelberher wanted to fire me, she didn't call me even one time despite Ms. Dunkelberger knew my cell phone number. Also, prior to firing me, Ms. Dunkelberger didn't email me even one time despite she knew my email address, and Ms. Dunkelberger never notified me that my May 17, 2017 Request for a LWOP had been denied by Dr. Prince and by Allean Raneta Bonin.

**Fact No. 47.** During the New Employee Orientation, we got acquainted with newly hired Manager of one of the Units of the New Mexico VA Health Care System Ms. Michelle Tirado. Ms. Tirado was married to a military man, and she had three children. One of Ms. Tirado's daughters was studying in Italy. Ms. Tirado also gave me a few rides in her car to my home from work because she knew that I didn't have a car, I was renting a room, and I was the only family member in the United States. Ms. Tirado knew that I had just relocated to New Mexico from California. One of Ms. Tirado's houses was located in Southern California. I shared with Ms. Tirado my plans to go to Russia to refill a prescription of my hormonal pills and to perform an IVF attempt. When I was in Russia in 2017, we had an email exchange with Ms. Tirado. After Ms. Dunkelberger fired me on June 30, 2017, I shared this news with Ms. Tirado.

**Fact No. 48**. On May 17, 2017 in the evening, I approached Assistant Manager Mr. Phil Johnson, and I told him the same story about my attempts to have a child (my two unsuccessful marriages, the history of my dating with other guys, my unsuccessful In-Utero Insemination attempts with donor's sperm at Kaiser Permanente in San Francisco, my 2.5 year stay in Russia from 2014 to 2016, and my IVF attempts in Russia.) I said to Mr. Johnson that I had three hormonal pills left, that I would receive the medical document from my doctor within the next few hours, and that I urgently needed to go to Russia to refill a prescription of the hormonal pills and to perform an IVF procedure. I also informed Mr. Johnson about my age. Mr. Johnson gave me an OPM 71 form and asked me to fill it out. He seemed very understandable to my situation. He expressed compassion, and he said, "If you need to go – go!" Please, see Mr. Johnson's EEO Interrogatory (**ER 03748 Vol. 1, pages 218-219**), "The complainant came into the office, after business hours, on May 17, 2017 stating **s/he had one pill left** and **was flying to Russia the next day** to have Invitro Fertilization done. The complainant also stated his/her age to be 50 and that s/he had always wanted to have children and "this may be my last chance." I handed the complainant the OPM71 paper work and stated that this must be filled out and supporting documentation in English from the doctor must also be supplied. At this time I stated to the complainant that I could not approve Leave Without Pay but I would turn in the documentation **and if this was that important then s/he should go**."

   **Fact No. 49**. Ms. Dunkelberger said to me that I was not eligible for a Leave Without Pay pursuant to the Family and Medical Leave Act (the F.M.L.A.) because I didn't work at the VAMC for 12 months.

    a)  See Ms. Dunkelberger's Report of Contact dated April 18, 2017 (**ER 03748 Vol. 1, page 286**), ". I explained to her that she does not qualify for FMLA at this time because she has less than 1 year of service."

equesting and that Dr. Prince, Associate Director of Patient Care Services would be the one to approve or deny her request. I xplained to her that she does not qualify for FMLA at this time because she has less than 1 year of service. In order to request

    b)  See Mr. Johnson's May 18, 2017 letter to Dr. Prince (**ER 03748 Vol. 1, page 288**), "At that time, Carla informed Tatyana that since she just started she was not eligible for FMLA and she had not accrued enough leave to support a six week absence. Tatyana was also told that medical documentation, in English, would be needed prior to approval of Leave Without Pay."

leave of six weeks and go to Russia for a medical procedure. At that time, Carla informed Tatyana that since she just started she was not eligible for FMLA and she had not accrued enough leave to support a six week absence. Tatyana was also told that medical documentation, in English, would be needed prior to approval of Leave Without Pay. On the morning of May 17, 2017 Tatyana informed the 5D

    c)  Read Zack's Answer (Doc. No, 396) to my Original June 25, 2018 Complaint, page 4, lines 2-4, "4:21-5:2: Defendants admit that on April 18, 2017, Ms. Dunkelberger informed Plaintiff that she did not qualify for Family Medical Leave Act ("FMLA") leave because Plaintiff had less than one year of service with the VA."

2 ‖    4:21-5:2: Defendants admit that on April 18, 2017, Ms. Dunkelberger informed Plaintiff that she

3 ‖ did not qualify for Family Medical Leave Act ("FMLA") leave because Plaintiff had less than one year

4 ‖ of service with the VA. Defendants are without sufficient knowledge to admit or deny the remaining

**Fact No. 50**. Ms. Dunkelberger informed me that, in order for me to request **a LWOP**, I needed to submit **Form OPM 71**.

a) See Ms. Dunkelberger's Report of Contact dated April 18, 2017 (**ER 03748 Vol. 1, page 286**), "In order to request leave she would need to complete an **OPM 71**…"

xplained to her that she does not qualify for FMLA at this time because she has less than 1 year of service. In order to request eave she would need to complete an OPM 71 and provide supporting medical documentation. She stated her doctor was in

b) See Ms. Dunkelberger's Report of Contact dated May 16, 2017 (**ER 03748 Vol. 1, page 289**), "I reminded her at this time she would need to complete an **OPM 71**…"

get the pills. I reminded her at this time she would need to complete an OPM 71, provide supporting medical documentation to

c) See Mr. Johnson's May 18,2017 letter to Dr. Prince (**ER 03748 Vol. 1, page 288**), "On May 17, 2017 an **OPM 71** was given to Tatyana…"

management team that she was leaving to Russia on Thursday May 18, 2017 for six weeks. On May 17, 2017 an OPM 71 was given to Tatyana and she filled it out providing no supporting medical

d) Read Zack's Answer (Doc. No. 396), page 4, lines 6-9, "5:3-10: Defendants admit that on April 18, 2017, and May 15, 2017, Ms. Dunkelberger informed Plaintiff that to request **leave without pay ("LWOP")** for the length of time Plaintiff was requesting, she needed to submit a request to the Associate Director of Patient Care Services on **Form OPM-71** Request for Leave or Approved Absence…"

6       5:3-10. Defendants admit that on April 18, 2017, and May 15, 2017, Ms. Dunkelberger
7    informed Plaintiff that to request leave without pay ("LWOP") for the length of time Plaintiff was
8    requesting, she needed to submit a request to the Associate Director of Patient Care Services on Form
9    OPM-71 Request for Leave or Approved Absence, and submit supporting medical documentation, and

- 52 -

~~Fact No. 51~~. On May 17, 2017, I filled out an OPM form, and I requested a Leave Without Pay ~~for six weeks~~ from May 18 to July 07, 2017 (**ER 03748 Vol. 1, page 287**),

Request for Leave or Approved Absence

1. Name (Last, First, Middle)

2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN)) [redacted]

3. Organization Albuquerque VAMC

4. Type of Leave/Absence | Date From To | Time From To | Total Hours

Accrued Annual Leave

Restored Annual Leave

Advanced Annual Leave

Accrued Sick Leave

Advanced Sick Leave

Compensatory Time Off

Other Paid Absence (specify in remarks)

Leave Without Pay 05 18 17 07 07 17

5. Family and Medical Leave

6. Remarks: To treat my health issues in Russia

7. Certification

7a. Employee Signature

7b. Date 05 17 2017

8a. Official action on request: Approved Disapproved

8b. Reason for Disapproval

8c. Supervisor Signature

8d. Date 5-19-2017

Privacy Act Statement

Print Form Clear Form

See (**ER 03748 Vol. 1, page 287**),

> ☑ **Leave Without Pay**      05.18.17—07.07.17

Also, see the so-called Declaration of Carla Dunkelberger where she admitted that she **knew** that I was requesting a LWOP **for six weeks** (**ER 03748 Vol. 2, page 460, lines 10-13**), "6. On April 18, 2017, Ms. Drevaleva informed me that she would need to go to Russia in a few months for a medical procedure. I told her that I would not be able to approve her request at my level of authority due to the length of time that she was requesting, which I understood **to be approximately six weeks**."

> 10    6.    On April 18, 2017, Ms. Drevaleva informed me that she would need to go to Russia in a
> 11    few months for a medical procedure. I told her that I would not be able to approve her request at my
> 12    level of authority due to the length of time that she was requesting, which I understood to be
> 13    approximately six weeks. I informed her that Dr. Tina Prince, the Associate Director of Patient Care

Also, see the May 18, 2017 letter of Mr. Johnson to Dr. Prince (**ER 03748 Vol. 1, page 288**), "…Tatyana informed Carla Dunkelberger (Manager 5DT) that she needed to take extended **leave of six weeks** and go to Russia…"

> class in April Tatyana informed Carla Dunkleberger (Manager 5DT) that she needed to take extended leave of six weeks and go to Russia for a medical procedure. At that time, Carla informed Tatyana that

Also, please, notice that **six weeks** from May 18, 2017 to July 07, 2017 is **more than 30 calendar days**.

~~Fact No. 52.~~ Both Ms. Dunkelberger and Mr. Johnson never gave me ~~two SF-52 forms~~

pursuant to Attachment A to Memorandum 05-11 (**ER 03748 Vol. 1, page 317**):

    a) One SF-52 form was required for ~~a LWOP~~ that ~~exceeds 30 calendar days.~~

    b) Another SF-52 form was required for return back to duty.

Memorandum 05-11                                                            Attachment A

Leave Chart for General Schedule and Wage Grade Employees

| VI. Leave Without Pay | | | |
|---|---|---|---|
| a. Up to 1 calendar days | | X | Service Chief |
| b. 15 days to 1 year | | X  Five months | Appropriate PENTAD member (except for OWCP cases which is delegated to the HR Manager) |
| | | X, P (is SF-52) | SF-52 is required for LWOP exceeding 30 calendar days or (SF-52) and for the return to duty |

**Fact No. 53.** Ms. Dunkelberger said to me that she couldn't approve my Request for a

LWOP, and only **the Associate Director of Patient Care Services** and **the PENTAD member**

**Dr. Tina Prince** could approve my Request for a LWOP.

    a) See Ms. Dunkelberger's Report of Contact dated April 18, 2017 (**ER 03748 Vol. 1,**

        **page 286**), "At this time I explained to her that I would not be able to approve her

        request at my level of authority due to the length of time she was requesting and that

        **Dr. Prince**, **Associate Director of Patient Care Services** would be the one to

        approve or deny her request."

rved up enough money she would need to go back to Russia as she would be hiring a serrogate to have a child for her. At this me I explained to her that I would not be able to approve her request at my level of authority due to the length of time she was equesting and that Dr. Prince, Associate Director of Patient Care Services would be the one to approve or deny her request. I

b) See Ms. Dunkelberger's Report of Contact dated May 16, 2017 (**ER 03748 Vol. 1,**

   **page 289**), "it had to be approved by by **Dr. Prince, Associate Director of Patient**

   **Care Services** prior to leaving; that I could not approve her request."

request any time off, and that it had to be approved by by Dr. Prince, Associate Director of Patient Care Services prior to leaving; that I could not approve her request. Ms. Drevaleva verbalized understanding.

c) See Zack's June 04, 2021 Answer (Doc. No. 396), page 4, lines 6-8, "5:3-10:

   Defendants admit that on April 18, 2017, and May 15, 2017, Ms. Dunkelberger

   informed Plaintiff that to request leave without pay ("LWOP") for the length of time

   Plaintiff was requesting, she needed to submit a request to **the Associate Director of**

   **Patient Care Services**…"

6   5:3-10:  Defendants admit that on April 18, 2017, and May 15, 2017, Ms. Dunkelberger
-   informed Plaintiff that to request leave without pay ("LWOP") for the length of time Plaintiff was
8   requesting, she needed to submit a request to the Associate Director of Patient Care Services on Form

d) See the so-called Declaration of Carla Dunkelberger (**ER 03748 Vol. 2, page 460,**

   **lines 10-14**), "6. On April 18, 2017, Ms. Drevaleva informed me that she would need

   to go to Russia in a few months for a medical procedure. I told her that I would not be

   able to approve her request at my level of authority due to the length of time that she

was requesting, which I understood to be approximately six weeks. I informed her

that **Dr. Tina Prince**, **the Associate Director of Patient Care Services**, would be

10      6.      On April 18, 2017, Ms. Drevaleva informed me that she would need to go to Russia in a

11  few months for a medical procedure. I told her that I would not be able to approve her request at my

12  level of authority due to the length of time that she was requesting, which I understood to be

13  approximately six weeks. I informed her that Dr. Tina Prince, the Associate Director of Patient Care

14  Services, would be the one who would have to approve or deny her request. I also explained to her that

the one who would have to approve or deny her request.

e)  Please, also see the so-called Declaration of Carla Dunkelberger (**ER 03748 Vol. 2,**

**page 461, lines 11-12**), "The leave policy also included a chart noting that the

Approving Authority for LWOP in excess of 15 days is the "appropriate **PENTAD**

**member**," which in this case was **Dr. Prince**."

11  The leave policy also included a chart noting that the Approving Authority for LWOP in excess of 15

12  days is the "appropriate PENTAD member," which in this case was Dr. Prince. Attached hereto as

**Fact No. 54**. As of May 17, 2017, Mr. Johnson knew that I had just a few hormonal pills

left. See Mr. Johnson's EEO Interrogatory dated March 13, 2018 (**ER 03748 Vol. 1, page 218**),

"The complainant came into the office, after business hours, on May 17, 2017 stating **s/he had**

**one pill left**…"

and the circumstances surrounding this event? *The complainant came into the*
*office, after business hours, on May 17, 2017 stating s/he had one pill left and was*

Here, Ms. Johnson made a mistake. As of May 17, 2017, I had three hormonal pills left, not one pill. I was taking one pill a day every day, and I couldn't afford to miss a pill. I was unable to obtain these pills in the United States. Therefore, as of May 17, 2017, I had an emergency need to go to Russia to refill a prescription of my hormonal pills because I couldn't obtain these pills in the United States. Also, please, take into your consideration that the trip from Albuquerque, NM to Novosibirsk, Russia took approximately 48 hours, and I needed to take my hormonal pills during my trip.

**Fact No. 55**. During my May 17, 2017 conversation with Mr. Johnson. I informed him that I would receive my medical documentation from my Russian OB/GYN within the next few hours. I said to Mr. Johnson that I had only three hormonal pills left, and that I would leave to Russia on May 18, 2017. I said that I didn't have an opportunity to stay in the United States for a longer time in order to find a certified translator and to translate my medical document into English. I said that I would find a certified translator in Russia, translate the document, and I would email the translated document from Russia. Also, I said to Mr. Johnson that I would authorize my Russian speaking co-worker Ms. Nadya Das to informally translate this medical document for Ms. Dunkelberger and Mr. Johnson.

**Fact No. 56**. Both Ms. Dunkelberger and Mr. Johnson requested me to provide **my medical documentation** regarding my intention to go to Russia to perform an In-Vitro Fertilization (IVF) procedure:

a)  See Dunkelberger's April 18, 2017 Report of Contact (**ER 03748 Vol. 1, page 286**), "In order to request leave she would need to complete an OPM 71 and **provide supporting medical documentation**."

> xplained to her that she does not qualify for FMLA at this time because she has less than 1 year of service. In order to reques
> ame she would need to complete an OPM 71 and provide supporting medical documentation. She stated her doctor was in

b)  See Dunkelberger's May 16, 2017 Report of Contact (**ER 03748 Vol. 1, page 289**), "I reminded her at this time she would need to complete an OPM 71, **provide supporting medical documentation** to request any time off…"

> At this point, reminded her at this time she would need to complete an FMLA 71, provide supporting medical documentation in order to
> request any time off, and that it had to be approved by by Dr. Prince, Associate Director of Patient Care Services prior to

c)  See Johnson's May 18, 2017 letter to Dr. Prince (**ER 03748 Vol. 1, page 288**), "Tatyana was also told that **medical documentation**, in English, **would be needed**…"

> ative week absence. Tatyana was also told that medical documentation, in English, would be needed prior

d)  See the so-called "Declaration of Carla Dunkelberger" (**ER 03748 Vol. 2, page 460, lines 20-21**), "I reminded her that she would need to … **provide supporting medical documentation**…"

> 20  This is for a medical procedure and to use in related medication. I reminded her that she would need to
> 21  complete a leave request form, provide supporting medical documentation and receive approval from

**Fact No. 57**. I actually provided both Ms. Dunkelberger and Mr. Johnson with my medical documentation from my Russian OB/GYN three times:

1) On May 18, 2017 on Russian language (**ER 03748 Vol. 1, pages 29-30**)

2) On May 30, 2017 on English language (**ER 03748 Vol. 1, pages 32-33 and 264, 266**)

3) On July 14, 2017 on English language (**ER 03748 Vol. 1, pages 39-41 and 263**.)

**Fact No. 58**. Ms. Dunkelberger said to me that I didn't have a right to translate my medical documentation from Russian into English myself, and that only a certified translator had a right to translate my medical documentation.

**Fact No. 59.** As of May 17, 2017, I had not completed my Orientation as a newly appointed Medical Instrument Technician (Electrocardiograph.)

a) See Mr. Johnson's EEO Interrogatory (**ER 03748 Vol. 1, page 217**), "29. Was the complainant able to perform the essential duties of her position? *Complaintant did not complete orientation and, therefore, was unable to perform independently in the Medical Instrument Technician role*."

29. Was the complainant able to perform the essential duties of her position? *Complaintant did not complete orientation and, therefore, was unable to perform independently in the Medical Instrument Technician role.*

b) See Ms. Dunkelberger's EEO Interrogatory (**ER 03748 Vol. 1, page 227**),

"29. Was the complainant able to perform the essential duties of her position?

*Complainant did not complete orientation*

30. If not, please identify the duty or duties the complainant was unable to perform.

*The complainant was unable to perform independently in the Medical Instrument*

*Technician role due to not completing orientation*."

See (**ER 03748 Vol. 1, page 227**),

29. **Was the complainant able to perform the essential duties of her position?** *Complainant did not complete orientation.*

30. **If not, please identify the duty or duties the complainant was unable to perform.** *The complainant was unable to perform independently in the Medical Instrument Technician role due to not completing orientation.*

**Fact No. 60**. My medical doctor who had the actual knowledge about my In-Vitro Fertilization (IVF) was **in Russia** and not in the United States, and Ms. Dunkelberger **knew** about it.

a) See my first medical documentation from my Russian OB/GYN on Russian language

   (**ER 03748 Vol. 1, pages 29-30**)

b) See my first medical documentation from my Russian OB/GYN on English language

   (**ER 03748 Vol. 1, pages 32-33 and 264, 266**)

c) See my second medical documentation from my Russian OB/GYN on English language (**ER 03748 Vol. 1, pages 39-41 and 263**.)

d) See Ms. Dunkelberger's Report of Contact dated April 18, 2017 (**ER 03748 Vol. 1, page 286**), "She stated that her doctor was in Russia and that she could ask him to write a letter for her but it would be in Russian."

cave she would need to complete an OPM 71 and provide supporting medical documentation. She stated her doctor was in Russia and that she could ask him to write a letter for her but it would be in Russian  I explained to her that the documentation

**Fact No. 61.** On May 17, 2017, Mr. Johnson gave me an OPM 71 form, asked me to fill it out, and **he asked me to request a Leave Without Pay**. On May 17, 2017, Mr. Johnson **didn't** instruct me to request an Advanced Sick Leave for the purpose of pregnancy, an Advanced Annual Leave, or any other paid types of the leave. Please, notice that the OPM 71 form contains the options of the Advanced Sick Leave and the Advanced Annual Leave (**ER 03748 Vol. 1, page 287.**)

**Fact No. 62.** On May 17, 2017, during my verbal conversation with Mr. Johnson, I explained to him that Ms. Dunkelberger had informed me that I needed to provide my medical documentation, this documentation should be on English language, that I didn't have a right to translate this medical documentation myself from Russian into English, and that only a certified translator had a right to translate my medical documentation from Russian into English. On May 17, 2017, I explained to Mr. Johnson that I had only three hormonal pills left that were on three

days, that I couldn't obtain these pills in the United States, that I was waiting for my medical documentation from my Russian doctor, and that I couldn't wait for a longer time in Albuquerque, NM in order to find a certified translator, to translate my medical document, and to bring it to the attention of the VAMC. Moreover, on May 17, 2017, at the time of my verbal conversation with Mr. Johnson, I didn't have my medical document from my Russian doctor in my hands. I was still waiting for this document. I was expecting to receive this document during my night shift from May 17 to May 18, 2017. I notified Mr. Johnson that I was expecting to receive my medical document from my Russian doctor during my night shift from May 17 to May 18, 2017. I said to Mr. Johnson that I was planning to leave to Russia on May 18, 2017, and that I didn't have an opportunity to stay in Albuquerque, NM for a longer time because I was running out of my hormonal pills that I couldn't obtain in the United States. I said to Mr. Johnson that I would ask my Russian co-worker Ms. Nadya Das to informally translate my medical document into English language until I find a certified translator in Russia, and I promised to Mr. Johnson that I would email a translated version of my medical document to both Ms. Dunkelberger and Mr. Johnson.

**Fact No. 63**. After my conversation with Mr. Johnson, I spoke to Ms. Das, and I informed her that I urgently needed to go to Russia to refill a prescription of my hormonal pills and to perform an IVF attempt, and that Mr. Johnson verbally approved my leave. I filled out the OPM 71 form (**ER 03748 Vol. 1, page 287**), and I requested a Leave Without Pay (as Mr.

Johnson had instructed me) **from May 18, 2017 to July 07, 2017**. In my OPM 71 form, I wrote the reason for the leave, "To solve my health issues in Russia." I didn't write that I would go to Russia for the purpose of pregnancy because I didn't know who would read this form, and I wanted to protect my privacy. However, both Ms. Dunkelberger and Mr. Johnson knew that I would go to Russia to refill a prescription of my hormonal pills and to perform an IVF attempt. I put this OPM 71 form under the door of the Manager's office as Mr. Johnson had directed me.

**Fact No. 64**. As of May 17, 2017, I had three hormonal pills Jeanine left, I was taking one pill a day, and I couldn't afford to miss a pill. I brought these pills from Russia, and I couldn't obtain them in the United States. Ms. Dunkelberger knew that I had only a few hormonal pills left.

See Ms. Dunkelberger's Report of Contact dated May 16, 2017 (though I believe that my conversation with her occurred earlier) (**ER 03748 Vol. 1, page 289**.)  Please, notice that in this Report of Contact Ms. Dunkelberer stated that I had come to her Office on May 25, 2017. It was a typo (**ER 03748 Vol. 1, page 460, lines 23-25**, "The Report of Contact includes a typographical error. The date of the conversation was May 15, not May 25, 2017.")

See Ms. Dunkelberger's Report of Contact dated May 16, 2017 (**ER 03748 Vol. 1, page 289**), "She went on to explain that **she made a mistake and only has 5 pills left (**that are required to help with IVF) and that **she thought she had more**. These pills were prescribed by

her doctor in Russia and **can only be obtained in Russia**. She had found one pharmacy in New York that advertised on the internet they could get this medication. She stated she was planning to contact the pharmacy in New York to see if she could obtain the medication before she ran out and would let me know on May 16th if she was able to get the pills. I reminded her at this time she would need to complete an OPM 71, provide supporting medical documentation to request any time off, and that it had to be approved by by Dr. Prince, Associate Director of Patient Care Services prior to leaving; that I could not approve her request. Ms. Drevaleva verbalized understanding.

Ms. Dreveleva did not contact me on 5/16/17 to let me know if she had obtained the medication from New York."

free one time nvitro fertilization (IVF) she wanted to try this before she made "an embryo" as previously discussed. She went on to explain that she made a mistake and only has 5 pills left (that are required to help with IVF) and that she thought she had more. These pills were prescribed by her doctor in Russia and can only be obtained in Russia. She had found one pharmacy in New York that advertised on the internet they could get this medication. She stated she was planning to contact the pharmacy in New York to see if she could obtain the medication before she ran out and would let me know on May 16th if she was able to get the pills. I reminded her at this time she would need to complete an OPM 71, provide supporting medical documentation to request any time off, and that it had to be approved by by Dr. Prince, Associate Director of Patient Care Services prior to leaving; that I could not approve her request. Ms. Drevaleva verbalized understanding.

Ms. Dreveleva did not contact me on 5/16/17 to let me know if she had obtained the medication from New York.

**Fact No. 65**. As of May 17, 2017, Mr. Johnson knew that I had just a few hormonal pills left. See Mr. Johnson's EEO Interrogatory dated March 13, 2018 (**ER 03748 Vol. 1, page 218**), "The complaintant came into the office, after business hours, on May 17, 2017 stating **s/he had one pill left**…"

*and the circumstances surrounding this event? The complaintant came into the office, after business hours, on May 17, 2017 stating s/he had one pill left and was*

Here, Mr. Johnson erred because he stated that on May 17, 2017 I had only one hormonal pill left. In fact, on May 17, 2017 I had three hormonal pills left. However, generally speaking, Mr. Johnson was aware that I was running out of my hormonal medication that I couldn't obtain in the United States.

**Fact No. 66**. Ms. Dunkelberger requested me to provide my medical documentation **on English language**.

a) Read Dunkelberger's April 18, 2017 Report of Contact (**ER 03748 Vol. 1, page 286**), "I explained to her that the documentation would need to either written in English or **be translated from Russian to English**."

Russia and that she could ask him to write a letter for her but it would be in Russian. I explained to her that the documentation would need to either written in English or be translated from Russian to English. I also talked to her about possibly finding a

b) Read Mr. Johnson's May 18, 2017 letter to Dr. Prince (**ER 03748 Vol. 1, page 288**), " Tatyana was also told that **medical documentation, in English**, would be needed prior to approval of Leave Without Pay.

six week absence. Tatyana was also told that medical documentation, in English, would be needed prior to approval of Leave Without Pay. On the morning of May 17, 2017 Tatyana informed the 5D

c) See Dunkelberger's June 12, 2017 letter to me (**ER 03748 Vol. 1, page 290**), "You did not submit the required medical documentation, **in English**, prior to your departure to Russia. As a result of the disapproval, you are required to submit medical documentation, **in English**, to support your absence."

July 7, 2017.  However, your request was disapproved (see attached).  You did not submit the required medical documentation, in English, prior to your departure to Russia.  As a result of the disapproval, you are required to submit medical documentation, in English, to support your absences.  This time period must be covered to avoid being placed in Absent Without Leave

**Fact No. 67**. Both Ms. Dunkelberger and Mr. Johnson knew that the purpose of my 2017 trip to Russia was to refill a prescription of my hormonal pills and to perform an **In-Vitro Fertilization (IVF) procedure**.

a)  See Ms. Dunkelberger's Report of Contact dated April 18, 2017 (**ER 03748 Vol. 1, page 286**), "Tatyana Drevaleva told me that she needs to go to Russia in a few months for 4-6 weeks to "make an embryo." She stated she only had a few months worth of medication she needed to be on to help her to be able to "make an embryo." Then, after she has saved up enough money she would need to go back to Russia as she would be hiring a surrogate to have a child for her."

atyana Drevaleva told me that she needs to go to Russia in a few months for 4-6 weeks to "make an embryo." She stated she nly had a few months worth of medication she needed to be on to help her to be able to "make an embryo." Then, after she has aved up enough money she would need to go back to Russia as she would be hiring a surrogate to have a child for her. At this

b)  See Ms. Dunkelberger's report of Contact dated May 16, 2017 (**ER 03748 Vol. 1, page 289**), "Tatyana Drevaleva came to my office on 5/25/17 to speak about her need to go to Russia. She stated that since Russia offers a Free one time invitro fertilization (1VF) she wanted to try this before she made "an embryo" as previously discussed."

Tatyana Drevaleva came to my office on 5/25/17 to speak about her need to go to Russia  She stated that since Russia offers a free one time invitro fertilization (IVF) she wanted to try this before she made "an embryo" as previously discussed. She went

c) See Mr. Johnson's March 13, 2018 EEO Interrogatory (**ER 03748 Vol. 1, page 218**), "The complainant came into the office, after business hours, on May 17, 2017 stating s/he had one pill left and was flying to Russia the next day **to have Invitro Fertilization done**. The complainant also stated his/her age to be 50 and that s/he had always wanted to have children and "this may be my last chance." "

and the circumstances surrounding this event? *The complainant came into the office, after business hours, on May 17, 2017 stating s/ho had one pill left and was flying to Russia the next day to have Invitro Fertilization done. The complainant also stated his/her age to be 50 and that s/he had always wanted to have children and "this may be my last chance". I handed the complainant the OPM71 paper*

**Fact No. 68**. Ms. Dunkelberger underwent her EEO training two times, see (**ER 03748 Vol. 1, page 227**),

"32. Have you received training on EEO policy and procedure? *Yes*

33. If yes, when? *11/24/2016 and 7/30/2015 (see supporting documentation).*"

32. Have you received training on EEO policy and procedure? *Yes*

33. If yes, when? *11/24/2016 and 7/30/2015 (see supporting documentation).*

**Fact No. 69**. Ms. Johnson underwent his EEO training three times, see (**ER 03748 Vol. 1, page 217**),

32. "Have you received training on EEO policy and procedure? *Yes*

33. If yes, when? *11/30/2015, 7/21/2016 and 1/9/2018*"

32. Have you received training on EEO policy and procedure?   *Yes*

33. If yes, when?   *11/30/2015, 7/21/2016 and 1/9/2018*


**Fact No. 70**. My Russian doctor OB/GYN actually issued my medical documentation on Russian language only **on May 17, 2017**,

Please, see my medical document on Russian language (**ER 03748 Vol. 1, page 30**),

Лечащий врач                                                И.Б.Дзукаева

Заведующая п/отделением                        М.П.Оператор


17 мая 2017 года

# 17 мая 2017 года

Please, see a translation into English language (**ER 03748 Vol. 1, page 264**),

Attending Doctor           I.B. Dzutseva        (Signature)

Out-Patient Department Head     M.P. Oparina       (Signature)

May 17, 2017

# May 17, 2017

**Fact No. 71**. Please, notice that the time difference between Novosibirsk, the Russian Federation and Albuquerque, the State of New Mexico, the United States of America is **13 hours**, this information is available from a Google search.

## Novosibirsk, Novosibirsk Oblast, Russia is 13 hours ahead of Albuquerque, NM

10:24 PM Monday, in Novosibirsk, Novosibirsk Oblast, Russia is
9:24 AM Monday, in Albuquerque, NM

Therefore, if my Russian doctor issued my medical documentation on Russian language only on May 17, 2017, I received it only on May 18, 2017 due to the time difference between Novosibirsk and Albuquerque. The person who witnessed that I received my medical documentation on Russian language from my Russian doctor via the email is my Russian co-worker Ms. Nadya Das.

**Fact No. 72**. In my May 17, 2017 medical document, my Russian doctor indicated **the time frame** when I was eligible to enter into the IVF protocol in Russia: **from May 23, 2017 to September 31, 2017**. Please, see my medical document on Russian language (**ER 03748 Vol. 1, page 30**),

Примерные сроки вступления в программу ЭКО с 23.05.2017 до 31.09.2017 года.

# с 23.05.2017

Please, see a translation into English language (**ER 03748 Vol. 1, page 264**),

An approximate term of entering the extracorporal fertilization program from May 23, 2017 to September 31, 2017.

# from May 23, 2017

Therefore, in May 2017 I had an emergency need to go to Russia to perform an In-Vitro Fertilization (IVF) procedure because the time of entering into the Russian Governmental free of charge IVF program started **on May 23, 2017**.

**Fact No. 73**. I worked my night shift from May 17 to May 18, 2017 together with my Russian co-worker Ms. Nadya Das, see Zack's June 04, 2021 Answer (Doc. No. 396) to my

Original June 25, 2018 Complaint, page 4, lines 16-18, "5:14-6:4: Defendants admit that Plaintiff worked from 11:30 p.m. on May 17, 2017, to 8 a.m. on May 18, 2017. Defendants admit that Plaintiff worked with Ms. Das that night and told Ms. Das about her plans to go to Russia the next day for a medical reason."

| 16 | 5:14-6:4.  Defendants admit that Plaintiff worked from 11:30 p.m. on May 17, 2017, to 8 a.m. on |
|----|---|
| 17 | May 18, 2017.  Defendants admit that Plaintiff worked with Ms. Das that night and told Ms. Das about |
| 18 | her plans to go to Russia the next day for a medical reason.  Defendants admit that Ms. Dunkelberger |

Here, Zack lied when she wrote the phrase "for a medical reason." In fact, I specifically said to Ms. Das that the purpose of my trip to Russia was to refill a prescription of my hormonal pills and to perform an In-Vitro Fertilization (IVF) attempt.

**Fact No. 74**. On **May 17, 2017**, Mr. Johnson **verbally allowed** me to go to Russia to refill a prescription of my hormonal pills and to perform an IVF procedure.

a) See Mr. Johnson's March 13, 2018 EEO Interrogatory (**ER 03748 Vol. 1, pages 218-219**), "The complainant came into the office, after business hours, on May 17, 2017 stating s/he had one pill left and was flying to Russia the next day to have Invitro Fertilization done. The complainant also stated his/her age to be 50 and that s/he had always wanted to have children and "this may be my last chance." I handed the complainant the OPM71 paper work and stated that this must be filled out and

supporting documentation in English from the doctor must also be supplied. At this time I stated to the complaintant that I could not approve Leave Without Pay but I would turn in the documentation and **if this was that important then s/he should go**."

and the circumstances surrounding this event? *The complaintant came into the office, after business hours, on May 17, 2017 stating s/he had one pill left and was flying to Russia the next day to have Invitro Fertilization done. The complaintant also stated his/her age to be 50 and that s/he had always wanted to have children and "this may be my last chance". I handed the complaintant the OPM71 paper work and stated that this must be filled out and supporting documentation in English from the doctor must also be supplied. At this time I stated to the complaintant that I could not approve Leave Without Pay but I would turn in the documentation and if this was that important then s/he should go.*

See (**ER 03748 Vol. 1, page 219**), "if this was that important then **s/he should go**."

## *if this was that important then s/he should go.*

b) See the November 18, 2020 Memorandum of the 9th Circuit in Appeal No. 19-16395, page 4, "Drevaleva alleged that she was denied leave for her alleged disability and terminated even though she made a proper request that was approved by her supervisor."

failure to follow the proper procedure for requesting leave. However, Drevaleva alleged that she was denied leave for her alleged disability and terminated even though she made a proper request that was approved by her supervisor. Liberally

Please, also notice that Assistant U.S. Attorney Ms. Kimberly Robinson never filed a Petition for Rehearing of the November 18, 2020 Memorandum and never challenged the decision of the 9th Circuit that I had left my job **with a verbal permission** of Assistant Manager Mr. Phil Johnson.

**Fact No. 75.** During my night shift from May 17, to May 18, 2017, I received an email with my medical documentation from Russia. Ms. Das is a witness of this event because we stayed together with her in one cardiac monitoring room, and she observed that I had received an email with my medical documentation from Russia. I immediately attempted to forward this email to both Ms. Dunkelberger and Mr. Johnson from the VAMC's computer but I was unable to do it. Ms. Das made a suggestion that the VAMC's security didn't allow me to forward an email from Russia to Ms. Dunkelberger and Mr. Johnson. I notified Ms. Das that I would send this email to Ms. Dunkelberger and Mr. Johnson in the morning after my night shift from my personal computer.

**Fact No. 76**. On May 17, 2017, I asked my Russian co-worker Ms. Nadya Das to informally translate my medical documentation from Russian into English for Ms. Dunkelberger and Mr. Johnson until I can get a certified translator in Russia and until I email the translated copy to the VAMC. Ms. Das agreed to translate this document into English.

See the June 04, 2021 Answer (Doc. No. 396) of Assistant U.S. Attorney Ms. Adrienne Zack to my Original June 25, 2018 Complaint No. 4:18-cv-03748-HSG, see page 5, lines 8-9 of the Answer, "6:14-18: Defendants admit that Plaintiff asked and gave consent to Ms. Das to translate a document from Russian to English."

8  6:14-18: Defendants admit that Plaintiff asked and gave consent to Ms. Das to translate a
9  document from Russian to English. Defendants are without sufficient knowledge to admit or deny the

**Fact No. 77**. On **May 18, 2017** at **9.02 AM**, I emailed my medical documentation on Russian language to both Ms. Dunkelberger and Mr. Johnson (**ER 03748 Vol. 1, pages 28-30**.)

See (**ER 03748 Vol. 1, page 29**), "May 17, 2017 at 9.02 AM"

# Thu, May 18, 2017 at 9:02 AM

Tatyana Drevaleva <tdrevaleva@gmail.com>                          Thu, May 18, 2017 at 9:02 AM
To: "Dunkelberger, Carla" <Carla.Dunkelberger@va.gov>, Footerphil@gmail.com

выписка из амбулаторной карты

Tatyana Drevaleva <tdrevaleva@gmail.com>                          Thu, May 18, 2017 at 9:02 AM
To: "Dunkelberger, Carla" <Carla.Dunkelberger@va.gov>, Footerphil@gmail.com

[Quoted text hidden]
—
Respectfully,
Tanya

выписка.pdf
175K

See my medical document on Russian language (**ER 03748 Vol. 1, page 30**),

Case 3:18-cv-03748-WHA   Document 1-1   Filed 06/25/18   Page 3 of 3

Выписка из амбулаторной карты

Древалевой Татьяны Евгеньевны, 13.10.1966 года рождения

Древалева Т.Е. состоит в реестре проведения процедуры ЭКО по территориальной программе ОМС
Примерные сроки вступления в программу ЭКО с 23.05.2017 до 31.09.2017 года

Лечащий врач                                              И.Б.Дзуцева

Заведующая п/отделением                         М.П.Опарина

17 мая 2017 года

Please, read the plain language of my document on Russian language (**ER 03748 Vol. 1, page 30**),

"Государственное бюджетное учреждение здравоохранения Новосибирской области "Клинический центр охраны здоровья семьи и репродукции"

Поликлиническое отделение

ул. Киевская, 14

г. Новосибирск

Выписка из амбулаторной карты Древалёвой Татьяны Евгеньевны 13.10.1966 года рождения

Древалёва Т.Е. состоит в реестре проведения процедуры ЭКО по территориальной программе ОМС.

Примерные сроки вступления в программу ЭКО с 23.05.2017 до 31.09.2017.

Лечащий врач И.Б. Дзуцева

Заведующая п/отделением М.П. Опарина

17 мая 2017 года."

Here is a translation on English language (**ER Vol. 1, page 33**),

"Public Government-Financed Institution of Public Health of Novosibirsk Region

"Clinical Center for the Protection of Family Health and Reproduction"

Out-Patient Department

Kievskaya st., 14

Novosibirsk


EXTRACT FROM THE MEDICAL HISTORY

DREVALEVA, TATYANA EVGENIEVNA, DOB October 13, 1966

Drevaleva T.E. is included in the registry for carrying out the extracorporal fertilization procedure according to the Territorial Program of Compulsory Health Insurance.

An approximate term of entering the extracorporal fertilization program **from May 23, 2017** to September 31, 2017.

Attending Doctor                          I.B. Dzutseva (Signature)

Out-Patient Department Head        M.P.Oparina (Signature)

**May 17, 2017**

/Seal: Public Government-Financed Institution of Public Health of Novosibirsk Region "Clinical Center for the Protection of Family Health and Reproduction"/

I, Asya Sergeevna Pisareva, Director of Translation Bureau, Limited Liability Company – State Registration Certificate Series 54 Number 0004157325 State registration number 1095404006720 dd. March 19, 2009, residing in Novosibirsk, Russia, hereby certify that the foregoing is, to the best of my knowledge and belief, a true and accurate English translation of the Russian document made by Eleonora Alexandrovna Pyltseva, an official translator of the English and Russian languages.

[Signature] Asya Sergeevna Pisareva

Translation Bureau, Limited Liability Company

Suite 686, 57 K. Marx Pr., Novosibirsk, Russia

Tel./fax: (383) 210-57-39

e-mail: BNTI@narod.ru "

**Fact No. 78.** Please, pay attention to the following facts of the case:

1) The date when my Russian doctor issued the document was May 17, 2017. My Russian doctor didn't issue this document earlier

2) The date of entering to the IVF program in Russia was May 23, 2017

3) I received the document from my Russian doctor via email during my night shift from May 17, 2017 to May 18, 2017. The witness is Ms. Nadya Das

4) The date when I emailed this document on Russian language to Dunkelberger and Johnson is May 18, 2017 at 9.02 AM (**ER 03748 Vol. 1, page 29**.)

**Fact No. 79**. Mr. Johnson was aware about my age 50 yo at that time, see (**ER 03748 Vol. 1, page 218**), "The complaintant also stated his/her age to be 50…"

*flying to Russia the next day to have invitro Fertilization done. The complaintant also stated his/her age to be 50 and that s/he had always wanted to have children*

**Fact No. 80**. The New Mexico VA Health Care System was aware about my **age** 50 yo at that time and about my date of birth 10/13/1966, see my June 17, 2021 First Motion to Strike (Doc. No. 411) Zack's June 04, 2021 Answer (Doc. No. 396) to my Original June 25, 2018 Complaint No. 4:18-cv-03748-HSG, pages 8-13. Particularly, please, see read my SF 10-2850c form that I submitted with my job application for a position of an MIT (EKG) at the New

Mexico VA Health Care System in 2016 (Exhibit 341 to Doc. No. 408) where I answered these

questions:

6. Date of Birth. 10.13.1966.”

> 6. DATE OF BIRTH
> 10.13.1966

**Fact No. 81**. The New Mexico VA Health Care System was aware about my **age** because

the New Mexico VA Health Care System actually received my first medical documentation on

Russian language where the date of my birth was written, see (**ER 03748 Vol. 1, page 30**),

"… Древалёвой Татьяны Евгеньевны 13.10.1966 года рождения.”

## Древалевой Татьяны Евгеньевны, 13.10.1966 года рождения

**Fact No. 82**. The New Mexico VA Health Care System was aware about my **age** because

the New Mexico VA Health Care System actually received my first medical documentation on

English language where the date of my birth was written, see (**ER 03748 Vol. 1, page 33, 264,**

**and 266**). "DREVALEVA, TATYANA EVGENIEVNA, DOB October 13, 1966.”

## DREVALEVA, TATYANA EVGENIEVNA, DOB October 13, 1966

**Fact No. 83**. The New Mexico VA Health Care System was aware that I was born in

Novosibirsk, Russia, that I was a naturalized U.S. citizen, and that I was a citizen of both the

Russian Federation and the United States of America, see my SF 10-2850c form that I submitted

with my job application for a position of an MIT (EKG) at the New Mexico VA Health Care System in 2016 (Exhibit 341 to Doc. No. 408) where I answered these questions:

7. Place of Birth (City.) Novosibirsk

8. Country. Russia

9A. Citizenship. Naturalized U.S. Citizen.

9B. Country of Which you are a Citizen. USA, Russia.



**Fact No. 84**. The New Mexico VA Health Care System was aware that my grade was GS-7 and that my salary was $40,790 per annum, see (**ER 03748 Vol. 2, page 502**),

Position Title:                    Medical Instrument Technician (EKG)
Series, Grade, & Salary:          GS-0649- 7, Step 1, $40,790 per annum

**Fact No. 85.** On May 17, 2017 in the evening, I left to Russia. Registered Nurse from the 5D (Telemetry) Unit Ms. Chelsea Casey drove me to the Albuquerque Airport. I said to Ms. Casey that I was going to go to Russia to refill a prescription of my hormonal pills and to perform an In-Vitro Fertilization (IVF) attempt. Also, I said to Ms. Casey that I had spoken to Assistant Manager Mr. Phil Johnson, and he verbally allowed me to go to Russia to refill a prescription of my hormonal pills and to perform an IVF attempt.

**Fact No. 86**. On May 18, 2018, Ms. Dunkelberger was out of office. On May 18, 2017,

**Mr. Johnson** submitted my OPM 71 form with my request for Leave Without Pay to Dr. Prince.

Please, see Zack's June 04, 2021 Answer (Doc. No. 296) to my Original June 25, 2018

Complaint, page 7, lines 26-28, "Defendants aver that Mr. Johnson submitted Plaintiff's request

to Dr. Prince on Ms. Dunkelberger's behalf while she was out of the office."

26 | without pay and that Ms. Dunkelberger submitted the request to Dr. Prince. Defendants aver that Mr.

27 | Johnson submitted Plaintiff's request to Dr. Prince on Ms. Dunkelberger's behalf while she was out of

28 | the office. Defendants admit that Dr. Prince denied Plaintiff's request. Defendants respectfully refer the

**Fact No. 87**. Despite Mr. Johnson actually received my medical document on Russian

language on May 18, 2017 at 9.02 AM (**ER 03748 Vol. 1, page 29**), he wrote in his May 18,

2017 letter to Dr. Prince **that I had not submitted my medical documentation at all**, see (**ER**

**03748 Vol. 1, page 288**), "On May 17, 2017 an OPM 71 was given to Tatyana and she filled it

out **providing no supporting medical documentation**."

management team that she was leaving to Russia on Thursday May 18, 2017 for six weeks. On May 17,
2017 an OPM 71 was given to Tatyana and she filled it out providing no supporting medical
documentation.

**Fact No. 88**. Despite on May 17, 2017 Mr. Johnson verbally approved my request to go

to Russia to refill a prescription of my hormonal pills and to perform an IVF attempt see (**ER**

**03748 Vol. 1, page 219**), in his May 18, 2017 letter to Dr. Prince he **didn't recommend** her to

approve my request for a LWOP, see (**ER 03748 Vol. 1, page 288**), "At this time, **I do not recommend** approval of Tatyana Drevaleva's request for Leave Without Pay."

At this time, I do not recommend approval of Tatyana Drevaleva's request for Leave Without Pay.

Phillip Johnson RN, 5DT ANM

 

    **Fact No. 89**. Despite Mr. Johnson **knew** that the purpose of my 2017 trip to Russia was an **In-Vitro Fertilization** procedure, in his May 18,2017 letter to Dr. Prince he **didn't** write that the purpose of my trip to Russia was an IVF procedure, and he wrote that the purpose of my trip to Russia was "**a medical procedure**", see (**ER 03748 Vol. 1, page 288**), "…Tatyana informed Carla Dunkelberger (Manager 5DT) that she needed to take extended leave of six weeks and go to Russia for **a medical procedure**."

class in April Tatyana informed Carla Dunkleberger (Manager 5DT) that she needed to take extended leave of six weeks and go to Russia for a medical procedure. At that time, Carla informed Tatyana that

 

    **Fact No. 90**. On November 18, 2020, the 9th Circuit ruled in Appeal No. 19-16395, page 3, "Drevaleva alleged that her supervisors fraudulently concealed available leave options when she requested time off to travel to Russia to continue her in vitro fertilization procedures in Russia, imposed additional requirements on her application for leave without pay that were

inconsistent with the agency's policies, and **failed to provide a full explanation of the reason for her leave to the medical staff responsible for approving the leave request**."

The material fact of the case is that Assistant U.S. Attorney Ms. Kimberly Robinson did not file a Petition for rehearing of the November 18, 2020 Memorandum.

**Fact No. 91**. The internal policies of the U.S. Department of Veterans Affairs allows its employees to take **a Leave Without Pay** (a LWOP) for **up to one year**, see (**ER 03748 Vol. 1, page 317**) that is Attachment A to the Memorandum 05-11,

| Memorandum 05-11 | | | Attachment A |
|---|---|---|---|
| Leave Chart for General Schedule and Wage Grade Employees | | | |

| VI. Leave Without Pay | | | |
|---|---|---|---|
| a. Up to 15 calendar days | | X | Service Chief |
| b. 15 days to 1 year | | X - Plus memos | Appropriate PENTAD member (except for OWCP cases which is delegated to the HR Manager) |
| | | X -Plus 2 SF 52's | SF-52 required for LWOP exceeding 30 calendar days and SF-52 required for return to duty |

# b. 15 days to 1 year

**Fact No. 92**. On May 18, 2017, Dr. Prince denied my Request for a LWOP **without having knowledge** that the purpose of my 2017 trip to Russia was an **In-Vitro Fertilization** procedure, see Dr. Prince's March 15, 2018 EEO phone Interrogatory (**ER 03748 Vol. 1, page**

**239**), "**Q Are you aware of the complainant's disability she describes as being infertile to the point of needing in vitro fertilization?**

A No, sir. This is the first I have seen that information."

```
 2        Q    Was the complainant's disability of being
 3   infertile a factor when this occurred?
 4        A    No.  I had no knowledge that that was her
 5   concern that she was missing work for.
```

Also, see (**ER 03748 Vol. 1, page 245**), "**Q Was the complainant's disability of being infertile a factor when this occurred?**

A No. I had no knowledge that that was her concern that she was missing work for."

```
19        Q    Are you aware of the complainant's disability
20   she describes as being infertile to the point of
21   needing in vitro fertilization?
22        A    No, sir.  This is the first I have seen that
23   information.
```

Also, please, see Zack's June 04, 2021 Answer (Doc. No. 396) to my Original June 25,

28 ‖ the office.  Defendants admit that Dr. Prince denied Plaintiff's request  Defendants respectfully refer the

2018 Complaint, page 7, line 28, "Defendants admit that Dr. Prince denied Plaintiff's request."

 

**Fact No. 93**. On May 19, 2017, Dr. Prince and Allean Bonin denied my Request for a

LWOP **without giving any explanations about why this decision had been reached**, see (**ER**

**03748 Vol. 1, page 288**),

Allean Raneta Bonin ACNS

( Concur ) Non Concur

Dr. Tina Prince ADPCS

Concur / Non Concur

with Non-approval.

Also, please, see (**ER 03748 Vol. 1, page 287**),

| 8a. Official Action on Request: | ☐ Approved | ☒ Disapproved | (If disapproved, give reason. If annual leave, initiate action to reschedule.) |
|---|---|---|---|
| 8b. Reason for Disapproval: | | | |
| 8c. Supervisor Signature | | | 8d. Date  5-19-2017 |

Please, notice a material fact of the case that the section 8b of the OPM 71 form – reason for Disapproval – was **empty**.



**Fact No. 94.** After the denial of my request for a LWOP on May 19, 2017, both Ms. Dunkelberger and Mr. Johnson never notified me that my Request for a LWOP had been denied. They **never called me** using my cell phone number, and they **never emailed the denial letter to my email address** even though **they knew my email address**. See Ms. Cormier's Proposed Order granting her Motion to Dismiss (**ER 03748 Vol. 2, page 414, lines 16-17**), "Meanwhile, plaintiff's request for leave without pay had been denied and a letter to that effect was sent to her mailing address, **but not emailed to her**."

16 │ supervisor on May 30, 2017. Meanwhile, plaintiff's request for leave without pay had been denied and a
17 │ letter to that effect was sent to her mailing address, but not emailed to her

Also, please, see Zack's June 04, 2021 Answer (Do. No. 396), page 8, line 9-10, "Defendants admit that **Ms. Dunkelberger was aware of Plaintiff's email address** based on the email received on May 18, 2017."

9 │ Defendants admit that Ms. Dunkelberger was aware of Plaintiff's email address based on the email
10 │ received on May 18, 2017. Defendants admit that Ms. Dunkelberger emailed Plaintiff the termination

**Fact No. 95**. On May 30, 2017, I emailed my first medical documentation translated into English language to both Ms. Dunkelberger and Mr. Johnson, see (**ER 03748 Vol. 1, pages 32-33 and 264, 265, 266.**) See (**ER 03748 Vol. 1, page 32**),



**Fact No. 96**. Ms. Dunkelberger **actually received** my May 30, 2017 medical documentation on English language, see (**ER 03748 Vol. 1, page 265.**)

## Dunkelberger, Carla

| | |
|---|---|
| **From:** | Tatyana Drevaleva <tdrevaleva@gmail.com> |
| **Sent:** | Tuesday, May 30, 2017 9:05 AM |
| **To:** | Dunkelberger, Carla; Phil Johnson |
| **Subject:** | [EXTERNAL] Translated document. |
| **Attachments:** | img237.jpg |

I picked up the translated document only today.


--
Respectfully,
Tanya.


See the actual medical documentation on English language (**ER 03748 Vol. 1, pages 33, 264 and 266**),

Public Government-Financed Institution of Public
Health of Novosibirsk Region
"Clinical Center for the Protection of Family
Health and Reproduction"
Out-Patient Department
Kievskaya str., 14
Novosibirsk

## EXTRACT FROM THE MEDICAL HISTORY

### DREVALEVA, TATYANA EVGENIEVNA, DOB October 13, 1966

DREVALEVA T.E. is included in the registry for carrying out the extracorporal fertilization procedure according to the Territorial Program of Compulsory Health Insurance.

An approximate term of entering the extracorporal fertilization program from May 23, 2017 to September 31, 2017.

| Attending Doctor | I.B. Dzutseva | (Signature) |
|---|---|---|
| Out-Patient Department Head | M.P. Oparina | (Signature) |

May 17, 2017

/Seal: Public Government-Financed Institution of Public Health of Novosibirsk Region "Clinical Center for the Protection of Family Health and Reproduction"/

I, Asya Sergeyevna Pisareva, Director of Translation Bureau, Limited Liability Company – State Registration Certificate Series 54 Number 004137325 State registration number 1095404006720 dd. March 19, 2009, residing in Novosibirsk, Russia, hereby certify that the foregoing is, to the best of my knowledge and belief, a true and accurate English translation of the Russian document made by Eleonora Aleksandrovna Pyltseva, an official translator of the English and Russian languages.

*ASYA SERGEYEVNA PISAREVA*

*Translation Bureau, Limited Liability Company*
*Suite 606, 57 K.Marx Pr., Novosibirsk, Russia*
*Tel./fax: (383) 210-57-39*
*e-mail: BNTI@oerod.ru*

**Fact No. 97**. While being in Russia, I found a certified translator who translated my medical documentation into English. On May 30, 2017, I emailed the translated medical document to both Ms. Dunkelberger and Mr. Johnson (**ER 03748 Vol. 1, pages 31-33**.)

**Fact No. 98**. On June 09, 2017, Ms. Dunkelberger consulted with the specialist of the Human resources Ms. Rhonda Anderson, Dunkelberger reported to Anderson that I had been absent without leave starting May 21, 2017, and Dunkelberger sked Anderson how to fire me, see Dunkelberger's March 08, 2018 EEO Interrogatory (**ER 03748 Vol. 1, page 230**),

"10. Did you consult with H.R. or any other management officials regarding the termination? *Yes*

11. If so, who did you discuss it with? *Rhonda Anderson*

12. When was is discussed? *June 9, 2017*

13. What was discussed?

*We discussed that the complainants request for LWOP from May 18, 2017 through July 7, 2017 was denied, that the complainant had been in AWOL status since May 21, 2017, and that a Leave Request Clarification Memo notifying the complaint of this should be mailed to the complainants home of record; per Human Resource rules and regulations.*"

10. Did you consult with H.R. or any other management officials regarding the termination? *yes*

11. If so, who did you discuss it with? *Rhonda Anderson*

12. When was is discussed? *June 9, 2017*

13. What was discussed?

*We discussed that the complainants request for LWOP from May 18, 2017 through July 7, 2017 was denied, that the complainant had been in AWOL status since May 21, 2017, and that a Leave Request Clarification Memo notifying the complaint of this should be mailed to the complainants home of record; per Human Resource rules and regulations.*

**Fact No. 99**. On June 12, 2017, Ms. Dunkelberger hired substantially younger male employee Mr. David Williams to substitute my employment. Please, read my detailed explanation in the following filings:

a) Supplemental Brief named "Direct Evidence of Discrimination", October 28, 2019 (Doc. No. 202) (you may not read this document if it is currently stricken)

b) Third Motion to Vacate the Judgment, July 11, 2020 (Doc. No. 259) (it is not stricken)

c) My First Motion for Judgment on the Pleadings, June 17, 2021 (Doc. No. 410) (it is also not stricken.)

**Fact No. 100**. Also, Ms. Dunkelberger hired another male employee to substitute my employment Mr. David Trujillo, see my First Motion for Judgment on the Pleadings, June 17, 2021 (Doc. No. 410.)

Also, please, see (**ER 03748 Vol. 1, page 275**),

**From:** Dunkelberger, Carla
**Sent:** Monday, November 20, 2017 10:43 AM
**To:** Shafer, Amy V. <Amy.Shafer@va.gov>
**Cc:** Rincon, Donald M. <Donald.Rincon@va.gov>; Dunkelberger, Carla <Carla.Dunkelberger@va.gov>; Salazar-Ruiz, Andrew V. <Andrew.Salazar-Ruiz@va.gov>; Bonin, Allean R. <AlleanRanetta.Bonin@va.gov>
**Subject:** RE: Request for documents

1. Organizational chart – see attached
2. Breakdown of organizational unit for position in question (Medical Instrument Technician). EEO categories unknown.
   a. Tatyana Drevaleva, Medical Instrument Technician, GS-649-07, full time.
   b. Nadzeya Das, Medical Instrument Technician. GS-0649-06, full time.
   c. David Williams, Medical Instrument Technician. GS-0649-06, full time.
   d. David Trujillo, Medical Instrument Technician, GS-0649-05, full time
   e. Vacant Position, Medical Instrument Technician, GS-0649, full time.

   c.   David Williams, Medical Instrument Technician. GS-0649-06, full time.
   d.   David Trujillo, Medical Instrument Technician, GS-0649-05, full time

**Fact No. 101**. On June 12, 2017, Ms. Dunkelberger mailed a letter **to my home postal address in Albuquerque, NM** despite she **knew** that I would not receive this letter and I would not respond because at that time I was in Russia, see (**ER 03748 Vol. 1, 290**),

Also, please, read Zack's June 04, 2021 Answer (Doc. No. 396), page 8, lines 3-4,
"Defendants admit that they mailed a leave request clarification letter including Dr. Prince's
decision **to Plaintiff's last known address**."

3 ‖ Defendants deny the allegations   Defendants admit that they mailed a leave request clarification letter

4 ‖ including Dr  Prince's decision to Plaintiff's last known address   Defendants are without sufficient

Also, read Zack's June 04, 2021 Answer (Doc. No. 396), page 8, lines 7-8, "Defendants admit that Ms. Dunkelberger stated that there was a policy that required her **to mail any communication to Plaintiff's last known address, known as her "home of record**." "

> 7   8:21-9:2:  Defendants admit that Ms. Dunkelberger stated that there was a policy that required
> 8   her to mail any communication to Plaintiff's last known address, known as her "home of record."

Please, notice a material fact of the case that on June 12, 2017 Ms. Dunkelberger mailed her June 12, 2017 letter to my home postal address as follows (**ER 03748 Vol. 1, 290**):

Tatyana Drevaleva

431 Alcazar St., NE,

**ABQ (Albuquerque), NM**, 87108.

**Fact No. 102**. Despite Ms. Dunkelberger **actually received** my medical certification **on English** language on **May 30, 2017** (**ER 03748 Vol. 1, page 265**), in her June 12, 2017 letter to me she wrote that I had not provided my medical certification on English language, and **she demanded me to provide my medical documentation on English language**, see (**ER 03748 Vol. 1, page 290**), "However, your request was disapproved (see attached). You did not submit the required medical documentation, in English, prior to your departure to Russia. As a result of

the disapproval, **you are required to submit medical documentation, in English**, to support

your absence.".

July 7, 2017. However, your request was disapproved (see attached). You did not submit the required medical documentation, in English, prior to your departure to Russia. As a result of the disapproval, you are required to submit medical documentation, in English, to support your absences. This time period must be covered to avoid being placed in Absent Without Leave

**Fact No. 103**. Despite Ms. Dunkelberger **knew** that in June 2017 I was in Russia, and

despite she **knew** that I would not be able to receive her June 12, 2017 letter that she mailed to

my home postal address in Albuquerque, NM< and despite she **knew** that I would not be able to

respond to this letter, she nevertheless demanded me to IMMEDIATELY return back to work at

the VAMC, and she threatened to fire me if I don't respond and don't return back to work, see

(**ER 03748 Vol. 1, page 290**), "3. Please, contact me **immediately** upon receipt of this letter or

no later than (5 days) upon receipt of this letter. I can be reached at (505) 265-1711, extension

4617 or (505) 269-5035. Again, I must stress to you that it is YOUR responsibility to ensure any

absences are covered by approved leave requests. Failure to return to duty immediately or

comply with the above requirements may result in disciplinary action up to and including your

removal from Federal service."

3. Please contact me **immediately** upon receipt of this letter or no later than (5 days) upon receipt of this letter. I can be reached at (505) 265-1711, extension 4617 or (505) 269-5035. Again, I must stress to you that it is YOUR responsibility to ensure any absences are covered by approved leave requests. Failure to return to duty immediately or comply with the above requirements may result in disciplinary action up to and including your removal from Federal service.

**Fact No. 104**. Ms. Dunkelberger **knew** about the available paid leave options, see her June 12, 2017 letter to me (**ER 03748 Vol. 1, page 290**), "2…. In addition, I am enclosing … **Voluntary Leave Transfer Program**; …"

> 2. I am enclosing an OPM 71, Request for Leave or Approved Absence, for your use. In addition, I am enclosing Medical Center Memorandum (MCM) 05-11, Title 5 Leave Policy; MCM 05-24, Voluntary Leave Transfer Program; MCM 05-36, and MCM 05-8, Tours of Duty.

**Fact No. 105**. Despite Ms. Dunkelberger **already** placed me on the Absent Without Leave (the AWOL) starting May 21, 2017 (**ER 03748 Vol. 1, page 297-299**), in her June 12, 2017 letter she prevented me that I was at risk of being placed on the AWOL (**ER 03748 Vol. 1, page 290**), "This time period must be covered **to avoid being placed in Absent Without Leave (AWOL) status**."

> absences. This time period must be covered to avoid being placed in Absent Without Leave (AWOL) status.

**Fact No. 106**. The June 12, 2017 letter was unclaimed, and it was returned back to the VAMC, see (**ER 03748 Vol. 1, page 291**),

"USPS Tracking Results

Tracking Number: 70141200000081360083

Date & Time: June 13, 2017, 11:12 am

STATUS OF ITEM: Notice Left (No Authorized Recipient Available)

LOCATION: ALBUQUERQUE, NM 87108

We attempted to deliver your item at 11:12 am on June 13, 2017 in ALBUQUERQUE, NM 87108 and a notice was left because an authorized recipient was not available. You may arrange redelivery by using the Schedule a Redelivery feature on this page or may pick up the item at the Post Office indicated on the notice beginning June 14, 2017. If this item is unclaimed by June 28, 2017 then it will be returned to sender."

See (**ER 03748 Vol. 1, page 291**),

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| June 13, 2017, 11:12 am | Notice Left (No Authorized Recipient Available) | ALBUQUERQUE, NM 87108 |

▲

We attempted to deliver your item at 11.12 am on June 13, 2017 in ALBUQUERQUE, NM 87108 and a notice was left because an authorized recipient was not available. You may arrange redelivery by using the Schedule a Redelivery feature on this page or may pick up the item at the Post Office indicated on the notice beginning June 14, 2017. If this item is unclaimed by June 28, 2017 then it will be returned to sender.

| | | |
|---|---|---|
| June 13, 2017, 2:52 am | Departed USPS Facility | ALBUQUERQUE, NM 87101 |
| June 12, 2017, 9:01 pm | Arrived at USPS Facility | ALBUQUERQUE, NM 87101 |

See (**ER 03748 Vol. 1, page 291**),

USPS.com® - USPS Tracking® Results

*02 6/28/17*  Page 1 of 4

# USPS Tracking° Results

**FAQs**   (http://faq.usps.com/?articleid=220900)

**Track Another Package  +**

Remove

**Tracking Number: 70141200000081360083**

**In-Transit**

## Product & Tracking Information

**See Available Actions**

**Postal Product:**      **Features:**
                         Certified Mail™

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| June 13, 2017, 11:12 am | Notice Left (No Authorized Recipient Available) | ALBUQUERQUE, NM 87108 |

We attempted to deliver your item at 11.12 am on June 13, 2017 in ALBUQUERQUE, NM 87108 and a notice was left because an authorized recipient was not available. You may arrange redelivery by using the Schedule a Redelivery feature on this page or may pick up the item at the Post Office indicated on the notice beginning June 14, 2017. If this item is unclaimed by June 28, 2017 then it will be returned to sender

| June 13, 2017, 2:52 am | Departed USPS Facility | ALBUQUERQUE, NM 87101 |
| June 12, 2017, 9:01 pm | Arrived at USPS Facility | ALBUQUERQUE, NM 87101 |

**Fact No. 107**. Despite I never received the June 12, 2017 Ms. Dunkelberger's letter because it had been returned to the VAMC, Ms. Dunkelberger reported to Dr. Prince that I hadn't responded to the letter, that I didn't return back to work to the VAMC, and Ms. Dunkelberger obtained Dr. Prince's permission to fire me.

See Dr. Prince's March 15, 2018 EEO Interrogatory (**ER 03748 Vol. 1, pages 243-244**),

"**What was your role in the circumstances surrounding this event?**

A My role would have been to review the evidence packet with Ms. Dunkelberger and Ms. Bonin and to concur with the requested termination.

**Q Okay. What was your justification for your actions when these events occurred and the complainant was terminated?**

A From what I remember, the evidence packet was pretty solid as far as the AWOLs, the attempt to contact, **the letters sent to the only address we had**, because our HR requires we send certified letters to the address of record. **That was completed with no response**; and therefore, I supported the request for termination during probation."

24        What was your role in the circumstances
25    surrounding this event?

```
1      A    My role would have been to review the evidence
2    packet with Ms. Dunkelberger and Ms. Bonin and to
3    concur with the requested termination.
4      Q    Okay.  What was your justification for your
5    actions when these events occurred and the complainant
6    was terminated?
7      A    From what I remember, the evidence packet was
8    pretty solid as far as the AWOLs, the attempt to
9    contact, the letters sent to the only address we had,
10   because our HR requires we send certified letters to
11   the address of record.  That was completed with no
12   response; and therefore, I supported the request for
13   termination during probation.
```

**Fact No. 108**. Prior to firing me, the New Mexico VA Health Care System did not give me a Notice and an opportunity t be heard.

a)  See Dr. Prince's March 15, 2018 EEO Interrogatory (**ER 03748 Vol. 1, page 244**),

"**Q Did you discuss the termination with the complainant prior to her being terminated?**

A No, sir."

```
14        Q    Did you discuss the termination with the
15   complainant prior to her being terminated?
16        A    No, sir.
```

b) See Dr. Prince's March 15, 2018 EEO Interrogatory (**ER 03748 Vol. 1, page 245**),

**"Q Did the complainant tell you that she felt she was being discriminated against**

**when this occurred?**

A No, sir. I've never had a conversation with this employee -- former employee."

```
15        Q    Did the complainant tell you that she felt she
16   was being discriminated against when this occurred?
17        A    No, sir.  I've never had a conversation with
18   this employee -- former employee.
```

**Fact No. 109**. After Dr. Prince learned that the reason of my 2017 trip to Russia was an

IVF procedure, she still refused to reinstate me back to work, see Dr. Prince's March 15, 2018

EEO Interrogatory (**ER 03748 Vol. 1, page 245**),

**"Q Do you have anything to offer the complainant in resolution of this claim?**

A No, sir."

```
19        Q    Do you have anything to offer the complainant
20   in resolution of this claim?
21        A    No, sir.
```

- 103 -

**Fact No. 110.** After I arrived at Russia and started my full medical examination, my doctor referred me to an **unexpected** surgery (the removal of a cervical polyp.) After the surgery, I needed to wait for ten calendar days to obtain a pathology result. Afterwards, my doctor directed me to perform the hormonal blood tests for the levels of the Folliclestimulating Hormone (the FSH) and the Antimullerian Hormone (the AMH) on a definite day of a menstrual cycle. It meant that I needed to stay in Russia for a longer time that I had expected because I needed to obtain the pathology results and to perform my blood hormonal tests on the definite day of a menstrual cycle. I realized that I would not have an opportunity to return back to Albuquerque, NM on July 07, 2017.

**Fact No. 111**. On **July 01, 2017** that was **prior** to July 07, 2017 (the date until which I requested a LWOP), I emailed to both Ms. Dunkelberger and Mr. Johnson, and I informed them about my unexpected surgery and about my need to stay in Russia for a longer time to obtain the pathology results and to perform the blood tests for the FSH and the AMH (**ER 03748 Vol. 1, pages 43 and 301**),

"Dear Carla and Phil!

How are you?

I spent time getting fully examined before the IVF procedure. Unpleasantly, a gynecologist found a polyp of the cervical canal, and I got it removed. I waited for the pathology

result which was good. Now, the gynecologist wants me to get other blood tests for Folliclestimulating Hormone (FSH) and Antimullerian Hormone (AMH). I will have to do it at the beginning of the next menstrual period which will be in approximately 7-8 days. After I get the results, the gynecologist will let me know if I am eligible for the IVF cycle. I hope I am eligible. However, I will have to stay in Russia for 2-3 more weeks than I expected. Initially, I was planning to return back to the United States on July 7th. I will not be able to do it because I will have to wait until I can get the blood tests done for FSH and AMH. I requested another letter from my gynecologist confirming that currently I am getting examined in Novosibirsk for my IVF cycle. The gynecologist promised to give me this letter on Thursday next week. As soon as I get the letter, I will get it translated and forward it to you.

Please, allow me to spend other 2-3 weeks in Russia. Please, send me a form that I can fill out and return to you if necessary.

Thank you so much,

Respectfully,

Tanya Drevaleva."

See (**ER 03748 Vol. 1, page 43**),

## from Tanya Drevaleva from Siberia.

Tatyana Drevaleva <tdrevaleva@gmail.com>                                Sat, Jul 1, 2017 at 7:10 AM
To "Dunkelberger, Carla" <Carla.Dunkelberger@va.gov>, Phil Johnson <Footerphil@gmail.com>

Dear Carla and Phil!

How are you?

I spent time getting fully examined before the IVF procedure. Unpleasantly, a gynecologist found a polyp of the cervical canal and I got it removed. I waited for the pathology result which was good. Now, the gynecologist wants me to get other blood tests for Folliclestimulating Hormone (FSH) and Antimullenan Hormone (AMH). I will have to do it at the beginning of the next menstrual period which will be in approximately 7-8 days. After I get the results, the gynecologist will let me know if I am eligible for the IVF cycle. I hope I am eligible. However, I will have to stay in Russia for 2-3 more weeks than I expected. Initially, I was planning to return back to the United States on July 7th. I will not be able to do it because I will have to wait until I can get the blood tests done for FSH and AMH.

I requested another letter from my gynecologist confirming that currently I am getting examined in Novosibirsk for my IVF cycle. The gynecologist promised to give me this letter on Thursday next week. As soon as I get the letter, I will get it translated and forward it to you.

Please, allow me to spend other 2-3 weeks in Russia. Please, send me a form that I can fill out and return to you if necessary.

Thank you so much.

Respectfully,

Tanya Drevaleva.

**Fact No. 112**. On July 03, 2017 at 1.46 PM, I received an email from Ms. Dunkelberger that informed me that my full time job at the Raymond G. Murphy VAMC had been terminated "due to attendance issues" on June 30, 2017 (**ER 03748 Vol. 1, pages 35-38.**) Prior to receiving this email, I didn't get a Notice, and I was not given an opportunity to be heard.

Please, read the plain language of the Termination Letter (**ER 03748 Vol. 1, page 37**),

"2. The Associate Director, Patient Care Services, has recommended that you be terminated front your position for failure to qualify during your probationary period. Your termination is **due to attendance issues**."

your position for failure to qualify during your probationary period.  Your termination is due to attendance issues.

**Fact No. 113.** Prior to receiving the Termination Letter, I did not receive a Notice, and I was not given an opportunity to be heard.

**Fact No. 114**. On July 03, 2017 at 2.02 PM, I sent an email to Ms. Dunkelberger, and I asked her why she terminated my employment prior to July 07, 2017 (**ER 03748 Vol. 1, page 44**.) Here is the plain text of my July 03, 2017 email,

"Good afternoon Carla!

Why did you terminate my employment?

I submitted the proof that I would go to Russia to solve my medical problems (to perform an IVF procedure). I submitted the proof (a letter from my Russian physician) that I would be doing an IVF procedure in Russia. I submitted a request form to you where I asked you to allow

me to be absent from work from May 18th, 2017 **to July 7th, 2017**. You terminated my employment **on June 30th, 2017 which is before July 7th, 2017**. Please, give me the answer.

Thank you,

Respectfully,

Tatyana Drevaleva."

**Fact No. 115**. Ms. Dunkelberger never responded to my July 03, 2017 email. See Zack's June 04, 2021 Answer (Doc. No. 396), page 6, line 14, "Defendants admit that Ms. Dunkelberger did not respond to Plaintiff's email."

14 ‖ allegations. Defendants admit that Ms. Dunkelberger did not respond to Plaintiff's email. Defendants

**Fact No. 116.** On July 06, 2017, I obtained the second medical documentation from my Russian OB/GYN that confirmed that I needed to stay in Russia for a longer time to undergo a complete medical examination. On July 14, 2017 at 4.05 AM, I emailed a translated version of this second medical documentation to Mr. Winter, Ms. Dunkelberger and Mr. Johnson (**ER 03748 Vol. 1, pages 39-41.**) Here is a plain language of my July 14, 2017 email to Mr. Winter, Ms. Dunkelberger, and Mr. Johnson, "Here is a translated document dated July 6th, 2017 that I needed to spend more time in Russia for additional examination regarding my IVF procedure.

Respectfully,

Tatyana Drevaleva."

See (**ER 03748 Vol. 1, page 40**),

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                           Fri, Jul 14, 2017 at 4:05 AM
To: "Winter, William (ORM)" <william.winter@va.gov>, "Dunkelberger, Carla" <Carla.Dunkelberger@va.gov>,
Phil Johnson <Footerphil@gmail.com>

See (**ER 03748 Vol. 1, page 40**),

 Gmail

                                                            Tatyana Drevaleva <tdrevaleva@gmail.com>

**Перевод**

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                           Fri, Jul 14, 2017 at 4:05 AM
To: "Winter, William (ORM)" <william.winter@va.gov>, "Dunkelberger, Carla" <Carla.Dunkelberger@va.gov>,
Phil Johnson <Footerphil@gmail.com>

Here is a translated document dated July 6th, 2017 that I needed to spend more time in Russia for
additional examination regarding my IVF procedure.
Respectfully,
Tatyana Drevaleva.

[Quoted text hidden]
--
Respectfully
Tanya

^C9C0D5ADD7BF3EB5B57464DCD15E9020F335DC86019A6F1A41^pimgo_
distr.jpg
137K

**Fact No. 117.** Read the plain language of the July 06, 2017 letter from my Russian physician (**ER 03748 Vol. 1, page 41**),

"State Budgetary Public Health Care Institution of Novosibirsk Oblast[17]

Clinical Centre of Family Health Care and Reproduction

Outpatient Department

14 Kievskaya St., Novosibirsk

**State Budgetary Public Health Care Institution of Novosibirsk Oblast Clinical Centre for Planned Parenthood and Reproduction**

14 Kievskaya St., Novosibirsk-136, 630136

06 July, 2017

**Medical Assessment Report**

---

[17] The Novosibirsk Region, the Russian Federation.

Name: <u>Tatyana</u> Patronymic Name: Evgenievna Surname: Drevaleva

Date of birth: 13/10/1966

Received medical advice on_____

Diagnosis: Primary infertility of combined genesis.

T.E. Drevaleva is currently put in the registry for providing a program for in-vitro fertilization at the expense of the compulsory medical insurance. The queue code number is 147.

According to the Order of the Ministry of Health of the Russian Federation No. 107н dd. 30/08/2012 on Arrangements for the Use of Assisted Reproductive Technologies, Contraindications and Limitations for their Use, the patient T.E. Drevaleva currently has limitations for using the in-vitro fertilization program and require additional follow-up examination.

Head of the Outpatient Department of the Clinic [Signature] M.P. Oparina

Head of the Reproductive Health Department [Signature]

[Seal] State Budgetary Public Health Care Institution of Novosibirsk Oblast

Clinical Centre of Family Health Care and Reproduction

Outpatient Department

For references

Novosibirsk, Russia

I, Denis Alexandrovich Adamov, certify that I am fluent in the English and Russian languages, and that the above document in an accurate translation of the document entitled "Medical Assessment Report." "

See (**ER 03748 Vol. 1, page 41**),

Diagnosis: Primary infertility of combined genesis
1.E. Drevaleva currently is put in the registry for providing a program of in vitro fertilization at the expense of the compulsory medical insurance. The queue code number is 147
According to the Order of the Ministry of Health of the Russian Federation No. 107n dd 30.08.2012 on Arrangements for the Use of Assisted Reproductive Technologies. Contraindications and Limitations to their Use, the patient I.E. Drevaleva currently has limitations for using the in vitro fertilization program and require additional follow-up examination

See (**ER 03748 Vol. 1, page 41**),



**АГЕНТСТВО ПЕРЕВОДОВ МОНОТОН**
**MONOTON TRANSLATION AGENCY**

[Stamp]: State Budgetary Public Health Care Institution of Novosibirsk Oblast
Clinical Centre of Family Health Care and Reproduction
Outpatient Department
14 Kievskaya St., Novosibirsk

**State Budgetary Public Health Care Institution of Novosibirsk Oblast Clinical Centre for**
**Planned Parenthood and Reproduction**
14 Kievskaya St., Novosibirsk-136, 630136

06 July 2017

**Medical Assessment Report**

Name: Latyana Patronymic: Evgenievna Surname: Drevaleva
Date of birth 13 10 1966

Received a medical advice on ___ ___

Diagnosis: Primary infertility of combined genesis
T.E. Drevaleva currently is put in the registry for providing a program of in vitro fertilization at the expense of the compulsory medical insurance. The queue code number is 147
According to the Order of the Ministry of Health of the Russian Federation No 107н dd 30.08.2012 on Arrangements for the Use of Assisted Reproductive Technologies, Contraindications and Limitations to their Use, the patient T.E. Drevaleva currently has limitations for using the In vitro fertilization program and require additional follow-up examination

Head of the Outpatient Department of the Clinic [Signature] M.P. Oparina
Head of the Reproductive Health Department [Signature]

[Seal]: State Budgetary Public Health Care Institution of Novosibirsk Oblast
Clinical Centre of Family Health Care and Reproduction
Outpatient Department
For references
Novosibirsk, Russia

I, Denis Alekseedovich Adamov, certify that I am fluent in the English and Russian languages, and that the above document is an accurate translation of the document entitled «Medical Assessment Report»

- 113 -

**Fact No. 118**. Both Ms. Dunkelberger and Mr. Johnson never responded to my second medical certification. See Zack's June 04, 2021 Answer (Doc. No. 396), page 6, limes 21-22, "Defendants admit that Ms. Dunkelberger and Mr. Johnson did not respond to Plaintiff's emails."

21 │ with the text of the document. Defendants deny the allegations. Defendants admit that Ms.

22 │ Dunkelberger and Mr. Johnson did not respond to Plaintiff's emails. Defendants are without sufficient

**Fact No. 119.** On July 20, 2017 at 7.23 PM, I sent another email to Mr. Winter, Ms. Dunkelberger, and Mr. Johnson (**ER 03748 Vol. 1, page 45**),

"Good afternoon William, Carla and Phil!

How are you?

Bad news - I was discharged from the IVF protocol yesterday because, despite stimulation for 7 days, follicles were not growing.

1 want to spend 10-14 more days in Novosibirsk and have another pelvic ultrasound examination. If the follicles start growing, I will perform the IVF procedure. If not, I will fly to the USA.

I will let you know the date of my arrival to the USA. I will be happy to have a Mediation process with you and convince you to reinstate me back to work.

Thank you,

Respectfully,

Tatyana Drevaleva."


**Fact No. 120.** On July 27, 2017 at 7.09 PM, I sent another email to Mr. Winter, Ms. Dunkelberger, and Mr. Johnson (**ER 03748 Vol. 1, page 46**),

"Dear William, Carla and Phil!

Good news - my follicles started growing up. I had a pelvic ultrasound examination yesterday. The size of the follicles is 13 millimeters now versus 4 millimeters a week ago. The doctor wants to continue observing the follicles. I will have another pelvic ultrasound examination tomorrow.

I will keep you posted.

Have a wonderful and blessing day,

Tatyana."

**Fact No. 121**. Both Ms. Dunkelberger and Mr. Johnson never responded to my July 20 and July 27, 2017 emails.

Please, read Zack's Answer (Doc. No. 396), page 7, lines 5-6, "Defendants admit that Ms. Dunkelberger and Mr. Johnson did not respond to Plaintiff's emails."

5 ‖ documents is inconsistent with the text of the documents. Defendants deny the allegations.  Defendants

6 ‖ admit that Ms. Dunkelberger and Mr. Johnson did not respond to Plaintiff's emails.  Defendants are

**Fact No. 122.** On August 10, 2017 at 5.23 PM, I sent another email to Mr. Winter, Ms. Dunkelberger, and Mr. Johnson (**ER 03748 Vol. 1, page 47**),

"Dear Mr. Winter, Carla and Phil!

I will fly back to the USA on August 17th. Please, schedule a Mediation process as soon as possible to August 17th.

Respectfully,

Tatyana Drevaleva."

**Fact No. 123**. Both Ms. Dunkelberger and Mr. Johnson never responded to my August 10, 2017 email. Please, see Zack's Answer (Doc. No. 296), page 7, lines 13-14, "Defendants admit that Ms. Dunkelberger and Mr. Johnson did not respond to Plaintiff's emails."

13 | with the text of the document. Defendants deny the allegations. Defendants admit that Ms
14 | Dunkelberger and Mr. Johnson did not respond to Plaintiff's emails. Defendants are without sufficient

**Fact No. 124**. On August 17, 2017, I arrived at the JFK airport in New York, and I called the Raymond G. Murphy VAMC from the airport. I asked whether the VAMC scheduled the Mediation. I was told that the Mediation would occur not earlier than in two weeks. For me, it was impossible to fly from New York to Albuquerque, New Mexico because I didn't have a job in New Mexico, I didn't have my own place of living in New Mexico, I didn't have money, and I couldn't pay rent. On August 17, 2017, I flew to California from New York because I was hoping to stay at my friends' places in California. I couldn't do it in New Mexico.

**Fact No. 125.** After my arrival at California, the Raymond G. Murphy VAMC emailed me am "Agreement to Mediate and a Confidentiality Agreement" (**ER 03748 Vol. 1, pages 49-50**) which I signed on August 30, 2017 (**ER 03748 Vol. 1, page 50.**) I was invited to one of the VA facilities in California for the video Mediation. The video Mediation occurred on September 07, 2017. Ms. Dunkelberger and Acting Human Resources Officer Mr. Thomas E. Harris, Sr. were present at the Mediation.

**Fact No. 126.** On September 07, 2017, during the video Mediation, Ms. Dunkelberger said to me that my Request for a LWOP (my OPM 71 form) was denied by Dr. Prince. Therefore, **September 07, 2017** was the first day when I found out that my Request for a LWOP had been denied by Dr. Prince. It was a big surprise to me because, during my stay in Russia, nobody told me that my Request for a LWOP had been denied by Dr. Prince. During the September 07, 2017 Mediation, Ms. Dunkelberger also said to me that on June 12, 2017 she mailed a letter to my home postal address in Albuquerque, NM with the denial letter, and she requested me to immediately return back to work at the VAMC (**ER 03748 Vol. 1, page 290**.)

**Fact No. 127**. Please, read the plain language of the June 12, 2017 letter (**ER 03748 Vol. 1, page 290**),

"6/28/17

501/118

Tatyana E. Drevaleva

431 Alcazar Street, NE

Albuquerque, NM, 87108

Subj: Leave Request Clarification

1.  This letter is to notify that on May 17, 2017, you submitted a Leave Without Pay (LWOP) request on an OPM Form 71, Request for Leave or Approved Absence from May 18, 2017 through July 07, 2017. However, your request was disapproved (see attached). You did not submit the required medical documentation, in English, prior to your departure to Russia. As a result of the disapproval. You are required to submit medical documentation, in English, to support your absence. This time period must be covered to avoid being placed in Absent Without Leave (AWOL) status.

2.  I am enclosing an OPM 71, Request for Leave or Approved Absence, for your use. In addition, I am enclosing Medical Center Memorandum (MCM) 05-11, Title 5 Leave Policy; MCM 05-24, Voluntary Leave Transfer Program; MCM 05-36, and MCM 05-8 Tours of Duty.

3.  Please, contact me **immediately** upon receipt of this letter or no later than (5 days) upon receipt of this letter. I can be reached at (505) 265-1711, extension 4617 or (505) 269-5035. Again, I must stress to you that it is YOUR responsibility to ensure any absences are covered by approved leave requests. Failure to return to duty immediately or comply with the above requirements may result in disciplinary action up to and including your removal from Federal service.

[Signature]  **6/9/17**

Carla J. Dunkelberger

Nurse Manager, 5DT

Certified Mail Receipt

**6/12/17**

Tatyana Drevaleva

431 Alcazar St. NE

ABQ, NM, 87108."

**Fact No. 128.** Please, notice the following facts:

1) The letter was mailed on June 12, 2017 to my home postal address in Albuquerque, NM despite Dunkelberger knew that at that time I was in Russia, and that I would not be able to receive this letter and to respond

2) Dunkelberger knew that I had just relocated from California and that I didn't have any relatives in Albuquerque, NM who would be able to receive the letter and to notify me about it

3) The letter was not emailed to me. Please, read Defendants October 26, 2018 [PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND GRANTING LIMITED LEAVE TO AMEND (**ER 03748 Vol. 2, page 414, lines 15-17**), "While in Russia, plaintiff got the medical document translated and she emailed it to her supervisor on May 30, 2017. Meanwhile, plaintiff's request for leave without pay had been denied and a letter to that effect was sent to her mailing address, **but not emailed to her**."

4) In her letter that Dunkelberger signed on June 09, 2017, Dunkelberger claimed that I had not provided the VAMC with my medical documentation on English language. It was a Libel. On May 30, 2017 at 8.05 AM, I emailed my medical document on English language to both Dunbelberger and Johnson, see (**ER 03748 Vol. 1, pages 32-33**.)

**Fact No. 129.** During the EEO investigation, the Raymond G. Murphy provided the EEO Investigator Mr. Dennis Hayo with the evidence that on May 30, 2017 both Dunkelberger and Johnson actually received the translated into English language version of my medical documentation (**ER 03748 Vol. 1, page 265**.) However, in her letter that was signed on June 09, 2017 and that was mailed to my home postal address in Albuquerque, NM on June 12, 2017, Dunkelberger claimed that (**ER 03748 Vol. 1, page 290**), "You are required to submit medical documentation, in English, to support your absence."

- 121 -

Fact No. 130. During the September 07, 2017 video Mediation, Dunkelberger said that she had followed the VAMC's policies that instructed her to mail a letter to the home postal address that was on file. I asked Dunkelberger why she didn't email this letter to my email address. Dunkelberger responded that, because this letter was not encrypted, the VAMC's security policies didn't allow to email this letter to me. It was a Libel because the June 30, 2017 Termination Letter was not encrypted, and Dunkelberger emailed this letter to my email address.

Fact No. 131. The June 12, 2017 letter that was mailed to my home postal address in Albuquerque, NM was unclaimed, and it was returned back to the VAMC, see (**ER 03748 Vol. 1, page 291**),

"USPS Tracking Results

Tracking Number: 70141200000081360083

Date & Time: June 13, 2017, 11:12 am

STATUS OF ITEM: Notice Left (No Authorized Recipient Available)

LOCATION: ALBUQUERQUE, NM 87108

We attempted to deliver your item at 11:12 am on June 13, 2017 in ALBUQUERQUE, NM 87108 and a notice was left because an authorized recipient was not available. You may

arrange redelivery by using the Schedule a Redelivery feature on this page or may pick up the item at the Post Office indicated on the notice beginning June 14, 2017. If this item is unclaimed by June 28, 2017 then it will be returned to sender."

**Fact No. 132**. During the September 07, 2017 Mediation, Ms. Dunkelberger said that, because I didn't provide her with my medical documentation on English language, because I didn't respond to the June 12, 2017 letter, and because I didn't return back to work, she fired me.

Ms. Dunkelberger refused to listen to my explanations that I had never received the June 12, 2017 letter because it was mailed to my home postal address in Albuquerque, NM, and I was in Russia at that time.

**Fact No. 133.** During the Mediation, I said to Dunkelberger that I'd had no idea about the June 12, 2017 letter. I said to her that I had emailed her my medical documentation on both Russian and English languages. I asked Dunkelberger to reinstate me back to work. Dunkelberger refused. See Zack's June 04, 2021 Answer (Doc. No. 396), page 8, lines 18-19, "9:12-15: Defendants admit that **Plaintiff was not reinstated to her former position at the Albuquerque VAMC**."

18 │     9:12-15:  Defendants admit that Plaintiff was not reinstated to her former position at the
19 │ Albuquerque VAMC.  Defendants admit that Plaintiff filed a formal Complaint of Employment

**Fact No. 134**. In 2021, I learned that Ms. Dunkelberger didn't have any right to mail the leave request clarification form to my home postal address in Albuquerque, NM because, according to the VAMC's internal policies, this letter contained the **strictly confidential information about my request for a Leave Without Pay**.

See a detailed explanation in my July 24, 2021 filing named "The VHA's Circular 00-91, Elimination of Direct Mailing of Employee Earning and Leave Statements, 1993, available on the AFGE web-site" (Doc. No. 441.) According to the VAMC/s policy, the VAMC was obligated to do all of the following:

    1)  to invite me to the facility, and

    2)  to personally give me Dr. Prince's denial letter

    3)  in a sealed envelope

    4)  to endure a privacy.

**Fact No. 135**. On September 18, 2017 at 4.08 PM, I sent a letter to Ms. Cheryl Eliano who is a District 10 National Vice President of the American Federation of Government Employees (**ER 03748 Vol. 1, pages 65-67**) and (**ER 03748 Vol. 1, pages 185-187**.) I explained to Ms. Eliano about the termination of my employment from the Raymond G. Murphy VAMC,

and I asked to assist me to get reinstated back to work. Please, read the plain language of my letter to Ms. Eliano (**ER 03748 Vol. 1, pages 66-67**) and (**ER 03748 Vol. 1, pages 185-187**),

"Dear Cheryl!

My name is Tatyana Drevaleva. I was hired as a Monitor Technician at 5D at Albuquerque VAMC on April 3rd, 2017. In May 2017, I informed Manager Mrs. Carla Dunkelberger that I needed to go to Russia for an IVF attempt because I wanted to have children. I also informed Assistant manager Mr. Phil Johnson that I needed to go to Russia for the IVF attempt, I was taking hormonal pills, and I was running out of these pills. It was impossible to obtain these pills in the USA. Mr. Johnson verbally allowed me to go to Russia for the IVF attempt. On May 18th, 2017, I emailed Mrs. Dunkelberger and Mr. Johnson a document from my Russian OB/GYN confirming that I was in registry for the IVF attempt in Novosibirsk, Russia, and I needed to be there to perform the IVF attempt. This document was on Russian language. Also, I filled out the form asking for leave without pay from May 18th, 2017 to July 7, 2017. I left Albuquerque on May 18th, 2017. After I arrived at Novosibirsk, Russia, I got this document from my OB/GYN translated, and I emailed it to Mrs. Dunkelberger and Mr. Johnson.

My IVF attempt in Russia lasted for three months. Initially, my OB/GYN requested me to pass all lab tests, EKG, colposcopy, etc. Later, the doctor found a cervical polyp and requested to remove it. I had surgery on June 13th, 2017. Afterwards, I waited for the pathology result. After I got that result, the OB/GYN requested me to determine the level of hormones FSH (Follicle Stimulating Hormone) and AMH (Anti-Mullerian Hormone) that needed to be done on the

second day of my menstrual period. I waited for 14 days for the menstrual period. Afterwards, there was an actual attempt of IVF. Unfortunately, it was unsuccessful.

As soon as I realized that I needed to stay in Russia longer that July 7th, I emailed Mrs. Dunkelberger and Mr. Johnson, and I let them know that my OB/GYN requested additional tests (FSH and AMH), and I needed to stay in Russia for a longer time. I provided Mrs. Dunkelberger and Mr. Johnson with another document from my Russian physician confirming that I needed to stay in Russia for a longer time for additional examinations. However, Mrs. Dunkelberger fired me on June 30th – even before July 7th.

I contacted Mr. William Winter who is an EEO Counselor. He promised to schedule the Mediation date after I arrive back to the USA.

I returned back to the USA on August 18th. I contacted Mr. Winter, and he scheduled the Mediation process on September 7th. I went to the Mediation (the process was on Tele because I was in California. I was unemployed, I didn't have money to pay rent, and this was why I returned back to California to stay with some of my Russian friends). During the Mediation, Mrs. Dunkelberger said that she had submitted my written request for leave without pay to Dr. Prince. Dr. Prince denied my request because, according to Family Medical Leave Act, I qualified for Leave without Pay only after 12 months of working at the VA, and at that time I was working for only 1.5 months. I said that I didn't have an opportunity to wait for 12 months because I was running out of hormonal pills, I couldn't refill this prescription in the USA, and I was in registry for a free IVF attempt. I waited in line for this IVF attempt for 9 months, and my turn finally

came. Mrs. Dunkelberger said that the decision of Dr. Prince was mailed to my Albuquerque home postal address. Mrs. Dunkelberger said that I hadn't come back to work and I hadn't contacted with her after sending Dr. Prince's letter. I answered that there was no chance for me to get and read that mail because I was out of country, and Mrs. Dunkelberger knew it. I asked why she didn't email Dr. Prince's decision to my private email address. Mrs. Dunkelberger said that the letter was not encrypted, and she couldn't have emailed it to me. This was not true because she emailed me the termination Letter which was not encrypted. However, Mrs. Dunkelberger refused to reinstate me back to work.

During the Mediation, Director of Human Resources Mr. Thomas Harris requested my home postal address in California. He gave me his email address which is Thomas.Harris3@va.gov He promised to send me Dr. Prince's decision. On September 8th, 2017 I emailed Mr. Harris, and I provided him with my home postal address in California. He never replied, and I never got any document in mail from him.

I informed Mr. Winter that my intention was to file a formal EEO complaint. Also, I decided to contact with the Union and ask the Union to assist me to get reinstated back to work. From my point of view, I eft Albuquerque VAMC for the medical purpose, and I left with the permission of the Assistant Manager. It is not my fault that Mrs. Dunkelberger didn't inform me via email that my request for leave without pay was denied by Dr. Prince. I feel discriminated, retaliated and unlawfully terminated based on my disability to give birth to children. Also, I feel discriminated against my age (50 yo). Talking to my former colleagues over the phone, I found

out that Mrs. Dunkelberger hired two males for the positions of Monitor Technician. Obviously,

male employees will not have problems related to pregnancy. Also, the ages of these employees

are 30 yo and approximately 35 yo – much younger than I am.

I am asking the Union to assist me to get reinstated back to work.

Please, respond to my private email address tdrevaleva@gmail.com

You may call me any time. My cell phone number is 415-806-9864.

Thank you, have a wonderful day,

Respectfully,

Tatyana."

**Fact No. 136**. On September 19, 2017, I filed a formal EEO Complaint No. 200P-0501-

2017103883 (**ER 03748 Vol. 1, pages 123-125**.) Please, notice that my formal EEO Complaint

was a copy of my September 18, 2017 letter to Ms. Eliano. Please, read the plain language of my

formal EEO Complaint (**ER 03748 Vol. 1, pages 124-125**)[18],

---

[18] Please, notice that the Office of Resolution Management intentionally and maliciously redacted the plain text of my formal EEO Complaint and removed all information that was related to my disability.

"My name is Tatyana Drevaleva. I was hired as a Monitor Technician at 5D at Albuquerque VAMC on April 3rd, 2017. In May 2017, I informed Manager Mrs. Carla Dunkelberger that I needed to go to Russia for an IVF attempt because I wanted to have children. I also informed Assistant manager Mr. Phil Johnson that I needed to go to Russia for the IVF attempt, I was taking hormonal pills, and I was running out of these pills. It was impossible to obtain these pills in the USA. **Mr. Johnson verbally allowed me to go to Russia for the IVF attempt.** On May 18th, 2017, I emailed Mrs. Dunkelberger and Mr. Johnson a document from my Russian OB/GYN confirming that I was in registry for the IVF attempt in Novosibirsk, Russia, and I needed to be there to perform the IVF attempt. This document was on Russian language. Also, I filled out the form asking for leave without pay from May 18th, 2017 to July 7, 2017. I left Albuquerque on May 18th, 2017. After I arrived at Novosibirsk, Russia, I got this document from my OB/GYN translated, and I emailed it to Mrs. Dunkelberger and Mr. Johnson.

My IVF attempt in Russia lasted for three months. Initially, my OB/GYN requested me to pass all lab tests, EKG, colposcopy, etc. Later, the doctor found a cervical polyp and requested to remove it. I had surgery on June 13th, 2017. Afterwards, I waited for the pathology result. After I got that result, the OB/GYN requested me to determine the level of hormones FSH (Follicle Stimulating Hormone) and AMH (Anti-Mullerian Hormone) that needed to be done on the second day of my menstrual period. I waited for 14 days for the menstrual period. Afterwards, there was an actual attempt of IVF. Unfortunately, it was unsuccessful.

As soon as I realized that I needed to stay in Russia longer that July 7th, I emailed Mrs. Dunkelberger and Mr. Johnson, and I let them know that my OB/GYN requested additional tests (FSH and AMH), and I needed to stay in Russia for a longer time. I provided Mrs. Dunkelberger and Mr. Johnson with another document from my Russian physician confirming that I needed to stay in Russia for a longer time for additional examinations. However, Mrs. Dunkelberger fired me on June 30th – even before July 7th.

I contacted Mr. William Winter who is an EEO Counselor. He promised to schedule the Mediation date after I arrive back to the USA.

I returned back to the USA on August 18th. I contacted Mr. Winter, and he scheduled the Mediation process on September 7th. I went to the Mediation (the process was on Tele because I was in California. I was unemployed, I didn't have money to pay rent, and this was why I returned back to California to stay with some of my Russian friends). During the Mediation, Mrs. Dunkelberger said that she had submitted my written request for leave without pay to Dr. Prince. Dr. Prince denied my request because, according to Family Medical Leave Act, I qualified for Leave without Pay only after 12 months of working at the VA, and at that time I was working for only 1.5 months. I said that I didn't have an opportunity to wait for 12 months because I was running out of hormonal pills, I couldn't refill this prescription in the USA, and I was in registry for a free IVF attempt. I waited in line for this IVF attempt for 9 months, and my turn finally came. Mrs. Dunkelberger said that the decision of Dr. Prince was mailed to my Albuquerque home postal address. Mrs. Dunkelberger said that I hadn't come back to work and I hadn't

contacted with her after sending Dr. Prince's letter. I answered that there was no chance for me to get and read that mail because I was out of country, and Mrs. Dunkelberger knew it. I asked why she didn't email Dr. Prince's decision to my private email address. Mrs. Dunkelberger said that the letter was not encrypted, and she couldn't have emailed it to me. This was not true because she emailed me the termination Letter which was not encrypted. However, Mrs. Dunkelberger refused to reinstate me back to work.

During the Mediation, Director of Human Resources Mr. Thomas Harris requested my home postal address in California. He gave me his email address which is [Thomas.Harris3@va.gov](mailto:Thomas.Harris3@va.gov) He promised to send me Dr. Prince's decision. On September 8th, 2017 I emailed Mr. Harris, and I provided him with my home postal address in California. He never replied, and I never got any document in mail from him.

I informed Mr. Winter that my intention was to file a formal EEO complaint. Also, I decided to contact with the Union and ask the Union to assist me to get reinstated back to work. From my point of view, I eft Albuquerque VAMC for the medical purpose, and I left with the permission of the Assistant Manager. It is not my fault that Mrs. Dunkelberger didn't inform me via email that my request for leave without pay was denied by Dr. Prince. I feel discriminated, retaliated and unlawfully terminated based on my disability to give birth to children. Also, I feel discriminated against my age (50 yo). Talking to my former colleagues over the phone, I found out that Mrs. Dunkelberger hired two males for the positions of Monitor Technician. Obviously,

male employees will not have problems related to pregnancy. Also, the ages of these employees are 30 yo and approximately 35 yo – much younger than I am.

Tatyana Drevaleva

September 19, 2017."

**Fact No. 137.** On September 21, 2017 at 9.59 PM, I emailed Ms. Eliano the following letter (**ER 03748 Vol. 1, page 68**) and (**ER 03748 Vol. 1, page 188**),

"Dear Ms. Eliano!

Thank you so much for forwarding my case to Mr. Rael. I got his email today. I filed a formal EEO complaint. I am sending you a copy of that complaint.

Have a good night,

Respectfully,

Tanya."

**Fact No. 138.** On September 21, 2017, I also emailed Ms. Eliano the PDF files of my formal EEO complaint (**ER 03748 Vol. 1, page 68**). Please, notice that the Office of Resolution Management included a copy of my September 21, 2017 letter to Ms. Eliano to the Investigative

File but the ORM removed the PDF files of my formal EEO claim from this letter (**ER 03748 Vol. 1, page 188.**) Please, compare with (**ER 03748 Vol. 1, page 68.**)

**Fact No. 139**. An AFGE representative Ms. Karen Smith was assigned to assist me. Initially, Ms. Smith communicated with me (**ER 03748 Vol. 1, page 69**) and (**ER 03748 Vol. 1, pages 163-165.**) Initially, Ms. Smith communicated with me via email and over the phone (**ER 03748 Vol. 1, page 183.**) Subsequently, Ms. Smith stopped responding to my emails and phone calls.

**Fact No. 140.** On October 20, 2017 at 3.43 PM, Ms. Whitney Stenhouse who is the ORM's EEO Assistant sent an email to Director of the Raymond G. Murphy VAMC Mr. Andrew Welch, to the EEO Program Manager of the Raymond G. Murphy VAMC Mr. Donald Rincon, and to Ms. Amy Shafer (I am not sure what Ms. Shafer's title is) (**ER 03748 Vol. 1, page 140**),

"Dear Sirs,

Please find attached EEO correspondence concerning your facility. If you have questions, please contact the point of contact referenced in the attached correspondence.

Respectfully,

- 133 -

Whitney Stenhouse

EEO Assistant

Department of Veterans Affairs

Office of Resolution Management

Pacific District

Office: (310) 478-3711 ext.48054

Fax: (310) 268-4089."


**Fact No. 141.** On November 07, 2017 at 11.02 AM, the EEO Case Manager Mr. Carlos Funes sent an email to Ms. Any Shafer and the EEO Program Manager Mr. Donald Rincon at the Raymond G. Murphy VAMC (**ER 03748 Vol. 1, page 190**),

"Good Morning:

I am the assigned case manager for the case of Tatyana Drevaleva, 200P-0501-2017103883. We need to clarify an issue to properly review and assess her EEO claim.

1. CP claims that she e-mailed or filed a grievance on 9/18/17 with Ms. Cheryl Eliano. Can you please confirm or provide a copy if complainant filed any such grievance as applicable.

Please provide at your earliest convenience or **by November 13, 2017**. If you have any questions or concerns please feel free to let me know. Thank you for your assistance."

**Fact No. 142.** On November 07, 2017 at 10.07 AM[19], Ms. Amy Shafer responded to Mr. Funes (**ER 03748 Vol. 1, page 190**), "Cheryl Eliano is not listed in VISTA or Outlook."

**Fact No. 143.** On November 07, 2017 at 11.09 AM, the EEO Case Manager Mr. Carlos Funes sent an email to Ms. Any Shafer and the EEO Program Manager Mr. Donald Rincon at the Raymond G. Murphy VAMC (**ER 03748 Vol. 1, page 189**), "Good Morning: I will have to follow up and ask complainant but do you have any record of her filing a union grievance? Thanks."

**Fact No. 144.** On November 15, 2017 at 2.26 PM, the EEO Case Manager Mr. Carlos Funes sent an email to Ms. Amy Shafer and the EEO Program Manager Mr. Donald Rincon at the Raymond G. Murphy VAMC (**ER 03748 Vol. 1 page 189**),

"Good afternoon,

---

[19] Please, take into your consideration the time difference between Albuquerque, NM and Pittsburgh, PA where the ORM is located.

1 was following up on this request for information. Please provide the information if available so we can properly review the complaint and if we do not receive we will have to process the complaint with the information on file. Thank you.

Carlos Funes

EEO Case Manager

Department of Veterans Affairs

Office of Resolution Management Office:

(310) 478-3711 ext. 35819

Fax: (31 0) 268-4089"

**Fact No. 145.** On November 16, 2017, the ORM emailed me and Ms. Karen Smith (**ER 03748 Vol. 1, pages 81-92 and 173-174**) a Notice of Acceptance of the EEO Complaint for Tatyana Drevaleva, Case No. 200P-0501-2017103883, filed September 19, 2017, against officials of the VA Medical Center in Albuquerque, NM (**ER 03748 Vol. 1, pages 163-165**) and a template form of the Interrogatories (**ER 03748 Vol. 1, pages 166-172.**)

**Fact No. 146.** Please, read the plain language of the November 16, 2017 at 3.47 PM email of Ms. Eboney Tolliver who is an EEO Program Assistant of the Office of Resolution Management that was sent to me and to Ms. Karen Smith (**ER 03748 Vol. 1, pages 81**),

"Dear Ms. Smith,

Attached, please find a Notice of Acceptance (PR) letter regarding your client's EEO Complaint ending in 103883. If you have any questions, please contact the point of contact referenced in the attached correspondence."

Please, read the plain language of the Notice of Acceptance (**ER 03748 Vol. 1, page 166**), "Please complete the document and return it to Karla Malone, Team Lead Investigator **within 15 days of receipt** via encrypted email to: karla.malone@va.gov, or fax to: 727-299-6755 Attn: Karla Malone, Team Lead Investigator. You can also mail your answers to 140 Fountain Parkway N., Suite 620, St. Petersburg, FL 33716-1274."

**Fact No. 147.** On November 16, 2017 at 5.45 PM, the ORM emailed the same Interrogatories to the Director of the Raymond G. Murphy VAMC Mr. Andrew Welch and the EEO Program Manager of the Raymond G. Murphy VAMC Mr. Donald M. Rincon and requested to provide the written answers on the Interrogatories "**within 10 days of your receipt of this letter**" (**ER 03748 Vol. 1, pages 175-181**.) Please, notice that the EEO Program Manager of the Raymond G. Murphy VAMC Mr. Rincon read this email on November 16, 2017 at 5.48

PM (**ER 03748 Vol. 1, page 181**.) Please, notice that Director of the Raymond G. Murphy VAMC Mr. Welch didn't read this email at all (**ER 03748 Vol. 1, page 181**.)

**Fact No. 148**. Please, read the plain language of the November 16, 2017 at 5.45 PM email (**ER 03748 Vol. 1, page 181**),

"Dear Director Welch,

Attached, please find a Notice of Acceptance (PR) letter regarding an EEO case at your facility. EEO regulations require we notify you when this occurs. Questions/concerns regarding this matter should be addressed/sent directly to the point of contact identified in the attached correspondence.

Thank you,

Eboney Tolliver

EEO Program Assistant | Pacific District | Midwest District (MD)

Department of Veterans Affairs Office of Resolution Management-Midwest District (MD) | 12255 Enterprise Drive, Suite 5506 | Westchester, IL 60154

708.236.2800 Office

708.236.2898 Fax"

**Fact No. 149.** Specifically, the ORM requested the Raymond G. Murphy VAMC to provide the following documents "**within ten (10) days from receipt of request**" (**ER 03748 Vol. 1, pages 178-180**),

"**TERMINATION OF PROBATIONARY OR TEMPORARY OR TERM APPOINTMENT**

[x] Organizational chart for the organization unit in which the complainant was assigned at the time of the action in question.

[x] Breakdown of the organizational unit[3] of the position in question as of the date of the action. Provide name, position (title, series, and grade), type of appointment, and EEO category(s) (s as checked above for all employees and supervisors.

[x] Breakdown of terminations of probationary, temporary, of term appointments made within the organizational unit going back two years from the date of the action in question. Provide employee name, position (title, series, and grade), and EEO category(s), type of appointment, date of appointment, date of termination, reason for termination, and name, position, and EEO category(s) of the agency official(s) initiating the action.

[x] Request for Personnel Actions SF 52 (both sides) and SF 50 requesting and effecting recruitment and termination for position in question.

[x]  Vacancy  announcement  and  any  other  documentation  citing  conditions  of employment for the position in question.

[x] Written notice of termination of probationary, temporary or term appointment.

[x] If termination is conduct related, documentation related to conduct issue(s).

[x]  If  termination  is  performance  related,  complainant's  performance  standards, performance rating of record and any documents related to counseling sessions.

[x]  Regulatory  guidelines  and  local  policies  and  procedures  concerning  termination  of probationary, temporary or term appointments in effect at the time of the action at issue.

[x]  Complainant's  position  description  or  functional  statement  for  the  position  from which s/he was terminated.

[x] If the complainant's position was subsequently filled, the name and EEO category(s) of the selectee and date of appointment. If reprisal is a basis, indicate whether the selectee has had prior EEO activity.

[x] Pertinent article(s) of negotiated union agreement, if applicable.


**TIME AND ATTENDANCE**

[x] Organizational chart for the organizational unit to which the complainant is assigned and in which action occurred, if the units are different.

[x] Statistical breakdown of the organizational unit[4] where the action in question occurred as of the date of the action. Provide name, position (tide, series, and grade), and EEO category(s), as checked above, for all employees and supervisors.

[x] Summary data on leave use by employee's in complainant's section who are subordinates of the Responding Management Official (RMO) going back two years from the date of the action as follows:

    If time and attendance issue relates to a disciplinary action:

        [x] For the two year period prior to the action in question, provide name, position (tide, series, and grade), and EEO category(s) of employee(s) affected, action taken based on leave use, date of action, and name position, and EEO category(s) of the agency official(s) who initiated the action.

    If time and attendance issue is **<u>not</u>** related to a disciplinary action:

        [x] For the two year period prior to the action in question, provide name, position (title, series, and grade), and EEO category(s) of employee(s) who requested leave, if

the leave was granted or denied, reason for leave denial and name, position, and EEO category(s) of the agency official(s) effecting the decision. Complainant's leave request(s) as well as leave requests for comparable employees.

[x] Documentation of any counseling provided concerning complainant's leave usage or leave usage pattern for complainant and subordinate employees comparable to complainant

[x] Complainant's time and attendance or leave records for the two-year period prior to the action in question.

[x] Pertinent regulatory guidelines and local policies and procedures concerning leave administration in effect at the time of the action in question.

[x] Pertinent article(s) of the negotiated union agreement, if applicable.

[3] Organizational unit is defined as the section where complainant was employed (or sought employment if complaint was filed by an applicant for employment) when the complaint was filed. For example, if the complainant worked for Human Resources Management (FIRM) Service/Division/Product Line in the Labor Relations Section, the organizational unit is the Labor Relations Section.

[4] Organizational unit is defined as the section where complainant was employed (or sought employment if complaint was filed by an applicant for employment) when the complaint was filed. For example, if the complainant worked for Human Resources Management (HRM) Service/Division/Product Line in the Labor Relations Section, the organizational unit is the Labor Relations Section."

**Fact No. 150**. The deadline for the Raymond G. Murphy VAMC to provide the ORM with the listed above documents was **November 26, 2017**. I was unable to find in the EEO Investigative File the date when the Raymond G. Murphy VAMC sent the requested documents to the ORM.

**Fact No. 151**. Please, notice that the Raymond G. Murphy provided the ORM with only the following completely irrelevant documents that I was able to find in the EEO Investigative file:

1) Associate Director/Patient Care Services Acute Care Service (I guess it is an Organizational Chart) (**ER 03748 Vol. 1, page 267**)

2) Functional Statement with the description of the duties of Medical Instrument Technicians (EKG) (**ER 03748 Vol. 1, pages 268-273**)

3) Memorandum (unnumbered) with the phone numbers for the unplanned leave and with my April 18, 2017 signature (**ER 03748 Vol. 1 pages 261-262**)

4) VA Handbook 5021/6, Chapter 2, Title 5 Probationary/Trial Period Employees (**ER 03748 Vol. 1, pages 304-306**)

5) Memorandum 05-48 Employee Courtesy and Conduct (**ER 03748 Vol. 1, pages 307-311**)

6) Memorandum 05-11 Title 5 Leave Policy (**ER 03748 Vol. 1, pages 312-324**)

7) Memorandum 05-8 Tours of Duty (**ER 03748 Vol. 1, pages 325-327**.)


**Fact No. 152.** On November 19, 2017 which was within 15 days from receiving the November 16, 2017 letter from the ORM, I responded to the ORM's Interrogatories, see (**ER 03748 Vol. 1, pages 202-211**),

"Tatyana E. Drevaleva

10660 Hidden Mesa Place, Monterey, CA, 93940

415-806-9864, tdrevaleva@gmail.com

Case No: 200P-0501-2017103883

Date Filed: September 19, 2017

Interrogatory.

- 144 -

Complainant Name: Tatyana Drevaleva

1.   What is your position, work location and unit?

My position was a Monitor Technician and Nursing Assistant. The location was: Raymond G. Murphy Veterans Affairs Medical Center, Albuquerque, NM, unit 5D.

2.   What is your disability?

My disability is infertility. I can't give birth to children by a natural way. My infertility is based on chronic endometritis, polyposis of endometrium (before, I had 5 surgeries – polypectomies), and a low ovarian reserve which is related to my age. I have a low level of Antimullerian hormone and an increased level of Follicle Stimulating Hormone.

3.   When did the disability develop?

The disability developed over the past 5-7 years. Throughout all these years, I tried to get pregnant but unsuccessful. I had sexual relationships with two men but I didn't get pregnant. I did approximately 7 intra-uterus inseminations at Kaiser Permanente but I didn't get pregnant. I had one polypectomy (the uterine polyp) at Kaiser Permanente in Richmond, CA, two polypectomies (polyps of endometrium) in Russia, and two removals of polyps of cervical canal in Russia. Also, I did three IVF attempts in Russia in 2015 – 2016.

4.   What caused it?

The polyposis of endometrium and cervical canal was caused by genetics. My Mom and my Aunt had polypectomies. Also, polyposis of endometrium and cervical canal was caused by a hormonal misbalance.

The chronic endometritis was caused by numerous polypectomies. I was informed by my Gynecologist that I had the Asherman syndrome, also known as uterine synechiae. It is a condition characterised by the formation of intrauterine adhesions, which are usually sequela from injury to the endometrium, and is often associated with infertility.

The low ovarian syndrome was caused by my age 50 yo. The number of follicles in my ovaries was significantly low.

5.   Is this a permanent disability? If not, then explain how long it is expected to last.

It is a permanent disability. I can't treat this genetic disorder, and I can't decrease my age. I can try to cure chronic endometritis but I haven't been successful yet despite my numerous attempts including antibiotics.

The only way I can have children is IVF with a surrogate Mom.

6.  Do you have medical documents about your impairment/medical condition/disability?

If so, please provide documentation.

The documentation that I have is in Russian. It confirms the fact of multiple polyp removals as well as the fact of chronic endometritis and the low ovarian reserve. It confirms the levels of AMH and FSH. I can request translating these documents into English at your request. I can also request documentation from Kaiser Permanente confirming the fact that I unsuccessfully tried to get pregnant, and I had multiple IUI attempts in 2012 – 2013. I don't have this documentation with me. I can provide you with a document from my Russian OB/GYN confirming that I was in registry for an IVF attempt through the Ministry of Health of the Novosibirsk Region in Russia.

7.  Do you take any medication because of the impairment?

I was taking hormonal pills named Jeanine http://www.dx-health.com/en/jeanine-contraceptive-p-142  to try to save my ovarian reserve. I took these pills without intermission for almost one year since my IVF attempt in 2016. The reason of taking these pills is to turn my menstrual periods off so I wouldn't loose ova. These pills are available in Russia and are not available in the United States. Currently, I am taking other hormonal pills named Femoston 2/10 https://www.medicines.org.uk/emc/medicine/15925 for the same reason.

I underwent an extensive treatment trying to cure my chronic endometritis. I took a lot of antibiotics in Russia, and I underwent many culture tests from my uterus. The diagnosis of chronic endometritis was confirmed after biopsy of endometrium.

Also, currently I am taking Vitrum Prenatal    http://www.unipharmus.com/vitrum-prenatal.html  vitamins and Folic Acid.

8.  Does the medication have any side effects that impact your ability to perform your duties? If so, please explain.

The mentioned above medications do not have any side effects that impact my ability to perform duties of a Monitor Technician and Nursing Assistant.

9.  Does the impairment/medical condition/disability limit anything you would do normally in everyday life? If yes, what normal life functions are limited and how are they limited?

My disability does not limit I would do normally in everyday life.

10. What are the major duties that you are required to carry out on your job?

I was hired as a Monitor Technician. My duty was to observe cardiac monitors. Also, I was assigned to perform duties as a Nursing Assistant. I took vital signs, measured input and output, changed linens, gave patients a shower, and assisted patients the way they needed.

11. Are you able to perform the major duties of your position, as someone else would normally be able to perform the duties?

Yes, I was able to perform all duties of my position. However, I needed reasonable accommodations. In my case, I needed to go to Russia to refill the prescription of Jeanine and to perform an IVF attempt. Because I am a citizen of the Russian Federation, I had a right for a free of charge IVF attempt. In order for me to have this free IVF attempt, I needed to wait in line for 9 months. In May 2017, I found out that my turn in line finally came. Even if I performed an IVF attempt in Russia for money, the cost would be approximately $2000 – 2500 in comparison to $15000 in the United States. My salary of a Monitor Technician which is approximately $40000 per year does not allow me to perform an IVF attempt in the United States. Health insurance in the USA doesn't cover IVF attempts. Also, I couldn't wait to work for my employer for 12 months because 1) my ovarian reserve is getting lower and lower each month at my age, 2) I ran out of hormonal pills Jeanine that I couldn't obtain in the United States.

a) Would you say your ability to perform these duties differs slightly, moderately or significantly from someone else performing the job?

I think my ability to perform my duties would differ from a young female with a good ovarian reserve and a healthy endometrium. This female would not need IVF attempts in order to get pregnant. This female would get pregnant by a natural way. Other than that, I don't see any additional differences between me and other colleagues who are hired for the same position. My infertility would no way affect my ability to observe cardiac monitors and act as a Nursing Assistant taking vital signs and assisting patients.

12. Were you given any restrictions related to performing the duties of your job?

No, I was not given restrictions to performing duties as a Monitor Technician and Nursing Assistant.

13. Explain when and how management became aware of your disability?

In May 2017, I approached Ms. Dunkelberger, and I verbally explained to her what I just explained in this Interrogatory. I said that I was 50 yo and I didn't have children despite I wanted to have children very much. I said that I had been married twice but both husbands refused to give me children. I said that I'd had numerous attempts to get pregnant by a natural way with two boyfriends and using IUI in the USA and IVF in Russia with donor's sperm. I said that in

2016 I had an IVF attempt in Russia, and I created an embryo which is stored frozen in Russia. I said that I couldn't afford the price of IVF in the United States. I said that I was in line for a free IVF attempt in Russia as a citizen of the Russian Federation. I said that I was running out of hormonal pills that were prescribed by a Russian physician and that I couldn't obtain in the United States. I said that I had been waiting for 9 months for a free IVF attempt in Russia, and my turn came in. I said that I couldn't miss this turn, otherwise I would lose a right for a free IVF attempt. I said that OI was 50 yo, and my chances to have a baby from my own ovum were getting smaller and smaller. I also said that my plan was to go to Russia for an IVF attempt, to create an embryo, to freeze it, and to return back to the United States to continue performing my duties as a Monitor Technician. Ms. Dunkelberger's face expressed that she was very much unpleased. She asked me whether I will request another time off in order to go to Russia again to create another embryo. I said that I didn't know because I wasn't sure how this upcoming IVF attempt would be going on. Ms. Dunkelberger said that according to FMLA I would have to work for the VAMC for 12 months to be eligible for a leave without pay. I said that I couldn't wait for 12 months because I had only a few hormonal pills left, and my turn for a free IVF attempt in Russia came in. Ms. Dunkelberger requested a copy of my medical record confirming my intention to perform an IVF attempt. I said that I would request this document from my Russian OB/GYN. Ms. Dunkelberger said that I needed to provide the VAMC with the translated document prior to my departure. I said that I would try my best.

I requested this document from my Russian physician. It took approximately 7-8 days for the Russian office to process this document. There was no way to expedite this process. On May

17th, 2017, Ms. Dunkelberger was out of her office. I approached Assistant Manager of 5D Mr.

Phil Johnson, and I said to him exactly what I wrote in this Interrogatory and what I said to Ms.

Dunkelberger – that I needed to go to Russia for an IVF attempt, that I couldn't get pregnant by a

natural way, that I spent many years trying to get pregnant using UIU and IVF, that I had only 3

hormonal pills left, and I spoke to Ms. Dunkelberger about my medical condition that required a

trip to Russia. I said to Mr. Johnson that Ms. Dunkelberger had requested a translated document

from my Russian physician prior to my departure. However, because of the delay with a Russian

office, I got this document in Russian only on May 17th, 2017 when I had only 3 hormonal pills

left. There was no way to continue staying in the USA and translating the document into English

because, if I didn't get hormonal pills, I would be bleeding.

Mr. Johnson verbally allowed me to go to Russia to refill my hormonal pills and to

perform an IVF attempt. His exact words were, "If you need to go – you should go!" I said to

Mr. Johnson that I will provide Ms. Dunkelberger and him with a translated document as soon as

I get to Russia. Mr. Johnson agreed. I said that I trusted my Russian speaking co-worker Ms.

Nadya Das who worked as a Monitor Technician at 5D. I verbally authorized Nadya to translate

this document into English for my Manager. Ms. Dunkelberger said that I didn't have a right to

translate this document myself. Only a certified translator could do it.

Also, Mr. Johnson provided me with a form to request leave without pay. I filled this

form out. I didn't know exactly how much time I needed to spend in Russia, so I requested a

leave without pay from May 18th, 2017 to July 07th, 2017. Because Ms. Dunkelberger was out of office, I put this document under the door of her office. I don't have a copy of that document.

The witness of all events described above is Ms. Nadya Das who witnessed how I called my Russian physician's office and requested the document, how I called my brother who was in Russia and asked him to go to my doctor's office, how I called the receptionist and requested to email me a copy of that document. Also, I informed Ms. Das that I had talked to Ms. Dunkelberger and Mr. Johnson, and Mr. Johnson verbally allowed me to go to Russia. I also notified Ms. Das verbally that I authorize her to translate this document for Ms. Dunkelberger until I get the official translation.

14. What exactly management know about your disability. Be specific.

The management knew that, despite of my numerous attempts to get pregnant, the only way was only IVF with donor's sperm. Also, the management knew that I was not planning to carry pregnancy. I was going to be absent from work for a relatively short amount of time. I was going to create an embryo, freeze it, and return to work in Albuquerque. Also, read my description above. I emailed Ms. Dunkelberger and Mr. Johnson a copy of the document from my Russian OB/GYN that I needed to go to Russia for an IVF attempt because I was in registry of patients for a free IVF attempt through the Ministry of Health of the Novosibirsk Region. I emailed this document on Russian language on May 18th, 2017 (prior to my departure) and I emailed the same document on English language from Russia on May 30th, 2017. Both Ms.

Dunkelberger and Mr. Johnson never responded and never acknowledged that they received both documents (the original and a translated copy). However, both Ms. Dunkelberger and Mr. Johnson knew my private email address.

15. Please identify the management official for denying your leave request.

After I submitted both an original document and a translated copy to Ms. Dunkelberger and Mr. Johnson, I was not aware what the subsequent process would be. I didn't know whether Ms. Dunkelberger would approve or deny my request or somebody else would do it. During Mediation on September 07, 2017, Ms. Dunkelberger said that my request for leave without pay had been denied by Dr. Prince. So, according to Ms. Dunkelberger, the official who denied my request for leave without pay was Dr. Prince. I don't know whether Ms. Dunkelberger said to Dr. Prince that the purpose of my trip to Russia was an IVF attempt. Personally, I didn't speak directly with Dr. Prince about my infertility disability.

a) Please describe your working relationship with this individual.

I met Dr. Prince only once during the Orientation. She held a group meeting with new hires. She spoke about our role at the VAMC. Other than that, I didn't have any discussions with Dr. Prince.

b) How and when did this individual become aware of the protected bases that you believe are the subject of discrimination?

I don't know how and when Ms. Dunkelberger submitted my request for leave without pay to Dr. Prince. I even didn't know that my request would be submitted to Dr. Prince. I don't know what Ms. Dunkelberger said to Dr. Prince about the purpose of my trip to Russia. I don't remember whether I wrote the purpose of an IVF procedure in my request for leave without pay. I don't have a copy of my request.

16. How and when did you become aware that you leave request was denied?

After I emailed an original document and a translated copy to Ms. Dunkelberger and Mr. Johnson, I never heard back from both of them. I was in Russia pursuing my IVF attempt. Nobody let me know that my request was denied and nobody let me know that my request was denied by Dr. Prince. I got a Termination letter from Ms. Dunkelberger on July 03rd, 2017. The first time when I discovered that my request for leave without pay was denied by Dr. Prince was during the Mediation on September 07th, 2017.

17. What justification was provided for denying the leave?

During the Mediation on September 07th, 2017, Ms. Dunkelberger said that my request for leave without pay had been denied by Dr. Prince because I didn't meet the requirements to qualify for this leave under FMLA. I didn't work at the VA for 12 months, and therefore my request was denied. However, Ms. Dunkelberger knew very well that it was impossible for me to

wait for 12 months before requesting this leave. I really don't know if Ms. Dunkelberger explained to Dr. Prince about my particular situation – that I was 50 yo, I tried to have children by a natural way and using UIU and IVF, I ran out of my hormonal pills, and I waited for 9 months for a free attempt of IVF in Russia, and my turn finally came in, and if I didn't arrive for this IFV attempt, I would lose this chance.

18. What policy or procedure was identified to support the denial of leave?

Ms. Dunkelberger identified FMLA. I needed to work at the VA for 12 months before requesting leave without pay.

19. Why was denial of leave unacceptable to you?

It was unacceptable because I had no any other chance to try to have a baby. Health insurance in the USA doesn't pay a full price for an IVF attempt. The price of one IVF attempt in the United States is $15000 which I can't afford because of my salary of $40000 per year. Even if my request for leave without pay was denied, Ms. Dunkelberder was supposed to immediately let me know. She didn't let me know when I was in Russia. Prior to my termination, I didn't know what my request for leave without pay was denied. During the Mediation on September 07, 2017, Ms. Dunkelberger said that she had mailed the denial letter to my home postal address in Albuquerque, NM. Ms. Dunkelberger knew very well that at that time I was out of country, I

was in Russia, and I had no way to get and respond this letter. Ms. Dunkelberger never emailed this letter to me even though she knew my private email address. During the Mediation on September 07th, 2017, Ms. Dunkelberger said that she couldn't have emailed me this denial letter because it was not encrypted. I think this is a lie and an attempt to find an excuse. Ms. Dunkelberger emailed me the termination letter which was not encrypted. Ms. Dunkelberger never offered me to communicate with her via the phone, never called me and never informed me that my request for leave without pay had been denied by Dr. Prince.

20. Did you discuss the leave denial with any management officials?

Yes, I asked Ms. Dunkelberger in my email dated July 03, 2017 why she terminated me. She never responded. Again, she never let me know that my request for leave without pay was denied by Dr. Prince.

a) Who and when

The first time I asked Ms. Dunkelberger why she terminated my employment. I requested a leave without pay until July 07th, 2017, and Ms. Dunkelberger terminated my employment prior to this date – on June 30th, 2017. I was informed on July 03rd, 2017. The second time I asked Ms. Dunkelberger why she terminated my employment during the Mediation on September 07th, 2017. Ms. Dunkelberger said that my request had been denied by Dr. Prince. I requested to speak with Dr. Prince directly but I never got any answer.

b)  What was discussed and what was the outcome of the discussion?

I asked why I had never been informed that my request for leave without pay was denied. Ms. Dunkelberger said that she had mailed the denial letter to my home postal address in Albuquerque, NM. I said that I was out of country at that time, and I never got the denial letter. I also said that Ms. Dunkelberger knew that I was out of country but she never informed me via email, never called me, and never requested me to give her a call. Also, she never answered my emails when I sent my documents to her. Ms. Dunkelberger said that because I didn't respond to the letter that she sent to my home postal address in Albuquerque, NM, she fired me. I said that I had never gotten that letter, I didn't know that my request for leave without pay was denied, and I asked Ms. Dunkelberger to reinstate me back to work. Ms. Dunkelberger refused. I requested to speak with Dr. Prince but I never got any answer.

21. Why do you believe that the protected basis or bases outlined in this complaint was/were factors(s) in the denial of leave?

I remember how unpleasant Ms. Dunkelberger seemed when I first informed her about my intention to have a baby. She seemed very irritated. She asked me if I would request a leave again to create another embryo. I think she also asked whether I was planning to be absent from work in case if the baby is born. She never responded to my emails after I sent her an original document from my Russian OB/GYN and a translated copy. She never sent me a denial letter of Dr. Prince. She terminated my employment even before July 07th, 2017. She refused to reinstate

me back to work. Afterwards, speaking over the phone to Ms. Nadya Das, I discovered that Ms. Dunkelberger hired two male Monitor Technicians to substitute me. Obviously, male employees will not have problems related to pregnancy. Also, I found out that these employees are much younger than I am. They are 30 and 35 yo in comparison to my age 51 yo now. Also, I found out that at least one of these employees is stable in his marriage and already has children.

22. Are you aware of a coworker who was not denied leave in similar circumstances?

No, I am not aware of coworkers who were not denied leave in similar circumstances (related to pregnancy).

I am aware of a coworker who was not terminated her employment at 5D despite she attended a nursing school and couldn't have full time employment at the VA during her study. She was allowed to work only 1 time per month at 5D observing cardiac monitors. Her employment was not terminated because she was absent from work.

a) Please identify by full name and title.

I think her name is Melanie. She is a Registered Nurse at ICU.

b) Please identify this by their protected basis(es) as outlined above in your complaint.

I said to Ms. Dunkelberger and Mr. Johnson that I would spend approximately 6 weeks in Russia for my IVF attempt. I said that I did not intend to become pregnant myself. I said that I would create an embryo and return back to the United States to work at the VA. My employment

was terminated. Melanie, who couldn't have worked full time during her study for 2 years at a nursing school, was allowed to work at the VA one time per month, and her employment was not terminated. It confirms my statement that I was discriminated due to my disability, retaliated and unlawfully terminated.

c)  Please explain how they were treated differently than you.

Melanie's employment was not terminated even though she couldn't have worked full time. Melanie was allowed to work once a month for 2 years. After I was absent from work for 5 weeks due to my disability, my employment was terminated. I was never informed that my leave without pay was denied.

Another individual who was treated differently that I is Ms. Chelsea Casey, a newly hired Registered Nurse at 5D. She was hired at the same time when I was hired. Ms. Casey was a new grad from a nursing school. Ms. Casey said that prior to getting employed by the Raymond G. Murphy VAMC she got approximately 5 phone calls from Ms. Dunkelberger who offered her to apply for a job opening of a Registered Nurse and who was inviting her to work at the VA. Ms. Dunkelberger called Ms. Casey five times to invite her to work but didn't call me even one time when my request for leave without pay had been denied.

d)  Please describe your working relationship with this individual.

I worked with Melanie maybe twice when she observed cardiac monitors. I really like Melanie. She is a very conscientious lady. I also like Ms. Casey very much. She is a good friend and a good coworker. She worked as a Monitor Technician for 5 years, and she knows EKG very

well. I showed her Torsades de Pointes when the patient had it (not all other nurses agreed to see it). She gave me rides to work and from work because I don't have a car. She gave me a ride to the airport when I left Albuquerque to Russia despite it was late and her daughters were sleeping. She took one of the daughters with her to give me a ride to the airport. She wished me to have a good trip. She knew the purpose of my trip.

e)  How and when did this individual become aware of the protected bases that you outlined above?

I let Ms. Casey know that I wanted to have children, and therefore I was going to go to Russian for an IVF attempt. Also, while being in Russia, I communicated via email with Ms. Michelle Tirado who was also hired at the same time when I was hired. Ms. Tirado is a Nursing Manager. I shared the details of my stay in Russia with Ms. Tirado. I didn't know Ms. Casey's private email address, therefore I didn't have a correspondence with her from Russia.

23. Please identify the management official responsible for terminating you.

In the Termination Letter dated June 30th, 2017, it is written, "The Associate Director, Patient Care Services, has recommended that you be terminated from your position for failure to qualify during your probationary period. Your termination is due to attendance issues." This is a complete libel. During my employment starting April 2nd to May 18th, 2017, I didn't miss even one day of work, and I was never late to work. I was verbally allowed to go to Russia by

Assistant Manager Mr. Johnson, and I requested a leave without pay from May 18th, 2017 to July 07th, 2017.

24. What justification was provided for your termination?

The justifications that were provided for my termination were: 1) probationary period, 2) attendance issues.

25. What policy or procedure was identified to support the termination?

"The decision to terminate you immediately in lieu of a two (2) week notice is due to your absent without leave (AWOL) status since May 21, 2017". Again, this is a libel. I left the VA with a verbal permission of Assistant Manager Mr. Johnson. When my request for leave without pay was denied, nobody notified me.

26. Why was the termination unacceptable to you?

I was happy and proud that I was privileged to serve Veterans. I really loved the VA and my job. I wanted to have a child, and I left to Russia for a relatively short amount of time with a permission of an Assistant Manager. I also informed a Manager in detail why I needed a trip to Russia and why I couldn't perform an IVF attempt in the United States. I anticipated returning back to my duties at the VA after I create an embryo. Manager Ms. Dunkelberger never let me

know that my request for leave without pay had been denied by Dr. Prince. Ms. Dunkelberger never responded to my emails after I sent her documents from my Russian physician. Ms. Dunkenbelger mailed the denial letter to my home postal address in Albuquerque, NM even though she knew that I had no chance to read this letter. Ms. Dunkelberger accused me in being absent from work even though she knew that 1) I got Mr. Johnson's permission to go to Russia, 2) I never missed any day of work, and I was never late to work. Ms. Dunkelberger didn't care about my knowledge of EKG. I passed the EKG test with a score of 100%. I was good interpreting cardiac rhythms because I like it. Ms. Dunkelberger didn't care that I would be a real benefit to the hospital because of my EKG knowledge. Now, when I am fired from the probationary period for "absence", who will hire me? The guess is that I will have problems with all subsequent potential employers who will think that I was terminated from the VA from being absent. I was even denied Unemployment Insurance benefits because Ms. Dunkelberger said that I had been fired for being absent. This is totally unacceptable, and this is a libel. Therefore, I demand to overturn Ms. Dunkelbergers decision and reinstate me back to work with a backpay.


27. Did you discuss the termination with any management officials? Yes, I did.

a)  Who and when?

I discussed my termination with Ms. Dunkelberger. First time, I asked her in writing in my email to her dated July 03rd, 2017. I asked her why she fired me. She never responded. The

second time I asked Ms. Dunkelberger why she fired me during the Mediation on September 07th, 2017.

b) What was discussed and what was the outcome of the discussion?

During the Mediation on September 07th, 2017, I said to Mediators and to Ms. Dunkelberger that I had gone to Russia with a verbal permission of Mr. Johnson. Ms. Dunkelberger said that she had emailed me the denial letter to my home postal address in Albuquerque, NM. I said that there was no way to receive that letter because I was in Russia, and Ms. Dunkelberger knew it. I asked why she didn't email me this letter. Ms. Dunkelberger said that the letter was not encrypted. I said that I had gotten a Termination letter which was not encrypted. Also, I said that Ms. Dunkelberger knew my private email address but never answered my emails. I asked Ms. Dunkelberger to reinstate me back to work. She refused.

28. Why do you believe that you were discriminated against because of the protected bases that you outlined above when you were terminated?

I was discriminated against my disability to give birth to children. I was also discriminated against my age. Ms. Dunkelberger knew that I went to Russia with a permission of Assistant Manager Mr. Johnson but she accused me in being absent. She never responded my emails when I sent her documents about my health condition. She never informed me that my request for leave without pay was denied. She never called me to let me know that my request was denied, and she never sent me an email. She terminated my employment prior to July 07th,

2017. She refused to reinstate me back to work after I arrived at the USA. She hired two male employees who will not have problems related to pregnancy. She hired much younger employees that I am. Dr. Prince never responded to my request to speak with her in person. In contrast, Melanie was allowed to work for only once a month for 2 years when she was in a nursing school. Ms. Casey got 5 phone calls from Ms. Dunkelberger when this Manager offered her employment at the VA.

29. Are you aware of a coworker who was not subjected to **termination** in similar circumstances?

No, I am not aware.

The above information has furnished without a pledge of confidence and I understand that it may be shown to the interested parties of this complaint.

This statement is made under penalty of perjury, this November 19th, 2017.

___Tatyana E. Drevaleva_____

(Affiant's signature)"

**Fact No. 153**. Also, please, read my November 19, 2017 letter to Ms. Karla Malone (**ER 03748 Vol. 1, page 212**),

"To Ms. Karla Malone

My name is Tatyana Evgenievna Drevaleva.

Date: November 19th, 2017.

The complaint above outlines the specific basis or bases that you have identified as the subject of discrimination in your complaint. Please provide identifying information for the applicable basis or bases identified above in your complaint:

Age: _yes __ Sex: _yes (pregnancy)_ Disability: _yes __ "

**Fact No. 154.** On November 17, 2017 at 2.51 PM, Ms. Amy Shafer sent an email to Ms. Dunkelberger and Mr. Donald Rincon (**ER 03748 Vol. 1, page 276**),

"**Subject**: Request for documents.

**Importance**: High.

Good afternoon

The Office of Resolution Management (ORM) is requesting the documents listen on the attachment in the Tatyana Drevaleva complaint, case number 2000P-0501-2017103883.

Please send the documents to the EEO office as soon as possible.

Thankyou

Amy."

**Fact No. 155.** On November 17, 2017 at 4.06 PM, Ms. Amy Shafer sent an email to Mr. Andrew Salazar-Ruiz (I don't know the title of Mr. Salazar-Ruiz) and sent the copies of Ms. Dunkelberger and Mr. Rincon (**ER 03748 Vol. 1, page 276**),

"I received an out of office from Carla – not sure how long she will be gone (???) Can you help with this??

**Fact No. 156**. On November 20, 2017 at 10.43 AM, Ms. Dunkelberger sent an email to Ms. Amy Shafer, Mr. Donald Rincon, Mr. Andrew Salazar-Ruiz, and Ms. Allean Bonin (**ER 03748 Vol. 1, page 275**),

"1. Organizational chart – see attached.

2.  Breakdown of organizational unit for position in question (Medical Instrument Technician), EEO categories unknown.

       a. Tatyana Drevaleva, Medical Instrument Technician, GS-649-**07**, full time.

       b. Nadzeya Das, Medical Instrument Technician, GS-0649-**06**, full time.

       c. David Williams, Medical Instrument Technician, GS-0649-**06**, full time.

       d. David Trujillo, Medical Instrument Technician, GS-0649-**05**, full time.

       e. Vacant position, Medical Instrument Technician, GS-0649, full time.

3. Functional Statement –see attached.

4. If complainant's position subsequently filled… - **As of today, November 20, 2017, this position has not been filled.**

5. Summary data on leave use… - As of today, November 20, 2017, **there have been no time and attendance issues for those employees in the Medical Instrument Technician role in the exception of the complainant Ms. Drevaleva**

6. Documentation on any counseling provided concerning leave usage. - As of today, November 20, 2017, I have not issued any "counseling" to the complainant or other Medical Instrument Technicians concerning leave usage.

7. Complainants time and attendance on leave records… - I no longer have access to this information. I would suggest contacting Payroll or HR.

Carla Dunkelberger…"

**Fact No. 157.** Please, pay attention to the following facts of Ms. Dunkelberger's November 20, 2017 at 10. 43 AM email (**ER 03748 Vol. 1, page 275**):

1) I was a Medical Instrument Technician with the highest grade GS7. All other Medical Instrument Technicians had lower grades GS6 and GS5. It means that I was unprofitable for Ms. Dunkelberger because she needed to pay me approximately 4 (four) thousand U.S. dollars per year more for my grade GS7. No doubt Ms. Dunkelberger wanted to fire me and to hire the Medical Instrument Technicians with lower grades.

2) Ms. Dunkelberger lied that, as of November 20, 2017, nobody had been hired to substitute my employment. In fact, on June 12, 2017 Ms. Dunkelberger hired Mr. David Williams to substitute my employment. Please, see Doc. No. 202, October 28, 2019, Supplemental Brief "Direct Evidence of Discrimination"

3) Ms. Dunkelberger continued to put dirt on me and to accuse me in being absent without leave

4) Despite Ms. Dunkelberger kept accusing me in being absent without leave. She acknowledged that there was no counseling to me regarding leave usage.

**Fact No. 158.** On November 20, 2017 at 11.13 AM, Ms. Dunkelberger sent another email to Ms. Amy Shafer, Mr. Donald Rincon, Mr. Andrew Salazar-Ruiz, and Ms. Allean Bonin (**ER 03748 Vol. 1, page 274**),

"I would like to add the following to #6.

- On April 18, 2017 Ms. Drevaleva signed for, was given a copy of, and verbalized understanding of MCM 05-11 Title 5 Duty and Leave Policy, MCM 05-8 Tours of Duty, MCM 05-48 Employee Courtesy and Conduct, and a memo for established phone numbers and unplanned leave

- Ms. Drevaleva was sent a Leave Request Clarification Memo on June 12, 2017 letting her know her request for leave without pay was disapproved and that she needed to contact her supervisor to appropriately request leave.

Carla Dunkelberger…"

**Fact No. 159.** Please, pay attention to the following facts of Ms. Dunkelberger's November 20, 2017 at 11.13 AM letter (**ER 03748 Vol. 1, page 274**):

1) Ms. Dunkelberger didn't mention a wide variety of paid leave options for pregnancy

2) Ms. Dunkelberger mentioned that the June 12, 2017 letter had been sent to me but she failed to clarify that this letter was mailed to my home postal address in Albuquerque, NM where I had no opportunity to receive it and to respond. Ms. Dunkelberger failed to mention that this letter was never emailed to me.

**Fact No. 160**. The Office of Resolution Management had 180 days to finish the investigation of this Complaint (**ER 03748 Vol. 1, page 165**.) The Office of Resolution Management's deadline to finish the investigation of my EEO Complaint was March 18, 2018. Investigator Mr. Dennis Hayo was assigned to investigate my EEO claim. On March 02, 2018, Mr. Hayo asked me to extend the deadline for investigating my EEO claim for 30 days (**ER 03748 Vol. 1, page 160**),

"RE: Tatyana Drevaleva

EEO Claim #103883

Good Afternoon Ms. Drevaleva,

It was good to speak to today. As you know I am the EEO Investigator assigned to investigate your claim of workplace discrimination. The case was assigned to me February 28 and is due March 18, 2018. Mr. Phil Johnson is on leave until March 12. I am requesting a 30

day extension to complete the investigation. I have attached an Extension Request for you to consider. Please feel free to call me if you have any questions.

Regards,

Denis Hayo."

**Fact No. 161**. Please, notice that on March 02, 2018 Investigator Mr. Hayo asked me for a 30 (thirty) day extension (**ER 03748 Vol. 1, page 160**) but on February 28, 2018 the Lead EEO Administrative Assistant Ms. Rena M. Wollmann emailed me a request for extension of time for 60 (sixty) days to investigate my EEO claim (**ER 03748 Vol. 1, pages 161-162**.) Ms. Wollman assured me that (**ER 03748 Vol. 1, page 161**), "ORM strives to complete every investigation in an efficient and effective manner. Unfortunately, we have been unable to assign your client's case for investigation until now. We plan on completing the investigation as efficiently and effectively as possible. Would you consider providing Mr. Hayo with an extension to complete the investigation into the complaint of discrimination? I have attached the extension request form to this email, you can fill that out or simply respond to this email, if you are agreeable to an extension in your client's case. Thank you for your consideration."

On March 05, 2018, I granted the ORM's request for extension of time for 60 (sixty) days to investigate my EEO claim (**ER 03748 Vol. 1, page 159**.) I wrote, "I am giving you sixty days per your request. Please, try to finish the investigation as soon as you can."

**Fact No. 162**. Afterwards, on March 13, 2018 Assistant Manager of the Raymond G. Murphy VAMC Mr. Phil Johnson issued his response to the ORM's EEO Interrogatories. Please, notice that, pursuant to the November 16, 2017 letter of the EEO (**ER 03748 Vol. 1, page 166**) that directed the Raymond G. Murphy VAMC to respond to the Interrogatories **within 15 days**, the deadline for the Raymond G. Murphy VAMC to respond to the Interrogatories was December 01, 2017. Please, notice that Mr. Johnson issued his response to the EEO Interrogatories on March 13, 2018 which was **in 3.5 months outside the deadline**.

**Fact No. 163.** Please, read the March 13, 2018 EEO statement of Mr. Johnson (**ER 03748 Vol. 1, pages 213-222),**

**"The accepted claim(s) under investigation are:**

**A. Whether Complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, complainant was terminated during her probationary period.**

**B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

I, **Phil Johnson**, solemnly swear/affirm that the responses and documents I provide in response to the following questions are true and complete to the best of my knowledge and belief. Please write your full legal name. Phillip Leroy Johnson

**Please answer the following questions:**

1. Please identify the VA facility where you are employed.

   *Raymond G. Murphy Medical Center*

2. For what period of time have you been employed there? *Since June 2003*

3. What unit or section of the facility do you work in? *5D Telemetry*

4. Please identify your position and grade at the facility where you are employed.

   *Assistant Nurse Manager; Nurse 2*

5. Please identify your first line supervisor during that period. *Carla Dunkelberger*

6. Please identify your second line supervisor during that period. *Allean Bonin*

7. Please describe your working relationship with the complainant, Tatyana Drevaleva, during that period. *I was an Assistant Nurse Manager*

8. Where did the complainant fall in your chain of command? *N/A*

   a. If the complainant was in your chain of command how long was she there? *N/A*

9. What is the complainant's position and grade? The complainant's position was Medical Instrument Technician. *Grade was GS7*

10. Was the complainant a probationary employee? *Yes*

- 174 -

If yes, please explain the dates of her probationary employment and what probationary employment means.

*Probation period started at time of expected appointment on April 2, 2017. The first year of employment is subject to a probationary period. The probationary period is a period of time in which supervisors are required to study an employ[yee's] potential closely to determine whether s/he is suited for successful government work.*

11. What unit or section is the complainant assigned to? 5D Telemetry, Nursing service

12. What was your working relationship with the complainant? *The complaintaint was orienting to the position and I was a supervisor and helped with orientation to the Telemetry monitors.*

13. What is your sex? *Male*

14. When did you first become aware of the complainant's sex?

*I am not aware of the complaintants sex. Ther complaintant referred to self as female.*

15. How did you become aware of the complainant's sex?

*I am not aware of the complaintants sex. Ther complaintant referred to self as female.*

16. What is your month and year of birth? *April 1956*

17. When did you first become aware of the complainant's age? *May 17, 2017*

18. How did you become aware of the complainant's age?

    *Complaintant stated age during our discussion about leaving for Russia.*

19. Do you have a disability? *Yes*

    a.  If yes, would you like to share your disability for the record? *Hearing Impaired*

20. Are you aware of the complainant's disability he describes as being infertile to the point of needing In Vitro Fertilization?

    *The complainant did not state that s/he had a disability or that s/he was infertile.*

    a.  If yes, please describe your knowledge of **her disability of being infertile**? *N/A*

21. How and when did you become aware of the complainant's disability? *N/A*

22. How long has the complainant had this disability? *N/A*

23. How long is it expected to continue? *N/A*

24. Please, describe which of complainant's normal life functions to your knowledge that was substantially limited because of her disability.

    *The complainant did not state that s/he had a disability.*

25. Please describe in detail how the normal life functions identified above were substantially limited by the complainant's impairment/disability. *N/A*

26. Did the complainant use medication and/or assistive devices for his disability? If yes,

    a.  Identify and describe their purpose.

        *The complainant did not state that s/he had a disability.*

27. To your knowledge did the complainant's medication and/or assistive devices affected any of the complainant's normal life functions? If yes,

    a.   Describe the normal life function. *N/A*

28. Describe the degree to which the function is affected. *N/A*

29. Was the complainant able to perform the essential duties of her position? *Complaintant did not complete orientation and, therefore, was unable to perform independently in the Medical Instrument Technician role.*

30. If not, please identify the duty or duties the complainant was unable to perform. *Because the complaintant did not complete orientation s/he was unable to perform independently in the Medical Instrument Technician role.*

31. Indicate how the disability impacted accomplishing these duties. *Complaintant did not state s/he had a disability*

32. Have you received training on EEO policy and procedure? *Yes*

33. If yes, when? *11/30/2015, 7/21/2016 and 1/9/2018*


**A. Whether Complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, complainant was terminated during her probationary period.**

**B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

1. Please identify the individual responsible for terminating the complainant?

   *Complainant's conduct resulted in termination.*

2. The complainant claims that in May 2017 she told Ms. Dunkelberger that she wanted to have children but was running out of time because she was 50 years old. She told Ms. Dunkelberger that she planned to go to Russia for an IVF attempt. Ms. Dunkelberger's face expressed she was very much unpleased and Ms. Dunkelberger told her that according to FMLA she would have to work for the VAMC for 12 months to be eligible for leave without pay. She told Ms. Dunkelberger that she could not wait for 12 months because it was her turn for a free IVF attempt in Russia. Ms. Dunkelberger requested a copy of her medical records confirming her intention to perform an IVF. She told Ms. Dunkelberger that she would request the medical documents from her Russian OB/GYN. Ms. Dunkelberger stated she needed the documents prior to her departure. On May 17, 2017 Ms. Dunkelberger was out of the office. She told Assistant Manager, Phil Johnson, the same thing she told Ms. Dunkelberger. She told him on May 17, 2017 she received the Russian medical documents which were written in Russian. She only had 3 hormonal pills left and she would start bleeding if she did not go to Russia. There was no time to translate the

medical documents. <u>Mr. Johnson told her that if she needed to go she should go.</u> She told Mr. Johnson that she would provide him with a translated document as soon as she got to Russia and Mr. Johnson agreed. She told Mr. Johnson that a Russian co-worker could translate the document until she could get an official translation. She filled out a Request for Leave Without Pay form for the period from May 18, 2017 through July 7, 2017 and slipped in under Ms. Dunkelberger's door, since she was not in the office. On May 30, 2017, she emailed, from Russia, her Russian OB/GYN medical documentation of her need for IVF in the English language. She received no response. When she left she did not know if her Request for Leave Without Pay would be approved or denied by Ms. Dunkelberger. On July 3, 2017 she received a termination letter. This was the first time she found her Leave Without Pay Request had been denied. Ms. Dunkelberger mailed the termination letter to her home in NM instead of emailing it to her in Russia. The justification provided in the termination letter was that she was on probationary period and attendance issues. What was your role and the circumstances surrounding this event?

*The complainant came into the office, after business hours, on May 17, 2017 stating s/he had one pill left and was flying to Russia the next day to have Invitro Fertilization done. The complainant also stated his/her age to be 50 and that s/he had always wanted to have children and "this may be my last chance". I handed the complainant the OPM71 paper work and stated that this must be filled out and supporting documentation in English from the doctor must also be supplied. At this*

*time I stated to the complainant that I could not approve Leave Without Pay but I would turn in the documentation **<u>and if this was that important then s/he should go.</u>***

3.  What was your justification for your actions when the complainant when these events occurred and the complainant was terminated? *Do not understand the question*

4.  Did you discuss this with the complainant? *Cannot answer the question*

    1. If yes, when? *N/A*

    2. What was discussed? *N/A*

    3. What was the outcome of the discussion? *N/A*

    4. Did you discuss this with Ms. Dunkelberger? *N/A*

    5. If yes, when was it discussed? *N/A*

    6. What was discussed? *N/A*

    7. Did you consult with H.R. or any other management officials regarding the termination? *No*

    8. If so, who did you discuss it with? *N/A*

    9. When was is discussed? *N/A*

    10. What was discussed? *N/A*

11. What policy or regulation supports terminating the complainant in these circumstances? (Please provide that policy to the investigator for the record). *MCM 05-11 Title 5 Leave Policy, MCM 05-8 tours of Duty, MCM 05-48 Employee Courtesy and Conduct, Master Agreement berween the Department of Veterans Affairs and the American Federation of Government Employees  (2011) Article 35 Section 10, Leave Without Pay (LWOP).*

12. The complainant claims that, Melonie, an ICU Registered Nurse was a Similarly Situated Employee that was treated more favorably that she was when her Leave Without Pay was denied. Melanie was not terminated when she attended nursing school and was allowed to work 1 time per month observing cardiac monitors. When Melanie was absent from work she was not terminated even though she couldn't have worked full time. For this reason she was discriminated against because of her disability. *I have no Knowledge of a "Melonie"*

13. What is Melonie's last name? *N/A*

14. What was Melonie's position and grade? *N/A*

15. Where did Melonie fall in your chain of command? *N/A*

16. What is Melonie's sex? *N/A*

17. What is Melonie's age? *N/A*

18. Does Melonie have a disability? *N/A*

19. Do you believe Melonie is a Similarly Situated Employee? *N/A*

20. What was your justification for not terminating Melonie under the above circumstances? *N/A*

21. The complainant claims that two <u>young males</u> were hired to replace her position because they would not have pregnancy issues. How do you respond? *The position was open to either Female or Male and the qualified applicants were hired.*

22. Was the complainant's disability of **being infertile** a factor when this occurred? *The complainant did not state s/he had a disability*

23. Was the complainant's **age** a factor when this occurred? *No*

    a. If yes, please explain how? *N/A*

24. Was the complainant's **sex** a factor when this occurred? *I am not aware of the complaintant's sex*

    b. If yes, please explain how? *N/A*

25. Was the complainant's **disability** a factor when this occurred? *The complaintant did not state s/he had a disability*

    c. If yes, please explain how? *N/A*

26. Did you discriminate against the complainant because of her age, race or disability when this occurred? *No*

27. Did the complainant tell you that he felt that she was being discriminated when this occurred? *Do not understand the question*

28. If yes, when? *N/A*

29. What was discussed and what was the outcome of the discussion? *N/A*

30. Do you have anything to offer the complainant in resolution of this claim? *No*

31. Is there anything else pertinent to these specific events that we have not discussed? *No*

**PLEASE NOTE THAT ORM RESERVES THE RIGHT TO SUPPLEMENT OR ASK ADDITIONAL QUESTIONS AS THE INVESTIGATION REQUIRES.**

**The above information has been furnished without a pledge of confidence and I understand that it may be shown to any interested party[ies] with a need to know for this complaint. This includes but is not limited to VA, EEOC, contracting officials with a need to know during the course and scope of the informal and formal EEO process including administrative procedures and litigation as applicable and mandated by law.**

This statement is made under penalty of perjury on this _13_day of _March, 2018.

Phil Johnson RN, 5DT ANM

Phil Johnson."


**Fact No. 164**. On March 08, 2018, Ms. Carla Dunkelberger issued her Response to the ORM's EEO Interrogatories. Please, notice that this response was **in over 3 months** after the December 01, 2017 deadline to answer the Interrogatories. Now, please, read the March 08, 2018 response of Ms. Carla Dunkelberger to the ORM's EEO Interrogatories (**ER 03748 Vol. 1, pages 223-232**),

"**"The accepted claim(s) under investigation are:**

**A. Whether Complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, complainant was terminated during her probationary period.**

**B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

I, **Carla Dunkelberger**, solemnly swear/affirm that the responses and documents I provide in response to the following questions are true and complete to the best of my knowledge and belief.

Please write your full legal name. *Carla Jahns Dunkelberger*

**Please answer the following questions:**

1. Please identify the VA facility where you are employed.

    *Raymond G. Murphy Medical Center*

2. For what period of time have you been employed there? *Since October 2012*

3. What unit or section of the facility do you work in? *5D Telemetry, Nursing Service*

4. Please identify your position and grade at the facility where you are employed. *5D Telemetry Nurse Manager; Nurse 3*

5. Please identify your first line supervisor during that period. *Allean Bonin*

6. Please identify your second line supervisor during that period. *Dr. Tina Prince*

7. Please describe your working relationship with the complainant, Tatyana Drevaleva, during that period. *I was the complainants direct supervisor*

8. .Where did the complainant fall in your chain of command? *N/A*

    a.   If the complainant was in your chain of command how long was she there? *N/A*

9. What is the complainant's position and grade? The complainants complainants position and grade was: *Medical Instrument Technician;GS7*

10. Was the complainant a probationary employee? *Yes*

   a. If yes, please explain the dates of her probationary employment and what probationary employment means.

   *Probation period started at time of excepted appointment on April 2, 2017. The first year of employment is subject to a probationary period. The probationary period is a period of time in which supervisors are required to study an employee's potential closely to determine whether s/he is suited for successful government work.*

11. What unit or section is the complainant assigned to? *5D Telemetry, Nursing service*

12. What was your working relationship with the complainant? *I was the complainants direct supervisor.*

13. What is your sex? *Female*

14. When did you first become aware of the complainant's sex?

   *I am not aware of the complainants sex. The complainant referred to self as a female.*

15. How did you become aware of the complainant's sex?

   *I am not aware of the complainants sex. The complainant referred to self as a female.*

16. What is your month and year of birth? *May 1973*

17. When did you first become aware of the complainant's age? *I am not aware of the complainants age.*

18. How did you become aware of the complainant's age? *I am not aware of the complainants age.*

19. Do you have a disability? *no*

    b.  If yes, would you like to share your disability for the record? *N/A*

20. Are you aware of the complainant's disability he describes as being **infertile to the point of needing In Vitro Fertilization**?

    *The complainant did not state that s/he had a disability or that s/he was infertile. On May 15, 2017 the complainant stated that since Russia offers a free one time invitro fertilization and that the complainant wanted to try this.*

    a.  If yes, please describe your knowledge of **her disability of being infertile**? *N/A*

21. How and when did you become aware of the complainant's disability? *N/A*

22. How long has the complainant had this disability? *N/A*

23. How long is it expected to continue? *N/A*

24. Please, describe which of complainant's normal life functions to your knowledge that was substantially limited because of her disability.

    *The complainant did not state that s/he had a disability.*

25. Please describe in detail how the normal life functions identified above were substantially limited by the complainant's impairment/disability. *N/A*

26. Did the complainant use medication and/or assistive devices for his disability? If yes,

   a.   Identify and describe their purpose.

        *The complainant did not state that s/he had a disability.*

27. To your knowledge did the complainant's medication and/or assistive devices affected any of the complainant's normal life functions? If yes,

   a.   Describe the normal life function. *N/A*

28. Describe the degree to which the function is affected. *N/A*

29. Was the complainant able to perform the essential duties of her position? *Complainant did not complete orientation*

30. If not, please identify the duty or duties the complainant was unable to perform. *The complainant was unable to perform independently in the Medical Instrument Technician role due to not completing orientation.*

31. Indicate how the disability impacted accomplishing these duties. *The complainant did not state that s/he had a disability.*

32. Have you received training on EEO policy and procedure? *Yes*

33. If yes, when? *11/24/2016 and 7/30/2015 (see supporting documentation).*


**A. Whether Complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, complainant was terminated during her probationary period.**

**B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

1. Please identify the individual responsible for terminating the complainant? *The complainant's conduct resulted in termination.*

2. The complainant claims that in May 2017 she told Ms. Dunkelberger that she wanted to have children but was running out of time because she was 50 years old. She told Ms. Dunkelberger that she planned to go to Russia for an IVF attempt. Ms. Dunkelberger's face expressed she was very much unpleased and Ms. Dunkelberger told her that according to FMLA she would have to work for the VAMC for 12 months to be eligible for leave without pay. She told Ms. Dunkelberger that she could not wait for 12 months because it was her turn for a free IVF attempt in Russia. Ms. Dunkelberger requested a copy of her medical records confirming her intention to perform an IVF. She told Ms. Dunkelberger that she would request the medical documents from her Russian OB/GYN. Ms. Dunkelberger stated she needed the documents prior to her departure. On May 17, 2017 Ms. Dunkelberger was out of the office. She told Assistant Manager, Phil Johnson, the same thing she told Ms. Dunkelberger. She told him on May 17, 2017 she received the Russian medical documents which were written in Russian. She only had 3 hormonal pills left and she would start bleeding if she did not go to Russia. There was no time to translate the medical documents. Mr. Johnson told her that if she needed to go she should go. She

- 189 -

told Mr. Johnson that she would provide him with a translated document as soon as she got to Russia and Mr. Johnson agreed. She told Mr. Johnson that a Russian co-worker could translate the document until she could get an official translation. She filled out a Request for Leave Without Pay form for the period from May 18, 2017 through July 7, 2017 and slipped in under Ms. Dunkelberger's door, since she was not in the office. On May 30, 2017, she emailed, from Russia, her Russian OB/GYN medical documentation of her need for IVF in the English language. She received no response. When she left she did not know if her Request for Leave Without Pay would be approved or denied by Ms. Dunkelberger. On July 3, 2017 she received a termination letter. This was the first time she found her Leave Without Pay Request had been denied. Ms. Dunkelberger mailed the termination letter to her home in NM instead of emailing it to her in Russia. The justification provided in the termination letter was that she was on probationary period and attendance issues. What was your role and the circumstances surrounding this event?

*On May 15, 2017, the complainant told me that since Russia offered free one time invitro fertilization that s/he wanted to try this and that s/he would need to leave to go to Russia soon and that s/he would let me know on May 16,2017 when s/he needed to leave. I reminded the complainant that s/he did not qualify for FMLA due to less than 1 year of service, would need to complete an OPM71, provide supporting medical documentation in English, and that it had to be submitted for approval to the ADPCS*

*for approval prior to leaving for Russia; that I could not approve the request. The complainant verbalized understanding.*

*On June 12, 2017 the complainant was mailed a memo with notification that the complainants request for Leave Without Pay (LWOP) from May 18, 2017 through July 7, 2017 was denied. The memo was mailed to the complainants home of record as required by Human Resources.*

*The complainants termination letter was mailed to the complainants home of record as required by HR. In addition, a copy of the termination letter was e-mailed to the complainant on July 3, 2017 as a courtesy..*

3. What was your justification for your actions when the complainant when these events occurred and the complainant was terminated? *Do not understand the question*

4. Did you discuss this with the complainant? *Unable to answer based on not understanding previous question.*

[Number 4.] If yes, when? *N/A*

5. What was discussed? *N/A*

6. What was the outcome of the discussion? *N/A*

7. Did you discuss this with Mr. Johnson? *N/A*

8. If yes, when was it discussed? *N/A*

9.  What was discussed? *N/A*

10. Did you consult with H.R. or any other management officials regarding the termination? *Yes*

11. If so, who did you discuss it with? *Rhonda Anderson*

12. When was is discussed? *June 9, 2017*

13. What was discussed?

    *We discussed that the complainants request for LWOP from May 18, 2017 through July 7, 2017 was denied, that the complainant had been in AWOL status since May 21, 2017, and that a Leave Request Clarification Memo notifying the complaint of this should be mailed to the complainants home of record; per Human Resource rules and regulations.*

14. What policy or regulation supports terminating the complainant in these circumstances? (Please provide that policy to the investigator for the record). *MCM 05-11 Title 5 Leave Policy, MCM 05-8 Tours of Duty, MCM 05-48 Employee Courtesy and Conduct, Master Agreement between the Department of Veterans Affairs and the American Federation of Government Employees (2011), Article 35 Section 10, Leave Without Pay (LWOP), and memo for established phone numbers and unplanned leave.*

15. The complainant claims that, Melonie, an ICU Registered Nurse was a Similarly Situated Employee that was treated more favorably that she was when her Leave Without Pay was denied. Melanie was not terminated when she attended nursing

school and was allowed to work 1 time per month observing cardiac monitors. When Melanie was absent from work she was not terminated even though she couldn't have worked full time. For this reason she was discriminated against because of her disability. *I have no knowledge of a "Melonie"*

16. What is Melonie's last name? *I have no knowledge of a "Melonie"*

17. What was Melonie's position and grade? *N/A*

18. Where did Melonie fall in your chain of command? *N/A*

19. What is Melonie's sex? *N/A*

20. What is Melonie's age? *N/A*

21. Does Melonie have a disability? *N/A*

22. Do you believe Melonie is a Similarly Situated Employee? *N/A*

23. What was your justification for not terminating Melonie under the above circumstances? *N/A*

24. The complainant claims that two <u>young males</u> were hired to replace her position because they would not have pregnancy issues. How do you respond? *Two vacancies for the Medical Instrument Technician position have been filled since the complainants termination. One vacancy was filled by a male and the other by a female.*

25. Was the complainant's disability of **being infertile** a factor when this occurred? *The complainant did not state s/he had a disability*

26. Was the complainant's **age** a factor when this occurred? *I am not aware of the complainants age.*

    a.   If yes, please explain how?

27. Was the complainant's **sex** a factor when this occurred? *I am not aware of the complainants sex. The complainant referred to self as a female.*

    b.   If yes, please explain how?

28.  Was the complainant's **disability** a factor when this occurred? *The complainant did not state s/he had a disability*

    c.   If yes, please explain how?

29.  Did you discriminate against the complainant because of her age, race or disability when this occurred? *No*

*30.* Did the complainant tell you that he felt that she was being discriminated when this occurred? *Do not understand the question; specifically what "this" is referring to.*

31. If yes, when? *N/A*

32. What was discussed and what was the outcome of the discussion? *N/A*

33.  Do you have anything to offer the complainant in resolution of this claim?

*The complainant was terminated during probationary status as a result of not following proper leave policies and procedures.*

34. Is there anything else pertinent to these specific events that we have not discussed?

*The complainant's AWOL status negatively impacted patient care and delayed completion of the complainants orientation. Staff morale is negatively affected as a result of a coworker not showing up for scheduled tours.*

*The complainant signed, was given a copy of, and verbalized understanding of MCM 05-11 Title 5 Duty and Leave Policy, MCM 05-8 Tours of Duty, and MCM 05-48 Employee Courtesy and Conduct, and a memo for established phone numbers and unplanned leave on April 18, 2017 (see supporting documentation).*

*The complainant was notified on multiple occasions the process to appropriately request leave for an extended period of time and that the unit level management team did not have the approval to grant such leave.*

**PLEASE NOTE THAT ORM RESERVES THE RIGHT TO SUPPLEMENT OR ASK ADDITIONAL QUESTIONS AS THE INVESTIGATION REQUIRES.**

**The above information has been furnished without a pledge of confidence and I understand that it may be shown to any interested party[ies] with a need to know for this complaint. This includes but is not limited to VA, EEOC, contracting officials with a need to know during the course and scope of the informal and formal EEO process including administrative procedures and litigation as applicable and mandated by law.**

This statement is made under penalty of perjury on this _8TH___day of

_March_____, 2018.

_Carla Dunkelberger, RN MSN MBA_____

Carla Dunkelberger."


**Fact No. 165.** Please, notice that Ms. Dunkelberger and Mr. Johnson provided **the identical answers** on the EEO Interrogatories. Please, see the table below. Please, notice that Mr. Johnson literally copies and pasted Ms. Dunkelberger's answers with the minor variations.

| Row No. | Questions | Carla Dunkelberger March 08, 2018 | Phil Johnson March 13, 2018 |
|---|---|---|---|
| 1 | 14. When did you first become aware of the complainant's sex? | I am not aware of the complainants sex. The complainant referred to self as a female. | I am not aware of the complaintants sex. Ther complaintant referred to self as female. |
| 2 | 15. How did you become aware of the complainant's sex? | I am not aware of the complainants sex. The complainant referred to self as a female. | I am not aware of the complaintants sex. Ther complaintant referred to self as female. |
| 3 | 17. When did you first become aware of the | I am not aware of the | May 17, 2017 |

| | complainant's age? | complainants age. | |
|---|---|---|---|
| 4 | 18. How did you become aware of the complainant's age? | I am not aware of the complainants age. | Complainant stated age during our discussion about leaving for Russia. |
| 5 | 20. Are you aware of the complainant's disability he describes as being infertile to the point of needing In Vitro Fertilization? | The complainant did not state that s/he had a disability or that s/he was infertile. On May 15, 2017 the complainant stated that since Russia offers a free one time invitro fertilization and that the complainant wanted to try this. | The complaintant did not state that s/he had a disability or that s/he was infertile. |
| 6 | a. If yes, please describe your knowledge of her disability of being infertile? | N/A | N/A |
| 7 | 21. How and when did you become aware of the complainant's disability? | The complainant did not state that s/he had a disability. | N/A |
| 8 | 22. How long has the | N/A | N/A |

| | complainant had this disability? | | |
|---|---|---|---|
| 9 | 23. How long is it expected to continue? | N/A | N/A |
| 10 | 24. Please describe which of complainant's normal life functions, to your knowledge that was substantially limited because of her disability. | The complainant did not state that s/he had a disability. | The complaintant did not state that s/he had a disability. |
| 11 | 25. Please describe in detail how the normal life functions identified above were substantially limited by the complainant's impairment/disability. | N/A | N/A |
| 12 | 26. Did the complainant use medication and/or assistive devices for his disability? If yes,<br><br>a. Identify and describe their purpose. | The complainant did not state that s/he had a disability. | The complaintant did not state that s/he had a disability. |
| 13 | 27. To your knowledge did | N/A | N/A |

| | | | |
|---|---|---|---|
| | the complainant's medication and/or assistive devices affect any of the complainant's normal life functions? If yes,<br><br>a. Describe the normal life function. | | |
| 14 | 28. Describe the degree to which the function is affected. | N/A | N/A |
| 15 | 29. Was the complainant able to perform the essential duties of her position? | Complainant did not complete orientation. | Complaintant did not complete orientation and, therefore, was unable to perform independently in the Medical Instrument Technician role. |
| 16 | 30. If not, please identify the duty or duties the complainant was unable to perform. | The complainant was unable to perform independently in the Medical Instrument Technician role due to not completing orientation. | Because the complaintant did not complete orientation s/he was unable to perform independently in the Medical Instrument Technician role. |
| 17 | 31. Indicate how the disability impacted accomplishing these duties. | The complainant did not state that s/he had a disability. | Complaintant did not state s/he had a disability |

| 18 | 32. Have you received training on EEO policy and procedure? | Yes | Yes |
|---|---|---|---|
| 19 | 33. If yes, when? | 11/24/2016 and 7/30/2015 (see supporting documentation). | 11/30/2015, 7/21/2016 and 1/9/2018 |
| 20 | **B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.** | | |
| 21 | 1. Please identify the individual responsible for terminating the complainant? | The complainants conduct resulted in termination. | Complaintants' conduct resulted in termination. |
| 22 | 2. The complainant claims that in May 2017 she told Ms. Dunkelberger that she wanted to have children but was running out of time because she was 50 years old. She told Ms. Dunkelberger that she planned to go to Russia for an IVF attempt. Ms. Dunkelberger's face expressed she was very | On May 15, 2017, the complainant told me that since Russia offered free one time invitro fertilization that s/he wanted to try this and that s/he would need to leave to go to Russia soon and that s/he would let me know on May 16, 2017 when s/he needed to leave. I reminded the | The complainant came into the office, after business hours, on May 17, 2017 stating s/he had one pill left and was flying to Russia the next day to have Invitro Fertilization done. The complainant also stated his/her age to be 50 and that s/he had always wanted to have children and "this may be |

much unpleased and Ms. Dunkelberger told her that according to FMLA she would have to work for the VAMC for 12 months to be eligible for leave without pay. She told Ms. Dunkelberger that she could not wait for 12 months because it was her turn for a free IVF attempt in Russia. Ms. Dunkelberger requested a copy of her medical records confirming her intention to perform an IVF. She told Ms. Dunkelberger that she would request the medical documents from her Russian OB/GYN. Ms. Dunkelberger stated she needed the documents prior to her departure. On May 17, 2017 Ms. Dunkelberger was out of the office. She told

complainant that s/he did not qualify for FMLA due to less than 1 year of service, would need to complete an OPM71, provide supporting medical documentation in English, and that it had to be submitted for approval to the ADPCS for approval prior to leaving for Russia; that I could not approve the request. The complainant verbalized understanding. On June 12, 2017 the complainant was mailed a memo with notification that the complainants request for Leave Without Pay (LWOP) from May 18, 2017 through July 7, 2017 was denied. The memo was mailed to the complainants home of

my last chance". I handed the complainant the OPM71 paper work and stated that this must be filled out and supporting documentation in English from the doctor must also be supplied. At this time I stated to the complainant that I could not approve Leave Without Pay but I would turn in the documentation and if this was that important then s/he should go.

| | | |
|---|---|---|
| Assistant Manager, Phil Johnson, the same thing she told Ms. Dunkelberger. She told him on May 17, 2017 she received the Russian medical documents which were written in Russian. She only had 3 hormonal pills left and she would start bleeding if she did not go to Russia. There was no time to translate the medical documents. Mr. Johnson told her that if she needed to go she should go. She told Mr. Johnson that she would provide him with a translated document as soon as she got to Russia and Mr. Johnson agreed. She told Mr. Johnson that a Russian co-worker could translate the document until she could get an official translation. She | record as required by Human Resources. The complainants termination letter was mailed to the complainants home of record as required by HR. In addition, a copy of the termination letter was e-mailed to the complainant on July 3, 2017 as a courtesy. | |

| | | |
|---|---|---|
| filled out a Request for Leave Without Pay form for the period from May 18, 2017 through July 7, 2017 and slipped in under Ms. Dunkelberger's door, since she was not in the office. On May 30, 2017 she emailed, from Russia, her Russian OB/GYN medical documentation of her need for IVF in the English language. She received no response. When she left she did not know if her Request for Leave Without Pay would be approved or denied by Ms. Dunkelberger. On July 3, 2017 she received a termination letter. This was the first time she found her Leave Without Pay Request had been denied. Ms. Dunkelberger mailed the termination letter to her home in NM | | |

| | | | |
|---|---|---|---|
| | instead of emailing it to her in Russia. The justification provided in the termination letter was that she was on probationary period and attendance issues. What was your role and the circumstances surrounding this event? | | |
| 23 | 3. What was your justification for your actions when the complainant when these events occurred and the complainant was terminated? | Do not understand the question. | Do not understand the question |
| 24 | 4. Did you discuss this with the complainant? | Unable to answer based on not understanding previous question. | Cannot answer the question |
| 25 | 4. If yes, when? | N/A | N/A |
| 26 | 5. What was discussed? | N/A | N/A |
| 27 | 6. What was the outcome of the discussion? | N/A | N/A |
| 28 | 7. Did you discuss this with | N/A | |

|  | Mr. Johnson? |  |  |
|---|---|---|---|
| 29 | 4. Did you discuss this with Ms. Dunkelberger? |  | N/A |
| 30 | 8. If yes, when was it discussed? | N/A | N/A |
| 31 | 9. What was discussed? | N/A | N/A |
| 32 | 10. Did you consult with H.R. or any other management officials regarding the termination? | yes | No |
| 33 | 11. If so, who did you discuss it with? | Rhonda Anderson | N/A |
| 34 | 12. When was is discussed? | June 9, 2017 | N/A |
| 35 | 13. What was discussed? | We discussed that the complainants request for LWOP from May 18, 2017 through July 7, 2017 was denied, that the complainant had been in AWOL status since May 21, 2017, and that a Leave Request Clarification Memo notifying the complaint of this should be mailed to the | N/A |

| | | complainants home of record; per Human Resource rules and regulations. | |
|---|---|---|---|
| 36 | 14. What policy or regulation supports terminating the complaint in these circumstances? (Please provide that policy to the investigator for the record). | MCM 05-11 Title 5 Leave Policy, MCM 05-8 Tours of Duty, MCM 05-48 Employee Courtesy and Conduct, Master Agreement between the Department of Veterans Affairs and the American Federation of Government Employees (2011), Article 35 Section 10, Leave Without Pay (LWOP), and memo for established phone numbers and unplanned leave. | MCM 05-11 Title 5 Leave Policy, MCM 05-8 tours of Duty, MCM 05-48 Employee Courtesy and Conduct, Master Agreement between the Department of Veterans Affairs and the American Federation of Government Employees (2011) Article 35 Section 10, Leave Without Pay (LWOP). |
| 37 | 15. The complainant claims that, Melonie, an ICU Registered Nurse was a Similarly Situated Employee that was treated more favorably that she was when her Leave Without Pay was denied. Melanie | I have no knowledge of a "Melonie." | I have no Knowledge of a "Melonie." |

|  | | | |
|---|---|---|---|
|  | was not terminated when she attended nursing school and was allowed to work 1 time per month observing cardiac monitors. When Melanie was absent from work she was not terminated even though she couldn't have worked full time. For this reason she was discriminated against because of her disability. | | |
| 38 | 16. What is Melonie's last name? | I have no knowledge of a "Melonie." | N/A |
| 39 | 17. What was Melonie's position and grade? | N/A | N/A |
| 40 | 18. Where did Melonie fall in your chain of command? | N/A | N/A |
| 41 | 19. What is Melonie's sex? | N/A | N/A |
| 42 | 20. What is Melonie's age? | N/A | N/A |
| 43 | 21. Does Melonie have a disability? | N/A | N/A |
| 44 | 22. Do you believe Melonie is a Similarly Situated | N/A | N/A |

| | | | |
|---|---|---|---|
| | Employee? | | |
| 45 | 23. What was your justification for not terminating Melonie under the above circumstances? | N/A | N/A |
| 46 | 24. The complainant claims that two <u>young males</u> were hired to replace her position because they would not have pregnancy issues. How do you respond? | Two vacancies for the Medical Instrument Technician position have been filled since the complainants termination. One vacancy was filled by a male and the other by a female. | The position was open to either Female or Male and the qualified applicants were hired. |
| 47 | 25. Was the complainant's disability of **being infertile a** factor when this occurred? | The complainant did not state that s/he had a disability. | The complaintant did not state s/he had a disability |
| 48 | 26 Was the complainant's **age** a factor when this occurred? | I am not aware of the complainants age. | No |
| 49 | a. If yes, please explain how? | No answer | N/A |
| 50 | 27 Was the complainant's **sex** a factor when this occurred? | I am not aware of the complainants sex. The complainant referred to self as a female. | I am not aware of the complaintant's sex. |

| 51 | b. If yes, please explain how? | No answer | N/A |
|----|----|----|----|
| 52 | 28 Was the complainant's **disability** a factor when this occurred? | The complainant did not state that s/he had a disability. | The complaintant did not state s/he had a disability |
| 53 | c. If yes, please explain how? | No answer | N/A |
| 54 | 29 Did you discriminate against the complainant because of her **age, race or disability** when this occurred? | No | No |
| 55 | 30 Did the complainant tell you that he felt that she was being discriminated when this occurred? | Do not understand the question; specifically what "this" is referring to. | Do not understand the question |
| 56 | 31 If yes, when? | N/A | N/A |
| 57 | 32 What was discussed and what was the outcome of the discussion? | N/A | N/A |
| 58 | 33 Do you have anything to offer the complainant in resolution of this claim? | The complainant was terminated during probationary status as a result of not following proper leave policies and | No |

| | | procedures. | |
|---|---|---|---|
| 59 | 34 Is there anything else pertinent to these specific events that we have not discussed? | The complainant's AWOL status negatively impacted patient care and delayed completion of the complainants orientation. Staff morale is negatively affected as a result of a coworker not showing up for scheduled tours. The complainant signed, was given a copy of, and verbalized understanding of MCM 05-11 Title 5 Duty and Leave Policy, MCM 05-8 Tours of Duty, and MCM 05-48 Employee Courtesy and Conduct, and a memo for established phone numbers and unplanned leave on April 18, 2017 (see supporting documentation). The complainant was notified on multiple occasions the process to appropriately | No |

| | | request leave for an extended period of time and that the unit level management team did not have the approval to grant such leave. | |
|---|---|---|---|

**Fact No. 166**. Please, notice that both Dunkelberger and Johnson provided the following common answers:

1)  They both stated that they were not aware about my sex (rows No. 1 and 2)

2)  They both claimed that I hadn't stated that I had a disability (rows No. 5-14, 17, 47)

3)  They both fraudulently avoided to answer the Investigator's question about whether I was able to perform the essential functions of the job. They both answered that I hadn't completed an orientation (rows No. 15-16.) But it was not the Investigator's question. The Investigator was specifically asking whether I was able to perform the essential functions of the job as a Medical Instrument Technician due to my disability. Both Dubkelberger and Johnson substituted the Investigator's question about the essential functions of the job by a completely different answer about the orientation.

4)  Both Dunkelberger and Johnson received a formal EEO training (row No. 19.) Moreover, Dunkelberger was aware about the VAMC's paid leave policies such as the Voluntary

Leave Transfer Program, see Dunkelberger's June 12, 2017 letter to me (**ER 03748 Vol. 1, page 290**)

5)  They accused me in violating the VAMC's leave policies, they identified the same leave policies that I allegedly violated (MCM 05-11 Title 5 Leave Policy, MCM 05-8 Tours of Duty, MCM 05-48 Employee Courtesy and Conduct, Master Agreement between the Department of Veterans Affairs and the American Federation of Government Employees (2011), Article 35 Section 10, Leave Without Pay (LWOP), and memo for established phone numbers and unplanned leave) but they failed to specify **how exactly** I allegedly violated these leave policies (row No. 36)

6)  They stated that my conduct had resulted in termination but they failed to specify what exactly conduct I exhibited that resulted in termination (row No. 21)

7)  Dunkelberger pretended not to be aware about my age. However, during our April 18, 2017 conversation, I told her that I was 50 yo at that time (row No. 4)

8)  Johnson was more honest and he stated that he had been aware about my age (row No. 4)

9)  Dunkelberger lied under the oath that a male and a female had been hired to substitute my employment. However, Dunkelberger failed to identify the names of the male and the female (row No. 46)

10) Johnson avoided answering the question about whether two males had been hired to substitute my employment. Johnson stated that the qualified candidates had been hired (row No. 46)

11) Both Dubkelberger and Johnson answered that they didn't understand the investigator's question about how they justified the fact of the termination of my employment and whether they discussed it with me (rows No. 23-27, 55)

12) Both Dunnelberger and Johnson refused to give a direct answer about whether they spoke to each other prior to terminating my employment (rows No. 28-31)

13) Dunkelberger acknowledged that she had spoken to the HR official Mr. Rhonda Anderson about the termination of my employment (row No. 32-35)

14) Johnson acknowledged that I had an emergency need to go to Russia because I "had one [hormonal] pill left" (row No. 22)

15) Dunkelberger intentionally lied that, since Russia offers a one time free of charge in-vitro fertilization I "wanted to try this" (row No. 22)

16) Johnson confirmed that she had allowed me to go to Russia (row No. 22)

17) Dunkelberger mentioned about the June 12, 2017 letter but intentionally failed to disclose that this letter was mailed to my home postal address in Albuquerque, NM instead of being emailed to me to enable me to read it when I was in Russia (row No. 22)

18) Both Dunkelberger and Johnson denied their knowledge of a similarly situated employee "Melonie" (rows No. 37-45)

19) I believe that both Dunkelberger and Johnson intentionally and maliciously prevented the EEO Investigator to speak to similarly situated employees Nurses Melanie and Chelsea whom I identified in my EEO claim

20) Dunkelberger lied under the oath that my age had not been a factor for the termination of my employment (row No. 48-49)

21) Johnson denied the fact that my age was a factor for the termination of my employment (row No. 48-49)

22) Both Dunkelberger and Johnson denied the fact that my sex was a factor for firing me (row No. 50-51)

23) Both Dunkelberger and Johnson claimed that I hadn't stated that I had a disability, and therefore they claimed that my disability was not the factor for firing me (row No. 52-53)

24) Both Dunkelberger and Johnson pretended not to understand the Investigator's question about whether I told them that I had been discriminated (rows No. 55-57)

25) Dunkelberger actively accused me in being absent without leave (the AWOL) and for violating the VAMC's leave policies (rows No. 58-59.) Both Dunkelberger and Johnson refused to offer me anything.

**Fact No. 167.** Please, see a direct evidence of discrimination against my disability that is Robinson's Opposition to my Motion for Preliminary Injunction (**ER 03748 Vol. 2, from page 454, line 26 to page 455, line 9**), "Here, Plaintiff has stated only "the agency failed to provide [her] with reasonable accommodations to go to Russia for an IVF attempt" and that she was terminated because of her disability. Dkt. 39 at 2, 4. These sparse, conclusory allegations do not even suffice to show that she has a disability within the meaning the Rehabilitation Act, let alone the other threshold elements. Even if she had shown the threshold elements, whether a particular

accommodation—**in her case long-term and repeated leave and possibly benefits under the Family Medical Leave Act** so that she could "attempt to have a baby"—is reasonable "depends on the individual circumstances of each case" and "requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards." *Wong*, 192 F.3d at 818. **Plaintiff has not, on the current record, shown that the accommodation would have been reasonable or possible**. Thus, the current record does not favor, much less clearly favor, Plaintiff on her disability discrimination claim."

Therefore, Robinson confirmed that the U.S. Department of Veterans Affairs had attempted to avoid giving me a "long term repeated leave." Also, Robinson maliciously denied the fact that I was disabled. Following Robinson's fraud, Mr. Alsup wrote in his July 11, 2019 Order, page 8, footnote *, "Insofar as plaintiff fails to plausibly allege that she was denied reasonable accommodation, this order need not and does not address whether plaintiff's infertility is a cognizable disability under the ADA." Also, in his July 11, 2019 Order, Mr. Alsup, a District Judge with 45 years of experience, stated that (page 7, lines 14-16), "Plaintiff thus appears to allege that defendants violated the Rehabilitation Act of 1973 when they failed to give plaintiff — a federal employee with an allegedly cognizable disability under the ADA — reasonable accommodation **in the form of sick leave**." In my post-July 11, 2019 Judgment filings, I demonstrated that the scope of the reasonable accommodations was not the Sick Leave. The scope of the reasonable accommodations was giving me flexible working time, giving me a time off to go to Russia, and providing me with Telework.

**Fact No. 168.** On March 08, 2018 at 8.02 PM, Investigator Mr. Dennis Hayo sent an email to Ms. Dunkelberger with additional questions (**ER 03748 Vol. 1, pages 233-234.**) On March 12, 2018, Ms. Dunkelberger answered these questions (**ER 03748 Vol. 1, pages 233-234**),

"Good Evening Dr. Dunkelberger, I have a couple of more questions for you to clarify the claim. You may simply answer on this email. **Please remember you are still under oath**.

1. You testified that you told the complainant that she did not qualify for FMLA due to less than 1 year service and would need to complete an OPM71 and provide medical documentation in English and would need to be submitted to the Assistant Director of Patient Care Services prior to leaving for Russia. You told the complainant that you could not approve the request. The complainant verbalized that she understood. When was this? *April 18, 2017 and May 15, 2017*

2. When was the first date that the complainant was AWOL after this above conversation? *May 21, 2017*

3. Did the complainant ever tell you that she felt she was being discriminated against? *No*

4. If yes, when and what was discussed? *N/A*."

**Fact No. 169.** Please, notice that Dunkelberger fraudulently placed me on the Absent Without Leave status (the AWOL) starting May 21, 2017 **without notifying me**.

Please, see (**ER 03748 Vol. 1, page 297**),

```
DREVALEVA,TATYANA E              T&L 221  Telework Ind: None   ████████

      Date     TW  Scheduled Tour        Tour Exceptions
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Sun 14-May-17      07:30P-08:00A
Mon 15-May-17      07:30P-08:00A
Tue 16-May-17      07:30P-08:00A
Wed 17-May-17      11:30P-08:00A
Thu 18-May-17      Day Off
Fri 19-May-17      Day Off
Sat 20-May-17      Day Off
Sun 21-May-17      07:30P-08:00A        07:30P-08:00A    WP LWOP
                                        AWOL

        INAPPROPRIATE LEAVE REQUEST
Mon 22-May-17      07:30P-08:00A        07:30P-08:00A    WP LWOP
                                        AWOL

        INAPPROPRIATE LEAVE REQUEST
Tue 23-May-17      07:30P-08:00A        07:30P-08:00A    WP LWOP
                                        AWOL

        INAPPROPRIATE LEAVE REQUEST
Wed 24-May-17      Day Off
Thu 25-May-17      Day Off
Fri 26-May-17      Day Off
Sat 27-May-17      Day Off
```

- 217 -

Please, see (**ER 03748 Vol. 1, page 298**),

```
OREVALEVA, TATYANA  E            T&L 221  Telework Ind: None    ████████

     Date       TW  Scheduled Tour        Tour Exceptions
  ----------------------------------------------------------------
  un 28-May-17      11:30P-08:00A         11:30P-08:00A      WP LWOP
                                          AWOL

           INAPPROPRIATE LEAVE REQUEST
  Mon 29-May-17     Day Off
  Tue 30-May-17     07:30A-04:00P         07:30A-04:00P      WP LWOP
                                          AWOL

           INAPPROPRIATE LEAVE REQUEST
  Wed 31-May-17     07:30A-04:00P         07:30A-04:00P      WP LWOP
                                          AWOL

           INAPPROPRIATE LEAVE REQUEST
  Thu  1-Jun-17     07:30P-08:00A         07:30P-08:00A      WP LWOP
                                          AWOL

           INAPPROPRIATE LEAVE REQUEST
  Fri  2-Jun-17     Day Off
  Sat  3-Jun-17     Day Off
  Sun  4-Jun-17     07:30P-08:00A         07:30P-08:00A      WP LWOP
                                          AWOL

           INAPPROPRIATE LEAVE REQUEST
  Mon  5-Jun-17     07:30P-08:00A         07:30P-08:00A      WP LWOP
                                          AWOL

           INAPPROPRIATE LEAVE REQUEST
  Tue  6-Jun-17     07:30P-08:00A         07:30P-08:00A      WP LWOP
                                          AWOL

           INAPPROPRIATE LEAVE REQUEST
  Wed  7-Jun-17     11:30P-08:00A         11:30P-08:00A      WP LWOP
                                          AWOL

           INAPPROPRIATE LEAVE REQUEST
  Thu  8-Jun-17     Day Off
  Fri  9-Jun-17     Day Off
  Sat 10-Jun-17     Day Off
```

- 218 -

Please, see (**ER 03748 Vol. 1, page 299**),

```
DREVALEVA,TATYANA E            T&L 221  Telework Ind: None    ████████

     Date       TW  Scheduled Tour            Tour Exceptions
-----------------------------------------------------------------------
un 11-Jun-17        Day Off
on 12-Jun-17        Day Off
ue 13-Jun-17        Day Off
Wed 14-Jun-17       11:30P-08:00A            11:30P 08:00A     WP LWOP
                                                AWOL

          INAPPROPRIATE LEAVE REQUEST
Thu 15-Jun-17       07:30P-08:00A            07:30P-08:00A     WP LWOP
                                                AWOL

          INAPPROPRIATE LEAVE REQUEST
Fri 16-Jun-17       07:30P-08:00A            07:30P-08:00A     WP LWOP
                                                AWOL

          INAPPROPRIATE LEAVE REQUEST
Sat 17-Jun-17       11:30P-08:00A            11:30P-08:00A     WP LWOP
                                                AWOL

          INAPPROPRIATE LEAVE REQUEST
Sun 18-Jun-17       Day Off
Mon 19-Jun-17       07:30A-04:00P            07:30A-04:00P     WP LWOP
                                                AWOL

          INAPPROPRIATE LEAVE REQUEST
Tue 20-Jun-17       07:30A-04:00P            07:30A-04:00P     WP LWOP
                                                AWOL

          INAPPROPRIATE LEAVE REQUEST
Wed 21-Jun-17       07:30A-04:00P            07:30A-04:00P     WP LWOP
                                                AWOL

          INAPPROPRIATE LEAVE REQUEST
Thu 22-Jun-17       07:30A-04:00P            07:30A-04:00P     WP LWOP
                                                AWOL

          INAPPROPRIATE LEAVE REQUEST
Fri 23-Jun-17       07:30A-04:00P            07:30A-04:30P     WP LWOP
                                                AWOL

          INAPPROPRIATE LEAVE REQUEST
Sat 24-Jun-17       Day Off
```

**Fact No. 170**. Please, also notice that the Raymond G. Murphy VAMC provided Investigator Mr. Dennis Hayo with four non-readable documents from the Human Resources.

- 219 -

Please, notice that Investigator Mr. Hayo failed to request the readable versions of these documents, and Hayo included the non-readable versions into the Investigative File.

Document No. 1 (**ER 03748 Vol. 1, page 295**),

Document No. 2 (**ER 03748 Vol. 1, page 296**),

Standard Form 52

Page 1 of 2

**REQUEST FOR PERSONNEL ACTION**

Document No. 3 (**ER 03748 Vol. 1, page 277**)

Standard Form 52

Page 1 of 2

**REQUEST FOR PERSONNEL ACTION**

Document No. 4 (**ER 03748 Vol. 1, page 303**),



Please, notice that the fact that the Raymond G. Murphy VAMC provided the EEO Investigator with four non-readable versions of the documents about the termination of my employment confirms the fact that it was an **intentional** discrimination.

**Fact No. 171**. On March 15, 2018, Investigator Mr. Hayo conducted a phone conversation with Dr. Tina Prince (**ER 03748 Vol. 1, pages 235-249**),

"REPORTER'S TRANSCRIPT OF EXAMINATION OF DR. TINA PRINCE Transcription of proceedings in the above entitled cause of the telephonic examination of DR. TINA PRINCE, before EEO INVESTIGATOR DENNIS HAYO, at 11:30 a.m., MST, on March 15, 2018.

Reported by: Shannon L. Marcos, C.S.R. 8348

PROCEEDINGS

INVESTIGATOR HAYO: We are now on the record. Today is the 15th day of March 2018. It is 2:31 p.m., Eastern Standard Time. I am Dennis Hayo and I'm an EEO investigator with the Department of Veterans Affairs, Office of Resolution Management. I will be recording the testimony of Dr. Tina Prince, T-i-n-a, last name P-r-i-n-c-e, in the matter of a complaint of discrimination filed by Tatyana Drevaleva. I'll spell first name T-a-t-y-a-n-a. Last name D-r-e-v-a-l-e-v-a. Against the New Mexico VA Health Care System. The complaint number is 200P-0501-2017103883.

Dr. Prince, do you solemnly swear or affirm that the information given in response to the following questions is true and complete to the best of your knowledge and belief?

THE WITNESS: I do.

INVESTIGATOR HAYO: Please note that this oath is issued without a pledge of confidence. This means that parties with the need no know will have access to other information contained within this investigative report.

It should be noted that to the extent you use names of employees or other witnesses, including veterans and beneficiaries, this investigator will redact the names and substitute an identifier before making the transcript part of the EEO file to the fullest extent possible.

Would you like a copy of your affidavit to review and to keep as part of your record with respect to this complaint?

THE WITNESS: Yes.

INVESTIGATOR HAYO: Do you have a representative?

THE WITNESS: No. I am in my office alone.

INVESTIGATOR HAYO: Is it okay to proceed?

THE WITNESS: Yes.

INVESTIGATOR HAYO: The accepted claims under investigation are:

A. Whether complainant was discriminated against based on age, sex (female), and disability when from through May 18th, 2017, complainant was terminated during her probationary period.

And B. Whether complainant was discriminated against based on age, sex (female), and disability when on June 30th, 2017, complainant was terminated during her probationary period.


EXAMINATION

BY INVESTIGATOR HAYO:

**Q Dr. Prince, please identify the VA facility 4 where you are presently employed?**

A I work at the New Mexico VA Health Care System in Albuquerque, New Mexico.

**Q How long have you been employed there?**

A From March 5th, 2016 to present.

**Q What unit or section of the facility do you work in?**

A I'm a Pentad member reporting to the director.

**Q When you say "Pentad," what does Pentad mean?**

A That is the five associate directors that report to our director. It's the Executive Leadership Team.

**Q Please identify your position and grade at the facility where you're employed.**

A I am the Associate Director of Patient Care Services, Nurse Executive. I am a Nurse 5, Step 6.

**Q Where does Carla Dunkelberger fall in your chain of command?**

A She is the nurse manager of an acute care telemetry unit and she falls under Raneta, R-a-n-e-t-a, Bonin, B-o-n-i-n, who is the Chief Nurse of Acute Care Nursing Service. Raneta reports to me.

**Q And did you have a working relationship with the complainant Tatyana Drevaleva?**

- 225 -

A No, sir.

**Q Was the complainant in your chain of command?**

A She would have fallen in my chain of command as an employee of by detailing the medical telemetry unit with nurse manager Carla Dunkelberger. So she is in my chain of command, yes.

**Q What is your sex?**

A Female.

**Q When did you first become aware of the complainant's sex?**

A I don't remember. I don't even -- I don't remember.

**Q What is your month and year of birth?**

A May 1959.

**Q Are you aware of the complainant's age?**

A No, sir.

**Q Are you aware of the complainant's disability she describes as being infertile to the point of needing in vitro fertilization?**

A No, sir. This is the first I have seen that information.

**Q In regards to the claim -- I'm going to go ahead and read the claim again just to refresh your memory. Okay?**

A Hello?

**Q Go ahead.**

A Okay.

**Q All right. The complaint reads:**

**A. Whether complainant was discriminated against based on age, sex (female), and disability, when from May 18th, 2017, complainant was terminated during her probationary period.**

**And B. Whether complainant was discriminated against based on age, sex (female), and disability, when on June 30th, 2017, complainant was terminated during her probationary period.**

**Please identify the individual responsible for terminating the complainant. And that would be the management official from the VA responsible for terminating.**

A Yes, sir. That would be myself.

**Q Okay.**

A The nurse manager completed -- the nurse manager compiled the evidence packet, was reviewed by our HR advisors, and concurred by her chief nurse. And then –

**Q Okay. Can I stop you for a moment, please?**

A Yes. Yes.

**Q Your nurse manager, again, could you just –**

A Carla. Carla Dunkelberger.

**Q Okay.**

A And she would receive concurrence from the acute care chief nurse Raneta Bonin.

**Q Okay.**

A I don't know -- I don't remember who the HR advisors were that reviewed the packet. We have several teams that work with us, and I have no recollection of which one it was.

I do know we do not issue a termination without HR reviewing and advisement. That is a standard.

**Q Okay. I'm going to –**

A Can I ask you -- can we go off the record a minute?

**Q Yes. We're now off the record.**

**(Off the record.)**

**BY INVESTIGATOR HAYO:**

Q The complainant claims that in May 2017, she told Mrs. Dunkelberger that she wanted to have children but was running out of time because she was 50 years old. She told Mrs. Dunkelberger that she planned to go to Russia for an in vitro fertilization attempt. Mrs. Dunkelberger's face expressed she was very much unpleased. And Ms. Dunkelberger told her, according to FMLA she would have to work for the VA Medical Center for 12 months to be eligible for leave without pay.

She told Ms. Dunkelberger that she could not wait for 12 months because it was her turn for a free IVF attempt in Russia.

Mrs. Dunkelberger requested a copy of her medical records confirming her intention to perform IVF. She told Ms. Dunkelberger that she would request the medical documents from her Russian OB-GYN. Ms. Dunkelberger stated she needed the documents prior to her departure.

On May 17th, 2017, Ms. Dunkelberger was out of the office. She told assistant manager Phil Johnson the same thing she told Mrs. Dunkelberger. She told him on May 17th, 2017, she received the Russian medical documents which were written in Russian. She had only three hormonal pills left and she would start bleeding if she did not go to Russia.

There was no time to translate the medical documents. **Mr. Johnson told her that she needed to go -- that she needed to go and she should go if she needed to go.**

**She told Mr. Johnson that she would provide him with the translated documents as soon as she got to Russia and Mr. Johnson agreed. She told Mr. Johnson that a Russian coworker could translate the documents until she could get an official translation.**

She filled out a request for leave without pay form for the period of May 18th, 2017 through July 7th, 2017, and slipped it under Ms. Dunkelberger's door since she was not in the office.

On May 30th, 2017, she emailed, from Russia, her Russian OB-GYN medical documentation of her need for IVF in the English language. She received no response.

When she left, she did not know if her request for leave without pay would be approved or denied by Mrs. Dunkelberger.

On July 3rd, 2017, she received a termination letter. **This was the first time she found her leave without pay request had been denied.**

Ms. Dunkelberger mailed the termination letter to her home in New Mexico instead of emailing it to Russia.

Justification provided in the termination letter was that she was on probation period -- she was on probation during this period and had attendance issues.

**What was your role in the circumstances surrounding this event?**

A My role would have been to review the evidence packet with Ms. Dunkelberger and Ms. Bonin and to concur with the requested termination.

**Q Okay. What was your justification for your actions when these events occurred and the complainant was terminated?**

A From what I remember, the evidence packet was pretty solid as far as the AWOLs, the attempt to contact, the letters sent to the only address we had, because our HR requires we send certified letters to the address of record. That was completed with no response; and therefore, I supported the request for termination during probation.

**Q Did you discuss the termination with the complainant prior to her being terminated?**

A No, sir.

**Q Besides the HR person that you've already identified or you could not remember, was there anybody, any other manager, besides Ms. Dunkelberger, was there any other manager that you discussed this with?**

A No, sir.

**Q Do you believe that the policies and procedures regarding termination were followed by the facility and agency in this particular circumstance?**

A Yes.

**Q Was the complainant's disability of being infertile a factor when this occurred?**

A No. I had no knowledge that that was her concern that she was missing work for.

**Q Was the complainant's age a factor when this occurred?**

A No, sir. I have no idea what her age is.

**Q Was the complainant's sex a factor when this occurred?**

A No, sir.

**Q Did you discriminate against the complainant because of her age, race, sex, or disability?**

A No, sir.

**Q Did the complainant tell you that she felt she was being discriminated against when this occurred?**

A No, sir. I've never had a conversation with this employee -- former employee.

**Q Do you have anything to offer the complainant in resolution of this claim?**

A No, sir.

**Q Is there anything else pertinent to the specific events that we have not discussed that you would like to discuss now?**

A No, sir.

INVESTIGATOR HAYO: We can go off the record. (Whereupon the proceedings were adjourned at 11:47 a.m., Mountain Standard Time.)

I, DR. TINA PRINCE, declare under penalty of perjury that the foregoing is true and correct; that I have read my interview under oath and have made the necessary corrections, additions, or changes to my answers that I deem necessary. Executed on this_____day of _____, 2018.

_____

DR. TINA PRINCE."

**Fact No. 172.** On March 02, 2018, employee of the Employee Relations of the Raymond G. Murphy VAMC Mr. Clifford Speakman issued his responses to the EEO Interrogatories (**ER 03748 Vol. 1, pages 250-257**.) On March 09, 2018, Mr. Speakman issued an additional response to the EEO Interrogatories (**ER 03748 Vol. 1, pages 258-259**.) Please, notice that I have no idea

who Mr. Speakman is and why the Raymond G. Murphy VAMC assigned this individual to respond to the EEO Interrogatories.

**Fact No. 173**. Please, read Mr. Speakman's March 02, 2018 responses to the EEO Interrogatories (**ER 03748 Vol. 1, pages 250-257**),

"**The accepted claim(s) under investigation are:**

A. **Whether Complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, complainant was terminated during her probationary period.**

B. **Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

I, **Clifford Speakman**, solemnly swear/affirm that the responses and documents I provide in response to the following questions are true and complete to the best of my knowledge and belief.

Please write your full legal name.

[blank]

**Please answer the following questions:**

1. Please identify the VA facility where you are employed.

   Albuquerque NMVAHCS

2. For what period of time have you been employed there?

   October 18, 2015

3. What unit or section of the facility do you work in?

   Employee Relations

4. Please identify your position and grade at the facility where you are employed.

   Employee Relations Specialist GS-12

5. Please describe your working relationship with the complainant, Tatyana Dreyaleva, during that period.

   Do not know Tatyana Dreyaleva

6. Where did the complainant fall in your chain of command?

   Employee Relations Specialist

7. What is the complainant's position and grade?

   Medical Instrument Technician GS-07

8. Was the complainant a probationary employee?

   Yes

a. If yes, please explain the dates of her probationary employment and what probationary employment means.

Station Entrance on Duty was April 2, 2017, and was terminated on June 30, 2017. Probationary period is 1 year

9.   What unit or section is the complainant assigned to?

Nursing Servive

10. What is your sex?

Male

11. When did you first become aware of the complainant's sex?

3/1/2018

12. How did you become aware of the complainant's sex?

I reviewed the record on 3/1/2018

13. What is your month and year of birth?

Year is 1963 You have no need for Month

14. When did you first become aware of the complainant's age?

When I reviewed the record 3/1/2018

15. How did you become aware of the complainant's age?

Stated in record

16. Do you have a disability?

    Yes

    a.  If yes, would you like to share your disability for the record? No

17. Are you aware of the complainant's disability she describes as being **infertile to the point of needing In Vitro Fertilization**?

    No

    a.  If yes, please describe your knowledge of her disability of being infertile?

        [no answer]

18. How and when did you become aware of the complainant's disability?

    When I reviewed record 3/1/2018.

19. How long has the complainant had this disability?

    Unknown to me

20. How long is it expected to continue?

    Unknown to me

21. Please describe which of complainant's normal life functions, to your knowledge that was substantially limited because of her disability.

    Unknown to me

22. Please describe in detail how the normal life functions identified above were substantially

limited by the complainant's impairment/disability.

Unknown to me

23. Did the complainant use medication and/or assistive devices for his disability?

If yes,

a. Identify and describe their purpose.

Unknown to me

24. To your knowledge did the complainant's medication and/or assistive devices affect any

of the complainant's normal life functions?

If yes,

a.   Describe the normal life function.

Unknown to me

25. Describe the degree to which the function is affected.

Unknown to me

26.  Was the complainant able to perform the essential duties of her position?

Unknown to me

27.  If not, please identify the duty or duties the complainant was unable to perform.

Unknown to me

28.  Indicate how the disability impacted accomplishing these duties.

Unknown to me

29. Have you received training on EEO policy and procedure?

No

30. If yes, when?

N/A

**A. Whether Complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, complainant was terminated during her probationary period.**

**B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

1.  Please identify the individual responsible for terminating the complainant?

[*No answer – T.D.*]

2.  The complainant claims that in May 2017 she told Ms. Dunkelberger that she wanted to have children but was running out of time because she was 50 years old. She told Ms. Dunkelberger that she planned to go to Russia for an IVF attempt. Ms.

Dunkelberger's face expressed she was very much unpleased and Ms. Dunkelberger told her that according to FMLA she would have to work for the VAMC for 12 months to be eligible for leave without pay. She told Ms. Dunkelberger that she could not wait for 12 months because it was her turn for a free IVF attempt in Russia . Ms. Dunkelberger requested a copy of her medical records confirming her intention to perform an IVF. She told Ms. Dunkelberger that she would request the medical documents from her Russian O8/GYN. Ms. Dunkelberger stated she needed the documents prior to her departure. On May 17, 2017 Ms. Dunkelberger was out of the office. She told Assistant Manager, Phil Johnson, the same thing she told Ms. Dunkelberger. She told him on May 17, 2017 she received the Russian medical documents which were written in Russian . She only had 3 hormonal pills left and she would start bleeding if she did not go to Russia. There was no time to translate the medical documents. <u>Mr. Johnson told her that if she needed to go she should go</u>. She told Mr. Johnson that she would provide him with a translated document as soon as she got to Russia and Mr. Johnson agreed. She told Mr. Johnson that a Russian co-worker cculd translate the document until she could get an official translation. She filled out a Request for Leave Without Pay form for the period from May 18, 2017 through July 7, 2017 and slipped in under Ms. Dunkelberger's door, since she was not in the office. On May 30, 2017 she emailed, from Russia, her Russian OB/GYN medical documentation of her need for IVF in the English language. She received no response. When she left she did not know if her Request for Leave Without Pay

would be approved or denied by Ms. Dunkelberger. On July 3, 2017 she received a termination letter. This was the first time she found her Leave Without Pay Request had been denied. Ms. Dunkelberger mailed the termination letter to her home in NM instead of emailing it to her in Russia. The justification provided in the termination letter was that she was on probationary period and attendance issues. What was your role and the circumstances surrounding this event?

None

3.  Did you discuss this with the complainant? No

4.  If yes, when? N/A

5.  What was discussed? N/A

6.  What was the outcome of the discussion? N/A

7.  Did you discuss this with Ms. Dunkelberger? No

8.  If yes, when was it discussed? N/A

9.  What was discussed? N/A

10. Did you discuss this with Mr. Johnson? No

11. If yes , when was it discussed? N/A

12. What was discussed? N/A

13. What policy or regulation supports terminating the complainant in these circumstances? (Please provide that policy to the investigator for the record).

MCM-05-11, MCM 05-8 and MCM 05-48

14. Where the Agency and Facility policies regarding termination followed in this instance?

Agency web page in the MCM library

    a.   If no, please explain why? N/A

15. Did you discriminate against the complainant because of her **age, race or disability** when this occurred? ***No***

16. Did the complainant tell you that he felt that she was being discriminated when this occurred? No

17. lf yes, when? N/A

18. What was discussed and what was the outcome of the discussion?

Unknown to me

19. Do you have anything to offer the complainant in resolution of this claim? No

20. ls there anything else pertinent to these specific events that we have not discussed?

No

**PLEASE NOTE THAT ORM RESERVES THE RIGHT TO SUPPLEMENT OR ASK ADDITIONAL QUESTIONS AS THE INVESTIGATION REQUIRES. The above information has been furnished without a pledge of confidence and I understand that it may be shown to any interested party[ies] with a need to know for this complaint. This includes but is not limited to VA, EEOC, contracting officiaJ.s with a need to know during**

the course and scope of the informal and formal EEO process including administrative procedures and litigation as applicable and mandated by law.

This statement is made under penalty of perjury on this 2nd day of March 2018.

Signature: Clifford Speakman."

**Fact No. 174.** Please, read Mr. Speakman's **Supplemental Affidavit**, March 09, 2018 (**ER 03748 Vol. 1, pages 259-259**),

1. "What is the Agency's justification for terminating the complainant?

   Absent Without Leave

2. Who was responsible for terminating the complainant?

   Service request the action/Due to the employee being on Trial/Probation the HRO approves the action

3. What specific Agency/Facility policy supports termination in instances such as this?

   Title 5 Leave Policy MCM 05-11 / Tours of duty MCM 05-8 / Employee courtesy and Conduct MCM 05-48

4. Where the Agency/Facility policy's followed when this termination occurred? Yes

5. Is there anything else you would like to add? No

This statement is made under penalty of perjury on this 9th day of March 2018.

Signature: Clifford Speakman."

**Fact No. 175**. I have no idea who Mr. Speakman is and how he is related to the process of the termination of my employment. I never met Mr. Speakman in person. From what I understood, Mr. Speakman is a Human Resources specialist. Mr. Speakman never received an EEO training. However, for whatever reason, he was authorized to make a decision in terminating my employment. Mr. Speakman did the following:

1) was misled by Ms. Dunkelberger regarding the AWOL status, didn't know that Mr. Johnson had verbally approved my leave

2) didn't speak to both Ms. Dunkelberger and Mr. Johnson about the circumstances of my case and about my health condition

3) didn't review the medical documentation that I emailed to both Ms. Dunkelberger and Mr. Johnson

4) recklessly disregarded the fact that the June 12, 2017 letter that was mailed to my home postal address in Albuquerque, NM was returned back to the Agency

5) recklessly disregarded Article 33 of the AFGE Master Agreement that said that Title 38 probationary employees may be terminated only after a Summary Board Review is

conducted and after being given both a 15 day Notice and an opportunity to be represented by a representative of their choice

6) approved Ms. Dunkelberger's proposal to terminate my employment

7) claimed that the reason of the termination of my employment was "Absent Without Leave"

8) claimed that the Agency's policies were followed, and cited Title 5 Leave Policy MCM 05-11 / Tours of duty MCM 05-8 / Employee courtesy and Conduct MCM 05-48 while not being able to explain how exactly my "conduct" allegedly violated these policies

9) never contacted with me and never questioned me about the reasons of being absent from work

10) refused to offer me any remedy after he learned that, in fact, I went to Russia to perform an IVF procedure, and my trip was verbally approved by Mr. Johnson

11) was unable to provide the name and the title of the person who was responsible for terminating my employment

12) was inconsistent and discrepant in his answers:

"17. Are you aware of the complainant's disability she describes as being **infertile to the point of needing In Vitro Fertilization**? No

18. How and when did you become aware of the complainant's disability?

When I reviewed record 3/1/2018."

Therefore, Mr. Speakman denied his knowledge about my disability of being infertile but immediately stated the date when he learned about this disability.

**Fact No. 176**. On March 27, 2018, the EEO Investigator Mr. Dennis Hayo issued the following Report (**ER 03748 Vol. 1, pages 194-201**), read from (**ER 03748 Vol. 1, page 196**),

"**V. Summary**

INVESTIGATOR'S NOTE: The age of the complainant, RMO's and witnesses is their age on the date of the first claim of the event of the claim which is May 18, 2017.

**Summary**

The witnesses testified to the following:

The **complainant** (Sex: Female; Age: 51; Disability: Yes) was hired by the Albuquerque VAMC as a Monitor Technician on April 3, 2017. Her disability is Infertility. She does not have any children. For the past 5-7 years she has been unable to get pregnant. It is caused by genetics, hormonal misbalance and age. It is permanent and she cannot be treated for it. She was taking hormonal pills for the condition. The pills were available in Russia. She is currently taking other hormonal pills named Femoston. She was in Russia when she was taking antibiotics. These medications do not have any side effects that impact her ability to perform her duties. Her

disability does not limit anything that would normally be done in everyday life. Her duties included observing cardiac monitors, taking vital signs, changing linens, giving patients showers and assisting patients. She was able to perform all her duties. Because of a reduced cost for treatment she needed to go to Russia to refill prescriptions and receive In Vitro Fertilization (IVF) as a citizen of the Russian Federation. She could not afford the price of IVF in the U.S. Other than being able to get pregnant she does not see any additional differences between her and other female colleagues who are hired for the same position and duties. Ms. Dunkelberger became aware of her disability in May 2017 when she explained that she wanted children. Her date of birth is March 3, 1966. Her sex is female. (7-1, pp. 1-3, 7-8, 7-9 and 7-14)

The **complainant**, in May 2017, told Ms. Dunkelberger that she wanted to have children but was running out of time because she was 50 years old. She told Ms. Dunkelberger that she planned to go to Russia for an IVF attempt. Ms. Dunkelberger' s face expressed she was very much unpleased and Ms. Dunkelberger told her that according to FMLA she would have to work for the VAMC for 12 months to be eligible for leave without pay. She told Ms. Dunkelberger that she could not wait for 12 months because it was her turn for a free IVF attempt in Russia. Ms. Dunkelberger requested a copy of her medical records confirming her intention to perform an IVF. She told Ms. Dunkelberger that she would request the medical documents from her Russian OB/GYN. Ms. Dunkelberger stated she needed the documents prior to her departure. On May 17, 2017 Ms. Dunkelberger was out of the office. She told Assistant Manager, Phil Johnson,

the same thing she told Ms. Dunkelberger. She told him on May 17, 2017 she received the Russian medical documents which were written in Russian. She only had 3 hormonal pills left and she would start bleeding if she did not go to Russia. There was no time to translate the medical documents. Mr. Johnson told her that if she needed to go she should go. She told Mr. Johnson that she would provide him with a translated document as soon as she got to Russia and Mr. Johnson agreed. She told Mr. Johnson that a Russian co-worker could translate the document until she could get an official translation. She filled out a Request for Leave Without Pay (LWOP) form for the period from May 18, 2017 through July 7, 2017 and slipped in under Ms. Dunkelberger' s door, since she was not in the office. On May 30, 2017 she emailed, from Russia, her Russian OB/GYN medical documentation of her need for IVF in the English language. She received no response. When she left she did not know if her Request for LWOP would be approved or denied by Ms. Dunkelberger. On July 3, 2017 she received a termination letter. This was the first time she found her Leave LWOP Request had been denied. Ms. Dunkelberger mailed the termination letter to her home in NM instead of emailing it to her in Russia. The justification provided in the termination letter was that she was on a probationary period and attendance issues. (7-1, pp. 3-5, 7-13 and 7-16)

During mediation on September 7, 2017 Ms. Dunkelberger said that her Leave Without Pay had been denied by Dr. Prince because she didn't meet the requirements to qualify for this leave under FMLA by working at the VA for 12 months. She did not discuss this with Dr.

Prince. She has no working relationship with Dr. Prince other than when she had a group meeting with him when she was a new hire. Ms. Dunkelberger stated she sent the termination letter to her home instead of emailing it to her because it was not encrypted. She never received a phone call from Ms. Dunkelberger. This was unacceptable because she received verbal permission to go to Russia from Mr. Johnson and she was 50 years old and this was the only chance she had to get her hormonal pills and a free IVF. It was her turn and if she missed it she would lose this chance. (7-1, pp. 5-7, 7-8, 7-13, 7-15 and 7-17 through 7-20)

The **Complainant** identified Melanie, an ICU Registered Nurse as a Similarly Situated Employee that was treated more favorably that she was when her LWOP was denied. She is unaware of Melanie's last name. Melanie was not terminated when she attended nursing school and was allowed to work 1 time per month observing cardiac monitors. When Melanie was absent from work she was not terminated even though she couldn't have worked full time. For this reason she was discriminated against because of her disability. (7-1, p. 7)

The **complainant** believes that she was discriminated against because of her disability of not being able to have children and her age. She found that Ms. Dunkelberger hired two, younger, male employees to replace her position. Male employees would not have problems

related to pregnancy. Melonie was allowed to work for only once a month while in nursing school but was not terminated. (7-1, p. 7, pp. 9)

**Phillip Johnson**, RMO (Sex: Male; Age: 61; Disability; Yes) has been assigned to the Raymond G. Murphy Medical Center. He is the Assistant Nurse Manager in 5D Telemetry. His first line supervisor is Carla Dunkelberger. He did have a working relationship with the complainant as the Nurse Manager by helping the complaint orient to her position to Telemetry Monitors. The complainant started employment on April 2, 2017 and was in a probationary period for one year. Probationary periods are times when supervisors are required to study and employee's potential to determine whether they are suited for successful government work. He is unaware of the complainant's sex but she refers to herself as female. He became aware of the complainant's age, on May 17, 2017, during a discussion about her leaving for Russia. The complainant never stated that she was disabled or infertile. He is unaware of her disability. He has received training in EEO policy and procedure. (7-2, pp. 2-5)

**Phillip Johnson**, RMO testified that on May 17, 2017, after business hours, the complainant came to his office and stated she had one pill left and was flying to Russia the next day to have In Vitro Fertilization done. She stated she was 50 years old, wanted to have children and this may be her last chance. He handed her the OPM71 paperwork and stated that this must

be filled out and supporting documentation, from the doctor, in English, must be supplied. He told the complainant that he could not approve Leave Without Pay (LWOP) and that he would turn in the documentation and if this was that important then she should go. He has no knowledge of a "Melonie" who was treated more favorably than the complainant and was absent from work and was not terminated. When the complainant was terminated her position was open and a Female and Male qualified applicants were hired. (7-2, pp. 6-8 and 7-17 through 7-20)

The complainant's race, age and disability were not factors when this occurred. He did not discriminate against the complainant. (7-2, p. 9)

**Dr. Carla Dunkelberger**, RMO (Sex: Female; Age: 44; Disability: No) is a 5D Telemetry Nurse Manager in the Nursing Service Unit at the Raymond G. Murphy Medical Center and has been employed there since October of 2012. Her second line supervisor is Dr. Tina Prince. She was the complainant's direct supervisor. The complainant was a GS-7 Medical Instrument Technician and was a probationary employee. Her probationary period began on April 2, 2017. This is a period of time in which supervisors are required to study an employee's potential to determine whether she is suited for successful government work. The complainant was assigned to 5D Telemetry, Nursing Service. She is female and was born in May 1973. She is unaware of the complainant's sex. The complainant identified herself as female and she is

unaware of the complainant's age. The complainant never said she was infertile or that she had a disability. On May 15, 2017, the complainant stated that since Russia offers a free one time IVF that she wanted to try this. She was unable to observe if the complainant was able perform her duties because the complainant did not complete orientation. She has received training in EEO policy and procedure. (7-3, pp. 2-6, 7-9 and 7-14)

On April 18, 2017 she told the complainant that she did not qualify for FMLA due to less than 1 year service and would need to complete an OPM71 and provide medical documentation in English and would need to be submitted to the Assistant Director of Patient Care Services prior to leaving for Russia. She told the complainant that she could not approve the request. The complainant verbalized that she **understood**. On May 15, 2017, the complainant wanted leave to go to Russia soon for IVF and the complainant would let her know on May 16, 2017 when she needed the leave. She reminded the complainant she did not qualify for FMLA due to less than 1 year service and would need to complete an OPM71 and provide medical documentation in English and would need to be submitted to the Assistant Director of Patient Care Services prior to leaving for Russia. The complainant was told she could not approve the request. The complainant verbalized that she understood. The complainant was Absent Without Leave (AWOL) beginning May 21, 2017. On June 12, 2017 the complainant was mailed a memo with notification that her LWOP request from May 18, 2017 through July 7, 2018 was denied. The memo was mailed to the complainant's home of record by Human Resources. On July 3, 2017 a

letter of termination was mailed to the complainant's home of record and a copy of the termination letter was emailed to the complainant as a courtesy. The complainants AWOL negatively impacted patient care and delayed completion of the complainant's orientation. The complainant was terminated during her probationary period because she did not follow the proper leave policies and procedures. The policies that support terminating the complainant are in the Title 5 Leave policy MCM 05-11, Tours of Duty Policy MCM 05-8, Employee Courtesy and Conduct Policy MCM 05-48, Master Agreement between the Department of VA and American Federation of Government Employees (2011) Article 35 Section 10, LWOP, and memo for established phone number and unplanned leave. She has no knowledge of a "Melonie" that is a Similarly Situated Employee that was treated more favorably than the complainant. Two vacancies for Medical Instrument Technician position have been filled since the complainant's termination. One vacancy was filled by a male and the other by a female. (7-3, pp. 6-9, p. 11, 7-6, 7-7, 7-10, 7-11, 7-15 and 7-17 thought 7-20)


INVESTIGATOR NOTE: The Termination Letter from the Facility to the complainant dated June 30, 2017 indicated that the termination was due to attendance issues while in a probationary period. (7-13)

The complainant was notified on multiple occasions the process to request leave for an extended period of time and that unit level management team did not have the approval to grant such leave. The complainant's disability was not a factor when this occurred because she was unaware the complainant had a disability. The complainant did not state she had a disability. The complainant's sex was not a factor when this occurred because she is unaware of the complainant's sex. She did not discriminate against the complainant when this occurred. The complainant did not tell her she felt she was being discriminated against when this occurred. (7-3, pp. 9-11)

**Dr. Tina Prince**, RMO (Sex: Female; Age: 58) has been employed at the New Mexico VA Health Care System in Albuquerque NM since March 5, 2016. She is the Associate Director of Patient Care Services, Nurse Executive and reports to the Director. Carl Dunkelberger is the Nurse Manager of Acute Care Telemetry Unit and Ms. Dunkelberger falls two levels below her in her chain of command. The complainant reported to Ms. Dunkelberger. She had no working relationship with the complainant. She does not recall when she became aware of the complainant's sex. She is unaware of the complainant's age. She first became aware of the complainant's disability of In Vitro Fertilization when she was notified of this claim. (7-4, pp. 4-5)

She is the individual responsible for terminating the complainant's employment at the VA. Carla Dunkelberger completed the evidence packet reviewed by her Chief Nurse, Raneta Bonin, and was reviewed by Human Resources. She cannot remember who, in H.R. reviewed the file. Her role was that she reviewed the evidence packet and found that it was pretty solid as far as the AWOL's, the attempt to contact, the certified letters sent to the address of record. There was no response. Therefore she supported the request for termination during probation. She did not discuss the termination with the complainant. She believes the facility and agency policies were followed when this occurred.

     (7-4, pp. 6-10 and 7-6 and 7-17 through 7-20)

She is the individual responsible for terminating the complainant's employment at the VA. Carla Dunkelberger completed the evidence packet reviewed by her Chief Nurse, Raneta Bonin, and was reviewed by Human Resources. She cannot remember who, in H.R. reviewed the file. Her role was that she reviewed the evidence packet and found that it was pretty solid as far as the AWOL's, the attempt to contact, the certified letters sent to the address of record. There was no response. Therefore she supported the request for termination during probation. She did not discuss the termination with the complainant. She believes the facility and agency policies were followed when this occurred.

     (7-4, pp. 6-10 and 7-6 and 7-17 through 7-20)

The complainant's age, sex and disability were not factors when this occurred. The complainant did not tell her that she felt she was being discriminated against when this occurred. She did not discriminate against the complainant when this occurred. (7-4, p. 11)

**Clifford Speakman**, SME (Sex: Male; Age: 44; Disability; Yes) has been employed at the Albuquerque NMVAHCS as an Employee Relations Specialist GS-12 since October of 2015. He does not know the complainant. She was a GS-7 Medical Instrument Technician at the Facility. She was hired on April 2, 2017 and terminated on June 20, 2017. She was hired as a probationary employee for 1 year. He is a male, born in 1963 and has a disability. He became aware of the complainant's sex and age on March 1, 2018 and is unaware of her disability. The agency justification for terminating the complainant was that she was AWOL. The Service requested the action due to the complainant being on Trial/Probation and the Human Resource Officer approved the action. He had no role in the complainant being terminated. The Agency/Facility policy that supports termination in this instance is found in Title 5 Leave Policy MCM 05-11, Tours of Duty MCM 05-8 and Employee Courtesy and Conduct MCM 05-48. (7-5, pp. 2-4, 7-5a, pp. 2 and 7-17 through 7-10)

The information in this report was obtained from witness testimonies and documentation provided by the Complainant and/or the Agency.

Date: March 27, 2018

Investigator Mr. Dennis Hayo [original signature]

EEO Investigator."

**Fact No. 177**. The Office of Resolution Management never issued a Determination (**ER 03748 Vol. 1, pages 328-334**), and the Agency never responded to my Notice of Intention to File a Lawsuit (**ER 03748 Vol. 1, pages 335-340**.)

**Fact No. 178**. On June 25, 2018, I filed a complaint for employment Discrimination No. 18-cv-03748-SVK at the U.S. District Court for the Northern District of California (**ER 03748 Vol. 1, pages 2-27.**) Subsequently, this lawsuit got into the hands of Judge Alsup (Doc. No. 33.)

**Fact No. 179**. During the litigation of my lawsuit No. 3:18-cv-03748-WHA, I found out that on May 18, 2017 Mr. Phil Johnson submitted a letter to Dr. Tina Prince who was the VAMC's Supervisor who was responsible for approving my Request for a LWOP (**ER 03748 Vol. 1, 288**.) In this letter, Mr. Johnson wrote the following, "Tatyana Drevaleva was hired as a

Telemetry Technician On April 2, 2017 and participated in NEO[20] on April 3, 2017. She is currently orienting as a telemetry technician on the night shift. While attending the NEO class in April Tatyana informed Carla Dunkelberger (Manager 5DT) that she needed to take extended leave of six weeks and go to Russia **for a medical procedure**. At that time, Carla informed Tatyana that since she just started she was not eligible for FMLA and she had not accrued enough leave to support a week week absence. Tatyana was also told that medical documentation, in English, would be needed prior to approval of Leave Without Pay. On the morning of May 17, 2017 Tatyana informed the 5D management team that she was leaving to Russia on Thursday May 18, 2017 for six weeks. On May 17, 2017 an OPM 71 was given to Tatyana and she filled it out providing no supporting medical documentation.

At this time, I do not recommend approval of Tatyana Drevaleva's request for Leave Without Pay."

**Fact No. 180**. Please, notice that Mr. Johnson was lying to Dr. Prince. First, Mr. Johnson wrote that I hadn't provided my medical documentation. In fact, on May 18, 2018, I emailed my medical documentation to Ms. Dunkelberger and Mr. Johnson at 9.02 AM (**ER 03748 Vol. 1, pages 28-30**.) Also, Mr. Johnson wrote that he didn't recommend Dr. Prince to approve my Request for a LWOP. In fact, on May 17, 2017 Mr. Johnson verbally approved my Request for a LWOP. His exact words were, "If you need to go – go!" During the EEO investigation, Mr.

---

[20] The New Employee's Orientation.

Johnson confirmed in his Interrogatories that he had verbally approved my request for a LWOP. Please, see (**ER 03748 Vol. 1, page 219**), "At this time I stated to the complainant that I could not approve Leave Without Pay but I would turn in the documentation **and if this was that important then s/he should go**."

 

    **Fact No. 181**. Also, see the EEO Investigator Mr. Hayo's statement that (**ER 03748 Vol. 1 page 198**), "[Mr. Johnson] told the complainant that he could not approve Leave Without Pay (LWOP) and that he would turn in the documentation **and if this was that important then she should go**."

 

    **Fact No. 182**. Because of Dunkelberger's Libel about the reasons of the termination of my employment, I was not receiving my Unemployment Insurance benefits (**ER 03748 Vol. 2, pages 506-517**.)

 

    **Fact No. 183.** Because of Dunkelberger's Libel about the reasons of the termination of my employment, my full time employment offer in the Minneapolis VAMC in 2018 (**ER 03748 Vol. 2, pages 597-598**) was rescinded  (**ER 03748 Vol. 2, pages 599-603**) after Hiring Official of the Minneapolis VAMC Mr. Joseph Glazer spoke over the phone with Dunkelberger and after

she said to him that I had been fired for failure to follow the proper steps to obtain a LWOP and

for subsequent absence without leave.


**Fact No. 184**. Also, in 2018 I was not hired by the West Los Angeles VAMC (**ER 03748

Vol. 2, pages 605-607**.)


**Fact No. 185**. The only job I could have performed was to clean streets together with

firmer convicted felons and to work as a live-in Caregiver taking care of elderly people. In 2019,

I was evicted from my place of living in Daly City. In July 2019, after Alsup maliciously

accused me in lying in front of the audience and after he dismissed my Amended Complaint and

entered a Judgment in favor of Defendants, I spent a week in a homeless shelter in San Francisco

with no hope to find a job and to ever get out of the shelter. Both Alsup and Robinson didn't

care, and they kept laughing at me, and they kept torturing me with a pleasure.


**Fact No. 186**. On December 03, 2018 and on July 11, 2019, during the litigation of my

lawsuit No. 3:18-cv-03748-WHA, Alsup intentionally and maliciously ruled against me. Alsup

didn't care that I was defamed about the reasons of the termination of my employment and that I

was unable to obtain employment in my professional field as a Monitor Technician. I believe that

Alsup could have possibly criminally conspired with Attorney Robinson. I believe that Robinson

could have possibly filed a fabricated Declaration of Carla Dunkelberger under the penalty of perjury. I believe that Alsup ruled against me in all my lawsuits, granted all Robinson's frivolous Motions to Dismiss, recklessly disregarded all facts of the case and all my legal arguments, and intentionally tortured and humiliated me with pleasure because he wanted to conceal the material fact of the case that the alleged Declaration of Carla Dunkelberger under the penalty of perjury could have been possibly fabricated. I believe that Mr. Dunkelberger never wrote this Declaration herself and never redacted the Exhibits to this Declaration herself. For me, it is obvious that on March 04, 2020 Alsup intentionally, maliciously, and criminally accused me in abusing my IFP status, stated that my lawsuit No. 3:20-cv-00820-WHA was frivolous and duplicative, dismissed this lawsuit, and subsequently denied two Motions for Reconsideration. I believe it was done it furtherance of criminal conspiracy with Robinson because the lawsuit No. 3:20-cv-00820-WHA explicitly included the Declaration of Carla Dunkelberger.

Alsup denied all my Motions to Vacate the Judgment, never conducted a Case Management Conference, intentionally and maliciously denied my request to appoint a Counsel, and intentionally and maliciously denied my request to transfer the case to the U.S. District Court of New Mexico for a further proceeding. All Alsup did was: he constantly abused me, intentionally tortured and humiliated me, and intentionally and maliciously denied my right for relief. I believe that Alsup and Robinson could have possibly created a plan how to torture me for a longer time and how to deny my right for relief. I wonder if Secretary Wilkie paid both Alsup and Robinson for intentionally torturing me and for denying my right for relief.

**Fact No. 187**. On November 18, 2020, during the litigation of Appeal No. 19-16395, the U.S. Court of Appeals for the 9th Circuit remanded my Title VII claim and my Rehabilitation Act of 1973 claim back to the District Court for a further proceeding. Please, notice that Robinson didn't file any Petition for Rehearing, and she didn't challenge the ruling of the 9th Circuit that the Agency had violated the leave policies and that I had left my job with permission of Assistant Manager Mr. Phil Johnson. However, Robinson still continued to torture me, and she didn't petition to the District Court with a request to grant my Motion for Preliminary Injunction and to IMMEDIATELY reinstate me back to work. Instead, Robinson kept attempting to procrastinate for very extended periods of time, and she kept denying my right for relief. Therefore, the November 18, 2020 Memorandum of the 9th Circuit in Appeal No, 19-16395 didn't stop both Alsup and Robinson from harassing me.

**Fact No. 188**. Please, notice that, after the 9th Circuit remanded my lawsuit No. 3:18-cv-03748-WHA back to the District Court, Alsup immediately resigned. I believe he resigned because he was no longer able to hide the fact that the alleged Declaration of Carla Dunkelberger under the penalty of perjury could have been possibly fabricated. Also, Alsup recused himself after I had reported his disgusting behavior to the Chief Judge and to the Ombudsmen of the U.S. District Court for the Northern District of California and after I notified him that, if he keeps presiding over my lawsuit, I feared that I would not be able to refrain myself, and I could

possibly throw a shoe into his face. I asked Alsup to recuse himself from judging my lawsuits and thus to protect himself from my possible physical abuse. Next day, he recused himself from judging all my lawsuits. In my subsequent email exchange with Alsup's Secretary Ms. Angela Diienno, I explained that I was taking care of Alsup, and that my intention was to protect him from my possible physical abuse. I explained to Ms. Diienno that I was glad that Alsup had recused himself from judging my lawsuits and thus Alsup protected himself from my possible physical abuse.

**Fact No. 189**. Please, notice that, immediately after the 9th Circuit announced that it would remand my Title VII claim and my Rehabilitation Act claim back to the District Court, Robinson immediately emailed me and offered me to stipulate and to transfer my lawsuit No. 3:18-cv-03748-JCS to the District Court of New Mexico. I believe she did it not because she wanted to help me. I believe that she wanted to transfer my lawsuit No.3:18-cv-03748-JCS to the District Court of New Mexico only because she wanted to escape liability for her crime that was intentionally and maliciously denying my right for relief on account of sex and filing a possibly fabricated Declaration of Carla Dunkelberger under the penalty of perjury with severely redacted Exhibits.

**Fact No. 190**. Please, notice that, following Alsup's fraudulent March 04, 2020 Order in the lawsuit No. 4:20-cv-00820-HSG, the U.S. Supreme Court ruled in case No. 20-5581, October 13, 2020, "The motion for leave to proceed *in forma pauperis* is denied, and the petition for a writ of certiorari is dismissed. See Rule 39.8. As the petitioner has repeatedly abused this Court's process, the Clerk is directed not to accept any further petitions in noncriminal matters from petitioner unless the docketing fee required by Rule 38(a) is paid and the petition is submitted in compliance with Rule 33.1. See *Martin v. District of Columbia Court of Appeals*, 506 U. S. 1 (1992) (per curiam)."

The U.S. Supreme Court didn't change its mind after I sent a Motion for Reconsideration of the October 13, 2020 Order that accused me in abusing the Court's process (up to today, I have no idea what U.S. Supreme Court's process I allegedly abused and how.)

I declare under the penalty of perjury, under the Federal laws, under the laws of the State of California, and under the laws of the State of New Mexico that all foregoing is true and correct. Executed at San Francisco, CA on September 25, 2021.

Respectfully submitted,

s/ Tatyana Drevaleva

Plaintiff Pro Se

September 25, 2021.

**Ashley Kittrell**

| | |
|---|---|
| **From:** | Tatyana Drevaleva <tdrevaleva@gmail.com> |
| **Sent:** | Saturday, September 25, 2021 8:02 PM |
| **To:** | Lyman, Christine (USANM); NMDdb_Proposed Text Johnson; NMDml_Magistrate Judge Robbenhaar's Chambers |
| **Subject:** | Case No. 1:21-cv-00761-WJ-JFR. Meet and Confer Session with Attorney Lyman. |
| **Attachments:** | Drevaleva__Plaintiff's Statement of Facts__Part 1__00761__September 25, 2021.pdf; Exhibit 367.pdf; Drevaleva__Defendants' Objections__Part 1__00761__September 25, 2021.docx; Exhibit 368.pdf; PROOF OF ELECTRONIC SERVICE__Lyman__00761__September 25, 2021.pdf; JSR-V3.pdf; Order__Robbenhaar__September17, 2021.pdf |

<mark>**CAUTION - EXTERNAL:**</mark>

Ms. Lyman,

This is a Meet and Confer session pursuant to the September 17, 2021 Order of the Hon. Judge John Robbenhaar.

I am sending you Plaintiff's Statement of Facts, Part 1.

I am also sending you the Excerpts of the Record, Volumes 1, 2, 3, and 4.

I am sending you the template of Defendants' Objections to Plaintiff's Statement of Facts, Part 1. Please, fill out this template and return it back to me prior to October 04, 2021, so I could have an opportunity to review your objections.

I am sending a copy of this email to the Hon. Judges Johnson and Robbenhaar, so these Judges could have an opportunity to review the Excerpts of the Record and to review my Statement of Facts, Part 1.

Please, remember that we need to meet and confer with you over the phone prior or on October 14, 2021. Before this date, we need to establish the material facts of the case, the legal arguments, and the points of disagreement, so we could present our meet and confer session to the attention of the District Court.

Please, let me know if you have any questions.

Tatyana.

<mark>**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.</mark>

No. 19-16395

**Court of Appeals for the 9th Circuit**

Tatyana Evgenievna Drevaleva

*Plaintiff-Appellant Pro Se*

v.

1) The U.S. Department of Veterans Affairs

2) Mr. Robert Wilkie, Esq. in his capacity as an acting Secretary of the U.S. Department of Veterans Affairs

*Defendants-Appellees*

*The District Court for Northern California,*

*case No.3:18-cv-03748, Hon. Judge William Alsup*

# EXERPTS OF THE RECORD,

# VOLUME 1.

**Docket No. 1** – Complaint for Employment Discrimination against the U.S. Department of Veterans Affairs and Mr. Peter O'Rourke in his capacity as an acting Secretary of the U.S. Department of Veterans Affairs, June 25, 2018.

Facility – the Raymond G. Murphy VAMC in Albuquerque, NM.

I declare under the penalty of perjury and under the Federal laws that all foregoing is true and correct. Executed at San Francisco, CA on September 05, 2020.

Respectfully submitted,

s/ Tatyana Drevaleva

Petitioner Pro Se

3015 Clement St., Apt. 204, San Francisco, CA, 94121

415-806-9864; tdrevaleva@gmail.com

Date: September 05, 2020.

**Docket No. 1**

June 25, 2018.

Complain for employment Discrimination against the U.S. Department of Veterans Affairs and Mr. Peter O'Rourke in is capacity as an acting Secretary of the U.S. Department of Veterans Affairs.

Facility: the Raymond G. Murphy VAMC, Albuquerque, NM.

1

1  Tatyana Evgenievna Drevaleva

2  10660 Hidden Mesa Place

3  Monterey, CA, 93940

4  415-806-9864, tdrevaleva@gmail.com

5  Plaintiff in Pro Per

**FILED**

JUN 26 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

6

7  THE UNITED STATES DISTRICT COURT

8  NORTHERN DISTRICT OF CALIFORNIA

9

10

11                                    )

12  Tatyana E. Drevaleva              )
                                      )   **CV 18 3748**
13                                    )
                                      )                          **SVK**
14          Plaintiff,                )
                                      )
15      vs.                           )   Complaint for Employment
                                      )
16  1) The U.S. Department of Veterans)   Discrimination.
       Affairs                        )
17                                    )   Demand for Jury Trial.
    2) Mr. Peter O'Rourke, Acting United)
18     States Secretary of Veterans Affairs)
       810    Vermont    Avenue,    NW)
19     Washington, DC 20420           )
                                      )
20  Facility: New Mexico VA Healthcare System)
           1501 San Pedro Drive, S.E. )
21         Albuquerque, NM 87108      )
                                      )
22         Defendant.                 )
                                      )
23

24      Plaintiff Tatyana Drevaleva herein submits her Complaint for Employment

25  Discrimination against the U.S. Department of Veterans Affairs.

26  1) **Jurisdiction**: This court has jurisdiction over this complaint because: a) the Defendant is

27      the U.S. Department of Veterans Affairs, b) there are Federal questions involved such as

28      the 1st and the 5th Amendments to the U.S. Constitution, c) I am suing the United States

2

under 28 I.S.C. §1346(b)(1), "Subject to the provisions of chapter 171 of this title, the district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred"

2) **Venue** is appropriate in this Court. Read 28 U.S.C. §1402(b), "Any civil action on a tort claim against the United States under subsection (b) of section 1346 of this title may be prosecuted only <u>in the judicial district where the plaintiff resides</u> or wherein the act or omission complained of occurred." Currently, Plaintiff Tatyana Drevaleva is residing in Monterey County

3) Plaintiff Tatyana Drevaleva is a former employee of the Raymond G. Murphy Veterans Affairs Medical Center in Albuquerque, NM.

**Introduction.**

I was retaliated and unlawfully terminated from the Raymond G. Murphy VAMC (the Hospital) for my intention to have a child. I was not reinstated back to work. To substitute me, the Hospital hired two male employees who were much younger than I am. The Department of Veterans Affairs (the Agency) failed to issue its decision in my retaliation and unlawful termination case. The Agency also refused to give me a Right to Sue Letter.

**Statement of Facts.**

I was hired as a Medical Instrument Technician (Electrocardiograph), Full Time at the Raymond G. Murphy VAMC (the Hospital) starting on April 03, 2017. I was undergoing the Orientation, and I was expecting to work as a Monitor Technician observing cardiac monitors at 5D. The Manager of 5D was Ms. Carla Dunkelberger, RN, the Assistant Manager was Mr. Phil Johnson, RN.

Complaint for Employment Discrimination

3

1    I am a citizen of the United States of America and the Russian Federation. I was born in
2    Russia and got naturalized in the United States in December 2013.

3    At that time of hire, I was 50 yo. I was fully qualified for this position. I possess a
4    certificate of an EKG Technician issued by City College of San Francisco, a BLS HCP card, and
5    a number of years of experience working as an Electrocardiography and a Monitor Technician at
6    leading hospitals of Northern California such as UC Davis, Kaiser Permanente Medical centers
7    in Oakland and Walnut Creek, LifeWatch, Inc., the San Francisco VAMC, and Alameda Health
8    System.

9    In the beginning of May 2017, I informed Ms. Dunkelberger that I was 50 yo. I said that I
10   had been married twice but I didn't have children because both husbands refused to give me
11   children. I said that I also had sexual relationships with men in a hope to get pregnant and give
12   birth to the baby but unsuccessfully. I also said that, while being a patient of Kaiser Permanente,
13   I underwent approximately eight in-utero inseminations (IUIs) using donor's sperm but I didn't
14   get pregnant. I also said that I had spent 2.5 years in Russia from January 2014 to July 2016
15   trying to get a full medical examination and to find a solution to get pregnant. I said that in
16   Russia I had undergone three attempts of In-Vitro Fertilization (IVF), and I have an embryo
17   which is frozen in Russia. I said that at that time I was taking hormonal pills named Jeanine

18   https://www.drugs.com/international/jeanine.html

19   that I brought from Russia and that was not available in the United States. The goal of
20   these pills is to prevent menstrual periods and stop ovulation. These pills were prescribed by my
21   Russian OB/GYN. I was taking these pills non-stop starting July 2016. In the beginning of May
22   2017, I had approximately 10 (ten) pills, and I couldn't refill these pills in the United States. I
23   couldn't afford to be without this medication because otherwise I would be heavily bleeding.

24   I said to Ms. Dunkelberger that in Russia I had a right to perform a free of charge IVF
25   attempt as a citizen of Russia. I said that I had been in the registry of patients of the Ministry of
26   Health of the Novosibirsk Region of Russia. I was on a waiting list for the free IVF attempt for
27   approximately 9 (nine) months, and my turn just came in. I informed Ms. Dunkelberger that I
28   urgently needed to fly to Russia to refill a prescription for Jeanine and to perform an IVF

Complaint for Employment Discrimination

4

1   attempt. I also pointed out at the price of one IVF attempt in the United States (approximately 15
2   – fifteen thousand U.S. dollars), and I said that there was no chance for me to afford paying this
3   amount of money with my salary 40 – forty thousand U.S. dollars per year minus taxes.

4       In the United States, I don't have a family. I am twice divorced, and I have no relatives.
5   When I moved to Albuquerque, NM, I rented a room. I provided the Hospital with my home
6   postal address in Albuquerque, NM. I notified Ms. Dunkelberger that I don't have any relatives
7   and family members in the United States, I live alone, I don't have a car, I don't have any
8   definite place of living, and I rent a room in Albuquerque.

9       I said to Ms. Dunkelberger that my plan was to go to Russia for approximately 1.5
10  months, to refill my Jeanine pills, to perform a free of charge attempt of IVF procedure, to freeze
11  the embryo if the IVF procedure is successful, and to return back to work in the Hospital. I said
12  that I was not planning to carry a pregnancy myself because of previous multiple gynecological
13  surgeries and my age 50 yo. I didn't believe that with my pre-existing gynecological condition
14  and age I could carry the pregnancy myself. I informed Ms. Dunkelberger about my plan to work
15  in the Hospital, to earn money, and to hire a surrogate Mom in Russia because it is cheaper than
16  to hire the surrogate Mom in the United States.

17      During the conversation, I could observe that Ms. Dunkelberger was very dissatisfied by
18  my story and explanations. She asked me whether I was planning to return to Russia to make the
19  third embryo. I answered that I was not sure because I didn't know if I still had my own eggs at
20  that time.

21      Ms. Dunkelberger said to me that she couldn't pay me salary and benefits when I am in
22  Russia. I answered that I didn't require her to pay me salary and benefits when I am in Russia. I
23  requested a Leave Without Pay (LWOP). Ms. Dunkelberger said that in order for me to qualify
24  for this Leave, I needed to be employed by the Hospital during one year according to the Family
25  and Medical Leave Act (FMLA). I answered that I had no chance to wait for one year because I
26  had just a few pills of Jeanine left, I needed to refill the prescription in Russia because Jeanine
27  was not available in the United States, I needed to perform a free IVF attempt because I waited
28  for 9 months to be eligible, my turn just came in, I was 50 yo, my chances to have children were

Complaint for Employment Discrimination

5

very small, and I couldn't afford to pay 15 thousand U.S. dollars for one IVF attempt in the United States.

Ms. Dunkelberger requested a written document from an OB/GYN that I really need an IVF procedure. I said that at that time I didn't have health insurance in the United States but I would be requesting my Russian OB/GYN to provide this letter. Ms. Dunkelberger said that I needed to get a certified translator to translate this document, and I couldn't translate myself. I said that I would request this document from Russia but I had no control of the processing time of my request. I also said that, if I don't have time to translate this document in the United States, I would translate it in Russia and send Ms. Dunkelberger a translated copy. Ms. Dunkelberger said that she needed this document prior to my departure to Russia.

I contacted my Russian OB/GYN in Novosibirsk, the Russian Federation, and I requested this document. It took seven days to process my request. I made multiple phone calls to Russia to remind my Russian physician to email me this document.

On May 17, 2017, I worked a night shift together with my co-worker Mrs. Nadya Das who is a Russian speaking lady and a Monitor Technician at 5D. I said to Nadya about my plan to go to Russia to perform an IVF procedure. On that night, Ms. Dunkelberger was absent. I was told that she would be absent for two weeks, and she would return back to work only at the end of May 2017. I spoke to Assistant Manager Mrs. Phil Johnson on that night. I said to him that I had spoken to Ms. Dunkelberger about my plan to go to Russia for an IVF procedure, and I told Mr. Johnson exactly the same things that I had told Ms. Dunkelberger (that I was 50 yo, that I didn't have children, that I performed approximately 8 IUI procedures with donor's sperm, that I spent 2.5 years in Russia for my medical examination and treatment, that I underwent multiple gynecological surgeries, that I performed 3 attempts of IVF, that I had an embryo that is frozen in Russia, that I had a right for a free of charge IVF attempt in Russia, that I had only three pills of Jeanine left, that I couldn't refill these pills in the United States, I needed to go to Russia to perform a free IVF attempt, I couldn't pay $15 thousand U.S. dollars for one IVF attempt in the United States, I requested documentation from my Russian OB/GYN that I am in Registry of the Ministry of Health of the Novosibirsk Region of Russia for a free IVF attempt, that I didn't have

Complaint for Employment Discrimination

6

time to get this document translated in the United States but I will translate it in Russia and email it to Ms. Dunkelberger and Mr. Johnson. Also, I gave my verbal consent that I allow Mrs. Nadya Das to preliminary translate this document before I have a chance to officially translate it in Russia.

Because on that night Ms. Dunkelberger was absent, I asked Mr. Johnson's permission to go to Russia for the mentioned above purposes. The exact words of Mr. Johnson were, "If you need to go – go!" Therefore, he verbally allowed me to go to Russia. He gave me a form to fill out and request a LWOP. I filled this form out, and I requested a LWOP from May 18, 2017 to July 07, 2017. Unfortunately, I don't have a copy of that form. I put the completed form under the door of Mr. Johnson's office.

Afterwards, I spoke to Ms. Das, and I told her that Mr. Johnson had verbally allowed me to go to Russia for the IVF purpose. I also informed Ms. Das that I would be absent from May 18, 2017 to July 07, 2017.

During my shift, I received a document from my Russian OB/GYN in the email. I said about it to Ms. Das. I informed her that I would email this document to Ms. Dunkelberger and Mr. Johnson in the morning. I also said to Ms. Das that I give her my permission to translate this document into English language for Ms. Dunkelberger and Mr. Johnson until I have a chance to officially translate it in Russia.

In the morning of May 18, 2017, I emailed this document to Ms. Dunkelberger and Mr. Johnson. In the evening of May 18, 2017, I departed from Albuquerque to New York and then to Russia.

After I arrived at Novosibirsk, Russia, I immediately started to undergo a medical examination for the upcoming IVF procedure. I visited my Russian OB/GYNs, I performed blood tests, etc. I found a translating company, I got the document translated, and I emailed it to Ms. Dunkelberger and Mr. Johnson on May 30, 2017. During my stay in Russia, I also sent a few emails to Ms. Dunkelberger and Mr. Johnson explaining how the preparation for the IVF procedure was going on. I never heard back from both Ms. Dunkelberger and Mr. Johnson.

Complaint for Employment Discrimination

7

1    In June 2017, my doctor found a cervical polyp, and I underwent a surgery
2  (polypectomy) in June 2017. Afterwards, I needed to wait for approximately 2 weeks to get the
3  pathology result. After I got the pathology result, my OB/GYN ordered blood tests for the
4  Follicle Stimulating Hormone (FSH) and the Anti-Mullerian Hormone (AMH), and I needed to
5  wait for another approximately 12 days in order to be eligible to get these tests done on the
6  second day of my menstrual period. It became obvious that I would not have time to perform an
7  IVF procedure and return back to the United States until July 07, 2017.

8    I requested another document from my Russian OB/GYN that I needed some extension
9  time for my IVF procedure. On July 01, 2017, I emailed Ms. Dunkelberger and Mr. Johnson
10  informing them that my OB/GYN ordered the blood tests for FSH and AMH, and I would not
11  have time to return back to the USA before July 07, 2017. I requested additional time off to stay
12  in Russia.

13    On July 03, 2017, I got an email from Ms. Dunkelberger. It was her first email since my
14  stay in Russia. This email informed me that my employment had been terminated on June 30,
15  2017. For me, it was a complete shock. Ms. Dunkelberger terminated my employment even
16  before July 07, 2017. On July 03, 2017, I send an email to Ms. Dunkelberger and Mr. Johnson
17  asking why my employment was terminated. I never heard back from them.

18    On July 14, 2017, I sent Ms. Dunkelberger and Mr. Johnson a translated version of the
19  second letter from my OB/GYN confirming the fact that I needed some extension time in Russia
20  to complete my IVF procedure. Again, both Ms. Dunkelberger and Mr. Johnson never
21  responded.

22    I timely connected with Mr. William Winter who was assigned to be my EEO counselor.
23  He informed me about the upcoming Mediation after I return back to the USA.

24    In July 2017, I sent a few more emails to Ms. Dunkelberger and Mr. Johnson informing
25  them about what was going on with my IVF procedure. Again, I never heard back from both of
26  them.

27

28

Complaint for Employment Discrimination

8

encrypted, and therefore she didn't email it to me. To me, it didn't make any sense. Ms. Dunkelberger emailed me the Termination Letter which was not encrypted.

While being employed by the Hospital, I spoke to other female employees who were not pregnant. One of them said that when she studied to become a Registered Nurse, Ms. Dunkelberger allowed her to work as a Monitor Technician once a month at 5D. Another employee, a new hire Registered Nurse, revealed that prior of getting hired she received five phone calls from Ms. Dunkelberger who were asking her to fill out a job application to work as an RN at 5D. Contrary, both Ms. Dunkelberger and Mr. Johnson never communicated with me regarding my pregnancy issues, never answered my emails from Russia, never called me over the phone, never requested my home postal address in Russia, and never answered my question why my employment was terminated prior to July 07, 2017.

Ms. Dunkelberger refused to reinstate me back to work. On September 19, 2017, I filed a formal Complaint of Employment Discrimination. The deadline for the Department of Veterans Affairs (the Agency) to issue the decision was on March 18, 2018. I also contacted with the Union (AFGE), and my representative was Ms. Karen Smith.

The Employment Development Department denied my Unemployment Insurance benefits because Ms. Dunkelberger said to them that I had been fired for cause (that I went to Russia without her permission). I have been receiving Food Stamps and General Assistance from Monterey County.

Talking over the phone with Ms. Nadya Das, I learned that Ms. Dunkelberger had hired two Monitor Technicians to substitute me. Both of them were males, and their ages were 30 and 35 years old. One of them was married and had children.

I realized that I was discriminated against my age 50 yo., my sex (female), and my desire to get pregnant. I realized that Ms. Dunkelberger had refused to reinstate me back to work because she hired two young males, and one of them was already married and had children.

On December 28, 2017, I requested a Right to Sue letter from the Agency because I had a right not to wait for 180 days if I was discriminated against my age. I got an answer that the Agency doesn't issue the Right to Sue letters.

Complaint for Employment Discrimination

9

1    On August 10, 2017, I sent an email to Mr. Winter, Ms. Dunkelberger, and Mr. Johnson

2    informing them that I would come back to the United States on August 17, 2017. Again, both

3    Ms. Dunkelberger and Mr. Johnson never responded.

4    I arrived in California on August 18, 2017, and I moved to Monterey, CA to stay with my

5    friends and be looking for a job. Also, I applied for the Unemployment Insurance benefits.

6    On September 07, 2017, I had Mediation via the Telecommunication services from the

7    VA facility in Marina, CA. I told my part of the story – that I went to Russia for an IVF

8    procedure, that I had gotten a verbal permission of Mr. Johnson to go to Russia, that I sent emails

9    to both Ms. Dunkelberger and Mr. Johnson from Russia informing them about the steps of my

10   examination and the IVF procedure, that I never heard back from both Ms. Dunkelberger and

11   Mr. Johnson, and that I was fired on June 30, 2017. I asked Ms. Dunkelberger to reinstate me

12   back to work.

13   Ms. Dunkelberger said that yes, she had received my request for a LWOP, and she

14   submitted this request to Dr. Tina Prince (a Director of Nursing Services). Dr. Prince denied my

15   request because I had not worked at the Hospital for one year according to FMLA. Ms.

16   Dunkelberger said that the Hospital mailed Dr. Prince's decision to my home postal address in

17   Albuquerque, NM, and I didn't respond. Ms. Dunkelberger said that because I went to Russia

18   without a permission, because I didn't respond to Dr. Prince's letter that was mailed to my home

19   postal address in Albuquerque, NM, and because I didn't return back to work, I was fired on

20   June 30, 2017.

21   To me, this explanation didn't make any sense. Ms. Dunkelberger knew very well that I

22   was not in Albuquerque, and I was in Russia. I asked her why she mailed this letter to my

23   address in Albuquerque instead of mailing it to Russia or emailing it to me if she knew that I was

24   in New Mexico. Ms. Dunkelberger answered that there was a policy to use the mailing address

25   that was on the file, and therefore the letter was mailed to my address in Albuquerque. I asked

26   why she didn't email this letter to my email address. She definitely knew my email address

27   because I sent so many emails to her. Ms. Dunkelberger answered that the letter was not

28

Complaint for Employment Discrimination

10

I sent two requests for the Alternative Dispute Resolution to the Agency, and I've never heard back. Also, on March 05, 2018, I gave the Agency 60 days of extension to investigate my complaint per their request. The new deadline to issue the Agency's decision was on May 18, 2018.

On April 11, 2018, I requested a copy of the Agency's final decision.

On May 18, 2018, I never heard from the Agency about the decision.

On May 21st, 2018, I notified the Agency about my intention to file a lawsuit.

On May 30, 2018, I got a phone call and an email from Ms. Jeanne Long who informed me that my case had been received in OEDCA on 4/26/18, and they docketed a due date of 6/25/18 (60 days). Actually, I had never gotten any official notification that my case was forwarded to OEDCA on April 26, 2018, and the decision would be issued in sixty days. Ms. Long attempted to force me to forward my case to the OEDCA office in order to be procedurally dismissed. I answered that the Agency was obligated to issue its decision by May 18, 2018 but failed to do it. I still requested a decision.

By June 22nd, 2018, I never heard from the Agency and never received the Decision.

The Union Representative Ms. Smith stopped her communication with me after I requested her to submit my Interrogatories to Ms. Dunkelberger and Mr. Smith. She is no longer responding my emails and phone calls.

Because the Agency failed to issue the decision by May 18, 2018 and the Agency didn't issue the decision during 30 days after I notified them about my intention to file a lawsuit, I am filing this lawsuit.

## Legal Standard.

### First cause of action – Pregnancy Discrimination.

Read 42 U.S.C. §2000e(k), "The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe

Complaint for Employment Discrimination

11

1   benefit programs, as other persons not so affected but similar in their ability or inability to work,
2   and nothing in section 2000e–2(h) of this title shall be interpreted to permit otherwise."

3   Read 29 CFR Appendix to Part 1604, Questions and Answers on the Pregnancy
4   Discrimination Act, Public Law 95-555, 92 Stat. 2076 (1978),

5   "5. **Q**. If, for pregnancy-related reasons, an employee is unable to perform the functions
6   of her job, does the employer have to provide her an alternative job? **A**. An employer is required
7   to treat an employee temporarily unable to perform the functions of her job because of her
8   pregnancy-related condition in the same manner as it treats other temporarily disabled
9   employees, whether by providing modified tasks, alternative assignments, disability leaves,
10  leaves without pay, etc…

11  6. **Q**. What procedures may an employer use to determine whether to place on leave as
12  unable to work a pregnant employee who claims she is able to work or deny leave to a pregnant
13  employee who claims that she is disabled from work? **A**. An employer may not single out
14  pregnancy-related conditions for special procedures for determining an employee's ability to
15  work. However, an employer may use any procedure used to determine the ability of all
16  employees to work. For example, if an employer requires its employees to submit a doctor's
17  statement concerning their inability to work before granting leave or paying sick benefits, the
18  employer may require employees affected by pregnancy-related conditions to submit such
19  statement. Similarly, if an employer allows its employees to obtain doctor's statements from their
20  personal physicians for absences due to other disabilities or return dates from other disabilities, it
21  must accept doctor's statements from personal physicians for absences and return dates
22  connected with pregnancy-related disabilities.

23  7. **Q**. Can an employer have a rule which prohibits an employee from returning to work
24  for a predetermined length of time after childbirth? **A**. No.

25  8. **Q**. If an employee has been absent from work as a result of a pregnancy-related
26  condition and recovers, may her employer require her to remain on leave until after her baby is
27  born? **A**. No. An employee must be permitted to work at all times during pregnancy when she is
28  able to perform her job.

Complaint for Employment Discrimination

9. **Q**. Must an employer hold open the job of an employee who is absent on leave because she is temporarily disabled by pregnancy-related conditions? **A**. Unless the employee on leave has informed the employer that she does not intend to return to work, her job must be held open for her return on the same basis as jobs are held open for employees on sick or disability leave for other reasons."

Read the Handbook on Leave and Workplace Flexibilities for Childbirth, Adoption, and Foster Care of the Office of the Personnel Management (OPM) of the VA system,

https://www.opm.gov/policy-data-oversight/pay-leave/leave-administration/fact-sheets/handbook-on-leave-and-workplace-flexibilities-for-childbirth-adoption-and-foster-care.pdf

Page 9,

"A. *Sick Leave*

An employee is entitled to use sick leave for personal medical needs while pregnant or recovering from childbirth, to care for a family member who is pregnant or recovering from childbirth, to care for a family member with a serious health condition, or for general family care purposes such as well-baby doctor visits or illnesses. An agency may request administratively acceptable evidence indicating the duration of the employee's or family member's recovery from childbirth. Most health care providers certify that the recovery period following childbirth is about 6-8 weeks.

Tip: Sick leave is an entitlement that may be used without invoking leave under the Family Medical Leave Act (FMLA). See Section E. for information on FMLA.

*Sick Leave for Employee's Own Care*

An employee who is the birth mother is entitled to use any accumulated or accrued sick leave for prenatal care, any period of incapacity due to her pregnancy—including periods of morning sickness or medically prescribed bed rest—childbirth, and recovery from childbirth. There is no limit on the amount of sick leave that an employee may use for her own personal medical needs, however an employee has no entitlement to use sick leave except for authorized sick leave purposes."

Complaint for Employment Discrimination

13

Page 14,

"E.  *Family and Medical Leave*

Under the Family and Medical Leave Act (FMLA), Federal employees are entitled to a total of up to 12 workweeks of unpaid leave during any 12-month period for one or more of these purposes related to childbirth:

- the birth of a son or daughter of the employee and the care of such son or daughter…

- a serious health condition of the employee that makes the employee unable to perform the essential functions of his or her position.

Tip:  An employee must have completed at least 12 months of service (not required to be consecutive and not required to be at the same agency) as a covered Federal employee (generally, an employee at an executive agency) in order to be entitled to FMLA leave. However, an agency may still provide a new employee not eligible for FMLA with a FMLA-like benefit.

*FMLA for Employee's Own Care*

An employee who must be absent from work because of a serious health condition is entitled to unpaid FMLA leave for prenatal care or any period of incapacity due to pregnancy, childbirth, or recovery from childbirth.  This is because, according to the definition of serious health condition (see discussion of serious health condition under Section A. on Sick Leave), any period of incapacity due to pregnancy or childbirth, or for prenatal care, is considered a serious health condition, even if the employee does not receive active medical treatment from a health care provider during the period of incapacity or the period of incapacity does not last more than 3 consecutive calendar days.

Tip:  Since sick leave and FMLA leave are two separate entitlements, an employee does not need to invoke FMLA to use sick leave for her period of recovery from childbirth.  She can use 6-8 weeks of sick leave for recovery from childbirth, then later invoke FMLA to bond with her baby."

Page 21,

"G. *Leave Without Pay*

Complaint for Employment Discrimination

14

An employee may request leave without pay (LWOP) to be absent from work for purposes related to pregnancy and childbirth. An employee may request LWOP without invoking FMLA, even if he or she has available paid leave. Supervisors should refer to agency internal policy and collective bargaining and/or union agreements prior to granting approval. However, agencies are encouraged to offer leave without pay for a longer period than what is provided for under the FMLA, to the maximum extent practicable for pregnancy and childbirth.

LWOP can be used in addition to the flexibilities that are already available, subject to agency policy and any applicable collective bargaining agreement.

Tip: For new employees who are not yet eligible for FMLA, an agency can provide the employee with a LWOP benefit that would mirror a FMLA benefit."

<u>Conclusion:</u> I timely provided the Agency with documentation from my Russian OB/GYN that I needed to perform an IVF procedure. Despite I was a new employee and not eligible for a leave under FMLA, the Agency could provide me with a LWOP. The Agency was obligated to keep my working place until I return back to work under Question 9 of 29 CFR Appendix to Part 1604. In fact, the Agency discriminated and unlawfully terminated me because of my health condition that was related to pregnancy. The Agency refused to reinstate me back to work during the Mediation on September 07, 2017.

**Second case of action – Sex Discrimination.**

Read Title VII, Civil Rights Act of 1964, as amended (42 U.S. Code § 2000e–16 - Employment by Federal Government),

"(a) *Discriminatory practices prohibited; employees or applicants for employment subject to coverage.* All personnel actions affecting employees or applicants for employment ... shall be made free from any discrimination based on race, color, religion, <u>sex</u>, or national origin."

"(c) *Civil action by employee or applicant for employment for redress of grievances; time for bringing of action; head of department, agency, or unit as defendant*

Within 90 days of receipt of notice of final action taken by a department, agency ... on a complaint of discrimination based on race, color, religion, sex or national origin, brought

Complaint for Employment Discrimination

1   pursuant to subsection (a) of this section, ... <u>or after one hundred and eighty days from the filing</u>

2   <u>of the initial charge with the department, agency,</u> ... an employee or applicant for employment, if

3   aggrieved by the final disposition of his complaint, <u>or by the failure to take final action on his</u>

4   <u>complaint,</u> may file a civil action as provided in section 2000e-5 of this title, in which civil

5   action the head of the department, agency, or unit, as appropriate, shall be the defendant."

6   "(e) *Government agency or official not relieved of responsibility to assure*

7   *nondiscrimination in employment or equal employment opportunity.* Nothing contained in this

8   Act shall relieve any Government agency or official of its or his primary responsibility to assure

9   nondiscrimination in employment as required by the Constitution and statutes or of its or his

10  responsibilities under Executive Order 11478 relating to equal employment opportunity in the

11  Federal Government."

12  Sources: https://www.dol.gov/oasam/regs/statutes/2000e-16.htm

13  https://www.law.cornell.edu/uscode/text/42/2000e-16

14  Read the Executive Order 11478 -- Equal employment opportunity in the Federal

15  Government,

16  "Under and by virtue of the authority vested in me as President of the United States by

17  the Constitution and statutes of the United States, it is ordered as follows:

18  **Section 1.** It is the policy of the Government of the United States to provide equal

19  opportunity in Federal employment for all persons, to prohibit discrimination in employment

20  because of race, color, religion, <u>sex</u>, national origin, handicap, or <u>age</u>, and to promote the full

21  realization of equal employment opportunity through a continuing affirmative program in each

22  executive department and agency. This policy of equal opportunity applies to and must be an

23  integral part of every aspect of personnel policy and practice in the employment, development,

24  advancement, and treatment of civilian employees of the Federal Government.

25  **Sec. 2.** The head of each executive department and agency shall establish and maintain an

26  affirmative program of equal employment opportunity for all civilian employees and applicants

27  for employment within his jurisdiction in accordance with the policy set forth in section 1. It is

28  the responsibility of each department and agency head, to the maximum extent possible, to

Complaint for Employment Discrimination

16

provide sufficient resources to administer such a program in a positive and effective manner; assure that recruitment activities reach all sources of job candidates; <u>utilize to the fullest extent the present skills of each employee</u>; <u>provide the maximum feasible opportunity to employees to enhance their skills so they may perform at their highest potential and advance in accordance with their abilities</u>; provide training and advice to managers and supervisors to assure their understanding and implementation of the policy expressed in this Order; assure participation at the local level with other employers, schools, and public or private groups in cooperative efforts to improve community conditions which affect employability; and provide for a system within the department or agency for periodically evaluating the effectiveness with which the policy of this Order is being carried out."

Source: https://www.archives.gov/federal-register/codification/executive-order/11478.html

Read The Pregnancy Discrimination Act of 1978,

"That section 701 of the Civil Rights Act of 1964 is amended by adding at the end thereof the following new subsection:

"(k) The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or <u>on the basis of pregnancy, childbirth, or related medical conditions</u>; and <u>women affected by pregnancy, childbirth, or related medical conditions</u> shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 703(h) of this title shall be interpreted to permit otherwise..."

Source: https://www.eeoc.gov/laws/statutes/pregnancy.cfm

Read *Brown v. GSA*, 425 U.S. 820 (1976), "Section 717 of the Civil Rights Act of 1964, as added by § 11 of the Equal Employment Opportunity Act of 1972, proscribes federal employment discrimination and establishes an administrative and judicial enforcement system. The statute provides that personnel actions affecting federal employees or job applicants "shall be made free from any discrimination based on race, color, religion, <u>sex</u>, or national origin," § 717(a); delegates enforcement authority to the Civil Service Commission (CSC), § 717(b); and

Complaint for Employment Discrimination

permits an aggrieved employee to file a civil action in a federal district court for review of his claim of employment discrimination."

Source: https://supreme.justia.com/cases/federal/us/425/820/

Conclusion. The Agency fired me because I am a woman, and my intention was to get pregnant. The Agency hired two male Monitor Technicians to substitute me, and later refused to rehire me back to work. Therefore, the Agency clearly discriminated me against my sex.

**Third cause of action – Age Discrimination.**

Read The Age Discrimination in Employment Act (ADEA) – 29 U.S.C. §623,

"(a) *Employer practices*. It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age…"

Read 29 U.S. Code § 633a - Nondiscrimination on account of age in Federal Government employment,

"(c) Civil actions; jurisdiction; relief

Any person aggrieved may bring a civil action in any Federal district court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter."

Read 29 U.S. Code § 626 - Recordkeeping, investigation, and enforcement

"(c) Civil actions; persons aggrieved; jurisdiction; judicial relief; termination of individual action upon commencement of action by Commission; jury trial

(1) Any person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter…

(2) In an action brought under paragraph (1), a person shall be entitled to a trial by jury of any issue of fact in any such action for recovery of amounts owing as a result of a violation of this chapter, regardless of whether equitable relief is sought by any party in such action."

Complaint for Employment Discrimination

18

Read 29 CFR 1625.2 - Discrimination prohibited by the Act, "It is unlawful for an employer to discriminate against an individual in any aspect of employment because that individual is 40 years old or older."

Conclusion. The Agency fired me because I was 50 yo and hired two individuals who were 30 and 35 years old. Because of that, the Agency clearly committed Age Discrimination. I am entitled to a jury trial and recovery of damages as a result of violation.

**Fourth cause of action – Disability Discrimination, Failure to Provide me with Reasonable Accommodations.**

Read the Executive Order 13548 of July 26, 2010 signed by President Barack Obama that intended to make the Federal Government a model for hiring and retaining individuals with disabilities,

"Sec. 3. *Increasing Agencies' Retention and Return to Work of Individuals with Disabilities.* (a) The Director of the Office of Personnel Management, in consultation with the Secretary of Labor and the Chair of the Equal Employment Opportunity Commission, shall identify and assist agencies in implementing strategies for retaining Federal workers with disabilities in Federal employment including, but not limited to, training, the use of centralized funds to provide reasonable accommodations, increasing access to appropriate accessible technologies, and ensuring the accessibility of physical and virtual workspaces.

Sec. 4. *Definitions.* (a) "Disability" shall be defined as set forth in the ADA Amendments Act of 2008."

Source: https://www.gpo.gov/fdsys/pkg/FR-2010-07-30/pdf/2010-18988.pdf

Read The Americans with Disabilities Act of 1990 (ADA) – 42 U.S.C. §12102,

"(1) *Disability.* The term "disability" means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment (as described in paragraph (3)).

Complaint for Employment Discrimination

19

(2) *Major life activities*

    (B) Major bodily functions. For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including … reproductive functions.

(3) *Regarded as having such an impairment.* For purposes of paragraph (1)(C):

    (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."

(4) *Rules of construction regarding the definition of disability*

    (C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

(9) *Reasonable accommodation.* The term "reasonable accommodation" may include—

    (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, … and other similar accommodations for individuals with disabilities."

Read 42 U.S.C. §12112. Discrimination

"(a) *General rule.* No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

Read the Agency's mandatory compliance with the Rehabilitation Act of 1973, as amended, "The Rehabilitation Act of 1973, as amended (29 U.S.C. 701, et seq.), requires each agency in the Executive Branch of the Federal government to establish programs that will facilitate the hiring, placement, and advancement of individuals with disabilities. One method for determining agency progress in fulfilling these requirements is through the production of reports at certain intervals showing, for example, the number of employees with disabilities who are

Complaint for Employment Discrimination

20

hired, promoted, trained, or reassigned over a given time period; the percentage of employees with disabilities in the work force and in various grades and occupations; etc. Such reports bring to the attention of agency top management, OPM, and the Congress, the progress or any deficiencies within specific agencies or the Federal government as a whole in the hiring, placement, and advancement of individuals with disabilities."

Source: Standard Form 256 – Self-Identification of Disability

https://www.opm.gov/forms/pdf_fill/sf256.pdf

Read The Federal Agency Employment Strategies: A Framework For Disability Inclusion,

"G. Career Development and Advancement. Examples of existing, promising, and emerging personnel strategies and practices relating to career development and advancement include the following:

1) Adopting a promotion policy that includes disability among the positive selection factors or that provides priority consideration to qualified employees with disabilities

2) Determining whether management slots can be set-aside for individuals with disabilities and inform supervisors of the need to nominate employees with disabilities….

5) Providing career enhancement/leadership development opportunities, including reviewing employee development programs to ensure that no barriers exist for people with disabilities."

"H. Retention Examples of existing, promising, and emerging personnel strategies and practices relating to retention include the following:

1) Adopting disability management and prevention programs (return-to-work programs)

6) Developing and implementing a plan to review proposed terminations to ensure disability accommodations were considered, where appropriate

8) Analyzing and monitoring terminations of permanent employees and reporting to the Secretary or other agency head and Administration on a quarterly basis."

Complaint for Employment Discrimination

Source: https://www.dol.gov/odep/pdf/FAEStrategies.pdf

Conclusion. The Agency terminated my employment due to my disability to give birth to children by a natural way. The Agency failed to provide me with placement and advancement according to the Rehabilitation Act of 1973 as amended. The Agency refused to provide me with reasonable accommodations according to the Executive Order 13548 of July 26, 2010. The Agency failed to provide me with a return-to-work program according to The Federal Agency Employment Strategies: A Framework For Disability Inclusion.

**Fifth cause of action – Libel.**

I went to Russia for an IVF procedure with a verbal permission of Assistant Manager Mr. Johnson. However, the Agency said to the Employment Development Department that I had been fired because I left my working place without a permission. The Agency committed Libel. As a result, I haven't received the Unemployment Insurance Compensation.

Libel is not protected by the First Amendment to the U.S. Constitution and the Article 1, Section 2(a) of the California Constitution. Read *Gertz v. Robert Welch, Inc.* (No. 72-617) 418 U.S. 323 (1974), "Under the First Amendment, there is no such thing as a false idea…. There is no constitutional value in false statements of fact…. The erroneous statement of fact is not worthy of constitutional protection… But it remained true that, in a wide range of situations, the ordinary citizen could make out a *prima facie* case without proving more than a defamatory publication, and could recover general damages for injury to his reputation unless defeated by the defense of truth." Source: https://www.law.cornell.edu/supremecourt/text/418/323

Also, read *McDonald v. Smith*, 472 U.S. 479 (1985), "It does not follow that the Framers of the First Amendment believed that the Petition Clause provided absolute immunity from damages for libel." Source: https://supreme.justia.com/cases/federal/us/472/479/case.html

Conclusion.

The United States is liable for damages caused by libel.

**Sixth cause of action – Intentional Infliction of Emotional Distress (IIED).**

I need to establish four elements of IIED:

Complaint for Employment Discrimination

a) <u>The defendant acts.</u> The Agency retaliated and unlawfully terminated me against my age, my sex, my desire to get pregnant, and my disability to get pregnant by a natural way

b) <u>The defendant's conduct is outrageous.</u> It is outrageous to deprive me an opportunity to have children. It is outrageous not to reinstate me back to work and to lie to the EDD that I was fired for cause. It is outrageous to deprive me a source of income and therefore to deprive me an opportunity to go to Russia again and perform another IVF attempt again. It is outrageous to deprive me an opportunity to work and to serve the Community. My skills of an EKG/Monitor Technician are deteriorating

c) <u>The defendant acts for the purpose of causing the victim emotional distress so severe that it could be expected to adversely affect mental health.</u> The Agency's behavior could be expected to adversely affect my mental health. I am 50 yo, unemployed, without a family and children. Currently, I am working for the General Assistance program of Monterey County cleaning streets. I am working together with a felon who was released from a prison after 30 years of being sentenced for murder. Another my co-worker was in jail many times, one time for 8 years for battery. I clean streets removing trash, cigarette ends, etc. This is what my current working conditions are instead of working at the Hospital observing cardiac monitors

d) <u>The defendant's conduct causes such distress.</u> After I gave the Agency 60 days of extension to process my claim and gave the Agency a 30 day notification about my intention to file a lawsuit, the Agency is still not in hurry to issue its decision. The Agency attempted to force me to forward my complaint to OEDCA in order to dismiss it. Despite I requested arbitration two times, the Agency didn't provide me with the dates of the Arbitration. At this point, I feel that the Agency is going to dismiss my complaint and put me into another long waiting period of going through a litigation in a court.

Source: https://www.law.cornell.edu/wex/intentional_infliction_of_emotional_distress

**Seventh cause of action – Depriving me Liberty and Property without a due process.**

Read the 5th Amendment to the U.S. Constitution, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury,

1    except in cases arising in the land or naval forces, or in the militia, when in actual service in time

2    of war or public danger; nor shall any person be subject for the same offense to be twice put in

3    jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against

4    himself, <u>nor be deprived of life, liberty, or property, without due process of law</u>; nor shall private

5    property be taken for public use, without just compensation."

6    <u>Due Process Clause.</u>

7    The guarantee of due process for all persons requires the government to respect all rights,

8    guarantees, and protections afforded by the U.S. Constitution and all applicable statutes before

9    the government can deprive any person of life, liberty, or property. Due process essentially

10   guarantees that a party will receive a fundamentally fair, orderly, and just judicial proceeding.

11   While the Fifth Amendment only applies to the federal government, the identical text in the

12   Fourteenth Amendment explicitly applies this due process requirement to the states as well.

13   Courts have come to recognize that two aspects of due process exist: procedural due

14   process and substantive due process. The procedural due process aims to ensure fundamental

15   fairness by guaranteeing a party the right to be heard, ensuring that the parties receive proper

16   notification throughout the litigation, and ensures that the adjudicating court has the appropriate

17   jurisdiction to render a judgment. Meanwhile, substantive due process has developed during

18   the 20th century as protecting those substantive rights so fundamental as to be "implicit in the

19   concept of ordered liberty."

20   Source: https://www.law.cornell.edu/wex/fifth_amendment

21   <u>Conclusion.</u> I had a full time employment status at the Hospital. By firing me, not

22   reinstating me back to work, the Agency deprived me liberty to work in my occupation and

23   property that I could purchase if I was employed and had money income. By not notifying me

24   about the Agency's decision to terminate my employment and sending a letter to my home postal

25   address in Albuquerque, NM instead of sending it to Russia, the Agency violated the procedural

26   due process clause of the 5th Amendment.

27

28

## **Conclusion**.

Based on everything stated above, I experienced the following adverse events:

1) Being unemployed for almost one year, losing my EKG reading skills

2) Losing a source of income and the Unemployment Insurance benefits

3) Not being able to pay for another IVF attempt and for the surrogate mother

4) Not being able to create a family and to have children

5) Not being able to purchase property such as a car and a house

6) Not being able to pay my debts off

7) Not being able to study, to obtain a degree in the United States, and to obtain a better paid job.


My Pray for Relief.

Read 28 U.S. Code § 2674 - Liability of United States, "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."

I am respectfully asking the Court:

1) To reinstate me back to work at the Raymond G. Murphy VAMC or another VA Hospital

2) To reimburse me with all lost salary and benefits at the amount determined after calculations

3) To award compensatory damages:

- for a lost opportunity to have children

- for the lost opportunity to get a degree and a better paid job

- for the intentional infliction of emotional distress.

I evaluate the amount of compensatory damages as 5 (five) million US. Dollars. I will use this sum of money perform IVF attempts. As an alternative, I will use this money to purchase donor's eggs, donor's sperm, hiring surrogate mothers, and paying for taking care of the

Complaint for Employment Discrimination

children. I want to have at least three children. Also, I will use this money to pay for my education in the United States

    4) To award me Attorney's Fees at the amount determined at the end of the case.

    5) To award punitive damages for libel that I was fired for cause in the amount 2 (two) million U.S. dollars. I am requesting punitive damages for libel "in the hope of deterring such reckless and damaging conduct and abuse of power in the future."

    Source: a) Man wins defamation case against the United States (the Plaintiff was awarded $1.6 million US dollars of punitive damages in a defamation lawsuit against the Federal Government)

    http://www.wlf.org/litigating/case_detail.asp?id=501

    b) *Vidrine v. United States,* No. 6:07-CV-1204, U.S. District Court for the Western District of Louisiana (September 30, 2011)

    http://www.wlf.org/litigating/case_detail.asp?id=501


I declare under the penalty of perjury under the Federal laws and the laws on the State of California that the foregoing is true and correct. Executed at City of Monterey, CA, on June 24th, 2018.



Respectfully submitted,

Date: June 24th, 2018        Sign Name:

                Print Name:  Tatyana E. Drevaleva

Complaint for Employment Discrimination

# ATTACHMENTS.

**Attachment 1** – my letter to Ms. Dunkelberger and Mr. Johnson with a medical record from my Russian OB/GYN that I am in registry for the IVF procedure (on Russian language). I sent this email on May 18, 2018 prior to my departure to Russia.

**Attachment 2** – my May 30, 2017 letter to Ms. Dunkelberger and Mr. Johnson with a translated version of the document from my Russian OB/GYN that I sent on May 18, 2017.

**Attachment 3** – Termination Letter that I received from Ms. Dunkelberger on July 03, 2017.

**Attachment 4** – my July 14, 2017 letter to Ms. Dunkelberger and Mr. Johnson with a document from my Russian OB/GYN that I need extension to stay in Russia for the IVF procedure.

**Attachment 5** – my letters to Ms. Dunkelberger and Mr. Johnson to which I never got any reply.

**Attachment 6** – agreement to mediate signed.

**Attachment 7** – Flow Chart explaining the EEO process.

**Attachment 8** – Complaint for Employment Discrimination.

**Attachment 9** – contact with the Union (AFGE).

**Attachment 10** – my unsuccessful attempts to get an ADR process, and my request for the Agency's final decision.

**Attachment 11** – Notice of Acceptance and template of Interrogatories.

**Attachment 12** – my submitted Interrogatories.

**Attachment 13** – my unsuccessful attempt to get a Right to Sue Letter.

**Attachment 14** – the Agency's request for extension of time to investigate my complaint.

**Attachment 15** – I granted the Agency with sixty days of extension.

**Attachment 16** – official correspondence, summary of my complaint from the Agency.

**Attachment 17** – referral of my complaint to the final agency's decision.

**Attachment 18** – my case was forwarded to OEDCA.

**Attachment 19** – my Notice of Intention to File a Lawsuit, the Agency's response, and my Reply.

Complaint for Employment Discrimination

27

**Attachment 1** - my letter to Ms. Dunkelberger and Mr. Johnson with a medical record from my Russian OB/GYN that I am in registry for the IVF procedure (on Russian language). I sent this email on May 18, 2017 prior to my departure to Russia.

28

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

## выписка из амбулаторной карты

---

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                    Thu, May 18, 2017 at 9:02 AM
To: "Dunkelberger, Carla" <Carla.Dunkelberger@va.gov>, Footerphil@gmail.com

[Quoted text hidden]
--
Respectfully,
Tanya.

---

📄 **выписка.pdf**
175K

Государственное бюджетное
учреждение здравоохранения
Новосибирской области
«Клинический центр охраны
здоровья семьи и репродукции»
**Поликлиническое
отделение**
ул. Камская, 14
г. Новосибирск

## Выписка из амбулаторной карты

Древалевой Татьяны Евгеньевны, 13.10.1966 года рождения

Древалева Т.Е. состоит в реестре проведения процедуры ЭКО по территориальной программе ОМС.

Примерные сроки вступления в программу ЭКО с 23.05.2017 до 31.09.2017 года.

Лечащий врач                                                    И.Б.Дзуцева

Заведующая п/отделением                              М.П.Опарина

17 мая 2017 года

30

**Attachment 2** – my May 30, 2017 letter to Ms. Dunkelberger and Mr. Johnson with a translated version of the document from my Russian OB/GYN that I sent on May 18, 2017.

 Gmail

**Tatyana Drevaleva <tdrevaleva@gmail.com>**

## Translated document.

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                        Tue, May 30, 2017 at 8:05 AM
To: "Dunkelberger, Carla" <Carla.Dunkelberger@va.gov>, Phil Johnson <Footerphil@gmail.com>

I picked up the translated document only today.

--
Respectfully,
Tanya.

**img237.jpg**
551K

32

Public Government-Financed Institution of Public
Health of Novosibirsk Region
"Clinical Center for the Protection of Family
Health and Reproduction"
Out-Patient Department
Kievskaya str., 14
Novosibirsk

## EXTRACT FROM THE MEDICAL HISTORY

DREVALEVA, TATYANA EVGENIEVNA, DOB October 13, 1966

DREVALEVA T.E. is included in the registry for carrying out the extracorporal fertilization procedure according to the Territorial Program of Compulsory Health Insurance.

An approximate term of entering the extracorporal fertilization program from May 23, 2017 to September 31, 2017.

| | | |
|---|---|---|
| Attending Doctor | I.B. Dzutseva | (Signature) |
| Out-Patient Department Head | M.P. Oparina | (Signature) |

May 17, 2017

/Seal: Public Government-Financed Institution of Public Health of Novosibirsk Region "Clinical Center for the Protection of Family Health and Reproduction"/

I, Asya Sergeyevna Pisareva, Director of Translation Bureau, Limited Liability Company – State Registration Certificate Series 54 Number 004157325 State registration number 1095404006720 dd. March 19, 2009, residing in Novosibirsk, Russia, hereby certify that the foregoing is, to the best of my knowledge and belief, a true and accurate English translation of the Russian document made by Eleonora Aleksandrovna Pyltseva, an official translator of the English and Russian languages.

ASYA SERGEYEVNA PISAREVA

Translation Bureau, Limited Liability Company
Suite 606, 57 K.Marx Pr., Novosibirsk, Russia
Tel./fax: (383) 210-57-39
e-mail: BNM@narod.ru

33

**Attachment 3** – Termination Letter that I received from Ms. Dunkelberger on July 03, 2017.

34

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

## from Tanya Drevaleva from Siberia.

**Dunkelberger, Carla** <Carla.Dunkelberger@va.gov>                    Mon, Jul 3, 2017 at 1:46 PM
To: Tatyana Drevaleva <tdrevaleva@gmail.com>, "Johnson, Phillip L." <Phillip.Johnson@va.gov>, "Salazar-Ruiz, Andrew V." <Andrew.Salazar-Ruiz@va.gov>
Cc: "Dunkelberger, Carla" <Carla.Dunkelberger@va.gov>, "Anderson, Rhonda R." <Rhonda.Anderson2@va.gov>, "Bonin, Allean R." <AlleanRanetta.Bonin@va.gov>

Please see attached.


Carla Dunkelberger, RN, MSN, MBA

Nurse Manager, 5D Telemetry

Raymond G. Murphy VA Medical Center





Integrity, Commitment, Advocacy,

Respect, Excellence


**From:** Tatyana Drevaleva [mailto:tdrevaleva@gmail.com]
**Sent:** Saturday, July 01, 2017 8:11 AM
**To:** Dunkelberger, Carla <Carla.Dunkelberger@va.gov>; Phil Johnson <Footerphil@gmail.com>
**Subject:** [EXTERNAL] from Tanya Drevaleva from Siberia.

[Quoted text hidden]

 **T.D..pdf**
75K



**DEPARTMENT OF VETERANS AFFAIRS**
Raymond G. Murphy Medical Center
1501 San Pedro Drive SE
Albuquerque NM 87108-5154

JUN 3 0 2017

In Reply Refer To: 501/108

Tatyana E. Drevaleva
Nursing Service (118)
New Mexico VA Health Care System
1501 San Pedro Drive SE
Albuquerque, NM 87108

Subject: Termination during Probationary Period

1. At the time of your Excepted Appointment on April 2, 2017, as a Medical Instrument Technician, you were informed that your first year of employment would be subject to a trial/probationary period. The trial/probationary period is an important part of the hiring process and during this time, supervisors are required to study an employee's potential closely to determine whether s/he is suited for successful government work. When it becomes apparent that an employee's conduct, general character traits or capacity do not meet the requirements for satisfactory service, the supervisor is required to initiate action to separate the employee.

2. The Associate Director, Patient Care Services, has recommended that you be terminated from your position for failure to qualify during your probationary period. Your termination is due to attendance issues.

3. The effective date of your termination will be June 30, 2017. The decision to terminate you immediately in lieu of a two (2) week notice is due to your absent without leave (AWOL) status since May 21, 2017. You must properly clear the facility, turn in any government property to your supervisor and clear any indebtedness prior to the release of your final paycheck.

4. You are entitled to:

   a) seek corrective action before the U.S. Office of Special Counsel (OSC); or

   b) a discrimination complaint with the Office of Resolution Management (ORM).

You shall be deemed to have exercised your option to appeal this action at such time as you timely initiate action to appeal to MSPB, or OSC, or a discrimination complaint.

5. If you believe this action is based on discrimination on the basis of race, color, religion, sex, national origin, age or disabling condition, you may file a complaint of discrimination. If you elect to file a complaint of discrimination, you may do so by contacting the Office of Resolution Management (ORM) at 1-888-737-3361. Your complaint will be processed in accordance with EEOC regulations at 29 C.F.R., Part 1614. Your initial contact with the ORM office must be done within 45 calendar days of the effective date of this action.

6. If you elect to seek corrective action by the OSC's Complaints Examining Unit (OSC Appeal Form) (https://osc.gov/), your complaint will be limited to a determination as to whether the agency took one or more personnel actions against you in violation of 5 USC 2302(b) (prohibited personnel

37

Tatyana E. Drevaleva
Termination during Probationary Period
Page 2

practices). This can include, but is not limited to claims of reprisal for whistleblowing and/or engaging in protected activity. If you are making a claim of retaliation for engaging in one or more protected activities and OSC dismisses your claim, you may have the right to file an individual right of action (IRA) appeal to the MSPB, but such an appeal will be limited to an adjudication of whether you proved that your protected activity was a contributing factor in the effected action.

7. Whichever is filed first, an appeal for the corrective action to OSC, or a discrimination complaint, shall be considered an election by you to proceed under that appeal process.

8. If you have any questions concerning this matter or the rights described above, or if you need assistance or additional information, please contact Rhonda Anderson, Human Resources Specialist, at extension 2381.

Thomas E. Harris Sr.
Acting Human Resources Officer

38

**Attachment 4** – my July 14, 2017 letter to Ms. Dunkelberger and Mr. Johnson with a document from my Russian OB/GYN that I need extension to stay in Russia for the IVF procedure.

39

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

## Перевод

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                    Fri, Jul 14, 2017 at 4:05 AM
To: "Winter, William (ORM)" <william.winter@va.gov>, "Dunkelberger, Carla" <Carla.Dunkelberger@va.gov>,
Phil Johnson <Footerphil@gmail.com>

Here is a translated document dated July 6th, 2017 that I needed to spend more time in Russia for
additional examination regarding my IVF procedure.
Respectfully,
Tatyana Drevaleva.

[Quoted text hidden]

--
Respectfully,
Tanya.

**^C9C0D5ADD7BF3EB5B57464DCD15E9020F335DC66019A6F1A41^pimgo_
distr.jpg**
137K

40



# АГЕНТСТВО ПЕРЕВОДОВ МОНОТОН
# MONOTON TRANSLATION AGENCY

ООО "Монотон" 630007 г Новосибирск, ул Октябрьская, д 42, офис 3301, www.monoton.su e-mail: inbox@monoton.su, тел +7(383)287-59-21, +7-913-782-5847

Monoton LLC, 42 Oktyabrskaya st., suite 3301, Novosibirsk, Russia 630007, www.monoton.su, e-mail: inbox@monoton.su, phone +7(383)287-59-21, +7-913-782-5847

[Stamp]: State Budgetary Public Health Care Institution of Novosibirsk Oblast
    Clinical Centre of Family Health Care and Reproduction
    Outpatient Department
    14 Kievskaya St., Novosibirsk

**State Budgetary Public Health Care Institution of Novosibirsk Oblast Clinical Centre for Planned Parenthood and Reproduction**
14 Kievskaya St., Novosibirsk-136, 630136

06 July 2017

### Medical Assessment Report

Name: Tatyana Patronymic: Evgenievna Surname: Drevaleva
Date of birth 13/10/1966

Received a medical advice on  _____

Diagnosis: Primary infertility of combined genesis
T.E. Drevaleva currently is put in the registry for providing a program of in vitro fertilization at the expense of the compulsory medical insurance. The queue code number is 147.
According to the Order of the Ministry of Health of the Russian Federation No. 107н dd. 30/08/2012 on Arrangements for the Use of Assisted Reproductive Technologies, Contraindications and Limitations to their Use, the patient T.E. Drevaleva currently has limitations for using the in vitro fertilization program and require additional follow-up examination.

Head of the Outpatient Department of the Clinic [Signature] M.P. Oparina
Head of the Reproductive Health Department [Signature]

[Seal]: State Budgetary Public Health Care Institution of Novosibirsk Oblast
    Clinical Centre of Family Health Care and Reproduction
    Outpatient Department
    For references
    Novosibirsk, Russia

**I, Denis Aleksandrovich Adamov, certify that I am fluent in the English and Russian languages, and that the above document is an accurate translation of the document entitled «Medical Assessment Report».**



41

**Attachment 5** – my letters to Ms. Dunkelberger and Mr. Johnson to which I never got any reply.

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

**from Tanya Drevaleva from Siberia.**

---

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                                    Sat, Jul 1, 2017 at 7:10 AM
To: "Dunkelberger, Carla" <Carla.Dunkelberger@va.gov>, Phil Johnson <Footerphil@gmail.com>

Dear Carla and Phil!

How are you?

I spent time getting fully examined before the IVF procedure. Unpleasantly, a gynecologist found a polyp of the cervical canal, and I got it removed. I waited for the pathology result which was good. Now, the gynecologist wants me to get other blood tests for Folliclestimulating Hormone (FSH) and Antimullerian Hormone (AMH). I will have to do it at the beginning of the next menstrual period which will be in approximately 7-8 days. After I get the results, the gynecologist will let me know if I am eligible for the IVF cycle. I hope I am eligible. However, I will have to stay in Russia for 2-3 more weeks than I expected. Initially, I was planning to return back to the United States on July 7th. I will not be able to do it because I will have to wait until I can get the blood tests done for FSH and AMH.

I requested another letter from my gynecologist confirming that currently I am getting examined in Novosibirsk for my IVF cycle. The gynecologist promised to give me this letter on Thursday next week. As soon as I get the letter, I will get it translated and forward it to you.

Please, allow me to spend other 2-3 weeks in Russia. Please, send me a form that I can fill out and return to you if necessary.

Thank you so much,

Respectfully,

Tanya Drevaleva.

43

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

**from Tanya Drevaleva from Siberia.**

**Tatyana Drevaleva** <tdrevaleva@gmail.com>
To: "Dunkelberger, Carla" <Carla.Dunkelberger@va.gov>

Mon, Jul 3, 2017 at 2:02 PM

Good afternoon Carla!

Why did you terminate my employment? I submitted the proof that I would go to Russia to solve my medical problems (to perform an IVF procedure). I submitted the proof (a letter from my Russian physician) that I would be doing an IVF procedure in Russia. I submitted a request form to you where I asked you to allow me to be absent from work from May 18th, 2017 to July 7th, 2017. You terminated my employment on June 30th, 2017 which is before July 7th, 2017. Please, give me the answer.

Thank you,

Respectfully,

Tatyana Drevaleva.

[Quoted text hidden]
--
Respectfully,
Tanya.

44

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

**from Tatyana Drevaleva.**

---

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                                    Thu, Jul 20, 2017 at 7:23 PM
To: "Winter, William (ORM)" <william.winter@va.gov>, "Dunkelberger, Carla" <Carla.Dunkelberger@va.gov>,
Phil Johnson <Footerphil@gmail.com>

Good afternoon William, Carla and Phil!

How are you?

Bad news – I was discharged from the IVF protocol yesterday because, despite stimulation for 7 days,
follicles were not growing.

I want to spend 10-14 more days in Novosibirsk and have another pelvic ultrasound examination. If the
follicles start growing, I will perform the IVF procedure. If not, I will fly to the USA.

I will let you know the date of my arrival to the USA. I will be happy to have a Mediation process with you
and convince you to reinstate me back to work.

Thank you,

Respectfully,

Tatyana Drevaleva.

45

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

## from Tanya.

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                    Thu, Jul 27, 2017 at 7:09 PM
To: "Winter, William (ORM)" <william.winter@va.gov>, "Dunkelberger, Carla" <Carla.Dunkelberger@va.gov>,
Phil Johnson <Footerphil@gmail.com>

Dear William, Carla and Phil!

Good news – my follicles started growing up. I had a pelvic ultrasound examination yesterday. The size of
the follicles is 13 millimeters now versus 4 millimeters a week ago. The doctor wants to continue observing
the follicles. I will have another pelvic ultrasound examination tomorrow.

I will keep you posted.

Have a wonderful and blessing day,

Tatyana.

46

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

## from Tatyana Drevaleva.

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                   Thu, Aug 10, 2017 at 5:23 PM
To: "Winter, William (ORM)" <william.winter@va.gov>, "Dunkelberger, Carla" <Carla.Dunkelberger@va.gov>,
Phil Johnson <Footerphil@gmail.com>

Dear Mr. Winter, Carla and Phil!

I will fly back to the USA on August 17th. Please, schedule a Mediation process as soon as possible to
August 17th.

Respectfully,

Tatyana Drevaleva.

47

**Attachment 6** – agreement to mediate signed.

**FOR USE IN EEO RELATED CASES**

**AGREEMENT TO MEDIATE AND CONFIDENTIALITY AGREEMENT
ORM Case No.: 200P-0501-2017103883**

This is an agreement by the parties identified below to participate in mediation and adhere to the confidentiality provisions applicable to the mediation process as described in the Administrative Dispute Resolution Act of 1996, 5 U.S.C. § 574 (ADRA).

1. The parties understand that mediation is being used to discuss, and potentially resolve, issues that have arisen in the workplace and are the subject of the above-referenced EEO complaint. The parties understand that the mediator's role is to facilitate communication among the parties and assist them in exploring options for resolving the dispute. The mediator(s) does not make decisions for the parties, render a determination on the merit of the issue(s) raised, or act as an advocate for either party. Should either party designate an individual to serve as their representative, providing advice and counsel during the process, such information will be shared with all parties in advance of the session.

2. Mediation sessions are not recorded or transcribed. All notes taken by the mediator(s) are destroyed at the completion of the mediation process. The parties agree not to subpoena the mediator(s) or compel the mediator(s) to produce documents provided by a party in a pending or future administrative or judicial procedure. Also, the mediator(s) will not voluntarily testify on behalf of a party in any pending or future administrative or judicial proceeding.

3. The parties understand that any oral statement, or any written communication prepared specifically for the mediation, which is provided only to the mediator(s) in confidence will be kept confidential by the mediator(s) with the exception of information concerning fraud, waste, abuse, criminal activity, sexual harassment, or threats of imminent harm. The parties also understand that oral and written communications shared with all parties are not protected and may be disclosed and matters that are admissible in a court of law or other administrative process continue to be admissible even though brought up in the mediation process. The parties understand that they have the option of contracting to increase their own confidentiality obligations by initialing the **statement in the box below**.

4. Although communications made in the presence of all parties and written materials shared with all parties may be disclosed, no party shall be bound by anything said or done during the mediation process unless a written agreement is reached and executed by all necessary parties.

5. If an agreement is reached, it shall be reduced to writing and when signed and approved by the appropriate authorities for all parties, the document shall be legally binding upon the parties to the agreement.

49

6. If the matter is not resolved through mediation, a party may pursue other available avenues of redress. However, it is that party's responsibility to be aware of and comply with all time limits and deadlines associated with those processes. By electing to use mediation, such deadlines are not waived or tolled unless otherwise agreed to in writing.

---

**Expanded Confidentiality Statement**

TD _____ In addition to the confidentiality described above, we further agree that oral communications made with all parties present or otherwise confidential documents a party makes available to all parties will be confidential in this mediation. We also understand that despite this agreement for additional confidentiality, outside parties may still have access under the Freedom of Information Act to documents which a party makes available to all other parties and that a party's failure to comply with any confidentiality obligations beyond the protections of ADRA may not be enforceable.

---

BY SIGNATURE BELOW, I ACKNOWLEDGE THAT I HAVE READ, UNDERSTAND, AND AGREE TO THE PROVISIONS OF THIS AGREEMENT.

_Tatyana Drevaleva_ _____ 08.30.2017

**Aggrieved Party/Complainant**     **Date**

_____     _____

**Aggrieved Party/Complainant's Representative**     **Date**

_____     _____

**Management Official**     **Date**

_____     _____

**Facility Representative**     **Date**

**Attachment 7** – Flow Chart explaining the EEO process.



# EEO Complaint Process Flowchart and Timeframes

The EEO Counselor will advise the aggrieved party of the right to seek resolution through the ADR process. If ADR is elected, informal counseling is extended an additional 60 days. ADR can be utilized at anytime during the EEO process prior to the EEOC Hearing.

Incident or Action

45 Days — Contact EEO Counselor — Or — ADR

30 Days — Right to File Notice Issued

15 Days — Formal Complaint Filed (VA Form 4939)

Acceptability Determination By ORM Intake Specialist

Entire Complaint Dismissed | Partial Dismissal / Partial Acceptance | Entire Complaint Accepted

180 Days

Investigation of Accepted Claims

Advisement of Rights Notice

30 Days — Request Hearing Before EEOC

30 Days — Request Agency Decision

Administrative Judge's Decision

60 Days — Final Agency Decision by OEDCA

40 Days — Agency Decides to Implement or Appeal Administrative Judge's Decision

30 Days — Appeal OEDCA Decision to EEOC

Agency Appeals to EEOC | Agency Issues Final Action to Implement Administrative Judge's Decision

90 Days

30 Days — Appeal to EEOC | Or | 90 Days — File Civil Action

30 Days — Complainant Appeals to EEOC | Or | 90 Days

File Civil Action

52

**Informal Stage**: An individual (aggrieved) who believes that he or she has been discriminated against must initiate contact with an EEO Counselor within 45 days of the date of the matter alleged to be discriminatory, or in the case of a personnel action, within 45 days of the effective date of the action. An aggrieved may seek EEO counseling by either calling 1-888-RES-EEO1 (1-888-737-3361) or visiting the local ORM Field Office.

An EEO Counselor will advise the aggrieved that he or she must elect to have their dispute(s) informally resolved through the agency's Alternative Dispute Resolution (ADR) procedure(s) where the agency agrees to offer ADR or pursue resolution through the EEO complaint process. If the EEO complaint process is elected, the Counselor will make necessary inquiries into the matter to facilitate an informal resolution between the parties. The EEO Counselor is required to complete counseling with the aggrieved within 30 calendar days of the initial contact. When counseling is completed, the EEO Counselor will issue a Notice of Right to File a Discrimination Complaint to the aggrieved individual.

If ADR is elected, the pre-complaint processing period shall be ninety (90) calendar days. If the matter is not resolved within a 90-calendar day period or ADR continues beyond the 90-calendar day period, the EEO counselor will issue a Notice of Right to File a Discrimination Complaint on the 90th day. ORM encourages use of ADR throughout the EEO complaint process.

**Formal Complaint Stage**: A formal complaint must be submitted in writing, preferably on VA Form 4939, signed by the complainant, and submitted to the local ORM Field Office within 15 calendar days of receipt of the Notice of Right to File a Discrimination Complaint. The ORM Field Office will determine if the complaint is acceptable for processing.

**Investigative Stage**: If a complaint is accepted for investigation, an EEO Investigator will be assigned to the case. The investigator is authorized to take statements from witnesses under oath and gather pertinent documents and records. The investigator will assemble the file and prepare a report, which summarizes the evidence gathered.

**Advisement of Rights:** When the investigation is completed, the complainant will be provided a copy of the investigative file and advised of his/her right to request an EEOC hearing or final agency decision rendered by the Office of Employment Discrimination Complaint Adjudication (OEDCA).

**Hearing Stage:** If a complainant elects a hearing, the investigative file will be transferred to the nearest EEOC District Office. An Administrative Judge may conduct a hearing. If a hearing is conducted, it will be recorded and transcribed verbatim. Witnesses may be called to testify and may be cross examined by the complainant and a VA representative. All documents submitted by the parties and accepted by the Administrative Judge will be entered into the record. The

53

Administrative Judge will issue a decision within 180 days of receiving the investigative file from the agency and will transmit the decision and file to the Agency.

**Final Agency Decision Stage:**  After receiving the Administrative Judge's decision, the agency will implement the decision within 40 days, or appeal the decision to EEOC. If the complainant is dissatisfied with the Administrative Judge's decision or the final action taken by the Agency, he/she may appeal to EEOC's Office of Federal Operations. If there has been no hearing, OEDCA will address all issues in the complaint; find discrimination or find no discrimination; and advise the complainant of his/her right to appeal the decision to EEOC's Office of Federal Operations, or to file a civil action in Federal District Court.

**Appeal Stage:**  If the complainant disagrees with the Agency's final action (dismissals and Final Agency Decisions) he/she may file an appeal with EEOC's Office of Federal Operations, within 30 calendar days of receipt of the Agency's final action. If the appeal is timely, EEOC will adjudicate the complaint. The EEOC's appellate decision is final and binding on both parties, unless either party timely requests reopening

54

**Attachment 8** – Complaint for Employment Discrimination.



**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT
11301 Wilshire Boulevard
Building 220, 2nd Floor
Los Angeles, CA 90073

September 14, 2017

*In reply refer to:* 08H

VIA: Electronic Mail

Tatyana Drevaleva
tdrevaleva@gmail.com

Dear Ms. Drevaleva:

I am closing the informal counseling on the matter you presented to this office on July 5, 2017, Case Number: **200P-0501-2017103883**. Your complaint is as follows:

| Basis | Claim & Date of Occurrence |
|---|---|
| **Disability** (Physical) | **Termination** (Probationary)<br><br>On June 30, 2017, Ms. Drevaleva, the Aggrieved Party (**AP**) was issued a Notice of Termination. |

Upon receipt of this letter please notify me no later than 5 business days whether the above information is incorrect.

I have enclosed a copy of the Notice of Right to File a Discrimination Complaint (including VA Form 4939). At this point, you have two options available to you. To help you make your decision, I have also enclosed a link to the Equal Employment Opportunity Commission's (EEOC) website for an overview of the guidelines on the federal sector EEO complaint process. http://www.eeoc.gov/federal/

Please select one of the options below as your final decision:

**Option 1:** You can choose to file a formal complaint of discrimination on some or all of the claim(s) listed above. If you wish to file a formal complaint, please complete, sign, and date the VA Form 4939; returning the form to the address listed on the *Notice of Right to File a Discrimination Complaint.*

> **If you decide to file a formal complaint, you have 15 calendar days from receipt of this notice in which to do so.** Please do not mail the VA Form 4939 to me; your formal complaint must be mailed to the address listed on the first page of the enclosed *Notice of Right to File a Discrimination Complaint.*

Upon receipt of a formal complaint, the Office of Resolution Management (ORM) will review your complaint and determine if the claim(s)[1] raised meet(s) EEOC's procedural requirements for continued processing.

If your complaint meets procedural requirements and is accepted by ORM for investigation, you will be given the opportunity to submit any documentation in support of your allegations of discrimination to the ORM investigator assigned to investigate your complaint, as part of the process for gathering evidence relevant to the merits of your accepted claim(s). There is no need to provide evidence in support of your claim(s) until notified that your claim(s) is accepted for investigation.

**Option 2**: You can take no further action, indicating your wish not to pursue the allegations listed above any further.

If you have any questions or need assistance, please call me at (888) 566-3982, Ext. 10256.

Sincerely,

William Winter
EEO Counselor

Enclosure: Notice of Right to File a Discrimination Complaint
          VA Form 4939

---

[1] A claim is the action(s) the Agency has taken or is taking that causes the aggrieved person to believe s/he is the victim of discrimination for which, if proven, there is a remedy under the federal equal employment statues. It is important to limit your description of the specific claim(s) to one or two sentences.



# Office of Resolution Management
*Department of Veterans Affairs*

## NOTICE OF RIGHT TO FILE A DISCRIMINATION COMPLAINT

Aggrieved Person: **Tatyana Drevaleva**
Case Number: **200P-0501-2017103883**

1. If you are not satisfied with the results of the informal EEO process and believe that you have been subjected to discrimination because of race, color, religion, sex, national origin, age, disability, genetic information, or retaliation, you have the right to file a formal complaint of discrimination. **If you decide to file a formal complaint, you must do so WITHIN FIFTEEN CALENDAR DAYS OF RECEIPT OF THIS NOTICE.**

2. Attached is VA Form 4939, Complaint of Employment Discrimination. If you choose to file a formal complaint at this time, use this form, and carefully read the instructions on the reverse side before completing it. The counselor is available to assist you in filling out this form and to answer any questions you may have about it. If you require assistance, please contact your counselor immediately. **Please note that the 15-calendar day time frame will not be extended due to your need to seek my assistance in completing this form.**

3. You may file a complaint in person, by mail, fax, or e-mail with the District Manager at the address below:

   **District Manager**
   **Department of Veterans Affairs**
   **Office of Resolution Management (08H)**
   **11301 Wilshire Boulevard**
   **Building 220, 2nd Floor**
   **Los Angeles, CA 90073**

   **Fax: 310-268-4089**

   **Email: ORMPDO4939@va.gov**

4. You must identify each claim you are protesting and provide the date on which each occurred. Your complaint must be limited to the claim(s) you discussed with the counselor. Therefore, if there are any claims that you have not discussed with the counselor, you must do so immediately. Regulations require that you provide the Department with an opportunity to resolve each claim informally at EEO counseling.

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS) - 9-24-2015

Page 2.
Notice of Right to File a Discrimination Complaint
Aggrieved Person: Tatyana Drevaleva
Case Number: 200P-0501-2017103883

5. You are entitled to representation at every stage of the complaint process. You may choose anyone as a representative, unless the person occupies a position within VA that would create a conflict of interest. If you do select a representative, you must inform this ORM District Office, in writing, of the representative's name, telephone number, and business address.

6. If you are a member of the bargaining unit, you may have the right to dispute the events discussed with the counselor through the union grievance procedure. Regulations provide that you may file either a grievance or an EEO complaint about the events in dispute, but not both. Should you file both, whichever you file first (a union grievance or an EEO complaint) will be considered an election to proceed in that forum.

7. If you are complaining about a matter that may be appealed to the Merit Systems Protection Board (MSPB), you may file an EEO complaint or an MSPB appeal, but not both. Whichever you file first (a formal EEO complaint or an MSPB appeal) will be considered an election to proceed in that forum. If the counselor can be of further assistance to you, please advise.

COMPLAINT CASE NUMBER:

OMB NO.: 2900-0716
EXPIRATION DATE: DEC 31, 2019
RESPONDENT BURDEN: 30 Min.

**VA** Department of Veterans Affairs

# COMPLAINT OF EMPLOYMENT DISCRIMINATION

*Read the instructions on the reverse side of this form carefully before completing the front of this form.*

| 1. NAME *(Last, first, middle initial)(Please print)* | 3. MAILING ADDRESS | 4a. WORK TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| 2. EMAIL ADDRESS | | 4b. PRIMARY TELEPHONE NUMBER *(Include Area Code)* |

| 5. ARE YOU: | 6a. JOB TITLE, SERIES AND GRADE | 7. NAME AND ADDRESS OF VA FACILITY WHERE DISCRIMINATION OCCURRED |
|---|---|---|
| ☐ A VA EMPLOYEE | | |
| ☐ AN APPLICANT FOR EMPLOYMENT | 6b. SERVICE/SECTION/PRODUCT LINE | |
| ☐ A FORMER VA EMPLOYEE | | |

NOTE: For each employment related matter that you believe was discriminatory you must list the basis *(list one or more of the following)*:
Race *(Specify)*, Color *(Specify)*, Religion *(Specify)*, Sex *(Male or Female)*, National Origin *(Specify)*, Age *(Provide date of birth)*,
Disability *(Specify)*, Genetic Information *(including family medical history)*, and/or Reprisal for participating in the EEO process or opposing unlawful discrimination.

| 8. BASIS | 9. CLAIM(S) *(What employment related claim(s) - personnel action(s), incident(s), or event(s) caused you to file this complaint? Briefly state the specific claim, personnel action and/or event that caused you to file this complaint. Use an additional sheet of paper if necessary. You should not include information that violates the Privacy Act of 1974 and the Health Insurance Portability and Accountability Act (HIPAA). Some examples are patient medical records, personal records of other VA-employees, etc.)* | 10. DATE OF OCCURRENCE *(Include the most recent date(s))* |
|---|---|---|
| | | |

11. REMEDIES SOUGHT *(Use an additional sheet of paper if necessary.)*

| 12a. DO YOU HAVE A REPRESENTATIVE? | 12c. PROVIDE THE NAME AND ADDRESS OF YOUR REPRESENTATIVE | 12d. TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| ☐ YES ☐ NO | | |
| 12b. IF "YES," IS HE OR SHE AN ATTORNEY? | | 12e. EMAIL ADDRESS |
| ☐ YES ☐ NO | | |

| 13a. HAVE YOU CONTACTED AN EEO COUNSELOR? | 13b. NAME OF EEO COUNSELOR | 13c. DATE OF INITIAL CONTACT WITH ORM |
|---|---|---|
| ☐ YES ☐ NO | | |

14. If you contacted an EEO Counselor more than 45 calendar days after the Date(s) of Occurrence, listed in item 10, or if this complaint is filed more than 15 calendar days after receipt of a Notice of Right to File a Discrimination Complaint, you must explain why you were untimely in seeking EEO counseling or untimely in filing a complaint. *(Use an additional sheet of paper, if necessary.)*

| 15a. HAVE YOU FILED A UNION GRIEVANCE ON ANY CLAIM(S) LISTED ABOVE? | 15b. IF "YES," LIST THE CLAIM(S) AND DATE GRIEVANCE FILED | 16a. HAVE YOU FILED AN APPEAL WITH THE MERIT SYSTEM PROTECTION BOARD (MSPB) ON ANY OF THE CLAIMS LISTED ABOVE? | 16b. IF "YES," LIST THE ISSUE(S) AND DATE MSPB APPEAL FILED. |
|---|---|---|---|
| ☐ YES ☐ NO | | ☐ YES ☐ NO | |

| 17a. HAVE YOU FILED THIS COMPLAINT WITH ANYONE ELSE? | 17b. IF "YES," PROVIDE THE NAME AND ADDRESS |
|---|---|
| ☐ YES ☐ NO | |

| 18. SIGNATURE OF COMPLAINANT *(Do not print)* | 19. DATE |
|---|---|

VA FORM
MAR 2017 **4939**

SUPERSEDES VA FORM 4939, MAR 2013,
WHICH SHOULD NOT BE USED.

# COMPLAINT OF EMPLOYMENT DISCRIMINATION INSTRUCTIONS

**Read the following instructions carefully before you complete this form. Please complete all items on the complaint form.**

**GENERAL:** Pursuant to the Equal Employment Opportunity Commission (EEOC) Title 29 Code of Federal Regulations (29 C.F.R.) §1614, VA Form 4939, Complaint of Employment Discrimination, can be used by VA employees, former employees and applicants for employment who file a formal Equal Employment Opportunity (EEO) complaint of discrimination. This regulation prohibits discrimination based on race, color, religion, gender (sex), national origin, age (40 years and over), physical or mental disability, genetic information (including family medical history), and/or reprisal for participating in the EEO process or opposing unlawful discrimination.

You can obtain assistance from your EEO Counselor in filling out this form. Your EEO Counselor can also answer any questions you may have about this form. In item 8, you should specify the basis of your complaint: race, color, religion, gender (sex), national origin, age *(date of birth)*, physical or mental disability *(specific information about your disability)*, genetic information (including family medical history), and/or reprisal for participating in the EEO process or opposing unlawful discrimination. If you list "Reprisal," please state the nature of the prior EEO activity in which you were engaged, i.e. did you file a prior EEO complaint? Use an additional sheet of paper, if necessary.

It is very important that you be precise as to the dates of all actions or events you are protesting. In addition, the claims listed in item 9, must be limited to those claims discussed with an EEO Counselor *(discussed within 45 calendar days of occurrence of the event, or within 45 calendar days of the effective date, if a personnel action)* or like or related claims. If any of the claims listed in item 9 were discussed with an EEO Counselor, but not within 45 calendar days of their occurrence or of their effective date, you must explain why you waited more than 45 calendar days. If any of the claims listed in item 9 were not discussed with an EEO Counselor, please contact the Office of Resolution Management (ORM), Regional EEO Officer IMMEDIATELY. The requirement that you contact an EEO Counselor about every claim listed in item 9 will not be waived under any circumstances. Failure to do so will only delay the processing of your complaint.

It is your responsibility to keep the (ORM) informed of your current address. If you move, immediately advise the ORM District Office where you filed this complaint of your new address. In addition, you may receive certified and express mail in connection with your complaint. It is your responsibility to claim all certified and express mail. Failure to notify ORM of a change in address or to claim certified and express mail may lead to dismissal of your complaint.

**REPRESENTATION:** You may have a representative of your own choosing at all stages of the processing of your complaint. No EEO Counselor, EEO Investigator or EEO Officer may serve as a representative. (Your representative need not be an attorney, but only an attorney representative may sign the complaint on your behalf.)

**WHEN TO FILE:** Your formal complaint must be filed within 15 calendar days of the date you received the *"Notice of Right to File a Discrimination Complaint"* (NRTF) from your EEO Counselor. If you do not meet this time limit, you must explain why you waited more than 15 calendar days to file. These time limits may be extended under certain circumstances; however, they will NOT be waived and your complaint will NOT be investigated unless you explain your untimeliness and the explanation is acceptable in accordance with EEOC, 29 C.F.R. §1614(c).

**WHERE TO FILE:** The complaint should be filed with the ORM District Office identified in the NRTF. You may submit a copy either by mail, in person, electronically (via e-mail), or by facsimile. Filing instructions are contained in the cover letter attached to the NRTF.

**PRIVACY ACT STATEMENT:** Maintenance and disclosure of VA Form 4939 is made in accordance with the Privacy Act of 1974. Collection of the information on this form is authorized and/or required by the regulations of the EEOC, 29 C.F.R. §1614. All records, from which information is retrieved, by the name or personal identifier of a respondent, are maintained by a Government-wide Systems of Records: EEOC/GOVT-1, Equal Employment Opportunity Complaint Records and Appeal Records. The information collected will be used by ORM to determine whether your complaint is acceptable for investigation and in connection with any subsequent investigation and processing of your complaint. In the course of any investigation, this form may be shown to any individual who may be required by regulations, policies or procedures of the EEOC and/or ORM to provide information in connection with this complaint, including individuals you may have identified as responsible for the acts or events at issue in this complaint. Other disclosures may be: (a) to respond to a request form from a Member of Congress regarding the status of the complaint or appeal; (b) to respond to a court subpoena and/or to refer to a district court in connection with a civil suit; (c) to disclose information to authorized officials or personnel to adjudicate a complaint or appeal; or (d) to disclose information to another Federal agency or to a court or third party in litigation when the Government is party to a suit before the court.

**RESPONDENT BURDEN STATEMENT:** In accordance with the Paperwork Reduction Act of 1995, The Department of Veterans Affairs (VA) may not conduct or sponsor, and the respondent is not required to respond to this collection of information unless it displays a valid OMB Control Number. The valid OMB Control Number for this information collection is 2900-0716. The collection of this information is voluntary. However, the information is necessary to determine if your complaint of employment discrimination is acceptable for further processing in accordance with EEOC, 29 C.F.R. §1614. The time required to complete this information collection is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing the form. Send comments regarding this burden estimate or any other aspects of this collection, including suggestions for reducing this burden, to VA Clearance Officer (005R1B), 810 Vermont Avenue, Washington, DC 20420. SEND COMMENTS ONLY. DO NOT SEND THIS FORM, A COMPLAINT OF EMPLOYMENT DISCRIMINATION, OR REQUEST FOR BENEFITS TO THIS ADDRESS

REVERSE OF VA FORM 4939, MAR 2017

**COMPLAINT CASE NUMBER**

CASE NUMBER

**Department of Veterans Affairs** | **COMPLAINT OF EMPLOYMENT DISCRIMINATION**

*Read the instructions on the reverse side of this form carefully before completing the front of this form.*

| | | | |
|---|---|---|---|
| **NAME** (First, Middle Last)(Please print) | **3 MAILING ADDRESS** | | **4a WORK TELEPHONE NUMBER** |
| Tatyana E. Drevaleva | 10660 Hidden Mesa Place | | |
| **EMAIL ADDRESS** | Monterey CA 93940 | | **4b PRIMARY TELEPHONE** (Include Area Code) |
| tatevaleva@gmail.com | | | |

| **6. ARE YOU** | **6a JOB TITLE, SERIES AND GRADE** | **7 NAME AND ADDRESS OF VA FACILITY WHERE DISCRIMINATION OCCURRED** |
|---|---|---|
| ☐ A VA EMPLOYEE | Medical Instrument Technician (EKG) G-7 | Raymond G Murphy VA Medical Center |
| ☐ AN APPLICANT FOR EMPLOYMENT | **6b SERVICE/SECTION/PRODUCT LINE** | 1501 San Pedro SE |
| ☒ A FORMER VA EMPLOYEE | 5D, I observed cardiac monitors. Also, I was trained as a CNA. | Albuquerque NM 87108 |

**NOTE:** For each employment related matter that you believe was discriminatory you must list the bases (list one or more of the following): Race (Specify), Color (Specify), Religion (Specify), Sex (Male or Female), National Origin (Specify), Age (Provide date of birth), Disability (Specify), Genetic Information (including family medical history), and/or Reprisal for participating in the EEO process or opposing unlawful discrimination.

| **8. BASIS** | **9. CLAIM(S)** (What employment related claim(s) - personnel action(s), incident(s), or event(s) caused you to file this complaint? Briefly state the specific claim, personnel action and/or event that caused you to file this complaint. Use an additional sheet of paper if necessary. You should not include information that violates the Privacy Act of 1974 and the Health Insurance Portability and Accountability Act (HIPAA). Some examples are patient medical records, personnel records of other VA employees, etc.) | **10. DATE OF OCCURRENCE** (Include the most recent date(s)) |
|---|---|---|
| I was discriminated, retaliated and unlawfully terminated based on my disability to give birth to children by a natural way and my age. | See a separate sheet of paper. | My termination date is June 30th, 2017. |

**11 REMEDIES SOUGHT** (Use an additional sheet of paper if necessary)
I had a Mediation on September 7th, 2017. Manager Mrs. Dunkelberger refused to reinstate me back to work

| **12a. DO YOU HAVE A REPRESENTATIVE?** | **12c. PROVIDE THE NAME AND ADDRESS OF YOUR REPRESENTATIVE** | **12d TELEPHONE NUMBER** |
|---|---|---|
| ☐ YES ☒ NO | | |
| **12b. IF "YES" IS HE OR SHE AN ATTORNEY?** | | **12e EMAIL ADDRESS** |
| ☐ YES ☐ NO | | |

| **13a. HAVE YOU CONTACTED AN EEO COUNSELOR?** | **13b NAME OF EEO COUNSELOR** | **13c. DATE OF INITIAL CONTACT WITH ORM** |
|---|---|---|
| ☒ YES ☐ NO | Mr. William Winter | 07/05/2017 |

14 If you contacted an EEO Counselor more than 45 calendar days after the Date(s) of Occurrence listed in item 10 of this complaint (a filed more than 15 calendar days after receipt of a Notice of Right to File a Discrimination Complaint, you must explain why you were untimely in seeking EEO counseling or untimely in filing a complaint. (Use an additional sheet of paper if necessary.)

| **15a. HAVE YOU FILED A UNION GRIEVANCE ON ANY CLAIM(S) LISTED ABOVE?** | **15b IF "YES" LIST THE CLAIM(S) AND DATE GRIEVANCE FILED** | **16a HAVE YOU FILED AN APPEAL WITH THE MERIT SYSTEM PROTECTION BOARD (MSPB) ON ANY OF THE CLAIMS LISTED ABOVE?** | **16b IF "YES" LIST THE CLAIM(S) AND DATE MSPB APPEAL FILED** |
|---|---|---|---|
| ☒ YES ☐ NO | I emailed Ms. Cheryl Eliano on 09.18.2017 | ☐ YES ☒ NO | |

| **17a HAVE YOU FILED THIS COMPLAINT WITH ANYONE ELSE?** | **17b IF "YES" PROVIDE THE NAME AND ADDRESS** |
|---|---|
| ☐ YES ☒ NO | |

| **18 SIGNATURE OF COMPLAINANT** (Do not print) | **19 DATE** |
|---|---|
| Tatyana Drevaleva | 09.19.2017 |

VA FORM **4939** MAY 2017 | SUPERSEDES VA FORM 4939, MAR 2013 WHICH SHOULD NOT BE USED

62

My name is Tatyana Drevaleva. I was hired as a Monitor Technician at 5D at Albuquerque VAMC on April 3rd, 2017. In May 2017, I informed Manager Mrs. Carla Dunkelberger that I needed to go to Russia for an IVF attempt because I wanted to have children. I also informed Assistant manager Mr. Phil Johnson that I needed to go to Russia for the IVF attempt, I was taking hormonal pills, and I was running out of these pills. It was impossible to obtain these pills in the USA. Mr. Johnson verbally allowed me to go to Russia for the IVF attempt. On May 18th, 2017, I emailed Mrs. Dunkelberger and Mr. Johnson a document from my Russian OB/GYN confirming that I was in registry for the IVF attempt in Novosibirsk, Russia, and I needed to be there to perform the IVF attempt. This document was on Russian language. Also, I filled out the form asking for leave without pay from May 18th, 2017 to July 7, 2017. I left Albuquerque on May 18th, 2017. After I arrived at Novosibirsk, Russia, I got this document from my OB/GYN translated, and I emailed it to Mrs. Dunkelberger and Mr. Johnson.

My IVF attempt in Russia lasted for three months. Initially, my OB/GYN requested me to pass all lab tests, EKG, colposcopy, etc. Later, the doctor found a cervical polyp and requested to remove it. I had surgery on June 13th, 2017. Afterwards, I waited for the pathology result. After I got that result, the OB/GYN requested me to determine the level of hormones FSH (Follicle Stimulating Hormone) and AMH (Anti-Mullerian Hormone) that needed to be done on the second day of my menstrual period. I waited for 14 days for the menstrual period. Afterwards, there was an actual attempt of IVF. Unfortunately, it was unsuccessful.

As soon as I realized that I needed to stay in Russia longer that July 7th, I emailed Mrs. Dunkelberger and Mr. Johnson, and I let them know that my OB/GYN requested additional tests (FSH and AMH), and I needed to stay in Russia for a longer time. I provided Mrs. Dunkelberger and Mr. Johnson with another document from my Russian physician confirming that I needed to stay in Russia for a longer time for additional examinations. However, Mrs. Dunkelberger fired me on June 30th – even before July 7th.

I contacted Mr. William Winter who is an EEO Counselor. He promised to schedule the Mediation date after I arrive back to the USA.

I returned back to the USA on August 18th. I contacted Mr. Winter, and he scheduled the Mediation process on September 7th. I went to the Mediation (the process was on Tele because I was in California. I was unemployed, I didn't have money to pay rent, and this was why I returned back to California to stay with some of my Russian friends). During the Mediation, Mrs. Dunkelberger said that she had submitted my written request for leave without pay to Dr. Prince. Dr. Prince denied my request because, according to Family Medical Leave Act, I qualified for Leave without Pay only after 12 months of working at the VA, and at that time I was working for only 1.5 months. I said that I didn't have an opportunity to wait for 12 months because I was running out of hormonal pills, I couldn't refill this prescription in the USA, and I was in registry for a free IVF attempt. I waited in line for this IVF attempt for 9 months, and my turn finally came. Mrs. Dunkelberger said that the decision of Dr. Prince was mailed to my Albuquerque home postal address. Mrs. Dunkelberger said that I hadn't come back to work and I hadn't contacted with her after sending Dr. Prince's letter. I answered that there was no chance for me to get and read that mail because I was out of country, and Mrs. Dunkelberger knew it. I asked why she didn't email Dr. Prince's decision to my private email address. Mrs. Dunkelberger said that the letter was not encrypted,

63

and she couldn't have emailed it to me. This was not true because she emailed me the termination Letter which was not encrypted. However, Mrs. Dunkelberger refused to reinstate me back to work.

During the Mediation, Director of Human Resources Mr. Thomas Harris requested my home postal address in California. He gave me his email address which is Thomas.Harris3@va.gov He promised to send me Dr. Prince's decision. On September 8th, 2017 I emailed Mr. Harris, and I provided him with my home postal address in California. He never replied, and I never got any document in mail from him.

I informed Mr. Winter that my intention was to file a formal EEO complaint. Also, I decided to contact with the Union and ask the Union to assist me to get reinstated back to work. From my point of view, I eft Albuquerque VAMC for the medical purpose, and I left with the permission of the Assistant Manager. It is not my fault that Mrs. Dunkelberger didn't inform me via email that my request for leave without pay was denied by Dr. Prince. I feel discriminated, retaliated and unlawfully terminated based on my disability to give birth to children. Also, I feel discriminated against my age (50 yo). Talking to my former colleagues over the phone, I found out that Mrs. Dunkelberger hired two males for the positions of Monitor Technician. Obviously, male employees will not have problems related to pregnancy. Also, the ages of these employees are 30 yo and approximately 35 yo – much younger than I am.

Tatyana Grevoleva

September 19, 2017.

64

**Attachment 9** – contact with the Union (AFGE).

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

## from Tatyana Drevaleva - Albuquerque VAMC.

---

**Tatyana Drevaleva** <tdrevaleva@gmail.com>
To: cheryl.eliano@afge.org

Mon, Sep 18, 2017 at 4:08 PM

Dear Cheryl!

My name is Tatyana Drevaleva. I was hired as a Monitor Technician at 5D at Albuquerque VAMC on April 3rd, 2017. In May 2017, I informed Manager Mrs. Carla Dunkelberger that I needed to go to Russia for an IVF attempt because I wanted to have children. I also informed Assistant manager Mr. Phil Johnson that I needed to go to Russia for the IVF attempt, I was taking hormonal pills, and I was running out of these pills. It was impossible to obtain these pills in the USA. Mr. Johnson verbally allowed me to go to Russia for the IVF attempt. On May 18th, 2017, I emailed Mrs. Dunkelberger and Mr. Johnson a document from my Russian OB/GYN confirming that I was in registry for the IVF attempt in Novosibirsk, Russia, and I needed to be there to perform the IVf attempt. This document was on Russian language. Also, I filled out the form asking for leave without pay from May 18th, 2017 to July 7, 2017. I left Albuquerque on May 18th, 2017. After I arrived at Novosibirsk, Russia, I got this document from my OB/GYN translated, and I emailed it to Mrs. Dunkelberger and Mr. Johnson.

My IVF attempt in Russia lasted for three months. Initially, my OB/GYN requested me to pass all lab tests, EKG, colposcopy, etc. Later, the doctor found a cervical polyp and requested to remove it. I had surgery on June 13th, 2017. Afterwards, I waited for the pathology result. After I got that result, the OB/GYN requested me to determine the level of hormones FSH (Follicle Stimulating Hormone) and AMH (Anti-Mullerian Hormone) that needed to be done on the second day of my menstrual period. I waited for 14 days for the menstrual period. Afterwards, there was an actual attempt of IVF. Unfortunately, it was unsuccessful.

As soon as I realized that I needed to stay in Russia longer that July 7th, I emailed Mrs. Dunkelberger and Mr. Johnson, and I let them know that my OB/GYN requested additional tests (FSH and AMH), and I needed to stay in Russia for a longer time. I provided Mrs. Dunkelberger and Mr. Johnson with another document from my Russian physician confirming that I needed to stay in Russia for a longer time for additional examinations. However, Mrs. Dunkelberger fired me on June 30th – even before July 7th.

I contacted Mr. William Winter who is an EEO Counselor. He promised to schedule the Mediation date after I arrive back to the USA.

I returned back to the USA on August 18th. I contacted Mr. Winter, and he scheduled the Mediation process on September 7th. I went to the Mediation (the process was on Tele because I was in California. I was unemployed, I didn't have money to pay rent, and this was why I returned back to California to stay with some of my Russian friends). During the Mediation, Mrs. Dunkelberger said that she had submitted my written request for leave without pay to Dr. Prince. Dr. Prince denied my request because, according to Family Medical Leave Act, I qualified for Leave without Pay only after 12 months of working at the VA, and at that time I was working for only 1.5 months. I said that I didn't have an opportunity to wait for 12 months because I was running out of hormonal pills, I couldn't refill this prescription in the USA, and I was in registry for a free IVF attempt. I waited in line for this IVF attempt for 9 months, and my turn finally came. Mrs. Dunkelberger said that the decision of Dr. Prince was mailed to my Albuquerque home postal address. Mrs. Dunkelberger said that I hadn't come back to work and I hadn't contacted with her after sending Dr. Prince's letter. I answered that there was no chance for me to get and read that mail because I

66

was out of country, and Mrs. Dunkelberger knew it. I asked why she didn't email Dr. Prince's decision to my private email address. Mrs. Dunkelberger said that the letter was not encrypted, and she couldn't have emailed it to me. This was not true because she emailed me the termination Letter which was not encrypted. However, Mrs. Dunkelberger refused to reinstate me back to work.

During the Mediation, Director of Human Resources Mr. Thomas Harris requested my home postal address in California. He gave me his email address which is Thomas.Harris3@va.gov He promised to send me Dr. Prince's decision. On September 8th, 2017 I emailed Mr. Harris, and I provided him with my home postal address in California. He never replied, and I never got any document in mail from him.

I informed Mr. Winter that my intention was to file a formal EEO complaint. Also, I decided to contact with the Union and ask the Union to assist me to get reinstated back to work. From my point of view, I left Albuquerque VAMC for the medical purpose, and I left with the permission of the Assistant Manager. It is not my fault that Mrs. Dunkelberger didn't inform me via email that my request for leave without pay was denied by Dr. Prince. I feel discriminated, retaliated and unlawfully terminated based on my disability to give birth to children. Also, I feel discriminated against my age (50 yo). Talking to my former colleagues over the phone, I found out that Mrs. Dunkelberger hired two males for the positions of Monitor Technician. Obviously, male employees will not have problems related to pregnancy. Also, the ages of these employees are 30 yo and approximately 35 yo – much younger than I am.

I am asking the Union to assist me to get reinstated back to work.

Please, respond to my private email address tdrevaleva@gmail.com

You may call me any time. My cell phone number is 415-806-9864.

Thank you, have a wonderful day,

Respectfully,


Tatyana.


--
Respectfully,
Tanya.

67

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

## from Tatyana Drevaleva.

**Tatyana Drevaleva** <tdrevaleva@gmail.com>
To: cheryl.eliano@afge.org

Thu, Sep 21, 2017 at 9:59 PM

Dear Ms. Eliano!

Thank you so much for forwarding my case to Mr. Rael. I got his email today.
I filed a formal EEO complaint. I am sending you a copy of that complaint.
Have a good night,

--
Respectfully,
Tanya.

**4 attachments**

**1.pdf**
225K

**2.pdf**
261K

**3.pdf**
157K

**Envelope.pdf**
87K

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

## Tatyana Drevaleva - AFGE Representative.

**Tatyana Drevaleva** <tdrevaleva@gmail.com>
To: "Winter, William (ORM)" <william.winter@va.gov>

Fri, Oct 20, 2017 at 10:16 AM

Dear Mr. Winter!

Please, make a note that since today Ms. Karen Smith is my official AFGE representative.

Mr. Smith could be contacted at karen.smith20@va.gov or 505-250-2120

Thank you,

Respectfully,

Tatyana Drevaleva.

69

**Attachment 10** – my unsuccessful attempts to get an ADR process, and my request for the Agency's final decision.

 **Gmail**

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

## Formal ADR Request TD 103883

---

**Cavanagh, Paul (ORM)** <Paul.Cavanagh@va.gov>                Mon, Oct 30, 2017 at 1:53 PM
To: "Rincon, Donald M." <Donald.Rincon@va.gov>
Cc: Tatyana Drevaleva <tdrevaleva@gmail.com>, Workplace ADR <workplaceadr@va.gov>, "Shafer, Amy V."
<Amy.Shafer@va.gov>, "Pino, Lisa M." <Lisa.Pino@va.gov>

Don:

Please note that the complainant in case 103883 has elected to participate in ADR during the formal stage.
I have created a case in ADRTracker under the number 18-501-004.

Please confirm the Agency's willingness to participate in ADR, and if so, coordinate the mediation. If you
need assistance securing a mediator, please feel free to reach out to ORM. Thanks!

Best,

**Paul L. Cavanagh**

Program Specialist

Department of Veterans Affairs

Office of Resolution Management

1575 I St. NW

10th Floor

Washington, DC 20420

Email: paul.cavanagh@va.gov

Phone: (202) 461-0271



*VA Core Values:* Integrity Commitment Advocacy Respect Excellence

**71**

*VA Core Characteristics:* Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

*"Thank you for contacting the Office of Resolution Management. Our goal is to provide you with exceptional customer service. Please take a moment to complete a very brief survey to let us know how my service was today"*

Click Here

72

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

**from Tatyana Drevaleva - case number 103883.**

---

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                    Mon, Oct 30, 2017 at 2:26 PM
To: "Rincon, Donald M." <Donald.Rincon@va.gov>, "Cavanagh, Paul (ORM)" <Paul.Cavanagh@va.gov>

Dear Mr. Rincon!

My name is Tatyana Drevaleva, my case number is 103883. I just requested an ADR process. Ultimately, I am looking for getting reinstated back to work at Raymond G. Murphy VAMC. I have an AFGE representative.

Can I undergo the ADR process while being physically present in California? Currently, I am unemployed. I am receiving Food Stamps and General Assistance from Monterey County where I am currently residing. I have no money to fly to Albuquerque and to rent a place of living there.

Please, feel free to ask any questions. My cell phone number is 415-806-9864, my email address is tdrevaleva@gmail.com

Thank you,

Respectfully,


Tatyana Drevaleva.

73

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

**from Tatyana Drevaleva.**

---

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                    Fri, Nov 3, 2017 at 2:46 PM
To: "Winter, William (ORM)" <william.winter@va.gov>

Dear Mr. Winter!

I was offered an ADR process approximately 1 week ago. I contacted with Mr. Rincon to find our whether I would be able to stay in California during the ADR process. Since then, I've never heard back neither from Mr. Rincon nor from you. Please, give me an update about the status of my case and give me the date of the ADR process.
Thank you,

--
Respectfully,
Tanya
415-806-9864.

74

 Gmail

**Tatyana Drevaleva <tdrevaleva@gmail.com>**

---

## Requesting the information about the date of an ADR process.

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                    Thu, Nov 16, 2017 at 3:20 PM
To: "Rincon, Donald M." <Donald.Rincon@va.gov>

Mr. Rincon,

Please, give me the information about the possible second ADR process. I already had Mediation on
September 7th, 2017 which was unsuccessful. Afterwards, I was offered another ADR process.


--
Respectfully,
Tanya.

75

# M Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

## Documents.

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                    Thu, Apr 12, 2018 at 11:34 AM
To: "Smith, Karen Y. (ABQ)" <Karen.Smith20@va.gov>, "Winter, William (ORM)" <william.winter@va.gov>

I mailed both documents yesterday.

--
Respectfully,
Tanya.

---

**2 attachments**

📄 **MX-2615N_20180411_152136__Request to Participate in ADR.pdf**
11K

📄 **MX-2615N_20180411_154731__Request for Agency's Decision__April 11, 2018.pdf**
27K

76

To the Department of Veterans Affairs

ADR Program Office (08)

810 Vermont Ave, NW Washington, DC 20420

WorkplaceADR@va.gov

From Tatyana Evgenievna Drevaleva

10660 Hidden Mesa Place, Monterey, CA, 93940

tdrevaleva@gmail.com, 415-806-9864

Request to participate in the Alternative Dispute Resolution Program.

Please, accept my request to participate in the Alternative Dispute Resolution Program.

EEO Complaint for Tatyana Drevaleva, ORM Case No. 200P-0501-2017103883, Filed September 19, 2017.

Respectfully submitted,

Tatyana E. Drevaleva

*Tatyana Drevaleva*

April 11, 2018.

77

Tatyana 200P-0501-2017103883

# OFFICE OF RESOLUTION MANAGEMENT
## POST INVESTIGATION ELECTION FORM

**Tatyana Drevaleva**
**200P-0501-2017103883**
**New Mexico VA HCS**
**1501 San Pedro Drive, SE**
**Albuquerque, NM 87108**

As stated on the ***Advisement of Rights Notice***, please indicate your election by checking the box next to **ONE** of the following processing options.

[X] Request a final agency decision (FAD) from the Office of Employment Discrimination Complaint Adjudication (OEDCA).

[ ] Request a hearing from the Equal Employment Opportunity Commission. **Note: If you select this option, please fill out the attached Hearing Request Form. Remember to provide ORM a copy of your request for a hearing.**

[ ] By checking this box, I voluntarily withdraw my complaint. I understand that my withdrawal is final, that processing of my complaint will cease, and I am precluded from reinstating these matters in the future. This withdrawal is voluntary, and no one, including agents of the Office of Resolution Management, the Department of Veterans Affairs, nor any other Federal agency, has coerced, intimidated, or threatened me to take this action.

**Please mail this form to:**
**Department of Veterans Affairs**
**Office of Resolution Management 08H**
**11301 Wilshire Blvd., Bldg. 220, 2nd Floor**
**Los Angeles, CA 90073**
**Attn: Sophia Eaves, Pacific District Manager**
**Fax Number: (310) 268-4089**

*Tatyana Drevaleva*
_____
Complainant's Name

*April 11, 2018*
_____
Date

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)

 **Gmail**

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

## from Tatyana Drevaleva - case No. 200P-0501-2017103883.

---

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                         Wed, May 9, 2018 at 3:18 PM
To: "Funes, Carlos (ORM)" <Carlos.Funes@va.gov>, "Smith, Karen Y. (ABQ)" <Karen.Smith20@va.gov>,
"Winter, William (ORM)" <william.winter@va.gov>, Claudia.Mendez3@va.gov

Good afternoon!

Thank you for sending me a Referral of my Complaint for FAD.
I believe that the deadline to serve me with the FAD is May 18, 2018.
Also, I haven't heard from your Agency about scheduling an Arbitration despite I had submitted my request
for it.
This is the second time when your Agency fails to schedule an Arbitration despite my written request.
I am requesting the last time to schedule an Arbitration.
Please, send me the FAD not later than on May 18, 2018, and I will take further steps.

--
Respectfully.
Tanya.

79

**Attachment 11** – Notice of Acceptance and template of Interrogatories.

 Gmail

**Tatyana Drevaleva <tdrevaleva@gmail.com>**

---

## OFFICIAL CORRESPONDENCE: PR

---

**Tolliver, Eboney (ORM)** <Eboney.Tolliver@va.gov>          Thu, Nov 16, 2017 at 3:47 PM
Reply-To: "Tolliver, Eboney (ORM)" <Eboney.Tolliver@va.gov>
To: "Smith, Karen Y. (ABQ)" <Karen.Smith20@va.gov>
Cc: "tdrevaleva@gmail.com" <tdrevaleva@gmail.com>

Dear Ms. Smith,

Attached, please find a Notice of Acceptance (PR) letter regarding your client's EEO Complaint ending in **103883**. If you have any questions, please contact the point of contact referenced in the attached correspondence.

Thank you,

Eboney Tolliver

Eboney Tolliver

EEO Program Assistant | Pacific District | Midwest District (MD)

Department of Veterans Affairs

Office of Resolution Management-Midwest District (MD) | 2255 Enterprise Drive, Suite 5506 | Westchester, IL 60154

708.236.2800 Office

708.236.2898 Fax

*Thank you for contacting the Office of Resolution Management. Our goal is to provide you with exceptional customer service. Please take a moment to complete a very brief survey to let us know how my service was today.*

Click Here

**NOTE:**

**If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law.**

**If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.**

81



**VA Core Values:** Integrity Commitment Advocacy Respect Excellence

**VA Core Characteristics:** Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

---

**2 attachments**

**TD-103883Accept Letter - Atty-Rep.pdf**
64K

**Drevaleva_103883_Term Prob_FMLA.PDF**
48K



**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT
11301 Wilshire Boulevard Building 220, 2nd Floor
Los Angeles, CA 90073

In reply refer to: 08H

November 16, 2017

VIA: E-Mail Only

Karen Smith, Representative
Karen.Smith20@va.gov

**SUBJECT: Notice of Acceptance of the EEO Complaint for Tatyana Drevaleva, Case No. 200P-0501-2017103883, filed September 19, 2017, against officials of the VA Medical Center in Albuquerque, NM.**

1. On July 5, 2017, your client initiated contact with an EEO counselor. Counseling concluded on September 14, 2017, when your client was mailed[1] the *Notice of Right to File a Discrimination Complaint*, which was received on September 14, 2017. On September 19, 2017, your client filed a formal complaint of discrimination, VA Form 4939.

2. Your client's complaint of discrimination raises the following claim:

> **A. Whether complainant was discriminated against based on age, sex (female[2]) and disability, when from May 18, 2017, through June 30, 2017, complainant was denied leave without pay under the FMLA.[3]**

> **B. Whether complainant was discriminated against based on age, sex (female[4]) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

3. We have determined that the claim A and claim B as stated above meets procedural requirements and are therefore **ACCEPTED** for investigation and further processing.

4. If your client believes that the accepted claim is improperly formulated, incomplete, or incorrect, this office must receive written notice within **7 calendar days** of receipt of this letter. Any written statement of disagreement will be included in the complaint file. We will assume that the claim is correctly stated if no statement indicating otherwise is received by this office within **7 calendar days**.

---

[1] Complainant did not obtain representation until after counseling concluded.
[2] Includes pregnancy discrimination
[3] Absent without leave status was first applied on May 21, 2017.
[4] Includes pregnancy discrimination

83

Page 2
Notice of Acceptance
Tatyana Drevaleva
200P-0501-2017103883

5. We will assign the accepted claim to an impartial investigator under the supervision of the Office of Resolution Management (ORM). The investigator will contact you and your client directly in order to obtain information or evidence you may wish to offer. The investigator is only authorized to investigate the claim specified above.

6. Your client has additional rights that are fully explained in the enclosure to this letter.

7. **Failure to keep this office advised of any change of address could lead to dismissal of this complaint**. All subsequent actions on the complaint will be mailed or delivered to you with copies to the complainant, unless the complainant advises us in writing that s/he is no longer represented by you.

8. Our fax number is (310) 268-4089. If you have any questions, please contact Carlos Funes, Case Manager, at 310-478-3711 x. 35819.

Sincerely,

*Jonathan Shimkus*

for

Sophia Eaves
Pacific District Manager

Enclosures: Complainant Rights

Interrogatory - Send responses via email to: Karla.Malone@va.gov, telephone number: (727) 540-3968

cc:     Tatyana Drevaleva, (Via e-mail only) tdrevaleva@gmail.com

Facility Director
Facility EEO Program Manager

84

Page 3
Notice of Acceptance
Tatyana Drevaleva
200P-0501-2017103883

## Complainant Rights

The investigation must be completed within **180** calendar days of filing your complaint. You will receive a copy of the investigative file upon completion. You will be advised, in writing, of your right to request a **Final Agency Decision (FAD)** from the VA's Office of Employment Discrimination Complaint Adjudication (OEDCA) in Washington, DC, or a **hearing** by an administrative judge appointed by the Equal Employment Opportunity Commission (EEOC).

| Requesting a Hearing |
|---|

In order to request a hearing, you must meet the following criteria:
- You have received your completed investigative file **-OR-**
- 180 calendar or more days elapsed since you filed your formal complaint (and you have not received your complete investigative file)

| To request that EEOC appoint an administrative judge to hear your complaint, you must complete EEOC's "Hearing Request Form" and send it to: | You must send a **copy** of your EEOC hearing request to this office: |
|---|---|
| U.S. Equal Employment Opportunity Commission<br>Phoenix District Office<br>3300 North Central Avenue Suite 690<br>Phoenix AZ 85012-2504 | Department of Veterans Affairs<br>Office of Resolution Management<br>11301 Wilshire Boulevard<br>Building 220, 2nd Floor<br>Los Angeles, CA 90073 |

You are required to certify to the EEOC administrative judge that you sent a copy of the request for a hearing to the Office of Resolution Management at the above address.

| Requesting a Final Agency Decision |
|---|

To request a FAD, you must have received your completed investigative file.

| To request a FAD, submit the FAD request form which will be included in your investigation file to: |
|---|
| Department of Veterans Affairs<br>Office of Resolution Management<br>11301 Wilshire Boulevard, Building 220, 2nd Floor<br>Los Angeles, CA 90073 |

If you request a FAD, it will be rendered by VA's Office of Employment Discrimination Complaint Adjudication (OEDCA) in Washington, DC. The FAD will address all claims, and a decision will be made on the merits of your complaint. You may appeal the FAD to EEOC if you are dissatisfied with the decision. OEDCA will provide you with specific information regarding your appeal rights following its final agency decision, including your right to file a civil action in an appropriate United States District Court.

| Requesting Civil Action |
|---|

If you have not received a copy of the investigative file within 180 calendar days from date you filed your formal complaint, and you do not wish to have a hearing, you also have the right to file a civil action in an appropriate United States District Court. If you file a civil action, the court may, at its discretion and upon your request, appoint an attorney to represent you in the matter, if you do not have or cannot afford one. The court may also authorize the civil action to begin without payment of fees, costs, or other security. Finally, if you decide to file a civil action, you must name David J. Shulkin, M.D., Secretary of Veterans Affairs as the defendant.

| Requesting ADR |
|---|

The EEOC encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints. Agencies and complainants can realize many advantages from using ADR. ADR offers parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in your complaint, please contact the ORM case manager listed in the letter or the ADR program manager at workplaceadr@va.gov.

85

Complainant Name: Tatyana Drevaleva, Case No: 200P-0501-2017103883, Date Filed: September 19, 2017

 ## VA OFFICE OF RESOLUTION MANAGEMENT

# INTERROGATORY

**The complainant's testimony is a vital and integral part of conducting an investigation into a complaint of discrimination.**

**Attached is an interrogatory that will serve as part of the complainant's testimony in regards to the accepted complaint.**

**Please complete the document and return it to Karla Malone, Team Lead Investigator within 15 days of receipt via encrypted email to:** karla.malone@va.gov, or fax to: 727-299-6755 Attn: Karla Malone, Team Lead Investigator. You can also mail your answers to 140 Fountain Parkway N., Suite 620, St. Petersburg, FL 33716-1274.

I solemnly swear/affirm that the information given in response to the following questions is true and complete to the best of my knowledge and belief.

Name: _____

Date: _____

The complaint above outlines the ***specific basis or bases*** that you have identified as the subject of discrimination in your complaint. Please provide identifying information for the applicable basis or bases identified above in your complaint:

Age: _____ Sex: _____ Disability: _____

A.    **Whether complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, through June 30, 2017, complainant was denied leave without pay under the FMLA.**

B.    **Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

1

Initials:_____

86

Complainant Name: Tatyana Drevaleva, Case No: 200P-0501-2017103883, Date Filed: September 19, 2017

1. What is your position, work location and unit?

2. What is your disability?

3. When did the disability develop?

4. What caused it?

5. Is this a permanent disability?   If not, then explain how long it is expected to last.

6. Do you have medical documents about your impairment/medical condition/disability? If so, please provide documentation.

7. Do you take any medication because of the impairment?

8. Does the medication have any side effects that impact your ability to perform your duties?  If so, please explain.

9. Does the impairment/medical condition/disability limit anything you would do normally in everyday life? If yes, what normal life functions are limited and how are they limited?

10. What are the major duties that you are required to carry out on your job?

11. Are you able to perform the major duties of your position, as someone else would normally be able to perform the duties?  If no,

    a. Would you say your ability to perform these duties differs slightly, moderately or significantly from someone else performing the job?

12. Were you given any restrictions related to performing the duties of your job?  If so,

Initials:_____

2

87

    a. Who provided the restrictions? When?

    b. What were the restrictions?

    c. Are the restrictions permanent? If not, for how long you would have the restrictions?

13. Explain when and how management became aware of your disability?

14. What exactly management know about your disability. Be specific.

**A. Whether complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, through June 30, 2017, complainant was denied leave without pay under the FMLA.**

15. Please identify the management official for denying your leave request.

    a. Please describe your working relationship with this individual.

    b. How and when did this individual become aware of the protected bases that you believe are the subject of discrimination?

16. How and when did you become aware that you leave request was denied?

17. What justification was provided for denying the leave?

Initials:_____

3

88

**Complainant Name: Tatyana Drevaleva, Case No: 200P-0501-2017103883, Date Filed: September 19, 2017**

18. What policy or procedure was identified to support the denial of leave?

19. Why was denial of leave unacceptable to you?

20. Did you discuss the leave denial with any management officials? If so,
    a. Who and when?

    b. What was discussed and what was the outcome of the discussion?

21. Why do you believe that the protected basis or bases outlined in this complaint was/were factors(s) in the denial of leave?

Initials:_____

22. Are you aware of a coworker who was not denied leave in similar circumstances? If so,
   a. Please identify by full name and title.

   b. Please identify this by their protected basis(es) as outlined above in your complaint.

   c. Please explain how they were treated differently than you.

   d. Please describe your working relationship with this individual.

   e. How and when did this individual become aware of the protected bases that you outlined above?

**B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

23. Please identify the management official responsible for terminating you.

24. What justification was provided for **your termination?**

25. What policy or procedure was identified to support the termination?

26. Why was the termination unacceptable to you?

Initials:____

5

Complainant Name: Tatyana Drevaleva, Case No: 200P-0501-2017103883, Date Filed: September 19, 2017

27. Did you discuss the **termination** with any management officials?  If so,
    a.  Who and when?

    b.  What was discussed and what was the outcome of the discussion?

28. Why do you believe that you were discriminated against because of the protected bases that you outlined above when you were terminated?

29. Are you aware of a coworker who was not subjected to **termination** in similar circumstances?  If so,
    a.  Please identify by full name and title.

    b.  Please explain how they were treated differently than you.

    c.  You have identified the specific basis or bases that you feel is the subject of discrimination above.  Please provide that same information for your coworker.

Initials:____

Complainant Name: Tatyana Drevaleva, Case No: 200P-0501-2017103883, Date Filed: September 19, 2017

The above information has furnished without a pledge of confidence and I understand that it may be shown to the interested parties of this complaint.

This statement is made under penalty of perjury, this _____ 2017.

_____

(Affiant's signature)

Initials:_____

7

92

**Attachment 12** – my submitted Interrogatories.

# M Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

## Tatyana Drevaleva - Interrogatory.

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                    Mon, Nov 20, 2017 at 12:07 AM
To: karla.malone@va.gov

See attached.

--
Respectfully,
Tanya.

---

📄 **Drevaleva__interrogatory November 19, 2017.pdf**
341K

Tatyana E. Drevaleva

10660 Hidden Mesa Place, Monterey, CA, 93940

415-806-9864, tdrevaleva@gmail.com

Case No: 200P-0501-2017103883

Date Filed: September 19, 2017

Interrogatory.

Complainant Name: Tatyana Drevaleva

1. What is your position, work location and unit?

      My position was a Monitor Technician and Nursing Assistant. The location was: Raymond G. Murphy Veterans Affairs Medical Center, Albuquerque, NM, unit 5D.

2. What is your disability?

      My disability is infertility. I can't give birth to children by a natural way. My infertility is based on chronic endometritis, polyposis of endometrium (before, I had 5 surgeries – polypectomies), and a low ovarian reserve which is related to my age. I have a low level of Antimullerian hormone and an increased level of Follicle Stimulating Hormone.

3. When did the disability develop?

      The disability developed over the past 5-7 years. Throughout all these years, I tried to get pregnant but unsuccessful. I had sexual relationships with two men but I didn't get pregnant. I did approximately 7 intra-uterus inseminations at Kaiser Permanente but I didn't get pregnant. I had one polypectomy (the uterine polyp) at Kaiser Permanente in Richmond, CA, two polypectomies (polyps of endometrium) in Russia, and two removals of polyps of cervical canal in Russia. Also, I did three IVF attempts in Russia in 2015 – 2016.

4. What caused it?

      The polyposis of endometrium and cervical canal was caused by genetics. My Mom and my Aunt had polypectomies. Also, polyposis of endometrium and cervical canal was caused by a hormonal misbalance.

      The chronic endometritis was caused by numerous polypectomies. I was informed by my Gynecologist that I had the Asherman syndrome, also known as uterine synechiae. It is a condition characterised by the formation of intrauterine adhesions, which are usually sequela from injury to the endometrium, and is often associated with infertility.

      The low ovarian syndrome was caused by my age 50 yo. The number of follicles in my ovaries was significantly low.

5. Is this a permanent disability? If not, then explain how long it is expected to last.

It is a permanent disability. I can't treat this genetic disorder, and I can't decrease my age. I can try to cure chronic endometritis but I haven't been successful yet despite my numerous attempts including antibiotics.

The only way I can have children is IVF with a surrogate Mom.

6. Do you have medical documents about your impairment/medical condition/disability? If so, please provide documentation.

    The documentation that I have is in Russian. It confirms the fact of multiple polyp removals as well as the fact of chronic endometritis and the low ovarian reserve. It confirms the levels of AMH and FSH. I can request translating these documents into English at your request. I can also request documentation from Kaiser Permanente confirming the fact that I unsuccessfully tried to get pregnant, and I had multiple IUI attempts in 2012 – 2013. I don't have this documentation with me. I can provide you with a document from my Russian OB/GYN confirming that I was in registry for an IVF attempt through the Ministry of Health of the Novosibirsk Region in Russia.

7. Do you take any medication because of the impairment?

    I was taking hormonal pills named Jeanine http://www.dx-health.com/en/jeanine-contraceptive-p-142 to try to save my ovarian reserve. I took these pills without intermission for almost one year since my IVF attempt in 2016. The reason of taking these pills is to turn my menstrual periods off so I wouldn't loose ova. These pills are available in Russia and are not available in the United States. Currently, I am taking other hormonal pills named Femoston 2/10 https://www.medicines.org.uk/emc/medicine/15925 for the same reason.

    I underwent an extensive treatment trying to cure my chronic endometritis. I took a lot of antibiotics in Russia, and I underwent many culture tests from my uterus. The diagnosis of chronic endometritis was confirmed after biopsy of endometrium. Also, currently I am taking Vitrum Prenatal http://www.unipharmus.com/vitrum-prenatal.html vitamins and Folic Acid.

8. Does the medication have any side effects that impact your ability to perform your duties? If so, please explain.

    The mentioned above medications do not have any side effects that impact my ability to perform duties of a Monitor Technician and Nursing Assistant.

9. Does the impairment/medical condition/disability limit anything you would do normally in everyday life? If yes, what normal life functions are limited and how are they limited?

    My disability does not limit I would do normally in everyday life.

10. What are the major duties that you are required to carry out on your job?

    I was hired as a Monitor Technician. My duty was to observe cardiac monitors. Also, I was assigned to perform duties as a Nursing Assistant. I took vital signs, measured input and output, changed linens, gave patients a shower, and assisted patients the way they needed.

11. Are you able to perform the major duties of your position, as someone else would normally be able to perform the duties?

    Yes, I was able to perform all duties of my position. However, I needed reasonable accommodations. In my case, I needed to go to Russia to refill the prescription of Jeanine

and to perform an IVF attempt. Because I am a citizen of the Russian Federation, I had a right for a free of charge IVF attempt. In order for me to have this free IVF attempt, I needed to wait in line for 9 months. In May 2017, I found out that my turn in line finally came. Even if I performed an IVF attempt in Russia for money, the cost would be approximately $2000 – 2500 in comparison to $15000 in the United States. My salary of a Monitor Technician which is approximately $40000 per year does not allow me to perform an IVF attempt in the United States. Health insurance in the USA doesn't cover IVF attempts. Also, I couldn't wait to work for my employer for 12 months because 1) my ovarian reserve is getting lower and lower each month at my age, 2) I ran out of hormonal pills Jeanine that I couldn't obtain in the United States.

a) Would you say your ability to perform these duties differs slightly, moderately or significantly from someone else performing the job?

I think my ability to perform my duties would differ from a young female with a good ovarian reserve and a healthy endometrium. This female would not need IVF attempts in order to get pregnant. This female would get pregnant by a natural way. Other than that, I don't see any additional differences between me and other colleagues who are hired for the same position. My infertility would no way affect my ability to observe cardiac monitors and act as a Nursing Assistant taking vital signs and assisting patients.

12. Were you given any restrictions related to performing the duties of your job?

No, I was not given restrictions to performing duties as a Monitor Technician and Nursing Assistant.

13. Explain when and how management became aware of your disability?

In May 2017, I approached Ms. Dunkelberger, and I verbally explained to her what I just explained in this Interrogatory. I said that I was 50 yo and I didn't have children despite I wanted to have children very much. I said that I had been married twice but both husbands refused to give me children. I said that I'd had numerous attempts to get pregnant by a natural way with two boyfriends and using IUI in the USA and IVF in Russia with donor's sperm. I said that in 2016 I had an IVF attempt in Russia, and I created an embryo which is stored frozen in Russia. I said that I couldn't afford the price of IVF in the United States. I said that I was in line for a free IVF attempt in Russia as a citizen of the Russian Federation. I said that I was running out of hormonal pills that were prescribed by a Russian physician and that I couldn't obtain in the United States. I said that I had been waiting for 9 months for a free IVF attempt in Russia, and my turn came in. I said that I couldn't miss this turn, otherwise I would lose a right for a free IVF attempt. I said that OI was 50 yo, and my chances to have a baby from my own ovum were getting smaller and smaller. I also said that my plan was to go to Russia for an IVF attempt, to create an embryo, to freeze it, and to return back to the United States to continue performing my duties as a Monitor Technician. Ms. Dunkelberger's face expressed that she was very much unpleased. She asked me whether I will request another time off in order to go to Russia again to create another embryo. I said that I didn't know because I wasn't sure how this upcoming IVF attempt would be going on. Ms. Dunkelberger said that according to FMLA I would have to work for the VAMC for 12 months to be eligible for a leave without pay. I said that I couldn't wait for

12 months because I had only a few hormonal pills left, and my turn for a free IVF attempt in Russia came in. Ms. Dunkelberger requested a copy of my medical record confirming my intention to perform an IVF attempt. I said that I would request this document from my Russian OB/GYN. Ms. Dunkelberger said that I needed to provide the VAMC with the translated document prior to my departure. I said that I would try my best.

I requested this document from my Russian physician. It took approximately 7-8 days for the Russian office to process this document. There was no way to expedite this process. On May 17th, 2017, Ms. Dunkelberger was out of her office. I approached Assistant Manager of 5D Mr. Phil Johnson, and I said to him exactly what I wrote in this Interrogatory and what I said to Ms. Dunkelberger – that I needed to go to Russia for an IVF attempt, that I couldn't get pregnant by a natural way, that I spent many years trying to get pregnant using UIU and IVF, that I had only 3 hormonal pills left, and I spoke to Ms. Dunkelberger about my medical condition that required a trip to Russia. I said to Mr. Johnson that Ms. Dunkelberger had requested a translated document from my Russian physician prior to my departure. However, because of the delay with a Russian office, I got this document in Russian only on May 17th, 2017 when I had only 3 hormonal pills left. There was no way to continue staying in the USA and translating the document into English because, if I didn't get hormonal pills, I would be bleeding.

Mr. Johnson verbally allowed me to go to Russia to refill my hormonal pills and to perform an IVF attempt. His exact words were, "If you need to go – you should go!" I said to Mr. Johnson that I will provide Ms. Dunkelberger and him with a translated document as soon as I get to Russia. Mr. Johnson agreed. I said that I trusted my Russian speaking co-worker Ms. Nadya Das who worked as a Monitor Technician at 5D. I verbally authorized Nadya to translate this document into English for my Manager. Ms. Dunkelberger said that I didn't have a right to translate this document myself. Only a certified translator could do it.

Also, Mr. Johnson provided me with a form to request leave without pay. I filled this form out. I didn't know exactly how much time I needed to spend in Russia, so I requested a leave without pay from May 18th, 2017 to July 07th, 2017. Because Ms. Dunkelberger was out of office, I put this document under the door of her office. I don't have a copy of that document.

The witness of all events described above is Ms. Nadya Das who witnessed how I called my Russian physician's office and requested the document, how I called my brother who was in Russia and asked him to go to my doctor's office, how I called the receptionist and requested to email me a copy of that document. Also, I informed Ms. Das that I had talked to Ms. Dunkelberger and Mr. Johnson, and Mr. Johnson verbally allowed me to go to Russia. I also notified Ms. Das verbally that I authorize her to translate this document for Ms. Dunkelberger until I get the official translation.

14. What exactly management know about your disability. Be specific.

The management knew that, despite of my numerous attempts to get pregnant, the only way was only IVF with donor's sperm. Also, the management knew that I was not planning to carry pregnancy. I was going to be absent from work for a relatively short amount of time. I was going to create an embryo, freeze it, and return to work in Albuquerque. Also, read my description above. I emailed Ms. Dunkelberger and Mr. Johnson

a copy of the document from my Russian OB/GYN that I needed to go to Russia for an IVF attempt because I was in registry of patients for a free IVF attempt through the Ministry of Health of the Novosibirsk Region. I emailed this document on Russian language on May 18th, 2017 (prior to my departure) and I emailed the same document on English language from Russia on May 30th, 2017. Both Ms. Dunkelberger and Mr. Johnson never responded and never acknowledged that they received both documents (the original and a translated copy). However, both Ms. Dunkelberger and Mr. Johnson knew my private email address.

15. Please identify the management official for denying your leave request.

After I submitted both an original document and a translated copy to Ms. Dunkelberger and Mr. Johnson, I was not aware what the subsequent process would be. I didn't know whether Ms. Dunkelberger would approve or deny my request or somebody else would do it. During Mediation on September 07, 2017, Ms. Dunkelberger said that my request for leave without pay had been denied by Dr. Prince. So, according to Ms. Dunkelberger, the official who denied my request for leave without pay was Dr. Prince. I don't know whether Ms. Dunkelberger said to Dr. Prince that the purpose of my trip to Russia was an IVF attempt. Personally, I didn't speak directly with Dr. Prince about my infertility disability.

    a) Please describe your working relationship with this individual.
    I met Dr. Prince only once during the Orientation. She held a group meeting with new hires. She spoke about our role at the VAMC. Other than that, I didn't have any discussions with Dr. Prince.

    b) How and when did this individual become aware of the protected bases that you believe are the subject of discrimination?
    I don't know how and when Ms. Dunkelberger submitted my request for leave without pay to Dr. Prince. I even didn't know that my request would be submitted to Dr. Prince. I don't know what Ms. Dunkelberger said to Dr. Prince about the purpose of my trip to Russia. I don't remember whether I wrote the purpose of an IVF procedure in my request for leave without pay. I don't have a copy of my request.

16. How and when did you become aware that you leave request was denied?

After I emailed an original document and a translated copy to Ms. Dunkelberger and Mr. Johnson, I never heard back from both of them. I was in Russia pursuing my IVF attempt. Nobody let me know that my request was denied and nobody let me know that my request was denied by Dr. Prince. I got a Termination letter from Ms. Dunkelberger on July 03rd, 2017. The first time when I discovered that my request for leave without pay was denied by Dr. Prince was during the Mediation on September 07th, 2017.

17. What justification was provided for denying the leave?

During the Mediation on September 07th, 2017, Ms. Dunkelberger said that my request for leave without pay had been denied by Dr. Prince because I didn't meet the requirements to qualify for this leave under FMLA. I didn't work at the VA for 12 months, and therefore my request was denied. However, Ms. Dunkelberger knew very well that it was impossible for me to wait for 12 months before requesting this leave. I really don't know if Ms. Dunkelberger explained to Dr. Prince about my particular situation – that I was

50 yo, I tried to have children by a natural way and using UIU and IVF, I ran out of my hormonal pills, and I waited for 9 months for a free attempt of IVF in Russia, and my turn finally came in, and if I didn't arrive for this IFV attempt, I would lose this chance.

18. What policy or procedure was identified to support the denial of leave?

Ms. Dunkelberger identified FMLA. I needed to work at the VA for 12 months before requesting leave without pay.

19. Why was denial of leave unacceptable to you?

It was unacceptable because I had no any other chance to try to have a baby. Health insurance in the USA doesn't pay a full price for an IVF attempt. The price of one IVF attempt in the United States is $15000 which I can't afford because of my salary of $40000 per year. Even if my request for leave without pay was denied, Ms. Dunkelberder was supposed to immediately let me know. She didn't let me know when I was in Russia. Prior to my termination, I didn't know what my request for leave without pay was denied. During the Mediation on September 07, 2017, Ms. Dunkelberger said that she had mailed the denial letter to my home postal address in Albuquerque, NM. Ms. Dunkelberger knew very well that at that time I was out of country, I was in Russia, and I had no way to get and respond this letter. Ms. Dunkelberger never emailed this letter to me even though she knew my private email address. During the Mediation on September 07th, 2017, Ms. Dunkelberger said that she couldn't have emailed me this denial letter because it was not encrypted. I think this is a lie and an attempt to find an excuse. Ms. Dunkelberger emailed me the termination letter which was not encrypted. Ms. Dunkelberger never offered me to communicate with her via the phone, never called me and never informed me that my request for leave without pay had been denied by Dr. Prince.

20. Did you discuss the leave denial with any management officials?

Yes, I asked Ms. Dunkelberger in my email dated July 03, 2017 why she terminated me. She never responded. Again, she never let me know that my request for leave without pay was denied by Dr. Prince.

a) Who and when

The first time I asked Ms. Dunkelberger why she terminated my employment. I requested a leave without pay until July 07th, 2017, and Ms. Dunkelberger terminated my employment prior to this date – on June 30th, 2017. I was informed on July 03rd, 2017. The second time I asked Ms. Dunkelberger why she terminated my employment during the Mediation on September 07th, 2017. Ms. Dunkelberger said that my request had been denied by Dr. Prince. I requested to speak with Dr. Prince directly but I never got any answer.

b) What was discussed and what was the outcome of the discussion?

I asked why I had never been informed that my request for leave without pay was denied. Ms. Dunkelberger said that she had mailed the denial letter to my home postal address in Albuquerque, NM. I said that I was out of country at that time, and I never got the denial letter. I also said that Ms. Dunkelberger knew that I was out of country but she never informed me via email, never called me, and never requested me to give her a call. Also, she never answered my emails when I sent my documents to her. Ms. Dunkelberger said that because I didn't

respond to the letter that she sent to my home postal address in Albuquerque, NM, she fired me. I said that I had never gotten that letter, I didn't know that my request for leave without pay was denied, and I asked Ms. Dunkelberger to reinstate me back to work. Ms. Dunkelberger refused. I requested to speak with Dr. Prince but I never got any answer.

21. Why do you believe that the protected basis or bases outlined in this complaint was/were factors(s) in the denial of leave?

I remember how unpleasant Ms. Dunkelberger seemed when I first informed her about my intention to have a baby. She seemed very irritated. She asked me if I would request a leave again to create another embryo. I think she also asked whether I was planning to be absent from work in case if the baby is born. She never responded to my emails after I sent her an original document from my Russian OB/GYN and a translated copy. She never sent me a denial letter of Dr. Prince. She terminated my employment even before July 07th, 2017. She refused to reinstate me back to work. Afterwards, speaking over the phone to Ms. Nadya Das, I discovered that Ms. Dunkelberger hired two male Monitor Technicians to substitute me. Obviously, male employees will not have problems related to pregnancy. Also, I found out that these employees are much younger than I am. They are 30 and 35 yo in comparison to my age 51 yo now. Also, I found out that at least one of these employees is stable in his marriage and already has children.

22. Are you aware of a coworker who was not denied leave in similar circumstances?

No, I am not aware of coworkers who were not denied leave in similar circumstances (related to pregnancy).

I am aware of a coworker who was not terminated her employment at 5D despite she attended a nursing school and couldn't have full time employment at the VA during her study. She was allowed to work only 1 time per month at 5D observing cardiac monitors. Her employment was not terminated because she was absent from work.

a) Please identify by full name and title.

I think her name is Melanie. She is a Registered Nurse at ICU.

b) Please identify this by their protected basis(es) as outlined above in your complaint.

I said to Ms. Dunkelberger and Mr. Johnson that I would spend approximately 6 weeks in Russia for my IVF attempt. I said that I did not intend to become pregnant myself. I said that I would create an embryo and return back to the United States to work at the VA. My employment was terminated. Melanie, who couldn't have worked full time during her study for 2 years at a nursing school, was allowed to work at the VA one time per month, and her employment was not terminated. It confirms my statement that I was discriminated due to my disability, retaliated and unlawfully terminated.

c) Please explain how they were treated differently than you.

Melanie's employment was not terminated even though she couldn't have worked full time. Melanie was allowed to work once a month for 2 years. After I

101

was absent from work for 5 weeks due to my disability, my employment was terminated. I was never informed that my leave without pay was denied. Another individual who was treated differently that I is Ms. Chelsea Casey, a newly hired Registered Nurse at 5D. She was hired at the same time when I was hired. Ms. Casey was a new grad from a nursing school. Ms. Casey said that prior to getting employed by the Raymond G. Murphy VAMC she got approximately 5 phone calls from Ms. Dunkelberger who offered her to apply for a job opening of a Registered Nurse and who was inviting her to work at the VA. Ms. Dunkelberger called Ms. Casey five times to invite her to work but didn't call me even one time when my request for leave without pay had been denied.

d) Please describe your working relationship with this individual.

I worked with Melanie maybe twice when she observed cardiac monitors. I really like Melanie. She is a very conscientious lady. I also like Ms. Casey very much. She is a good friend and a good coworker. She worked as a Monitor Technician for 5 years, and she knows EKG very well. I showed her Torsades de Pointes when the patient had it (not all other nurses agreed to see it). She gave me rides to work and from work because I don't have a car. She gave me a ride to the airport when I left Albuquerque to Russia despite it was late and her daughters were sleeping. She took one of the daughters with her to give me a ride to the airport. She wished me to have a good trip. She knew the purpose of my trip.

e) How and when did this individual become aware of the protected bases that you outlined above?

I let Ms. Casey know that I wanted to have children, and therefore I was going to go to Russian for an IVF attempt. Also, while being in Russia, I communicated via email with Ms. Michelle Tirado who was also hired at the same time when I was hired. Ms. Tirado is a Nursing Manager. I shared the details of my stay in Russia with Ms. Tirado. I didn't know Ms. Casey's private email address, therefore I didn't have a correspondence with her from Russia.

23. Please identify the management official responsible for terminating you.

In the Termination Letter dated June 30th, 2017, it is written, "The Associate Director, Patient Care Services, has recommended that you be terminated from your position for failure to qualify during your probationary period. Your termination is due to attendance issues." This is a complete libel. During my employment starting April 2nd to May 18th, 2017, I didn't miss even one day of work, and I was never late to work. I was verbally allowed to go to Russia by Assistant Manager Mr. Johnson, and I requested a leave without pay from May 18th, 2017 to July 07th, 2017.

24. What justification was provided for **your termination?**

The justifications that were provided for my termination were: 1) probationary period, 2) attendance issues.

25. What policy or procedure was identified to support the termination?

"The decision to terminate you immediately in lieu of a two (2) week notice is due to your absent without leave (AWOL) status since May 21, 2017". Again, this is a libel. I left the

VA with a verbal permission of Assistant Manager Mr. Johnson. When my request for leave without pay was denied, nobody notified me.

26. Why was the termination unacceptable to you?

I was happy and proud that I was privileged to serve Veterans. I really loved the VA and my job. I wanted to have a child, and I left to Russia for a relatively short amount of time with a permission of an Assistant Manager. I also informed a Manager in detail why I needed a trip to Russia and why I couldn't perform an IVF attempt in the United States. I anticipated returning back to my duties at the VA after I create an embryo. Manager Ms. Dunkelberger never let me know that my request for leave without pay had been denied by Dr. Prince. Ms. Dunkelberger never responded to my emails after I sent her documents from my Russian physician. Ms. Dunkenbelger mailed the denial letter to my home postal address in Albuquerque, NM even though she knew that I had no chance to read this letter. Ms. Dunkelberger accused me in being absent from work even though she knew that 1) I got Mr. Johnson's permission to go to Russia, 2) I never missed any day of work, and I was never late to work. Ms. Dunkelberger didn't care about my knowledge of EKG. I passed the EKG test with a score of 100%. I was good interpreting cardiac rhythms because I like it. Ms. Dunkelberger didn't care that I would be a real benefit to the hospital because of my EKG knowledge. Now, when I am fired from the probationary period for "absence", who will hire me? The guess is that I will have problems with all subsequent potential employers who will think that I was terminated from the VA from being absent. I was even denied Unemployment Insurance benefits because Ms. Dunkelberger said that I had been fired for being absent. This is totally unacceptable, and this is a libel. Therefore, I demand to overturn Ms. Dunkelbergers decision and reinstate me back to work with a backpay.

27. Did you discuss the **termination** with any management officials? Yes, I did.

a) Who and when?

I discussed my termination with Ms. Dunkelberger. First time, I asked her in writing in my email to her dated July 03rd, 2017. I asked her why she fired me. She never responded. The second time I asked Ms. Dunkelberger why she fired me during the Mediation on September 07th, 2017.

b) What was discussed and what was the outcome of the discussion?

During the Mediation on September 07th, 2017, I said to Mediators and to Ms. Dunkelberger that I had gone to Russia with a verbal permission of Mr. Johnson. Ms. Dunkelberger said that she had emailed me the denial letter to my home postal address in Albuquerque, NM. I said that there was no way to receive that letter because I was in Russia, and Ms. Dunkelberger knew it. I asked why she didn't email me this letter. Ms. Dunkelberger said that the letter was not encrypted. I said that I had gotten a Termination letter which was not encrypted. Also, I said that Ms. Dunkelberger knew my private email address but never answered my emails. I asked Ms. Dunkelberger to reinstate me back to work. She refused.

28. Why do you believe that you were discriminated against because of the protected bases that you outlined above when you were terminated?

I was discriminated against my disability to give birth to children. I was also discriminated against my age. Ms. Dunkelberger knew that I went to Russia with a

permission of Assistant Manager Mr. Johnson but she accused me in being absent. She never responded my emails when I sent her documents about my health condition. She never informed me that my request for leave without pay was denied. She never called me to let me know that my request was denied, and she never sent me an email. She terminated my employment prior to July 07th, 2017. She refused to reinstate me back to work after I arrived at the USA. She hired two male employees who will not have problems related to pregnancy. She hired much younger employees that I am. Dr. Prince never responded to my request to speak with her in person. In contrast, Melanie was allowed to work for only once a month for 2 years when she was in a nursing school. Ms. Casey got 5 phone calls from Ms. Dunkelberger when this Manager offered her employment at the VA.

29. Are you aware of a coworker who was not subjected to **termination** in similar circumstances?

      No, I am not aware.


The above information has furnished without a pledge of confidence and I understand that it may be shown to the interested parties of this complaint.

This statement is made under penalty of perjury, this November 19th, 2017.

__Tatyana E. Drevaleva_____

(Affiant's signature)

104

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

## OFFICIAL CORRESPONDENCE: PR

---

**Tatyana Drevaleva** <tdrevaleva@gmail.com>
To: "Smith, Karen Y. (ABQ)" <Karen.Smith20@va.gov>

Fri, Nov 24, 2017 at 10:54 AM

Dear Karen!

Happy Thanksgiving!
Thank you so much for offering me help. I already submitted my Interrogatory answers and related documents.
By the way, I was offered an ADR process. I am not sure what it is - whether it is another Mediation or Arbitration.
I never heard about the date and the time of this alleged ADR process. I was told that the person who is responsible for it is Mr. Rincon. I emailed him with a request to give me the date and time of the ADR process but I've never heard back from him.
Afterwards, I called Mr. William Winter and asked what is going on. Mr. Winter said that the ADR process is probably inconvenient because I already had Mediation which was unsuccessful.
Because my complaint includes age discrimination, I think I have a right to file a lawsuit without waiting for 180 days until the VA processes my claim.
Because of the age discrimination issue, I think I don't have to obtain a Right to Sue letter before filing a complaint in a District Court. Anyway, I will have to give a written 30 day notice to the VA about my intention to file a lawsuit. I haven't done it yet because I need to solve other issues.
When I file a lawsuit, I will sue the VA for libel. The VA said that I had left the facility for my trip to Russia without a permission. Actually, I got a verbal permission of Assistant manager Mr. Johnson before my trip. The VA transmitted the libel to the third party such as the Employment Development Department. because of that, the EDD thinks that I was fired for cause and doesn't pay me Unemployment Insurance benefits. Currently, I am receiving food stamps and general assistance from Monterey County.
I will try to find an attorney at law who will give me the consultation, I will give the agency a 30 day notice, and I will file a lawsuit. I need to protect my good name from libel of the VA.
Please, let me know if you have any questions.
Have a wonderful weekend,
Respectfully,

Tanya.

[Quoted text hidden]
--
Respectfully,
Tanya.

105

**Attachment 13** – my unsuccessful attempt to get a Right to Sue Letter.

To the Department of Veterans Affairs
The Raymond G. Murphy VAMC
1501 San Pedro Dr. SE, Albuquerque, NM 87108
from a former employee
Tatyana E. Drevaleva
10660 Hidden Mesa Place
Monterey, CA, 93940
Cell 415-806-9864
tdrevaleva@gmail.com

December 28th, 2017

Request for a right to sue letter.

I was discriminated against my disability to give birth to children by a natural way and against my age. I filed a formal EEO complaint, and I submitted my answers on the Interrogatory questions. Since then, your agency keeps silence and is not moving forward to investigate my complaint. In the mean time, I am unemployed and not even receiving unemployment insurance benefits. The reason is a libel that the Raymond G. Murphy VAMC conducted to the Employment Development Department about the reasons of my leave without pay.

Because my complaint includes age discrimination, I have a right not to wait for 180 days when my complaint will be investigated within your agency. Therefore, I am demanding a right to sue letter. I will file a complaint in a District Court. I will sue your agency for 1) Sex and Pregnancy discrimination, 2) Age discrimination, 3) Libel.

Tatyana E. Drevaleva

107

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

## Request for a Right to Sue letter.

---

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                           Thu, Dec 28, 2017 at 9:18 PM
To: "Winter, William (ORM)" <william.winter@va.gov>, "Smith, Karen Y. (ABQ)" <Karen.Smith20@va.gov>

See the attachment.

--
Respectfully,
Tanya.

---

📑 **Request for a right to sue letter December 28, 2017.pdf**
97K

108

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

## FW: Request for a Right to Sue letter.-TD 103883

---

**Funes, Carlos (ORM)** <Carlos.Funes@va.gov>
To: Tatyana Drevaleva <tdrevaleva@gmail.com>
Cc: "Smith, Karen Y. (ABQ)" <Karen.Smith20@va.gov>

Thu, Jan 4, 2018 at 2:55 PM

Dear Ms. Drevaleva:

Thank you for your email. We received your request for a "right to sue" letter.

We do not issue "right to sue" letters for people participating in the EEO Process. However, if you review the complainant's rights enclosure to your notice of acceptance, you will see a heading addressing your right to request civil action. It says:

If you have not received a copy of the investigative file within 180 calendar days from date you filed your formal complaint, and you do not wish to have a hearing, you also have the right to file a civil action in an appropriate United States District Court. If you file a civil action, the court may, at its discretion and upon your request, appoint an attorney to represent you in the matter, if you do not have or cannot afford one. The court may also authorize the civil action to begin without payment of fees, costs, or other security. Finally, if you decide to file a civil action, you must name, David J. Shulkin, M.D., Secretary of Veterans Affairs as the defendant.

I hope that this is helpful and responsive to your request.

Sincerely,

**Carlos Funes**

**EEO Case Manager**

**Department of Veterans Affairs**

**Office of Resolution Management**

**Office: (310) 478-3711 ext. 35819**

**Fax: (310) 268-4089**

109



*VA Core Values:* Integrity Commitment Advocacy Respect Excellence

*VA Core Characteristics:* Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

*"Thank you for contacting the Office of Resolution Management. Our goal is to provide you with exceptional customer service. Please take a moment to complete a very brief survey to let us know how my service was today"*

Click Here

**NOTE: If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.**

**From:** Tatyana Drevaleva [mailto:tdrevaleva@gmail.com]
**Sent:** Thursday, December 28, 2017 9:18 PM
**To:** Winter, William (ORM); Smith, Karen Y. (ABQ)
**Subject:** [EXTERNAL] Request for a Right to Sue letter.

See the attachment.

--

Respectfully,

Tanya.

110

**Attachment 14** – the Agency's request for extension of time to investigate my complaint.

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

## Offical Correspondece

---

**Wollmann, Rena (ORM)** <Rena.Wollmann@va.gov>                    Wed, Feb 28, 2018 at 10:40 AM
To: "Smith, Karen Y. (ABQ)" <Karen.Smith20@va.gov>, "Drevaleva, Tatyana E."
<Tatyana.Drevaleva@va.gov>
Cc: "Hayo, Dennis (ORM)" <Dennis.Hayo@va.gov>, "tdrevaleva@gmail.com" <tdrevaleva@gmail.com>

Good Afternoon,


ORM strives to complete every investigation in an efficient and effective manner.  Unfortunately, we have
been unable to assign your client's case for investigation until now.    We plan on completing the
investigation as efficiently and effectively as possible.    Would you consider providing Mr. Hayo with an
extension to complete the investigation into the complaint of discrimination?  I have attached the extension
request form to this email, you can fill that out or simply respond to this email, if you are agreeable to an
extension in your client's case.


Thank you for your consideration.


# Rena M. Wollmann

Rena M. Wollmann

Lead EEO Administrative Assistant

ORM Investigation and Contracting Team (OICT)

1000 Liberty Avenue, Room 1801

Pittsburgh, PA 15222

412-482-5208


How were my services today?


"This e-mail and any attachments are intended only for the use of the addressee(s) named herein
and may contain privileged and/or confidential information. If you are not the intended recipient
of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail,
and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please
notify me via return e-mail and via telephone at (412) 482-5205 and permanently delete the
original and any copy of any e-mail and any printout thereof."

---

**2 attachments**

 **Extension Request.docx**
402K

**Assignment Letter.pdf**
145K



# Office of Resolution Management

**Department of Veterans Affairs**
**Tatyana Drevaleva – Case No. 200P-0501-2017103883**

1.　　EEOC regulations require that the formal investigation be completed within 180 days of the file date. The regulatory timeline expires on March 18, 2018.

2.　　ORM requests a voluntary extension of 60 days to the timeline from March 18, 2018 to allow time for the investigator to adequately and properly investigate your complaint.

_____　　　_____
Complainant　　　　　　　　　　　　　　　Date

**CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT QUTOMATED TRACKING SYSTEM (CATS)**

114



**DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management**
**William S. Moorhead Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh, PA 15222**

February 28, 2018

Dennis Hayo, EEO Investigator
Office Resolution Management 08B
William S. Moorhead Federal Building
1000 Liberty Avenue, Suite 1801
Pittsburgh, PA 15222

SUBJECT: Assignment of Investigation

1. You are hereby assigned to investigate the following discrimination complaint:

**Tatyana Drevaleva – Case No. 200P-0501-2017103883– New Mexico VA HCS**

2. This letter will be your authorization to: (1) investigate the accepted claim(s) in this complaint; (2) require all employees of the Department of Veterans Affairs to cooperate with the investigation; and (3) require employees of the agency having any knowledge of the matter accepted for investigation to furnish testimony without a pledge of confidence. Pursuant to 29 C.F.R. §1614.108 (c) (2), the Investigator's authority to administer the oath is automatic during the course of this investigation.

3. For questions or assistance, please call me at 412-482-5205.

Sincerely,

Daniel Spilsbury
OICT Manager

CC:    Complainant
       Karen Smith, Representative
       Andrew Welch, Director, Facility Director
       Don Rincon, EEO Program Manager

**Attachment 15** – I granted the Agency with sixty days of extension.

 **Gmail**

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

## Official Correspondence TD

---

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                    Mon, Mar 5, 2018 at 12:46 PM
To: "Hayo, Dennis (ORM)" <Dennis.Hayo@va.gov>

Mr. Hayo,

Here is the document.
I gave you sixty days per your request. Please, try to finish the investigation ASAP.
Thank you,

Tanya.

[Quoted text hidden]
--
Respectfully,
Tanya.

---

📄 **MX-2615N_20180305_130730.pdf**
23K

117



# Office of Resolution Management
### Department of Veterans Affairs
**Tatyana Drevaleva – Case No. 200P-0501-2017103883**

1.    EEOC regulations require that the formal investigation be completed within 180 days of the file date.  The regulatory timeline expires on March 18, 2018.

2.    ORM requests a voluntary extension of 60 days to the timeline from March 18, 2018 to allow time for the investigator to adequately and properly investigate your complaint.

_Tatyana Drevaleva_          _03. 05. 2018._
Complainant                  Date

*I am giving you sixty days per your request. Please, try to finish the investigation as soon as you can.*

**CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT QUTOMATED TRACKING SYSTEM (CATS)**

118

**Attachment 16** – official correspondence, summary of my complaint from the Agency.



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**William S. Moorhead Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh, PA 15222**

| | |
|---|---|
| Tatyana Drevaleva<br>10660 Hidden Mesa Pl.<br>Monterey, CA 93940<br><br>Complainant<br><br>    v.<br><br>Secretary<br>Department of Veterans Affairs<br>810 Vermont Avenue, NW<br>Washington, DC 20420 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No: 200P-0501-2017103883<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Facility:    New Mexico VA Healthcare System
              1501 San Pedro Drive, S.E.
              Albuquerque, NM 87108

_____

Initials:____

1

120



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**William S. Moorhead Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh, PA 15222**

**Tatyana Drevaleva**
Table of Contents
**200P-0501-2017101883**

**1. Formal Complaint**
Formal Complaint ........................................... 1-1
Notice of Receipt ........................................... 1-2
Investigator Assignment .................................. 1-3

**2. EEO Counselor's Report**
Counselor's Report ......................................... 2-1
Documents Submitted During Counseling ............ 2-2
Notice of Right to File ..................................... 2-3
Notice of Informal Counseling .......................... 2-4

**3. Procedural Review**
60 Day Investigative Extension ......................... 3-1
Notice of Acceptance ...................................... 3-2
Documents Submitted During Procedural Review .. 3-3
Request for Documents .................................... 3-4

**4. Settlement Agreements**
Nothing Attached ........................................... 4-1

**5. Prior Appellate Activity**
Nothing Attached ........................................... 5-1

**6. Report of Investigation Summary**
Case No. 200H-0541-2016100378 ...................... 6-1

**7. Exhibits, Evidence**
Affidavit of Tatyana Drevaleva (Complainant) ...... 7-1
Affidavit of Phil Johnson (RMO) ....................... 7-2
Affidavit of Carla Dunkelberger (RMO) ............... 7-3
Affidavit of Dr. Tina Prince (RMO) .................... 7-4
Affidavit of Clifford Speakman (SME) ................ 7-5
Supplemental Affidavit of Clifford Speakman ....... 7-5a
Unit Organizational Chart ............................... 7-6
Complainant's Acknowledgement of Leave Procedures 4-18-17 . 7-7
Complainant's Medical Documents ..................... 7-8

Complainants Functional Statement ............................................ 7-9
Dunkelberger Report of Contact April 18, 2017 ........................... 7-10
Dunkelberger Report of Contact May 25, 2017 ............................ 7-11
Dunkelberger Denial of Leave June 9, 2017 ................................ 7-12
Termination Notice June 30, 2017 .............................................. 7-13
Complainant's Personnel Action SF-52 ....................................... 7-14
Facility Leave Records .............................................................. 7-15
Complainant's Emails to Management ......................................... 7-16
Agency Policy Regarding Probation ............................................ 7-17
Facility Policy on Employee Courtesy ......................................... 7-18
Facility Title 5 Leave Policy ....................................................... 7-19
Facility Tour of Duty Policy ........................................................ 7-20

OMB NO. 2023-0746
EXPIRATION DATE Dec 31 2016
RESPONDENT BURDEN 20 min

COMPLAINT CASE NUMBER

**VA** Department of Veterans Affairs | **COMPLAINT OF EMPLOYMENT DISCRIMINATION**

*Read the instructions on the reverse side of this form carefully before completing the front of this form.*

| 1 NAME | 3 MAILING ADDRESS | 4a WORK TELEPHONE NUMBER |
|---|---|---|
| Tatyana E. Drevaleva | 10660 Hidden Mesa Place, Monterey CA, 93940 | |
| **5** EMAIL ADDRESS | | 4b PRIMARY TELEPHONE NUMBER |
| tdrevaleva@mail.com | | (415) 806-8664 |

| 6 ARE YOU | 6a JOB TITLE, SERIES AND GRADE | 7 NAME AND ADDRESS OF VA FACILITY WHERE DISCRIMINATION OCCURRED |
|---|---|---|
| ☐ A VA **EMPLOYEE** | Medical Instrument Technician (EKG) G-7 | Raymond G. Murphy VA Medical Center, |
| ☐ AN APPLICANT **FOR EMPLOYMENT** | 6b SERVICE/SECTION/PRODUCT LINE | 1501 San Pedro SE |
| ☒ A FORMER VA EMPLOYEE | 5D. I observed cardiac monitors. Also, I was trained as a CNA. | Albuquerque, NM 87108 |

**NOTE:** For each employment related matter that you believe was discriminatory you must list the bases (list one or more of the following): Race (Specify), Color (Specify), Religion (Specify), Sex (Male or Female), National Origin (Specify), Age (Provide date of birth), Disability (Specify), Genetic Information (including family medical history), and/or Reprisal for participating in the EEO process or opposing unlawful discrimination.

| **8. BASIS** | **9. CLAIM(S)** *(What employment related claim(s) personnel action(s), adverse action(s) or events caused you to file this complaint. Please be specific as to the specific action, personnel action and or event that caused you to file this complaint. Please be as specific as possible. If you are additionally alleging a pattern of harassment, you should also include information that supports the Privacy Act of 1974 and the Health Insurance Portability and Accountability Act (HIPAA). Some examples are patient medical records, personal records of other VA employees, etc.)* | **10. DATE OF OCCURRENCE** *(Include the most recent date(s))* |
|---|---|---|
| I was discriminated, retaliated and unlawfully terminated based on my disability to ▮▮▮▮▮ by a natural way and my age. | See a separate sheet of paper. | My termination date is June 30th, 2017. |

**11** REMEDIES SOUGHT (If an additional sheet of paper)
I had a Mediation on September 7th, 2017. Manager Mrs. Dunkelberger refused to reinstate me back to work.

| 12a. DO YOU HAVE A REPRESENTATIVE? | 12c. PROVIDE THE NAME AND ADDRESS OF YOUR REPRESENTATIVE | 12d. TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| ☐ YES ☒ NO | | |
| 12b. IF "YES," IS HE OR SHE AN ATTORNEY? | | 12n. EMAIL ADDRESS |
| ☐ YES ☐ NO | | |

| 13a. HAVE YOU CONTACTED AN EEO COUNSELOR? | 13b. NAME OF EEO COUNSELOR | 13c. DATE OF INITIAL CONTACT WITH ORM |
|---|---|---|
| ☒ YES ☐ NO | Mr. William Winter | 07/05/2017 |

14. *If you contacted an EEO Counselor more than 45 calendar days after the Date(s) of Occurrence, listed in item 10, or if the complaint is filed more than 15 calendar days after you received a Notice of Right to File a Discrimination Complaint, you must explain why you were untimely in seeking EEO counseling or untimely in filing a complaint. (Use an additional sheet of paper, if necessary.)*

| 15a. HAVE YOU FILED A UNION GRIEVANCE ON ANY CLAIM(S) LISTED ABOVE? | 15b. IF "YES," LIST THE CLAIM(S) AND DATE GRIEVANCE FILED | 16a. HAVE YOU FILED AN APPEAL WITH THE MERIT SYSTEM PROTECTION BOARD (MSPB) ON ANY OF THE CLAIMS LISTED ABOVE? | 16b. IF "YES," LIST THE ISSUE(S) AND DATE MSPB APPEAL FILED |
|---|---|---|---|
| ☒ YES ☐ NO | I emailed Ms. Cheryl Eliano on 09.18.2017 | ☐ YES ☒ NO | |

| 17a. HAVE YOU FILED THIS COMPLAINT WITH ANYONE ELSE? | 17b. IF "YES," PROVIDE THE NAME AND ADDRESS |
|---|---|
| ☐ YES ☒ NO | |

| 18 SIGNATURE OF COMPLAINANT (Do not print) | 19 DATE |
|---|---|
| *Tatyana Drevaleva* | 09.19.2017 |

VA FORM **4939** MAR 2017 | SUPERSEDES VA FORM 4939, MAR 2013 WHICH SHOULD NOT BE USED

123

My name is Tatyana Drevaleva. I was hired as a Monitor Technician at 5D at Albuquerque VAMC on April 3rd, 2017. In May 2017, I informed Manager Mrs. Carla Dunkelberger that I needed to go to Russia for an ▮▮▮▮▮▮ because I wanted to have children. I also informed Assistant manager Mr. Phil Johnson that I needed to go to Russia for the ▮▮▮▮▮▮▮▮. I was taking ▮▮▮▮▮▮▮▮▮, and I was running out of these ▮▮▮▮ It was impossible to obtain these pills in the USA. Mr. Johnson verbally allowed me to go to Russia for the ▮▮▮▮▮▮▮ On May 18th, 2017, I emailed Mrs. Dunkelberger and Mr. Johnson a document from my Russian ▮▮▮▮▮▮ confirming that I was in registry for the ▮▮▮▮▮▮▮▮ in Novosibirsk, Russia, and I needed to be there to perform the ▮▮▮▮▮▮▮▮▮ This document was on Russian language. Also, I filled out the form asking for leave without pay from May 18th, 2017 to July 7, 2017. I left Albuquerque on May 18th, 2017. After I arrived at Novosibirsk, Russia, I got this document from my ▮▮▮▮▮▮ translated, and I emailed it to Mrs. Dunkelberger and Mr. Johnson.

My ▮▮▮▮▮▮▮▮ in Russia lasted for three months. Initially, my ▮▮▮▮▮▮ requested me to pass all lab tests, ▮▮▮▮▮▮▮▮▮▮, etc. Later, the doctor found a ▮▮▮▮▮▮▮▮ and requested to remove it. I had surgery on June 13th, 2017. Afterwards, I waited for the pathology result. After I got that result, the ▮▮▮▮▮▮▮ requested me to determine the level of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and a ▮▮▮▮▮ (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that needed to be done on the second day of my ▮▮▮▮▮▮▮▮▮▮ I waited for 14 days for the ▮▮▮▮▮▮▮▮▮▮ Afterwards, there was an actual attempt of ▮▮ Unfortunately, it was unsuccessful.

As soon as I realized that I needed to stay in Russia longer that July 7th, I emailed Mrs. Dunkelberger and Mr. Johnson, and I let them know that my ▮▮▮▮▮▮ requested additional tests (▮▮▮▮▮▮▮▮▮▮), and I needed to stay in Russia for a longer time. I provided Mrs. Dunkelberger and Mr. Johnson with another document from my Russian physician confirming that I needed to stay in Russia for a longer time for additional examinations. However, Mrs. Dunkelberger fired me on June 30th – even before July 7th.

I contacted Mr. William Winter who is an EEO Counselor. He promised to schedule the Mediation date after I arrive back to the USA.

I returned back to the USA on August 18th. I contacted Mr. Winter, and he scheduled the Mediation process on September 7th. I went to the Mediation (the process was on Tele because I was in California. I was unemployed, I didn't have money to pay rent, and this was why I returned back to California to stay with some of my Russian friends). During the Mediation, Mrs. Dunkelberger said that she had submitted my written request for leave without pay to Dr. Prince. Dr. Prince denied my request because, according to Family Medical Leave Act, I qualified for Leave without Pay only after 12 months of working at the VA, and at that time I was working for only 1.5 months. I said that I didn't have an opportunity to wait for 12 months because I was running out of ▮▮▮▮▮▮▮▮▮▮▮ I couldn't refill this prescription in the USA, and I was in registry for a free ▮▮▮▮▮▮▮▮▮ I waited in line for this ▮▮▮▮▮▮▮▮ for 9 months, and my turn finally came. Mrs. Dunkelberger said that the decision of Dr. Prince was mailed to my Albuquerque home postal address. Mrs. Dunkelberger said that I hadn't come back to work and I hadn't contacted with her after sending Dr. Prince's letter. I answered that there was no chance for me to get and read that mail because I was out of country, and Mrs. Dunkelberger knew it. I asked why she didn't email Dr. Prince's decision to my private email address. Mrs. Dunkelberger said that the letter was not encrypted,

124

and she couldn't have emailed it to me. This was not true because she emailed me the termination Letter which was not encrypted. However, Mrs. Dunkelberger refused to reinstate me back to work.

During the Mediation, Director of Human Resources Mr. Thomas Harris requested my home postal address in California. He gave me his email address which is Thomas.Harris3@va.gov He promised to send me Dr. Prince's decision. On September 8th, 2017 I emailed Mr. Harris, and I provided him with my home postal address in California. He never replied, and I never got any document in mail from him.

I informed Mr. Winter that my intention was to file a formal EEO complaint. Also, I decided to contact with the Union and ask the Union to assist me to get reinstated back to work. From my point of view, I left Albuquerque VAMC for the medical purpose, and I left with the permission of the Assistant Manager. It is not my fault that Mrs. Dunkelberger didn't inform me via email that my request for leave without pay was denied by Dr. Prince. I feel discriminated, retaliated and unlawfully terminated based on my disability to ▮▮▮▮▮▮▮▮▮▮▮▮. Also, I feel discriminated against my age (50 yo). Talking to my former colleagues over the phone, I found out that Mrs. Dunkelberger hired two males for the positions of Monitor Technician. Obviously, male employees will not have problems related to ▮▮▮▮▮▮. Also, the ages of these employees are 30 yo and approximately 35 yo – much younger than I am.

Tatyana Drevoleva

September 19, 2017.

125

| | |
|---|---|
| **From:** | Tatyana Drevaleva <tdrevaleva@gmail.com> |
| **Sent:** | Tuesday, September 19, 2017 6:47 PM |
| **To:** | ORMPDO4939; Winter, William (ORM) |
| **Subject:** | [EXTERNAL] Complaint of Discrimination. |
| **Attachments:** | 1.pdf; 2.pdf; 3.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

see attachments.


--
Respectfully,
Tanya.



**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT
11301 Wilshire Boulevard Building 220, 2nd Floor
Los Angeles, CA 90073

In reply refer to: 08H

October 20, 2017

VIA: Electronic Mail

Tatyana Drevaleva
TDREVALEVA@GMAIL.COM

**SUBJECT: Notice of Receipt of your Discrimination Complaint No. 200P-0501-2017103883, Filed September 19, 2017**

1. This letter acknowledges receipt of your discrimination complaint. The official filing date of your complaint is **September 19, 2017,** based on the date your E-mail was received. This notice also provides you with written notification of your rights, as well as the time requirements for exercising those rights.

2. If your claims are accepted, your case will be assigned to an impartial investigator under the supervision of the Office of Resolution Management (ORM). The investigator will contact you directly in order to obtain information or evidence you may wish to offer. The investigation must be completed within 180 calendar days of the filing of your complaint. You will be provided with a copy of the investigative file upon completion and you will be advised, in writing, of your right to request a Final Agency Decision (FAD) from the Office of Employment Discrimination Complaint Adjudication (OEDCA), or a hearing by an administrative judge appointed by the Equal Employment Opportunity Commission (EEOC).

3. If the investigation has not been completed within the 180 calendar-day time limit, regulations permit the agency and the complainant to agree, in writing, to extend the investigative period for not more than 90 calendar days. ORM will make every good faith effort to complete the investigation within the prescribed period. However, where workload demands make it impossible to complete a timely investigation, we will work with you to seek mutual agreement to extend the period so that the investigation can be completed before you seek an EEOC hearing or a final agency decision from OEDCA.

4. You must keep this office advised of any change of address. Failure to do so could lead to dismissal of your complaint. You must also immediately advise this office, in writing, of the name, address, and telephone number of any person you may choose to represent you in this matter. All subsequent actions on your complaint will be mailed or delivered to your representative, with copies to you, unless you advise us in writing that you are no longer represented by that individual.

5. The EEOC encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints at the lowest possible level. Agencies and complainants

Page 2
Notice of Receipt

can realize many advantages from using ADR.  ADR offers the parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion.  Please see the Mediation Program Information Sheet enclosed.  If you are interested in using mediation to address the issues raised in your complaint, please contact the ADR Director at workplaceadr@va.gov.

Sincerely,

Sophia Eaves
Pacific District Manager

Enclosures:  Mediation Program Information Sheet
Counselor's Report

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)

# MEDIATION PROGRAM INFORMATION SHEET

## What Is Mediation?

Mediation is an informal way for employees to address disputes with a fellow employee, manager, or colleague. In mediation, a neutral person called a mediator helps two or more persons explore ways to resolve their differences and reach an agreement that best addresses their interests. Mediation allows the parties to create their own unique solutions, instead of taking the problem to an outside decision-maker and having that person's solution imposed on them.

Mediation does not focus on who is right and who is wrong. It focuses on forward thinking and solving the problem. The mediator has no authority to make decisions for the parties. The parties decide what is important to each of them and make decisions based on those factors. The mediator helps the parties communicate, make informed decisions by understanding and listening to each other, and work together to create options and acceptable solutions.

## Why Should I Request Mediation?

While conflict is a natural part of our daily lives, unresolved disputes may become unproductive and negatively impact the work environment. In these instances, mediation can save time and resources for all involved. Mediation can improve communication and prevent future misunderstandings. Mediation provides an opportunity to discuss sensitive issues and concerns in a private setting. Mediation helps the parties to look realistically at the best and worst case alternatives to resolving the dispute, and when possible, develop mutually satisfactory solutions. By agreeing to mediate, neither party gives up any rights to other processes that may be available to address the dispute. Parties can designate a representative to attend the mediation and provide support and advice during the process.

## How Does Mediation Fit Into The EEO Process?

An individual who has initiated the EEO complaint process may advise an Office of Resolution Management (ORM) EEO counselor of his/her interest in mediation as opposed to EEO counseling. The EEO counselor will inquire and find out if the Agency is willing to participate in mediation. If so, the pre-complaint process will be extended for no more than 90 calendar days from the individual's date of initial contact with the EEO counselor to allow the parties to mediate. If mediation does not resolve the matter, the EEO counselor will advise the individual of his/her right to file a formal EEO complaint.

After a formal EEO complaint has been filed, the complainant may request mediation at any time during the processing of his/her complaint. If the Agency

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)

129

agrees to mediate, the processing of the EEO complaint will be held in abeyance for no more than 90 calendar days from the date of the request to mediate. If the complaint is not resolved in mediation, the EEO complaint process resumes at the point mediation was requested.

## How Do I Begin The Mediation Process?

The mediation process is initiated by contacting the ORM official assigned to the EEO complaint or ORM's ADR Program Office. If the request does not involve an issue of fraud, waste, abuse, criminal activity, sexual harassment, or removal for cause, the other party involved in the dispute will be contacted to see if (s)he is amenable to mediation. If the other party is willing to mediate, the ORM ADR Program Office or Facility ADR Coordinator obtains mediators from within VA or another Federal agency, depending on the parties' preference. In some instances, where a party is a member of the bargaining unit, the union may be notified of and invited to participate in the mediation session.

## What Happens During The Mediation Session?

Generally, the mediator begins with an introduction, explaining the process, each party's role, and establishing ground rules. Then, each party is afforded an opportunity to share information about the dispute. The mediator may continue with all parties in a joint session, exploring ways to address the issues raised or the mediator may meet separately with each party in private caucuses. Any information shared only with the mediator will be kept confidential unless permission is given to the mediator to disclose to the other party. If the parties can find common ground and agree to terms, those terms are documented in an agreement.

## What If An Agreement Is Reached?

A written agreement is drafted and signed by all necessary parties. Once the agreement is signed by all parties, the contract is binding and enforceable. The parties may agree not to disclose the terms of the agreement to those who do not have a need to know; however, the document itself is not confidential and may be disclosed to establish compliance.

## What If An Agreement Is Not Reached?

If mediation was elected during the EEO complaint process, the process resumes at the point mediation was requested.

## What If I Have More Questions?

If you would like additional information, please contact the ORM ADR Program Office at workplaceadr@va.gov.

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)

130



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**PACIFIC DISTRICT**
**COUNSELOR REPORT**



**CASE NUMBER: 200P-0501-2017103883**
**COUNSELOR NAME: Winter, William**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Name of Aggrieved Party: | | | Ms. Tatyana E. Drevaleva | | | | |
| Home and/or Alternate Address: | | | 10660 Hidden Mesa Place, Monterey, CA, 93940 | | | | |
| Home Telephone Number: | | | 415-806-9864 | | | | |
| Cellular/Mobile Number | | | 415-806-9864 | | | | |
| Business Address: | | | 1501 San Pedro Drive SE, Albuquerque, NM 87108 | | | | |
| Business Telephone Number: | | | (505) 265-1711 x2441 | | | | |
| Email Address: | | | tdrevaleva@gmail.com | | | | |
| Position Title/Grade: | | | | | | | |
| Employee | Former Employee | X | Applicant | | | | |
| VHA | X | VBA | NCA | | Canteen | | Other |
| Title 5 | | Title 38 | Hybrid T38 | | Full-time | | Part-time |
| Probationary | | Career | Career Conditional | | Temporary | | Term |
| Name of Facility: | | | VAMC, ALBUQUERQUE | | | | |
| Address of Facility: | | | 1501 San Pedro Drive SE, Albuquerque, NM 87108 | | | | |
| Facility Telephone Number: | | | (505) 265-1711 | | | | |
| Name of Representative: | | | N/A | | | | Attorney False |
| Representative's Address: | | | N/A | | | | |
| Representative's Telephone: | | | N/A | | | | |

**NOTIFICATION OF PROCEDURAL RIGHTS**

| | | | | |
|---|---|---|---|---|
| Initial Contact: | Telephone | | Date: | 07/05/2017 |
| Initial Interview | E-Mail | | Date: | 07/10/2017 |
| Rights & Responsibilities/Notices: | Electronic Mail | 07/05/2017 | Rec'd: | 07/13/2017 |
| Notice to Unreachable Aggrieved: | UPS/Cert Mail: | | Rec'd: | N/A |
| Agreed to Waive Anonymity: | YES [X] | NO [] | Date | 07/10/2017 |
| Notification to Facility Director | Electronic Mail: | | Date: | 07/13/2017 |
| ADR offered by facility [ ] MOU [ ]: | YES [X] | NO [] | Date: | 07/05/2017 |
| Facility Returned Signed Refusal | YES [] | NO [X] | Date | N/A |
| ADR Agreed to by Aggrieved: | YES [X] | NO [] | Date: | 07/12/2017 |
| Settlement (SA) [] | Withdrawal (WD) []: | | Date: | N/A |
| Notice of Closure (for SA/WD): | Regular Mail: | | Rec'd: | N/A |
| Notice of Right to File: | Electronic Mail: | 09/14/2017 | Rec'd: | 09/14/2017 |

131

Case Number: 200P-0501-2017103883
Name of Aggrieved Party: Ms. Tatyana E. Drevaleva
Name of Facility: VAMC, ALBUQUERQUE
Date of Initial Contact: 07/05/2017

## RMO/WITNESS INFORMATION

| | |
|---|---|
| Responding Management Official(s): (Name, Title, Telephone Number) | Carla Dunkelberger, Nurse Manager, (505) 265-1711 x4617 |
| Witness(es) Suggested for Interview by Aggrieved Party (Name, Title, Tele #): | None |
| Witness(es) Suggested for Interview by RMO (Name, Title, Telephone Number): | None |

| Claim - 1: Termination (Probationary) Incident Date: 06/30/2017 | | | | | | |
|---|---|---|---|---|---|---|
| **Bases: Age - (DOB: 10/1966), Disability: (Physical)** | | | | | | |
| | Yes (date) | No | | Yes (date) | No | If claim is untimely, explain reason for the untimeliness in description of claim below.* |
| Mixed Case | | X | MSPB Filed | | X | |
| Union Grievance Filed | | X | Is Claim Timely | 06/30/2017 | | |
| Administrative Grievance Filed | | | | | X | |
| Have you contacted another EEO Official? | | | Not Reported | | | Don Rincon, EEO Program Manager |

**Brief Description of Claim:**
Ms. Drevaleva, the Aggrieved Party (AP) claimed that she was discriminated against when on;

June 30, 2017, she (AP) was terminated.

**Resolution Sought:**
AP requested to be allowed to return to work.

**Management's Response:**
Management was not contacted due to requested ADR.

**Informal Documents Requested/Received:**
Notice of Termination (Probationary), dated June 30, 2017.

## SUMMARY OF RESOLUTION EFFORTS

July 12, 2017, AP elected ADR.

September 7, 2017, ADR Tracker recorded the mediation as not resolved.

September 14, 2017, issued the NORF; conducted the formal final interview after counseling concluded.

Case Number: 200P-0501-2017103883
Name of Aggrieved Party: Ms. Tatyana E. Drevaleva
Name of Facility: VAMC, ALBUQUERQUE
Date of Initial Contact: 07/05/2017

## FINAL INTERVIEW

During the final interview the results of informal counseling and resolution efforts were discussed with the aggrieved party. The aggrieved was informed that the claim(s) listed above were the only claim(s) addressed during the informal EEO counseling. If a formal Complaint of Discrimination is filed, a claim that has not been brought to the attention of an EEO counselor and is not like or related to a claim that has been brought to the attention of an EEO counselor is subject to dismissal in accordance to CFR 1614.107 a(2).

The Notice of Right to File a Discrimination Complaint and VA Form 4939 were sent by Electronic Mail on September 14, 2017.

William Winter                                      9/29/2017
EEO Counselor                                       Date

**Stenhouse, Whitney (ORM)**

| | |
|---|---|
| **From:** | Stenhouse, Whitney (ORM) |
| **Sent:** | Friday, October 20, 2017 3:44 PM |
| **To:** | 'tdrevaleva@gmail.com' |
| **Subject:** | Official Correspondence |
| **Attachments:** | NOR Drevaleva 103883 CP.pdf |

Dear Ma'am,

Please find attached EEO correspondence concerning your complaint.

Respectfully,

*Whitney Stenhouse*
*EEO Assistant*
*Department of Veterans Affairs*
*Office of Resolution Management*
*Pacific District*
*Office: (310) 478-3711 ext.48054*
*Fax: (310) 268-4089*



**VA Core Values:** Integrity Commitment Advocacy Respect Excellence
**VA Core Characteristics:** Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

*"Thank you for contacting the Office of Resolution Management. Our goal is to provide you with exceptional customer service. Please take a moment to complete a very brief survey to let us know how my service was today"*
Click Here

**NOTE:** *If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.*

**134**



**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT
11301 Wilshire Boulevard Building 220, 2nd Floor
Los Angeles, CA 90073

October 20, 2017

VIA: Electronic Mail                                        In reply refer to: 08H

Andrew Welch, Director
Department of Veterans Affairs
New Mexico VA Healthcare System
1501 San Pedro Drive, SE
Albuquerque, NM 87108

**SUBJECT: Notice of Receipt of Discrimination Complaint – Tatyana Drevaleva, Case No. 200P-0501-2017103883, Filed September 19, 2017**

1. This is to inform you that Tatyana Drevaleva filed an EEO complaint of discrimination on September 19, 2017.

2. ORM is reviewing the complaint to determine if it meets the Equal Employment Opportunity Commission's (EEOC) requirements for investigation and further processing. You will be provided a copy of the procedural determination letter.

3. We have enclosed a document outlining what you can expect next as the complaint is processed.

Sincerely,

Sophia Eaves
Pacific District Manager

Enclosures:  What to Expect During the Complaint Process
                      Counselor's Report

cc. Don Rincon, EEO Program Manager



# Office of Resolution Management

*Department of Veterans Affairs*

## WHAT TO EXPECT DURING THE COMPLAINT PROCESS

**WHY DID I RECEIVE THIS NOTICE?**
You received the *Notice of Receipt* because an employee, applicant, or former employee under your chain has filed a formal complaint of discrimination.

**WHAT HAPPENS NEXT?**
If ORM dismisses the complaint, the complainant can appeal the decision to the EEOC. If ORM accepts the complaint, in whole or in part, we will assign an investigator.

**WHAT CAN MANAGEMENT EXPECT AT THE INVESTIGATIVE PHASE?**
The investigator will develop impartial and appropriate factual information on the claims accepted for processing. ORM must complete the investigation within **180 days** of the date the formal complaint was filed (for mixed case claims[1] ORM must complete the investigation within 120 days), so we need the cooperation of all witnesses, including management officials.

After the investigation is completed, ORM will send you a summary of the investigation. You should review the summary and determine if resolution should be attempted. ORM is available to consult or provide a mediator at this stage.

**WHAT OCCURS AFTER THE INVESTIGATION?**
The employee can elect an EEOC hearing or a final agency decision from OEDCA (the complainant does not have the right to an EEOC hearing on mixed case claims). If a hearing is elected, your management officials will work with the agency representative (usually a Chief Counsel attorney) to prepare for the hearing.

**WHEN DOES THE PROCESS END?**
The employee can also file in U.S. District Court after 180 days have elapsed from the formal filing date or after the case has been adjudicated (120 days for mixed case claims). If that occurs Regional Counsel works with a U.S. Attorney from the Department of Justice.

**For more information on the EEO complaint process and ORM, please visit ORM's website: http://www.va.gov/orm/**

---

[1] A mixed case complaint alleges an action that is appealable to the MSPB was taken for discriminatory reasons.

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)




## DEPARTMENT OF VETERANS AFFAIRS
## OFFICE OF RESOLUTION MANAGEMENT
## PACIFIC DISTRICT
## COUNSELOR REPORT

### CASE NUMBER: 200P-0501-2017103883
### COUNSELOR NAME: Winter, William

| Name of Aggrieved Party: | Ms. Tatyana E. Drevaleva | | | | | | |
|---|---|---|---|---|---|---|---|
| Home and/or Alternate Address: | 10660 Hidden Mesa Place, Monterey, CA, 93940 | | | | | | |
| Home Telephone Number: | 415-806-9864 | | | | | | |
| Cellular/Mobile Number | 415-806-9864 | | | | | | |
| Business Address: | 1501 San Pedro Drive SE, Albuquerque, NM 87108 | | | | | | |
| Business Telephone Number: | (505) 265-1711 x2441 | | | | | | |
| Email Address: | tdrevaleva@gmail.com | | | | | | |
| Position Title/Grade: | | | | | | | |
| Employee | Former Employee | X | Applicant | | | | |
| VHA | X | VBA | | NCA | | Canteen | Other |
| Title 5 | | Title 38 | | Hybrid T38 | | Full-time | Part-time |
| Probationary | | Career | | Career Conditional | | Temporary | Term |
| Name of Facility: | VAMC, ALBUQUERQUE | | | | | | |
| Address of Facility: | 1501 San Pedro Drive SE, Albuquerque, NM 87108 | | | | | | |
| Facility Telephone Number: | (505) 265-1711 | | | | | | |
| Name of Representative: | N/A | | | | | Attorney False | |
| Representative's Address: | N/A | | | | | | |
| Representative's Telephone: | N/A | | | | | | |

### NOTIFICATION OF PROCEDURAL RIGHTS

| | | | | |
|---|---|---|---|---|
| Initial Contact: | Telephone | | Date: | 07/05/2017 |
| Initial Interview | E-Mail | | Date: | 07/10/2017 |
| Rights & Responsibilities/Notices: | Electronic Mail | 07/05/2017 | Rec'd: | 07/13/2017 |
| Notice to Unreachable Aggrieved: | UPS/Cert Mail: | | Rec'd: | N/A |
| Agreed to Waive Anonymity: | YES  [X] | NO [] | Date | 07/10/2017 |
| Notification to Facility Director | Electronic Mail: | | Date: | 07/13/2017 |
| ADR offered by facility [  ] MOU [  ]: | YES   [X] | NO [] | Date: | 07/05/2017 |
| Facility Returned Signed Refusal | YES   [] | NO [X] | Date | N/A |
| ADR Agreed to by Aggrieved: | YES   [X] | NO [] | Date: | 07/12/2017 |
| Settlement (SA)  [] | Withdrawal (WD)  []: | | Date: | N/A |
| Notice of Closure (for SA/WD): | Regular Mail: | | Rec'd: | N/A |
| Notice of Right to File: | Electronic Mail: | 09/14/2017 | Rec'd: | 09/14/2017 |

137

Case Number: 200P-0501-2017103883
Name of Aggrieved Party: Ms. Tatyana E. Drevaleva
Name of Facility: VAMC, ALBUQUERQUE
Date of Initial Contact: 07/05/2017

## RMO/WITNESS INFORMATION

| Responding Management Official(s): (Name, Title, Telephone Number) | Carla Dunkelberger, Nurse Manager, (505) 265-1711 x4617 |
|---|---|
| Witness(es) Suggested for Interview by Aggrieved Party (Name, Title, Tele #): | None |
| Witness(es) Suggested for Interview by RMO (Name, Title, Telephone Number): | None |

**Claim - 1: Termination** (Probationary) **Incident Date:** 06/30/2017
**Bases: Age** - (DOB: 10/1966), **Disability:** (Physical)

| | Yes (date) | No | | Yes (date) | No | If claim is untimely, explain reason for the untimeliness in description of claim below.* |
|---|---|---|---|---|---|---|
| Mixed Case | | X | MSPB Filed | | X | |
| Union Grievance Filed | | X | Is Claim Timely | 06/30/2017 | | |
| Administrative Grievance Filed | | | | | X | |
| Have you contacted another EEO Official? | Not Reported | | | Don Rincon, EEO Program Manager | | |

**Brief Description of Claim:**
Ms. Drevaleva, the Aggrieved Party (AP) claimed that she was discriminated against when on;

June 30, 2017, she (AP) was terminated.

**Resolution Sought:**
AP requested to be allowed to return to work.

**Management's Response:**
Management was not contacted due to requested ADR.

**Informal Documents Requested/Received:**
Notice of Termination (Probationary), dated June 30, 2017.

## SUMMARY OF RESOLUTION EFFORTS

July 12, 2017, AP elected ADR.

September 7, 2017, ADR Tracker recorded the mediation as not resolved.

September 14, 2017, issued the NORF; conducted the formal final interview after counseling concluded.

Case Number: 200P-0501-2017103883
Name of Aggrieved Party: Ms. Tatyana E. Drevaleva
Name of Facility: VAMC, ALBUQUERQUE
Date of Initial Contact: 07/05/2017

---

## FINAL INTERVIEW

During the final interview the results of informal counseling and resolution efforts were discussed with the aggrieved party. The aggrieved was informed that the claim(s) listed above were the only claim(s) addressed during the informal EEO counseling. If a formal Complaint of Discrimination is filed, a claim that has not been brought to the attention of an EEO counselor and is not like or related to a claim that has been brought to the attention of an EEO counselor is subject to dismissal in accordance to CFR 1614.107 a(2).

The Notice of Right to File a Discrimination Complaint and VA Form 4939 were sent by Electronic Mail on September 14, 2017.

William Winter                                              9/29/2017
EEO Counselor                                              Date

## Stenhouse, Whitney (ORM)

| | |
|---|---|
| **From:** | Stenhouse, Whitney (ORM) |
| **Sent:** | Friday, October 20, 2017 3:43 PM |
| **To:** | Welch, Andrew M. |
| **Cc:** | Rincon, Donald M.; Shafer, Amy V. |
| **Subject:** | Official Correspondence |
| **Attachments:** | NOR Drevaleva 103883 Fac.pdf |
| **Signed By:** | whitney.stenhouse@va.gov |

Dear Sir,

Please find attached EEO correspondence concerning your facility.

If you have questions, please contact the point of contact referenced in the attached correspondence.

Respectfully,

*Whitney Stenhouse*
*EEO Assistant*
*Department of Veterans Affairs*
*Office of Resolution Management*
*Pacific District*
*Office: (310) 478-3711 ext.48054*
*Fax: (310) 268-4089*



**VA Core Values:** Integrity Commitment Advocacy Respect Excellence
**VA Core Characteristics:** Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

*"Thank you for contacting the Office of Resolution Management. Our goal is to provide you with exceptional customer service. Please take a moment to complete a very brief survey to let us know how my service was today"*
Click Here

**NOTE:** *If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.*

140



**DEPARTMENT OF VETERANS AFFAIRS**
Office of Resolution Management
William S. Moorhead Federal Building
1000 Liberty Avenue, Suite 1801
Pittsburgh, PA 15222

February 28, 2018

Dennis Hayo, EEO Investigator
Office Resolution Management 08B
William S. Moorhead Federal Building
1000 Liberty Avenue, Suite 1801
Pittsburgh, PA 15222

SUBJECT: Assignment of Investigation

1.  You are hereby assigned to investigate the following discrimination complaint:

**Tatyana Drevaleva – Case No. 200P-0501-2017103883– New Mexico VA HCS**

2.  This letter will be your authorization to: (1) investigate the accepted claim(s) in this complaint; (2) require all employees of the Department of Veterans Affairs to cooperate with the investigation; and (3) require employees of the agency having any knowledge of the matter accepted for investigation to furnish testimony without a pledge of confidence.  Pursuant to 29 C.F.R. §1614.108 (c) (2), the Investigator's authority to administer the oath is automatic during the course of this investigation.

3.  For questions or assistance, please call me at 412-482-5205.

Sincerely,

Daniel Spilsbury
OICT Manager

CC:   Complainant
      Karen Smith, Representative
      Andrew Welch, Director, Facility Director
      Don Rincon, EEO Program Manager




**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**PACIFIC DISTRICT**
**COUNSELOR REPORT**

**CASE NUMBER: 200P-0501-2017103883**
**COUNSELOR NAME: Winter, William**

| | | | | | | |
|---|---|---|---|---|---|---|
| Name of Aggrieved Party: | | Ms. Tatyana E. Drevaleva | | | | |
| Home and/or Alternate Address: | | 10660 Hidden Mesa Place, Monterey, CA, 93940 | | | | |
| Home Telephone Number: | | 415-806-9864 | | | | |
| Cellular/Mobile Number | | 415-806-9864 | | | | |
| Business Address: | | 1501 San Pedro Drive SE, Albuquerque, NM 87108 | | | | |
| Business Telephone Number: | | (505) 265-1711 x2441 | | | | |
| Email Address: | | tdrevaleva@gmail.com | | | | |
| Position Title/Grade: | | | | | | |
| Employee | Former Employee | X | Applicant | | | |
| VHA | X | VBA | | NCA | Canteen | Other |
| Title 5 | | Title 38 | | Hybrid T38 | Full-time | Part-time |
| Probationary | | Career | | Career Conditional | Temporary | Term |
| Name of Facility: | | VAMC, ALBUQUERQUE | | | | |
| Address of Facility: | | 1501 San Pedro Drive SE, Albuquerque, NM 87108 | | | | |
| Facility Telephone Number: | | (505) 265-1711 | | | | |
| Name of Representative: | | N/A | | | Attorney False | |
| Representative's Address: | | N/A | | | | |
| Representative's Telephone: | | N/A | | | | |

**NOTIFICATION OF PROCEDURAL RIGHTS**

| | | | | |
|---|---|---|---|---|
| Initial Contact: | Telephone | | Date: | 07/05/2017 |
| Initial Interview | E-Mail | | Date: | 07/10/2017 |
| Rights & Responsibilities/Notices: | Electronic Mail | 07/05/2017 | Rec'd: | 07/13/2017 |
| Notice to Unreachable Aggrieved: | UPS/Cert Mail: | | Rec'd: | N/A |
| Agreed to Waive Anonymity: | YES [X] | NO [] | Date | 07/10/2017 |
| Notification to Facility Director | Electronic Mail: | | Date: | 07/13/2017 |
| ADR offered by facility [ ] MOU [ ]: | YES [X] | NO [] | Date: | 07/05/2017 |
| Facility Returned Signed Refusal | YES [] | NO [X] | Date | N/A |
| ADR Agreed to by Aggrieved: | YES [X] | NO [] | Date: | 07/12/2017 |
| Settlement (SA) [] | Withdrawal (WD) []: | | Date: | N/A |
| Notice of Closure (for SA/WD): | Regular Mail: | | Rec'd: | N/A |
| Notice of Right to File: | Electronic Mail: | 09/14/2017 | Rec'd: | 09/14/2017 |

142

Case Number: 200P-0501-2017103883
Name of Aggrieved Party: Ms. Tatyana E. Drevaleva
Name of Facility: VAMC, ALBUQUERQUE
Date of Initial Contact: 07/05/2017

## RMO/WITNESS INFORMATION

| | |
|---|---|
| Responding Management Official(s): (Name, Title, Telephone Number) | Carla Dunkelberger, Nurse Manager, (505) 265-1711 x4617 |
| Witness(es) Suggested for Interview by Aggrieved Party (Name, Title, Tele #): | None |
| Witness(es) Suggested for Interview by RMO (Name, Title, Telephone Number): | None |

**Claim - 1: Termination** (Probationary) **Incident Date:** 06/30/2017
**Bases: Age** - (DOB: 10/1966), **Disability:** (Physical)

| | Yes (date) | No | | Yes (date) | No | If claim is untimely, explain reason for the untimeliness in description of claim below.* |
|---|---|---|---|---|---|---|
| Mixed Case | | X | MSPB Filed | | X | |
| Union Grievance Filed | | X | Is Claim Timely | 06/30/2017 | | |
| Administrative Grievance Filed | | | | | X | |
| Have you contacted another EEO Official? | | Not Reported | | | Don Rincon, EEO Program Manager |

**Brief Description of Claim:**
Ms. Drevaleva, the Aggrieved Party (AP) claimed that she was discriminated against when on;

June 30, 2017, she (AP) was terminated.

**Resolution Sought:**
AP requested to be allowed to return to work.

**Management's Response:**
Management was not contacted due to requested ADR.

**Informal Documents Requested/Received:**
Notice of Termination (Probationary), dated June 30, 2017.

## SUMMARY OF RESOLUTION EFFORTS

July 12, 2017, AP elected ADR.

September 7, 2017, ADR Tracker recorded the mediation as not resolved.

September 14, 2017, issued the NORF; conducted the formal final interview after counseling concluded.

Case Number: 200P-0501-2017103883
Name of Aggrieved Party: Ms. Tatyana E. Drevaleva
Name of Facility: VAMC, ALBUQUERQUE
Date of Initial Contact: 07/05/2017

---

### FINAL INTERVIEW

---

During the final interview the results of informal counseling and resolution efforts were discussed with the aggrieved party. The aggrieved was informed that the claim(s) listed above were the only claim(s) addressed during the informal EEO counseling. If a formal Complaint of Discrimination is filed, a claim that has not been brought to the attention of an EEO counselor and is not like or related to a claim that has been brought to the attention of an EEO counselor is subject to dismissal in accordance to CFR 1614.107 a(2).

The Notice of Right to File a Discrimination Complaint and VA Form 4939 were sent by Electronic Mail on September 14, 2017.

*Biwfht*

William Winter                                    9/29/2017
EEO Counselor                                     Date



**DEPARTMENT OF VETERANS AFFAIRS**
Raymond G. Murphy Medical Center
1501 San Pedro Drive SE
Albuquerque NM 87108-5154

JUN 3 0 2017

In Reply Refer To: 501/108

Tatyana E. Drevaleva
Nursing Service (118)
New Mexico VA Health Care System
1501 San Pedro Drive SE
Albuquerque, NM 87108

Subject:  Termination during Probationary Period

1. At the time of your Excepted Appointment on April 2, 2017, as a Medical Instrument Technician, you were informed that your first year of employment would be subject to a trial/probationary period. The trial/probationary period is an important part of the hiring process and during this time, supervisors are required to study an employee's potential closely to determine whether s/he is suited for successful government work. When it becomes apparent that an employee's conduct, general character traits or capacity do not meet the requirements for satisfactory service, the supervisor is required to initiate action to separate the employee.

2. The Associate Director, Patient Care Services, has recommended that you be terminated from your position for failure to qualify during your probationary period. Your termination is due to attendance issues.

3. The effective date of your termination will be June 30, 2017. The decision to terminate you immediately in lieu of a two (2) week notice is due to your absent without leave (AWOL) status since May 21, 2017. You must properly clear the facility, turn in any government property to your supervisor and clear any indebtedness prior to the release of your final paycheck.

4. You are entitled to:

   a)  seek corrective action before the U.S. Office of Special Counsel (OSC); or

   b)  a discrimination complaint with the Office of Resolution Management (ORM).

You shall be deemed to have exercised your option to appeal this action at such time as you timely initiate action to appeal to MSPB, or OSC, or a discrimination complaint.

5. If you believe this action is based on discrimination on the basis of race, color, religion, sex, national origin, age or disabling condition, you may file a complaint of discrimination. If you elect to file a complaint of discrimination, you may do so by contacting the Office of Resolution Management (ORM) at 1-888-737-3361. Your complaint will be processed in accordance with EEOC regulations at 29 C.F.R., Part 1614. Your initial contact with the ORM office must be done within 45 calendar days of the effective date of this action.

6. If you elect to seek corrective action by the OSC's Complaints Examining Unit (OSC Appeal Form) (https://osc.gov/), your complaint will be limited to a determination as to whether the agency took one or more personnel actions against you in violation of 5 USC 2302(b) (prohibited personnel

145

Tatyana E. Drevaleva
Termination during Probationary Period
Page 2

practices).  This can include, but is not limited to claims of reprisal for whistleblowing and/or engaging in protected activity.  If you are making a claim of retaliation for engaging in one or more protected activities and OSC dismisses your claim, you may have the right to file an individual right of action (IRA) appeal to the MSPB, but such an appeal will be limited to an adjudication of whether you proved that your protected activity was a contributing factor in the effected action.

7.  Whichever is filed first, an appeal for the corrective action to OSC, or a discrimination complaint, shall be considered an election by you to proceed under that appeal process.

8.  If you have any questions concerning this matter or the rights described above, or if you need assistance or additional information, please contact Rhonda Anderson, Human Resources Specialist, at extension 2381.

Thomas E. Harris Sr.
Acting Human Resources Officer

146



**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT
11301 Wilshire Boulevard
Building 220, 2nd Floor
Los Angeles, CA 90073

September 14, 2017

*In reply refer to:* 08H

VIA: Electronic Mail

Tatyana Drevaleva
tdrevaleva@gmail.com

Dear Ms. Drevaleva:

I am closing the informal counseling on the matter you presented to this office on July 5, 2017, Case Number: **200P-0501-2017103883**. Your complaint is as follows:

| Basis | Claim & Date of Occurrence |
|---|---|
| **Disability** (Physical) | **Termination** (Probationary)<br><br>On June 30, 2017, Ms. Drevaleva, the Aggrieved Party (**AP**) was issued a Notice of Termination. |

Upon receipt of this letter please notify me no later than 5 business days whether the above information is incorrect.

I have enclosed a copy of the Notice of Right to File a Discrimination Complaint (including VA Form 4939). At this point, you have two options available to you. To help you make your decision, I have also enclosed a link to the Equal Employment Opportunity Commission's (**EEOC**) website for an overview of the guidelines on the federal sector EEO complaint process. http://www.eeoc.gov/federal/

Please select one of the options below as your final decision:

**Option 1:** You can choose to file a formal complaint of discrimination on some or all of the claim(s) listed above. If you wish to file a formal complaint, please complete, sign, and date the VA Form 4939; returning the form to the address listed on the *Notice of Right to File a Discrimination Complaint.*

> **If you decide to file a formal complaint, you have 15 calendar days from receipt of this notice in which to do so.** Please do not mail the VA Form 4939 to me; your formal complaint must be mailed to the address listed on the first page of the enclosed *Notice of Right to File a Discrimination Complaint.*

Page 2
Notice of Right to File a Discrimination Complaint
Name of Aggrieved: Tatyana Drevaleva
Case Number: 200P-0501-2017103883

Upon receipt of a formal complaint, the Office of Resolution Management (ORM) will
review your complaint and determine if the claim(s)[1] raised meet(s) EEOC's procedural
requirements for continued processing.

If your complaint meets procedural requirements and  is accepted by ORM for
investigation, you will be given the opportunity to submit any documentation in support
of your allegations of discrimination to the ORM investigator assigned to investigate
your complaint, as part of the process for  gathering evidence relevant to the merits of
your accepted claim(s). There is no need to provide evidence in support of your claim(s)
until notified that your claim(s) is accepted for investigation.

**Option 2**:  You can take no further action, indicating your wish not to pursue the
allegations listed above any further.

If you have any questions or need assistance, please call me at (888) 566-3982, Ext.
10256.

Sincerely,

William Winter
EEO Counselor

Enclosure:  Notice of Right to File a Discrimination Complaint
            VA Form 4939

---

[1] A claim is the action(s) the Agency has taken or is taking that causes the aggrieved person to believe
s/he is the victim of discrimination for which, if proven, there is a remedy under the federal equal
employment statues.  It is important to limit your description of the specific claim(s) to one or two
sentences.



# Office of Resolution Management
*Department of Veterans Affairs*

## NOTICE OF RIGHT TO FILE A DISCRIMINATION COMPLAINT

Aggrieved Person: **Tatyana Drevaleva**
Case Number: **200P-0501-2017103883**

1. If you are not satisfied with the results of the informal EEO process and believe that you have been subjected to discrimination because of race, color, religion, sex, national origin, age, disability, genetic information, or retaliation, you have the right to file a formal complaint of discrimination. **If you decide to file a formal complaint, you must do so WITHIN FIFTEEN CALENDAR DAYS OF RECEIPT OF THIS NOTICE.**

2. Attached is VA Form 4939, Complaint of Employment Discrimination. If you choose to file a formal complaint at this time, use this form, and carefully read the instructions on the reverse side before completing it. The counselor is available to assist you in filling out this form and to answer any questions you may have about it. If you require assistance, please contact your counselor immediately. **Please note that the <u>15-calendar day</u> time frame will not be extended due to your need to seek my assistance in completing this form.**

3. You may file a complaint in person, by mail, fax, or e-mail with the District Manager at the address below:

   **District Manager**
   **Department of Veterans Affairs**
   **Office of Resolution Management (08H)**
   **11301 Wilshire Boulevard**
   **Building 220, 2nd Floor**
   **Los Angeles, CA 90073**

   **Fax: 310-268-4089**

   Email: <u>ORMPDO4939@va.gov</u>

4. You must identify each claim you are protesting and provide the date on which each occurred. Your complaint must be limited to the claim(s) you discussed with the counselor. Therefore, if there are any claims that you have not discussed with the counselor, you must do so immediately. Regulations require that you provide the Department with an opportunity to resolve each claim informally at EEO counseling.

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS) - 9-24-2015

Page 2.
Notice of Right to File a Discrimination Complaint
Aggrieved Person:  Tatyana Drevaleva
Case Number: 200P-0501-2017103883

5.  You are entitled to representation at every stage of the complaint process.
    You may choose anyone as a representative, unless the person occupies a
    position within VA that would create a conflict of interest.  If you do select a
    representative, you must inform this ORM District Office, in writing, of the
    representative's name, telephone number, and business address.

6.  If you are a member of the bargaining unit, you may have the right to dispute
    the events discussed with the counselor through the union grievance
    procedure.  Regulations provide that you may file either a grievance <u>or</u> an
    EEO complaint about the events in dispute, but <u>not both</u>.  Should you file both,
    whichever you file first (a union grievance or an EEO complaint) will be
    considered an election to proceed in that forum.

7.  If you are complaining about a matter that may be appealed to the Merit
    Systems Protection Board (MSPB), you may file an EEO complaint <u>or</u> an
    MSPB appeal, but <u>not both</u>.  Whichever you file first (a formal EEO complaint
    or an MSPB appeal) will be considered an election to proceed in that forum.  If
    the counselor can be of further assistance to you, please advise.

COMPLAINT CASE NUMBER:

OMB NO.: 2900-0718
EXPIRATION DATE: DEC 31, 2019
RESPONDENT BURDEN: 30 Min.

**VA** Department of Veterans Affairs

# COMPLAINT OF EMPLOYMENT DISCRIMINATION

*Read the instructions on the reverse side of this form carefully before completing the front of this form.*

| 1. NAME (Last, first, middle initial)(Please print) | 3. MAILING ADDRESS | 4a. WORK TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| 2. EMAIL ADDRESS | | 4b. PRIMARY TELEPHONE NUMBER (Include Area Code) |

| 5. ARE YOU: | 6a. JOB TITLE, SERIES AND GRADE | 7. NAME AND ADDRESS OF VA FACILITY WHERE DISCRIMINATION OCCURRED |
|---|---|---|
| ☐ A VA EMPLOYEE | | |
| ☐ AN APPLICANT FOR EMPLOYMENT | 6b. SERVICE/SECTION/PRODUCT LINE | |
| ☐ A FORMER VA EMPLOYEE | | |

NOTE: For each employment related matter that you believe was discriminatory you must list the bases (list one or more of the following):
Race (Specify), Color (Specify), Religion (Specify), Sex (Male or Female), National Origin (Specify), Age (Provide date of birth),
Disability (Specify), Genetic Information (including family medical history), and/or Reprisal for participating in the EEO process or opposing unlawful discrimination.

## 9. CLAIM(S)

| 8. BASIS | (What employment related claim(s) - personnel action(s), incident(s), or event(s) caused you to file this complaint? Briefly state the specific claim, personnel action and/or event that caused you to file this complaint. Use an additional sheet of paper if necessary. You should not include information that violates the Privacy Act of 1974 and the Health Insurance Portability and Accountability Act (HIPAA). Some examples are patient medical records, personal records of other VA employees, etc.) | 10. DATE OF OCCURRENCE (Include the most recent date(s)) |
|---|---|---|
| | | |

11. REMEDIES SOUGHT (Use an additional sheet of paper if necessary.)

| 12a. DO YOU HAVE A REPRESENTATIVE? | 12c. PROVIDE THE NAME AND ADDRESS OF YOUR REPRESENTATIVE | 12d. TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| ☐ YES   ☐ NO | | |
| 12b. IF "YES," IS HE OR SHE AN ATTORNEY? | | 12e. EMAIL ADDRESS |
| ☐ YES   ☐ NO | | |

| 13a. HAVE YOU CONTACTED AN EEO COUNSELOR? | 13b. NAME OF EEO COUNSELOR | 13c. DATE OF INITIAL CONTACT WITH ORM |
|---|---|---|
| ☐ YES   ☐ NO | | |

14. If you contacted an EEO Counselor more than 45 calendar days after the Date(s) of Occurrence, listed in item 10, or if this complaint is filed more than 15 calendar days after receipt of a Notice of Right to File a Discrimination Complaint, you must explain why you were untimely in seeking EEO counseling or untimely in filing a complaint. (Use an additional sheet of paper, if necessary.)

| 15a. HAVE YOU FILED A UNION GRIEVANCE ON ANY CLAIM(S) LISTED ABOVE? | 15b. IF "YES," LIST THE CLAIM(S) AND DATE GRIEVANCE FILED | 16a. HAVE YOU FILED AN APPEAL WITH THE MERIT SYSTEM PROTECTION BOARD (MSPB) ON ANY OF THE CLAIMS LISTED ABOVE? | 16b. IF "YES," LIST THE ISSUE(S) AND DATE MSPB APPEAL FILED. |
|---|---|---|---|
| ☐ YES   ☐ NO | | ☐ YES   ☐ NO | |

| 17a. HAVE YOU FILED THIS COMPLAINT WITH ANYONE ELSE? | 17b. IF "YES," PROVIDE THE NAME AND ADDRESS |
|---|---|
| ☐ YES   ☐ NO | |

| 18. SIGNATURE OF COMPLAINANT (Do not print) | 19. DATE |
|---|---|

VA FORM **4939**
MAR 2017

SUPERSEDES VA FORM 4939, MAR 2013,
WHICH SHOULD NOT BE USED.

## COMPLAINT OF EMPLOYMENT DISCRIMINATION INSTRUCTIONS
**Read the following instructions carefully before you complete this form. Please complete all items on the complaint form.**

**GENERAL:** Pursuant to the Equal Employment Opportunity Commission (EEOC) Title 29 Code of Federal Regulations (29 C.F.R.) §1614, VA Form 4939, Complaint of Employment Discrimination, can be used by VA employees, former employees and applicants for employment who file a formal Equal Employment Opportunity (EEO) complaint of discrimination. This regulation prohibits discrimination based on race, color, religion, gender (sex), national origin, age (40 years and over), physical or mental disability, genetic information (including family medical history), and/or reprisal for participating in the EEO process or opposing unlawful discrimination.

You can obtain assistance from your EEO Counselor in filling out this form. Your EEO Counselor can also answer any questions you may have about this form. In item 8, you should specify the basis of your complaint: race, color, religion, gender (sex), national origin, age *(date of birth)*, physical or mental disability *(specific information about your disability)*, genetic information (including family medical history), and/or reprisal for participating in the EEO process or opposing unlawful discrimination. If you list "Reprisal," please state the nature of the prior EEO activity in which you were engaged, i.e. did you file a prior EEO complaint? Use an additional sheet of paper, if necessary.

It is very important that you be precise as to the dates of all actions or events you are protesting. In addition, the claims listed in item 9, must be limited to those claims discussed with an EEO Counselor *(discussed within 45 calendar days of occurrence of the event, or within 45 calendar days of the effective date, if a personnel action)* or like or related claims. If any of the claims listed in item 9 were discussed with an EEO Counselor, but not within 45 calendar days of their occurrence or of their effective date, you must explain why you waited more than 45 calendar days. If any of the claims listed in item 9 were not discussed with an EEO Counselor, please contact the Office of Resolution Management (ORM), Regional EEO Officer IMMEDIATELY. The requirement that you contact an EEO Counselor about every claim listed in item 9 will not be waived under any circumstances. Failure to do so will only delay the processing of your complaint.

It is your responsibility to keep the (ORM) informed of your current address. If you move, immediately advise the ORM District Office where you filed this complaint of your new address. In addition, you may receive certified and express mail in connection with your complaint. It is your responsibility to claim all certified and express mail. Failure to notify ORM of a change in address or to claim certified and express mail may lead to dismissal of your complaint.

**REPRESENTATION:** You may have a representative of your own choosing at all stages of the processing of your complaint. No EEO Counselor, EEO Investigator or EEO Officer may serve as a representative. (Your representative need not be an attorney, but only an attorney representative may sign the complaint on your behalf.)

**WHEN TO FILE:** Your formal complaint must be filed within 15 calendar days of the date you received the *"Notice of Right to File a Discrimination Complaint"* (NRTF) from your EEO Counselor. If you do not meet this time limit, you must explain why you waited more than 15 calendar days to file. These time limits may be extended under certain circumstances; however, they will NOT be waived and your complaint will NOT be investigated unless you explain your untimeliness and the explanation is acceptable in accordance with EEOC, 29 C.F.R. §1614(c).

**WHERE TO FILE:** The complaint should be filed with the ORM District Office identified in the NRTF. You may submit a copy either by mail, in person, electronically (via e-mail), or by facsimile. Filing instructions are contained in the cover letter attached to the NRTF.

**PRIVACY ACT STATEMENT:** Maintenance and disclosure of VA Form 4939 is made in accordance with the Privacy Act of 1974. Collection of the information on this form is authorized and/or required by the regulations of the EEOC, 29 C.F.R. §1614. All records, from which information is retrieved, by the name or personal identifier of a respondent, are maintained by a Government-wide Systems of Records: EEOC/GOVT-1, Equal Employment Opportunity Complaint Records and Appeal Records. The information collected will be used by ORM to determine whether your complaint is acceptable for investigation and in connection with any subsequent investigation and processing of your complaint. In the course of any investigation, this form may be shown to any individual who may be required by regulations, policies or procedures of the EEOC and ORM to provide information in connection with this complaint, including individuals you may have identified as responsible for the acts or events at issue in this complaint. Other disclosures may be: (a) to respond to a request form from a Member of Congress regarding the status of the complaint or appeal; (b) to respond to a court subpoena and/or to refer to a district court in connection with a civil suit; (c) to disclose information to authorized officials or personnel to adjudicate a complaint or appeal; or (d) to disclose information to another Federal agency or to a court or third party in litigation when the Government is party to a suit before the court.

**RESPONDENT BURDEN STATEMENT:** In accordance with the Paperwork Reduction Act of 1995, The Department of Veterans Affairs (VA) may not conduct or sponsor, and the respondent is not required to respond to this collection of information unless it displays a valid OMB Control Number. The valid OMB Control Number for this information collection is 2900-0716. The collection of this information is voluntary. However, the information is necessary to determine if your complaint of employment discrimination is acceptable for further processing in accordance with EEOC, 29 C.F.R. §1614. The time required to complete this information collection is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing the form. Send comments regarding this burden estimate or any other aspects of this collection, including suggestions for reducing this burden, to VA Clearance Officer (005R1B), 810 Vermont Avenue, Washington, DC 20420. SEND COMMENTS ONLY. DO NOT SEND THIS FORM, A COMPLAINT OF EMPLOYMENT DISCRIMINATION, OR REQUEST FOR BENEFITS TO THIS ADDRESS

REVERSE OF VA FORM 4939, MAR 2017

## Winter, William (ORM)

| | |
|---|---|
| **From:** | Microsoft Outlook |
| **To:** | tdrevaleva@gmail.com |
| **Sent:** | Thursday, September 14, 2017 11:43 AM |
| **Subject:** | Relayed: OFFICIAL CORRESPONDENCE - Notice of Right to File |

**Delivery to these recipients or groups is complete, but no delivery notification was sent by the destination server:**

tdrevaleva@gmail.com (tdrevaleva@gmail.com)

Subject: OFFICIAL CORRESPONDENCE - Notice of Right to File

153



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
11301 Wilshire Boulevard
Building 220, 2nd Floor
Los Angeles, CA 90073

July 13, 2017

*In reply refer to*: 08H

VIA: E-mail

Andrew Welch, Director
VA New Mexico Health Care System
1501 San Pedro Drive, SE
Albuquerque, NM 87108

**Subject: Notice of Informal Counseling, Tatyana Drevaleva,**
**Case Number: 200P-0501-2017103883**

1. The above-named employee contacted the Office of Resolution Management (ORM), on July 5, 2017, regarding the matter listed below. The Responsible Management Official(s) (RMO) has the right to know of the allegation(s) raised; therefore, we encourage you to share this correspondence with her. For your convenience, we have attached a brief overview of the EEO complaint process and what management can expect.

| Basis | Claim & Date of Occurrence |
|-------|---------------------------|
| Disability (Physical) | **Termination** (Probationary)<br><br>On June 30, 2017, Ms. Drevaleva, the Aggrieved Party (**AP**) was issued a Notice of Termination. |

| Name & Title of Responsible Management Official Involved |
|----------------------------------------------------------|
| Ms. Carla Dunkelberger, Nurse Manager |

| Resolution Requested |
|----------------------|
| AP requests to be allowed to return to work. |

| Alternative Dispute Resolution |
|--------------------------------|
| ADR is requested. |

2. William Winter is the assigned EEO counselor and will contact your EEO program manager/liaison for their assistance if necessary. In order to establish the timeliness of the claim, we are requesting the following document and information:

    a. None requested.

154

Page 2
Notice of Informal Counseling
Case No: 200P-0501-2017103883

When an individual presents their allegations to a VA EEO official, to include EEO Managers, Specialists, Assistants, and Interns, the EEO official must provide the individual with his/her rights to file an EEO complaint with the Office of Resolution Management. If it has been determined that the above named individual contacted your office regarding the stated claims, please provide ORM with the EEO Complaint and Dispute Tracking Report form signed by the employee.

3. It is important to the processing of the complaint that our office receives this information in a timely manner. **Please return the requested information and the attached notices preferably via email to** william.winter@va.gov **or by fax at (310) 268-4089 within five (5) business days of receipt of this letter.** Your cooperation in providing this information to our office is greatly appreciated.

4. Our goal in the informal stage of the EEO process is to assist the employee and management in reaching a resolution of the claims. Therefore, it is VA's policy to offer ADR at this stage. If you refuse to offer ADR, you must submit *VA Form 0889c, Notice of Refusal to Offer Alternative Dispute Resolution for EEO related issues* and route through the appropriate channels. A copy of the *Notice* must be provided to ORM for the complaint file.

5. If an informal resolution cannot be reached during the informal stage, the employee has a right to file a formal EEO complaint. At that stage, ORM will review the complaint to determine if it meets the procedural requirements for investigation. In anticipation of that determination, please direct your staff to return the enclosed Merit Systems Protection Board (MSPB)/Grievance forms if either of the following two situations applies:

    a. Has the employee filed a grievance through the negotiated grievance process? If so, we need a copy of the formal grievance and verification of whether grievance was filed by employee or union.

    b. If the issue raised with the EEO counselor was also filed with the MSPB, we need a copy of the MSPB filing.

6. If you have any questions, please contact Bill Winter, EEO Counselor at 888-566-3982, ext. 10256.

Sincerely,

Sophia Eaves
Pacific District Manager

Revised: March 2017

155

Page 3
Notice of Informal Counseling
Case No: 200P-0501-2017103883

Enclosures (2):
1. What to Expect During the Complaint Process
2. Record of MSPB Appeal or a Grievance

cc: Don Rincon, EEO Program Manager

156

## OFFICE OF RESOLUTION MANAGEMENT
### WHAT TO EXPECT DURING THE EEO COMPLAINT PROCESS

**WHY DID I RECEIVE THIS NOTICE?**
You received the *Notice of Informal Counseling* because an employee, applicant, or former employee under your chain of command contacted an EEO counselor. We have copied your EEO program manager/liaison.

**WHAT ACTIONS SHOULD I TAKE?**
There are a few actions that you should direct your staff to take:
- If ADR is not being offered, return a refusal via *VA Form 0889c*.
- Advise the EEO counselor if the employee has filed a grievance or MSPB appeal on the issue(s).
- Communicate your expectation that management should attempt to resolve the complaint. The goal of the informal stage of the complaint process is to resolve the issue at the lowest level. The Department has set a goal of 50% resolution rate of EEO informal complaints. If the employee did not elect mediation, the EEO counselor will work with management and the employee to resolve the issue.

**HOW LONG WILL THIS PHASE OF THE PROCESS LAST?**
ORM has 30 days to complete counseling if ADR is not elected, and 90 days if it is.

**WHAT HAPPENS IF THE CASE IS NOT RESOLVED?**
If resolution efforts are not successful, the employee will have 15 days to file a formal complaint from when the informal stage is closed.

**WHEN DOES ORM INVESTIGATE THE COMPLAINT?**
If the employee files a formal complaint, ORM will acknowledge receipt and send you a copy of the formal complaint. We will then review the complaint to determine if it meets EEOC's procedural requirements for investigation.

We will notify you of our determination to either accept the complaint for investigation, in whole, or in part; or dismiss the complaint. If ORM accepts the complaint for investigation, we will advise you and make a request for relevant documentation. We need you to direct your staff to respond to all document requests. **Failure to provide requested documentation/information may result in an adverse inference for the Department in the form of a finding of discrimination.**

**WHAT CAN MANAGEMENT EXPECT AT THE INVESTIGATIVE PHASE?**
The investigator will develop impartial and appropriate factual information on the claims accepted for processing. ORM must complete the investigation within 180 days of the date the formal complaint was filed, so we need the cooperation of all witnesses, including management officials.

After the investigation is completed, ORM will send you a summary of the investigation. You should review the summary and determine if resolution should be attempted. ORM is available to consult or provide a mediator at this stage.

**WHAT OCCURS AFTER THE INVESTIGATION?**
The employee can elect an Equal Employment Opportunity Commission hearing or a final agency decision from VA's Office of Employment Discrimination Complaint Adjudication. If a hearing is elected, your management officials will work with the agency representative (usually Regional Counsel Attorney) to prepare for the hearing.

**WHEN DOES THE PROCESS END?**
The employee can also file in U.S. District Court after 180 days have elapsed from the formal filing date or after the case has been adjudicated. If that occurs Regional Counsel works with a U.S. Attorney from the Department of Justice.

For more information, visit http://vaww4.va.gov/orm/Index.asp

Revised: March 2017

157



# Office of Resolution Management
*Department of Veterans Affairs*

## RECORD OF APPEAL TO
## MERIT SYSTEMS PROTECTION BOARD (MSPB)/NEGOTIATED GRIEVANCE

**Aggrieved Person: Tatyana Drevaleva**
**Case Number: 200P-0501-2017103883**

→ ☐ **This employee has filed an appeal with the MSPB on _____.** (If you indicate that the employee has filed an appeal with the MSPB on the claim(s), please enclose documentation that establishes the filing date of the MSPB appeal.)

→ ☐ **This employee has filed a formal union grievance on _____.**
(If you indicate that the employee has raised the claim(s) in a negotiated grievance procedure, please enclose a dated copy of the grievance (or other documentation that establishes when the grievance was filed).

→ ☐ **Formal union grievance filed by employee.**

☐ **Formal union grievance filed by Union.**

### EEO OFFICE CONTACT

→ ☐ **This employee contacted the local EEO Office on _____.**

→ ☐ **This employee was advised of their right to file a complaint with the Office of Resolution Management (ORM) and the requirement to make contact with ORM within 45 Calendar days of the alleged event or personnel action.**

   ☐ **Employee signed and received EEO Complaint and Dispute Tracking Form.**
   (If you indicate that the employee has signed EEO Complaint and Dispute Tracking Form, please enclose copy of the form (or other documentation that establishes notice).

   ☐ **Employee declined/refused to sign EEO Complaint and Dispute Tracking Form.**

_____        _____
**Senior Executive/Designee**                          **Date**


_____        _____
**EEO Manager/Liaison**                                  **Date**

Revised: March 2017

158



# Office of Resolution Management

### *Department of Veterans Affairs*
**Tatyana Drevaleva – Case No. 200P-0501-2017103883**

1.    EEOC regulations require that the formal investigation be completed within 180 days of the file date.  The regulatory timeline expires on March 18, 2018.

2.    ORM requests a voluntary extension of 60 days to the timeline from March 18, 2018 to allow time for the investigator to adequately and properly investigate your complaint.

*Tatyana Drevaleva*                    *03. 05. 2018.*
_____
Complainant                    Date

*I am giving you sixty days per your request. Please, try to finish the investigation as soon as you can.*

**CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT QUTOMATED TRACKING SYSTEM (CATS)**

159

**Hayo, Dennis (ORM)**

| | |
|---|---|
| **From:** | Hayo, Dennis (ORM) |
| **Sent:** | Friday, March 02, 2018 4:46 PM |
| **To:** | tdrevaleva@gmail.com |
| **Subject:** | Official Correspondence TD |
| **Attachments:** | Extension Request-Dreyaleva.docx |

RE:  Tatyana Drevaleva EEO Claim #103883

Good Afternoon Ms. Drevaleva,

It was good to speak to today.  As you know I am the EEO Investigator assigned to investigate your claim of workplace discrimination.  The case was assigned to me February 28 and is due March 18, 2018.  Mr. Phil Johnson is on leave until March 12.  I am requesting a 30 day extension to complete the investigation.  I have attached an Extension Request for you to consider.

Please feel free to call me if you have any questions.

Regards,

*Dennis G. Hayo*

Dennis G. Hayo,
EEO Investigator
Department of Veterans Affairs
Office of Resolution Management
William Moorhead Federal Building
1000 Liberty Avenue, Suite 1801
Pittsburgh, PA 15222
202-657-9217

160

**Hayo, Dennis (ORM)**

| | |
|---|---|
| **From:** | Wollmann, Rena (ORM) |
| **Sent:** | Wednesday, February 28, 2018 1:40 PM |
| **To:** | Smith, Karen Y. (ABQ); Drevaleva, Tatyana E. |
| **Cc:** | Hayo, Dennis (ORM); tdrevaleva@gmail.com |
| **Subject:** | Offical Correspondece |
| **Attachments:** | Extension Request.docx; Assignment Letter.pdf |

Good Afternoon,

ORM strives to complete every investigation in an efficient and effective manner. Unfortunately, we have been unable to assign your client's case for investigation until now. We plan on completing the investigation as efficiently and effectively as possible. Would you consider providing Mr. Hayo with an extension to complete the investigation into the complaint of discrimination? I have attached the extension request form to this email, you can fill that out or simply respond to this email, if you are agreeable to an extension in your client's case.

Thank you for your consideration.

*Rena M. Wollmann*

Rena M. Wollmann
Lead EEO Administrative Assistant
ORM Investigation and Contracting Team (OICT)
1000 Liberty Avenue, Room 1801
Pittsburgh, PA 15222
412-482-5208

How were my services today?

"This e-mail and any attachments are intended only for the use of the addressee(s) named herein and may contain privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please notify me via return e-mail and via telephone at (412) 482-5205 and permanently delete the original and any copy of any e-mail and any printout thereof."

161



# Office of Resolution Management

### *Department of Veterans Affairs*
### Tatyana Drevaleva – Case No. 200P-0501-2017103883

1.      EEOC regulations require that the formal investigation be completed within 180 days of the file date.  The regulatory timeline expires on March 18, 2018.

2.      ORM requests a voluntary extension of 60 days to the timeline from March 18, 2018 to allow time for the investigator to adequately and properly investigate your complaint.


_____      _____
Complainant                                          Date

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT QUTOMATED TRACKING SYSTEM (CATS)



**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT
11301 Wilshire Boulevard Building 220, 2nd Floor
Los Angeles, CA 90073

In reply refer to: 08H

November 16, 2017

VIA: E-Mail Only

Karen Smith, Representative
Karen.Smith20@va.gov

**SUBJECT: Notice of Acceptance of the EEO Complaint for Tatyana Drevaleva, Case No. 200P-0501-2017103883, filed September 19, 2017, against officials of the VA Medical Center in Albuquerque, NM.**

1. On July 5, 2017, your client initiated contact with an EEO counselor. Counseling concluded on September 14, 2017, when your client was mailed[1] the *Notice of Right to File a Discrimination Complaint,* which was received on September 14, 2017. On September 19, 2017, your client filed a formal complaint of discrimination, VA Form 4939.

2. Your client's complaint of discrimination raises the following claim:

   A. **Whether complainant was discriminated against based on age, sex (female[2]) and disability, when from May 18, 2017, through June 30, 2017, complainant was denied leave without pay under the FMLA.[3]**

   B. **Whether complainant was discriminated against based on age, sex (female[4]) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

3. We have determined that the claim A and claim B as stated above meets procedural requirements and are therefore **ACCEPTED** for investigation and further processing.

4. If your client believes that the accepted claim is improperly formulated, incomplete, or incorrect, this office must receive written notice within **7 calendar days** of receipt of this letter. Any written statement of disagreement will be included in the complaint file. We will assume that the claim is correctly stated if no statement indicating otherwise is received by this office within **7 calendar days**.

---

[1] Complainant did not obtain representation until after counseling concluded.
[2] Includes pregnancy discrimination
[3] Absent without leave status was first applied on May 21, 2017.
[4] Includes pregnancy discrimination

163

Page 2
Notice of Acceptance
Tatyana Drevaleva
200P-0501-2017103883

5.  We will assign the accepted claim to an impartial investigator under the supervision of the Office of Resolution Management (ORM).  The investigator will contact you and your client directly in order to obtain information or evidence you may wish to offer.  The investigator is only authorized to investigate the claim specified above.

6. Your client has additional rights that are fully explained in the enclosure to this letter.

7.  **Failure to keep this office advised of any change of address could lead to dismissal of this complaint**.  All subsequent actions on the complaint will be mailed or delivered to you with copies to the complainant, unless the complainant advises us in writing that s/he is no longer represented by you.

8.  Our fax number is (310) 268-4089.  If you have any questions, please contact Carlos Funes, Case Manager, at 310-478-3711 x. 35819.

Sincerely,

*Jonathan Shimkus*

for

Sophia Eaves
Pacific District Manager

Enclosures:   Complainant Rights

Interrogatory - Send responses via email to: Karla.Malone@va.gov, telephone number: (727) 540-3968

cc:    Tatyana Drevaleva, (Via e-mail only) tdrevaleva@gmail.com

Facility Director
Facility EEO Program Manager

164

Page 3
Notice of Acceptance
Tatyana Drevaleva
200P-0501-2017103883

## Complainant Rights

The investigation must be completed within **180** calendar days of filing your complaint. You will receive a copy of the investigative file upon completion. You will be advised, in writing, of your right to request a **Final Agency Decision (FAD)** from the VA's Office of Employment Discrimination Complaint Adjudication (OEDCA) in Washington, DC, or a **hearing** by an administrative judge appointed by the Equal Employment Opportunity Commission (EEOC).

### Requesting a Hearing

In order to request a hearing, you must meet the following criteria:
- You have received your completed investigative file **-OR-**
- 180 calendar or more days elapsed since you filed your formal complaint (and you have not received your complete investigative file)

| To request that EEOC appoint an administrative judge to hear your complaint, you must complete EEOC's "Hearing Request Form" and send it to: | You must send a **copy** of your EEOC hearing request to this office: |
|---|---|
| U.S. Equal Employment Opportunity Commission<br>Phoenix District Office<br>3300 North Central Avenue Suite 690<br>Phoenix AZ 85012-2504 | Department of Veterans Affairs<br>Office of Resolution Management<br>11301 Wilshire Boulevard<br>Building 220, 2nd Floor<br>Los Angeles, CA 90073 |

You are required to certify to the EEOC administrative judge that you sent a copy of the request for a hearing to the Office of Resolution Management at the above address.

### Requesting a Final Agency Decision

To request a FAD, you must have received your completed investigative file.

| To request a FAD, submit the FAD request form which will be included in your investigation file to: |
|---|
| Department of Veterans Affairs<br>Office of Resolution Management<br>11301 Wilshire Boulevard, Building 220, 2nd Floor<br>Los Angeles, CA 90073 |

If you request a FAD, it will be rendered by VA's Office of Employment Discrimination Complaint Adjudication (OEDCA) in Washington, DC. The FAD will address all claims, and a decision will be made on the merits of your complaint. You may appeal the FAD to EEOC if you are dissatisfied with the decision. OEDCA will provide you with specific information regarding your appeal rights following its final agency decision, including your right to file a civil action in an appropriate United States District Court.

### Requesting Civil Action

If you have not received a copy of the investigative file within 180 calendar days from date you filed your formal complaint, and you do not wish to have a hearing, you also have the right to file a civil action in an appropriate United States District Court. If you file a civil action, the court may, at its discretion and upon your request, appoint an attorney to represent you in the matter, if you do not have or cannot afford one. The court may also authorize the civil action to begin without payment of fees, costs, or other security. Finally, if you decide to file a civil action, you must name David J. Shulkin, M.D., Secretary of Veterans Affairs as the defendant.

### Requesting ADR

The EEOC encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints. Agencies and complainants can realize many advantages from using ADR. ADR offers parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in your complaint, please contact the ORM case manager listed in the letter or the ADR program manager at workplaceadr@va.gov.

Complainant Name: Tatyana Drevaleva, Case No: 200P-0501-2017103883, Date Filed: September 19, 2017



## VA OFFICE OF RESOLUTION MANAGEMENT

# INTERROGATORY

**The complainant's testimony is a vital and integral part of conducting an investigation into a complaint of discrimination.**

**Attached is an interrogatory that will serve as part of the complainant's testimony in regards to the accepted complaint.**

**Please complete the document and return it to Karla Malone, Team Lead Investigator within 15 days of receipt via encrypted email to:** karla.malone@va.gov, or fax to: 727-299-6755 Attn: Karla Malone, Team Lead Investigator. You can also mail your answers to 140 Fountain Parkway N., Suite 620, St. Petersburg, FL 33716-1274.

I solemnly swear/affirm that the information given in response to the following questions is true and complete to the best of my knowledge and belief.

Name: _____

Date: _____

The complaint above outlines the ***specific basis or bases*** that you have identified as the subject of discrimination in your complaint. Please provide identifying information for the applicable basis or bases underlined above in your complaint:

Age: _____ Sex: _____ Disability: _____

A.    **Whether complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, through June 30, 2017, complainant was denied leave without pay under the FMLA.**

B.    **Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

Initials:____

1

**Complainant Name: Tatyana Drevaleva, Case No: 200P-0601-2017103883, Date Filed: September 19, 2017**

1.  What is your position, work location and unit?

2.  What is your disability?

3.  When did the disability develop?

4.  What caused it?

5.  Is this a permanent disability?   If not, then explain how long it is expected to last.

6.  Do you have medical documents about your impairment/medical condition/disability? If so, please provide documentation.

7.  Do you take any medication because of the impairment?

8.  Does the medication have any side effects that impact your ability to perform your duties?  If so, please explain.

9.  Does the impairment/medical condition/disability limit anything you would do normally in everyday life? If yes, what normal life functions are limited and how are they limited?

10. What are the major duties that you are required to carry out on your job?

11. Are you able to perform the major duties of your position, as someone else would normally be able to perform the duties?  If no,

    a.  Would you say your ability to perform these duties differs slightly, moderately or significantly from someone else performing the job?

12. Were you given any restrictions related to performing the duties of your job?  If so,

Initials:____

2

167

Complainant Name: Tatyana Drevaleva, Case No: 200P-0501-2017103883, Date Filed: September 19, 2017

    a. Who provided the restrictions? When?

    b. What were the restrictions?

    c. Are the restrictions permanent? If not, for how long you would have the restrictions?

13. Explain when and how management became aware of your disability?

14. What exactly management know about your disability. Be specific.

**A.   Whether complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, through June 30, 2017, complainant was denied leave without pay under the FMLA.**

15. Please identify the management official for denying your leave request.

    a. Please describe your working relationship with this individual.

    b. How and when did this individual become aware of the protected bases that you believe are the subject of discrimination?

16. How and when did you become aware that you leave request was denied?

17. What justification was provided for denying the leave?

Initials:____

3

168

Complainant Name: Tatyana Drevaleva, Case No: 200P-0501-2017103883, Date Filed: September 19, 2017

18. What policy or procedure was identified to support the denial of leave?

19. Why was denial of leave unacceptable to you?

20. Did you discuss the leave denial with any management officials?  If so,
    a.  Who and when?

    b.  What was discussed and what was the outcome of the discussion?

21. Why do you believe that the protected basis or bases outlined in this complaint
    was/were factors(s) in the denial of leave?

Initials:____

4

Complainant Name: Tatyana Drevaleva, Case No: 200P-0501-2017103883, Date Filed: September 19, 2017

22. Are you aware of a coworker who was not denied leave in similar circumstances? If so,
    a. Please identify by full name and title.

    b. Please identify this by their protected basis(es) as outlined above in your complaint.

    c. Please explain how they were treated differently than you.

    d. Please describe your working relationship with this individual.

    e. How and when did this individual become aware of the protected bases that you outlined above?

**B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

23. Please identify the management official responsible for terminating you.

24. What justification was provided for **your termination?**

25. What policy or procedure was identified to support the termination?

26. Why was the termination unacceptable to you?

Initials:____

5

170

Complainant Name: Tatyana Drevaleva, Case No: 200P-0501-2017103883, Date Filed: September 19, 2017

27. Did you discuss the **termination** with any management officials? If so,
    a. Who and when?

    b. What was discussed and what was the outcome of the discussion?

28. Why do you believe that you were discriminated against because of the protected bases that you outlined above when you were terminated?

29. Are you aware of a coworker who was not subjected to **termination** in similar circumstances? If so,
    a. Please identify by full name and title.

    b. Please explain how they were treated differently than you.

    c. You have identified the specific basis or bases that you feel is the subject of discrimination above. Please provide that same information for your coworker.

Initials:____

Complainant Name: Tatyana Drevaleva, Case No: 200P-0501-2017103883, Date Filed: September 19, 2017

The above information has furnished without a pledge of confidence and I understand that it may be shown to the interested parties of this complaint.

This statement is made under penalty of perjury, this _____ 2017.

_____
(Affiant's signature)

**Tolliver, Eboney (ORM)**

| | |
|---|---|
| **From:** | Tolliver, Eboney (ORM) |
| **Sent:** | Thursday, November 16, 2017 5:48 PM |
| **To:** | Smith, Karen Y. (ABQ) |
| **Cc:** | 'tdrevaleva@gmail.com' |
| **Subject:** | OFFICIAL CORRESPONDENCE: PR |
| **Attachments:** | TD-103883Accept Letter - Atty-Rep.pdf; Drevaleva_103883_Term Prob_FMLA.PDF |

| | |
|---|---|
| **Importance:** | High |
| **Sensitivity:** | Confidential |

| **Tracking:** | **Recipient** | **Delivery** |
|---|---|---|
| | Smith, Karen Y. (ABQ) | Delivered: 11/16/2017 5:48 PM |
| | 'tdrevaleva@gmail.com' | |

Dear Ms. Smith,

Attached, please find a Notice of Acceptance (PR) letter regarding your client's EEO Complaint ending in **103883**. I you have any questions, please contact the point of contact referenced in the attached correspondence.

Thank you,

Eboney Tolliver
*Eboney Tolliver*
EEO Program Assistant | Pacific District | Midwest District (MD)
Department of Veterans Affairs
Office of Resolution Management-Midwest District (MD) | 2255 Enterprise Drive, Suite 5506 | Westchester, IL 60154
708.236.2800 Office
708.236.2898 Fax

*Thank you for contacting the Office of Resolution Management. Our goal is to provide you with exceptional customer service. Please take a moment to complete a very brief survey to let us know how my service was today.*

Click Here
**NOTE:**
**If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law.**
**If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.**



**VA Core Values:** Integrity Commitment Advocacy Respect Excellence
**VA Core Characteristics:** Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

173

**Tolliver, Eboney (ORM)**

| | |
|---|---|
| **From:** | Microsoft Outlook |
| **To:** | tdrevaleva@gmail.com |
| **Sent:** | Thursday, November 16, 2017 5:48 PM |
| **Subject:** | Relayed: OFFICIAL CORRESPONDENCE: PR |

**Delivery to these recipients or groups is complete, but no delivery notification was sent by the destination server:**

tdrevaleva@gmail.com (tdrevaleva@gmail.com)

Subject: OFFICIAL CORRESPONDENCE: PR

174



**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT
11301 Wilshire Boulevard Building 220, 2nd Floor
Los Angeles, CA 90073

November 16, 2017

In reply refer to: 08H

VIA: E-mail

Andrew Welch, Director
Department of Veterans Affairs
New Mexico VA Healthcare System
1501 San Pedro Drive, SE
Albuquerque, NM 87108

**SUBJECT: Notice of Acceptance of EEO Complaint of Tatyana Drevaleva, 200P-0501-2017103883 Filed on September 19, 2017**

1. This is to inform you that Tatyana Drevaleva, Former Employee, filed a complaint of discrimination on September 19, 2017. Enclosed is a copy of the acceptance letter that was sent to the complainant.

2. All documents and records, including the Official Personnel Folder related to this complaint, must be maintained at the facility and made available at the time of the investigation.

3. Advanced preparation for the investigation is to begin as soon as possible. This preparation includes securing all documents (appropriately redacted)[1] identified in the attachment to this letter. We require that the requested information be provided to our office, within **10 calendar days of your receipt of this letter,** to:

<div align="center">

Department of Veterans Affairs
Office of Resolution Management (SED-O8J)
Attn: Document Request, Karla Malone
**karla.malone@va.gov**
140 Fountain Parkway, Suite 620
St. Petersburg, FL 33716

</div>

If any of the requested documents or information does not exist or is not maintained by your facility, please have an appropriate management official provide a signed and dated statement identifying the information and explaining why it cannot be provided.

---

[1] Any patient/veteran information must conform with VA's guidelines/criteria for release of information and have the appropriate documentation to verify authorization to release such information to ORM.

175

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)

Page 2.
Notice of Acceptance
Tatyana Drevaleva
200P-0501-2017103883

4. The protection of the privacy of Veterans, their dependents and beneficiaries, as well as the privacy of all employees and contractors of VA, and other individuals for whom personal records are created and maintained in accordance with Federal law is a critical requirement. As such, documents provided to us in response to our requests for documents or information **must be redacted prior to their release to ORM** for VA sensitive information[2] and personally identifiable information (PII). Specific examples of information that should be redacted/sanitized before their release to ORM include:

   a. Social security numbers
   b. Names of veterans, their dependents and/or beneficiaries
   c. Medical/diagnostic and/or veteran claim information related to specific veterans, their dependents and/or beneficiaries
   d. Dates of birth (the exception to this are for cases that allege age based discrimination).
   e. Complainant's medical information, unless this information is accompanied with a release of information signed by the complainant.

5. ORM will make two requests for information deemed necessary for inclusion in the investigative file. This letter is considered the first request for information. If an additional request is necessary, it will be prepared by the investigator assigned to this complaint. Requests will be documented in the investigative file along with your facility's response, or lack thereof. **Failure to submit the requested documents may result in an adverse inference/sanction against the Agency.**

6. The Equal Employment Opportunity Commission (EEOC) encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints at the lowest possible level. Agencies and complainants can realize many advantages from using ADR. ADR offers the parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion.

---

[2] VA sensitive information as defined by Public Law 109-461, is all Departmental data, on any storage media or in any form or format, which requires protection due to the risk of harm that could result from inadvertent or deliberate disclosure, alteration, or destruction of the information. The term includes information whose improper use or disclosure could adversely affect the ability of an agency to accomplish its mission, proprietary information, records about individuals requiring protection under various confidentiality provisions such as the Privacy Act and the Health Insurance Portability and Accountability Act (HIPAA).

176

Page 3.
Notice of Acceptance
Tatyana Drevaleva
200P-0501-2017103883

If you are interested in using mediation to address the issues raised in this complaint, please contact Carlos Funes, ORM Case Manager, at (310) 478-3711 x. 35819, or the ADR Program at workplaceadr@va.gov.

Sincerely,

*Jonathan Shimkus*

for

Sophia Eaves
Pacific District Manager

Enclosures:  Acceptance Letter
             Document List

cc:  EEO Facility Program Manager

**177**

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)

Page 4.
Notice of Acceptance
Tatyana Drevaleva
200P-0501-2017103883

---

**REQUESTED DOCUMENTS FOR PENDING EEO INVESTIGATIONS**

**COMPLAINANT'S NAME:** TATYANA DREVALEVA
**CASE NUMBER:** 200P-0501-2017103883
**DATE FILED:** SEPTEMBER 19, 2017

**INSTRUCTIONS:** Please provide documents checked (√) below. This information is due in the ORM Field Office within ten (10) days of receipt of request. Documents must be accompanied by a statement from an appropriate official certifying the documents as true and accurate. Statements must be on official stationery, dated, signed and must include the title of the certifying official. The EEO category(s)/bases of this complaint are checked (√) below:

**EEO CATEGORIES (BASES)**

| | | |
|---|---|---|
| []RACE | []COLOR | [X]AGE (DATE OF BIRTH) |
| [X]SEX | []NATIONAL ORIGIN | [X]DISABILITY |
| []RELIGION | []REPRISAL | |

---

**TERMINATION OF PROBATIONARY OR TEMPORARY OR TERM APPOINTMENT**

[X] Organizational chart for the organization unit in which the complainant was assigned at the time of the action in question.

[X] Breakdown of the organizational unit[3] of the position in question as of the date of the action. Provide name, position (title, series, and grade), type of appointment, and EEO category(s)(s as checked above for all employees and supervisors.

[X] Breakdown of terminations of probationary, temporary, or term appointments made within the organizational unit going back two years from the date of the action in question. Provide employee name, position (title, series, and grade), and EEO category(s), type of appointment, date of appointment, date of termination, reason for termination, and name, position, and EEO category(s) of the agency official(s) initiating the action.

[X] Request for Personnel Actions SF 52 (both sides) and SF 50 requesting and effecting recruitment and termination for position in question.

[X] Vacancy announcement and any other documentation citing conditions of employment for the position in question.

[X] Written notice of termination of probationary, temporary or term appointment.

[X] If termination is conduct related, documentation related to conduct issue(s).

---

[3] Organizational unit is defined as the section where complainant was employed (or sought employment if complaint was filed by an applicant for employment) when the complaint was filed. For example, if the complainant worked for Human Resources Management (HRM) Service/Division/Product Line in the Labor Relations Section, the organizational unit is the Labor Relations Section.

178

Page 5.
Notice of Acceptance
Tatyana Drevaleva
200P-0501-2017103883

[X] If termination is performance related, complainant's performance standards, performance rating of record and any documents related to counseling sessions.

[X] Regulatory guidelines and local policies and procedures concerning termination of probationary, temporary or term appointments in effect at the time of the action at issue.

[X] Complainant's position description or functional statement for the position from which s/he was terminated.

[X] If the complainant's position was subsequently filled, the name and EEO category(s) of the selectee and date of appointment. If reprisal is a basis, indicate whether the selectee has had prior EEO activity.

[X] Pertinent article(s) of negotiated union agreement, if applicable.

### TIME AND ATTENDANCE

[] Organizational chart for the organizational unit to which the complainant is assigned and in which action occurred, if the units are different.

[] Statistical breakdown of the organizational unit [4] where the action in question occurred as of the date of the action. Provide name, position (title, series, and grade), and EEO category(s), as checked above, for all employees and supervisors.

[X] Summary data on leave use by employee's in complainant's section who are subordinates of the Responding Management Official (RMO) going back two years from the date of the action as follows:

> If time and attendance issue relates to a disciplinary action:
> [X] For the two year period prior to the action in question, provide name, position (title, series, and grade), and EEO category(s) of employee(s) affected, action taken based on leave use, date of action, and name position, and EEO category(s) of the agency official(s) who initiated the action.

> If time and attendance issue is **not** related to a disciplinary action:
> [X] For the two year period prior to the action in question, provide name, position (title, series, and grade), and EEO category(s) of employee(s) who requested leave, if the leave was granted or denied, reason for leave denial and name, position, and EEO category(s) of the agency official(s) effecting the decision. Complainant's leave request(s) as well as leave requests for comparable employees.

---

[4] Organizational unit is defined as the section where complainant was employed (or sought employment if complaint was filed by an applicant for employment) when the complaint was filed. For example, if the complainant worked for Human Resources Management (HRM) Service/Division/Product Line in the Labor Relations Section, the organizational unit is the Labor Relations Section.

179

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)

Page 6.
Notice of Acceptance
Tatyana Drevaleva
200P-0501-2017103883

[X] Documentation of any counseling provided concerning complainant's leave usage or leave usage pattern for complainant and subordinate employees comparable to complainant.

[X] Complainant's time and attendance or leave records for the two-year period prior to the action in question.

[X] Pertinent regulatory guidelines and local policies and procedures concerning leave administration in effect at the time of the action in question.

[X] Pertinent article(s) of the negotiated union agreement, if applicable.

180

## Tolliver, Eboney (ORM)

| | |
|---|---|
| **From:** | Tolliver, Eboney (ORM) |
| **Sent:** | Thursday, November 16, 2017 5:45 PM |
| **To:** | Welch, Andrew M. |
| **Cc:** | Rincon, Donald M. |
| **Subject:** | OFFICIAL CORRESPONDENCE: PR |
| **Attachments:** | TD-103883Accept Letter - Atty-Rep.pdf; TD-103883-Accept letter - Facility.pdf |
| | |
| **Importance:** | High |
| **Sensitivity:** | Confidential |

| **Tracking:** | Recipient | Delivery | Read |
|---|---|---|---|
| | Welch, Andrew M. | Delivered: 11/16/2017 5:45 PM | |
| | Rincon, Donald M. | Delivered: 11/16/2017 5:45 PM | Read: 11/16/2017 5:48 PM |

Dear Director Welch,

Attached, please find a Notice of Acceptance (PR) letter regarding an EEO case at your facility. EEO regulations require we notify you when this occurs. Questions/concerns regarding this matter should be addressed/sent directly to the point of contact identified in the attached correspondence.

Thank you,

Eboney Tolliver
*Eboney Tolliver*
EEO Program Assistant | Pacific District | Midwest District (MD)
Department of Veterans Affairs
Office of Resolution Management-Midwest District (MD) | 2255 Enterprise Drive, Suite 5506  | Westchester, IL  60154
708.236.2800 Office
708.236.2898 Fax

*Thank you for contacting the Office of Resolution Management. Our goal is to provide you with exceptional customer service.*
*Please take a moment to complete a very brief survey to let us know how my service was today.*

<u>Click Here</u>
NOTE:
**If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law.**
**If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.**



**VA Core Values:**  Integrity Commitment Advocacy Respect Excellence
**VA Core Characteristics:**  Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

**Funes, Carlos (ORM)**

| | |
|---|---|
| **From:** | Tatyana Drevaleva <tdrevaleva@gmail.com> |
| **Sent:** | Tuesday, November 07, 2017 10:30 AM |
| **To:** | Funes, Carlos (ORM) |
| **Subject:** | [EXTERNAL] Fwd: from Tatyana Drevaleva. |

---------- Forwarded message ----------
From: **Cheryl Eliano** <Cheryl.Eliano@afge.org>
Date: Mon, Sep 25, 2017 at 2:05 AM
Subject: Re: from Tatyana Drevaleva.
To: Tatyana Drevaleva <tdrevaleva@gmail.com>
Cc: "Walter Greely Jr." <Walter.Greely@afge.org>, Brently Carr <Brently.Carr@afge.org>

No problem.

Sent from my iPhone

> On Sep 22, 2017, at 12:00 AM, Tatyana Drevaleva <tdrevaleva@gmail.com> wrote:
>
> Dear Ms. Eliano!
>
> Thank you so much for forwarding my case to Mr. Rael. I got his email today.
> I filed a formal EEO complaint. I am sending you a copy of that complaint.
> Have a good night,
>
> --
> Respectfully,
> Tanya.
> <1.pdf>
> <2.pdf>
> <3.pdf>
> <Envelope.pdf>


--
Respectfully,
Tanya.

**Funes, Carlos (ORM)**

| | |
|---|---|
| **From:** | Tatyana Drevaleva <tdrevaleva@gmail.com> |
| **Sent:** | Tuesday, November 07, 2017 10:31 AM |
| **To:** | Funes, Carlos (ORM) |
| **Subject:** | [EXTERNAL] Fwd: please contact me |

---------- Forwarded message ----------
From: **Tatyana Drevaleva** <tdrevaleva@gmail.com>
Date: Fri, Oct 20, 2017 at 9:06 AM
Subject: Re: please contact me
To: "Smith, Karen Y. (ABQ)" <Karen.Smith20@va.gov>

Good morning Karen!

Thank you for your letter. I am happy to contact you but you didn't provide me with your direct phone number.
Could you, please, give me your phone number and the best time to call you? As an alternative, could you, please, give me a phone call any time at 415-806-9864?
Thank you so much,

Tanya.

On Fri, Oct 20, 2017 at 8:47 AM, Smith, Karen Y. (ABQ) <Karen.Smith20@va.gov> wrote:

Good morning Ms. Drevaleva,

Can you please contact me at your convenience.

Thanks in advance.

Karen Smith

AFGE Union Steward

--
Respectfully,

183

Tanya.


--
Respectfully,
Tanya.

## Funes, Carlos (ORM)

| | |
|---|---|
| **From:** | Tatyana Drevaleva <tdrevaleva@gmail.com> |
| **Sent:** | Tuesday, November 07, 2017 10:29 AM |
| **To:** | Funes, Carlos (ORM) |
| **Subject:** | [EXTERNAL] Fwd: from Tatyana Drevaleva - Albuquerque VAMC. |

---------- Forwarded message ----------
From: **Tatyana Drevaleva** <tdrevaleva@gmail.com>
Date: Mon, Sep 18, 2017 at 4:08 PM
Subject: from Tatyana Drevaleva - Albuquerque VAMC.
To: cheryl.eliano@afge.org

Dear Cheryl!

My name is Tatyana Drevaleva. I was hired as a Monitor Technician at 5D at Albuquerque VAMC on April 3rd, 2017. In May 2017, I informed Manager Mrs. Carla Dunkelberger that I needed to go to Russia for an IVF attempt because I wanted to have children. I also informed Assistant manager Mr. Phil Johnson that I needed to go to Russia for the IVF attempt, I was taking hormonal pills, and I was running out of these pills. It was impossible to obtain these pills in the USA. Mr. Johnson verbally allowed me to go to Russia for the IVF attempt. On May 18th, 2017, I emailed Mrs. Dunkelberger and Mr. Johnson a document from my Russian OB/GYN confirming that I was in registry for the IVF attempt in Novosibirsk, Russia, and I needed to be there to perform the IVf attempt. This document was on Russian language. Also, I filled out the form asking for leave without pay from May 18th, 2017 to July 7, 2017. I left Albuquerque on May 18th, 2017. After I arrived at Novosibirsk, Russia, I got this document from my OB/GYN translated, and I emailed it to Mrs. Dunkelberger and Mr. Johnson.

My IVF attempt in Russia lasted for three months. Initially, my OB/GYN requested me to pass all lab tests, EKG, colposcopy, etc. Later, the doctor found a cervical polyp and requested to remove it. I had surgery on June 13th, 2017. Afterwards, I waited for the pathology result. After I got that result, the OB/GYN requested me to determine the level of hormones FSH (Follicle Stimulating Hormone) and AMH (Anti-Mullerian Hormone) that needed to be done on the second day of my menstrual period. I waited for 14 days for the menstrual period. Afterwards, there was an actual attempt of IVF. Unfortunately, it was unsuccessful.

As soon as I realized that I needed to stay in Russia longer that July 7th, I emailed Mrs. Dunkelberger and Mr. Johnson, and I let them know that my OB/GYN requested additional tests (FSH and AMH), and I needed to stay in Russia for a longer time. I provided Mrs. Dunkelberger and Mr. Johnson with another document from my Russian physician confirming that I needed to stay in Russia for a longer time for additional examinations. However, Mrs. Dunkelberger fired me on June 30th – even before July 7th.

I contacted Mr. William Winter who is an EEO Counselor. He promised to schedule the Mediation date after I arrive back to the USA.

I returned back to the USA on August 18th. I contacted Mr. Winter, and he scheduled the Mediation process on September 7th. I went to the Mediation (the process was on Tele because I was in California. I was

185

unemployed, I didn't have money to pay rent, and this was why I returned back to California to stay with some of my Russian friends). During the Mediation, Mrs. Dunkelberger said that she had submitted my written request for leave without pay to Dr. Prince. Dr. Prince denied my request because, according to Family Medical Leave Act, I qualified for Leave without Pay only after 12 months of working at the VA, and at that time I was working for only 1.5 months. I said that I didn't have an opportunity to wait for 12 months because I was running out of hormonal pills, I couldn't refill this prescription in the USA, and I was in registry for a free IVF attempt. I waited in line for this IVF attempt for 9 months, and my turn finally came. Mrs. Dunkelberger said that I hadn't come back to work and I hadn't contacted with her after sending Dr. Prince's letter. I answered that there was no chance for me to get and read that mail because I was out of country, and Mrs. Dunkelberger knew it. I asked why she didn't email Dr. Prince's decision to my private email address. Mrs. Dunkelberger said that the letter was not encrypted, and she couldn't have emailed it to me. This was not true because she emailed me the termination Letter which was not encrypted. However, Mrs. Dunkelberger refused to reinstate me back to work.

During the Mediation, Director of Human Resources Mr. Thomas Harris requested my home postal address in California. He gave me his email address which is Thomas.Harris3@va.gov He promised to send me Dr. Prince's decision. On September 8th, 2017 I emailed Mr. Harris, and I provided him with my home postal address in California. He never replied, and I never got any document in mail from him.

I informed Mr. Winter that my intention was to file a formal EEO complaint. Also, I decided to contact with the Union and ask the Union to assist me to get reinstated back to work. From my point of view, I eft Albuquerque VAMC for the medical purpose, and I left with the permission of the Assistant Manager. It is not my fault that Mrs. Dunkelberger didn't inform me via email that my request for leave without pay was denied by Dr. Prince. I feel discriminated, retaliated and unlawfully terminated based on my disability to give birth to children. Also, I feel discriminated against my age (50 yo). Talking to my former colleagues over the phone, I found out that Mrs. Dunkelberger hired two males for the positions of Monitor Technician. Obviously, male employees will not have problems related to pregnancy. Also, the ages of these employees are 30 yo and approximately 35 yo – much younger than I am.

I am asking the Union to assist me to get reinstated back to work.

Please, respond to my private email address tdrevaleva@gmail.com

You may call me any time. My cell phone number is 415-806-9864.

Thank you, have a wonderful day,

Respectfully,


Tatyana.



--
Respectfully,
Tanya.



--
Respectfully,

186

Tanya.

**Funes, Carlos (ORM)**

| | |
|---|---|
| **From:** | Tatyana Drevaleva <tdrevaleva@gmail.com> |
| **Sent:** | Tuesday, November 07, 2017 10:30 AM |
| **To:** | Funes, Carlos (ORM) |
| **Subject:** | [EXTERNAL] Fwd: from Tatyana Drevaleva. |
| **Attachments:** | 1.pdf; 2.pdf; 3.pdf; Envelope.pdf |

---------- Forwarded message ----------
From: **Tatyana Drevaleva** <tdrevaleva@gmail.com>
Date: Thu, Sep 21, 2017 at 9:59 PM
Subject: from Tatyana Drevaleva.
To: cheryl.eliano@afge.org

Dear Ms. Eliano!

Thank you so much for forwarding my case to Mr. Rael. I got his email today.
I filed a formal EEO complaint. I am sending you a copy of that complaint.
Have a good night,

--
Respectfully,
Tanya.

--
Respectfully,
Tanya.

188

**Funes, Carlos (ORM)**

| | |
|---|---|
| **From:** | Funes, Carlos (ORM) |
| **Sent:** | Wednesday, November 15, 2017 2:56 PM |
| **To:** | Shafer, Amy V.; Rincon, Donald M. |
| **Subject:** | RE: TD-103883 Official Correspondence |

Good Afternoon:

I was following up on this request for information. Please provide the information if available so we can properly review the complaint and if we do not receive we will have to process the complaint with the information on file. Thank you.

**Carlos Funes**
**EEO Case Manager**
**Department of Veterans Affairs**
**Office of Resolution Management**
**Office: (310) 478-3711 ext. 35819**
**Fax: (310) 268-4089**



*VA Core Values:* Integrity Commitment Advocacy Respect Excellence
*VA Core Characteristics:* Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

*"Thank you for contacting the Office of Resolution Management. Our goal is to provide you with exceptional customer service. Please take a moment to complete a very brief survey to let us know how my service was today"*

<u>Click Here</u>

***NOTE: If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.***

**From:** Shafer, Amy V.
**Sent:** Tuesday, November 07, 2017 10:29 AM
**To:** Funes, Carlos (ORM) <Carlos.Funes@va.gov>; Rincon, Donald M. <Donald.Rincon@va.gov>
**Subject:** RE: TD-103883 Official Correspondence

I will check with HR.

**From:** Funes, Carlos (ORM)
**Sent:** Tuesday, November 07, 2017 11:09 AM
**To:** Shafer, Amy V. <<u>Amy.Shafer@va.gov</u>>; Rincon, Donald M. <<u>Donald.Rincon@va.gov</u>>
**Subject:** RE: TD-103883 Official Correspondence

Good Morning:

I will have to follow up and ask complainant but do you have any record of her filing a union grievance? Thanks.

189

**Carlos Funes**
**EEO Case Manager**
**Department of Veterans Affairs**
**Office of Resolution Management**
**Office: (310) 478-3711 ext. 35819**
**Fax: (310) 268-4089**



**VA Core Values:** Integrity Commitment Advocacy Respect Excellence
**VA Core Characteristics:** Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

*"Thank you for contacting the Office of Resolution Management. Our goal is to provide you with exceptional customer service. Please take a moment to complete a very brief survey to let us know how my service was today"*

Click Here

**NOTE: If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.**

**From:** Shafer, Amy V.
**Sent:** Tuesday, November 07, 2017 10:07 AM
**To:** Funes, Carlos (ORM); Rincon, Donald M.
**Subject:** RE: TD-103883 Official Correspondence

Cheryl Eliano is not listed in VISTA or Outlook.

**From:** Funes, Carlos (ORM)
**Sent:** Tuesday, November 07, 2017 11:02 AM
**To:** Rincon, Donald M. <Donald.Rincon@va.gov>
**Cc:** Shafer, Amy V. <Amy.Shafer@va.gov>
**Subject:** TD-103883 Official Correspondence

Good Morning:

I am the assigned case manager for the case of Tatyana Drevaleva, 200P-0501-2017103883. We need to clarify an issue to properly review and assess her EEO claim.

1. CP claims that she e-mailed or filed a grievance on 9/18/17 with Ms. Cheryl Eliano. Can you please confirm or provide a copy if complainant filed any such grievance as applicable.

Please provide at your earliest convenience or by November 13, 2017. If you have any questions or concerns please feel free to let me know. Thank you for your assistance.

**Carlos Funes**
**EEO Case Manager**
**Department of Veterans Affairs**
**Office of Resolution Management**
**Office: (310) 478-3711 ext. 35819**
**Fax: (310) 268-4089**

190



**VA Core Values:** Integrity Commitment Advocacy Respect Excellence
**VA Core Characteristics:** Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

*"Thank you for contacting the Office of Resolution Management. Our goal is to provide you with exceptional customer service. Please take a moment to complete a very brief survey to let us know how my service was today"*

<u>Click Here</u>

**NOTE:  If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law.  If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.**

191

RESERVED

**RESERVED**



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**William Moorhead Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh, PA 15222**

**Investigative Report**
**In the Matter of the EEO Complaint of Discrimination of:**

| | | |
|---|---|---|
| Ms. Tatyana Drevaleva | ) | |
| 10660 Hidden Mesa Pl. | ) | |
| Monterey, CA 93940 | ) | |
| | ) | |
| Complainant | ) | |
| | ) | |
| v. | ) | ORM No. 200P-0501-2017103883 |
| | ) | |
| Secretary | ) | |
| Department of Veterans Affairs | ) | |
| 810 Vermont Avenue NW | ) | |
| Washington, DC 20420 | ) | |
| Respondent | ) | |

Facility: New Mexico VA Healthcare System
1501 San Pedro Drive, S.E.
Albuquerque, N.M. 87108

Dennis G. Hayo
EEO Investigator
Office of Resolution Management
William Moorhead Federal Building
1000 Liberty Avenue, Suite 1801
Pittsburgh, PA 15222

### I. Introduction

Having met all procedural requirements for acceptance, with respect to the issues specified hereafter; this complaint was assigned for investigation on February 28, 2018. (1-3)

### II. Background

Tatyana Drevaleva, hereinafter referred to as the Complainant, was employed as a Monitor Technician at the Albuquerque NM VA Medical Center from April 3, 2017 until June 30, 2017 when she was terminated. She contacted an EEO Counselor on July 5, 2018. Counseling attempts were unsuccessful in resolving

194

her complaint and she filed a formal complaint on September 14, 2017. On March 5, 2018 the complainant requested to extend the investigation period by 60 days. (1-1, 2-1, 3-1 and 3-2)

<u>INVESTIGATOR NOTE:</u> Events A and B are like or related and will therefore investigated concurrently.

### III. Claims and Bases

**A. Whether complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, through June 30, 2017, the complainant was denied leave without pay under the FMLA.**

**B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

<u>INVESTIGATOR'S NOTE:</u> The Acceptance Letter dated November 16, 2017 identified pregnancy as being a discriminatory factor related to the complainant's sex (female).

### IV. Review of Documents

7-1 Affidavit of Tatyana Drevaleva (Complainant)
7-2 Affidavit of Phillip Johnson (RMO)
7-3 Affidavit of Carla Dunkelberger (RMO)
7-4 Affidavit of Dr. Tina Prince (RMO)
7-5 Affidavit of Clifford Speakman (SME)
7-5a Supplemental Affidavit of Clifford Speakman (SME)
7-6 Unit Organizational Chart
7-7 Complainant's Acknowledgement of Leave Procedures Letter 4-18-17
7-8 Complainants' Medical Documents
7-9 Complainants' Functional Statement
7-10 Dunkelberger Report of Contact 4-18-17
7-11 Dunkelberger Report of Contact 5-25-17
7-12 Dunkelberger Denial of Leave 6-9-17
7-13 Termination Notice 6-30-17
7-14 Complainants' Personnel Action SF-52 Hired 4-2-17
7-15 Complainants' Leave Records
7-16 Complainant Emails to Management
7-17 Agency Policy Regarding Probation Employees
7-18 Facility Policy on Employee Courtesy
7-19 Facility Title 5 Leave Policies
7-20 Facility Tour of Duty Policy

# V. Summary

INVESTIGATOR'S NOTE:  The age of the complainant, RMO's and witnesses is their age on the date of the first claim of the event of the claim which is May 18, 2017.

**Summary**

The witnesses testified to the following:

The **complainant** (Sex: Female; Age: 51; Disability: Yes) was hired by the Albuquerque VAMC as a Monitor Technician on April 3, 2017.  Her disability is Infertility.  She does not have any children.  For the past 5-7 years she has been unable to get pregnant.  It is caused by genetics, hormonal misbalance and age.  It is permanent and she cannot be treated for it.  She was taking hormonal pills for the condition.  The pills were available in Russia.  She is currently taking other hormonal pills named Femoston.  She was in Russia when she was taking antibiotics.  These medications do not have any side effects that impact her ability to perform her duties.  Her disability does not limit anything that would normally be done in everyday life.  Her duties included observing cardiac monitors, taking vital signs, changing linens, giving patients showers and assisting patients.  She was able to perform all her duties.  Because of a reduced cost for treatment she needed to go to Russia to refill prescriptions and receive In Vitro Fertilization (IVF) as a citizen of the Russian Federation.   She could not afford the price of IVF in the U.S.  Other than being able to get pregnant she does not see any additional differences between her and other female colleagues who are hired for the same position and duties.  Ms. Dunkelberger became aware of her disability in May 2017 when she explained that she wanted children.  Her date of birth is March 3, 1966. Her sex is female.  (7-1, pp. 1-3, 7-8, 7-9 and 7-14)

The **complainant,** in May 2017, told Ms. Dunkelberger that she wanted to have children but was running out of time because she was 50 years old.  She told Ms. Dunkelberger that she planned to go to Russia for an IVF attempt.  Ms. Dunkelberger' s face expressed she was very much unpleased and Ms. Dunkelberger told her that according to FMLA she would have to work for the VAMC for 12 months to be eligible for leave without pay.  She told Ms. Dunkelberger that she could not wait for 12 months because it was her turn for a free IVF attempt in Russia.  Ms. Dunkelberger requested a copy of her medical records confirming her intention to perform an IVF.  She told Ms. Dunkelberger that she would request the medical documents from her Russian OB/GYN.  Ms. Dunkelberger stated she needed the documents prior to her departure.  On May 17, 2017 Ms. Dunkelberger was out of the office.  She told Assistant Manager, Phil Johnson, the same thing she told Ms. Dunkelberger.  She told him on May 17, 2017 she received the Russian medical documents which were written in

Russian. She only had 3 hormonal pills left and she would start bleeding if she did not go to Russia. There was no time to translate the medical documents. Mr. Johnson told her that if she needed to go she should go. She told Mr. Johnson that she would provide him with a translated document as soon as she got to Russia and Mr. Johnson agreed. She told Mr. Johnson that a Russian co-worker could translate the document until she could get an official translation. She filled out a Request for Leave Without Pay (LWOP) form for the period from May 18, 2017 through July 7, 2017 and slipped in under Ms. Dunkelberger's door, since she was not in the office. On May 30, 2017 she emailed, from Russia, her Russian OB/GYN medical documentation of her need for IVF in the English language. She received no response. When she left she did not know if her Request for LWOP would be approved or denied by Ms. Dunkelberger. On July 3, 2017 she received a termination letter. This was the first time she found her Leave LWOP Request had been denied. Ms. Dunkelberger mailed the termination letter to her home in NM instead of emailing it to her in Russia. The justification provided in the termination letter was that she was on a probationary period and attendance issues. (7-1, pp. 3-5, 7-13 and 7-16)

During mediation on September 7, 2017 Ms. Dunkelberger said that her Leave Without Pay had been denied by Dr. Prince because she didn't meet the requirements to qualify for this leave under FMLA by working at the VA for 12 months. She did not discuss this with Dr. Prince. She has no working relationship with Dr. Prince other than when she had a group meeting with him when she was a new hire. Ms. Dunkelberger stated she sent the termination letter to her home instead of emailing it to her because it was not encrypted. She never received a phone call from Ms. Dunkelberger. This was unacceptable because she received verbal permission to go to Russia from Mr. Johnson and she was 50 years old and this was the only chance she had to get her hormonal pills and a free IVF. It was her turn and if she missed it she would lose this chance. (7-1, pp. 5-7, 7-8, 7-13, 7-15 and 7-17 through 7-20)

The **Complainant** identified Melanie, an ICU Registered Nurse as a Similarly Situated Employee that was treated more favorably that she was when her LWOP was denied. She is unaware of Melanie's last name. Melanie was not terminated when she attended nursing school and was allowed to work 1 time per month observing cardiac monitors. When Melanie was absent from work she was not terminated even though she couldn't have worked full time. For this reason she was discriminated against because of her disability. (7-1, p. 7)

The **complainant** believes that she was discriminated against because of her disability of not being able to have children and her age. She found that Ms. Dunkelberger hired two, younger, male employees to replace her position. Male employees would not have problems related to pregnancy. Melonie was allowed to work for only once a month while in nursing school but was not terminated. (7-1, p. 7, pp. 9)

**Phillip Johnson**, RMO (Sex: Male; Age: 61; Disability; Yes) has been assigned to the Raymond G. Murphy Medical Center. He is the Assistant Nurse Manager in 5D Telemetry. His first line supervisor is Carla Dunkelberger. He did have a working relationship with the complainant as the Nurse Manager by helping the complaint orient to her position to Telemetry Monitors. The complainant started employment on April 2, 2017 and was in a probationary period for one year. Probationary periods are times when supervisors are required to study and employee's potential to determine whether they are suited for successful government work. He is unaware of the complainant's sex but she refers to herself as female. He became aware of the complainant's age, on May 17, 2017, during a discussion about her leaving for Russia. The complainant never stated that she was disabled or infertile. He is unaware of her disability. He has received training in EEO policy and procedure. (7-2, pp. 2-5)

**Phillip Johnson**, RMO testified that on May 17, 2017, after business hours, the complainant came to his office and stated she had one pill left and was flying to Russia the next day to have In Vitro Fertilization done. She stated she was 50 years old, wanted to have children and this may be her last chance. He handed her the OPM71 paperwork and stated that this must be filled out and supporting documentation, from the doctor, in English, must be supplied. He told the complainant that he could not approve Leave Without Pay (LWOP) and that he would turn in the documentation and if this was that important then she should go. He has no knowledge of a "Melonie" who was treated more favorably than the complainant and was absent from work and was not terminated. When the complainant was terminated her position was open and a Female and Male qualified applicants were hired. (7-2, pp. 6-8 and 7-17 through 7-20)

The complainant's race, age and disability were not factors when this occurred. He did not discriminate against the complainant. (7-2, p. 9)

**Dr. Carla Dunkelberger**, RMO (Sex: Female; Age: 44; Disability: No) is a 5D Telemetry Nurse Manager in the Nursing Service Unit at the Raymond G. Murphy Medical Center and has been employed there since October of 2012. Her second line supervisor is Dr. Tina Prince. She was the complainant's direct supervisor. The complainant was a GS-7 Medical Instrument Technician and was a probationary employee. Her probationary period began on April 2, 2017. This is a period of time in which supervisors are required to study an employee's potential to determine whether she is suited for successful government work. The complainant was assigned to 5D Telemetry, Nursing Service. She is female and was born in May 1973. She is unaware of the complainant's sex. The complainant identified herself as female and she is unaware of the complainant's age. The complainant never said she was infertile or that she had a disability. On May 15, 2017, the complainant stated that since Russia offers a free one time IVF that she wanted to try this. She was unable to observe if the complainant was able perform her duties because the complainant did not complete

orientation. She has received training in EEO policy and procedure. (7-3, pp. 2-6, 7-9 and 7-14)

On April 18, 2017 she told the complainant that she did not qualify for FMLA due to less than 1 year service and would need to complete an OPM71 and provide medical documentation in English and would need to be submitted to the Assistant Director of Patient Care Services prior to leaving for Russia. She told the complainant that she could not approve the request. The complainant verbalized that she understood. On May 15, 2017, the complainant wanted leave to go to Russia soon for IVF and the complainant would let her know on May 16, 2017 when she needed the leave. She reminded the complainant she did not qualify for FMLA due to less than 1 year service and would need to complete an OPM71 and provide medical documentation in English and would need to be submitted to the Assistant Director of Patient Care Services prior to leaving for Russia. The complainant was told she could not approve the request. The complainant verbalized that she understood. The complainant was Absent Without Leave (AWOL) beginning May 21, 2017. On June 12, 2017 the complainant was mailed a memo with notification that her LWOP request from May 18, 2017 through July 7, 2018 was denied. The memo was mailed to the complainant's home of record by Human Resources. On July 3, 2017 a letter of termination was mailed to the complainant's home of record and copy of the termination letter was emailed to the complainant as a courtesy. The complainants AWOL negatively impacted patient care and delayed completion of the complainant's orientation. The complainant was terminated during her probationary period because she did not follow the proper leave policies and procedures. The policies that support terminating the complainant are in the Title 5 Leave policy MCM 05-11, Tours of Duty Policy MCM 05-8, Employee Courtesy and Conduct Policy MCM 05-48, Master Agreement between the Department of VA and American Federation of Government Employees (2011) Article 35 Section 10, LWOP, and memo for established phone number and unplanned leave. She has no knowledge of a "Melonie" that is a Similarly Situated Employee that was treated more favorably than the complainant. Two vacancies for Medical Instrument Technician position have been filled since the complainant's termination. One vacancy was filled by a male and the other by a female. (7-3, pp. 6-9, p. 11, 7-6, 7-7, 7-10, 7-11, 7-15 and 7-17 thought 7-20)

INVESTIGATOR NOTE: The Termination Letter from the Facility to the complainant dated June 30, 2017 indicated that the termination was due to attendance issues while in a probationary period. (7-13)

The complainant was notified on multiple occasions the process to request leave for an extended period of time and that unit level management team did not have the approval to grant such leave. The complainant's disability was not a factor when this occurred because she was unaware the complainant had a disability. The complainant did not state she had a disability. The complainant's sex was not a factor when this occurred because she is unaware of the complainant's

sex. She did not discriminate against the complainant when this occurred. The complainant did not tell her she felt she was being discriminated against when this occurred. (7-3, pp. 9-11)

**Dr. Tina Prince**, RMO (Sex: Female; Age: 58) has been employed at the New Mexico VA Health Care System in Albuquerque NM since March 5, 2016. She is the Associate Director of Patient Care Services, Nurse Executive and reports to the Director. Carl Dunkelberger is the Nurse Manager of Acute Care Telemetry Unit and Ms. Dunkelberger falls two levels below her in her chain of command. The complainant reported to Ms. Dunkelberger. She had no working relationship with the complainant. She does not recall when she became aware of the complainant's sex. She is unaware of the complainant's age. She first became aware of the complainant's disability of In Vitro Fertilizatio☐ when she was notified of this claim. (7-4, pp. 4-5)

She is the individual responsible for terminating the complainant's employment at the VA. Carla Dunkelberger completed the evidence packet reviewed by her Chief Nurse, Raneta Bonin, and was reviewed by Human Resources. She cannot remember who, in H.R. reviewed the file. Her role was that she reviewed the evidence packet and found that it was pretty solid as far as the AWOL's, the attempt to contact, the certified letters sent to the address of record. There was no response. Therefore she supported the request for termination during probation. She did not discuss the termination with the complainant. She believes the facility and agency policies were followed when this occurred. (7-4, pp. 6-10 and 7-6 and 7-17 through 7-20)

The complainant's age, sex and disability were not factors when this occurred. The complainant did not tell her that she felt she was being discriminated against when this occurred. She did not discriminate against the complainant when this occurred. (7-4, p. 11)

**Clifford Speakman**, SME (Sex: Male; Age: 44; Disability; Yes) has been employed at the Albuquerque NMVAHCS as an Employee Relations Specialist GS-12 since October of 2015. He does not know the complainant. She was a GS-7 Medical Instrument Technician at the Facility. She was hired on April 2, 2017 and terminated on June 20, 2017. She was hired as a probationary employee for 1 year. He is a male, born in 1963 and has a disability. He became aware of the complainant's sex and age on March 1, 2018 and is unaware of her disability. The agency justification for terminating the complainant was that she was AWOL. The Service requested the action due to the complainant being on Trial/Probation and the Human Resource Officer approved the action. He had no role in the complainant being terminated. The Agency/Facility policy that supports termination in this instance is found in Title 5 Leave Policy MCM 05-11, Tours of Duty MCM 05-8 and Employee Courtesy and Conduct MCM 05-48. (7-5, pp. 2-4, 7-5a, pp. 2 and 7-17 through 7-10)

The information in this report was obtained from witness testimonies and documentation provided by the Complainant and/or the Agency.

Dennis N. Hayo

March 27, 2018

Investigator                                    Date
EEO Investigator

Tatyana E. Drevaleva

10660 Hidden Mesa Place, Monterey, CA, 93940

415-806-9864, tdrevaleva@gmail.com

Case No: 200P-0501-2017103883

Date Filed: September 19, 2017

Interrogatory.

Complainant Name: Tatyana Drevaleva

1. What is your position, work location and unit?
   My position was a Monitor Technician and Nursing Assistant. The location was:
   Raymond G. Murphy Veterans Affairs Medical Center, Albuquerque, NM, unit 5D.
2. What is your disability?
   My disability is infertility. I can't give birth to children by a natural way. My
   infertility is based on chronic endometritis, polyposis of endometrium (before, I had 5
   surgeries – polypectomies), and a low ovarian reserve which is related to my age. I have a
   low level of Antimullerian hormone and an increased level of Follicle Stimulating Hormone.
3. When did the disability develop?
   The disability developed over the past 5-7 years. Throughout all these years, I tried
   to get pregnant but unsuccessful. I had sexual relationships with two men but I didn't get
   pregnant. I did approximately 7 intra-uterus inseminations at Kaiser Permanente but I
   didn't get pregnant. I had one polypectomy (the uterine polyp) at Kaiser Permanente in
   Richmond, CA, two polypectomies (polyps of endometrium) in Russia, and two removals of
   polyps of cervical canal in Russia. Also, I did three IVF attempts in Russia in 2015 – 2016.
4. What caused it?
   The polyposis of endometrium and cervical canal was caused by genetics. My Mom
   and my Aunt had polypectomies. Also, polyposis of endometrium and cervical canal was
   caused by a hormonal misbalance.
   The chronic endometritis was caused by numerous polypectomies. I was informed
   by my Gynecologist that I had the Asherman syndrome, also known as uterine synechiae. It
   is a condition characterised by the formation of intrauterine adhesions, which are usually
   sequela from injury to the endometrium, and is often associated with infertility.
   The low ovarian syndrome was caused by my age 50 yo. The number of follicles in
   my ovaries was significantly low.
5. Is this a permanent disability? If not, then explain how long it is expected to last.

202

It is a permanent disability. I can't treat this genetic disorder, and I can't decrease my age. I can try to cure chronic endometritis but I haven't been successful yet despite my numerous attempts including antibiotics.

The only way I can have children is IVF with a surrogate Mom.

6. Do you have medical documents about your impairment/medical condition/disability? If so, please provide documentation.

The documentation that I have is in Russian. It confirms the fact of multiple polyp removals as well as the fact of chronic endometritis and the low ovarian reserve. It confirms the levels of AMH and FSH. I can request translating these documents into English at your request. I can also request documentation from Kaiser Permanente confirming the fact that I unsuccessfully tried to get pregnant, and I had multiple IUI attempts in 2012 – 2013. I don't have this documentation with me. I can provide you with a document from my Russian OB/GYN confirming that I was in registry for an IVF attempt through the Ministry of Health of the Novosibirsk Region in Russia.

7. Do you take any medication because of the impairment?

I was taking hormonal pills named Jeanine http://www.dx-health.com/en/jeanine-contraceptive-p-142 to try to save my ovarian reserve. I took these pills without intermission for almost one year since my IVF attempt in 2016. The reason of taking these pills is to turn my menstrual periods off so I wouldn't loose ova. These pills are available in Russia and are not available in the United States. Currently, I am taking other hormonal pills named Femoston 2/10 https://www.medicines.org.uk/emc/medicine/15925 for the same reason.

I underwent an extensive treatment trying to cure my chronic endometritis. I took a lot of antibiotics in Russia, and I underwent many culture tests from my uterus. The diagnosis of chronic endometritis was confirmed after biopsy of endometrium.

Also, currently I am taking Vitrum Prenatal http://www.unipharmus.com/vitrum-prenatal.html vitamins and Folic Acid.

8. Does the medication have any side effects that impact your ability to perform your duties? If so, please explain.

The mentioned above medications do not have any side effects that impact my ability to perform duties of a Monitor Technician and Nursing Assistant.

9. Does the impairment/medical condition/disability limit anything you would do normally in everyday life? If yes, what normal life functions are limited and how are they limited?

My disability does not limit I would do normally in everyday life.

10. What are the major duties that you are required to carry out on your job?

I was hired as a Monitor Technician. My duty was to observe cardiac monitors. Also, I was assigned to perform duties as a Nursing Assistant. I took vital signs, measured input and output, changed linens, gave patients a shower, and assisted patients the way they needed.

11. Are you able to perform the major duties of your position, as someone else would normally be able to perform the duties?

Yes, I was able to perform all duties of my position. However, I needed reasonable accommodations. In my case, I needed to go to Russia to refill the prescription of Jeanine

203

and to perform an IVF attempt. Because I am a citizen of the Russian Federation, I had a right for a free of charge IVF attempt. In order for me to have this free IVF attempt, I needed to wait in line for 9 months. In May 2017, I found out that my turn in line finally came. Even if I performed an IVF attempt in Russia for money, the cost would be approximately $2000 – 2500 in comparison to $15000 in the United States. My salary of a Monitor Technician which is approximately $40000 per year does not allow me to perform an IVF attempt in the United States. Health insurance in the USA doesn't cover IVF attempts. Also, I couldn't wait to work for my employer for 12 months because 1) my ovarian reserve is getting lower and lower each month at my age, 2) I ran out of hormonal pills Jeanine that I couldn't obtain in the United States.

a) Would you say your ability to perform these duties differs slightly, moderately or significantly from someone else performing the job?

I think my ability to perform my duties would differ from a young female with a good ovarian reserve and a healthy endometrium. This female would not need IVF attempts in order to get pregnant. This female would get pregnant by a natural way. Other than that, I don't see any additional differences between me and other colleagues who are hired for the same position. My infertility would no way affect my ability to observe cardiac monitors and act as a Nursing Assistant taking vital signs and assisting patients.

12. Were you given any restrictions related to performing the duties of your job?

No, I was not given restrictions to performing duties as a Monitor Technician and Nursing Assistant.

13. Explain when and how management became aware of your disability?

In May 2017, I approached Ms. Dunkelberger, and I verbally explained to her what I just explained in this Interrogatory. I said that I was 50 yo and I didn't have children despite I wanted to have children very much. I said that I had been married twice but both husbands refused to give me children. I said that I'd had numerous attempts to get pregnant by a natural way with two boyfriends and using IUI in the USA and IVF in Russia with donor's sperm. I said that in 2016 I had an IVF attempt in Russia, and I created an embryo which is stored frozen in Russia. I said that I couldn't afford the price of IVF in the United States. I said that I was in line for a free IVF attempt in Russia as a citizen of the Russian Federation. I said that I was running out of hormonal pills that were prescribed by a Russian physician and that I couldn't obtain in the United States. I said that I had been waiting for 9 months for a free IVF attempt in Russia, and my turn came in. I said that I couldn't miss this turn, otherwise I would lose a right for a free IVF attempt. I said that OI was 50 yo, and my chances to have a baby from my own ovum were getting smaller and smaller. I also said that my plan was to go to Russia for an IVF attempt, to create an embryo, to freeze it, and to return back to the United States to continue performing my duties as a Monitor Technician. Ms. Dunkelberger's face expressed that she was very much unpleased. She asked me whether I will request another time off in order to go to Russia again to create another embryo. I said that I didn't know because I wasn't sure how this upcoming IVF attempt would be going on. Ms. Dunkelberger said that according to FMLA I would have to work for the VAMC for 12 months to be eligible for a leave without pay. I said that I couldn't wait for

204

12 months because I had only a few hormonal pills left, and my turn for a free IVF attempt in Russia came in. Ms. Dunkelberger requested a copy of my medical record confirming my intention to perform an IVF attempt. I said that I would request this document from my Russian OB/GYN. Ms. Dunkelberger said that I needed to provide the VAMC with the translated document prior to my departure. I said that I would try my best.

I requested this document from my Russian physician. It took approximately 7-8 days for the Russian office to process this document. There was no way to expedite this process. On May 17th, 2017, Ms. Dunkelberger was out of her office. I approached Assistant Manager of 5D Mr. Phil Johnson, and I said to him exactly what I wrote in this Interrogatory and what I said to Ms. Dunkelberger – that I needed to go to Russia for an IVF attempt, that I couldn't get pregnant by a natural way, that I spent many years trying to get pregnant using UIU and IVF, that I had only 3 hormonal pills left, and I spoke to Ms. Dunkelberger about my medical condition that required a trip to Russia. I said to Mr. Johnson that Ms. Dunkelberger had requested a translated document from my Russian physician prior to my departure. However, because of the delay with a Russian office, I got this document in Russian only on May 17th, 2017 when I had only 3 hormonal pills left. There was no way to continue staying in the USA and translating the document into English because, if I didn't get hormonal pills, I would be bleeding.

Mr. Johnson verbally allowed me to go to Russia to refill my hormonal pills and to perform an IVF attempt. His exact words were, "If you need to go – you should go!" I said to Mr. Johnson that I will provide Ms. Dunkelberger and him with a translated document as soon as I get to Russia. Mr. Johnson agreed. I said that I trusted my Russian speaking co-worker Ms. Nadya Das who worked as a Monitor Technician at 5D. I verbally authorized Nadya to translate this document into English for my Manager. Ms. Dunkelberger said that I didn't have a right to translate this document myself. Only a certified translator could do it.

Also, Mr. Johnson provided me with a form to request leave without pay. I filled this form out. I didn't know exactly how much time I needed to spend in Russia, so I requested a leave without pay from May 18th, 2017 to July 07th, 2017. Because Ms. Dunkelberger was out of office, I put this document under the door of her office. I don't have a copy of that document.

The witness of all events described above is Ms. Nadya Das who witnessed how I called my Russian physician's office and requested the document, how I called my brother who was in Russia and asked him to go to my doctor's office, how I called the receptionist and requested to email me a copy of that document. Also, I informed Ms. Das that I had talked to Ms. Dunkelberger and Mr. Johnson, and Mr. Johnson verbally allowed me to go to Russia. I also notified Ms. Das verbally that I authorize her to translate this document for Ms. Dunkelberger until I get the official translation.

14. What exactly management know about your disability. Be specific.

The management knew that, despite of my numerous attempts to get pregnant, the only way was only IVF with donor's sperm. Also, the management knew that I was not planning to carry pregnancy. I was going to be absent from work for a relatively short amount of time. I was going to create an embryo, freeze it, and return to work in Albuquerque. Also, read my description above. I emailed Ms. Dunkelberger and Mr. Johnson

205

a copy of the document from my Russian OB/GYN that I needed to go to Russia for an IVF attempt because I was in registry of patients for a free IVF attempt through the Ministry of Health of the Novosibirsk Region. I emailed this document on Russian language on May 18th, 2017 (prior to my departure) and I emailed the same document on English language from Russia on May 30th, 2017. Both Ms. Dunkelberger and Mr. Johnson never responded and never acknowledged that they received both documents (the original and a translated copy). However, both Ms. Dunkelberger and Mr. Johnson knew my private email address.

15. Please identify the management official for denying your leave request.

After I submitted both an original document and a translated copy to Ms. Dunkelberger and Mr. Johnson, I was not aware what the subsequent process would be. I didn't know whether Ms. Dunkelberger would approve or deny my request or somebody else would do it. During Mediation on September 07, 2017, Ms. Dunkelberger said that my request for leave without pay had been denied by Dr. Prince. So, according to Ms. Dunkelberger, the official who denied my request for leave without pay was Dr. Prince. I don't know whether Ms. Dunkelberger said to Dr. Prince that the purpose of my trip to Russia was an IVF attempt. Personally, I didn't speak directly with Dr. Prince about my infertility disability.

    a) Please describe your working relationship with this individual.
I met Dr. Prince only once during the Orientation. She held a group meeting with new hires. She spoke about our role at the VAMC. Other than that, I didn't have any discussions with Dr. Prince.

    b) How and when did this individual become aware of the protected bases that you believe are the subject of discrimination?
I don't know how and when Ms. Dunkelberger submitted my request for leave without pay to Dr. Prince. I even didn't know that my request would be submitted to Dr. Prince. I don't know what Ms. Dunkelberger said to Dr. Prince about the purpose of my trip to Russia. I don't remember whether I wrote the purpose of an IVF procedure in my request for leave without pay. I don't have a copy of my request.

16. How and when did you become aware that you leave request was denied?

After I emailed an original document and a translated copy to Ms. Dunkelberger and Mr. Johnson, I never heard back from both of them. I was in Russia pursuing my IVF attempt. Nobody let me know that my request was denied and nobody let me know that my request was denied by Dr. Prince. I got a Termination letter from Ms. Dunkelberger on July 03rd, 2017. The first time when I discovered that my request for leave without pay was denied by Dr. Prince was during the Mediation on September 07th, 2017.

17. What justification was provided for denying the leave?

During the Mediation on September 07th, 2017, Ms. Dunkelberger said that my request for leave without pay had been denied by Dr. Prince because I didn't meet the requirements to qualify for this leave under FMLA. I didn't work at the VA for 12 months, and therefore my request was denied. However, Ms. Dunkelberger knew very well that it was impossible for me to wait for 12 months before requesting this leave. I really don't know if Ms. Dunkelberger explained to Dr. Prince about my particular situation – that I was

50 yo, I tried to have children by a natural way and using UIU and IVF, I ran out of my hormonal pills, and I waited for 9 months for a free attempt of IVF in Russia, and my turn finally came in, and if I didn't arrive for this IFV attempt, I would lose this chance.

18. What policy or procedure was identified to support the denial of leave?

Ms. Dunkelberger identified FMLA. I needed to work at the VA for 12 months before requesting leave without pay.

19. Why was denial of leave unacceptable to you?

It was unacceptable because I had no any other chance to try to have a baby. Health insurance in the USA doesn't pay a full price for an IVF attempt. The price of one IVF attempt in the United States is $15000 which I can't afford because of my salary of $40000 per year. Even if my request for leave without pay was denied, Ms. Dunkelberder was supposed to immediately let me know. She didn't let me know when I was in Russia. Prior to my termination, I didn't know what my request for leave without pay was denied. During the Mediation on September 07, 2017, Ms. Dunkelberger said that she had mailed the denial letter to my home postal address in Albuquerque, NM. Ms. Dunkelberger knew very well that at that time I was out of country, I was in Russia, and I had no way to get and respond this letter. Ms. Dunkelberger never emailed this letter to me even though she knew my private email address. During the Mediation on September 07th, 2017, Ms. Dunkelberger said that she couldn't have emailed me this denial letter because it was not encrypted. I think this is a lie and an attempt to find an excuse. Ms. Dunkelberger emailed me the termination letter which was not encrypted. Ms. Dunkelberger never offered me to communicate with her via the phone, never called me and never informed me that my request for leave without pay had been denied by Dr. Prince.

20. Did you discuss the leave denial with any management officials?

Yes, I asked Ms. Dunkelberger in my email dated July 03, 2017 why she terminated me. She never responded. Again, she never let me know that my request for leave without pay was denied by Dr. Prince.

a) Who and when

The first time I asked Ms. Dunkelberger why she terminated my employment. I requested a leave without pay until July 07th, 2017, and Ms. Dunkelberger terminated my employment prior to this date – on June 30th, 2017. I was informed on July 03rd, 2017. The second time I asked Ms. Dunkelberger why she terminated my employment during the Mediation on September 07th, 2017. Ms. Dunkelberger said that my request had been denied by Dr. Prince. I requested to speak with Dr. Prince directly but I never got any answer.

b) What was discussed and what was the outcome of the discussion?

I asked why I had never been informed that my request for leave without pay was denied. Ms. Dunkelberger said that she had mailed the denial letter to my home postal address in Albuquerque, NM. I said that I was out of country at that time, and I never got the denial letter. I also said that Ms. Dunkelberger knew that I was out of country but she never informed me via email, never called me, and never requested me to give her a call. Also, she never answered my emails when I sent my documents to her. Ms. Dunkelberger said that because I didn't

207

respond to the letter that she sent to my home postal address in Albuquerque, NM, she fired me. I said that I had never gotten that letter, I didn't know that my request for leave without pay was denied, and I asked Ms. Dunkelberger to reinstate me back to work. Ms. Dunkelberger refused. I requested to speak with Dr. Prince but I never got any answer.

21. Why do you believe that the protected basis or bases outlined in this complaint was/were factors(s) in the denial of leave?

I remember how unpleasant Ms. Dunkelberger seemed when I first informed her about my intention to have a baby. She seemed very irritated. She asked me if I would request a leave again to create another embryo. I think she also asked whether I was planning to be absent from work in case if the baby is born. She never responded to my emails after I sent her an original document from my Russian OB/GYN and a translated copy. She never sent me a denial letter of Dr. Prince. She terminated my employment even before July 07th, 2017. She refused to reinstate me back to work. Afterwards, speaking over the phone to Ms. Nadya Das, I discovered that Ms. Dunkelberger hired two male Monitor Technicians to substitute me. Obviously, male employees will not have problems related to pregnancy. Also, I found out that these employees are much younger than I am. They are 30 and 35 yo in comparison to my age 51 yo now. Also, I found out that at least one of these employees is stable in his marriage and already has children.

22. Are you aware of a coworker who was not denied leave in similar circumstances?

No, I am not aware of coworkers who were not denied leave in similar circumstances (related to pregnancy).

I am aware of a coworker who was not terminated her employment at 5D despite she attended a nursing school and couldn't have full time employment at the VA during her study. She was allowed to work only 1 time per month at 5D observing cardiac monitors. Her employment was not terminated because she was absent from work.

a) Please identify by full name and title.

I think her name is Melanie. She is a Registered Nurse at ICU.

b) Please identify this by their protected basis(es) as outlined above in your complaint.

I said to Ms. Dunkelberger and Mr. Johnson that I would spend approximately 6 weeks in Russia for my IVF attempt. I said that I did not intend to become pregnant myself. I said that I would create an embryo and return back to the United States to work at the VA. My employment was terminated. Melanie, who couldn't have worked full time during her study for 2 years at a nursing school, was allowed to work at the VA one time per month, and her employment was not terminated. It confirms my statement that I was discriminated due to my disability, retaliated and unlawfully terminated.

c) Please explain how they were treated differently than you.

Melanie's employment was not terminated even though she couldn't have worked full time. Melanie was allowed to work once a month for 2 years. After I

was absent from work for 5 weeks due to my disability, my employment was terminated. I was never informed that my leave without pay was denied. Another individual who was treated differently that I is Ms. Chelsea Casey, a newly hired Registered Nurse at 5D. She was hired at the same time when I was hired. Ms. Casey was a new grad from a nursing school. Ms. Casey said that prior to getting employed by the Raymond G. Murphy VAMC she got approximately 5 phone calls from Ms. Dunkelberger who offered her to apply for a job opening of a Registered Nurse and who was inviting her to work at the VA. Ms. Dunkelberger called Ms. Casey five times to invite her to work but didn't call me even one time when my request for leave without pay had been denied.

d) Please describe your working relationship with this individual.

I worked with Melanie maybe twice when she observed cardiac monitors. I really like Melanie. She is a very conscientious lady. I also like Ms. Casey very much. She is a good friend and a good coworker. She worked as a Monitor Technician for 5 years, and she knows EKG very well. I showed her Torsades de Pointes when the patient had it (not all other nurses agreed to see it). She gave me rides to work and from work because I don't have a car. She gave me a ride to the airport when I left Albuquerque to Russia despite it was late and her daughters were sleeping. She took one of the daughters with her to give me a ride to the airport. She wished me to have a good trip. She knew the purpose of my trip.

e) How and when did this individual become aware of the protected bases that you outlined above?

I let Ms. Casey know that I wanted to have children, and therefore I was going to go to Russian for an IVF attempt. Also, while being in Russia, I communicated via email with Ms. Michelle Tirado who was also hired at the same time when I was hired. Ms. Tirado is a Nursing Manager. I shared the details of my stay in Russia with Ms. Tirado. I didn't know Ms. Casey's private email address, therefore I didn't have a correspondence with her from Russia.

23. Please identify the management official responsible for terminating you.

In the Termination Letter dated June 30th, 2017, it is written, "The Associate Director, Patient Care Services, has recommended that you be terminated from your position for failure to qualify during your probationary period. Your termination is due to attendance issues." This is a complete libel. During my employment starting April 2nd to May 18th, 2017, I didn't miss even one day of work, and I was never late to work. I was verbally allowed to go to Russia by Assistant Manager Mr. Johnson, and I requested a leave without pay from May 18th, 2017 to July 07th, 2017.

24. What justification was provided for **your termination?**

The justifications that were provided for my termination were: 1) probationary period, 2) attendance issues.

25. What policy or procedure was identified to support the termination?

"The decision to terminate you immediately in lieu of a two (2) week notice is due to your absent without leave (AWOL) status since May 21, 2017". Again, this is a libel. I left the

209

VA with a verbal permission of Assistant Manager Mr. Johnson. When my request for leave without pay was denied, nobody notified me.

26. Why was the termination unacceptable to you?

I was happy and proud that I was privileged to serve Veterans. I really loved the VA and my job. I wanted to have a child, and I left to Russia for a relatively short amount of time with a permission of an Assistant Manager. I also informed a Manager in detail why I needed a trip to Russia and why I couldn't perform an IVF attempt in the United States. I anticipated returning back to my duties at the VA after I create an embryo. Manager Ms. Dunkelberger never let me know that my request for leave without pay had been denied by Dr. Prince. Ms. Dunkelberger never responded to my emails after I sent her documents from my Russian physician. Ms. Dunkenbelger mailed the denial letter to my home postal address in Albuquerque, NM even though she knew that I had no chance to read this letter. Ms. Dunkelberger accused me in being absent from work even though she knew that 1) I got Mr. Johnson's permission to go to Russia, 2) I never missed any day of work, and I was never late to work. Ms. Dunkelberger didn't care about my knowledge of EKG. I passed the EKG test with a score of 100%. I was good interpreting cardiac rhythms because I like it. Ms. Dunkelberger didn't care that I would be a real benefit to the hospital because of my EKG knowledge. Now, when I am fired from the probationary period for "absence", who will hire me? The guess is that I will have problems with all subsequent potential employers who will think that I was terminated from the VA from being absent. I was even denied Unemployment Insurance benefits because Ms. Dunkelberger said that I had been fired for being absent. This is totally unacceptable, and this is a libel. Therefore, I demand to overturn Ms. Dunkelbergers decision and reinstate me back to work with a backpay.

27. Did you discuss the **termination** with any management officials? Yes, I did.

a) Who and when?
I discussed my termination with Ms. Dunkelberger. First time, I asked her in writing in my email to her dated July 03rd, 2017. I asked her why she fired me. She never responded. The second time I asked Ms. Dunkelberger why she fired me during the Mediation on September 07th, 2017.

b) What was discussed and what was the outcome of the discussion?
During the Mediation on September 07th, 2017, I said to Mediators and to Ms. Dunkelberger that I had gone to Russia with a verbal permission of Mr. Johnson. Ms. Dunkelberger said that she had emailed me the denial letter to my home postal address in Albuquerque, NM. I said that there was no way to receive that letter because I was in Russia, and Ms. Dunkelberger knew it. I asked why she didn't email me this letter. Ms. Dunkelberger said that the letter was not encrypted. I said that I had gotten a Termination letter which was not encrypted. Also, I said that Ms. Dunkelberger knew my private email address but never answered my emails. I asked Ms. Dunkelberger to reinstate me back to work. She refused.

28. Why do you believe that you were discriminated against because of the protected bases that you outlined above when you were terminated?

I was discriminated against my disability to give birth to children. I was also discriminated against my age. Ms. Dunkelberger knew that I went to Russia with a

210

permission of Assistant Manager Mr. Johnson but she accused me in being absent. She never responded my emails when I sent her documents about my health condition. She never informed me that my request for leave without pay was denied. She never called me to let me know that my request was denied, and she never sent me an email. She terminated my employment prior to July 07th, 2017. She refused to reinstate me back to work after I arrived at the USA. She hired two male employees who will not have problems related to pregnancy. She hired much younger employees that I am. Dr. Prince never responded to my request to speak with her in person. In contrast, Melanie was allowed to work for only once a month for 2 years when she was in a nursing school. Ms. Casey got 5 phone calls from Ms. Dunkelberger when this Manager offered her employment at the VA.

29. Are you aware of a coworker who was not subjected to **termination** in similar circumstances?

    No, I am not aware.


The above information has furnished without a pledge of confidence and I understand that it may be shown to the interested parties of this complaint.

This statement is made under penalty of perjury, this November 19th, 2017.

__Tatyana E. Drevaleva_____
(Affiant's signature)

211

Tatyana E. Drevaleva

10660 Hidden Mesa Place, Monterey, CA, 93940

415-806-9864, tdrevaleva@gmail.com

Case No: 200P-0501-2017103883

Date Filed: September 19, 2017

To Ms. Karla Malone

My name is Tatyana Evgenievna Drevaleva.

Date: November 19th, 2017.

The complaint above outlines the specific basis or bases that you have identified as the subject of discrimination in your complaint. Please provide identifying information for the applicable basis or bases identified above in your complaint:

Age: __yes_____ Sex: __yes (pregnancy)__ Disability: __yes____

212



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**William S. Moorhead Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh, PA 15222**

Written Affidavit of **Phil Johnson** in the Matter of the EEO Complaint of Discrimination
of discrimination filed by **Tatyana Dreyaleva**

| | |
|---|---|
| Tatyana Dreyaleva ) | |
| 10660 Hidden Mesa Pl. ) | |
| Monterey, CA 93940 ) | |
| ) | |
| ) | |
| Complainant ) | |
| ) | |
| v. ) | Case No: 200P-0501-2017103883 |
| ) | |
| David Shulkin, Secretary ) | |
| Department of Veterans Affairs ) | |
| 810 Vermont Avenue, NW ) | |
| Washington, DC 20420 ) | |
| Respondent ) | |
| ) | |
| ) | |
| ) | |

Facility:   New Mexico VA Healthcare Center
            1501 San Pedro Drive, S.E.
            Albuquerque, NM 87108

_____

**The accepted claim(s) under investigation are:**

   **A. Whether Complainant was discriminated against based on age, sex**
      **(female) and disability, when from May 18, 2017, complainant was**
      **terminated during her probationary period.**

   **B. Whether complainant was discriminated against based on age, sex**
      **(female) and disability, when on June 30, 2017, complainant was**
      **terminated during her probationary period.**

Affiant's Initials: __PJ_____   Date:__03/12/2018_____

213

**2 |** P a g e

I, **Phil Johnson**, solemnly swear/affirm that the responses and documents I provide in response to the following questions are true and complete to the best of my knowledge and belief.

Please write your full legal name.     *Phillip Leroy Johnson*

**Please answer the following questions:**

1. Please identify the VA facility where you are employed.
   *Raymond G. Murphy Medical Center*

2. For what period of time have you been employed there?     *Since June 2003*

3. What unit or section of the facility do you work in?     *5D Telemetry*

4. Please identify your position and grade at the facility where you are employed.
   *Assistant Nurse Manager; Nurse 2*

5. Please identify your first line supervisor during that period.   *Carla Dunkelberger*

6. Please identify your second line supervisor during that period.     *Allean Bonin*

7. Please describe your working relationship with the complainant, Tatyana Dreyaleva, during that period.     *I was an Assistant Nurse Manager*

Affiant's Initials:__PJ___   Date:_3/13/2018____

214

**3 | P a g e**

8. Where did the complainant fall in your chain of command?   *N/A*


a. If the complainant's was in your chain of command how long was she there?   *N/A*


9. What is the complainant's position and grade?   *The complaintant's position was Medical Instrument Technician. Grade was GS7*


10. Was the complainant a probationary employee?   *Yes*

If yes, please explain the dates of her probationary employment and what probationary employment means.
*Probation period started at time of expected appointment on April 2, 2017. The firstyear of employment is subject to a probationary period. The probationary period is a period of time in which supervisors are required to study an emplo potential closely to determine whether s/he is suited for successful government work.*


11. What unit or section is the complainant assigned to?   *5D Telemetry, Nursing service*


12. What was your working relationship with the complainant?   *The complaintaint was orienting to the position and I was a supervisor and helped with orientation to the Telemetry monitors.*


13. What is your sex?   *Male*


14. When did you first become aware of the complainant's sex?   *I am not aware of the complainants sex. Ther complainant referred to self as female.*


15. How did you become aware of the complainant's sex?   *I am not aware of the complainants sex. Ther complainant referred to self as female.*

Affiant's Initials:__PJ___   Date:_3/13/2018____

215

**4 |** P a g e

16. What is your month and year of birth?     *April 1956*

17. When did you first become **aware of the complainant's age?**     *May 17, 2017*

18. **How did you become aware of the complainant's age?**     *Complaintant stated age during our discussion about leaving for Russia.*

19. Do you have a disability? *yes*

   a.  If yes, would you like to share your disability for the record?
       *Hearing Impaired*

20. Are you aware of the complainant's disability he describes as being **infertile to the point of needing In Vitro Fertilization?**     *The complaintant did not state that s/he had a disability or that s/he was infertile.*

   a.  If yes, please describe your knowledge of **her disability of being infertile?**     *N/A*

21. How and when did you become aware of the complainant's disability?     *N/A*

22. How long has the complainant had this disability?     *N/A*

23. How long is it expected to continue?     *N/A*

24. **Please describe which of complainant's normal life functions, to your** knowledge that was substantially limited because of her disability.     *The complaintant did not state that s/he had a disability.*

25. Please describe in detail how the normal life functions identified above were **substantially limited by the complainant's impairment/disability.**     *N/A*

**Affiant's Initials:__PJ___    Date:_3/13/2018____**

216

**5 |** P a g e

26. Did the complainant use medication and/or assistive devices for his disability?  If yes,

   a.  Identify and describe their purpose.
   *The complaintant did not state that s/he had a disability.*

27. To your knowledge did the complainant's medication and/or assistive devices aff   t any of the complainant's normal life functions? If yes,

   a.  Describe the normal life function.
*N/A*

28. Describe the degree to which the function is affected. *N/A*

29. Was the complainant able to perform the essential duties of her position? *Complaintant did not complete orientation and, therefore, was unable to perform independently in the Medical Instrument Technician role.*

30. If not, please identify the duty or duties the complainant was unable to perform. *Because the complaintant did not complete orientation s/he was unable to perform independently in the Medical Instrument Technician role.*

31. Indicate how the disability impacted accomplishing these duties.   *Complaintant did not state s/he had a disability*

32. Have you received training on EEO policy and procedure?   *Yes*

33. If yes, when?   *11/30/2015, 7/21/2016 and 1/9/2018*

217

6 | P a g e

**A. Whether Complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, complainant was terminated during her probationary period.**

**B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

1. Please identify the individual responsible for terminating the complainant? *Complaintant's conduct resulted in termination*

2. The complainant claims that in May 2017 she told Ms. Dunkelberger that she wanted to have children but was running out of time because she was 50 years old. She told Ms. Dunkelberger that she planned to go to Russia for an IVF attempt. **Ms. Dunkelberger's face expressed she was very much unpleased and** Ms. Dunkelberger told her that according to FMLA she would have to work for the VAMC for 12 months to be eligible for leave without pay. She told Ms. Dunkelberger that she could not wait for 12 months because it was her turn for a free IVF attempt in Russia. Ms. Dunkelberger requested a copy of her medical records confirming her intention to perform an IVF. She told Ms. Dunkelberger that she would request the medical documents from her Russian OB/GYN. Ms. Dunkelberger stated she needed the documents prior to her departure. On May 17, 2017 Ms. Dunkelberger was out of the office. She told Assistant Manager, Phil Johnson, the same thing she told Ms. Dunkelberger. She told him on May 17, 2017 she received the Russian medical documents which were written in Russian. She only had 3 hormonal pills left and she would start bleeding if she did not go to Russia. There was no time to translate the medical documents. Mr. Johnson told her that if she needed to go she should go. She told Mr. Johnson that she would provide him with a translated document as soon as she got to Russia and Mr. Johnson agreed. She told Mr. Johnson that a Russian co-worker could translate the document until she could get an official translation. She filled out a Request for Leave Without Pay form for the period from May 18, 2017 through July 7, 2017 and **slipped in under Ms. Dunkelberger's door, since she was not in the office. On May 30, 2017** she emailed, from Russia, her Russian OB/GYN medical documentation of her need for IVF in the English language. She received no response. When she left she did not know if her Request for Leave Without Pay would be approved or denied by Ms. Dunkelberger. On July 3, 2017 she received a termination letter. This was the first time she found her Leave Without Pay Request had been denied. Ms. Dunkelberger mailed the termination letter to her home in NM instead of emailing it to her in Russia. The justification provided in the termination letter was that she was on probationary period and attendance issues. What was your role and the circumstances surrounding this event? *The complaintant came into the office, after business hours, on May 17, 2017 stating s/he had one pill left and was flying to Russia the next day to have Invitro Fertilization done.The complaintant also stated his/her age to be 50 and that s/he had always wanted to have children and "this may be my last chance". I handed the complaintant the OPM71 paper*

218

**7 | P a g e**

*work and stated that this must be filled out and supporting documentation in English from the doctor must also be supplied. At this time I stated to the complainant that I could not approve Leave Without Pay but I would turn in the documentation and if this was that important then s/he should go.*

3. What was your justification for your actions when the complainant when these events occurred and the complainant was terminated?   *Do not understand the question*

4. Did you discuss this with the complainant?     *Cannot answer the question*

   1. If yes, when?   *N/A*

   2. What was discussed?   *N/A*

   3. What was the outcome of the discussion?   *N/A*

   4. Did you discuss this with Ms. Dunkelberger?   *N/A*

   5. If yes, when was it discussed?   *N/A*                                     Commented [JPL1]:

   6. What was discussed?   *N/A*

   7. Did you consult with H.R. or any other management officials regarding the termination?   *No*

   8. If so, who did you discuss it with?   *N/A*

Affiant's Initials:__PJ___   Date:_3/13/2018____

8 | P a g e

9. When was is discussed?   *N/A*

10. What was discussed?   *N/A*

11. What policy or regulation supports terminating the complainant in these circumstances? (Please provide that policy to the investigator for the record). *MCM 05-11 Title 5 Leave Policy, MCM 05-8 tours of Duty, MCM 05-48 Employee Courtesy and Conduct, Master Agreement berween the Department of Veterans Affairs and the American Federation of Government Employees (2011) Article 35 Section 10, Leave Without Pay (LWOP).*

12. The complainant claims that, Melonie, an ICU Registered Nurse was a Similarly Situated Employee that was treated more favorably that she was when her Leave Without Pay was denied.  Melanie was not terminated when she attended nursing school and was allowed to work 1 time per month observing cardiac monitors.  When Melanie was absent from work she was not terminated even though she couldn't have worked full time.  For this reason she was discriminated against because of her disability.   *I have no Knowledge of a "Melonie"*

13. What is Melonie's last name? *N/A*

14. What was Melonie's position and grade? *N/A*

15. Where did Melonie fall in your chain of command? *N/A*

16. What is Melonie's sex? *N/A*

17. What is Melonie's age?   *N/A*

18. Does Melonie have a disability? *N/A*

19. Do you believe Melonie is a Similarly Situated Employee? *N/A*

20. What was your justification for not terminating Melonie under the above circumstances? *N/A*

Affiant's Initials:__PJ___    Date:_3/13/2018____

220

**9** | P a g e

21. The complainant claims that two <u>young males</u> were hired to replace her position because they would not have pregnancy issues.  How do you respond?        *The position was open to either Female or Male and the qualified applicants were hired.*

22. Was the complainant's  disability of **being infertile a** factor when this occurred?  *The complainant did not state s/he had a disability*

23. Was the complainant's **age** a factor when this occurred?   *No*

   a.  If yes, please explain how?   *N/A*

24. Was the **complainant's sex** a factor when this occurred?       *I am not aware of the complaintant's sex.*

   b.  If yes, please explain how?      *N/A*

25. Was the complainant's **disability** a factor when this occurred?  *The complaintant did not state s/he had a disability*

   c.  If yes, please explain how?       *N/A*

26. Did you discriminate against the complainant because of her **age, race or disability** when this occurred?       *No*

27. Did the complainant tell you that he felt that she was being discriminated when this occurred?       *Do not understand the question*

28. If yes, when?      *N/A*

29. What was discussed and what was the outcome of the discussion?     *N/A*

30. Do you have anything to offer the complainant in resolution of this claim?   *No*

Affiant's Initials:__PJ___   Date:_3/13/2018____

10 | P a g e

31. Is there anything else pertinent to these specific events that we have not discussed?     *No*

**PLEASE NOTE THAT ORM RESERVES THE RIGHT TO SUPPLEMENT OR ASK ADDITIONAL QUESTIONS AS THE INVESTIGATION REQUIRES.**

**The above information has been furnished without a pledge of confidence and I understand that it may be shown to any interested party[ies] with a need to know for this complaint. This includes but is not limited to VA, EEOC, contracting officials with a need to know during the course and scope of the informal and formal EEO process including administrative procedures and litigation as applicable and mandated by law.**

This statement is made under penalty of perjury on this _13_day of _March, 2018.

Phil Johnson RN, 5DT ANM
Phil Johnson



**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT
**William S. Moorhead Federal Building
1000 Liberty Avenue, Suite 1801
Pittsburgh, PA 15222**

Written Affidavit of **Carla Dunkelberger** in the Matter of the EEO Complaint of
Discrimination of discrimination filed by **Tatyana Dreyaleva**

| | |
|---|---|
| Tatyana Dreyaleva )<br>10660 Hidden Mesa Pl. )<br>Monterey, CA 93940 )<br> )<br> )<br>Complainant )<br> )<br>v. )<br> )<br>David Shulkin, Secretary )<br>Department of Veterans Affairs )<br>810 Vermont Avenue, NW )<br>Washington, DC  20420 )<br>Respondent )<br> )<br> )<br> )<br> ) | Case No: 200P-0501-2017103883 |

Facility:    New Mexico VA Healthcare Center
          1501 San Pedro Drive, S.E.
          Albuquerque, NM 87108

---

**The accepted claim(s) under investigation are:**

**A. Whether Complainant was discriminated against based on age, sex
(female) and disability, when from May 18, 2017, complainant was
terminated during her probationary period.**

**B. Whether complainant was discriminated against based on age, sex
(female) and disability, when on June 30, 2017, complainant was
terminated during her probationary period.**

---

Affiant's Initials:    CD          Date:   3/8/18

223

**2 |** P a g e

I, **Carla Dunkelberger**, solemnly swear/affirm that the responses and documents I provide in response to the following questions are true and complete to the best of my knowledge and belief.

Please write your full legal name. *Carla Jahns Dunkelberger*

**Please answer the following questions:**

1. Please identify the VA facility where you are employed. *Raymond G. Murphy Medical Center*

2. For what period of time have you been employed there? *Since October 2012*

3. What unit or section of the facility do you work in? *5D Telemetry, Nursing Service*

4. Please identify your position and grade at the facility where you are employed. *5D Telemetry Nurse Manager; Nurse 3*

5. Please identify your first line supervisor during that period. *Allean Bonin*

6. Please identify your second line supervisor during that period. *Dr. Tina Prince*

7. Please describe your working relationship with the complainant, Tatyana Dreyaleva, during that period. *I was the complainants direct supervisor.*

Affiant's Initials:___CD___      Date:___3/8/18___

224

3 | P a g e

8. Where did the complainant fall in your chain of command? *N/A*


a. If the complainant's was in your chain of command how long was she there? *N/A*


9. What is the complainant's position and grade? The complainants complainants position and grade was: *Medical Instrument Technician; GS7*


10. Was the complainant a probationary employee? *Yes*


a. If yes, please explain the dates of her probationary employment and what probationary employment means.

   *Probation period started at time of excepted appointment on April 2, 2017. The first year of employment is subject to a probationary period. The probationary period is a period of time in which supervisors are required to study an employee's potential closely to determine whether s/he is suited for successful government work.*


11. What unit or section is the complainant assigned to? *5D Telemetry, Nursing Service*


12. What was your working relationship with the complainant? *I was the complainants direct supervisor.*


13. What is your sex? *Female*


14. When did you first become aware of the complainant's sex? *I am not aware of the complainants sex. The complainant referred to self as a female.*


15. How did you become aware of the complainant's sex? *I am not aware of the complainants sex. The complainant referred to self as a female.*

**4 |** P a g e

16. What is your month and year of birth? *May 1973*

17. When did you first become aware of the complainant's age? *I am not aware of the complainants age.*

18. How did you become aware of the complainant's age? *I am not aware of the complainants age.*

19. Do you have a disability? *no*

   a. If yes, would you like to share your disability for the record? *N/A*

20. Are you aware of the complainant's disability he describes as being **infertile to the point of needing In Vitro Fertilization**?

   *The complainant did not state that s/he had a disability or that s/he was infertile. On May 15, 2017 the complainant stated that since Russia offers a free one time invitro fertilization and that the complainant wanted to try this.*

   a. If yes, please describe your knowledge of **her disability of being infertile**? *N/A*

21. How and when did you become aware of the complainant's disability? *The complainant did not state that s/he had a disability.*

22. How long has the complainant had this disability? *N/A*

23. How long is it expected to continue? *N/A*

24. Please describe which of complainant's normal life functions, to your knowledge that was substantially limited because of her disability. *The complainant did not state that s/he had a disability.*

5 | P a g e

25. Please describe in detail how the normal life functions identified above were substantially limited by the complainant's impairment/disability. *N/A*

26. Did the complainant use medication and/or assistive devices for his disability?   If yes,
    a. Identify and describe their purpose.
    *The complainant did not state that s/he had a disability.*

27. To your knowledge did the complainant's medication and/or assistive devices affect any of the complainant's normal life functions? If yes,

    a. Describe the normal life function.
    *N/A*

28. Describe the degree to which the function is affected. *N/A*

29. Was the complainant able to perform the essential duties of her position? *Complainant did not complete orientation.*

30. If not, please identify the duty or duties the complainant was unable to perform. *The complainant was unable to perform independently in the Medical Instrument Technician role due to not completing orientation.*

31. Indicate how the disability impacted accomplishing these duties. *The complainant did not state that s/he had a disability.*

32. Have you received training on EEO policy and procedure? *Yes*

33. If yes, when? *11/24/2016 and 7/30/2015 (see supporting documentation).*

**A. Whether Complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, complainant was terminated during her probationary period.**

Affiant's Initials:___CD___      Date:___3/8/18___

227

6 | P a g e

**B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

1. Please identify the individual responsible for terminating the complainant? *The complainants conduct resulted in termination.*

2. The complainant claims that in May 2017 she told Ms. Dunkelberger that she wanted to have children but was running out of time because she was 50 years old. She told Ms. Dunkelberger that she planned to go to Russia for an IVF attempt. Ms. Dunkelberger's face expressed she was very much unpleased and Ms. Dunkelberger told her that according to FMLA she would have to work for the VAMC for 12 months to be eligible for leave without pay. She told Ms. Dunkelberger that she could not wait for 12 months because it was her turn for a free IVF attempt in Russia. Ms. Dunkelberger requested a copy of her medical records confirming her intention to perform an IVF. She told Ms. Dunkelberger that she would request the medical documents from her Russian OB/GYN. Ms. Dunkelberger stated she needed the documents prior to her departure. On May 17, 2017 Ms. Dunkelberger was out of the office. She told Assistant Manager, Phil Johnson, the same thing she told Ms. Dunkelberger. She told him on May 17, 2017 she received the Russian medical documents which were written in Russian. She only had 3 hormonal pills left and she would start bleeding if she did not go to Russia. There was no time to translate the medical documents. <u>Mr. Johnson told her that if she needed to go she should go.</u> She told Mr. Johnson that she would provide him with a translated document as soon as she got to Russia and Mr. Johnson agreed. She told Mr. Johnson that a Russian co-worker could translate the document until she could get an official translation. She filled out a Request for Leave Without Pay form for the period from May 18, 2017 through July 7, 2017 and slipped in under Ms. Dunkelberger's door, since she was not in the office. On May 30, 2017 she emailed, from Russia, her Russian OB/GYN medical documentation of her need for IVF in the English language. She received no response. When she left she did not know if her Request for Leave Without Pay would be approved or denied by Ms. Dunkelberger. On July 3, 2017 she received a termination letter. This was the first time she found her Leave Without Pay Request had been denied. Ms. Dunkelberger mailed the termination letter to her home in NM instead of emailing it to her in Russia. The justification provided in the termination letter was that she was on probationary period and attendance issues. What was your role and the circumstances surrounding this event?

*On May 15, 2017, the complainant told me that since Russia offered free one time invitro fertilization that s/he wanted to try this and that s/he would need to leave to go to Russia soon and that s/he would let me know on May 16,2017 when s/he needed to leave. I reminded the complainant that s/he did not qualify for FMLA due to less than 1 year of service, would need to complete an OPM71, provide supporting medical documentation in English, and that it had to be submitted for*

228

**7 |** P a g e

*approval to the ADPCS for approval prior to leaving for Russia; that I could not approve the request. The complainant verbalized understanding.*

*On June 12, 2017 the complainant was mailed a memo with notification that the complainants request for Leave Without Pay (LWOP) from May 18, 2017 through July 7, 2017 was denied. The memo was mailed to the complainants home of record as required by Human Resources.*

*The complainants termination letter was mailed to the complainants home of record as required by HR. In addition, a copy of the termination letter was e-mailed to the complainant on July 3, 2017 as a courtesy.*

3. What was your justification for your actions when the complainant when these events occurred and the complainant was terminated? *Do not understand the question.*

4. Did you discuss this with the complainant? *Unable to answer based on not understanding previous question.*

4. If yes, when? *N/A*

5. What was discussed? *N/A*

6. What was the outcome of the discussion? *N/A*

7. Did you discuss this with Mr. Johnson? *N/A*

8. If yes, when was it discussed? *N/A*

9. What was discussed? *N/A*

Affiant's Initials:____CD____   Date:___3/8/18_____

**229**

8 | P a g e

10. Did you consult with H.R. or any other management officials regarding the termination? *yes*

11. If so, who did you discuss it with? *Rhonda Anderson*

12. When was is discussed? *June 9, 2017*

13. What was discussed?

    *We discussed that the complainants request for LWOP from May 18, 2017 through July 7, 2017 was denied, that the complainant had been in AWOL status since  May 21, 2017, and that a Leave Request Clarification Memo notifying the complaint of this should be mailed to the complainants home of record; per Human Resource rules and regulations.*

14. What policy or regulation supports terminating the complainant in these circumstances?  (Please provide that policy to the investigator for the record). *MCM 05-11 Title 5 Leave Policy, MCM 05-8 Tours of Duty, MCM 05-48 Employee Courtesy and Conduct, Master Agreement between the Department of Veterans Affairs and the American Federation of Government Employees (2011), Article 35 Section 10, Leave Without Pay (LWOP), and memo for established phone numbers and unplanned leave.*

15. The complainant claims that, Melonie, an ICU Registered Nurse was a Similarly Situated Employee that was treated more favorably that she was when her Leave Without Pay was denied.  Melanie was not terminated when she attended nursing school and was allowed to work 1 time per month observing cardiac monitors.  When Melanie was absent from work she was not terminated even though she couldn't have worked full time.  For this reason she was discriminated against because of her disability.

    *I have no knowledge of a "Melonie."*

16. What is Melonie's last name? *I have no knowledge of a "Melonie."*

17. What was Melonie's position and grade? *N/A*

18. Where did Melonie fall in your chain of command? *N/A*

19. What is Melonie's sex? *N/A*

Affiant's Initials:   CD   Date:  3/8/18

230

**9** | P a g e

20. What is Melonie's age?  *N/A*

21. Does Melonie have a disability? *N/A*

22. Do you believe Melonie is a Similarly Situated Employee? *N/A*

23. What was your justification for not terminating Melonie under the above circumstances? *N/A*

24. The complainant claims that two <u>young males</u> were hired to replace her position because they would not have pregnancy issues.  How do you respond?

    *Two vacancies for the Medical Instrument Technician position have been filled since the complainants termination. One vacancy was filled by a male and the other by a female.*

25. Was the complainant's  disability of **being infertile a** factor when this occurred?

    *The complainant did not state that s/he had a disability.*

26 Was the complainant's **age** a factor when this occurred? *I am not aware of the complainants age.*

    a.  If yes, please explain how?

27 Was the complainant's **sex** a factor when this occurred? *I am not aware of the complainants sex. The complainant referred to self as a female.*

    b.  If yes, please explain how?

28 Was the complainant's **disability** a factor when this occurred? *The complainant did not state that s/he had a disability.*

    c.  If yes, please explain how?

29 Did you discriminate against the complainant because of her **age, race or disability** when this occurred? *No*

Affiant's Initials:___CD_____     Date:__3/8/18_____

231

10 | P a g e

30 Did the complainant tell you that he felt that she was being discriminated when this occurred? *Do not understand the question; specifically what "this" is referring to.*

31 If yes, when? *N/A*

32 What was discussed and what was the outcome of the discussion? *N/A*

33 Do you have anything to offer the complainant in resolution of this claim?

*The complainant was terminated during probationary status as a result of not following proper leave policies and procedures.*

34 Is there anything else pertinent to these specific events that we have not discussed?

*The complainant's AWOL status negatively impacted patient care and delayed completion of the complainants orientation. Staff morale is negatively affected as a result of a coworker not showing up for scheduled tours.*

*The complainant signed, was given a copy of, and verbalized understanding of MCM 05-11 Title 5 Duty and Leave Policy, MCM 05-8 Tours of Duty, and MCM 05-48 Employee Courtesy and Conduct, and a memo for established phone numbers and unplanned leave on April 18, 2017 (see supporting documentation).*

*The complainant was notified on multiple occasions the process to appropriately request leave for an extended period of time and that the unit level management team did not have the approval to grant such leave.*

**PLEASE NOTE THAT ORM RESERVES THE RIGHT TO SUPPLEMENT OR ASK ADDITIONAL QUESTIONS AS THE INVESTIGATION REQUIRES.**

**The above information has been furnished without a pledge of confidence and I understand that it may be shown to any interested party[ies] with a need to know for this complaint. This includes but is not limited to VA, EEOC, contracting officials with a need to know during the course and scope of the informal and formal EEO process including administrative procedures and litigation as applicable and mandated by law.**

This statement is made under penalty of perjury on this __8TH__ day of __March__, 2018.

__Carla Dunkelberger, RN MSN MBA__
Carla Dunkelberger

**Hayo, Dennis (ORM)**

| | |
|---|---|
| **From:** | Dunkelberger, Carla |
| **Sent:** | Monday, March 12, 2018 2:01 PM |
| **To:** | Hayo, Dennis (ORM) |
| **Cc:** | Dunkelberger, Carla |
| **Subject:** | RE: EEO Claim TD CD |

Please see below.

Carla Dunkelberger, RN, MSN, MBA
Nurse Manager, 5D Telemetry
Raymond G. Murphy VA Medical Center
Office (505) 265-1711 ext 4617
Cell (505) 269-5035





Integrity, Commitment, Advocacy,
Respect, Excellence

**From:** Hayo, Dennis (ORM)
**Sent:** Thursday, March 08, 2018 8:02 PM
**To:** Dunkelberger, Carla <Carla.Dunkelberger@va.gov>
**Subject:** EEO Claim TD CD
**Importance:** High

RE: Drevaleva EEO Claim #103883

Good Evening Dr. Dunkelberger,

I have a couple of more questions for you to clarify the claim. You may simply answer on this email. Please remember you are still under oath.

QUESTIONS:

233

1. **You testified that you told the complainant that she did not qualify for FMLA due to less than 1 year service and would need to complete an OPM71 and provide medical documentation in English and would need to be submitted to the Assistant Director of Patient Care Services prior to leaving for Russia.  You told the  complainant that you could not approve the request.  The complainant verbalized that she understood.  When was this?** *April 18, 2017 and May 15, 2017*

2. **When was the first date that the complainant was AWOL after this above conversation?** *May 21, 2017*

3. **Did the complainant ever tell you that she felt she was being discriminated against?** *No*

4. **If yes, when and what was discussed?** *N/A*

Thank you for assistance.

Regards,

*Dennis G. Hayo*

Dennis G. Hayo,
EEO Investigator
Department of Veterans Affairs
Office of Resolution Management
William Moorhead Federal Building
1000 Liberty Avenue, Suite 1801
Pittsburgh, PA 15222
202-657-9217

234

1

In the matter of:                    )
                                     )
TATYANA DREVALEVA,                   )
                                     )
          Complainant,               )
                                     )Case No.
    vs                               )200P-0501-2017103883
                                     )
DEPARTMENT OF VETERANS               )
AFFAIRS, NEW MEXICO VA HEALTH )
CARE SYSTEM,                         )
                                     )
          Respondent.                )
_____)


## REPORTER'S TRANSCRIPT OF
## EXAMINATION OF DR. TINA PRINCE


Transcription of proceedings in the above entitled
cause of the telephonic examination of DR. TINA PRINCE,
before EEO INVESTIGATOR DENNIS HAYO, at 11:30 a.m.,
MST, on March 15, 2018.


Reported by:  Shannon L. Marcos, C.S.R. 8348


PETERSON REPORTING VIDEO & LITIGATION SERVICES

2

1                        PROCEEDINGS

2

3            INVESTIGATOR HAYO:  We are now on the record.

4            Today is the 15th day of March 2018.  It is

5      2:31 p.m., Eastern Standard Time.  I am Dennis Hayo and

6      I'm an EEO investigator with the Department of Veterans

7      Affairs, Office of Resolution Management.  I will be

8      recording the testimony of Dr. Tina Prince, T-i-n-a,

9      last name P-r-i-n-c-e, in the matter of a complaint of

10     discrimination filed by Tatyana Drevaleva.  I'll spell

11     first name T-a-t-y-a-n-a.  Last name D-r-e-v-a-l-e-v-a.

12     Against the New Mexico VA Health Care System.  The

13     complaint number is 200P-0501-2017103883.

14           Dr. Prince, do you solemnly swear or affirm

15     that the information given in response to the following

16     questions is true and complete to the best of your

17     knowledge and belief?

18           THE WITNESS:  I do.

19           INVESTIGATOR HAYO:  Please note that this oath

20     is issued without a pledge of confidence.  This means

21     that parties with the need no know will have access to

22     other information contained within this investigative

23     report.

24           It should be noted that to the extent you use

25     names of employees or other witnesses, including

**3**

1    veterans and beneficiaries, this investigator will

2    redact the names and substitute an identifier before

3    making the transcript part of the EEO file to the

4    fullest extent possible.

5            Would you like a copy of your affidavit to

6    review and to keep as part of your record with respect

7    to this complaint?

8            THE WITNESS:  Yes.

9            INVESTIGATOR HAYO:  Do you have a

10   representative?

11           THE WITNESS:  No.  I am in my office alone.

12           INVESTIGATOR HAYO:  Is it okay to proceed?

13           THE WITNESS:  Yes.

14           INVESTIGATOR HAYO:  The accepted claims under

15   investigation are:

16           A.  Whether complainant was discriminated

17   against based on age, sex (female), and disability when

18   from through May 18th, 2017, complainant was terminated

19   during her probationary period.

20           And B.  Whether complainant was discriminated

21   against based on age, sex (female), and disability when

22   on June 30th, 2017, complainant was terminated during

23   her probationary period.

24

25

PETERSON REPORTING VIDEO & LITIGATION SERVICES

237

4

1                    EXAMINATION

2    BY INVESTIGATOR HAYO:

3        Q    **Dr. Prince, please identify the VA facility**

4    **where you are presently employed?**

5        A    I work at the New Mexico VA Health Care System

6    in Albuquerque, New Mexico.

7        Q    **How long have you been employed there?**

8        A    From March 5th, 2016 to present.

9        Q    **What unit or section of the facility do you**

10   **work in?**

11       A    I'm a Pentad member reporting to the director.

12       Q    **When you say "Pentad," what does Pentad mean?**

13       A    That is the five associate directors that

14   report to our director.  It's the Executive Leadership

15   Team.

16       Q    **Please identify your position and grade at the**

17   **facility where you're employed.**

18       A    I am the Associate Director of Patient Care

19   Services, Nurse Executive.  I am a Nurse 5, Step 6.

20       Q    **Where does Carla Dunkelberger fall in your**

21   **chain of command?**

22       A    She is the nurse manager of an acute care

23   telemetry unit and she falls under Raneta, R-a-n-e-t-a,

24   Bonin, B-o-n-i-n, who is the Chief Nurse of Acute Care

25   Nursing Service.  Raneta reports to me.

PETERSON REPORTING VIDEO & LITIGATION SERVICES

238

5

1    **Q**    **And did you have a working relationship with**

2  **the complainant Tatyana Drevaleva?**

3    A    No, sir.

4    **Q**    **Was the complainant in your chain of command?**

5    A    She would have fallen in my chain of command

6  as an employee of by detailing the medical telemetry

7  unit with nurse manager Carla Dunkelberger.  So she is

8  in my chain of command, yes.

9    **Q**    **What is your sex?**

10    A    Female.

11    **Q**    **When did you first become aware of the**

12  **complainant's sex?**

13    A    I don't remember.  I don't even -- I don't

14  remember.

15    **Q**    **What is your month and year of birth?**

16    A    May 1959.

17    **Q**    **Are you aware of the complainant's age?**

18    A    No, sir.

19    **Q**    **Are you aware of the complainant's disability**

20  **she describes as being infertile to the point of**

21  **needing in vitro fertilization?**

22    A    No, sir.  This is the first I have seen that

23  information.

24    **Q**    **In regards to the claim -- I'm going to go**

25  **ahead and read the claim again just to refresh your**

6

1   **memory.  Okay?**

2       A      Hello?

3       **Q      Go ahead.**

4       A      Okay.

5       **Q      All right.  The complaint reads:**

6            A.  Whether complainant was discriminated

7   against based on age, sex (female), and disability,

8   when from May 18th, 2017, complainant was terminated

9   during her probationary period.

10           And B.  Whether complainant was discriminated

11  against based on age, sex (female), and disability,

12  when on June 30th, 2017, complainant was terminated

13  during her probationary period.

14           Please identify the individual responsible for

15  terminating the complainant.  And that would be the

16  management official from the VA responsible for

17  terminating.

18      A      Yes, sir.  That would be myself.

19      **Q      Okay.**

20      A      The nurse manager completed -- the nurse

21  manager compiled the evidence packet, was reviewed by

22  our HR advisors, and concurred by her chief nurse.  And

23  then --

24      **Q      Okay.  Can I stop you for a moment, please?**

25      A      Yes.  Yes.

240

7

1    Q    Your nurse manager, again, could you just --

2    A    Carla.  Carla Dunkelberger.

3    Q    Okay.

4    A    And she would receive concurrence from the

5    acute care chief nurse Raneta Bonin.

6    Q    Okay.

7    A    I don't know -- I don't remember who the HR

8    advisors were that reviewed the packet.  We have

9    several teams that work with us, and I have no

10   recollection of which one it was.

11        I do know we do not issue a termination

12   without HR reviewing and advisement.  That is a

13   standard.

14   Q    Okay.  I'm going to --

15   A    Can I ask you -- can we go off the record a

16   minute?

17   Q    Yes.  We're now off the record.

18        (Off the record.)

19   BY INVESTIGATOR HAYO:

20   Q    The complainant claims that in May 2017, she

21   told Mrs. Dunkelberger that she wanted to have children

22   but was running out of time because she was 50 years

23   old.  She told Mrs. Dunkelberger that she planned to go

24   to Russia for an in vitro fertilization attempt.

25   Mrs. Dunkelberger's face expressed she was very much

8

1    unpleased.  And Ms. Dunkelberger told her, according to

2    FMLA she would have to work for the VA Medical Center

3    for 12 months to be eligible for leave without pay.

4         She told Ms. Dunkelberger that she could not

5    wait for 12 months because it was her turn for a free

6    IVF attempt in Russia.

7         Mrs. Dunkelberger requested a copy of her

8    medical records confirming her intention to perform

9    IVF.  She told Ms. Dunkelberger that she would request

10   the medical documents from her Russian OB-GYN.

11   Ms. Dunkelberger stated she needed the documents prior

12   to her departure.

13        On May 17th, 2017, Ms. Dunkelberger was out of

14   the office.  She told assistant manager Phil Johnson

15   the same thing she told Mrs. Dunkelberger.  She told

16   him on May 17th, 2017, she received the Russian medical

17   documents which were written in Russian.  She had only

18   three hormonal pills left and she would start bleeding

19   if she did not go to Russia.  There was no time to

20   translate the medical documents.  Mr. Johnson told her

21   that she needed to go -- that she needed to go and she

22   should go if she needed to go.

23        She told Mr. Johnson that she would provide

24   him with the translated documents as soon as she got to

25   Russia and Mr. Johnson agreed.  She told Mr. Johnson

PETERSON REPORTING VIDEO & LITIGATION SERVICES

242

9

1    that a Russian coworker could translate the documents

2    until she could get an official translation.

3           She filled out a request for leave without pay

4    form for the period of May 18th, 2017 through July 7th,

5    2017, and slipped it under Ms. Dunkelberger's door

6    since she was not in the office.

7           On May 30th, 2017, she emailed, from Russia,

8    her Russian OB-GYN medical documentation of her need

9    for IVF in the English language.  She received no

10   response.

11          When she left, she did not know if her request

12   for leave without pay would be approved or denied by

13   Mrs. Dunkelberger.

14          On July 3rd, 2017, she received a termination

15   letter.  This was the first time she found her leave

16   without pay request had been denied.

17          Ms. Dunkelberger mailed the termination letter

18   to her home in New Mexico instead of emailing it to

19   Russia.

20          Justification provided in the termination

21   letter was that she was on probation period -- she was

22   on probation during this period and had attendance

23   issues.

24          What was your role in the circumstances

25   surrounding this event?

**10**

1    A    My role would have been to review the evidence

2    packet with Ms. Dunkelberger and Ms. Bonin and to

3    concur with the requested termination.

4    **Q    Okay.  What was your justification for your**

5    **actions when these events occurred and the complainant**

6    **was terminated?**

7    A    From what I remember, the evidence packet was

8    pretty solid as far as the AWOLs, the attempt to

9    contact, the letters sent to the only address we had,

10   because our HR requires we send certified letters to

11   the address of record.  That was completed with no

12   response; and therefore, I supported the request for

13   termination during probation.

14   **Q    Did you discuss the termination with the**

15   **complainant prior to her being terminated?**

16   A    No, sir.

17   **Q    Besides the HR person that you've already**

18   **identified or you could not remember, was there**

19   **anybody, any other manager, besides Ms. Dunkelberger,**

20   **was there any other manager that you discussed this**

21   **with?**

22   A    No, sir.

23   **Q    Do you believe that the policies and**

24   **procedures regarding termination were followed by the**

25   **facility and agency in this particular circumstance?**

PETERSON REPORTING VIDEO & LITIGATION SERVICES

244

**11**

1    A    Yes.

2    **Q    Was the complainant's disability of being**

3    **infertile a factor when this occurred?**

4    A    No.  I had no knowledge that that was her

5    concern that she was missing work for.

6    **Q    Was the complainant's age a factor when this**

7    **occurred?**

8    A    No, sir.  I have no idea what her age is.

9    **Q    Was the complainant's sex a factor when this**

10   **occurred?**

11   A    No, sir.

12   **Q    Did you discriminate against the complainant**

13   **because of her age, race, sex, or disability?**

14   A    No, sir.

15   **Q    Did the complainant tell you that she felt she**

16   **was being discriminated against when this occurred?**

17   A    No, sir.  I've never had a conversation with

18   this employee -- former employee.

19   **Q    Do you have anything to offer the complainant**

20   **in resolution of this claim?**

21   A    No, sir.

22   **Q    Is there anything else pertinent to the**

23   **specific events that we have not discussed that you**

24   **would like to discuss now?**

25   A    No, sir.

PETERSON REPORTING VIDEO & LITIGATION SERVICES

245

12

1          INVESTIGATOR HAYO:  We can go off the record.

2          (Whereupon the proceedings were adjourned at

3          11:47 a.m., Mountain Standard Time.)

4

5

6

7

8

9

10                      *    *    *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PETERSON REPORTING VIDEO & LITIGATION SERVICES

246

**13**

1    I, SHANNON L. MARCOS, Certified Shorthand Reporter for

2    the State of California, do hereby certify:

3

4    That the foregoing interview under oath was reported by

5    me stenographically and later transcribed into

6    typewriting under my direction; that the foregoing is a

7    true record of the proceedings taken at that time.

8

9

10

11    Dated:  This _____ day of _____ 2018 at Prescott,

12    Arizona.

13

14

15

16

17    _____

18    SHANNON L. MARCOS

19    CSR No. 8348

20

21

22

23

24

25

PETERSON REPORTING VIDEO & LITIGATION SERVICES

247

14

1                                       ERRATA SHEET

2

3    In the matter of:                    )
                                          )
4    TATYANA DREVALEVA,                   )
                                          )
5             Complainant,                )
                                          )Case No.
6        vs                               )200P-0501-2017103883
                                          )
7    DEPARTMENT OF VETERANS               )
     AFFAIRS, NEW MEXICO VA HEALTH        )
8    CARE SYSTEM,                         )
                                          )
9             Respondent.                 )
     _____)

10

11   INTERVIEW OF:  DR. TINA PRINCE

12   I have reviewed the transcript of my testimony.  I wish
     to make the following corrections/changes:

13

14   PAGE      LINE      CORRECTION

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____              _____


PETERSON REPORTING VIDEO & LITIGATION SERVICES

248

15

1      I, DR. TINA PRINCE, declare under penalty of

2   perjury that the foregoing is true and correct; that I

3   have read my interview under oath and have made the

4   necessary corrections, additions, or changes to my

5   answers that I deem necessary.

6      Executed on this_____day of _____,

7   2018.

8

9

10

11

12            _____

13                  DR. TINA PRINCE

14

15

16

17

18

19

20

21

22

23

24

25

**PETERSON REPORTING VIDEO & LITIGATION SERVICES**

249



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**William S. Moorhead Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh, PA 15222**

Written Affidavit of **Clifford Speakman** in the Matter of the EEO Complaint of
Discrimination of discrimination filed by **Tatyana Dreyaleva**

| | |
|---|---|
| Tatyana Dreyaleva ) | |
| 10660 Hidden Mesa Pl. ) | |
| Monterey, CA 93940 ) | |
| ) | |
| ) | |
| Complainant ) | |
| ) | |
| v. ) | Case No: 200P-0501-2017103883 |
| ) | |
| David Shulkin, Secretary ) | |
| Department of Veterans Affairs ) | |
| 810 Vermont Avenue, NW ) | |
| Washington, DC 20420 ) | |
| ) | |
| Respondent ) | |
| ) | |
| ) | |
| ) | |

Facility:    New Mexico VA Healthcare Center
             1501 San Pedro Drive, S.E.
             Albuquerque, NM 87108

---

**The accepted claim(s) under investigation are:**

A. **Whether Complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, complainant was terminated during her probationary period.**

B. **Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

Affiant's Initials: _CB_   Date: _3/2/18_

**2 |** P a g e

I, **Clifford Speakman**, solemnly swear/affirm that the responses and documents I provide in response to the following questions are true and complete to the best of my knowledge and belief.

Please write your full legal name.

**Please answer the following questions:**

1. Please identify the VA facility where you are employed.

Albuquerque NMVAHCS

2. For what period of time have you been employed there?
October 18, 2015

3. What unit or section of the facility do you work in?
Employee Relations

4. Please identify your position and grade at the facility where you are employed.
Employee Relations Specialist GS-12

5. Please describe your working relationship with the complainant, Tatyana Dreyaleva, during that period.
Do not know Tatyana Dreyaleva

6. Where did the complainant fall in your chain of command?
Employee Relations Specialist

7. What is the complainant's position and grade?
Medical Instrument Technician GS-07

Affiant's Initials: _____  Date: 3/2/18

8. Was the complainant a probationary employee?
Yes

   a. If yes, please explain the dates of her probationary employment and what
      probationary employment means.
Station Entrance on Duty was April 2, 2017, and was terminated on June 30, 2017.
Probationary period is 1 year

9. What unit or section is the complainant assigned to?
Nursing Servive

10. What is your sex?
Male

11. When did you first become aware of the complainant's sex?
3/1/2018

12. How did you become aware of the complainant's sex?
I reviewed the record on 3/1/2018

13. What is your month and year of birth?
Year is 1963 You have no need for Month

14. When did you first become aware of the complainant's age?
When I reviewed the record 3/1/2018

15. How did you become aware of the complainant's age?
Stated in record

16. Do you have a disability?
Yes

      a. If yes, would you like to share your disability for the record?
   No

17. Are you aware of the complainant's disability she describes as being **infertile to the
point of needing In Vitro Fertilization**?
No

      a. If yes, please describe your knowledge of **her disability of being
infertile**?

---

Affiant's Initials: _____   Date: 3/2/18

4 | Page

18. How and when did you become aware of the complainant's disability?
When I reviewed record 3/1/2018

19. How long has the complainant had this disability?
Unknown to me

20. How long is it expected to continue?
Unknown to me

21. Please describe which of complainant's normal life functions, to your knowledge that was substantially limited because of her disability.
Unknown to me

22. Please describe in detail how the normal life functions identified above were substantially limited by the complainant's impairment/disability.
Unknown to me

23. Did the complainant use medication and/or assistive devices for his disability? If yes,
    a. Identify and describe their purpose.
Unknown to me

24. To your knowledge did the complainant's medication and/or assistive devices affect any of the complainant's normal life functions? If yes,

    a. Describe the normal life function.
Unknown to me

25. Describe the degree to which the function is affected.
Unknown to me

26. Was the complainant able to perform the essential duties of her position?
Unknown to me

27. If not, please identify the duty or duties the complainant was unable to perform.
Unknown to me

28. Indicate how the disability impacted accomplishing these duties.
Unknown to me


29. Have you received training on EEO policy and procedure?

No

Affiant's Initials: _____   Date: 3/2/18

000134

253

30. If yes, when?
N/A

**A. Whether Complainant was discriminated against based on age, sex (female) and disability, when from May 18, 2017, complainant was terminated during her probationary period.**

**B. Whether complainant was discriminated against based on age, sex (female) and disability, when on June 30, 2017, complainant was terminated during her probationary period.**

1. Please identify the individual responsible for terminating the complainant?

2. The complainant claims that in May 2017 she told Ms. Dunkelberger that she wanted to have children but was running out of time because she was 50 years old. She told Ms. Dunkelberger that she planned to go to Russia for an IVF attempt. Ms. Dunkelberger's face expressed she was very much unpleased and Ms. Dunkelberger told her that according to FMLA she would have to work for the VAMC for 12 months to be eligible for leave without pay. She told Ms. Dunkelberger that she could not wait for 12 months because it was her turn for a free IVF attempt in Russia. Ms. Dunkelberger requested a copy of her medical records confirming her intention to perform an IVF. She told Ms. Dunkelberger that she would request the medical documents from her Russian OB/GYN. Ms. Dunkelberger stated she needed the documents prior to her departure. On May 17, 2017 Ms. Dunkelberger was out of the office. She told Assistant Manager, Phil Johnson, the same thing she told Ms. Dunkelberger. She told him on May 17, 2017 she received the Russian medical documents which were written in Russian. She only had 3 hormonal pills left and she would start bleeding if she did not go to Russia. There was no time to translate the medical documents. Mr. Johnson told her that if she needed to go she should go. She told Mr. Johnson that she would provide him with a translated document as soon as she got to Russia and Mr. Johnson agreed. She told Mr. Johnson that a Russian co-worker could translate the document until she could get an official translation. She filled out a Request for Leave Without Pay form for the period from May 18, 2017 through July 7, 2017 and slipped in under Ms. Dunkelberger's door, since she was not in the office. On May 30, 2017 she emailed, from Russia, her Russian OB/GYN medical documentation of her need for IVF in the English language. She received no response. When she left she did not know if her Request for Leave Without Pay would be approved or denied by Ms. Dunkelberger. On July 3, 2017 she received a termination letter. This was the first time she found her Leave Without Pay Request had been denied. Ms. Dunkelberger mailed the termination letter to her home in NM instead of emailing it to her in Russia. The justification provided in the termination letter was

Affiant's Initials: _____ Date: 3/2/18

254

that she was on probationary period and attendance issues. What was your role and the circumstances surrounding this event?

None

3. Did you discuss this with the complainant?

No

4. If yes, when?

N/A

5. What was discussed?

N/A

6. What was the outcome of the discussion?

N/A

7. Did you discuss this with Ms. Dunkelberger?

No

8. If yes, when was it discussed?

N/A

9. What was discussed?

N/A

10. Did you discuss this with Mr. Johnson?

No

11. If yes, when was it discussed?

N/A

12. What was discussed?

N/A

13. What policy or regulation supports terminating the complainant in these circumstances?  (Please provide that policy to the investigator for the record).

Affiant's Initials: _____   Date: 3/2/18

MCM-05-11, MCM 05-8 and MCM 05-48

14. Where the Agency and Facility policies regarding termination followed in this instance?

Agency web page in the MCM library
   a. If no, please explain why?
N/A

15. Did you discriminate against the complainant because of her **age, race or disability** when this occurred?
**No**

16. Did the complainant tell you that he felt that she was being discriminated when this occurred?
No

17. If yes, when?
N/A

18. What was discussed and what was the outcome of the discussion?

**Unknown to me**

19. Do you have anything to offer the complainant in resolution of this claim?
No

20. Is there anything else pertinent to these specific events that we have not discussed?
No

**PLEASE NOTE THAT ORM RESERVES THE RIGHT TO SUPPLEMENT OR ASK ADDITIONAL QUESTIONS AS THE INVESTIGATION REQUIRES.**

**The above information has been furnished without a pledge of confidence and I understand that it may be shown to any interested party[ies] with a need to know**

**8 | Page**

for this complaint. This includes but is not limited to VA, EEOC, contracting officials with a need to know during the course and scope of the informal and formal EEO process including administrative procedures and litigation as applicable and mandated by law.

This statement is made under penalty of perjury on this 2 day of *March*, 2018.

Clifford Speakman



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**William S. Moorhead Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh, PA 15222**

# SUPPLEMENTAL AFFIDAVIT

Written Affidavit of **Clifford Speakman** in the Matter of the EEO Complaint of
Discrimination of discrimination filed by **Tatyana Dreyaleva**

| | |
|---|---|
| Tatyana Dreyaleva )<br>10660 Hidden Mesa Pl. )<br>Monterey, CA 93940 )<br>)<br>)<br>Complainant )<br>)<br>v. )<br>)<br>David Shulkin, Secretary )<br>Department of Veterans Affairs )<br>810 Vermont Avenue, NW )<br>Washington, DC 20420 )<br>)<br>Respondent )<br>)<br>)<br>)<br>) | Case No: 200P-0501-2017103883 |

Facility:    New Mexico VA Healthcare Center
             1501 San Pedro Drive, S.E.
             Albuquerque, NM 87108

_____

**The accepted claim(s) under investigation are:**

   **A.** Whether Complainant was discriminated against based on age, sex
(female) and disability, when from May 18, 2017, complainant was
terminated during her probationary period.

   **B.** Whether complainant was discriminated against based on age, sex
(female) and disability, when on June 30, 2017, complainant was
terminated during her probationary period.

Affiant's Initials: _____    Date: 3/9/18

2 | Page

I, **Clifford Speakman**, solemnly swear/affirm that the responses and documents I provide in response to the following questions are true and complete to the best of my knowledge and belief.

**Please fully answer the following questions:**

1. What is the Agency's justification for terminating the complainant?

Absent Without Leave

2. Who was responsible for terminating the complainant?

Service request the action/Due to the employee being on Trial/Probation the HRO approves the action.

3. What specific Agency/Facility policy supports termination in instances such as this?

Title 5 Leave Policy MCM 05-11 / Tours of duty MCM 05-8 /
Employee courtesy and Conduct MCM 05-48

4. Where the Agency/Facility policy's followed when this termination occurred?

Yes

5. Is there anything else you would like to add?

No

**PLEASE NOTE THAT ORM RESERVES THE RIGHT TO SUPPLEMENT OR ASK ADDITIONAL QUESTIONS AS THE INVESTIGATION REQUIRES.**

**The above information has been furnished without a pledge of confidence and I understand that it may be shown to any interested party[ies] with a need to know for this complaint. This includes but is not limited to VA, EEOC, contracting officials with a need to know during the course and scope of the informal and formal EEO process including administrative procedures and litigation as applicable and mandated by law.**

This statement is made under penalty of perjury on this ___9___ day of ___March___, 2018.

_____
Clifford Speakman

Affiant's Initials: ___CS___   Date: 3/9/18



| PROFESSIONAL OVERSIGHT FTEE | | | | | | | |
|---|---|---|---|---|---|---|---|
| CLINICS | TOTAL RN/LPN/NA/HT/NP/CNS/CRNA | RN | LPN | NA/HT | NP | CNS | CRNA |
| Anesthesia | 22.00 | 7.00 | 0.00 | 3.00 | 0.00 | 0.00 | 12.00 |
| BHCL | 152.25 | 79.75 | 16.00 | 45.00 | 10.00 | 1.50 | 0.00 |
| Education Svc | 4.00 | 4.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Emergency Svc | 6.00 | 0.00 | 0.00 | 0.00 | 6.00 | 0.00 | 0.00 |
| Geriatrics | 85.50 | 62.50 | 7.00 | 16.00 | 0.00 | 0.00 | 0.00 |
| Imaging | 2.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 |
| Integrated Care | 12.00 | 9.00 | 2.00 | 1.00 | 0.00 | 0.00 | 0.00 |
| Medicine Svc | 67.00 | 48.00 | 5.00 | 5.00 | 9.00 | 0.00 | 0.00 |
| Neurology | 2.50 | 1.50 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 |
| Path & Lab Svc | 13.00 | 0.00 | 0.00 | 13.00 | 0.00 | 0.00 | 0.00 |
| PM&R | 2.00 | 0.00 | 0.00 | 0.00 | 2.00 | 0.00 | 0.00 |
| Research | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SCI/D | 62.50 | 34.50 | 2.00 | 26.00 | 0.00 | 0.00 | 0.00 |
| Surgical Svc | 64.50 | 34.50 | 2.00 | 26.00 | 0.00 | 0.00 | 0.00 |
| TOTAL AUTH FTEE | 496.25 | 282.75 | 34.00 | 156.00 | 31.00 | 1.50 | 12.00 |

000141

*(handwritten: AD 6/28/17)*

**Department of**
**Veterans Affairs**

# Memorandum

Date: **October 26 2015**

From: ACNS, Nursing Service (118)

Subj: Nursing Service Call-Off Procedure

To: All Nursing Service Staff

Thru: Nurse Managers

Effective 15 November 2015, the following procedure must be adhered to when the need for unplanned leave arises and it is necessary for you to call off for a shift:

Requests for leave must be communicated directly with your Nurse Manager* or Assistant Nurse Manager,* during regular hours (Monday to Friday from 0800 to 1530). If your Nurse Manager or Assistant Nurse Manager is not available, you may call you the Off Tour Supervisor* @ 505-265-1711 ext 2090 and request leave.

During all other hours (15:31 to 07:59, and on weekends and holidays), call offs/requests for unplanned leave are accepted by the Off Tour Nursing Supervisors** as follows:

1. As soon as the employee knows he or she needs to call off, they will contact the Nursing Supervisor office at 505-265-1711 ext. 2090.
   a. Requests submitted via other methods or calling any number other than ext. 2090, may not be received, which will result in the employee being marked as Absent Without Leave (AWOL). AWOL is a non-pay status that covers an absence from duty which has not been approved. (www.opm.gov/policy-data-oversight/employee-relations//reference-materials/.)
   b. It is not acceptable to text a leave request to a Manager or Supervisor.
   c. Requests for leave will be accepted from individuals other than the employee *only* if the employee is incapacitated (documentation may be required).
   d. Overhead paging the night supervisor or contacting them thru the emergency pager in order to request leave is unacceptable, has a negative impact on patient care, and may result in disciplinary action.
   e. Failure to request a specific type of leave will result in AWOL.

2. When extension 2090 is answered, an employee may request Sick Leave (SL), Family Care (CB), or unplanned Annual Leave (AL) for emergency purposes only.
   a. Requests for CB are appropriate when an employee is caring for a family member who has a condition which would qualify for SL.
   b. Requests for AL in lieu of SL or CB, are subject to supervisory approval as stated in Master Agreement, 2011, Article 35, Section 4, paragraph G.
   c. If extension 2090 is not answered, the employee may leave a voice message requesting SL or CB. Employee must request a specific type of leave and a specific time duration of the leave. Appropriate SL, and CB, requests submitted via voice message can be assumed to be approved.

**2105**
VA FORM
MAR 1989

**261**

*CP 6/28/17*

2.

Memorandum: Nursing Service Call-Off Procedure

> d. Requests for AL (Unplanned leave or Serious Personal Needs Situations) must be requested directly with the Off Tour Supervisor. (AFGE Master Agreement, Article 35, Section 2, paragraphs C. 2 and 3.) Voice messages requesting AL for emergency purposes are not appropriate.
> e. In all cases, the approval of a leave request is subject to Nurse Manager/Nursing Off Tour Supervisor discretion, and all current VA leave usage policies and agreements.

3. Leave Without Pay (LWOP) is an approved temporary non-pay status and absence from duty. Requests must be submitted using form OPM-71, and must be approved by the Service Chief. (MCM 05-1, Attachment A, and MCM 05-11, Attachment A.) Telephonic requests for LWOP cannot be granted by Nurse Managers or Nursing Off Tour Supervisors. Failure to submit a written request for LWOP, from the employee to the Service Chief, will result in AWOL.

4. Upon discovery that a leave request cannot be supported by the employee's leave balance, the request will be annotated as AWOL until an appropriate request is entered by the employee; subject to approval by unit *management* and/or the Service Chief. It is an employee responsibility to be aware of their current leave balance.

O/S

_____

Cynthia Nuttall, PhD
Associate Chief, Nursing Service

* Nurse Manager/Assistant Nurse Manager phone numbers: Carla: **505-269-5035,** Joseph: **505-250-1787**, Phil: **505-933-3591** or **505-265-1711** ext. **4617/2668** (Monday - Friday). In the event the nurse manager or assistant nurse manager is unavailable, you may call the Off Tour Supervisor at **505-265-1711** ext. **2090** and request leave.

** Off Tour Nursing Supervisor phone number: **505-265-1711 ext. 2090** during all other hours (i.e. 15:31 to 07:59, weekends, and holidays).

I acknowledge receipt of this notification on the date indicated below.

*TATYANA GREVALEVA*

_____
Print Name

_____          *04. 18. 2017*
Signature                                      Date



# АГЕНТСТВО ПЕРЕВОДОВ МОНОТОН
# MONOTON TRANSLATION AGENCY

[Stamp] State Budgetary Public Health Care Institution of Novosibirsk Oblast
Clinical Centre of Family Health Care and Reproduction
Outpatient Department
14 Kievskaya St., Novosibirsk

**State Budgetary Public Health Care Institution of Novosibirsk Oblast Clinical Centre for Planned Parenthood and Reproduction**
14 Kievskaya St., Novosibirsk-136, 630136

06 July 2017

## Medical Assessment Report

Name: Tatyana Patronymic: Evgenyevna Surname: Drevaleva
Date of birth 13/10/1966

Received a medical advice on _____

Diagnosis: Primary infertility of combined genesis
T.E. Drevaleva currently is put in the registry for providing a program of in vitro fertilization at the expense of the compulsory medical insurance. The queue code number is 147.
According to the Order of the Ministry of Health of the Russian Federation No 107н dd. 30/08/2012 on Arrangements for the Use of Assisted Reproductive Technologies, Contraindications and Limitations to their Use, the patient T.E. Drevaleva currently has limitations for using the in vitro fertilization program and require additional follow-up examination.

Head of the Outpatient Department of the Clinic [Signature] M.P. Oparina
Head of the Reproductive Health Department [Signature]

[Seal] State Budgetary Public Health Care Institution of Novosibirsk Oblast
Clinical Centre of Family Health Care and Reproduction
Outpatient Department
For references
Novosibirsk, Russia

I, Denis Aleksandrovich Adamov, certify that I am fluent in the English and Russian languages, and that the above document is an accurate translation of the document entitled «Medical Assessment Report».



Public Government-Financed Institution of Public
Health of Novosibirsk Region
"Clinical Center for the Protection of Family
Health and Reproduction"
Out-Patient Department
Kievskaya str., 14
Novosibirsk

## EXTRACT FROM THE MEDICAL HISTORY

DREVALEVA, TATYANA EVGENIEVNA, DOB October 13, 1966

DREVALEVA T.E. is included in the registry for carrying out the extracorporal fertilization procedure according to the Territorial Program of Compulsory Health Insurance.

An approximate term of entering the extracorporal fertilization program from May 23, 2017 to September 31, 2017.

| | | |
|---|---|---|
| Attending Doctor | I.B. Dzutseva | (Signature) |
| Out-Patient Department Head | M.P. Oparina | (Signature) |

May 17, 2017

/Seal: Public Government-Financed Institution of Public Health of Novosibirsk Region "Clinical Center for the Protection of Family Health and Reproduction"/

I, Asya Sergeyevna Pisareva, Director of Translation Bureau, Limited Liability Company – State Registration Certificate Series 54 Number 004157325 State registration number 1095404006720 dd. March 19, 2009, residing in Novosibirsk, Russia, hereby certify that the foregoing is, to the best of my knowledge and belief, a true and accurate English translation of the Russian document made by Eleonora Aleksandrovna Pyltseva, an official translator of the English and Russian languages.

ASYA SERGEYEVNA PISAREVA

*Translation Bureau, Limited Liability Company*
*Suite 606, 57 K.Marx Pr., Novosibirsk, Russia*
*Tel./fax: (383) 210-57-39*
*e-mail: BNTI@narod.ru*

264

QD 6/28/17

## Dunkelberger, Carla

| | |
|---|---|
| **From:** | Tatyana Drevaleva <tdrevaleva@gmail.com> |
| **Sent:** | Tuesday, May 30, 2017 9:05 AM |
| **To:** | Dunkelberger, Carla; Phil Johnson |
| **Subject:** | [EXTERNAL] Translated document. |
| **Attachments:** | img237.jpg |

I picked up the translated document only today.


--
Respectfully,
Tanya.

1

265

*Q2 6/28/17*

Public Government-Financed Institution of Public
Health of Novosibirsk Region
"Clinical Center for the Protection of Family
Health and Reproduction"
Out-Patient Department
Kievskaya str., 14
Novosibirsk

## EXTRACT FROM THE MEDICAL HISTORY

### DREVALEVA, TATYANA EVGENIEVNA, DOB October 13, 1966

DREVALEVA T.E. is included in the registry for carrying out the extracorporal fertilization procedure according to the Territorial Program of Compulsory Health Insurance.

An approximate term of entering the extracorporal fertilization program from May 23, 2017 to September 31, 2017.

| Attending Doctor | I.B. Dzutseva | (Signature) |
| Out-Patient Department Head | M.P. Oparina | (Signature) |

May 17, 2017

/Seal: Public Government-Financed Institution of Public Health of Novosibirsk Region "Clinical Center for the Protection of Family Health and Reproduction"/

I, Asya Sergeyevna Pisareva, Director of Translation Bureau, Limited Liability Company – State Registration Certificate Series 54 Number 004157325 State registration number 1095404006720 dd. March 19, 2009, residing in Novosibirsk, Russia, hereby certify that the foregoing is, to the best of my knowledge and belief, a true and accurate English translation of the Russian document made by Eleonora Aleksandrovna Pyltseva, an official translator of the English and Russian languages.

*ASYA SERGEYEVNA PISAREVA*

*Translation Bureau, Limited Liability Company*
*Suite 605, 57 K.Marx Pr., Novosibirsk, Russia*
*Tel./fax: (383) 210-57-39*
*e-mail: BNTI@narod.ru*

266



# Associate Director/Patient Care Services
## Acute Care Service

As of Oct 06, 2017

**Equipment Integration Specialist**
1.00 GS 0301-11 #10421-O
1.00 FTEE

**Administration Business Manager**
1.00 GS 0512-12 #500250
1.00 FTEE

**Secretary**
1.00 GS 318-6 # 50132
1.00 FTEE

**Admin Asst (NPSB)**
1.00 GS303-06 #502760
1.00 FTEE

**Admin Asst**
3.00 GS303-07 #501120
3.00 FTEE

**Supply Technician**
1.00 GS2005-6 #5225
1.00 FTEE

21.50 Professional Prac. Total FTEE

### PROFESSIONAL PRACTICE

**Chief Nurse Professional Practice**
1.00 RN VN 610
1.00 FTEE

**VANAP Professional Dev NM**
1.00 RN VN610
0.50 FTEE
(OAA funds .50 VA funds .50)

****VANAP Faculty**
6.00 RN VM610
0.00 FTEE
(OAA funds 6.00)

**Nurse Recruiter**
1.00 RN VN 610
1.00 FTEE

**Program Specialist (EDU)**
1.00 GS301-9 #502800
1.00 FTEE

**PSA (Student Coord)**
1.00 GS303-07 #500860
1.00 FTEE

**Clinical Care Outcomes**
3.00 RN VN610 - Wound Care
2.00 RN VN610 - PI Coord.
1.00 RN VN610 - BCMA Coord.
1.00 RN VN610 - SPH/F Coord.
2.00 RN VN610 - Clin. Nurse Spec.
1.00 RN VN610 Diabetic Educator
10.00 FTEE

### ACUTE CARE

**Chief Nurse, Acute Care Services**
1.00 RN VN 610
1.00 FTEE

**3A**
36.50 RN VN610
3.40 MSA GS679-5
19.00 NA GS 621-5 #5227A
58.90 FTEE

**5D**
29.30 RN VN610
2.80 MSA GS679-5
15.50 NA GS 621-5 #5227A
3.00 LPN GS620 -5/6/7
5.00 Med. Inst. Tech. GS-0649-07
55.60 FTEE

**5A**
33.40 RN VN610
3.00 MSA GS679-5
28.50 NA GS621-5 #5227A
3.00 LPN GS620-5/6/7
67.90 FTEE

**ED**
35.00 RN VN610
15.00 HT GS640-6 #10285A
5.00 MSA GS679-5
9.50 NA GS621-5 #5227A
64.50 FTEE

377.70 Acute Care Total FTEE

**SDU**
30.40 RN VN610
2.40 MSA GS679-5
7.50 NA GS621-5 #5227A
40.30 FTEE

**MICU**
30.60 RN VN610
3.00 MSA GS679-5
4.00 NA GS 621-5 #5227
37.60 FTEE

**SICU**
23.70 RN VN610
2.20 MSA GS679-5
5.00 HT GS640-5 #4037A
1.00 NA GS 621-5 #5227
2.00 RN VN610 - Homeless Prog
1.00 APRN VN16 - Homeless Prog
1.00 LPN GS620-5/6/7 Homeless Prog
35.90 FTEE

**Patient Flow**
1.00 RN (NM) VN610
5.00 RN (NOD) VN610
1.00 RN VN610 Transfer Coord.
7.00 RN VN610 Utilization Mgmt.
2.00 RN VN610 Discharge Planners
16.00 FTEE

### PERIOPERATIVE

**Chief Nurse, Perioperative**
1.00 RN VN610 - NM
1.00 FTEE

**OR**
30.90 RN VN610
3.00 ST GS640-7 #50111A (ASC)
7.00 HT GS640-7 #4947A
5.00 NA GS621-5 #5227A
1.00 PSC GS 303-05 # 2813
1.00 Supply Tech GS 2005-7 #500230
1.00 Med. Inst. Tech. GS-0649-07
48.90 FTEE

**PACU/ASU**
22.00 RN VN610
5.00 MSA GS679-5
27.00 FTEE

76.90 Perioperative Total FTEE

### STERILE PROCESSING

1.00 Nurse Mgr (Chief, SPS) VN 0610-00/00
1.00 FTEE

1.00 Secretary (OA) GS0318-5 #5160
1.00 Staff Nurse (RME Coord) VN610
1.00 Med. Supply Tech (QA) GS-0622-07 #502750
3.00 FTEE

1.00 Supv. Inv. Mgmt Spec. GS-2010-11 #5050
2.00 Supv. Inv. Mgmt Spec. GS-2010-09 #50135A
1.00 Supv. Med. Supply Tech GS-0622-07 #4916A
2.00 Lead Med. Supply Tech GS-0622-07 #5002A
30.00 Med. Supply Tech GS-0622-05 #4528A
36.00 FTEE

40.00 Sterile Processing Total FTEE

### FTEE TOTALS

1.00 Equipment Integration Specialist
21.50 Administration
377.70 Acute Care
76.90 PeriOperative
**477.10 Acute Care Svc TOTAL**

Nurse Executive — Date

Chief, HRMO — Date

Associate Director, Patient Care Services — Date

Associate Director — Date

Director — Date

**PROFESSIONAL OVERSIGHT FTEE**

| CLINICS | TOTAL RN/LPN/NA/HT/NP/CNS/CRNA | RN | LPN | NA/HT | NP | CNS | CRNA |
|---|---|---|---|---|---|---|---|
| Anesthesia | 22.00 | 7.00 | 0.00 | 3.00 | 0.00 | 0.00 | 12.00 |
| BHCL | 153.25 | 79.75 | 16.00 | 45.00 | 10.00 | 1.50 | 0.00 |
| Education Svc | 4.00 | 4.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Emergency Svc | 6.00 | 0.00 | 0.00 | 0.00 | 6.00 | 0.00 | 0.00 |
| Geriatrics | 85.50 | 62.50 | 7.00 | 16.00 | 0.00 | 0.00 | 0.00 |
| Imaging | 2.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 |
| Integrated Care | 12.00 | 9.00 | 2.00 | 1.00 | 0.00 | 0.00 | 0.00 |
| Medicine Svc | 67.00 | 48.00 | 5.00 | 5.00 | 9.00 | 0.00 | 0.00 |
| Neurology | 2.50 | 1.50 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 |
| Path & Lab Svc | 13.00 | 0.00 | 0.00 | 13.00 | 0.00 | 0.00 | 0.00 |
| PM&R | 2.00 | 0.00 | 0.00 | 0.00 | 2.00 | 0.00 | 0.00 |
| Research | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SCI/D | 62.50 | 34.50 | 2.00 | 26.00 | 0.00 | 0.00 | 0.00 |
| Surgical Svc | 64.50 | 34.50 | 2.00 | 26.00 | 2.00 | 0.00 | 0.00 |
| TOTAL AUTH FTEE | 496.25 | 282.75 | 34.00 | 135.00 | 31.00 | 1.50 | 12.00 |

000148

Memorandum 05-34                                    Attachment B

Department of Veterans Affairs
New Mexico VA Health Care System
Albuquerque, New Mexico
**Functional Statement Signature Page**

Position Title: Medical Instrument Technician (EKG)
Series/Grade: GS-0649-07
Position Location: 5D Telemetry – Nursing Service

_Ashelberger, RN MSN MBA_                    3/21/17
Supervisor                                   Date

_Allean R Bonin, MSN/RN_                      3/21/2017
Service Chief                                 Date

**Functional Statement Review (Certification of Accuracy)**

_____              _____
Supervisor Signature                 Date

_____              _____
Supervisor Signature                 Date

_____              _____
Supervisor Signature                 Date

**Human Resources Reviewer:**
FLSA: _____   Exempt: _____   Non-Exempt:
_____
BUS Code: _____   CLC: _____
Supervisory Level: _____
Sensitivity Level: _____ (Non-Sensitive): _____ (Non Critical Sensitive): _____
(Critical): _____ (Special): _____
Position Risk Determination: _____
Drug Testing: Yes or No

"2013 Functional Statement Signature Page"          Rev. 05/2013

B-1

268

**New Mexico VA Health Care System**
**Albuquerque, New Mexico**
**Nursing Service**

**Medical Instrument Technician (Electrocardiograph Technician), GS-0649-07**

**Functional Statement**

Employee Name (Print): _____

Signature: _____ Date: _____

**General Description of Assigned Duties:**
The Medical Instrument Technician (MIT) position is located in the Telemetry Unit within the Nursing Service Line at the New Mexico VA Health Care System. The MIT's functions are to monitor the patient's electrocardiogram (EKG) waveforms in a centralized station and notify the appropriate clinical staff as directed. The employee must be willing to work cooperatively as a member of the inpatient team and demonstrate customer service principles in all aspects of work. The MIT will perform job duties independently and in accordance with established departmental and hospital procedures, including telemetry monitoring and patient care-related tasks. The MIT reports to the Telemetry Unit Nurse Manager, but must work in collaboration with all members of the patient care team.

**Duties and Responsibilities:**
This represents the full performance level. Medical instrument technicians (MIT) at this level operate and monitor electrocardiographic equipment. They monitor tracings to identify arrhythmias and when gross abnormalities appear, and when to get the immediate attention of a nurse. They evaluate and determine appropriate, correct machine adjustments. This includes adapting equipment and accessories to yield the best results. They edit and select an appropriate sample portion of the tracing for further interpretation by a nurse and/or further diagnosis by the provider.

The technician provides continuous cardiac rhythm interpretation and reporting of monitor tracing of patients to appropriate clinical staff. The technician performs cardiac monitoring activities that include initiating, monitoring, recording, interpreting, documenting, and discontinuing telemetry. Other MIT duties include, but are not limited to the following:

269

- Continuously monitors electrocardiogram (EKG) tracings.
- Be skilled in interpreting a variety of normal and abnormal EKG tracings and communicates the information to appropriate clinical staff
- Recognizes changes in patients' condition and is astute in identifying the need for intervention
- Performs 12-Lead EKGs
- Has practical knowledge of treatment procedures
- Has knowledge of medical terminology, cardiac conditions, effects of medical and nursing therapies
- Operates and monitor EKG equipment
- Has knowledge of equipment, materials, and supplies, used to perform telemetry
- Maintains patient cardiac rhythm tracing record and other accompanying documentation
- Edits and selects appropriate sample portions of tracing for review by provider
- Sets alarm parameters established by the provider
- Follows emergency procedures
- Routinely evaluates the integrity of equipment both prior to placement on patient and during the patient's telemetry monitoring
- Maintains and keeps track of telemetry equipment as patients are discharged and transferred
- Evaluates patients for discharge from telemetry in collaboration with providers
- Performs supplemental downtime duties which may include additional patient care tasks

**Age, Development, and Cultural Needs of Patients Requirements:**
Provides appropriate, age-specific care for patients ranging in age from 17 through the geriatric years. The position requires the incumbent to possess or develop an understanding of the particular needs of different types of patients. Sensitivity to the special needs of all patients in respect to age, developmental requirements, and culturally related factors must be consistently achieved.

**Supervisory Controls:**
The Medical Instrument Technician is administratively and clinically responsible to the Telemetry Unit Nurse Manager and/or assigned designee. The MIT's supervisor or designee provides assignments, indicating generally what is to be done, quantity expected, deadlines, and priority of assignments. The supervisor or designee provides additional, specific instructions for new, difficult, or unusual assignments including suggested work methods or advice on the availability of source materials. The Medical Instrument Technician uses initiative in carrying out the recurring work duties independently, referring only problems and unfamiliar situations not covered by instructions to the supervisor or designee for help. The supervisor or designee assures

270

that finished work is accurate and in compliance with instructions and established procedures.

**Qualification Requirements:**

Basic Requirements for Grade Determination:

- **A. Citizenship**: Citizen of the United States
- **B. English Language Proficiency:** MITs must be proficient in spoken and written English as required by 38 U.S.C. 7402(d) and 7407(d).
- **C. Experience**: At least 1 year of experience comparable to the next lower grade level which demonstrates the knowledge, skills, abilities, and other characteristics related to the duties of the positions to be filled. This would be experience which provided knowledge of the equipment, standard tests and procedures, and typical readings including arrhythmias and abnormalities. In addition, the candidate must demonstrate the following Knowledge, Skills, and Abilities:

1. Knowledge of typical patient reactions and signs of distress including the ability to recognize, report potentially lethal arrhythmias.
2. Knowledge of common equipment settings and standardized procedures plus knowledge of common errors and corrective measures.
3. Knowledge of universal precautions and sterilization techniques and ability to follow CDC guidelines in cleaning equipment.
4. Demonstrates the skills and knowledge required to serve as a facility expert in all aspects of EKG monitoring and equipment.
5. Demonstrates the skills and knowledge to support the Heart Station by independently performing exercise stress tests and Holter monitoring.
6. Ability to monitor the patient for adverse reactions and take appropriate action.
7. Ability to modify procedures/positions to obtain the correct results for patients with complicated medical conditions.
8. Ability to act as a mentor or preceptor to lower graded technicians.
9. Ability to conduct in-service training on the EKG monitoring and equipment and related instrumentation.
10. Ability to maintain Basic Life Support (BLS) and Advanced Cardiac Life Support (ACLS) certifications.
11. Ability to maintain Telemetry Certification (as defined at the unit level).

**Customer Service:**

Meets the needs of customers while supporting VA missions.

Routinely identifies the customer's situation properly and performs the tasks required to resolve the customer's questions/issues accurately and in a timely manner. Follows up as necessary to ensure a satisfactory resolution. Consistently responds to customer

requests for assistance promptly and in a friendly and professional manner. Listens to customer feedback, positive and/or negative, and acts to resolve matters/situations within his/her control. Questions/issues not within the employee's control are referred in a timely manner appropriate staff able to assist with the situation. Meets customer expectations in most cases as determined through established customer surveys or other appropriate feedback systems.

In most instances, provides verbal and/or written information in a timely manner to customers that is thorough and correct, using clear and precise communication methods to ensure customers understand. Provides the customer with consistent information according to the established policies and procedures. Recognizes the value of individuals as evidence by supportive and cooperative interactions.

Consistently communicates and treats customers (Veterans, their representatives, visitors, and all VA staff) in a courteous, tactful, and respectful manner that is responsive to the customer's needs. Handles conflict and problems in dealing with the customer constructively and appropriately. Demonstrates the ability to adjust to change or work pressure in a pleasant and constructive manner. Handles differences of opinion in a professional, businesslike fashion as an effective team member through active participation in working towards team objectives and assisting in group effort.

Applies concepts of customer relation and advocacy. Participates in and promotes customer service programs.

**Confidentiality and Security:**
Maintains IT security at all times. Protects printed and electronic files containing sensitive data in accordance with provisions of the Privacy Act of 1974 and other applicable laws, Federal regulations, VA statutes and policy, and VHA policy. Protects the data from unauthorized release or from loss, alteration, or unauthorized deletion. Follows applicable regulations and instructions regarding access to computerized files, release of access codes, etc.

**Compliance:**
Assesses compliance with Joint Commission (JC) and other program review criteria that governs service and ensures that requirements are in place and functioning properly as evidenced by both internal and external reviews. Demonstrates participation and knowledge in the facility's Compliance and Business Integrity Program to prevent violations of the law as well as maintaining high ethical standards.

272

**Green Environmental Management System (GEMS):**

The New Mexico Veterans Affairs Health Care System, Environment of Care Guideline facilitates the use of the Green Environmental Management Systems (GEMS) to attain continual improvement in environmental programs.  VHA has adopted the International Organization for Standardization (ISO) 14001, Environmental Management Systems – Requirements with Guidelines for Use, as the standard for the GEMS program.  Thus, the policies and procedures of this guideline are in conformance with ISO 14001.  MITs are familiar with and comply with GEMS policies and procedures applicable to the position of Medical Instrument Technician (Electrocardiograph Technician), GS-0649-05 and the Telemetry Unit.

273

**Malone, Karla (ORM)**

| | |
|---|---|
| **From:** | Shafer, Amy V. |
| **Sent:** | Monday, November 20, 2017 2:23 PM |
| **To:** | Malone, Karla (ORM) |
| **Cc:** | Rincon, Donald M. |
| **Subject:** | FW: Request for documents |
| **Signed By:** | amy.shafer@va.gov |

Please see the email below in the Tatyana Drevaleva complaint, case number 200P-0501-2017103883.

**From:** Dunkelberger, Carla
**Sent:** Monday, November 20, 2017 11:13 AM
**To:** Shafer, Amy V. <Amy.Shafer@va.gov>
**Cc:** Rincon, Donald M. <Donald.Rincon@va.gov>; Salazar-Ruiz, Andrew V. <Andrew.Salazar-Ruiz@va.gov>; Bonin, Allean R. <AlleanRanetta.Bonin@va.gov>; Dunkelberger, Carla <Carla.Dunkelberger@va.gov>
**Subject:** RE: Request for documents

I would like to add the following to #6.

- On April 18, 2017 Ms. Drevaleva signed for, was given a copy of, and verbalized understanding of MCM 05-11 Title 5 Duty and Leave Policy, MCM 05-8 Tours of Duty, MCM 05-48 Employee Courtesy and Conduct, and a memo for established phone numbers and unplanned leave.
- Ms. Drevaleva was sent a Leave Request Clarification Memo on June 12, 2017 letting her know her request for leave without pay was disapproved and that she needed to contact her supervisor to appropriately request leave.

Carla Dunkelberger, RN, MSN, MBA
Nurse Manager, 5D Telemetry
Raymond G. Murphy VA Medical Center
Office (505) 265-1711 ext 4617
Cell (505) 269-5035





Integrity, Commitment, Advocacy,
Respect, Excellence

1

274

**From:** Dunkelberger, Carla
**Sent:** Monday, November 20, 2017 10:43 AM
**To:** Shafer, Amy V. <Amy.Shafer@va.gov>
**Cc:** Rincon, Donald M. <Donald.Rincon@va.gov>; Dunkelberger, Carla <Carla.Dunkelberger@va.gov>; Salazar-Ruiz, Andrew V. <Andrew.Salazar-Ruiz@va.gov>; Bonin, Allean R. <AlleanRanetta.Bonin@va.gov>
**Subject:** RE: Request for documents

1. Organizational chart – see attached
2. Breakdown of organizational unit for position in question (Medical Instrument Technician). EEO categories unknown.
   a. Tatyana Drevaleva, Medical Instrument Technician, GS-649-07, full time.
   b. Nadzeya Das, Medical Instrument Technician. GS-0649-06, full time.
   c. David Williams, Medical Instrument Technician. GS-0649-06, full time.
   d. David Trujillo, Medical Instrument Technician, GS-0649-05, full time
   e. Vacant Position, Medical Instrument Technician, GS-0649, full time.
3. Functional Statement – see attached
4. If complainant's position subsequently filled… – As of today, November 20, 2017, this position has not been filled.
5. Summary data on leave use… - As of today, November 20, 2017, there have been no time and attendance issues for those employees in the Medical Instrument Technician role with the exception of the complainant Ms. Drevaleva.
6. Documentation of any counseling provided concerning leave usage. – As of today, November 20, 2017, I have not issued any "counseling" to the complainant or other Medical Instrument Technicians concerning leave usage.
7. Complainants time and attendance or leave records… - I no longer have access to this information. I would suggest contacting Payroll or HR.

Carla Dunkelberger, RN, MSN, MBA
Nurse Manager, 5D Telemetry
Raymond G. Murphy VA Medical Center
Office (505) 265-1711 ext 4617
Cell (505) 269-5035





Integrity, Commitment, Advocacy,
Respect, Excellence

2

275

**From:** Shafer, Amy V.
**Sent:** Friday, November 17, 2017 4:06 PM
**To:** Salazar-Ruiz, Andrew V. <Andrew.Salazar-Ruiz@va.gov>
**Cc:** Dunkelberger, Carla <Carla.Dunkelberger@va.gov>; Rincon, Donald M. <Donald.Rincon@va.gov>
**Subject:** FW: Request for documents
**Importance:** High

I received an out of office from Carla – not sure how long she will be gone(???) Can you help with this?

**From:** Shafer, Amy V.
**Sent:** Friday, November 17, 2017 2:51 PM
**To:** Dunkelberger, Carla <Carla.Dunkelberger@va.gov>
**Cc:** Rincon, Donald M. <Donald.Rincon@va.gov>
**Subject:** Request for documents
**Importance:** High

Good afternoon,

The Office of Resolution Management (ORM) is requesting the documents listed on the attachment in the Tatyana Drevaleva complaint, case number 200P-0501-2017103883.

Please send the documents to the EEO office as soon as possible.

Thank you.
Amy

3

276

Standard Form 52

## REQUEST FOR PERSONNEL ACTION

**PART A - Requesting Office** *(Also complete Part B, Items 1, 7-22, 32, 33, 36 and 39.)*

| 1. Action Requested | 2. Request Number |
|---|---|
| Recruitment | ARPA: 2339204 |

| 3. For Additional Information Call (Name and Telephone Number) | 4. Proposed Effective Date |
|---|---|
| AVILA, MARY E    EXT. (505) 265-1711 x2037 | 10/18/2016 |

277

# Medical Instrument Technician (EKG)

DEPARTMENT OF VETERANS AFFAIRS

Veterans Affairs, Veterans Health Administration

## Overview

**Open & closing dates**
🕐 11/16/2016 to 01/04/2017

**Salary**
$40,040 to $52,052 per year

**Pay scale & grade**
GS 07

**Work schedule**
Full-Time - Full Time

**Appointment type**
Permanent

## Locations

5 vacancies in the following location:

**Albuquerque, NM**
5 vacancies

**Relocation expenses reimbursed**
No

## This job is open to

 **The public**
U.S. citizens, nationals or those who owe allegiance to the U.S., and excepted service employees.

**Announcement number**
ABQ-16-768-WJB-1850730-BU

**Control number**

456522000

# Duties

## Summary

VA encourages persons with disabilities to apply. The health related positions in VA are covered by Title 38, and are not covered by the Schedule A excepted appointment authority.

## Responsibilities

**Nursing Service is seeking 5 Medical Instrument Technician (MIT) (EKG) to join the team!** The MIT position is located in the Telemetry Unit within the Nursing Service Line at the New Mexico VA Health Care System. The MIT's functions are to monitor the patient's electrocardiogram (EKG) waveforms in a centralized station and notify the appropriate clinical staff as directed. The employee must be willing to work cooperatively as a member of the inpatient team and demonstrate customer service principles in all aspects of work. The MIT will perform job duties independently and in accordance with established departmental and hospital procedures, including telemetry monitoring and patient care-related tasks. The MIT reports to the Telemetry Unit Nurse Manager, but must work in collaboration with all members of the patient care team.

**Work Schedule:** Rotating Shifts
**Functional Statement Title /#:** Medical Instrument Technician (EKG) /N/A
**Fair Labor Standards Act:** Non-Exempt
**Bargaining Unit Status Code:** 1272

## Travel Required

Not required

## Supervisory status

No

## Who May Apply

### This job is open to...

United States Citizens

Questions? This job is open to 1 group.

## Job family (Series)

0649 Medical Instrument Technician
(https://www.usajobs.gov//Search/?j=0649)

# Requirements

## Conditions Of Employment

- Must pass pre-employment examination
- Must be proficient in written and spoken English
- Designated and-or Random Drug Testing required
- Background and-or Security Investigation required

- Selective Service Registration is required for males born after 12/31/1959.

**Physical Requirements:** VA Handbook 5005/15, Part II, Appendix G27, Medical Instrument Technician Qualification Standards. This can be found in the local Human Resources Office.

## Qualifications

### Basic Requirements

- **Citizenship:** Be a citizen of the United States.
- **English Language Proficiency:** Medical Instrument Technicians must be proficient in spoken and written English.
- **Education:** There are no specific educational requirements for this occupation. Education may be substituted for experience only at the GS-4 and GS-5 levels.

Experience refers to paid and unpaid experience, including volunteer work done through National Service programs (e.g., Peace Corps, AmeriCorps) and other organizations (e.g., professional; philanthropic; religions; spiritual; community; student; social). Volunteer work helps build critical competencies, knowledge, and skills and can provide valuable training and experience that translates directly to paid employment. You will receive credit for all qualifying experience, including volunteer experience.

### Grade Determinations:

**GS-7 Experience.** At least 1 year of experience comparable to the next lower grade level which demonstrates the knowledge, skills, abilities, and other characteristics related to the duties of the positions to be filled. This would be experience which provided knowledge of the equipment, standard tests and procedures, and typical readings including arrhythmias and abnormalities. In addition, the candidate must demonstrate the following KSAs: (No Education Substitute)

1. Knowledge of typical patient reactions and signs of distress including the ability to recognize, report and treat potentially lethal arrhythmias.

2. Knowledge of common equipment settings and standardized procedures plus knowledge of common errors and corrective measures.

3. Ability to modify procedures/positions to obtain the correct results with patients with complicating conditions such as amputations, Parkinson's disease, structural defects, and scar tissue.

4. Ability to act as a mentor or preceptor to lower graded technicians.

5. Ability to conduct in-service training on the EKG equipment and related instrumentation.

**References:** VA Handbook 5005/15, Part II, Appendix G27, Medical Instrument Technician Qualification Standards. This can be found in the local Human Resources Office.

## Education

**Note:** Only education or degrees recognized by the U.S. Department of Education from accredited colleges, universities, schools, or institutions may be used to qualify for Federal employment. You can verify your education here: http://ope.ed.gov/accreditation/
(http://ope.ed.gov/accreditation/)
. If you are using foreign education to meet qualification requirements, you must send a Certificate of Foreign Equivalency with your transcript in order to receive credit for that education.

## Additional information

It is the policy of the VA to not deny employment to those that have faced financial hardships or periods of unemployment.
This job opportunity announcement may be used to fill additional vacancies.
This position is in the Excepted Service and does not confer competitive status.

In Accordance with VA Handbook 5383 (VA Drug-Free Workplace Program) Applicants tentatively selected for VA employment in a testing designated position are subject to urinalysis to screen for illegal drug use prior to appointment. Applicants who refuse to be tested will be denied employment with VA.

## How You Will Be Evaluated

IN DESCRIBING YOUR EXPERIENCE, PLEASE BE CLEAR AND SPECIFIC. WE MAY NOT MAKE ASSUMPTIONS REGARDING YOUR EXPERIENCE.

Your application, résumé and/or supporting documentation will be verified.  Please follow all instructions carefully. Errors or omissions may affect consideration for employment.

**NOTE:** The Professional Standards Board (a peer-review group) will recommend the grade and salary for new appointments.

## Background checks and security clearance

### Security clearance

Other
(https://www.usajobs.gov//Help/faq/job-announcement/security-clearances/)

# Required Documents

All applicants are **required** to submit the following supporting document type(s):
·Other (VA Form 10-2850c Application for Associated Health Occupations )
·Resume

Applicants may also submit the following supporting document type(s),which may not be required for all applicants:

·Cover Letter
·DD-214
·OF-306
·Other Veterans Document
·SF-15
·SF-50
·Transcript

**VA Form 10-2850c** - Application for Associated Health Occupations **(required)**. (Available at the VA Forms Website: http://www.va.gov/vaforms/search_action.asp?FormNo=10-2850&tkey=&Action=Search (http://www.va.gov/vaforms/search_action.asp?FormNo=10-2850&amp;tkey=&amp;Action=Search) )

Please use this checklist (http://www.va.gov/OHRM/joblistings/applicantchecklist.pdf)

to make sure you have included other documents required for your application, such as a copy of your transcript (if using education to qualify), documentation to support Veterans Preference claims, etc. You will not be contacted for additional information.

**Veterans' Preference:** When applying for Federal Jobs, eligible Veterans should claim preference for 5pt (TP), or 10pt (CP/CPS, XPP, XP), or for Sole Survivor Preference (SSP), on the Occupational Questionnaire in the section(s) provided. A legible copy of your DD214(s) indicating character of service, disability certification, SF-15 (if claiming 10 pt. preference) or if you are currently serving on active duty and expected to be released or discharged within 120 days;

documentation related to your active duty service which reflects the dates of service, character of service (honorable, general, etc.), or dates of impending separation. Documentation is required for eligibility verification.

**Faxing Applications or Supporting Documents:** You are encouraged to apply online. Applying online will allow you to review and track the status of your application. If you are unable to apply online or unable to upload your supporting documents to your online application, follow the directions located at the following site: Fax Options (http://www.va.gov/OHRM/joblistings/FaxOptions.doc)
. The Vacancy ID of the job opportunity announcement is 1850730.

**NOTE:** If you applied online and your application is complete, do not fax the paper application (1203-FX) as this will overwrite your prior online responses and may result in you being found ineligible.

## If you are relying on your education to meet qualification requirements:

You **MUST** submit a copy of your transcript if you want to substitute your education for experience. If you claim qualifications based on education, and do not submit a transcript, your education will not be used in making a qualification determination and you may be found "**not qualified**".

Education must be accredited by an accrediting institution recognized by the U.S. Department of Education in order for it to be credited towards qualifications. Therefore, provide only the attendance and/or degrees from schools accredited by accrediting institutions recognized by the U.S. Department of Education. (http://www.ed.gov/admins/finaid/accred/)

Failure to provide all of the required information as stated in this vacancy announcement may result in an ineligible rating or may affect the overall rating.

# Benefits

A career with the U.S. Government provides employees with a comprehensive benefits package. As a federal employee, you and your family will have access to a range of benefits that are designed to make your federal career very rewarding.

- Benefits for federal employees
  (https://www.usa.gov/benefits-for-federal-employees#item-36407)
- Healthcare insurance
  (https://www.opm.gov/healthcare-insurance/)
- Pay and leave
  (https://www.usajobs.gov/Help/working-in-government/pay-and-leave/)

VA offers a comprehensive benefits package. This link provides an overview of the benefits currently offered: http://www.vacareers.va.gov/why-choose-va/benefits/index.asp (http://www.vacareers.va.gov/why-choose-va/benefits/index.asp)
.

**Receiving Service Credit for Earning Annual (Vacation) Leave:** Federal Employees earn annual leave at a rate (4, 6 or 8 hours per pay period) which is based on the number of years they have served as a Federal employee.

Eligibility for benefits depends on the type of position you hold and whether your position is full-time, part-time, or intermittent. Contact the hiring agency for more information on the specific benefits offered.

# How to Apply

**All applicants are encouraged to apply online.**

**To apply for this position**, you must complete the View Occupational Questionnaire (https://ApplicationManager.gov/Questionnaire.aspx?ID=5911235&PreviewType=Questionnaire)

000163

and submit the documentation specified in the Required Documents section below.

The complete application package must be submitted by 11:59 PM (EST) on Wednesday, January 04, 2017 to receive consideration.

1.  To begin, click **Apply Online** to create a USAJOBS account or log in to your existing account. Follow the prompts to select your USAJOBS resume and/or other supporting documents and complete the occupational questionnaire.

2.  Click **Submit My Answers** to submit your application package.

<u>NOTE</u>:  It is your responsibility to ensure your responses and appropriate documentation is submitted prior to the closing date.

To verify your application is complete, log into your USAJOBS account, https://my.usajobs.gov/Account/Login
(https://my.usajobs.gov/Account/Login)
, select the Application Status link and then select the more information link for this position. The Details page will display the status of your application, the documentation received and processed, and any correspondence the agency has sent related to this application.  Your uploaded documents may take several hours to clear the virus scan process.

To return to an incomplete application, log into your USAJOBS account and click Update Application in the vacancy announcement.  You must re-select your resume and/or other documents from your USAJOBS account or your application will be incomplete.

## Agency contact information

👤 Whitney Balaskovits

### Phone

(505)256-2760
(tel:///(505)256-2760)

### Email

WHITNEY.BALASKOVITS@VA.GOV
(mailto:WHITNEY.BALASKOVITS@VA.GOV)

Learn more about this agency
(#agency-modal-trigger)

### Address

VHA New Mexico HCS Albuquerque
DVA New Mexico VA Health Care System
HR Management Service 05
Albuquerque, NM

Vacancy Identification Number (VIN): 1850730

**OUR MISSION**: To fulfill President Lincoln's promise – "To care for him who shall have borne the battle, and for his widow, and his orphan" – by serving and honoring the men and women who are America's Veterans. How would you like to become a part of a team providing compassionate care to Veterans?

Failing to submit any documentation listed under the "Required Documents" tab by the closing date may result in loss of consideration.
Recruitment/Relocation incentives are NOT authorized for this position.

**\*\*\* MACINTOSH (APPLE) COMPUTER USERS – IT IS RECOMMENDED THAT YOU CONTACT THE AGENCY ENSURE YOUR DATA HAS BEEN SAVED**

## Next steps

After we receive application packages (including all required documents) and the vacancy announcement closes, we will review applications to ensure qualification and eligibility requirements are met. During our review, if your résumé and application package do not support your questionnaire answers, we will adjust your rating accordingly. After the review is complete, a referral certificate(s) is issued and applicants will be notified of their status by email (if provided); otherwise, applicants will receive a notification letter via the U.S. Postal Service. Referred applicants will be notified as such and may be contacted directly by the hiring office for an interview. All referred applicants receive a final notification once a selection decision has been made.

You may check the status of your application at any time by logging into your USAJOBS account and clicking on "Application Status." For a more detailed update of your status, click on "more information." Information regarding applicant notification points
(https://help.usajobs.gov/index.php/Why_have_I_not_heard_anything_back_after_applying%3F_How_long_does_it_take_to_hear_from_an_agency_after_I_have_applied%3F)

(https://help.usajobs.gov/index.php/Why_have_I_not_heard_anything_back_after_applying%3F_How_long_does_it_take_to_hear_from_an_agency_after_I_have_applied%3F)

can be found in the USAJobs Resource Center.
(https://help.usajobs.gov/index.php/Why_have_I_not_heard_anything_back_after_applying%3F_How_long_does_it_take_to_hear_from_an_agency_after_I_have_applied%3F)

# Fair & Transparent

The Federal hiring process is setup to be fair and transparent. Please read the following guidance.

## Equal Employment Opportunity Policy

The United States Government does not discriminate in employment on the basis of race, color, religion, sex (including pregnancy And gender identity), national origin, political affiliation, sexual orientation, marital status, disability, genetic information, age, membership in an employee organization, retaliation, parental status, military service, or other non-merit factor.

- Equal Employment Opportunity (EEO) office at OPM
  (https://www.opm.gov/about-us/our-people-organization/support-functions/equal-employment-opportunity/)
- Office of Equal Opportunity
  (http://www.eeoc.gov/eeoc/internal_eeo/index.cfm)

## Reasonable Accommodation Policy

Federal agencies must provide reasonable accommodation to applicants with disabilities where appropriate. Applicants requiring reasonable accommodation for any part of the application and hiring process should contact the hiring agency directly. Determinations on requests for reasonable accommodation will be made on a Case-by-Case basis.

A reasonable accommodation is any change in the workplace or the way things are customarily done that provides an equal employment opportunity to an individual with a disability. Under the Rehabilitation Act of 1973 the Equal Employment Opportunity Commission (EEOC) must provide reasonable accommodations:

- An applicant with a disability needs an accommodation to have an equal opportunity to apply for a job.
- An employee with a disability needs an accommodation to perform the essential job duties or to gain access to the workplace.
- An employee with a disability needs an accommodation to receive equal access to benefits, such as details, training, and office-sponsored events.
- Disability Employment - Reasonable Accommodations
  (https://www.opm.gov/policy-data-oversight/disability-employment/reasonable-accommodations/)

- How to contact an agency
  (https://www.usajobs.gov//Help/how-to/application/agency/contact/)

## Legal and regulatory guidance

Financial suitability
(https://www.usajobs.gov//Help/working-in-government/fair-and-transparent/financial-suitability/)

Social security number request
(https://www.usajobs.gov//Help/working-in-government/fair-and-transparent/social-security-number/)

Privacy Act
(https://www.usajobs.gov//Help/working-in-government/fair-and-transparent/privacy-act/)

Signature & False statements
(https://www.usajobs.gov//Help/working-in-government/fair-and-transparent/signature-false-statements/)

Selective Service
(https://www.usajobs.gov//Help/working-in-government/fair-and-transparent/selective-service/)

New employee probationary period
(https://www.usajobs.gov//Help/working-in-government/fair-and-transparent/probationary-period/)

AL 6/28/17

| REPORT OF CONTACT | VA OFFICE | IDENTIFICATION NOS. (C,XC,SS,XSS,V,K, etc.) |
|---|---|---|
| NOTE: This form must be filled out in ink or on typewriter as it becomes a permanent record in veterans' folders. | NMVAHCS | |

| ST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)* | DATE OF CONTACT |
|---|---|
| evaleva, Tatyana | April 18, 2017 |

| DRESS OF VETERAN | TELEPHONE NO. OF VETERAN |
|---|---|
| | |

| RSON CONTACTED | TYPE OF CONTACT   *(Check)* |
|---|---|
| | ☒ PERSONAL   ☐ TELEPHONE |

| DDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED |
|---|---|
| | |

**RIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN**

atyana Drevaleva told me that she needs to go to Russia in a few months for 4-6 weeks to "make an embryo." She stated she nly had a few months worth of medication she needed to be on to help her to be able to "make an embryo." Then, after she has aved up enough money she would need to go back to Russia as she would be hiring a serrogate to have a child for her. At this me I explained to her that I would not be able to approve her request at my level of authority due to the length of time she was equesting and that Dr. Prince, Associate Director of Patient Care Services would be the one to approve or deny her request. I xplained to her that she does not qualify for FMLA at this time because she has less than 1 year of service. In order to request eave she would need to complete an OPM 71 and provide supporting medical documentation. She stated her doctor was in Russia and that she could ask him to write a letter for her but it would be in Russian. I explained to her that the documenation would need to either written in English or be translated from Russian to English. I also talked to her about possibly finding a doctor in town that may be able to provide her with medical documentation and medication in the event she was not able to get an approved leave of absence until later. Ms. Drevaleva verbalized understanding of the proper procedure to request leave.

| DIVISION OR SECTION | EXECUTED BY *(Signature and Title)* | |
|---|---|---|
| Nursing | Carla Dunkelberger, NM | *Dunkelberger, RN* |
| | | *SDJ Nurse Manager* |

Automated VA Form 119

286

QD 6/28/17

## Request for Leave or Approved Absence

| 1. Name *(Last, first, middle)* Drevaleva Tatyana E | 2. Employee or Social Security Number **(Enter only the last 4 digits of the Social Security Number (SSN))** |
|---|---|

**3. Organization** Albuquerque VAMC, 5D

| 4. Type of Leave/Absence *(Check appropriate box(es) below)* | Date | | Time | | Total Hours | 5. Family and Medical Leave |
|---|---|---|---|---|---|---|
| | From | To | From | To | | |

| | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advanced Annual Leave | | | | | | ☐ **I hereby invoke my entitlement to Family and Medical Leave for:** |
| ☐ Accrued Sick Leave | | | | | | |
| ☐ Advanced Sick Leave | | | | | | ☐ Birth/Adoption/Foster Care |

**Purpose:**
☐ Illness/injury/incapacitation of requesting employee
☐ Medical/dental/optical examination of requesting employee
☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
☐ Care of family member with a serious health condition
☐ Other

☐ Serious health condition of spouse, son, daughter, or parent
☐ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.*

☐ **Compensatory Time Off**
☐ **Other Paid Absence** *(Specify in Remarks)*
☑ **Leave Without Pay** 05.18.17-07.07.17

**6. Remarks:** To solve my health issues in Russia.

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

| 7a. Employee Signature Tatyana Drevaleva | 7b. Date 05.17.2017 |
|---|---|

| 8a. Official Action on Request: ☐ Approved ☑ Disapproved | *(If disapproved, give reason. If annual leave, initiate action to reschedule.)* |
|---|---|

**8b. Reason for Disapproval:**

| 8c. Supervisor Signature Ana R Prince DND RN | 8d. Date 5-19-2017 |
|---|---|

**PRIVACY ACT STATEMENT**
Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

| Office of Personnel Management<br>5 CFR 630 | Local Reproduction Authorized | OPM Form 71<br>Rev. September 2009<br>Formerly Standard Form (SF) 71<br>Previous editions usable |
|---|---|---|

Print Form     Clear Form

287

OP 6/28/17



**DEPARTMENT OF VETERANS AFFAIRS**
New Mexico VA Health Care Systems
1501 San Pedro Drive SE
Albuquerque, NM 87108-5154

05/18/2017

In Reply Refer To:

Tatyana Drevaleva was hired as a telemetry technician On April 2, 2017 and participated in NEO on April 3, 2017. She is currently orienting as a telemetry technician on the night shift. While attending the NEO class in April Tatyana informed Carla Dunkleberger (Manager 5DT) that she needed to take extended leave of six weeks and go to Russia for a medical procedure. At that time, Carla informed Tatyana that since she just started she was not eligible for FMLA and she had not accrued enough leave to support a six week absence. Tatyana was also told that medical documentation, in English, would be needed prior to approval of Leave Without Pay. On the morning of May 17, 2017 Tatyana informed the 5D management team that she was leaving to Russia on Thursday May 18, 2017 for six weeks. On May 17, 2017 an OPM 71 was given to Tatyana and she filled it out providing no supporting medical documentation.

At this time, I do not recommend approval of Tatyana Drevaleva's request for Leave Without Pay.

Phillip Johnson RN, 5DT ANM

Allean Raneta Bonin ACNS

( Concur ) Non Concur

Dr. Tina Prince ADPCS

( Concur / Non Concur

with Non -approval

288



*02 4/20/17*

| REPORT OF CONTACT | VA OFFICE | IDENTIFICATION NOS. (C.XC,SS,XSS,V,K, etc.) |
|---|---|---|
| NOTE: This form must be filled out in ink or on typewriter as it becomes a permanent record in veterans' folders. | NMVAHCS | |

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)* | DATE OF CONTACT |
|---|---|
| Drevaleva, Tatyana | May 16, 2017 |

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN |
|---|---|
| | |

| PERSON CONTACTED | TYPE OF CONTACT *(Check)* |
|---|---|
| | ☒ PERSONAL ☐ TELEPHONE |

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED |
|---|---|
| | |

**BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN**

Tatyana Drevaleva came to my office on 5/25/17 to speak about her need to go to Russia. She stated that since Russia offers a free one time invitro fertilization (IVF) she wanted to try this before she made "an embryo" as previously discussed. She went on to explain that she made a mistake and only has 5 pills left (that are required to help with IVF) and that she thought she had more. These pills were prescribed by her doctor in Russia and can only be obtained in Russia. She had found one pharmacy in New York that advertised on the internet they could get this medication. She stated she was planning to contact the pharmacy in New York to see if she could obtain the medication before she ran out and would let me know on May 16th if she was able to get the pills. I reminded her at this time she would need to complete an OPM 71, provide supporting medical documentation to request any time off, and that it had to be approved by by Dr. Prince, Associate Director of Patient Care Services prior to leaving; that I could not approve her request. Ms. Drevaleva verbalized understanding.

Ms. Dreveleva did not contact me on 5/16/17 to let me know if she had obtained the medication from New York.

| DIVISION OR SECTION | EXECUTED BY *(Signature and Title)* |
|---|---|
| Nursing | Carla Dunkelberger, NM *Dunkelberger NM* |
| | *5D Nurse Manager* |

Automated VA Form 119

QA 6/28/17

501/118

Tatyana E. Drevaleva
431 Alcazar Street NE
Albuquerque, NM 87108

Subj: Leave Request Clarification

1. This letter is to notify that on May 17, 2017, you submitted a Leave Without Pay (LWOP) request on an OPM Form 71, Request for Leave or Approved Absence from May 18, 2017 through July 7, 2017. However, your request was disapproved (see attached). You did not submit the required medical documentation, in English, prior to your departure to Russia. As a result of the disapproval, you are required to submit medical documentation, in English, to support your absences. This time period must be covered to avoid being placed in Absent Without Leave (AWOL) status.

2. I am enclosing an OPM 71, Request for Leave or Approved Absence, for your use. In addition, I am enclosing Medical Center Memorandum (MCM) 05-11, Title 5 Leave Policy; MCM 05-24, Voluntary Leave Transfer Program; MCM 05-36, and MCM 05-8, Tours of Duty.

3. Please contact me **immediately** upon receipt of this letter or no later than (5 days) upon receipt of this letter. I can be reached at (505) 265-1711, extension 4617 or (505) 269-5035. Again, I must stress to you that it is YOUR responsibility to ensure any absences are covered by approved leave requests. Failure to return to duty immediately or comply with the above requirements may result in disciplinary action up to and including your removal from Federal service.

Carla J. Dunkelberger    6/9/17
Nurse Manager, 5DT

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com.

O F F I C I A L   U S E

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

6/12/17

7014 1200 0000 8136 0043

Sent To  Tatyana Drevaleva
Street, Apt. No.; or PO Box No.  431 Alcazar St NE
City, State, ZIP+4  ABQ, NM 87108

000171

290



# USPS Tracking® Results

**FAQs**   (http://faq.usps.com/?articleId=220900)

**Track Another Package +**

Remove

**Tracking Number:** 70141200000081360083

     **In-Transit**

## Product & Tracking Information            **See Available Actions**

**Postal Product:**        **Features:**
                          Certified Mail™

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| **June 13, 2017, 11:12 am** | **Notice Left (No Authorized Recipient Available)** | **ALBUQUERQUE, NM 87108** |



We attempted to deliver your item at 11:12 am on June 13, 2017 in ALBUQUERQUE, NM 87108 and a notice was left because an authorized recipient was not available. You may arrange redelivery by using the Schedule a Redelivery feature on this page or may pick up the item at the Post Office indicated on the notice beginning June 14, 2017. If this item is unclaimed by June 28, 2017 then it will be returned to sender.

| | | |
|---|---|---|
| June 13, 2017, 2:52 am | Departed USPS Facility | ALBUQUERQUE, NM 87101 |
| June 12, 2017, 9:01 pm | Arrived at USPS Facility | ALBUQUERQUE, NM 87101 |

OR 6/28/17

## Request for Leave or Approved Absence

| 1. Name *(Last, first, middle)* | 2. Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN)) |
|---|---|

**3. Organization**

| 4. Type of Leave/Absence *(Check appropriate box(es) below)* | Date From | Date To | Time From | Time To | Total Hours | 5. Family and Medical Leave |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advanced Annual Leave | | | | | | **I hereby invoke my entitlement to Family and Medical Leave for:** |
| ☐ Accrued Sick Leave | | | | | | |
| ☐ Advanced Sick Leave | | | | | | ☐ Birth/Adoption/Foster Care |

**Purpose:**
- ☐ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

☐ Serious health condition of spouse, son, daughter, or parent

☐ Serious health condition of self

| ☐ Compensatory Time Off | | | | | | *Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act. Medical certification of a serious health condition may be required by your agency.* |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | | |
| ☐ Leave Without Pay | | | | | | |

**6. Remarks:**

**7. Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/ approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

| 7a. Employee Signature | 7b. Date |
|---|---|

| 8a. Official Action on Request:   ☐ Approved   ☐ Disapproved | *(If disapproved, give reason. If annual leave, initiate action to reschedule.)* |
|---|---|

**8b. Reason for Disapproval:**

| 8c. Supervisor Signature | 8d. Date |
|---|---|

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

| Office of Personnel Management 5 CFR 630 | Local Reproduction Authorized | OPM Form 71 Rev. September 2009 Formerly Standard Form (SF) 71 Previous editions usable |
|---|---|---|

[ Print Form ]          [ Clear Form ]



**DEPARTMENT OF VETERANS AFFAIRS**
Raymond G. Murphy Medical Center
1501 San Pedro Drive SE
Albuquerque NM 87108-5154

JUN 3 0 2017

Tatyana E. Drevaleva
Nursing Service (118)
New Mexico VA Health Care System
1501 San Pedro Drive SE
Albuquerque, NM 87108

In Reply Refer To: 501/108

Subject: Termination during Probationary Period

1. At the time of your Excepted Appointment on April 2, 2017, as a Medical Instrument Technician, you were informed that your first year of employment would be subject to a trial/probationary period. The trial/probationary period is an important part of the hiring process and during this time, supervisors are required to study an employee's potential closely to determine whether s/he is suited for successful government work. When it becomes apparent that an employee's conduct, general character traits or capacity do not meet the requirements for satisfactory service, the supervisor is required to initiate action to separate the employee.

2. The Associate Director, Patient Care Services, has recommended that you be terminated from your position for failure to qualify during your probationary period. Your termination is due to attendance issues.

3. The effective date of your termination will be June 30, 2017. The decision to terminate you immediately in lieu of a two (2) week notice is due to your absent without leave (AWOL) status since May 21, 2017. You must properly clear the facility, turn in any government property to your supervisor and clear any indebtedness prior to the release of your final paycheck.

4. You are entitled to:

   a) seek corrective action before the U.S. Office of Special Counsel (OSC); or

   b) a discrimination complaint with the Office of Resolution Management (ORM).

You shall be deemed to have exercised your option to appeal this action at such time as you timely initiate action to appeal to MSPB, or OSC, or a discrimination complaint.

5. If you believe this action is based on discrimination on the basis of race, color, religion, sex, national origin, age or disabling condition, you may file a complaint of discrimination. If you elect to file a complaint of discrimination, you may do so by contacting the Office of Resolution Management (ORM) at 1-888-737-3361. Your complaint will be processed in accordance with EEOC regulations at 29 C.F.R., Part 1614. Your initial contact with the ORM office must be done within 45 calendar days of the effective date of this action.

6. If you elect to seek corrective action by the OSC's Complaints Examining Unit (OSC Appeal Form) (https://osc.gov/), your complaint will be limited to a determination as to whether the agency took one or more personnel actions against you in violation of 5 USC 2302(b) (prohibited personnel

Tatyana E. Drevaleva
Termination during Probationary Period
Page 2

practices). This can include, but is not limited to claims of reprisal for whistleblowing and/or engaging in protected activity. If you are making a claim of retaliation for engaging in one or more protected activities and OSC dismisses your claim, you may have the right to file an individual right of action (IRA) appeal to the MSPB, but such an appeal will be limited to an adjudication of whether you proved that your protected activity was a contributing factor in the effected action.

7. Whichever is filed first, an appeal for the corrective action to OSC, or a discrimination complaint, shall be considered an election by you to proceed under that appeal process.

8. If you have any questions concerning this matter or the rights described above, or if you need assistance or additional information, please contact Rhonda Anderson, Human Resources Specialist, at extension 2381.

Thomas E. Harris Sr.
Acting Human Resources Officer

NOTIFICATION OF PERSONNEL ACTION

FIRST ACTION                    SECOND ACTION

EMPLOYEE DATA

POSITION DATA

Standard Form 52

## REQUEST FOR PERSONNEL ACTION

**PART A - Requesting Office** *(Also complete Part B, Items 1, 7-22, 32, 33, 36 and 39.)*

| 1. Action Requested | 2. Request Number |
|---|---|
| Recruitment | ARPA: 2339204 |

| 3. For Additional Information Call (Name and Telephone Number) | 4. Proposed Effective Date |
|---|---|
| AVILA, MARY E      EXT. (505) 265-1711 x2037 | 10/18/2016 |

| 5. Action Requested By (Typed Name, Title, Signature, and Request Date) | 6. Action Authorized By (Typed Name, title, signature, and Concurrence Date) |
|---|---|
| NUTTALL, CYNTHIA K | Electronically Approved By:  NUTTALL, CYNTHIA K |
| SIGNED  10/18/2016 | SIGNED  10/18/2016 |

**PART B - For Preparation of SF 50 0** *(Use only codes in FPM Supplement 292-1. Show all dates in month-day-year order.)*

| 1. Name (Last, First, Middle) | 2. SSN | 3. Date of Birth | 4. Effective Date: 04/02/2017 |
|---|---|---|---|
| Drevaleva, Tatyana Evgenievna | | | |

| **FIRST ACTION** | | **SECOND ACTION** | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 170 | EXCEPTED APPOINTMENT | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| Z64 | VBV 38 U.S.C. 7401(3) | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | MED INSTRMNT TECH(EKG) FS |

)

CR 6/28/17

DREVALEVA,TATYANA E          T&L 221  Telework Ind: None

```
     Date      TW  Scheduled Tour        Tour Exceptions
------------------------------------------------------------------------
Sun 14-May-17      07:30P-08:00A
Mon 15-May-17      07:30P-08:00A
Tue 16-May-17      07:30P-08:00A
Wed 17-May-17      11:30P-08:00A
Thu 18-May-17      Day Off
Fri 19-May-17      Day Off
Sat 20-May-17      Day Off
Sun 21-May-17      07:30P-08:00A        07:30P-08:00A    WP LWOP
                                        AWOL

           INAPPROPRIATE LEAVE REQUEST
Mon 22-May-17      07:30P-08:00A        07:30P-08:00A    WP LWOP
                                        AWOL

           INAPPROPRIATE LEAVE REQUEST
Tue 23-May-17      07:30P-08:00A        07:30P-08:00A    WP LWOP
                                        AWOL

           INAPPROPRIATE LEAVE REQUEST
Wed 24-May-17      Day Off
Thu 25-May-17      Day Off
Fri 26-May-17      Day Off
Sat 27-May-17      Day Off
```

297



QD 6/28/17

```
DREVALEVA,TATYANA E          T&L 221  Telework Ind: None

    Date      TW  Scheduled Tour      Tour Exceptions
--------------------------------------------------------------
un 28-May-17      11:30P-08:00A       11:30P-08:00A   WP LWOP
                                       AWOL

        INAPPROPRIATE LEAVE REQUEST
on 29-May-17      Day Off
ue 30-May-17      07:30A-04:00P       07:30A-04:00P   WP LWOP
                                       AWOL

        INAPPROPRIATE LEAVE REQUEST
ed 31-May-17      07:30A-04:00P       07:30A-04:00P   WP LWOP
                                       AWOL

        INAPPROPRIATE LEAVE REQUEST
hu  1-Jun-17      07:30P-08:00A       07:30P-08:00A   WP LWOP
                                       AWOL

        INAPPROPRIATE LEAVE REQUEST
Fri  2-Jun-17     Day Off
Sat  3-Jun-17     Day Off
Sun  4-Jun-17     07:30P-08:00A       07:30P-08:00A   WP LWOP
                                       AWOL

        INAPPROPRIATE LEAVE REQUEST
Mon  5-Jun-17     07:30P-08:00A       07:30P-08:00A   WP LWOP
                                       AWOL

        INAPPROPRIATE LEAVE REQUEST
Tue  6-Jun-17     07:30P-08:00A       07:30P-08:00A   WP LWOP
                                       AWOL

        INAPPROPRIATE LEAVE REQUEST
Wed  7-Jun-17     11:30P-08:00A       11:30P-08:00A   WP LWOP
                                       AWOL

        INAPPROPRIATE LEAVE REQUEST
Thu  8-Jun-17     Day Off
Fri  9-Jun-17     Day Off
Sat 10-Jun-17     Day Off
```

298

@2 6/28/17

DREVALEVA,TATYANA E          T&L 221  Telework Ind: None

| Date | TW | Scheduled Tour | Tour Exceptions | |
|------|----|----|----|----|
| un 11-Jun-17 | | Day Off | | |
| on 12-Jun-17 | | Day Off | | |
| ue 13-Jun-17 | | Day Off | | |
| ed 14-Jun-17 | | 11:30P-08:00A | 11:30P-08:00A<br>AWOL | WP LWOP |
| | | INAPPROPRIATE LEAVE REQUEST | | |
| hu 15-Jun-17 | | 07:30P-08:00A | 07:30P-08:00A<br>AWOL | WP LWOP |
| | | INAPPROPRIATE LEAVE REQUEST | | |
| ri 16-Jun-17 | | 07:30P-08:00A | 07:30P-08:00A<br>AWOL | WP LWOP |
| | | INAPPROPRIATE LEAVE REQUEST | | |
| Sat 17-Jun-17 | | 11:30P-08:00A | 11:30P-08:00A<br>AWOL | WP LWOP |
| | | INAPPROPRIATE LEAVE REQUEST | | |
| Sun 18-Jun-17 | | Day Off | | |
| Mon 19-Jun-17 | | 07:30A-04:00P | 07:30A-04:00P<br>AWOL | WP LWOP |
| | | INAPPROPRIATE LEAVE REQUEST | | |
| Tue 20-Jun-17 | | 07:30A-04:00P | 07:30A-04:00P<br>AWOL | WP LWOP |
| | | INAPPROPRIATE LEAVE REQUEST | | |
| Wed 21-Jun-17 | | 07:30A-04:00P | 07:30A-04:00P<br>AWOL | WP LWOP |
| | | INAPPROPRIATE LEAVE REQUEST | | |
| Thu 22-Jun-17 | | 07:30A-04:00P | 07:30A-04:00P<br>AWOL | WP LWOP |
| | | INAPPROPRIATE LEAVE REQUEST | | |
| Fri 23-Jun-17 | | 07:30A-04:00P | 07:30A-04:00P<br>AWOL | WP LWOP |
| | | INAPPROPRIATE LEAVE REQUEST | | |
| Sat 24-Jun-17 | | Day Off | | |

299

**Malone, Karla (ORM)**

| | |
|---|---|
| **From:** | Tatyana Drevaleva <tdrevaleva@gmail.com> |
| **Sent:** | Monday, November 20, 2017 3:11 AM |
| **To:** | Malone, Karla (ORM) |
| **Subject:** | Fwd: [EXTERNAL] from Tanya Drevaleva from Siberia. |

---------- Forwarded message ----------
From: **Tatyana Drevaleva** <tdrevaleva@gmail.com>
Date: Mon, Jul 3, 2017 at 2:02 PM
Subject: Re: [EXTERNAL] from Tanya Drevaleva from Siberia.
To: "Dunkelberger, Carla" <Carla.Dunkelberger@va.gov>

Good afternoon Carla!

Why did you terminate my employment? I submitted the proof that I would go to Russia to solve my medical problems (to perform an IVF procedure). I submitted the proof (a letter from my Russian physician) that I would be doing an IVF procedure in Russia. I submitted a request form to you where I asked you to allow me to be absent from work from May 18th, 2017 to July 7th, 2017. You terminated my employment on June 30th, 2017 which is before July 7th, 2017. Please, give me the answer.

Thank you,

Respectfully,

Tatyana Drevaleva.

On Mon, Jul 3, 2017 at 1:46 PM, Dunkelberger, Carla <Carla.Dunkelberger@va.gov> wrote:

Please see attached.

Carla Dunkelberger, RN, MSN, MBA

Nurse Manager, 5D Telemetry

Raymond G. Murphy VA Medical Center

1





Integrity, Commitment, Advocacy,

Respect, Excellence

**From:** Tatyana Drevaleva [mailto:tdrevaleva@gmail.com]
**Sent:** Saturday, July 01, 2017 8:11 AM
**To:** Dunkelberger, Carla <Carla.Dunkelberger@va.gov>; Phil Johnson <Footerphil@gmail.com>
**Subject:** [EXTERNAL] from Tanya Drevaleva from Siberia.


Dear Carla and Phil!

How are you?

I spent time getting fully examined before the IVF procedure. Unpleasantly, a gynecologist found a polyp of the cervical canal, and I got it removed. I waited for the pathology result which was good. Now, the gynecologist wants me to get other blood tests for Folliclestimulating Hormone (FSH) and Antimullerian Hormone (AMH). I will have to do it at the beginning of the next menstrual period which will be in approximately 7-8 days. After I get the results, the gynecologist will let me know if I am eligible for the IVF cycle. I hope I am eligible. However, I will have to stay in Russia for 2-3 more weeks than I expected. Initially, I was planning to return back to the United States on July 7th. I will not be able to do it because I will have to wait until I can get the blood tests done for FSH and AMH.

I requested another letter from my gynecologist confirming that currently I am getting examined in Novosibirsk for my IVF cycle. The gynecologist promised to give me this letter on Thursday next week. As soon as I get the letter, I will get it translated and forward it to you.

Please, allow me to spend other 2-3 weeks in Russia. Please, send me a form that I can fill out and return to you if necessary.

Thank you so much,

Respectfully,

2

301

Tanya Drevaleva.



--
Respectfully,
Tanya.


--
Respectfully,
Tanya.

3

000183

**REQUEST FOR PERSONNEL ACTION**

Standard Form 52
Rev 7/91
U.S. Office of Personnel Management
Guide to Processing Personnel Actions, Chapter 4

| PART A - Requesting Office | (Also complete Part B, Items 1, 7-22, 32, 33, 36 and 39) | |
|---|---|---|
| 1. Actions Requested | | 2. Request Number |
| 3. For Additional Information Call    (Name and Telephone Number) | | 4. Proposed Eff. Date |

303

## CHAPTER 2. TITLE 5 PROBATIONARY/TRIAL PERIOD EMPLOYEES

**1. SCOPE.** This chapter contains the policy and procedure needed for taking actions against title 5 employees serving on a probationary [or trial] period under title 5 Code of Federal Regulations (CFR) Parts 315 or 307 in the Department of Veterans Affairs (VA). This includes employees appointed under 38 U.S.C. 7401(3), i.e., permanent full-time hybrids, and employees appointed under 38 U.S.C. 7405(a)(1)(B), i.e. part-time hybrids and part-time or full-time temporary hybrids serving on an appointment not limited to one year less, who have not completed a probationary period. General information regarding title 5 probationary periods is contained in VA Handbook 5005, part II, chapter 2, section A, paragraph 9. Information regarding probationary periods for permanent part-time and full-time hybrid employees is contained in VA Handbook 5005, part II, chapter 3, section F, paragraph 4 and VA Handbook 5005, part II, chapter 2, paragraph 9a. Information concerning supervisory and Senior Executive Service probationary periods may be found in VA Handbooks 5005, part III, Staffing, and 5027, part III, Senior Executive Service, respectively.

**2. RESPONSIBILITIES**

    a. Managers/Supervisors will continually review the services of employees serving in a probationary status. Supervisors must assure by active measures that the work records of unsatisfactory employees or of those whose services are merely borderline are promptly referred to appropriate officials for action.

    b. The Chief, Human Resources Management, or designee, is responsible for:

    (1) Assisting management officials with probationary procedures.

    (2) Reviewing proposed probationary actions for conformance with policies and procedures.

    (3) Advising employees about probationary procedures and rights.

**3. [EXCLUSIONS**

    a. Any individual who meets <u>one or more</u> of the following definitions will not be covered by this chapter:

    (1) An individual in the competitive service who is not serving a probationary or trial period under an initial appointment;

    (2) An individual in the competitive service who has completed one (1) year of current continuous service under an appointment that was not a temporary appointment limited to one (1) year or less;

    (3) A preference eligible in the excepted service who has completed one (1) year of current continuous service in the same or similar positions in an Executive agency, the United States Postal Service, or the Postal Rate Commission;

(4) An individual in the excepted service (other than a preference eligible) who is not serving a probationary or trial period under an initial appointment pending conversion to the competitive service;

(5) An individual in the excepted service (other than a preference eligible) who has completed two (2) years of current continuous service in the same or similar position in an Executive agency under an appointment that was not a temporary appointment limited to one (1) year or less.

b. Use the procedures outlined in VA Handbook 5021, Part I, for employees who are not covered by this chapter.]

**4. [TERMINATION OF PROBATIONERS FOR UNSATISFACTORY PERFORMANCE OR CONDUCT]**

a. [VA may terminate an employee serving on a probationary or trial period because his/her work performance or conduct fails to demonstrate fitness or qualifications for continued employment. Employment is to be terminated by notifying employees in writing as to why they are being separated and the effective date of the action. The information in the notice as to why an employee is being terminated shall, as a minimum, consist of the conclusions as to the inadequacies of his performance or conduct].

b. [VA may also terminate an employee serving on a probationary period for reasons based in whole or in part on conditions arising before the employee's appointment. Use procedures outlined in 5 CFR 315.805 for probationary pre-employment actions.

c. Probation ends when the employee completes his or her scheduled tour of duty on the day before the anniversary date of the employee's appointment. For example, when the last workday is a Friday and the anniversary date is the following Monday, the probationer must be separated before the end of the tour of duty on Friday since Friday would be the last day the employee actually has to demonstrate fitness for further employment.]

**5. [APPEAL RIGHTS TO THE MERIT SYSTEMS PROTECTION BOARD.** Probationary employees may appeal to the Merit Systems Protection Board in writing the decision to terminate them for unsatisfactory performance or conduct based upon the following]:

a. [**Discrimination.** An employee may appeal to the Board under this chapter a termination not required by statute which the employee alleges was based on partisan political reasons or marital status.]

b. [**Improper Procedure.** A probationer may appeal on the grounds that the termination was not effected in accordance with the procedural requirements of 5 CFR 315.805.]

[ ]

**[6. SEPARATION OF PERSONS WHO FAIL TO REGISTER UNDER SELECTIVE SERVICE LAW.**
An individual who is serving under a probationary appointment made on or after November 8, 1985, and is not exempt from registration, will be terminated under 5 CFR, part 300, subpart G if he has not registered as required, unless:

000186

**NOVEMBER 20, 2007**

**VA HANDBOOK 5021/6**
**PART III**
**CHAPTER 2**

   a.  The individual registers for the Selective Service and submits a new statement of Selective Service registration status, including his date of birth, to VA; or,

   b.  The individual is age twenty-six (26) or older and OPM determines that his failure to register was neither knowing nor willful, after the individual submits a written request for a determination by OPM and an explanation of why he failed to register.]

000187

New Mexico VA Health Care System                    Memorandum 05-48
Albuquerque, New Mexico                             December 21, 2015
                                                    05/KC/CB/RTS

## EMPLOYEE COURTESY AND CONDUCT

1. **Policy:**  Each medical center employee is expected to serve diligently, loyally and
cooperatively; to avoid misconduct and other activities that conflict with his/her employment; to
conduct himself/herself both on and off duty in a manner that is creditable to the employee, the
Federal Government, the Department of Veterans Affairs, and the medical center.  It is the policy
of this facility that each employee will exhibit sensitivity, compassion and concern in dealing
with VA employees, the public and veterans we serve.  VA Employees will provide dignified
and caring service that exemplifies the highest standards of customer service.  Behavior that is
hostile or of a volatile nature (e.g., verbal or physical aggression) will not be tolerated.  Failure to
comply with conduct expectations/requirements may result in appropriate corrective/ disciplinary
action.

2. **Responsibility:**
   a. Medical Center Director is responsible for ensuring compliance with the standards of
      conduct and the medical center's policies/statements regarding an employee's conduct.
   b. Service Chiefs and Supervisors are responsible for informing employees, at least annually,
      of the Standards of Ethical Conduct for Employees of the Executive Branch, customer
      service policies and the contents of this policy and VA Employee Handbook.  This should
      be documented in the employee's competency assessment and/or in service minutes.
      Service Chiefs and Supervisors are responsible for ensuring that all communications,
      whether verbal or written (including messages sent via electronic mail) are conducted in a
      professional and courteous manner and to investigate and take appropriate action on any
      report of unprofessional, discourteous behavior demonstrated by an employee.
   c. Human Resources Management Service (HRMS) provides assistance and advisories in the
      interpretation and application of the Standards of Conduct to employees, Supervisors and
      management officials.  The HRMS will ensure distribution of the VA Employee Handbook
      and this policy to all employees during new employee orientation and thereafter upon
      request.
   d. Employees are to adhere to their responsibilities as VA employees as outlined in this
      policy, VA Employee Handbook, medical center policies, position description/functional
      statements , Principles of Ethical Conduct, (Attachment A) and regulations.  Employees
      are responsible for ensuring that any individual seeking advice or assistance will be helped
      in a prompt, courteous, and cooperative manner.

3. **Procedure:**
   a. Employees shall not engage in criminal, infamous, dishonest, immoral, or notoriously
      disgraceful conduct, or other conduct prejudicial to the government.  Employee conduct,
      on or off the job, which reflects adversely on the Federal Government, as the employer,
      may be grounds for disciplinary action in addition to whatever penalty is prescribed by
      law.

307

**Memorandum 05-48**
**Subj: Employee Courtesy and Conduct**
**December 21, 2015**
**2.**

    (1) Employees must refrain and avoid any action and/or conduct that result in or creates the appearance of using public office for private gain; giving preferential treatment to individuals, groups or organizations; impeding government efficiency or economy; losing impartiality; making a government decision outside official channels and adversely affecting the confidence of the public in the integrity of the government. Employees are to adhere to the Ethical Standards of Conduct.

    (2) Staff are expected to adhere to supervisory instructions.

    (3) Employees are to avoid misconduct and any other activities in conflict with their employment; to exercise courtesy and dignity and otherwise conduct themselves both on and off duty in a manner reflecting credit upon themselves and the VA.

b. Indebtedness: VA employees are expected to manage their just financial obligations in a proper and timely manner. Upon receipt of letters of indebtedness (including judgments), HRMS will review for compliance with legal and regulatory guidance, and prepare letters to the creditor and Supervisor as necessary. Complaints that are incomplete will be returned to the creditor for additional information. Judgments will be forwarded to Payroll for garnishment action.

c. Intoxicants/Drugs: An employee may not use intoxicants and/or illegal drugs in such a manner that his/her work performance and/or conduct is adversely affected; an employee may not report for duty under the influence of intoxicants/drugs or use said items while on duty, nor may an employee sell or attempt to sell items on VA property. Certain positions are subject to random urine analysis drug testing requiring staff to submit upon being notified. Identification of illegal drug use could result in disciplinary action up to and including removal.

d. Financial Interests: VA employees are to refrain from entering into any type of financial interests and/or obligations with employees, VA beneficiaries or patients. Employees are to refer to the Standards of Ethical Conduct for information or contact HRMS or Regional Counsel.

e. Hostile and/or Volatile Behavior: Employees are to refrain from inappropriate behavior that demonstrates and/or suggests disruptive, threatening or volatile actions or communication toward staff, beneficiaries and/or patients. The medical center has a "zero tolerance" policy regarding this type of behavior. Employees are also to refrain from statements and/or remarks that are unsubstantiated resulting in defamatory, slanderous, or disrespectful in nature or behavior that is disruptive to the work environment. Failure to adhere to these requirements will result in immediate corrective action, up to removal from Federal employment.

f. Leave Administration: Employees are responsible for reporting for duty as scheduled and being at their post of duty during official duty hours. Employees are responsible for properly requesting leave and acquiring approval for said leave prior to its use. Failure to adhere to proper leave requesting procedures could result in corrective actions.

308

Memorandum 05-48
Subj: Employee Courtesy and Conduct
December 21, 2015
3.

g. Whistleblower Protection: It is a prohibited personnel practice for an agency to subject an employee to a personnel action if the action is threatened, proposed, taken or not taken because of Whistleblower activities. Whistleblower means disclosing information that one reasonably believes is evidence of a violation of any law, rule, or regulation, or gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. Employees are protected if they make such a disclosure to the Office of Special Counsel or the Inspector General. Employees are also protected if they make such a disclosure to any other individual or organization (e.g., a Congressional committee or the media), provided that Law does not specifically prohibit the disclosure. Information about appeal rights, grievance procedures and where to file is available in HRMS.

h. Gambling/Selling/Betting: VA employees shall not participate, while on government property or on official government duty, in any form of gambling activity or device, including lotteries, pools and numbers slips or on behalf of some gambling agent. Employees are not permitted to sell items (e.g., Avon, Tupperware, etc.) to other employees during duty hours or on the premises.

i. Loans: VA employees may not engage in business-type activity involving the borrowing or lending of money on Federal premises except as part of a recognized credit union.

j. Staff-Patient Relationships:

(1) Staff members will maintain optimal ethical conduct and practices and are expected to limit their contact with patients and patients' families, both on and off duty, to those activities deemed therapeutically beneficial to the patient. An exception from accepted practice may signal the beginning of an unhealthy staff-patient relationship. Such a departure from accepted practice may include the giving or receiving of gifts, visiting a patient at home when off-duty, or any similar interaction. Social, economic, and/or sexual relationships with patients or member of patients' families may be basis for disciplinary/adverse action.

(2) Employees are expected to demonstrate interpersonal and communication skills that enable them to establish and maintain professional relationships with patients, families, and other members of health care teams. Employees are expected to demonstrate behaviors that reflect a commitment to continuous professional development, ethical practice, an understanding and sensitivity to diversity and a responsible attitude toward their patients, their profession, and society.

k. Patient Abuse: It is a fundamental policy that no one may physically or verbally abuse a veteran patient and/or beneficiary. An employee may not abuse a patient by speaking harshly or rudely to the patient, teasing or ridiculing the patient, scolding the patient, or treating the patient in an indifferent manner. Any form of patient abuse, either intentional or unintentional, by an employee is cause for disciplinary action, up to removal. Also, an employee who witnesses the abuse of a patient without promptly reporting it to a proper authority is subject to disciplinary action.

**Memorandum 05-48**
**Subj: Employee Courtesy and Conduct**
**December 21, 2015**
**4.**

l.  Customer Service Standards:  The fundamental principle of customer service is to put forth a courteous manner, with a presence that indicates a calm and helpful attitude.  Employees will wear an identification badge in a visible manner during duty hours.  All individuals will be accorded dignity and treated with compassion and respect in a prompt manner.  Employees are responsible for interacting with each other in a courteous, respectful and professional manner to facilitate the accomplishment of the work of the organization.

m. Misuse of government property:  All employees have the responsibility to protect and conserve government property.  They may not use it or allow it to be used for purposes other than those that are job-related.  Applicable property includes but is not limited to computers, motor vehicles, office supplies, telephones, fax machines, and laboratory equipment.  VA employees are permitted limited use of government equipment for personal needs if the use does not interfere with official business and involves minimal additional expense to the Government.  This limited personal use of government office equipment should take place during the employee's non-work time.

4. **References:**  VHA Directive 2006-41, Veterans Health Care Service Standard and VA Handbook 5025, Part IV, Appendix A.

5. **Rescission:**  Medical Center Memorandum 05-48, Employee Courtesy and Conduct dated January 22, 2013.

6. **Expiration Date:**  December 21, 2018.


**Signed MCM in D/FMO File**
Andrew M. Welch, MHA, FACHE
Director

Attachment

Distribution:  "M"

310

Memorandum 05-48                                          Attachment A

**Principles of Ethical Conduct**

These 14 principles of ethical conduct identify, in a nutshell, what is expected of every federal employee. Failure to adhere to them can result in disciplinary or criminal penalties.

1. Public service is a public trust, requiring employees to place loyalty to the Constitution, the laws and ethical principles above private gain.
2. Employees shall not hold financial interests that conflict with the conscientious performance of duty.
3. Employees shall not engage in financial transactions using nonpublic government information, or allow the improper use of such information to further any private interest.
4. An employee shall not, except as permitted by the Standards of Ethical Conduct, solicit or accept any gift or other item of monetary value from any person or entity seeking official action from, doing business with, or conducting activities regulated by the employee's agency, or whose interests may be substantially affected by the performance or nonperformance of the employee's duties.
5. Employees shall put forth honest effort in the performance of their duties.
6. Employees shall not knowingly make unauthorized commitments or promises of any kind purporting to bind the government.
7. Employees shall not use public office for private gain.
8. Employees shall act impartially and not give preferential treatment to any private organization or individual.
9. Employees shall protect and conserve federal property and shall not use it for other than authorized activities.
10. Employees shall not engage in outside employment or activities, including seeking or negotiating for employment that conflicts with official government duties and responsibilities.
11. Employees shall disclose waste, fraud, abuse and corruption to appropriate authorities.
12. Employees shall satisfy in good faith their obligations as citizens, including all financial obligations, especially those -- such as federal, state or local taxes -- that are imposed by law.
13. Employees shall adhere to all laws and regulations that provide equal opportunity for all Americans regardless of race, color, religion, sex, national origin, age or disability.
14. Employees shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in the Standards of Ethical Conduct. Whether particular circumstances create an appearance that the law or these standards have been violated shall be determined from the perspective of a reasonable person with knowledge of the relevant facts.

**New Mexico VA Health Care System**  Memorandum 05-11
**Albuquerque, New Mexico**  May 5, 2016
  05/KC/CB/ya

### TITLE 5 LEAVE POLICY

1. **Policy:** To establish policies and procedures regarding leave administration for full-time and regularly scheduled part-time General Schedule (GS), Wage Grade (WG), Canteen employees, including Graduate Nurse Technicians and Hybrid Title 38 occupations. The policy shall be administered on a uniform and equitable basis within the scope of applicable laws and regulations and negotiated agreements.

2. **Responsibility:**
   a. The Human Resources Officer is responsible for the interpretation of policy and regulations regarding leave and supervisory training pertaining to leave administration.
   b. Service Chiefs are responsible for administering leave in accordance with this policy, for establishing a leave requesting procedure in order to ensure consistent approval practice for all employees and for maintaining an adequate work force to meet demands of the service.
   c. Supervisors are responsible for maintaining control over attendance and leave of their employees by planning the use of Annual Leave (AL) throughout the year with their employees, approving/disapproving leave requests to the degree delegated by the Service Chief and in accordance with this policy, and informing employees concerning leave matters.
   d. Each employee is responsible for complying with leave policies. In cooperation with his/her supervisor, each employee should schedule AL to prevent forfeiture at the end of the leave year.
   *NOTE:* Each service will ensure that Unit Timekeepers are informed of absences. Unit Timekeepers will not be required to assume the supervisor's responsibility in connection with attendance control, acting upon individual leave requests or determining the acceptability of Sick Leave (SL) certification.

3. **Procedure:**
   a. **Annual Leave (AL):** Full-time and part-time employees earn AL depending on their length of service:
      (1) Full-time (per full bi-weekly period)
          (a) Less than 3 years: 4 hours
          (b) 3 to 15 years: 6 hours (10 hours for the last full pay period)
          (c) More than 15 years: 8 hours
      (2) Senior Executive Service (SES): 8 hours
      (3) Part-time (hours earned for hours worked in a pay status)
          (a) Less than 3 years: 1 hour for each 20 hours in a pay status
          (b) 3 to 15 years: 1 hour for each 13 hours in a pay status
          (c) More than 15 years: 1 hour for each 10 hours in a pay status. Temporary employees are not entitled to earn AL unless they hold an appointment of 90 calendar days or more. Requests for AL will be considered in light of current and anticipated workloads and availability of staff so essential VA activities and services will not be interrupted. To the extent possible, consideration will be given to the preference of individual employees.

312

Memorandum 05-11
Subj: **Title 5 Leave Policy**
May 5, 2016
2.

All requests will be submitted with sufficient lead time to provide for appropriate approving authority action prior to the date leave is required. All leave must be requested and approved through the employee Electronic Time and Attendance (ETA) Menu (see Attachment A). There is no authority to approve AL from which the employee will not be returning to duty. A maximum balance of 240 hours (30 days) may be carried forward from one leave year to the next leave year. Any amount over this maximum total should be used before the end of the leave year or it will be forfeited.

b. **Restoration of AL:** The normal rule that AL in excess of the maximum permissible carry-over (240 hours) be automatically forfeited at the end of the leave year *may be suspended* under the following conditions:

(1) **Administrative Error** – AL lost due to an administrative error may be restored. In addition to permitting a retroactive change, there is authority to permit the future restoration of all AL to which an employee is entitled in correcting an administrative error.

(2) **Exigencies of Public Business** – Even with the best of planning and scheduling of AL usage throughout the year, operational demands may not permit usage to avoid forfeiture of leave by some employees. The exigency, whether anticipated or unanticipated, must be of such importance to preclude the use of AL. The exigency should occur in such case where there is no reasonable alternative to the cancellation of the scheduled leave. There is a requirement that this AL be scheduled in advance for use, and in writing before the start of the third biweekly pay period prior to the end of the leave year. Normally, the decision to cancel scheduled leave because of exigencies should be made in advance unless a bona fide emergency precludes an advance decision.

(3) **Sickness** – When employees have scheduled AL in advance but are prevented from using it because of illness, they may substitute AL (or non-paid leave) for SL. However, when separation is known in advance, the granting of AL is limited to cases where exigencies of service require such action. Sickness is not in itself a basis for permitting AL to be forfeited and subsequently restored for later use. The supervisor has the responsibility to schedule or reschedule the use of AL to avoid forfeiture, even though an absence because of illness occurred during the year.

c. **Administrative Approval for Restoration of Leave** – The Director is the deciding official for the restoration of AL as warranted by the regulations. The scheduling and, as necessary, rescheduling of AL must be in writing. The Veterans Health Information Systems and Technology Architecture (Vista) Electronic Time & Attendance (ETA) System may be used. Documentation, which must be retained in accordance with regulations, must contain:

(1) The calendar dates the leave was requested and approved by the leave approving official.

(2) The date(s) and the amount (days/hours) on which the leave was scheduled for actual use.

(3) The calendar date(s)/hours the cancelled leave was rescheduled for use.

313

Memorandum 05-11
Subj: **Title 5 Leave Policy**
May 5, 2016
3.

        (4) The reason(s) for the subsequent canceling of approved leave (e.g., because of an exigency of the public business). Documentation must include the beginning and ending dates of the exigency and a copy of the approval action.

        (5) The date(s) during which the leave was rescheduled for use and the amount of leave (days/hours) that was rescheduled for use, including the amount of hours unused in excess of the maximum AL carryover amount.

        (6) Supervisors will be expected to provide the documentation above, in addition to their service leave usage plan, if submitting a memorandum requesting restoration of an employee's forfeited AL.

        *NOTE:* Restored AL that is unused prior to the expiration of the time limit is *forfeited*, unless the employee separates before that time. In such a case, the lump-sum payment will include the amount unused restored AL that has been credited to a separate account.

  d. **Sick Leave (SL):** An employee who is incapacitated for duty has the responsibility to request approval from immediate supervisor, leave approving official, or if the employee cannot call personally, have some responsible person report the illness or incapacitating injury as soon as practicable. Generally, this will be at the beginning of the tour of duty but not later than 2 hours thereafter. The employee's obligation is to complete one phone call to the established number or an alternate number employee was notified to use in order to request sick leave. If the supervisor is not available, employee may use voicemail to notify supervisor of type of leave requested due to incapacitation for duty. Sick leave of three (3) days or less may be requested orally and approved by the supervisor (see Attachment A); however, ETA Menu request must also be completed. An employee on SL for more than three (3) workdays must request SL through the ETA Menu upon return to duty and furnish satisfactory medical evidence of the need for SL during the period of absence. An employee who expects to be absent more than 1 day will inform the supervisor of his/her expected date of return to duty and notify the supervisor of any change. In the case of extended illness, daily reports will not be required. The employee may be required to call his/her supervisor prior to returning to duty.

  e. **Authorized Absence (AA):** An authorized absence is an absence administratively approved, which does not result in a charge to leave of any kind, or in loss of basic salary. The following will be used as the *guide* in determining the types of absences from duty which may be authorized without charge to leave if:

        (1) The activity is considered to be of substantial benefit to VA in accomplishing its general mission or one of its specific functions, or

        (2) The activity will clearly enhance an employee's ability to perform the duties of the position presently occupied or may be expected to prospectively occupy, or

        (3) The basis for excusing the employee is fairly consistent with prevailing practices of other Federal establishments in the area concerning the same or similar activities.

        *NOTE:* Authorized absence is not appropriate when an employee is required to perform duties off the main campus, which are part of their regularly assigned duties as described in their functional statement or position description (e.g., nursing home inspections, visits to other clinics, duty in CBOCs, etc.).

314

Memorandum 05-11
Subj:  Title 5 Leave Policy
May 5, 2016
4.

    f.  **Leave Without Pay (LWOP):**  A temporary non-pay status and absence from duty in lieu of sick or annual leave.  The authorization of LWOP is a matter of administrative discretion.  Requests for LWOP will be considered in light of current and anticipated workloads.  An employee cannot demand that LWOP be granted as a matter of right except in the case of disabled veterans who are entitled to LWOP if necessary for medical treatment under Executive Order 5396; and reservists and members of the National Guard who are entitled to LWOP if necessary to perform military training duties.  Employees who are disabled on the job and file claims with the Office of Workers Compensation Program (OWCP) may be granted LWOP for the entire period of absence from duty.  LWOP may also be granted in cases where an employee who has made application for disability retirement.  LWOP in these circumstances may be granted until it is judged that the employee will not be able to return to duty and may be granted regardless of whether or not the employee has annual leave

    g.  **Advanced Sick Leave** is for the purpose of serious disability, ailments, or for adoption related purposes.  An employee with no time limit in his or her appointment may be granted advanced sick leave not in excess of 30 days (240 hours).  An employee serving under a time limited or term appointment may be granted sick leave up to the total leave that would otherwise be earned during the term of the appointment.  There may not be more than 30 days (240 hours) of advanced sick leave on an employee's record at any one time.  In the case of sick leave for family care and bereavement, any or all of the first five (5) days (40 hours or its equivalent for part-time employees or employees on uncommon tours of duty) used for those purposes each leave year may be advanced.

    h.  **Advanced Annual Leave:**  All requests for annual leave should be made in advance.  There is no authority to approve annual leave from which the employee will not be returning to duty, unless such approval meets the needs of the service (34 Comp. Gen. 61).  Annual leave may be advanced only in an amount that can be earned by the end of the leave year in which it is granted.  When an employee is serving under an appointment which will expire before the end of the leave year, annual leave may be advanced up to the amount the employee would otherwise earn during the term of the appointment.

    i.  **Other Types Of Leave** which are available include advanced AL, SL for adoption, SL for General Family Care or Bereavement/ SL to Care for a Family Member with a Serious Health Condition (see <u>Medical Center Memorandum (MCM) 05-38, Sick Leave for General Family Care or Bereavement/Sick Leave to Care for a Family Member with a Serious health Condition</u>), Military Leave, Court Leave, leave for workers compensation cases, absences for maternity reason, leave in connection with travel, paid leave for bone marrow or organ donors, absences for religious purposes, excused absences.  An employee may invoke the Family Medical Leave Act (FMLA) (see <u>MCM 05-36, Family and Medical Leave Act</u>).  Employees may request to become a leave recipient under the Voluntary Leave Transfer Program (VLTP).  (See <u>MCM 05-24, Voluntary Leave Transfer Program (VLTP)</u>.

    j.  See Attachment A through C for Leave Chart and Leave Request Templates.

**Memorandum 05-11**
**Subj: Title 5 Leave Policy**
**May 5, 2016**
**5.**

4. **References:** 5 United States Code (USC) §6301-6308; 6321-6323; 6326; 5 Code of Federal Regulations (CFR) Part 63; VA Handbook 5011, Hours of Duty and Leave; Master Agreement between the Department of Veterans Affairs and American Federation of Government Employees.

5. **Rescission:** Medical Center Memorandum 05-11, Title 5 Leave Policy dated March 6, 2013.

6. **Expiration Date:** May 5, 2019.


**Signed MCM in D/FMO File**
Andrew M. Welch, MHA, FACHE
Director

Attachments

Distribution: "M"

316

Memorandum 05-11                                                        Attachment A

## Leave Chart for General Schedule and Wage Grade Employees

| Type of Leave | Type of Request | | Approving Authority |
|---|---|---|---|
| | ETA | OPM-71 Form | |
| **I. Annual Leave** | X | | Service Chief (except for FMLA request see MCM 05-36) |
| **II. Restoration of Leave** | X | Plus memos | Director |
| **III. Advanced Annual Leave** | | X - Plus memos | Appropriate PENTAD member |
| **IV. Sick Leave** | | | |
| a. 3 days or less | X | | Service Chief (may be relegated) |
| b. More than 3 days | X | X - Plus medical documentation | Service Chief (may be relegated) (except for FMLA request see MCM 05-36) |
| **V. Advanced Sick Leave** | | X - Plus memos, medical documentation | Appropriate PENTAD member |
| **VI. Leave Without Pay** | | | |
| a. Up to 15 calendar days | | X | Service Chief |
| b. 15 days to 1 year | | X - Plus memos | Appropriate PENTAD member (except for OWCP cases which is delegated to the HR Manager) |
| | | X -Plus 2 SF-52's | SF-52 required for LWOP exceeding 30 calendar days and SF-52 required for return to duty |
| **VII. Court Related Absence i.e. Jury Service** | X - Copy of jury notice or subpoena | | Service Chief |
| **VIII. Absence for Maternity Reasons (not a separate leave category)** | X | X – Plus memos, medical documentation | Determined by type of leave |
| **IX. Absence Without Leave (AWOL)** | NA | NA | NA |
| **X. Absence for Religious Observance (not a separate leave category)** | X | | Service Chief |
| **XI. Authorized Absence** | | | |
| a. 8 hours or less | X | | Service Chief |
| b. More than 8 hours | X-Copy of Travel Authority for Temporary Duty | | Service Chief (See MCM 14A-4 and MCM 135-9) |
| c. More than 8 hours | X | X | ACOS/E--if official travel is **not involved** (See MCM 14A-4 and MCM 135-9) |

317

Memorandum 5-11                                                    Attachment B

### Leave Without Pay (LWOP); Advanced Annual or Sick Leave

From:  (employee) ( )
Subj:  Request for Leave Without Pay Request (LWOP); or Advanced Annual or Sick Leave
To:    (Appropriate Pentad Approving Official) (108); (001); (002); (11)
Thru:  Chief, Human Resources Management Service (05)
Thru:  Chief, (Service) ( )
Thru:  Supervisor ( )

---

**PART I    GENERAL INFORMATION    (To be completed by employee)**

1. I, (Employee Name, Position Title, & Service) am requesting Leave as indicated below:

   ___ # days LWOP

   ___ # hours Advanced Annual Leave;  ___ # hours Advanced AL on Record

   ___ # hours Advance Sick Leave;  ___ # hours advanced SL on Record

2. Duty Status:  ___ Full-Time; or ___ Part-Time working _#_ hours bi-weekly.  Tour of

   duty:  (i.e., Monday thru Friday, from, 8:00 a.m. thru, 4:30 p.m.)

3. Dates requested: _____

4. Reason for leave request:

   _____ Medically Related (requires supporting medical documentation)

   _____ Self       _____ Family Member

   _____ Military Active Duty

   _____ Other (Please Explain):

   _____

   _____

5. Justification for leave request:

   _____

   _____

6. It is my intention to return to duty on (date).

---

_____        _____
Employee's Signature                      (Date)

318

Memorandum 5-11                                              Attachment B

### Leave Without Pay (LWOP); Advanced Annual or Sick Leave

Attachments:
_____ OPM Form 71, "Request for Leave or Approved Absence"
_____ Supporting Medical Certification

_____

[I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal. References: Medical Center Memorandum 05-11, Title 5 Leave Policy, or Medical Center Memorandum 05-1, Title 38 Duty and Leave Policy].

**PART II      TO BE COMPLETED BY SERVICE CHIEF**

Employee has submitted the following:
                _____ Appropriately completed Memorandum of Request
                _____ OPM 71: Request for Leave or Approved Absence
                _____ Medical Certification.
                _____ Military Orders.
                _____ Other documentation that supports request

How will coverage be provided in the absence of employee?
_____

_____


Additional Comments
_____

_____


Recommend Approval/Recommend Disapproval (provide justification)


_____        _____
Chief , (Service)  Signature                    (Date)

Memorandum 5-11                                                    Attachment B

**Leave Without Pay (LWOP); Advanced Annual or Sick Leave**

---

**PART III    HUMAN RESOURCES MANAGEMENT REVIEW**

Service Chief has provided the following:
_____ Memorandum with Recommendation
_____ Memorandum of Request from Employee
_____ Appropriately completed OPM 71:  Request for Leave or Approved Absence
_____ Sufficient Medical Certification to Support Request
_____ Military Orders
_____ Other documentation that supports request _____

Comments:

_____

_____

Request meets Regulatory Criteria/Does not Meet Regulatory Criteria
As outlined in VA Handbook 5011:  Hours of Duty and Leave and/or Medical Center
Memorandum 05-1 Title 38 Duty and Leave Policy or Medical Center Memorandum 05-11
Title 5 Leave Policy.

_____          _____
Kathleen Catanach                                                 Date
Chief, Human Resources Management Service

---

B-3

**320**

Memorandum 5-11                                                    Attachment B

**Leave Without Pay (LWOP); Advanced Annual or Sick Leave**

| <u>**PART IV**</u>    **DECISION OFFICIAL** |
|---|

Approve/Disapprove

_____          _____

Appropriate PENTAD Official Signature                        Date

Remarks, if necessary:

_____

_____

To be completed by HRMS:
_____     Date approval received
_____     Date copy provided to Financial Management Service, Attn: Payroll (04)
_____     Date copy provided to Service

B-4

321

Memorandum 5-11                                          Attachment C

**Authorized Absence**

From: (employee)
Subj: Authorized Absence Request
To:    Chief, Service          (    )
Thru: (Pentad-Approving Official)\
Thru: Chief, Human Resources Management Service (05)

---

**PART I    GENERAL INFORMATION    (To be completed by employee)**

   1.  Employee Name, Position Title, & Service:

     _____

     _____

   2.  Dates requested: _____

   3.  Number of hours requested: _____

   4.  Number of hours requested for travel time: _____

   5.  Justification of request and benefits to VA

     _____

     _____

   6.  Additional remarks:

     _____

     _____

_____
Signature of Employee

Attachment:  supporting documentation

C-1

322

Memorandum 5-11                                    Attachment C

<div align="center">**Authorized Absence**</div>

---

**PART II   TO BE COMPLETED BY SERVICE CHIEF**

Has the employee submitted the following:
　　　　　_____ Above Request from Employee is appropriate
　　　　　_____ OPM 71: Request for Leave or Approved Absence
　　　　　_____ Itinerary of training/conference

How will coverage be provided in the absence of employee?
_____

_____

Additional Comments
_____

_____

Recommend Approval/Recommend Disapproval


_____
Service Chief Signature Block; Signature; and　　(Date)

---

**PART III   HUMAN RESOURCES MANAGEMENT REVIEW**

Did the Service submit the following:
　　　　　_____ Service Chief Recommendation
　　　　　_____ Appropriately completed OPM Form 71: Request for Leave or
　　　　　　　　　Approved Absence
　　　　　_____ Itinerary of training/conference
Comments:

_____

_____

Request meets Regulatory Criteria/Does not Meet Regulatory Criteria
(As outlined in VA Handbook 5011: Hours of Duty and Leave and/or Medical Center
Memorandum 05-1 Title 38 Duty and Leave Policy or Medical Center Memorandum 05-11 Title
5 Leave Policy)


_____
Kathleen Catanach
Chief, Human  Resources Management Service

---

C-2

**323**

Memorandum 5-11                                    Attachment C

**Authorized Absence**

```
┌─────────────────────────────────────────────────────────────┐
│ PART IV   APPROVAL                                          │
│                                                             │
│ Concur/Do Not Concur                                        │
│                                                             │
│                                                             │
│ _____                            │
│ PENTAD Official Signature        (Date)                     │
│                                                             │
│                                                             │
│                                                             │
│ Approve/Disapprove                                          │
│                                                             │
│                                                             │
│                                                             │
│ _____                            │
│ George Marnell, Director                                    │
│                                                             │
│                                                             │
│ Remarks, if necessary:                                      │
│                                                             │
│ _____ │
│                                                             │
│ _____ │
│                                                             │
└─────────────────────────────────────────────────────────────┘
```

To be completed by HRMS:
_____   Date approval received
_____   Date copy provided to Financial Management Service, Attn: Payroll (04)
_____   Date copy provided to Service

324

New Mexico VA Health Care System
Albuquerque, New Mexico

Memorandum 05-8
April 27, 2016
05/KC/CB/RTS

## TOURS OF DUTY

1. **Policy:** To establish a policy regarding workweeks and work schedules applicable to all employees of the New Mexico VA Health Care System (NMVAHCS), including employees at Veteran Outreach Centers and Community Based Clinics. Every effort will be made when scheduling hours and tours of duty for employees of the NMVAHCS to assure proper care and treatment of patients, efficiency in management and conduct of the NMVAHCS functions, and equitable treatment of employees.

2. **Responsibility:**
   a. The Associate Director, Assistant Director, Associate Director Patient Care Services, Chief of Staff (COS), as appropriate, are responsible for authorizing tours of duty, which vary from the normal administrative workweek.
   b. Service Chief is responsible for periodic review of hours of duty to assure the NMVAHCS needs are met, with due consideration to employee needs. He/she is also responsible for adhering to the provisions of appropriate negotiated contracts with labor organizations regarding tours of duty.
   c. Employees are expected to be on duty the full period of the tour of duty, unless absent on approved leave, to observe the opening and closing hours established for the tour of duty; and to adhere to established lunch and break periods.

3. **Procedure:**
   a. The administrative workweek is Sunday through Saturday. The basic workweek for full-time employees shall be 40 hours in length and shall consist of five 8-hour days exclusive of the 30-minute lunch period. The 40-hour basic workweek may include Saturday and Sunday; however, the basic workweek may not extend over more than 6 days in the administrative workweek. Normal business hours are 8:00 a.m. to 4:30 p.m., Monday through Friday. Full-time physicians, dentists, optometrists, and podiatrists shall be continuously subject to call unless officially excused. This requirement for availability exists 24 hours per day, 7 days per week.
   b. When adherence to the normal tour is administratively impractical, will handicap operations or result in substantially increased costs, other tours of duty may be established. These other tours of duty are considered uncommon tours of duty and require prior approval of the Associate Director, Assistant Director, Associate Director for Patient Care, Services or COS, as appropriate. Uncommon tours of duty are established and approved based on the needs of the medical center and not for the benefit of individual employees.
   c. All regularly scheduled employees on a part-time work schedule must have an approved part-time tour of duty on file. All part-time tours of duty exceeding 5 hours require a 30-minute lunch period.
   d. Request for approval of uncommon tours of duty will be submitted through Human Resources Management Service (05) for technical review, to the Associate Director, Assistant Director, Associate Director Patient Care Services or COS, as appropriate, for final approval (see attached sample, Attachment A).
   e. Where more than one tour of duty exists for any category of employees, employees affected shall be afforded the opportunity of rotation.

325

**Memorandum 05-8**
**Subj: Tours of Duty**
**April 27, 2016**
**2.**

Periodic rotation on an impartial and reasonable basis is encouraged so that all employees concerned will share in assignment between the less desirable and more desirable tours of duty. Before ordering mandatory rotation, supervisors should canvass their employees to determine if there are any volunteers. Supervisors are expected to be familiar with information on tours of duty outlined in the current Master Agreement between the Department of VA and the American Federation of Government Employees (AFGE).

f. Tours of duty will not be changed arbitrarily and insofar as possible, employees will be given notice of any changes in their schedule at least one administrative workweek in advance. Sympathetic consideration will be extended to employees who have religious scruples against working on their Sabbath. Insofar as possible, work schedules should be arranged to permit employees observance of their Sabbath on whatever day it occurs.

4. **References:** 5 CFR Part 630.210; VA Handbook 5011; Master Agreement between the Department of Veterans Affairs and AFGE Local 2063 and the Albuquerque VAMC.

5. **Rescission:** Medical Center Memorandum 05-8, Tours of Duty dated February 26, 2013.

6. **Expiration Date:** April 27, 2019.

**Signed MCM in D/FMO File**
Andre M. Welch, MHA, FACHE
Director

Attachment

Distribution: "M"

326

Memorandum 05-8                                                    Attachment A

**SAMPLE**

**Department of Veterans Affairs**

**Date:**

**From:**

**Subj:** Request for Uncommon Tour of Duty

**To:**
**Thru: Chief,** Human Resources Management Service (05)

1. Request the following tour of duty be established for _____ Service due to
(Example: increased workload, extended office coverage, efficiency of the Service, etc.):
Monday thru Friday – 7:00a.m. to 3:30 p.m.

(Note: A tour of duty is established/changed and approved based on the needs of the New
Mexico VA Health Care System and not to accommodate individual employee requests).
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
2. If a Service is requesting a change in an uncommon tour, the request must indicate both the
present tour and the proposed tour, as follows:

|    From    |    To:    |
|------------|-----------|
| Mon. thru Wed. 8:00 – a.m. to 12:00 Noon | Mon. & Tues. – 7:30a.m. – 11:30 a.m. |
| Thurs. & Fri. 12:30 p.m. – 4:30 p.m. | Wed. thru Fri. – 8:00 a.m.- 12:00 noon |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
3. The following remark must be added to all requests:

"Employee(s) will be given notice of any change in their work schedule at least one
administrative workweek in advance." (Two weeks, if Bargaining Unit Employee.)


_____
SERVICE CHIEF'S SIGNATURE

APPROVED/DISAPPROVED

                        (Note: Any tour of duty exceeding five (5) hours
                        requires a 30-minute lunch period)

\* _____
Request is submitted to Chief of Staff, Associate Director, Asst. Director, Associate Director for
Patient Care Services as appropriate, for approval.

A-1

327

**Attachment 17** – referral of my complaint to the final agency's decision.

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

## Official Correspondence

---

**Mendez, Claudia (ORM)** <Claudia.Mendez3@va.gov>                    Tue, May 8, 2018 at 7:36 AM
To: "Smith, Karen Y. (ABQ)" <Karen.Smith20@va.gov>, "Drevaleva, Tatyana E."
<Tatyana.Drevaleva@va.gov>
Cc: "tdrevaleva@gmail.com" <tdrevaleva@gmail.com>

---

Dear Ms. Smith and Ms. Drevaleva,


Please find attached EEO correspondence concerning your case.


If you have questions or concerns, please contact the point of contact
referenced in the attached correspondence.



*Claudia A. Mendez*

EEO Counselor

Department of Veterans Affairs

Office of Resolution Management

(310) 478-3711 ext.42095

Fax: (310) 268-4089




*VA Core Values:* Integrity Commitment Advocacy Respect Excellence

*VA Core Characteristics:* Trustworthy | Accessible | Quality | Innovative | Agile | Integrated


*"Thank you for contacting the Office of Resolution Management. Our goal is to provide you with exceptional
customer service. Please take a moment to complete a very brief survey to let us know how my service was today"*

329

Click Here

Note: If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.

📄 **Drevaleva,Tatyana-200P-0501-2017103883.pdf**
16K

330



**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT
11301 Wilshire Boulevard Building 220, 2nd Floor
Los Angeles, CA 90073

In reply refer to: 08H

May 8, 2018

VIA: E-Mail

Department of Veterans Affairs
Office of Employment Discrimination
Complaint Adjudication (00D)
810 Vermont Ave., NW
Washington, DC 20420

**SUBJECT:  Referral of Complaint for Final Agency Decision – Tatyana Drevaleva. Case Number 200P-0501-2017103883, Filed September 19, 2017.**

1. Enclosed is the investigative file pertaining to the above referenced complaint. **Please issue a Final Agency Decision (FAD).**

2. We are referring this matter to your office for a FAD because:

> The complainant expressly requested a FAD in writing. ORM received the complainant's FAD request on April 20, 2018. Copies of the *Notice of Advisement of Rights* dated April 4, 2018 and the complainant's FAD request are enclosed.

3. We will notify you immediately if the matter is settled, if the complainant withdraws the complaint(s), if the complainant files a civil action that appears to raise some or all of the matter(s) alleged in this complaint, or if we learn that the complainant requested a hearing without notifying us of that fact.

4. Questions concerning this referral should be directed to Carlos Funes at carlos.funes@va.gov. We have advised the complainant of this referral by copy of this letter.

Sincerely,

Sophia Eaves
Pacific District Manager

Enclosure:    EEO complaint file

cc:    Tatyana Drevaleva
       10660 Hidden Mesa Place
       Monterey, CA 93940

       Andrew Welch, Medical Center Director

**Attachment 18** – my case was forwarded to OEDCA.

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

## RE: [EXTERNAL] from TD Case

**Funes, Carlos (ORM)** <Carlos.Funes@va.gov>                    Mon, May 21, 2018 at 7:35 AM
To: Tatyana Drevaleva <tdrevaleva@gmail.com>, "Smith, Karen Y. (ABQ)" <Karen.Smith20@va.gov>

Ms. Drevaleva:


Your case was forwarded to OEDCA for a decision as you requested on 5/8/18.  We do
not work for OEDCA so you have to wait to hear from them directly or when they issue a
decision.   Here is some information from their website and mail information:


Department of Veterans Affairs

Office of Employment Discrimination

Complaint Adjudication (00D)

810 Vermont Ave., NW

Washington, DC 20420

https://www.oedca.va.gov/


We are not made aware of any discovery issues if OEDCA made such requests to your
directly because your case was forwarded to them.  Please confer with your
representative on those issues.  If you need anything else please let me know.



**Carlos Funes**

**EEO Case Manager**

**Department of Veterans Affairs**

**Office of Resolution Management**

**Office:  (310) 478-3711 ext. 35819**

**Fax: (310) 268-4089**


333



**VA Core Values:** Integrity Commitment Advocacy Respect Excellence

**VA Core Characteristics:** Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

*"Thank you for contacting the Office of Resolution Management. Our goal is to provide you with exceptional customer service. Please take a moment to complete a very brief survey to let us know how my service was today"*

Click Here

**NOTE:  If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law.  If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.**

**From:** Tatyana Drevaleva [mailto:tdrevaleva@gmail.com]
**Sent:** Friday, May 18, 2018 9:48 AM
**To:** Winter, William (ORM) <william.winter@va.gov>; Smith, Karen Y. (ABQ) <Karen.Smith20@va.gov>; Funes, Carlos (ORM) <Carlos.Funes@va.gov>; Mendez, Claudia (ORM) <Claudia.Mendez3@va.gov>
**Subject:** [EXTERNAL] from Tatyana Drevaleva.

Good afternoon!

Today is a deadline for issuing your Decision.

Also, I haven't heard from the Union representative regarding whether she was able to submit my Interrogatories to Ms. Dunkelberger, Ms. Das, and Mr. Johnson.

Please, let me know about the status of my case.

--

Respectfully,

Tanya.

334

**Attachment 19** – my Notice of Intention to File a Lawsuit, the Agency's response, and my Reply.

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

## RE: [EXTERNAL] from TD Case

---

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                    Mon, May 21, 2018 at 1:12 PM
To: "Funes, Carlos (ORM)" <Carlos.Funes@va.gov>, Claudia.Mendez3@va.gov, "Winter, William (ORM)"
<william.winter@va.gov>
Cc: "Smith, Karen Y. (ABQ)" <Karen.Smith20@va.gov>

Good afternoon!

The deadline for your agency to issue a decision was May 18, 2018. Today is May 21, 2018, and I still
haven't gotten a decision.
I am notifying you about my intention to file an action in a Federal Court. I will send you my letter today.
In thirty days from today, I will sue you in the District Court;.
Respectfully,

Tanya.


[Quoted text hidden]
--
Respectfully,
Tanya.

336

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

## RE: [EXTERNAL] from TD Case

---

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                    Mon, May 21, 2018 at 2:49 PM
To: "Funes, Carlos (ORM)" <Carlos.Funes@va.gov>, Claudia.Mendez3@va.gov, "Winter, William (ORM)"
<william.winter@va.gov>
Cc: "Smith, Karen Y. (ABQ)" <Karen.Smith20@va.gov>

Notice of Intention to File a Lawsuit.

On Mon, May 21, 2018 at 7:35 AM, Funes, Carlos (ORM) <Carlos.Funes@va.gov> wrote:
[Quoted text hidden]


--
Respectfully,
Tanya.

---

📄 **Drevaleva__Notice of Intention to File a Lawsuit__May 21, 2018.pdf**
70K

337

To the Department of Veterans Affairs

from Tatyana Evgenievna Drevaleva

former Medical Instrument Technician

at the Raymond G. Murphy VAMC

10660 Hidden Mesa Place, Monterey, CA, 93940

Case number 200P-0501-2017103883, Filed September 19, 2017.


Notice of Intention to File a Lawsuit.


On September 19, 2017 I filed a retaliation and unlawful termination claim within the Veterans Affairs Administration. I gave sixty days of extension, and the due date to issue a decision was on May 18, 2018. However, I didn't receive such a decision.

I am notifying you about my intention to file a lawsuit for pregnancy discrimination, age discrimination, sex discrimination, retaliation and unlawful termination, libel, and professional negligence for failure to issue a decision prior to or on May 18, 2018.

I will file a lawsuit in the District Court in thirty days from the date of this Notice.

Respectfully,


Tatyana E. Drevaleva

May 21, 2018.

338

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

## Notice of Intention to File a lawsuit - Letter to OEDCA

**Long, Jeanne** <jean.long@va.gov>
To: "tdrevaleva@gmail.com" <tdrevaleva@gmail.com>

Wed, May 30, 2018 at 9:12 AM

Good Afternoon Ms. Drevaleva,


This email is in response to the unsuccessful phone call I made this afternoon to you. Your case was received in OEDCA on 4/26/18 and we docketed a due date of 6/25/18 (60 days). If it is your intention to file a civil action please forward the action to our office so we can procedurally dismiss your case. Thank you


**Jeanne Long**

**Administrative Officer**

**OEDCA**

**202-461-4176**

339

 Gmail

Tatyana Drevaleva <tdrevaleva@gmail.com>

## Notice of Intention to File a lawsuit - Letter to OEDCA

**Tatyana Drevaleva** <tdrevaleva@gmail.com>                    Wed, May 30, 2018 at 2:58 PM
To: "Long, Jeanne" <jean.long@va.gov>, "Smith, Karen Y. (ABQ)" <Karen.Smith20@va.gov>, "Winter, William (ORM)" <william.winter@va.gov>

Good afternoon Ms. Long!

Thank you for giving me a phone call this morning and sending me your email.

I am following the guidelines that your agency determined in our earlier correspondence. On March 05, 2018, I gave your agency sixty days of extension to investigate my complaint. The new deadline for your agency to finish the investigation and to issue a Determination Letter was on May 18, 2018. Because your agency failed to issue the Determination Letter on May 18, 2018, I will file a lawsuit after June 21, 2018.

Your request to forward the action to your office in order to dismiss my case is against the First Amendment to the U.S. Constitution which allows me to petition freely. Your agency is still obligated to issue the Determination Letter. Also, despite two my requests for the arbitration, your agency never scheduled the arbitration.

Since now, all my communication with your agency will be only in writing.

Respectfully,

Tatyana.

[Quoted text hidden]
--
Respectfully,
Tanya.

340

JS-CAND 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Tatyana Evgenievna Drevaleva

**(b)** County of Residence of First Listed Plaintiff    Monterey
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Pro Se

## DEFENDANTS
1) The U.S. Department of Veterans Affairs et al.

County of Residence of First Listed Defendant    Washington, D.C.
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | Pharmaceutical Personal Injury Product Liability | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | ☒ 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | | | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | ☒ 790 Other Labor Litigation | **SOCIAL SECURITY** | 480 Consumer Credit |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 190 Other Contract | 362 Personal Injury –Medical Malpractice | | **IMMIGRATION** | 862 Black Lung (923) | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | 465 Other Immigration Actions | 864 SSID Title XVI | 891 Agricultural Acts |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | 865 RSI (405(g)) | 893 Environmental Matters |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 895 Freedom of Information Act |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 896 Arbitration |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | 871 IRS–Third Party 26 USC § 7609 | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation–Transfer
- ☐ 8 Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 I.S.C. §1346(b)(1) and other.
Brief description of cause:
Retaliation and unlawful termination for my desire to get pregnant.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, Fed. R. Civ. P.
**DEMAND $** 7,000,000.00
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*:
JUDGE     DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)
*(Place an "X" in One Box Only)*
☐ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE    ☐ EUREKA-MCKINLEYVILLE

**DATE** 06/24/2018     **SIGNATURE OF ATTORNEY OF RECORD**

341

**Ashley Kittrell**

| | |
|---|---|
| **From:** | Tatyana Drevaleva <tdrevaleva@gmail.com> |
| **Sent:** | Saturday, September 25, 2021 8:10 PM |
| **To:** | Lyman, Christine (USANM); NMDdb_Proposed Text Johnson; NMDml_Magistrate Judge Robbenhaar's Chambers |
| **Subject:** | Case No. 1:21-cv-00761-WJ-JFR. Excerpts of the Record in Appeal No. 19-16395, Volume 1. |
| **Attachments:** | Drevaleva__Exerpts__03748__Volume 1__numbered.pdf |

<mark>**CAUTION - EXTERNAL:**</mark>

--
Respectfully,
Tanya.

<mark>**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.</mark>

No. 19-16395

**Court of Appeals for the 9th Circuit**

Tatyana Evgenievna Drevaleva

*Plaintiff-Appellant Pro Se*

v.

1) The U.S. Department of Veterans Affairs

2) Mr. Robert Wilkie, Esq. in his capacity as an acting Secretary of the U.S. Department of Veterans Affairs

*Defendants-Appellees*

*The District Court for Northern California,*

*case No.3:18-cv-03748, Hon. Judge William Alsup*

# EXERPTS OF THE RECORD,

# VOLUME 2.

**Docket No. 34** - Defendants' Motion to Dismiss the Complaint, October 09, 2018 **(pages 342-352)**

**Docket No. 38** - Plaintiff's Motion to Strike Defendants' Motion to Dismiss; Declaration, October 18, 2018 **(pages 353-374)**

**Docket No. 39** - Plaintiff's Motion for Preliminary Injunction; Declaration, October 19, 2018 **(pages 375-382)**

**Docket No. 40** - Plaintiff's Opposition to Defendants' Motion to Dismiss, Declaration, October 21, 2018 **(pages 383-404)**

**Docket No. 41** - Defendants' Reply to Plaintiff's Opposition to Motion to Dismiss, Proposed Order, October 26, 2018 **(pages 405-419)**

**Docket No. 42** - Plaintiff's Request for Leave to File a Supplemental Brief, October 27, 2018 **(pages 420-422)**

**Docket No. 43** - Defendants' Errata Re Reply Memorandum in Support of Defendants' Motion to Dismiss, October 30, 2018 **(pages 423-425)**

**Docket No. 44** - Defendants' Opposition to Plaintiff's Motion to Strike Defendants' Motion to Dismiss, F.R.C.P. 12(f), October 29, 2018 **(pages 426-429)**

**Docket No. 45** - Defendants' Opposition to Plaintiff's Request for Leave to File a Supplemental Brief Re Defendants' Motion to Dismiss; Declaration of Claire T. Cormier; [Proposed] Order, October 29, 2018 **(pages 430-433)**

**Docket No. 46** - Reply to Defendants' Opposition to Plaintiff's Request for Leave to File a Supplemental Brief, October 29, 2018 **(pages 434-437)**

**Docket No. 47** - Reply to Defendants' Opposition to Plaintiff's Motion to Strike, October 29, 2018 **(pages 438-441)**

**Docket No. 48** - Notice of Appearance, Ms. Kimberly Robinson, Esq., October 30, 2018 **(pages 442-444)**

**Docket No. 49** - Notice of Appearance, Ms. Kimberly Robinson, Esq., October 30, 2018 **(pages 445-447)**

**Docket No. 50** - Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction. Declaration of Carla Dunkelberger. Exhibits, November 02, 2018 **(pages 448-486)**

**Docket No. 51** - ORDER DENYING REQUEST TO FILE SUPPLEMENTAL BRIEFING, November 02, 2018 **(pages 487-489)**

**Docket No. 53** - Plaintiff's Response to General Order 71, November 08, 2018 **(pages 490-638)**

I declare under the penalty of perjury and under the Federal laws that all foregoing is true and correct. Executed at San Francisco, CA on September 05, 2020.

Respectfully submitted,

s/ Tatyana Drevaleva

Petitioner Pro Se

3015 Clement St., Apt. 204, San Francisco, CA, 94121

415-806-9864; tdrevaleva@gmail.com

Date: September 05, 2020.

**Docket No. 34**

October 09, 2018.

Defendants' Motion to Dismiss the Complaint.

1  ALEX G. TSE (CSBN 152348)
   United States Attorney
2  SARA WINSLOW (DCBN 457643)
   Assistant United States Attorney
3  Chief, Civil Division
   CLAIRE T. CORMIER (CSBN 154364)
4  Assistant United States Attorney

5       U.S. Attorney's Office/Civil Division
        150 Almaden Blvd., Suite 900
6       San Jose, CA 95113
        Telephone: (408) 535-5044
7       Fax: (408) 535-5081
        Email: claire.cormier@usdoj.gov
8
   Attorneys for Defendant Robert Wilkie
9  Secretary, U.S. Dept. of Veterans Affairs

10                UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                 SAN FRANCISCO DIVISION

13
                                    ) CASE NO. 18-CV-3748-WHA
14  TATYANA E. DREVALEVA,           )
                                    )
15              Plaintiff,          ) NOTICE OF MOTION AND MOTION TO
                                    ) DISMISS
16      v.                          )
                                    )
17  1) The U.S. DEPARTMENT OF VETERANS ) Date: November 29, 2018
    AFFAIRS                         ) Time: 8:00 a.m.
18                                  ) Courtroom 12, 19th Floor
    2) ROBERT WILKIE, Secretary, U.S. Dept. of ) Hon. William H. Alsup
19  Veterans Affairs,              )
                                    )
20              Defendants.         )
    _____ )
21
22                    **NOTICE OF MOTION**

23       PLEASE TAKE NOTICE that on Thursday, November 29, 2018, at 8:00 a.m., or as soon

24  thereafter as the parties may be heard in Courtroom 12, 19th Floor, United States Courthouse, 450

25  Golden Gate Avenue, San Francisco, CA, Defendant U.S. Department of Veterans Affairs ("VA") and

26  Defendant Robert Wilkie, Secretary of the VA[1], will move this Court for an order dismissing the

27  _____

28      [1] Pursuant to Fed. R. Civ. P. Rule 25(d) Secretary Wilkie is automatically substituted for his
    predecessor in office.

MOTION TO DISMISS - Case No. 18-CV-3748-WHA
                        1

343

Complaint for failure to comply with Rule 10 of the Federal Rules of Civil Procedure, for lack of jurisdiction pursuant to Rule 12(b)(1), and for failure to state a claim under Rule 12(b)(6). Defendant's Motion is based on this notice, the points and authorities in support of this motion, the pleadings on file in this matter, and on such oral argument as the Court may permit.

Pursuant to Civ. L.R. 7-3, any opposition is due within fourteen days of service of this motion. Accordingly, Plaintiff's opposition must be served and filed by October 23, 2018.

**ISSUES TO BE DECIDED**

1) Whether the Complaint should be dismissed for failure to comply with Rule 10.

2) Whether Plaintiff's fifth, sixth, and seventh claims set forth in her Complaint must be dismissed for lack of subject matter jurisdiction without leave to amend because Title VII of the Civil Rights Act is her exclusive remedy for the conduct complained of.

3) Whether the Federal Tort Claims Act bars Plaintiff's tort claims.

4) Whether the United States Department of Veterans Affairs is a proper defendant in this matter.

5) Whether Plaintiff may seek punitive damages against a federal defendant.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. FACTS[2]**

Plaintiff, Tatyana E. Drevaleva, was employed as a medical instrument technician at the Raymond G. Murphy Veterans Affairs Medical Center ("VAMC") in Albuquerque, New Mexico. Complaint at p. 2. After working at the VAMC for about a month and a half, Plaintiff requested leave without pay ("LWOP") and travelled to Russia. Complaint at p. 3, 6. Plaintiff planned to undergo an In-Vitro Fertilization ("IVF") procedure and search for a surrogate mother in Russia since she cannot carry the pregnancy herself. Complaint at p. 4.

While in Russia, Plaintiff emailed a translated document from her Russian OB/GYN explaining that she was in the Russian registry to receive an IVF procedure. Complaint attachment 2. Plaintiff updated her supervisors on her IVF procedure by email and informed them that she was staying in

---

[2] Many of the "facts" presented in this motion are based on Plaintiff's allegations. Defendant presents these facts for purposes of this motion only. Should this case proceed beyond this motion, Defendant may present evidence disputing certain allegations.

Russia a month longer than originally predicted. Complaint at p. 6, 7. Plaintiff requested additional time off, and her supervisor replied stating that Plaintiff had been let go. Complaint at p. 7. Plaintiff returned to the United States after remaining in Russia for another month. Complaint at p. 7, 8.

In a mediation proceeding, Plaintiff learned that her supervisor submitted her LWOP request to the Director of Nursing Services, who denied her request under the Family Medical Leave Act ("FMLA") because she did not qualify for leave under the FMLA, which requires the employee to have worked for the employer for at least one year. Complaint at p. 8. The supervisor explained that a letter stating Plaintiff's leave was denied was mailed to her home and could not be emailed to Plaintiff in Russia because it was against VAMC policy. Complaint at p. 8, 9. After the VAMC refused to reinstate her, Plaintiff learned that the VAMC hired two younger male monitor technicians. Complaint at p. 9. This led Plaintiff to file claims for pregnancy discrimination, sex discrimination, age discrimination, and disability discrimination against the VAMC. Complaint at p. 10-21 (Causes of Action 1 through 4).

Plaintiff moved from New Mexico to California, where she applied for Unemployment Insurance benefits. Complaint at p. 8. She did not receive the benefits because the Employment Development Department ("EDD") learned that Plaintiff was let go for cause. Complaint at p. 9. Plaintiff alleges the VAMC committed libel when her supervisor told the EDD that she was discharged for cause because she traveled to Russia without approved leave. Complaint at p. 21 (Fifth Cause of Action).

Plaintiff alleges the VAMC intentionally caused her emotional distress ("IIED") by relieving her of her position at the VAMC and depriving her of the opportunity to have children. Complaint at p.21-22 (Sixth Cause of Action).

Finally, Plaintiff alleges the VAMC deprived her of liberty or property in violation of the Fifth Amendment of the United States Constitution. Complaint at p. 22-23 (Seventh Cause of Action). She claims the VAMC deprived her of the liberty to work and of any property she would have purchased if she was still employed at the VAMC. Complaint at p.23.

All of Plaintiff's seven claims arise from her employment at the VAMC. Her prayer for relief requests reinstatement, back pay, compensatory damages of five million dollars, attorney's fees, and punitive damages for libel in the amount of two million dollars. Complaint at p. 24-25.

## II.    LEGAL STANDARDS

Rule 10 of the Federal Rules of Civil Procedure requires a plaintiff to state her claims "in numbered paragraphs, each limited as far as practicable to a single set of circumstances." This allows a defendant to respond to the complaint allegations "refer[ring] by number to a paragraph" in the complaint. Fed. R. Civ. P. 10(b). Plaintiff's Complaint lacks numbered paragraphs.

Where subject matter jurisdiction is lacking, dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) is the appropriate disposition. *MacKay v. Pfiel*, 827 F.2d 540, 543 (9th Cir. 1987). Once the defendant objects based on a lack of subject matter jurisdiction, plaintiff bears the burden of establishing that the court has subject matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Federal courts have limited jurisdiction, and the presumption is that a complaint falls outside this limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).

A Rule 12(b)(1) motion may launch a facial or factual jurisdictional attack. In a facial attack, "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In evaluating a facial attack, the Court must accept the factual allegations in plaintiff's complaint as true. *Miranda v. Reno*, 238 F.3d 1156, 1157 n.1 (9th Cir. 2001). The court, however, does not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *Ileto v. Glock Inc.,* 349 F.3d 1191, 1199-200 (9th Cir. 2003). When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted), and construe them in the light most favorable to the plaintiff. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). Legal conclusions couched as factual allegations, however, are not entitled to the assumption of truth, *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009), and therefore are insufficient to defeat a motion to dismiss for failure to state a claim. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2008).

346

## III.    STATUTORY FRAMEWORK FOR EMPLOYMENT-RELATED CLAIMS

Title VII of the Civil Rights Act of 1964, as amended, makes it "an unlawful employment practice for an employer to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The terms "because of sex" or "on the basis of sex" include, "but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . . ." 42 U.S.C. § 2000e(k).

Congress extended the protections of Title VII to federal employees. Title VII states, "[a]ll personnel actions affecting employees or applicants for employment . . . in executive agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). The extension of Title VII to federal employees also included "rigorous administrative exhaustion requirements." *Brown v. General Services Administration*, 425 U.S. 820, 833 (1976). The requirements create "a dispute resolution system that requires a complaining party to pursue administrative relief prior to court action, thereby encouraging quicker, less formal, and less expensive resolution of disputes within the Federal Government and outside of court." *West v. Gibson*, 527 U.S. 212, 218-19 (1999).

## IV.    ARGUMENT

### A.    Rule 10 of the Federal Rules of Civil Procedure requires Plaintiff to state her claims in numbered paragraphs.

Under Rule 10 of the Federal Rules of Civil Procedure, a complaint must state a party's claims in sequentially "numbered paragraphs, each limited as far as practicable to a single set of circumstances" in a manner that "would promote clarity . . . ." Fed. R. Civ. P. 10(b). A complaint is subject to dismissal if it fails to comply with Rule 10 and makes it difficult for "any Defendant to properly respond to the allegations." *Jacob v. Flagg,* 2010 WL 4974868 at *3 (S.D. Cal. Dec. 1, 2010) (plaintiff's complaint

1  was dismissed for failing to comply with Rule 10); *see also Bishop v. Mohave Mental Health*

2  *Incorporated,* 2017 WL 1927918 at *3 (D. Ariz. May, 10, 2017).

3       Here, Plaintiff's complaint fails to comply with Rule 10 making it difficult for Defendants to

4  properly respond to Plaintiff's allegations. Thus, Plaintiff's complaint should be dismissed with leave to

5  amend because it violates Rule 10.

6       **B.    Title VII preempts Plaintiff's tort and constitutional claims.**

7       In *Brown,* 425 U.S. at 835, the Supreme Court held that Title VII "provides the exclusive judicial

8  remedy for claims of discrimination in federal employment." Where a federal employee asserts a claim

9  under Title VII, that statute is exclusive of any other remedy against both the federal government and the

10  individual federal employees alleged to have participated in the discrimination. *White v. General*

11  *Services Administration*, 652 F.2d 913, 916-17 (9th Cir. 1981). The Court in *Brown* held that "[s]ection

12  717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16 (1970 ed., Supp. IV), proscribes federal

13  employment discrimination and establishes an administrative and judicial enforcement system." *Brown*,

14  425 U.S. at 829. The Supreme Court held that section 717 is a "precisely drawn, detailed statute [that]

15  preempts more general remedies," and thus it "provides the exclusive remedy for claims of

16  discrimination in federal employment." *Id.* at 834-35.

17       Based upon the legislative history and structure of section 717 of Title VII (42 U.S.C. § 2000e-

18  16), the Court found that "[t]he balance, completeness, and structural integrity of § 717 are inconsistent

19  with the . . . contention that the judicial remedy afforded by § 717(c) was designed merely to supplement

20  other putative judicial relief." *Brown*, 425 U.S. at 832. Therefore, because it was Congress' intent to

21  create an "unambiguous . . . exclusive, preemptive administrative and judicial scheme for the redress of

22  federal employment discrimination," Plaintiff may not "bootstrap" additional causes of action onto her

23  Title VII complaint. *Id.* at 829-30.

24       **1.    Preemption of Plaintiff's Constitutional Claim**

25       The Ninth Circuit has rejected supplemental statutory and constitutional claims where those

26  claims were remediable under Title VII or involved the same factual predicate as the plaintiff's Title VII

27  claim. *See Nolan v. Cleland*, 686 F.2d 806, 814-15 (9th Cir. 1982) (holding that *Brown's* holding cannot

28  be circumvented where the factual predicate for the plaintiff's constitutional claim is the discrimination

that is the basis for her Title VII claim); *Brazil v. U.S. Dep't of Navy*, 66 F.3d 193, 198 (9th Cir. 1995) (rejecting plaintiff's Fifth Amendment equal protection claim because his claim was covered by the "massive and complex program" of Title VII). Other circuits agree. *See, e.g, Belhomme v. Widnall*, 127 F.3d 1214, 1217 (10th Cir. 1997) (holding that "Title VII preempts any constitutional cause of action that a court might find under the First or Fifth Amendments for discrimination in federal employment").

In this case, Plaintiff alleges she was deprived of liberty and property without due process by the VAMC. Complaint at p. 22. Plaintiff claims that, by discharging her, the VAMC deprived her of the liberty to work and the property she would have been able to purchase if she was still employed at the VAMC. Complaint at p. 23. Plaintiff's Title VII causes of action state the VAMC discriminated against her by discharging her because of sex, age, and her pregnancy-related health conditions. Complaint at p.14, 17. Defendant is unaware of any case where the court permitted a plaintiff to maintain a separate constitutional claim where the plaintiff brought an employment discrimination claim under Title VII. Because Plaintiff predicates her constitutional and Title VII causes of action on the same event – her termination – this Court should dismiss Plaintiff's seventh cause of action because Title VII preempts any constitutional claim with the same factual predicate and provides the "exclusive remedy" for federal employment discrimination claims. *Brown*, 425 U.S. at 834-35.

## 2. Preemption of State Tort Claims

The Ninth Circuit and the Supreme Court have both held that, due to Title VII's comprehensive scope, it preempts other causes of action seeking to redress the same wrong, including tort claims based upon the same discriminatory employment actions. *Brown*, 425 U.S. at 835; *Williams v. General Services Administration*, 905 F.2d 308, 311 (9th Cir. 1990).

Here, both of Plaintiff's tort claims are based upon her employment at the VAMC and the alleged discriminatory actions taken by her supervisor and the VAMC. Plaintiff claims she was defamed when her former supervisor told the EDD that she was discharged because she travelled to Russia without approved leave. Complaint at p. 21. Plaintiff also claims the VAMC intentionally caused her emotional distress by discharging her, depriving her of her opportunity to work and have children. Complaint at p. 22. Thus, the Court should dismiss Plaintiff's libel and IIED causes of action because

349

1    Title VII provides the exclusive remedy for federal employment discrimination actions and preempts

2    tort claims seeking to redress the same wrong.

3    **C.    The Federal Tort Claims Act bars Plaintiff's tort claims even if Title VII did not**

4    **preempt them.**

5        Even if Plaintiff's tort claims were not preempted by Title VII, they would still be subject to

6    dismissal. The Federal Tort Claims Act ("FTCA") provides the "exclusive remedy for tortious conduct

7    by the United States" and effected a broad waiver of sovereign immunity, making the United States

8    liable for the tortious acts of its employees, with certain exceptions. *See Federal Deposit Ins. Corp. v.*

9    *Craft,* 157 F.3d 697, 716 (9th Cir.1998); 28 U.S.C. § 2674. The FTCA, however, "only allows claims

10   against the United States" and does not allow claims against a federal employee or a federal agency. *See*

11   *Federal Deposit Ins. Corp.,* 157 F.3d at 706; *Kennedy v. United States Postal Serv.,* 145 F.3d 1077,

12   1078 (9th Cir.1998) (per curiam) (The court held that the "United States Postal Service in its own name

13   is not a claim against the United States.")

14       The FTCA also provides that an "action shall not be instituted . . . against the United States,"

15   unless the claimant has first exhausted 0administrative remedies. 28 U.S.C. § 2675(a). Additionally,

16   under the FTCA, any claims for libel are expressly excluded from the general waiver of sovereign

17   immunity for tort claims. *See* 28 U.S.C. § 2680(h). This Court would have jurisdiction over Plaintiff's

18   tort claims against the United States *only* if there was an express waiver of sovereign immunity. *See*

19   *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33-34 (1992). Absent a waiver, sovereign immunity

20   shields the United States and its agencies from suit. *See Loeffler v. Frank*, 486 U.S. 549, 554 (1988).

21       In this case, Plaintiff is asserting libel and IIED claims against the VA and its Secretary.

22   Complaint at p. 21, 22. The FTCA provides her "exclusive remedy" when bringing tort claims against

23   the government and requires a plaintiff to exhaust her administrative remedies before bringing an action

24   against the United States. *Federal Deposit Ins. Corp.,* 157 F.3d at 716; 28 U.S.C. § 2675(a). Here,

25   Plaintiff has not provided any allegation or evidence that she has exhausted her administrative remedies.

26   Even if she had, the Ninth Circuit has held that the proper defendant in an FTCA claim is the United

27   States; the FTCA bars bringing an action against a federal employee or federal agency. *Kennedy*, 145

28

350

1  F.3d at 1078. Additionally, Plaintiff asserts a claim for libel against the VAMC, a tort expressly

2  excluded from the waiver of immunity by the United States under the FTCA. 28 U.S.C. § 2680(h).

3     Finally, there is no evidence the United States waived its sovereign immunity in this case, a

4  requirement for this Court to have jurisdiction over Plaintiff's tort claims. *See Nordic Village, Inc.*, 503

5  U.S. at 33-34; *Loeffler*, 486 U.S. at 554. Therefore, even if Title VII did not preempt Plaintiff's tort

6  claims, she is prohibited from asserting them under the FTCA for naming an improper defendant, for

7  failing to exhaust administrative remedies, for asserting an expressly excluded claim, and because there

8  is no evidence the United States has waived its sovereign immunity in this case. Her tort claims should

9  be dismissed.

10    **D.      The Department of Veterans Affairs is an improper defendant.**

11    Section 717 of Title VII, 42 U.S.C. § 2000e-16, states that in a Title VII discrimination action,

12  "the head of the department, agency, or unit . . . shall be the defendant." 42 U.S.C. § 2000e-16(c). The

13  terms "department," "agency," and "unit" are defined in section 2000e-16(a). "[A]gency" refers to one

14  of the "executive agencies as defined in section 105 of Title 5." In turn, 5 U.S.C. § 105 states that

15  "'Executive agency' means an Executive department, a Government corporation, [or] an independent

16  establishment." 5 U.S.C. §101 further defines "Executive department" as one of the thirteen cabinet-

17  level departments, including the VA.

18    Plaintiff named the VA and the Secretary of the VA as defendants. Complaint at p. 1. In a Title

19  VII discrimination action, the head of the department or agency, the Secretary of the VA in this case, is

20  the only proper defendant. 42 U.S.C. § 2000e-16(c). Thus, under Title VII, Plaintiff improperly named

21  the VA as a defendant, and it should be dismissed as a defendant from this action.

22    **E.      Punitive damages are not available against federal government defendants.**

23    As provided in 42 U.S.C. Section 1981a(b)(1), punitive damages are not available against federal

24  government defendants in a Title VII case. Section 1981a(b)(1) states, "[a] complaining party may

25  recover punitive damages under this section against a respondent (other than a government, government

26  agency or political subdivision . . . .)" 42 U.S.C. § 1981a(b)(1). Plaintiff does not expressly request

27  punitive damages as a remedy for her Title VII claim, but she should not be allowed to amend to do so.

28

1    Plaintiff does request punitive damages as a remedy for her libel claim. As discussed above, that

2    claim must be dismissed. Plaintiff, however, could not recover punitive damages from the federal

3    government even if she could pursue a tort claim. Section 2674 of the FTCA provides, the United States

4    "shall not be liable for . . . punitive damages." Even "if the local law provides for punitive damages, or

5    permits application of standards which result in plaintiffs getting more than compensatory damages,

6    only compensatory damages may be awarded." *Felder v. United States*, 543 F.2d 657, 669 (9th Cir.

7    1976) (quoting *United States v. English*, 521 F.2d 63, 70 (9th Cir. 1975)). Therefore, such damages are

8    unrecoverable under either Title VII or the FTCA and should be stricken from the complaint.

9    **V.    CONCLUSION**

10   Since Title VII provides the exclusive remedy for discrimination in federal employment, any

11   additional claims asserted by Plaintiff under tort and constitutional law are preempted and must be

12   dismissed. Plaintiff is limited to her claims of discrimination under Title VII and cannot "bootstrap" tort

13   and constitutional claims onto her Title VII complaint. Even if Title VII did not preempt Plaintiff's tort

14   claims, the claims are barred under the FTCA. Additionally, the VA should be removed from this action

15   because the "head of the department" is the only proper defendant in a Title VII discrimination action.

16   Finally, punitive damages are not available against a federal employer under Title VII or the FTCA.

17   Plaintiff's fifth, sixth, and seventh causes of action should be dismissed with prejudice and

18   without leave to amend. All claims against the VA should be dismissed with prejudice and without leave

19   to amend. The prayer for punitive damages should be stricken. Finally, because Plaintiff's complaint

20   fails to comply with Rule 10, the remainder of the complaint – the first through fourth causes of action

21   against the Secretary – should be dismissed with leave to amend and with instructions that any amended

22   complaint should be written in numbered paragraphs.

23                                                    Respectfully submitted,

24                                                    ALEX G. TSE
                                                      United States Attorney
25

26   Dated: October 9, 2018                           ___/s/  Claire T. Cormier____
                                                      CLAIRE T. CORMIER
27                                                    Assistant United States Attorney

28

MOTION TO DISMISS - Case No. 18-CV-3748-WHA

352

**Docket No. 38**

October 18, 2018.

Plaintiff's Motion to Strike Defendants' Motion to Dismiss;

Declaration.

1    Tatyana Evgenievna Drevaleva

2    No current home postal address, no mailing address

3    Currently residing in California

4    415-806-9864, tdrevaleva@gmail.com

5    Plaintiff in Pro Per

6

7                    THE UNITED STATES DISTRICT COURT

8                    NORTHERN DISTRICT OF CALIFORNIA

9

10

|  |  |
|---|---|
| ) | |
| ) | |
| Tatyana E. Drevaleva ) | Case No. 3:2018cv03748 |
| ) | |
| ) | |
| Plaintiff, ) | Notice of Motion; Motion to Strike |
| ) | |
| vs. ) | Defendants' Motion to Dismiss, F.R.C.P. |
| ) | |
| 1) The U.S. Department of Veterans ) | Rule 12(f); Memorandum of Points and |
| Affairs ) | Authorities; Declaration. |
| ) | |
| 2) Mr. Peter O'Rourke, Acting United ) | |
| States Secretary of Veterans Affairs ) | |
| 810 Vermont Avenue, NW ) | |
| Washington, DC 20420 ) | Date: November 29, 2018 |
| ) | |
| Facility: New Mexico VA Healthcare System ) | Time: 8.00 AM |
| 1501 San Pedro Drive, S.E. ) | |
| Albuquerque, NM 87108 ) | Location: Courtroom 12, 19th Floor |
| ) | |
| Defendant. ) | Judge: Hon. William Alsup |
| ) | |

24  _____

25          TO THE HONORABLE COURT, ALL PARTIES, AND COUNSEL ON RECORD.

26

27

28                              Page **1** of **18**

         Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

                                                                    354

1. NOTICE IS HEREBY GIVEN that on 11/29/2018 at 8.00AM or as soon thereafter as the matter may be heard in Courtroom 12, the 19th Floor of The United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA, 94102, Plaintiff Tatyana E. Drevaleva will move the Court to strike Defendants' Motion to Dismiss according to F.R.C.P. Rule 12(f).

2. Said Motion shall be based on this Notice, the attached Motion to Strike Defendants' motion to Dismiss, the attached Memorandum of Points and Authorities, the attached Declaration, the pleadings and papers on file, and on such additional maters as may be presented to the Court prior to or at the hearing.

Dated: October 18, 2018           Signed: Tatyana Drevaleva 

**TABLE OF CONTENTS**

I.   Introduction…………………………………………………………………………5

II.  Statement of Facts………………………………………………………………...5

III. Legal Standard…………………………………………………………………8

    Issue 1………………………………………………………………………8

    Issue 2……………………………………………………………………...11

    Issue 3……………………………………………………………………...11

    Issue 4……………………………………………………………….....12

    Issue 5……………………………………………………………………...17

IV. Conclusion…………………………………………………………………18

**STATUTES**

The U.S. Constitution…………………………………………………………..13, 14, 15, 17

The First Amendment to the U.S. Constitution…………………………………11, 14, 15

The Fifth Amendment to the U.S. Constitution…………………………………11, 14, 15

Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

355

29 U.S.C. §701 or The Rehabilitation Act of 1973……………………………11, 14, 16, 17

28 U.S.C. §1331…………………………………………………………………………11

28 U.S.C. §1746………………………………………………………………………...18

28 U.S.C. §2680(h)……………………………………………………………………17

29 CFR Appendix to Part 1604, Q. & A. on the Pregnancy Discrimination Act……………….11

42 U.S.C. §12102(2)(B) or The Americans with Disabilities Act (ADA) …………11, 14, 16, 17

42 U.S.C. §1981…………………………………………………………………12, 13, 16, 17

42 U.S.C. §1983……………………………………………………………………13, 16, 17

42 U.S.C. §1985……………………………………………………………………...13, 17

42 U.S.C. §1986……………………………………………………………………...13, 17

42 U.S.C. §1988……………………………………………………………………...13, 17

42 U.S.C. §2000d……………………………………………………………………13, 17

42 U.S.C. §2000e……………………………………………………………………….15

42 U.S.C. §2000e-16…………………………………………………………………...13

42 U.S.C. §2000e–2(m)………………………………………………………………...16

42 U.S.C. §2000e–5(g)(2)(B)…………………………………………………………16

Executive Order 11478………………………………………………………………13, 14

F.R.C.P. Rule 10(b)……………………………………………………… 5, 8, 9, 10, 11

F.R.C.P. Rule 12(b)(1)……………………………………………………………....5, 11

F.R.C.P. Rule 12(b)(6)……………………………………………………………5, 11, 12

F.R.C.P. Rule 12(f)……………………………………………………………......5

F.R.C.P. Rule 19……………………………………………………………………..9

F.R.C.P. Rule 8(a)……………………………………………………………………11

F.R.C.P. Rule 8(a)(2)……………………………………………………………......10

The Age Discrimination in Employment Act or the ADEA…………………………11, 15, 16, 17

The Americans with Disabilities Act (ADA) or 42 U.S.C. §12102(2)(B)………...11, 14, 16, 17

The Civil Rights Act of 1964, §717(c)……………………………………………......13

Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

356

The Civil Rights Act of 1964, the 1972 Amendment, Section 717……………………….12, 13

The Civil Rights Act of 1964, Title VII……………………………5, 11, 12, 13, 14, 15, 16, 17

The Declaratory Judgment Act………………………………………………………….12

The Equal Employment Opportunity Act of 1972, §11…………………………….…….12

The Family Medical Leave Act or the FMLA……………………………………………..8

The Federal Tort Claims Act or the FTCA…………………………………………5, 17

The Rehabilitation Act of 1973 or 29 U.S.C. §701………………………….......11, 14, 16, 17

**CASE LAW**

*Belhomme v. Widnall*, 127 F.3d 1214, 1217 (10th Cir. 1997)…………………………..14, 15

*Bishop v. Mohave Mental Health Incorporated*, 2017 WL 1927918 at *3 (D. Ariz. May, 10, 2017)……………………………………………………………………………...10

*Brazil v. U.S. Dep't of Navy*, 66 F.3d 193, 198 (9th Cir. 1995)………………………..…14

*Brown v. General Services Administration*, 425 U.S. 820, 833 (1976)……………...12, 13, 15, 17

*Carey v. Piphus*, 435 U.S. 247, 264 (1978)…………………………………………...16

*Department of the Navy v. Egan*, 484 U.S. 518 (1988)……………………………….…14

*Desert Palace, Inc. v. Costa*, 539 U. S. 90 (2003)…………………………………………15

*Dorfmont v. Brown*, 913 F.2d 1399 (9th Cir. 1990)……………………………………14

*EEOC v. Arabian American Oil Co.*, 499 U. S. 244 (1991)………………………...…16

*Federal Express Corp. v. Holowecki*, 552 U. S. 389 (2008)……………………………...16

*Gross v. FBL Financial Services, Inc.,* 557 U.S. 167 (2009)…………………………….15

*Jacob v. Flagg*, 2010 WL 4974868 at *3 (S.D. Cal. Dec. 1, 2010)……………………….9

*Lindh v. Murphy*, 521 U. S. 320 (1997)………………………………………………16

*Nolan v. Cleland*, 686 F.2d 806, 814-15 (9th Cir. 1982)……………………………13

*Patterson v. P.H.P. Healthcare Corp.,* 90 F.3d 927, 937 (5th Cir. 1996)……………...…16

*Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989)…………………………………………15

*Scott v. Perry*, 569 F.2d 1064 (9th Cir. 1973)……………………………………………13

Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

357

*White v. General Services Administration*, 652 F.2d 913, 916-17 (9th Cir. 1981)…………....13

### MEMORANDUM OF POINTS AND AUTHORITIES

**3. Introduction.**

Defendants try to escape from liability for committing discrimination at workplace and unlawful termination. According to F.R.C.P. Rule 12(f) "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The Court may act (2) on motion made by a party … before responding to the pleading…"

**4. Statement of Facts.**

The Defendants' Motion to Dismiss is based on the following issues:

1) That my Complaint should be dismissed for failure to follow the requirements set forth in F.R.C.P. Rule 10(b) because I didn't number the paragraphs

2) That the District Court doesn't have jurisdiction over my Complaint – F.R.C.P. Rule 12(b)(1)

3) That I didn't state the claim upon which relief could be granted – F.R.C.P. Rule 12(b)(6)

4) That "fifth, sixth, and seventh claims set forth in her Complaint must be dismissed for lack of subject matter jurisdiction without leave to amend because Title VII of the Civil Rights Act is her exclusive remedy for the conduct complained of" (Motion to Dismiss, page 2, lines 9-11)

5) That "the Federal Tort Claims Act bars Plaintiff's tort claims" (Motion to Dismiss, page 2, line 12)

6) That "the United States Department of Veterans Affairs is a[n] [im]proper defendant in this matter" (Motion to Dismiss, page 2, line 12)

Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

358

7) That "Plaintiff may [not] seek punitive damages against a federal defendant" (Motion to Dismiss, page 2, line 14).

5. Later, the Defendants attempt to mislead the Court regarding the allegations in the Plaintiff's Complaint. Here are the points of misleading:

1) In her version, Ms. Cormier stated, "After working at the VAMC for about a month and a half, Plaintiff requested leave without pay ("LWOP") and travelled to Russia." In fact, I explained in my Complaint that, after working at the VAMC for 1.5 months, I approached Manager Ms. Dunkelberger and told her the history of my battle with infertility, I said that I was running out of hormonal pills that were not available in the USA, I said that I needed to go to Russia to refill the hormonal pills and to perform an IVF attempt because I was in the Registry of patients who are entitled to a free of charge IVF, and that I couldn't afford this procedure in the United States because of its high price and my low salary. Later, I approached Assistant Manager Mr. Johnson and told him the same story. It was Ms. Dunkelberger who said that she couldn't pay me while I am in Russia (Complaint, page 4, lines 21-22.) It was Mr. Johnson who offered me to submit an application for LWOP (Complaint, page 6, lines 7-8.) It was not my initial initiative to request LWOP

2) Read Ms. Cormier's statement, "Plaintiff planned to undergo an In-Vitro Fertilization ("IVF") procedure and search for a surrogate mother in Russia since she cannot carry the pregnancy herself." Read my Complaint, page 4, "I said to Ms. Dunkelberger that my plan was to go to Russia for approximately 1.5 months, to refill my Jeanine pills, to perform a free of charge attempt of IVF procedure, to freeze the embryo if the IVF procedure is successful, and to return back to work in the Hospital." I didn't say to Ms. Dunkelberger that I was planning to be searching a surrogate mother during that upcoming trip to Russia. Ms. Cormier

Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

359

intentionally fails to acknowledge that Mr. Johnson verbally allowed me to go to Russia for my IVF procedure (Complaint, page 6, lines 6-7, "The exact words of Mr. Johnson were, "If you need to go – go!" Therefore, he verbally allowed me to go to Russia"). Ms. Cormier also intentionally fails to acknowledge that I informed my co-worker Ms. Das that Mr. Johnson verbally allowed me to go to Russia (Complaint, page 6, lines 11-13, "Afterwards, I spoke to Ms. Das, and I told her that Mr. Johnson had verbally allowed me to go to Russia for the IVF purpose. I also informed Ms. Das that I would be absent from May 18, 2017 to July 07, 2017")

3) Read Ms. Cormier's statement, "While in Russia, Plaintiff emailed a translated document from her Russian OB/GYN explaining that she was in the Russian registry to receive an IVF procedure." In fact, I emailed the original document from my Russian OB'GYN (in Russian) to both Ms. Dunkelberger and Mr. Johnson prior to my trip to Russia. While in Russia, I emailed both Ms. Dunkelberger and Mr. Johnson the translated version of the same document. In approximately one month, I emailed both Ms. Dunkelberger and Mr. Johnson the second document from my OB/GYN stating that I needed to spend more time in Russia for additional examinations and procedures

4) Read Ms. Cormier's statement, "Plaintiff updated her supervisors on her IVF procedure by email and informed them that she was staying in Russia a month longer than originally predicted. Plaintiff requested additional time off, and her supervisor replied stating that Plaintiff had been let go." In fact, I explained in my Complaint that, despite sending several regular emails to both Ms. Dunkelberger and Mr. Johnson and informing them about how I was doing in Russia, I never heard back from both Supervisors. After sending another email and informing that I needed to stay in Russia longer than I had expected, I got a Termination Letter from Ms. Dunkelberger. Despite I requested LWOP initially until July 07, 2017, I

Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

1  was fired in June 30, 2017 – seven days prior to July 07, 2017. I sent Ms.
2  Dunkelberger another email and asked why she terminated my employment, and
3  again I never heard back

4  5)  Read Ms. Cormier's statement, "In a mediation proceeding, Plaintiff learned that
5  her supervisor submitted her LWOP request to the Director of Nursing Services,
6  who denied her request under the Family Medical Leave Act ("FMLA") because
7  she did not qualify for leave under the FMLA, which requires the employee to
8  have worked for the employer for at least one year. The supervisor explained that
9  a letter stating Plaintiff's leave was denied was mailed to her home and could not
10  be emailed to Plaintiff in Russia because it was against VAMC policy." Here, Ms.
11  Cormier fails to acknowledge that I pointed out in my Complaint that the VAMC
12  <u>knew</u> that I was not in the United States, and it mailed me the denial letter to my
13  home postal address in Albuquerque, NM. Later, the VAMC accused me in not
14  responding to that letter that I had never received and fired me. The VAMC never
15  informed me via the email about Dr. Prince's denial. Despite the VAMC said it
16  couldn't have emailed me the denial letter because it was not encrypted, the
17  VAMC anyhow emailed me the Termination Letter that was not encrypted
18  (Complaint, page 8, lines 13-27 to page 9, lines 1-2)

19  6)  Therefore, I am respectfully asking the Court to strike Defendants' Motion to
20  Dismiss from page 2, line 16 to page 3, line 17

21  7)  The remaining Ms. Cormier's statements about the causes of action in my
22  Complaint are accurate, and I am not objecting (page 3, lines 18-27).

## 6. Legal Standard.

7.  **Issue 1.** That my Complaint should be dismissed for failure to follow the
requirements set forth in FRCP Rule 10(b) because I didn't number the paragraphs.

Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

FRCP Rule 12(b) sets forth the defenses for dismissing the Complaint:

       (1) lack of subject-matter jurisdiction;

       (2) lack of personal jurisdiction;

       (3) improper venue;

       (4) insufficient process;

       (5) insufficient service of process;

       (6) failure to state a claim upon which relief can be granted; and

       (7) failure to join a party under Rule 19.

Rule 12(b) doesn't allow the Court to dismiss the Complaint for failure to follow the requirements of FRCP Rule 10.

8. Read FRCP Rule 10(b), "Paragraphs; Separate Statements. A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence—and each defense other than a denial—must be stated in a separate count or defense." The plain language of Rule 10 doesn't say that failure to follow Rule 10(b) should be a ground to dismiss the claim.

9. Even though Ms. Cormier criticizes the Plaintiff for failure to number the paragraphs in my Complaint, her defense lacks numbered paragraphs. Ms. Cormier numbered the sections of her pleading but didn't number each paragraph as set forth in Rule 10(b).

10. Read *Jacob v. Flagg*, 2010 WL 4974868 at *3 (S.D. Cal. Dec. 1, 2010), "Additionally, under Federal Rule of Civil Procedure 10(b), a plaintiff should state "each claim founded as a separate transaction or occurrence" as a "separate count." Fed.R.Civ.P. 10(b). Rule 10 provides that a "party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." *Id*. For the following reasons, the Court dismisses the Complaint for

Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

362

failure to comply with the pleading standards of Rule 8(a)(2) and Rule 10(b)….the Court **DISMISSES** the Complaint with leave to amend."

11. Read *Bishop v. Mohave Mental Health Incorporated,* 2017 WL 1927918 at *3 (D. Ariz. May, 10, 2017), "Plaintiff's Amended Complaint is again comprised of a series of letters, is disjointed, and is very difficult to understand…. Finally, the Court specifically instructed Plaintiff that in any amended complaint he must comply with Rule 10(b) of the Federal Rules of Civil Procedure, which requires that Plaintiff organize his Complaint in numbered paragraphs. However, Plaintiff again has styled his Amended Complaint as a series of disjointed letters, which makes it difficult for any Defendant to properly respond to the allegations. Therefore, the Court will dismiss Plaintiff's Amended Complaint."

"IT IS ORDERED that Plaintiff's Amended Complaint … is dismissed for failure to comply with Rules 8 and 10 of the Federal Rules of Civil Procedure.

IT IS FURTHER ORDERED that Plaintiff is granted leave to file a second amended complaint by June 9, 2017."

Source:

https://scholar.google.com/scholar_case?case=7774365666945586035&q=Bishop+v. +Mohave+Mental+Health+Incorporated&hl=en&as_sdt=2006&as_vis=1

12. <u>My argument</u>. Despite my Complaint (as well as Ms. Cormier's Motion to Dismiss) doesn't have numbered paragraphs, I believe that Ms. Cormier was able to understand my Complaint and respond. She didn't object that my Complaint was difficult to read, and she was unable to properly respond to allegations. Also, I was able to understand Ms. Cormier's pleading, and I am able to respond. I am not raising my objection that Ms. Cormier's Motion must be dismissed because Ms. Cormier didn't number each paragraph according to Rule 10(b). Therefore, I am respectfully asking the Court to strike Ms. Cormier's Motion to Dismiss from page 5, line 21 to page 6, line 5 about

Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

363

dismissing my Complaint for failure to number each paragraph according to Rule 10(b).

13. **Issue 2.** That the District Court doesn't have jurisdiction over my Complaint – FRCP Rule 12(b)(1).

14. Read 28 U.S.C. §1331, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." In my Complaint, I listed the 1st and the 5th Amendments to the U.S. Constitution and Federal laws such as Title VII, the ADEA, the ADA, the Rehabilitation Act of 1973, and other such as 29 CFR Appendix to Part 1604, Questions and Answers on the Pregnancy Discrimination Act.

15. Therefore, I am respectfully asking the Court to strike Ms. Cormier's Motion to Dismiss, page 2, lines 1-2, "for lack of jurisdiction pursuant to Rule 12(b)(1)."

16. **Issue 3.** That I didn't state the claim upon which relief could be granted – F.R.C.P. Rule 12(b)(6).

17. Read FRCP Rule 8(a) about how to state the claim upon which relief could be granted,

"(a) Claim for Relief. A pleading that states a claim for relief must contain:

(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief."

Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

364

18. <u>My argument</u>. 1) Read the ground that I stated for this Court's jurisdiction in my Complaint, page 1, lines 26-28, page 2, lines 1-8

    2) Read my short and plain statement that I am entitled for relief in my Complaint, page 24, lines 1-10

    3) Read my demand for relief sought in my Complaint, page 24, lines 12-28 and page 25, lines 1-13.

Therefore, I am respectfully asking the Court to strike Ms. Cormier's Motion to Dismiss, page 2, line 2, "for failure to state a claim under Rule 12(b)(6)."

19. **Issue 4.** That "fifth, sixth, and seventh claims set forth in her Complaint must be dismissed for lack of subject matter jurisdiction without leave to amend because Title VII of the Civil Rights Act is her exclusive remedy for the conduct complained of" (Motion to Dismiss, page 2, lines 9-11).

20. In her assertion that "Title VII of the Civil Rights Act is [the Plaintiff's] <u>exclusive</u> remedy for the conduct complained of," Ms. Cormier relies on *Brown v. General Services Administration*, 425 U.S. 820, 833 (1976). Ms. Cormier misuses the definition of the word "exclusive."

21. Read *Brown v. General Services Administration*, "Section 717 of the Civil Rights Act of 1964, as added by §11 of the Equal Employment Opportunity Act of 1972, proscribes federal employment discrimination and establishes an administrative and judicial enforcement system. The statute provides that personnel actions affecting federal employees or job applicants "shall be made free from any discrimination based on <u>race, color, religion, sex, or national origin</u>…"

22. "Forty-two days later, [Plaintiff Brown] brought suit in the District Court, alleging jurisdiction under Title VII of the Civil Rights Act of 1964 "with particular reference to" § 717. <u>He also alleged jurisdiction under the general federal question statute, the Declaratory Judgment Act, and 42 U.S.C. § 1981.</u> The District Court granted respondents'

Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

365

1  motion to dismiss made on the ground that petitioner had not filed the complaint within

2  the 30-day period specified by § 717(c), and the Court of Appeals affirmed.

23. *Held*: Section 717 provides the <u>exclusive</u> judicial remedy for claims of discrimination in
   federal employment, and, since petitioner failed to file a timely complaint under § 717(c),
   the District Court properly dismissed his complaint."

   Source: https://supreme.justia.com/cases/federal/us/425/820/

24. The <u>exclusive</u> judicial remedy in this context means that, after the 1972 Amendment to
   the Civil Rights Act of 1964, the Federal employees are able to sue their employers for
   discrimination based on race, color, religion, sex, or national origin only using Section
   717 and <u>not</u> using other Federal statutes such as 42 U.S.C. §1981.

   Also, read my citation of *Brown v GSA* in my Complaint, page 16, lines 23-28, and page
   17, lines 1-3.

25. Ms. Cormier also cites *White v. General Services Administration*, 652 F.2d 913, 916-17
   (9th Cir. 1981). Read *White*, "In addition to his Title VII claim, White asserted claims
   under 42 U.S.C. § 1981, 1983, 1985, 1986, 1988, 2000d and the Constitution. Before trial
   the magistrate ruled that Title VII was the exclusive remedy available to a federal
   employee <u>alleging job-related racial discrimination</u>. He therefore recommended that the
   district court dismiss all claims other than those based on 42 U.S.C. § 2000e-16."

26. "In *Brown*, the Supreme Court, after a review of both the statutory language and the
   legislative history, concluded that the effect of the 1972 amendments was to make Title
   VII the exclusive remedy for federal employee race discrimination. The *Brown* rule was
   subsequently applied by this court in *Scott v. Perry*, 569 F.2d 1064 (9th Cir. 1973)."

   Source: https://openjurist.org/652/f2d/913/white-v-general-services-administration

27. Later, Ms. Cormier cites *Nolan v. Cleland*, 686 F.2d 806, 814-15 (9th Cir. 1982). In
   *Nolan*, the District Court properly struck Nolan's due process claim and Executive Order
   11478 in favor of Title VII. However, Nolan didn't allege age discrimination, disability
   discrimination, failure to provide reasonable accommodations, libel, and intentional

Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

inflction of emotional distress. I am alleging age discrimination, disability discrimination, failure to provide reasonable accommodations, Libel, and the IEDD which are outside of scope of Title VII. Therefore, my 5th Amendment allegation (Seventh cause of action) is based on not only on Title VII but on all other mentioned above allegations. The facts on my alleged Pregnancy discrimination could not be viewed as a sole part of sex discrimination meaning only Title VII because they are closely related to disability discrimination (reproductive system is one of the major body functions described in ADA or 42 U.S.C. §12102(2)(B) and failure to provide with reasonable accommodations (Rehabilitation Act or 29 U.S.C. 701.) The Executive Order 11478 also can't be excluded from my Complaint because it contains age discrimination which is outside of scope of Title VII.

28. Later, Ms. Cormier cites *Brazil v. U.S. Dep't of Navy*, 66 F.3d 193, 198 (9th Cir. 1995) and saying that the Court rejected "plaintiff's Fifth Amendment equal protection claim because his claim was covered by the "massive and complex program" of Title VII." Read *Brazil*, "The Supreme Court's holding in *Department of the Navy v. Egan*, 484 U.S. 518 (1988), and our own in *Dorfmont v. Brown*, 913 F.2d 1399 (9th Cir. 1990), cert. denied, 499 U.S. 905 (1991), <u>preclude judicial review of security clearance decisions made by the Executive or his delegee. That bar to review applies equally, we conclude, in the context of a Title VII discrimination action</u>."

Source: https://casetext.com/case/brazil-v-us-dept-of-navy

29. The Court didn't have jurisdiction to perform judicial review of security clearance in the context of Title VII. It has nothing common with my case. Therefore, I am respectfully asking the Court to strike Ms. Cormier's speculation citing *Brazil*.

30. Later, Ms. Cormier continues her attempt to mislead the Court by citing *Belhomme v. Widnall*, 127 F.3d 1214, 1217 (10th Cir. 1997) and saying that "Title VII preempts any constitutional cause of action that a court might find under the First or Fifth Amendments for discrimination in federal employment." Read *Belhomme*, "…we affirm the district

Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

court's judgment on all of the appellant's claims: the appellant's individual claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. (as amended), <u>was time bared</u> under the regulations of the Equal Employment Opportunity Commission (EEOC); his class action was not presented to the EEOC, and his other statutory and constitutional claims either fail to state a claim as a matter of law or are preempted by provisions of Title VII."

31. "…Mr. Belhomme's claims under the Constitution fail because the Supreme Court has clearly stated that a federal employee's only avenue for judicial relief from federal employment discrimination is through Title VII. See *Brown v. General Servs. Admin.*, 425 U.S. 820, 828-829, 835 (1976). As a result, Title VII preempts any constitutional cause of action that a court might find under the First or Fifth Amendments for discrimination in federal employment."

Source: https://www.casemine.com/judgement/us/59148173add7b04934484b54#

32. My Complaint includes age discrimination and disability discrimination that are not covered by Title VII. Therefore, *Belhomme* doesn't apply to my case.

33. I am asking the Court to strike another Ms. Cormier's phrase, "Plaintiff's <u>Title VII</u> causes of action state the VAMC discriminated against her by discharging her because of sex, <u>age</u>, and her pregnancy-related health conditions" (Motion to Dismiss, page 7, lines 9-10). Does Ms. Cormier understand the scope of Title VII? Can she realize that age discrimination is not covered by Title VII?

34. Maybe Ms. Cormier will be able to understand the difference between Title VII and ADEA is she reads *Gross v. FBL Financial Services, Inc*., 557 U.S. 167 (2009), "Because Title VII is materially different with respect to the relevant burden of persuasion, this Court's interpretation of the ADEA is not governed by Title VII decisions such as *Price Waterhouse* and *Desert Palace, Inc. v. Costa*, 539 U. S. 90. This Court has never applied Title VII's burden-shifting framework to ADEA claims and declines to do so now. When conducting statutory interpretation, the Court "must be careful not to apply rules

Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

368

applicable under one statute to a different statute without careful and critical examination." *Federal Express Corp. v. Holowecki*, 552 U. S. ___, ___. Unlike Title VII, which has been amended to explicitly authorize discrimination claims where an improper consideration was "a motivating factor" for the adverse action, see 42 U. S. C. §§2000e–2(m) and 2000e–5(g)(2)(B), the ADEA does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor. Moreover, Congress neglected to add such a provision to the ADEA when it added §§2000e–2(m) and 2000e–5(g)(2)(B) to Title VII, even though it contemporaneously amended the ADEA in several ways. When Congress amends one statutory provision but not another, it is presumed to have acted intentionally, see *EEOC v. Arabian American Oil Co*., 499 U. S. 244, and "negative implications raised by disparate provisions are strongest" where the provisions were "considered simultaneously when the language raising the implication was inserted," *Lindh v. Murphy*, 521 U. S. 320. Pp. 5–6."

Source: https://www.law.cornell.edu/supct/html/08-441.ZS.html

35. On Page 7, line 27 and page 8, lines 1-2, Ms. Cormier asks the Court to dismiss Libel and IIED from my Complaint because "Title VII provides the exclusive remedy for federal employment discrimination actions and preempts tort claims seeking to redress the same wrong." Again, the fifth cause of action Libel and the sixth cause of action IIED in my Complaint are related not only to Title VII but also to ADEA, ADA, and the Rehabilitation Act of 1973. Moreover, I can allege IIED in connection to my first, second, third, and fourth causes of action, see *Carey v. Piphus*, 435 U.S. 247, 264 (1978) and *Patterson v. P.H.P. Healthcare Corp*., 90 F.3d 927, 937 (5th Cir. 1996) (concluding that Title VII's standard of proof to establish compensatory damages is comparable to the Section 1981 and 1983 standard to demonstrate emotional distress).

Source:

https://www.americanbar.org/content/dam/aba/administrative/labor_law/meetings/2011/annualmeeting/004.authcheckdam.pdf

Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

**36.** <u>My argument</u>. In her Motion, Ms. Cormier misuses the definition of the word "exclusive" and speculates that Title VII is the only viable claim of my Complaint. She says that all other claims such as Libel, IIED, and Depriving me liberty and property without a due process should be dismissed from my complaint without leave to amend because they don't fit into the definition of Title VII claim. The *Brown* rule allows the Courts to proceed Federal employee's race, color, religion, sex, or national origin claims only under Title VII and not under 42 U.S.C. § 1981, 1983, 1985, 1986, 1988, 2000d and the Constitution. Ms. Cormier's pure speculation regarding my fifth, six, and seventh causes of action in regard to Title VII is inappropriate, and I am respectfully asking the Court to strike it (Motion to Dismiss, from page 6, line 6 to page 8, line 2.)

**37. Issue 5.** That "the Federal Tort Claims Act bars Plaintiff's tort claims."

**38.** In this Motion, I will ask the Court to strike only one part of Ms. Cormier's Motion to Dismiss. I will discuss other parts of Issue 5 in my upcoming Opposition to Defendants' Motion to Dismiss.

**39.** Read the Motion to Dismiss, page 9, lines 1-2, "Additionally, Plaintiff asserts a claim for libel against the VAMC, a tort expressly excluded from the waiver of immunity by the United States under the FTCA. 28 U.S.C. § 2680(h)."

**40.** <u>My argument</u>. This is pure speculation, and I asking the Court to strike it. I am asserting the claim for Libel <u>against the VAMC</u> and not against the United States. Ms. Cormier can't invoke the waiver of sovereign immunity <u>by the United States</u> under 28 U.S.C. § 2680(h) as a defense against my claim against the VAMC.

**41.** Moreover, the gravamen of my fifth cause of action "Libel" arises from my Title VII, ADEA, ADA, and my Rehabilitation Act claims (the Agency discriminated against my sex, age, and disability, and lied about the reasons of the termination of my employment.) The gravamen of my fifth cause of action "Libel" doesn't arise from the FTCA. I already

Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

370

exhausted the administrative remedies because I explained to the EEO all details related to the cause of action "Libel."

**42.** I submitted to the Court the proof that I exhausted the EEO administrative remedies. The Department of Veterans Affairs allowed me to file a lawsuit. Read Attachment 7 to my Complaint, the last page, "If there has been no hearing, OEDCA will address all issues in the complaint; find discrimination or find no discrimination; and advise the complainant of his/her right … to file a civil action in Federal District Court."

**43.** Lastly, Ms. Cormier didn't file her Declaration and didn't declare under the penalty of perjury and under the Federal laws that everything she wrote was true and correct. Without declaring that, her Motion to Dismiss is hearsay. She broke 28 U.S. Code § 1746, and therefore her Motion should be dismissed.

**44. Conclusion.**

I am respectfully asking the Court to strike portions of Ms. Cormier's Motion to Dismiss for the reasons explained above. I have other objections regarding Issue 5, Issue 6, and Issue 7, and I am going to discuss these objections in my upcoming Opposition to Defendants' Motion to Dismiss. Also, I am asking the Court to strike the whole Motion to Dismiss for Ms. Cormier's failure to declare under the penalty of perjury and under the Federal laws that all foregoing is true and correct.

Respectfully submitted,

Date: October 18th, 2018                Sign Name:

                Print Name:  Tatyana E. Drevaleva

Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

371

1   Tatyana Evgenievna Drevaleva

2   No current home postal address, no mailing address

3   Currently residing in California

4   415-806-9864, tdrevaleva@gmail.com

5   Plaintiff in Pro Per

6

7                    THE UNITED STATES DISTRICT COURT

8                    NORTHERN DISTRICT OF CALIFORNIA

9

10

11                                              )
                                                )
12   Tatyana E. Drevaleva                       )   Case No. 3:2018cv03748
                                                )
13                                              )
                  Plaintiff,                    )
14                                              )   Declaration to Motion to Strike
                     vs.                        )
15                                              )   Defendants' Motion to Dismiss, F.R.C.P.
     1) The U.S. Department of Veterans         )   Rule 12(f).
16       Affairs                                )
                                                )
17   2) Mr. Peter O'Rourke, Acting United       )
         States Secretary of Veterans Affairs   )
18       810 Vermont Avenue, NW                 )   Date: November 29, 2018
         Washington, DC  20420                  )
19                                              )   Time: 8.00 AM
     Facility: New Mexico VA Healthcare System  )
20       1501 San Pedro Drive, S.E.             )   Location: Courtroom 12, 19th Floor
         Albuquerque, NM 87108                  )
21                                              )   Judge: Hon. William Alsup
                  Defendant.                    )
22                                              )
                                                )
23   _____)

24          I, Plaintiff Tatyana E. Drevaleva, hereby declare:

25          1)  I am a Plaintiff Pro se and a party in this action

26          2)  I have personal knowledge of the facts stated herein, which are known by me to be

27              true and correct, and I will testify competently thereto

28

3) Defendants attempted to mislead the Court by saying that my Complain should be stricken for failure to comply with FRCP Rule 10(b)

4) Defendants attempted to mislead the Court by incorrectly stating the facts in my Complaint

5) Defendants attempted to mislead the Court by saying that my Complaint should be stricken for failure to comply with FRCP Rule 12(b)(1) and Rule 12(b)(6)

6) Defendants attempted to mislead the Court by saying that the only viable claim in my Complaint is Title VII

7) Defendants attempted to mislead the Court by carefully withholding my allegations of Age discrimination, Disability discrimination, and Failure to provide me with reasonable accommodations

8) Defendants attempted to mislead the Court by saying that Age discrimination is included into the scope of Title VII

9) Defendants attempted to mislead the Court by saying that the Libel, IIED, and the 5th Amendment to the U.S. Constitution causes of action should be stricken from my Complaint without leave to amend

10) Defendants attempted to mislead the Court by saying that my Complaint is not viable under FTCA, and the Government didn't waive the Sovereign immunity

11) Defendants failed to declare under the penalty of perjury and under the Federal laws that everything they said in their Motion to Dismiss is true and correct

12) Therefore, I am respectfully asking the Court to strike the portions of Defendants' Motion to Strike for the reasons explained above

13) Also, I am respectfully asking the Court to strike the Motion to Dismiss in its entirety for failure to declare under the penalty of perjury and under the Federal laws that everything is true and correct.

Page **2** of **3**

Declaration to Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

373

I declare under the penalty of perjury, under the Federal laws and under the laws of the State of California that all foregoing is true and correct. Executed at City of San Francisco, CA on October 18th, 2018.

Respectfully submitted,

Date: October 18th, 2018      Sign Name:

Print Name: Tatyana E. Drevaleva

Declaration to Motion to Strike Defendants' Motion to Dismiss, case No. 3:2018cv03748

374

**Docket No. 39**

October 19, 2018.

Plaintiff's Motion for Preliminary Injunction;

Declaration.

1    Tatyana Evgenievna Drevaleva

2    No current home postal address, no mailing address

3    Currently residing in California

4    415-806-9864, tdrevaleva@gmail.com

5    Plaintiff in Pro Per

6

7           THE UNITED STATES DISTRICT COURT

8           NORTHERN DISTRICT OF CALIFORNIA

9

10

| | |
|---|---|
| 11 | ) |
| | ) |
| 12   Tatyana E. Drevaleva | )   Case No. 3:2018cv03748 |
| 13 | ) |
| 14       Plaintiff, | ) |
| | )   Notice of Motion; Motion for Preliminary |
| 15        vs. | )   Injunction, F.R.C.P. Rule 65(a); |
| 16    1) The U.S. Department of Veterans | ) |
|        Affairs | )   Memorandum of Points and Authorities; |
| 17    2) Mr. Robert Wilkie, Acting United | )   Declaration. |
|        States Secretary of Veterans Affairs | ) |
| 18        810 Vermont Avenue, NW | ) |
|        Washington, DC 20420 | ) |
| 19 | )   Date: November 29, 2018 |
| 20   Facility: New Mexico VA Healthcare System | ) |
|        1501 San Pedro Drive, S.E. | )   Time: 8.00 AM |
| 21        Albuquerque, NM 87108 | ) |
| | )   Location: Courtroom 12, 19th Floor |
| 22        Defendant. | ) |
| | )   Judge: Hon. William Alsup |
| 23 | ) |

24   _____

25      TO THE HONORABLE COURT, ALL PARTIES, AND COUNSEL ON RECORD.

26

27

28                Page **1** of **4**

376

1. NOTICE IS HEREBY GIVEN that on 11/29/2018 at 8.00AM or as soon thereafter as the matter may be heard in Courtroom 12, the 19th Floor of The United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA, 94102, Plaintiff Tatyana E. Drevaleva will move the Court to grant the Plaintiff with preliminary injunction to get reinstated back to work at any VAMC immediately after hearing of this Motion according to FRCP Rule 65(a).

2. Said Motion shall be based on this Notice, the attached Motion for Preliminary Injunction, the attached Memorandum of Points and Authorities, the attached Declaration, the pleadings and papers on file, and on such additional maters as may be presented to the Court prior to or at the hearing.

Dated: October 19, 2018                    Signed: Tatyana Drevaleva

## MEMORANDUM OF POINTS AND AUTHORITIES.

3. **Introduction.**

4. I was retaliated and unlawfully terminated from the Raymond G. Murphy VAMC in June 2017 for my attempt to have a baby, for my age, and for my disability. The Agency failed to provide me with reasonable accommodations to go to Russia for an IVF attempt. The Agency refused to reinstate me back to work. The Agency didn't issue the Determination after I filed a formal EEO Complaint and after I notified the Agency about my intention to file a lawsuit. I filed a Complaint at the District Court of Northern California in June 2018. On October 09, 2018, Defendants filed a Motion to Dismiss my Complaint where they used the affirmative defense. In this Motion, they didn't say and didn't present any evidence that I was fired for cause meaning that I did something bad for the Hospital or the patients. Defendants didn't say that I would have been fired anyway absent of my trip to Russia for the IVF procedure.

Motion for Preliminary Injunction, case No. 3:2018cv03748

5. **Statement of Facts**.

6. I was fired for my attempt to have a baby using the IVF procedure in Russia. Despite I got a verbal permission of Assistant Manager of 5D Mr. Johnson to go to Russia for the IVF procedure and despite I provided my Supervisors with medical documentation from my Russian OB/GYN that I was in the registry of patients for the IVF procedure in Russia, I was fired from my work when I was in Russia. I was discriminated against my sex, against my age, against my disability, and the Agency failed to provide me with reasonable accommodations. To substitute me, the Agency hired two male employees who were 30 and 35 yo (much younger in comparison to my age 50 yo at that time.) The Agency lied about the reasons of terminating my employment. As a result, a subsequent full time employment offer at the Minneapolis VAMC was cancelled, and I was also not hired for a position of a Medical Instrument Technician at the Los Angeles VAMC. Also, I was not receiving unemployment insurance benefits as a result of the Agency's Libel. Currently, I am suffering from unemployment and the absence of money. I have nowhere to live, I don't have a car, and I am very limited in finding employment.

7. **Legal Standard**.

8. Read FRCP Rule 65(a),

"(a) Preliminary Injunction.

(1) *Notice*. The court may issue a preliminary injunction only on notice to the adverse party.

(2) *Consolidating the Hearing with the Trial on the Merits*. Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing. Even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial

Page **3** of **4**

Motion for Preliminary Injunction, case No. 3:2018cv03748

378

record and need not be repeated at trial. But the court must preserve any party's right to a jury trial."

9. **Conclusion**.

10. I am respectfully asking the Court to grant me with preliminary injunction according to FRCP Rule 65(a) and IMMEDIATELY reinstate me back to work at any VAMC to an equivalent (Medical Instrument Technician Electrocardiograph) or a similar full time job with benefits right after hearing of this Motion. Before or after hearing of this Motion, I am asking the Court to advance the trial on the merits and consolidate it with the hearing. If the Court dismisses Defendants' Motion to Strike and proceeds my case to a jury trial, I will continue this litigation while I am employed. It is too hard to be unemployed and not to have money and benefits. I am asking the Court to reinstate me to work to a place which is free of discrimination.

Respectfully submitted,

Date: October 19th, 2018          Sign Name:

                                 Print Name: Tatyana E. Drevaleva

Motion for Preliminary Injunction, case No. 3:2018cv03748

379

1  Tatyana Evgenievna Drevaleva

2  No current home postal address, no mailing address

3  Currently residing in California

4  415-806-9864, tdrevaleva@gmail.com

5  Plaintiff in Pro Per

6

7                    THE UNITED STATES DISTRICT COURT

8                    NORTHERN DISTRICT OF CALIFORNIA

9

10

11                                          )
                                            )
12   Tatyana E. Drevaleva                   )    Case No. 3:2018cv03748
                                            )
13                                          )
            Plaintiff,                       )
14                                          )    Declaration to Motion for Preliminary
            vs.                             )
15                                          )    Injunction, F.R.C.P. Rule 65(a).
     1) The U.S. Department of Veterans)
16       Affairs                           )
                                            )
17   2) Mr. Robert Wilkie, Acting United)
         States Secretary of Veterans Affairs )
18       810    Vermont    Avenue,   NW)        Date: November 29, 2018
         Washington, DC 20420             )
19                                          )    Time: 8.00 AM
     Facility: New Mexico VA Healthcare System )
20       1501 San Pedro Drive, S.E.         )    Location: Courtroom 12, 19th Floor
         Albuquerque, NM 87108             )
21                                          )    Judge: Hon. William Alsup
            Defendant.                       )
22                                          )
                                            )
23   _____)

24          I, Plaintiff Tatyana E. Drevaleva, hereby declare:

25          1) I am a Plaintiff Pro se and a party in this action

26          2) I have personal knowledge of the facts stated herein, which are known by me to be

27             true and correct, and I will testify competently thereto

28                              Page **1** of **3**

            Declaration to Motion for Preliminary Injunction, case No. 3:2018cv03748

380

3) I was retaliated and unlawfully terminated from the Raymond G. Murphy VAMC for my attempt to have a baby, for my age, and for my disability. The Agency failed to provide me with reasonable accommodations

4) To substitute me, the Agency hired two young male employees who will obviously not have problems with pregnancy

5) The Agency lied about the reasons of terminating my employment. As a result, I was not receiving Unemployment Insurance benefits. Also, a subsequent full time employment offer at the Minneapolis VAMC was cancelled this year. Also, I was not hired for a full time position of a Medical Instrument Technician (EKG) at the Los Angeles VAMC this year

6) The Agency's conduct makes it very difficult for me to obtain full time employment with benefits. Currently, I am unemployed or have infrequent jobs working as a Caregiver. I have nowhere to live, I don't have a car, and I am very limited finding employment

7) In their October 09, 2018 Motion to Dismiss my Complaint, Defendants didn't say that I would have been fired anyway absent of my trip to Russia because I did anything bad for the Hospital or the patients. Defendants can't present any evidence that I was fired for cause

8) Therefore, I am respectfully asking the Court to grant me with preliminary injunction and IMMEDIATELY (right after hearing of this Motion) reinstate me back to work at any VAMC for a full time position with benefits under FRCP Rule 65(a). If the Court dismisses Defendants' Motion to Dismiss and proceeds my case to a jury trial, I will litigate my case while being employed. I am asking the Court to reinstate me back to work to any place which is free of discrimination.

Declaration to Motion for Preliminary Injunction, case No. 3:2018cv03748

I declare under the penalty of perjury, under the Federal laws and under the laws of the State of California that all foregoing is true and correct. Executed at City of San Francisco, CA on October 19th, 2018.

Respectfully submitted,

Date: October 19th, 2018          Sign Name:

                                  Print Name:  Tatyana E. Drevaleva

Declaration to Motion for Preliminary Injunction, case No. 3:2018cv03748

382

**Docket No. 40**

October 21, 2018.

Plaintiff's Opposition to Defendants' Motion to Dismiss,

Declaration.

1     Tatyana Evgenievna Drevaleva

2     No current home postal address, no mailing address

3     Currently residing in California

4     415-806-9864, tdrevaleva@gmail.com

5     Plaintiff in Pro Per

6

7                 THE UNITED STATES DISTRICT COURT

8                 NORTHERN DISTRICT OF CALIFORNIA

9

10

11                                   )

12    Tatyana E. Drevaleva              )     Case No. 3:2018cv03748

13                                  )

14           Plaintiff,          )     Opposition to Defendants' Motion to

15             vs.               )     Dismiss; Memorandum of Points and

16   1) The U.S. Department of Veterans )     Authorities; Declaration.
      Affairs                        )

17   2) Mr. Robert Wilkie, Acting United )
      States Secretary of Veterans Affairs )

18       810 Vermont Avenue, NW)
      Washington, DC 20420        )

19                                 )     Date: November 29, 2018

20   Facility: New Mexico VA Healthcare System )     Time: 8.00 AM
      1501 San Pedro Drive, S.E.    )

21       Albuquerque, NM 87108     )     Location: Courtroom 12, 19th Floor

22           Defendant.         )     Judge: Hon. William Alsup
                                  )

23

24   _____

25       1. Plaintiff Tatyana E. Drevaleva is hereby submitting her Opposition to Defendants'

26         Motion to Dismiss my Complaint.

27

28                      Page **1** of **19**

384

# TABLE OF CONTENTS

I.   Introduction……………………………………………………………….4

II.  Statement of Facts…………………………………………………………...5

III. Legal Standard……………………………………………………….…..6

      Issue 5……………………………………………………………...6

      Issue 6……………………………………………………………10

      Issue 7……………………………………………………………11

IV. Conclusion…………………………………………………………………17

# TABLE OF AUTHORITIES

**Statutes**

The 1st Amendment to the U.S. Constitution………………………………………....7

The 5th Amendment to the U.S. Constitution………………………………...7, 18

28 U.S.C. §1346(b)………………………………………………………….6, 7

28 U.S.C. §1402(b)………………………………………………………….....7

28 U.S.C. §2401(b)……………………………………………………………6

28 U.S.C. §2671……………………………………………………………….6

28 U.S.C. §2679(a)………………………………………………………….....7

28 U.S.C. §2680(h)……………………………………………………………9

28 USC §2874………………………………………………………...…11

29 CFR Appendix to Part 1604, Questions and Answers on the Pregnancy Discrimination Act, Public Law 95-555, 92 Stat. 2076 (1978)………………………………………18

42 U.S.C. §1981a…………………………………………………………...11

42 U.S.C. §1981a(a)(1)…………………………………………………...14, 16

42 U.S.C. §1981a(b)(3)……………………………………………………....16

42 U.S.C. §2000e–16 or section 717 of the Civil Rights Act of 1964………………9, 14, 18

42 U.S.C. §2000e–2 or section 703 of the Civil Rights Act of 1964…………………14, 18

Opposition to Motion to Dismiss, case No. 3:2018cv03748

385

42 U.S.C. §2000e–2(m)……………………………………………………………15

42 U.S.C. §2000e–3 or section 704 of the Civil Rights Act of 1964……………………….....14

42 U.S.C. §2000e–5 or section 706 of the Civil Rights Act of 1964……………………….....14

42 U.S.C. §2000e–5(e)(3)……………………………………………………………13

42 U.S.C. §2000e–5(f)……………………………………………………………12, 13

42 U.S.C. §2000e–5(f)(1)……………………………………………………………14

42 U.S.C. §2000e–5(f)(3)……………………………………………………………7, 8

42 U.S.C. §2000e–5(f)(5)……………………………………………………………..14

42 U.S.C. §2000e–5(g)(1) or Section 706(g) of the Civil Rights Act of 1964………………14, 15

42 U.S.C. §2000e–5(g)(2)(B)(i)……………………………………………………....15

42 U.S.C. §2000e–5(k)……………………………………………………………...15

42 U.S.C. §9848(b)(2)(A)……………………………………………………………14

ADA or 42 U.S.C. §12112……………………………………………7, 9, 10, 17, 18

ADEA or 29 U.S.C. §623……………………………………………7, 9, 10, 17, 18

ADEA or 29 U.S.C. §633a………………………………………………………..7

Executive Order 11478……………………………………………………………...13

FRCP Rule 10……………………………………………………………………5

FRCP Rule 12(b)(1)……………………………………………………………5

FRCP Rule 12(b)(6)……………………………………………………………5

FRCP Rule 53……………………………………………………………………15

FRCP Rule 65(a)……………………………………………………………….....17

FRCP Rule 65(b)……………………………………………………………………17

The Equal Employment Opportunity Act of 1972, §11………………………………………9

The Federal Tort Claims Act or FTCA………………………………5, 6, 7, 8, 9, 10, 11, 17

The Rehabilitation Act of 1973 or 29 U.S.C. §701……………………………………10, 11, 18

Title VII of the Civil Rights Act of 1964…………………………………….....5, 6, 11, 16

Opposition to Motion to Dismiss, case No. 3:2018cv03748

386

**Case Law**

*Brown v. General Services Administration*, 425 U.S. 820, 833 (1976)………………………9, 18

*Continental Cablevision v. United States Postal Serv.*, 945 F.2d 1434, 1440 (8th Cir.1991)……7

*Day v. Woodworth*, 13 How. 363, 371 (1852)………………………………………………..…12

*Federal Deposit Ins. Corp. v. Craft*, 157 F.3d 697, 716 (9th Cir.1998)………………………..6

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1196 (9th Cir. 2002)……………………………16

*Juarez v. AutoZone Stores, Inc.*, Case No. 08-CV-00417-WVG (S.D. Cal. Nov. 17, 2014)…....12

*Kennedy v. United States Postal Serv.*, 145 F.3d 1077, 1078 (9th Cir.1998)…………………7, 9

*Molzof v. United States*, The U.S. Supreme Court, No. 90-838 (1992)………………………....12

*Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 15 -17 (1991)…………………………....12

*Pollard v. E. I. du Pont de Nemours & Co.*, 532 U.S. 843 (2001)……………………………....16

*Safeway Portland Employees' Fed. Credit Union v. FDIC,* 506 F.2d 1213, 1215-16 (9th Cir. 1974)……………………………………………………………………………………………..6

*Shelton v. United States Customs Service,* 565 F.2d 1140, 1141 (9th Cir. 1977)……………..…6

*Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 255 (1984)………………………………...12

*Vidrine v. United States*, No. 6:07-CV-1204, U.S. District Court for the Western District of Louisiana (September 30, 2011)…………………………………………………………...17

## MEMORANDUM OF POINTS AND AUTHORITIES.

**2. Introduction.**

3. On October 09, 2018, Defendants filed a Motion to Dismiss my Complaint where they listed only affirmative defense and didn't say that I would have been fired anyway absent of my trip to Russia for an IVF procedure. On October 18, 2018, I filed a Motion to Strike Defendants' Motion to Dismiss. On October 19, 2018, I filed a Motion for Preliminary Injunction where I asked the Court to immediately reinstate me back to work at any VAMC for a full time position with benefits.

Opposition to Motion to Dismiss, case No. 3:2018cv03748

387

4. In my Motion to Strike, I discussed why definite portions of the Motion to Dismiss should be stricken. I also asked the Court to strike the Motion to Dismiss in its entirety for failure to declare under the penalty of perjury and under Federal laws that all foregoing is true and correct.

5. In this Opposition, I will discuss the remaining issues that were raised in the Motion to Dismiss. I will explain why some of Defendants' allegations are not relevant.

**6. Statement of Facts.**

7. Defendants' Motion to Dismiss is based on the following issues:

    1) That my Complaint should be dismissed for failure to follow the requirements set forth in FRCP Rule 10 (I didn't number the paragraphs)

    2) That the District Court doesn't have jurisdiction over my Complaint – FRCP Rule 12(b)(1)

    3) That I didn't state the claim upon which relief could be granted – FRCP Rule 12(b)(6)

    4) That "fifth, sixth, and seventh claims set forth in her Complaint must be dismissed for lack of subject matter jurisdiction without leave to amend because Title VII of the Civil Rights Act is her exclusive remedy for the conduct complained of" (Motion to Dismiss, page 2, lines 9-11)

    5) That "the Federal Tort Claims Act bars Plaintiff's tort claims" (Motion to Dismiss, page 2, line 12)

    6) That "the United States Department of Veterans Affairs is a[n] [im]proper defendant in this matter" (Motion to Dismiss, page 2, line 12)

    7) That "Plaintiff may [not] seek punitive damages against a federal defendant" (Motion to Dismiss, page 2, line 14).

8. In my Motion to Strike, I asked the Court to strike Issues 1-4 and partially Issue 5.

9. In this Opposition, I will oppose Issues 5, 6, and 7.

Page **5** of **19**

Opposition to Motion to Dismiss, case No. 3:2018cv03748

388

**10. Legal Standard.**

11. **Issue 5.** That "The Federal Tort Claims Act bars Plaintiff's tort claims."

12. <u>Part 1</u>. Ms. Cormier mentions that the FTCA (she doesn't specify what section of the FTCA she means) "provides the "exclusive remedy for tortious conduct by the United States" and effected a broad waiver of sovereign immunity, making the United States liable for the tortious acts of its employees, with certain exceptions." Also, Ms. Cormier claims that "The FTCA … "only allows claims against the United States' and does not allow claims against a federal employee or a federal agency." On the other hand, Ms. Cormier admits the preemption of my FTCA claim by Title VII (Motion to Dismiss, page 8, line 5.)

13. Read the FTCA or 28 U.S. Code § 2671 – Definitions, "As used in this chapter and <u>sections 1346(b)</u> and 2401(b) of this title, the term "Federal agency" includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or <u>agencies of the United States</u>, but does not include any contractor with the United States.

14. Read *Federal Deposit Ins. Corp. v. Craft,* 157 F.3d 697, 716 (9th Cir.1998), "The FTCA is the exclusive remedy for tortious conduct by the United States, and <u>it only allows claims against the United States</u>. Although such claims can arise from the acts or omissions of United States agencies (28 U.S.C. § 2671), <u>an agency itself cannot be sued under the FTCA</u>. *Shelton v. United States Customs Service,* 565 F.2d 1140, 1141 (9th Cir. 1977) ("It is well established that federal agencies are not subject to suit eo nomine unless so authorized by Congress in explicit language."); *Safeway Portland Employees' Fed. Credit Union v. FDIC,* 506 F.2d 1213, 1215-16 (9th Cir. 1974)."
Source: https://casetext.com/case/federal-deposit-insurance-corporation-v-craft

Opposition to Motion to Dismiss, case No. 3:2018cv03748

389

15. Read *Kennedy v. United States Postal Serv.,* 145 F.3d 1077, 1078 (9th Cir.1998), "Because the United States is the only proper party defendant in an FTCA action, the district court correctly dismissed her complaint as improperly filed against the Postal Service and Runyon. The FTCA is the exclusive remedy for tort actions against a federal agency, and this is so despite the statutory authority of any agency to sue or be sued in its own name.   See 28 U.S.C. § 2679(a) (1998).   A claim against the United States Postal Service in its own name is not a claim against the United States. See *Continental Cablevision v. United States Postal Serv.,* 945 F.2d 1434, 1440 (8th Cir.1991).   Because the plaintiff brought an FTCA action against a person and entity not subject to the FTCA, the district court properly dismissed the named defendants."

    Source: https://caselaw.findlaw.com/us-9th-circuit/1011179.html

16. <u>My argument</u>. I mentioned the FTCA only in the context of the venue. The FTCA or 28 USC §1346(b) (my Complaint, page 2, line 1) and 28 U.S.C. §1402(b) (my Complaint, page 2, line 9) allow the Plaintiff to bring the action against the United States "in the judicial district where the plaintiff resides." When I filed my Complaint, I resided in Monterey, CA.

17. The gravamen of my claim doesn't arise from the FTCA. It arises from Title VII, the ADA, the Rehabilitation Act, the ADEA, the 1st Amendment and the 5th Amendment to the U.S. Constitution, and the IIED. I believe that I can ask the Court to strike the FTCA allegation out of my Complaint. Even in this case, I will have a right to keep my Complaint in the District Court of Northern California because I am alleging Age discrimination, and, under 29 U.S. Code §633a, I can bring a civil action in <u>any</u> Federal district court.

18. However, under Title VII, I have a right to maintain the civil action at the District Court in the State of New Mexico. Read 42 U.S. Code § 2000e–5(f)(3), "Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter.

Opposition to Motion to Dismiss, case No. 3:2018cv03748

Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office…."

19. If I strike the FTCA allegation from my Complaint, I will have to ask the Court to transfer my case to the District Court of the State of New Mexico according to the requirements of 42 U.S. Code § 2000e–5(f)(3) because the discriminatory practice occurred in New Mexico. However, I am not sure if the phrase "or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice" allows me to maintain this lawsuit in California. Currently, I am a contractor with two caregiving companies in California

20. Part 2. Later, Ms. Cormier points out that, to be eligible to sue the U.S. under the FTCA, I needed to exhaust the administrative remedies, and the U.S. has to waive the sovereign immunity (Motion to Dismiss, page 8, lines 14-20).

21. My argument. The gravamen of my Complaint doesn't arise from the FTCA. I asked the Court to strike this part of Ms. Cormier's pleading in my Motion to Strike. Read Attachment 7 to my Complaint, the last page, "If there has been no hearing, OEDCA will address all issues in the complaint; find discrimination or find no discrimination; and advise the complainant of his/her right … to file a civil action in Federal District Court."

22. Ms. Cormier talked about the sovereign immunity of the United States but didn't talk about the alleged sovereign immunity of the Agency of the United States. Because I didn't name the United States as a defendant in this action, the conversation about the sovereign immunity is improper.

Opposition to Motion to Dismiss, case No. 3:2018cv03748

391

23. Read Attachment 13 to my Complaint where I provided the proof that I tried to obtain a Right to Sue Letter.

24. Read Attachment 19 to my Complaint where I provided the proof that I notified the Agency about my intention to file a lawsuit.

25. Moreover, read the citation of *Brown v GSA* in my Complaint, page 16, line 23-28, page 17, pages 1-2, "Section 717 of the Civil Rights Act of 1964, as added by § 11 of the Equal Employment Opportunity Act of 1972… permits an aggrieved employee to file a civil action in a federal district court for review of his claim of employment discrimination."

26. Part 3. Ms. Cormier asserts that "the Ninth Circuit has held that the proper defendant in an FTCA claim is the United States; the FTCA bars bringing an action against a federal employee or federal agency. *Kennedy*, 145 F.3d at 1078" (Motion to Dismiss, page 8, lines 26-27, page 9, line 1.)

27. My argument. The gravamen of my Complaint doesn't arise from the FTCA. I already notified the Court about my intention to strike the FTCA allegation out of my Complaint.

28. Part 4. Read the Motion to Dismiss, page 9, lines 1-2, "Additionally, Plaintiff asserts a claim for libel against the VAMC, a tort expressly excluded from the waiver of immunity by the United States under the FTCA. 28 U.S.C. § 2680(h)."

29. My argument. This is pure speculation, and I asked the Court to strike it in my Motion to Strike. I am asserting the claim for Libel against the VAMC and not against the United States. Ms. Cormier can't invoke the waiver of sovereign immunity by the United States under 28 U.S.C. § 2680(h) as a defense against my claim against the VAMC.

30. Moreover, the gravamen of my fifth cause of action "Libel" arises from my Title VII, ADEA, ADA, and my Rehabilitation Act claims (the Agency discriminated against my sex, age, and disability, and lied about the reasons of the termination of my

Opposition to Motion to Dismiss, case No. 3:2018cv03748

employment.) The gravamen of my fifth cause of action "Libel" doesn't arise from the FTCA. I already exhausted the administrative remedies because I explained to the EEO all details related to the cause of action "Libel."

31. **Issue 6**. That "the United States Department of Veterans Affairs is a[n] [im]proper defendant in this matter."

32. Ms. Cormier is correct that, if I invoke Title VII, I need to name the head of the Agency as a Defendant. I did that.

33. However, I am also alleging Age Discrimination that is outside of the scope of Title VII. According to the ADEA or 29 U.S.C. §623, "It shall be unlawful for an employer… to discharge any individual… because of such individual's age."

34. The plain language of 29 U.S.C. §623 doesn't say that I need to name the head of the Agency as a Defendant. The plain language of 29 U.S.C. §623 says "it should be unlawful for an employer" to fire me because of my age. Obviously, the Acting Secretary of the Department of Veterans Affairs was not my employer. The Agency itself (the Department of Veterans Affairs) was my employer, therefore, I named it as a Defendant.

35. Also, read my allegation of Disability discrimination, the ADA or 42 U.S.C. §12112, "No covered entity shall discriminate against a qualified individual on the basis of disability…" (Complaint, page 19, lines 17-21). Obviously, Mr. Robert Wilkie is not a covered entity. Therefore, I properly named the U.S. Department of Veterans Affairs as a Defendant in my ADA cause of action.

36. Moreover, read my allegation of the failure to provide with reasonable accommodations (the Rehabilitation Act of 1973) in my Complaint, page 19, lines 23-28, page 20, lines 107, "… 29 U.S.C. 701, et seq… requires each agency in the Executive Branch of the Federal government to establish programs that will facilitate the hiring, placement, and advancement of individuals with disabilities." Obviously,

Opposition to Motion to Dismiss, case No. 3:2018cv03748

393

Mr. Wilkie doesn't fall into the category of the Agency. Therefore, I properly named the U.S. Department of Veterans Affairs as a Defendant in my Rehab. Act claim.

37. **Issue 7**. That "Plaintiff may [not] seek punitive damages against a federal defendant."

38. Ms. Cormier cited 42 U.S.C. Section 1981a(b)(1) and said that punitive damages were not available "against federal government defendants in a Title VII case" (Motion to Dismiss, page 9, lines 23-24.)

39. Read the plain language of 42 U.S.C. Section 1981a(b)(1),

"(1) Determination of punitive damages

A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."

40. My argument. Ms. Cormier contradicts herself. On one hand, she says that Mr. Robert Wilkie should be named as a Defendant in my Title VII Complaint. Mr. Wilkie is not the Government, not the Governmental Agency, and not a Political Subdivision speaking by the plain language of 42 U.S.C. Section 1981a(b)(1). The plain language of 42 U.S.C. Section 1981a(b)(1) doesn't include a Head of the Agency into the list of exemptions along with the Government, the Governmental Agency, and a Political Subdivision.

41. Moreover, even if the Defendant were the Government in the FTCA claim where punitive damages are not allowed according to the plain language of 28 USC §2874 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive

Page **11** of **19**

Opposition to Motion to Dismiss, case No. 3:2018cv03748

394

damages"), the Court should still award the Plaintiff with "damages awards that may have a punitive effect."

42. Read *Molzof v. United States*, The U.S. Supreme Court, No. 90-838 (1992), "We agree with petitioner's interpretation of the term "punitive damages," and conclude that the Government's reading of 2674 is contrary to the statutory language. Section 2674 prohibits awards of "punitive damages," not "damages awards that may have a punitive effect." "Punitive damages" is a legal term of art that has a widely accepted common law meaning; "[p]unitive damages have long been a part of traditional state tort law." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 255 (1984). Although the precise nature and use of punitive damages may have evolved over time, and the size and frequency of such awards may have increased, this Court's decisions make clear that the concept of "punitive damages" has a long pedigree in the law. "It is a well-established principle of the common law that, in actions of trespass and all actions on the case for torts, a jury may inflict what are called exemplary, <u>punitive</u>, or vindictive damages upon a defendant, <u>having in view the enormity of his offense, rather than the measure of compensation to the plaintiff</u>." *Day v. Woodworth*, 13 How. 363, 371 (1852). See [502 U.S. 301, 307]  also *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 15 -17 (1991); id., at 25-27); (SCALIA, J., concurring in judgment)."

Source: https://caselaw.findlaw.com/us-supreme-court/502/301.html

43. <u>My argument</u>. It is well established that the victims of the Pregnancy discrimination are awarded punitive damages. Read *Juarez v. AutoZone Stores, Inc*., Case No. 08-CV-00417-WVG (S.D. Cal. Nov. 17, 2014) where the jury awarded the victim of the Pregnancy Discrimination with $185 million U.S. dollars.

Source: https://en.wikipedia.org/wiki/Juarez_v._AutoZone_Stores,_Inc .

44. Read 42 U.S. Code § 2000e–16,

"(d) Section 2000e–5(f) through (k) of this title applicable to civil actions

Opposition to Motion to Dismiss, case No. 3:2018cv03748

395

1    The provisions of section 2000e–5(f) through (k) of this title, as

2    applicable, shall govern civil actions brought hereunder, and the same

3    interest to compensate for delay in payment shall be available as in cases

4    involving nonpublic parties."

5    (e) Government agency or official not relieved of responsibility to assure

6    nondiscrimination in employment or equal employment opportunity

7    Nothing contained in this Act shall relieve any Government agency or

8    official of its or his primary responsibility to assure nondiscrimination in

9    employment as required by the Constitution and statutes or of its or his

10   responsibilities under Executive Order 11478 relating to equal

11   employment opportunity in the Federal Government.

12   (f) Section 2000e–5(e)(3) of this title applicable to compensation discrimination

13   Section 2000e–5(e)(3) of this title shall apply to complaints of

14   discrimination in compensation under this section."

15   45. Read 42 U.S. Code §2000e–5(e)(3),

16   "(A) For purposes of this section, an unlawful employment practice occurs, with

17   respect to discrimination in compensation in violation of this subchapter, when a

18   discriminatory compensation decision or other practice is adopted, when an

19   individual becomes subject to a discriminatory compensation decision or other

20   practice, or when an individual is affected by application of a discriminatory

21   compensation decision or other practice, including each time wages, benefits, or

22   other compensation is paid, resulting in whole or in part from such a decision or

23   other practice.

24   (B) In addition to any relief authorized by section 1981a of this title, liability may

25   accrue and an aggrieved person may obtain relief as provided in subsection (g)(1),

26   including recovery of back pay for up to two years preceding the filing of the

27   charge, where the unlawful employment practices that have occurred during the

28

Page **13** of **19**

Opposition to Motion to Dismiss, case No. 3:2018cv03748

charge filing period are similar or related to unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge."

46. Read the definition of "Compensation" at 42 U.S. Code § 9848(b)(2)(A),

"(2) Compensation. In this subsection, the term "compensation"—

(A) includes salary, bonuses, periodic payments, severance pay, the value of any vacation time, the value of a compensatory or paid leave benefit not excluded by subparagraph (B), and the fair market value of any employee perquisite or benefit not excluded by subparagraph (B)."

47. Read 42 U.S. Code § 1981a(a)(1),

"(1) Civil rights

In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 [42 U.S.C. 2000e–5, 2000e–16] against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act [42 U.S.C. 2000e–2, 2000e–3, 2000e–16], and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover <u>compensatory and punitive damages</u> as allowed in subsection (b), in addition to any relief authorized by <u>section 706(g)</u> of the Civil Rights Act of 1964 [*which means 42 U.S. Code §2000e-5*], from the respondent."

48. Read 42 U.S. Code §2000e–5(f)(1),

"Upon application by the complainant and in such circumstances as <u>the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the action without the payment of fees, costs, or security</u>."

49. Read 42 U.S. Code §2000e–5(f)(5),

"(5) It shall be the duty of the judge designated pursuant to this subsection to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited. If such judge has not scheduled the case for trial within one hundred and twenty days after issue has been joined, that judge may appoint a master pursuant to rule 53 of the Federal Rules of Civil Procedure."

50. Read 42 U.S. Code §2000e–5(g)(1) or Section 706(g) of the Civil Rights Act of 1964,

"(g) Injunctions; appropriate affirmative action; equitable relief; accrual of back pay; reduction of back pay; limitations on judicial orders

(1) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate…"

51. Read 42 U.S. Code §2000e–5(g)(2)(B)(i),

"(B) On a claim in which an individual proves a violation under section 2000e–2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court—

(i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) of this title…"

52. Read 42 U.S. Code §2000e–5(k),

"(k) Attorney's fee; liability of Commission and United States for costs

Opposition to Motion to Dismiss, case No. 3:2018cv03748

398

In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission <u>and the United States shall be liable for costs the same as a private person</u>."

53. <u>My argument</u>: I requested the compensation (additionally to recovering lost wages and benefits) at the amount of 5 million U.S. dollars which I will spend for purchasing donor eggs, donor sperm, hiring surrogate Moms, and raising my children because I will be a single Mom. I requested only future medical expenses that are authorized by law, "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). The cap on damages recoverable under Title VII does not limit front pay, which is not compensatory damages, or recovery under state antidiscrimination statutes. See *Pollard*, 532 U.S. at 852; *Hemmings v. Tidyman's Inc*., 285 F.3d 1174, 1196 (9th Cir. 2002) (Title VII damages cap inapplicable to $650,000 award of noneconomic damages under Washington Law Against Discrimination).

Source:

https://www.americanbar.org/content/dam/aba/administrative/labor_law/meetings/2011/annualmeeting/004.authcheckdam.pdf

54. Besides, I am entitled to obtaining both compensatory and punitive damages under 42 U.S. Code § 1981a(a)(1). The Agency deprived me a right to have my own children using my own eggs. Now, I am 52 yo, and I even don't know if I am able to have children using my own eggs. It is beyond any extent of the most horrible offense that a human being could ever suffer – to be deprived of an opportunity to have his/her own children using his/her own genetic material. The amount of punitive damages will be determined by the Jury at the trial.

Opposition to Motion to Dismiss, case No. 3:2018cv03748

399

55. I am entitled to expedited Jury Trial as soon as possible. I am entitled to appointing an Attorney (I am not sure if I want to use this option). I am entitled to immediately reinstating me back to work with a full range of wages and benefits and "other compensation." I am entitled to obtaining a restraining Order to prevent the Agency to distribute Libel that I was fired for cause because I had negligently failed to obtain LWOP.

56. I requested separate punitive damages for Libel because the amount was similar to the amount awarded in *Vidrine v. United States* – damages for reputation, emotional distress, mental anguish, loss of enjoyment of life, and humiliation; loss of consortium as results of Libel.

Source: https://www.casemine.com/judgement/us/5914f272add7b0493497f2be

57. However, Ms. Cormier didn't cite any provision of the law that prohibits District Courts to award punitive damages for Libel in employment discrimination cases against the Head of the Agency and the Agency itself (not against the United States in the FTCA action.)

**58. Conclusion.**

59. In her Motion to Dismiss, Ms. Cormier used only affirmative defense. She didn't demonstrate that the Agency would have fired me anyway regardless of my Title VII, ADA, ADEA, etc. claims. Therefore, I have a chance to prevail in my Complaint. Therefore, I am respectfully asking Hon. Judge Alsup:

1) To immediately reinstate me back to work (see my Motion for Preliminary Injunction, FRCP Rule 65(a))

2) To issue a restraining order prohibiting the Raymond G. Murphy VAMC from distributing Libel that I was fired for cause because I had negligently failed to obtain LWOP – FRCP Rule 65(b)

3) To strike the FTCA allegation from my Complaint

Opposition to Motion to Dismiss, case No. 3:2018cv03748

400

4) To determine whether to maintain my lawsuit at the District Court of Northern California or to transfer it to the District Court of New Mexico

5) To determine whether, despite the *Brown* rule, I have a right to maintain a separate cause of action "Pregnancy Discrimination" because, under the circumstances of my case, this Pregnancy discrimination was closely related with Disability Discrimination and Failure to Provide me with Reasonable Accommodations. Moreover, 42 U.S. Code § 2000e–16 doesn't contain the provisions described in 29 CFR Appendix to Part 1604, Questions and Answers on the Pregnancy Discrimination Act, Public Law 95-555, 92 Stat. 2076 (1978). Please, read my citation of this statute in my Complaint, from page 11, line 3 to page 12, line 5. I believe that the Legislature should adopt the issues described at 29 CFR Appendix to Part 1604, Q. and A. on the PDA to the employment in Federal sector

6) To proceed my case to a Jury Trial ASAP

7) To order the Department of Veterans Affairs to pay all costs and fees that I will incur as a Plaintiff in this lawsuit

8) To decide whether to appoint a free of charge Counsel to help me with my case. Even if I have a Counsel, I preserve a right to draft my pleadings myself and make decisions about my case myself

9) If my Complaint survives the Motion to Dismiss, I will re-submit my demand for different types of damages that I am entitled to according to the provisions of Title VII, ADA, ADEA, the Rehab, Act, the IIED, the 5th Amendment to the U.S. Constitution, and for Libel. Sources:

https://www.americanbar.org/content/dam/aba/administrative/labor_law/meetings/2011/annualmeeting/004.authcheckdam.pdf

and

https://www.eeoc.gov/federal/directives/md-110_chapter_11.cfm

Opposition to Motion to Dismiss, case No. 3:2018cv03748

401

Respectfully submitted,

Date: October 21st, 2018                Sign Name:

                                        Print Name:  Tatyana E. Drevaleva

Opposition to Motion to Dismiss, case No. 3:2018cv03748

402

1 Tatyana Evgenievna Drevaleva

2 No current home postal address, no mailing address

3 Currently residing in California

4 415-806-9864, tdrevaleva@gmail.com

5 Plaintiff in Pro Per

6

7 THE UNITED STATES DISTRICT COURT

8 NORTHERN DISTRICT OF CALIFORNIA

9

10

11

12 Tatyana E. Drevaleva          )      Case No. 3:2018cv03748

13                      )

14         Plaintiff,       )      Declaration to Opposition to

15         vs.             )      Defendants' Motion to Dismiss.

16 1) The U.S. Department of Veterans )    Affairs                )

17 2) Mr. Robert Wilkie, Acting United )

18    States Secretary of Veterans Affairs )      810 Vermont Avenue, NW)      Date: November 29, 2018    Washington, DC 20420      )

19                     )      Time: 8.00 AM

20 Facility: New Mexico VA Healthcare System )      1501 San Pedro Drive, S.E.    )      Location: Courtroom 12, 19th Floor

21      Albuquerque, NM 87108     )      Judge: Hon. William Alsup

22         Defendant.       )

23 _____)

24      I, Plaintiff Tatyana E. Drevaleva, hereby declare:

25     1) I am a Plaintiff Pro se and a party in this action

26     2) I have personal knowledge of the facts stated herein, which are known by me to be

27        true and correct, and I will testify competently thereto

28

Declaration to Opposition to Defendants' Motion to Dismiss, case No. 3:2018cv03748

403

3) I am asking the Court to strike FTCA from my Complaint because the gravamen of my Complaint doesn't arise from FTCA

4) I am asking the Court to decide whether to maintain my lawsuit in California or to transfer it to the District Court in New Mexico

5) I am entitled to different types of damages including punitive under Title VII

6) I am asking the Court to issue a temporary restraining Order prohibiting the Raymond G. Murphy VAMC to distribute Libel that I was fired for cause because I had negligently failed to obtain LWOP

7) I am entitled to get immediately reinstated me back to work at any VAMC

8) I am asking the Court to decide whether I can maintain a separate cause of action "Pregnancy Discrimination" despite the *Brown* rule

9) I am entitled to a Jury Trial ASAP

10) The Department of Veterans Affairs must pay all costs that I will incur in this lawsuit as a Plaintiff

11) I am entitled to a free of charge Counsel to help me with my case. Even if I have a Counsel, I preserve a right to draft my pleadings myself and to make decisions about my case myself.


I declare under the penalty of perjury, under the Federal laws and under the laws of the State of California that all foregoing is true and correct. Executed at City of San Francisco, CA on October 21st, 2018.


Respectfully submitted,

Date: October 21st, 2018          Sign Name:

                                  Print Name:  Tatyana E. Drevaleva

Page **2** of **2**

Declaration to Opposition to Defendants' Motion to Dismiss, case No. 3:2018cv03748

404

**Docket No. 41**

October 26, 2018.

Defendants' Reply to Plaintiff's Opposition to Motion to Dismiss,

Proposed Order.

1    ALEX G. TSE (CSBN 152348)
   United States Attorney
2    SARA WINSLOW (DCBN 457643)
   Assistant United States Attorney
3    Chief, Civil Division
   CLAIRE T. CORMIER (CSBN 154364)
4    Assistant United States Attorney

5       U.S. Attorney's Office/Civil Division
      150 Almaden Blvd., Suite 900
6       San Jose, CA  95113
      Telephone: (408) 535-5082
7       Fax:  (408) 535-5081
      Email:  claire.cormier@usdoj.gov
8
   Attorneys for Defendant Robert Wilkie
9    Secretary, U.S. Dept. of Veterans Affairs

10

11                UNITED STATES DISTRICT COURT

             NORTHERN DISTRICT OF CALIFORNIA
12
               SAN FRANCISCO DIVISION
13

14    TATYANA E. DREVALEVA,         )  CASE NO. 18-CV-3748-WHA
                                )
15               Plaintiff,       )  REPLY MEMORANDUM IN SUPPORT OF
                                 )  DEFENDANTS' MOTION TO DISMISS
16      v.                             )
                                 )
17    1) The U.S. DEPARTMENT OF VETERANS )  Date: November 29, 2018
   AFFAIRS                         )  Time: 8:00 a.m.
18                                  )  Courtroom 12, 19th Floor
   2) ROBERT WILKIE, Secretary, U.S. Dept. of )  Hon. William H. Alsup
19    Veterans Affairs,             )
                                 )
20              Defendants.      )
   ————————————————————— )
21

22    **I.**      **Introduction**

23       Plaintiff has many arguments against the Defendants' motion to dismiss, some of which relate to

24    issues that Defendants have not yet attempted to raise. Though the Secretary anticipates that he will later

25    file a motion for summary judgment relating to all claims that survive this motion, at this point

26    Defendants are seeking dismissal with prejudice of Plaintiff's impermissible constitutional and tort

27    claims, her claim for punitive damages, and all of her claims against the Department of Veterans Affairs

28    ("VA"). Defendants are not yet seeking to dismiss Plaintiff's claims against the Secretary for

406

1  discrimination based on sex (including pregnancy) under Title VII, age under the Age Discrimination in

2  Employment Act ("ADEA"), or disability under the Rehabilitation Act, except to ask the Court to

3  require Plaintiff to provide an amended complaint written in numbered paragraphs.

4  **II.      Sovereign immunity bars many of Plaintiff's claims.**

5       Plaintiff argues that sovereign immunity does not apply to her claims because she is not suing the

6  *United States*, but, instead, the VA and its Secretary. *See* Opposition to Defendants' Motion to Dismiss

7  ("Pl. Opp.") ¶ 22. "In sovereign immunity analysis, any lawsuit against an agency of the United States

8  or against an officer of the United States in his or her official capacity is considered an action against the

9  United States." *Balser v. Dep't of Justice, Office of U.S. Trustee*, 327 F.3d 903, 907 (9th Cir. 2003).

10  "Consequently, a person attempting to sue a federal agency or officer must demonstrate that the claim

11  being asserted is covered by a specific statutory authorization to sue the United States. . . ." *Weber v.*

12  *Department of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008), quoting 14 Charles Alan Wright,

13  Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3655 (3d ed. 1998).

14       Except for the claims that the Secretary is not attempting to permanently dismiss at this juncture,

15  *i.e.*, the claims against the Secretary under Title VII, the ADEA, and the Rehabilitation Act, Plaintiff has

16  not demonstrated a waiver of sovereign immunity that would allow her claims to proceed. Accordingly,

17  all of her claims against the VA and her fifth (libel), sixth (intentional infliction of emotional distress or

18  IIED), and seventh (deprivation of liberty and property) causes of action against the Secretary should be

19  dismissed, and her prayer for punitive damages should be stricken.

20  **III.     Plaintiff cannot obtain punitive damages from federal defendants.**

21       Because claims against agencies and their officers are treated as claims against the United States

22  for sovereign immunity purposes, Plaintiff cannot assert claims for punitive damages against Secretary

23  Wilkie or the VA, or the United States under the FTCA. *See* Motion to Dismiss at 9-10 and Pl. Opp.

24  ¶¶ 37-43. Punitive damages against the government can be awarded only if they are explicitly allowed

25  by the relevant statute. *See Siddiqui v. United States*, 359 F.3d 1200, 1203-1204 (9th Cir. 2004). Here

26  there is no statute even plausibly allowing punitive damages against the government, let alone explicitly

27  doing so. Plaintiff's prayer for punitive damages should be stricken.

28

407

**IV.  Plaintiff's tort and constitutional claims are preempted.**

Plaintiff's Opposition does not discuss the issue of Title VII as an exclusive remedy, instead merely pointing out that she argued this issue in her Motion to Strike. Nevertheless, Defendants will address Plaintiff's argument, treating it as incorporated by reference into her Opposition.

As argued in Defendants' motion, the Supreme Court has held that Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment." *Brown v. General Services Administration*, 425 U.S. 820, 835 (1976). Plaintiff states in her Motion to Strike that her "5th Amendment allegation (Seventh cause of action) is based on not only on Title VII but on all other mentioned above allegations," which included "age discrimination, disability discrimination, failure to provide reasonable accommodations, Libel, and the IEDD which are outside of scope of Title VII." ECF 38 ¶ 27. She also states that her tort claims for libel and intentional infliction of emotional distress "are related not only to Title VII but also to ADEA, ADA, and the Rehabilitation Act of 1973." ECF 38 ¶ 35. Similarly, she states that the gravamen of her libel claim "arises from [her] Title VII, ADEA, ADA, and [her] Rehabilitation Act claims." ECF 38 ¶ 41. Thus, Plaintiff is not denying that her tort and constitutional claims are related to her Title VII claims, even if they are also related to her other discrimination claims. Accordingly, the exclusive remedy rule as stated in *Brown* applies here to bar Plaintiffs' fifth through seventh causes of action for all the reasons stated in Defendant's motion.

However, even if one separately looks at the claims as being brought under the other discrimination statutes that Plaintiff cites, the result would be the same because the Rehabilitation Act and ADEA also preempt Plaintiff's constitutional and tort claims.

The ADEA is the "exclusive enforcement mechanism" for age discrimination in the work place and is "exclusive of any other remedy" against both the federal government and any individual federal employee who allegedly engaged in the discriminatory conduct. *May v. McDonald*, 2015 WL 448417 at *2 (N.D. Cal. 2015) (dismissing the plaintiff's non-ADEA age-based claims because the ADEA preempts them). Additionally, the ADEA's comprehensive scheme shows "Congress clearly intended that all claims of age discrimination be limited to the rights and procedures authorized by the ADEA" and that the ADEA is the exclusive remedy for age discrimination claims. *Britt v. Grocers Supply Co.*,

408

1   *Inc.*, 978 F.2d 1441, 1148 (5th Cir. 1992) (quoting *Ring v. Crisp County Hosp. Auth.*, 652 F.Supp. 477,

2   482 (M.D. Ga 1987)).

3         Similarly, the Rehabilitation Act "is the exclusive remedy for discrimination in employment . . .

4   on the basis of handicap." *Boyd v. U.S. Postal Service*, 752 F.2d 410, 413 (9th Cir. 1985). Similar to

5   Title VII and the ADEA, a plaintiff may not bring additional claims based on the same facts as the

6   Rehabilitation Act claims. *Miller v. Olesiuk*, 2013 WL 4532146 at *7 (N.D. Cal. 2013). The

7   incorporation of section 717 of the Civil Rights Act of 1964, 42 U.S.C. section 2000e-16 into the

8   Rehabilitation Act offers "a strong argument that statutory remedies are exclusive" in these types of

9   claims. *Shirey v. Devine*, 670 F.2d 1188, 1207 at n.7 (D.C. Cir. 1982); *see also Hughes v. U.S. Postal

10  Service*, 700 F.Supp. 779, 783 (S.D.N.Y 1988); *Welsh v. Hagler*, 83 F.Supp.3d 212, 222 (D.D.C. 2015).

11        Here, to the extent that Plaintiff's tort and constitutional claims could be segregated as solely

12  age-based or disability-based and thus not part of her Title VII claims (even though she concedes

13  otherwise), they would still be preempted by the ADEA's and the Rehabilitation Act's exclusive

14  enforcement mechanism.

15  **V.    The VA cannot be a defendant under Title VII, the Rehabilitation Act, or the ADEA.**

16        While acknowledging that, for her Title VII claim, the Secretary is the only proper defendant,

17  Plaintiff argues that she can name the VA as the defendant for her Americans with Disabilities Act

18  ("ADA") claim, Rehabilitation Act claim, or ADEA claim. Pl. Opp. ¶¶ 31-36. Plaintiff is mistaken.

19        First, while the ADA excludes the federal government from its definition of "employer" (*see* 42

20  U.S.C. § 12111(5)(B)(i)), the ADA's standards of substantive liability are incorporated in the

21  Rehabilitation Act. *Blackman-Baham v. Kelly*, 2017 WL 679514 at *10 (N.D. Cal. 2017). Accordingly,

22  Plaintiff cannot bring a claim against the federal government under the ADA, but she can attempt to

23  bring a similar disability discrimination claim under the Rehabilitation Act.

24        Claims under the Rehabilitation Act and the ADEA, like Title VII, are required to be brought

25  against the head of the agency, not the agency itself. The Rehabilitation Act borrows "the remedies,

26  procedures, and rights" from Title VII. *Lopez v. Johnson*, 333 F.3d 959, 961 (9th Cir. 2003), citing 29

27  U.S.C. § 794a(a)(1). This has been held to mean that the only proper defendant for a Rehabilitation Act

28  claim is the head of the agency. *Walton v. U.S. Marshals Service*, 2005 WL 2230151 at *2 (N.D. Cal.

**409**

2005). Similarly, for suits alleging age discrimination in federal employment under the ADEA, the Ninth Circuit has held that the only proper defendant is the head of the agency, here the Secretary. *See Romain v. Shear*, 799 F.2d 1416, 1418 (9th Cir. 1986). "When a provision of the ADEA can be traced to a complimentary section of Title VII, the two should be construed consistently." *Id*.

Plaintiff's ADA claim should be dismissed in its entirety, and her Title VII, Rehabilitation Act, and ADEA claims against the VA should also be dismissed with prejudice. Her claims against the Secretary under Title VII, the Rehabilitation Act, and the ADEA should be dismissed for failure to comply with Rule 10 of the Federal Rules of Civil Procedure[1], but she should be given leave to file an amended complaint, using the required paragraph numbers, for those limited claims.

## VI. Plaintiff's tort claims are barred for numerous reasons.

Plaintiff seems to misunderstand the limitations on tort actions against the federal government. *See* Pl. Opp. ¶¶ 11-30. Whether the claim is being made nominally against the United States, an agency, or a federal employee, the exclusive remedy for such tort claims is a Federal Tort Claims Act ("FTCA") claim against the United States. *See United States v. Smith*, 499 U.S. 160, 173 (1991) (noting that the FTCA is "exclusive of any other civil action or proceeding for money damages" against a government employee). A federal agency cannot be sued for tortious conduct. *See FDIC v. Craft*, 157 F.3d 697, 706 (9th Cir. 1998). Although tort claims "can arise from the acts or omissions of United States agencies (28 U.S.C. § 2671), an agency itself cannot be sued under the FTCA." *Id*., citing *Shelton v. United States Customs Service*, 565 F.2d 1140, 1141 (9th Cir. 1977) ("It is well established that federal agencies are not subject to suit *eo nomine* unless so authorized by Congress in explicit language."). Where a tort action is brought against a federal agency or head of agency, dismissal of those defendants is the proper result. *Kennedy v. United States Postal Service*, 145 F.3d 1077, 1078 (9th Cir 1998). Therefore, whether Plaintiff invokes the FTCA, and whether she attempts to sue the United States, the VA, the Secretary of the VA, or any VA employee, any tort claim is subject to the requirements and limitations of the FTCA.

---

[1] Plaintiff argued in her Motion to Strike (ECF 38 ¶¶ 9-12) that Rule 10's paragraph numbering requirement applied equally to Defendants' motion to dismiss. Rule 10 requires paragraph numbering for "pleadings." Pleadings are limited to iterations of complaints and answers, not arguments in motions. *See* Fed. R. Civ. P. 7(a).

As discussed in Defendants' motion, Plaintiff has not alleged compliance with the required administrative remedies that are a prerequisite to a tort action in District Court. Motion to Dismiss at 8. In addition, her libel claim is expressly excluded from the FTCA's waiver of sovereign immunity. *See* 28 U.S.C. § 2680(h). Finally, she has not sued the United States, which is the only proper defendant in a tort action relating to alleged tortious conduct by federal employees. Therefore, even if her tort claims were not preempted by Title VII, the ADEA, and the Rehabilitation Act, her claims for libel and intentional infliction of emotional distress would require dismissal.

## VII.    Plaintiff's extraneous requests are improper in her motion opposition.

Plaintiff seems to ask the Court for additional orders or guidance in her opposition to the motion to dismiss. For example, she discusses whether the case should perhaps be venued in New Mexico. Pl. Opp. ¶¶ 18-19. She discusses what remedies may be allowed in this case (*see* Pl. Opp. ¶¶ 45-54), even though the only argument on that subject in the motion to dismiss related to punitive damages. She seems to ask the Court to appoint counsel for her. *See* Pl. Opp. ¶ 55. In her conclusion, she asks for several other varieties of relief that are not the subject of the Defendants' motion to dismiss, including reinstatement, a restraining order related to alleged libel, a legal determination regarding her pregnancy discrimination claim, and an expedited jury trial. Pl. Opp. ¶ 59. If the Plaintiff wishes the Court to rule on any of these issues, an opposition to a motion to dismiss is not the appropriate vehicle.

## VIII.   CONCLUSION

For all the foregoing reasons and the reasons stated in Defendants' motion to dismiss, Plaintiff's fifth, sixth, and seventh causes of action should be dismissed with prejudice and without leave to amend. Plaintiff's ADA claim against both defendants and all claims against the VA should be dismissed with prejudice and without leave to amend. The prayer for punitive damages should be stricken. Finally, because Plaintiff's complaint fails to comply with Rule 10, the remainder of the complaint – the first through fourth causes of action against the Secretary pursuant to Title VII, the ADEA, and the

Rehabilitation Act – should be dismissed with leave to amend and with instructions that any amended

complaint should be written in numbered paragraphs.

Respectfully submitted,

ALEX G. TSE
United States Attorney

Dated: October 26, 2018                    ___/s/  Claire T. Cormier___
                                           CLAIRE T. CORMIER
                                           Assistant United States Attorney

1  ALEX G. TSE (CSBN 152348)
   United States Attorney
2  SARA WINSLOW (DCBN 457643)
   Assistant United States Attorney
3  Chief, Civil Division
   CLAIRE T. CORMIER (CSBN 154364)
4  Assistant United States Attorney

5      U.S. Attorney's Office/Civil Division
       150 Almaden Blvd., Suite 900
6      San Jose, CA  95113
       Telephone: (408) 535-5082
7      Fax:  (408) 535-5081
       Email:  claire.cormier@usdoj.gov
8
   Attorneys for Defendant Robert Wilkie
9  Secretary, U.S. Dept. of Veterans Affairs

10
                 UNITED STATES DISTRICT COURT
11
               NORTHERN DISTRICT OF CALIFORNIA
12
                  SAN FRANCISCO DIVISION
13
                                )  CASE NO. 18-CV-3748-WHA
14  TATYANA E. DREVALEVA,        )
                                )
15              Plaintiff,       )  [PROPOSED] ORDER GRANTING
                                )  DEFENDANTS' MOTION TO DISMISS AND
16     v.                        )  GRANTING LIMITED LEAVE TO AMEND
                                )
17  1) The U.S. DEPARTMENT OF VETERANS )
    AFFAIRS                      )  Date: November 29, 2018
18                               )  Time: 8:00 a.m.
    2) ROBERT WILKIE, Secretary, U.S. Dept. of )  Courtroom 12, 19th Floor
19  Veterans Affairs,            )  Hon. William H. Alsup
                                )
20              Defendants.      )
                                )
21  _____

22  **I.    Introduction**

23        In this employment discrimination action, defendants United States Department of Veterans

24  Affairs ("VA") and Robert Wilkie, Secretary of the VA, move for dismissal of plaintiff's claims against

25  them. They seek dismissal of some claims without leave to amend and some with leave to amend. For

26  the following reasons, the motion is GRANTED.

27

28

413

## II.     Plaintiff's Allegations

Plaintiff alleges that she began working for the VA in New Mexico in April 2017. In May 2017, she advised her supervisor that she had been on a waiting list for a free In-Vitro Fertilization attempt in Russia and that her turn just came up. She told her supervisor that she urgently needed to fly to Russia to perform the procedure and to get related medication. She anticipated being in Russia for about 1.5 months. The supervisor advised plaintiff that she did not qualify for leave without pay under the Family and Medical Leave Act because she had not worked for the VA for the required one year period. The supervisor also advised her that plaintiff should provide a written medical document in English prior to plaintiff going to Russia.

On May 17, 2017, because the supervisor was not present, plaintiff told an assistant manager of her need to go to Russia. She alleges that he gave verbal permission for her to go. Plaintiff filled out a form requesting leave without pay and put it under the door of the assistant manager. On May 18, 2017, plaintiff emailed to her supervisor and the assistant manager a medical document in Russian from her OB/GYN. She departed for Russia the same day.

While in Russia, plaintiff got the medical document translated and she emailed it to her supervisor on May 30, 2017. Meanwhile, plaintiff's request for leave without pay had been denied and a letter to that effect was sent to her mailing address, but not emailed to her.

On July 1, 2017, plaintiff emailed her supervisor and the assistant manager advising them that, due to a medical complication, she would need to stay in Russia for a longer period of time and she requested additional leave. On July 3, 2017, plaintiff received an email from her supervisor advising her that she had been terminated on June 30, 2017.

Plaintiff moved from New Mexico to California, where she applied for Unemployment Insurance benefits. She did not receive the benefits because the Employment Development Department learned that plaintiff was let go for cause.

Plaintiff alleges that these events constitute discrimination based on sex, pregnancy, age, and disability under Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act, and the Rehabilitation Act. She also alleges claims for libel, intentional

414

1  infliction of emotional distress, and deprivation of liberty and property without the due process required

2  by the Fifth Amendment to the U.S. Constitution.

3      Plaintiff requests various remedies, including punitive damages.

4  **III.   Analysis**

5      Rule 10 of the Federal Rules of Civil Procedure requires a plaintiff to state her claims "in

6  numbered paragraphs, each limited as far as practicable to a single set of circumstances." This allows a

7  defendant to respond to the complaint allegations "refer[ring] by number to a paragraph" in the

8  complaint. Fed. R. Civ. P. 10(b). Plaintiff's complaint lacks numbered paragraphs. The entirety of

9  plaintiff's complaint is dismissed for this reason. *See Jacob v. Flagg,* 2010 WL 4974868 at *3 (S.D. Cal.

10 Dec. 1, 2010). Accordingly, to the extent that the Court allows plaintiff to file an amended complaint, as

11 discussed below, it must be written in numbered paragraphs.

12     Federal courts have limited jurisdiction, and the presumption is that a complaint falls outside this

13 limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Where subject

14 matter jurisdiction is lacking, dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) is the

15 appropriate disposition. *MacKay v. Pfiel*, 827 F.2d 540, 543 (9th Cir. 1987).

16     A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of

17 the claims alleged in the complaint. *Ileto v. Glock Inc.,* 349 F.3d 1191, 1199-200 (9th Cir. 2003).

18     For both a facial challenge to jurisdiction under Rule 12(b)(1) and a challenge to the sufficiency

19 of claims under Rule 12(b)(6), the Court must accept the factual allegations in plaintiff's complaint as

20 true. *Miranda v. Reno*, 238 F.3d 1156, 1157 n.1 (9th Cir. 2001), *Erickson v. Pardus*, 551 U.S. 89, 94

21 (2007) (per curiam). The Court, however, need not assume the truth of legal conclusions. *Western

22 Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981); *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

23     **A.    Title VII preempts Plaintiff's tort and constitutional claims.**

24     Plaintiff concedes that her tort and constitutional claims are based, at least in part, on the laws

25 governing discrimination under Title VII. The Supreme Court has held that Title VII "provides the

26 exclusive judicial remedy for claims of discrimination in federal employment." *Brown v. General

27 Services Administration*, 425 U.S. 820, 835 (1976). Where a federal employee asserts a claim under

28 Title VII, that statute is exclusive of any other remedy against both the federal government and the

1  individual federal employees alleged to have participated in the discrimination. *White v. General*

2  *Services Administration*, 652 F.2d 913, 916-17 (9th Cir. 1981). The Court in *Brown* held that "[s]ection

3  717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16 (1970 ed., Supp. IV), proscribes federal

4  employment discrimination and establishes an administrative and judicial enforcement system." *Brown*,

5  425 U.S. at 829. The Supreme Court held that section 717 is a "precisely drawn, detailed statute [that]

6  preempts more general remedies," and thus it "provides the exclusive remedy for claims of

7  discrimination in federal employment." *Id.* at 834-35.

8         Based upon the legislative history and structure of section 717 of Title VII (42 U.S.C. § 2000e-

9  16), the Court found that "[t]he balance, completeness, and structural integrity of § 717 are inconsistent

10  with the . . . contention that the judicial remedy afforded by § 717(c) was designed merely to supplement

11  other putative judicial relief." *Brown*, 425 U.S. at 832. Therefore, because it was Congress' intent to

12  create an "unambiguous . . . exclusive, preemptive administrative and judicial scheme for the redress of

13  federal employment discrimination," a plaintiff may not "bootstrap" additional causes of action onto her

14  Title VII complaint. *Id.* at 829-30.

15         This remains true even though plaintiff also asserts that her claims arise out of other

16  discrimination statutes, specifically the ADEA and the Rehabilitation Act.[1] The ADEA is the "exclusive

17  enforcement mechanism" for age discrimination in the work place and is "exclusive of any other

18  remedy" against both the federal government and any individual federal employee who allegedly

19  engaged in the discriminatory conduct. *May v. McDonald*, 2015 WL 448417 at *2 (N.D. Cal. 2015);

20  *Britt v. Grocers Supply Co., Inc.*, 978 F.2d 1441, 1148 (5th Cir. 1992). Similarly, the Rehabilitation Act

21  "is the exclusive remedy for discrimination in employment . . . on the basis of handicap."  *Boyd v. U.S.*

22  *Postal Service*, 752 F.2d 410, 413 (9th Cir. 1985); *Miller v. Olesiuk*, 2013 WL 4532146 at *7 (N.D. Cal.

23  2013).

24         Accordingly, to the extent that plaintiff's tort and constitutional claims could be segregated as

25  solely age-based or disability-based and thus not part of her Title VII claims (even though she concedes

26

27         [1] Plaintiff also asserts claims under the ADA, but that statute does not allow claims against the
28  federal government, which is excluded from that statute's definition of employer. *See* 42 U.S.C. §
    12111(5)(B)(i).

1   otherwise), they would still be preempted by the ADEA's and the Rehabilitation Act's exclusive

2   enforcement mechanism.

3        Because plaintiff admits that her tort and constitutional claims arise out of the same events as her

4   discrimination claims, it would be futile to allow her to amend these claims. Plaintiff's fifth, sixth, and

5   seventh causes of action are therefore dismissed with prejudice and without leave to amend.

6        **B.**     **The FTCA bars plaintiff's tort claims even if Title VII did not preempt them.**

7        The Federal Tort Claims Act ("FTCA") provides the "exclusive remedy for tortious conduct by

8   the United States" and effected a broad waiver of sovereign immunity, making the United States liable

9   for the tortious acts of its employees, with certain exceptions. *See Federal Deposit Ins. Corp. v. Craft,*

10   157 F.3d 697, 716 (9th Cir.1998); 28 U.S.C. § 2674. Whether the claim is being made nominally against

11   the United States, an agency, or a federal employee, the FTCA is the exclusive remedy for such tort

12   claims. *See United States v. Smith*, 499 U.S. 160, 173 (1991). Although tort claims "can arise from the

13   acts or omissions of United States agencies (28 U.S.C. § 2671), an agency itself cannot be sued under

14   the FTCA." *Craft,* 157 F.3d at 706. The only proper defendant in an FTCA case is the United States; it

15   does not allow claims against a federal employee or a federal agency. *See Craft,* 157 F.3d at 706.

16        Additionally, under the FTCA, any claims for libel are expressly excluded from the general

17   waiver of sovereign immunity for tort claims. *See* 28 U.S.C. § 2680(h).

18        Plaintiff is attempting to sue the VA and its Secretary (not the "United States") for the torts of

19   libel and intentional infliction of emotional distress. Those claims must be dismissed even if they were

20   not preempted by Title VII. However, because they are preempted, and because a claim for libel is

21   barred by sovereign immunity, it would be futile to allow plaintiff to attempt to amend to state these

22   claims against the United States. Accordingly, for these additional reasons, her fifth and sixth causes of

23   action are dismissed with prejudice and without leave to amend.

24        **C.**     **The Department of Veterans Affairs is an improper defendant.**

25        Section 717 of Title VII, 42 U.S.C. § 2000e-16, states that in a Title VII discrimination action,

26   "the head of the department, agency, or unit . . . shall be the defendant." 42 U.S.C. § 2000e-16(c).

27   Similarly, claims under the Rehabilitation Act and the ADEA are required to be brought against the head

28   of the agency, not the agency itself. *See Lopez v. Johnson*, 333 F.3d 959, 961 (9th Cir. 2003), citing 29

1    U.S.C. § 794a(a)(1); *Walton v. U.S. Marshals Service*, 2005 WL 2230151 at *2 (N.D. Cal. 2005);

2    *Romain v. Shear*, 799 F.2d 1416, 1418 (9th Cir. 1986). Thus, plaintiff improperly named the VA as a

3    defendant for her discrimination claims, and it should be dismissed as a defendant with prejudice and

4    without leave to amend.

5             **D.    Sovereign immunity bars many of plaintiff's claims.**

6             Plaintiff argues that sovereign immunity does not apply to her claims because she is not suing the

7    *United States*, but, instead, the VA and its Secretary. "In sovereign immunity analysis, any lawsuit

8    against an agency of the United States or against an officer of the United States in his or her official

9    capacity is considered an action against the United States." *Balser v. Dep't of Justice, Office of U.S.*

10   *Trustee*, 327 F.3d 903, 907 (9th Cir. 2003). "Consequently, a person attempting to sue a federal agency

11   or officer must demonstrate that the claim being asserted is covered by a specific statutory authorization

12   to sue the United States. . . ." *Weber v. Department of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir.

13   2008), quoting 14 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and*

14   *Procedure* § 3655 (3d ed. 1998).

15           Except for the claims that the Secretary is not attempting to permanently dismiss at this juncture,

16   *i.e.*, the claims against the Secretary under Title VII, the ADEA, and the Rehabilitation Act, plaintiff has

17   not demonstrated a waiver of sovereign immunity that would allow her claims. Accordingly, all of her

18   claims against the VA and her fifth (libel), sixth (intentional infliction of emotional distress or IIED),

19   and seventh (deprivation of liberty and property) causes of action against the Secretary are dismissed

20   with prejudice and without leave to amend.

21           **E.    Plaintiff cannot obtain punitive damages from federal defendants.**

22           Because claims against federal agencies and their officers are treated as claims against the United

23   States for sovereign immunity purposes, plaintiff cannot assert claims for punitive damages against

24   Secretary Wilkie or the VA. Punitive damages against the government can be awarded only if they are

25   explicitly allowed by the relevant statute. *See Siddiqui v. United States*, 359 F.3d 1200, 1203-1204 (9th

26   Cir. 2004). Here there is no statute even plausibly allowing punitive damages against the government, let

27   alone explicitly doing so. Plaintiff's prayer for punitive damages is therefore stricken.

28

418

## IV. Conclusion

Defendants' motion to dismiss is hereby GRANTED. Plaintiff's fifth, sixth, and seventh causes of action are dismissed with prejudice and without leave to amend. All claims against the Department of Veterans Affairs are dismissed with prejudice and without leave to amend. The claim for disability discrimination pursuant to the Americans with Disabilities Act ("ADA") is dismissed with prejudice and without leave to amend. The prayer for punitive damages is stricken. Finally, because plaintiff's complaint fails to comply with Rule 10, the remainder of the complaint – the first through fourth causes of action against the Secretary – are dismissed. Plaintiff is hereby given limited leave to file an amended complaint within 30 days of the date of this order. Her amended complaint, which must be written in numbered paragraphs, must be limited to her claims of discrimination based on sex (including pregnancy), age, and/or disability, it may be brought only against the Secretary of the VA, it may not include claims based on the ADA, and it may not include a prayer for punitive damages. Defendant's answer, motion, or other response to the amended complaint will be due 30 days after plaintiff files the amended complaint.[2]

Dated: November ___, 2018

                        _____
                        WILLIAM H. ALSUP
                        United States District Judge

---

[2] In her opposition to the motion to dismiss, plaintiff seems to ask the Court for additional orders or guidance. These include issues relating to venue, remedies, and appointment of counsel. If the plaintiff wishes the Court to rule on any of these issues, an opposition to a motion to dismiss is not the appropriate vehicle.

419

**Docket No. 42**

October 27, 2018.

Plaintiff's Request for Leave to File a Supplemental Brief.

1  Tatyana Evgenievna Drevaleva

2  No current home postal address

3  Currently residing in California

4  415-806-9864, tdrevaleva@gmail.com

5  Plaintiff in Pro Per

6

7  THE UNITED STATES DISTRICT COURT

8  NORTHERN DISTRICT OF CALIFORNIA

9

10

11  )
   )
12  Tatyana E. Drevaleva            )  Case No. 3:18-cv-03748
   )
13                                  )
       Plaintiff,                   )
14                                  )
            vs.                     )
15                                  )
   1) The U.S. Department of Veterans )  Request for Leave to File a Supplemental
16      Affairs                     )  Brief.
                                    )
17  2) Mr. Robert Wilkie, Acting United )
       States Secretary of Veterans Affairs )  Judge: Hon. William Alsup
18      810 Vermont Avenue, NW      )
       Washington, DC 20420         )
19                                  )
   Facility: New Mexico VA Healthcare System )
20      1501 San Pedro Drive, S.E.  )
       Albuquerque, NM 87108        )
21                                  )
                                    )
22          Defendant.              )
                                    )
23  _____)

24      Plaintiff Tatyana Drevaleva herein submits her Request for Leave to File a Supplemental

25  Brief as a response to Defendants' Reply to my Opposition to the Motion to Dismiss.

26      On October 26, 2018, Defendants filed a Reply to my Opposition to the Motion to

27  Dismiss. In this Reply, Defendants raised new issues that were not presented in their Motion to

28  Dismiss.

421

Plaintiff agrees with some of the objections that were raised in Defendants' Reply. However, the Reply contains a lot of misleading information and the new issues that the Defendants didn't present in their Motion to Dismiss.

Plaintiff is hereby requesting the Court's leave to file a Supplemental Brief to discuss Defendants' objections that are correct and the objections that are libelous.

I declare under the penalty of perjury under the Federal laws and the laws on the State of California that the foregoing is true and correct. Executed at City of Sacramento, CA, on October 27th, 2018.

Respectfully submitted,

Date: October 27th, 2018                    Sign Name: _____

                                            Print Name:  Tatyana E. Drevaleva

Request for Leave to File a Supplemental Brief, case No. 3:18-cv-03748

422

**Docket No. 43**

October 30, 2018.

Defendants' Errata Re Reply Memorandum in Support of Defendants' Motion to Dismiss.

1  ALEX G. TSE (CSBN 152348)
   United States Attorney
2  SARA WINSLOW (DCBN 457643)
   Assistant United States Attorney
3  Chief, Civil Division
   CLAIRE T. CORMIER (CSBN 154364)
4  Assistant United States Attorney

5      U.S. Attorney's Office/Civil Division
       150 Almaden Blvd., Suite 900
6      San Jose, CA 95113
       Telephone: (408) 535-5082
7      Fax: (408) 535-5081
       Email: claire.cormier@usdoj.gov
8
   Attorneys for Defendant Robert Wilkie
9  Secretary, U.S. Dept. of Veterans Affairs

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13
   TATYANA E. DREVALEVA,            )  CASE NO. 18-CV-3748-WHA
14                                   )
              Plaintiff,             )
15                                   )  ERRATA RE REPLY MEMORANDUM IN
       v.                            )  SUPPORT OF DEFENDANTS' MOTION TO
16                                   )  DISMISS
                                     )
17 1) The U.S. DEPARTMENT OF VETERANS )
   AFFAIRS                           )  Date: November 29, 2018
18                                   )  Time: 8:00 a.m.
   2) ROBERT WILKIE, Secretary, U.S. Dept. of )  Courtroom 12, 19th Floor
19 Veterans Affairs,                 )  Hon. William H. Alsup
                                     )
20            Defendants.            )
                                     )
21 _____

22        Defendants have noted two citation errors in the Reply Memorandum in Support of Defendants'

23 Motion to Dismiss filed on October 26, 2018 as ECF 41. At page 3, lines 23-24, the citation to *May v.*

24 *McDonald* should be 2015 WL 4484171 at *2 (N.D. Cal. 2015). At page 4, line 9, the citation to *Shirey*

25 *v. Devine* should be 670 F.2d 1188, 1191 at n.7 (D.C. Cir. 1982). Defendants' counsel has sent copies of

26 both of these cases by email to Plaintiff.

27

28

424

Respectfully submitted,

ALEX G. TSE
United States Attorney

Dated: October 30, 2018

_____/s/  Claire T. Cormier_____
CLAIRE T. CORMIER
Assistant United States Attorney

**Docket No. 44**

October 29, 2018.

Defendants' Opposition to Plaintiff's Motion to Strike Defendants' Motion to Dismiss, F.R.C.P. 12(f).

ALEX G. TSE (CABN 152348)
United States Attorney
SARA WINSLOW (DCBN 457643)
Chief, Civil Division
KIMBERLY A. ROBINSON (DCBN 999022)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7298
    FAX: (415) 436-6748
    kimberly.robinson3@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TATYANA E. DREVALEVA,<br><br>    Plaintiff,<br><br>  v.<br><br>1) The UNITED STATES DEPARTMENT OF VETERANS AFFAIRS,<br><br>2) ROBERT WILKIE, Secretary, U.S. Dept. of Veterans Affairs,<br><br>    Defendants. | CASE No. 18-CV-3748-WHA<br><br>DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' MOTION TO DISMISS, F.R.C.P. 12(f)<br><br>Date: November 29, 2018<br><br>Time: 8:00 a.m.<br><br>Location: Courtroom 12, 19th Floor<br><br>Honorable William Alsup |

**INTRODUCTION**

Plaintiff filed a motion to strike Defendants' motion to dismiss under Federal Rule of Civil Procedure (Rule) 12(f). Because Plaintiff moved to strike a motion rather than a pleading, her motion to strike is improper under Rule 12(f) and must be denied.

**ISSUE TO BE DECIDED**

Whether Plaintiff's Motion to Strike Defendants' Motion to Dismiss, F.R.C.P. 12(f) ("Motion to

Strike") should be denied where Plaintiff's motion seeks to strike a motion, rather than pleading, which is improper under Rule 12(f).

### BACKGROUND

On October 18, 2018, Plaintiff filed a "Notice of Motion; Motion to Strike Defendants' Motion to Dismiss, F.R.C.P. Rule 12(f); Memorandum of Points and Authorities; Declaration." Dkt. No. 38. Plaintiff states that her motion to strike Defendant's motion to dismiss "discuss[es] why definite portions of the Motion to Dismiss should be stricken." Dkt. 40 at 5.

### ARGUMENT

Rule 12(f) provides that "[a] court may strike from a *pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Emphasis added. Rule 7(a) defines pleadings as "a complaint; an answer to a complaint; an answer to a counterclaim designated as a counterclaim; an answer to a counterclaim; a third party complaint; and if the court orders one, a reply to an answer." Motions and supporting declarations are not "pleadings" and are therefore not subject to Rule 12(f). *See Sidney-Virstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983) (holding that district court erred in striking a motion under Rule 12(f) on the basis that a motion is not a pleading). Courts generally disfavor motions to strike because striking is such a drastic remedy. *Freeman v. ABC Legal Servs., Inc.*, 877 F. Supp. 2d 919, 923 (N.D. Cal. 2012) (*citing Stanbury Law Firm v. IRS,* 221 F.3d 1059, 1063 (8th Cir.2000) ("striking a party's pleadings is an extreme measure, and, as a result, we have previously held that 'motions to strike under Fed.R.Civ.P. 12(f) are viewed with disfavor and are infrequently granted.").

Plaintiff filed a motion to strike Defendants' motion to dismiss pursuant to Rule 12(f). Because Plaintiff's motion to strike is not directed at pleadings that are subject to be stricken under Rule 12(f), Plaintiff's motion is improper and must be denied. *A.H. Robins Co.*, 697 F.2d at 885.

# CONCLUSION

In light of the foregoing, Defendants respectfully request that this Court deny Plaintiff's Motion to Strike.

DATED: October 29, 2018

Respectfully submitted,

ALEX G. TSE
United States Attorney

_____/s/ Kimberly A. Robinson_____
KIMBERLY A. ROBINSON
Assistant United States Attorney

Attorneys for Defendants

**Docket No. 45**

October 29, 2018.

Defendants' Opposition to Plaintiff's Request for Leave to File a Supplemental Brief Re Defendants' Motion to Dismiss; Declaration of Claire T. Cormier; [Proposed] Order.

1   ALEX G. TSE (CSBN 152348)
  United States Attorney
2   SARA WINSLOW (DCBN 457643)
  Assistant United States Attorney
3   Chief, Civil Division
  CLAIRE T. CORMIER (CSBN 154364)
4   Assistant United States Attorney

5       U.S. Attorney's Office/Civil Division
      150 Almaden Blvd., Suite 900
6       San Jose, CA 95113
      Telephone: (408) 535-5082
7       Fax: (408) 535-5081
      Email: claire.cormier@usdoj.gov
8
  Attorneys for Federal Defendants
9

10               UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13                     )   CASE NO. 18-CV-3748-WHA
  TATYANA E. DREVALEVA,         )
14                     )
           Plaintiff,      )   OPPOSITION TO PLAINTIFF'S REQUEST FOR
15                     )   LEAVE TO FILE A SUPPLEMENTAL BRIEF RE
     v.                 )   DEFENDANTS' MOTION TO DISMISS;
16                     )   DECLARATION OF CLAIRE T. CORMIER;
  1) The U.S. DEPARTMENT OF VETERANS )   [PROPOSED] ORDER
17   AFFAIRS                   )
                    )   Date: November 29, 2018
18   2) ROBERT WILKIE, Secretary, U.S. Dept. of )   Time: 8:00 a.m.
  Veterans Affairs,            )   Courtroom 12, 19th Floor
19                     )   Hon. William H. Alsup
           Defendants.    )
20                     )

21   _____

22       Defendants interpret Plaintiff's Request for Leave to File a Supplemental Brief as a Motion for

23   Administrative Relief pursuant to Civil L. R. 7-11. That rule requires the moving party to include either

24   a stipulation or a declaration stating why a stipulation could not be obtained. Plaintiff has included

25   neither. The Court can thus deny Plaintiff's request for this procedural reason.

26       More substantively, Plaintiff does not explain what she perceives as the "new issues that were

27   not presented" in Defendants' motion to dismiss, or what "misleading information" is contained in the

28   reply. She thus has not provided any basis for her request for additional briefing.

431

1    However, if the Court believes it would be helpful to allow Plaintiff to provide additional

2    briefing, it may, of course, do so. Defendants' undersigned counsel, however, requests that no further

3    briefing from Defendants relating to the motion to dismiss be requested during the time period that

4    Defendants' original counsel will be on leave (from October 31 to November 12, 2018), as discussed in

5    the declaration, below.

6                                                  Respectfully submitted,

7                                                  ALEX G. TSE
                                                   United States Attorney
8

9    Dated: October 29, 2018                        /s/  Claire T. Cormier
                                                   CLAIRE T. CORMIER
10                                                 Assistant United States Attorney

11

12                    **DECLARATION OF CLAIRE T. CORMIER**

13    I, Claire T. Cormier, declare as follows:

14        1.      I am an attorney in good standing with the bar of this Court. I represent the federal

15    defendants in the above-captioned case.

16        2.      Except for matters stated on information and belief, the matters stated in this declaration

17    are true of my own knowledge and, if necessary, I could and would competently testify to them.

18        3.      After this case was transferred from the San Jose to the San Francisco division of the

19    Court, the decision was made in the United States Attorney's Office to transfer the case to a San

20    Francisco Assistant United States Attorney ("AUSA"). However, I was advised that I should still retain

21    responsibility for the motion to dismiss that I filed. Accordingly, I remain responsible for any additional

22    filings relating to the Defendants' motion to dismiss. The balance of the case is being transferred to

23    AUSA Kimberly Robinson in our San Francisco office. I am informed and believe that she has filed a

24    response to Plaintiff's recent motion to strike and that she will file a response to Plaintiff's motion for a

25    preliminary injunction.

26        4.      I will be on leave beginning October 31, 2018. I am scheduled to return to the office on

27    November 13, 2018. For most of that time, I will be out of the country without access to my office's

28

1  network, including email. Accordingly, I will not be available to provide any further briefing relating to

2  the motion to dismiss during that time period, should the Court desire any.

3       I declare under penalty of perjury that the foregoing is true and correct. Executed on October 29,

4  2018 at San Jose, California.

5                 /s/ Claire T. Cormier

6                 CLAIRE T. CORMIER

7

8            **[PROPOSED] ORDER**

9      Plaintiff's Request for Leave to File a Supplemental Brief is DENIED.

10

11  _____, 2018

12                 WILLIAM H. ALSUP
               UNITED STATES DISTRICT JUDGE

433

**Docket No. 46**

October 29, 2018.

Reply to Defendants' Opposition to Plaintiff's Request for Leave to File a Supplemental Brief.

1  Tatyana Evgenievna Drevaleva

2  No current home postal address

3  Currently residing in California

4  415-806-9864, tdrevaleva@gmail.com

5  Plaintiff in Pro Per

6

7  THE UNITED STATES DISTRICT COURT

8  NORTHERN DISTRICT OF CALIFORNIA

9

10

11                                                    )
                                                      )
12  Tatyana E. Drevaleva                              )    Case No. 3:18-cv-03748
                                                      )
13                   Plaintiff,                       )
                                                      )
14                   vs.                              )
                                                      )
15    1) The U.S. Department of Veterans              )    Reply to Defendants' Opposition to
16       Affairs                                      )    Plaintiff's Request for Leave to File a
                                                      )
17    2) Mr. Robert Wilkie, Acting United             )    Supplemental Brief.
         States Secretary of Veterans Affairs         )
18       810   Vermont   Avenue,   NW)                )    Judge: Hon. William Alsup
         Washington, DC 20420                         )
19                                                    )
    Facility: New Mexico VA Healthcare System         )
20       1501 San Pedro Drive, S.E.                   )
         Albuquerque, NM 87108                        )
21                                                    )
                                                      )
22                   Defendant.                       )
                                                      )
23  _____          )

24          Plaintiff Tatyana Drevaleva herein submits her Reply to Defendants' Opposition to my

25  Request for Leave to File a Supplemental Brief as a response to Defendants' Reply to my

26  Opposition to the Motion to Dismiss.

27          On October 29, 2018, Defendants filed an Opposition to my Request for Court's Leave to

28  File a Supplemental Brief. Defendants again attempted to mislead the Court. They said that

Page **1** of **3**

Reply to Defend. Oppos. to Request for Leave to File a Supp. Brief, case No. 3:18-cv-03748

435

viewed my "Request for Leave to File a Supplemental Brief as a Motion for Administrative Relief pursuant to Civil L. R. 7-11.That rule requires the moving party to include either a stipulation or a declaration stating why a stipulation could not be obtained." This has nothing common with the truth.

Read the Civil Local Rule 7-11, "The Court recognizes that during the course of case proceedings a party may require a Court order with respect to miscellaneous administrative matters, not otherwise governed by a federal statute, Federal or local rule or standing order of the assigned judge. These motions would include matters such as <u>motions to exceed otherwise applicable page limitations or motions to file documents under seal, for example</u>."

In fact, my Request for Court's Leave to File a Supplemental Brief is not even a Motion. This Request is governed by the Civil Local Rule 7-3(d), "**Supplementary Material**. Once a reply [to an Opposition to the Motion] is filed, <u>no additional memoranda, papers or letters may be filed without prior Court approval</u>,…"

The Civ. L.R. 7-3(d) doesn't say that I need to file a Motion to get the Court's permission to file an additional memorandum after Defendants' Reply to my Opposition to the Motion. This Rule simply says that I need to obtain the Court's approval to file the Supplementary material. I did it using a Request but not a Motion.

Ms. Cormier argues that I didn't explain in my Request what exactly I want to say in my upcoming Supplemental Brief (if the Court allows me). I felt that I would initially obtain the Court's permission, and later I would give my full explanations about all points of Defendants' misleading in their Reply.

Ms. Cormier informed the Court that another Counsel (Ms. Robinson) had filed a pleading while Ms. Cormier is still representing my case. However, I didn't see in PACER any Notice of Change of Counsel which is a breach of the Civil Local Rule 5-1(c)(2)(C).

Lastly, Ms. Cormier again failed to declare under the Federal laws that all foregoing is true and correct.

For the reasons explained above, I am respectfully asking the Court to dismiss Defendants' Opposition and allow me to submit a Supplemental Brief.

Page **2** of **3**

Reply to Defend. Oppos. to Request for Leave to File a Supp. Brief, case No. 3:18-cv-03748

436

I declare under the penalty of perjury under the Federal laws and the laws on the State of California that the foregoing is true and correct. Executed at City of San Francisco, CA, on October 29th, 2018.

Respectfully submitted,

Date: October 29th, 2018                    Sign Name:

                                            Print Name:  Tatyana E. Drevaleva

Reply to Defend. Oppos. to Request for Leave to File a Supp. Brief, case No. 3:18-cv-03748

437

**Docket No. 47**

October 29, 2018.

Reply to Defendants' Opposition to Plaintiff's Motion to Strike.

1　Tatyana Evgenievna Drevaleva

2　No current home postal address

3　Currently residing in California

4　415-806-9864, tdrevaleva@gmail.com

5　Plaintiff in Pro Per

6

7　　　　　　　THE UNITED STATES DISTRICT COURT

8　　　　　　　NORTHERN DISTRICT OF CALIFORNIA

9

10

11　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
12　Tatyana E. Drevaleva　　　　)　Case No. 3:18-cv-03748
　　　　　　　　　　　　　　　　)
13　　　　　　Plaintiff,　　　　　)
　　　　　　　　　　　　　　　　)
14　　　　　　　vs.　　　　　　　)
　　　　　　　　　　　　　　　　)
15　1) The U.S. Department of Veterans )
16　　Affairs　　　　　　　　　　)　Reply to Defendants' Opposition to
　　　　　　　　　　　　　　　　)
17　2) Mr. Robert Wilkie, Acting United)　Plaintiff's Motion to Strike.
　　States Secretary of Veterans Affairs )
18　　810 Vermont Avenue, NW)　Judge: Hon. William Alsup.
　　Washington, DC 20420　　)
19　　　　　　　　　　　　　　　)　November 29, 2018; 8:00 AM
Facility: New Mexico VA Healthcare System )
20　　1501 San Pedro Drive, S.E.　)　Courtroom 12, 19th Floor
　　　Albuquerque, NM 87108　　)
21　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
22　　　　　　Defendant.　　　　)
　　　　　　　　　　　　　　　　)
23　_____)

24　　　　Plaintiff Tatyana Drevaleva herein submits her Reply to Defendants' Opposition to my

25　Motion to Strike.

26　　　　Ms. Robinson is absolutely correct that I made a mistake by filing a Motion to Strike in

27　response to a Motion to Dismiss which is not a pleading. However, it was my sincere mistake

28　and not an attempt to mislead the Court. I will try to correct this mistake by filing a Motion for

Reply to Defendants'. Opposition. to Motion to Strike, case No. 3:18-cv-03748

439

1  Relief from a Proceeding pursuant to FRCP Rule 60(a) which says, "Corrections Based on

2  Clerical Mistakes; Oversights and Omissions. The court may correct a clerical mistake or a

3  mistake arising from oversight or omission whenever one is found in a judgment, order, or other

4  part of the record. The court may do so on motion or on its own, with or without notice."

5      I filed this Motion to Strike before the deadline for filing an Opposition to Defendants'

6  Motion to Dismiss. Therefore, I will respectfully ask the Court to view my Motion to Strike as a

7  part of my Opposition to Defendants' Motion to Dismiss.

8      In her Opposition, Ms. Robinson didn't give her answer on any of the issues that I

9  presented in my Motion to Strike. I will respectfully ask the Court to order Ms. Robinson to give

10  answers on the issues presented in my Motion to Strike.

11      The official Counsel for Defendants now is Ms. Claire Cormier who appeared in this case

12  on October 09, 2018. New Counsel Ms. Robinson failed to file a Notice of Change of Counsel

13  which is a breach of the Civil Local Rule 5-1(c)(2)(C). Also, see U.S. Code, Title 26 Appendix,

14  Rule 24(a)(3), "Subsequent Appearance: Where counsel has not previously appeared, counsel

15  shall file an entry of appearance in duplicate, signed by counsel individually, containing the

16  name and docket number of the case, the name, mailing address, telephone number, and Tax

17  Court bar number of counsel so appearing, and a statement that counsel is admitted to practice

18  before the Court…."

19      Source:  https://www.law.cornell.edu/uscode/html/uscode26a/usc_sec_26a_00000024----

20  000-.html

21      Ms. Cormier stated in her Declaration to her Opposition to my Request to File a

22  Supplemental Brief that Ms. Robinson would enter the case. However, according to the Civil

23  Local Rule 5-1(c)(2)(C), it should be a separate Notice of Change of Counsel if the old Counsel

24  is still representing the case.

25      Source: https://www.cand.uscourts.gov/ecf/maintainaccount#SUBSTITUTE

26      Therefore, the Court should not recognize Ms. Robinson as a Counsel in this case, and

27  her Opposition must be dismissed.

28

Reply to Defendants'. Opposition. to Motion to Strike, case No. 3:18-cv-03748

440

1    See *Epley v. Califro*, Supreme Court of California, [Sac. No. 6671. In Bank. Mar. 26,

2    1958.], "That Thomas T. Califro was an attorney at law gave him no legal right to represent his

3    codefendants for the reason that they were still represented of record by other attorneys….The

4    court's unawareness of Thomas's status as an attorney was not material to its determination that

5    no answer had been filed and that dismissal was mandatory."

6    Source: https://law.justia.com/cases/california/supreme-court/2d/49/849.html

7    Lastly, Ms. Robinson failed to declare under the penalty of perjury and under Federal

8    laws that all foregoing is true and correct. She broke 28 U.S. Code §1746. Without declaring

9    that, her Opposition is hearsay and must be dismissed.

10

11    I declare under the penalty of perjury under the Federal laws and the laws on the State of

12    California that the foregoing is true and correct. Executed at City of San Francisco, CA, on

13    October 29th, 2018.

14

15    Respectfully submitted,

16    Date: October 29th, 2018              Sign Name:

17

18                                          Print Name:  Tatyana E. Drevaleva

19

20

21

22

23

24

25

26

27

28

Reply to Defendants'. Opposition. to Motion to Strike, case No. 3:18-cv-03748

441

**Docket No. 48**

October 30, 2018.

Notice of Appearance,

Ms. Kimberly Robinson, Esq.

ALEX G. TSE (CABN 152348)
United States Attorney
SARA WINSLOW (DCBN 457643)
Chief, Civil Division
KIMBERLY A. ROBINSON (DCBN 999022)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7298
FAX: (415) 436-6748
kimberly.robinson3@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TATYANA E. DREVALEVA,<br><br>          Plaintiff,<br><br>     v.<br><br>1) The UNITED STATES DEPARTMENT OF<br>VETERANS AFFAIRS,<br><br>2) ROBERT WILKIE, Secretary, U.S. Dept. of<br>Veterans Affairs,<br><br>          Defendants. | CASE No. 18-CV-03748-WHA<br><br>**NOTICE OF APPEARANCE** |

**NOTICE OF APPEARANCE**

PLEASE TAKE NOTICE that Kimberly A. Robinson, Assistant United States Attorney, will

serve as counsel for the defendant, United States of America.  Please direct all notices, pleadings, and

correspondence to Ms. Robinson's attention at the following address:

United States Attorney's Office
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102
Tel: (415) 436-7298
Fax: (415) 436-6748
E-mail: kimberly.robinson3@usdoj.gov

443

1

2       While Alex Tse and Sara Winslow will appear on the pleadings, no service need be made on

3  them.

4  Dated:  October 30, 2018                Respectfully submitted,

5                                ALEX G. TSE

6                                United States Attorney

7

8                              */s/ Kimberly A. Robinson*

9                              KIMBERLY A. ROBINSON
                                Assistant United States Attorney

**Docket No. 49**

October 30, 2018.

Notice of Appearance,

Ms. Kimberly Robinson, Esq.

ALEX G. TSE (CABN 152348)
United States Attorney
SARA WINSLOW (DCBN 457643)
Chief, Civil Division
KIMBERLY A. ROBINSON (DCBN 999022)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7298
    FAX: (415) 436-6748
    kimberly.robinson3@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TATYANA E. DREVALEVA, | CASE No. 18-CV-03748-WHA |
| Plaintiff, | **NOTICE OF APPEARANCE** |
| v. | |
| 1) The UNITED STATES DEPARTMENT OF VETERANS AFFAIRS, | |
| 2) ROBERT WILKIE, Secretary, U.S. Dept. of Veterans Affairs, | |
| Defendants. | |

**NOTICE OF APPEARANCE**

    PLEASE TAKE NOTICE that Kimberly A. Robinson, Assistant United States Attorney, will

serve as counsel for the defendants, the U.S. Department of Veterans Affairs and Robert Wilkie,

Secretary of the U.S. Department of Veterans Affairs. Please direct all notices, pleadings, and

correspondence to Ms. Robinson's attention at the following address:

        United States Attorney's Office
        450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102
        Tel: (415) 436-7298

1    Fax: (415) 436-6748
     E-mail: kimberly.robinson3@usdoj.gov

2         While Alex Tse and Sara Winslow will appear on the pleadings, no service need be made on

3    them.

4    Dated:  October 30, 2018                    Respectfully submitted,

5
                                                 ALEX G. TSE
6                                                United States Attorney

7
                                                  /s/ Kimberly A. Robinson
8                                                KIMBERLY A. ROBINSON
                                                 Assistant United States Attorney
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF APPEARANCE
Case No. 18-CV-03748-WHA

447

**Docket No. 50**

November 02, 2018.

Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction.

Declaration of Carla Dunkelberger.

Exhibits.

ALEX G. TSE (CABN 152348)
United States Attorney
SARA WINSLOW (DCBN 457643)
Chief, Civil Division
KIMBERLY A. ROBINSON (DCBN 999022)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7298
    FAX: (415) 436-6748
    kimberly.robinson3@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TATYANA E. DREVALEVA,<br><br>    Plaintiff,<br><br>  v.<br><br>1) The UNITED STATES DEPARTMENT OF VETERANS AFFAIRS,<br><br>2) ROBERT WILKIE, Secretary, U.S. Dept. of Veterans Affairs,<br><br>    Defendants. | CASE No. 18-CV-3748-WHA<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date: November 29, 2018<br><br>Time: 8:00 a.m.<br><br>Location: Courtroom 12, 19th Floor<br><br>Honorable William Alsup |

## I. INTRODUCTION

The Court should deny Plaintiff's motion for preliminary injunctive relief pursuant to Federal Rule of Civil Procedure 65 because Plaintiff cannot meet the demanding standard for either preliminary injunctive relief or the mandatory injunctive relief requested here.

## II. BACKGROUND

On April 2, 2017, Plaintiff, Tatyana E. Drevaleva, began working as a medical instrument

449

technician at the Raymond G. Murphy Veterans Affairs Medical Center ("VAMC") in Albuquerque, New Mexico. Dkt. 1 at 2. Her first year of employment was considered a trial/probationary period. Declaration of Carla Dunkelberger ("Dunkelberger Decl.") at Exhibit H (June 30, 2017 letter re: Plaintiff's termination). Just after she began work, Plaintiff met with her supervisor, Carla Dunkelberger, to review the agency's leave-related procedures and to sign a document acknowledging receipt of a notification about procedures regarding unplanned leave. Dunkelberger Decl. at ¶ 5; *see also id.* at Exhibit A (signed memorandum regarding leave procedures).

After working at the VAMC for about a month and a half, Plaintiff requested leave without pay ("LWOP") to travel to Russia to undergo an In-Vitro Fertilization ("IVF") procedure and to search for a surrogate mother in Russia since she cannot carry a pregnancy. Dkt. 1 at 3, 4; *see also* Dunkelberger Decl. at ¶ 6, Exhibit C (Ms. Dunkelberger's May 16, 2017 Report of Contact regarding her conversation with Plaintiff about Russia trip). Ms. Dunkelberger told Plaintiff she did not have the authority to approve her request due to the short length of time Plaintiff had worked at the VAMC and that an associate director of the VAMC, Dr. Tina Prince, would determine whether the request could be granted. Dkt. 1 at 4; Dunkelberger Decl. at ¶ 6. During this conversation, Ms. Dunkelberger also explained that Plaintiff did not have sufficient time in service to qualify for leave under the Family Medical Leave Act and that she would need to provide medical documentation, in English, prior to any leave so that upper management could consider whether to approve leave. Dkt. 1 at 4; Dunkelberger Decl. at ¶ 6, Exhibit B (Dunkelberger's Report of Contact memorializing her conversation with Plaintiff).

On May 15, 2017, Plaintiff again told Ms. Dunkelberger of her need to travel to Russia and Ms. Dunkelberger again told Plaintiff that she would need to complete the leave request form, provide medical documentation in English, and receive approval from Dr. Prince of the VAMC. Dunkelberger Decl. at ¶ 7, Exhibit C (Dunkelberger's May 16, 2017 Report of Contact memorializing her May 15, 2017 conversation). On May 17, 2017, while Ms. Dunkelberger was out of the office, Dunkelberger Decl. at ¶ 8, Plaintiff allegedly told an acting supervisor, Phillip Johnson, that she was leaving for Russia the next day. Dkt. 1 at 5. He gave her a leave request form and Plaintiff alleges that Mr. Johnson verbally gave her permission to take the leave. *Id.* at 6. Plaintiff alleges that she submitted the leave

450

request form, initially with no supporting documentation, requesting leave without pay from May 18 to July 7, 2017. *Id.*; Dunkelberger Decl. at ¶ 8; *see also* Exhibits D and E (leave request form and the related memorandum). On May 18, 2017, Plaintiff traveled to Russia. Dkt. 1 at 6. The same day, she emailed a copy of a document from her Russian OB/GYN written in Russian to Ms. Dunklerger and Mr. Johnson. *Id.* Plaintiff did not email a translated version of the document until May 30, 2017. *Id.* On or about June 9, 2017, the agency mailed to Plaintiff a letter telling her that her leave request had been denied and asking her for certain additional information. Dunkelberger Decl. at ¶ 9. It also warned of possible termination. *See* Exhibit F (letter advising that leave request had been denied). On June 30, 2017, Plaintiff was terminated effective immediately. *Id.* at ¶ 10; *see also* Exhibit H (*see* email from Dunkelberger to Plaintiff attaching termination letter). On July 1, 2017, plaintiff emailed her supervisors advising them that she would need to stay in Russia for an additional few weeks. Dkt. 1 at 7. She requested an additional leave request form. *Id.* On July 3, 2017, her supervisor emailed her a copy of the termination letter. *Id.* Plaintiff promptly initiated the EEO counseling process. *Id.*

After being terminated, Plaintiff applied for a position at a different VA facility. *Id.* at 8. Plaintiff alleges that she was not hired after the facility learned of her previous termination. Dkt. 39 at 3. Plaintiff is currently going through the administrative EEO process for that claim. Dkt 1. at 10.

Plaintiff's motion seeks a mandatory injunction to "IMMEDIATELY reinstate [her] to work at any VAMC to an equivalent (Medical Instrument Technician Electrocardiograph) or a similar full time job with benefits." Dkt. 39 at 4. She alleges that her unlawful termination was based on her efforts to become pregnant, her age, and her disability, which appear to relate to her first, second, third, and fourth causes of action (Dkt. 1 at 10-18). *Id.* at 2, 3. She alleges the agency failed to provide her with a reasonable accommodation to go to Russia and attempt IVF, a reference to her fourth cause of action (Dkt. 1 at 18-21). *Id.* She also argues that the agency's "libel," the alleged lies about the reasons for her termination, her fifth cause of action (Dkt. 1 at 21), led to a denial of unemployment benefits. *Id.* at 3. Plaintiff additionally alleges that she is "suffering from unemployment and the absence of money," and that she does not have a home or a car and is "limited in finding employment," which appear to relate to her sixth cause of action for intentional infliction of emotional distress (Dkt. 1 at 21-22). *See, e.g.*, *id.* at

451

3. Finally, Plaintiff's references to her termination also appear to relate to her seventh cause of action, the right to due process under the U.S. Constitution (Dkt. 1 at 22-23). *See, e.g.*, *id.* at 2.

## III.    LEGAL STANDARD

An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997 (per curiam) (citation omitted) (stating that a preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless movant, *by clear showing*, carries the burden of persuasion.")  "A plaintiff seeking a preliminary injunction must show that: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in her favor; and (4) an injunction is in the public interest." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing *Winter*, 555 U.S. at 20)).  Alternatively, a plaintiff can show that there are "'serious questions going to the merits' and the 'balance of hardships tips sharply towards' [plaintiff], as long as the second and third *Winter* factors are [also] satisfied." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).  In general, "[P]laintiffs seeking a preliminary injunction face a difficult task in proving that they are entitled to this extraordinary remedy." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010).  Plaintiff's burden is aptly described as a "heavy" one. *Id.* Preliminary injunctions are "never awarded as a right." *Id.* at 24.

The purpose of a preliminary injunction "is to preserve the status quo and the rights of the parties until a final judgment issues in the cause." *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).  A preliminary injunction may not be used to obtain "a preliminary adjudication on the merits," but only to preserve the status quo pending final judgment. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).  Accordingly, where, as here, a plaintiff seeks mandatory injunctive relief—seeking to alter the status quo—"courts should be extremely cautious." *Stanley v. Univ. of S. California*, 13 F.3d 1313, 1319 (9th Cir. 1994).  A mandatory injunction "goes well beyond simply maintaining the status quo *pendente lite* and is particularly disfavored." *Id.* at 1320 (internal quotations and alteration omitted).  A mandatory injunction "should not be issued unless the

1    facts and law clearly favor the moving party." *Anderson v. United States,* 612 F.2d 1112, 1114 (9th Cir.

2    1980). Mandatory injunctions "are not granted unless extreme or very serious damage will result and

3    are not issued in doubtful cases[.]" *Id.* at 1115. A party seeking a mandatory injunction "must establish

4    that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Garcia,* 786

5    F.3d at 740 (9th Cir. 2015) (emphasis in original).

6    **IV.    ARGUMENT**

7       **A. Plaintiff Has Not Shown That The Facts And Law Clearly Favor Her Position**

8         Plaintiff has not met her burden to demonstrate that her claims are clearly favored to succeed.

9         **1.    Title VII Claim**

10        Under Title VII, to demonstrate discrimination on the basis of sex, a plaintiff must ordinarily

11   show that: (1) she belonged to a protected class; (2) she was qualified for her job; (3) she was subjected

12   to an adverse employment action; and (4) similarly situated employees not in her protected class

13   received more favorable treatment. *See, e.g.*, *Moran v. Selig*, 447 F.3d 748, 753 (9th Cir. 2006).

14   Because Plaintiff alleges in conclusory fashion only that she was terminated because she was a woman

15   trying to have a child, Dkt. 39 at 2, 3, and that she was discriminated against because of her sex, *id.*, she

16   has failed to establish a prima facie case for sex discrimination under Title VII. In fact, Plaintiff's

17   termination was based on a VA leave policy, that she purported to understand (Dunkelberger Decl. at ¶¶

18   7-8), which pertained to her absence without leave. *Id.* at ¶ 9. The current record does not favor, much

19   less clearly favor, Plaintiff on her Title VII claim.

20        **2.    Age Discrimination in Employment Act ("ADEA") Claim**

21        To establish a prima facie case for age discrimination under the ADEA, a plaintiff must show

22   that: (1) she was at least forty years old; (2) she was performing her job satisfactorily; (3) her

23   employment was terminated; and (4) she was replaced by a substantially younger employee with equal

24   or inferior qualifications or discharged under circumstances otherwise giving rise to an inference of age

25   discrimination. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir.2008).

26        Plaintiff has alleged only that she was at least forty years of age at the time of the alleged age

27   discrimination and that she was replaced by two younger men. Dkt. 39 at 3. She has not alleged facts

28

453

1 meeting her burden with respect to the other elements of a prima facie case. Further, her dismissal was

2 due to her violation of leave procedures and had nothing to do with her age. Dunkelberger Decl. at ¶ 9.

3 The current record does not favor, much less clearly favor, Plaintiff on her age discrimination claim.

### 3. Rehabilitation Act Claim

5 The threshold consideration for a claim under the Rehabilitation Act is, among other things,

6 whether a plaintiff is (1) an individual with a disability, (2) otherwise qualified, and (3) subjected to

7 discrimination solely by reason of the disability. *See Mustafa v. Clark County Sch. Dist.,* 157 F.3d 1169,

8 1174 (9th Cir.1998). An individual has a disability if he has a physical or mental impairment which

9 substantially limits one or more major life activities, a record of such impairment, or is regarded as

10 having such an impairment. 29 C.F.R. § 1630.2(g). Under the Rehabilitation Act, a "qualified

11 individual" is an individual with a disability "who, with or without reasonable accommodation, can

12 perform the essential functions of [the] position." 29 C.F.R. § 1630.2(m). Essential functions are the

13 fundamental duties of the relevant position. *Id.* at 1630.2(n)(1). To determine whether the Plaintiff is

14 subjected to discrimination solely by reason of disability, the Ninth Circuit uses a two-pronged scheme.

15 *Smith v. Barton*, 914 F.2d 1330, 1339 (9th Cir. 1990). Under this scheme, if the employer disclaims any

16 reliance on the employee's disability in having taken the employment action, *McDonnell Douglas* Title

17 VII disparate impact analysis should be used to determine if the employer's reason is pretextual.

18 *Teahan v. Metro–North Commuter R.R. Co.*, 951 F.2d 511, 514–16 (2d Cir.1991), citing *McDonnell*

19 *Douglas Corp. v. Green,* 411 U.S. 792 (1973). Assuming there is a disability within the meaning of the

20 Rehabilitation Act, a court can then consider whether that disability has been sufficiently demonstrated

21 and whether the entity failed to provide a reasonable accommodation. *See, e.g.*, *Vinson v. Thomas*, 288

22 F.3d 1145, 1154 (9th Cir. 2002). The plaintiff bears the initial burden of producing evidence that a

23 reasonable accommodation was possible. *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 816-17

24 (9th Cir.1999). Thereafter, the burden shifts to the agency to produce rebuttal evidence that the

25 requested accommodation was not reasonable. *Id.* at 817.

26 Here, Plaintiff has stated only "the agency failed to provide [her] with reasonable

27 accommodations to go to Russia for an IVF attempt" and that she was terminated because of her

28 DEFENDANT'S OPPOSITION TO PLAINTIFF'S PI MOTION
18-CV-3748 WHA                                   6

454

disability. Dkt. 39 at 2, 4. These sparse, conclusory allegations do not even suffice to show that she has a disability within the meaning the Rehabilitation Act, let alone the other threshold elements. Even if she had shown the threshold elements, whether a particular accommodation—in her case long-term and repeated leave and possibly benefits under the Family Medical Leave Act so that she could "attempt to have a baby"—is reasonable "depends on the individual circumstances of each case" and "requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards." *Wong*, 192 F.3d at 818. Plaintiff has not, on the current record, shown that the accommodation would have been reasonable or possible. Thus, the current record does not favor, much less clearly favor, Plaintiff on her disability discrimination claim.

### 4. Constitutional and Tort Claims

As discussed in Defendant's motion to dismiss (Dkt. 34), Plaintiff's constitutional and tort claims are likely to fail. In *Brown v. General Services Administration*, 425 U.S. 820, 835 (1976), the Supreme Court held that Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment." Where a federal employee asserts a claim under Title VII, that statute is exclusive of any other remedy against both the federal government and the individual federal employees alleged to have participated in the discrimination. *White v. General Services Administration*, 652 F.2d 913, 916-17 (9th Cir. 1981). The Court in *Brown* held that "[s]ection 717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16 (1970 ed., Supp. IV), proscribes federal employment discrimination and establishes an administrative and judicial enforcement system." *Brown*, 425 U.S. at 829. The Court held that section 717 is a "precisely drawn, detailed statute [that] preempts more general remedies," and thus "provides the exclusive remedy for claims of discrimination in federal employment." *Id.* at 834-35.

Based upon the legislative history and structure of section 717 of Title VII (42 U.S.C. § 2000e-16), the Court found that "[t]he balance, completeness, and structural integrity of § 717 are inconsistent with the . . . contention that the judicial remedy afforded by § 717(c) was designed merely to supplement other putative judicial relief." *Brown*, 425 U.S. at 832. Therefore, because it was Congress' intent to create an "unambiguous . . . exclusive, preemptive administrative and judicial scheme for the redress of

455

1    federal employment discrimination," Plaintiff may not "bootstrap" additional causes of action onto her

2    Title VII complaint.  *Id.* at 829-30.

3             **a.  Due Process Claim**

4             The Ninth Circuit has rejected supplemental statutory and constitutional claims where those

5    claims were remediable under Title VII or involved the same factual predicate as the plaintiff's Title VII

6    claim.  *See Nolan v. Cleland*, 686 F.2d 806, 814-15 (9th Cir. 1982) (holding that *Brown's* holding

7    cannot be circumvented where the factual predicate for the plaintiff's constitutional claim is the

8    discrimination that is the basis for her Title VII claim); *Brazil v. U.S. Dep't of Navy*, 66 F.3d 193, 198

9    (9th Cir. 1995) (rejecting plaintiff's Fifth Amendment equal protection claim because his claim was

10   covered by the "massive and complex program" of Title VII).  Thus, Plaintiff's due process claim is

11   unlikely to succeed.

12            **b.  Tort Claims**

13            Plaintiff's tort claims for IIED and libel are also unlikely to succeed.  The Ninth Circuit and the

14   Supreme Court have both held that, due to Title VII's comprehensive scope, it preempts other causes of

15   action seeking to redress the same wrong, including tort claims based upon the same discriminatory

16   employment actions. *Brown*, 425 U.S. at 835; *Williams v. General Services Administration*, 905 F.2d

17   308, 311 (9th Cir. 1990).  Additionally, Plaintiff's libel claim will also fail because any claims for libel

18   are expressly excluded from the general waiver of sovereign immunity for tort claims under the Federal

19   Tort Claims Act.  *See* 28 U.S.C. § 2680(h).

20            Accordingly, because Plaintiff has not shown that the facts and the law are clearly in her favor

21   (or even that she is likely to succeed on her claims), she should not be granted preliminary injunctive

22   relief.  *Anderson*, 612 F.2d at 1114.

23       **B.  Plaintiff Has Not Shown Irreparable Harm**

24            Plaintiff also cannot demonstrate irreparable harm.  "Irreparable harm" is traditionally defined as

25   harm for which there is no adequate legal remedy, such as an award of damages.  *Ariz. Dream Act Coal*

26   *v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017), *cert. denied*, 138 S. Ct 1279 (2018); *see also Weinberger*

27   *v. RomeroBarcelo*, 456 U.S. 305, 312 (1982) (the basis for injunctive relief is irreparable injury and the

28   DEFENDANT'S OPPOSITION TO PLAINTIFF'S PI MOTION

456

inadequacy of legal remedies). The standard is demanding: "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" to qualify as irreparable, and "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. at 90. Indeed, where, as here, the federal government is the employer, the standard is even more demanding, requiring an extraordinary showing of irreparable injury. *Id.* at 91-92 n. 68 (stating that circumstances must be "genuinely extraordinary"; that is, they must be a "far depart[ure] from the normal situation" of employment discharge.) "[A]n insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual." *Sampson*, 415 U.S. at 93 n. 68; *see Hartikka v. U.S.*, 754 F. 2d 1516, 1518 (9th Cir. 1985) (internal citation omitted) (finding loss of income and other job benefits to a discharged U.S. Air Force captain insufficient to meet the *Sampson* standard for injunctive relief); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 595 (1952) ("[a] plaintiff is not entitled to an injunction if money damages would fairly compensate him for any wrong he may have suffered."); *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (holding that plaintiff had adequate remedy at law for claims seeking money damages and back pay for her job loss).

Here, Plaintiff has requested mandatory injunctive relief to alter the status quo and "IMMEDIATELY reinstate [her] back to work at any VAMC to an equivalent (Medical Instrument Technician Electrocardiograph) or similar full time job with benefits after hearing of this Motion." Dkt. 39 at 4, ¶ 10; *Stanley*, 13 F.3d at 1320. In her motion, she alleges difficulties as a result of being unemployed and not having "money and benefits." *See id.* This is not irreparable injury even under the more lax standard applied in non-federal government personnel actions. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."). This is because there is an adequate remedy at law, such as backpay or frontpay, for Plaintiff's loss of job and benefits. *Sampson*, 415 U.S. at 93 n.

68. Therefore, Plaintiff cannot make a showing of irreparable harm, let alone meet the higher standard for irreparable harm in a federal government personnel action. *Id.* at 84, 91-92.

## C. Plaintiff Has Not Shown That the Equities and Public Interest Favor Her

"The third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 420 (2009). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

Here, where Plaintiff was a probationary employee of a federal agency, the public consequences of injunctive relief are significant. Preliminary injunctive relief for terminations of probationary employees like Plaintiff is inconsistent with the Veterans Administration's administrative procedures for employee discharges and would disturb the balance achieved between the rights of federal employees and the interests of the government maintaining an efficient civil service. *See Sampson*, 415 U.S. at 949-50 (noting the "historical denial of all equitable relief in court cases [affecting the administrative process]" because of the "well-established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'") (internal case citations omitted). Accordingly, there is a significant public interest in not granting preliminary injunctive relief here.

## V. CONCLUSION

Plaintiff has not met her burden to establish that a mandatory injunction should issue. The motion for a preliminary injunction should be denied.

DATED: November 2, 2018                    Respectfully submitted,

                                           ALEX G. TSE
                                           United States Attorney

                                           _____*/s/ Kimberly A. Robinson*_____
                                           KIMBERLY A. ROBINSON
                                           Assistant United States Attorney

                                           Attorneys for Defendants

1 ALEX G. TSE (CABN 152348)
United States Attorney
2 SARA WINSLOW (DCBN 457643)
Chief, Civil Division
3 KIMBERLY A. ROBINSON (DCBN 999022)
Assistant United States Attorney
4

5     450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
6     Telephone: (415) 436-7298
      FAX: (415) 436-6748
7     kimberly.robinson3@usdoj.gov

8 Attorneys for Defendants
9

10                     UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12                        SAN FRANCISCO DIVISION

13
   TATYANA E. DREVALEVA,              )  CASE NO. 18-CV-3748-WHA
14                                     )
                  Plaintiff,           )
15                                     )  DECLARATION OF CARLA DUNKELBERGER
        v.                             )
16                                     )
   1) The U.S. DEPARTMENT OF VETERANS )
17 AFFAIRS                             )
                                       )
18 2) ROBERT WILKIE, Secretary, U.S. Dept. of )
   Veterans Affairs,                   )
19                                     )
                  Defendants.          )
20 _____)

21     I, Carla Dunkelberger, declare as follows:

22     1.    Except for matters stated on information and belief, the matters stated in this declaration

23 are true of my own knowledge and, if necessary, I could and would competently testify to them.

24     2.    In 2017, I was the Nurse Manager of the 5D Telemetry Unit at the Raymond G. Murphy

25 VA Medical Center in Albuquerque, New Mexico. During the time that Tatyana Drevaleva was

26 employed there, I was her first level supervisor.

27     3.    On February 8, 2017, I recommended that Ms. Drevaleva be hired for a Medical

28 Instrument Technician position. I am informed and believe that her entry on duty date was April 2, 2017.

459

4. Some of the documents attached as exhibits to this declaration include mention of Ms. Drevaleva's medical issues. Though I am informed that she has revealed much of this information in her public filings in this case, I have redacted certain information to protect her medical privacy.

5. On April 18, 2017, I discussed various leave issues with Ms. Drevaleva. This included having her sign a document acknowledging receipt of a notification about procedures for calling in regarding unplanned leave. The memo noted that Leave Without Pay ("LWOP") requests must be approved by the Service Chief and that telephonic requests for LWOP cannot be granted by the Nurse Managers or Nursing Off Tour Supervisors. Attached hereto as **Exhibit A** is a true and correct copy of the memorandum Ms. Drevaleva signed on April 18, 2017.

6. On April 18, 2017, Ms. Drevaleva informed me that she would need to go to Russia in a few months for a medical procedure. I told her that I would not be able to approve her request at my level of authority due to the length of time that she was requesting, which I understood to be approximately six weeks. I informed her that Dr. Tina Prince, the Associate Director of Patient Care Services, would be the one who would have to approve or deny her request. I also explained to her that she did not qualify for Family and Medical Leave Act leave because she had less than one year of service. Ms. Drevaleva verbalized that she understood the proper procedure to request leave. Attached hereto as **Exhibit B** is a true and correct copy of a Report of Contact that I wrote on or about April 18, 2017 memorializing my conversation with Ms. Drevaleva.

7. On May 15, 2017, Ms. Drevaleva came to my office to again discuss her need to go to Russia for a medical procedure and to obtain related medication. I reminded her that she would need to complete a leave request form, provide supporting medical documentation, and receive approval from Dr. Prince prior to taking leave. Attached hereto as **Exhibit C** is a true and correct copy of a Report of Contact that I wrote on May 16, 2017 memorializing the May 15 conversation with Ms. Drevaleva. The Report of Contact includes a typographical error. The date of the conversation was May 15, not May 25, 2017.

8. I was on leave on May 17 and May 18, 2017. I believe that Phillip Johnson was the Acting Nurse Manager of my unit on those dates. When I returned to the unit, I learned that Ms. Drevaleva had submitted a request for LWOP for May 18, 2017 through July 7, 2017 without any

460

1  supporting medical documentation and that the request had been denied by Dr. Prince. Sometime after

2  my return, I received copies of both the leave request form and a related memorandum. True and correct

3  copies of those documents are attached hereto as **Exhibits D and E.**

4       9.     On or about June 9, I signed a letter to Ms. Drevaleva advising her that her leave request

5  had been denied and requesting certain information from her. I am informed and believe that the letter

6  was mailed to her home of record on or about June 12, 2017. A true and correct copy of the letter, minus

7  the noted enclosures, is attached hereto as **Exhibit F**.

8       10.     Among the enclosures that I sent to Ms. Drevaleva with Exhibit F was a copy of the VA's

9  leave policy. It notes that granting LWOP is a matter of administrative discretion and that employees

10  cannot demand LWOP except under very limited circumstances that did not apply to Ms. Drevaleva.

11  The leave policy also included a chart noting that the Approving Authority for LWOP in excess of 15

12  days is the "appropriate PENTAD member," which in this case was Dr. Prince. Attached hereto as

13  **Exhibit G** is a true and correct copy of the leave policy that I sent to Ms. Drevaleva.

14       11.     I am informed and believe that Ms. Drevaleva was terminated effective June 30, 2017

15  due to her being absent without leave since May 21, 2017. Attached hereto as **Exhibit H** is a true and

16  correct copy of an email I sent to Ms. Drevaleva on July 3, 2017 attaching the June 30, 2017 termination

17  letter.

18       I declare under penalty of perjury that the foregoing is true and correct. Executed on November

19  1, 2018 at Albuquerque, New Mexico.

20

21                                    */s/Carla Dunkelberger, RN MSN MBA*
                                  CARLA DUNKELBERGER, RN MSN MBA

22

23

24

25

26

27

28

461

# EXHIBIT

# A

**Department of
Veterans Affairs**

)

)                    @ 6/28/17

# Memorandum

Date: **October 26 2015**

From: ACNS, Nursing Service (118)

Subj: Nursing Service Call-Off Procedure

To: All Nursing Service Staff

Thru: Nurse Managers

Effective 15 November 2015, the following procedure must be adhered to when the need for unplanned leave arises and it is necessary for you to call off for a shift:

Requests for leave must be communicated directly with your Nurse Manager* or Assistant Nurse Manager,* during regular hours (Monday to Friday from 0800 to 1530). If your Nurse Manager or Assistant Nurse Manager is not available, you may call you the Off Tour Supervisor* @ 505-265-1711 ext 2090 and request leave.

During all other hours (15:31 to 07:59, and on weekends and holidays), call offs/requests for unplanned leave are accepted by the Off Tour Nursing Supervisors** as follows:

1. As soon as the employee knows he or she needs to call off, they will contact the Nursing Supervisor office at 505-265-1711 ext. 2090.
   a. Requests submitted via other methods or calling any number other than ext. 2090, may not be received, which will result in the employee being marked as Absent Without Leave (AWOL). AWOL is a non-pay status that covers an absence from duty which has not been approved. (www.opm.gov/policy-data-oversight/employee-relations//reference-materials/.)
   b. It is not acceptable to text a leave request to a Manager or Supervisor.
   c. Requests for leave will be accepted from individuals other than the employee *only* if the employee is incapacitated (documentation may be required).
   d. Overhead paging the night supervisor or contacting them thru the emergency pager in order to request leave is unacceptable, has a negative impact on patient care, and may result in disciplinary action.
   e. Failure to request a specific type of leave will result in AWOL.

2. When extension 2090 is answered, an employee may request Sick Leave (SL), Family Care (CB), or unplanned Annual Leave (AL) for emergency purposes only.
   a. Requests for CB are appropriate when an employee is caring for a family member who has a condition which would qualify for SL.
   b. Requests for AL in lieu of SL or CB, are subject to supervisory approval as stated in Master Agreement, 2011, Article 35, Section 4, paragraph G.
   c. If extension 2090 is not answered, the employee may leave a voice message requesting SL or CB. Employee must request a specific type of leave and a specific time duration of the leave. Appropriate SL, and CB, requests submitted via voice message can be assumed to be approved.

**2105**
VA FORM
MAR 1989

463

*AP 6/28/17*

2.

Memorandum: Nursing Service Call-Off Procedure

    d. Requests for AL (Unplanned leave or Serious Personal Needs Situations) must be requested directly with the Off Tour Supervisor. (AFGE Master Agreement, Article 35, Section 2, paragraphs C. 2 and 3.) Voice messages requesting AL for emergency purposes are not appropriate.

    e. In all cases, the approval of a leave request is subject to Nurse Manager/Nursing Off Tour Supervisor discretion, and all current VA leave usage policies and agreements.

3. Leave Without Pay (LWOP) is an approved temporary non-pay status and absence from duty. Requests must be submitted using form OPM-71, and must be approved by the Service Chief. (MCM 05-1, Attachment A, and MCM 05-11, Attachment A.) Telephonic requests for LWOP cannot be granted by Nurse Managers or Nursing Off Tour Supervisors. Failure to submit a written request for LWOP, from the employee to the Service Chief, will result in AWOL.

4. Upon discovery that a leave request cannot be supported by the employee's leave balance, the request will be annotated as AWOL until an appropriate request is entered by the employee; subject to approval by unit *management* and/or the Service Chief. It is an employee responsibility to be aware of their current leave balance.

O/S

_____

Cynthia Nuttall, PhD
Associate Chief, Nursing Service

* Nurse Manager/Assistant Nurse Manager phone numbers: Carla: **505-269-5035,** Joseph: **505-250-1787,** Phil: **505-933-3591** or **505-265-1711 ext. 4617/2668** (Monday - Friday). In the event the nurse manager or assistant nurse manager is unavailable, you may call the Off Tour Supervisor at **505-265-1711 ext. 2090** and request leave.

** Off Tour Nursing Supervisor phone number: **505-265-1711 ext. 2090** during all other hours (i.e. 15:31 to 07:59, weekends, and holidays).

I acknowledge receipt of this notification on the date indicated below.

*TATYANA DREVALEVA*
Print Name

_____
Signature

*04. 18. 2017*
Date

464

# EXHIBIT

# B

02 6/28/17

| REPORT OF CONTACT | VA OFFICE | IDENTIFICATION NOS. (C,XC,SS,XSS,V,K, etc.) |
|---|---|---|
| NOTE: This form must be filled out in ink or on typewriter as it becomes a permanent record in veterans' folders. | NMVAHCS | |

| ST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)* | DATE OF CONTACT |
|---|---|
| evaleva, Tatyana | April 18, 2017 |

| DRESS OF VETERAN | TELEPHONE NO. OF VETERAN |
|---|---|
| | |

| RSON CONTACTED | TYPE OF CONTACT *(Check)* |
|---|---|
| | ☒ PERSONAL   ☐ TELEPHONE |

| )DRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED |
|---|---|
| | |

RIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN

atyana Drevaleva told me that she needs to go to Russia in a few months for 4-6 weeks to ███████ she needed to be on to help her to be able to ████████ Then, after she has aved up enough money she would need to go back to Russia as she would be hiring a ████████ At this me I explained to her that I would not be able to approve her request at my level of authority due to the length of time she was equesting and that Dr. Prince, Associate Director of Patient Care Services would be the one to approve or deny her request. I xplained to her that she does not qualify for FMLA at this time because she has less than 1 year of service. In order to request eave she would need to complete an OPM 71 and provide supporting medical documentation. She stated her doctor was in Russia and that she could ask him to write a letter for her but it would be in Russian. I explained to her that the documenation would need to either written in English or be translated from Russian to English. I also talked to her about possibly finding a ████████ ████████ e event she was not able to get an approved leave of absence until later. Ms. Drevaleva verbalized understanding of the proper procedure to request leave.

| DIVISION OR SECTION | EXECUTED BY *(Signature and Title)* |
|---|---|
| Nursing | Carla Dunkelberger, NM *(signature)* Dunkelberger, RN |
| Automated VA Form 119 | 5DT Nurse Manager |

466

# EXHIBIT

# C

OC 6/28/17

| REPORT OF CONTACT | VA OFFICE | IDENTIFICATION NOS. (C,XC,SS,XSS,V,K, etc.) |
|---|---|---|
| NOTE: This form must be filled out in ink or on typewriter as it becomes a permanent record in veterans' folders. | NMVAHCS | |

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)* | DATE OF CONTACT |
|---|---|
| Drevaleva, Tatyana | May 16, 2017 |

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN |
|---|---|
| | |

| PERSON CONTACTED | TYPE OF CONTACT *(Check)* |
|---|---|
| | ☒ PERSONAL  ☐ TELEPHONE |

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED |
|---|---|
| | |

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN

Tatyana Drevaleva came to my office on 5/25/17 to speak about her need to go to Russia. She stated that since ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as previously discussed. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

get the phone. I reminded her at this time she would need to complete an OPM 71, provide supporting medical documentation to request any time off, and that it had to be approved by by Dr. Prince, Associate Director of Patient Care Services prior to leaving; that I could not approve her request. Ms. Drevaleva verbalized understanding.

Ms. Dreveleva did not contact me on 5/16/17 to let me know if she had obtained the medication from New York.

| DIVISION OR SECTION | EXECUTED BY *(Signature and Title)* |
|---|---|
| Nursing | Carla Dunkelberger, NM  *Dunkelberger, RN* *5DT Nurse Manager* |

Automated VA Form 119

468

# EXHIBIT

# D

## Request for Leave or Approved Absence

| 1. **Name** (Last, first, middle) Drevaleva Tatyana E | 2. **Employee or Social Security Number (Enter only the last 4 digits of the Social Security Number (SSN))** 4099 |
|---|---|

3. **Organization** Albuquerque VAMC, 5D

| 4. **Type of Leave/Absence** (Check appropriate box(es) below) | Date From | Date To | Time From | Time To | Total Hours | 5. **Family and Medical Leave** |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advanced Annual Leave | | | | | | **I hereby invoke my** |
| ☐ Accrued Sick Leave | | | | | | ☐ **entitlement to Family and Medical Leave for:** |
| ☐ Advanced Sick Leave | | | | | | |
| **Purpose:** ☐ Illness/injury/incapacitation of requesting employee | | | | | | ☐ Birth/Adoption/Foster Care |
| ☐ Medical/dental/optical examination of requesting employee | | | | | | ☐ Serious health condition of spouse, son, daughter, or parent |
| ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement. | | | | | | ☐ Serious health condition of self |
| ☐ Care of family member with a serious health condition | | | | | | |
| ☐ Other | | | | | | *Contact your supervisor and/or your personnel office to obtain additional information about your* |
| ☐ **Compensatory Time Off** | | | | | | *entitlements and responsibilities under the Family and Medical* |
| ☐ **Other Paid Absence** (Specify in Remarks) | | | | | | *Leave Act. Medical certification of a serious health condition may be* |
| ☑ **Leave Without Pay** | 05.18.17 | 07.07.17 | | | | *required by your agency.* |

6. **Remarks:** To solve my health issues in Russia.

7. **Certification:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification on this form may be grounds for disciplinary action, including removal.

| 7a. **Employee Signature** Tatyana Drevaleva | 7b. **Date** 05.17.2017 |
|---|---|

| 8a. **Official Action on Request:** ☐ Approved ☑ Disapproved | (If disapproved, give reason. If annual leave, initiate action to reschedule.) |
|---|---|

8b. **Reason for Disapproval:**

| 8c. **Supervisor Signature** Ana R Prince DNP, RN | 8d. **Date** 5-19-2017 |
|---|---|

**PRIVACY ACT STATEMENT**

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: to the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to a Federal Life insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to Title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

| Office of Personnel Management 5 CFR 630 | Local Reproduction Authorized | OPM Form 71 Rev. September 2009 Formerly Standard Form (SF) 71 Previous editions usable |
|---|---|---|

Print Form    Clear Form

470

# EXHIBIT

# E



**DEPARTMENT OF VETERANS AFFAIRS**
New Mexico VA Health Care Systems
1501 San Pedro Drive SE
Albuquerque, NM 87108-5154

05/18/2017

In Reply Refer To:

Tatyana Drevaleva was hired as a telemetry technician On April 2, 2017 and participated in NEO on April 3, 2017. She is currently orienting as a telemetry technician on the night shift. While attending the NEO class in April Tatyana informed Carla Dunkleberger (Manager 5DT) that she needed to take extended leave of six weeks and go to Russia ████████████ At that time, Carla informed Tatyana that since she just started she was not eligible for FMLA and she had not accrued enough leave to support a six week absence. Tatyana was also told that medical documentation, in English, would be needed prior to approval of Leave Without Pay. On the morning of May 17, 2017 Tatyana informed the 5D management team that she was leaving to Russia on Thursday May 18, 2017 for six weeks. On May 17, 2017 an OPM 71 was given to Tatyana and she filled it out providing no supporting medical documentation.

At this time, I do not recommend approval of Tatyana Drevaleva's request for Leave Without Pay.

Phillip Johnson RN, 5DT ANM

Allean Raneta Bonin ACNS

Concur / Non Concur

Dr. Tina Prince ADPCS

Concur / Non Concur

with Non -approval

HUMAN RESOURCES
MANAGEMENT SERVICE (05)
RECEIVED

2017 MAY 23 AM 8:53

VA MEDICAL CENTER
ALBUQUERQUE, NM 87108

472

# EXHIBIT

# F

02-6/28/17

501/118

Tatyana E. Drevaleva
431 Alcazar Street NE
Albuquerque, NM 87108

Subj: Leave Request Clarification

1. This letter is to notify that on May 17, 2017, you submitted a Leave Without Pay (LWOP) request on an OPM Form 71, Request for Leave or Approved Absence from May 18, 2017 through July 7, 2017. However, your request was disapproved (see attached). You did not submit the required medical documentation, in English, prior to your departure to Russia. As a result of the disapproval, you are required to submit medical documentation, in English, to support your absences. This time period must be covered to avoid being placed in Absent Without Leave (AWOL) status.

2. I am enclosing an OPM 71, Request for Leave or Approved Absence, for your use. In addition, I am enclosing Medical Center Memorandum (MCM) 05-11, Title 5 Leave Policy; MCM 05-24, Voluntary Leave Transfer Program; MCM 05-36, and MCM 05-8, Tours of Duty.

3. Please contact me **immediately** upon receipt of this letter or no later than (5 days) upon receipt of this letter. I can be reached at (505) 265-1711, extension 4617 or (505) 269-5035. Again, I must stress to you that it is YOUR responsibility to ensure any absences are covered by approved leave requests. Failure to return to duty immediately or comply with the above requirements may result in disciplinary action up to and including your removal from Federal service.

Carla J. Dunkelberger    6/9/17
Carla J. Dunkelberger
Nurse Manager, 5DT

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com®

OFFICIAL USE

| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here    6/12/17

Sent To  Tatyana Drevaleva
Street, Apt. No.; or PO Box No.  431 Alcazar St NE
City, State, ZIP+4  ABQ, NM 87108

7014 1200 0000 8136 0063

474

# EXHIBIT

# G

AP 6/28/17

New Mexico VA Health Care System
Albuquerque, New Mexico

Memorandum 05-11
May 5, 2016
05/KC/CB/ya

## TITLE 5 LEAVE POLICY

1. **Policy:** To establish policies and procedures regarding leave administration for full-time and regularly scheduled part-time General Schedule (GS), Wage Grade (WG), Canteen employees, including Graduate Nurse Technicians and Hybrid Title 38 occupations. The policy shall be administered on a uniform and equitable basis within the scope of applicable laws and regulations and negotiated agreements.

2. **Responsibility:**
   a. The Human Resources Officer is responsible for the interpretation of policy and regulations regarding leave and supervisory training pertaining to leave administration.
   b. Service Chiefs are responsible for administering leave in accordance with this policy, for establishing a leave requesting procedure in order to ensure consistent approval practice for all employees and for maintaining an adequate work force to meet demands of the service.
   c. Supervisors are responsible for maintaining control over attendance and leave of their employees by planning the use of Annual Leave (AL) throughout the year with their employees, approving/disapproving leave requests to the degree delegated by the Service Chief and in accordance with this policy, and informing employees concerning leave matters.
   d. Each employee is responsible for complying with leave policies. In cooperation with his/her supervisor, each employee should schedule AL to prevent forfeiture at the end of the leave year.
   *NOTE:* Each service will ensure that Unit Timekeepers are informed of absences. Unit Timekeepers will not be required to assume the supervisor's responsibility in connection with attendance control, acting upon individual leave requests or determining the acceptability of Sick Leave (SL) certification.

3. **Procedure:**
   a. **Annual Leave (AL):** Full-time and part-time employees earn AL depending on their length of service:
      (1) Full-time (per full bi-weekly period)
          (a) Less than 3 years: 4 hours
          (b) 3 to 15 years: 6 hours (10 hours for the last full pay period)
          (c) More than 15 years: 8 hours
      (2) Senior Executive Service (SES): 8 hours
      (3) Part-time (hours earned for hours worked in a pay status)
          (a) Less than 3 years: 1 hour for each 20 hours in a pay status
          (b) 3 to 15 years: 1 hour for each 13 hours in a pay status
          (c) More than 15 years: 1 hour for each 10 hours in a pay status. Temporary employees are not entitled to earn AL unless they hold an appointment of 90 calendar days or more. Requests for AL will be considered in light of current and anticipated workloads and availability of staff so essential VA activities and services will not be interrupted. To the extent possible, consideration will be given to the preference of individual employees.

476

Memorandum 05-11
Subj: Title 5 Leave Policy
May 5, 2016
2.

All requests will be submitted with sufficient lead time to provide for appropriate approving authority action prior to the date leave is required. All leave must be requested and approved through the employee Electronic Time and Attendance (ETA) Menu (see Attachment A). There is no authority to approve AL from which the employee will not be returning to duty. A maximum balance of 240 hours (30 days) may be carried forward from one leave year to the next leave year. Any amount over this maximum total should be used before the end of the leave year or it will be forfeited.

b. **Restoration of AL:** The normal rule that AL in excess of the maximum permissible carry-over (240 hours) be automatically forfeited at the end of the leave year *may be suspended* under the following conditions:

   (1) **Administrative Error** – AL lost due to an administrative error may be restored. In addition to permitting a retroactive change, there is authority to permit the future restoration of all AL to which an employee is entitled in correcting an administrative error.

   (2) **Exigencies of Public Business** – Even with the best of planning and scheduling of AL usage throughout the year, operational demands may not permit usage to avoid forfeiture of leave by some employees. <u>The exigency, whether anticipated or unanticipated, must be of such importance to preclude the use of AL.</u> The exigency should occur in such case where there is no reasonable alternative to the cancellation of the scheduled leave. There is a requirement that this AL be scheduled in advance for use, and in writing before the start of the third biweekly pay period prior to the end of the leave year. Normally, the decision to cancel scheduled leave because of exigencies should be made in advance unless a bona fide emergency precludes an advance decision.

   (3) **Sickness** – When employees have scheduled AL in advance but are prevented from using it because of illness, they may substitute AL (or non-paid leave) for SL. However, when separation is known in advance, the granting of AL is limited to cases where exigencies of service require such action. <u>Sickness is not in itself a basis for permitting AL to be forfeited and subsequently restored for later use.</u> The supervisor has the responsibility to schedule or reschedule the use of AL to avoid forfeiture, even though an absence because of illness occurred during the year.

c. **Administrative Approval for Restoration of Leave** – The Director is the deciding official for the restoration of AL as warranted by the regulations. The scheduling and, as necessary, rescheduling of AL must be in writing. The Veterans Health Information Systems and Technology Architecture (Vista) Electronic Time & Attendance (ETA) System may be used. Documentation, which must be retained in accordance with regulations, must contain:

   (1) The calendar dates the leave was requested and approved by the leave approving official.

   (2) The date(s) and the amount (days/hours) on which the leave was scheduled for actual use.

   (3) The calendar date(s)/hours the cancelled leave was rescheduled for use.

6/28/17

Memorandum 05-11
Subj: Title 5 Leave Policy
May 5, 2016
3.

(4) The reason(s) for the subsequent canceling of approved leave (e.g., because of an exigency of the public business). Documentation must include the beginning and ending dates of the exigency and a copy of the approval action.

(5) The date(s) during which the leave was rescheduled for use and the amount of leave (days/hours) that was rescheduled for use, including the amount of hours unused in excess of the maximum AL carryover amount.

(6) Supervisors will be expected to provide the documentation above, in addition to their service leave usage plan, if submitting a memorandum requesting restoration of an employee's forfeited AL.
*NOTE:* Restored AL that is unused prior to the expiration of the time limit is *forfeited*, unless the employee separates before that time. In such a case, the lump-sum payment will include the amount unused restored AL that has been credited to a separate account.

d. **Sick Leave (SL):** An employee who is incapacitated for duty has the responsibility to request approval from immediate supervisor, leave approving official, or if the employee cannot call personally, have some responsible person report the illness or incapacitating injury as soon as practicable. Generally, this will be at the beginning of the tour of duty but not later than 2 hours thereafter. The employee's obligation is to complete one phone call to the established number or an alternate number employee was notified to use in order to request sick leave. If the supervisor is not available, employee may use voicemail to notify supervisor of type of leave requested due to incapacitation for duty. Sick leave of three (3) days or less may be requested orally and approved by the supervisor (see Attachment A); however, ETA Menu request must also be completed. An employee on SL for more than three (3) workdays must request SL through the ETA Menu upon return to duty and furnish satisfactory medical evidence of the need for SL during the period of absence. An employee who expects to be absent more than 1 day will inform the supervisor of his/her expected date of return to duty and notify the supervisor of any change. In the case of extended illness, daily reports will not be required. The employee may be required to call his/her supervisor prior to returning to duty.

e. **Authorized Absence (AA):** An authorized absence is an absence administratively approved, which does not result in a charge to leave of any kind, or in loss of basic salary. The following will be used as the *guide* in determining the types of absences from duty which may be authorized without charge to leave if:

(1) The activity is considered to be of substantial benefit to VA in accomplishing its general mission or one of its specific functions, or

(2) The activity will clearly enhance an employee's ability to perform the duties of the position presently occupied or may be expected to prospectively occupy, or

(3) The basis for excusing the employee is fairly consistent with prevailing practices of other Federal establishments in the area concerning the same or similar activities.
*NOTE:* Authorized absence is not appropriate when an employee is required to perform duties off the main campus, which are part of their regularly assigned duties as described in their functional statement or position description (e.g., nursing home inspections, visits to other clinics, duty in CBOCs, etc.).

478

Memorandum 05-11
Subj: Title 5 Leave Policy
May 5, 2016
4.

f. **Leave Without Pay (LWOP):** A temporary non-pay status and absence from duty in lieu of sick or annual leave. The authorization of LWOP is a matter of administrative discretion. Requests for LWOP will be considered in light of current and anticipated workloads. An employee cannot demand that LWOP be granted as a matter of right except in the case of disabled veterans who are entitled to LWOP if necessary for medical treatment under Executive Order 5396 and reservists and members of the National Guard who are entitled to LWOP if necessary to perform military training duties. Employees who are disabled on the job and file claims with the Office of Workers Compensation Program (OWCP) may be granted LWOP for the entire period of absence from duty. LWOP may also be granted in cases where an employee who has made application for disability retirement. LWOP in these circumstances may be granted until it is judged that the employee will not be able to return to duty and may be granted regardless of whether or not the employee has annual leave.

g. **Advanced Sick Leave** is for the purpose of serious disability, ailments, or for adoption related purposes. An employee with no time limit in his or her appointment may be granted advanced sick leave not in excess of 30 days (240 hours). An employee serving under a time limited or term appointment may be granted sick leave up to the total leave that would otherwise be earned during the term of the appointment. There may not be more than 30 days (240 hours) of advanced sick leave on an employee's record at any one time. In the case of sick leave for family care and bereavement, any or all of the first five (5) days (40 hours or its equivalent for part-time employees or employees on uncommon tours of duty) used for those purposes each leave year may be advanced.

h. **Advanced Annual Leave:** All requests for annual leave should be made in advance. There is no authority to approve annual leave from which the employee will not be returning to duty, unless such approval meets the needs of the service (34 Comp. Gen. 61). Annual leave may be advanced only in an amount that can be earned by the end of the leave year in which it is granted. When an employee is serving under an appointment which will expire before the end of the leave year, annual leave may be advanced up to the amount the employee would otherwise earn during the term of the appointment.

i. **Other Types Of Leave** which are available include advanced AL, SL for adoption, SL for General Family Care or Bereavement/ SL to Care for a Family Member with a Serious Health Condition (see Medical Center Memorandum (MCM) 05-38, Sick Leave for General Family Care or Bereavement/Sick Leave to Care for a Family Member with a Serious health Condition), Military Leave, Court Leave, leave for workers compensation cases, absences for maternity reason, leave in connection with travel, paid leave for bone marrow or organ donors, absences for religious purposes, excused absences. An employee may invoke the Family Medical Leave Act (FMLA) (see MCM 05-36, Family and Medical Leave Act). Employees may request to become a leave recipient under the Voluntary Leave Transfer Program (VLTP). (See MCM 05-24, Voluntary Leave Transfer Program (VLTP).

j. See Attachment A through C for Leave Chart and Leave Request Templates.

**479**

Memorandum 05-11
Subj: Title 5 Leave Policy
May 5, 2016
5.

4. **References:** 5 United States Code (USC) §6301-6308; 6321-6323; 6326; 5 Code of Federal Regulations (CFR) Part 63; VA Handbook 5011, Hours of Duty and Leave; Master Agreement between the Department of Veterans Affairs and American Federation of Government Employees.

5. **Rescission:** Medical Center Memorandum 05-11, Title 5 Leave Policy dated March 6, 2013.

6. **Expiration Date:** May 5, 2019.

Signed MCM in D/FMO File
Andrew M. Welch, MHA, FACHE
Director

Attachments

Distribution: "M"

480

Memorandum 05-11

Attachment A

## Leave Chart for General Schedule and Wage Grade Employees

| Type of Leave | Type of Request | | Approving Authority |
|---|---|---|---|
| | ETA | OPM-71 Form | |
| **I. Annual Leave** | X | | Service Chief (except for FMLA request see MCM 05-36) |
| **II. Restoration of Leave** | X | Plus memos | Director |
| **III. Advanced Annual Leave** | | X - Plus memos | Appropriate PENTAD member |
| **IV. Sick Leave** | | | |
| a. 3 days or less | X | | Service Chief (may be relegated) |
| b. More than 3 days | X | X - Plus medical documentation | Service Chief (may be relegated) (except for FMLA request see MCM 05-36) |
| **V. Advanced Sick Leave** | | X - Plus memos, medical documentation | Appropriate PENTAD member |
| **VI. Leave Without Pay** | | | |
| a. Up to 15 calendar days | | X | Service Chief |
| b. 15 days to 1 year | | X - Plus memos | Appropriate PENTAD member (except for OWCP cases which is delegated to the HR Manager) |
| | | X - Plus 2 SF-52's | SF-52 required for LWOP exceeding 30 calendar days and SF-52 required for return to duty |
| **VII. Court Related Absence i.e. Jury Service** | X - Copy of jury notice or subpoena | | Service Chief |
| **VIII. Absence for Maternity Reasons (not a separate leave category)** | X | X - Plus memos, medical documentation | Determined by type of leave |
| **IX. Absence Without Leave (AWOL)** | NA | NA | NA |
| **X. Absence for Religious Observance (not a separate leave category)** | X | | Service Chief |
| **XI. Authorized Absence** | | | |
| a. 8 hours or less | X | | Service Chief |
| b. More than 8 hours | X - Copy of Travel Authority for Temporary Duty | | Service Chief (See MCM 14A-4 and MCM 135-9) |
| c. More than 8 hours | X | X | ACOS/B--if official travel is not involved (See MCM 14A-4 and MCM 135-9) |

A-1

481

# EXHIBIT

# H

**From:** Dunkelberger, Carla </O=VA/OU=VISN 18/CN=RECIPIENTS/CN=VHAABQDUNKEC> on behalf of Dunkelberger, Carla
**Sent:** Monday, July 03, 2017 1:46 PM
**To:** Tatyana Drevaleva; Johnson, Phillip L.; Salazar-Ruiz, Andrew V.
**Cc:** Dunkelberger, Carla; Anderson, Rhonda R.; Bonin, Allean R.
**Subject:** RE: [EXTERNAL] from Tanya Drevaleva from Siberia.
**Attachments:** T.D..pdf

Please see attached.

Carla Dunkelberger, RN, MSN, MBA
Nurse Manager, 5D Telemetry
Raymond G. Murphy VA Medical Center



Integrity, Commitment, Advocacy,
Respect, Excellence

**From:** Tatyana Drevaleva [mailto:tdrevaleva@gmail.com]
**Sent:** Saturday, July 01, 2017 8:11 AM
**To:** Dunkelberger, Carla ; Phil Johnson
**Subject:** [EXTERNAL] from Tanya Drevaleva from Siberia.

Dear Carla and Phil!

How are you?

Unless

Now the

However, I will have to stay in Russia for 2-3 more weeks than I expected. Initially, I was planning to return

1

483

back to the United States on July 7th. I will not be able to do it because I will have to wait until I can get the

I requested another letter from my           confirming that currently I am getting examined in Novosibirsk for          promised to give me this letter on Thursday next week. As soon as I get the letter, I will get it translated and forward it to you.

Please, allow me to spend other 2-3 weeks in Russia. Please, send me a form that I can fill out and return to you if necessary.

Thank you so much,

Respectfully,

Tanya Drevaleva.

2

484



**DEPARTMENT OF VETERANS AFFAIRS**
Raymond G. Murphy Medical Center
1501 San Pedro Drive SE
Albuquerque NM 87108-5154

JUN 3 0 2017

In Reply Refer To: 501/108

Tatyana E. Drevaleva
Nursing Service (118)
New Mexico VA Health Care System
1501 San Pedro Drive SE
Albuquerque, NM 87108

Subject: Termination during Probationary Period

1. At the time of your Excepted Appointment on April 2, 2017, as a Medical Instrument Technician, you were informed that your first year of employment would be subject to a trial/probationary period. The trial/probationary period is an important part of the hiring process and during this time, supervisors are required to study an employee's potential closely to determine whether s/he is suited for successful government work. When it becomes apparent that an employee's conduct, general character traits or capacity do not meet the requirements for satisfactory service, the supervisor is required to initiate action to separate the employee.

2. The Associate Director, Patient Care Services, has recommended that you be terminated from your position for failure to qualify during your probationary period. Your termination is due to attendance issues.

3. The effective date of your termination will be June 30, 2017. The decision to terminate you immediately in lieu of a two (2) week notice is due to your absent without leave (AWOL) status since May 21, 2017. You must properly clear the facility, turn in any government property to your supervisor and clear any indebtedness prior to the release of your final paycheck.

4. You are entitled to:

    a) seek corrective action before the U.S. Office of Special Counsel (OSC); or

    b) a discrimination complaint with the Office of Resolution Management (ORM).

You shall be deemed to have exercised your option to appeal this action at such time as you timely initiate action to appeal to MSPB, or OSC, or a discrimination complaint.

5. If you believe this action is based on discrimination on the basis of race, color, religion, sex, national origin, age or disabling condition, you may file a complaint of discrimination. If you elect to file a complaint of discrimination, you may do so by contacting the Office of Resolution Management (ORM) at 1-888-737-3361. Your complaint will be processed in accordance with EEOC regulations at 29 C.F.R., Part 1614. Your initial contact with the ORM office must be done within 45 calendar days of the effective date of this action.

6. If you elect to seek corrective action by the OSC's Complaints Examining Unit (OSC Appeal Form) (https://osc.gov/), your complaint will be limited to a determination as to whether the agency took one or more personnel actions against you in violation of 5 USC 2302(b) (prohibited personnel

**485**

Tatyana E. Drevaleva
Termination during Probationary Period
Page 2

practices). This can include, but is not limited to claims of reprisal for whistleblowing and/or engaging in protected activity. If you are making a claim of retaliation for engaging in one or more protected activities and OSC dismisses your claim, you may have the right to file an individual right of action (IRA) appeal to the MSPB, but such an appeal will be limited to an adjudication of whether you proved that your protected activity was a contributing factor in the effected action.

7. Whichever is filed first, an appeal for the corrective action to OSC, or a discrimination complaint, shall be considered an election by you to proceed under that appeal process.

8. If you have any questions concerning this matter or the rights described above, or if you need assistance or additional information, please contact Rhonda Anderson, Human Resources Specialist, at extension 2381.

Thomas E. Harris Sr.
Acting Human Resources Officer

486

## Docket No. 51

November 02, 2018.

ORDER DENYING REQUEST TO FILE SUPPLEMENTAL BRIEFING.

United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TATYANA EVGENIEVNA DREVALEVA,

        Plaintiff,

   v.

U.S. DEPARTMENT OF VETERANS
AFFAIRS, et al.,

        Defendants.

                      /

No. C 18-03748 WHA

**ORDER DENYING
REQUEST TO FILE
SUPPLEMENTAL
BRIEFING**

In this *pro se* employment discrimination action, defendants filed a motion to dismiss
pursuant to FRCP 12(b)(1) and 12(b)(6). Plaintiff filed her opposition and defendants
responded (Dkt. Nos. 40, 41). Plaintiff now requests leave to file supplemental briefing
pursuant to Local Rule 7-3(d).

Local Rule 7-3(d) states, "[o]nce a reply is filed, no additional memoranda, papers,
or letters may be filed with the court without prior approval" unless new evidence has been
submitted in the reply or relevant judicial opinions were published after the reply or opposition
was filed. Neither exception applies here.

Plaintiff alleges that defendants raised new issues in their reply that were not present
in their motion to dismiss. Plaintiff, however, fails to identify these new issues and does not
explain what information she found to be "misleading" in defendants' reply (Dkt. No. 42 at 1).
Plaintiff has already had the opportunity to present arguments and cite to case law in her

opposition and various other requests and motions she has submitted. The Court finds no basis for permitting additional briefing, thus, plaintiff's request for leave to file a supplemental brief is hereby **DENIED**.

    **IT IS SO ORDERED.**

Dated:   November 2, 2018.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

489

**Docket No. 53**

November 08, 2018.

Plaintiff's Response to General Order 71.

1   Tatyana Evgenievna Drevaleva

2   No current home postal address

3   Currently residing in California

4   415-806-9864, tdrevaleva@gmail.com

5   Plaintiff in Pro Per

6

7                   THE UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9

10

11                                          )
                                            )
12    Tatyana E. Drevaleva                  )    Case No. 3:18-cv-03748
                                            )
13                                          )
                  Plaintiff,                )
14                                          )
                      vs.                   )
15                                          )
      1) The U.S. Department of Veterans    )    Response to General Order 71.
16       Affairs                            )
                                            )    Judge: Hon. William Alsup
17    2) Mr. Robert Wilkie, Acting United   )
         States Secretary of Veterans Affairs )
18       810   Vermont   Avenue,   NW)
         Washington, DC  20420              )
19                                          )
      Facility: New Mexico VA Healthcare System )
20         1501 San Pedro Drive, S.E.       )
           Albuquerque, NM 87108            )
21                                          )
                  Defendant.                )
22                                          )
                                            )
23   _____   )

24          Plaintiff Tatyana Drevaleva herein submits her Response to General Order 71.

25          **Documents that Plaintiff must produce to Defendant.**

26          a) All communications concerning the factual allegations or claims at issue in this

27              lawsuit between the plaintiff and the defendant.

28

Response to General Order 71, case No. 5:18-cv-03748-LHK

491

I already provided all communications concerning the factual allegations or claims at issue in this lawsuit between the plaintiff and the defendant. See Attachments to my Complaint.

  b)  Claims, lawsuits, administrative charges, and complaints by the plaintiff that rely upon any of the same factual allegations or claims as those at issue in this lawsuit.

    1)  Currently a formal EEO complaint against the Minneapolis VAMC is pending. I honestly answered question 31 on the form VHA-10-2850c whether I was fired from any job within the last 5 years. I said that I had been fired from the Raymond G. Murphy VAMC for my trip to Russia to solve some of my medical issues. After getting a full time employment offer at the Minneapolis VAMC for the position of a Medical Instrument Technician (EKG) and going through a pre-employment screening process, that job offer was cancelled. The Supervisor from the Minneapolis VAMC contacted with the Raymond G. Murphy VAMC and was told that I had been fired for negligently failing to obtain LWOP.

    2)  Currently, a formal EEO Complaint is pending against the Los Angeles VAMC. I honestly answered question 31 on the form VHA-10-2850c whether I was fired from any job within the last 5 years. I said that I had been fired from the Raymond G. Murphy VAMC for my trip to Russia to solve some of my medical issues. In June 2018, I had a phone job interview with the Los Angeles VAMC for the position of a Medical Instrument Technician (EKG). I said to the interviewer that I had been fired from the Raymond G. Murphy VAMC for my trip to Russia to solve some of my medical issues. The interviewer asked if I needed to go to Russia again for a follow up. I said that yes, I will need to go to Russia for a follow up when I have money. I was not hired for this position.

  c)  Documents concerning the formation and termination, if any, of the employment relationship at issue in this lawsuit, irrespective of the relevant time period.

    1)  See Exhibit 1 – a full time job offer

    2)  See Attachment 3 to my Complaint – Termination Letter.

d) Documents concerning the terms and conditions of the employment relationship at issue in this lawsuit.

See Exhibit 1 – a full time job offer. I was entitled to all benefits that are available for full time employees.

e) Diary, journal, and calendar entries maintained by the plaintiff concerning the factual allegations or claims at issue in this lawsuit.

See Attachments 1, 2, 4, 5, and 6 to my Complaint.

f) The plaintiff's current resume(s).

See Exhibit 2 – my current Resume outlining my experience as an EKG/Monitor Technician.

g) Documents in the possession of the plaintiff concerning claims for unemployment benefits, unless production is prohibited by applicable law.

See Exhibit 3 – my Unemployment Insurance claim. Notice that the VAMC told the EDD that I had "no medical advice" to quit my job. Also, the VAMC lied to the EDD that I submitted the documentation from my physician only after I returned back from Russia, "Clmt did not present doctors notes until after she came back."

h) Documents concerning: (i) communications with potential employers; (ii) job search efforts; and (iii) offer(s) of employment, job description(s), and income and benefits of subsequent employment. The defendant shall not contact or subpoena a prospective or current employer to discover information about the plaintiff's claims without first providing the plaintiff 30 days' notice and an opportunity to file a motion for a protective order or a motion to quash such subpoena. If such a motion is filed, contact will not be initiated or the subpoena will not be served until the motion is ruled upon.

(i) Communications with potential employers – I contacted many potential employers. I am submitting only 20 confirmations of my job applications. In fact, I submitted much more. See Exhibit 4.

(ii) Job search efforts – I might have lost the pieces of evidence of my job search that I submitted to Monterey County because I moved from Monterey to the Bay

Response to General Order 71, case No. 5:18-cv-03748-LHK

493

Area. I am submitting what I have. At the Court's request, I will request the Monterey County to provide me with copies of my job search sheets for other months. Of course, in fact, I submitted much more job applications that I listed on the forms. See Exhibit 5.

(iii) While receiving the General Assistance at Monterey County, I worked for 36 hours a month cleaning streets from cigarette ends and removing trash. I received 170 - 340 dollars per month. I might have lost the remaining sheets because I moved from the Monterey County to the Bay Area. See Exhibit 6 and Exhibit 7 – salary.

Starting July 2018, I have been working as a Caregiver at the company "California Caregivers". See Exhibit 8 which is copies of paystubs.

Also, I am working as a Caregiver at the company "Home Care Assistance", see copies of paystubs at Exhibit 9.

i) Documents concerning the termination of any subsequent employment.

I was not fired from any job after I was fired from the Raymond G. Murphy VAMC.

However, two employment offers were terminated in relation to this current litigation.

1) A full time employment offer for the position of a Medical Instrument Technician (EKG) at the Minneapolis VAMC. While submitting my job application, I honestly answered question 31 on the VHA-10-2850c that I was fired within the last 5 years from the Raymond G. Murphy VAMC for my trip to Russia to solve my medical issues. My employment offer was terminated after the Minneapolis VAMC contacted with the Raymond G. Murphy VAMC and learned that I had been fired for negligently requesting LWOP. See Exhibit 10.

2) Also, I was not hired for the full time position of a Medical Instrument Technician (EKG) at the Los Angeles VAMC. While submitting my job application, I honestly answered question 31 on the VHA-10-2850c that I was fired within the last 5 years from the Raymond G. Murphy VAMC for my trip to Russia to solve my medical issues. During the phone job interview in June 2018, the interviewer

Response to General Order 71, case No. 5:18-cv-03748-LHK

494

1  asked me whether I was planning to go to Russia again for a follow up. I said that

2  yes, I need to go to Russia again for a follow up as soon as I have money, and I

3  would obtain the Supervisor's permission to go to Russia for a medical treatment.

4  I was not hired for this position. See Exhibit 11.

5  j) Any other document(s) upon which the plaintiff relies to support the plaintiff's

6  claims.

7  See Exhibit 12 which is Letters of Reference from my previous employers.

8  See Exhibit 13 which is the Performance Evaluation from the San Francisco VAMC

9  where my performance was rated as outstanding and exceptional.

10

11  **Information that Plaintiff must produce to Defendant.**

12  a. Identify persons the plaintiff believes to have knowledge of the facts concerning the

13  claims or defenses at issue in this lawsuit, and a brief description of that knowledge.

14  1) Mrs. Nadya Das who is a Russian speaking Monitor Technician at 5D. She is a

15  witness that I received the documentation on Russian language from my Russian

16  OB/GYN on the night from May 17, 2017 to May 18, 2017. After I spoke to Mr.

17  Johnson on May 17, 2017 and after he verbally allowed me to go to Russia for an IVF

18  procedure, I told Mrs. Das about it. I said to her how happy I was that Mr. Johnson

19  verbally allowed me to go to Russia for the IVF procedure

20  2) Mrs. Chelsea Casey who is a Registered Nurse at 5D. She drove me to the airport on

21  May 18, 2017. Most likely, I said to her that Mr. Johnson verbally allowed me to go

22  to Russia for the IVF procedure. Also, Mrs. Casey told me that Ms. Dunkelberger had

23  called her five times about an employment offer as a Registered Nurse at 5D. At that

24  time, Mrs. Case was married and already had two children. Mrs. Casey was not

25  pregnant and already had two children, therefore Ms. Dunkelberger wanted to hire her

26  and retain. In contrast, Ms. Dunkelberger didn't call me even one time when she

27  decided to cancel my job because I went to Russia for an IVF procedure and I wanted

28  to have a child.

Response to General Order 71, case No. 5:18-cv-03748-LHK

495

3) Mrs. Michelle Tirado who is a Nursing Manager (I don't know in what unit). We had email exchange with Mrs. Tirado when I was in Russia, and I shared with her the details that were related to my medical examination and the upcoming IVF procedure. I don't remember but I think I could have told Mrs. Tirado that Mr. Johnson had verbally allowed me to go to Russia for the IVF procedure.

4) Melanie (I don't know what her last name is) who is a Registered Nurse at ICU. Sometimes, she observes cardiac monitors at 5D. Melanie told me that when she attended college to become a Registered Nurse, Ms. Dunkelberger allowed her to work at 5D only once a month. To the best of my suggestion, Melanie was not pregnant at that time and didn't plan to become pregnant. In contrast, Ms. Dunkelberger failed to provide me with reasonable accommodations and threw me out of job for being absent.

5) Mr. Phil Johnson who is an Assistant Manager at 5D. He verbally allowed me to go to Russia on May 17, 2017. His exact words were, "If you need to go – go!"

b. Describe the categories of damages the plaintiff claims.

**Part 1**. IMMEDIATE reinstatement to work for a full time permanent position with all benefits (medical, dental, vision, thrift savings plan 401k, flexible spending account, life insurance, sick leave, paid vacation, eligibility under the FMLA, and other benefits I am eligible to as a permanent full time employee) at any VAMC.

**Part 2.** Promotion – hiring for a higher paying position.

**Part 3.** Waiving my probationary period.

**Part 4.** Ordering the VA to pay for my education. When Ms. Dunkelberger hired me, she said that the VA would pay for my education after I work for more than one year. Because Ms. Dunkelberger discriminated me and fired me, the VA must pay for my education without waiting for one year because I've been unemployed for 1.5 years since I was fired.

**Part 5. Back Pay** is available under Title VII, the ADEA, and the Rehab. Act. Once the plaintiff establishes that unlawful discrimination caused her loss, she is entitled to back pay. See *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 417-18 (1975) (holding that back pay should be

496

denied only in unusual circumstances where the award would frustrate the statutory purpose of eradicating discrimination and making victims whole).

**Elements of the Back Pay award.**

1) Wages and Salary.

The plaintiff bears the burden of establishing the value of her lost salary, but the plaintiff is not required to establish the exact dollar amount. See *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 156 (3d Cir. 1999) (holding that "uncertainties [in the calculation of back pay] are resolved against a discriminating employer"). The plaintiff may also recover overtime, shift differentials, commissions, tips, cost-of-living increases, merit increases, and raises due to promotion by showing that she would have earned those items absent discrimination. See, e.g., *Cox v. Am. Cast Iron Pipe Co*., 784 F.2d 1546, 1563 (11th Cir. 1986).

2) Fringe benefits.

Similarly, the plaintiff bears the burden of proof for claims for fringe benefits, such as vacation pay, pension and retirement benefits, stock options and bonus plans, savings plan contributions, cafeteria plan benefits, profit-sharing benefits, and medical and life insurance benefits. The plaintiff must demonstrate her entitlement to and the value of such benefits with reasonable certainty. *Vaughn v. Sabine Cnty*., 104 F. App'x. 980, 985 (5th Cir. 2004) (a jury may consider the value of employee benefits in making a back pay determination so long as evidence in the record supports a calculation). When the employee would have been obligated to pay part of the cost of benefits, that portion of the cost may reduce the back pay award.

3) Pre-Judgment Interest.

The Supreme Court established a strong presumption that prejudgment interest on back-pay awards should be granted in employment discrimination cases. See *Loeffler v. Frank*, 486 U.S. 549, 557-58 (1988) ("Prejudgment interest may be awarded in a suit against the Postal Service brought under Title VII.").

4) Negative Tax Consequences.

Response to General Order 71, case No. 5:18-cv-03748-LHK

497

1    To receive additional back pay to compensate the increased tax liability of a lump-sum

2    back pay in a single year, the plaintiff need to prove the amount of increased income tax

3    burden. See *O'Neill v. Sears, Roebuck & Co.*, 108 F. Supp. 2d 443, 447 (E.D. Pa. 2000)

4    (allowing the recovery of the increased tax liability from the lump sum award of back pay

5    and front pay where expert testimony was provided specifying the award's tax

6    consequences).

7    <u>The period of recovery for back pay awards</u>. Back pay is generally awarded from the occurrence

8    of the alleged discrimination until the harm suffered by the plaintiff is redressed. See *Thorne v.*

9    *City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986). The plaintiff must demonstrate the

10    amount of economic harm she has suffered as a result of the alleged discrimination. I am

11    requesting the back pay award from May 18, 2017 to the moment when I am reinstated back to

12    work.

13    **Part 6. Front Pay.**

14    Front pay compensates the plaintiff for the future effects of discrimination when reinstatement

15    would be an appropriate, but not feasible, remedy or for the estimated length of the interim

16    period before the plaintiff could return to her former position. See *Pollard v. E.I. du Pont de*

17    *Nemours & Co.*, 532 U.S. 843, 850 (2001); see, e.g., *Donlin v. Philips Lighting N. Am. Corp.*,

18    581 F.3d 73, 87-88 (3d Cir. 2009) (affirming the award of 10-year front-pay to a temporary

19    employee who was not offered a permanent position because of unlawful sex discrimination). I

20    am requesting the Front Pay at the amount of the Jury's discretion.

21    **Part 7. Compensatory damages.**

22      1) Title VII.

23      I am requesting $300,000.00 00 for "emotional pain, suffering, inconvenience, mental

24      anguish, loss of enjoyment of life, and other nonpecuniary losses" as described in 42 U.S.

25      Code § 1981a(b)(3). The cap on damages recoverable under Title VII does not limit front

26      pay, which is not compensatory damages, or recovery under state antidiscrimination

27      statutes. See *Pollard*, 532 U.S. at 852).

28      2) The ADEA.

Response to General Order 71, case No. 5:18-cv-03748-LHK

498

1   I am requesting liquidated damages in the amount of both back pay, front pay, and

2   benefits.

3   Under the ADEA, the court must award liquidated damages once the plaintiff established

4   that the employer's willful violations. See *Tyler v. Union Oil Co. of Cal.,* 304 F.3d 379,

5   398 (5th Cir. 2002). The ADEA allows an award of damages only for pecuniary benefits

6   connected to the job, but not for compensatory damages for mental anguish, pain,

7   suffering, humiliation, and loss of employment. *Collazo v. Nicholson*, 535 F.3d 41, 44-45

8   (5th Cir. 2008).

9   3)  The Rehabilitation Act of 1973.

10   Damages for emotional distress are available under *Sheely v. MRI Radiology Network,*

11   *P.A.*, 2007 WL 3087215, at *18 (11th Cir. Oct. 24, 2007). I am asking the Court to

12   impose damages for emotional distress at the amount of the Jury's discretion.

13   Damages for emotional distress must be supported by competent evidence of genuine

14   injury, but medical evidence is not necessary. *Heaton v. Weitz Co*., 534 F.3d 882, 891

15   (8th Cir. 2008); see *Rodriguez-Torres v. Caribbean Forms Mfr., Inc*., 339 F.3d 52, 63-64

16   (1st Cir. 2005) (noting that expert medical testimony is not a prerequisite for an

17   emotional distress award). The plaintiff's testimony may be sufficient so long as she

18   offers specific facts as to the nature of her claimed emotional distress and as to the causal

19   connection to the employer's alleged violation. Id.; *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*,

20   333 F.3d 536, 546-47 (4th Cir. 2003).

21   The employer is liable for all harms it inflicted upon an eggshell plaintiff. See *EEOC v.*

22   *AIC Sec. Investigations,* Ltd., 55 F.3d 1276, 1286 (7th Cir. 1995)

23   **Part 8. Five million U.S. dollars for future medical expenses for Pregnancy discrimination**

24   **despite the *Brown* rule.** The Agency put me into the situation where I don't know whether I still

25   have fertile eggs at the age of 53 yo. The Agency put me into the situation where I need to think

26   about purchasing donor's sperm, donor's eggs, and to hire surrogate Moms. I also need money

27   for my own medical examination and treatment if I still have fertile eggs and I am eligible for

28   future IVF attempts.

Response to General Order 71, case No. 5:18-cv-03748-LHK

499

**Part 9. "Damages awards that may have a punitive effect"** under *Molzof v. United States,* The U.S. Supreme Court, No. 90-838 (1992) in the amount determined by the Jury for pregnancy discrimination. The VAMC deprived me an opportunity to work in my professional field, to earn money, to purchase a car, a house, to get education and a higher paid job, to hire a surrogate Mom for my embryo, and to go to Russia for other IVF attempts. Now, I am at the age of 52 yo. I don't know whether I have eggs that are fertile. I feel that the VAMC committed the most horrible crime ever possible – deprived me an opportunity to have children using my own genetic material. Therefore, I am requesting this amount of money additionally to the damages described above.

**Part 10. "Damages for reputation, emotional distress, mental anguish, loss of enjoyment of life, and humiliation; loss of consortium as results of Libel"** under *Vidrine v. United States* in the amount of 2 million U.S. dollars. This amount is close to the amount awarded in *Vidrine*.

**Part 11. Attorney's Fees** available under Title VII.

**Part 12. Costs.** The VA must pay all costs related to this litigation including the cost of relocation to my new place of work and the cost of renting a place of living for a few months after I am reinstated back to work.

c. State whether the plaintiff has applied for disability benefits and/or social security disability benefits after the adverse action, whether any application has been granted, and the nature of the award, if any. Identify any document concerning any such application.

No, I didn't apply for the disability and/or social security benefits.

I declare under the penalty of perjury under the Federal laws and the laws on the State of California that the foregoing is true and correct. Executed at City of San Francisco, CA, on November 08, 2018.

Respectfully submitted,

Date: November 08, 2018          Sign Name:

Print Name:  Tatyana E. Drevaleva

Response to General Order 71, case No. 5:18-cv-03748-LHK

500

**Exhibit 1.**

A full time job offer at the Raymond G. Murphy VAMC.



**Department of Veterans Affairs**
**New Mexico VA Healthcare System**
**1501 San Pedro Drive SE**
**Albuquerque NM 87108-5154**

March 27, 2017

In Reply Refer To:    501/05

Tatyana E. Drevaleva
6100 California St.
San Francisco, CA 94121

SUBJ:  Appointment

1.  This is to confirm your selection for appointment at the New Mexico VA Health Care System as follows:

| | |
|---|---|
| Type of Appointment: | Excepted Appointment |
| Work Schedule: | Full Time |
| Effective Date: | April 2, 2017 |
| Position Title: | Medical Instrument Technician (EKG) |
| Series, Grade, & Salary: | GS-0649- 7, Step 1, $40,790 per annum |
| Reporting Date: | April 3, 2017 |
| Reporting Time: | 8:00 am |

2.  This appointment will not become effective until you have been formally processed by Benefits Section Human Resources Management Service.  Please report to the New Mexico VA Health Care System, Education Annex, Building 133 on **April 3, 2017 at 8:00 a.m.**

3.  In order that you may obtain the required employee identification badge and vehicle parking decal, you will need to present your driver's license; vehicle registration and proof of insurance to the VA Police at the appropriate opportunity during the new employee orientation, which is the first four (4) days of your employment.  For new employee orientation, dress is business casual with comfortable shoes, as you will be required to do some walking.

4.  You will be contacted by an employee of this office regarding the eQip program, the electronic background investigation process.

5.  We look forward to your association with the New Mexico VA Health Care System. If you have any questions regarding this matter, please contact Roxanne Cardwell, Supervisory Human Resources Specialist at 505-265-1711, extension 2244.

K. Catanach
Chief, Human Resources Management Service

Attachment

502

**Exhibit 2.**

A current Resume as an EKG/Monitor Technician.



# TATYANA DREVALEVA

6100 California Str., San Francisco, CA, 94121
415-806-9864    tdrevaleva@gmail.com

## EKG TECHNICIAN

Experienced EKG and Monitor Technician. Known for dedication to providing premium patient care. Skills include:

— *Observing and maintaining Cardiac Monitors*
— *Reading Cardiac Rhythms*
— *Reporting critical changes to RNs and MDs*
— *12 and 15 lead EKGs*

— *Holter, Event and Blood Pressure Monitors*
— *Treadmill and ESE stress tests*
— *Lexiscan and Persantine stress tests*
— *Editing Rhythm Strips*
— *Acting as a Unit Secretary*

— *Data Entry (50 WPM)*
— *Taking Patient Vitals*
— *Patient Education*
— *Compliance with HIPAA & JCAHO standards*

## Certification

**Electrocardiography Technician (EKG Technician)**    2009-Present
**BLS HCP**    2016-Present

## Professional Experience

# Raymond G. Murphy VA Medical Center

1501 San Pedro SE,
Albuquerque, NM, 87108
40 hours a week, Carla Dunkelberger, 505-265-1711

**Monitor Technician**    April 2017 – June 2017
- Observed cardiac monitors, interpreted and mounted rhythm strips
- Reported critical results to RNs and MDs

# Alameda Health System

1411 E 31st St., Oakland, CA, 94602
36 hours a week, Gilbert Harding, 510-535-7379

**Monitor Technician**    April 2013 – September 2013
- Observed and interpreted cardiac rhythms at SDU and 5 East
- Reported abnormal rhythms to RNs and residents
- Kept proper documentation

# "Maxim Staffing Solutions" agency    Veterans Affairs Medical Center

4150 Clement Str., San Francisco, CA, 94121
40 hours per week, Marilyn Morrissey 415-221-4810 ext. 22070

**EKG Technician**    May 2012 – March 2013
- Did exercise stress tests with and without a radiotracer (hot and cold Treadmills),
- Did Lexiscan and Persantine pharmacological stress tests

# Kaiser Permanente Medical Center    280 W. Macarthur Blvd., Oakland, CA, 94611

40-72 hours a week, Vanessa Martinez, 510-926-0422

**Monitor Technician**    September 2011 – March 2012
- Observed cardiac rhythms at Med/Surg 8 and 9, mounted strips and interpreted cardiac rhythms every 4 hours
- Kept documentation (red alarm sheet, inventory sheet, pagers and phones assignment sheet, etc.)
- Reported critical changes to RNs and MDs
- Compliance with JCAHO regulations (exchange batteries, etc.)

504

## "On Assignment" Staffing Agency   Kaiser Permanente Medical Center

1425 South Main Str., Walnut Creek, CA, 94596
40 hours a week, Cindy Fugitt, (925) 295-5197

**EKG Technician**   August 2011 – September 2011
- Did 12 and 15 lead EKGs on out- and inpatients
- Hooked Holter Monitors up, did initial review of transmissions
- Was trained to do Treadmills and Event Monitors

## "Maxim Staffing Solutions" agency   LifeWatch Services, Inc.

1 Market Str., San Francisco, CA, 94105
40 hours a week, Kelly Hafner, (847) 720-2100

**Certified Cardiographic Technician, ACT Technician II**   April 2011 - July 2011
- Did initial Review of ACT transmissions – analyzed the type of trigger, recognized whether or not it is an MD notification according to LifeWatch criteria and modified criteria for different clinics and individually for patients, reviewed previous transmissions, troubleshoot problems, obtained manual recordings.
- Edited transmissions – cut strips, did measurements, analyzed the rhythm.
- Compliance with HIPAA and OSHA regulations

## University of California San Francisco Medical Center

1600 Divisadero Str., San Francisco, CA, 94115
40 hours a week, Jhoric de Guzman, (415) 885-7798;

**Patient Care Assistant**   August 2010 - February 2011
- Consistently praised for efficient handling of patient care and administrative assistant duties (e.g., preparing patients rooms for admissions, answering phones, maintaining medical records, etc.) that allowed doctors and nursing staff to focus on the health concerns of their patients.
- Demonstrated proficiency in taking patient vital signs, as well as in performing EKGs.
- Ensured the cleanliness, sanitation and maintenance of all facilities, patient rooms and equipment

## University of California Davis Medical Center

2315 Stockton Blvd., Sacramento, CA, 95817
40 hours a week, Kristen Higginson, (916) 734-2119;

**EKG Technician,**   December 2009 - April 2010
- Performed 12 and 15 lead EKGs, Holter and Event Monitors, Blood Pressure Monitors, Stress Tests (Treadmills and Pharmacological Stress Tests – Lexiscan)
- Ensured privacy for all patients, assured that patient was physically and emotionally comfortable throughout the recording of electrocardiogram
- Worked with MUSE, Invision, Lotus Notes, EMR, GEMS and other computer programs
- Reported critical findings on EKGs to RNs and physicians.

## SUMMARY: I worked as an EKG Technician 37.8 percent, as a Monitor Technician 46 percent, as a Patient Care Assistant 16.2 percent of my time.

## Education:

- City College of San Francisco. Address: 50 Phelan Ave, San Francisco, CA 94112. Certificate of an EKG Technician, 2009; Anatomy 25 in 2009, GPA 4.0 (Dean's list)

- 108 hours of passed internship as an EKG Technician at California Pacific Medical Center, Kanbar Cardiac Center in 2009. Address: 2333 Buchanan St, San Francisco, CA 94115.

505

**Exhibit 3.**

Unemployment Insurance Claim.

EMPLOYMENT DEVELOPMENT DEPT
UI CENTER OAKLAND
PO BOX 2044
OAKLAND          CA 94604-2044



         N O T I C E   O F   D E T E R M I N A T I O N / R U L I N G

                                        DATE MAILED        09/25/17
                                        BENEFIT YEAR BEGAN 08/27/17

T E DREVALEVA              8530         EDD TELEPHONE NUMBERS:
10660 HIDDEN MESA PL                   ENGLISH      1-800-300-5616
MONTEREY          CA 93940-2003        SPANISH      1-800-326-8937
                                       CANTONESE    1-800-547-3506
                                       MANDARIN     1-866-303-0706
                                       VIETNAMESE   1-800-547-2058
                                       TTY          1-800-815-9387


                                       SSA NUMBER


YOU ARE NOT ELIGIBLE TO RECEIVE BENEFITS UNDER CALIFORNIA UNEMPLOYMENT
INSURANCE CODE SECTION 1256 BEGINNING 05/14/17 AND CONTINUING UNTIL YOU
RETURN TO WORK AFTER THE DISQUALIFYING ACT AND EARN $2250.00 OR MORE IN
BONA FIDE EMPLOYMENT, AND YOU CONTACT THE ABOVE OFFICE TO REOPEN YOUR
CLAIM.

YOU QUIT YOUR LAST JOB WITH RAYMOND G MURPHY VA BECAUSE OF HEALTH CONCERNS.
YOU HAD NO MEDICAL ADVICE TO QUIT.  AFTER CONSIDERING AVAILABLE
INFORMATION,  THE DEPARTMENT FINDS THAT YOU DO NOT MEET THE LEGAL
REQUIREMENTS FOR PAYMENT OF BENEFITS.  SECTION 1256 PROVIDES - AN
INDIVIDUAL IS DISQUALIFIED IF THE DEPARTMENT FINDS HE VOLUNTARILY QUIT HIS
MOST RECENT WORK WITHOUT GOOD CAUSE OR WAS DISCHARGED FOR MISCONDUCT FROM
HIS MOST RECENT WORK.  SECTION 1260A PROVIDES - AN INDIVIDUAL DISQUALIFIED
UNDER SECTION 1256 IS DISQUALIFIED UNTIL HE/SHE, SUBSEQUENT TO THE
DISQUALIFYING ACT, PERFORMS SERVICES IN BONA FIDE EMPLOYMENT FOR WHICH
HE/SHE RECEIVES REMUNERATION EQUAL TO OR IN EXCESS OF FIVE TIMES HIS OR HER
WEEKLY BENEFIT AMOUNT.

YOU ARE NOT ELIGIBLE TO RECEIVE BENEFITS UNDER CALIFORNIA UNEMPLOYMENT
INSURANCE CODE SECTION 1253C BEGINNING 08/27/17 AND ENDING WHEN THE
DISQUALIFYING CONDITIONS NO LONGER EXIST, AND YOU CONTACT THE ABOVE OFFICE
TO REOPEN YOUR CLAIM.

YOU ARE UNWILLING TO ACCEPT EMPLOYMENT FOR WHICH YOU ARE QUALIFIED BY
EXPERIENCE AND TRAINING.  AFTER CONSIDERING AVAILABLE INFORMATION, THE
DEPARTMENT FINDS THAT YOU DO NOT MEET THE LEGAL REQUIREMENTS FOR PAYMENT OF
BENEFITS.  SECTION 1253C PROVIDES - AN INDIVIDUAL IS ELIGIBLE FOR BENEFITS
IN A WEEK ONLY IF THE DEPARTMENT FINDS HE WAS ABLE TO WORK AND AVAILABLE
FOR WORK.

APPEAL:

**EDD**
Employment
Development
Department
State of California

YOU HAVE THE RIGHT TO FILE AN APPEAL IF YOU DO NOT AGREE WITH ALL OR PART OF THIS DECISION.

TO APPEAL, YOU MUST DO ALL OF THE FOLLOWING:

A. COMPLETE THE ENCLOSED APPEAL FORM (DE 1000M) OR WRITE A LETTER STATING THAT YOU WANT TO APPEAL THIS DECISION. IF YOU WRITE A LETTER TO APPEAL, EXPLAIN THE REASON WHY YOU DO NOT AGREE WITH THE DEPARTMENT'S DECISION. WRITE YOUR SOCIAL SECURITY NUMBER ON EACH DOCUMENT YOU SUBMIT TO THE DEPARTMENT. (TITLE 22, CALIFORNIA CODE OF REGULATIONS (CCR), SECTION 5008).

B. MAIL THE DE 1000M OR YOUR LETTER TO THE ADDRESS OF THE OFFICE LISTED ON THE FIRST PAGE OF THIS DECISION.

C. FILE YOUR APPEAL WITHIN THIRTY (30) DAYS OF THE MAIL DATE OF THIS NOTICE OR NO LATER THAN 10/25/17.

YOUR HANDBOOK, "A GUIDE TO BENEFITS AND EMPLOYMENT SERVICES," GIVES MORE INFORMATION ABOUT APPEALS. IF YOU DO NOT HAVE A HANDBOOK, YOU CAN READ OR ORDER THE HANDBOOK ONLINE BY VISITING THE DEPARTMENT'S WEBSITE AT WWW.EDD.CA.GOV. TO ORDER A HANDBOOK, VISIT WWW.EDD.CA.GOV/FORMS, ENTER PUBLICATION NUMBER "DE 1275A" IN THE FORM LOCATOR, AND FOLLOW THE ONLINE INSTRUCTIONS.

APPEAL INFORMATION:

WHEN YOUR APPEAL IS RECEIVED, YOUR CASE WILL BE REVIEWED. IF THE DECISION REMAINS THE SAME, THE DEPARTMENT WILL SEND YOUR APPEAL TO THE OFFICE OF APPEALS. IF YOU APPEAL AFTER THE 30 DAYS, YOU MUST INCLUDE THE REASON FOR THE DELAY. THE ADMINISTRATIVE LAW JUDGE WILL DETERMINE WHETHER YOU HAD GOOD CAUSE FOR THE DELAY. IF THE ADMINISTRATIVE LAW JUDGE DETERMINES YOU DID NOT HAVE GOOD CAUSE FOR SUBMITTING YOUR APPEAL LATE, YOUR APPEAL WILL BE DISMISSED.

THE OFFICE OF APPEALS WILL SEND YOU A LETTER WITH THE DATE, PLACE, AND TIME OF YOUR HEARING AND A PAMPHLET EXPLAINING APPEAL HEARING PROCEDURES. AT THE HEARING, THE ADMINISTRATIVE LAW JUDGE WILL LISTEN TO YOU, EXAMINE THE FACTS, AND ISSUE A DECISION. YOU MAY HAVE A REPRESENTATIVE OR SOMEONE ELSE HELP YOU DURING THE HEARING.

CONTINUING CERTIFICATION:

IF YOU ARE ELIGIBLE TO CONTINUE TO CERTIFY FOR BENEFITS WHILE YOU WAIT FOR THE ADMINISTRATIVE LAW JUDGE'S DECISION, THE DEPARTMENT WILL ISSUE CONTINUED CLAIM FORMS AND YOU MUST CONTINUE TO CERTIFY FOR BENEFITS ON TIME. IN SOME CASES, YOU WILL NOT BE ABLE TO CERTIFY FOR BENEFITS UNTIL THE ADMINISTRATIVE LAW JUDGE ISSUES A DECISION. IF THE ADMINISTRATIVE LAW JUDGE DECIDES YOU ARE ELIGIBLE FOR BENEFITS, THE DEPARTMENT WILL ISSUE CONTINUED CLAIM FORMS. BENEFITS CAN ONLY BE PAID FOR WEEKS THAT YOU HAVE CERTIFIED FOR BENEFITS AND ARE OTHERWISE ELIGIBLE TO RECEIVE BENEFIT PAYMENTS.

OTHER SERVICES:
VISIT WWW.EDD.CA.GOV FOR INFORMATION ABOUT (1) JOB REFERRALS,

**EDD**
**Employment Development Department**
State of California

ENGLISH 1-800-300-5616
SPANISH 1-800-326-8937
CANTONESE 1-800-547-3506
MANDARIN 1-866-303-0706
VIETNAMESE 1-800-547-2058
TTY (no voice) 1-800 815-9387
website: www.edd.ca.gov

VO IAA
0157
09/22/17

RECEIVED
OCT 18 2017
BY

**APPEAL FORM**

If you disagree with the Notice of Determination(s) and/or Determination(s)/Rulings by the EDD, you may appeal the decision(s) to the California Unemployment Insurance Appeals Board (CUIAB) by completing this form and explaining why you disagree. You must sign the form and return it to the EDD at the office address listed on the notice that you are appealing. **YOU HAVE 30 DAYS FROM THE MAIL DATE OF THE NOTICE TO FILE A TIMELY APPEAL.** If you appeal after the 30-day period, you must include the reason for the delay. The administrative law judge (ALJ) will determine whether you had good cause for the delay. If the ALJ determines you did not have good cause to submit your appeal late, your appeal will be dismissed.

**CLAIMANTS:** While your appeal is pending, **you must continue to certify for benefits.** If you are found eligible, you can be paid only for periods for which you have certified and have met all other eligibility requirements.

NOTE: Claimants for Disaster Unemployment Assistance (DUA) have 60 days to file an appeal. Employers appealing the *Notice of Determination or Assessment*, DE 3807, have 30 days to file an appeal.

**SECTION I APPELLANT INFORMATION**

**INSTRUCTIONS:** The following information must be provided by the Appellant (the claimant or employer who is appealing a notice), or by the authorized agent or representative of the Appellant. The signature of the Appellant or agent is required. Please use **BLACK INK** when filling out this form.

Claimant Name: _Tatyana Drevaleva_    Social Security Number:

Do you need a translator? ☐ Yes ☒ No  If yes, what language/dialect?

Appellant Address: _10660 Hidden Mesa Place_    Telephone No.: _(415) 806-9864_
_Monterey CA 93940_    Fax No.: ( ) -
E-mail Address: _tdrevaleva @ gmail. com_    Cell Phone No.: ( ) -

☒ I authorize the CUIAB to send confidential information regarding my appeal to the e-mail address listed above.

☒ I authorize the CUIAB to send confidential information regarding my appeal by text message or voice mail to the cell phone number listed above.

**Complete this section for employer appeals only**

Employer Account Number: _____  Agent Name (if applicable): _____

Agent Address: _____
Street No., Apt. No., or P.O. Box    City    State    ZIP Code

**SECTION II APPELLANT STATEMENT**

**INSTRUCTIONS:** Explain the reason for your appeal and why you disagree with the decision(s). If required, attach additional pages to this form and write your name and Social Security number on each page.

I disagree with the determination in the notice dated _09.25.17_ because _Before I left to Russia, I explained to a Manager that I needed to go to Russia for an IVF attempt. I got a verbal permission of an Assistant Manager to go to Russia for the IVF attempt. I provided the Manager and the Assistant Manager with documentation from my Russian ob/gyn. The Manager said that my application for leave without pay was denied only after I returned back to the USA. She never informed me about it when I was in Russia._

Signature of Appellant or Agent: _Tatyana Drevaleva_    Date: _10.13.2017_

DE 1000M Rev. 8 (6-15)    - Versión en español al dorso -    CU

509

I was hired for a full-time position at Raymond G. Murphy VAMC in Albuquerque, NM. I am a female 50 yo. I went to Russia for an IVF attempt because I don't have children and I wanted to have children. Before leaving, I informed my manager that I needed to go to Russia for a free IVF attempt. Also, I was running out of hormonal pills that were available in Russia and were not available in the USA. The manager requested a copy of medical documentation. I provided the manager with a copy of a document from my Russian OB/GYN that I was in registry for a free IVF attempt, and my turn in line came. I emailed this document to the manager prior to the departure. Also, I spoke to the assistant manager who verbally allowed me to go to Russia for an IVF attempt. I filled out a form (I don't have a copy of that form) where I requested leave without pay starting May 18th, 2017 to July 7th, 2017. The manager was not at her office at that time.

I emailed the document on Russian language prior to my departure. I couldn't wait more because I had only three hormonal pills left, and I couldn't stop taking them. I arrived at Russia and found a certified translating agency. They translated the document from my Russian physician, and I emailed it to the manager and the assistant manager. I didn't hear back from both of them.

After I arrived at Russia, things went on unpredictably. My OB/GYN ordered to have a full medical examination. I spent a few weeks to complete all tests. Afterwards, the doctor ordered to perform surgery to remove a polyp on the cervical canal. I did it. Afterwards, I waited for 7 days for the pathology result. Afterwards, the doctor ordered two hormonal tests which could be done only on the second day of the menstrual period. I needed to wait for another two weeks to be eligible to get these tests done. I requested a document from my physician that I needed to stay in Russia for a longer time because of these ordered hormonal tests. The physician issued this letter. I informed my manager in my email that I needed to stay in Russia for a longer time. As a response, I got a termination letter dated June 30th, 2017 – even prior to the July 7th when I initially planned to return back to the USA.

I stayed in Russia and performed the IVF attempt. Unfortunately, it was unsuccessful. I timely filed an informal EEO complaint . The VAMC scheduled the date of Mediation on September 7th. During the mediation, the manager said that my application for a leave without pay was denied by the Chief Nurse (if I described her title correctly) because I hadn't worked for 12 months prior to my leave according to FMLA. The manager said that the denial letter was mailed to my Albuquerque home postal address. Obviously, the manager knew that I was not in Albuquerque at that time I was in Russia and I didn't have a chance to read that mail. I asked why she didn't inform me in the email because she knew my private email address. She responded that, according to the policies of VAMC, she was supposed to mail the letter to my home postal address. She said that she hadn't emailed me this letter because it was not encrypted. This was not true because she emailed me the termination letter which was not encrypted.

The manager refused to take me back to work. Speaking with my former colleagues over the phone, I discovered that she hired two male employees to substitute me – 30 yo and 35 yo. Obviously, male employees will not have issues related to pregnancy. Moreover, they are much younger than I am.

I filed a formal EEO complaint. It will take time to proceed this complaint.

I believe that the manager discriminated me against my disability to give birth to children by a natural way. Also, she discriminated me against my age.

Respectfully submitted,

Tatyana Drevaleva

October 13th, 2017

*Tatyana Drevaleva*

510

EMPLOYMENT DEVELOPMENT DEPT
UI CENTER OAKLAND
PO BOX 2044
OAKLAND        CA 94604-2044

          N O T I C E   O F   D E T E R M I N A T I O N / R U L I N G

                                    DATE MAILED        09/25/17
                                    BENEFIT YEAR BEGAN 08/27/17


T E DREVALEVA           8530         EDD TELEPHONE NUMBERS:
10660 HIDDEN MESA PL                 ENGLISH      1-800-300-5616
MONTEREY        CA 93940-6631        SPANISH      1-800-326-8937
                                     CANTONESE    1-800-547-3506
                                     MANDARIN     1-866-303-0706
                                     VIETNAMESE   1-800-547-2058
                                     TTY          1-800-815-9387


                                     SSA NUMBER
YOU ARE NOT ELIGIBLE TO RECEIVE BENEFITS UNDER CALIFORNIA UNEMPLOYMENT
INSURANCE CODE SECTION 1256 BEGINNING 05/14/17 AND CONTINUING UNTIL YOU
RETURN TO WORK AFTER THE DISQUALIFYING ACT AND EARN $2250.00 OR MORE IN
BONA FIDE EMPLOYMENT, AND YOU CONTACT THE ABOVE OFFICE TO REOPEN YOUR
CLAIM.

YOU QUIT YOUR LAST JOB WITH RAYMOND G MURPHY VA BECAUSE OF HEALTH CONCERNS.
YOU HAD NO MEDICAL ADVICE TO QUIT.  AFTER CONSIDERING AVAILABLE
INFORMATION,  THE DEPARTMENT FINDS THAT YOU DO NOT MEET THE LEGAL
REQUIREMENTS FOR PAYMENT OF BENEFITS.  SECTION 1256 PROVIDES - AN
INDIVIDUAL IS DISQUALIFIED IF THE DEPARTMENT FINDS HE VOLUNTARILY QUIT HIS
MOST RECENT WORK WITHOUT GOOD CAUSE OR WAS DISCHARGED FOR MISCONDUCT FROM
HIS MOST RECENT WORK.  SECTION 1260A PROVIDES - AN INDIVIDUAL DISQUALIFIED
UNDER SECTION 1256 IS DISQUALIFIED UNTIL HE/SHE, SUBSEQUENT TO THE
DISQUALIFYING ACT, PERFORMS SERVICES IN BONA FIDE EMPLOYMENT FOR WHICH
HE/SHE RECEIVES REMUNERATION EQUAL TO OR IN EXCESS OF FIVE TIMES HIS OR HER
WEEKLY BENEFIT AMOUNT.

YOU ARE NOT ELIGIBLE TO RECEIVE BENEFITS UNDER CALIFORNIA UNEMPLOYMENT
INSURANCE CODE SECTION 1253C BEGINNING 08/27/17 AND ENDING WHEN THE
DISQUALIFYING CONDITIONS NO LONGER EXIST, AND YOU CONTACT THE ABOVE OFFICE
TO REOPEN YOUR CLAIM.

YOU ARE UNWILLING TO ACCEPT EMPLOYMENT FOR WHICH YOU ARE QUALIFIED BY
EXPERIENCE AND TRAINING.  AFTER CONSIDERING AVAILABLE INFORMATION, THE
DEPARTMENT FINDS THAT YOU DO NOT MEET THE LEGAL REQUIREMENTS FOR PAYMENT OF
BENEFITS.  SECTION 1253C PROVIDES - AN INDIVIDUAL IS ELIGIBLE FOR BENEFITS
IN A WEEK ONLY IF THE DEPARTMENT FINDS HE WAS ABLE TO WORK AND AVAILABLE
FOR WORK.

APPEAL:

YOU HAVE THE RIGHT TO FILE AN APPEAL IF YOU DO NOT AGREE WITH ALL OR PART

Appeal Documents for TATYANA-XXX-XX

511

OF THIS DECISION.

TO APPEAL, YOU MUST DO ALL OF THE FOLLOWING:

A. COMPLETE THE ENCLOSED APPEAL FORM (DE 1000M) OR WRITE A LETTER STATING
THAT YOU WANT TO APPEAL THIS DECISION.  IF YOU WRITE A LETTER TO APPEAL,
EXPLAIN THE REASON WHY YOU DO NOT AGREE WITH THE DEPARTMENT'S DECISION.
WRITE YOUR SOCIAL SECURITY NUMBER ON EACH DOCUMENT YOU SUBMIT TO THE
DEPARTMENT.  (TITLE 22, CALIFORNIA CODE OF REGULATIONS (CCR), SECTION
5008).

B. MAIL THE DE 1000M OR YOUR LETTER TO THE ADDRESS OF THE OFFICE LISTED ON
THE FIRST PAGE OF THIS DECISION.
C.  FILE YOUR APPEAL WITHIN THIRTY (30) DAYS OF THE MAIL DATE OF THIS
NOTICE OR NO LATER THAN 10/25/17.

YOUR HANDBOOK, "A GUIDE TO BENEFITS AND EMPLOYMENT SERVICES," GIVES MORE
INFORMATION ABOUT APPEALS. IF YOU DO NOT HAVE A HANDBOOK, YOU CAN READ OR
ORDER THE HANDBOOK ONLINE BY VISITING THE DEPARTMENT'S WEBSITE AT
WWW.EDD.CA.GOV. TO ORDER A HANDBOOK, VISIT WWW.EDD.CA.GOV/FORMS, ENTER
PUBLICATION NUMBER "DE 1275A" IN THE FORM LOCATOR, AND FOLLOW THE ONLINE
INSTRUCTIONS.

APPEAL INFORMATION:

WHEN YOUR APPEAL IS RECEIVED, YOUR CASE WILL BE REVIEWED. IF THE DECISION
REMAINS THE SAME, THE DEPARTMENT WILL SEND YOUR APPEAL TO THE OFFICE OF
APPEALS. IF YOU APPEAL AFTER THE 30 DAYS, YOU MUST INCLUDE THE REASON FOR
THE DELAY. THE ADMINISTRATIVE LAW JUDGE WILL DETERMINE WHETHER YOU HAD GOOD
CAUSE FOR THE DELAY. IF THE ADMINISTRATIVE LAW JUDGE DETERMINES YOU DID NOT
HAVE GOOD CAUSE FOR SUBMITTING YOUR APPEAL LATE, YOUR APPEAL WILL BE
DISMISSED.

THE OFFICE OF APPEALS WILL SEND YOU A LETTER WITH THE DATE, PLACE, AND TIME
OF YOUR HEARING AND A PAMPHLET EXPLAINING APPEAL HEARING PROCEDURES.  AT
THE HEARING, THE ADMINISTRATIVE LAW JUDGE WILL LISTEN TO YOU, EXAMINE THE
FACTS, AND ISSUE  A DECISION. YOU MAY HAVE A REPRESENTATIVE OR SOMEONE ELSE
HELP YOU DURING THE HEARING.

CONTINUING CERTIFICATION:

IF YOU ARE ELIGIBLE TO CONTINUE TO CERTIFY FOR BENEFITS WHILE YOU WAIT FOR
THE ADMINISTRATIVE LAW JUDGE'S DECISION, THE DEPARTMENT WILL ISSUE
CONTINUED CLAIM FORMS AND YOU MUST CONTINUE TO CERTIFY FOR BENEFITS ON
TIME. IN SOME CASES, YOU WILL NOT BE ABLE TO CERTIFY FOR BENEFITS UNTIL THE
ADMINISTRATIVE LAW JUDGE ISSUES A DECISION. IF THE ADMINISTRATIVE LAW JUDGE
DECIDES YOU ARE ELIGIBLE FOR BENEFITS, THE DEPARTMENT WILL ISSUE CONTINUED
CLAIM FORMS. BENEFITS CAN ONLY BE PAID FOR WEEKS THAT YOU HAVE CERTIFIED
FOR BENEFITS AND ARE OTHERWISE ELIGIBLE TO RECEIVE BENEFIT PAYMENTS.

OTHER SERVICES:
VISIT WWW.EDD.CA.GOV FOR INFORMATION ABOUT (1) JOB REFERRALS,
(2) DISABILITY INSURANCE, (3) OTHER EDD SERVICES (4) SERVICES OFFERED BY
OTHER AGENCIES.

DE1080 CZ  REV. 1 (06-05)                        (ERE)

Appeal Documents for TATYANA-XXX-XX-

512

EMPLOYMENT DEVELOPMENT DEPT
UI CENTER OAKLAND
PO BOX 2044
OAKLAND        CA 94604-2044

NOTICE  OF  DETERMINATION / RULING

DATE MAILED        09/25/17
BENEFIT YEAR BEGAN 08/27/17

RAYMOND G MURPHY VA        8530
1501 SAN PEDRO SE
ALBUQUERQUE    MN 87108

EDD TELEPHONE NUMBERS:
ENGLISH        1-800-300-5616
SPANISH        1-800-326-8937
CANTONESE      1-800-547-3506
MANDARIN       1-866-303-0706
VIETNAMESE     1-800-547-2058
TTY            1-800-815-9387

CONCERNING THE UNEMPLOYMENT INSURANCE CLAIM OF:

T E DREVALEVA
SSN

YOU PROVIDED INFORMATION REGARDING THE ELIGIBILITY OF THE CLAIMANT NAMED
ABOVE UNDER CALIFORNIA UNEMPLOYMENT INSURANCE CODE (CUIC) SECTION 1256 AND
SECTION 1253C.  WE HAVE CONSIDERED ALL OF THE AVAILABLE FACTS AND REACHED
THE CONCLUSION STATED BELOW.  PLEASE DO NOT RESUBMIT THE SAME ELIGIBILITY
INFORMATION IN REPLY TO ANY FUTURE CLAIMS NOTICES.  THIS DECISION IS FINAL
UNLESS MODIFIED, RECONSIDERED, OR APPEALED.  WE HAVE INFORMED THE CLAIMANT
OF THE FOLLOWING RESULTS:

"YOU ARE NOT ELIGIBLE TO RECEIVE BENEFITS UNDER CALIFORNIA UNEMPLOYMENT
INSURANCE CODE SECTION 1256 BEGINNING 05/14/17 AND CONTINUING UNTIL YOU
RETURN TO WORK AFTER THE DISQUALIFYING ACT AND EARN $2250.00 OR MORE IN
BONA FIDE EMPLOYMENT, AND YOU CONTACT THE ABOVE OFFICE TO REOPEN YOUR
CLAIM."

"YOU QUIT YOUR LAST JOB WITH RAYMOND G MURPHY VA BECAUSE OF HEALTH
CONCERNS.  YOU HAD NO MEDICAL ADVICE TO QUIT.  AFTER CONSIDERING AVAILABLE
INFORMATION,  THE DEPARTMENT FINDS THAT YOU DO NOT MEET THE LEGAL
REQUIREMENTS FOR PAYMENT OF BENEFITS."
"YOU ARE NOT ELIGIBLE TO RECEIVE BENEFITS UNDER CALIFORNIA UNEMPLOYMENT
INSURANCE CODE SECTION 1253C BEGINNING 08/27/17 AND ENDING WHEN THE
DISQUALIFYING CONDITIONS NO LONGER EXIST, AND YOU CONTACT THE ABOVE OFFICE
TO REOPEN YOUR CLAIM."

"YOU ARE UNWILLING TO ACCEPT EMPLOYMENT FOR WHICH YOU ARE QUALIFIED BY
EXPERIENCE AND TRAINING.  AFTER CONSIDERING AVAILABLE INFORMATION, THE
DEPARTMENT FINDS THAT YOU DO NOT MEET THE LEGAL REQUIREMENTS FOR PAYMENT OF
BENEFITS."

YOUR RESERVE ACCOUNT WILL NOT BE SUBJECT TO CHARGES FOR THIS PERIOD OF

513

UNEMPLOYMENT.

SEPARATION DATE: 05/17/17
RESERVE ACCOUNT NUMBER: 0160411-5

APPEAL:

YOU HAVE THE RIGHT TO FILE AN APPEAL IF YOU DO NOT AGREE WITH ALL OR PART
OF THIS DECISION.

TO APPEAL, YOU MUST DO ALL OF THE FOLLOWING:

A. COMPLETE THE ENCLOSED APPEAL FORM (DE1000M) OR WRITE A LETTER STATING
THAT YOU WANT TO APPEAL THIS DECISION.  IF YOU WRITE A LETTER TO APPEAL,
EXPLAIN WHY YOU DO NOT AGREE WITH THE DEPARTMENT'S DECISION. WRITE THE
CLAIMANT'S NAME AND SOCIAL SECURITY NUMBER ON EACH DOCUMENT YOU SUBMIT TO
THE DEPARTMENT (TITLE 22, CALIFORNIA CODE OF REGULATIONS, SECTION 5008).

B. MAIL THE DE 1000M OR YOUR LETTER TO THE ADDRESS OF THE OFFICE LISTED ON
THE FIRST PAGE OF THIS DECISION.

C.  FILE YOUR APPEAL WITHIN THIRTY (30) DAYS OF THE MAIL DATE OF THIS
NOTICE OR NO LATER THAN 10/25/17.

APPEAL INFORMATION:

WHEN YOUR APPEAL IS RECEIVED, YOUR CASE WILL BE REVIEWED. IF THE DECISION
REMAINS THE SAME, THE DEPARTMENT WILL SEND YOUR APPEAL TO THE OFFICE OF
APPEALS. IF YOU APPEAL AFTER THE 30 DAYS, YOU MUST INCLUDE THE REASON FOR
THE DELAY. THE ADMINISTRATIVE LAW JUDGE WILL DETERMINE WHETHER YOU HAD GOOD
CAUSE FOR THE DELAY. IF THE ADMINISTRATIVE LAW JUDGE DETERMINES YOU DID NOT
HAVE GOOD CAUSE FOR SUBMITTING YOUR APPEAL LATE, YOUR APPEAL WILL BE
DISMISSED.

THE OFFICE OF APPEALS WILL SEND YOU A LETTER WITH THE DATE, PLACE, AND TIME
OF YOUR HEARING AND A PAMPHLET EXPLAINING APPEAL HEARING PROCEDURES.  AT
THE HEARING, THE ADMINISTRATIVE LAW JUDGE WILL LISTEN TO YOU, EXAMINE THE
FACTS, AND ISSUE  A DECISION. YOU MAY HAVE A REPRESENTATIVE OR SOMEONE ELSE
HELP YOU DURING THE HEARING.

DE1080 EZ  REV. 1 (06-05)                    (ERE)

Appeal Documents for TATYANA-XXX-XX-

514



Employment
Development
Department
State of California

## VQ RECORD OF CLAIM STATUS INTERVIEW VOLUNTARY QUIT (VQ)

Date of Interview _09-20-17_

1. **SSN** _____  2. **Claimant's Last Name** DREVALEVA 8-10am IDD

3. **BYB** 08-27-17 _____  4. **Affected Week(s)** 2we 09/09/17 _____

5. **Potentially Disqualifying Facts** VQ Reason medical trip to Russia _____

6. **Check if Applicable**
   ☐ Information Only   ☐ Pre-Appeal   ☐Re-Det.

7. **Documents Made Part of Record**
   ☐ ER Pro Dated _____   ☐ 1173 Dated _____   ☒ Other aa2403 _____

8. **ATTEMPTS TO REACH CLAIMANT:**

   Phone No.: 415 806 9864 _____   Time Called: 9:40am   ☐ Will Call-Time Clmt Called: _____

   **Results of Call:**

   · ☒ Reached Clmt   ☐ Busy   ☐ Disconnected/Wrong #   ☐ No Answer

   **Or Left Message:**
   ☐ On Machine OR
   ☐ with a **Responsible Party:** Name _____   Relationship _____

   ☐ For clmt to refer to the Notice Of Appointment, DE 4800 and decision will be based on available information.

   ☐ For clmt to return call by: Date: _____ Time: _____ or a decision will be made based on available information.

   Call returned?
   ☐ **NO**, as of Date: _____ Time: _____
   ☐ **OR YES**, Date: _____ Time call returned: _____

   ☐ DE 4365 sent on: Date: _____ Suspense Date: _____ ☐ No Response

9. **CLAIMANT INFORMATION:**

   ☒ Verified last employer - Name RAYMOND G MURPHY VA

   LDW: 05/17/17   Job Title monitor technician

   Duration 1.5 mo   Rate of Pay $ 19.65   Per hr

   **WHEN** did clmt quit? Date 05/17/17

   **WHO** did clmt tell? Name Mr Johnson Title: mgr

   **HOW** did clmt notify ER of the quit? ☒ In person ☐ By phone ☐ Other _____

   **WHY** Record the clmt's **Primary Reason** for quitting. Document specific dates and facts of **FINAL INCIDENT.** I had started a new job but had to go to Russia for medical reasons and I had gotten permission from one of the mgrs but another mgr (who was my supervisor and was out of town when I was notified) had me terminated. I think it was retaliation against me. I had gone to Russia for IVF treatment and I had been on a waiting list and I let my employer know when I was notified. As soon as I was given the ok from Russia I told my ER and got verbal permission from Mr F Johnson, field mgr (it was witnessed by coworker). Carla Dunkelburgur, my supervisor was the manager who fired me. She told me that if I brought medical documentation to prove my treatment that I would be ok. I also sent email to mgmt to let them know how to contact me while I was out of the country. I found out that they sent paperwork to my home address, not to email. I was also told that the Doctor was the one who denied me. I have gone through mediation but they will not take me back. I have

515

filed a complaint with EEOC. They stated that I had not worked there long enough to qualify for FMLA but I think they discriminated against me as potential mother (pregnancy act). Ms Dunkelburgur contacted me at home address while I was out of the country and that the reason that I was really terminated was job abandonment. (05/15/17 - 08/17/17).

**WHAT** steps did clmt take to preserve his/her job? (i.e., LOA, transfer, grievance, discuss problem with employer) I did ask about leave but was told that I had not been there long enough and I could not wait another year for the IVF treatment.

IF NONE, WHY NOT? _____

10. **ATTEMPTS TO REACH EMPLOYER/AGENT:**

ER name: RAYMOND G MURPHY VA      Agent Name: _____

Phone No.: ER 505-265-1711    Agent    **x** _____

Date Called: 09/20/17    Time Called: 9:45am   ; _____

**Results of Call:**

☐ Reached ER    ☐ Busy    ☐ Disconnected/Wrong #    ☐ No Answer

**Or Left Message:**

☒ On Machine OR

☐ with a **Responsible Party:** Name: _____ Title: _____

☒ For ER to return call by: Date: 09/22/17   Time: 10am    or a decision will be made based on available information.

Call returned?
☒ NO, as of Date: 09/22/17   Time: noon _____
☐ YES, Date: _____ Time call returned: _____

☐ DE 4463 or ☐ DE 6363 sent on: Date: _____ Suspense Date: _____ ☐ No Response

11. **EMPLOYER/AGENT INFORMATION:**

Date: _____ Time: _____

Spoke with:

☐ ER

☐ Agent Name Contact _____ Clmt's Job Title _____

   Duration _____ Rate of Pay $ _____ Per _____

**WHEN** did the clmt quit? Date _____ **LDW** _____

**WHO** did clmt tell he/she was quitting? Name _____ Title _____

**HOW** did clmt quit? ☐ In person ☐ By phone ☐ Other _____

**WHY** did clmt quit? What reason(s) did clmt give, **FINAL INCIDENT?** _____

**WHAT** steps did clmt take to preserve his/her job? (LOA, transfer, grievance, etc.) _____

12. **ATTEMPTS TO RESOLVE CONFLICTING INFORMATION OR OBTAIN INFORMATION FROM OTHER SOURCES:**

☐ Clmt    ☐ ER    ☐ Other (Name/Title/Ph #): _____

Date Called: _____ Time Called: _____

**Results of Call:**
Reached    ☐ Clmt    ☐ ER    ☐ Other or    ☐ Busy    ☐ Disconnected/Wrong #    ☐ No Answer

**Or Left Message:**

516

☐ On Machine **OR**
☐ with a **Responsible Party**: Name: _____ Title/Relationship: _____

☐ To return call by: Date: _____ Time: _____ or a decision will be made based on available information.

Call returned?
☐ **NO**, as of Date: _____ Time: _____
☐ OR **YES**, Date: _____ Time call returned: _____

☐ DE 4463 or ☐ DE 6363 sent on: Date: _____ Suspense Date: _____ ☐ No Response

---

13. <u>SUMMARY OF MATERIAL FACTS AND REASON FOR DECISION</u>:

clmt quit her job 05/17/17 due to medical issues (per clmt she was really fired for job abandonment although she stated that she left for medical issues). clmt had to go back to Russia for medical treatments (IVF) and she states that although she knew that she did not qualify for a leave due to shortness of work history (1.5mo) she got verbal permission from a manager (not her supervisor who was on vacation) to go to Russia for medical treatments. Clmt states that she was gone 4 mo. Clmt did not present doctors notes until after she came back. ER was contacted for phone interview but did not respond.

R/D - based on limited info, the dept finds the clmt did not have a compelling reason to quit (desire for children is commendable but not compelling) and clmt did not attempt to preserve her job. The dept finds the clmt is disqualified from receiving benefits under section 1256 of CUIC.

**LEGAL RESULTS** Under Section 1256 of the UI Code, clmt is ☐ VQ Eligible ☒ VQ Disqualified. RD VQ235A _____

ER/Agent Address 1501 SAN PEDRO SE _____ ALBUQUERQUE ___ MN 87108 _____

ER Acct. No. 0160411 _____

Decision Made On Date 09/22/17 Time 2pm_____

ER _____

Department Representative

☐ **Best Resolved at Appeal**

☐ **Reviewed & Affirmed**

_____ **(initials)**

---

517

**Exhibit 4.**

Communications with potential employers.



**Tatyana Drevaleva <tdrevaleva@gmail.com>**

## Monitor Technician / Unit Clerk - Med-Surg / Telemetry (PT/40) at Central Valley>Sutter Tracy Community Hospital

**Human Resources** <hr-sutterhealth@invalidemail.com>                    Tue, Jul 17, 2018 at 3:05 PM
To: tdrevaleva@gmail.com



July 17, 2018

Re: Application for Requisition #STCH-1808700

Hello Tatyana Evgenievna Drevaleva,

Thank you for applying to Sutter Health and expressing your interest in joining our pioneering team that proudly cares for more than 3 million of our neighbors across Northern California.

Sutter Health is always looking for qualified people, and although the position has been filled and is no longer available, we want to encourage you to continue to consider Sutter Health for employment opportunities.

There are several things you can do right now to better assist you in pursuing other employment opportunities at Sutter Health.

- Continually visit our career site for positions you are interested in and qualified for.
- Be the first to know about positions by setting up alerts on your candidate profile so you are notified when we are looking for an exceptional candidate like you.
- Stay connected- Follow us on Facebook, Twitter and LinkedIn to learn about the many innovative ways we make a difference in the lives of the people of Northern California.

Sutter Health is always searching for new pathways and breakthrough on the frontiers of medicine, health technology and patient care. Our not-for-profit network of hospitals and care centers is expanding and warmly welcomes talented, compassionate people dedicated to providing exceptional care and service.

Again, thank you for your application, and we hope you will continue to think of Sutter Health as part of your career endeavors.

Warm Regards,

Sutter Health Recruitment

---



**this_message_in_html.htm**
3K

519

 **Gmail**

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

**Kaiser Permanente - RESPONSE REQUIRED for Monitor Technician position - 636381 - AB - DUE BY 8/3/2018**

---

**Recruitment Services** <Recruitment-Services@kp.org>                    Wed, Aug 1, 2018 at 8:20 AM
To: tdrevaleva@gmail.com

Dear Valued Candidate,

Thank you for your expressed interest in the above mentioned position.  The position details are:

- **Title:** Monitor Technician
- **Department:** 5 West Neuro Med-Surg and Telemetry
- **Status:** Call-in/On-Call
- **Shift:** Day
- **Working Days:** Monday - Sunday, 7:30 AM- 8:00 PM
- **Location:** 4867 W. Sunset Blvd. Los Angeles 90027

 * READ, FOLLOW, AND COMPLETE **ALL** INSTRUCTIONS LISTED BELOW ON OR BEFORE **THE DUE DATE NOTED IN THE SUBJECT LINE OF THIS EMAIL** IN ORDER TO CONTINUE BEING

520

# CONSIDERED FOR THIS POSITION.

**Step 1: <u>CANDIDATE SNAPSHOT</u>**

- **STOP!** Make sure your **NAME** is noted on the Candidate Snapshot so you are easily identified by the recruiter.

- Please **DO NOT** reply to this email directly. Instead, forward this email to <u>SCAL-TA-Support@kp.org</u> with your completed Candidate Snapshot attached. Please complete the attached form in its entirety.  Provide a brief, to the point response for each question indicated. "See resume" is **NOT** acceptable.

- Microsoft Word or PDF documents are acceptable. Please save the document in the following format: **Last Name, First**

521

**Name_position_job number (i.e. Doe, John_Manager_12345)**

- (We will only accept Microsoft Word or PDF document attachments. DO NOT provide a Google Docs link. DO NOT change the subject line when replying to this email.)

- **Review your online KP profile to ensure that <u>all your information is accurate and updated</u>:**
    - Work experience (List only employment history that can be verified)
    - Dates of employment
    - Education (List only degrees that can be verified)
    - Certifications/Licenses (Upload required Certifications/Licenses as attachments. PSV not required)

- If the "required" license/certifications are not uploaded, it may exclude you as a candidate.
- **Please be sure that the resume attached to your online profile is current and outlines the last 10 years of your employment history.**

**Step 2: UPLOAD LICENSES/CERTIFICATES**

Please upload a copy of all required licenses/certificates for this position to your profile on the KP Careers Website. Follow the steps below:

1. Visit our Careers Website: **www.kaiserpermanentejobs.org**
2. Click on the "My Profile" blue tab located at the top of the page.
3. In the "My Account" page, read the "Acknowledgement" statement and answer accordingly
4. You should now be directed to the Login page where you may

523

enter your User name and Password

5. Once you have signed in, click on the "Access my profile" link on the right side of the page

6. Ensure that all your License/Certification information is detailed in the "Personal Information" section. (Issue/Expiration date, License/Certification number, etc)

7. Edit the "Attach a File" section of your profile.

8. Click "Choose File" and select the document you would like to upload.

9. In the "Comments about the file" field box, please type "Certificates"

10. Click "Attach" (Please ensure that the attachment includes both the

**front** and **back** of the **signed** license/certificate.)  Your attached documents must be clear and legible.

11. Once you are done uploading your documents, click "Save and Continue" at the bottom of the page

12. Once you arrive at your Summary page, please click "Submit"

13. The system will **<u>ONLY</u>** accept **Microsoft Word** or **PDF** documents as attachments. JPEG files will **<u>NOT</u>** be accepted and need to be converted into **PDF** documents or pasted on a **Microsoft Word** document in order to be attached.

\* Failure to complete these requirements within the specified time will automatically eliminate you from the selection process. Upon review of your completed Candidate Snapshot, if you are determined to be a prevailing candidate, you may be contacted for further consideration.

Best Regards,

Kaiser Permanente
SCAL Talent Acquisition Support
Email: SCAL-TA-Support@kp.org

Careers Website: www.jobs.kp.org

**3 attachments**

 **Monitor Tech_636381_Candidate Snapshot.docx**
38K

**Instructions for Attaching License and Cards.pdf**
802K

**this_message_in_html.html**
17K



**Tatyana Drevaleva <tdrevaleva@gmail.com>**

## Branch Office Interview Confirmation

**Terence Morales** <terencem@careindeed.com>                    Fri, Aug 3, 2018 at 5:12 PM
To: "tdrevaleva@gmail.com" <tdrevaleva@gmail.com>, "terencem@careindeed.com"
<terencem@careindeed.com>, "humanresources@careindeed.com" <humanresources@careindeed.com>





Dear Tatyana,

Thank you for your interest in Care Indeed. We are actively looking for dedicated and compassionate Caregivers like you to serve our clients.

We would like to invite you to our office to complete the application and for an interview scheduled on **8/9/2018 1:00 PM at 102 S. El Camino Real, San Mateo, CA 94401.**

In addition to, kindly fill out the online application prior to coming to the office in the link provided: SMO HM: https://workforcenow.adp.com/jobs/apply/posting.html? client=careindeed&jobId=40280& lang=en_US&source=CC2.

Please bring the following required documents:

1. State Issued Driver's License or ID (Original)
2. Social Security Card (Original)
3. If you don't have number 1 AND 2 you must provide Passport or Permanent Resident Card (Original)
4. TB test or Chest X-Ray result (TB test must be 90 days new; Chest X-Ray must be 18 months new)
5. CPR or First Aid Certificate
6. Flu Shot (fall/winter season)

*We Are Changing Home Care Through Kindness*

*More than anything, how we treat each other is what matters the most. At Care Indeed, kindness is a workplace policy. Kindness is having a deep understanding of what our clients need: the need to be cared for with love and compassion. Kindness is knowing what our caregivers want: a workplace where they can continue to grow and be treated like family. This is how we make a difference, one client at a time, one caregiver at a time.*

527

7. Auto Policy (for Drivers)

8. A copy of your Resume

9. (3) Three Professional References

10. Any other Certificates or License (RN, LVN, CNA, HHA)

Dress Code: Business Casual

Sincerely,

Terence Morales
Talent Acquisition Recruiter

Care Indeed, Inc.
www.careindeed.com
890 Santa Cruz Ave.
Menlo Park, CA 94025

Direct/SMS: +1 4089339841
Office: (844) 600-5627
24/7 Toll free: 8775043822
Fax: (888) 401-7847

   

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

 **Tatyana Drevaleva <tdrevaleva@gmail.com>**

## Healthcare Technician - eICU / Central Monitoring (Part Time / Evenings) at Sacramento Metropolitan>Sutter Valley Hospital

**Human Resources** <hr-sutterhealth@invalidemail.com>                    Wed, Jul 11, 2018 at 11:35 AM
To: tdrevaleva@gmail.com



July 11, 2018

Re: Application for Requisition #SVH-1810348

Hello Tatyana Evgenievna Drevaleva,

Thank you for applying to Sutter Health and expressing your interest in joining our pioneering team that proudly cares for more than 3 million of our neighbors across Northern California.

Sutter Health is always looking for qualified people, and although the position has been filled and is no longer available, we want to encourage you to continue to consider Sutter Health for employment opportunities.

There are several things you can do right now to better assist you in pursuing other employment opportunities at Sutter Health.

- Continually visit our career site for positions you are interested in and qualified for.
- Be the first to know about positions by setting up alerts on your candidate profile so you are notified when we are looking for an exceptional candidate like you.
- Stay connected- Follow us on Facebook, Twitter and LinkedIn to learn about the many innovative ways we make a difference in the lives of the people of Northern California.

Sutter Health is always searching for new pathways and breakthrough on the frontiers of medicine, health technology and patient care. Our not-for-profit network of hospitals and care centers is expanding and warmly welcomes talented, compassionate people dedicated to providing exceptional care and service.

Again, thank you for your application, and we hope you will continue to think of Sutter Health as part of your career endeavors.

Warm Regards,

Sutter Health Recruitment

 **this_message_in_html.htm**
3K

 **Gmail**

**Tatyana Drevaleva <tdrevaleva@gmail.com>**

## Outcome of your referral for the position of Medical Instrument Technician (EKG), CBAL-10231282-18-AG

**usastaffingoffice@opm.gov** <usastaffingoffice@opm.gov>
Reply-To: Arturo.Guntin@va.gov
To: tdrevaleva@gmail.com

Tue, Jun 26, 2018 at 11:30 AM

Dear Tatyana Drevaleva,

Thank you for your interest in Federal employment with the Syracuse VA Medical Center.

We regret to inform you that you were not selected for the position of:

- GS-0649-00 in Syracuse, New York

Another candidate has been selected. If you have any questions regarding this notice, contact Arturo Guntin at (315) 425-4400 or Arturo.Guntin@va.gov.

We appreciate your interest in employment with the Department of Veterans Affairs and encourage you to visit https://www.usajobs.gov/ to view and apply for other employment opportunities.

530

 **Gmail**

Tatyana Drevaleva <tdrevaleva@gmail.com>

## Outcome of your referral for the position of Medical Instrument Technician (EKG), CBAL-10231282-18-AG

**Tatyana Drevaleva** <tdrevaleva@gmail.com>
To: Arturo.Guntin@va.gov

Tue, Jun 26, 2018 at 12:19 PM

Mr. Guntin,

Could you, please, give me the explanations about why I was not selected for the position of a Medical Instrument Technician (EKG) without even a job interview?
Please, give me a written explanation.
You can also contact me using my cell phone number 415-806-9864.
Thank you,
Respectfully,

Tatyana Drevaleva.
[Quoted text hidden]
--
Respectfully,
Tanya.

531

 **Gmail**

**Tatyana Drevaleva <tdrevaleva@gmail.com>**

## Outcome of your referral for the position of Medical Instrument Technician (EKG), CBAL-10231282-18-AG

**Guntin, Arturo** <Arturo.Guntin@va.gov>                    Tue, Jun 26, 2018 at 1:10 PM
To: Tatyana Drevaleva <tdrevaleva@gmail.com>

Good afternoon Ms. Drevaleva:

It is up to the hiring managers to interview or not the candidates based on the resumes acquired through the list. Please keep applying and good luck the next time.


Thank you


*Arturo Guntin*

*Human Resources Specialist*

*Department of Veterans Affairs*

*Veterans Health Administration*

*800 Irving Avenue, Syracuse NY 13210*

*Phone: 315-425-4400 ext 54632*

*Fax: (315)425-2447*



**From:** Tatyana Drevaleva [mailto:tdrevaleva@gmail.com]
**Sent:** Tuesday, June 26, 2018 3:20 PM
**To:** Guntin, Arturo
**Subject:** [EXTERNAL] Fwd: Outcome of your referral for the position of Medical Instrument Technician (EKG), CBAL-10231282-18-AG

[Quoted text hidden]

532



**Tatyana Drevaleva <tdrevaleva@gmail.com>**

---

## Cardiac Laboratory Technician- Cardiology- Santa Cruz at San Francisco-South Bay/Peninsula Coast>Palo Alto Medical Foundation

**Human Resources** <hr-sutterhealth@invalidemail.com>                    Mon, Jun 25, 2018 at 9:26 AM
To: tdrevaleva@gmail.com



June 25, 2018

Re: Application for Requisition #PAMF- 1807602

Hello Tatyana Evgenievna Drevaleva,

Thank you for applying to Sutter Health and expressing your interest in joining our pioneering team that proudly cares for more than 3 million of our neighbors across Northern California.

Sutter Health is always looking for qualified people, and although the position has been filled and is no longer available, we want to encourage you to continue to consider Sutter Health for employment opportunities.

There are several things you can do right now to better assist you in pursuing other employment opportunities at Sutter Health.

- Continually visit our career site for positions you are interested in and qualified for.
- Be the first to know about positions by setting up alerts on your candidate profile so you are notified when we are looking for an exceptional candidate like you.
- Stay connected- Follow us on Facebook, Twitter and LinkedIn to learn about the many innovative ways we make a difference in the lives of the people of Northern California.

Sutter Health is always searching for new pathways and breakthrough on the frontiers of medicine, health technology and patient care. Our not-for-profit network of hospitals and care centers is expanding and warmly welcomes talented, compassionate people dedicated to providing exceptional care and service.

Again, thank you for your application, and we hope you will continue to think of Sutter Health as part of your career endeavors.

Warm Regards,

Sutter Health Recruitment

---


**this_message_in_html.htm**
3K

533

 **Gmail**

**Tatyana Drevaleva <tdrevaleva@gmail.com>**

## HPMC - We received your application

**melissa.sanabria@hpmedcenter.com** <melissa.sanabria@hpmedcenter.com>    Sat, Jun 9, 2018 at 11:14 PM
To: tdrevaleva@gmail.com

Thank you for your recent interest in employment opportunities at Hollywood Presbyterian Medical Center. We have received your application.

Due to the large volume of applications processed it is not possible to contact every individual. We ask your patience while your application is being evaluated. An applicant will receive an initial phone call only when selected for an interview.

We appreciate your interest in working at Hollywood Presbyterian Medical Center and wish you success in attaining your employment goals.

Hollywood Presbyterian Medical Center
Human Resources

534

 **Gmail**

**Tatyana Drevaleva <tdrevaleva@gmail.com>**

## Monitor Technician / Unit Clerk - Med-Surg / Telemetry (PT/40) at Sutter Health

**Human Resources** <hr-sutterhealth@invalidemail.com>          Sat, Jun 9, 2018 at 6:06 PM
To: Tatyana Drevaleva <tdrevaleva@gmail.com>



Re: Application for Requisition #STCH-1808700

Hello Tatyana Evgenievna Drevaleva,

We really want to thank you for applying to Sutter Health and your interest in joining our team that proudly cares for more than 3 million of our neighbors. We have received your application, and are currently reviewing your qualifications and experience. If you are a match for the role, a member of our recruiting team will be in touch with you to discuss next steps. For information regarding the status of your application, please log into your candidate account and view your submission under the MyJob Folder tab.

In the meantime, keep in touch! Follow us on Facebook, Twitter and LinkedIn to learn about the many innovative ways we make a difference in the lives of the people in our local communities.

Again, thank you for your application and we hope to be in contact with you soon.

Warm regards,

Sutter Health Recruitment

---

 **this_message_in_html.htm**
2K

535



**Tatyana Drevaleva <tdrevaleva@gmail.com>**

## Cardiac Device Technician Santa Rosa Full Time at Sutter Health

**Human Resources** <hr-sutterhealth@invalidemail.com>        Sat, Jun 9, 2018 at 6:00 PM
To: Tatyana Drevaleva <tdrevaleva@gmail.com>



Re: Application for Requisition #SPMF-1803551

Hello Tatyana Evgenievna Drevaleva,

We really want to thank you for applying to Sutter Health and your interest in joining our team that proudly cares for more than 3 million of our neighbors. We have received your application, and are currently reviewing your qualifications and experience. If you are a match for the role, a member of our recruiting team will be in touch with you to discuss next steps. For information regarding the status of your application, please log into your candidate account and view your submission under the MyJob Folder tab.

In the meantime, keep in touch! Follow us on Facebook, Twitter and LinkedIn to learn about the many innovative ways we make a difference in the lives of the people in our local communities.

Again, thank you for your application and we hope to be in contact with you soon.

Warm regards,

Sutter Health Recruitment

 **this_message_in_html.htm**
2K

536



**Tatyana Drevaleva <tdrevaleva@gmail.com>**

## Cardiac Laboratory Technician- Cardiology- Santa Cruz at Sutter Health

**Human Resources** <hr-sutterhealth@invalidemail.com>                    Sat, Jun 9, 2018 at 5:54 PM
To: Tatyana Drevaleva <tdrevaleva@gmail.com>



Re: Application for Requisition #PAMF- 1807602

Hello Tatyana Evgenievna Drevaleva,

We really want to thank you for applying to Sutter Health and your interest in joining our team that proudly cares for more than 3 million of our neighbors. We have received your application, and are currently reviewing your qualifications and experience. If you are a match for the role, a member of our recruiting team will be in touch with you to discuss next steps. For information regarding the status of your application, please log into your candidate account and view your submission under the MyJob Folder tab.

In the meantime, keep in touch! Follow us on Facebook, Twitter and LinkedIn to learn about the many innovative ways we make a difference in the lives of the people in our local communities.

Again, thank you for your application and we hope to be in contact with you soon.

Warm regards,

Sutter Health Recruitment

---


**this_message_in_html.htm**
2K

537



**Tatyana Drevaleva <tdrevaleva@gmail.com>**

## EKG Technician - Summit EKG Department (On Call, Day) at Sutter Health

**Human Resources** <hr-sutterhealth@invalidemail.com>                    Fri, Jun 8, 2018 at 8:31 PM
To: Tatyana Drevaleva <tdrevaleva@gmail.com>



Re: Application for Requisition #ABSMC - 1809563

Hello Tatyana Evgenievna Drevaleva,

We really want to thank you for applying to Sutter Health and your interest in joining our team that proudly cares for more than 3 million of our neighbors. We have received your application, and are currently reviewing your qualifications and experience. If you are a match for the role, a member of our recruiting team will be in touch with you to discuss next steps. For information regarding the status of your application, please log into your candidate account and view your submission under the MyJob Folder tab.

In the meantime, keep in touch! Follow us on Facebook, Twitter and LinkedIn to learn about the many innovative ways we make a difference in the lives of the people in our local communities.

Again, thank you for your application and we hope to be in contact with you soon.

Warm regards,

Sutter Health Recruitment

---



**this_message_in_html.htm**
2K

538



**Tatyana Drevaleva <tdrevaleva@gmail.com>**

## Cardiology Technician II-Cardiology/EKG (Part Time, Day) at Sutter Health

**Human Resources** <hr-sutterhealth@invalidemail.com>                    Thu, Jun 7, 2018 at 10:47 PM
To: Tatyana Drevaleva <tdrevaleva@gmail.com>



Re: Application for Requisition #ABSMC-1808223

Hello Tatyana Evgenievna Drevaleva,

We really want to thank you for applying to Sutter Health and your interest in joining our team that proudly cares for more than 3 million of our neighbors. We have received your application, and are currently reviewing your qualifications and experience. If you are a match for the role, a member of our recruiting team will be in touch with you to discuss next steps. For information regarding the status of your application, please log into your candidate account and view your submission under the MyJob Folder tab.

In the meantime, keep in touch! Follow us on Facebook, Twitter and LinkedIn to learn about the many innovative ways we make a difference in the lives of the people in our local communities.

Again, thank you for your application and we hope to be in contact with you soon.

Warm regards,

Sutter Health Recruitment

---


**this_message_in_html.htm**
2K

539

 **Tatyana Drevaleva <tdrevaleva@gmail.com>**

## Healthcare Technician - eICU / Central Monitoring (Part Time / Evenings) at Sutter Health

**Human Resources** <hr-sutterhealth@invalidemail.com>          Thu, Jun 7, 2018 at 10:43 PM
To: Tatyana Drevaleva <tdrevaleva@gmail.com>



Re: Application for Requisition #SVH-1810348

Hello Tatyana Evgenievna Drevaleva,

We really want to thank you for applying to Sutter Health and your interest in joining our team that proudly cares for more than 3 million of our neighbors. We have received your application, and are currently reviewing your qualifications and experience. If you are a match for the role, a member of our recruiting team will be in touch with you to discuss next steps. For information regarding the status of your application, please log into your candidate account and view your submission under the MyJob Folder tab.

In the meantime, keep in touch! Follow us on Facebook, Twitter and LinkedIn to learn about the many innovative ways we make a difference in the lives of the people in our local communities.

Again, thank you for your application and we hope to be in contact with you soon.

Warm regards,

Sutter Health Recruitment

---

 **this_message_in_html.htm**
2K

540

        **Tatyana Drevaleva <tdrevaleva@gmail.com>**

---

## EKG Monitor Technician - Central Monitoring (Short Hour, Day/Night) at Sutter Health

**Human Resources** <hr-sutterhealth@invalidemail.com>      Thu, Jun 7, 2018 at 10:36 PM
To: Tatyana Drevaleva <tdrevaleva@gmail.com>



Re: Application for Requisition #SMCCV-1808248

Hello Tatyana Evgenievna Drevaleva,

We really want to thank you for applying to Sutter Health and your interest in joining our team that proudly cares for more than 3 million of our neighbors. We have received your application, and are currently reviewing your qualifications and experience. If you are a match for the role, a member of our recruiting team will be in touch with you to discuss next steps. For information regarding the status of your application, please log into your candidate account and view your submission under the MyJob Folder tab.

In the meantime, keep in touch! Follow us on Facebook, Twitter and LinkedIn to learn about the many innovative ways we make a difference in the lives of the people in our local communities.

Again, thank you for your application and we hope to be in contact with you soon.

Warm regards,

Sutter Health Recruitment

---

 **this_message_in_html.htm**
2K

541

 **Gmail**

**Tatyana Drevaleva <tdrevaleva@gmail.com>**

## El Camino Hospital has received your information

**hr@elcaminohospital.org** <hr@elcaminohospital.org>                    Thu, Jun 7, 2018 at 6:47 PM
To: tdrevaleva@gmail.com

Thank you for considering El Camino Hospital as your future employer. We have received your application.

At the present time, we are evaluating the applications we have received. Only those applicants who most closely match the requirements for the position will be contacted.
Due to the high volume of applications we receive, we are unable to respond to telephone calls regarding your application.

Human Resources Department

542



**Tatyana Drevaleva <tdrevaleva@gmail.com>**

## RE: Application from Tatyana Drevaleva for Cardiac Monitor Technician, Part-Time, San Jose, CA

**samm@talentmerchants.com**
<sammtalentmerchantscom4_5vq@indeedemail.com>
To: "Tatyana Drevaleva (Indeed)" <tdrevaleva@gmail.com>

Wed, May 16, 2018 at 10:07 PM

Thanks Tatyana,

Sorry for the delay. These are 20 hours a month part time remote jobs paying about 35hr. If that is doable for you we'll send you a Right to Represent form via Docusign.

Samuel D. Merchant, CEO
Talent Merchants, INC
FON: 510.851.3594
FAX: 510.662.4761
EML: samm@talentmerchants.com
IM for Yahoo!, SKYPE: samueldmerchant
WEB: www.talentmerchants.com

"Talent Merchants, Inc. is an E-Verify-Registered Employer"

**From:** Tatyana Drevaleva [tatyanadrevaleva5_4wd@indeedemail.com]
**Sent:** Thursday, May 10, 2018 7:57 PM
**To:** samm@talentmerchants.com
**Subject:** Application from Tatyana Drevaleva for Cardiac Monitor Technician, Part-Time, San Jose, CA



**Tatyana Drevaleva applied to the job Cardiac Monitor Technician, Part-Time in San Jose, CA on Indeed**

Tatyana Drevaleva
6100 California Str., San Francisco, CA, 94121
415-806-9864 tdrevaleva@gmail.com

Monitor/EKG Technician

Dear Hiring Manager!
I am responding your ad for a job opening of a Monitor/EKG Technician. I am offering you experience working as a Monitor Technician at Raymond G. Murphy VA Medical Center, Kaiser Permanente Medical Center in Oakland, Alameda Health System and LifeWatch, Inc. Also, I am offering you experience working as an EKG Technician at Veterans Affairs Medical Center in San Francisco, UC Davis Medical Center and Kaiser Permanente Medical Center in Walnut Creek. I possess certifications of EKG Technician issued by City College of San Francisco and BLS HCP.
Key qualifications:
- Certificates of an EKG Technician and BLS HCP
- Experience working as an EKG and Monitor Technician
- Experience working at two VA Medical Centers with an excellent Performance Evaluation
- Unit Secretary experience
- Able to transcribe physician orders

543

- Able to facilitate all inter- and intra-departmental communications, act as a Unit Receptionist and as a Nursing Assistant,
Please, accept my Resume into your consideration. I will be happy to schedule a job interview with you and discuss how my experience could fit into the mission, vision and core values of your organization.

Respectfully,

Tatyana Drevaleva.

- Reply to this email to contact Tatyana Drevaleva via Indeed, or contact at: tatyanadrevaleva5_4wd@indeedemail.com | **415-806-9864**

# Tatyana Drevaleva

## Experienced EKG Technician, Monitor Technician

tdrevaleva@gmail.com | 415-806-9864

San Francisco, CA 94121

Skills include:
— Observing and maintaining Cardiac Monitors
— Reading Cardiac Rhythms
— Reporting critical changes to RNs and MDs
— 12 and 15 lead EKGs
— Holter, Event and Blood Pressure Monitors
— Treadmill and ESE stress tests
— Lexiscan and Persantine stress tests
— Editing Rhythm Strips
— Acting as a Unit Secretary
— Data Entry (50 WPM)
— Taking Patient Vitals
— Patient Education
— Compliance with HIPAA & JCAHO standards

---

## Work Experience

### Monitor Technician
**Raymond G. Murphy VA Medical Center** - Albuquerque, NM

April 2017 to June 2017

Observed cardiac monitors, interpreted and mounted rhythm strips, reported critical findings to RNs and MDs.

### Monitor Technician
**Alameda Health System** - Oakland, CA

April 2013 to September 2013

Served as a member of a healthcare team providing Electrocardiography services for patients of Alameda County.
• Observed and interpreted cardiac rhythms at SDU and 5 East
• Reported abnormal rhythms to RNs and MDs
• Kept proper documentation

### EKG Technician

**Veterans Affairs Medical Center in San Francisco** - San Francisco, CA

May 2012 to March 2013

I work through staffing agency "Maxim". This job is temporary.
Serve as a member of a healthcare team providing Electrocardiography services for Veterans.
• Do exercise stress tests with and without a radiotracer (hot and cold Treadmills),
• Do Lexiscan and Persantine pharmacological stress tests

### Monitor Technician

**Kaiser Permanente Medical Center** - Oakland, CA

September 2011 to March 2012

Served as a member of healthcare team in a Kaiser Permanente hospital providing cardiac monitoring services for inpatients.
• Observed cardiac rhythms on monitors at Med/Surg 8 and 9, mounted strips and interpreted cardiac rhythms every 4 hours
• Kept proper documentation (red alarm sheet, inventory sheet, pagers and phones assignment sheet, etc.)
• Reported critical changes to RNs and MDs
• Compliance with JCAHO regulations (exchange batteries, etc.)

### EKG Technician

**Kaiser Permanente Medical Center** - Walnut Creek, CA

August 2011 to September 2011

Served as a member of healthcare team in a Kaiser Permanente hospital and clinics providing electrocardiography services, stress testing and ambulatory monitoring services for in and outpatients.
• Did 12 and 15 lead EKGs on out- and inpatients
• Hooked Holter Monitors up, did initial review of transmissions
• Was trained to do Treadmills and Event Monitors

### Certified Cardiographic Technician, ACT Technician II

**LifeWatch Services, Inc** - San Francisco, CA

April 2011 to July 2011

Served as a member of healthcare team for cardiac arrhythmia monitoring. Work with LifeStar ACT Ambulatory Cardiac Telemetry I and III Monitors.
• Initial Review of ACT transmissions - analyzed the type of trigger, recognized whether or not it is an MD notification according to LifeWatch criteria and modified criteria for different clinics and individually for patients, reviewed previous transmissions, troubleshot problems, obtained manual recordings.
• Edited transmissions - cut strips, did measurements, analyzed the rhythm.
• Compliance with HIPAA and OSHA regulations.
• Reacted calmly and effectively in emergency situations.

### Patient Care Assistant

**University of California San Francisco Medical Center at Mount Zion** - San Francisco, CA

2010 to 2011

Served as a member of healthcare team for Peri-Operative Services in Pre-Op, Post Anesthesia Care Unit and Operating Room.

545

• Consistently praised for efficient handling of patient care and administrative assistant duties (e.g., preparing patients rooms for admissions, answering phones, maintaining medical records, etc.) that allowed doctors and nursing staff to focus on the health concerns of their patients.
• Demonstrated proficiency in taking patient vital signs, as well as in performing EKGs.
• Ensured the cleanliness, sanitation and maintenance of all facilities, patient rooms and equipment.

### EKG Technician

**University of California Davis Medical Center** - Sacramento, CA

2009 to 2010

Served as a member of healthcare team in a main hospital providing electrocardiography services, stress testing and ambulatory monitoring services for in and outpatients.
• Ensured privacy for all patients.
• Assured that patient was physically and emotionally comfortable throughout the recording of electrocardiogram
• Worked with MUSE, Invision, Lotus Notes, EMR, GEMS and other computer programs
• Reported critical findings on EKGs to RNs and physicians.

## Education

courses: Chemistry 1A, Human Physiology
Peralta Colleges - Oakland, CA
2013 to 2013

EKG Technician Certificate
City College of San Francisco - San Francisco, CA
2009 to 2009

## Skills

MS Office: MS Word, MS Excel, MS Access, MS Power Point, MS Outlook, MS Outlook Express, Adobe Photoshop, Internet resources (10+ years), to perform EKG, to read rhythm strips, to do Holters, to perform cardiac stress tests (3 years)

## Links

• https://www.linkedin.com/in/tatyana-drevaleva-0426a62b?trk=nav_responsive_tab_profile

## Certifications

### EKG Technician
June 2009 to Present

EKG Technician certificate that I earned at City College of San Francisco.

### BLS HCP
October 2016 to October 2018

546

## Additional Information

Bilingual in English and Russian.
Worked as a Caregiver in the USA through IHSS and "California Caregivers". Have an HCA number.

---

**Suspect spam or fraud?** Report this message to Indeed

By replying or using an indeedemail.com email address, you agree that this email will be processed and analyzed according to the Indeed Cookie Policy, Privacy Policy, and Terms of Service.
Indeed | 6433 Champion Grandview Way, Building 1, Austin, TX 78750

**Suspect spam or fraud?** Report this message to Indeed



**Tatyana Drevaleva <tdrevaleva@gmail.com>**

## Cardiac Monitor Technician - 686468

**celeste.sanchez@kp.org** <celeste.sanchez@kp.org>
To: tdrevaleva@gmail.com

Fri, May 11, 2018 at 4:34 PM

Aloha,

While living in Hawaii is fantastic, there are also challenges with the cost of living, housing, etc. Please take the time to research living in Hawaii and if you are still interested respond to this email.

The applied to an on-call (per-diem), Cardiac Monitor Technician position at Moanalua Medical Center in Hawaii. Relocation assistance is not available for this position.

Thank you.

No response in 5-business days will result in decline on your behalf due to lack of interest.

- - - - - - - - - - - -
**Best regards,**
**Celeste Sanchez**
Recruiter
Non-Licensed, Patient Technical, Pharmacy Technicians, Medical Assistants, Food and Nutrition

**Kaiser Permanente**
Human Resources
501 Alakawa Street. Suite 201
Honolulu, HI 96817

Office: (808) 432-4920
Fax:    (808) 432-4989
Hawaii Recruitment Services
**kp.org/thrive**

---

 **this_message_in_html.html**
3K

548

 **Gmail**

**Tatyana Drevaleva <tdrevaleva@gmail.com>**

## Job Application Response

**Careers By Web** <careersbyweb@interimhealthcare.com>
To: tdrevaleva@gmail.com

Mon, Mar 19, 2018 at 1:22 PM

Thank you for your interest in Interim HealthCare. We will contact you to schedule an appointment if your resume meets our job requirements. We look forward to the possibility of having you join our family of caregivers and professional staff. Thank you, Interim HealthCare Human Resources E: hr1@interimhc.COM P: 530-722-1530 Ex. 2205

Office Contact Information: San Jose
901 Campisi Way Suite 360
Campbell CA , 95008
Phone: (408) 286-6888
Fax: (408) 453-2937

Thank you
Interim HealthCare

This is an autoreply, do not REPLY to this email.

549

**Exhibit 5.**

Job search efforts.

## Monterey County Department of Social Services



**RECEIVED**

MAY 11 2018

MONTEREY COUNTY
DEPT. OF SOCIAL SERVICES
SEASIDE CA 93955

### JOB SEARCH MONTH: April

Do not begin before the first of the month.

### Complete and return by: 4/26/2018

| Case Name: | Tatyana Drevaleva | Case Number: | | 2117337-G5 |
|---|---|---|---|---|
| | | Date: 04/16/18 | | Worker Number: 3304 |
| **Mailing Address:** 10660 Hidden Mesa Place | | | | **Worker Name:** |
| **City, State, Zip:** Monterey, Ca 93940-6631 | | Sat Kartar Khalsa | | |

| | | |
|---|---|---|
| ☑ | Work hours assigned. Timesheet and Job Searches must be returned by | 04/26/18 |
| ☐ | No work hours assigned. Completed Job Searches must be returned by | |

Because you are able to work, you are required to look for a job.
If you are physically unable to work the entire month, a doctor's note is required.

☐ **During the month of application you must complete ten (10) job searches.**

☑ **Following the month of application you must complete twenty-four (24) job searches each month.**

There are two ways to look for work:

1. **IN PERSON** (not a phone call): Fill out an application if possible. Write down the name of the business, the person you talked to, and the position you applied for.

2. **INTERNET**: Write down the job you applied for, the website, and confirmation number. You may use a smart phone or computer. Libraries have computers you may use.

## Your General Assistance will stop if this form is not returned complete by the due date.

| | Date | Employer / Business | Position / job | Contact person or Confirmation # | Phone Number | Result |
|---|---|---|---|---|---|---|
| | 7/1/2015 | Monterey County Personnel | Clerk Typist | Jane Smith ABC123456 | 123-4567 | not hiring |
| 1 | 04.02.18 | Medical Staffing Network ISP | Monitor Technician | online Indeed | | not avail. waiting |
| 2 | 04.02.18 | Preventice Solution | Monitor Technician | online Indeed | | not avail. waiting |
| 3 | 04.03.18 | Preventice Services LLC | Monitor Technician | online Indeed | | not avail. waiting |
| 4 | 04.03.18 | El Camino Hospital | EKG Tech | online | | not avail. waiting |
| 5 | 04.04.18 | KPG Staffing Company | EKG Tech | online Indeed | | not avail. waiting |
| 6 | 04.05.18 | Medi-Lynx Cardiac Monitoring | Monitor Tech | online Indeed | | not avail. waiting |
| 7 | 04.06.18 | Talent Merchants San Jose | Monitor Tech | online Indeed | 510-851-3594 | not avail. waiting |

Certified EKG Tech

| | Date | Employer / Business | Position / job | Contact person or Confirmation # | Phone Number | Result |
|---|---|---|---|---|---|---|
| 8 | 04.06.18 | Advance Community Care Inglewood, CA | Monitor Tech | online Indeed | not avail. | waiting |
| 9 | 04.06.18 | Advance Community Care Inglewood, CA | Monitor Tech | online Indeed | not avail. | waiting |
| 10 | 04.07.18 | Global Service Resources LA | Monitor Tech | online Indeed | not avail. | waiting |
| 11 | 04.07.18 | Hired On, Pasadena, CA | Monitor Tech | online Indeed | not avail. | waiting |
| 12 | 04.07.18 | Integrated Healthcare Holdings, Anaheim, CA | Monitor Tech | online Indeed | not avail. | waiting |
| 13 | 04.07.18 | Keck Medical Center LA, CA Float Pool | Monitor Tech | online Indeed | not avail. | waiting |
| 14 | 04.07.18 | Keck Medical Center LA, CA, Step Down | Monitor Tech | online Indeed | not avail. | waiting |
| 15 | 04.07.18 | University of Southern California LA, CA | EKG Tech | online Indeed | not avail. | waiting |
| 16 | 04.08.18 | Kaiser Permanente Fresno, CA | EKG Tech | online Indeed | not avail. | waiting |
| 17 | 04.09.18 | Kaiser Permanente Sacramento, CA | EKG Tech | online | not avail. | waiting |
| 18 | 04.09.18 | Kaiser Permanente Los Angeles, CA | Monitor Technician | online | not avail. | waiting |
| 19 | 04.09.18 | Kaiser Permanente Honolulu, HI | Cardiology Tech I | online | not avail. | waiting |
| 20 | 04.10.18 | Kaiser Permanente Honolulu, HI | Cardiology Tech II | online | not avail. | waiting |
| 21 | 04.10.18 | Kaiser Permanente Atlanta, GA | EKG Tech | online | not avail. | waiting |
| 22 | 04.10.18 | Kaiser Permanente Atlanta, CA | Cardiology Stress Lab Tech | online | not avail. | waiting |
| 23 | 14.10.18 | Kaiser Permanente Honolulu, HI | Cardiac Monitor Tech | online | not avail. | waiting |
| 24 | 14.10.18 | Kaiser Permanente Honolulu, HI | Cardiac Monitoring Tech | online | not avail. | waiting |

686462

I state that this information is true and correct. I give the Department of Social Services permission to contact any of the employers to verify my statements.

## DECLARATION

I DECLARE UNDER THE PENALTY OF PERJURY THAT ALL INFORMATION GIVEN ON THE GENERAL ASSISTANCE APPLICATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE. I UNDERSTAND THAT I MAY BE CRIMINALLY PROSECUTED IF I HAVE NOT TOLD THE TRUTH ABOUT MY SITUATION.

_Tatyana Arevaleva_
Signature

04.16.2018
Date

05.11.2018

552

## Monterey County Department of Social Services

**RECEIVED**

### JOB SEARCH MONTH: Nov-17

Do not begin before the first of the month.

### Complete and return by: | 11/20/2017

DEC 0 1 2017

MONTEREY COUNTY
DEPT. OF SOCIAL SERVICES
SEASIDE, CA 93955

| | | **Case Number:** 2117337 | |
|---|---|---|---|
| **Case Name:** | TATYANA DREVALEVA | **Date:** 11/02/17 | **Worker Number:** 3001 |
| **Mailing Address:** | 1718 SAN PABLO AVE | | **Worker Name:** |
| **City, State, Zip:** | SEASIDE CA 93955 | J ALVAREZ | |

☑ Work hours assigned. Timesheet and Job Searches must be returned by 11/20/17

☐ No work hours assigned. Completed Job Searches must be returned by

Because you are able to work, you are required to look for a job.
If you are physically unable to work the entire month, a doctor's note is required.

☑ **During the month of application you must complete ten (10) job searches.**

☐ **Following the month of application you must complete twenty-four (24) job searches each month.**

There are two ways to look for work:

1. **IN PERSON** (not a phone call): Fill out an application if possible. Write down the name of the business, the person you talked to, and the position you applied for.

2. **INTERNET**: Write down the job you applied for, the website, and confirmation number. You may use a smart phone or computer. Libraries have computers you may use.

## Your General Assistance will stop if this form is not returned complete by the due date.

| | Date | Employer / Business | Position / job | Contact person or Confirmation # | Phone Number | Result |
|---|---|---|---|---|---|---|
| | 7/1/2015 | Monterey County Personnel | Clerk Typist | Jane Smith ABC123456 | 123-4567 | not hiring |
| 1 | 11.15.17 | San Francisco VAMC | EKG Tech | online | 415-221-4810 | waiting |
| 2 | 11.16.17 | San Francisco VAMC | EKG Tech | online | 415-221-4810 | waiting |
| 3 | 11.17.17 | San Francisco VAMC | EKG Tech | online | 415-221-4810 | waiting |
| 4 | 11.17.17 | San Francisco VAMC | EKG Tech | online | 415-221-4810 | waiting |
| 5 | 11.18.17 | Kaiser Permanente Santa Clara | Patient Care Technician | online | 408-851-1000 | waiting |
| 6 | 11.19.17 | Kaiser Perman. San Jose | PCT | online | 408-972-3000 | waiting |
| 7 | 11.20.17 | Kaiser Permanente San Jose | PCT | online | 408-972-3000 | waiting |

CO 551-E 08-2015 General Assistance Job Search Form

Page 1

553

| | Date | Employer / Business | Position / job | Contact person or Confirmation # | Phone Number | Result |
|---|---|---|---|---|---|---|
| 8 | 11. 20.17 | Kaiser Permanente Roseville | PCT | 946 | online 916-784-4000 | waiting |
| 9 | 11. 21. 17 | Kaiser Perm. Georgia | EKG Tech | | online 800-611-1811 | waiting |
| 10 | 11. 20. 17 | Kaiser Perm. South San Fran | PCT | | online 650-742-2000 | waiting |
| 11 | 11. 20. 17 | Kaiser South San Fran. | PCT | | online 650-742-2000 | waiting |
| 12 | 11. 20. 17 | Kaiser Denver Colorado | Cardiology Technician | | online 303-338-3800 | waiting |
| 13 | 11. 20. 17 | Kaiser Lafayette Colorado | Cardiology Technician | | online 303-338-4545 | waiting |
| 14 | 11. 20. 17 | Kaiser Duluth Georgia | Cardiac Tech | | online 800-611-1811 | waiting |
| 15 | 11. 20. 17 | Kaiser South San Francisco | PCT | | online 650-742-2000 | waiting |
| 16 | 11. 20. 17 | CPMC Santa Rosa | PCT | | online 415-600-6400 | waiting |
| 17 | 11. 20. 17 | Sutter Lakeside | Patient Access Tech | | online 707-262-5085 | waiting |
| 18 | 11. 20. 17 | Sutter La beside | Patient Access Tech | | online 707-262-5085 | waiting |
| 19 | 11. 20. 17 | Minneapolis VAMC | EKG Tech | | online 612-725-2000 | waiting |
| 20 | 11. 20. 17 | Denver, CO VAMC | EKG Tech | | online 303-399-8020 | waiting |
| 21 | 11. 20. 17 | Sutter Modesto | Moniter Tech | | online 209-550-4792 | waiting |
| 22 | 11. 20. 17 | Sutter Modesto | Moniter Tech Unit Clerk | | online 209-550-4792 | waiting |
| 23 | 11. 20. 17 | Sutter Modesto | Moniter Tech Unit Clerk | | online 209-550-4792 | waiting |
| 24 | 11. 20. 17 | Sutter Vallejo, CA | PCT | | online 707-554-4444 | waiting |

I state that this information is true and correct. I give the Department of Social Services permission to contact any of the employers to verify my statements.

Tatyana Drevaleva

Signature

11. 20. 2017

Date

## Monterey County Department of Social Services

### JOB SEARCH MONTH:   Jul 2018

**Do not begin before the first of the month.**

### Complete and return by:   7/13/2018

| | |
|---|---|
| **Case Name:**   **TATYANA DREVALEVA** | **Case Number:** 2117337-G5 |
| | **Date:** 06/28/18 **Worker Number:** 3304 |
| **Mailing Address:** 10660 HIDDEN MESA PL | |
| **City, State, Zip:** MONTEREY, CA 93940-6631 | **S. Khalsa** **Worker Name:** |

☑ Work hours assigned. Timesheet and Job Searches must be returned by      07/13/18

☐ No work hours assigned. Completed Job Searches must be returned by

Because you are able to work, you are required to look for a job.
If you are physically unable to work the entire month, a doctor's note is required.

☐ **During the month of application you must complete ten (10) job searches.**

☑ **Following the month of application you must complete twenty-four (24) job searches each month.**

There are two ways to look for work:

1. **IN PERSON** (not a phone call): Fill out an application if possible. Write down the name of the business, the person you talked to, and the position you applied for.

2. **INTERNET**: Write down the job you applied for, the website, and confirmation number. You may use a smart phone or computer. Libraries have computers you may use.

## Your General Assistance will stop if this form is not returned complete by the due date.

| | Date | Employer / Business | Position / job | Contact person or Confirmation # | Phone Number | Result |
|---|---|---|---|---|---|---|
| | 7/1/2018 | Monterey County Personnel | Clerk Typist | Jane Smith ABC123456 | 123-4567 | not hiring |
| 1 | 07.01.18 | Home Care Assistance San Carlos CA | Caregiver | online | 650-338-4708 | waiting |
| 2 | 07.02.18 | Home Care Assistance San Bruno, CA | Caregiver | online | 650-338-4708 | waiting |
| 3 | 07.02.18 | Senior Resource Group | Caregiver | online | not avail | waiting |
| 4 | 07.02.18 | Home Care Assistance San Francisco CA | Caregiver | online | 415-265-6268 | waiting |
| 5 | 07.02.18 | Senior Resource Center San Francisco | Caregiver | online | not avail | waiting |
| 6 | 07.03.18 | Pacifica Senior Living Daly City, CA | Caregiver | online | not avail | waiting |
| 7 | 07.03.18 | Westborough Royale San Francisco | Caregiver | online | not avail | waiting |

G25 555

| | Date | Employer / Business | Position / job | Contact person or Confirmation # | Phone Number | Result |
|---|---|---|---|---|---|---|
| 8 | 07.04.18 | Bright Star Care Mill Valley, CA | Caregiver | online | not avail. | waiting. |
| 9 | 07.04.18 | Alegre Home Care SF | Caregiver | online | not avail | waiting |
| 10 | 07.05.18 | Home Care Assistance Oakland, CA | Caregiver | online | 510-770-6672 | on wait. |
| 11 | 07.06.18 | Via Home Care SF | Caregiver | online | not avail. | waiting |
| 12 | 07.06.18 | On Lok SF | Caregiver | online | not avail. | waiting |
| 13 | | | | | | |
| 14 | | | | | | |
| 15 | | | | | | |
| 16 | | | | | | |
| 17 | | | | | | |
| 18 | | | | | | |
| 19 | | | | | | |
| 20 | | | | | | |
| 21 | | | | | | |
| 22 | | | | | | |
| 23 | | | | | | |
| 24 | | | | | | |

I state that this information is true and correct. I give the Department of Social Services permission to contact any of the employers to verify my statements.

_____        _____
            Signature                                          Date

CO 551-E 08-2015  General Assistance Job Search Form          **2117337-G5**                          Page 2

556

## Monterey County Department of Social Services

RECEIVED

JUN 28 2010

MONTEREY COUNTY
DEPT. OF SOCIAL SERV
SEASIDE

## JOB SEARCH MONTH: _____ Jun-18

**Do not begin before the first of the month.**

### Complete and return by: | 21-Jun-18 |

| Case Name: | TATYANA DREVALEVA | Case Number: | |
|---|---|---|---|
| | | 2117337-G5 | |
| Mailing Address: | 10660 HIDDEN MESA PL | Date: | Worker Number: |
| City, State, Zip: | MONTEREY, CA 93940-6631 | 06/08/18 | 27LS03330K |
| | | S. KHALSA | Worker Name: |

☑ Work hours assigned. Timesheet and Job Searches must be returned by    June 21, 20

☐ No work hours assigned. Completed Job Searches must be returned by

Because you are able to work, you are required to look for a job.
If you are physically unable to work the entire month, a doctor's note is required.

☐ **During the month of application you must complete ten (10) job searches.**

☑ **Following the month of application you must complete twenty-four (24) job searches each month.**

There are two ways to look for work:

1. **IN PERSON** (not a phone call): Fill out an application if possible. Write down the name of the business, the person you talked to, and the position you applied for.

2. **INTERNET**: Write down the job you applied for, the website, and confirmation number. You may use a smart phone or computer. Libraries have computers you may use.

## Your General Assistance will stop if this form is not returned complete by the due date.

| | Date | Employer / Business | Position / job | Contact person or Confirmation # | Phone Number | Result |
|---|---|---|---|---|---|---|
| | 6/1/2018 | Monterey County Personnel | Clerk Typist | Jane Smith ABC123456 | 123-4567 | not hiring |
| 1 | 06. 01.18 | Long Beach Memorial Medical Center | EKG Tech | online | not avail. | waiting |
| 2 | 06. 02.18 | Scripps Encinitas CA | Telemetry Tech | online | not avail | waiting |
| 3 | 06. 02.18 | Sutter Health Berkeley, CA | EKG Tech | online | not avail | waiting |
| 4 | 06. 03.18 | Sutter Health Eden Medical Center | EKG Tech | online | not avail. | waiting |
| 5 | 06. 04.18 | Sutter Health Santa Cruz, CA | EKG Tech | online | not avail. | waiting |
| 6 | 06. 04.18 | Sutter Health Oakland, CA | EKG Tech | online | not avail | waiting |
| 7 | 06. 04.18 | Sutter Health Santa Rosa, CA | EKG Tech | online | not avail | waiting |

557

| | Date | Employer / Business | Position / job | Contact person or Confirmation # | Phone Number | Result |
|---|---|---|---|---|---|---|
| 8 | 06.05.18 | Sutter Health Tracy, CA | Monitor Technician | online | not avail | waiting |
| 9 | 06.05.18 | Kaiser Permanente Denver, CO | Cardiology Technician | online | not avail | waiting |
| 10 | 06.05.18 | Kaiser Permanente Duluth, GA | Cardiac Stress Lab Tech | online | not avail | waiting |
| 11 | 06.05.18 | Kaiser Permanente Denver, CO 698166 | Cardiac Stress Lab Tech | online | not avail | waiting |
| 12 | 06.05.18 | Kaiser Permanente Jonesboro, GA | Cardiac Stress Lab Tech 656909 | online | not avail | waiting |
| 13 | 06.05.18 | Allied Travel Web Los Angeles, CA | Tele Tech | online | not avail | waiting |
| 14 | 06.05.18 | Good Samaritan Hospital Los Angeles, CA | EKG Tech | online | not avail. | waiting |
| 15 | 06.05.18 | Hired On, LLC Pasadena, CA | EKG Tech | online | not avail. | waiting |
| 16 | 06.06.18 | Avanti Hospitals Los Angeles, CA | EKG Tech | online | not avail | waiting |
| 17 | 06.06.18 | Keck Medical Center Los Angeles, CA | Telemetry Technician | online | not avail | waiting |
| 18 | 06.06.18 | Avanti Hospital Gardena, CA | EKG Tech | online | not avail. | waiting |
| 19 | 06.07.18 | Keck Medical Center Los Angeles, CA | Monitor Tech | online | not avail. | waiting |
| 20 | 06.07.18 | Hollywood Presbyterian Los Angeles, CA | Monitor Tech | online | not avail | waiting |
| 21 | 06.08.18 | Doctor's Medical Center Modesto, CA | Monitor Tech | online | not avail. | waiting |
| 22 | 06.09.18 | Doctor's Medical Center Fountain Valley, CA | Monitor Tech | online | not avail | waiting |
| 23 | 06.09.18 | Doctor's Medical Center Goodyear, AZ | Monitor Tech | online | not avail | waiting |
| 24 | 06.09.18 | Doctor's Medical Center San Louis Obispo | Monitor Tech | online | not avail. | waiting |

I state that this information is true and correct. I give the Department of Social Services permission to contact any of the employers to verify my statements.

Tatyana Orevaleva
Signature

June 10, 2018
Date

**Exhibit 6.**

Work sheets as a Janitor at Monterey County.

4/16/2018

Pg. 1 of 2

**GENERAL ASSISTANCE WORK EXPERIENCE PROGRAM (GAWEP) TIMESHEET**

Intake    Ongoing

CSLD: _____

User Agency: _____ DRO Park _____

Last Work Day: 04 / 19 / 2018

Address: _____

Month  Day  Year

Name of Participant: Tatyana Drevaleva

Case #: 2117337-G5

POST HOURS WORKED FOR EACH DAY DURING WEEK

| Dates: | 4/16 | 4/17 | 4/18 | 4/19 | 4/20 | Month hours are for: 04-2018 |
|--------|------|------|------|------|------|------|
|        | Monday | Tuesday | Wednesday | Thursday | Friday | |
| Assigned | | | 4 | 4 | | Total hrs this week    8 |
| Worked | | | 4 | 4 | | Total hrs next week    22 |
| Absence | | | | | | Total hrs assigned    30 |

**DO NOT CHANGE FORM. CUSTOMER MUST WORK HOURS AS ASSIGNED.**

Max allowable payment $ 340

1. Would you give another employer a favorable reference?     2. Would you consider participant for a job if you had an opening?

Yes ✓   No_____   Unsure_____     Yes ✓   No_____ Unsure_____

RECEIVED

MAY 11 2018

MONTEREY COUNTY
DEPT. OF SOCIAL SERVICES
SEASIDE, CA

3. Attitude:     Punctuality:

Good ✓   Fair_____   Poor_____   Good ✓   Fair_____ Poor_____

5. COMMENTS: _____

EW / ES assigning hours: Bisranguez     work site supervisor signature: _____

CO - 673-S revised 7/12/06

---

4/16/2018

Pg. 2 of 2

**GENERAL ASSISTANCE WORK EXPERIENCE PROGRAM (GAWEP) TIMESHEET**

Intake    Ongoing

CSLD: _____

User Agency: _____ SS Parks _____

Last Work Day: 04 / 26 / 2018

Address: _____

Month  Day  Year

Name of Participant: Tatyana Drevaleva

Case #: 2117337-G5

POST HOURS WORKED FOR EACH DAY DURING WEEK

| Dates: | 4/23 | 4/24 | 4/25 | 4/26 | 4/27 | Month hours are for: 04-2018 |
|--------|------|------|------|------|------|------|
|        | Monday | Tuesday | Wednesday | Thursday | Friday | |
| Assigned | 8 | 8 | | 6 | | Total hrs this week    22 |
| Worked | 4 | 4 | | 6 | | Total hrs next week    8 |
| Absence | | | | | | Total hrs assigned    30 |

**DO NOT CHANGE FORM. CUSTOMER MUST WORK HOURS AS ASSIGNED.**

Max allowable payment $ 340

1. Would you give another employer a favorable reference?     2. Would you consider participant for a job if you had an opening?

Yes ✓   No_____   Unsure_____     Yes ✓   No_____ Unsure_____

RECEIVED

MAY 11 2018

MONTEREY COUNTY
DEPT. OF SOCIAL SERVICES
SEASIDE, CA

3. Attitude:     4. Punctuality:

Good ✓   Fair_____   Poor_____   Good ✓   Fair_____ Poor_____

5. COMMENTS: _____

EW / ES assigning hours: Bisranguez     work site supervisor signature: _____

CO - 673-S revised 7/12/06

560

GENERAL ASSISTANCE WORK EXPERIENCE PROGRAM (GAWEP) TIMESHEET

Intake    Ongoing
CSLD: _____

User Agency: SS Parks

Last Work Day: 01 / 18 / 2018
Month    Day    Year

Address: _____

Name of Participant: Tohyana Drevaleva

Case #: 2117337-G5

POST HOURS WORKED FOR EACH DAY DURING WEEK

| Dates: | 01-15 | 01-16 | 01-17 | 01-18 | 01-19 |
|--------|-----------|-----------|-----------|-----------|-----------|
|        | Monday | Tuesday | Wednesday | Thursday | Friday |
| Assigned |  | 8 | 8 | 6 |  |
| Worked |  | 8 | 8 | 6 |  |
| Absence |  |  |  |  |  |

Month hours are for: 01 2018

Total hrs this week: 22

Total hrs next week: 0

Total hrs assigned: 30

DO NOT CHANGE FORM. CUSTOMER MUST WORK HOURS AS ASSIGNED.

Max allowable payment $ 340

1. Would you give another employer a favorable reference?
Yes ✓    No_____    Unsure_____

**RECEIVED**
**FEB 09 2018**
MONTEREY COUNTY
DEPT. OF SOCIAL SERVICES
SEASIDE, CA 93955

2. Would you consider participant for a job if you had an opening?
Yes ✓    No_____    Unsure_____

3. Attitude:
Good ✓    Fair_____    Poor_____

4. Punctuality:
Good ✓    Fair_____    Poor_____

5. COMMENTS: _____

EW / ES assigning hours: SK Rodriguez    work site supervisor signature: _____

CO - 673-S revised 7/12/06

---

01/09/2018    Pg 2of2

GENERAL ASSISTANCE WORK EXPERIENCE PROGRAM (GAWEP) TIMESHEET

Intake    Ongoing
CSLD: _____

User Agency: DPO Parks

Last Work Day: 01 / 23 / 2018
Month    Day    Year

Address: _____

Name of Participant: Tohyana Drevaleva

Case #: 2117337-G5

POST HOURS WORKED FOR EACH DAY DURING WEEK

| Dates: | 01-22 | 01-23 | 01-24 | 01-25 | 01-26 |
|--------|-----------|-----------|-----------|-----------|-----------|
|        | Monday | Tuesday | Wednesday | Thursday | Friday |
| Assigned | 4 | 4 |  |  |  |
| Worked | 4 | 4 |  |  |  |
| Absence |  |  |  |  |  |

Month hours are for: 01-2018

Total hrs this week: 8

Total hrs next week: 0

Total hrs assigned: 30

DO NOT CHANGE FORM. CUSTOMER MUST WORK HOURS AS ASSIGNED.

Max allowable payment $ 340

1. Would you give another employer a favorable reference?
Yes ✓    No_____    Unsure_____

**RECEIVED**
**FEB 09 2018**
MONTEREY COUNTY
DEPT. OF SOCIAL SERVICES
SEASIDE, CA 93955

2. Would you consider participant for a job if you had an opening?
Yes_____    No_____    Unsure_____

3. Attitude:
Good ✓    Fair_____    Poor_____

4. Punctuality:
Good ✓    Fair_____    Poor_____

5. COMMENTS: _____

EW / ES assigning hours: SK Rodriguez    work site supervisor signature: _____

CO - 673-S revised 7/12/06

561

**GENERAL ASSISTANCE WORK EXPERIENCE PROGRAM (GAWEP) TIMESHEET**

Intake ☐   Ongoing ☐
CSLD: _____

User Agency: DRO PARK

Last Work Day: 03 / 21 / 2018
Month   Day   Year

Address: _____

Name of Participant: Tatyana Drevaleva          Case #: 2117337-G5

POST HOURS WORKED FOR EACH DAY DURING WEEK

| Dates: | 3 19 | 3 20 | 3 21 | 3 22 | 3 23 | |
|---|---|---|---|---|---|---|
| | **Monday** | **Tuesday** | **Wednesday** | **Thursday** | **Friday** | Month hours are for: 03-2018 |
| Assigned | | 4 | | | | Total hrs this week  8 |
| Worked | | | 4 | | | Total hrs next week  8 |
| Absence | | RAIN OUT | | | | Total hrs assigned  30 |

**DO NOT CHANGE FORM. CUSTOMER MUST WORK HOURS AS ASSIGNED.**

RECEIVED

Max allowable payment $ 340

1. Would you give another employer a favorable reference?

MAR 21 2018
MONTEREY COUNTY
DEPT. OF SOCIAL SERVICES
SEASIDE. CA 93955

Yes ✓   No _____   Unsure _____

2. Would you consider participant for a job if you had an opening?

Yes ✓   No _____   Unsure _____

3. Attitude:
Good ✓   Fair _____   Poor _____

4. Punctuality:
Good ✓   Fair _____   Poor _____

5. COMMENTS:

EW / ES assigning hours: Distanque          work site supervisor signature: _____

CO - 673-S revised 7/12/06

---

01 28 2018

**GENERAL ASSISTANCE WORK EXPERIENCE PROGRAM (GAWEP) TIMESHEET**

Intake ☐   Ongoing ☐
CSLD: _____

User Agency: SS Parks

Last Work Day: 07 / 12 / 2018
Month   Day   Year

Address: _____

Name of Participant: Tatyana Drevaleva          Case #: 2117337-G5

POST HOURS WORKED FOR EACH DAY DURING WEEK

| Dates: | 7 9 | 7 10 | 7 11 | 7 12 | 7 13 | |
|---|---|---|---|---|---|---|
| | **Monday** | **Tuesday** | **Wednesday** | **Thursday** | **Friday** | Month hours are for: 07-2018 |
| Assigned | 8 | 8 | 8 | 6 | | Total hrs this week  30 |
| Worked | 8 | 8 | 8 | 6 | | Total hrs next week  0 |
| Absence | | SICK | | | | Total hrs assigned  30 |

**DO NOT CHANGE FORM. CUSTOMER MUST WORK HOURS AS ASSIGNED.**

RECE

1. Would you give another employer a favorable reference?

JUL
MONTEREY
DEPT. OF SO
SEASI

Yes ✓   No _____   Unsure _____

2. Would you consider participant for a job if you had an opening?

Yes ✓   No _____   Unsure _____

3. Attitude:
Good ✓   Fair _____   Poor _____

4. Punctuality:
Good ✓   Fair _____   Poor _____

5. COMMENTS:

EW / ES assigning hours: Distanque          work site supervisor signature: _____

CO - 673-S revised 7/12/06

562

**GENERAL ASSISTANCE WORK EXPERIENCE PROGRAM (GAWEP) TIMESHEET**

Intake / Ongoing
CSLD: 3304

User Agency: Seaside Parks

Last Work Day: 06/21/2018
Month   Day   Year

Address:

Name of Participant: TATYANA DREVALEVA

Case #: 2117 337-GS

POST HOURS WORKED FOR EACH DAY DURING WEEK

| Dates: | 6/18 | 6/19 | 6/20 | 6/21 | 6/22 | |
|---|---|---|---|---|---|---|
| | Monday | Tuesday | Wednesday | Thursday | Friday | Month hours are for: June 2018 |
| Assigned | 8 | | 8 | 6 | | Total hrs this week  22 |
| Worked | 8 | | 8 | 6 | | Total hrs next week  8 (last) |
| Absence | | | | | | Total hrs assigned  30 |

**DO NOT CHANGE FORM. CUSTOMER MUST WORK HOURS AS ASSIGNED.**

Max allowable payment $ 340

1. Would you give another employer a favorable reference?
   Yes ✓   No_____   Unsure_____

2. Would you consider participant for a job if you had an opening?
   Yes ✓   No_____   Unsure_____

3. Attitude:
   Good ✓   Fair_____   Poor_____

4. Punctuality:
   Good ✓   Fair_____   Poor_____

RECEIVED
JUN 28 2018
MONTEREY COUNTY
DEPT. OF SOCIAL SERVICES
SEASIDE, CA 93955

5. COMMENTS:

EW / ES assigning hours: SKfdalna   6/8/18   work site supervisor signature: _____

CO - 673-S revised 7/12/06

---

PAGE 1 of 2

**GENERAL ASSISTANCE WORK EXPERIENCE PROGRAM (GAWEP) TIMESHEET**

Intake / Ongoing
CSLD: 3304

User Agency: Seaside Parks

Last Work Day: 06/21/2018
Month   Day   Year

Address:

Name of Participant: TATYANA DREVALEVA

Case #: 2117337-GS

POST HOURS WORKED FOR EACH DAY DURING WEEK

| Dates: | 6/11 | 6/12 | 6/13 | 6/14 | 6/15 | |
|---|---|---|---|---|---|---|
| | Monday | Tuesday | Wednesday | Thursday | Friday | Month hours are for: June 2018 |
| Assigned | 8 | | | | | Total hrs this week  8 |
| Worked | 8 | | | | | Total hrs next week  22 |
| Absence | | | | | | Total hrs assigned  30 |

**DO NOT CHANGE FORM. CUSTOMER MUST WORK HOURS AS ASSIGNED.**

Max allowable payment $ 340

1. Would you give another employer a favorable reference?
   Yes _____   No_____   Unsure_____

2. Would you consider participant for a job if you had an opening?
   Yes _____   No _____   Unsure_____

3. Attitude:
   Good_____   Fair_____   Poor_____

4. Punctuality:
   Good_____   Fair_____   Poor_____

RECEIVED
JUN 28 2018
MONTEREY COUNTY
DEPT. OF SOCIAL SERVICES
SEASIDE, CA 93955

5. COMMENTS:

EW / ES assigning hours: _____   6/8/18   work site supervisor signature: _____

CO - 673-S revised 7/12/06

563

**GENERAL ASSISTANCE WORK EXPERIENCE PROGRAM (GAWEP) TIMESHEET**

Intake   Ongoing
CSLD: 300|

User Agency: Seaside Parks

Last Work Day: / /

Address: 610 Olympia St, Seaside

Month   Day   Year

Name of Participant: Tatyana Prevaleva   Case #: 2117337

POST HOURS WORKED FOR EACH DAY DURING WEEK

Dates: 11/20/17   11/21/17   11/23/17

| | Monday | Tuesday | Wednesday | Thursday | Friday | |
|---|---|---|---|---|---|---|
| Assigned | 8 | 8 | 8 | | | Month hours are for: NOV 2017 |
| Worked | 8 | | 8 | | | Total hrs this week 24 |
| Absence | | | | | | Total hrs next week ⊘ |
| | | | | | | Total hrs assigned 24 |

*DO NOT CHANGE FORM. CUSTOMER MUST WORK HOURS AS ASSIGNED.*

Max allowable payment $ 340

RECEIVED
NOV 29 2017
MONTEREY COUNTY
DEPT OF SOCIAL SERVICES
SEASIDE, CA 93955

1. Would you give another employer a favorable reference?
   Yes ✓   No_____   Unsure_____

2. Would you consider participant for a job if you had an opening?
   Yes ✓   No_____   Unsure_____

3. Attitude:
   Good ✓   Fair_____   Poor_____

4. Punctuality:
   Good ✓   Fair_____   Poor_____

5. COMMENTS:

EW / ES assigning hours: Alvarez

work site supervisor signature:

CO - 673-S revised 7/12/06

Fernando Avila   978.0456

564

**Exhibit 7.**

Salary for working as a Janitor at Monterey County.

**COUNTY OF MONTEREY**
DEPARTMENT OF SOCIAL AND EMPLOYMENT SERVICES

000241569

| | |
|---|---|
| CHECK NUMBER: | 210338107 |
| ISSUE DATE: | 12/26/2017 |
| PAYMENT AMOUNT: | $340.00 |
| PAYMENT FOR: | TATYANA DREVALEVA |
| PAYMENT PERIOD: | 12/2017 |
| CASE WORKER: | 033304 |
| CASE NUMBER: | 2117337 |

**COUNTY OF MONTEREY**
DEPARTMENT OF SOCIAL AND EMPLOYMENT SERVICES

000237500

| | |
|---|---|
| CHECK NUMBER: | 210334462 |
| ISSUE DATE: | 11/03/2017 |
| PAYMENT AMOUNT: | $170.00 |
| PAYMENT FOR: | TATYANA DREVALEVA |
| PAYMENT PERIOD: | 10/2017 |
| CASE WORKER: | 033001 |
| CASE NUMBER: | 2117337 |

**COUNTY OF MONTEREY**
DEPARTMENT OF SOCIAL AND EMPLOYMENT SERVICES

000246302

| | |
|---|---|
| CHECK NUMBER: | 210342840 |
| ISSUE DATE: | 02/22/2018 |
| PAYMENT AMOUNT: | $340.00 |
| PAYMENT FOR: | TATYANA DREVALEVA |
| PAYMENT PERIOD: | 01/2018 |
| CASE WORKER: | 033304 |
| CASE NUMBER: | 2117337 |

566

**COUNTY OF MONTEREY**
DEPARTMENT OF SOCIAL AND EMPLOYMENT SERVICES

000252656

| | |
|---|---|
| CHECK NUMBER: | 210349194 |
| ISSUE DATE: | 05/24/2018 |
| PAYMENT AMOUNT: | $340.00 |
| PAYMENT FOR: | TATYANA DREVALEVA |
| PAYMENT PERIOD: | 04/2018 |
| CASE WORKER: | 033304 |
| CASE NUMBER: | 2117337 |

---

**COUNTY OF MONTEREY**
DEPARTMENT OF SOCIAL AND EMPLOYMENT SERVICES

000240768

| | |
|---|---|
| CHECK NUMBER: | 210337306 |
| ISSUE DATE: | 12/08/2017 |
| PAYMENT AMOUNT: | $340.00 |
| PAYMENT FOR: | TATYANA DREVALEVA |
| PAYMENT PERIOD: | 11/2017 |
| CASE WORKER: | 033304 |
| CASE NUMBER: | 2117337 |

---

**COUNTY OF MONTEREY**
DEPARTMENT OF SOCIAL AND EMPLOYMENT SERVICES

000250447

| | |
|---|---|
| CHECK NUMBER: | 210346985 |
| ISSUE DATE: | 04/18/2018 |
| PAYMENT AMOUNT: | $132.00 |
| PAYMENT FOR: | TATYANA DREVALEVA |
| PAYMENT PERIOD: | 02/2018 |
| CASE WORKER: | 033304 |
| CASE NUMBER: | 2117337 |

567

**000254343**

## COUNTY OF MONTEREY
DEPARTMENT OF SOCIAL AND EMPLOYMENT SERVICES

CHECK NUMBER:      210350881
ISSUE DATE:        06/11/2018
PAYMENT AMOUNT:    $286.00
PAYMENT FOR:       TATYANA DREVALEVA
PAYMENT PERIOD:    05/2018
CASE WORKER:       033304
CASE NUMBER:       2117337

**000250448**

## COUNTY OF MONTEREY
DEPARTMENT OF SOCIAL AND EMPLOYMENT SERVICES

CHECK NUMBER:      210346986
ISSUE DATE:        04/18/2018
PAYMENT AMOUNT:    $340.00
PAYMENT FOR:       TATYANA DREVALEVA
PAYMENT PERIOD:    03/2018
CASE WORKER:       033304
CASE NUMBER:       2117337

**000255780**

## COUNTY OF MONTEREY
DEPARTMENT OF SOCIAL AND EMPLOYMENT SERVICES

CHECK NUMBER:      210352316
ISSUE DATE:        06/29/2018
PAYMENT AMOUNT:    $308.00
PAYMENT FOR:       TATYANA DREVALEVA
PAYMENT PERIOD:    06/2018
CASE WORKER:       033304
CASE NUMBER:       2117337

568

**Exhibit 8.**

"California Caregivers", copies of paystubs.

CALIFORNIA CAREGIVERS HOME HEALTHCARE LLC
1100 CORPORATE WAY STE 200
SACRAMENTO CA 95831-6120

A87P-4116
ORG1:Departments
ORG2:8827 Staff
EE ID: 505

TATYANA E DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO CA 94121

NON-NEGOTIABLE

*Payrolls by Paychex, Inc.*

PAYABLE IF DESIRED AT: WELLS FARGO BANK, N.A.
ALL WELLS FARGO BANKS
115 HOSPITAL DR, VAN WERT, OH

NON-NEGOT

---

**PERSONAL AND CHECK INFORMATION**
Tatyana E Drevaleva
6100 California Street
San Francisco, CA 94121
**Soc Sec #:** xxx-xx-4099  **Employee ID:** 505

**Home Department:** 8827 Staff / Departments

**Pay Period:** 07/15/18 **to** 07/21/18
**Check Date:** 07/27/18  **Check #:** 6084901035
**NET PAY ALLOCATIONS**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 1482.94 | 1482.94 |
| **NET PAY** | **1482.94** | **1482.94** |

| EARNINGS | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|
| | Hourly | 40.00 | 12.2500 | 490.00 | 40.00 | 490.00 |
| | Overtime | 74.00 | 18.3750 | 1359.75 | 74.00 | 1359.75 |
| | **Total Hours** | 114.00 | | | 114.00 | |
| | **Gross Earnings** | | | 1849.75 | | 1849.75 |
| | **Total Hrs Worked** | 114.00 | | | | |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 114.68 | 114.68 |
| | Medicare | | 26.82 | 26.82 |
| | Fed Income Tax | S 2 | 159.26 | 159.26 |
| | CA Income Tax | S 7 0 | 47.55 | 47.55 |
| | CA Disability | | 18.50 | 18.50 |
| | **TOTAL** | | 366.81 | 366.81 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **1482.94** | **1482.94** |

*Payrolls by Paychex, Inc.*

**0087 A87P-4116** California CareGivers Home Healthcare LLC • 1100 Corporate Way STE 200 • Sacramento CA 95831-6120 • (916) 478-2828

570

CALIFORNIA CAREGIVERS HOME HEALTHCARE LLC
1100 CORPORATE WAY STE 200
SACRAMENTO CA 95831-6120

A87P-4116
ORG1:Departments
ORG2:8827 Staff
EE ID: 505          DD

Payrolls by Paychex, Inc.

TATYANA E DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO CA 94121

**NON-NEGOTIABLE**

Payrolls by Paychex, Inc.

**NON-NEGOTIABLE**

---

**PERSONAL AND CHECK INFORMATION**
Tatyana E Drevaleva
6100 California Street
San Francisco, CA 94121
**Soc Sec #:** xxx-xx-4099   **Employee ID:** 505

**Home Department:** 8827 Staff / Departments

**Pay Period:** 07/22/18 **to** 07/28/18
**Check Date:** 08/03/18   **Check #:** 27693
**NET PAY ALLOCATIONS**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 1482.94 |
| Chkg 1255 | 1375.98 | 1375.98 |
| **NET PAY** | **1375.98** | **2858.92** |

**EARNINGS**

| DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|
| Hourly | 40.00 | 12.2500 | 490.00 | 80.00 | 980.00 |
| Overtime | 66.00 | 18.3750 | 1212.75 | 140.00 | 2572.50 |
| **Total Hours** | 106.00 | | | 220.00 | |
| **Gross Earnings** | | | 1702.75 | | 3552.50 |
| **Total Hrs Worked** | 106.00 | | | | |

**WITHHOLDINGS**

| DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| Social Security | | 105.58 | 220.26 |
| Medicare | | 24.69 | 51.51 |
| Fed Income Tax | S 2 | 141.62 | 300.88 |
| CA Income Tax | S 7 0 | 37.85 | 85.40 |
| CA Disability | | 17.03 | 35.53 |
| **TOTAL** | | 326.77 | 693.58 |

| **NET PAY** | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **1375.98** | **2858.92** |

Payrolls by Paychex, Inc.

**0087 A87P-4116**   California CareGivers Home Healthcare LLC • 1100 Corporate Way STE 200 • Sacramento CA 95831-6120 • (916) 478-2828

CALIFORNIA CAREGIVERS HOME HEALTHCARE LLC   A87P-4116
1100 CORPORATE WAY STE 200                  ORG1:Departments
SACRAMENTO CA  95831-6120                   ORG2:8827 Staff
                                            EE ID: 505          DD

Payrolls by Paychex, Inc.

TATYANA E DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO CA  94121

NON-NEGOTIABLE

Payrolls by Paychex, Inc.

NON-NEGOTIABLE

**PERSONAL AND CHECK INFORMATION**
Tatyana E Drevaleva
6100 California Street
San Francisco, CA  94121
**Soc Sec #:** xxx-xx-4099   **Employee ID:**  505

**Home Department:** 8827 Staff / Departments

**Pay Period:** 07/29/18 to 08/04/18
**Check Date:**  08/10/18   **Check #:**  27873
**NET PAY ALLOCATIONS**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 1482.94 |
| Chkg 1255 | 1240.19 | 2616.17 |
| **NET PAY** | **1240.19** | **4099.11** |

| EARNINGS | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|
| | Hourly | 40.00 | 12.2500 | 490.00 | 120.00 | 1470.00 |
| | Overtime | 56.00 | 18.3750 | 1029.00 | 196.00 | 3601.50 |
| | **Total Hours** | 96.00 | | | 316.00 | |
| | **Gross Earnings** | | | 1519.00 | | 5071.50 |
| | **Total Hrs Worked** | 96.00 | | | | |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 94.17 | 314.43 |
| | Medicare | | 22.03 | 73.54 |
| | Fed Income Tax | S 2 | 119.57 | 420.45 |
| | CA Income Tax | S 7 0 | 27.85 | 113.25 |
| | CA Disability | | 15.19 | 50.72 |
| | **TOTAL** | | 278.81 | 972.39 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **1240.19** | **4099.11** |

**0087 A87P-4116**  California CareGivers Home Healthcare LLC • 1100 Corporate Way STE 200 • Sacramento CA  95831-6120 • (916) 478-2828

572

CALIFORNIA CAREGIVERS HOME HEALTHCARE LLC   A87P-4116
1100 CORPORATE WAY STE 200                  ORG1:Departments
SACRAMENTO CA  95831-6120                   ORG2:8827 Staff
                                            EE ID: 505          DD

TATYANA E DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO CA  94121

NON-NEGOTIABLE

*Payrolls by Paychex, Inc.*

NON-NEGOTIABLE

| **PERSONAL AND CHECK INFORMATION** | | |
|---|---|---|
| Tatyana E Drevaleva | | |
| 6100 California Street | | |
| San Francisco, CA  94121 | | |
| **Soc Sec #:** xxx-xx-4099   **Employee ID:** 505 | | |

**Home Department:** 8827 Staff / Departments

**Pay Period:** 08/05/18 **to** 08/11/18
**Check Date:** 08/17/18   **Check #:** 28052
**NET PAY ALLOCATIONS**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 1482.94 |
| Chkg 1255 | 1093.29 | 3709.46 |
| **NET PAY** | **1093.29** | **5192.40** |

| **EARNINGS** | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|
| | Hourly | 36.00 | 12.2500 | 441.00 | 156.00 | 1911.00 |
| | Overtime | 48.00 | 18.3750 | 882.00 | 244.00 | 4483.50 |
| | **Total Hours** | 84.00 | | | 400.00 | |
| | **Gross Earnings** | | | 1323.00 | | 6394.50 |
| | **Total Hrs Worked** | 84.00 | | | | |

| **WITHHOLDINGS** | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 82.03 | 396.46 |
| | Medicare | | 19.18 | 92.72 |
| | Fed Income Tax | S 2 | 96.05 | 516.50 |
| | CA Income Tax | S 7 0 | 19.22 | 132.47 |
| | CA Disability | | 13.23 | 63.95 |
| | **TOTAL** | | 229.71 | 1202.10 |

| **NET PAY** | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **1093.29** | **5192.40** |

**0087 A87P-4116**  California CareGivers Home Healthcare LLC • 1100 Corporate Way STE 200 • Sacramento CA  95831-6120 • (916) 478-2828

573

CALIFORNIA CAREGIVERS HOME HEALTHCARE LLC
1100 CORPORATE WAY STE 200
SACRAMENTO CA 95831-6120

A87P-4116
ORG1:Departments
ORG2:8827 Staff
EE ID: 505          DD

*Payrolls by Paychex, Inc.*

TATYANA E DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO CA 94121

NON-NEGOTIABLE

*Payrolls by Paychex, Inc.*

NON-NEGOTIABLE

**PERSONAL AND CHECK INFORMATION**
Tatyana E Drevaleva
6100 California Street
San Francisco, CA 94121
**Soc Sec #:** xxx-xx-4099    **Employee ID:** 505

**Home Department:** 8827 Staff / Departments

**Pay Period:** 08/26/18 **to** 09/01/18
**Check Date:** 09/07/18    **Check #:** 28597
**NET PAY ALLOCATIONS**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 1482.94 |
| Chkg 1255 | 351.70 | 4483.15 |
| **NET PAY** | **351.70** | **5966.09** |

| EARNINGS | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|
| | Hourly | 17.00 | 11.0000 | 187.00 | 191.00 | 2296.00 |
| | Overtime | 12.00 | 16.5000 | 198.00 | 272.00 | 4945.50 |
| | **Total Hours** | 29.00 | | | 463.00 | |
| | **Gross Earnings** | | | 385.00 | | 7241.50 |
| | **Total Hrs Worked** | 29.00 | | | | |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 23.87 | 448.97 |
| | Medicare | | 5.58 | 105.00 |
| | Fed Income Tax | S 2 | | 516.55 |
| | CA Income Tax | S 7 0 | | 132.47 |
| | CA Disability | | 3.85 | 72.42 |
| | **TOTAL** | | 33.30 | 1275.41 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **351.70** | **5966.09** |

*Payrolls by Paychex, Inc.*

**0087 A87P-4116**  California CareGivers Home Healthcare LLC • 1100 Corporate Way STE 200 • Sacramento CA 95831-6120 • (916) 478-2828

574

CALIFORNIA CAREGIVERS HOME HEALTHCARE LLC
1100 CORPORATE WAY STE 200
SACRAMENTO CA  95831-6120

A87P-4116
ORG1:Departments
ORG2:8827 Staff
EE ID: 505      DD

TATYANA E DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO CA  94121

NON-NEGOTIABLE

NON-NEGOTIABLE

**PERSONAL AND CHECK INFORMATION**
Tatyana E Drevaleva
6100 California Street
San Francisco, CA  94121
**Soc Sec #:** xxx-xx-4099    **Employee ID:**  505

**Home Department:** 8827 Staff / Departments

**Pay Period:** 09/02/18 **to** 09/08/18
**Check Date:** 09/14/18    **Check #:** 28781
**NET PAY ALLOCATIONS**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 1482.94 |
| Chkg 1255 | 987.33 | 5470.48 |
| **NET PAY** | **987.33** | **6953.42** |

| EARNINGS | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|
| | Hourly | 40.00 | 11.0000 | 440.00 | 231.00 | 2736.00 |
| | Overtime | 47.75 | 16.5000 | 787.88 | 319.75 | 5733.38 |
| | **Total Hours** | 87.75 | | | 550.75 | |
| | **Gross Earnings** | | | 1227.88 | | 8469.38 |
| | **Total Hrs Worked** | 87.75 | | | | |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 76.13 | 525.10 |
| | Medicare | | 17.81 | 122.81 |
| | Fed Income Tax | S 2 | 84.63 | 601.18 |
| | CA Income Tax | S 7 0 | 15.04 | 147.51 |
| | CA Disability | | 12.28 | 84.70 |
| | **TOTAL** | | 205.89 | 1481.30 |

| DEDUCTIONS | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | Lyft | 34.66 | 34.66 |
| | **TOTAL** | 34.66 | 34.66 |

| NET PAY | | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | | **987.33** | **6953.42** |

**0087 A87P-4116**  California CareGivers Home Healthcare LLC • 1100 Corporate Way STE 200 • Sacramento CA  95831-6120 • (916) 478-2828

**575**

NON-NEGOTIABLE

NON-NEGOTIABLE

*Payrolls by Paychex, Inc.*

CALIFORNIA CAREGIVERS HOME HEALTHCARE LLC
1100 CORPORATE WAY STE 200
SACRAMENTO CA 95831-6120

A87P-4116
ORG1:Departments
ORG2:8827 Staff
EE ID: 505          DD

TATYANA E DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO CA 94121

---

**PERSONAL AND CHECK INFORMATION**
Tatyana E Drevaleva
6100 California Street
San Francisco, CA 94121
**Soc Sec #:** xxx-xx-4099   **Employee ID:** 505

**Home Department:** 8827 Staff / Departments

**Pay Period:** 09/02/18 **to** 09/08/18
**Check Date:** 09/14/18   **Check #:** 28781
**NET PAY ALLOCATIONS**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 1482.94 |
| Chkg 1255 | 987.33 | 5470.48 |
| **NET PAY** | **987.33** | **6953.42** |

| EARNINGS | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|
| | Hourly | 40.00 | 11.0000 | 440.00 | 231.00 | 2736.00 |
| | Overtime | 47.75 | 16.5000 | 787.88 | 319.75 | 5733.38 |
| | **Total Hours** | 87.75 | | | 550.75 | |
| | **Gross Earnings** | | | 1227.88 | | 8469.38 |
| | **Total Hrs Worked** | 87.75 | | | | |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 76.13 | 525.10 |
| | Medicare | | 17.81 | 122.81 |
| | Fed Income Tax | S 2 | 84.63 | 601.18 |
| | CA Income Tax | S 7 0 | 15.04 | 147.51 |
| | CA Disability | | 12.28 | 84.70 |
| | **TOTAL** | | 205.89 | 1481.30 |

| DEDUCTIONS | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | Lyft | 34.66 | 34.66 |
| | **TOTAL** | 34.66 | 34.66 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **987.33** | **6953.42** |

*Payrolls by Paychex, Inc.*

**0087 A87P-4116** California CareGivers Home Healthcare LLC • 1100 Corporate Way STE 200 • Sacramento CA 95831-6120 • (916) 478-2828

576

CALIFORNIA CAREGIVERS HOME HEALTHCARE LLC
1100 CORPORATE WAY STE 200
SACRAMENTO CA 95831-6120

A87P-4116
ORG1:Departments
ORG2:8827 Staff
EE ID: 505       DD

*Payrolls by Paychex, Inc.*

TATYANA E DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO CA 94121

**NON-NEGOTIABLE**

*Payrolls by Paychex, Inc.*

**NON-NEGOTIABLE**

**PERSONAL AND CHECK INFORMATION**
Tatyana E Drevaleva
6100 California Street
San Francisco, CA 94121
**Soc Sec #:** xxx-xx-4099    **Employee ID:** 505

**Home Department:** 8827 Staff / Departments

**Pay Period:** 09/09/18 **to** 09/15/18
**Check Date:** 09/21/18    **Check #:** 28959
**NET PAY ALLOCATIONS**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 1482.94 |
| Chkg 1255 | 468.97 | 5939.45 |
| **NET PAY** | **468.97** | **7422.39** |

| EARNINGS | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|
| | Hourly | 18.00 | 11.0000 | 198.00 | 249.00 | 2934.00 |
| | Overtime | 19.50 | 16.5000 | 321.75 | 339.25 | 6055.13 |
| | **Total Hours** | 37.50 | | | 588.25 | |
| | **Gross Earnings** | | | 519.75 | | 8989.13 |
| | **Total Hrs Worked** | 37.50 | | | | |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 32.23 | 557.33 |
| | Medicare | | 7.53 | 130.34 |
| | Fed Income Tax | S 2 | 5.82 | 607.00 |
| | CA Income Tax | S 7 0 | | 147.51 |
| | CA Disability | | 5.20 | 89.90 |
| | **TOTAL** | | 50.78 | 1532.08 |

| DEDUCTIONS | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | Lyft | | 34.66 |
| | **TOTAL** | | 34.66 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **468.97** | **7422.39** |

*Payrolls by Paychex, Inc.*

**0087 A87P-4116** California CareGivers Home Healthcare LLC • 1100 Corporate Way STE 200 • Sacramento CA 95831-6120 • (916) 478-2828

577

CALIFORNIA CAREGIVERS HOME HEALTHCARE LLC  A87P 4116
1100 CORPORATE WAY STE 200
SACRAMENTO CA  95831-6120

ORG1:Departments
ORG2:8827 Staff
EE ID: 505          DD

*Payrolls by Paychex, Inc.*

TATYANA E DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO CA  94121

NON-NEGOTIABLE

*Payrolls by Paychex, Inc.*

NON-NEGOTIABLE

**PERSONAL AND CHECK INFORMATION**
Tatyana E Drevaleva
6100 California Street
San Francisco, CA  94121
**Soc Sec #:** xxx-xx-4099    **Employee ID:** 505

**Home Department:** 8827 Staff / Departments

**Pay Period:** 09/16/18 to 09/22/18
**Check Date:** 09/28/18    **Check #:** 29140
**NET PAY ALLOCATIONS**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 1482.94 |
| Chkg 1255 | 551.88 | 6491.33 |
| **NET PAY** | **551.88** | **7974.27** |

| EARNINGS | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|
| | Hourly | 26.00 | 11.0000 | 286.00 | 275.00 | 3220.00 |
| | Overtime | 20.50 | 16.5000 | 338.25 | 359.75 | 6393.38 |
| | **Total Hours** | 46.50 | | | 634.75 | |
| | **Gross Earnings** | | | 624.25 | | 9613.38 |
| | **Total Hrs Worked** | 46.50 | | | | |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 38.70 | 596.03 |
| | Medicare | | 9.05 | 139.39 |
| | Fed Income Tax | S 2 | 16.27 | 623.27 |
| | CA Income Tax | S 7 0 | 2.11 | 149.62 |
| | CA Disability | | 6.24 | 96.14 |
| | **TOTAL** | | 72.37 | 1604.45 |

| DEDUCTIONS | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | Lyft | | 34.66 |
| | **TOTAL** | | 34.66 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **551.88** | **7974.27** |

*Payrolls by Paychex, Inc.*

**0087 A87P-4116**  California CareGivers Home Healthcare LLC • 1100 Corporate Way STE 200 • Sacramento CA  95831-6120 • (916) 478-2828

578

CALIFORNIA CAREGIVERS HOME HEALTHCARE LLC
1100 CORPORATE WAY STE 200
SACRAMENTO CA 95831-6120

A87P-4116
ORG1:Departments
ORG2:8827 Staff
EE ID: 505 DD

*Payrolls by Paychex, Inc.*

TATYANA E DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO CA 94121

NON-NEGOTIABLE

*Payrolls by Paychex, Inc.*

NON-NEGOTIABLE

| EARNINGS | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|
| | Hourly | 27.00 | 11.0000 | 297.00 | 302.00 | 3517.00 |
| | Overtime | 21.00 | 16.5000 | 346.50 | 380.75 | 6739.88 |
| | **Total Hours** | 48.00 | | | 682.75 | |
| | **Gross Earnings** | | | 643.50 | | 10256.88 |
| | **Total Hrs Worked** | 48.00 | | | | |

**PERSONAL AND CHECK INFORMATION**
Tatyana E Drevaleva
6100 California Street
San Francisco, CA 94121
**Soc Sec #:** xxx-xx-4099   **Employee ID:** 505

**Home Department:** 8827 Staff / Departments

**Pay Period:** 09/23/18 to 09/29/18
**Check Date:** 10/05/18   **Check #:** 29323
**NET PAY ALLOCATIONS**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 1482.94 |
| Chkg 1255 | 567.30 | 7058.63 |
| **NET PAY** | **567.30** | **8541.57** |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 39.90 | 635.93 |
| | Medicare | | 9.33 | 148.72 |
| | Fed Income Tax | S 2 | 18.20 | 641.47 |
| | CA Income Tax | S 7 0 | 2.33 | 151.95 |
| | CA Disability | | 6.44 | 102.58 |
| | **TOTAL** | | 76.20 | 1680.65 |

| DEDUCTIONS | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | Lyft | | 34.66 |
| | **TOTAL** | | 34.66 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **567.30** | **8541.57** |

*Payrolls by Paychex, Inc.*

**0087 A87P-4116** California CareGivers Home Healthcare LLC • 1100 Corporate Way STE 200 • Sacramento CA 95831-6120 • (916) 478-2828

579

CALIFORNIA CAREGIVERS HOME HEALTHCARE LLC
1100 CORPORATE WAY STE 200
SACRAMENTO CA 95831-6120

A87P-4116
ORG1:Departments
ORG2:8827 Staff
EE ID: 505        DD

TATYANA E DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO CA 94121

NON-NEGOTIABLE

*Payrolls by Paychex, Inc.*

NON-NEGOTIABLE

**PERSONAL AND CHECK INFORMATION**
Tatyana E Drevaleva
6100 California Street
San Francisco, CA 94121
**Soc Sec #:** xxx-xx-4099    **Employee ID:** 505

**Home Department:** 8827 Staff / Departments

**Pay Period:** 09/30/18 to 10/06/18
**Check Date:** 10/12/18   **Check #:** 29508
**NET PAY ALLOCATIONS**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 1482.94 |
| Chkg 1255 | 567.30 | 7625.93 |
| **NET PAY** | **567.30** | **9108.87** |

| EARNINGS | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|
| | Hourly | 27.00 | 11.0000 | 297.00 | 329.00 | 3814.00 |
| | Overtime | 21.00 | 16.5000 | 346.50 | 401.75 | 7086.38 |
| | **Total Hours** | 48.00 | | | 730.75 | |
| | **Gross Earnings** | | | 643.50 | | 10900.38 |
| | **Total Hrs Worked** | 48.00 | | | | |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 39.89 | 675.82 |
| | Medicare | | 9.34 | 158.06 |
| | Fed Income Tax | S 2 | 18.20 | 659.67 |
| | CA Income Tax | S 7 0 | 2.33 | 154.28 |
| | CA Disability | | 6.44 | 109.02 |
| | **TOTAL** | | 76.20 | 1756.85 |

| DEDUCTIONS | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | Lyft | | 34.66 |
| | **TOTAL** | | 34.66 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **567.30** | **9108.87** |

*Payrolls by Paychex, Inc.*

**0087 A87P-4116** California CareGivers Home Healthcare LLC • 1100 Corporate Way STE 200 • Sacramento CA 95831-6120 • (916) 478-2828

580

CALIFORNIA CAREGIVERS HOME HEALTHCARE LLC
1100 CORPORATE WAY STE 200
SACRAMENTO CA 95831-6120

A87P-4116
ORG1:Departments
ORG2:8827 Staff
EE ID: 505          DD

TATYANA E DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO CA 94121

NON-NEGOTIABLE

*Payrolls by Paychex, Inc.*

NON-NEGOTIABLE

---

**PERSONAL AND CHECK INFORMATION**
Tatyana E Drevaleva
6100 California Street
San Francisco, CA 94121
**Soc Sec #:** xxx-xx-4099   **Employee ID:** 505

**Home Department:** 8827 Staff / Departments

**Pay Period:** 10/07/18 **to** 10/13/18
**Check Date:** 10/19/18   **Check #:** 29691
**NET PAY ALLOCATIONS**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 1482.94 |
| Chkg 1255 | 607.04 | 8232.97 |
| **NET PAY** | **607.04** | **9715.91** |

| EARNINGS | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|
| | Hourly | 33.00 | 11.0000 | 363.00 | 362.00 | 4177.00 |
| | Overtime | 20.00 | 16.5000 | 330.00 | 421.75 | 7416.38 |
| | **Total Hours** | 53.00 | | | 783.75 | |
| | **Gross Earnings** | | | 693.00 | | 11593.38 |
| | **Total Hrs Worked** | 53.00 | | | | |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 42.97 | 718.79 |
| | Medicare | | 10.04 | 168.10 |
| | Fed Income Tax | S 2 | 23.15 | 682.82 |
| | CA Income Tax | S 7 0 | 2.87 | 157.15 |
| | CA Disability | | 6.93 | 115.95 |
| | **TOTAL** | | 85.96 | 1842.81 |

| DEDUCTIONS | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | Lyft | | 34.66 |
| | **TOTAL** | | 34.66 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **607.04** | **9715.91** |

*Payrolls by Paychex, Inc.*

**0087 A87P-4116**  California CareGivers Home Healthcare LLC • 1100 Corporate Way STE 200 • Sacramento CA 95831-6120 • (916) 478-2828

581

CALIFORNIA CAREGIVERS HOME HEALTHCARE LLC
1100 CORPORATE WAY STE 200
SACRAMENTO CA 95831-6120

A87P-4116
ORG1:Departments
ORG2:8827 Staff
EE ID: 505      DD

TATYANA E DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO CA 94121

NON-NEGOTIABLE

NON-NEGOTIABLE

| EARNINGS | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|
| | Hourly | 18.00 | 11.0000 | 198.00 | 380.00 | 4375.00 |
| | Overtime | 16.00 | 16.5000 | 264.00 | 437.75 | 7680.38 |
| | **Total Hours** | 34.00 | | | 817.75 | |
| | **Gross Earnings** | | | 462.00 | | 12055.38 |
| | **Total Hrs Worked** | 34.00 | | | | |

**PERSONAL AND CHECK INFORMATION**
Tatyana E Drevaleva
6100 California Street
San Francisco, CA 94121
**Soc Sec #:** xxx-xx-4099   **Employee ID:** 505

**Home Department:** 8827 Staff / Departments

**Pay Period:** 10/21/18 to 10/27/18
**Check Date:** 11/02/18   **Check #:** 30054
**NET PAY ALLOCATIONS**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 0.00 | 1482.94 |
| Chkg 1255 | 421.99 | 8654.96 |
| **NET PAY** | **421.99** | **10137.90** |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 28.64 | 747.43 |
| | Medicare | | 6.70 | 174.80 |
| | Fed Income Tax | S 2 | 0.05 | 682.87 |
| | CA Income Tax | S 7 0 | | 157.15 |
| | CA Disability | | 4.62 | 120.57 |
| | **TOTAL** | | 40.01 | 1882.82 |

| DEDUCTIONS | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | Lyft | | 34.66 |
| | **TOTAL** | | 34.66 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **421.99** | **10137.90** |

**0087 A87P-4116**  California CareGivers Home Healthcare LLC • 1100 Corporate Way STE 200 • Sacramento CA 95831-6120 • (916) 478-2828

582

**Exhibit 9.**

"Home Care Assistance", copies of paystubs.

## PERSONAL AND CHECK INFORMATION

TATYANA DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO, CA 94121

**Soc Sec #:** XXX-XX-XXXX   **Employee ID:** 14099
**Hire Date:** 09/08/18
**Status:** PT
**Filing Status:**
Federal: Single, 2
State: CA, Single, 2
**Dept:** 160

**Pay Period:** 10/22/18 to 10/28/18
**Check Date:** 11/01/18   **Check #:** 3506049618
**TIME OFF** (Based On Policy Year)

*DESCRIPTION*
SF SICK - HOURS
  TOTAL BAL
   3.925

## EARNINGS

| DESCRIPTION | HRS/ UNITS | RATE | CURRENT ($) | YTD HRS/ UNITS | YTD ($) |
|---|---|---|---|---|---|
| REGULAR | 8.00 | 17.0000 | 136.00 | | |
| REGULAR | 4.00 | 16.0000 | 64.00 | 112.75 | 1810.75 |
| ORIENTATION & T | | | | 5.00 | 75.00 |
| *HOURS WORKED* | 12.00 | | | 117.75 | |
| *ADJ EARNINGS* | | | 200.00 | | 1885.75 |
| *GROSS EARNINGS* | 12.00 | | 200.00 | 117.75 | 1885.75 |

## WITHHOLDINGS

| DESCRIPTION | CURRENT ($) | YTD ($) |
|---|---|---|
| FEDERAL W/H | | 39.96 |
| OASDI | 12.40 | 116.92 |
| MEDICARE | 2.90 | 27.35 |
| STATE W/H CA | | 2.03 |
| STATE SDI CA | 2.00 | 18.86 |
| *TOTAL* | 17.30 | 205.12 |

## NET PAY ALLOCATIONS

| DESCRIPTION | CURRENT ($) | YTD ($) |
|---|---|---|
| Check Amount | 182.70 | 1680.63 |
| **Net Pay** | **182.70** | **1680.63** |

| | CURRENT ($) | YTD ($) |
|---|---|---|
| **NET PAY** | 182.70 | 1680.63 |

Payrolls by Paychex, Inc.

**0400-R904** HOME CARE ASSISTANCE OF CALIFO ■ 1255 OAKMEAD PKWY ■ SUNNYVALE, CA 94085 ■

584



PERSONAL AND CONFIDENTIAL EARNINGS

TATYANA DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO, CA 94121

Soc Sec #: XXX-XX-XXXX  Employee ID: 14099
Hire Date: 09/08/18
Status: PT
Filing Status:
Federal: Single, 2
State: CA, Single, 2
Dept: 520

Pay Period: 09/03/18 to 09/09/18
Check Date: 09/13/18    Check #: 3506049310
TIME OFF (Based On Policy Year)

DESCRIPTION
SF SICK - HOURS
   TOTAL BAL
     0.433

| EARNINGS | DESCRIPTION | HRS/ UNITS | RATE | CURRENT ($) | YTD HRS/ UNITS | YTD ($) |
|---|---|---|---|---|---|---|
| | REGULAR | 8.00 | 15.0000 | 120.00 | 8.00 | 120.00 |
| | ORIENTATION & T | 5.00 | 15.0000 | 75.00 | 5.00 | 75.00 |
| | *HOURS WORKED* | 13.00 | | | 13.00 | |
| | *ADJ EARNINGS* | | | 195.00 | | 195.00 |
| | *GROSS EARNINGS* | 13.00 | | 195.00 | 13.00 | 195.00 |

| WITHHOLDINGS | DESCRIPTION | | | CURRENT ($) | | YTD ($) |
|---|---|---|---|---|---|---|
| | OASDI | | | 12.09 | | 12.09 |
| | MEDICARE | | | 2.83 | | 2.83 |
| | STATE SDI CA | | | 1.95 | | 1.95 |
| | *TOTAL* | | | 16.87 | | 16.87 |

**NET PAY ALLOCATIONS**

| DESCRIPTION | CURRENT ($) | YTD ($) |
|---|---|---|
| Check Amount | 178.13 | 178.13 |
| Net Pay | 178.13 | 178.13 |

| NET PAY | CURRENT ($) | YTD ($) |
|---|---|---|
| | 178.13 | 178.13 |

Payrolls by Paychex, Inc.
0400-R904 HOME CARE ASSISTANCE OF CALIFO ■ 1255 OAKMEAD PKWY ■ SUNNYVALE, CA 94085 ■

585

FOLD AND REMOVE

FOLD AND REMOVE

**PERSONAL AND CHECKING INFORMATION**

TATYANA DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO, CA 94121

Soc Sec #: XXX-XX-XXXX   Employee ID: 14099
Hire Date: 09/08/18
Status: PT
Filing Status:
Federal: Single, 2
State: CA, Single, 2
Dept: 520

Pay Period: 09/10/18 to 09/16/18
Check Date: 09/20/18    Check #: 3506049358

**TIME OFF** *(Based On Policy Year)*

DESCRIPTION
SF SICK - HOURS
  TOTAL BAL
  0.925

**EARNINGS**

| DESCRIPTION | HRS/ UNITS | RATE | CURRENT ($) | YTD HRS/ UNITS | YTD ($) |
|---|---|---|---|---|---|
| REGULAR | 4.00 | 15.0000 | 60.00 | | |
| REGULAR | 8.00 | 16.0000 | 128.00 | | |
| REGULAR | 2.75 | 17.0000 | 46.75 | 22.75 | 354.75 |
| ORIENTATION & T | | | | 5.00 | 75.00 |
| HOURS WORKED | 14.75 | | | 27.75 | |
| ADJ EARNINGS | | | 234.75 | | 429.75 |
| GROSS EARNINGS | 14.75 | | 234.75 | 27.75 | 429.75 |

**WITHHOLDINGS**

| DESCRIPTION | CURRENT ($) | YTD ($) |
|---|---|---|
| FEDERAL W/H | 0.40 | 0.40 |
| OASDI | 14.55 | 26.64 |
| MEDICARE | 3.40 | 6.23 |
| STATE SDI CA | 2.35 | 4.30 |
| TOTAL | 20.70 | 37.57 |

**NET PAY ALLOCATIONS**

| DESCRIPTION | CURRENT ($) | YTD ($) |
|---|---|---|
| Check Amount | 214.05 | 392.18 |
| Net Pay | 214.05 | 392.18 |

| | CURRENT ($) | YTD ($) |
|---|---|---|
| **NET PAY** | 214.05 | 392.18 |

Payrolls by Paychex, Inc.

0400-R904 HOME CARE ASSISTANCE OF CALIFO ■ 1255 OAKMEAD PKWY ■ SUNNYVALE, CA 94085 ■

586



TATYANA DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO, CA 94121

Soc Sec #: XXX-XX-XXXX    Employee ID: 14099
Hire Date: 09/08/18
Status: PT
Filing Status:
Federal: Single, 2
State: CA, Single, 2
Dept: 160

Pay Period: 10/08/18 to 10/14/18
Check Date: 10/18/18    Check #: 3506049538
TIME OFF (Based On Policy Year)

DESCRIPTION
SF SICK - HOURS
   TOTAL BAL
   2.592

| EARNINGS | DESCRIPTION | HRS/ UNITS | RATE | CURRENT ($) | YTD HRS/ UNITS | YTD ($) |
|---|---|---|---|---|---|---|
| | REGULAR | 4.00 | 16.0000 | 64.00 | 72.75 | 1150.75 |
| | ORIENTATION & T | | | | 5.00 | 75.00 |
| | *HOURS WORKED* | 4.00 | | | 77.75 | |
| | *ADJ EARNINGS* | | | 64.00 | | 1225.75 |
| | *GROSS EARNINGS* | 4.00 | | 64.00 | 77.75 | 1225.75 |

| WITHHOLDINGS | DESCRIPTION | CURRENT ($) | YTD ($) |
|---|---|---|---|
| | FEDERAL W/H | | 16.12 |
| | OASDI | 3.97 | 76.00 |
| | MEDICARE | 0.93 | 17.78 |
| | STATE W/H CA | | 0.18 |
| | STATE SDI CA | 0.64 | 12.26 |
| | TOTAL | 5.54 | 122.34 |

**NET PAY ALLOCATIONS**

| DESCRIPTION | CURRENT ($) | YTD ($) |
|---|---|---|
| Check Amount | 58.46 | 1103.41 |
| Net Pay | 58.46 | 1103.41 |

| NET PAY | CURRENT ($) | YTD ($) |
|---|---|---|
| | 58.46 | 1103.41 |

Payrolls by Paychex, Inc.
**0400-R904** HOME CARE ASSISTANCE OF CALIFO  ▪  1255 OAKMEAD PKWY  ▪  SUNNYVALE, CA 94085  ▪

587

**PERSONAL AND CHECK INFORMATION**
Tatyana E Drevaleva
6100 California Street
San Francisco, CA 94121
Soc Sec #: xxx-xx-4099   Employee ID: 505

Home Department: 8827 Staff / Departments

Pay Period: 07/15/18 to 07/21/18
Check Date: 07/27/18   Check #: 6084901035

**NET PAY ALLOCATIONS**

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Check Amount | 1482.94 | 1482.94 |
| NET PAY | 1482.94 | 1482.94 |

| | | | | | YTD ($) |
|---|---|---|---|---|---|
| Hourly | 40.00 | 12.2500 | 490.00 | 40.00 | 490.00 |
| Overtime | 74.00 | 18.3750 | 1359.75 | 74.00 | 1359.75 |
| Total Hours | 114.00 | | | 114.00 | |
| Gross Earnings | | | 1849.75 | | 1849.75 |
| Total Hrs Worked | 114.00 | | | | |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 114.68 | 114.68 |
| | Medicare | | 26.82 | 26.82 |
| | Fed Income Tax | S 2 | 159.26 | 159.26 |
| | CA Income Tax | S 7 0 | 47.55 | 47.55 |
| | CA Disability | | 18.50 | 18.50 |
| | **TOTAL** | | 366.81 | 366.81 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | 1482.94 | 1482.94 |

Payrolls by Paychex, Inc.
0087 A87P-4116  California CareGivers Home Healthcare LLC • 1100 Corporate Way STE 200 • Sacramento CA 95831-6120 • (916) 478-2828

588

FOLD AND REMOVE

FOLD AND REMOVE

**PERSONAL AND CHECK INFORMATION**

TATYANA DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO, CA 94121

Soc Sec #: XXX-XX-XXXX   Employee ID: 14099
Hire Date: 09/08/18
Status: PT
Filing Status:
Federal: Single, 2
State: CA, Single, 2
Dept: 160

Pay Period: 10/15/18 to 10/21/18
Check Date: 10/25/18      Check #: 3506049579
**TIME OFF** (Based On Policy Year)

DESCRIPTION
SF SICK - HOURS
  TOTAL BAL
    3.525

**NET PAY ALLOCATIONS**

| DESCRIPTION | CURRENT ($) | YTD ($) |
|---|---|---|
| Check Amount | 394.52 | 1497.93 |
| **Net Pay** | **394.52** | **1497.93** |

**EARNINGS**

| DESCRIPTION | HRS/ UNITS | RATE | CURRENT ($) | YTD HRS/ UNITS | YTD ($) |
|---|---|---|---|---|---|
| REGULAR | 16.00 | 16.0000 | 256.00 | | |
| REGULAR | 12.00 | 17.0000 | 204.00 | 100.75 | 1610.75 |
| ORIENTATION & T | | | | 5.00 | 75.00 |
| **HOURS WORKED** | 28.00 | | | 105.75 | |
| **ADJ EARNINGS** | | | 460.00 | | 1685.75 |
| **GROSS EARNINGS** | 28.00 | | 460.00 | 105.75 | 1685.75 |

| WITHHOLDINGS | DESCRIPTION | CURRENT ($) | YTD ($) |
|---|---|---|---|
| | FEDERAL W/H | 23.84 | 39.96 |
| | OASDI | 28.52 | 104.52 |
| | MEDICARE | 6.67 | 24.45 |
| | STATE W/H CA | 1.85 | 2.03 |
| | STATE SDI CA | 4.60 | 16.86 |
| | **TOTAL** | 65.48 | 187.82 |

| | | CURRENT ($) | YTD ($) |
|---|---|---|---|
| **NET PAY** | | 394.52 | 1497.93 |

Payrolls by Paychex, Inc.
**0400-R904** HOME CARE ASSISTANCE OF CALIFO ■ 1255 OAKMEAD PKWY ■ SUNNYVALE, CA 94085 ■

589

FOLD AND REMOVE

FOLD AND REMOVE

**PERSONAL AND CHECK INFORMATION**

TATYANA DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO, CA 94121

Soc Sec #: XXX-XX-XXXX    Employee ID: 14099
Hire Date: 09/08/18
Status: PT
Filing Status:
Federal: Single, 2
State: CA, Single, 2
Dept: 160

Pay Period: 10/01/18 to 10/07/18
Check Date: 10/11/18    Check #: 3506049491

**TIME OFF** (Based On Policy Year)

DESCRIPTION
SF SICK - HOURS
  TOTAL BAL
    2.458

**NET PAY ALLOCATIONS**

| DESCRIPTION | CURRENT ($) | YTD ($) |
|---|---|---|
| Check Amount | 338.53 | 1044.95 |
| Net Pay | 338.53 | 1044.95 |

**EARNINGS**

| DESCRIPTION | HRS/ UNITS | RATE | CURRENT ($) | YTD HRS/ UNITS | YTD ($) |
|---|---|---|---|---|---|
| REGULAR | 20.00 | 16.0000 | 320.00 | | |
| REGULAR | 4.00 | 17.0000 | 68.00 | 68.75 | 1086.75 |
| ORIENTATION & T | | | | 5.00 | 75.00 |
| HOURS WORKED | 24.00 | | | 73.75 | |
| ADJ EARNINGS | | | 388.00 | | 1161.75 |
| GROSS EARNINGS | 24.00 | | 388.00 | 73.75 | 1161.75 |

| WITHHOLDINGS | DESCRIPTION | CURRENT ($) | YTD ($) |
|---|---|---|---|
| | FEDERAL W/H | 15.72 | 16.12 |
| | OASDI | 24.06 | 72.03 |
| | MEDICARE | 5.63 | 16.85 |
| | STATE W/H CA | 0.18 | 0.18 |
| | STATE SDI CA | 3.88 | 11.62 |
| | TOTAL | 49.47 | 116.80 |

| | CURRENT ($) | YTD ($) |
|---|---|---|
| **NET PAY** | 338.53 | 1044.95 |

Payrolls by Paychex, Inc.

**0400-R904** HOME CARE ASSISTANCE OF CALIFO ■ 1255 OAKMEAD PKWY ■ SUNNYVALE, CA 94085 ■

590

FOLD AND REMOVE

FOLD AND REMOVE

## PERSONAL AND CHECK INFORMATION

TATYANA DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO, CA 94121

Soc Sec #: XXX-XX-XXXX    Employee ID: 14099
Hire Date: 09/08/18
Status: PT
Filing Status:
Federal: Single, 2
State: CA, Single, 2
Dept: 520

Pay Period: 09/17/18 to 09/23/18
Check Date: 09/27/18    Check #: 3506049405
**TIME OFF** (Based On Policy Year)

DESCRIPTION
SF SICK - HOURS
   TOTAL BAL
      1.392

### EARNINGS

| DESCRIPTION | HRS/ UNITS | RATE | CURRENT ($) | YTD HRS/ UNITS | YTD ($) |
|---|---|---|---|---|---|
| REGULAR | 8.00 | 15.0000 | 120.00 | | |
| REGULAR | 6.00 | 16.0000 | 96.00 | 36.75 | 570.75 |
| ORIENTATION & T | | | | 5.00 | 75.00 |
| **HOURS WORKED** | 14.00 | | | 41.75 | |
| **ADJ EARNINGS** | | | 216.00 | | 645.75 |
| **GROSS EARNINGS** | 14.00 | | 216.00 | 41.75 | 645.75 |

### WITHHOLDINGS

| DESCRIPTION | CURRENT ($) | YTD ($) |
|---|---|---|
| FEDERAL W/H | | 0.40 |
| OASDI | 13.39 | 40.03 |
| MEDICARE | 3.13 | 9.36 |
| STATE SDI CA | 2.16 | 6.46 |
| **TOTAL** | 18.68 | 56.25 |

### NET PAY ALLOCATIONS

| DESCRIPTION | CURRENT ($) | YTD ($) |
|---|---|---|
| Check Amount | 197.32 | 589.50 |
| **Net Pay** | 197.32 | 589.50 |

| | CURRENT ($) | YTD ($) |
|---|---|---|
| **NET PAY** | 197.32 | 589.50 |

Payrolls by Paychex, Inc.

**0400-R904** HOME CARE ASSISTANCE OF CALIFO ■ 1255 OAKMEAD PKWY ■ SUNNYVALE, CA 94085 ■

591

## PERSONAL AND CHECK INFORMATION

TATYANA DREVALEVA
6100 CALIFORNIA STREET
SAN FRANCISCO, CA 94121

Soc Sec #: XXX-XX-XXXX   Employee ID: 14099
Hire Date: 09/08/18
Status: PT
Filing Status:
Federal: Single, 2
State: CA, Single, 2
Dept: 160

Pay Period: 09/24/18 to 09/30/18
Check Date: 10/04/18   Check #: 3506049446
**TIME OFF** (Based On Policy Year)

DESCRIPTION
SF SICK - HOURS
   TOTAL BAL
      1.658

## EARNINGS

| DESCRIPTION | HRS/ UNITS | RATE | CURRENT ($) | YTD HRS/ UNITS | YTD ($) |
|---|---|---|---|---|---|
| REGULAR | 8.00 | 16.0000 | 128.00 | 44.75 | 698.75 |
| ORIENTATION & T | | | | 5.00 | 75.00 |
| *HOURS WORKED* | 8.00 | | | 49.75 | |
| *ADJ EARNINGS* | | | 128.00 | | 773.75 |
| *GROSS EARNINGS* | 8.00 | | 128.00 | 49.75 | 773.75 |

## WITHHOLDINGS

| DESCRIPTION | CURRENT ($) | YTD ($) |
|---|---|---|
| FEDERAL W/H | | 0.40 |
| OASDI | 7.94 | 47.97 |
| MEDICARE | 1.86 | 11.22 |
| STATE SDI CA | 1.28 | 7.74 |
| TOTAL | 11.08 | 67.33 |

## NET PAY ALLOCATIONS

| DESCRIPTION | CURRENT ($) | YTD ($) |
|---|---|---|
| Check Amount | 116.92 | 706.42 |
| **Net Pay** | **116.92** | **706.42** |

| NET PAY | CURRENT ($) | YTD ($) |
|---|---|---|
| | 116.92 | 706.42 |

Payrolls by Paychex, Inc.

**0400-R904** HOME CARE ASSISTANCE OF CALIFO ■ 1255 OAKMEAD PKWY ■ SUNNYVALE, CA 94085 ■

592

**Exhibit 10.**

Termination of a full time employment offer as a Medical Instrument Technician (EKG) at the Minneapolis VAMC.

 Gmail

**Tatyana Drevaleva <tdrevaleva@gmail.com>**

## Tatyana Drevaleva Confirmation of Tentative Offer Full Time Permanent - MIT (EKG) Tech

**Hildebrandt, Gary L.** <Gary.Hildebrandt@va.gov>                    Wed, Mar 14, 2018 at 4:02 PM
To: "tdrevaleva@gmail.com" <tdrevaleva@gmail.com>, "Ussery, Randall C.," <Randall.Ussery@va.gov>,
"Jones, William S." <William.Jones23@va.gov>, "Daly, Amy L." <Amy.Daly@va.gov>, "Larive, Tara M."
<Tara.Larive@va.gov>

Hi Tatyana,

Thank you for accepting my tentative offer for our full time, permanent, Medical Instrument
Technician position in our Nurse Executive service line. We look forward to your starting with
us! A final job offer will be contingent on completion of pre-employment requirements and a
review by a professional standards board. As we discussed, your final pay will be based upon
the final determination of our Professional Standards Board and a review of your education
and experience.

Randy Ussery is our pre-employment subject matter expert and he will contact you to begin
the pre-employment requirements. He will coordinate the transfer process from you current
VA and work with your HR department to confirm relevant information.

Here are links to the U.S. Office of Personnel Management's Insurance Operations and
Retirement Operations Homepages, and also for additional benefits program homepages:

- Insurance Operations Homepage: http://www.opm.gov/insure/

- Retirement Operations Homepage: http://www.opm.gov/retire

- Vision/Dental Information: www.benefeds.com

- Flexible Spending Accounts: www.fsafeds.com

- Thrift Savings Plan Information (401K): www.tsp.gov

Also attached are the KSA for the grades of GS-6 and GS-7. Please fill these out in as much detail as
possible, answering the questions specifically and including the years and or months of experience for
each question. These KSAs will be submitted to the professional standards board for determining the grade
at which you will be appointed.

594

If you have questions during the process, feel free to contact Randy or William Jones. Randy will be contacting you shortly to initiate the pre-employment process.

Thank you,

Gary L. Hildebrandt

Human Resources Specialist

Minneapolis VA Healthcare System

One Vetrans Drive

Minneapolis, MN 55417

Phone: 612-629-7308

Fax: 612-467-2287



*How are we doing?*

*Human Resources values your opinion!*

**Visit:** http://feedback.htm.va.gov/HRQuickCard

VISN 23 VA Midwest Health Care Network

Minneapolis, MN-618

**4 attachments**

 **Fact Sheet – ANNUAL LEAVE.PDF**
42K

595

 **Fact Sheet Sick Leave.pdf**
118K

 **KSA GS 6 Template.docx**
15K

**KSA GS 7 Template.docx**
18K

596



**Tatyana Drevaleva <tdrevaleva@gmail.com>**

---

## Tatyana Drevaleva Confirmation of Tentative Offer Full Time Permanent - MIT (EKG) Tech

---

**Daly, Amy L.** <Amy.Daly@va.gov>                                    Thu, Mar 15, 2018 at 5:23 AM
To: "tdrevaleva@gmail.com" <tdrevaleva@gmail.com>

Welcome to the team Tatyana!!!

I didn't get to introduce myself as my Assistant Nurse Manager Tara interviewed you. But my name is Amy Daly and I will be your Nurse Manager for the team. Tara is super excited about having you join the team (as am I obviously) 😊

I wanted to just reach out to you quickly as you proceed through some of these cumbersome HR pre-hire things (but I understand you have worked within our system before- so hopefully we can facilitate a transfer of things easily) I'm not sure if you'll have to go through the normal pre-hire "stuff"- including the KSAs???

I will f/u with Gary/William from HR to see if you will have to go to Boards if you are already a GS status?

Either way, I just wanted to reach out and let you know that moving forward- please keep in touch with me if you have any questions about anything; Or if you're not hearing back from HR, or whatever the case may be; just let me know. I'll keep tabs on where you are at in this process and make sure things keep moving along….

We're excited to have you join the team and I'm looking forward to meeting you!

If there are any other questions,

*Amy Daly, MSN, RN-BC, VHA-CM*

*Nurse Manager, Critical Resource Teams*

*Minneapolis VAHCS*

*612-467-4392 (office)*

**From:** Hildebrandt, Gary L.
**Sent:** Wednesday, March 14, 2018 6:02 PM
**To:** tdrevaleva@gmail.com; Ussery, Randall C., <Randall.Ussery@va.gov>; Jones, William S. <William.Jones23@va.gov>; Daly, Amy L. <Amy.Daly@va.gov>; Larive, Tara M. <Tara.Larive@va.gov>
**Subject:** Tatyana Drevaleva Confirmation of Tentative Offer Full Time Permanent - MIT (EKG) Tech

[Quoted text hidden]

 **Gmail**

Tatyana Drevaleva <tdrevaleva@gmail.com>

---

## from Tatyana Drevaleva - a acndidate for the job opening odf a Medical Instrument Technician (EKG) at the Minneapolis VAMC.

**Jones, William S.** <William.Jones23@va.gov>                                            Tue, Jun 26, 2018 at 6:48 AM
To: Tatyana Drevaleva <tdrevaleva@gmail.com>
Cc: "Corradi, Steven" <Steven.Corradi@va.gov>, "Flores, Christian A." <Christian.Flores@va.gov>, "Ussery, Randall C.," <Randall.Ussery@va.gov>, "Glazer, Joseph E." <Joseph.Glazer@va.gov>


Hello Tatyana,


Per conversation 06/25/2018, I am unable to extend a firm job offer due to a discrepancy in your background investigation.  I sent a rescinded offer to you by certified mail with the address on your resume showing 6100 California Street, San Francisco, CA 94121 on 05/09/2018.  This certified mail was returned to me due wrong address.  I will send another rescinded offer to you by certified mail for your records at the new address.  Your new address is 10660 Hidden Mesa Place, Monterey, CA 93940.  For more details about your background investigation, please contact Mr. Joe Glazer at (612) 467-4344.


**From:** Tatyana Drevaleva [mailto:tdrevaleva@gmail.com]
**Sent:** Monday, June 25, 2018 12:46 PM
**To:** Jones, William S. <William.Jones23@va.gov>; Ussery, Randall C., <Randall.Ussery@va.gov>
**Subject:** [EXTERNAL] from Tatyana Drevaleva - a acndidate for the job opening odf a Medical Instrument Technician (EKG) at the Minneapolis VAMC.

[Quoted text hidden]

599

 Gmail

**Tatyana Drevaleva <tdrevaleva@gmail.com>**

---

## from Tatyana Drevaleva - a acndidate for the job opening odf a Medical Instrument Technician (EKG) at the Minneapolis VAMC.

**Glazer, Joseph E.** <Joseph.Glazer@va.gov>                    Wed, Jun 27, 2018 at 4:28 AM
To: Tatyana Drevaleva <tdrevaleva@gmail.com>, "Jones, William S." <William.Jones23@va.gov>
Cc: "Corradi, Steven" <Steven.Corradi@va.gov>, "Flores, Christian A." <Christian.Flores@va.gov>, "Ussery, Randall C.," <Randall.Ussery@va.gov>, "Larive, Tara M." <Tara.Larive@va.gov>, "Kimble, Brad" <Brad.Kimble@va.gov>, "Dunkelberger, Carla" <Carla.Dunkelberger@va.gov>

Tatyana Drevaleva


I reviewed the results of your preliminary background check and determined that you were  not suitable for a Medical Instrument Technician  position at this time.   Suitability factor 1 of 5 CFR 731.202 (b) and Additional consideration 1, 4 and 7  of 5 CFR 731.202 (c).   You stated that you were "fired from the Raymond G. Murphy VAMC on June 30, 2017".


As you did not properly request your time off for your trip thru the proper chain, this is misconduct and negligence in employment, making you unsuitable for a position at the MPLS VAMC.


Thank you


Glazer



Joseph E. Glazer

Human Resources Specialist-Security

Human Resources Management Service

VA Medical Center

One Veterans Drive

Minneapolis, MN  55417

612-467-4344

612-467-2287 (fax)

joseph.glazer@va.gov

600

"How was your service in Human Resources today?  Please take a few moments to complete the HR Customer Service Quick Card at this link:

http://feedback.htm.va.gov/HRQuickCard/feHRQuickCard.aspx

**From:** Tatyana Drevaleva [mailto:tdrevaleva@gmail.com]
**Sent:** Tuesday, June 26, 2018 2:17 PM
**To:** Jones, William S. <William.Jones23@va.gov>
**Cc:** Corradi, Steven <Steven.Corradi@va.gov>; Flores, Christian A. <Christian.Flores@va.gov>; Ussery, Randall C., <Randall.Ussery@va.gov>; Glazer, Joseph E. <Joseph.Glazer@va.gov>; Larive, Tara M. <Tara.Larive@va.gov>
**Subject:** Re: [EXTERNAL] from Tatyana Drevaleva - a acndidate for the job opening odf a Medical Instrument Technician (EKG) at the Minneapolis VAMC.

[Quoted text hidden]

601

 Gmail

**Tatyana Drevaleva <tdrevaleva@gmail.com>**

---

## from Tatyana Drevaleva - a acndidate for the job opening odf a Medical Instrument Technician (EKG) at the Minneapolis VAMC.

**Glazer, Joseph E.** <Joseph.Glazer@va.gov>                                    Wed, Jun 27, 2018 at 10:42 AM
To: Tatyana Drevaleva <tdrevaleva@gmail.com>
Cc: "Jones, William S." <William.Jones23@va.gov>, "Corradi, Steven" <Steven.Corradi@va.gov>, "Flores, Christian A." <Christian.Flores@va.gov>, "Ussery, Randall C.," <Randall.Ussery@va.gov>, "Larive, Tara M." <Tara.Larive@va.gov>, "Kimble, Brad" <Brad.Kimble@va.gov>, "Dunkelberger, Carla" <Carla.Dunkelberger@va.gov>

Ms. Drevaleva – the suitability determination was made IAW 5 CFR 731.202, I wish nothing but the best for you with your future endeavors. This matter is closed and I will no longer reply to messages on this matter.

Thank you

Glazer

Joseph E. Glazer

Human Resources Specialist-Security

Human Resources Management Service

VA Medical Center

One Veterans Drive

Minneapolis, MN  55417

612-467-4344

612-467-2287 (fax)

joseph.glazer@va.gov

"How was your service in Human Resources today? Please take a few moments to complete the HR Customer Service Quick Card at this link:

http://feedback.htm.va.gov/HRQuickCard/feHRQuickCard.aspx

602

**From:** Tatyana Drevaleva [mailto:tdrevaleva@gmail.com]
**Sent:** Wednesday, June 27, 2018 12:26 PM
**To:** Glazer, Joseph E. <Joseph.Glazer@va.gov>
**Cc:** Jones, William S. <William.Jones23@va.gov>; Corradi, Steven <Steven.Corradi@va.gov>; Flores, Christian A. <Christian.Flores@va.gov>; Ussery, Randall C., <Randall.Ussery@va.gov>; Larive, Tara M. <Tara.Larive@va.gov>; Kimble, Brad <Brad.Kimble@va.gov>; Dunkelberger, Carla <Carla.Dunkelberger@va.gov>

[Quoted text hidden]

[Quoted text hidden]

603

**Exhibit 11.**

Failure to hire at the Los Angeles VAMC.



Tatyana Drevaleva <tdrevaleva@gmail.com>

## FW: Interview Confirmation_ MIT (EKG)

**Ryou, Kathy G.** <Kathy.Ryou2@va.gov>                     Mon, Jun 18, 2018 at 4:52 PM
To: "tdrevaleva@gmail.com" <tdrevaleva@gmail.com>

This email is a confirmation for your **PHONE interview** for MIT (EKG)  with Nursing Services, Medical / Surgical

Your interview ins confirmed for:

- **Monday, June 25th**
- **1:00pm**

Please complete and send the following documents **before** the interview date for consideration:

- Business references – **one of the reference must be your current Supervisor** / 2850 application
- Nurse Application Addendum
- Fingerprint Record Sheet
- 2850 Application
- 2017 Performance Appraisal
- Time and Attendance Report 6/2017 to current

Thank you kindly,

**KATHY G. RYOU**

**ADMINISTRATIVE OFFICER,  Nursing Service**

**GLA West Los Angeles Hospital**

**11301 Wilshire Blvd**

**Los Angeles, CA 90073**

**BLDG 500 / Room 6215**

**310-478-3711  ext 40565**

**4 attachments**

 **Document2.docx**
183K

**vha-10-2850a-fill RN (2).pdf**
757K

**Nurse Application Addendum (Fillable).pdf**
202K

**Fingerprint Record Sheet - digital.pdf**
146K

 **Gmail**

Tatyana Drevaleva <tdrevaleva@gmail.com>

## Interview Confirmation_ 2850 Application

**Ryou, Kathy G.** <Kathy.Ryou2@va.gov>                                          Fri, Jul 6, 2018 at 4:42 PM
To: Tatyana Drevaleva <tdrevaleva@gmail.com>

Thank you for your interest in employment with Greater Los Angeles Health Care System and the position for MIT EKG. We have reviewed  your application and interview with other qualified candidates, and I regret to inform you that you have not been selected for further consideration.

We appreciated the time you invested for our interview process and encourage you to visit www.usajobs.gov to consider and apply for another employment opportunities.

We wish you success in your future career endeavors.

Kindest regards.

Kathy Ryou

**From:** Tatyana Drevaleva [mailto:tdrevaleva@gmail.com]
**Sent:** Friday, July 06, 2018 2:47 PM
**To:** Ryou, Kathy G. <Kathy.Ryou2@va.gov>
**Subject:** [EXTERNAL] Re: Interview Confirmation_ 2850 Application

[Quoted text hidden]

**Exhibit 12.**

Letters of Reference from my previous employers.

UNIVERSITY OF CALIFORNIA, DAVIS



BERKELEY • DAVIS • IRVINE • LOS ANGELES • RIVERSIDE • SAN DIEGO • SAN FRANCISCO          SANTA BARBARA • SANTA CRUZ

UC DAVIS HEART CENTER
UC DAVIS MEDICAL CENTER
2315 STOCKTON BOULEVARD
SACRAMENTO, CALIFORNIA 95817
(916) 734-5513
FAX: (916) 734-5378

April 6, 2010

To Whom It May Concern:

I am pleased to write this letter of reference for Tatyana Drevaleva.

Tatyana had worked for us for over three months. She has performed electrocardiograms; Hooked up ambulatory monitors (Holters, events and blood pressure monitors) and started to learn how to do nuclear stress tests. During this time she has become proficient in performing electrocardiograms and ambulatory monitors with incredible degree of accuracy and efficiency.

Tatyana was an excellent employee. She had great work ethic beyond reproach. She is compassionate and has excellent customer service skills. Aside from her ability to easily comprehend technical assignments, her drive and amiable demeanor make her an ideal employee and popular addition to our staff.

Any organization considering Tatyana has my most enthusiastic recommendation. Should you have any questions please contact me at 916 734-5503.

Sincerely,

Kristen Higginson, CCT
Supervisor, Electrocardiography Services
Kristen.Higginson@ucdmc.ucdavis.edu

609

San Francisco VA Medical Center
Nuclear Medicine Section
Department of Radiology

Carina Mari Aparici
Chief, Nuclear Medicine
Associate Professor in Radiology
University of California San Francisco, UCSF

January 28, 2013

To whom it may concern,

Tatyana Drevaleva has worked as an EKG technologist in Nuclear Medicine for about a year. She is an extremely pleasant, helpful and caring person. She is very detail oriented and always performs to the best of her abilities. The quality of the work she performs is very important to her. Her medical background makes her comfortable with a broad patient population.

In summary, and based on my prior description of Tatyana, I strongly recommend her for your program. Would you have any questions please do not hesitate to contact me.

Sincerely,

Carina Mari Aparici
Chief, Nuclear Medicine
Associate Professor in Radiology
University of California San Francisco, UCSF

610

January 22, 2011
3181 SW Sam Jackson Park Rd
Portland, Oregon  97239

Dear Sirs,

I strongly recommend Tatyana Drevaleva.  I have known Tatyana for over two and a half years and I see an extremely positive person who genuinely cares about those around her. She will always perform to the best of her abilities – I've never seen her able to give less than one hundred percent to any task that she is performing, either personal or professional.  The quality of the work she performs is also very important to her – she knows that the patient is dependent on her, and insists on doing the best that she can for the patient.

She enjoys a diverse ethnic background, and her language skills and medical background makes her comfortable with a broad patient population.   In summary, the combination of Tatyana's skills, background and nature makes her ideally suited for a health care position.

Sincerely,

Justin B. Fletcher
Assistant Professor
Oregon Health & Science University
fletchju@ohsu.edu
(503) 494-4494

611

To Whom It May Concern


As a registered nurse at Kaiser Permanente, I have the pleasure of working with, Tatyana Drevaleva. I would like to take this time to recommend her to you. I feel confident she will be successful. She is a dedicated worker. She pays attention to details, notice changes, and recognizes patterns. For example, I had a patient that was in second degree heart block. The previous monitor technicians said it was sinus bradycardia. I was very busy with one of my other patients and didn't get a chance to look at it for myself. Tatyana noticed it right away and notified me. We both were in agreement. I was able to notify the doctor and treat the patient properly, thanks to Tatyana. The patient's condition did not decline, due to Taytana's dedication to do the best job she can and she does this every time she is at work.


If you have any questions regarding this recommendation, please don't hesitate to contact me at veronicagrigsby@yahoo.com.


Sincerely

Veronica Grigsby

612

October 22, 2012


To Whom It May Concern:

I have worked with Tatyana Drevaleva for the last several months in the San Francisco Veterans Affairs exercise/stress lab.  We have worked together every Friday, overseeing the stress tests. She has been an outstanding co-worker. She is extremely conscientious, and ensures the patient has been properly evaluated prior to starting any cardiac stress test. She explains the process to the patient and then helps assist them as well as the provider during the studies. Her medical background proves to be a tremendous asset as she will call concerning issues to the provider's attention immediately. In addition, she is polite and patient with our very diverse, often nervous, population.

I am happy to provide any additional information and answer any questions you may have.


Sincerely,



Jacqueline Ruckel, RN, NP
Cardiology
San Francisco Veterans Affairs Medical Center
4150 Clement St. # 111C
San Francisco, CA 94121

415-221-4810 ext 2693

613

Dr. Fletcher,

Tattayana Drevaleva has requested a letter of reference to the Post-doctoral Fellowship in Biomedical Informatics.  I have supervised Tattayana for approximately six months as her direct supervisor. Tattayana has worked for Kaiser Permanente-Oakland as a Telemetry Technician.  During this time, Tattayana has shown herself to have great attention to detail.  She takes great pride in all aspects of her work.  I recommend Tattayana for the Biomedical Informatics program.

Jason White

Assistant Manager

9th Floor Med-Surg/Tele

Kaiser Permanente - Oakland

614

11/1/12

To Whom It May Concern,

I have the pleasure to work with Tatyana Drevaleva in Treadmill Lab @ SFVAMC.  Tatyana is reliable, dependable & personable.  Tatyana takes her work seriously and willing to spend the extra time to get a good base line EKG before proceeding with stress test.  She is conscientious in observing the cardiac monitor while my head is turned to do other tasks.  The SFVAMC Treadmill Lab has never been so clean since Tatyana join our team

I highly recommend Tatyana and any question, please feel free to contact me.

Sincerely,


Linda Ho, FNP-BC

(415) 221-4810x2694

SFVAMC

4150 Clement St

San Francisco, CA 94121

 **KAISER PERMANENTE**

February 29, 2012

**Mr. Justin Fletcher, Ph. D.**

Dear **Dr. Fletcher,**

Ms. Tatyana Drevaleva has been employed at Kaiser Permanente Northern California since September 2011. She has been assigned as a Monitor Technician in the Medical-Surgical/Telemetry unit.

She is a diligent worker, dependable and trustworthy. She executes her skills with knowledge.

I also found Tatyana proficient and reliable in the discharge of her duties and responsibilities. I give Ms. Drevaleva my highest recommendation.

Sincerely,

**Vanessa A. Martinez, RN, BSN**
Department Nurse Manager
9-F, Med-Surg/Telemetry/Stroke/Residence Training
Oakland Medical Center
Tel. No. 510-926-0422

280 West MacArthur Blvd. Suite #9036 Oakland, CA 94611
Phone (510)752-7543 Fax (510)7527535 e-mail Vanessa.A.Martinez@kp.org

616



ALAMEDA
HEALTH SYSTEM

August 21, 2013

To whom it may concern,

I would like to recommend Ms. Tatyana Drevaleva to a position she is applying for. She is currently our telemetry monitor technician that helps monitor 2 different nursing units. She is a very hard working and dedicated staff and an important part of our team. She pays attention to great detail and always makes certain that all our telemetry monitored patients are doing okay. She immediately notifies the appropriate channels as situations arise. All I can say is that she will be an asset wherever she may go.

Please let me know if you have any further questions.
Thank you very much

Sincerely,

Robbie Masangkay
Assistant Nurse Manager
5East (Medical-Surgical/Telemetry/Oncology) & Step-Down Unit
Highland General Hospital
510-437-4986
rmasangkay@alamedahealthsystem.org

1411 E 31st St.  Oakland, CA 94602
Phone:  (510) 437-4800     Website:  www.alamedahealthsystem.org

617



## STAFFING SOLUTIONS

Dear Sir or Madam,

Tatyana Drevaleva was an important asset to our company when she was working for us. Not only did she meticulously provide great care, she was extremely attentive to the growing demands of our firm. As our company went through changes, Tatyana was more than willing to adjust to our company policy. During her time with us she would complete documents on time, was a pleasure to work with, and had great feedback for her work ethic and attention to details. Any company would be lucky to have Tatyana be part of their team.

Sincerely,

Mark Mulhall

**Recruitment Specialist**

850 Montgomery Street | San Francisco, CA

Phone: (415) 248-5360  Fax:(855) 245-8741

mamulhal@maxhealth.com

Confidentiality Statement: "The information contained in this facsimile/email transmission is privileged and confidential and is intended only for the use of the recipient listed above. If you are neither the intended recipient or an employee or agent of the intended recipient responsible for the delivery of this information, you are hereby notified that the disclosure, copying, use or distribution of this information is strictly prohibited. If you have received this transmission in error, please notify us immediately to arrange for the return of the transmitted documents or to verify their destruction."

Confidential Health Information Attached. "Health care information is personal and sensitive. It is being faxed/emailed to you with appropriate authorization from the patient/employee or under circumstances that do not require patient authorization. You, the recipient, are obligated to maintain this information in a safe, secure and confidential manner. Re-disclosure without additional patient consent or authorization or as permitted by law is prohibited. Unauthorized re-disclosure or failure to maintain the confidentiality of this information could subject you to penalties under Federal and/or State law."

618

June 2, 2010

Dear Sirs,

I have known Tatyana Drevaleva for the last year and a half. As a physician, I respect her medical skills, and as a person, I respect the effort and ability Tatyana gives to all her work, both professional and personal.

She is a very caring person, and always insists on performing on work of the highest quality as she is aware that her patients are dependent on her.

Her professional background combines many aspects of the medical field, from physician and pharmaceutical sales representative in Russia to EKG technician in the United States. This rich background makes her well qualified for many positions in health care and provides the experience for the different aspects a job may take, as well as for dealing with a diverse patient population.

In summary, I strongly recommend Tatyana; she would be an asset to any organization.

Sincerely,     *M Mendelson*

Michael Mendelson, MD PhD
University of California, San Francisco (ret.)
Tel 415 828 55 57
mendelsonm@sbcglobal.net

619

UNIVERSITY OF CALIFORNIA, SAN FRANCISCO



BERKELEY • DAVIS • IRVINE • LOS ANGELES • RIVERSIDE • SAN DIEGO • SAN FRANCISCO          SANTA BARBARA • SANTA CRUZ

SCHOOL OF MEDICINE                                          Division of Cardiology
DEPARTMENT OF MEDICINE                                      505 Parnassus Avenue, M1176
                                                            San Francisco, CA 94143-0124
                                                            (415) 476-1326  FAX (415) 502-8627

To Whom It May Concern,

As Chief Cardiology fellow at University of California San Francisco, I worked closely
with Tanya Drevaleva in the Stress Testing Laboratory at the San Francisco Veteran's
Administration Medical Center (one of our training sites). I supervised stress tests that
Tanya performed, and can attest to her compassionate patient care, impressive work
ethic, and attention to detail. A former physician in Russia, Tanya's prior training and
career shine through in her skills communicating with patients, interpreting EKGs, and
dealing with occasionally unpredictable hemodynamic and physiologic changes in the
Stress Testing Laboratory. Tanya routinely arrived to work early, reading about all
inpatients and outpatients scheduled for that day and identifying potentially problematic
issues well in advance. Her efforts made my job much easier, and ensured that the Stress
Lab ran smoothly. Tanya is also impressively meticulous, paying close attention to
radiation safety during nuclear stress tests, EKG lead placement to eliminate artifact, and
adherence to test protocols. This characteristic will serve her well in future positions in
the healthcare industry.

We will miss Tanya at the VA Medical Center, and I give her my strongest
recommendation for future roles in healthcare. I can be reached by email at
babak.nazer@ucsf.edu if there are additional questions.

Sincerely,

Babak Nazer, MD
Chief Cardiology Fellow 2012-2013
University of California San Francisco

620



Monday September 12, 2011

To whom it may concern:

This letter is in reference to Tatyana Drevaleva. Tatyana is an employee of On Assignment and has worked for us as an EKG technician. She is extremely eager to learn, very professional and did a great job representing On Assignment at our client site. I would not have any hesitations using Tatyana again for any assignment that we may have that would be a great match for her background and qualifications.

If you have any other questions regarding Tatyana please do not hesitate to call or email me.

Thanks,

**Nicole Meyeraan**
*Sr. Recruiter*
*On Assignment, Inc.*
t: (510) 663-8622 x14606
f: (866) 264-8812
Nicole.Meyeraan@onassignment.com
www.onassignment.com

1970 Broadway
Suite 200
Oakland, CA 94612
510.663.6622
510.663.8583 fax

www.oahealthcare.com

621



# STANFORD
CANCER CENTER

*Stanford Hospital & Clinics*

June 9, 2010

To whom it may concern

Ms. Tatyana Drevaleva was a volunteer at the Stanford Cancer Center from December 2008 to June 2009. She performed the functions as noted in the job description below.

Tatyana is a very enthusiastic and has a keen eye for situations where a patient needs assistance.

She performed the volunteer function very well and with lots of energy. I wish her the very best in her professional endeavor.

*Roscette Weiss*

Rosette Weiss

Stanford Hospital and Clinics

Cancer Center

875 Blake Wilbur Drive

Stanford, CA 94305

650.723.4268

rweiss@stanfordmed.org

Patient Navigators are a critical component of Stanford Cancer Concierge Services, serving as ambassadors for the Stanford Cancer Center. They work directly with patients to provide them with the highest quality hospitality and service to ensure a comfortable experience while in the Cancer Center. Volunteering is a rich, rewarding opportunity and we are always looking to expand our group of talented navigators.

Our volunteers meet and greet guests as they enter the Cancer Center. They assist patients, families and caregivers with questions and direct them to the proper resources. They escort patients to appointments or the main hospital. They visit patients and provide hospitality in the Cancer Center Clinics, Mammography, Infusion Treatment areas and Radiation

622

Therapy. Occasionally, they help at the Welcome Desk to answer phone and distribute materials. They share information with patients and families about the classes and groups offered through our Supportive Care Program.

The Cancer Center is open Monday through Friday and has 3 shifts per day available:

8-11 am, 11am-2 pm and 2-5 pm.

Volunteers also have an opportunity to work in the Clinics, visit patient exam rooms, update them about wait times, and sit with those who need some company. This involves reading and understanding information on the physicians' boards. There are two shifts available for this role: Monday through Friday, 9-1 and 1-5.

Candidates should have excellent communication skills, both oral and written. Well-developed social skills are required. Basic computer skills are a must. Volunteers must be people oriented, friendly and helpful.

Expectations/requirements: dependability, punctuality, enthusiasm, sincerity, flexibility and a willingness to learn. Attend a hospital orientation. Commit to a minimum of one 3 or 4-hour shift per week for 6-12 months.

623

March 6, 2012

To Whom It May Concern:

I, Mosesal Zakia White, am writing this letter of recommendation for Tatyana Drevaleva. Tatyana is one our most compassionate and trusting employees. She does her work with diligence.  She pays close attention to details and always follows through with her task or concerns. In her home country (Russia) she was a Medical Doctor. She was a   Monitor Technician with my facility at Kaiser Oakland Medical Center. I feel that Ms. Drevaleva will be a good candidate for your program. If there are any questions or concerns; please, feel free to call me at 803-378-8788.

Professionally Yours,

Mosesal Zakia White, RN BSN, MHA

624



**School of Health and Physical Education**

Health Care Technology Department

John Adams Campus
1860 Hayes Street
San Francisco, CA 94117

July 6, 2010

Jhoric de Guzman
Supervisor
Mt. Zion OR
1600 Divisadero Street Box 1651, 3rd Flr
University of California, San Francisco
San Francisco, CA 94143-1651

Re:  Tatyana Drevaleva

I have known Tatyana Drevaleva since Spring semester 2009 as a student in my EKG class and subsequently as an EKG Tech intern at the Non-Invasive Cardiology Lab of California Pacific Medical Center that happens to be the lab that I manage.  Tatyana was a diligent student who actively engaged in clinical discussions.  She has comprehensive advantage among her classmates due to her extensive medical knowledge based on her post-graduate medical studies in Russia. This enables her to fully understand and empathize with patients under her care.

Tatyana has shown unique determination to acquire the skills and principles in patient care in our current health care system.  She has shown the same level of eagerness in learning from seasoned technicians based on her dynamic interaction with them. Tatyana is not only equipped with the knowledge and skills for patient care, she intently listens to her patients and makes it a point to remember that the patient is the focus and priority and not just the procedures or tasks that need to be done.

If you need further information, please feel free to contact me at 415-600-1240 or you may send me an e-mail at rfrancia@ccsf.edu.

Sincerely,

Rufino C. Francia
EKG Instructor

625

**Exhibit 13.**

Performance Evaluation from the San Francisco VAMC.

| **VA** Department of Veterans Affairs | **PERFORMANCE APPRAISAL PROGRAM** | |
|---|---|---|

*IMPORTANT: For additional information see VA Handbook 5013/1, Part 1. If additional space is needed for any item on this form, use page 6.*

| PERFORMANCE PLAN AND APPRAISAL OF | | |
|---|---|---|
| EMPLOYEE'S NAME *(Last, First, Middle Initial)* <br> TATYANA DREVALEVA | POSITION TITLE, SERIES AND NUMBER <br><br> M.I.T.-EKG Technician | GRADE/SALARY <br><br> GS-7 |
| DEPARTMENT/OFFICE <br> Nuclear Medicine | | LOCATION <br> SFVAMC-building 203 |

| DATE ASSIGNED PRESENT POSITION <br> 5/14/2012 *(MM/DD/YYYY)* | DUE DATE OF WITHIN-GRADE INCREASE <br> na | *(MM/DD/YYYY)* | PERIOD COVERED BY THIS PERFORMANCE PLAN <br> FROM ~~10/1/2011~~ 05/14/2012 *(MM/DD/YYYY)* TO 9/30/2012 12/12/12 *(MM/DD/YYYY)* |
|---|---|---|---|
| SIGNATURE AND TITLE OF RATER PREPARING THIS PERFORMANCE PLAN <br> *Chief Radiology Admin* | DATE *(MM/DD/YYYY)* <br> 12/12/12 | SIGNATURE OF EMPLOYEE | DATE *(MM/DD/YYYY)* |

### SECTION A - PERFORMANCE PLAN

Reflect the performance elements for the position to be rated. An element is defined as a component of a position that is sufficiently important to warrant written appraisal. Normally each position has four or five elements. Designate with an asterisk the element(s) considered critical. Specific performance standards must be written for each element. There are usually three to five performance standards for each element. When writing performance standards, only the fully successful level of achievement need be defined.

PERFORMANCE ELEMENTS/STANDARDS

### *1.* \*Technical Skills (Critical Element):
• Performs accurate work in a timely manner.
• Maintains knowledge and skill through continuing education and practice
• Takes responsibility for safety and high quality performance in the workplace
• Observes proper patient identification as regulated by Hospital Policy.
• Follows Nuclear Medicine Physician/Cardiologists written guidelines / protocols.
• Takes responsibility for completion of examination  immediately after
scan is finished. Notifies Tech, Nurse and/or Physician in a timely manner.
• Performs EKG, stress EKG and accurately records event. Notifies Nurse/physician of any abnormalities.
  Informs NMT of exam completion; Ensures patient workflow is optimum.

### *2.* \*Customer Service (Critical Element):
• Understand that customer service is essential to achieving our mission.
• Courteous in all interactions with patients, visitors, vendors, physicians, other hospital staff and co-workers.
• Employee consistently communicates with and assists customer, visitors and staff in a courteous and professional manner and promotes a positive image of the Nuclear Medicine Department and SFVAMC.
• Promotes teamwork by cooperating with and supporting staff, visitors and customers in achieving hospital goals / mission.
• Recognizes co-workers as customers and responds to them accordingly.
• Highly responsive to requests for help, information and services.
• Searches for and recognizes "best practices" in customer service.
• Seeks to assist customers in any possible way including getting additional help if required.
• Listens to concerns of customers and resolves complaints and concerns effectively and promptly.

627

---

**SECTION A - PERFORMANCE PLAN** *(Continued)*

PERFORMANCE ELEMENTS/STANDARDS

### *3.* *Record Keeping / Quality Assurance  (Critical Element):

• Follows guidelines for properly registering and editing examinations; Follows protocols and guidelines from Physician notes as needed. Consults with Physicians, Nurses or NMT's for clarification before exams initiated.
• Properly retrieves and utilizes data from Vista/CPRS.
• Properly identifies patient information in electronic records.
• Enters correct data on all patient information, Vista/CPRS to ensure accuracy and efficiency.
• Enters pertinent patient information into CPRS / Order Entry, NMIS Notes, such as patient refusals, cancellations or any complications. Notifies scheduler and supervisor in any change of patient appointments.

### *4.* *Quality of Work  (Critical Element):

• Employee is expected to perform **all** assigned examinations at an acceptable level of quality and accuracy.
• Always completes cases, to include case edit, per standard protocols such as routinely performing EKG studies that are either hot or cold studies.

### *5.* Personal Mastery:

• Assumes responsibility for personal development and career goals
• Participates in training and other self-development activities.
• Actively seeks information on how one is perceived by others.
• Improves behavior, skills and knowledge as a result of evaluation and feed back.
• Takes initiative for continuous learning.
• Learns from setbacks or failures as well as from successful efforts
• Manages self effectively, including time.

### *6.* Flexibility / Adaptability:

• Willing and able to learn new procedures and technology.
• Responds appropriately to new or changing situations
• Works well with all levels and types of people among several different departments to enhance workflow and patient experience.

### *7.* Performance Standards  (Critical Element):

• ADP Security:  Regularly follows and adheres to established policy and procedures of the Hospital's ADP Security Program as specified in Policy Memorandum.
• On a daily basis the incumbent is able to successfully demonstrate the knowledge and skills detailed in the Competency Assessment Checklist including the knowledge and skills necessary to provide care appropriate to the age of the patients served.  These include demonstrating the ability to appropriately and courteously relate to internal and external customers, maintain the confidentiality of patient/employee information, and to function and work in a safe manner, as well as demonstrating an on going commitment to and understanding of the Medical Center's Performance Improvement Program. The incumbent must also demonstrate the knowledge of changes associated with aging and principles of human growth and development, possess the ability to assess and interpret patient data and the ability to identify age-specific needs such as considering age related factors and how it affects the radiographic appearance of the anatomy or how the age related factors must be considered while positioning patient in order to best demonstrate anatomy parts.

*No more than 2 substantiated complaints, incidents or events of unsuccessful performance are allowed in the rating period for any of these standards.*

| SECTION A - PERFORMANCE PLAN *(Continued)* |
| --- |

PERFORMANCE ELEMENTS/STANDARDS

| CHANGES TO PERFORMANCE PLAN *(Changes may be recorded anytime during the rating period)* |
| --- |

ELEMENT DESCRIPTION/TITLE

STANDARD (S)

ELEMENT DESCRIPTION/TITLE

STANDARD (S)

| SIGNATURE OF RATER | DATE *(MM/DD/YYYY)* | SIGNATURE OF EMPLOYEE | DATE *(MM/DD/YYYY)* |
| --- | --- | --- | --- |
|  |  |  |  |

## SECTION B - PROGRESS REVIEW

At least one progress review is required during the appraisal year. Employee must be informed of his/her progress as measured against the performance plan. Additional progress reviews may be documented on page 6.

A performance review was conducted and discussed, and the employee's performance as of this date:

☒  Is considered Fully Successful or better.

☐  Needs improvement to be Fully Successful or better. *(See VA Handbook, 5013/1, Part I, Paragraph 7, for additional required action.)*

| SIGNATURE OF RATER | DATE *(MM/DD/YYYY)* | SIGNATURE OF EMPLOYEE | DATE *(MM/DD/YYYY)* |
| --- | --- | --- | --- |
|  |  |  |  |

629

## SECTION C - ACTUAL ACHIEVEMENT

Indicate the single, overall level of achievement that best describes the employee's performance for each ELEMENT shown in Section A. Do not indicate achievement for each individual standard. Specific examples of performance must be provided in the space below for each element where a level of achievement other than Fully Successful has been assigned. **Assignment of the Exceptional level means that Fully Successful performance standards have been significantly surpassed. This level is reserved for employees whose performance in the element far exceeds normal expectations and results in major contributions to the accomplishment of organizational goals.**

| ELEMENTS *(Use the same key word description for each element as in Section A)* | LEVELS OF ACHIEVEMENT | | |
|---|---|---|---|
| | EXCEPTIONAL | FULLY SUCCESSFUL | UNACCEPTABLE |
| 1. Technical Skills (Critical Element) | ☒ | ☐ | ☐ |
| 2. Customer Service (Critical Element) | ☒ | ☐ | ☐ |
| 3. Record Keeping/Quality Assurance (Critical Element) | ☒ | ☐ | ☐ |
| 4. Quality of Work (Critical Element) | ☒ | ☐ | ☐ |
| 5. Personal Mastery | ☒ | ☐ | ☐ |
| 6. Flexibility/Adaptability | ☒ | ☐ | ☐ |
| 7. Performance Standards (Critical Element) | ☒ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |

Describe specific examples of performance for each element where a level of achievement other than Fully Successful has been assigned above. Specific achievements at the Fully Successful level may be described.

ELEMENTS/ACHIEVEMENT(S)

See attachment

Keep Focused on pt. care. let Supervisor direct + supervise. Stay focused on Technical aspects of your expertise 12/12/12. expertise.

NARRATIVE SUMMARY - OPTIONAL *(Provide any additional significant accomplishments, as well as other factors such as details or training experiences related to the overall performance plan. Capacity to assume a more responsible position may also be addressed.)*

## SECTION D - OVERALL RATING

**TYPE OF RATING**

☒ ANNUAL RATING OF RECORD ☐ SPECIAL RATING OF RECORD ☐ SUMMARY RATING (POSITION CHANGES - EMPLOYEE OR RATER)

**PERIOD COVERED BY THIS APPRAISAL**

FROM _____ *(MM/DD/YYYY)_____ TO _____ *(MM/DD/YYYY)_____

**NOTE: Recommended Performance Rating** - Using achievement levels assigned in Section C and the criteria described below, check the appropriate rating.

**PERFORMANCE RATING**

☒ **OUTSTANDING** - Achievement levels for all elements are designated as Exceptional.

☐ **EXCELLENT** - Achievement levels for all critical elements are designated as Exceptional. Achievement levels for noncritical elements are designated as at least Fully Successful. Some, but not all, noncritical elements may be designated as Exceptional.

☐ **FULLY SUCCESSFUL** - The achievement level for at least one critical element is designated as Fully Successful. Achievement levels for other critical and noncritical elements are designated as at least Fully Successful or higher.

☐ **MINIMALLY SATISFACTORY** - Achievement levels for all critical elements are designated as at least Fully Successful. However, the achievement level(s) for one (or more) noncritical elements is (are) designated as unacceptable.

☐ **UNACCEPTABLE** - The achievement level(s) for one (or more) critical element(s) is (are) designated as unacceptable.

**SIGNATURE AND TITLE OF RATER**

*[signature]* , Chief Radiology Administrator

DATE *(MM/DD/YYYY)* 12/12/2012

## SECTION E - HIGHER LEVEL REVIEW/APPROVAL

Required only for Minimally Satisfactory and Unacceptable ratings of record; unless organization has chosen to have higher level approval required for Outstanding ratings of record.

☒ Concur with recommended rating.

☐ Do not concur with rating. Approve rating of _____

**BASIS FOR PERFORMANCE RATING CHANGE**

**SIGNATURE AND TITLE OF APPROVAL OFFICIAL**

*[signature]* Chief, Nuclear Medicine

DATE *(MM/DD/YYYY)* 12/12/2012

A copy of this performance appraisal was given to me. ▶

**SIGNATURE OF EMPLOYEE** Tatyana Drevaleva

DATE *(MM/DD/YYYY)* 12.12.2012

VA FORM 0750, JUN 2011

5

631

USE THIS AREA FOR ANY ADDITIONAL INFORMATION

VA FORM 0750  JUN 2011

632

M.I.T.-EKG Technician GS 7

Nuclear Medicine Department

Performance Standards

## *1.* Technical Skills (Critical Element):

- Performs accurate work in a timely manner.
- Maintains knowledge and skill through continuing education and practice
- Takes responsibility for safety and high quality performance in the workplace
- Observes proper patient identification as regulated by Hospital Policy.
- Follows Nuclear Medicine Physician/Cardiologists written guidelines / protocols.
- Takes responsibility for completion of examination immediately after scan is finished. Notifies Tech, Nurse and/or Physician in a timely manner.
- Performs EKG, stress EKG and accurately records event. Notifies Nurse/physician of any abnormalities. Informs NMT of exam completion; Ensures patient workflow is optimum.

## *2.* Customer Service (Critical Element):

- Understand that customer service is essential to achieving our mission.
- Courteous in all interactions with patients, visitors, vendors, physicians, other hospital staff and co-workers.
- Employee consistently communicates with and assists customer, visitors and staff in a courteous and professional manner and promotes a positive image of the Nuclear Medicine Department and SFVAMC.
- Promotes teamwork by cooperating with and supporting staff, visitors and customers in achieving hospital goals / mission.
- Recognizes co-workers as customers and responds to them accordingly.
- Highly responsive to requests for help, information and services.
- Searches for and recognizes "best practices" in customer service.
- Seeks to assist customers in any possible way including getting additional help if required.
- Listens to concerns of customers and resolves complaints and concerns effectively and promptly.

## *3.* Record Keeping / Quality Assurance (Critical Element):

- Follows guidelines for properly registering and editing examinations; follows protocols and guidelines from Physician notes as needed. Consults with Physicians, Nurses or NMT's for clarification before exams initiated.
- Properly retrieves and utilizes data from Vista/CPRS.
- Properly identifies patient information in electronic records.
- Enters correct data on all patient information, Vista/CPRS to ensure accuracy and efficiency.
- Enters pertinent patient information into CPRS / Order Entry, NMIS Notes, such as patient refusals,
  cancellations or any complications. Notifies scheduler and supervisor in any change of patient appointments.

633

### 4. Quality of Work (Critical Element):
- Employee is expected to perform all assigned examinations at an acceptable level of quality and accuracy.
- Always completes cases, to include case edit, per standard protocols such as routinely performing EKG studies that are either hot or cold studies.

### 5. Personal Mastery:
- Assumes responsibility for personal development and career goals
- Participates in training and other self-development activities.
- Actively seeks information on how one is perceived by others.
- Improves behavior, skills and knowledge as a result of evaluation and feedback.
- Takes initiative for continuous learning.
- Learns from setbacks or failures as well as from successful efforts
- Manages self effectively, including time.

### 6. Flexibility / Adaptability:
- Willing and able to learn new procedures and technology.
- Responds appropriately to new or changing situations
- Works well with all levels and types of people among several different departments to enhance workflow and patient experience.

### 7. Performance Standards (Critical Element):
- ADP Security: Regularly follows and adheres to established policy and procedures of the Hospital's ADP security Program as specified in Policy Memorandum.
- On a daily basis the incumbent is able to successfully demonstrate the knowledge and skills detailed in the Competency Assessment Checklist including the knowledge and skills necessary to provide care appropriate to the age of the patients served.
- These include demonstrating the ability to appropriately and courteously relate to internal and external customers, maintain the confidentiality of patient/employee information, and to function and work in a safe manner, as well as demonstrating an ongoing commitment to and understanding of the Medical Center's Performance Improvement Program.
- The incumbent must also demonstrate the knowledge of changes associated with aging and principles of human growth and development, possess the ability to assess and interpret patient data and the ability to identify age-specific needs such as considering age related factors and how it affects the radiographic appearance of the anatomy or how the age related factors must be considered while positioning patient in order to best demonstrate anatomy parts.

*No more than 2 substantiated complaints, incidents or events of unsuccessful performance are allowed in the rating period for any of these standards.*

634

## MIT-EKG Tech GS 7
### Nuclear Medicine Service
### Position Description

**I.    Duties and Responsibilities:**

1.    The incumbent is required to oversee and supervise the activities that take place in the stress testing laboratory and support the physicians, nurses and technologists in using the diagnostic instruments, equipment and accessories. In addition, the following duties will be:

- Receives requests or instructions for procedures from physicians, NMT, nurses.
- Assess the type of stress test that will provide the most clinical data, with instructions or input from Cardiologists, Physicians, NMTS', nurses.
- Upon patient arrival, ascertains their compliance with dietary and pharmacologic prerequisites to d if tests can continue or need to reschedule.
- Explains the procedures and positions the patient for desired results.
- Assists with monitoring the patient during procedures and monitors and records patient reactions a tolerance.
- Serves as technical expert in the operation and calibration, maintenance of specialized medical equipment and instruments.
- Performs a full range of specialized tests or studies according to established methods.

2.    The incumbent receives all customers in a courteous and professional demeanor and disseminates accurate information.  The incumbent to require to:

- Registry all patients procedures in the VISTA system correctly; updates CPRS as specific to EKG testing.
- Inform technologists of patient arrival to the Nuclear Medicine Service.
- Directs phone call to the proper person.
- Notifies Supervisor of any scheduling changes for each patient.
- Serves as a Radiology escort when needed.
- When needed participants in department's CQI program.
- Notify the appropriate medical personnel when a patient may need medical assistance.

Additional functions are:
- Receives physician consult requests, prioritizes and follows physician instructions.
- Assess and determine best type of stress test that will provide most clinically useful information an test most appropriate for the patient. Which would be:
  - o   Treadmill exercise test without nuclear imaging
  - o   Treadmill exercise test with nuclear imaging
  - o   Pharmacologically induced stress test with nuclear imaging.
- Decisions made at the time of scheduling the patient and at the patient arrival. Then ascertains pati compliance and if necessary consults with Physicians, Nurses or Technologist if a change of patien status.
- Secures confidence and cooperation with the patient before and during procedure. Positions patient needed for best compliance and patient comfort.
- Practical knowledge of cardiovascular structures and functions; applies ECG electrodes in proper positions and records patient weight and vital signs in CPRS.

635

- Assists the physician or other medical staff in performing stress tests or tilt table tests. Operates the computer controlled treadmill correctly and efficiently.
- Accurately enters and retrieves patient test data from treadmill data base and aims for test completi under 45 minutes.
- Assists during procedures and monitors patient condition or patient change of condition physically upon the ECG strip and notifies physicians, nurses or NMT's of any changes.
- The employee is capable of correctly interpreting the ECG to recognized onset of potential serious rhythm disturbances or conduction abnormalities and takes appropriate actions.

## II.   Knowledge Required by the Position:

The incumbent is required to have a complete and thorough knowledge of the Nuclear Medicine Service policies and procedures in order to maintain a consistent workflow rate in an expeditious and effec manner. The incumbent must be knowledgeable in the following elements:

1.  Knowledge of medical terminology coinciding with the interpretation of requested types of nuclear examinations.

2.  Knowledge of anatomy coinciding with the identification of Nuclear Medicine images.

3.  Complete knowledge of Vista and CPRS to review patient information as specific to Nuclear Medi testing.

4.  Ability to instruct and to education patients about NMprocedures.

5.  Knowledge of the Nuclear Medicine Service and Medical Center policies and procedures.

6.  Ability to work with and to deal with co-workers, patients, and customers from diverse background and educational levels. Develop effective working relationships with line, staff, and top managem officials to secure understanding and support of service and section program.

7.  Ability to handling age-specific patients and knowledge of age-specific standards in regards to limitation of older persons under their care.

## III.   Supervisory Control:

The incumbent works independently, under the supervision of the Physician, Nurses or NMT's. Th incumbent must apply independent judgment in day-to-day operations. The NMT supervisor is the incumbent's first line supervisor and the Chief of Nuclear Medicine and/or the Chief Radiology Administ as second level supervisor.

## IV.   Guidelines:

Procedures for completing the work have been established and specific guidelines are available as needed for reference purposes. The policy and directives of the Medical Center, Nuclear Medicine Servic Federal Codes of Regulations, JCAH, CQI, and OSHA guide the incumbent. The incumbent exercise good judgment in locating and selecting appropriate guidelines, references, and procedures for applications to specific cases and requests.

**V.    Complexity:**
The incumbent performs a full range EKG technical duties and administrative support functions to facilitate the accomplishment of the responsibilities of the Nuclear Medicine Service. Duties includes the dissemination of procedural instructions to each patient with whom in contact, the ensuring patient compli and the accuracy and recording of patient data before, during and after studies.

**VI.    Scope and Effect:**
The incumbent is required to initiate, disseminate, and maintain the necessary equipment utilized a indicated by the policies and procedures of the VA Medical Center and Nuclear Medicine Service. The in of the initiation of the administrative procedures by the incumbent is to assure that all persons referred to t service have been properly received, scheduled and documented as required by the policies of the VA Mec Center and Nuclear Medicine Service.

**VII.    Qualifications:** The MIT-EKG technician must have at least ONE year of hospital experience whi demonstrates the appropriate and effective operation and execution of EKG testing; exercise testing and ti table testing. 40 hour EKG course from accredited institution by the US Department of Education is prefer Current BCLS and renew every 2 years.

**VIII.    Age Specific Criteria:** Checks patient clinical data for age or any documented physical limitations shows awareness of diminished exercise capacity for normal aging, lower maximal heart rates with norma aging and physical limitations of elderly patients; observes older patient mobility and steadiness while pat moves on/off treadmill; ensures elderly patients do not get up too quickly and assists patients as needed.

**IX.    Computer Security:** protects printed and electronic files containing sensitive data in accordance w the provisions of the Privacy Act of 1974 and other applicable laws, Federal Regulations, VA statutes and VHA policy; Protects all data from unauthorized release or loss, alteration or unauthorized deletion. Follo applicable regulations and instructions regarding access to computer files, release of access codes, etc. Use word processing software to execute office automation functions such as data storage, retrieval of docume letters, creating/editing reports and memoranda; sending transmitting email. Uses Veteran Health Informat and Technology Architecture (VISTA) and CPRS system to access patient information.

**X.    Physical Demands:**
The work is moderately active. Typically, the employee stands, bends, reaches for long periods of and must have flexibility and dexterity for fine EKG equipment and ECG pad placements. However, there may be some walking; standing; bending; carrying of light items such as paper, books, small parts, etc.

**XI.    Work Environment:**
The work environment involves everyday tasks within the Nuclear Medicine Department. As such, a working knowledge of department specific safety is critical. The work area is adequately lighted, heated and ventilated.

**XII.    Customer Service:** Incumbent must meet the needs of customers while supporting VA missions; consistently communicate and treat customers (veterans, their representatives, visitors, and all VA staff) in a courteous, tactful, and respectful manner; provide customer with consistent information according to established policies and procedures; and handle conflict and problems in dealing with customers constructively and appropriately.

637

638

**Ashley Kittrell**

| | |
|---|---|
| **From:** | Tatyana Drevaleva <tdrevaleva@gmail.com> |
| **Sent:** | Saturday, September 25, 2021 8:13 PM |
| **To:** | Lyman, Christine (USANM); NMDdb_Proposed Text Johnson; NMDml_Magistrate Judge Robbenhaar's Chambers |
| **Subject:** | Case No. 1:21-cv-00761-WJ-JFR. Excerpts of the Record in Appeal No. 19-16395, Volume 2. |
| **Attachments:** | Drevaleva__Exerpts__03748__Volume 2__numbered.pdf |

==**CAUTION - EXTERNAL:**==

--
Respectfully,
Tanya.

==**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.==

**Ashley Kittrell**

| | |
|---|---|
| **From:** | Tatyana Drevaleva <tdrevaleva@gmail.com> |
| **Sent:** | Saturday, September 25, 2021 8:13 PM |
| **To:** | Lyman, Christine (USANM); NMDdb_Proposed Text Johnson; NMDml_Magistrate Judge Robbenhaar's Chambers |
| **Subject:** | Case No. 1:21-cv-00761-WJ-JFR. Excerpts of the Record in Appeal No. 19-16395, Volumes 3 and 4. |
| **Attachments:** | Drevaleva__Exerpts__03748__Volume 3__numbered.pdf; Drevaleva__Exerpts__03748__Volume 4__numbered.pdf |

<mark>**CAUTION - EXTERNAL:**</mark>

--
Respectfully,
Tanya.

<mark>**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.</mark>

No. 19-16395

**Court of Appeals for the 9th Circuit**

Tatyana Evgenievna Drevaleva

*Plaintiff-Appellant Pro Se*

v.

1) The U.S. Department of Veterans Affairs

2) Mr. Robert Wilkie, Esq. in his capacity as an acting Secretary of the U.S. Department of Veterans Affairs

*Defendants-Appellees*

*The District Court for Northern California,*

*case No.3:18-cv-03748, Hon. Judge William Alsup*

# EXERPTS OF THE RECORD,

# VOLUME 3.

**Docket No. 54** – Plaintiff's Reply to Defendants' Opposition to my Motion for Preliminary Injunction, November 09, 2018, beginning (**pages 639-895**.)

I declare under the penalty of perjury and under the Federal laws that all foregoing is true and correct. Executed at San Francisco, CA on April 11, 2021.

Respectfully submitted,

s/ Tatyana Drevaleva

Petitioner Pro Se

3015 Clement St., Apt. 204, San Francisco, CA, 94121

415-806-9864; tdrevaleva@gmail.com

Date: April 11, 2021.

**Docket No. 54.**

November 09, 2018.

Plaintiff's Reply to Defendants' Opposition to my Motion for Preliminary Injunction,

Beginning.

1  Tatyana Evgenievna Drevaleva

2  No current home postal address

3  Currently residing in California

4  415-806-9864, tdrevaleva@gmail.com

5  Plaintiff in Pro Per

6

7                THE UNITED STATES DISTRICT COURT

8                NORTHERN DISTRICT OF CALIFORNIA

9

10

11                          )
                            )
12  Tatyana E. Drevaleva    )    Case No. 3:18-cv-03748
                            )
13            Plaintiff,    )
                            )
14        vs.               )
                            )
15                          )
    1) The U.S. Department of Veterans )   Reply to Defendants' Opposition to my
16      Affairs             )
                            )    Motion for Preliminary Injunction.
17  2) Mr. Robert Wilkie, Acting United )
       States Secretary of Veterans Affairs )   Judge: Hon. William Alsup.
18     810 Vermont Avenue, NW )
       Washington, DC 20420  )   November 29, 2018, 8:00 AM
19                          )
    Facility: New Mexico VA Healthcare System )   Courtroom 12, 19th Floor
20     1501 San Pedro Drive, S.E. )
       Albuquerque, NM 87108 )   450 Golden Gate Ave.,
21                          )
              Defendant.    )    San Francisco, CA, 94102.
22                          )
   _____)

23

24        Plaintiff Tatyana Drevaleva herein submits a Reply to Defendants' Opposition to my

25  Motion for Preliminary Injunction.

26

27

28

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

640

# TABLE OF CONTENTS

I.   Introduction……………………………………………………………………4

II.  Statement of Facts………………………………………………………..…5

     a)  Objections to Pieces of Evidence presented in the Opposition……………...…8

III. Legal Standard……………………………………………………..…11

     a)  The FMLA…………………………………………………………..11

     b)  The Rehabilitation Act of 1973……………………………………………14

     c)  The ADEA………………………………………………………..…15

IV.  Constitutional Claims……………………………………………………16

     a)  The Due Process Clause of the 5th Amendment to the U.S. Constitution…………...16

     b)  My Constitutional Right to Be a Parent……………………………………..16

V.   The IIED……………………………………………………………...17

VI.  Libel……………………………………………………………………17

VII. Irreparable Harm………………………………………………………18

VIII. The Equities and Public Interest Favor Me………………………………………18

IX.  Conclusion……………………………………………………………18

# TABLE OF AUTHORITIES

**Statutes**

The U.S. Constitution……………………………………………………………...18

The First Amendment to the U.S. Constitution………………………………………..16, 17

The Fifth Amendment to the U.S. Constitution including the Due Process Clause…………………………………………………………5, 11, 16, 17

The Ninth Amendment to the U.S. Constitution………………………………………...9, 17

The Fourteenth Amendment to the U.S. Constitution…………………………………16

Utah's Constitution, Article 1 § 1………………………………………………..…17

5 U.S.C. §2302(b)………………………………………………………………17

5 U.S.C. §6301(2)………………………………………………………………12

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

641

5 U.S.C. §6381……………………………………………………………………………12

5 U.S.C. §6387…………………………………………………………………...12, 13

5 U.S.C. Chapter 63, subchapter V……………………………………………………...12

28 U.S.C. §2680(h)……………………………………………………………………5, 17

29 U.S.C. §760……………………………………………………………………………..14

29 U.S.C. §780……………………………………………………………………………...14

29 U.S.C. §790……………………………………………………………………………14

29 U.S.C. §796……………………………………………………………………………14

42 U.S.C. §12102…………………………………………………………………………14

29 C.F.R §825.300………………………………………………………………………...13

29 C.F.R Appendix to Part 1604, Questions and Answers on the Pregnancy Discrimination Act, Public Law 95-555, 92 Stat. 2076 (1978)……………………………………………...7

29 C.F.R. §1630.2(g)……………………………………………………………………14

29 C.F.R. §1630.2(m)……………………………………………………………………...14

The ADEA…………………………………………………………..……..4, 15, 16, 17, 18

The Family Medical Leave Act or the FMLA…………………………….6, 7, 9, 10, 11, 12, 13, 16

The Federal Tort Claims Act or the FTCA……………………………………………...17

The FMLA or 29 U.S.C. §2611…………………………………………………………...12

The FMLA or 29 U.S.C. §2611(2)(B)……………………………………………………12

The FMLA or 29 U.S.C. §2619……………………………………………………………12

The FMLA or 29 U.S.C. §2651…………………………………………………………...13

The FMLA or 29 U.S.C. §2653……………………………………………………..12, 13

The FMLA or 29 U.S.C. Chapter 28………………..……………………………………12

The Rehabilitation Act of 1973…………………………………...…..4, 6, 10, 14, 15, 16, 17, 18

Title VII of the Civil Rights Act of 1964……………………………………………4, 5, 18

Title XI of the Civil Rights Act of 1964……………………………………………...18

**Case Law**

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

642

*Bentivegna v. United States Dep't of Labor*, 694 F.2d 619, 621 (9th Cir.1982)……………...…15

*Brown v. GSA*, 425 U.S. 820 (1976)……………………………………………………………...5

*Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir.2008)…………………...15

*Doe v. Irwin*, 441 F Supp 1247; U.S. D.C. of Michigan, (1985)………………………………16

*Doe v. New York Univ.*, 666 F.2d 761, 774-75 (2nd Cir.1981)…………………………………15

*Gibson-Michaels v. FDIC*, No. 06-1940 (RMU), 2007 U.S. Dist LEXIS 32564 (D.D.C. May 3, 2007)……………………………………………………………………………………………....16

*Giesken v. Dept. of Veterans Affairs*, No. 06-14901-BC, 2007 U.S. Dist. LEXIS 31971 (E.D.Mich. May 2, 2007)………………………………………………………………………..16

*In re U.P.*, 648 P 2d 1364; Utah, (1982)…………………………………………………….....17

*In the Interest of Cooper*, 621 P 2d 437; 5 Kansas App Div 2d 584, (1980)…………….… ..16

*Langton v. Maloney*, 527 F Supp 538, D.C. Conn. (1981)……………………………………...16

*Matter of Delaney*, 617 P 2d 886, Oklahoma (1980)…………………………………………16

*Smith v. Barton*, 914 F.2d 1330, 1339 (9th Cir. 1990)………………………………………15

*Vidrine v. United States*, No. 6:07-CV-1204, U.S. District Court for the Western District of Louisiana (2011)……………………………………………………………………………...17

*Zolin*, 812 F.2d at 1107……………………………………………………………………15

## MEMORANDUM OF POINTS AND AUTHORITIES

**Introduction.**

Defendants Opposition to my Motion for Preliminary Injunction is based on the following allegations:

1)  That I can't establish my Title VII claim because the termination of my employment was based on the VA policy of LWOP

2)  That I didn't establish a Prima Facie case under the ADEA

3)  That I didn't have disability, and therefore I can't claim the Rehab. Act; and the accommodations that I requested to go to Russia for an IVF attempts are unreasonable

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

643

4) That my Due Process claim is likely to fall because this claim is preempted by Title VII according to the *Brown* rule

5) That my IIED claim is likely to fall because this claim is preempted by Title VII according to the *Brown* rule

6) That my Libel claim is likely to fall because this claim is excluded from "the general waiver of sovereign immunity for tort claims under the Federal Tort Claims Act. See 28 U.S.C. § 2680(h)"

7) That I didn't show irreparable harm

8) That I didn't show that that the equities and public interest favor me because I was a probationary employee.

**Statement of Facts.**

Mr. Robinson intentionally misinterpreted the facts of the Complaint.

1. Read the Opposition, page 2, lines 4-6, "Just after began work, Plaintiff met with her supervisor, Carla Dunkelberger, to review the agency's leave-related procedures and to sign a document acknowledging receipt of a notification about procedures regarding unplanned leave."

My objection: On April 18, 2017, I signed the document that informed me in general about the leave procedures at the VAMC. At that time (on April 18, 2017), I didn't discuss with Ms. Dunkelberger that I was running out of hormonal pills and that I needed to go to Russia for an IVF procedure.

2. Read the Opposition, page 2, lines 8-10, "After working at the VAMC for about a month and a half, Plaintiff requested leave without pay ("LWOP") to travel to Russia to undergo an In-Vitro Fertilization ("IVF") procedure and to search for a surrogate mother in Russia since she cannot carry a pregnancy."

My objection. After working at the VAMC for 1.5 months, I informed Ms. Dunkelberger that I was running out of hormonal pills that I couldn't obtain in the U.S. Also, I informed her that I needed to go to Russia for a free of charge IVF procedure because I couldn't afford to pay $15000 dollars for one IVF attempt in the U.S., because I am a citizen of Russia, because I was in registry for a free IVF procedure, and because my turn came. Ms. Dunkelberger requested

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

644

1 medical documentation, and I requested this documentation from my Russian OB/GYN. Ms.

2 Dunkelberger said that she couldn't pay me for the period of time when I am absent from work,

3 and I said it was OK with me.

4       On May 17, 2017, because Ms. Dunkelberger was not available on that day, I spoke to

5 Mr. Phil Johnson who offered me to submit a request for LWOP. I am repeating again that it was

6 not my initiative to submit a form requesting LWOP. It was Mr. Johnson's offer, and I followed

7 his suggestion. Mr. Johnson didn't offer me to submit a request for Annual Leave (AL) as

8 outlined in the AFGE Master Agreement, Article 35, Section 2, paragraphs C, 2 and 3 (page 188

9 of the Master Agreement). See Exhibit A to Defendants' Opposition, page 2, paragraph d. Also,

10 Mr. Johnson didn't offer me to submit a request for Sick Leave for pregnancy purposes as

11 outlined in the AFGE Master Agreement, Article 35, Section 4, paragraph E and 1 (page 190 of

12 the Master Agreement). See Exhibit 1 – AFGE Master Agreement. Therefore, the Agency forced

13 me to request LWOP in violation of the AFGE Master Agreement. The Agency also violated the

14 Rehabilitation Act of 1973 and didn't provide me with reasonable accommodations for the

15 purpose of the IVF procedure.

16       I said to both Ms. Dunkelberger and Mr. Johnson that I was planning to only refill my

17 prescription for hormonal pills and to perform an IVF procedure. I didn't say that I was planning

18 to search for a surrogate Mom during that trip. Moreover, Mr. Johnson verbally approved my trip

19 to Russia for the purpose of refilling my hormonal pills and performing an IVF procedure. His

20 exact words were, "If you need to go – go!"

21       3. Read the Opposition, page 2, lines 15-18, "During this conversation, Ms. Dunkelberger

22 also explained that Plaintiff did not have sufficient time in service to qualify for leave under the

23 Family Medical Leave Act and that she would need to provide medical documentation, in

24 English, prior to any leave so that upper management could consider whether to approve leave."

25       This is true. Ms. Dunkelberger said to me that I didn't qualify for leave under FMLA

26 because I worked less than one year at the VAMC. However, Ms. Dunkelberger fraudulently

27 withheld the information from me that, according to the VA policy, I was entitled for leave

28

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

645

because of the medical condition related to pregnancy, without invoking the FMLA, and despite of my probationary status.

Read citations of the "Handbook on Leave and Workplace Flexibilities for Childbirth, Adoption, and Foster Care of the Office of the Personnel Management (OPM) of the VA system" in my Complaint, page 12, line 6 through page 14, line 10. See Exhibit 2 – the "Handbook", pages 9, 14, 21.

Also, according to 29 CFR Appendix to Part 1604, Questions and Answers on the Pregnancy Discrimination Act, Public Law 95-555, 92 Stat. 2076 (1978), I was entitled to return back to work after leave that was related to pregnancy. Read my Complaint, from page 11, line 3 to page 12, line 5.

Ms. Dunkelberger said to me that I needed to provide medical documentation in English confirming that I was undergoing an IVF procedure. After my conversation with Ms. Dunkelberger, I immediately requested this documentation from my Russian physician. It took one week to get this document. I got it via email only on May 17, 2017 or even at early morning on May 18, 2017. I got it on Russian language, and at that time I had only three hormonal pills left. I didn't have a chance to stay in the U.S. for a longer time in order to find a certified translator and translate this document from Russian into English. Ms. Dunkelberger said that I didn't have a right to translate this document myself, and I needed to find a certified specialist to get it translated. I emailed this document in Russian language to both Ms. Dunkelberger and Mr. Johnson at 9.02 AM on May 18, 2017 (see Attachment 1 to my Complaint). During my verbal conversation with Ms. Johnson on May 17, 2017, I said to him that I would get this document translated in Russia, and I will email a translated version as soon as I can. I also said that, if Mr. Johnson wants to know what is written in this document, I authorize Mrs. Nadya Das (my former Russian speaking co-worker) to translate this document for Mr. Johnson. I also informed Mrs. Das that I allowed her to read and translate this document for Mr. Johnson.

Ms. Dunkelberger is lying that my initial conversation with her regarding the issue that I was running out of hormonal pills and I needed to go to Russia for n IVF procedure occurred on May 16, 2017. In fact, I first spoke to Ms. Dunkelberger about these issues when I had ten

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

hormonal pills left. So, the approximate date of my initial conversation with Ms. Dunkelberger was May 10, 2017 and not May 16, 2017. After the May 10 conversation, I immediately requested medical documentation from my Russian OB/GYN. Ms. Dunkelberger failed to write in her Declaration that I had spoken to her approximately on May 10, 2017 regarding my upcoming trip to Russia.

In her letter that was mailed to my home postal address in Albuquerque, NM on June 12, 2017, Ms. Dunkelberger was also lying that I didn't submit medical documentation in English confirming that I went to Russia for the purpose of IVF. I already submitted the proof that I had emailed this documentation on English language to both Ms. Dunkelberger and Mr. Johnson on May 30, 2017 (Attachment 2 to my Complaint). Moreover, Ms. Dunkelberger mailed this letter to my home postal address in Albuquerque, NM knowing very well that I would not be able to receive it, read it, and respond because at that time I was in Russia.

In his May 18, 2017 letter, Mr. Johnson lied that he didn't recommend approval of my request for LWOP. He verbally allowed me to go to Russia in the evening on May 17, 2017. I have a witness Ms. Nadya Das which whom I shared this fact. I might have also told Ms. Chelsey Casey (a RN at 5D) and Ms. Michelle Tirado (a Nursing Manager at another department) that Mr. Johnson verbally allowed me to go to Russia. I remember very well that I told Mrs. Das about it because we worked together with her observing cardiac monitors on the night on May 17, 2017. Mrs. Das is a witness that on that night I received the documentation from my Russian OB/GYN (on Russian language) saying that I am in the registry for the IVF procedure. There was no way for me to get this document translated prior to my trip to Russia because I had only three hormonal pills left, and I immediately needed to go to Russia to refill my prescription.

Objections to Pieces of Evidence presented in the Opposition.

1) Exhibit C. Ms. Dunkelberger said that I had come to her office on 5/25/2017 "to speak about her need to go to Russia." This is a complete lie because on 05/25/2017 I was already in Russia. I flew from Albuquerque to New York on May 18, 2017

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

647

2) Before my departure to Russia, I informed Ms. Dunkelberger that I was trying to obtain the Jeanine hormonal medication from an online pharmacy in New York. I guess that advertisement was a scam because nobody answered my multiple phone calls. I was afraid to put my credit card number on that web-site because I didn't know if that alleged pharmacy existed. The Jeanine medication is not approved by the FDA for being sold in the United States, and any attempt of the online pharmacies to sell this medication in the United States was illegal. This is why I was unable to obtain this medication in the United States, and the only way for me to get Jeanine was to go to Russia

3) Exhibit D demonstrates that I submitted my official request for LWOP from May 18, 2017 to July 07, 2017. I didn't break the rules, and I followed the guidelines that Ms. Dunkelberger described to me during our April 18, 2017 conversation. However, as you can see, the VAMC broke the official rules because it didn't write the reason of disapproval of my request for LWOP. See part 8a – Official action on request – Disapproved. If disapproved, give reason. See part 8b below – Reason for Disapproval – it is empty. The VAMC didn't write any reason for disapproval of my request for LWOP. Therefore, it was not me who broke the rules. It was the Agency who broke the FMLA requirement to notify me that I was not eligible for the FMLA and to explain the reason why I was not eligible.

4) Exhibit E is a May 18, 2017 statement of Mr. Phillip Johnson confirming that I spoke to the management team about my upcoming trip to Russia. However, Mr. Johnson lied that on May 18, 2017 I didn't provide "supporting medical documentation." In fact, I emailed the document from my Russian OB/GYN on Russian language to both Ms. Dunkelberger and Mr. Johnson on May 18, 2017 at 9.02 AM (see Attachment 1 to my Complaint). I didn't provide this medical documentation on May 17, 2017 together with my request for LWOP because I didn't have it on May 17, 2017. I obtained it only late evening on May 17, 2017 or very early morning (approximately 2.00 AM) on May 18, 2017. When Mr. Johnson submitted my request for LWOP to Allean Bonin and Dr. Prince on May 18, 2017 and said that I didn't provide medical documentation, it was a lie because, in fact, I

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

648

provided such documentation in Russian. There was no chance for me to wait in Albuquerque until I translate it into English because on May 17, 2017 I had only three hormonal pills left, and I needed to take one pill each day. In order to fly from Albuquerque to Novosibirsk, Russia, I needed approximately 37 hours. I needed to take hormonal pills during my flight. I couldn't wait in Albuquerque, NM until I find a certified translator, translate this document into English (it could take a few days), submit this document to Ms. Dunkelberger, and wait for Dr. Prince's approval.

5) Moreover, both Allean Bonin and Dr. Prince discriminated me because they knew that I would go to Russia for the IVF procedure. They broke the internal VAMC policies that require management to approve LWOP without invoking the FMLA and give the maximum possible leave time to a woman who wants to get pregnant. Also, both Allean Bonin and Dr. Prince broke the Rehabilitation Act and failed to provide me with reasonable accommodations. Also, both Allean Bonin and Dr. Prince broke the AFGE Master Agreement, page 190,

> "E. Sick leave shall be granted to Title 38 employees when:
>
> > 1. They are incapacitated for the performance of their duties because of personal illness, disease, injury, <u>pregnancy</u> and confinement."

6) Exhibit F is Ms. Dunkelberger's letter that she sent to my home postal address in Albuquerque, NM on 06/12/2017. Ms. Dunkelberger wrote, "You did not submit the required medical documentation, in English, prior to your departure to Russia. As a result of the disapproval, you are required to submit medical documentation, in English, to support your absences." Ms. Dunkelberger was lying because she received medical documentation in English in the email on May 30, 2017. Moreover, Ms. Dunkelberger mailed this letter to my home postal address in Albuquerque, NM knowing very well that there was no chance for me to receive this letter and to respond because at that time I was in Russia. Ms. Dunkelberger was receiving my emails from Russia but she never responded. She never requested my home postal address in Russia, and she never emailed me this letter. She didn't want me to work at her unit because I was a woman, and I

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

649

wanted to become have a child. Therefore, Ms. Dunkelberger threw me out of job and accused me in not providing medical documentation (which was a lie) and not responding her letter (which I never received because she never sent it to the place where I would be able to receive it)

7) Exhibit G is a VAMC policy regarding LWOP, "The authorization of LWOP is a matter of the administrative discretion." However, both Allean Bonin and Dr. Prince failed to follow the guidelines of the "Handbook" and failed to provide me with LWOP without invoking the FMLA and to the maximum reasonable time as to a woman who was trying to have a baby. Also, the Agency should not have even mention LWOP because I was entitled to Sick Leave according to the AFGE Master Agreement.

8) Read the Termination letter, "The Associate Director, Patient Care Services, has recommended that you be terminated from your position for failure to qualify during your probationary period. Your termination is due to attendance issues." This letter says nothing about the Agency's denial of my request for LWOP under the FMLA. Therefore, the Agency broke the FMLA requirement to notify me that I was not eligible for the FMLA and state the reason why I was not eligible. Moreover, the Agency terminated my employment without the due process – without giving me a notice and without giving me an opportunity to be heard. Thus, the Agency broke the Due Process clause of the 5th Amendment to the U.S. Constitution. The Agency put blame on me and accused me in "attendance issues." Later, the Agency lied to the Minneapolis VAMC that I had "negligently failed to request LWOP", and it was the reason of terminating my employment in Albuquerque. The Agency also lied to the Employment Development Department that I didn't provide medical documentation until after I came back from Russia, and my Unemployment Insurance benefits were denied.

**Legal Standard**.

**The FMLA.**

The Family and Medical Leave Act (FMLA) doesn't apply to the Federal Government.

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

650

The FMLA is codified as 29 U.S. Code Chapter 28. Subchapter 1 includes the General Requirements for Leave (§§2611 – 2619). Read 29 U.S. Code §2611(2)(B) "Exclusions: The term "eligible employee" does not include (i) any Federal officer or employee covered under subchapter V of chapter 63 of title 5."

Read 5 U.S. Code Chapter 63 – Leave, subchapter V – Family and Medical Leave.

Read 5 U.S. Code §6381, "(1) the term "employee" means any individual who— (A)is an "employee", as defined by section 6301(2), including any individual employed in a position referred to in clause (v) or (ix) of section 6301(2), but excluding any individual employed by the government of the District of Columbia 1 any individual employed on a temporary or intermittent basis, and any employee of the Government Accountability Office or the Library of Congress; and (B) has completed at least 12 months of service as an employee (within the meaning of subparagraph (A))."

Read 5 U.S. Code § 6387 – Regulations, "The Office of Personnel Management shall prescribe regulations necessary for the administration of this subchapter. The regulations prescribed under this subchapter shall, to the extent appropriate, be consistent with the regulations prescribed by the Secretary of Labor to carry out title I of the Family and Medical Leave Act of 1993."

Read the FMLA or 29 U.S. Code §2653 - Encouragement of more generous leave policies, "Nothing in this Act or any amendment made by this Act shall be construed to discourage employers from adopting or retaining leave policies more generous than any policies that comply with the requirements under this Act or any amendment made by this Act."

Read the information on the web-site of the Department of Labor (see Exhibit 3)

Source: https://www.dol.gov/whd/regs/compliance/whdfs28d.pdf

"Employers must:

• Provide employees with general notice about the FMLA

• Notify employees concerning their eligibility status and rights and responsibilities under the FMLA; and

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

651

• Notify employees whether specific leave is designated as FMLA leave and the amount of time that will count against their FMLA leave entitlement.

The eligibility notice may be either oral or in writing and must:

• Be provided within five business days of the initial request for leave or when the employer acquires knowledge that an employee leave may be for an FMLA-qualifying reason;

• Inform the employee of his or her eligibility status; and

• If the employee is determined to be not eligible for FMLA leave, state at least one reason why."

<u>My argument</u>. The Agency invoked the FMLA even though the FMLA doesn't apply to me as to a Federal employee. Moreover, the Agency broke its own regulations described on page 36 of the "Handbook", "<u>An employee may request LWOP without invoking FMLA</u>, even if he or she has available paid leave. Supervisors should refer to agency internal policy and negotiated bargaining union agreements prior to approval. However, <u>agencies are encouraged to offer leave without pay for a longer period than what is provided for under the FMLA, to the maximum extent practicable for pregnancy and childbirth</u>."

The Agency solely rejected my request for LWOP without referring to the agency's internal policy regarding the childbirth and without negotiating with the AFGE (the Union).

Also, the Agency broke both 5 U.S. Code §6387 and 29 U.S. Code §2653 and didn't provide me with a more generous leave policy.

Despite the Agency claimed that it had denied my request for LWOP under the FMLA, the Agency didn't provide me within five business days from my May 17, 2017 request with the information whether I was eligible for the FMLA, didn't inform me about my eligibility status, and didn't state at least one reason why I was not eligible for the FMLA. See 29 CFR 825.300 - Employer notice requirements.

Also, the Agency broke the FMLA or 29 U.S. Code § 2651 - Effect on other laws,

"(a) Federal and State antidiscrimination laws

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

652

Nothing in this Act or any amendment made by this Act shall be construed to modify or affect any Federal or State law <u>prohibiting discrimination on the basis of race, religion, color, national origin, sex, age, or disability</u>.

(b) State and local laws

Nothing in this Act or any amendment made by this Act shall be construed <u>to supersede any provision of any State or local law that provides greater family or medical leave rights than the rights established under this Act</u> or any amendment made by this Act."

**The Rehabilitation Act of 1973.**

Ms. Robinson mislead the Court and said that I didn't have disability according to 29 C.F.R. § 1630.2(g), 29 C.F.R. § 1630.2(m), and other.

Read the Rehabilitation Act of 1973 on the web-site of the EEOC

https://www.eeoc.gov/laws/statutes/rehab.cfm

"Subject to subparagraphs (C), (D), (E), and (F), the term "individual with a disability" means, for purposes of sections 701, 711, and 712 of this title and subchapters II, IV, V, and VII of this chapter [29 U.S.C. §§ 760 et seq., 780 et seq., 790 et seq., and 796 et seq.], **any person who has a disability as defined in section 12102 of Title 42.**"

Read 42 U.S. Code § 12102 - Definition of disability,

"(1) Disability. The term "disability" means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment (as described in paragraph (3)).

(2) Major life activities

(B) Major bodily functions

For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and **reproductive functions**.

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

653

(3) Regarded as having such an impairment. For purposes of paragraph (1)(C):

    (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or <u>she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity</u>."

<u>My argument.</u> I have disability based on my inability to carry pregnancy (reproductive function). I was fired from my job, and it means that I was subjected to an action prohibited by this chapter whether or not my inability to carry pregnancy limited my major life activity.

<u>Prima Facie under the Rehabilitation Act</u> as defined in *Smith v. Barton*, 914 F.2d 1330, 1339 (9th Cir. 1990):

"To prevail in a case brought under section 504, a plaintiff must show that the plaintiff is:

(1) a handicapped person under the Act;

(2) otherwise qualified for the position sought;

(3) being excluded from the position solely by reason of plaintiff's handicap; and

(4) seeking a position that exists as part of a program or activity receiving federal financial assistance.

*Doe v. New York Univ.*, 666 F.2d 761, 774-75 (2nd Cir.1981). See also *Zolin*, 812 F.2d at 1107; *Bentivegna v. United States Dep't of Labor*, 694 F.2d 619, 621 (9th Cir.1982)."

Source: https://openjurist.org/914/f2d/1330/smith-v-barton

I clearly qualify for all four prongs of the Prima Facie because I am handicapped under the Act, I am qualified for this job, I was fired, I am looking for reinstating to the VA.

**The ADEA.**

I clearly established a Prima Facie case for Age Discrimination under *Diaz v. Eagle Produce Ltd. P'ship,* 521 F.3d 1201, 1207 (9th Cir.2008). I was 50 yo when I was fired. I was performing my satisfactorily. I passed an EKG test with a score of 100%, and I found EKG Rhythm abnormalities such as Torsades de Pointes, 2nd degree AV blocks, prolonged QT

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

654

1    intervals, etc. that full time Registered Nurses of 5D didn't see. My employment was terminated.

2    I was replaced by two Monitor Technicians who were 30 and 35 yo.

3    **Constitutional Claims.**

4    **The Due Process Clause of the 5th Amendment to the U.S. Constitution.**

5    I was not given a notice, and I was not given an opportunity to be heard when the Agency

6    terminated my employment for the alleged FMLA violation. This conduct is outside of the scope

7    of Title VII, the ADEA, and the Rehab. Act, and therefore it is not preempted by Title VII, the

8    ADEA, or the Rehab. Act.

9    As a Title II Federal employee, I am not eligible to sue the Agency under the FMLA, see

10   *Gibson-Michaels v. FDIC*, No. 06-1940 (RMU), 2007 U.S. Dist LEXIS 32564 (D.D.C. May 3,

11   2007) and *Giesken v. Dept. of Veterans Affairs*, No. 06-14901-BC, 2007 U.S. Dist. LEXIS 31971

12   (E.D.Mich. May 2, 2007). Therefore, I am suing the Agency under the 5th Amendment to the

13   U.S. Constitution.

14   **My Constitutional right to be a parent.**

15   The rights of parents to the care, custody and nurture of their children is of such character

16   that it cannot be denied without violating those fundamental principles of liberty and justice

17   which lie at the base of all our civil and political institutions, and such right is a fundamental

18   right protected by this amendment (First) and Amendments 5, 9, and 14. *Doe v. Irwin*, 441 F

19   Supp 1247; U.S. D.C. of Michigan, (1985).

20   Parents have a fundamental constitutionally protected interest in continuity of legal bond

21   with their children. *Matter of Delaney*, 617 P 2d 886, Oklahoma (1980).

22   The liberty interest of the family encompasses an interest in retaining custody of one's

23   children and, thus, a state may not interfere with a parent's custodial rights absent due process

24   protections. *Langton v. Maloney*, 527 F Supp 538, D.C. Conn. (1981).

25   Parent's interest in custody of her children is a liberty interest which has received

26   considerable constitutional protection; a parent who is deprived of custody of his or her child,

27   even though temporarily, suffers thereby grievous loss and such loss deserves extensive due

28   process protection. *In the Interest of Cooper*, 621 P 2d 437; 5 Kansas App Div 2d 584, (1980).

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

655

1       The right of a parent not to be deprived of parental rights without a showing of fitness,

2  abandonment or substantial neglect is so fundamental and basic as to rank among the rights

3  contained in this Amendment (Ninth) and Utah's Constitution, Article 1 § 1. *In re U.P.*, 648 P 2d

4  1364; Utah, (1982).

5       The Agency deprived me a Constitutional right to be a parent. This right is not preempted

6  by Title VII, the ADEA, and the Rehabilitation Act. Therefore, I am suing the Agency under the

7  First, Fifth, and Ninth Amendments to the U.S. Constitution.

8      **The IIED.**

9      I can demand damages for the IIED under the Rehabilitation Act.

10     **Libel.**

11     I am not invoking the FTCA in my Complaint where Libel is expressly excluded by 28

12  U.S.C. § 2680(h). Moreover, I am not eligible to sue the Agency under the FTCA. When I got

13  the Termination Letter, I was given only one of two choices. The first choice was to file a claim

14  with the EEO for discrimination based on race, color, religion, sex, national origin, age, or

15  disabling condition. The second choice was to file a claim with the OSC's Complaints

16  Examining Unit for violation of 5 U.S.C. §2302(b) (prohibited personnel practices). Read the

17  Termination Letter (Attachment 3 to my Complaint, page 2 of the Letter), "Whichever you filed

18  first, an appeal for the corrective action to OSC, or a discrimination complaint, shall be

19  considered an election by you to proceed under that appeal process." I chose to proceed with the

20  EEO. Because my claim was not processed for the FTCA purpose, I am not eligible to sue the

21  Agency under the FTCA. Therefore, 28 U.S.C. § 2680(h) can't be used as a defense.

22     I am suing the Agency for "damages for reputation, emotional distress, mental anguish,

23  loss of enjoyment of life, and humiliation; loss of consortium as results of Libel" under *Vidrine*

24  *v. United States,* No. 6:07-CV-1204, U.S. District Court for the Western District of Louisiana

25  (September 30, 2011). Ms. Dunkelberger lied that on May 25, 2017 I came to her office to speak

26  about my need to go to Russia. Mr. Johnson lied to Dr. Prince that on May 18, 2017 I didn't

27  provide medical documentation. The Agency didn't send me Ms. Dunkelberger's letter and later

28  blamed me that I didn't respond to that letter and didn't return back to work. In this letter, Ms.

656

Dunkelberger lied that on June 12, 2017 I didn't provide medical documentation. The Agency lied to the EDD that I didn't provide doctor's notes until after I came back from Russia. The Agency lied to the Minneapolis VAMC that I had negligently failed to obtain LWOP, and it was the reason of terminating my employment.

**Irreparable Harm.**

The irreparable harm could occur if I don't have money to hire a surrogate Mom and to undergo another IVF procedure. I am 52 yo, and I even don't know if I have eggs that are eligible to give birth to children. I can't even pay for storing my embryo in Russia, and I am in constant fear.

**The Equities and Public Interest Favor Me.**

The Federal Government can't escape the crime of discrimination under Title VII, the ADEA, and the Rehab. Act. If the Court rules in my favor and IMMEDIATELY reinstates me back to work, it would be consistent with the intent of the Congress which wanted to see the Federal Government liable for discrimination to the extent of the private person. It would benefit the public interest, and it would possibly prevent the Government from committing other acts of discrimination.

It would show all Federal employees that they are covered by Title VII, the ADEA, the Rehabilitation Act, and that they are protected by the U.S. Constitution.

Moreover, under Title XI of the Civil Rights Act of 1964, Federal officials who were responsible for discriminating me under Title VII may go to prison for more than six month or to be fined for not more than $1000. If the Jury finds the VA officials liable for discrimination under Title VII, I am respectfully asking the Court to impose imprisonment for more than six month to Ms. Dunkelberger, Allean Bonin, Dr. Prince, and Mr. Johnson. It would also be the matter of the public interest because it would prevent other officials from committing the same crimes.

**Conclusion.**

I am respectfully asking the Court to deny Defendants' Opposition and IMMEDIATELY reinstate me back to work.

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

657

I declare under the penalty of perjury under the Federal laws and the laws on the State of California that the foregoing is true and correct. Executed at City of San Francisco, CA, on November 09, 2018.

Respectfully submitted,

Date: November 09, 2018             Sign Name:

                                    Print Name:  Tatyana E. Drevaleva

Reply to Opposition to my Motion for Preliminary Injunction, case No. 3:18-cv-03748

658

**Exhibit 1.**

AFGE Master Agreement.



**Master Agreement**

**between**

**the**

**Department of Veterans Affairs**

**and the**

**American Federation**

**of**

**Government Employees**

# 2011



**AFGE NVAC/AFL-CIO**





**MASTER AGREEMENT**

between the

**DEPARTMENT OF VETERANS AFFAIRS**

and the

**PLACEHOLDER**

**AMERICAN FEDERATION**

OF GOVERNMENT EMPLOYEES

**2011**



# TABLE OF CONTENTS

**Preamble** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **vii**

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1
ARTICLE 1 - RECOGNITION AND COVERAGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
ARTICLE 2 - GOVERNING LAWS AND REGULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . .6

**Labor-Management Collaboration** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**7**
ARTICLE 3 - LABOR-MANAGEMENT COOPERATION . . . . . . . . . . . . . . . . . . . . . . . . . . .9
ARTICLE 4 - LABOR-MANAGEMENT TRAINING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
ARTICLE 5 - LABOR-MANAGEMENT COMMITTEE . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
ARTICLE 6 - ALTERNATIVE DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
ARTICLE 7 - QUALITY PROGRAMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Employee Rights and Privileges** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**
ARTICLE 8 - CHILD CARE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
ARTICLE 9 - CLASSIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
ARTICLE 10 - COMPETENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
ARTICLE 11 - CONTRACTING OUT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
ARTICLE 12 - DETAILS AND TEMPORARY PROMOTIONS . . . . . . . . . . . . . . . . . . . . . . 42
ARTICLE 13 - REASSIGNMENT, SHIFT CHANGES, AND RELOCATIONS . . . . . . . . . . 46
ARTICLE 14 - DISCIPLINE AND ADVERSE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
ARTICLE 15 - EMPLOYEE ASSISTANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
ARTICLE 16 - EMPLOYEE AWARDS AND RECOGNITION . . . . . . . . . . . . . . . . . . . . . . 56
ARTICLE 17 - EMPLOYEE RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
ARTICLE 18 - EQUAL EMPLOYMENT OPPORTUNITY . . . . . . . . . . . . . . . . . . . . . . . . . 66
ARTICLE 19 - FITNESS FOR DUTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
ARTICLE 20 - TELEWORK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
ARTICLE 21 - HOURS OF WORK AND OVERTIME . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

664

## Employee Rights and Privileges (continued)

ARTICLE 22 - INVESTIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

ARTICLE 23 - MERIT PROMOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

ARTICLE 24 - OFFICIAL RECORDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

ARTICLE 25 - OFFICIAL TRAVEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

ARTICLE 26 - PARKING AND TRANSPORTATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

ARTICLE 27 - PERFORMANCE APPRAISAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

ARTICLE 28 - REDUCTION IN FORCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

ARTICLE 29 - SAFETY, HEALTH, AND ENVIRONMENT . . . . . . . . . . . . . . . . . . . . . . . 144

ARTICLE 30 - OCCUPATIONAL HEALTH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

ARTICLE 31 - SILENT MONITORING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

ARTICLE 32 - STAFF LOUNGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

ARTICLE 33 - TEMPORARY, PART-TIME, AND PROBATIONARY EMPLOYEES . . . . 178

ARTICLE 34 - JOB SHARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

ARTICLE 35 - TIME AND LEAVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

ARTICLE 36 - TIMELY AND PROPER COMPENSATION . . . . . . . . . . . . . . . . . . . . . . . 206

ARTICLE 37 - TRAINING AND CAREER DEVELOPMENT . . . . . . . . . . . . . . . . . . . . . 207

ARTICLE 38 - UNIFORMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

ARTICLE 39 - UPWARD MOBILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

ARTICLE 40 - WITHIN-GRADE INCREASES AND PERIODIC STEP INCREASES . . . 214

ARTICLE 41 - WORKERS' COMPENSATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

## Union Rights and Privileges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

ARTICLE 42 - AFFILIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

ARTICLE 43 - GRIEVANCE PROCEDURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 228

ARTICLE 44 - ARBITRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

ARTICLE 45 - DUES WITHHOLDING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

ARTICLE 46 - LOCAL SUPPLEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

ARTICLE 47 - MID-TERM BARGAINING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

ARTICLE 48 - OFFICIAL TIME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

ARTICLE 49 - RIGHTS AND RESPONSIBILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250

ARTICLE 50 - SURVEILLANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

ARTICLE 51 - USE OF OFFICIAL FACILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

**Title 38** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **259**

ARTICLE 52 - TITLE 38 ADVANCEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261

ARTICLE 53 - CLINICAL RESEARCH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

ARTICLE 54 - TITLE 38 NURSE PAY/SURVEY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 263

ARTICLE 55 - VHA PHYSICIAN AND DENTIST PAY . . . . . . . . . . . . . . . . . . . . . . . . . 265

ARTICLE 56 - TITLE 38 HYBRIDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 273

ARTICLE 57 - PHYSICAL STANDARDS BOARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

ARTICLE 58 - PROFESSIONAL STANDARDS BOARD . . . . . . . . . . . . . . . . . . . . . . . . . 285

ARTICLE 59 - PROFICIENCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

ARTICLE 60 - TITLE 38 REPRESENTATION AT BOARDS OR HEARINGS . . . . . . . . . 287

ARTICLE 61 - TITLE 38 VACANCY ANNOUNCEMENTS . . . . . . . . . . . . . . . . . . . . . . 288

ARTICLE 62 - VETERANS CANTEEN SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289

**General Provisions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **291**

ARTICLE 63 - RESEARCH GRANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 293

ARTICLE 64 - RESEARCH PROGRAMS AND DEMONSTRATION PROJECTS . . . . . 294

ARTICLE 65 - WAGE SURVEYS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296

ARTICLE 66 - TECHNOLOGY FOR ADMINISTERING, TRACKING, AND MEASURING
VBA WORK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297

**Duration of Agreement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **299**

**Index** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **305**



**PREAMBLE**



**Section - 1**

This Master Agreement is made between the Department of Veterans Affairs (the Department) and the American Federation of Government Employees (AFGE) National Veterans Affairs Council of Locals (the Union).

**Section - 2**

The Department and the Union agree that a constructive and cooperative working relationship between labor and management is essential to achieving the Department's mission and to ensuring a quality work environment for all employees.  The parties recognize that this relationship must be built on a solid foundation of trust, mutual respect, and a shared responsibility for organizational success.  Therefore, the parties agree to work together using partnership principles, Labor-Management Forums, and the Master Agreement to identify problems and craft solutions, enhance productivity, and deliver the best quality of service to the nation's veterans.

670

671



# INTRODUCTION



# ARTICLE 1 - RECOGNITION AND COVERAGE

### Section 1 - Exclusive Representative

AFGE is recognized as the sole and exclusive representative for all of those previously certified nonprofessional and professional employees, full-time, part-time, and temporary, in units consolidated and certified by the Federal Labor Relations Authority (FLRA) in Certificate No. 22-08518 (UC), dated February 28, 1980, and any subsequent amendments or certifications. The parties agree that should AFGE request the FLRA to include subsequently organized employees in the consolidated unit, such FLRA certification will not be opposed by the Department if the unit would otherwise be considered an appropriate unit under the law. Upon certification of FLRA, such groupings automatically come under this Agreement.

### Section 2 - AFGE Role

As the sole and exclusive representative, the Union is entitled to act for and to negotiate agreements covering all employees in the bargaining unit. The Union is responsible for representing the interests of all employees in the bargaining unit.

### Section 3 - Employee Representation

A.  The Department recognizes that, as the exclusive representative of employees in the bargaining unit, the Union has the right to speak for and to bargain on behalf of the employees it represents. The Department will not bypass the Union by entering into any formal discussions or agreements with other employee organizations or bargaining unit employees concerning all matters affecting personnel policies, practices, or working conditions. The Department will not assist or sponsor any labor organization other than AFGE in any matter related to grievances, collective bargaining, or conditions of employment of employees in the AFGE bargaining unit.

B.  Pursuant to 5 USC 7114(a)(2)(A), an exclusive representative of an appropriate unit in an agency shall be given the opportunity to be represented at any formal discussion (including those held with other employee organizations) between one or more representatives of the agency and one or more employees in the unit or their representatives concerning any grievance or any personnel policy or practices or other general condition of employment.

674

C. The Department's consultations and dealings with other employee organizations shall not assume the character of negotiations concerning conditions of employment in the AFGE bargaining unit.

## Section 4 - Unit Clarification

A. The Union will be predecisionally involved in bargaining unit determinations for position changes and establishment of new positions. When a position changes, and the parties do not agree over whether the position(s) is/are inside or outside the unit, the parties are encouraged to utilize the Alternate Dispute Resolution (ADR) process. If still unresolved, either party may file a Clarification of Unit (CU) petition with the FLRA. If the position previously has been in the bargaining unit, the employee and/or position will remain in the bargaining unit until a decision is issued on the petition.

B. If after predecisional involvement, the Department determines that a new, unencumbered position is outside the bargaining unit, the parties are encouraged to first attempt to resolve any disagreements through ADR methods. If no agreement is reached, the Union may file a CU petition through the FLRA.

C. The Department and the Union are encouraged to mutually decide CU issues and develop a system to communicate these decisions.

## Section 5 - Elections and Extensions of Represented Facilities

A. Whenever a CU or election petition is filed by either party, the filing party will send copies of the petition to the AFGE National Office at Membership and Organizing Department, 80 F Street, NW, Washington, DC 20001-1583 and to the Department at The Office of Labor-Management Relations (LMR), 810 Vermont Street, NW, Washington, DC 20420.

B. If employees are drawn from an existing facility and assigned to an unrepresented Community Based Outpatient Clinic (CBOC) (or similar entity) under the administrative control of the originating facility, and AFGE is the exclusive representative of all employees at the originating facility, the Department will not oppose any AFGE petition to represent employees who are assigned to that CBOC.

C. If an unrepresented CBOC (or similar entity) is staffed by new employees, and is under the administrative control of a facility entirely represented by AFGE, the Department will not oppose any AFGE election petition to represent employees who are assigned to the CBOC (or similar entity).

### Section 6 - Bargaining Unit Lists

A. Once per calendar year, upon request, the Department will provide to the Union, to the extent available in an existing automated database, listings of bargaining unit employee names, job titles, series, professional or non-professional status, service, work location, and duty station.

B. Twice per calendar year, upon request, a field facility will provide the local union, to the extent available in an existing automated database, listings of bargaining unit employee names, job titles, series, professional or non-professional status, service, work location, and duty station.

C. If the Department is temporarily unable to comply with the Union's request made under either A or B, it will immediately notify the Union of when the information will be available.

### Section 7 - Certification

The Department and the AFGE National Office will meet annually to discuss and review the accuracy of the AFGE certification and jointly request that the FLRA update the certification as necessary.

676

# ARTICLE 2 - GOVERNING LAWS AND REGULATIONS

## Section 1 - Relationship to Laws and Regulations

In the administration of all matters covered by this Agreement, officials and employees shall be governed by applicable federal statutes.  They will also be governed by government-wide regulations in existence at the time this Agreement was approved.

## Section 2 - Department Regulations

Where any Department regulation conflicts with this Agreement and/or a Supplemental Agreement, the Agreement shall govern.

677



**LABOR-MANAGEMENT COLLABORATION**



# ARTICLE 3 - LABOR-MANAGEMENT COOPERATION

## Section 1 - Guidance

The parties agree that the following sections should be interpreted as suggestions, not prescriptions.

## Section 2 - History

A. Since the inception of 5 USC Chapter 71, cooperation and communication have been and remain goals of labor-management relations. The implementation and maintenance of a cooperative working relationship between labor and management known as "Partnership" was established by Executive Order 12871 and a Presidential Memorandum dated October 28, 1999. The Order and the Memorandum were revoked by Executive Order 13203 in 2001.

B. In December, 2009, Executive Order 13522 was issued, creating Labor-Management Forums. Pursuant to the spirit of that Executive Order and this Master Agreement, the Department shall allow employees and their Union representatives to have predecisional involvement in all workplace matters to the fullest extent practicable, without regard to whether those matters are negotiable subjects of bargaining under 5 USC 7106; provide adequate information on such matters expeditiously to Union representatives where not prohibited by law; and make a good-faith attempt to resolve issues concerning proposed changes in conditions of employment, including those involving the subjects set forth in 5 USC 7106(b)(1), through discussion in its Labor-Management Forums.

## Section 3 - Purpose

While the parties are no longer required by Presidential Executive Order to engage in Partnership, the desire and intent in this Article is to describe and encourage effective labor-management cooperation. The Department and the Union are committed to working together at all levels to improve service to veterans, ensure a quality work environment for employees, and effect a more efficient administration of VA programs. The parties support and encourage cooperative labor-management relationships at all levels.

## Section 4 - Principles

Labor-management cooperation is premised on open communication between Union and Department officials. Because different approaches may effectively foster communication in different settings, specific methods for cooperation will be jointly determined by the affected parties. Normally, these efforts should be guided by the following principles:

680

A. Cooperation;

B. Mutual respect;

C. Open communication and sharing of information at all points along the decision-making process;

D. Trust;

E. Efficiency;

F. Consideration of each other's views and interests;

G. Identification of problems and workable solutions;

H. Understanding of, and respect for, the different roles that the Department and the Union can play in achieving mutual goals; and,

I. Minimizing or eliminating collective bargaining disputes.

### Section 5 - Scope

A. In a cooperative labor-management relationship, the parties may discuss any topic, including:

    1. Matters involving personnel policies, practices, and working conditions;

    2. Numbers, types, and grades of employees as well as methods, means and technology of work; and,

    3. Participation on labor-management committees.

B. If an agreement is reached using cooperative methods, by mutual consent the parties may choose to fulfill the collective bargaining obligation through such cooperation.

### Section 6 - Training

To promote effective labor-management relationships, the parties may determine the need for, and identify, appropriate training. Some types of training that may be appropriate include ADR, work process improvement, group dynamics, and relationship by objectives.

### Section 7 - Use of Time

A. Where the parties establish a joint labor-management committee (forum) under this article, union representatives will be on official time. This official time will not be counted against any allocated official time as described in this agreement.

681

B. In instances where sub-committees are established by this joint labor-management committee, and the parties have determined that Subject Matter Experts (SME) and/or union representatives are required, the Union will notify the Department of the appointment of a person to participate in sub-committee activities under this article and whether that person is participating as a SME for which duty time would be appropriate or as a union representative for which official time would be appropriate.  If designated as a union representative, that time will not be counted against any allocated official time as described in this agreement.

C. To the extent possible, activities will be conducted during the normal duty hours of the participants.  Committee members will be compensated in accordance with applicable law.  Once an individual has been designated by the Union to participate in cooperative labor-management activities, that person will be made available for such participation.

## Section 8 - Expenses

When activities are conducted under this article, the Department will bear the travel and per diem expenses of bargaining unit members involved in that activity to the extent permitted under the Federal Travel Regulations.

682

# ARTICLE 4 - LABOR-MANAGEMENT TRAINING

## Section 1 - Union Sponsored or Requested Labor-Management Relations Training

A. The parties agree that Union sponsored Labor-Management Relations (LMR) training is of mutual benefit when it covers appropriate areas (examples are: contract administration, grievance handling and information relating to federal personnel/labor relations laws, regulations, and procedures). Training which relates to internal union business will not be conducted or attended on official time.

B. Scheduling arrangements for the use of official time for training will be determined locally. Department personnel responsible for work scheduling will be given appropriate and adequate notice, to include specific agendas, of scheduled LMR training for maximum attendance.

C. The amount and use of official time for LMR training, other than joint LMR training, is an appropriate subject for local negotiation.

## Section 2 - Joint Master Agreement Training

The parties will jointly provide Master Agreement training. The cost of the Master Agreement joint training will be paid by the Department. Training will be done jointly; however, this does not preclude additional training by each party. Any training document will be prepared jointly.

## Section 3 - Joint Labor-Management Training

A. Each field facility will have a joint LMR training program. The ongoing program will have equal representation between the Union and the Department and decisions will be made by consensus consistent with interest-based bargaining principles. The local joint LMR training activity will develop a local LMR training plan which could consist of Interest-Based Bargaining, Alternative Dispute Resolution (ADR), Quality Programs, Cooperative LMR, communication skills, local supplements, district or regional training, etc.

B. LMR training will be recorded in each employee's individual training record.

C. Trainers appointed by the union will be on official time. This official time will not be counted against any allocated official time as described in this agreement. Attendees at joint labor management training will be on duty time. LMR training will normally be presented jointly unless training is conducted by a mutually agreed upon third-party. The parties may develop a joint train-the-trainer/facilitator program.

683

D. Local facilities are encouraged to give recognition to individuals or groups who materially advance the process of LMR training.

E. Normally, local facilities will ensure that appropriate resources are made available at the local level for joint LMR training.

F. The parties are encouraged to share training materials or experiences to nurture better LMR training.

G. The provisions of this article apply to joint training at all levels from local through national.

## Section 4 - Third-Party Sponsored Training

Third-party sponsored training may be considered duty time or official time, as appropriate.

## Section 5 - National Joint Training and Education Committee Charter

A. Purpose

The national parties have jointly established a National Training and Education Committee (NTEC) that will advise the Assistant Secretary for Human Resources and Administration (HRA) on joint labor-management training and education needs and will plan the development of agreed upon national labor relations training programs. The NTEC will recommend priorities and curricula for joint labor relations training and education to be accomplished in the Department with a national focus.

B. Objectives:

1. To identify national labor relations training and education needs of common interest to the Union, the Department, and the Administration;

2. To determine type and degree of joint training needed;

3. To determine the priorities for proposed national joint training;

4. To identify delivery methods for the proposed national joint training;

5. To recommend proposals to the Assistant Secretary for HRA and the Administrations for national joint training and education activities;

6. To charter appropriate sub-groups (this will include guidance, resources, and evaluation of final products);

7. To develop a communication and marketing plan for national joint training;

8. To plan uniform and consistent national labor relations training for the Union and the Department;

684

9. To facilitate and encourage participation of all parties in labor relations training and/or other educational programs, including facility requests for joint labor relations training;

10. To evaluate the success of training programs accomplished and share best practices;

11. To initiate needs assessments as appropriate to determine topics for joint training;

12. To provide subject matter experts for developing curricula and serving as faculty as needed;

13. To keep NPC advised of joint LMR training initiatives;

14. To allow any member of the NTEC to suggest an agenda item but the co-chairs will establish the agenda; and,

15. To assure that Department participants on the NTEC will have the authority to speak for their Administrations or staff offices.

C. Guiding Principles (Process Boundaries):

1. To ensure consistency with national goals of participating organizations;

2. To seek input/feedback from all organizations affected/involved;

3. To establish an atmosphere of mutual trust and respect;

4. To establish open and honest communications with a view toward recognizing and addressing the interests of the parties;

5. To share information and responsibility;

6. To focus on global issues of interest at the national and local levels; and,

7. To ensure a One-VA approach to national joint labor relations training.

D. Membership

1. NCA – 1 member

2. VHA – 1 member

3. VBA – 1 member

4. LMR – 1 member

5. OI&T – 1 member

6. EES – 1 member

7. AFGE – 6 members

8. AFGE support – 1 member (non-voting)

9. LMR support – 1 member (non-voting)

E. Structure and Decision Making Process:

   1. There shall be six Department members and six Union members;

   2. Co-chairpersons will represent the Union and the Department and will serve for two years. The responsibility for chairing the meetings will be rotated between the chairpersons;

   3. The NTEC will meet quarterly;

   4. Each year the NTEC will determine the agenda for the following year;

   5. Conference calls will be scheduled every two months and additional calls will be scheduled if needed;

   6. The Department will fund the travel and per diem for meetings of the NTEC;

   7. The Union will commit members to participate on curriculum development subgroups and to participate as instructors in joint training;

   8. Decisions will be made by using the consensus approach that integrates the interests of the parties (if consensus is not reached by the NTEC, the chairs will attempt to resolve the dispute); and

   9. Minutes will be recorded at each meeting and distributed to each member for review and comment, and then distributed as appropriate.

F. Definitions:

   1. Joint training - training agreed to by both parties.

   2. National joint training - national labor relations training mutually agreed to and developed by both the Union and Department to address mutual needs/concerns.

   3. National focus training and education - labor relations training which is global in content to assure uniformity and consistency at all levels.

   4. Intended audience of training and education - local union officials, stewards and representatives; Union national officials; first-level supervisors, managers and executives; Human Resources Management Officers and specialists; and employees.

686

G. Desired Outcomes:

1. More efficient use of resources through better collaboration and coordination of training and education activities affecting the Union and the Department;

2. Foster clear and effective communication mechanisms between the Union and the Department to ensure better collaboration;

3. Improve the relationship between the Union and the Department through collaborative and coordinated training and education activities;

4. Maximize participation in joint training and education at all levels;

5. Improve access to labor relations training at all levels; and,

6. Develop outcome measures to demonstrate success.

H. Additions:

The NTEC may add to this section, by mutual agreement.

## ARTICLE 5 - LABOR-MANAGEMENT COMMITTEE

There shall be a joint Labor-Management Relations Committee which shall meet twice a year in Washington, normally approximately six months apart, for up to a maximum of three days. The Department will authorize official time (if otherwise in a duty status) and travel and per diem for the five National Veterans Affairs Council Officers, fifteen District Representatives, five National Safety and Health Representatives, and twelve National Representatives, or alternates, for participation in these meetings. The parties will exchange agenda items sufficiently in advance so that arrangements can be made for appropriate representation. The Union will provide the Department with the names of the Union designated representatives as far in advance as possible but no later than three weeks in advance of the meeting so that official time, travel, and per diem may be arranged.

688

# ARTICLE 6 - ALTERNATIVE DISPUTE RESOLUTION

### Section 1 - Commitment

The Department and the Union are committed to the use of ADR problem-solving methods to foster a good labor-management relationship. The Union and Department at all levels should be committed to the use of ADR problem-solving methods as a priority to resolve disputed matters. Those involved in the development and use of an ADR system shall be trained in the principles and methods of ADR.

### Section 2 - Definitions and Intentions

A. ADR is an informal process which seeks early resolution of employee(s), labor, and management disputes.

B. Any ADR process must be jointly designed by the Union and the Department. ADR should be effective, timely, and efficient. It should focus on conflict resolution and problem-solving and foster a cooperative labor and management relationship. Participation in the ADR process must be voluntary.

C. ADR may be used in the context of labor-management cooperation.

D. The parties agree to ongoing evaluation to improve the process.

### Section 3 - Rights and Responsibilities

A. The parties have the responsibility of informing employees and management officials of the ADR option to resolve disputes. ADR should be undertaken in good faith and not circumscribed by formal rules and regulations.

B. Both parties will:

   1. Respond to questions about the ADR process;

   2. Provide information to employees on the ADR process; and,

   3. Help employees complete the designated ADR form.

C. Employees may utilize the ADR process to resolve individual concerns with the mutual consent of the Union and the Department. However, the parties agree to encourage the use of ADR except for the most egregious or frivolous matters.

689

D. Disputes resolved by ADR are final when written and signed. The Union and the Department will have the right to participate in all stages of the ADR process. This is in addition to an employee's right to Union representation.

E. ADR resolutions shall not set precedent unless agreed to by the parties. Resolutions under ADR cannot conflict with or supersede agreements between the parties.

F. Once an employee elects to use an ADR process, the Union has a right to participate in that process. This right is in addition to an employee's right to Union representation.

## Section 4 - Implementation

A. ADR is an appropriate subject matter for local negotiations.

B. ADR agreements must state the objective of all parties as well as a commitment from all parties to resolve their disputes in a non-adversarial environment.

C. The parties at all levels shall jointly adopt an ADR problem-solving method that will include mutually agreed upon third parties. ADR methods may include but are not limited to early neutral evaluation, mediation, interest-based problem solving, peer review, conciliation, facilitation, and neutral fact-finding.

D. ADR methods may be used prior to or during a grievance/arbitration or statutory appeal. In the use of ADR processes, contractual time frames will be stayed by mutual agreement. Statutory time frames cannot be stayed.

E. ADR data that is collected nationally for the use of the VA ADR Steering Committee will be provided to the Union member of that committee.

## Section 5 - Characteristics

A. Characteristics of a successful ADR program generally include:

1. The program is designed in cooperation with the local union;

2. Employees are educated on and made aware of the program;

3. All parties are encouraged to use the process and resolve workplace conflict at the earliest stage possible;

4. Adequate resources are allocated to the development and maintenance of the program;

5. The process is evaluated on an on-going basis; and,

690

6. Mediators and facilitators are adequately trained.

B. Successful mediators and facilitators generally are able to:

1. Assist the parties in identifying the issues;

2. Foster joint problem-solving;

3. Explore settlement opportunities;

4. Maintain strict neutrality;

5. Maintain complete confidentiality;

6. Structure the session so there will be an exchange of information;

7. Consider options to resolve issues;

8. Assist the parties in developing skills for defusing emotions; and,

9. Assist in developing a settlement agreement with the concurrence of all parties.

691

# ARTICLE 7 - QUALITY PROGRAMS

## Section 1 - Introduction

A. Both parties recognize the importance of a strong commitment to comprehensive quality programs in the Department. Service to the veteran is the cornerstone of the relationship between the Department and employees.

B. Both parties agree that a successful quality program must empower all employees to fully participate in the development and implementation of Department programs and processes. The Department recognizes the Union as the exclusive bargaining unit representative in implementing, maintaining, and improving these quality programs. Participation of bargaining unit employees in the Department's quality programs is a matter left to the discretion of the Union in its role on the facility Quality Council.

## Section 2 - General

A. The Quality Programs referred to in this article are to include Quality Programs initiated by the Department utilizing methods (such as LEAN, Six Sigma, Baldridge Criteria and Systems Redesign) aimed at reviewing and improving Department programs and processes.

B. Both parties agree that the commitment of the local facility Director and local union President is critical for success of Quality Programs.

C. Bargaining unit employees who spend time on Quality Programs initiated by the Department in a nonrepresentational capacity will be on duty time. Bargaining unit employees serving in a union representational capacity will be on official time. This official time will not be counted against any allocated official time as described in this agreement.

D. Time spent on Quality Programs initiated by the Department will be considered duty time.

E. It is recognized that all levels of the Department and the Union are responsible for successful implementation, maintenance, and improvement of quality programs. Therefore, the parties should strive for open communication, developing teamwork, sharing of information, integration and acceptance of the union/management role, reduced paperwork, improved work processes, etc.

F. It is in the interest of both parties that there be a sharing and communication of information regarding, e.g., Joint Commission, requirements, processes, and results.

692

## Section 3 - Quality Programs Council Charter

The following is the Charter agreed to by the parties.

---

### VA QUALITY COUNCIL CHARTER FOR QUALITY PROGRAMS

#### I.     PURPOSE

This charter establishes a National Quality Council (NQC/work group) and quality councils throughout the Department.  Members of the councils will demonstrate continuing commitment to the principles and practices of quality improvement both as council members and as participants in their respective organizations.

#### II.     SCOPE

A.  This charter applies to quality programs within the VA.

B.  Both the Department and the AFGE National VA Council (NVAC) mutually agree that the scope of the agreement will be limited to process, programs, and related issues as covered by this charter.  The Councils/Teams will not establish projects which are matters solely and properly subject to collective bargaining, matters currently covered by the Master Agreement, and individual/employee grievances and problems or other appeals/complaints processes as projects.  The AFGE NVAC will communicate this requirement to their locally appointed quality representatives.  The Department will similarly communicate this requirement.

C.  Neither the union nor the Department waives the right to bargain over quality initiatives which would otherwise be bargainable, nor do they waive any other legal, contractual, or past practice right.

D.  The Department and the union recognize that, in order for quality programs to be a successful tool in problem solving, the parties may agree to depart from the Federal Labor Management Relations Statute in such areas as the parties' rights and the negotiability of subjects.

E.  No bargaining unit employees will be coerced or intimidated into participating in Quality Improvement Teams (QITs).  Participation in the process is entirely voluntary.

F.  Union and management will recognize each other as legitimate customers in their everyday dealings with each other.

#### III.     GENERAL ROLES OF VA AND AFGE

The Department and the NVAC serve as champions of quality throughout the organization.  The National Quality Council and other work teams/groups, will

693

provide an environment that supports employee involvement, contribution, teamwork, and a positive atmosphere of trust/respect between management and employees.

## IV.    QUALITY COUNCILS/WORK GROUPS - GENERAL

A.  Purpose:

   1.  All Quality Councils/work groups will foster quality improvement by:

      a.  Providing visible leadership,

      b.  Encouraging subordinate managers and employees to use quality improvement techniques, and

      c.  Fostering the integration of quality improvement with management support systems.  Such systems include, e.g., strategic planning, performance management, and awards and recognition.

B.  Organization and Membership:

   The union may, at their discretion, select a number of employees equal to management's selections to serve on the Councils/work groups.  There must be present at least one person from both management and union.  In the event multiple unions participate in the program, the number of union members on a council shall not exceed that of management and AFGE shall determine the union membership mix.  All members will make every effort to attend the meetings.  All quality council members must have had quality improvement awareness training.  The union and the Department, respectively, will endeavor to select employees who they feel best represent the various components of the organizational entity.

## V.    THE NATIONAL QUALITY COUNCIL

A.  Purpose

   1.  Serves as the model for VA's quality improvement effort,

   2.  Provides leadership to foster quality improvement within VA, and,

   3.  Supports the integration of quality improvement in the day-to-day operations of VA.

B.  Membership

   1.  The NQC/work group shall include up to 4 representatives on the National Quality Council, each with an equal voice.  The NVAC President will make the selection of NVAC employees to sit on the NQC/work group.  Management will have equal membership to Union membership.

694

2. Each member of the Council will normally serve a minimum of 18 months. The Council will be co-chaired by the union and management.

C. Function

The NQC/work group fosters implementation of quality improvement by:

1. Examining the Department's Mission of the Quality Improvement (QI) Program and promoting the goals and principles established in it;

2. As necessary, establishing cross-functional and other projects designed to foster quality improvement throughout VA;

3. Providing assistance and support to other Councils/work groups;

4. Reviewing positive/negative quality improvement experiences from specific facilities as presented by NQC members;

5. Establishing guidance, procedures, and format for implementing quality improvement projects at the NQC/work group level; and,

6. Operating under the rules and procedures specified in Appendix A.


VI.   REGIONAL/AREA COUNCILS

Regional/Area Councils may be established at management's discretion. If such councils are established they shall comply with the guidelines for facility councils and/or national councils as appropriate.


VII.   FACILITY QUALITY COUNCILS

A. Where practicable, based upon the size of the activity, each activity will establish a Facility Quality Council (FQC/work group) or work group. Each FQC/work group will operate under a charter which includes at a minimum a statement of purpose, organization, membership, responsibilities, and functions. However, if the parties mutually agree, they may combine the functions of the FQC/work group into any facility partnership council.

B. Membership. The membership shall be personnel who work at the facility. Each council and/or work group will have co-chairs selected by consensus of the membership. The co-chairs may be rotated periodically.

C. Responsibilities

1. Promote quality improvement goals and principles,

2. Identify quality improvement opportunities, and

3. Recognize participation and accomplishments in the quality improvement process.

695

D. Procedures

Each QC/work group will establish its own operating procedures, deciding such issues as frequency of meetings, communication processes, and membership tenure.  All QC/work groups have the option to invite additional people to their meetings when the need for additional expertise arises.  All QC/work groups will make decisions based on consensus.

1. QC/work groups are encouraged to use an experienced facilitator for conducting Council meetings for the first year.

2. All quality council/work group meetings will be conducted during normal duty hours with the following exception: meetings may be held during normal/regular lunch or break periods with consensus of the council or team.  Any overtime related to Quality Council/work group work will be paid in accordance with governing directives and law.  Union representative participation shall be considered official time.  This official time will not be counted against any allocated official time as described in this agreement.

3. Quality Councils sponsor QIT activities.  The Councils:

   a. Determine the scope of the processes to be examined (e.g., is it a local or cross-component issue?);

   b. Prioritize and select processes for team action in their scope of authority (office staffing needs and workloads will necessarily be considered in making these decisions);

   c. Solicit volunteers and select team members, based on the particular skills and expertise needed by the team;

   d. Monitor and support teams and individuals working on quality efforts, including obtaining or providing necessary training;

   e. Obtain periodic reports from active teams; and,

   f. Obtain administrative support as necessary.

4. QC/work groups receive recommendations from the QITs they have sponsored.  They:

   a. Review all recommendations from their teams;

   b. Determine whether each recommendation is within their scope of authority to implement; and,

   c. Determine whether a recommendation should be referred to a higher level within the facility because of scope.

696

5. Implementation of recommendation from QITs will be handled as follows:

   a. The Service/Division Quality Council (S/DQC)/work groups will recommend to appropriate management quality improvement changes which can be implemented at the local level.

   b. When practicable based upon the size of the facility, the FQC/work group will receive recommendations from QITs they have sponsored and from the S/DQC/work groups. The FQC/work group will recommend to the appropriate senior management official those quality improvement changes that can be implemented at the Facility level.

   c. The QIT recommendations may be adopted and implemented, returned to a QIT for reconsideration, or rejected. On a timely basis, reconsidered or rejected recommendations will be accompanied by a clear, reasoned explanation to the QIT.

   d. Quality councils at the facility can approve projects within their scope and authority for QIT consideration. Projects involving cross-functional areas must be approved by the appropriate quality council (national, facility, or service/division).

## VIII.    QUALITY IMPROVEMENT TEAMS

A. Purpose

   The purpose of QITs is to conduct quality improvement projects which will result in improved VA operations.

B. Scope of Projects

   1. The Sponsoring Council will define the purpose and scope of each quality improvement project.

   2. QI initiatives will not focus on or result in loss of grade, pay, or bargaining unit positions (i.e., reduction in staffing).

C. Membership

   1. QIT members will be appointed by the appropriate Quality Council and may be drawn from employees in a VA component and representatives of outside groups, such as VA customers and partners who are closely associated with a particular process. The union may, at its discretion, designate a representative to fully participate as a member on each QIT without the need to use official time. The union representative will be appointed at the same time as other members of the QIT.

2. Employee participation in QI is voluntary. Employees may resign from the team at any time by notifying a Team Leader in writing. Employees will be fully informed concerning QI objectives and processes before their participation is requested. Employees will not be disadvantaged if they choose not to volunteer to serve on a team.

3. Prior to serving on a team, employees will be trained on QI techniques.

D. Team Leaders

1. Are selected by the QIT, or QC/work group;

2. May be any member of the team; and

3. Are responsible for calling meetings, communicating resource needs (e.g., personnel, training, funding, and equipment) and keeping the Council informed.

E. Team Facilitators

Team facilitators will be chosen by the Sponsoring QC/work group and should be from outside the team. The facilitator must be trained in QI problem solving methods and group dynamics. The facilitator may help in selecting and using problem-solving tools, train members of the team in their use, and help guide discussions.

F. Union Participation and Official Time

1. The union has the right to be present at all QIT Meetings. The union will determine who the representative will be at the team meetings, and in the event that he/she cannot be released from duty, the union may designate another representative or request the meeting be postponed until they are available.

2. The union will be provided the same advance notice of meetings that team members receive. Official time to attend such meetings, not to exceed a total of 5 hours per week/facility, shall be in addition to any official time presently allowed by local agreements.

G. Procedures

1. Descriptions of improvement projects will be accessible to all facilities and QITs via computer, where practicable, based upon the size of the facility.

2. All QIT meetings will be conducted during normal duty hours with the following exception: meetings may be held during normal/regular lunch or break periods with consensus of the team. Any overtime related to QIT work will be paid in accordance with governing directives and law.

698

Union representative participation shall be considered official time. This official time will not be counted against any allocated official time as described in this agreement.

3. Quality improvement projects will be selected by Quality Councils and/or QITs. When a QIT has selected a quality improvement project, the project will be submitted to the Quality Council for approval. Each QIT member will be trained in QI techniques and will apply those techniques towards the successful completion of the improvement project(s) on which the team is working.

4. To the extent possible, teams will receive the support they need for projects. Projects not self-generated will be defined and presented to the team. Team members who happen to be Union representatives will serve on the team as employees, not as the Union's representative.

5. QIT meetings are to be scheduled on a regular basis. Management will make every effort to insure that bargaining unit team members are released from normal duties to attend meetings.

6. The Sponsoring Council and/or management are responsible, to the extent possible, for providing teams access to data, staff, and contractors and with resources (training, travel funds, equipment, office supplies, facilities, time, etc.) necessary to carry out the quality improvement project.

H. Performance Appraisals

No adverse inference will be made in performance appraisals for professionally expressed opinions or positions taken on QIT issues by employees serving on QITs, or by employees not serving on QITs. Time spent performing QIT activities will not be evaluated in relation to performance standards of the employees' regular positions.

I. Awards

Any awards provided to QI teams will be group awards. Monetary awards for employees not participating on QI teams will not be adversely affected due to non-participation.

IX.   TRAINING

A. Every effort will be made to provide QI awareness training to all employees. The union's on-site representatives located in each local facility will be trained at the same time as other bargaining unit employees in the facility. If multiple sessions are required, the union representative will be offered attendance in the first session held at his/her facility.

699

B. VA management agrees to provide facilitator training courses for those employees selected to serve as facilitators.

C. Management and union/bargaining unit employees will receive training appropriate to their QI task or responsibility.

X.    COMMUNICATION/PUBLIC RELATIONS

A. All existing "Mission Statements" will be jointly examined by the appropriate Quality Council with changes made as necessary.  All new "Mission Statements" will be jointly developed by the appropriate Quality Council.

B. All QI publications, memoranda, circulars, directives, etc., unique to AFGE will be identified by both the official VA and union logos.

XI.    MANAGEMENT RESPONSIBILITIES

A. Local Management

1. Local management will reimburse employee authorized travel and other authorized expenses related to QI training and Council/Team participation.

2. The impact of QI Council/Team meetings and workload/tasking will be recognized by supervisors as valid work and appropriate/necessary adjustments will be made to employees' normal work loads, concerning due date extensions, workload counts, and deadlines.

B. Central Office (CO) management will provide administrative support to the NQC/work group.  Specifically, CO will:

1. Provide overall staff support to the NQC/work group.

2. Record, disseminate and modify/amend the minutes of all meetings of the NQC/work group.

3. Compile, distribute, and maintain a QI bibliography.

4. Share expertise in the quality field with the Facility Councils.

5. Maintain an inventory of QI courses and serve as liaison with the training coordinators of the Department.

6. Support the NQC/work group in issuing the newsletter and in other communication efforts.

7. Provide support and assistance to quality councils, as necessary.

700

XII.   NOTICE

A.   Any local QI agreement(s) in conflict with this charter will be superseded by this charter in those specific areas where the conflict exists.

B.   It is understood that QI now exists at some facilities and that it will require an expeditious transition period to implement all features of this QI national agreement.  The transition period will be no more than one hundred twenty (120) days from receipt of this program at the local station or conclusion of local bargaining, whichever is later, and less than one hundred twenty (120) days where possible.

C.   The composition of QITs in existence prior to the effective date of this agreement shall not be affected by this agreement.  Each facility will notify the local union of the QITs in existence prior to the effective date of this agreement.

D.   It is recognized by both parties that QI projects are initiated at all levels.  VA management must pay special attention to its obligation to provide union notification before implementation of QIT recommendations where appropriate.  VA management will closely monitor QI activities at all levels to assure that managers do not bypass the union.


XIII.   DURATION

Both the union and management recognize that to achieve cultural transformation, many changes in the operating process have to occur; therefore, either party may give written notice to reopen this charter 30 to 60 calendar days prior to the first annual anniversary of this charter.  The request for renegotiating the provision(s) of this charter shall be in writing and submitted 30 days prior to beginning the negotiations.  If reopened, all provisions of this charter shall remain in effect until conclusion of negotiations unless otherwise mutually agreed.  Participation by an individual employee in the QI effort remains voluntary despite any opposing position by management or the union.  Participation in the QI effort remains voluntary.  While either party may withdraw from the agreement at any time after 1 year, the parties are committed to utilizing QI for 1 year from the conclusion of their transition period or the establishment of a program.  Both union and management will consider withdrawal as the option of last resort only after extensive discussion and consultation fail to resolve a problem.  The union maintains that participation in QI is a union permissive right.


XIV.   TRAINING

The Department will provide joint training to the parties prior to implementation of the QI Program at the facility.  The parties agree that the Department will provide the necessary resources and training to ensure a successful program.

701

## APPENDIX A

**The National Quality Council will adhere to the following rules and behaviors:**

1. The Council meetings will be attended by principals/designees only. Every effort will be made to insure principals/designees are available for meetings. Observers, technical experts, and presenters may be invited to attend Council meetings in a non-voting/participating capacity. Any member may request to be briefed on decisions made at a previous meeting if the member was not in attendance when the decisions were made.

2. The Chairperson will designate a Council member in their absence to chair Council meetings.

3. The Council will operate by consensus decision-making. Consensus shall be defined as stated in Webster's Ninth New Collegiate Dictionary or newer edition.

4. A quorum must be present to conduct official business, with a quorum consisting of two thirds of the members.

5. An agenda will be prepared in advance for each meeting of the NQC/work group with each member being given the opportunity to submit items.

6. Discussion and decisions of the NQC/work group will be recorded in meeting reports and sent in draft to the members for approval before publication.

7. Facilitators will be obtained when needed. Facilitators will remain neutral and will not participate in decisions.

702



**EMPLOYEE PASSES AND PRIVILEGES**

704



# ARTICLE 8 - CHILD CARE

### Section 1 - Policy and Purpose

The parties recognize that working parents may have special child care needs during working hours. The parties recognize the need for such parents to secure appropriate child care arrangements. The Department will continue its efforts to secure adequate funding in order to support and foster child care services for its employees.

### Section 2 - Child Care Activities

A. The Department will continue to provide and/or support various activities in order to meet ongoing child care needs. These may include, but are not limited to, such things as child care and parenting information, child care resource and referral information, workshops, and counseling as available through the Employee Assistance Program.

B. It is the Department's intention to utilize available funds nationwide to foster local solutions to child care needs. These may include construction of on-site facilities or near-site facilities, participation in shared facilities with other federal agencies, establishment of mini-centers, or other child care services.

C. In accordance with PL 101-509 of the 1991 GSA Appropriations Act, the Department agrees to pay legally permissible expenses for training, conferences, or other meetings in connection with the provision of child care services for persons employed to provide child care services if the Department determines that such training, etc., is relevant and necessary. The Department also agrees to pay similar expenses for Department employees who have oversight responsibilities for the operation of child care facilities, i.e., members of local child care Committees and Boards of Directors, if it is determined such training is relevant and necessary.

D. The head of each facility or appropriate designee will provide inquiring employees with current listings of the qualified, licensed child care centers in the immediate area. Recognizing that a broad range of child care needs exists in compiling such listings, management will request specific information i.e., age groups served, types of programs offered, and special needs programs.

706

### Section 3 - Local Child Care Committees

A. When a site for a VA Child Care Center is selected, the parties will establish a local Committee comprised of one Department representative, one local union representative, parents, and other parties as appropriate. The Department will have subject matter experts available to meet with the Committee on an as-needed basis. The Committee will guide development of the local child care program, including development of marketing strategies, operating procedures, and admission priorities.

B. The Committee will have the opportunity to review and make recommendations which will be considered in the design of the facility. The Committee will participate in the selection of the child care provider.

C. Once the Center becomes operational, the Committee will be replaced by a Board of Directors which the Committee will assist in establishing. The local union will designate one representative to serve on the Board of Directors.

D. Bargaining unit employees who perform Child Care Committee functions in a nonrepresentational capacity will be on duty time. Bargaining unit employees serving in a union representational capacity will be on official time. This official time will not be counted against any allocated official time as described in this agreement.

### Section 4 - Employee Needs

A. It is agreed that the responsible official will grant emergency annual leave requests and consider emergency requests for leave without pay brought about by unexpected changes in child care arrangements, contingent upon operational exigency.

B. The Department agrees to utilize programs which may assist employees with child care needs; for example, part-time employment, job sharing, leave, flextime, etc.

C. The Department recognizes that it may be necessary for employees to contact child care providers during duty hours.

### Section 5 - Facilities

In accordance with 40 USC 490(b), the Department will provide space, equipment, furnishings, and other services necessary to support the operation of each child care facility on federal property.

### Section 6 - Miscellaneous

The parties agree that this Article will not delay or impact any pending child care initiatives. The Union will be kept informed of the child care initiatives.

707

# ARTICLE 9 - CLASSIFICATION

## Section 1 - General

A. Each position covered by this Agreement that is established or changed must be accurately described in writing and classified to the proper occupational title, series, code, and grade.

B. Title 5 position descriptions (PD) must clearly and concisely state the principal and grade controlling duties, responsibilities, and supervisory relationships of the position.

C. Employees will be furnished a current, accurate copy of the description of the position to which assigned at the time of assignment and upon request. In order to ensure accurate PDs, the term "other duties as assigned" should not be used to assign duties that are not related to the employee's position. In such instances, the employee should discuss these duties with the supervisor to determine whether the PD is accurate. The Department reserves its right to assign work that is not in the PD. If that occurs on a regular basis, the PD must be revised to accurately reflect the job duties.

D. Position descriptions will be kept current and accurate, and positions will be classified properly. Employees shall be properly compensated for duties performed on a regular and recurring basis. Changes to a position will be incorporated in the PD to assure that the position is correctly classified/graded to the proper title, series, and grade. Incidental changes may be made in the form of pen and ink notations on the PD as requested by the Department. The local union will be provided the opportunity to review proposed changes in PD descriptions and copies of updated PDs. Current PDs will be provided to the local union, upon request.

E. Employees dissatisfied with the classification of their positions should first discuss the problem with their supervisors. If a supervisor is unable to resolve the issue to the employee's satisfaction, the employee can discuss the matter with the Human Resources Manager or appropriate staff member who will explain the basis for the classification/job grading. An employee and/or the local union, upon request, will have access to the PD, evaluation report, if available, organizational and functional charts, and other pertinent information directly related to the classification of the position. This informal classification review process should be completed in a reasonable period of time. When a desk audit is conducted it will be completed within 90 days of the local union or employee request. This time frame may be extended by mutual consent. As appropriate, desk audits will be performed at the employee's work station. If the employee still believes there is an inequity, an appeal may be filed with the Department or Office

708

of Personnel Management (OPM), as appropriate.  An employee may file a classification/job grading appeal at any time through appropriate channels whether or not this informal classification review process was followed.

F.   The Department will meet and confer with the local union on procedures pertaining to systematic position classification and special maintenance reviews.

G.   Vacant positions will not be posted until the appointing authority assures that they are authorized, properly described, evaluated, and classified according to series, title, and grade.

H.   No position(s) will be downgraded without a thorough review.  For a downgraded position, the employee's pay and grade will be maintained on an incumbent basis in accordance with law and regulations.

I.   Delegations of authority for the classification of positions will be specified in Department policies and regulations.

## Section 2 - Classification Standards

A.   Title 5 positions will be classified by comparing the duties, responsibilities, and supervisory relationships in the official PD with the appropriate classification and job grading standard.

B.   The Department will apply newly issued OPM classification and job grading standards within a reasonable period of time.  The local union will be provided with copies of new standards.  Current standards will be provided upon request.

C.   The Department will provide the Union with copies of any Department guidance provided to OPM in connection with any classification standards.

## Section 3 - Classification Appeals

A.   The Department will provide employees and the local union with copies of procedures for filing classification appeals through the Department or OPM channels, upon request.

B.   Employees or their representatives are encouraged to submit their classification/job grading appeals through the local Human Resources Management (HRM) office.  The HRM office will forward the appeal to the Department or OPM, as appropriate, no later than 15 days from receipt and will provide the Local with 2 copies of the employee's appeal request. However, this does not preclude an employee from filing a classification/job grading appeal directly to the Department or OPM, as appropriate.

C. An employee who files a classification appeal is entitled to a copy of the classification appeal file. The local union is entitled to the same material, upon request.

D. General Schedule (GS) and Federal Wage System (FWS) employees who file appeals with the Department concerning the title, series and grade, and/or coverage of their position will have their appeal decided within a reasonable period of time with a goal of 60 days from the date the Appeals Office receives a completed application. Classification appeal decisions will be forwarded to the local union.

**Section 4 - Effective Date**

The effective date of a personnel action taken as a result of an appeal should not be later than the beginning of the fourth pay period following the date of the decision.

710

# ARTICLE 10 - COMPETENCE

A. The Department shall train bargaining unit employees on all new equipment, technology changes, and clinical procedures needed to perform the duties of their job. For employees who are subject to production and timeliness standards, the training time will be excluded from the production or timeliness standard.

B. Competencies established for an employee's position shall be in writing and communicated to the employee when the employee enters a position or when a new competency is established for the employee's position.

C. Prior to the assignment of an out of the ordinary duty, employees shall be encouraged to state if they feel that this is an area that they need to review. The request should not be used punitively against them and the review shall be authorized by the Department.

D. The local union shall have input into the training of employees who are expected to cross cover areas.

E. If problems arise with employees' competencies, remedial training shall be afforded.

F. Competencies must not exceed the scope of licensure, registration, or certification, whichever is applicable.

G. Copies of competencies will be provided to the local union. When the Department changes an employee's competency, the local union will be afforded a reasonable opportunity to bargain regarding negotiable matters related to the change.

H. Disputes over the matters that may be bargained concerning competencies may be referred to partnerships or the equivalent at the appropriate level.

I. For the purposes covered by this Agreement, competencies as such shall not be used for performance evaluations, as replacements for or additions to performance standards, or as qualification standards.

# ARTICLE 11 - CONTRACTING OUT

### Section 1 - Periodic Briefings

Periodic briefings will be held with AFGE officials at the local and national levels to provide the Union with information concerning any Department decisions that may impact bargaining unit employees in implementing Office of Management and Budget (OMB) Circular A-76.

### Section 2 - Site Visits

The Department will notify the local union if a site visit is going to be conducted for potential bidders seeking contracts for work performed by bargaining unit employees.  A local union representative may attend such a site visit.

### Section 3 - Union Notification

When the Department determines that unit work will be contracted out, the Department will notify the local union to provide them an opportunity to request to negotiate as appropriate.

### Section 4 - Employee Placement

When employees are adversely affected by a decision to contract out, the Department will make maximum effort to find available positions for employees.  This effort will include:

A.  Giving priority consideration for available positions within the Department;

B.  Establishing an employment priority list and a placement program; and,

C.  Paying reasonable costs for training and relocation that contribute to placement.

### Section 5 - Inventory of Commercial Activities

 The Department will maintain an inventory of all in-house commercial activities performed by the Department and will update this inventory annually.  The inventory will include information on all completed cost comparisons and will be made available to the Union upon request.

### Section 6 - Reopener

The parties agree that any agreement reached in Mid-term Bargaining regarding Contracting Out may be incorporated in this Agreement.

712

## ARTICLE 12 - DETAILS AND TEMPORARY PROMOTIONS

### Section 1 - General

A. A detail is the temporary assignment of an employee to a different position for a specified period of time, with the employee returning to his or her regular duties at the end of the detail. Details are intended only for the needs of the Department's work requirements when necessary services cannot be obtained by other desirable or practicable means.

B. Employees shall be recognized for the work they perform. Details of one week or more shall be recorded and maintained in the Official Personnel Folder/electronic Official Personnel Folder (OPF/eOPF). In addition, employees may document in the eOPF details of less than one week, by submitting an SF-172 or a memorandum.

C. The Department will provide notification of all details to the local union President. Where the detail did not result in changes to conditions of employment, the notification will be at least weekly. Where changes to conditions of employment would result, the Department will provide reasonable advance notice. When a detail is known far enough in advance and affects conditions of employment, the notification should occur as soon as practicable but no later than 10 days prior to the employee being detailed.

D. The following procedures shall apply when offering noncompetitive details of 10 consecutive workdays or more to both classified and unclassified positions:

   1. The Department will canvass the qualified employees to determine if anyone wishes to be detailed. If the same number of volunteers as vacancies exist, they shall be selected. If an employee believes he/she is qualified and is excluded from consideration for a detail because of lack of qualifications, the Department, upon request of the local union, will articulate in writing the qualifications required for performance of the detail that the employee lacks.

   2. If more employees volunteer than vacancies exist, the Department will select from the qualified volunteers. Seniority will be the selection criterion, except when management demonstrates and determines that the position to which an employee will be detailed requires unique skills and abilities that are not possessed by another qualified employee or that a medical or operational need requires or precludes the detail of a particular employee.

713

3. If there are no volunteers, then the least senior qualified employee(s) will be selected, except when the Department demonstrates and determines that the position to which an employee will be detailed requires unique skills and abilities that are not possessed by another qualified employee or that a medical or operational need requires or precludes the detail of a particular employee or when the Department makes a detail to accommodate a substantiated medical or health problem.

4. If there are fewer volunteers than vacancies, then the volunteers will be selected and additional persons will be selected as in Paragraph D. 3 in this section.

5. Seniority shall be defined locally through negotiations between the local union and the Department. Examples include service computation date, continuous service in the Department, continuous service in the facility, continuous government-wide service, and service time in a work unit. Once established, the definition of seniority will not be changed for the duration of the Master Agreement.

E. Details of less than 10 consecutive workdays shall be on a fair and equitable basis and procedures for such details will be a subject for local negotiations.

F. For details outside of the duty station, a case-by-case analysis must be done comparing the distance from the old duty station to the employee's residence versus the distance from the new duty station to the employee's residence. When a significant difference exists, the employee shall be given duty time for travel commensurate with the new duty station.

### Section 2 - Temporary Promotions

A. Employees detailed to a higher graded position for a period of more than 10 consecutive work days must be temporarily promoted. The employee will be paid for the temporary promotion beginning the first day of the detail. The temporary promotion should be initiated at the earliest date it is known by the Department that the detail is expected to exceed 10 consecutive work days. The 10 consecutive work day provision will not be circumvented by rotating employees into a higher-grade position for less than 10 days solely to avoid the higher rate of pay. For the purposes of this section, a GS employee, who performs the grade-controlling duties of a higher-graded position for at least 25% of his/her time for 10 consecutive work days or a FWS employee who performs higher-graded duties on a regular and recurring basis, shall be temporarily promoted. A Title 38 or Hybrid Title 38 employee who is detailed to a higher-graded assignment shall be referred, at the effective date of the detail, to a Professional Standards Board for

714

expedited promotion consideration. The Professional Standards Board will be held within 30 days of the effective date of the detail. The approving official should issue the decision as soon as possible.

B. Title 5 temporary promotions in excess of 60 calendar days shall be filled through competitive procedures under Article 23 - Merit Promotion as though the promotion were permanent. Temporary promotions of 60 days or less shall be made in accordance with Section 1.

## Section 3 - Detail to Lower-Graded Duties

Should the requirements of the Department necessitate a detail to a lower-level graded position, this will in no way adversely affect the detailed employee's salary, classification, or position of record.

## Section 4 - Representatives

The Department will make every effort to avoid placing a local union representative on a detail that would prevent that individual from performing representational functions. The Department agrees to notify the appropriate local union office prior to placing any designated local union representative(s) on detail away from the representative's normal duty station.

## Section 5 - Details for Medical Reasons

A. Employees who are temporarily unable to perform their assigned duties as certified by a health care provider may voluntarily submit a written request to the Department for temporary assignment to duties commensurate with the serious injury or illness and the employee's qualifications. The request will be accompanied by medical certification. The Department may require that such requests be reviewed by a Federal Medical Officer for medical sufficiency and appropriate recommendations. The Department will consider such requests in accordance with applicable rules and regulations and medical recommendations. The Department will, to the extent that it is operationally feasible, temporarily reassign the employee to an appropriate vacancy or duties and responsibilities within his/her own service/ section. Such reassignment will be commensurate with the employee's limitations and qualifications. Employees will continue to be considered for promotional opportunities for which they are otherwise qualified.

B. This section does not provide the procedures for employees affected by job-related injuries or who request reasonable accommodation; those subjects are addressed in other articles of this Agreement.

715

## Section 6 - Local Negotiations

The parties at the local level may negotiate additional procedures for details and temporary promotions.

## Section 7- Rotations

When the rotation of employees through higher-graded positions has the effect that compensation at the higher grade is avoided, the Department will comply with government-wide regulations.

716

# ARTICLE 13 - REASSIGNMENT, SHIFT CHANGES, AND RELOCATIONS

## Section 1 - General

A. Definition

For purposes of this Article, a reassignment means a change of an employee from one position to another while serving continuously within the Department, without promotion or demotion. Because they are permanent, all reassignments will be documented in the employee's electronic Official Personnel Folder (eOPF).

B. Reassignments in connection with reductions in force for Title 38 staffing adjustments are not governed by this Article, but are governed by procedures similar to Title 5 Reduction in Force (RIF) procedures.

C. If a reassignment, shift change, or relocation of a Title 38 employee involves an issue of professional conduct or competence, then 38 USC 7422 applies.

D. Reassignments shall not be used as punishment, harassment, or reprisal.

E. If more employees volunteer than vacancies exist, the Department will select from the qualified volunteers. Seniority will be the selection criterion. If there are an insufficient number of volunteers, then the least senior qualified employee(s) will be selected.

F. Seniority shall be defined locally.

G. Reassignment to a position that provides specialized experience that the employee does not already have and is required for subsequent promotion to a designated higher-graded position and/or to a position with known promotion potential must be made on a competitive basis. All excepted service reassignments shall be done fairly and equitably, with a full opportunity for the employee to be reassigned.

H. The request of an employee seeking reassignment shall be entitled to prompt and fair consideration.

## Section 2 - Local Bargaining

The parties agree that reassignment is a subject appropriate for local bargaining. General areas which should be addressed include, but are not limited to:

A. Posting of job notices;

B. Submitting voluntary requests;

C. Consideration of requests; and,

D. Notification of reassignments.

## Section 3 - Shift Change and Relocation

The parties recognize that giving consideration to seniority promotes improved employee morale and productivity. Employees may request to relocate from one area of the local duty station to another (or from one shift to another) in the same position, title, and series within the same service and with the same advancement potential. In filling such vacancy, seniority will be considered and the request will be granted if the employee has the requisite skills and abilities provided such relocation would be consistent with effective and efficient staffing. The Department reserves the right to make the assignments based on other good faith considerations in assuring effective management of the work force.

## Section 4 - Voluntary Requests for Reassignment

Employees may, in writing, make the following requests under the following conditions:

A. Types of Requests:

1. To work a particular shift within a work area (days, evenings and nights);

2. To work in a particular work location within the same shift (e.g., Building 4 second/pm shift);

3. To work in a particular building or work unit (e.g., Building 5 or Building 4-5E);

4. To be given relief assignments within the same shift on a continuing basis (e.g., an Environmental Management Service Housekeeping Aide or Nutrition & Food Service Worker relieves for two workers on their days off and a third employee on one day off. Examples of voluntary requests may include, but are not limited to the following: Housekeeping Aide, WG-2, to Laundry Worker, WG-2; Nursing Assistant, GS-4, to Health Technician, GS-4; File Clerk, GS-4 to Mail Clerk, GS-4);

5. To be reassigned to another facility;

6. Any additional types as negotiated locally.

B. Conditions:

1. An available vacancy must exist;

2. The employee must meet basic qualifications for the position (grade, title, and physical requirements);

3. The employee must be performing at an acceptable level of performance;

718

4. Requests for voluntary reassignments will be considered;

   a. First, within the work area

   b. Second, within the building and/or service

   c. Third, within the duty station

5. The selected employee shall normally be released and reassigned within two pay periods after written notification.

6. Requests will remain active and on file until rescinded by the employee.

Disputes involving reassignments shall be resolved through the negotiated grievance procedure.

## Section 5 - Administrative/Involuntary Reassignments

Administrative reassignments/involuntary reassignments are reassignments initiated by the Department to meet valid operational needs. When such a reassignment is to be done, the Department will provide the local union with 30 days' notice, and bargain to the extent required by law and this agreement prior to effectuating the involuntary reassignment. In an emergent situation where the Department has less than 30 days' notice of the need for the reassignment, the Department will provide the local union with as much advance notice as it has, and an explanation of why the 30 day timeframe could not be met. The Department will provide the local union with the reasons for the action, the number/title(s) of positions affected, and the actions the Department intends to take to reduce the impact on employees. Reassignments that are noted in other articles, such as but not limited to, Discipline, Investigations, Performance, Workers' Compensation, RIF, and Reasonable Accommodation, shall follow the procedural requirements found within those respective articles.

## Section 6 - Leave

All leave previously requested and approved will be transferred with the employee.

## Section 7 - Relocation Expenses

An employee whose duty station changes either involuntarily not for cause or due to promotion shall be entitled to relocation expenses in accordance with regulations. Employees who request to relocate, absent a promotion, may be entitled to relocation expenses.

## Section 8 - Voluntary Reduction in Grade

Prior to acting on an employee's request for a voluntary reduction in grade, the Department will assure that:

719

A.  The employee has been fully apprised in writing about the effects of such an action; and,

B.  The employee has been given an explanation of other alternatives relevant to the particular case.

## Section 9 - Reassignments for Medical Reasons

A.  Employees who are unable to perform their assigned duties as certified by a health care provider may voluntarily submit a written request to the Department for assignment to duties commensurate with the serious injury or illness and the employee's qualifications.  The request will be accompanied by medical certification.  The Department may require that such requests be reviewed by a federal medical officer for medical sufficiency and appropriate recommendations.  The Department will consider such requests in accordance with applicable rules and regulations and medical recommendations.

B.  The Department will, to the extent that it is operationally feasible, reassign the employee to an appropriate vacancy or duties and responsibilities within his/her own service/section.  Such reassignment will be commensurate with the employee's limitations and qualifications.  Employees will continue to be considered for promotional opportunities for which they are otherwise qualified.

C.  This section does not provide the procedures for employees affected by job-related injuries or who request reasonable accommodation; those subjects are addressed in other articles of this Agreement.

720

# ARTICLE 14 - DISCIPLINE AND ADVERSE ACTION

## Section 1 - General

The Department and the Union recognize that the public interest requires the maintenance of high standards of conduct. No bargaining unit employees will be subject to disciplinary action except for just and sufficient cause. Disciplinary actions will be taken only for such cause as will promote the efficiency of the service. Actions based upon substantively unacceptable performance should be taken in accordance with Title 5, Chapter 43 and will be covered in Article 27 - Performance Appraisal System.

## Section 2 - Definitions

For purposes of this article, the following definitions are used:

A. For Title 5 Employees:

   1. A disciplinary action is defined as admonishment, reprimand, or suspension of 14 calendar days or less and

   2. Adverse actions are removals, suspensions of more than 14 calendars days, reduction in pay or grade, or furloughs of 30 calendar days or less.

B. For Title 38 Employees:

   1. A disciplinary action is defined as an admonishment or reprimand taken against an employee for misconduct and

   2. A major adverse action is a suspension, transfer, reduction in grade, reduction in basic pay, or discharge taken against an employee for misconduct.

## Section 3 - Removal of Disciplinary Actions

Admonishments and reprimands may be removed from an employee's files after a six month period. If an employee requests removal of such actions after six months, they should be removed if the purpose of the discipline has been served. In all cases, an admonishment should be removed from an employee's file after two years and a reprimand will be removed after three years.

## Section 4 - Administrative Reassignment

Administrative reassignments will not be used as discipline against any employees, unless appropriate procedures are followed.

## Section 5 - Alternative and Progressive Discipline

The parties agree to a concept of alternative discipline which shall be a subject for local negotiations. The parties also agree to the concept of progressive discipline, which is discipline designed primarily to correct and improve employee behavior, rather than punish.

## Section 6 - Fairness and Timeliness

Disciplinary actions must be consistent with applicable laws, regulations, policy, and accepted practice within the Department. Discipline will be applied fairly and equitably and will not be used to harass employees. Disciplinary actions will be timely based upon the circumstances and complexity of each case.

## Section 7 - Processing Admonishments and Reprimands

A. An employee against whom an admonishment or reprimand is proposed is entitled to a 14 day advance written notice, unless the crime provisions are invoked. The notice will state the specific reasons for the proposed action. The Department agrees that the employee shall be given up to eight hours of time to review the evidence on which the notice of disciplinary action is based and that is being relied on to support the proposed action. Additional time may be granted on a case by case basis. Upon request, one copy of any document(s) in the evidence file will be provided to the employee and/or his designated representative.

B. The employee or his representative may respond orally and/or in writing as soon as practical but no later than 10 calendars days from receipt of the proposed disciplinary action notice. The response may include written statements of persons having relevant information and/or appropriate evidence.

C. Extensions for replying to proposed disciplinary actions may be granted for good cause. The management official will issue a written decision at the earliest practicable date. The written decision shall include the reason for the disciplinary action and a statement of findings and conclusions as to each charge. The decision shall also include a statement as to whether any sustained charges arose out of "professional conduct or competence," and a statement of the employee's appeal rights. In responding to a proposed disciplinary action, the employee will be entitled to local union representation.

## Section 8 - Processing Suspensions, Adverse Actions, and Major Adverse Actions

A. An employee against whom a suspension, adverse action, or major adverse action is proposed is entitled to 30 days advance written notice, except when the crime provisions have been invoked. The notice will state specific reasons for the proposed action. The Department agrees that the employee

722

shall be given the opportunity to use up to eight hours of time to review the evidence on which the notice is based and that is being relied on to support the proposed action.  Additional time may be granted on a case-by-case basis.  Upon request, one copy of any document(s) in the evidence file will be provided to the employee and his/her designated representative.

B.  The employee and/or representative may respond orally and/or in writing as soon as practical but no later than 14 calendar days from receipt of the proposed action notice.  The response may include written statements of the persons having relevant information and/or other appropriate evidence.  The Department has the right to restrict the response time to seven days when invoking the crime provision.

C.  Extensions for replying to proposed adverse actions and suspensions may be granted when good cause is shown.  The appropriate management official will issue a written decision at least five days prior to the effective date.  The written decision shall include the reason for the disciplinary action and a statement of findings and conclusions as to each charge.  The decision shall also include a statement if any sustained charges arose out of "professional conduct or competence" and a statement of the employee's appeal rights.  In responding to a proposed disciplinary action, the employee will be entitled to local union representation.

D.  These provisions do not apply to probationary or trial employees.

## Section 9 - Notice of Disciplinary Actions

A.  Notice of a final decision to take disciplinary action shall be in writing and shall inform the employee of appeal and grievance rights and his/her right to representation.  The employee will be given two copies of the notice; one copy may be furnished to the local union by the employee.  The Department will inform the local union when it takes a disciplinary action against a unit employee.

B.  Notices shall explain in detail the reasons for the action taken and all evidence relied upon to support the decision.  The notice will also advise the employee how long the action will be maintained in his/her file.  The supervisor shall discuss the notice with the employee.  If the employee elects to have a Union representative present, the discussion will be delayed until the local union has an opportunity to furnish a representative.

## Section 10 - Investigation of Disciplinary Actions

A.  The Department will investigate an incident or situation as soon as possible to determine whether or not discipline is warranted.  Ordinarily this inquiry will be made by the appropriate line supervisor.  The employee

who is the subject of the investigation will be informed of his/her right to representation before any questioning takes places or signed statements are obtained. Other employees questioned in connection with the incident who reasonably believe they may be subject to disciplinary action have the right to Union representation upon request.

B. Disciplinary investigations will be conducted fairly and impartially, and a reasonable effort will be made to reconcile conflicting statements by developing additional evidence. In all cases, the information obtained will be documented. Supervisory notes may be used to support an action detrimental to an employee only when the notes have been shown to the employee in a timely manner after the occurrence of the act and a copy provided to an employee as provided for in Article 24 - Official Records.

724

# ARTICLE 15 - EMPLOYEE ASSISTANCE

## Section 1 - Program Purpose

The purpose of the Department's Employee Assistance Program (EAP) is the appropriate prevention, treatment and rehabilitation of employees with alcohol, drug abuse or other biopsychosocial problems that are adversely affecting the employee's job performance and/or conduct. Biopsychosocial problems may include physical, emotional, financial, marital, family, legal, or vocational issues. Employees who suspect they may have such a problem, even in the early stage, are encouraged to voluntarily seek counseling and information on a confidential basis by contacting the individual(s) designated to provide such services. Supervisors are also encouraged to note when employees appear to be experiencing difficulties for which EAP may provide assistance, and to refer the employee to EAP for assistance. Early intervention may be helpful in returning the employee to full productivity. Employees and supervisors will be informed about the program annually.

## Section 2 - Record of Participation

A. The Department will ensure that the confidentiality of medical records of employees concerning treatment for problems related to alcohol, drugs, emotional concerns, or other personal issues will be preserved in accordance with current public laws and OPM regulations.

B. After an employee is no longer participating in the program, records will be maintained confidentially and preserved in accordance with applicable laws and regulations.

## Section 3 - Voluntary Participation

A. The Department will assure that no employee will have job security, performance rating, proficiency rating, or promotion opportunities jeopardized, or be subject to disciplinary action, adverse action or major adverse action, solely because of a request for counseling or referral assistance.

B. Although the existence and functions of counseling and referral programs will be publicized to employees, no employee will be required to participate or be penalized for merely declining referral to EAP services.

## Section 4 - Confidentiality

A. The parties recognize that employee trust and confidence in the program are keys to its success. For that reason, all confidential information and

records concerning employee counseling and treatment will be maintained in accordance with applicable laws, rules, and regulations.

B.  Without an employee's specific written consent, the supervisor may not obtain information about the substance of the employee's involvement with a counseling program.  Information obtained with the employee's authorization from such counseling programs may not serve as the basis for disciplinary action, adverse action or major adverse action.

## Section 5 - Relationship to Other Actions

A fundamental purpose of EAP is to assist employees with problems that may result in conduct or performance deficiencies.  However, the program is not intended to shield employees from corrective action in all instances. For this reason, the Department will hold in abeyance a proposed corrective action so long as the employee participates in EAP, does not engage in new instances of misconduct or performance deficiency, and successfully completes the treatment to which he/she is referred.  If the employee meets these requirements, the proposed corrective action will be rescinded.  This provision only applies in the first instance of the problem(s) requiring EAP assistance and does not apply if severe, egregious, or criminal misconduct is involved.  A successful program assists the employee in overcoming a personal problem so that performance and/or conduct improves and corrective action, such as disciplinary action, adverse action, major adverse action, or other performance-based actions, becomes unnecessary.

## Section 6 - Excused Absence

A supervisor or manager shall grant up to 1 hour (or more as necessitated by travel time or unusual circumstances) of excused absence for each counseling session, up to a maximum of 8 total hours, during the assessment/referral phase of rehabilitation.

## Section 7 - Leave Associated with EAP

It is the policy of the Department to grant leave (sick, annual, or LWOP) for the purpose of treatment or rehabilitation for employees under the EAP as would be granted for employees with any other health problem.

726

# ARTICLE 16 - EMPLOYEE AWARDS AND RECOGNITION

## Section 1 - Background and Purpose

Recognition of employees through monetary and non-monetary awards reflects the parties' efforts to promote continuous improvement in Department performance. The employee recognition program provides a positive indication of the parties' commitment to providing quality public service. The employee recognition program, as described in this article, has the following characteristics:

A. It is an incentive program; that is, employee recognition is based on achievement and improvement. Achievements are linked to the Department's mission of providing high quality care and service to veterans and the public. The program is intended to motivate employees to strive for excellence. Strong emphasis is placed on recognition of efforts to improve service to veterans and the public.

B. It recognizes the accomplishments of employees both as individuals and as members of groups or teams. Because of the interrelationship of work performed by employees, enhanced Department performance is sought through teamwork, not through competition among individuals. This program is based on the concept that individual employees who, through personal efforts and accomplishments support the goals of their teams, work units and, thus, deserve recognition. It is also based on the concept that groups or teams which improve Department performance deserve recognition. It recognizes that the Department, the Union, and employees have important roles in identifying and recognizing employees deserving of awards and praise. The intent of this program is to promote a positive work environment and to link awards to employee contributions that enhance Department performance.

C. Further, it is the intent of this program to ensure that employees will be appropriately rewarded regardless of changes in the Department's organizational structure, work processes, or work initiatives.

## Section 2 - Policy

A. There is no limit on the number of awards that employees may receive or the frequency with which they may receive awards unless otherwise stated in this article.

B. When employees are considered for awards, the relative significance and impact of their contributions will be considered in determining which type of award would constitute appropriate recognition and, for monetary awards, in determining the amount of money to be granted. Funding availability must also be considered in the granting of monetary awards.

727

C. Awards will be processed in a timely and expeditious manner.

D. The Department will provide an award recipient with written documentation that clearly articulates the specific reason(s) that the employee received the award. Employees are encouraged to relate this information to specific evaluation criteria when completing applications for merit promotion.

**Section 3 - Types of Awards**

Awards which employees may be eligible to receive include but are not limited to:

A. Special Contribution Award

B. Instant Award

C. Suggestion Award

D. Time-off Award

**Section 4 - Award Panels**

Each facility will establish award panels consisting of management and bargaining unit employees. The composition and membership of each panel will be decided jointly by the local union and the Department. The local union will designate the bargaining unit panel members. Panel decisions will be made by consensus and will then be forwarded to the Director of the facility. Award panels will be formed at the beginning of assessment period. Panels will perform the following functions, maintaining the strictest confidentiality and avoiding even the appearance of conflicts of interest:

A. Establish fair and equitable mission-related criteria for awards.

B. Operate within parameters as negotiated locally.

**Section 5 - Monetary Awards**

A. Special Contribution Awards

The special contribution award is a special act or service award which recognizes individuals or groups for major accomplishments or contributions which have promoted the mission of the organization. Award amounts should be linked to the significance and impact of the accomplishment or contribution. A special contribution award may be made to an individual employee or to a group. A group may consist of individuals from a single organization or multiple components/offices/units.

B. Instant Awards

This is a special act or service award given to an employee for noteworthy contributions or accomplishments in the public interest which are connected with or related to the recipient's official employment. The

728

distinction between a special contribution award and an instant award rests in the relative significance of the contribution or accomplishment.

C.  Suggestion Awards

The Department will encourage employees to file suggestions under the Department's Suggestion Program.  Suggestions will be considered in a fair and equitable manner.  Suggestion awards will be appropriate for tangible suggestions, intangible suggestions, and problem identification, as defined in the Department's Suggestion Program.

1.  In the event no decision is made regarding adoption or non-adoption of a suggestion within 90 days of submission, the employee, upon request, will be given a written or oral status report.

2.  Non-adoption of employee suggestions is to be written and contain specific reasons for non-adoption.

3.  If the idea set forth in a rejected suggestion is later adopted, the appropriate suggestion coordinator will reopen the case for award consideration if the matter is brought to their attention within two years after the date of rejection notice.

**Section 6 - Time-Off Awards**

Time-off awards may be granted to an individual or group of employees for contributions that benefit the Department.  These awards may be granted for contributions such as, but not limited to, the following:

A.  A significant contribution involving completion of a difficult project or assignment of importance to the mission of the Department;

B.  The completion of a specific assignment or project in advance of an established deadline and with favorable results;

C.  Displaying unusual initiative, innovation, or creativity in completing a project or improving the operation of a program or service;

D.  Displaying unusual courtesy or responsiveness to the public which clearly demonstrates performance beyond the call of duty and which produces positive results for the Department; and,

E.  Exemplary work by an employee as a canvasser for special campaigns or programs such as the Combined Federal Campaign, US Savings Bonds, or blood donor program.  (An award for such an effort may not exceed one work day per activity.)

## Section 7 - Award Nomination Procedures

A. Employees and management officials are encouraged to identify individual employees who they believe should be recognized for high quality accomplishments or contributions.

B. Nominations of individual employees should be submitted in writing to the appropriate manager or award panel. The nominations should include a description of the accomplishments or contributions of the nominee(s) and an explanation of their significance, as well as the name and telephone number of the employee submitting the nomination. Nominations should not include suggestions for the type of award or the amount of money to be granted. Information provided in the nominations will be considered in determining appropriate recognition.

730

# ARTICLE 17 - EMPLOYEE RIGHTS

## Section 1 - General

A. In an atmosphere of mutual respect, all employees shall be treated fairly and equitably and without discrimination in regard to their political affiliation, union activity, race, color, religion, national origin, gender, sexual orientation, marital status, age, or non-disqualifying handicapping conditions irrespective of the work performed or grade assigned. Employees will also be afforded proper regard for and protection of their privacy and constitutional rights. It is therefore agreed that the Department will endeavor to establish working conditions that are conducive to enhancing and improving employee morale and efficiency.

B. Instructions will be given in a reasonable and constructive manner. Such guidance will be provided in an atmosphere that will avoid public embarrassment or ridicule.

C. If an employee is to be served with a warrant or subpoena, it will be done in private without the knowledge of other employees to the extent it is within the Department's control.

D. No disciplinary, adverse, or major adverse action will be taken against an employee upon an ill-founded basis such as unsubstantiated rumors or gossip.

E. No employee will be subjected to intimidation, coercion, harassment, or unreasonable working conditions as reprisal or be used as an example to threaten other employees.

F. Recognizing that productivity is enhanced when employee morale is high, managers, supervisors, and employees shall endeavor to treat one another with utmost respect and dignity.

G. An employee who exercises any statutory or contractual right shall not be subjected to reprisal or retaliation, and shall be treated fairly and equitably.

H. All VA employees will, consistent with the Master Agreement and other collective bargaining agreements:

1. Be provided a healthy and safe environment;

2. Be encouraged to give suggestions and ideas to make the Department a better workplace and enable the Department to better serve veterans;

3. Be encouraged to enhance their work life and career development; and,

4. Be afforded assistance and told of expectations by the Department to enable them to perform their jobs.

731

## Section 2 - Rights to Union Membership

Under 5 USC 7102, each employee shall have the right to form and join a Union, to act as a designated Union representative, and to assist the Union without fear of penalty or reprisal. This right shall extend to participation in all Union activities including service as officers and stewards/representatives. A bargaining unit employee's grade level, compensation, title, or duties shall not limit the employee's right to serve as a Union official, to represent the bargaining unit or to participate in any Union activities.

## Section 3 - Rights to Union Representation

The Department recognizes an employee's right to assistance and representation by the Union, and the right to meet and confer with local union representatives in private during duty time, consistent with Article 48 - Official Time, and local supplemental agreements. If the employee and the local union representative cannot be released immediately, the employee and the local union representative will normally be released two hours before the end of their tour of duty. If such release is not made, appropriate relief from time frames will be afforded (e.g., one day extension for each day of delay). The Department agrees to annually inform all employees of the right to Union representation under 5 USC 7114(a)(2)(B) by postings on official bulletin boards and other appropriate means. During his/her initial orientation, each employee will be provided with a copy of Weingarten rights and the Master Agreement. These documents also will be available electronically.

## Section 4 - Use of Recording Devices

No electronic recording of any conversation between a bargaining unit employee and a Department official may be made without mutual consent except for Inspector General investigations, other law enforcement investigations, ORM/EEO investigations, or duly authorized Boards of Investigation. All electronic recordings will be transcribed. The employee will be given a copy of the recording at the same time they receive the transcript for review. The employee will have the right to review the transcript for accuracy, and may make corrections. The employee will receive a copy of the final corrected transcript. Information obtained in conflict with this Section will not be used as evidence against any employee.

## Section 5 - First Amendment Rights

Employees have the right to present their views to Congress, the Executive Branch, or other authorities and to otherwise exercise their First Amendment rights, consistent with applicable laws, without fear of penalty or reprisal.

732

## Section 6 - Access to Documentation

Consistent with the Privacy Act and related government wide regulations in existence on the effective date of the Master Agreement, employees have a right to be made aware of any information specifically maintained under their name and/or social security number or any other personal identifiers. This includes any documentation that is not covered by official records referenced in Article 24 - Official Records. In most cases, employees will be provided with copies of documents maintained in their eOPF or Merged Record Personnel Folder (MRPF). When no copy of a document in the eOPF, MRPF, or other system of records is automatically provided, the employee will receive a copy upon request. The Department will annually provide employees with a list of systems of records in which information is maintained and retrieved by employee name, social security number, or other personal identifier. Such list will include general descriptions of the types of documents included in each system of records. Information not in compliance with this provision may not be used against the employee.

## Section 7 - Personal Rights

A. Employees shall have the right to direct and fully pursue their private lives, personal welfare, and personal beliefs without interference, coercion, or discrimination by the Department so long as such activities do not conflict with job responsibilities or applicable laws.

B. The Department will make every reasonable effort to provide for secure storage of personal belongings.

C. The Department shall instruct employees on how to file a claim for reimbursement under 31 USC 3721 and related regulations and will make forms available in case of loss if some personal item is damaged, irretrievably lost, or destroyed.

## Section 8 - Dignity and Self Respect In Working Conditions

Employees, individually and collectively, have the right to expect, and to pursue, conditions of employment which promote and sustain human dignity and self-respect.

## Section 9 - Employee Right to Privacy

Searches and seizures by the Department of the private property of its employees are subject to Constitutional constraints. Employees may store personal papers and effects in their offices, desks, and file cabinets. However, a search or seizure of such items without a warrant may be justified if the Department has reasonable grounds for suspecting that the search will produce evidence that the employee is guilty of work-related misconduct,

733

or that the search is necessary for a non-investigative work-related purpose, such as insuring the internal security of the Department. Security concerns may necessitate searches of Department space or employees, subject to Constitutional constraints. It should be understood that employee's person and personal items owned by the employee, such as pocketbooks, briefcases or other like materials, are not subject to search without reasonable suspicion that criminal activity is involved. As an exception, if searches are used when individuals enter a facility, then such search methods must be conducted consistently for all individuals.

### Section 10 - Whistle-Blower Protection Act

Consistent with the Whistleblower Protection Act, currently codified at 5 USC 2302(B)(8), employees shall be protected against reprisal of any nature for the disclosure of information not prohibited by law or Executive Order which the employee reasonably believes evidences a violation of law, rule or regulation, or evidences gross mismanagement, a gross waste of funds, an abuse of authority, or substantial and specific danger to public or employee health or safety. The Department will annually notify employees about their rights under the Whistle Blower Protection Act. If training on the Whistle Blower Protection Act is required, employees will be provided duty time to complete it.

### Section 11 - Unlawful Orders

An employee has the right to refuse orders that would require the employee to violate an applicable law. The employee will promptly bring his/her specific concerns to the supervisor or appropriate Department official. The Department official will consider the employee's concern and promptly notify the employee whether the order is lawful or unlawful. Refusal to obey an unlawful order will not subject the employee to disciplinary or adverse action or major adverse action.

### Section 12 - Improper Orders

An employee has the right to question an improper order that would direct him/her to act outside the scope of practice, privileges, competencies, or qualifications. The employee will promptly bring his/her concern about the improper order to an appropriate supervisor. The supervisor will promptly apprise the employee whether the order was proper or improper. A refusal to obey an improper order will not subject the employee to disciplinary or adverse action or major adverse action.

### Section 13 - Conflicting Orders

When an employee receives conflicting orders, he/she will bring the conflict to the attention of the supervisor who gave the last order or another appropriate

734

supervisor. The employee will be given a clarified order. The employee will not be subject to disciplinary, major adverse or adverse action for following the clarified order.

### Section 14 - Group Meetings

The Department agrees that group meetings of employees serve as a useful means of communication. Employees may request group meetings to discuss their concerns about workplace issues. Supervisors will consider and provide a response to such requests. The right of the local union to be notified of and attend such meetings is set forth in Article 49 - Rights and Responsibilities.

### Section 15 - Labor Recognition Week

The parties agree to jointly present the concept of labor recognition week to the VA National Partnership Council. That concept would involve jointly sponsoring Labor Day Recognition Week during the week preceding Labor Day.

### Section 16 - Counseling

Counseling shall be reasonable, fair, and used constructively to encourage an employee's improvement in areas of conduct and performance. It should not be viewed as disciplinary action. At any counseling session where an employee has the right to local union representation, the employee shall be advised of that right at the beginning of the session.

A. Oral Counseling

When it is determined that oral counseling is necessary, the counseling will be accomplished during a private interview with the concerned employee and local union representative if requested and appropriate. If after such a meeting, the employee is dissatisfied and wishes to pursue a grievance, the employee may proceed to either Step 1 or to Step 2 of the grievance procedure. If there is to be more than one Department official involved in a counseling session with an employee, the employee will be so notified in advance and the employee may have a local union representative at the session.

B. Written Counseling

1. Written counseling will be accomplished in the same manner as specified above, except that two copies of a written statement will be given to the employee.

2. A written counseling for misconduct may only be kept or used to support other personnel actions for up to six months unless additional related misconduct occurs, and then it may be retained up to one year.

3.  A written counseling for performance may only be retained and used beyond the appeal period of the annual performance rating to support a timely personnel action related to that rating or any timely action taken during that period.

4.  In the case of probationary employees, a written counseling may be kept up to the time a decision is made whether or not the employee will be continued beyond the probationary period.

# ARTICLE 18 - EQUAL EMPLOYMENT OPPORTUNITY

## Section 1 - Policy

The Department and the Union affirm their commitment to the policy of providing equal employment opportunities to all employees and to prohibit discrimination because of race, color, religion, sex (including sexual harassment), sexual orientation, national origin, age (40 years of age and over), or disabling condition.

## Section 2 - Equal Employment Opportunity Program

The Department's Equal Employment Opportunity (EEO) Program shall be designed to promote equal employment opportunity in every aspect of the Department's personnel policy and practice in accordance with applicable law and government-wide rules and regulations. The program shall include, but not be limited to, the following:

A. Providing reasonable job accommodation for qualified disabled employees;

B. Reviewing selection processes and staffing procedures to identify those which are inconsistent with governing Federal EEO rules and regulations and taking corrective actions consistent with such rules and regulations in those instances where adverse EEO impacts are found;

C. Procedures that allow for the redesigning of jobs, where feasible and desirable, and which do not create an undue hardship to achieve the Department's mission to utilize to the maximum extent possible the present skills of qualified disabled employees;

D. Making reasonable accommodations for the religious needs of employees when such accommodations can be made without undue hardship to the conduct of Department programs;

E. Commitment to the prevention of workplace harassment and sexual harassment; and,

F. Affirmative Employment Plan(s).

## Section 3 - Reasonable Accommodations for Employees with Disabilities

A. In accordance with Section 501 of the Rehabilitation Act of 1973, as amended, and other government-wide rules and regulations pertaining to the employment of individuals with disabilities, the Department is committed to affirmative action for the employment, placement, and advancement of qualified individuals with disabilities including disabled veterans.

B. The Department will offer reasonable accommodation to qualified individuals with known physical disabilities or mental impairments, or those who have a record of past impairment regardless of the type of appointment, unless the Department can demonstrate that the accommodation would impose an undue hardship on the operation of the Department's program (as defined in 29 CFR 1614.203).

C. Requests should be made in accordance with VA Handbook 5975.1 (Processing Request for Reasonable Accommodation by Employees and Applicants with Disabilities) or in accordance with the local facility's Equal Employment Opportunity Commission (EEOC) approved policy on request for reasonable accommodation. The Department shall process requests for reasonable accommodation and provide accommodations, when appropriate, in as short a timeframe as is reasonable. When possible, decisions regarding accommodations should be rendered within 30 calendar days of the date the request was received.

D. The parties recognize that individual accommodations will be determined on a case-by-case basis, taking into consideration the employee's specific disability, the employee's suggestions for reasonable accommodations, existing limitations, the work environment, and undue hardship imposed on the operation of the Department's program as defined above. Qualified employees with disabilities may request specific accommodations. However, the Department is not required to provide the employee's accommodation of choice, as long as the Department provides a reasonable accommodation.

E. Should a non-probationary employee become unable to perform the essential functions of their position even with reasonable accommodation due to a disability, the Department shall offer to reassign the employee when there is a funded vacant position available for which the employee is qualified, subject to all conditions in 29 CFR 1614.203(g) being met.

F. For employees with disabilities, job restructuring is one of the principal means by which some qualified workers with disabilities can be accommodated. The principal steps in restructuring jobs are:

   1. Identify which factor, if any, makes a job incompatible with the worker's disability;

   2. If a barrier is identified in a nonessential job function, the barrier is eliminated so that the capabilities of the person may be used to the best advantage; and,

   3. Job restructuring does not alter the essential functions of the job (any changes made are those which enable the person with a disability to perform those essential functions).

738

G. The parties agree that in many cases, changes in the work environment and other accommodations enable persons with disabilities to more effectively perform their job duties. Alterations and accommodations may be, but are not limited to, the following:

1. Rearranging files or shelves;

2. Widening access areas;

3. Maintaining hazard-free pathways;

4. Raising or lowering equipment;

5. Moving equipment controls from one side to the other, or modifying them for hand or foot operations;

6. Installing special holding devices on desks, benches, chairs or machines; and,

7. Providing qualified interpreters for the hearing impaired.

H. With respect to the modernized systems environment, examples of accommodations are:

1. The surface that holds the terminal will be adjusted to a level suitable to the employee's needs;

2. The keyboard will have "light touch," guards, and other adaptive devices that will be considered;

3. Visually impaired employees will be permitted to label "home" keys;

4. Operational and training materials will be available in Braille;

5. Lap trays will be considered;

6. Computer based voice-output systems or VDT screen enlargers or other appropriate devices will be provided for visually impaired employees;

7. Hardware and software will be configured to accommodate color blindness (e.g., blinking cursor, highlighting); and,

8. Printer switches will be available in "light touch" and located in an easily accessible location.

I. An employee may be provided assistive devices if the Department determines that the use of the equipment is necessary to perform official duties. Such equipment does not cover personal items which the employee would be expected to provide, such as hearing aids or eye glasses.

J. The Department's facilities shall be accessible to employees with disabilities.

739

K.  The Department will be liberal in granting leave to accommodate the disabling conditions of employees.  For example:

1.  Leave without pay may be granted for illness or disability; and,

2.  Sick leave can be appropriately used by a person with a disability who uses prosthetic devices, wheel chairs, crutches, guide dog, or other similar type devices for equipment repair, guide dog training, or medical treatment.

L.  The Department will provide training to employees with disabilities on the same basis as other employees, consistent with this Agreement.  Once an employee is selected for training, the Department will provide reasonable accommodations to the employee to attend and complete the training.

M.  For the purpose of continuing to provide reasonable accommodations for hearing-impaired employees, the Department agrees to provide interpreter services for those employees who seek local union assistance and/or representation for their individual concerns, unless the employee wants to retain confidentiality.  To the extent possible, interpreter services should be arranged in advance, and the entire process treated with confidentiality.

N.  For the purpose of performing official business travel, the Department agrees to reimburse travel expenses that are necessary to reasonably accommodate the employee's disability, consistent with Federal Travel Regulations.

O.  Employees with disabilities may, where appropriate as a reasonable accommodation, request telework arrangements.

## Section 4 - Affirmative Employment Plans

A.  The Department's Affirmative Employment Plan shall be designed to promote positive opportunities for all employees to contribute to the Department's mission to the maximum extent possible, consistent with EEO principles.  The Department shall ensure that where there are situations of underrepresentation, targeted recruitment and development plans will be implemented.  The parties are encouraged to jointly develop Affirmative Employment Plans.

B.  Affirmative Employment Plans should include, where appropriate, provisions for reviewing individual services to ensure that affirmative employment policy is apparent within the service and to make more use of bridge positions and cross-training.

C.  The Department will fulfill any labor-management obligations, as appropriate, with the Union at the national level prior to submitting the National Affirmative Employment Plan to EEOC for approval.  The parties recognize that the National Affirmative Employment Plan must be submitted to EEOC.

740

D. The Department at the local level will fulfill any labor-management obligations, as appropriate, with the local union prior to submitting local Affirmative Employment Plans to the next organizational level where required (for example, to the Department or EEOC. The parties recognize that the local plans must be submitted to headquarters in sufficient time for the Department to meet the EEOC requirement in C above.

E. The Department will comply with all equal employment opportunity requirements throughout the Department, as outlined in 29 CFR 1614.102, the Disabled Veterans Affirmative Action Promotion Plan (38 USC 4214), 5 CFR Part 720, and the statutory or regulatory requirements in EEOC Management Directive 715 (MD-715).

## Section 5 - Information, Data, and Reports

A. The Department agrees to provide employees access to written information describing the discrimination complaint procedures and their local Affirmative Employment Plan(s).

B. The Department agrees to the timely posting of names, pictures, and office telephone numbers of EEO Counselors on designated local bulletin boards. The Department will also provide the local union with a current list of local EEO Counselors and will update the list when changes are made.

C. The Department agrees to provide the Union with copies of the National Affirmative Employment Plan and any other reports submitted to EEOC, including statistical data, concurrently with submission to the EEOC.

D. Each facility preparing an Affirmative Employment Plan and any other reports will provide a final copy of the same, including statistical data, to the appropriate local union when they are prepared.

## Section 6 - EEO Counselors

A. The Department agrees to post the contact information for the appropriate Office of Resolution Management (ORM) office on local bulletin boards.

B. The Department will assure that EEO counselors are available and accessible to employees who may have a discrimination complaint.

C. The responsibilities of the Department include counseling employees, former employees and applicants who believe they have been discriminated against in the workplace and informing the aggrieved person(s) about the EEO process. The EEO Counselor should work with the parties to provide a channel through which informal resolution(s) can be attempted.

D. The parties agree that proper training will be provided to designated EEO counselors consistent with appropriate EEOC regulations.

### Section 7 - VA Diversity Council/EEO Committees

A. The Union can appoint two representatives to serve on the Department of Veterans Affairs Diversity Council (VADC). The Department will provide official time, travel, and per diem for the employees appointed by the Union to serve on the VADC. Official time to attend such meetings shall be in addition to any official time presently allowed by this Agreement.

B. Local EEO committee meetings will be conducted during normal duty hours. Bargaining unit employees participating in local EEO committees and special emphasis programs, but not serving in a representational capacity, shall be on duty time.

C. The membership and operation of local committee(s), such as the EEO Advisory Committee, the Diversity Committee, etc., are appropriate subjects for local bargaining. The Department will provide official time for any local union representative serving on such local committees. Official time to attend such meetings shall be in addition to any official time presently allowed by this Agreement. The local union will determine who the representative will be at such meetings.

D. The membership and operation of local committee(s), such as the EEO Advisory Committee, the Diversity Committee, etc., are appropriate subjects for local bargaining. Bargaining unit members will be selected by the local union.

### Section 8 - Special Emphasis Program Managers (SEPM)

A. <u>Purpose</u>

The Special Emphasis Programs support and strengthen the EEO/Affirmative Action programs by addressing the unique concerns of particular constituent groups and helping to ensure that members of these groups are employed, advanced, and retained with the Department on a nondiscriminatory basis. Government-wide special emphasis programs include the Federal Women's Programs, the Hispanic Employment Program, the Selective Program for Handicapped Individuals, the Upward Mobility Program, the Veterans Employment Program, the Asian-American Program, Asian Pacific-American Program, Native-American Program, African-American Program, and other similar special emphasis programs. Other programs may be established at the discretion of a local committee, such as the EEO Committee, the Diversity Committee, etc.

B. <u>Responsibilities and Requirements</u>

The duties and responsibilities of SEPMs may include such activities as:

1. Analyzing employment policies and practices to identify barriers to the hiring, development, advancement, and retention of a particular constituency;

742

2. Recommending to the Department changes in personnel policies, practices, and procedures;

3. Initiating affirmative employment efforts; and,

4. Participating in planning the implementation, monitoring, and evaluating of the Federal Employment Opportunity Retention Plan.

Upon appointment to the collateral duty assignment of SEPM, the employee will receive, in writing, the duties and responsibilities of the SEPM, including time allocation for program activities. The employee may document this collateral duty by submitting an SF-172 or memorandum for inclusion into their eOPF.

C. <u>Selection of SEPMs</u>

The Department will request nominations from the local union when the Department is considering individuals to serve as SEPM on a collateral duty basis.

D. <u>Management Support</u>

The Special Emphasis Programs are an essential part of the total EEO program and merit the full cooperation of employees, supervisors, local union(s), and managers. Appropriate publicity and recognition should be given to the programs and training provided to SEPMs, as needed, and to supervisors and managers at all levels regarding the program's activities and goals as they relate to the mission of the agency. Similar information should be presented during the orientation of new employees. All SEPMs need management support in terms of facilities, time, and cooperation.

**Section 9 - Complaints**

The complaint process afforded to employees must follow the procedures set forth by government-wide EEOC regulations, which can be found in 29 CFR Part 1614 and its subparts.

# ARTICLE 19 - FITNESS FOR DUTY

## Section 1 - Scope

This article applies to Title 5 and Hybrid employees. For Title 38 employees see Article 57 - Physical Standards Boards. The Department may direct a Title 5 or Hybrid employee to undergo a fitness for duty examination only under those conditions authorized by this article and in accordance with 5 CFR 339. The Department will have the right to require medical examinations only if they are job related and consistent with business necessity.

## Section 2 - Prerequisite Conditions

When there are reasonable grounds to believe that a health problem is causing performance or conduct problems of an employee, the employee shall be given an opportunity to provide medical evidence documenting the health problem affecting his/her performance or conduct and/or an opportunity to voluntarily initiate an application for disability retirement on his/her own behalf.

## Section 3 - Medical Determination

A. The Department may require an employee receiving worker's compensation benefits or assigned to limited duties as a result of an on-the-job injury to report for medical evaluation when the Department has identified an assignment or position (including the employee's regular position) which it reasonably believes the employee can perform consistent with the medical limitations of his/her condition.

B. The Department may offer a medical examination when an individual has made a request for medical reasons for a change in duty status, assignment, working conditions, or any other benefit or special treatment (including reemployment on the basis of full or partial recovery from a medical condition) and the Department, after it has received and reviewed medical documentation, determines that it cannot grant, support, or act further on the request without verification of the clinical findings and current clinical status.

   1. When the Department orders or offers a medical examination under the provisions of the prevailing regulations, it shall inform the employee in writing of its reasons for ordering or offering the examination and the consequences of failure to cooperate. The Department shall designate the examining physician but shall offer the employee the opportunity to submit medical documentation from his/her personal physician which the Department shall review and make part of the file.

744

2.  The Department shall provide the examining physician with a copy of any approved medical evaluation protocol, applicable standards and requirements of the position, and/or a detailed position description of the duties of the position including critical elements, physical demands, and environmental factors.

3.  The Department shall order or offer a psychiatric evaluation to an employee only when the employee first provides results of a general medical or psychiatric examination or the Department has first conducted a nonpsychiatric medical examination and, after review of the documentation or examination report, the Department's physician concurs that a psychiatric evaluation is warranted for medical reasons.

C.  All medical examinations ordered or offered pursuant to Paragraphs 3A and 3B in this section shall be at no cost to the employee and performed on duty time at no charge to leave.

### Section 4 - Procedures

In seeking a fitness for duty examination which may or may not lead to a disability application, the following rules and procedures shall apply:

A.  In all discussions with any Department official, the employee shall be entitled to local union representation. Prior to any discussion, the employee shall be notified of this right, given an opportunity to contact and discuss the matter with his/her local union representative, and permitted the right of representation in such discussion.

B.  During these procedures, the employee will be apprised of his/her rights and, where supported by appropriate medical evidence, given the opportunity for suitable interim adjustments in his/her work assignments.

C.  The Department will ordinarily offer the employee a reassignment to a position when the results of a medical examination reveal that the employee:

1.  Cannot satisfactorily perform useful and efficient service in his/her regularly assigned job;

2.  Retains the capacity to do other work at the same grade or pay level within the work location or the commuting area; and,

3.  Otherwise meets the minimum qualifications for an available position that the Department seeks to fill.

D.  When the Department determines that the medical evidence reveals the employee is totally disabled for service in their current position, and

reasonable accommodation for another position cannot be made, the Department will so advise the employee and provide appropriate counseling.

## Section 5 - Counseling

When a disabled employee meets existing disability retirement requirements, the Department will counsel him/her concerning disability retirement and explain the procedure for voluntarily applying for disability retirement. In the event that such an employee is unable to file on his/her own behalf, the Department may initiate, with notice to the employee, an application for the employee in accordance with applicable laws and regulations.

A. The Department shall provide the employee proper notice, in accordance with 5 CFR Section 831.1205(b), and shall permit the employee 30 days in which to respond in writing.

B. If the medical evidence and performance records establish that the employee retains the capacity to perform satisfactorily in a vacant lower graded position which the Department seeks to fill within the employee's commuting area, the employee will be informed of his/her option to request such a demotion.

## Section 6 - Confidentiality of Records

All records pertaining to the employee's examination and any subsequent personal information included with an application for disability retirement are confidential and may be disclosed only to those with an administrative need to know or specifically authorized by the employee. There will be a written statement to the employee of the disclosure.

746

# ARTICLE 20 - TELEWORK

## Section 1 - General

A. The Department and the Union jointly recognize the mutual benefits of a flexible workplace program to the Department and its employees. Balancing work and family responsibilities, assistance to the elderly or disabled employees, and meeting environmental, financial, and commuting concerns are among its advantages. In recognizing these benefits, both parties also acknowledge the needs of the Department to accomplish its mission. The primary intent of the telework program is to support the mission of the Department in an alternative work setting. Telework must not be used as an alternative to or in lieu of dependent care. Employees who telework will be permitted to take care of personal matters in the same way as employees who do not telecommute. The Department Telework Program will be governed by applicable law, government-wide rules and regulations, VA Directives and Handbooks, and this article.

B. Any Telework Program established under this article will be a voluntary program which permits employees to work at home or at other approved sites away from the office for all or a part of the workweek.

C. The parties agree that employees participating in telework are performing the same duties as their counterparts working at VA facilities. In the interest of fairness and equity, employees shall not be disadvantaged on their performance expectations because of their participation in telework. The Department shall use the same measurements of work for employees who are on telework as are used for those employees who perform those same tasks at their Official Duty Station (ODS).

## Section 2 - Definitions

A. Telework

The terms "telework" and "telecommuting" are synonymous and include working at home or in satellite office sites or other approved telework work sites.

B. Alternate Duty Station (ADS)

A worksite other than the employee's official duty station, such as employee's residence (defined as a specific room or area within an employee's primary residence), a telecommuting center, a facility established by state, local, or county governments, private sector organizations for use by teleworkers, or an established satellite location including other VA facilities. The alternative worksite must be mutually agreeable to the employee and their supervisor.

747

C. <u>Official Duty Station (ODS)</u>

A telecommuting employee's official duty station continues to be the permanent duty station.  Generally, the official worksite for an employee covered by a telework agreement is the location of the regular worksite for the employee's position (that is, the place where the employee would normally work absent a telework agreement), as long as the employee is scheduled to report physically at least twice a pay period on a regular and recurring basis to that regular worksite.  Employees should refer to 5 CFR 531.605 for application of special situations.

D. <u>Telework Center</u>

The Department satellite facility that the General Services Administration (GSA) establishes to provide federal employees an opportunity to work at an alternative location that is geographically convenient to the employee's residence.  The space at the telework center is owned or leased by one or more federal agencies.

E. <u>Regular and Recurring Telework</u>

Regular and recurring telework means the employee works at an ADS on a regularly scheduled basis (for example, one or more days per week, the second Wednesday of each pay period, Tuesday afternoon, two hours per day, etc.), at a home, a telework center, or other offsite location.

F. <u>Short-Term or Temporary Telework</u>

Short-term or temporary telework is when an employee is prevented from reporting to the regular worksite due to an injury, recuperation from surgery, etc., for short periods of time (usually no more than three to six months).  Employees participating in this type of telework may work full-time or may combine part-time work with leave use depending on the circumstances of the individual and the portability/availability of work at the alternative site.

G. <u>Periodic or Intermittent Telework</u>

Periodic or intermittent telework is ad-hoc in nature and can be used when a project or assignment requires intense concentration or weather conditions are unfavorable.

## Section 3 - Criteria

If employees meet the criteria for telework, the Department may approve their participation in telework arrangements in accordance with applicable law and this article.  Department officials are responsible for determining which positions are appropriate for telework arrangements, consistent with labor

748

relations obligations. The guidelines for approving telework arrangements are based on, but not limited to, the following:

A. Work activities to be performed at an ADS must be portable (may be performed away from the traditional worksite, either in whole or in part, and can be evaluated by the supervisor);

B. The position's contact with other employees, the supervisor or manager, and serviced clientele is predictable and normally scheduled and can otherwise be accomplished via telephone or videoconferencing;

C. The technology needed to perform work offsite must be available;

D. Employees may be linked electronically to the traditional office location by computer or may simply take work to the ADS, requiring no computer;

E. Privacy Act materials, evidence, or sensitive documents (hard copy or electronic) may be accessed remotely, provided the employee agrees to protect government/VA records from unauthorized disclosure or damage and will comply with the requirements of the Privacy Act and all other applicable federal laws and government-wide regulations and other applicable VA Policies and Directives;

F. The employee volunteered (or concurred with the supervisor's recommendation) to perform work at the ADS;

G. An employee has a "fully successful" (or equivalent) performance appraisal. If the employee has worked more than 12 months and does not have an appraisal, they shall be assumed to be "Fully Successful" for purposes of telework;

H. The employee must have a telephone, workspace suitable to perform work, utilities adequate for installing equipment, and space that is free from interruptions and provides reasonable security and protection for government property;

I. The employee is willing to sign and abide by the Telework Program Agreement concerning participation in the Telework Program.

### Section 4 - Furniture and Equipment

A. Employees participating in the Telework Program will be provided equipment necessary to perform their duties, consistent with the telework proposal, VA Form 0740a (Oct 2008) and the Alternative Workplace Telework Agreement.

B. The Department will allow each employee on telework to use an assigned Department computer at the employee's ADS. If an employee prefers to use a personal computer, or if a portable computer is unavailable, the Department will load and maintain all software to the personal computer

749

that is necessary for accomplishing the job. A phone line and portable computer will be provided.

C. Any time the Department gives up space or otherwise downsizes the office, any excess equipment or furniture may be made available to employees in this program, subject to the limitations of Paragraph A above. Agreements between the local union and the facility will address how the equipment will be assigned.

## Section 5 - Telework Program Agreement

A. Prior to participating in the Telework Program, employees will be required to complete, on a one-time basis, a Telework Program Agreement that has been negotiated between the Department and the local union. A new Telework Program Agreement must be completed if significant changes occur (e.g., change in ADS address/location, change in supervisor, and/or change in official duty station). Continued participation in telework shall be subject to periodic review by the supervisor for compliance with the requirements of this article.

B. The Agreement documents a commitment by the employee and the supervisor to abide by the applicable guidelines and must be in place before the employee begins working at an alternative worksite.

C. Participants may be permitted to work at home or other telework worksites full days or a portion of a day.

D. At a minimum, Telework Agreements must contain the following:

1. ADS location such as the employee's home address or the address of the telecenter;

2. The location of the ADS must be of mutual agreement to the employee and the Department;

3. A telework schedule which identifies the days the employee will work each week, pay period, or month. For intermittent arrangements, the agreement should prescribe the procedures that will be used for approval of specifically requested days to be worked at the ADS. Agreements for short term/temporary use should identify the time period (from/to date), number of days, and hours per week or pay period during which work will be performed;

4. Procedures for administrative processes such as leave approval from the ADS, time and attendance reporting, weather dismissal time and attendance, etc.;

5. Privacy Act/security provision;

750

6. Description of the work to be performed at the alternative worksite that can include specific duties or projects to be completed and any deadlines for delivery that may apply;

7. Any procedures required for work processes such as a requirement to submit progress reports, submission, and review of completed work, participation in meetings, conference calls, etc.; and,

8. The duration of the employee's participation.

E. Teleworkers must complete and sign the Telework Self-Certification Safety Checklist (VA- 0740b) certifying that the ADS is safe and that all requirements to do official work at home are met. The employee agrees to permit inspections by representatives of the Department, as required, during normal working hours to insure proper maintenance of any government-owned property and conformance with safety standards. The employee will be provided advance notice of any inspection. The local union has the right to be present at the inspection. The date of the safety inspection will be coordinated between the safety inspector and the employee within five days of the day that the inspection has been determined to be needed. The date of this inspection will be provided to the local union.

## Section 6 - Hours of Work and Leave

A. Employees performing work at the alternate worksite will follow established procedures for requesting and obtaining approval of leave, consistent with Article 35 - Time and Leave of this Agreement.

B. Employees performing work at the alternate worksite are subject to the same maximum workday limits as they would be if they were performing work at their official duty station, consistent with Article 21 - Hours of Work and Overtime of this Agreement.

C. The number of days each week, pay period, or month an employee will work at an alternative worksite will vary depending on the individual arrangement made between the employee and the supervisor. Employees may work as few as one day per month or as many as five days per week for full time telework.

D. Employees on duty shall be available to participate in regular staff meetings and other meetings necessary to the accomplishment of work; have direct interaction with the supervisor, coworkers, and customers; and access equipment, files, and reference materials not available at the ADS. Supervisors will consider deviations from this requirement to include such circumstances as accommodating physical disabilities, recovery from illness or injury, field work, etc.

E. With supervisory approval, employees may choose to change their scheduled work hours, or change to or from an Alternative Work Schedule. For example, an employee may begin their work at an earlier time when working from home since no time is spent commuting to the worksite.

## Section 7 - Pay Issues

A. An employee's pay will not be negatively impacted solely by the employee's decision to telework. Overtime pay, premium pay, special salary rate, and other entitlements continue while the employee telecommutes as long as the employee remains eligible under Federal pay laws/authorities for overtime pay, premium pay, special salary rates, and other entitlements. Employees will be notified by the Department prior to accepting telework of any consequences to their pay entitlements that will result from telework.

B. The governing rules, regulations, and policies concerning attendance, leave, and overtime are unchanged by participation in telework. Hours of duty must be addressed in telework agreements. Employees will be compensated for overtime or night work performed with approval in advance.

C. To claim expenses related to the business use of part of the employee's home, the employee must meet specific requirements as found in the appropriate Internal Revenue Service's publications, currently IRS Publications 17 and 587. It is advisable to consult a tax advisor to see if a deduction might be available.

## Section 8 - Position Descriptions and Performance Standards

A. Telecommuting will seldom require changes in position descriptions, but may affect factors such as supervisory controls or work environment. An employee is not relieved of and is expected to meet the performance standards established for their position at the official duty station.

B. When there are no employees performing similar tasks at the ODS, the performance standards for telecommuting employees should be results-oriented and should describe the quantity and quality of expected work products and the method of evaluation.

## Section 9 - Temporary Recall from ADS

A. Employees who are on duty may be required to report to their ODS for previously scheduled training, conferences, other meetings, or to perform work on a short term basis that cannot otherwise be performed at the ADS or accomplished via telephone or other reasonable alternative methods.

752

B. Employees may also be required to report to their ODS for valid operational needs to perform agency work which cannot otherwise be performed on another workday, at the ADS, via telephone, or other reasonable alternative methods. In such cases, employees will be provided reasonable advance notice and be provided a reasonable time to report. Employees should make every effort to report as soon as possible.

C. When requiring an employee to report on short notice, the employee's needs will be considered along with the reason for the change in work location.

## Section 10 - Requests to Telework

The employee will submit a standard request form, Telework Proposal (VA-0740a) for their assignment to be performed at the ADS. The request will describe the duties to be performed and the specific day(s) involved. The request will be submitted to the Department for approval. The Department will document approval or denial of the request as soon as possible. Employees must make the request to work at the ADS at least one workday in advance; however, this time frame may be waived at the discretion of the Department. If the assignment is initiated by the Department, and the employee concurs, the employee is still responsible for submitting a Telework Program Work Assignment Request (VA-0870a) in addition to signing the Telework Program Agreement described in Section 5 of this article.

## Section 11 - Removal from Program

A. The Department may remove an employee from the Telework Program based on the employee's failure to adhere to the requirements specified in the Telework Program Agreement and/or a decline in overall performance below the fully successful level. Normally, employees will not be removed from participation for single, minor infractions of Telework Program requirements. Supervisors will counsel employees about specific problems before effecting removal. The counseling will be confirmed in writing. When a decision is made to remove an employee from the Telework Program, the employee must be given written notice indicating the reason(s) for removal. The employee may reapply for Telework Program participation 30 calendar days after removal from the program, provided that his/her performance is at least fully successful.

B. Any time an employee believes they need to permanently or temporarily return to work in the ODS, the employee will normally provide the Department with 30 calendar days notice of the needed change, except in emergency situations. The Department will make reasonable efforts to accommodate the employee's needs. Employees returning to the ODS in these circumstances must recognize that the equipment and workstations that are made available

753

by the Department may not immediately be the same as the ones they had prior to participating in the Telework Program. The Department is expected to provide the employee a complete work area equal or similar to that of others in their occupation in their assigned work area within a reasonable timeframe.

## Section 12 - Problems Affecting Work Performance

Employees will promptly inform supervisors whenever any problems arise which adversely affect their ability to perform work at the ADS. Examples could include situations such as equipment failure, power outages, telecommunications difficulties, etc.

## Section 13 - Emergency Closing/Group Dismissal

A. A telecommuting employee will sometimes, but not always, be affected by an emergency requiring the main office to close. When both the main office and the ADS are affected by a widespread emergency, the Department should grant the telecommuting employee excused absence as appropriate.

B. When an emergency affects only the ADS for a major portion of the workday, the Department can require the telecommuting employee to report to the main office, approve annual leave or leave without pay, or authorize an excused absence.

C. The telework site may be unaffected by emergencies that lead to closings and dismissals at the ODS. If work can proceed at an ADS, then the employee may not be excused from duty just because other employees elsewhere have been dismissed or excused from reporting.

## Section 14 - Telecommuting Centers

The parties agree to discuss the feasibility of telecommuting centers.

## Section 15 - Emergency Situations

In the event of a local emergency situation such as a transit strike or a natural disaster which adversely affects an employee's ability to commute to the workplace, the parties agree to immediately discuss possible temporary telework arrangements for affected employee(s).

## Section 16 - Evaluation of Program

The parties agree to meet six months after the implementation of this Agreement to assess any concerns relevant to employees working at their residence such as availability of laptop computers.

754

## Section 17 - Union Notification

The local union will be notified when employees are placed on telework and taken off telework.

## Section 18 - Local Telework Negotiations

Upon the effective date of this Agreement, the local parties may begin negotiations over the following issues:

A.  Application and selection procedures for participation in the telework and the alternative work schedule and compressed work schedule.  These procedures may include, but are not limited to, issues such as negotiating procedures for breaking ties if the number of applicants exceeds the number of opportunities available;

B.  Methods for resolving conflicting employee requests for specific work at home schedules;

C.  Methods for rewarding increased productivity of telecommuters;

D.  Procedures for disbursing excess equipment or furniture;

E.  Determining the eligibility of other positions, if any, for telework, alternative work schedules, and compressed work schedules that are not listed as currently eligible for telework;

F.  Determining the feasibility of establishing a local telework committee for oversight of telework; and,

G.  Any other issues affecting the bargaining unit not otherwise covered in this Article.

## Section 19 - Grandfather Clause

On the effective date of this Agreement, employees currently working at an ADS are not required to reapply for telework.

# ARTICLE 21 - HOURS OF WORK AND OVERTIME

## Section 1 - General

A. A change in the administrative workweek and changes in the regularly scheduled administrative workweek are considered changes in conditions of employment for purposes of the notice requirement of Article 49 - Rights and Responsibilities, of this Agreement. There are laws and government-wide regulations specific to certain groups of employees such as physicians, dentists, personnel covered by the Baylor Plan, and firefighters. Where there is a conflict with this article, those laws and government-wide regulations shall apply.

B. A rest period of 15 minutes duration will be allowed each employee twice during each eight hour day, normally one in the first half and one in the second half of the shift. A rest period of 10 minutes duration will be allowed each employee during each period of extended shift overtime of at least two hours duration. On days when all work is overtime, or in the case of extended shifts, a rest period of 15 minutes will be allowed for each period of four hours worked. Rest periods will not be added to periods of leave or the beginning or end of the employee's work shift. Except where the immediate work requirement of an employee's position requires the employee's constant presence, the Department will not restrict employee mobility during rest breaks.

C. "Basic work requirement" means the number of hours, excluding overtime hours, that an employee is required to work or is required to account for by leave or otherwise.

## Section 2 - Work Schedule Options (AWS and Credit Hours)

A. General

This section sets forth the procedures to be followed for Alternative Work Schedule (AWS) including flextime, compressed work schedules, and credit hours. This section also provides a menu of options that employees may request. AWS means a schedule other than the traditional eight hours fixed shift. Flexible work schedules, compressed work schedules, and credit hours are included in the definition of alternative work schedule. When an employee(s) makes a request supervisors must consider operational needs, including the employee's work unit(s) and the interests of the employee(s) before making a decision. The Department shall apply AWS in a fair and equitable manner. AWS is a subject for local bargaining consistent with this Agreement. AWS programs will not require the Department to extend the operating hours of the facility.

B. Flextime

1. "Flexible work schedule" means an eight hour workday in which the employee may vary the time of arrival and/or departure. A flexible work

756

schedule includes core time and a flexible band. "Flexible time" and "flexible bands" mean the specific periods of the workday during which employees may opt to vary their arrival and departure times.  Whenever possible, the flexible bands shall be 6:00 am to 6:00 pm.

2. "Modified Flex-tour" is a type of flextime where an employee selects a starting time within the established flexible time band.  This establishes the employee's assigned schedule; however, the employee is allowed 15 minutes flexibility on either side of the selected arrival time.  For example, an employee selecting 7:30 am as a starting time under modified flex-tour may report for work any time between 7:15 am and 7:45 am.  Changes in starting time must be approved by the supervisor.

3. "Flex-in/flex-out" - Employees working a flexible schedule will be allowed to flex out and in during the workday, subject to supervisory approval.  If a combination of an employee's starting time and the amount of time the employee is away from the worksite precludes the completion of a full workday prior to 6:00 pm, the employee will be placed in the appropriate leave category at his/her request or allowed the use of approved credit hours, as appropriate.

4. "Core hours" means that period of time when employees on a particular shift are expected to be at work.

C. Compressed Work Schedule (CWS)

1. "Compressed Work Schedule" (CWS) means, in the case of a full time employee, an 80 hour biweekly basic work requirement that is scheduled for less than 10 workdays, and in the case of a part-time employee, a biweekly basic work requirement of less than 80 hours that is scheduled for less than 10 workdays and that may require the employee to work more than eight hours in a day.

   a. "5-4-9" is a work schedule that includes eight workdays of nine hours each plus one workday of eight hours within the biweekly pay period.

   b. "4-10" is a work schedule that includes eight workdays of ten hours in each biweekly pay period.

   c. "6-12-8" is an eighty hour bi-weekly basic work schedule that includes six twelve hour workdays and one eight hour workday.

2. Requests for CWS:

   a. Each employee desiring to work under a CWS plan must submit a written request to his/her supervisor for a decision.  The Department shall act upon these requests as soon as possible, but in no case later than 30 calendar days after the request is made.  If the request

757

is denied, the supervisor will explain in writing the reasons for the denial; upon request, a sanitized copy will be provided to the local union. Decisions on CWS will be made based on valid operational needs. Employees already established in a CWS will not be required to file a new request for each pay period.

b. All new employees or re-hires shall be given the opportunity of requesting participation in the CWS plan.

c. Any conflicts in scheduling that result will be resolved in favor of the employee who is most senior, as defined locally.

d. Employees who wish to terminate or change their participation in a CWS may do so at the beginning of any pay period after notifying their supervisor at least one pay period in advance or as negotiated locally. Hardship situations will be considered to the greatest extent possible and handled on an individual basis.

e. When this contract is implemented, employees on CWS don't have to reapply for CWS in order to continue.

f. Conflicts in scheduling that involve more requests for a particular day off than can be accommodated will be handled in accordance with the provision of Section 2 C.2.c above. Hardship situations will be considered on a case-by-case basis and to the greatest extent possible.

g. Existing policies and practices remain in effect unless in conflict or inconsistent with this article.

h. CWS and credit hours may be used by employees in the same work or organizational unit.

i. Eligible employees will not be precluded from participating in CWS based solely on their position. This includes but is not limited to Veterans Benefits Administration (VBA), Austin Finance Center, Veterans Health Administration (VHA), and VA Central Office (VACO).

D. Credit Hours

1. Definition

a. Those hours within a flexible work schedule in excess of the employee's daily tour of duty which are performed at the employee's option with the approval of his/her supervisor, so as to vary the length of a succeeding workday or workweek. Employees cannot be required to work credit hours in lieu of overtime.

b. Employees on a flexible work schedule will not be precluded from earning credit hours based solely on their position.

758

2. Procedures

   a. Participating employees, including flextime/flex-tour participants and part-time employees, will be authorized to earn up to three credit hours per day, provided that there is work available for the employee and it can be performed at the requested time(s).

   b. Credit hours shall be earned in ¼-hour increments and may be used in ¼-hour increments.

   c. The maximum number of credit hours which a full-time employee may carry over from pay period to pay period is 24 hours.  A part-time employee may not carry over more than one quarter of the hours in his/her basic biweekly work schedule from pay period to pay period.

   d. When an employee ceases to work in a work unit where credit hours may be earned, the employee shall be given the following options:

      i. Sufficient advance notice to use earned credit hours prior to leaving the work unit;

      ii. Compensation for the earned credit hours at the employee's current rate of basic pay; or,

      iii. Transfer of the earned credit hours to the new work unit.

3. Request to Work Credit Hours

   a. Normally, the employee will request to work credit hours during the workday preceding the day he/she wishes to work.  This request will be submitted to the immediate supervisor.  In the supervisor's absence, the request shall be submitted to the next level supervisor.  The request shall be documented as approved or denied by the supervisor as soon as possible on the same day submitted.

   b. The above procedure shall not preclude the working of same day credit hours upon mutual agreement of the supervisor and the employee.

E. Exceptions

   1. CWS and Fixed Shift Employees

      The parties agree that there are situations that may not readily accommodate a plan described in this section.  Consideration and disposition of such situations shall be made on a case-by-case basis, subject to partnership and/or local bargaining.

2. Adverse Impact

If a facility experiences adverse impact pursuant to 5 USC 6131 with either the AWS or credit hours, negotiations in accordance with Article 47 - Mid-Term Bargaining of the Master Agreement will begin immediately in an attempt to resolve the impact to both parties' satisfaction.

3. Temporary Suspension of AWS and/or Credit Hour Plan

Temporary suspension of AWS and/or Credit Hours may be made for up to 14 days by a facility director, for a bona fide emergency, subject to immediate partnership discussions or negotiations.

F. Special Provisions for Suspension of CWS

1. CWS may be suspended when employees are attending and/or conducting training with beginning and ending times which would conflict with their CWS schedule.

2. An employee will continue to participate in the CWS plan while in travel status unless there is a need to change the work schedule; for example, the hours of operation at the travel site differ from those of the employee.

G. Miscellaneous

1. If the Department proposes to make any change to the AWS Plan (including the CWS Plan and Flextime Plan) or the Credit Hour Plan of bargaining unit employees or to restrict the application of the plans to any new position, the local union shall be notified and given an opportunity to bargain.

2. Employees who are Union representatives who are on a flextime plan shall be allowed to earn Credit Hours while involved in representational activities in accordance with the provisions of this Agreement. In the performance of labor-management activities, employees who are Union representatives will be given the opportunity to work the AWS Plan and/or the Credit Hour Plan in accordance with the provisions of this Agreement.

3. The parties understand and agree that Credit Hours for CWS are initiated by the employee, subject to approval by the supervisor. In contrast, the parties understand and agree that overtime and compensatory time (with the exception of religious compensatory time) are initiated by the Department. Flextime will be requested and bargained locally.

4. In maintaining adequate staffing coverage, it is agreed and understood that the Department shall approve CWS in a fair and equitable manner.

760

5. The Department shall provide the local union with advance written notice of any survey or study concerning AWS and/or Credit Hours in which information is sought from bargaining unit employees.

6. This Agreement does not preclude an employee from requesting an altered tour of duty for specific personal reasons.

7. Under a CWS plan, a full-time employee who is relieved or prevented from working on a day designated as a holiday (or an "in lieu of" holiday) by federal statute or Executive Order is entitled to his or her rate of basic pay for the number of hours of the CWS on that day, per 5 CFR Part 610.

8. If a part-time employee is relieved or prevented from working on a day within the employee's scheduled tour of duty that is designated as a holiday by federal statute or Executive Order, the employee is entitled to basic pay for the number of hours of the CWS on that day. When a holiday falls on a non-workday of a part-time employee, he/she is not entitled to an in lieu of day for that holiday.

9. Determining in lieu of holidays when holidays fall on non-workdays:

   a. If a holiday falls on a non-workday of the employee, except for holidays falling on a Sunday non-workday, the employee's preceding workday will be the designated in lieu of holiday.

   b. If the holiday falls on the Sunday non-workday of an employee, the subsequent workday will be the employee's designated in lieu of holiday.

H. Lunch Breaks

The Department shall continue the existing lunch and break arrangements. If the Department determines that an adjustment to lunch and/or breaks is necessary to solve any significant public service or operational problems caused by the AWS Plan, the local union shall be given the opportunity to bargain on such changes in working conditions.

**Section 3 - Tours of Duty/Scheduling**

A. For the purpose of this section, these definitions of terms are used:

1. Established Tour - A tour of duty approved with a specific beginning and ending time.

2. Work Shift - 1st shift (days), 2nd shift (evenings), 3rd shift (nights) within a 24 hour period.

B. An employee's workweek will usually not extend over more than five days of the period Sunday through Saturday.

C. Employees shall not be scheduled to work more than two of the established work shifts (days, evenings, and nights) within any fourteen consecutive day period unless the parties locally agree to a period longer than fourteen consecutive days.

D. Employees shall not be required to report to work unless they have had at least 12 hours of off-duty time between work tours. Exceptions may be made by mutual agreement between the employee and their supervisor.

E. Rotation - Scheduled off-tours shall be rotated fairly and equitably among affected employees, i.e., day/evening, day/night.

F. Rotation of weekends and holidays shall be on a fair and equitable basis within a group and may be a subject for local bargaining. The weekends are defined as Saturday and Sunday and may be expanded to include Friday or Monday when scheduling permits.

G. Records of weekend and off tours shall be kept by the Department to ensure fair and equitable treatment of employees. These records shall be readily available for review by the employees and local union.

H. Seniority among employees with comparable qualifications will be the determining factor for access to a preferred tour. Seniority will be defined locally.

I. Excessive use of overtime in any area will be evaluated by the local union and the Department to review staffing options.

J. Every practicable effort will be made to assure that work schedules will not be for more than six consecutive days for eight hour tours, three consecutive days for twelve hour tours, and four consecutive days for ten hour tours with no less than two consecutive days off. Changes in the above procedures shall not be made without notice to the local union.

K. The local union shall be provided schedules upon request. Alterations, procedures, and time frames for posting schedules shall be negotiated locally. If posted time sheets are altered, notification will be given to the employee in a timely manner.

L. When a change of uniform is required, the Department will provide up to ten minutes at the beginning and ending of a tour for the employees to change clothes. In addition, employees will be allowed a reasonable amount of time to change clothes when their clothing becomes soiled.

M. The Department will permit reasonable clean-up time at the end of each shift for the purpose of returning tools or equipment and cleaning up the work areas and machinery as necessary in each work area. No employee shall be required to remain after the end of his/her shift

without appropriate compensation for the purpose of cleaning up the designated area.

### Section 4 - General Overtime Provisions

A. Overtime shall be distributed in a fair and equitable manner.

B. When an employee works overtime, whether covered by the Fair Labor Standards Act or exempt, such overtime will be paid in increments of 15 minutes.

C. Employees shall be paid differential and premium pay in addition to the overtime compensation in accordance with applicable regulations.

D. It is agreed that non-bargaining unit employees shall not be scheduled on overtime to perform the duties of bargaining unit employees for the sole purpose of eliminating the need to schedule bargaining unit employees for overtime.

E. The Department shall make a reasonable effort to give the employee as much notice as possible when planned overtime is required, and further, will give due consideration to the employee's personal circumstances. At the employee's request, the Department will endeavor to avoid mandated overtime exceeding four hours at the end of the employee's tour of duty.

F. Those employees eligible by Title 5 or Title 38 can accrue and use compensatory time when approved by the Department. Eligible employees may request compensatory time off in lieu of premium pay for overtime work. The approving official will consider staffing needs in the decision whether to approve compensatory time. Supervisors shall not require the above mentioned employees to take compensatory time in lieu of overtime pay. Appropriate officials or their designees, may, at the request of a GS or FWS employee on a flexible schedule, grant compensatory time off in lieu of overtime pay, whether such overtime hours are regularly scheduled or irregular or occasional in nature. If the employee does not request compensatory time off in lieu of overtime pay, or if the employee's request for compensatory time off in lieu of overtime pay is not granted, the employee shall be compensated for such overtime under the applicable statutory provisions.

G. The Department shall, to the extent practicable, permit employees who earn compensatory time instead of overtime to use their compensatory time at the earliest time convenient to them within 26 pay periods. Normally, compensatory time off shall be granted before annual leave is approved. If annual leave would otherwise be forfeited, however, the annual leave shall be granted before compensatory time off. Any employee

763

who is unable to use compensatory time within 26 pay periods shall receive overtime pay instead.

H.  Employees who are required to work overtime will be allowed to call at no cost to themselves to make necessary arrangements.  This shall include but is not limited to dependent care arrangements and updates, medical appointments, classes and self-improvement commitments, etc.

I.  When employees in a voluntary situation indicate in advance that they will work overtime, the Department should have an expectation that they will keep their commitment.  It is understood that employees occasionally may be unable to report for assigned overtime work.  Therefore, an employee who volunteers for overtime work and fails to report as scheduled without good cause may have his or her name placed at the end of any overtime roster.

J.  Employees who are called back to work for a period of overtime unconnected to their regularly scheduled tour or who work overtime on their day(s) off are entitled to a minimum of two hours overtime pay. Employees called in for emergency work outside their basic workweek shall not normally be required to perform non-emergency functions.  This does not preclude employees from being called in to provide coverage in non-emergency situations.

K.  Rosters of employees will be utilized to determine voluntary or involuntary overtime.  The mechanics and eligibility of the rosters are subjects for local negotiations and seniority will be the criterion.  The Department will make available to the Union, upon request, current records of overtime assignments.

L.  Employees required to work through their non-duty meal period shall be paid for such time.

M.  In the event of an extension of a regular work shift into an evening or night work shift for more than a three hour overtime work period, reasonable time will be allowed, when possible, for procurement and eating of food. This will occur no later than three hours after the overtime starts.

### Section 5 - Paid On-Call/Standby

A.  Title 5 Employees and Hybrids earning on-call pay under authorities other than 38 USC 7454.

1.  Paid on-call and standby duty will be rotated among all qualified staff.  Records of paid on-call and standby duty shall be kept by the Department and made available to the local union upon request. Employees scheduled for paid on-call duty shall be issued pagers or

764

other mobile technology which will be used to notify them of a need for their return to duty.

2. On-call employees shall not be expected to work more than 16 consecutive hours of actual work, except in rare and unusual circumstances.

3. Employees will not be required to stay at home unless they are in a standby duty status (5 CFR 550.141) or required to wear and respond to beepers/pagers unless they are scheduled to be in an on-call duty status under the provisions of 38 USC 7457.

4. Employees shall not be scheduled on-call while on annual leave.

5. If an on-call or standby tour of duty is terminated in a work unit, the decision and reason shall be specific and in writing and forwarded to the local union to fulfill bargaining obligations.

6. Those employees currently in a standby pay retention status will continue to be paid under the provisions of 38 USC 7457(c).

B. Registered Nurse (RN), Certified Registered Nurse Anesthetist (CRNA), Physician Assistant (PA), Expanded Function Dental Auxiliary (EFDA), and Hybrids earning on-call pay under 38 USC 7453(h) or 7454:

1. RNs and CRNAs earn premium pay at 10% of their overtime rate for officially scheduled on-call duty pursuant to 38 USC 7453(h). PAs and EFDAs earn premium pay on the same basis as RNs for officially scheduled on-call duty pursuant to 38 USC 7454(a). Other hybrid employees may earn premium pay on the same basis as nurses for officially scheduled on-call duty pursuant to 38 USC 7454(b).

2. Procedures relating to on-call duty for employees covered by Paragraph 1 above are contained in VA Handbook 5007, Part V, Chapter 5, Paragraph 1. This paragraph is purely for informational purposes and is not itself subject to collective bargaining or grievable under the negotiated grievance procedure.

3. Records of on-call duty shall be kept by the Department and made available to the local union upon request.

## Section 6 - Local Negotiations

Those facilities having locally negotiated agreements will continue to honor those agreements so long as they do not conflict with the Master Agreement. A conflict shall be resolved in favor of the Master Agreement.

765

# ARTICLE 22 - INVESTIGATIONS

## Section 1 - General

A.  As exclusive representative, the local union shall be given the opportunity to be present at any examination of an employee in the bargaining unit(s) by a representative of the Department in connection with an investigation if:

1.  The employee reasonably believes that the examination may result in disciplinary action against the employee; and,

2.  The employee requests representation.

B.  The right to union representation is not intended to interfere with the routine interaction between supervisors and employees in the normal course of a workday.

C.  The Department shall annually inform its employees of their right to union representation under 5 USC 7114(a)(2)(B) by posting notice of such rights on bulletin boards and through other appropriate means.

D.  If any supervisor or Department official, in advance of or during the questioning of an employee, contemplates the likelihood of disciplinary action, the employee shall be informed of his/her right to union representation prior to further questioning.  If an employee in the bargaining unit requests local union representation, the Department will reschedule the meeting as soon as possible, and the local union will be given the opportunity to be present.

## Section 2 - Investigations

A.  The Department agrees that before employees conduct a formal investigation, they shall be properly trained.

B.  The Department will inform the local union in advance of a formal administrative investigation when a bargaining unit employee is the subject of the investigation or inquiry.

C.  Investigations should consider all facts, circumstances, and human factors. An investigation shall be conducted in an expeditious and timely manner.

D.  Employees have the right to be represented by the local union while being questioned in a formal investigation or while being required to provide a written or sworn statement.  Before such questioning begins or a statement given, employees will be informed of the reasons they are being questioned or asked to provide a statement.

766

E.   If an employee is the subject of an investigation, he/she will be informed of the right to local union representation prior to being questioned or asked to provide a statement.  The employee will also be informed of the nature of the allegation(s).  Once an employee requests local union representation, except in very rare and unusual circumstances, no further questioning will take place until the local union is present.

F.   Supervisors, employees, and local union representatives will not, except as specifically authorized, disclose any information about an investigation. A copy of the statement of the employee will be given to the employee and/or the employee's representative upon request.  If no action was taken as a result of this investigation, the employee who was the subject will receive the findings in a timely manner.

G.   Upon request, the subject of the investigation and the local union will be furnished a copy of the complete investigation file (not just the evidence file) and all other relevant and pertinent information which would be provided under the Freedom of Information Act (FOIA) or 5 USC 7114, which would normally include the Administrative Investigation Board (AIB) report findings.

H.   The statement of employee rights and obligations will be consistently applied throughout the bargaining unit.  That statement will be consistent with this Agreement and include the following:

1.   The employee's right to representation by the local union;

2.   The right of an employee to a copy of his/her personal statement or testimony; and,

3.   The right of an employee not to incriminate him/her self.

I.   When an employee has requested local union representation in an investigative proceeding, the local union representative may fully and actively represent the employee and is not limited to the role of an observer.

J.   An employee's representative shall receive a complete copy of all evidence used to support the Department's action.  This includes, but is not limited to, copies of all tapes, testimony/transcripts, recommendation and/or findings, and photographs.  The Department will make every effort to provide additional information requested by the employee's representative. The Department will provide a written explanation of any denial of information requested in a timely manner.

K.   The participation of bargaining unit employees on an AIB will be with the consultation of the Union.

767

# ARTICLE 23 - MERIT PROMOTION

## Section 1 - Purpose and Policy

The parties agree that the purpose and intent of the provisions contained herein are to ensure that promotions are made equitably and in a consistent manner. Promotions shall be based solely on job-related criteria and without regard to political, religious, labor organization affiliation or non-affiliation, marital status, race, color, sex, sexual orientation, national origin, non-disqualifying disabling condition, or age. This article sets forth the merit promotion system, policies, and procedures applicable to bargaining unit positions in the Department.

## Section 2 - Development of Career Pathways

A. The parties will explore various means of enhancing career opportunities including but not limited to career ladders, administration movement, broad banding, etc.

B. The parties are committed to establishing career ladder positions within the organization in those situations where positions and functions can be grouped in a way compatible with program and work considerations.

C. The parties agree to develop and implement career ladder positions through joint labor-management involvement. Labor and management will work together as follows:

1. Participation will include bargaining unit representatives appointed by the local union;

2. The parties will have appropriate personnel and classification support;

3. Review will consider existing positions and work functions within the respective component in all job categories (i.e., professional, technical, administrative, clerical, wage grade);

4. Consolidate/revise existing positions and develop career ladder positions where appropriate. The parties will attempt to design career ladders which provide opportunities for both lateral movement between career ladder positions and promotion to higher graded career ladder positions.

## Section 3 - Career Ladder Plans

A. Career ladder positions help employees develop to successfully perform higher level duties through training and incremental assignment of more complex work. The responsibilities assigned to the entry levels of career

768

ladder positions will involve more basic skills and knowledge compared to journey-level responsibilities. The responsibilities at each level of the career ladder position will be communicated to employees through the PD and career ladder plan. Career ladder plans will be tailored to the complexity of the job duties and will permit individuals to learn and assume the fuller range of duties.

B. A career ladder plan will be established for each career ladder position. The career ladder plan will outline the objective criteria for each grade level which an employee must meet in order to be promoted. A copy of the plan will be given to each employee upon entry into the career ladder and when the employee is promoted to a new level of the career ladder. The employee will also be advised of his/her earliest date of promotion eligibility. When career ladder plans are established and/or revised, the Department will provide notice to the local union in accordance with Article 49 - Rights and Responsibilities. The employee will be provided with a copy of any revised career ladder plan within 30 days of such revision.

## Section 4 - Career Ladder Advancement

A. At the time the employee reaches their earliest date of promotion eligibility, the Department will decide whether or not to promote the employee.

   1. If an employee is rated as successful and is meeting the promotion criteria in the career ladder plan, the Department will certify the promotion which will be effective at the beginning of the first pay period after the requirements are met.

   2. If an employee is not meeting the criteria for promotion, the employee will be given a written notice at least 60 days prior to earliest date of promotion eligibility. The written notice will state what the employee needs to do to meet the promotion plan criteria. Should a career ladder plan require only a three month training period, the above notice shall be a reasonable period prior to the earliest date of promotion eligibility.

      a. If the employee is making progress, the supervisor will ensure that the employee has the opportunity to acquire pertinent skills and knowledge and to demonstrate that they meet promotion requirements as soon as feasible.

      b. If the employee is experiencing problems, the provisions in Paragraph B of this section are applicable.

   3. In the event that the employee met the promotion criteria, but the appropriate Department official failed to initiate the promotion timely, the promotion will be retroactive to the beginning of the first pay period after the pay period in which the requirements were met.

B. At any time a supervisor and/or employee recognize an employee's need for assistance in meeting the career ladder advancement criteria, the supervisor and employee will develop a plan tailored to assisting the employee in meeting the criteria. The plan should include all applicable training, as well as any other appropriate support. At the request of the employee, the local union may provide assistance. If a non-probationary employee fails to meet the promotion criteria after the appropriate assistance, the Department may:

1. Provide the employee with additional time to meet the promotion criteria;

2. Assign the employee duties commensurate with their current grade (The career ladder plan may end, and the employee will remain at the level they attained within the career ladder. The employee may be reinstated back into the career ladder plan non-competitively if the employee remains in the position covered by the career ladder plan.); or,

3. The employee may be assigned to another position at the same grade and step.

C. If an employee is denied a career ladder promotion because of the unavailability of enough work at the next grade, the Department agrees that, if an employee performs the work of the higher-graded position for the required amount of time during a pay period to qualify for reclassification to the higher grade, the employee will be temporarily promoted for that entire pay period.

## Section 5 - Definitions

For the purpose of this article, the definitions contained in Part 335 and other related parts of Title 5 CFR shall be incorporated as a part of this Agreement except as otherwise defined in this Agreement.

## Section 6 - Applicability of Competitive Procedures

A. Promotions

Any selection for promotion must be made on a competitive basis unless it is excluded by Section 7 below.

B. Reassignments/Changes to Lower Grade

Any selection to a position that provides specialized experience (Job Qualification System for Trades and Labor Occupations, OPM Handbook X-118C) that the employee does not already have and is required for subsequent promotion to a designated higher grade position and/or to a position with known promotion potential must be made on a competitive basis.

770

C. <u>Details</u>

Competitive procedures will be applicable to any selection for detail of more than 60 days to a higher graded position, to a position with known promotion potential, or a position which provides specialized experience (Job Qualification System for Trades and Labor Occupations, OPM Handbook X-118C) required for subsequent promotion to a designated higher-graded position.

D. <u>Training</u>

Competitive procedures will be applicable to selections for training when eligibility for promotion to a particular position depends on whether the employee has completed that training.

E. <u>Appointments</u>

Competitive procedures apply to the transfer of a federal employee or to the reinstatement of a former federal employee to a position above the highest grade previously held permanently (unless the position is a higher-graded successor position as described in Paragraph D 5 of Section 7 of this article) or to a position at or below that grade if the position has promotional potential above the highest grade previously held permanently. The employee must not have been demoted or separated for cause from the higher grade(s) and, when competitive procedures apply, be identified as a well-qualified candidate with eligible Department employees to be eligible for appointment. To the extent feasible, the same qualification standards and the same methods of evaluation will be applied to both Department employees and persons being considered for appointment to higher-graded positions above the highest grade previously held permanently by transfer or reinstatement. If it is determined that these methods are not feasible, the parties will meet and confer on the methods to be utilized.

F. The procedures for vacancies filled under competitive actions are described in this article.

**Section 7 - Applicability of Noncompetitive Actions**

A. <u>Promotions</u>

The following promotions may be taken on a noncompetitive basis unless otherwise provided:

1. Promotion of the incumbent in a position that is reclassified at a higher grade due to the accretion of additional duties and responsibilities and not as the result of a planned management action;

2. Promotion of an incumbent or an individual entitled to re-employment rights to a position that is reclassified to a higher grade without significant change in duties or responsibilities either on the basis of a new classification standard or as the result of correction of an original classification error (When the incumbent of the upgraded position meets the legal requirements and qualification standards for promotion to the higher grade, the incumbent will be promoted.);

3. Promotion of an employee previously selected competitively for a lower step of a career ladder;

4. Promotion after receiving priority consideration;

5. Promotion of an employee when directed by authorized authorities (i.e., judges, arbitrators, FLRA, and other appropriate authorities);

6. Agencies may noncompetitively reinstate, transfer, or promote an employee up to the highest grade previously held on a permanent basis under career or career-conditional appointment, provided the employee was not demoted or separated from that grade for cause;

7. Temporary promotions to a higher grade totaling 60 days or less during any 12 month period (If a temporary promotion which was not expected to exceed 60 days was originally made on a noncompetitive basis, any extension beyond 60 days must be made under competitive procedures.);

8. Career ladder promotions following noncompetitive conversion of a cooperative education student in accordance with the requirements of applicable OPM policy;

9. Promotion of an employee covered by an approved training agreement;

10. Promotion of an employee placed competitively in a trainee position;

11. Any other noncompetitive action authorized by law or existing government-wide regulation.

B. Reassignments/Changes to Lower Grade

A reassignment or change to lower grade to a position that does not provide specialized experience (Job Qualification System for Trades and Labor Occupations, OPM Handbook X-118C) that the employee does not already have and is required for subsequent promotion to a designated higher-graded position or to a position having no known promotional potential may be taken on a noncompetitive basis.

C. Details

The following details may be made on a noncompetitive basis:

772

1. Details of 60 days or less to a higher-graded position (see Article 12 - Details and Temporary Promotions);

2. Details of 60 days or less to a position at the same or lower grade with known promotional potential or to a position which provides specialized experience (Job Qualification System for Trades and Labor Occupations, OPM Handbook X-118C) required for subsequent promotion to a designated higher-graded position;

3. Details to a position at the same or lower grade with no known promotion potential or to a position which does not provide specialized experience (Job Qualification System for Trades and Labor Occupations, OPM Handbook X-l l8C) required for subsequent promotion to a designated higher-graded position;

4. Details to unclassified duties.

D. <u>Other Noncompetitive Actions:</u>

1. Conversion of an employee from a temporary promotion to a permanent promotion in the same position and duty station provided the vacancy announcement for the temporary promotion indicated that the promotion could later become permanent;

2. Selection from an OPM-approved register;

3. Transfer of a federal employee or reinstatement of a former federal employee (including conversion to reinstatement from a temporary appointment) to a position at the same or lower grade than the highest permanent grade held under a career or career-conditional appointment provided the candidate was not demoted or separated for personal cause from a higher grade and also provided that the position does not have known promotion potential to a grade higher than the highest permanent grade held;

4. Reinstatement to the same career ladder position for which an employee was previously selected competitively or to a similar career ladder position having similar qualification requirements and having no greater known promotion potential;

5. Reinstatement of a former Department employee to a position which is the higher-graded successor to a position he/she previously held (Such reinstatements may be made noncompetitively when classification of the successor position is based on the establishment of a new position classification standard or the revision of a position classification standard.);

6. A position change permitted by reduction-in-force regulations;

7. Consideration or selection of:

    a.  Disabled veterans under 5 CFR 315.604;

    b.  Disabled veterans under 5 CFR 315.707;

    c.  Cooperative education students under 5 CFR 213.3202;

    d.  Veterans Readjustment Appointments under 5 CFR 307;

    e.  Severely handicapped appointments under 5 CFR 213.3102 (u) and (t);

    f.  Schedule A & B Excepted Appointments;

    g.  Any other noncompetitive action authorized by law or existing government-wide regulation.

E.  Additional procedures for noncompetitive details and reassignments are described in Article 12 - Details and Temporary Promotions and Article 13 - Reassignment, Shift Changes, and Relocations.

### Section 8 - Vacancy Announcements and Areas of Consideration

A.  All positions to be competitively filled in the bargaining unit by actions covered by this article shall be posted unless filled under Section 7 which provides for exclusions from coverage.  For the same type of vacancy (title, series, and grade), a certificate may be used for up to 90 days to refer candidates without re-announcing the vacancy.

B.  Prior to considering candidates from outside the bargaining unit, the Department agrees to first consider internal candidates for selection.

C.  Areas of Consideration

    The areas of consideration will be:

    1.  FIRST - Facility-wide (including satellites) except:

        a.  This area may be made more narrow or expanded through mutual agreement;

        b.  Where evidence suggests that the area of consideration is not expected to produce at least three qualified candidates, it may be expanded. (The vacancy announcement will identify the expanded area of consideration.);

        c.  For VACO unit positions, GS-12 and above, the area of consideration may be expanded.

    However, in all cases, (a, b, and c above), first and full consideration shall be given to any best qualified candidates within the facility (or more narrow area).

774

2. SECOND - Any other promotion candidate or candidate required to compete from other VA facilities.

3. THIRD -

    a. Reassignments/demotions to positions with higher known promotion potential.

    b. Reinstatements to positions at a higher grade or with higher known promotion potential.

    c. Transfers to positions at a higher grade or with higher known promotion potential.

D. Consideration of Department employees as promotion or promotion potential candidates outside the normal area of consideration for positions covered by this article will be considered as follows:

The employee can submit an application and supporting attachments, designated on the form, to the appropriate Human Resources (HR) Office. The applicant should indicate thereon the specific position or types of positions, and location(s) for which the employee wants to be considered. To ensure full consideration, employees should include on their applications information relevant to the assessment criteria for the position in which they may be interested. In order to be considered for a particular vacancy, the employees must have the form on file with the HR Office prior to closing of the announcement.

E. <u>Consideration of Department Candidates for Reinstatement</u>

When consideration is given to a former Department employee applying for reinstatement, noncompetitive referral will initially be made for:

1. Positions at the last grade;

2. A position which is the higher-graded successor to a position they previously held; and,

3. Positions at any higher grade(s) the employee held permanently if the employee was not demoted or separated for cause from the higher grade.

However, if vacancies do not exist at these grades, if requested by the employee, referral may be made to a lower-graded position. Last grade is defined as the grade of the last position held under a non-temporary appointment for reinstatement candidates. If applicants accept referral to the lower-graded position, they must sign a statement that they fully understand and accept the referral. However, employees will also be informed that they do not have to accept a lower-graded position in order

to be reinstated.  Consideration for bargaining unit positions above the last grade permanently held must be competitive.

F. <u>Information on Vacancy Announcements</u>

Vacancy announcements will include, at a minimum:

1. Statement of nondiscrimination;

2. Announcement number and opening and closing dates;

3. Position number(s), title(s), series, and grade(s);

4. Number of vacancies to be filled;

5. Promotional test to be used, if any, and where applicable, positions in the "same-line-of-work;"

6. Geographic and organizational location;

7. Time-in-grade requirements, if any;

8. Area of consideration;

9. Summary of qualification requirements and duties for the position;

10. Hours of work and/or the availability of alternative work schedule options;

11. If appropriate, a statement that the vacant position is a trainee position leading to a noncompetitive promotion and conditions for promotion;

12. Permanent or temporary nature and duration, if temporary;

13. Filing instructions;

14. Name and telephone number of the personnel specialist or other individual to contact for specific assessment criteria and other information relating to the announcement; and,

15. The HR Office or the address where the application is to be submitted.

The Department agrees to standardize VA vacancy announcements to the extent feasible.

G. <u>Announcing Career Ladder Vacancies and Vacancies Covered by Training Agreements</u>

Career ladder vacancies and vacancies covered by training agreements may be announced at any or all grades.  The local union will be provided with written notice of any changes in the posting of these announcements prior to being posted.

776

H. Posting and Distribution of Vacancy Announcements

The Department agrees to provide a copy of vacancy announcements to the local union at the time of or prior to postings.  In addition, the job analysis, without the rating guide, will be provided to the local union within the area of consideration.  The Department agrees to post vacancy announcements within the area of consideration and to make copies available to employees, upon request, in accordance with the following:

1. Individual vacancy announcements will remain open and posted for 15 workdays;

2. Open continuous announcements will remain posted at all times. (When it has been determined that an open continuous vacancy will be filled, the cut-off notice will be posted in order for all interested employees to apply.);

3. Scheduled employee absence of three weeks or less: Employees temporarily absent on approved leave, detail, at training courses, or on official business, for periods not to exceed three weeks may, upon their return, review position vacancies announced and closed during their absence, and make application for such vacancies in which they are interested.  Such late applications must be submitted within three workdays after return to duty and must be accompanied by a statement prepared and signed by the employee and also signed by their supervisor explaining the dates and reason(s) for the employee's absence.  Employees filing delayed applications under this provision will be considered only for those vacancies for which a best-qualified list has not yet been prepared.

I. Amending Vacancy Announcements

If a vacancy announcement has been posted and is later found to contain a substantial error concerning items listed in Paragraph F of Section 8, the announcement will be amended if the selecting official still intends to fill the position under the competitive process.  The amendment should cite the change(s) and indicate whether or not the original applicants need to re-file in order to be considered.

J. Vacancy Announcement/Locating Candidates

The local union and each applicant will be notified in writing if an announcement is canceled and will be provided with a reason for the cancellation.  However, such cancellations will not be used to compromise merit promotion principles.

## Section 9 - Knowledge, Skills, Abilities, and Other Characteristics

A. Definition

KSAO stands for knowledge, skill, ability, and other characteristics.

B. The parties agree that KSAOs developed for all current and future unit positions, and changes and modifications thereto, will be fair, job-related, applied equitably and uniformly, and established in accordance with law, higher authority rules and regulations, and this Agreement.

C. Changes to Established KSAOs

KSAOs will be established by a panel which will conduct job analysis and other prescribed duties. The panel will normally include a bargaining unit employee chosen with the concurrence of the local union. Absent mutual agreement, the Department will appoint panel members following discussions with the local union and informing the local union of the reason for its decision. Informational copies will be provided to the local union as part of the vacancy announcements. If KSAOs for specific positions (i.e., position numbers) are changed after their initial establishment and used in a promotion action, the newly developed KSAOs will be sent to the local union in advance of any future vacancy announcements and handled by the parties in accordance with their bargaining obligations under 5 USC Chapter 71.

D. Procedures

1. KSAOs will be developed by:

   a. Identifying the major tasks/duties of the position through a job analysis based on information contained in the PD, career ladder plan, qualification standards, and/or classification standards; and,

   b. Identifying the worker characteristics and demonstrated abilities (KSAOs) needed to perform the job.

2. KSAOs are defined as follows:

   a. Knowledge is a body of learned information used directly on the job;

   b. Skill is a present competence to perform a skill, and unlike an ability, involves observable, quantifiable, and measurable performance parameters such as typing and pipefitting;

   c. Ability is the power to perform an activity at the present time. (An ability is evidenced by the performance of some activity or work and should not be confused with an aptitude which is only a potential for performing an activity. An aptitude cannot be determined or measured by information in applications.);

778

d. Other Characteristics must be directly observable or measurable and job-related.

3. For each announced vacancy in the bargaining unit, not less than three and not more than eight KSAOs will normally be identified.

    a. KSAOs shall be measurable (degree of possession can be discerned) and reasonable (some candidates can be expected to possess them). Any KSAOs which do not meet these criteria will be dropped.

    b. The KSAOs developed will be reviewed to determine which ones are critical to successful job performance. These KSAOs (at least two) will be designated as selection factors.

    c. Task examples shall be developed for each KSAO. The task examples shall be derived from, and consistent with, the official PD of record. Task examples shall be identified in the vacancy announcement and fully documented and made part of the merit promotion package.

## Section 10 - Panel for Competitive Action

A. Subject to Paragraph C of Section 10, panels will be established for all competitive actions.

B. Panel Membership Requirements

1. Panel members shall be instructed in the tasks necessary to perform the panel's function.

2. Panels for bargaining unit positions will include two bargaining unit employees chosen with the concurrence of the local union. Absent mutual agreement, the Department reserves the right to appoint panel members following discussions with the local union and informing the local union of the reasons for its decision.

3. The parties recognize that some competitive actions may require larger or smaller panels. The Department may determine the necessary panel size.

4. Panel members will not be in competition for the vacancy(s) and must be at least the same grade or higher, if possible, than the vacancy to be filled.

5. A relative of an applicant may not serve on the panel.

6. Members of the panel should be familiar with the job requirements of the position(s) being filled.

C. Panel Information

The Department will provide the promotion panel with all of the necessary information for completing its function.

D. Panel Responsibilities

The Panel will:

1. Apply evaluation criteria to ensure that a well-qualified candidate is selected:

   a. When there are eight or fewer, (nine for two vacancies, ten for three, etc.) qualified promotion candidates, they will be referred in order of entry on duty date at the current Department facility to the selecting official for consideration without rating and ranking.

   b. When there are more than eight qualified promotion candidates in the first area of promotion consideration, a Panel shall be convened.

   c. Promotion candidates from outside the first area of promotion consideration shall be rated by the Panel if the candidates from the first area were rated and ranked.

   d. The Panel will evaluate each application in order to ascertain the relevancy of the candidate's background (including but not limited to work experience, awards, training, outside activities, etc.) to the KSAOs. Candidates will be evaluated on the extent to which they possess the KSAOs relevant to the position being filled. This assessment will be based on the applicant's description of the proportion of time spent performing relevant activities, the complexity of the activity, identifiable results, level of contacts involved in performing the work, or the scope of responsibilities and duties performed.

   e. In making this evaluation, the task examples should not be taken as the only types of evidence which demonstrate possession of a KSAO.

2. Determining the Best Qualified List for Referral:

   a. First Area of Promotion Consideration.

      1) The evaluation panel will review the listing of ranked promotion candidates to determine whether a meaningful break is present. The meaningful break is where:

         a) The lowest ranking candidate above the break should be able to perform the job with substantially equal success as all candidates with higher scores, and

780

      b) The highest ranking candidate below the break should not be able to perform with substantially equal success as those above the break.

    2) Promotion candidates above the break will be placed on the best qualified list for referral.  If there is no break and/or there are too many candidates above the break, the eight highest ranking candidates will constitute the best qualified list and be referred in order of their entry on duty date at the facility.

  b. In order to be referred, candidates who have to compete under the procedures of this article and who are outside the facility shall have a rating equal to or better than the meaningful break or cutoff established by the promotion candidates within the first area of promotion consideration.

  c. Length of service with the Department shall serve as a tie breaker where one is necessary.

  d. A copy of any referral list forwarded to a selecting official will be provided to the local union.

E.  Multiple Grade Levels or Locations

If an announcement pertains to more than one grade level or geographic location, a separate list of eligible persons will be developed for each grade level and location.

F. Documentation

The Panel will document working notes.  Notes may be annotated on worksheets used by the panel.  The notes will serve as reference material to document the process by which the decision was made.

G. Confidentiality

The results of the panel's actions will be treated confidentially and in accordance with provisions of the Privacy Act.

H. Decisions

The panel will make its decision(s) by consensus.

## Section 11 - Sources of Information on Candidates

A. Any awards the applicants have received must be considered by the selection panel but only to the extent they are relevant to the rating factors/job elements for the position being filled.

781

B. Once applications are received and the selecting panel convened, no other information on a candidate may be gathered unless with the approval of the panel.

C. VA Form 4676a, Employee Supplemental Qualifications Statement, is to be used, and it will be the primary source document used to evaluate qualifications and to rate and rank candidates.

    1.  Employees are responsible for giving complete and accurate information and for submitting VA Form 4676a by close of business on the seventh calendar day after the closing date of the vacancy announcement. If the panel has not yet been convened, late supplementals will be accepted for bona fide reasons. If the form is not submitted within that time, the panel will consider only the information available from other sources described in this section.

    2.  The SF-171, Personnel Qualifications Statement, may also be reviewed if available.

D. <u>Interviews</u>

If interviews are used, they must be job-related, reasonably consistent, and fair to all candidates. Also, if interviews are used, all candidates must be interviewed if reasonably available, in person or by telephone where circumstances warrant. If more than one Department official is conducting the interview, a union representative may be present upon the employee's request.

## Section 12 - Selection

A. In the event of unanticipated vacancy(s) in the same position and location as the posted vacancy occurring within 90 days of the selection, the selecting officer may make additional selections from the well-qualified candidates selected from the original vacancy announcement.

B. When a selection has been made, the Department will arrange a release date, notify the employee, and ensure that the appropriate personnel forms are processed. The effective date of a promotion action, other than promotion within a career ladder, will be the first day of the pay period in which the employee is scheduled to report. If an employee has been selected for promotion, has accepted the offer, and a reporting date has been established, and the resultant request for personnel action (SF-52) is not timely received and/or acted upon by the appointing official, the action shall be made retroactive to the reporting date.

C. Employees selected for career ladder positions will be promoted to the next higher grade level at the beginning of the first pay period after selection,

782

provided time in grade and any other legal promotion requirements are met.

D.   The Department recognizes that it is important for maintaining high morale to try to select from within the facility when the candidates are equally qualified to those candidates available from outside sources.  Thus, the Department will agree to look closely at the relative qualifications of candidates from outside and within and shall exercise good faith in the selection.

E.   If the vacancy is one for which an under-representation exists and is a targeted occupation as identified in the Affirmative Employment Plan, and there are well qualified candidates whose selection would reduce the under-representation, then the selection official will give serious consideration to those individuals.

F.   Upon request, the local union will be provided with a written reason for selecting an outside candidate.

### Section 13 - Priority Considerations

A.   Definition

For the purpose of this article, a priority consideration is the bona fide consideration for noncompetitive selection given to an employee as the result of a previous failure to properly consider the employee for selection because of procedural, regulatory, or program violation. Employees will receive one priority consideration for each instance of improper consideration.

B.   Processing

The procedures for processing a priority consideration shall be:

1.   Employees will be notified in writing by the authorized Department official of entitlement to each priority consideration.  Such notice will advise employees that if a vacancy is announced and posted and the employee wishes to exercise their priority consideration, the employee should submit the necessary application to the Human Resources Management Services (HRMS) with a written request that they wish priority consideration for the vacancy.

2.   Priority consideration is to be exercised by the selecting official at the option of the employee for an appropriate vacancy.  An appropriate vacancy is one that the employee is interested in, is eligible for, and which leads to the same grade level as the vacancy for which proper consideration was not given.

3. Prior to the evaluation of other applicants, the name(s) of the employee(s) requesting to exercise priority consideration will be referred to the selecting official.  The selecting official will make a determination on the request prior to evaluating other applicants.

4. The fact that the employee chooses to exercise a priority consideration does not preclude that employee from also filing an application through the regular posting process.

C. Local Union Notification

In order to assure compliance with this section, the local union will be furnished statistics on priority considerations granted and exercised and the results.  Statistics will be kept and provided to the local union on a quarterly basis.  The local union will also be notified in writing of each individual priority consideration completed.

## Section 14 - Special Consideration

A. Employees who were downgraded without personal cause (i.e., where the downgrade was not due to misconduct, inefficiency, or at the employee's own request), may be eligible for special consideration.  Re-promotion may be made to a grade previously held on a non-temporary basis or to an intervening grade.  This applies only when the employee was downgraded in the Department and the re-promotion is to a grade formerly held in the Department.

B. Employees under this provision will receive a special consideration for each grade for which they were demoted or downgraded.

## Section 15 - Keeping Employees Informed

A. Employees who apply for and inquire about a specific promotion action will be given the following information by the HR Office or the selecting official:

1. Whether they met the minimum qualification requirements;

2. Whether they were in the group from which selection was made;

3. Who was selected; and,

4. Upon request, the selecting official shall provide a verbal statement of the reason(s) why the employee was not selected and/or a written statement regarding what areas, if any, he/she should improve to increase their chances for future selection.

B. Upon request, an employee will be shown any record of production or any supervisory appraisal of past performance which has been used in considering him/her for promotion.  An employee is not entitled to

784

see records on another applicant unless he/she is the selecting official, a member of the selection panel, or otherwise officially involved in the promotion process, or he/she has the written consent of the subject of the record or is an agency official with a need to review the record. However, an employee and/or the local union shall have access, consistent with law, government-wide rule, or regulation, to all pertinent records used in the process of filling vacancies which are requested for the purpose of processing or filing a grievance, EEO complaint, or other appeal.

### Section 16 - Local Union Review of Competitive Actions

A. The local union will be permitted to conduct audits of promotion packages for all bargaining unit positions when it has reason to believe a discrepancy exists or when requested to do so by an employee.

B. The local union will provide the Department with the names of the local union representatives who are responsible for conducting audits. Any changes to the list of designated representatives will be sent to the Department in writing. The representative designated to conduct the audit will not have been an applicant for the promotion package being audited.

C. If the employee chooses to use the Union procedure, he/she must make a written request to the local union within 15 working days after the selection is posted on the biweekly promotion listing. A local union request under Paragraph A above must be made within the same time limits.

D. The designated Department official responsible for the package will make the pertinent records from the package available to the local union auditor within seven working days of receipt of the audit request. An auditor shall treat information confidentially and review it in HRMS in the presence of a Department official.

E. If, during the course of the audit, additional information is determined to be necessary, such information shall be secured from HRMS.

F. Employees who elect to use the grievance procedure rather than the Union audit procedure must initiate action in accordance with Article 43 - Grievance Procedure.

# ARTICLE 24 - OFFICIAL RECORDS

### Section 1 - Official Records and Files

No personnel record may be collected, maintained, or retained except in accordance with law, government-wide regulations, Department regulations, and this Agreement or its Supplements. All personnel records are confidential and shall be known or viewed by officials only with a legitimate need to know for the performance of their duties; they must be retained in a secure location. Employees shall be advised of the nature and purpose of their eOPF and its location.

### Section 2 - Access to Records

A. During normal duty hours, employees and/or their representative(s) designated in writing shall have the right to examine records personally identified to the employee (i.e., eOPF, EEO, evidence files, appeal and grievance records), PDs, and classification standards during normal duty hours. Employees, or their representative(s) designated in writing, may receive at no cost copies of personally identified records which have not been previously furnished. Additional copies will be provided; however, there may be a charge in accordance with the Department fee schedules in effect at the time of request.

B. Employees' access to their own medical records maintained by the Department may be refused only if, in the sole judgment of a health care professional, their disclosure would be harmful to the mental or physical health of the individual. In such cases, the medical record(s) may be released only to an employee's representative designated in writing. There may be instances where the Department health care official may encourage the release of medical information to another health care professional.

C. The employee shall have the right to prepare and enter a concise statement of disagreement with any document filed on the left (temporary) side of the eOPF. Nothing in this section shall negate an employee's right to grieve any matter.

D. Access to personnel records of the employee by the employee and/or the designated representative will be granted when requested if such records are maintained on the facility where the employee is located. If the records are not so maintained, the appropriate administrative office will immediately initiate action to obtain the records from their location within three working days of the request and make them available to the employee and/or designated representative.

786

## Section 3 - Outdated Records

A. All official personnel records shall be purged and information disposed of in accordance with appropriate records control schedules.

B. When eOPFs are purged, personal materials provided by the employee shall be returned to the employee (e.g., transcripts, certificates).

C. Each facility will maintain a system of follow-up to assure that any written counseling, disciplinary, or similar action with a time limit on it is removed on the proper date and returned to the employee.

D. If any outdated or unauthorized material is accidentally left in a file, it may not be used to support any personnel action detrimental to the employee.

## Section 4 - Supervisory Notes

A. Individual files on each employee not approved by the Department as an official system of records will not be kept by Department officials at any level.

B. Subject to Paragraph C of this section, if supervisors make a personal decision to keep notes on employees, the notes or files:

   1. Must be absolutely uncirculated and cannot be reviewed by anyone else (this includes secretaries, other supervisors, or Department officials); and,

   2. Must be maintained in secure fashion in order to prevent disclosure.

C. Supervisory notes may only be used to support any action detrimental to an employee if such note(s) have been shown to the employee at the earliest available time after the entry was made and a copy provided to the employee. Once an employee has received a copy of the supervisory note(s), the note(s) can be provided to an appropriate Department official with a legitimate need to know for the performance of their duties.

D. The time frames for retaining supervisory notes will be up to six months, unless used in a personnel action.

# ARTICLE 25 - OFFICIAL TRAVEL

## Section 1 - Compensation and Travel

A. To the maximum extent practicable, time spent in travel status away from the employee's ODS will be scheduled by the Department within the normal working hours.  Where it is necessary that travel be performed during non-duty hours, the employee will be paid overtime or may opt for compensatory time when such travel constitutes hours of work under 5 USC or the Fair Labor Standards Act, if applicable.  If the travel does not constitute hours of work under 5 USC or the Fair Labor Standards Act, the employee may be eligible for compensatory time for travel.  It is the employee's responsibility to request and obtain travel authority in advance of travel.

B. Official travel away from an employee's ODS is hours of work if the travel is:

1. Within the days and hours of the employee's regularly scheduled administrative workweek, including regularly scheduled overtime hours; or

2. Outside the hours of the employee's regularly scheduled administrative workweek, is ordered or approved, and meets one of the following four conditions:

   a. Involves the performance of work while traveling (such as driving a loaded truck);

   b. Is incident to travel that involves the performance of work while traveling (such as driving an empty truck back to the point of origin);

   c. Is carried out under arduous and unusual conditions (e.g., travel on rough terrain or under extremely severe weather conditions); or

   d. Results from an event that could not be scheduled or controlled administratively by any individual or agency in the executive branch of government (such as training scheduled solely by a private firm or a job-related court appearance required by a court subpoena).

3. To be creditable as hours of work, travel must be officially authorized.  In other words, travel must be for work purposes and must be approved by an authorized agency official or otherwise authorized under established agency policies.

C. When an employee performs official travel outside their normal working hours, but the travel does not constitute hours of work under 5 USC or the Fair Labor Standards Act, then the employee will be allowed to accrue compensatory time off for travel.

788

D. Employees are entitled to compensatory time off for travel consistent with 5 CFR 550.1404. For the purpose of compensatory time off for travel, time in a travel status includes:

1. Time spent traveling between the ODS and a temporary duty station;

2. Time spent traveling between two temporary duty stations; and,

3. The usual waiting time preceding or interrupting such travel (e.g., waiting at an airport or train station prior to departure).

4. Compensatory time off for travel shall be administered consistent with VA Handbook 5007, Part VIII, Chapter 15. Determinations regarding what is creditable as "usual waiting time" are within the sole and exclusive discretion of the employing agency. Employees may request credit of excess waiting time by providing a written explanation in the Remarks Section of VA Form 0861. The explanation must include the amount of excess waiting time requested, the reason for the excess waiting time, an explanation why the employee was unable to use the time for personal use and any additional information or documents that supports the request. Extended periods of waiting time when the employee is free to rest, sleep, or otherwise use the time for his or her own purposes, are not creditable as time in a travel status.

E. Compensatory time off for travel may only be earned for time in a travel status when such time is not otherwise compensable. Compensable refers to periods of time creditable as hours of work for the purpose of determining a specific pay entitlement. For example, certain travel time may be creditable as hours of work under the overtime pay provisions.

F. Compensatory time off for travel is forfeited:

1. If not used by the end of the 26th pay period after the pay period during which it was earned;

2. Upon voluntary transfer to another agency;

3. Upon separation from the Federal Government.

G. An employee may not receive payment for unused compensatory time off for travel.

### Section 2 - Change from Per Diem Allowance to Actual and Necessary Subsistence Expenses

A. Advance Authorization

An employee scheduled to travel in an area for which a per diem allowance is prescribed may request advance authorization for travel on the basis of actual and necessary subsistence expenses. Any such request will normally

be approved when the supporting justification showing that the unusual and exceptional circumstances for the request meets the requirements of the Federal Travel Regulations and Department-wide guidelines.

B. <u>Post Approval</u>

Reimbursement for actual and necessary subsistence expenses allowable under law and/or rules and regulations issued above will normally be authorized on a post-approval basis if the employee can justify that prudent expenses required by the ordered travel exceeds (as defined by the Federal Travel Regulations and Department-wide guidelines) the prescribed per diem rate. This provision applies only to travel involving assignments of 30 calendar days or less.

## Section 3 - Continuation of Approved Travel Expenses

Employees who are unable to arrive at or return from their destination as scheduled will be reimbursed for authorized travel expenses, and any applicable fees or penalties provided the inability to arrive or return is due to arduous travel conditions beyond the employee's control. Employees in these circumstances will be in travel/duty status for the duration of their absence.

## Section 4 - Advancement of Expenses

A. Employees required to travel shall have the option of requesting a travel advance. Such request shall be filed by the employee as soon as possible and processed by the Department as expeditiously as possible. Normally, the Department will not require an employee to travel overnight prior to receiving a travel advance. If an employee does not have adequate funds, the Department will make every effort to make alternative arrangements, in accordance with the Federal Travel Regulations, and Department-wide travel policy.

B. The Department shall process all claims for travel expenses as expeditiously as possible. The Department will make every effort to reimburse bargaining unit employees within five business days after submission of proper travel claim.

## Section 5 - Transportation, Travel, and Per Diem

A. The Department shall authorize local travel orders and pay expenses for Union representatives engaged in representational duties on official time, when traveling between locations such as integrated facilities, CBOCs, Veterans Integrated Service Network (VISN), and Area Offices, or Memorial Integrated Service Network (MISN), or their successor organizations.

790

B. The Department shall not require employees to use a government credit card unless the employee makes more than five authorized trips a year. However, the Department has the discretion to issue a travel charge card to any employee who requests it.

C. The Department shall issue cell phones or phone calling card(s) to employees, upon request, while on official travel.

D. When an employee on official travel uses a privately owned vehicle (POV), travel expense will be reimbursed consistent with the provisions in this article. Employees shall neither be required to use POVs for government business nor shall they suffer any loss of pay, reprisal, or adverse action on account of refusal to use a POV for government business. In the event the use of POVs is authorized, mileage for such use shall be compensated at the prevailing rate published in federal regulations.

E. Travel and per diem is an appropriate subject for local bargaining.

## Section 6 - Document and Property Loss/Theft

An employee is accountable for government documents or property in his/her possession and/or custody. Employees exercising reasonable care will not be held responsible for documents or property damaged, lost, or stolen from their possession and/or custody. Employees accountable for transporting government documents containing personally identifiable information must adhere to established work rules affecting the handling of such documents.

## Section 7 - Protective Assistance

The Department recognizes that some travel job assignments present a threat to the personal safety of employees. When employees or the local union bring such circumstances to the attention of the supervisor, appropriate measures will be taken to assure the safety of the employee. The parties agree to jointly review existing employee protective procedures from time to time to assure that employees receive the maximum feasible protection from such dangers.

## Section 8 - Return to Duty Station

An employee on a long-term assignment may be authorized occasional return trips to his/her permanent duty station at government expense on non-workdays. Approval for such return trips are at the administrative discretion of the authorizing official and may be authorized in accordance with the Federal Travel Regulations and the published travel policy of the Department.

## Section 9 - Travel Savings Award Program

A. It is the employee's option whether to participate in the Travel Savings Award Program. Each time the employee has saved the government two

791

hundred dollars or more, the Department shall reimburse the employee half the savings, as expeditiously as possible after the employee properly documents the savings. The amount of creditable savings will be reduced by the amount of any additional reimbursable transportation expenses that are incurred, such as additional taxicab charges.

B. If an employee on approved official government travel elects to use his/her own personal airline or hotel travel benefits, such as free airline vouchers or frequent traveler club benefits and similar items, and the use of the benefits results in a cost savings to the Department, the employee may request an award of up to half the savings consistent with the Travel Savings Award Program policy. Such funds shall be reimbursed to the employee as expeditiously as possible following the employee's submission of an approved request for reimbursement.

C. If an employee on approved official government travel elects to utilize lodging that costs less than the maximum lodging per diem rate, or completely avoids lodging expense, the employee may request an award of up to half the savings consistent with the Travel Savings Award Program policy. Such funds shall be reimbursed to the employee as expeditiously as possible following the employee's submission of an approved request for reimbursement. If the employee stays at a hotel, the hotel must be Federal Emergency Management Administration (FEMA) approved for fire/safety requirements. This can be verified at http://www.usfa.fema.gov/hotel/index.cfm, or its successor.

D. Transportation and lodging are not the exclusive bases for realizing creditable travel savings under this program. Employees may be eligible for reimbursement in other circumstances, consistent with the Travel Savings Award Program where the employee demonstrates a cost savings to the Department.

792

# ARTICLE 26 - PARKING AND TRANSPORTATION

## Section 1 - Local Negotiations

The parties agree that parking is a substantive subject for local supplemental negotiations to the extent not specifically covered in this Agreement.

## Section 2 - General

Where employees are not being charged for parking that is available at the time this Agreement becomes effective, no charge will be initiated for the duration of this Agreement except where required by law.  The parties agree that secure, adequate, and accessible parking for employees helps better serve customer needs and should be a consideration in local arrangements.

## Section 3 - Relocation

The Department agrees that if they relocate an office or should circumstances prompt changes in lease agreements, prior to the "solicitation for offers," the Department will notify the local union and/or place the issue on the agenda of the local Partnership Council.  Parking space for the local union is a subject for local bargaining.

## Section 4 - Violations

An employee will receive two courtesy warnings and one counseling prior to receiving a parking citation by VA police except where a vehicle is parked in clearly marked emergency lanes or parking spaces.  All citations issued will be reviewed by the Director or appropriate Department official who may make a recommendation to the Federal Court.  The citation or parking warnings will be purged in accordance with the VA Records Control Schedule.

## Section 5 - Shuttle Service

The Department may provide existing or future shuttle service on a space available, first come, first served basis for employee use.  Changes in the shuttle service used by employees are a subject for local bargaining.

## Section 6 - Security

In Department owned parking facilities, the Department will provide a safe and secure parking area for its employees including, but not limited, to the following:

A.   Lighting - Adequate lighting in all parking areas throughout the facility.

B. Security Service - For employee safety, VA police will provide escort service, when available and if requested, to parking areas under Department jurisdiction, traffic control, and general facility security.

C. Inspections - Inspections of grounds including facility and parking areas are to be regularly scheduled.

D. Pedestrian Crosswalks - Crosswalk areas from parking area to facility will be clearly marked.

E. Signage - Clearly understandable and unobstructed signs (traffic, pedestrian, etc.) consistent with both General Services Administration (GSA) standards and guidelines and safety traffic engineering principles are to be provided.

F. Problem Reporting - Local procedures will be negotiated for problem reporting, e.g., car lights left on, lights out on parking lots, damaged or obstructed signs, etc.

G. The provision of electronic security measures and security fencing are subjects for local bargaining.

## Section 7 - Commute Options

A. The parties agree to explore alternative commuting options and to encourage their use.

B. The Department will make appropriate arrangements for employees to advertise ride-sharing opportunities.

C. Where possible, the Department will work closely with public transportation agencies to ensure the availability of public transportation to the facility with special emphasis on accommodating mobility impaired employees.

## Section 8 - Transit Subsidies

A. Transit subsidies are designed to encourage employees to use mass transportation in commuting to reduce air pollution, noise, and traffic congestion in metropolitan areas.

B. As provided in the VA Directive 0633, or successor document, and any applicable collective bargaining agreement, qualified employees shall receive a subsidy in the form of transit vouchers for purchase of "fare media" or reimbursement that must be used toward public transportation commuting costs. All eligible bargaining unit employees shall be provided the benefit allowed each employee by the Directive.

794

# ARTICLE 27 - PERFORMANCE APPRAISAL

## Section 1 - Overview

A. The Department will strive for continuous improvement in performance to fulfill the Department's commitment to providing quality customer service. Accomplishment of the mission is intended to be achieved within an environment that both recognizes the interdependence of employee contributions and promotes teamwork. Improvement in Department performance will be sought by analyzing work processes and correcting systemic problems and/or revising processes, as appropriate.

B. Through a strategic management process, goals will be established, measured, and monitored in a systematic manner. The results of performance appraisal may be used as a basis for recognizing and rewarding accomplishments, identifying developmental needs, and recommending appropriate personnel actions.

C. The purpose of an employee's performance appraisal is to provide a fair and equitable framework for honest feedback and open two-way communication between employees and their supervisors. The performance appraisal focuses on contributions within the scope of the employee's job description in achievement of the Department's overall mission. The performance appraisal process includes an annual written appraisal for each employee.

D. The parties share an interest in improving the performance of the Department's workforce. This shall be achieved by establishing elements and standards that link the employee's performance to the Department's mission; providing employees with frequent feedback; recognizing individual and group performance; customer service; establishing appropriate rewards for good performance; identifying areas for improved performance; and actions to accomplish that improvement.

E. The parties believe that the performance appraisal process, constructively used, is one of the most effective methods for optimizing the effectiveness of the Department's workforce. The Department has a very real responsibility for helping employees maximize his/her performance, which can be accomplished through constructive and positive performance evaluations.

F. The performance appraisal process will emphasize:

   1. Communication with employees on a continuing basis regarding their achievements and areas in which they could improve;

795

2. Employee and employee representative participation in the development of the program;

3. Employee development/evolution of the supervisor's role to coach (rather than being used as a disciplinary tool);

4. Continued performance improvement of the organization and its employees and assistance to employees in improving unacceptable performance;

5. Recognition of special contributions as part of or in addition to regular job duties.

G. An annual rating of "fully successful" assures employees of eligibility for award consideration, promotion consideration, and within grade increases and serves as a positive, tangible assertion that the employee is meeting his/her job requirements.

H. The performance appraisal process as set forth in this article is intended to be innovative and evolutionary in nature. Its effectiveness is critical to the Department achieving its mission.

## Section 2 - Definitions

A. Appraisal

The process under which performance is reviewed and evaluated.

B. Appraisal Period

The established period of time for which performance will be reviewed and a rating of record will be prepared.

C. Critical Element

A work assignment or responsibility of such importance that unacceptable performance on the element would result in a determination that an employee's overall performance is unacceptable. Such elements shall be used to measure performance only at the individual level. Performance plans must contain at least one critical element that must be used in deriving a summary rating.

D. Non-Critical Element

A dimension or aspect of individual, team, or organizational performance, exclusive of a critical element, that is used in assigning a summary level. Such elements may include, but are not limited to, objectives, goals, programs plans, work plans, and other means of expressing expected performance. Performance plans must contain at least one non-critical element that must be used in deriving a summary rating.

796

E.  Minimum Appraisal Period

The 90 day period during which an employee must have performed under communicated performance elements and standards that may result in a performance rating.

F.  Performance

The accomplishment of work assignments or responsibilities.

G.  Performance Plan

All written or otherwise recorded, performance elements that set forth expected performance.  A plan must include all critical and non-critical elements and their performance standards.

H.  Performance Rating

The written or otherwise recorded appraisal of performance compared to the performance standard(s) for each critical and non-critical element on which there has been an opportunity to perform for the minimum period.

I.  Performance Standard

The management-approved expression of the performance threshold(s), requirement(s), or expectation(s) that must be met to be appraised at a particular level of performance.  A performance standard may include quality, quantity, timeliness, and manner of performance.  Performance standards can be written for more than one level of achievement where appropriate.  However, performance standards must be written at least at the fully successful achievement level.

J.  Progress Review

 A face-to-face meeting with employee(s), at least once during the appraisal period, about their performance.  Such a meeting usually occurs during the mid point period.

K.  Rating Official

The Department official who rates an employee's performance.  Normally, the Rating Official shall be the immediate supervisor.

L.  Rating of Record

The performance rating prepared at the end of the appraisal period for performance of assigned duties over the entire period and the assignment of a summary level.  This constitutes the official rating of record as defined in 5 CFR Part 430.

M.  Underline{Special Rating of Record}

A performance rating prepared at the end of the minimum 90 day period of performance, used in limited circumstances to document current performance as a basis of a personnel action.

N.  <u>Summary Ratings</u>

The record of the appraisal of each critical and non-critical element and the assignment of an overall rating.  These ratings will be assigned in accordance with the following criteria:

1.  Outstanding.  The achievement levels for all elements are designated as Exceptional.

2.  Excellent.  The achievement levels for all critical elements are designated as Exceptional.  Achievement levels for non-critical elements are designated as at least Fully Successful.  Some, but not all non-critical elements may be designated as Exceptional.

3.  Fully Successful.  The achievement level for at least one critical element is designated as Fully Successful.  Achievement levels for other critical and non-critical elements are designated as at least Fully Successful or higher.

4.  Minimally Satisfactory.  The achievement levels for all critical elements are designated as at least Fully Successful.  However, the achievement level(s) for one (or more) non-critical elements is (are) designated as Less Than Fully Successful.

5.  Unsatisfactory.  The achievement level(s) for one (or more) critical elements is (are) designated as Less Than Fully Successful.

**Section 3 - Policy**

A.  In its entirety and application, the performance appraisal process will to the maximum extent feasible, be fair, equitable, and strictly related to job performance as described by the employee's job description.

B.  Conduct unrelated to job performance shall not be considered in measuring an employee's performance.

C.  Performance appraisals shall be fair and objective.  They shall measure actual work performance over the entire rating period in relation to the performance requirements of the positions to which employees are assigned.  Regardless of the source(s) of information used for performance appraisal, such information will be collected, used, and maintained in accordance with the Privacy Act.

798

D. Union officials who are granted official time for representational activities under Article 48 - Official Time, will not be penalized in their performance appraisals for such use of official time. Their performance of duties shall be evaluated against assigned elements and performance standards for the time they were available to perform their duties. The use of official time, in accordance with this Agreement, shall not influence an employee's performance evaluation in any way. If an employee union official spends 100% on official time or does not spend a sufficient amount of time in the performance of regular duties during a performance period to be fairly rated against the performance standards, the employee's performance evaluation for the appraisal period will reflect that they were not given a rating for that performance appraisal period. For the purposes of personnel actions where a rating of record is necessary the last rating of record will be used.

### Section 4 - Performance Management Responsibilities

Performance management responsibilities:

A. Appropriate Department officials shall be responsible for:

1. Providing supervision and feedback to employees on an on-going basis with the goal of improving employee performance.

2. Nominating deserving employees for performance awards.

B. Employees are responsible for:

1. Performing the duties outlined in his/her position description and performance elements.

2. Promptly notifying supervisors about factors that interfere with his/her ability to perform his/her duties at the level of performance required by his/her performance elements.

### Section 5 - Performance Standards

A. Objective criteria will be used to the maximum extent feasible in establishing and applying performance standards and elements. The rating official will establish and communicate in writing to employee(s) critical and non-critical elements and performance standards, at the beginning of the appraisal period (normally within 30 days). After initial issuance of critical and non-critical elements and performance standards, the elements and standards will be provided annually, thereafter. All aspects of the performance plan, including numerical standards, measurement indicators, priorities, and weightings, if applicable, will be communicated in writing to the affected employees at the time the employees receive his/her performance elements and standards. The local union may provide input

799

into any changes to performance standards and/or establishment of new performance standards.

B. Whether or not more than one level is defined, the rating official will provide the employee with information that is adequate to inform him/ her of what is necessary to reach an "Exceptional" level on each element. Additional information regarding performance expectations can be in the form of written instructions, work plans, records of feedback sessions, responses to employee questions concerning performance, memoranda describing unacceptable performance, or any reasonable manner calculated to apprise the employee of the requirements against which he/ she is to be measured. This additional specification should be sufficient to assist the employee in achieving the "Exceptional" level.

C. Performance standards and elements to the maximum extent feasible shall be reasonable, realistic, attainable, and sufficient under the circumstances to permit accurate measurement of an employee's performance, and adequate to inform the employee of what is necessary to achieve a "Fully Successful" level of achievement. Performance standards that assess an employee's manner of performance must be job related, documented, and measurable. There must be a nexus between the expected manner of performance and the expected job results.

D. Performance standards must be written at least at the Fully Successful achievement level. However, standards can be written for more than one level of achievement where appropriate.

E. The local union shall be given reasonable written advance notice (no less than 15 calendar days) when the Department changes, adds to, or establishes new elements and performance standards. Prior to implementation of the above changes to performance standards, the Department shall meet all bargaining obligations.

F. To the maximum extent feasible, performance standards shall be defined in terms of objective criteria. In addition, they shall be defined in the terms of criteria that are observable, measurable, fair and job-related. Performance measures in terms of quality, quantity or timeliness, must provide a clear means of assessing whether objectives have been met.

G. Employees will be evaluated based on a comparison of performance with the standards established for the appraisal period. Elements and standards shall be based on the requirements of the employee's position.

H. Normally, elements are not weighted or assigned different priorities. However, the Department will inform the employee, at the time the elements and standards are communicated, whether aspects of any job elements are to be accorded different priority. If the elements, standards,

800

or priority changes, that change(s) will be communicated to the employee when it becomes effective.  In addition, each time an employee is assigned to a new position, the Department shall communicate the specific elements and performance standards, and any differing priority of the position that will apply to the employee.

I.  When the Department mandates national performance standards, all bargaining obligations with the Union shall be met at the national level.

## Section 6 - Communications

A.  An orientation briefing will be provided to all new employees entering on duty, and there will be an oral discussion to explain, clarify, and communicate the employee's job responsibilities as articulated in the employee's PD and/or performance plan.  The purpose of this discussion is to ensure that there is a clear and common understanding of the duties and responsibilities contained in the employee's PD and/or performance plan.

B.  Orientation sessions shall be held when there is a change in the work situation.  Examples may include, but are not limited to:

   1.   A change in the supervisor of record;

   2.   When the employee is detailed;

   3.   A change in the work unit's goals, objectives, or work processes;

   4.   A change in assignments; or

   5.   When an employee returns from an extended absence.

C.  Normally within 30 days after entry into the position or when an employee's PD or performance plan is changed, employees shall receive a copy of the PD and the performance plan.  Employees shall be advised of the major tasks and responsibilities of their jobs, including which are critical and non-critical, and any priority and weighting for the elements.

D.  The rating official will assure that the employee has an up-to-date PD, access to up-to-date copy of the Department's mission and goals and, if applicable, the career ladder plan, and will initiate a dialogue with the employee to discuss the employee's duties and responsibilities in relation to the organizational unit's goals and the Department's mission.  Employees are encouraged to bring training or developmental needs to the attention of the supervisor.

E.  At the beginning of each rating period and when changes are made to performance standards the Department agrees that the supervisory personnel shall meet with their employees to discuss new or revised critical and non-critical elements and standards; however, if the elements have not

801

changed, the supervisor shall communicate to them that the critical and non-critical elements will remain the same for the appraisal period.  Critical and non-critical elements and standards can change, among other cases, when an employee moves from one level in a career ladder position to another level.  The purpose of the meeting shall be to clarify any questions that the employees have concerning their performance standards (for example, explanations or examples of what employees must do to perform at each level).  Any questions left unanswered during the meetings referenced above will be responded to within one week of the end of the meeting.  If questions remain from a group meeting, the entire group shall be informed of the response.

### Section 7 - Uses of the Performance Appraisal Process

A. The performance appraisal process is used for making a basic determination that an employee is meeting their job requirements.  It is also the basis for making certain personnel-related decisions.

B. Within-Grade Increase - An employee who has attained a rating of "Fully Successful" and has achieved an "acceptable level of competence" will be entitled to appropriate within-grade increases.

C. A rating of "Fully Successful" will be used as the initial factor in determining basic eligibility for consideration of awards, promotions, and other personnel actions.

D. Each element in the employee's performance plan will be rated with one of the following "Levels of Achievement:"

   1. Exceptional

   2. Fully Successful

   3. Less Than Fully Successful

E. Performance standards will be written at the "Fully Successful" level of achievement.  Supervisors may elect to write standards at levels other than the "Fully Successful" achievement level, or to provide other guidance on how to exceed performance expectations.

F. In general, an "Exceptional" level of achievement means that all "Fully Successful" performance standards for the element are significantly surpassed.  This level is reserved for employees whose performance in the element far exceeds normal expectations and results in significant contributions to the organization.

G. An "Outstanding" summary rating is attained when the achievement levels for all elements are designated as "Exceptional." An "Excellent" summary rating is attained when the achievement levels for critical elements are

802

designated as "Exceptional" and the achievement levels for non-critical elements are designated as at least "Fully Successful." Employees who want to achieve the "Exceptional" achievement level on one or more of their elements are encouraged to talk with their supervisor about appropriate stretch goals for each element in question.

H.  Any employee receiving an "Outstanding" performance rating shall be eligible to receive an award.

I.  Any employee receiving an "Excellent" performance rating shall be eligible to receive an award.

J.  Any employee receiving a "Fully Successful" performance rating shall be eligible to receive an award.

### Section 8 - Process

A.  All bargaining unit employees will receive an annual performance appraisal for the period October 1 through September 30, or other dates agreed to by the national parties, thereby certifying that the job duties and responsibilities have been performed at an acceptable level.  The evaluation will be issued in writing to the employees within 60 calendar days of the end of the appraisal period.  Employees new to the Department (with less than 90 calendar days) as of October 1, will receive a delayed evaluation upon completion of the 90 calendar days.

B.  If there is a change from one permanent position to another during the last ninety days of the appraisal year, the special rating of record becomes the rating of record for the appraisal period.  The employee's existing rating shall be used as the rating of record until a rating of record is prepared.  Ratings for periods of time which are less than the full annual appraisal period will be so noted.  Ratings of record must be postponed or delayed as required in 5 CFR 430 and 531.

C.  The employee self-assessment is a critical source of employee performance information and can contribute to improved communication between supervisors and employees.  An employee who chooses to prepare such assessment shall be granted a reasonable amount of time to document the accomplishment and prepare the assessment.  The employee shall submit that self-assessment to their immediate supervisor within 10 working days after the end of the appraisal cycle.

D.  Employees should be aware that their self-assessment/input is essential to the appraisal process.  Employees are strongly encouraged to provide information to the rating official that can be used to supplement the rating official's knowledge concerning their performance and contributions to the mission of the Department.  Employees who wish to do self-assessments

under this section will be given appropriate guidance to help them prepare a performance self-assessment.  The guidance will be provided during duty time and structured around their performance plan.

E.  When evaluating performance, the Department shall not hold employees accountable for factors which affect performance that are beyond the control of the employee.  All changes in working procedures must be communicated to employees before they can be charged with errors.  If the initial instruction was communicated in writing, the change should also be communicated in writing.

F.  The fact that an employee assumes new tasks, receives new elements, changes positions, is a trainee, or gets promoted does not create a presumption that their performance may not be exceptional or otherwise deserving of recognition or an award.  Rather, each employee's appraisal shall be strictly based on their performance against those elements that apply during the relevant appraisal cycle.

## Section 9 - Progress Reviews and Informal Discussions

A.  Ongoing appraisal - An appraisal program shall include methods for appraising each critical and non-critical element during the appraisal period.  Performance on each critical and non-critical element shall be appraised against its performance standard(s).  Ongoing appraisal methods shall include, but not be limited to, conducting one or more progress reviews during each appraisal period.

B.  Supervisors will conduct at least one mid-point formal progress review with each employee and document the results of the review.

C.  The purpose of the progress review is to exchange information concerning the performance of the employee as compared to the established elements and standards.  In this review, employees are encouraged to discuss information which impacts on their performance.  The supervisor shall notify an employee of adverse information when he/she becomes aware of it; information not provided to the employee at that time shall not be used to adversely affect the employee's performance appraisal.  The review may include identification and consideration of any formal or informal training felt to be helpful in aiding the employee to accomplish his/her performance plan.

D.  Informal discussions are a standard part of supervision and should occur throughout an appraisal period.

   1.  Discussions may be initiated by the supervisor or employee. Discussions may be held one-on-one or between a supervisor and a work group.

804

2. Discussions should be candid, forthright dialogues between the supervisor and employee(s) aimed at improving the work product. Discussions will provide the opportunity to assess accomplishments and progress and identify and resolve any problems in the employee's or work team's work product. Where indicated, the supervisor shall provide additional guidance aimed at developing the employee(s) and improving the work product or outcome. Discussions will provide the employee the opportunity to seek further guidance and understanding of his/her work performance.

3. Informal discussions may become formal, depending on the circumstances.

### Section 10 - Performance Improvement Plan (PIP)

A. If the supervisor determines that the employee is not meeting the standards of his/her critical element(s), the supervisor shall identify the specific, performance-related problem(s). After this determination, the supervisor shall develop in consultation with the employee and local union representative, a written PIP. The PIP will identify the employee's specific performance deficiencies, the successful level of performance, the action(s) that must be taken by the employee to improve to the successful level of performance, the methods that will be employed to measure the improvement, and any provisions for counseling, training, or other appropriate assistance. In addition to a review of the employee's work products, the PIP will be tailored to the specific needs of the employee and may include additional instructions, counseling, assignment of a mentor, or other assistance as appropriate. For example, if the employee is unable to meet the critical element due to lack of organizational skills, the resulting PIP might include training on time management. If the performance deficiency is caused by circumstances beyond the employee's control, the supervisor should consider means of addressing the deficiency using other than a PIP. The parties agree that placing the employee on 100% review alone does to not constitute a PIP.

B. The PIP will afford the employee a reasonable opportunity of at least 90 calendar days to resolve the specific identified performance-related problem(s). The PIP period may be extended.

C. Ongoing communication between the supervisor and the employee during the PIP period is essential; accordingly, the supervisor shall meet with the employee on a bi-weekly basis to provide regular feedback on progress made during the PIP period. The parties may agree to a different frequency of feedback. The feedback will be documented in writing, with a copy provided to the employee. If requested by the employee, local union representation shall be allowed at the weekly meeting.

805

D. The goal of this PIP is to return the employee to successful performance as soon as possible.

E. At any time during the PIP period, the supervisor may conclude that the employee's performance has improved to the Fully Successful level and the PIP can be terminated. In that event, the supervisor will notify the employee in writing, terminate the PIP, and evaluate the employee as Fully Successful or higher.

F. In accordance with 5 CFR 432.105 (a) (2), if an employee has performed acceptably for one year from the beginning of an opportunity to demonstrate an acceptable performance (in the critical element(s) for which the employee was afforded an opportunity to demonstrate acceptable performance), and the employee's performance again becomes unacceptable, the Department shall afford the employee an additional opportunity to demonstrate acceptable performance before determining whether to propose a reduction in grade or removal.

## Section 11 - Performance-Based Actions

A. Should all remedial action fail and the employee's performance is determined to be unacceptable, the supervisor will issue a rating of unacceptable performance to the employee. One of the following actions will be taken: reassignment, reduction to the next lower appropriate grade, or removal.

B. An employee who is reassigned or demoted to a position at a lower grade shall receive a determination of his/her standing after 90 calendar days in the new position.

C. A notice of reassignment for performance reasons shall contain an explanation of the reasons why training had been ineffective or inappropriate. When a reassignment is proposed in these instances, the following shall apply:

   1. The reassignment shall be to an available position for which the employee has potential to achieve acceptable performance;

   2. The employee shall receive appropriate training and assistance to enable the employee to achieve an acceptable level of performance in the position;

   3. The reassignment shall be within the commuting area of the employee's current position; and

   4. The reassignment shall be at the grade and step level equal to that of the position held by the employee prior to the reassignment.

D. An employee whose reduction in grade or removal is proposed for unacceptable performance is entitled to:

806

1. Thirty calendar days' advance written notice of the proposed action which identifies both the specific instances of unacceptable performance by the employee on which the proposed action is based, and the critical element(s) of the employee's position involved in each instance of unacceptable performance;

2. A reasonable time, not to exceed 20 calendar days, to answer orally and in writing;

3. A reasonable amount of authorized time up to eight hours, to prepare an answer (additional time may be granted on a case-by-case basis);

4. The employee and/or his/her representative will be provided with a copy of the evidence file.

E. An official who sustains the proposed reasons against an employee in an action based on unacceptable performance will set forth his/her reasons for the decision in writing.

F. The employee will be given a written decision which:

1. Specifies the instances of unacceptable performance on which the decision is based; and

2. Specifies the effective date, the action to be taken, and the employee's right to appeal the decision.

G. The final decision in the case of a proposed action to either remove or downgrade an employee based on unacceptable performance shall be based on those instances which occurred during the 1-year period ending on the date of the notice proposing the performance-based action.

H. The decision shall inform the employee of their right to appeal to either the Merit Systems Protection Board (MSPB) in accordance with applicable laws or to file a grievance under the negotiated grievance procedure.

# ARTICLE 28 - REDUCTION IN FORCE

### Section 1 - Purpose

The Department and the Union recognize that unit employees may be seriously and adversely affected by a Reduction in Force (RIF), staffing adjustment (Title 38), reorganization, or transfer of function action.  The Department recognizes that attrition, reassignment, furlough, hiring freeze, and early retirement are among the alternatives to RIFs that may be available.  This article describes the exclusive procedures the Department will take in the event of a RIF, reorganization, or transfer of function as defined in this article.  It is also intended to protect the interests of employees while allowing the Department to exercise its rights and duties in carrying out the mission of the Department.

### Section 2 - Applicable Laws and Regulations

For purposes of Title 5 employees, the policy, procedures, and terminology described in this article are to be interpreted in conformance with 5 USC 3501-3504, 5 CFR Part 351, 29 CFR 1613.203, and other applicable government-wide laws and regulations.  For purposes of Title 38 employees, the policies, procedures, and terminology of this article are to be interpreted in conformance with VA Directive and Handbook 5111.  Either party may reopen Directive and Handbook 5111 within one year with proper notice.  Any successor to the Directive and Handbook or changes or revisions to this document will be developed through the predecisional involvement of the Union and subject to collective bargaining.

### Section 3 - Application

The Department agrees to fairly and equitably apply this article and any laws or regulations relating to any matter in this article.

### Section 4 - Union Notification

A.  Directors of VA facilities shall be responsible for properly notifying the Union in conjunction with any of the actions described in this article.

   1.  A facility-based action affecting the interests of one local union shall require notice to the President of that local.

   2.  A facility-based action affecting the interests of two or more local unions shall require notice to a party designated by the Union.

B.  For actions covered by this article, the Department agrees to notify the Union as described in Paragraphs A 1 and A 2 in this section at the earliest possible date but no later than 90 calendar days prior to the effective date.

808

C.  All notices per Sections A and B above will be given prior to any notice to affected unit employees.  Verbal notices will be confirmed in writing.

D.  A properly constructed notice to the Union under this section shall consist, at a minimum, of the following information:

   1.  The reason for the action;

   2.  The approximate number, types, and geographic location of position affected; and,

   3.  The approximate date of the action.

## Section 5 - Definitions

For the purpose of this article, the following terms are defined in law and regulations and are included for informational purposes:

A.  Reduction-In-Force (RIF)

   When the Department releases a competing employee from his/her competitive level by furlough for more than 30 days, separation, demotion, or reassignment requiring displacement, when the release is required because of lack of work, shortage of funds, insufficient personnel ceiling, reorganization, the exercise of reemployment rights or restoration rights, or reclassification of an employee's position due to erosion of duties when such action will take effect after the Department has formally announced a RIF in the employee's competitive area and when the RIF will take effect within 180 days.

B.  Transfer of Function

   The transfer of the performance of a continuing function from one competitive area and its addition to one or more other competitive areas or the movement of the competitive areas in which the function is performed to another commuting area is known as a transfer of function.

C.  Reorganization

   A reorganization is the planned elimination, addition, or redistribution of functions or duties in an organization or activity.

D.  Title 38 Staffing Adjustments

   Changes resulting in a reduction of full-time Title 38 staff may occur through separation or reassignment to other facilities or other commuting areas, changes in assignment or reassignment within the facility, and changes to a lower grade or pay based on changes in staffing levels or patterns of at least one full-time permanent Title 38 employee.

E. Competitive Area

An area in which employees compete for retention is known as a Competitive Area. A competitive area must be defined solely in terms of the Department's organizational services or units and geographical location, and it must include all employees within the competitive area as defined.

F. Competitive Level

Positions in a competitive area that are in the same grade (or occupational level) and classification series that are so alike in qualification requirements, duties, responsibilities, pay schedule, and working conditions that the incumbent of one position can successfully perform the critical elements of any other position in the level upon assignment to it, without loss of productivity or undue interruption is known as competitive level. Competitive levels for Title 38 employees will be determined in accordance with VA Directive and Handbook 5111.

## Section 6 - Freezing of Vacancies

The Department will freeze all relevant vacant positions within the facility 60 days prior to the effective date of a RIF. When the Department decides to fill a vacant position after the effective date of the RIF, whether previously frozen by virtue of RIF or in the creation of new vacancies, employees who have been demoted will be offered the vacancy, provided the employee is qualified or has been given a waiver of qualifications for the intended position. Employee entitlement to this special consideration shall be determined in accordance with Section 24 of this article.

## Section 7 - Employee Notification

An individual employee who is adversely affected by actions stated in this article shall be given a specific notice not less than 60 days prior to the effective date of the action. All such notices shall contain the information required by the OPM regulations in addition to the information required by this article.

## Section 8 - Content of Notices

The content of the specific notice shall include the following information:

A. The specific action to be taken;

B. The effective date of action;

C. The employee's competitive area, competitive level, subgroup and service date, and the annual performance ratings of record for the applicable three years;

810

D.  The place where the employee may inspect the regulations and records pertinent to his/her case;

E.  The reasons for retaining a lower standing employee in the same competitive level because of a continuing exception;

F.  Grade and pay retention information; and,

G.  The employee's grievance or appeal rights.

## Section 9 - Employee Information

The Department shall provide complete information needed by employees to fully understand the action and why they are affected.  At a minimum, the Department shall:

A.  Inform all employees as fully and as soon as possible of the plans or requirements for actions in accordance with applicable rules and regulations;

B.  Inform all employees of the extent of the affected competitive area, the regulations governing such action, and the kinds of assistance provided to affected employees;

C.  Maintain and publicize a list of vacancies Department-wide and maintain a copy of the government-wide job bulletins, such as Federal Jobs or Federal Research Service; and,

D.  Conduct a placement program within the Department to minimize the adverse impact on employees who are affected by RIF.  The placement program will include counseling for employees by qualified personnel on opportunities and alternatives available to affected employees.

## Section 10 - Personnel Files

The Union may review any bargaining unit employee's eOPF at an employee's request in writing if the employee believes that the information used to place him/her on the register is inaccurate, incomplete, or not in accordance with laws, rules, regulations, and provisions of this article.

## Section 11 - Records

The Department will maintain all lists, records, and information pertaining to actions taken under this article for at least two years in accordance with applicable rules and regulations.

## Section 12 - Retention Register

The Department will state in writing that to the best of its knowledge the retention register is accurate as of the date it was developed. A copy of the retention register will be made available to the Union at the earliest possible time.

## Section 13 - Employee Use of Authorized Time and Department Facilities

A. Employees who are identified for transfer of function, separation, or change to a lower grade as a result of RIF under this article shall be entitled to reasonable time while otherwise in a duty status without charge to leave for:

1. Preparing, revising and reproducing job resumes and/or job application forms;

2. Participating in employment interviews;

3. Using the telephone to locate suitable employment; and,

4. Reviewing job bulletins, announcement, etc.

B. Such employees will also be entitled to reasonable use of the following facilities and/or services for the purpose of locating suitable employment: telephone, reproduction equipment, interagency messenger mail, e-mail, typing, and counseling.

## Section 14 - Performance Appraisals

Except for employees who are re-rated after a period allowed in 5 CFR Part 432, annual performance appraisals for purpose of retention standing will be frozen 60 days prior to the effective date of the action. The three latest annual appraisals of record prior to the freeze will be used to determine eligibility for additional credit toward an employee's service computation date. To be credited under this section, an appraisal must have been issued to the employee with all appropriate reviews and signatures and must be on record.

## Section 15 - Release from Competitive Level

When an employee is to be released from his/her competitive level, the "best offer" is made. The offer will be as close to the employee's current grade as possible and in the same commuting area if possible.

## Section 16 - Employee Response to Specific Notice

Upon receipt of specific notice notifying the employee that he/she is offered a reassignment or change to lower grade or will be released from his/her competitive level, the employee shall have the 14 days specific notice period in which to accept or reject the offer made. If a position with a higher representative rate or grade (but not higher than the rate or grade of the employee's current position) becomes available on or before the effective

812

date of the RIF, the Department will make the better offer to the employee. However, making the better offer will not extend the 60 day notice period.

### Section 17 - Reassignment to a Different Geographic Area

Dislocation of employees outside of their commuting area shall be avoided when the Department has alternatives.  When the Department is not able to place an employee within the local commuting area and the employee is reassigned to another geographic area, such action will be considered to be in the best interest of the government.  The employee's relocation expenses shall be at government expense and reimbursed at the authorized rates.

### Section 18 - Relocation Trips

When the Department assigns an employee to a position requiring a move to another geographic area, the employee will be granted administrative leave and/or excused absence, as appropriate, to locate housing and make related arrangements at the new work location.  The employee shall be placed in travel status for such trips and shall receive travel and per diem reimbursement at the authorized rates.

### Section 19 - Time Allowed for Relocation

Employees reassigned to a different commuting area who relocate will be allowed a period of time, as appropriate, to complete the move and report to work at the new work location.

### Section 20 - Displaced Employees

The Department shall provide any employee to be separated by RIF or transfer of function with the appropriate information regarding unemployment benefits available to them.

### Section 21 - Details

Employees on detail will not be released during a RIF from the position to which they are detailed but, rather, from the affected employee's permanent position of record.

### Section 22 - Transfer of Function

A.   When a transfer of function occurs, the Department will first solicit qualified volunteers for transfer from among those employees in positions that have been identified for transfer.  If there are not enough qualified volunteers from among these affected employees, the Department will solicit qualified volunteers from the competitive area.

813

B. If the total number of employees who volunteer for transfer exceeds the total number of employees required to perform the function in the competitive area that is gaining the function, preference will be given to the volunteers with the highest retention standing. In the event there are not enough volunteers for the transfer, the employee with the lowest retention standing will be selected.

C. Whenever possible, affected employees who do not volunteer to be transferred shall be reassigned to vacant positions within the competitive area for which the employee is qualified and which the Department has determined to fill.

### Section 23 - Repromotion Rights of Affected Employees

For a period of two years, affected employees demoted by an action covered by this article will be re-promoted to vacancies as they occur according to the following criteria:

A. The Department determines to fill the vacancy;

B. The employee has the requisite skills and abilities for the position without undue interruption; and,

C. Another qualified employee does not have a higher retention standing.

### Section 24 - Reemployment Priority Rights of Affected Employees

Career and career-conditional employees who have received a specific RIF notice and have not declined a valid job offer at a rate lower than the current grade will be entered on the Department's Reemployment Priority List (RPL) for the commuting area in which they are qualified and available. Department components must use the RPL in filling vacancies before offering employment to an individual from inside or outside the Department (with some exceptions for veterans). Career employees may remain on the list for two years and career conditional employees for one year from the date of separation unless removed earlier through placement or declination of an offer.

814

# ARTICLE 29 - SAFETY, HEALTH, AND ENVIRONMENT

### Section 1 - General

A. The parties recognize that a safe and healthful work environment is valued by the Department; is necessary for the accomplishment of the Department's missions; and contributes to a high quality of life for the employees. It shall be the responsibility of the Department to establish and maintain an effective and comprehensive Occupational Safety and Health Program (Program) in accordance with Public Law 91-596, the Occupational Safety and Health Act of 1970 (referred to as the Act), Executive Order 12196, 29 CFR Part 1960 (and all its sub parts along with Directives and the VA Handbooks 7700 and 7700.1) and, 29 CFR 1904 (Occupational Safety and Health Administration (OSHA) Recordkeeping Provision for Federal Employees). In administering the program, the Department agrees to recognize the Union as the exclusive representative of bargaining unit employees. The Department shall furnish places and conditions of employment which are free of recognized hazards and unhealthful working conditions.

B. The Department will abate recognized hazards that are causing or are likely to cause death or serious harm and protect employees in the interim.

C. Specific procedures for preventing and abating safety and health hazards will be jointly developed with the Union through the National, Intermediate, and Local Safety committees.

### Section 2 - National Safety and Health Committee

The Union will have representation for each of the administrations that is a part of the Department Safety and Health Committee. Bargaining unit employees who spend time on the National Safety and Health Committees initiated by the Department in a nonrepresentational capacity will be on duty time. Bargaining unit employees serving in a union representational capacity will be on official time. This official time will not be counted against any allocated official time as described in this agreement. The Department shall pay for all meeting related travel expenses as well as per diem. The parties shall exchange agenda items as far in advance as possible of the meeting so that travel and per diem may be arranged.

### Section 3 - Union Participation

A. The Union President will designate five National Safety and Health Representatives who will each be on 50% official time. They will work with the Department's national-level safety and health officials in developing and implementing the Program. The National Safety and

Health Representatives will represent the interests of the Union and the employees in the development and implementation of all aspects of the Department's and Administrations' occupational safety and health program. The National Safety and Health Representatives will be the points of contact for any safety and health initiatives at the Department, Administration, and/or System levels that impact employee safety and health. The parties will develop joint training programs and materials in safety and health for bargaining unit employees. The representatives will provide training and assistance to local unions in the performance of their responsibilities under the Program. The National Safety and Health Representatives may visit facilities within the bargaining unit to work with local unions on safety and health matters. Notice of such visits will be given to the Director of each facility.

B.  The Department recognizes that Union participation in its Occupational Safety and Health Program is essential for the success of that Program. The Union may designate representatives at the facility level, intermediate levels, and the National level who will represent the interests of the Union and the employees in the development and implementation of this Program. The parties agree that work on the Safety and Health Program is a part of the ongoing Partnership between the Department and the Union. Time spent serving as a Union representative during safety and health inspections, as a member of a Safety and Health Committee or its subcommittees, developing plans for abatement of materials, investigating accidents, and safety-related committee assignments will be considered duty time.

C.  The National Safety and Health Representatives will be given copies of all Designated Agency Safety and Health Official (DASHO) letters and other national-level communications to the field on safety and health matters as well as all safety manuals and publications. The DASHO written correspondence and reports will include the Department's goals and objectives annually for reducing and eliminating occupational accidents, injuries, and illnesses. The report should include the plans and procedures for evaluating VBA, NCA, and VHA occupational safety and health programs and their effectiveness at all operational levels.

D.  The Department will pay tuition, travel, and per diem expenses for each National Safety and Health Representative to attend at least one conference each year.

E.  The NVAC President may designate additional representatives to work on individual projects of mutual interest to the parties. The NVAC President may designate representatives at the National or appropriate intermediate levels within the Department to develop and implement the Safety and Health Program at that level.

816

F. The Union's National, Intermediate, and local union Safety and Health Representatives will be authorized the use of long distance communications and conference call capabilities.

G. Each local union at a bargaining unit facility may designate a local Safety and Health Representative who will serve as the local union's point of contact for safety and health matters at the facility. Functions of local Safety and Health Representatives include, but are not limited to the following:

1. Conduct joint inspections;

2. Issue joint reports regarding inspection findings to the appropriate Department official;

3. Participate, as appropriate, in inspections conducted by governmental authorities outside the Department's control including Joint Commission;

4. Receive and investigate employee reports of unsafe or unhealthy conditions (employees should submit such reports to both the local union's and Department's representatives);

5. Develop and monitor abatement plans needed to correct local conditions as appropriate (all personnel subject to the hazard shall be advised of the action and of the interim protective measure in effect and shall be kept informed of the subsequent progress on the abatement plan. To document receipt, the completed Abatement Plans will be jointly signed by the local union's Safety Representative and a representative from the Department);

6. Refer matters to Environmental Protection Agency (EPA), OSHA and/ or National Institute for Occupational Safety and Health (NIOSH) as appropriate;

7. Receive copies of any written notice referred by a facility official in response to an employee report of an unsafe or unhealthy condition, in compliance with 29 CFR 1960 time limits;

8. Monitor preventive maintenance plans for Heating, Ventilating, and Air Conditioning (HVAC) system components;

9. Receive all reports of security incidents involving threats to employees, their offices, and property (such reports may be sanitized as appropriate);

10. Receive all accident reports (such reports may be sanitized as appropriate).

H.  Each facility with 25 or more employees will have an Occupational Safety and Health and Fire Prevention Committee (Committee) in accordance with 29 CFR 1960 and all its subparts.

I.  The local union will be afforded representatives on such Committees, the number of which is subject to local negotiation. The facility's Committee may establish subcommittees to address particular issues or subjects, and the local union will be represented on each subcommittee. The local union will be given the opportunity to have a representative on any other facility-level committee that relates to the safety and health issues of bargaining units. These will include, but not be limited to, Blood Borne Pathogens and Infection Control Committees.

J.  The local union will be given the opportunity to participate in all scheduled workplace inspections which are intended to detect hazards to employee safety and health, whether conducted by Department Safety and Health personnel, non-Department employees acting on behalf of the Department, OSHA and EPA personnel, or other regulatory agencies and bodies.

### Section 4 - Standards

A.  The Department shall comply with Occupational Safety and Health Standards issued under Section 6 of the Act and/or where the Secretary of Labor has approved compliance with alternative standards in accordance with 29 CFR 1960 and all its sub-parts. The Department will notify the Union in accordance with Article 47 - Mid-Term Bargaining, prior to the submission of any alternate standards to the Secretary of Labor. On a case-by-case basis, the parties shall adopt more stringent safety and/or health standards to address specific concerns.

B.  Personal Protective Equipment (PPE), as required by appropriate OSHA standards to protect employees from hazardous conditions encountered during the performance of their official duties will be provided and replaced as necessary at no cost to employees required to wear specific PPE. Employees who are exposed to the hazards of outdoor environments, such as heat or extreme cold weather, will be provided appropriate PPE to OSHA recommendations. Some commonly needed types of PPE include, but are not limited to: safety glasses; steel-toed safety shoes/boots; SPF lotion; etc. Hazard assessments to determine the need for PPE will be conducted by each facility for each workplace. These assessments will also evaluate the need for and feasibility of engineering controls or other devices designed to reduce workplace injuries and illnesses or eliminate the need for PPE. These assessments will be documented and a copy provided to the local union. When assessments determine the appropriateness of PPE, affected employees will have the opportunity to choose from available and

818

appropriate styles and sizes to optimize employee comfort and protection. Employees will receive training on the proper use and care of PPE.

C. Consistent with 5 CFR 1910.132, the Department shall provide training to those employees who are required by this section to use PPE and shall certify in writing that the training was provided.

D. Nothing in this section precludes local level negotiations.

**Section 5 - Report, Evaluation, and Abatement of Unsafe and Unhealthful Working Conditions**

A. Any employee, group of employees, or representatives of employees who believe that an unsafe or unhealthful working condition exists in any workplace has the right to report such condition to the appropriate supervisor, the facility director, the appropriate Department Safety and Health official, and the Union. In the case of immediate threat to life or danger of serious physical harm, the employee shall immediately report the situation to the supervisor and/or facility Safety and Health personnel.

B. Facility Safety and Health personnel and local safety representatives will evaluate employee reports of unsafe or unhealthful working conditions in accordance with 29 CFR 1960. The local union will be formally notified of all hazards as defined in 29 CFR 1960.

C. The Department agrees to ensure prompt abatement of unsafe and unhealthful working conditions.

D. If there is an emergency situation in an office or work area, the first concern is for the employees and the public they serve. Should it become necessary to evacuate a building, the Department will take precautions to guarantee the safety of employees and the public. Individuals ordinarily will not be readmitted until it is determined in conjunction with whatever expert resources have been called in, depending on the circumstances, that there is no longer danger to the evacuated personnel. "Expert resources" may include, but are not limited to, local police departments, the Federal Protective Service, local fire departments, appropriate health authorities, etc. The local union Health and Safety Committee members or local union Health and Safety Representatives will be notified as soon as the Department becomes aware regarding the emergency situation.

E. In accordance with 29 CFR 1960, an abatement plan will be prepared if the abatement of an unsafe or unhealthy working condition will not be possible within 30 calendar days. Such plan shall contain a proposed timetable for the abatement and a summary of steps being taken in the interim to protect employees from being injured as a result of the unsafe or unhealthy working conditions.

F. When abatement action is dependent upon GSA or other lessors, the abatement must be prepared in conjunction with appropriate members of that group. The facility Health and Safety Committee will be timely notified and consulted, and all personnel subject to the hazard shall be advised of interim measures in effect and shall be kept informed of subsequent progress on the abatement plan.

G. Prior to the establishment of an official abatement plan, the Department shall take interim steps for the protection of the employees.

H. Any equipment, devices, structures, clothing, supplies, tools, or instruments that are found to be unsafe will be removed from service, locked-out, and/or tagged-out or rendered inoperative, as appropriate.

I. An employee and/or their representative submitting a report of unhealthful or unsafe conditions should be notified in writing within 15 days if the official receiving the report determines there are not reasonable grounds to believe such a hazard exists and does not plan to make an inspection based on such report. A copy of each such notification shall be provided by the Department to the appropriate certified safety and health committee, where established. The Department's inspection or investigation report, if any, shall be given to the employee and/or their representative 15 days after completion of the inspection, for safety violations, or within 30 days, for health violations, unless there are compelling reasons.

## Section 6 - Comprehensive Analysis of Injuries and Illnesses

A. The Department agrees that comprehensive analysis will be performed to determine causes and appropriate corrective actions concerning patterns of injuries and illnesses that occur at each facility. The analysis will examine such factors as: the general conditions under which the affected employee's job is performed; the processes and procedures involved in the performance of that job; and, any unusual factors that may have contributed to the injury or illness. Recommendations to correct the conditions that contributed to the injury or illness will be included in the written results of this analysis and presented to the facility safety committee.

B. Particular attention will be paid where patterns of injuries or illnesses are found in a given occupation, facility, or part of a facility. Experience in correcting hazards will be shared within the Department in an effort to find optimal ways of reducing injuries and illnesses.

C. The Department shall post a copy of its agency annual summary of federal occupational injuries and illnesses for a facility, as compiled pursuant to 29 CFR 1960.67 or 1960.69, at such facility, not later than 45 calendar days after the close of the fiscal year or otherwise disseminate a copy of the annual

820

summary for a facility in written form to all employees of the facility. Copies of the annual summary shall be posted for a minimum of 30 consecutive days in a conspicuous place or places in the facility where notices to employees are customarily posted. Where facility activities are physically dispersed, the notice may be posted at the location to which employees report each day. Where employees do not primarily work at or report to a single location, the notice may be posted at the location from which the employees operate to carry out their activities. Each federal agency shall take necessary steps to ensure that such summary is not altered, defaced, or covered by other material.

## Section 7 - Imminent Danger Situations

A. The term "imminent danger" means any conditions or practices in any workplace which are such that a danger exists which could reasonably be expected to cause death or serious physical harm immediately or before the imminence of such danger can be eliminated through normal procedures (29 CFR 1960.2(u)).

B. In the case of imminent danger situations, employees shall make reports by the most expeditious means available. Consistent with 29 USC 651 and 29 CFR Part 1960 the employee has a right to decline to perform his/her assigned tasks because of a reasonable belief that, under the circumstances, the task poses an imminent risk of death or serious bodily harm coupled with a reasonable belief that there is insufficient time to effectively seek corrective action through normal hazard reporting and abatement procedures. However, in these instances, the employee must report the situation to his supervisor or another supervisor who is immediately available.

C. If the condition can be corrected and the corrected condition does not pose an imminent danger, the employee must return to work. If the supervisor cannot correct the condition, the supervisor shall request an inspection by facility safety and/or health personnel.

D. A local union representative will be given the opportunity to be present during the inspection by the facility safety and/or health personnel. If facility safety and/or health personnel decide the condition does not pose an imminent danger, the instruction to return to work shall be in writing and contain a statement declaring the area or assignment to be safe. When this notification is given to the employee, the local union shall be notified in writing as well.

E. When the Department receives a report that a dangerous, unhealthful or potentially dangerous or unhealthful condition is present at a particular work site, the Department shall notify the Health and Safety Committee

821

and the local union Health and Safety representative(s) of the alleged dangerous or unhealthful condition.

### Section 8 - Training

A.  The Department shall provide safety and health training for employees, including specialized job safety training, appropriate to the work performed by the employee.  This training will address the Department's and the facility's Occupational Safety and Health Program, with emphasis on the rights and responsibilities of employees.

B.  The Department will provide basic and specialized safety and health training for Union Safety and Health Representatives.  In accordance with applicable law and regulations, the Department shall provide training for all duties commensurate with the scope of the responsibilities.

C.  The Union will participate in the development of safety and health training, including curriculum and training materials.

### Section 9 - Allegations of Reprisal

The Department agrees there will be no restraint, interference, coercion, discrimination, or reprisal directed against an employee for filing a report of an unsafe or unhealthful working condition or for participating in Department Occupational Safety and Health Program activities or because of the exercise by an employee on behalf of him/herself or others, of any right afforded by Section 19 of the Occupational Safety and Health Act, Executive Order 12196, or 29 CFR 1960.

### Section 10 - Work-Related Injuries and Illnesses

A.  Employees must report any and all injuries that are work-related to their supervisor.  The supervisor will take appropriate action to insure that:

   1.  The employee has the opportunity to report to the Employee Health Physician or his/her personal physician for treatment, completion of necessary reports, etc.

   2.  Appropriate facility personnel are promptly notified to ensure timely processing of necessary reports and employee claims.  The Department agrees that assistance will be given to employees in preparing necessary forms and documents for submission to the Office of Workers' Compensation Programs (OWCP) and those employees will be informed of their rights under the Federal Employees' Compensation Act, as amended in 1974.

B.  An employee who has sustained a work-related injury or illness will be required to perform duties only to the extent and limits as prescribed by

822

the treating physician or the Employee Health Physician, as appropriate. No employee will be assigned duties when, in the physician's opinion, this would aggravate the employee's injury or illness. In the event that the employee's supervisor does not have limited duty that meets the physician's stated limitations for the employee, the supervisor will make a good faith effort to locate limited duty work within the facility that the employee can perform. If limited duty is not available, the employee will be placed on continuation of pay, if eligible, or in an appropriate leave status at the employee's option. The local union may suggest limited duty opportunities at the facility. The Union has the right to represent any unit employee at any stage of this procedure (see Article 19 - Fitness for Duty).

C. Within seven calendar days after receiving information of an occupational injury or illness, appropriate information concerning such injury or illness shall be entered on the log. The record shall be completed within seven calendar days after the receipt of information that an occupational injury or illness has occurred.

D. Qualified inspectors must have sufficient documented training/experience in recognizing the particular safety and/or health hazard that they are inspecting (note 29 CFR 1960.25). At the request of the local union, the Department will certify in writing, by reference to classes/ experience, that the inspector is sufficiently competent to recognize and evaluate the particular safety and/or health hazard that they are inspecting, and to suggest general abatement procedures.

## Section 11 - Use of Insecticides/Chemicals

There will be no application of insecticides/chemicals during working hours. However, exceptions may be made in sensitive hospital areas. Such other chemicals include paint, carpet glue, HVAC cleaning agents, and similar construction or maintenance chemicals. Whenever pesticides are used in a large scale application, the Health and Safety representatives as well as employees will receive advance notice about the spraying. Individuals with special health needs will be reasonably accommodated.

## Section 12 - Leases

A. Prior to occupancy by any employee of space occupied by the Department, the Department will provide the local union a copy of the pre-occupancy inspection to identify possible hazards or serious violations of OSHA standards. All leases will comply with 29 CFR 1960.34 and 41 CFR Part 102. Careful consideration should be made by the Department to avoid incompatible groupings, e.g., chemical or biological laboratories in office space.

823

B. Pursuant to 29 CFR 1960.30(d), when a hazard cannot be abated before occupancy, the local union and all employees subject to the hazard shall be advised of the preliminary abatement plan and of interim protective measures in effect, and shall be kept informed of subsequent progress on the abatement plan.

C. These provisions are not a waiver of the local union's right to request additional information, consultation, and bargaining.

## Section 13 - Temperature Conditions

The parties recognize that temperature conditions in and around work areas can have a direct bearing on employees' health. As a part of an overall emergency contingency plan, supervisors who may have employees who are susceptible to heat or cold illness within their working environment will have a written plan for appropriate emergent cooling or heating procedures. The parties agree that the problem of temperature extremes, either hot or cold, and appropriate measures to reduce the risk of exposed employees are appropriate matters for referral to established Health and Safety Committees or to the local Health and Safety Representatives, consistent with the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) guidelines and preventive medical guidelines for emergency procedures.

## Section 14 - Asbestos

A. The Department shall conduct an inspection in each facility to determine the existence of asbestos. Qualified inspectors will inspect the facility for asbestos under EPA standards for Hazardous Air Pollutants regulation.

B. The Department will review all construction and/or space modification contracts and/or work orders to determine if asbestos is present and, if so, how to proceed with appropriate removal or containment.

C. The Department will notify the local union prior to initiating procedures for asbestos removal.

D. Where it has been determined that asbestos exists in a facility, the Department will conduct periodic air sampling as appropriate.

E. If air sampling indicates that airborne concentrations of asbestos fibers exceeds regulatory levels, exposed employees will be notified in writing of the exposure within five days after discovery of the excessive asbestos concentration. The Department will assist affected employees in filling out and filing the appropriate OWCP forms.

F. If the airborne asbestos concentration amounts are exceeded, the Department will insure abatement of the asbestos hazard pursuant to 29 CFR 1910.1001(f).

824

G. Once significant airborne asbestos particles are detected, the Department will conduct sampling at intervals of no greater than three months to monitor employee exposure levels.

H. Union Health and Safety representatives will be given training on asbestos removal and permitted to monitor removal procedures.

I. Union Health and Safety Representatives will be given a copy of all tests monitoring asbestos levels.

J. Asbestos abatement plans may include the discontinuance of work or the shifting of employee work location. Notice of such abatement action will be provided to the local union in advance, except in an emergency situation in which the local union will be notified as soon as possible. The Department will meet its labor obligations in both instances.

K. The Department will ensure that all external surfaces within the unrestricted work environment in any facility shall be maintained free of accumulation of asbestos fibers.

L. Asbestos and asbestos-contaminated material shall be collected and disposed of in accordance with appropriate EPA regulations.

M. The Department will institute a medical surveillance program for all employees substantively engaged in work involving asbestos for 30 or more days per year. Employees who are exposed to airborne asbestos fibers will receive medical monitoring.

N. The Department will make available medical examinations and consultations to each employee prior to assignment to an area containing asbestos which requires that negative pressure respirators be worn.

O. When an employee is assigned to an area where substantive asbestos exposure will exceed 30 or more days per year, a medical examination must be given within 10 working days following the 30th day of exposure.

P. The Department shall record all measurements taken to monitor employee exposure to asbestos including tremolite, anthophyllite, and actinolite. Such records shall be maintained for at least 30 years. The records will include information such as the date of measurement, the operation which caused exposure, the sampling method employed by the Department, the number, duration and results of the samples, type of protective devices worn, and name of the employee exposed.

Q. The Department will initiate a maintenance program in all facilities that contain asbestos. Such a maintenance program will include:

1. Inventory of all asbestos containing materials in a facility;

2.  Periodic examinations of asbestos containing materials to detect deterioration;

3.  Written procedures for handling asbestos materials;

4.  Written procedures for asbestos disposal;

5.  Written procedures for dealing with asbestos related emergencies;

6.  Training of those required to handle asbestos containing material in safe handling procedures;

7.  Training of all affected personnel in prohibited activities which would enhance dangerous exposure; and,

8.  The Department must inform all affected employees regarding the standards contained within this section regarding asbestos.

Such information must be provided to each employee on a yearly basis and include instructions regarding safe asbestos handling. Also, access to information regarding exposure records and medical records must be provided on a yearly basis.

### Section 15 - Mold

A.  The Department shall conduct an inspection in each facility to determine the existence of mold. Qualified inspectors will inspect the facility for mold under EPA standards for Hazardous Air Pollutants regulation.

B.  The Department will review all construction and/or space modification contracts and/or work orders to determine if mold is present and, if so, how to proceed with appropriate removal or containment.

C.  The Department will notify the local union prior to initiating procedures for mold removal.

D.  Where it has been determined that mold exists in a facility, the Department will conduct periodic surface and air sampling as appropriate.

E.  If surface or air sampling indicates that airborne concentrations of mold exceeds levels in the control sample, exposed employees will be notified in writing of the exposure within five days after discovery of the excessive mold concentration. The Department will assist affected employees in filling out and filing the appropriate OWCP forms.

F.  If the airborne or surface mold concentration amounts are exceeded, the Department will ensure abatement of the mold hazard.

826

G. Once significant airborne or surface mold particles are detected, the Department will conduct sampling at intervals of no greater than three months to monitor employee exposure levels.

H. Union Health and Safety Representatives will be given training on mold removal and permitted to monitor removal procedures.

I. Union Health and Safety Representatives will be given a copy of all tests monitoring mold levels.

J. Mold abatement plans may include the discontinuance of work or the shifting of employee work location. Notice of such abatement action will be provided to the local union in advance, except in an emergency situation in which the local union will be notified as soon as possible. The Department will meet its labor obligations in both instances.

K. The Department will ensure that all external surfaces within the unrestricted work environment in any facility shall be maintained free of accumulation of mold.

## Section 16 - Use of Respirators

Situations requiring employees to wear respirators for safety shall be a subject for local bargaining which will include a process for respirator fit testing.

## Section 17 - On-site Security

A. The Department shall protect employees from abusive and threatening occurrences and shall take reasonable precautions to ensure such protections.

B. The Department shall arrange for emergency protective assistance at each facility to enable employees to receive assistance if the situation requires it.

C. Whenever an employee is faced with a physically threatening situation, the Department shall provide appropriate assistance.

D. Employees shall not be required to divulge personally identifiable information to the public in individual circumstances where the employee reasonably believes harassment or physical abuse may result. In such cases, the employee should inform the supervisor in a timely manner.

E. The Department shall equip reception areas with appropriate security devices to ensure, to the maximum extent possible, employee safety.

F. All phones will be labeled with appropriate emergency numbers.

**Section 18 - Emergency Preparedness**

A. Each facility shall have an emergency preparedness plan. This plan will publish the chain of command which will identify a member of the Department who will be physically present for employee direction during all scheduled work hours in each installation. The plan will also cover employee procedures in the event of fire, earthquake, bomb threat, tornado, flood, hurricane, weapons of mass destruction, or similar emergency or nationally declared emergencies. Evacuation drills will be conducted quarterly.

B. The Department agrees to make reasonable efforts to assure that each installation has adequate personnel available to administer Cardio-Pulmonary Resuscitation (CPR). All clinical personnel and other employees required to respond to code calls will become familiar with all work site locations within the facility.

   1. The Department will provide CPR shields and masks for those employees administering CPR.

   2. Training for CPR certification and/or recertification will be at no cost to the employees.

C. The Department agrees that the first concern when an employee is injured on the job is to make certain that the employee gets prompt emergency medical treatment. Doubts over whether medical attention is necessary will be resolved in favor of arranging medical treatment.

D. When it is necessary to assist an employee to return home because of illness or incapacitation or to provide transportation to a medical facility, the Department will arrange for transportation. If a co-worker is required to transport the employee, there will be no charge to leave for the co-worker.

E. The Department agrees to maintain adequate first aid supplies at each permanent installation. All employees will have reasonable access to these supplies.

**Section 19 - Smoking Cessation Program**

A. The parties agree that they will intensify efforts to assist those employees who are interested in breaking the smoking habit. The parties are committed to making cessation programs available to each and every employee who wishes to participate in them. The mechanics of the programs are an appropriate subject for local bargaining. Programs will include or be similar to programs conducted by the American Lung Association or the American Heart Association.

B. Employees who wish to stop smoking but who are unable to successfully complete a smoking cessation program, or who have quit smoking but are

828

experiencing related difficulties, may seek additional assistance through the EAP.  Employee participation in assistance or cessation programs is strictly voluntary.

## Section 20 - Video Display Terminals - Ergonomic Environment

Video Display Terminal (VDT) refers to a computer-like terminal which displays information on a television-like screen.

A.  The policy of the Department is to provide safe and healthful workplaces for all employees.  In keeping with the policy, the Department acknowledges that there are certain ergonomic and environmental factors that can contribute to the health and comfort of VDT users.  These factors involve the proper design of work stations and the education of managers, supervisors, and employees about the ergonomic job design and organizational solutions to VDT problems as recommended in various studies published by the NIOSH.

B.  The Department agrees that employees should be provided information about ergonomic hazards and how to prevent ergonomically-related injuries.  This information could be provided by OSHA Safety and Health Guidelines and other available literature.  The Department agrees to provide, to the maximum extent possible, workstations and equipment (chairs, tables, workstations, lighting, keyboards, screens, and printers, etc.) that meet ergonomic design criteria.  It is also agreed that when equipment is purchased, to the extent possible, training should be provided by a vendor on how to safely and properly operate that equipment.

C.  The Department will achieve this by:

  1.  Purchasing, using, and maintaining VDTs in a safe manner;

  2.  Providing accessory equipment, to include, but not limited to, keyboards, worktables, chairs that are height-adjustable and provide proper back support, foot rests, wrist rests, document holder, glare screens, and other ergonomic equipment;

  3.  The national parties agree to the process below for the purchase of furniture and office equipment to address individual requests for workstation modification.  Options:

    a.  Negotiate using a locally-developed, mutually-agreed process;

    b.  Negotiate on a case-by-case basis; or,

    c.  Use the Alternative below;

       Alternative:

       1)  The employee will be given an ergonomic assessment, which will identify the employee's needs and the available modifications;

829

2) The employee will be provided a list of available furniture/equipment;

3) The employee and a representative of the local union will meet with a Department official to discuss and decide on the employee's choice from among the available options;

4) The employee's choice will be selected if it is reasonable, considering all the circumstances.

The local parties also may agree to use the above procedure for furniture or equipment that is to be provided to a group of employees.

d. Seeking and acquiring information and technical assistance, as needed, from appropriate resources on methods for most effectively designing VDT work station layouts;

e. Laying out workspaces that are properly illuminated to reduce glare and ensure visual comfort to VDT users while providing adequate lighting for traditional clerical tasks;

f. Educating employees about the proper and safe operations of VDTs, including the value of interspersing prolonged periods of VDT use with other work tasks requiring less intensive visual concentration;

g. Where there are prolonged periods of VDT use and no other work tasks available, those employees shall be given a rest break;

h. Distributing information to all employees annually on VDTs and ergonomic furniture and identifying Department resources for more information;

i. Reviewing the set-up of equipment and furniture for VDT work stations as a regular part of safety and health inspections.

D. VDT Emissions Test

In accordance with standards for acceptable radiation emissions of VDTs, the Department will conduct periodic tests of terminals for any emissions. Any terminal that tests above standard will be repaired to meet the standard, or it will be removed from service.

E. Non-VDT Work Reassignment Request

If a pregnant employee requests reassignment for all or some portion of her pregnancy and has a written recommendation from her physician, the Department will reassign that employee to do available work that does not involve the use of a VDT.

830

F. VDT Breaks

Where an employee uses a VDT or other keying device for at least one hour, the employee shall receive a 10 minute break for every hour of utilization. Such breaks will be in addition to regularly scheduled rest periods. This does not preclude employees from receiving rest breaks when suitable non-VDT work is not available.

G. Lighting

1. VDTs shall be placed perpendicular to and away from windows and between rows of lights, to avoid excessive glare and where such an arrangement is not possible, windows shall be fitted with blinds or drapes.

2. Where the efforts in A. above have not satisfactorily resolved the problem of excessive glare, employees who operate a VDT will be furnished with an anti-glare screen.

3. An articulating task light which is adjustable in direction and intensity will be provided for users upon request.

4. The Department will provide lighting that is adequate/appropriate for the work setting.

H. Keyboard and Screen

1. Keyboards should be placed on a level and stable surface for normal keying function.

2. Keyboards, in combination with their supporting surface, chair and other furniture shall permit users to adopt and maintain neutral wrist positions.

3. Screens shall be easily adjustable for brightness.

4. Screens shall be adjustable horizontally and vertically to fit the user's line of vision.

5. Employees who operate a VDT will, upon request, be provided with adaptive devices such as a padded wrist rest, mouse pads, document holders that have adjustable height and tilt, foot rests, keyboard trays, and other appropriate adaptive devices designed to prevent repetitive strain injuries. The procedures stated in C.3 of this Section will be used in considering such requests.

I. Printers

1. Excessive impact printer noise shall be reduced by a combination of distance and/or noise-reducing techniques, such as noise-reducing

cover or shield, carpeting, partitions, and sound absorbing ceilings and walls.  Printers will meet the requirements of 29 CFR 1910.95(b)(1).

2.  Printers will be placed in a manner so that employees do not have to excessively bend, stoop, or reach to remove printed materials.

J.  <u>Chairs and Desks</u>

1.  The Department shall provide ergonomic adjustable chairs, designed to minimize musculoskeletal discomfort.

2.  When making an ergonomic assessment, professional consensus standards, including but not limited to, American National Standards Institute (ANSI) and NIOSH, should be considered when purchasing chairs and desks.  When assigning work space and purchasing chairs and desks, professional consensus standards, including but not limited to ANSI and NIOSH, will be followed when required by the National Technology Transfer and Advancement Act.

K.  <u>Training and Education</u>

1.  The Department shall provide information annually for the safe and healthful operation of VDTs and associated equipment.  The information shall include, but not be limited to instructions on relaxation exercise for visual and musculoskeletal strain, the proper use of footrests and wrist rests, adjusting furniture, proper posture, and other beneficial work habits.

2.  As new information becomes available, employees will be provided with updated information.

**Section 21 - Vision Program**

This section concerns VDTs, eye examinations, and eyeglasses/contacts (including disposable lenses) and is entered into by and between the Department and the Union.  This Agreement covers all employees in the AFGE bargaining unit that use a workplace VDT as part of their normal work and when the use of such equipment requires using PPE by an employee during the performance of their official duties in order to mitigate hazardous conditions encountered.  Any examinations or special eyeglasses/contacts given as PPE in this section must be consistent with OSHA guidelines regarding VDT usage.

A.  Employees experiencing eye problems from use of a workplace VDT would meet with the Department and explore options provided in Section 20 above to address this problem.

B.  Employees shall only be eligible for VDT related eye exams and eyeglasses/contacts (including disposable lenses) based upon supervisory certification that the employee does use a VDT in the course of their official duties and efforts made consistent with Section 20 are not sufficient to address the

832

results of the VDT use associated with the position. Based on receiving this certification the employee can request reimbursement as provided in Section C below.

C.  To request reimbursement, the employee must present a form obtained from the Department to a licensed optical practitioner (e.g., optometrist or ophthalmologist) which will indicate that any prescription should only be for workplace VDT use. The practitioner must certify on the form that the special eyeglasses/contacts (including disposable lenses) are for workplace VDT use. Special eyeglasses/contacts are those that are:

1.  Required due to workplace VDT use if the person would not require the use of special eyeglasses/contacts or other treatment for a job that would not cause the same level of eye problem; or,

2.  The special eyeglasses/contacts required for the work at the workplace VDT are different in prescription or design from those which would be required to meet the other general daily vision needs of the individual.

This form must be returned to the Department. If an eligible employee provides a completed form and a prescription from the practitioner indicating that the employee needs special eyeglasses/contacts (including disposable lenses) in order to operate a workplace VDT without eyestrain or because of other optical-related problems, the Department shall reimburse the employee for 100% of the eye examination in an amount not to exceed $50.

D.  An employee who has met the conditions listed in A and B above will be entitled to a pair of special eyeglasses/contacts (including disposable lenses) for workplace VDT operation at Department expense. The Department will bear the cost up to $175. The Department will either procure the special eyeglasses/contacts (including disposable lenses) of the employee's choice, or will reimburse the employee upon the presentation of proper documentation. The option will be left to the Department.

E.  Employees shall be entitled to a reasonable amount of excused absence to obtain eyeglasses/contacts (including disposable lenses), and VDT eyeglass/contact examination and fitting, provided that the employee, in fact, has an authorized VDT eyeglass/contact (including disposable lenses) prescription. Normally, this will not exceed two hours total time for all matters.

F.  If an eligible employee who has already received a Department provided pair of VDT glasses/contacts (including disposable lenses) believes that he/she needs a new VDT-related prescription, he/she shall be eligible to re-participate in the program, consistent with each of the steps identified above.

833

G. Eyeglasses/contacts (including disposable lenses) provided for under the terms of this Agreement remain government property, and as such, the employee may be requested to surrender them when the employee separates from the Department.

H. Employees are ineligible for participation in the Department's vision program while on OWCP, Leave Without Pay (LWOP) or extended sick leave.

## Section 22 - Indoor Air Quality

A. The parties agree that all employees are entitled to work in an environment containing safe and healthful indoor air quality.

B. The Department shall provide safe and healthful indoor air quality by conforming to laws, guidelines, regulations, and/or policies issued by federal regulatory agencies such as OSHA, ASHRAE, EPA, and GSA.

C. On-site investigations/inspections will be conducted when a problem concerning Indoor Air Quality or Building Related Illness is formally brought to the Department's attention. These investigations/inspections shall meet the criteria of the GSA Federal Property Management Regulations and the ASHRAE, the protocols of OSHA, or the American Conference of Government Industrial Hygienists.

D. In compliance with engineering standards, the Department shall maintain ventilation efficiency:

1. Ensuring that outdoor air supply dampers and room vents are open;

2. Removing or modifying partitions or obstructions which block fresh air flow;

3. Balancing the system to prevent to prevent inflow or outflow of contaminated air due to pressure differentials between rooms.

E. In all facilities, the Department shall ensure that:

1. Appropriate measures are taken to minimize and/or eliminate the impact of contamination from outside sources such as garages, cooling towers, building exhausts, etc.;

2. Where the levels of such contaminants become health threatening, the Department will either seek to relocate or evacuate the facility;

3. Temperature is maintained in accordance with ASHRAE standards;

4. Humidity is maintained in accordance with ASHRAE standards;

5. Filtration, electronic cleaners, chemical treatment with activated charcoal or other absorbents are used.

F. Microbial Contamination

834

1. The Department agrees to eliminate or control all known and potential sources of microbial contaminants by assessments and appropriate response to all areas where water collection and leakage has occurred including floors, roofs, HVAC cooling coils, drain pans, humidifiers containing reservoirs of stagnant water, air washers, fan coil units, and filters. Such response will normally require prompt cleaning and repair of contaminated areas.

2. The Department also agrees to:

   a. Clean and disinfect or remove and discard porous organic materials that are contaminated (e.g., damp insulation in ventilation system, moldy ceiling tiles, and mildewed carpets); and,

   b. Clean and disinfect non-porous surfaces where microbial growth has occurred with detergents, micro biocides, or other biocides and insuring that these cleaners have been removed before air handling units are turned on.

In any leased space the Department will deal with the lessor and/or GSA to achieve these objectives.

## Section 23 - Renovation and Construction

A. Wherever the Department decides to alter the physical work site of employees represented by the Union, the local union will be notified in advance in accordance with Article 47 - Mid-Term Bargaining.

B. The Department will:

   1. Isolate areas of significant renovation, painting, and carpet laying from occupied areas that are not under construction;

   2. Perform this work during evenings and weekends;

   3. Ensure that contaminated concentrations are sufficiently diluted prior to occupancy;

   4. Supply adequate ventilation during and after completion of work to assist in dilution of the contaminant level; and,

   5. In leased space work with the lessor and/or GSA in order to achieve and maintain these standards.

## Section 24 - Wellness Program

A. The parties agree that recognizing, minimizing, and coping with stress are essential parts of employee wellness. The Department will provide training

at least annually on stress reduction. This will be a part of each facility's Wellness Program.

B. Employees who feel they are experiencing harmful levels of job-related stress may contact employee counseling services.

C. Department facilities will establish Wellness Committees or subcommittees to address wellness and health programs.

D. The Department agrees to provide the following services:

1. Emergency diagnosis and initial treatment of injury or illness that becomes necessary during working hours and that is within the competency of the professional staff and facilities of the health service units and if the injury or illness is work-related and the above-described services are not available, the employee will be transported to the appropriate medical facility;

2. Provision for special health examinations for specific categories of employees whose work environment presents peculiar health hazards;

3. Individual facilities will provide diagnoses and/or screening tests and health education programs for unit employees as a health service;

   a. It is understood by the parties that these services are subordinate to the Department's mission.

   b. These services will be subject to the Department's determination of available resources.

4. Referral of employees to private physicians, dentists, and other community health resources, upon request.

   a. An employee will be expected to notify his/her supervisor of his/her intention to seek medical treatment in health units.

   b. When this is not feasible, the employee may report directly to the health unit or person authorized to render emergency care.

5. Each facility where employees are exposed to chemical or biological hazards will implement a medical surveillance program in accordance with applicable regulations.

6. The Department and the Union support wellness and initiatives that focus on various activities, including physical activity, weight management, smoking cessation, stress management, healthy lifestyle classes, and nutrition.

836

 a. Therefore, the Department will promote physical fitness and wellness by, at a minimum, providing stress reduction and physical fitness information.

 b. Where fitness facilities or fitness areas are available at the worksite, employees will be permitted access to them.

 c. If modifying, providing, or allowing access to a local fitness center, the local union will be involved in the process. The decision will give appropriate weight to such factors as health industry recommendations, facility design, maintenance, safety, and return on investment analysis.

 d. Employees may utilize wellness/fitness centers during duty hours, infrequently, for short periods of time, for the participation in physical wellness activities, at no additional cost to the employees. Where existing methods are already in place, they will be continued, until changed through negotiations. This section is subject to local negotiations.

E. The Department shall permit employees to do non-strenuous stretching exercise that are socially acceptable in an office setting to relieve physical stress and/or discomfort. Some of these exercises may be performed by the employees at their workstation during the work time as necessary. The need for this will vary from employee to employee. Participation shall be voluntary.

## Section 25 - Equipment, Machinery, and Furniture

A. Employees are encouraged to report (see Section 5) equipment, machinery, or furniture that cause or have potential to cause injuries such as repetitive motion injuries. The Department agrees to investigate such reports expeditiously and to implement appropriate corrective action. All such ergonomic assessments and/or recommendations shall be in writing and submitted to the local Safety and Health Committee.

B. As much as possible, equipment, machinery, and furniture purchased by the Department will be ergonomically compatible with the individual. The local union will be involved in the development of facility policies that address the selection and purchase of equipment, machinery, and furniture.

C. The Department will ensure that employees have been oriented to the use of new equipment or machinery and will ensure that this equipment or machinery has been inspected before initial use, when required.

D. Only qualified personnel shall perform maintenance or repair on or about moving or operating machines. This does not preclude the normal or necessary adjustments to be made to machinery or equipment while

837

in operation. Qualified personnel shall not be required to perform any maintenance or repair while the machine is in operation where it can be shown that there is a substantial risk of injury or a feasible alternative exists.

### Section 26 - Workplace Violence

The parties agree that violence should be eliminated from all workplaces within the Department. Each facility will develop a policy and a plan jointly with the local union on the prevention of violence. Annual training shall be offered to all employees.

### Section 27 - Safety and Health Records

A. The Department agrees to compile and maintain records required by the Act and the Department safety and health programs. The Department agrees to ensure access by employees, former employees, and Union representatives to records/logs of facility occupational injuries and illnesses (including copies of accident reports) and to the annual summary of these in accordance with 29 CFR 1960, consistent with FOIA and Privacy Act requirements.

B. The Department and the Union will identify employees who occupy positions that carry potential risks to their health. The parties will establish and maintain procedures for the medical surveillance of such employees.

### Section 28 - Hazardous Duty Pay and Environmental Differential

A. Environmental Differential (FWS)

   1. In accordance with 5 CFR Part 532, Subpart E, Appendix A, the appropriate environmental differential will be paid to an employee who is exposed to an unusually severe hazard, physical hardship, or a working condition meeting the standards described under the categories stated therein.

   2. If at any time an employee and/or the local union believes that differential pay is warranted under 5 CFR Part 532, Subpart E, Appendix A, the matter may be raised at step 3 of the negotiated grievance procedure.

B. Hazardous Duty Pay

   1. Pay for irregular or intermittent duty involving physical hardship or hazard for GS employees will be paid in accordance with the provisions of OPM regulations (5 CFR, Part 550, Sub-part I).

   2. The parties agree that any physical hardship or hazardous duties must be considered as part of position classification. Upon request, the Department shall inform the employee or local union whether or not such duties were taken into account in establishing the grade of the

838

position and how the duties affected the grade established including whether, absent those duties, the grade would have been lower.

### Section 29 - Arrangements for Health Hazards Involving Communicable Diseases

Facilities will:

A.  Make appropriate arrangements for employees interviewing individuals with known communicable disease;

B.  Take appropriate precautions when there is contact with a person who may have tuberculosis (TB) and employees with exposure or potential exposure to TB will be offered TB screening tests during working hours at no cost to the employees;

C.  Keep records of employees exposure to active TB at the work site;

D.  Take appropriate precautions against the spread of infectious diseases;

E.  Provide timely testing for employees who reasonably believe they were exposed in the course of their employment to a serious infectious disease (there will be no cost to the employees for leave or the exam); and,

F.  Employees are encouraged to get flu vaccinations once a year.

### Section 30 - Pollution Prevention Strategy

A.  The Department will maintain a current list of all hazardous materials in their respective sections/services and will be required to maintain paper copies of current Material Safety Data Sheets (MSDS) in each workplace.

B.  All facilities will identify each employee using hazardous chemicals in the performance of his/her duties.

C.  Assessments will be made for each of the hazardous chemicals and a determination will be made if there could be a less hazardous chemical which would fulfill the respective need.

D.  All chemicals or hazardous materials purchased shall require MSDS with purchase.

E.  Employees will be retrained at least annually on the handling and disposal of each hazardous chemical.

F.  The Professional Industrial Hygienist will perform a physical inventory and audit January and July of each year and report to the facility Safety Committee on the compliance requirements, training needs of persons handling hazardous chemicals, and disposals requirements.

839

G. Types and quantities of hazardous waste generated at each health care facility and the methods used for disposal of each type of waste will be identified.

H. The facility Safety Committee will review methods used to dispose of hazardous waste for compliance with applicable criteria.

I. All affected employees who may be affected by each hazardous chemical and the risks associated with the hazardous chemicals will be informed.

J. Monitoring is a proper subject for the Safety and Health Committee.

## Section 31 - Dissemination of Occupational Safety and Health Program Information

A. Any details of the Department's Occupational Safety and Health Program and applicable safety and health standards shall be made available upon request to employee representatives for review. A copy of any written program applying to the Department's Occupational Safety and Health Program should be provided to each committee member at the appropriate level.

B. Each workplace shall post conspicuously in each facility, and keep posted information for employees of the provisions of the Act and Executive Order 12196. Each facility will provide the poster to each workplace detailing the necessary elements of 29 CFR 1960.12. Posters shall not be altered, defaced or covered by other material(s). If damaged or altered the Department will take responsibility for replacing them within 30 days. The Department will inform all employees of their rights under 29 CFR 1960 on an annual basis in writing.

## Section 32 - Exposure to Radiation

In accordance with the United States Nuclear Regulatory Commission (NRC) guidance and standards, the Department shall take necessary preventive steps to protect employees from exposure to radiation.

A. Employees in high risk areas will be provided devices to measure current and accumulated exposure levels. Employees will be alerted monthly to the employees' current and accumulated exposure level, and annually to the employees' accumulated exposure level.

B. The Department will take additional steps necessary to prevent exposure if any employee is exposed to a level of radiation that is or could become a health or safety issue. Examples of known sources of possible exposure are security machines at points of entry and imaging/X-ray departments.

840

## Section 33 - Ergonomic Lifting

A. The Department agrees that all employees are a most valued resource and shall be recognized as such.

B. The Department agrees to provide employees with information concerning safe lifting. The Department further recognizes and agrees that this information must be appropriate to the specific work performed.

C. Any lifting equipment must be selected based on operational and employee needs, physical environment, hazard assessment, injury analysis, and Union input.

D. A joint committee, to include local union participation will be established in each facility to review available equipment, solicit employee input, and make recommendations. This may be done by a local health and safety committee, if one exists.

E. Implementation of this section also is appropriate for local negotiations.

## Section 34 - Temporary Work Restriction

When an employee provides the Department with a health care provider's statement that the employee has temporary work restrictions, the Department will address the employee's personal health care provider's recommendation and make a determination if there are any duties the employee can perform under those work restrictions. The Department will make every effort, to the extent it is operationally feasible, to identify duties the employee can perform in his/her position. The Department will inform the employee of the decision. Under the Health Insurance Portability and Accountability Act (HIPAA), the Department cannot contact the employee's personal health care provider without a signed release from the employee.

# ARTICLE 30 - OCCUPATIONAL HEALTH

## Section 1 - Purpose

The purpose of this article is to aid in the protection of employees from communicable diseases, maintain a healthful working environment, and provide preventive health measures.

## Section 2 - General

The following occupational health services, among others, shall be provided:

A. Emergency diagnosis and first aid treatment of an injury or illness that becomes necessary during working hours and that are within the competency of the professional staff and facilities of the available occupational health service unit, whether or not such illness was caused by employment.  Local policy may define emergency treatment of non-work related conditions in tracking of infectious diseases among the employee population.  In cases where necessary emergency treatment is not available onsite, the employee may be taken to his/her physician or suitable community medical facility if the employee requests it or is unable to request it.  Employees will be made aware annually that there may be charges for some services rendered;

B. Pre-placement examinations where required by applicable laws, VA policy, or the OPM instructions;

C. In-service occupational examinations of employees or examinations to appraise and report work environment health hazards to prevent and control health risks, as required;

D. Administering, at the discretion of the responsible occupational health service unit physician or occupational healthcare provider, treatments and medications:

   1. Furnished by the employee and prescribed in writing by a personal physician as reasonably necessary to maintain the employee at work; or,

   2. Prescribed by a physician providing medical care under 5 USC Chapter 81.

E. Preventive services to provide health education to maintain personal health; and to provide specific disease screening examinations and immunizations, in accordance with Article 29 - Safety, Health, and Environment, Section 24, D 2 and D 3 of this Agreement.

F. Referral, upon their request, of employees to community health resources.

842

## Section 3 - Service Requirements

The Department shall:

A. Provide post-exposure examinations as mandated by applicable regulatory agencies;

B. Provide medical surveillance for employees exposed to hazardous materials and communicable diseases (such as asbestos or tuberculosis). The Department shall provide the local union a list of any classification or position that is required to be part of the medical surveillance program, including but not limited to the "fit-tested" for respirators program.

C. Cooperate with local public health agencies, physicians and programs in providing measures that protect against diseases of public health significance.

D. The occupational health unit will be supplied the specific medical information about the duties of an employee's position and any other pertinent factors necessary to assess that employee's ability to perform the job. (See Article 19 - Fitness for Duty.)

E. Provide, or make arrangements for, health maintenance examinations for all Department employees eligible for them. The occupational health care provider will use discretion in determining how comprehensive the medical evaluation will be. Special tests and diagnostic procedures may be ordered as appropriate, based upon the evaluation's findings. Employees will be informed of any discrepancies or abnormalities shown in the evaluation; and, they will be encouraged to follow up with treatment or corrective action as soon as possible with their personal primary care provider.

## Section 4 - Occupational Health Services

A. The Department will provide an occupational health services program for all VA employees consistent with this Agreement and Department policy.

B. Where there are 300 or more federal employees working in one location and there are no existing health services, arrangements shall be made to establish a Department occupational health unit unless occupational health services can be furnished by participation in a nearby occupational health unit serving other federal employees. For locations with fewer than 300 employees, occupational health services shall be provided by contract with private or public sources or by establishment of an occupational health service unit, whichever is deemed to be more feasible.

C. Employees shall notify their supervisor when they seek treatment from an occupational health unit. When this is not feasible, they may report directly to the occupational health unit or person authorized to render emergency

843

care.  Facilities will have written procedures on how to address medical emergencies occurring to employees.

D.  The confidential nature of medical conditions shall be recognized and respected.  Employee medical records maintained by the Department must be separately and distinctly secured from any other medical records.

E.  Procedures for disability retirement and OWCP are not part of the Occupational Health program and are governed by Article 41 - Worker's Compensation and other applicable authorities.

F.  Occupational health services will be provided under the direction of a licensed independent practitioner.

### Section 5 - Immunizations

A.  Through vaccinations and immunizations of employees, the Department will assist in maintaining a high level of protection against epidemics of communicable disease such as influenza.  This will include the administration of vaccines, prophylactic drugs, and agents, usually without charge.  Employees will be notified in advance of any charges and the amount, given the option to accept or not accept the immunization/vaccination, and provided information about other service providers who provide the immunization/vaccination.

B.  Justification for allocations of vaccinations and immunizations to employee populations will be provided to the Union at the time of the immunizations.

### Section 6 - Treatment

Nature and Extent of Non-Work Related Treatment:

A.  It is an expectation that all employees will have a private personal physician or healthcare provider;

B.  If an employee suffers a minor illness or injury, which interferes with their ability to perform their duties, treatment may be rendered;

C.  Treatment will be limited to relieve their discomfort and enable them to remain at work, and in an emergency, appropriate care to stabilize and transport the employee will be rendered;

D.  If the installation has dental facilities, emergency treatment may be given for minor dental conditions;

E.  These treatments are not intended to provide definitive medical or dental care or replace the employee's primary care provider;

F.  The employee will be referred to their private physician or dentist for any necessary follow-up or definitive care;

844

G. In the event transportation or hospitalization is required, the employee will be responsible for associated costs;

H. On an annual basis, employees shall be advised in writing that they will be charged for transportation and hospitalization.

### Section 7 - Pandemics

A pandemic is defined as an epidemic of infectious disease that is widespread across human populations.

A. The parties agree that employees are an essential resource in caring for Veterans. The Department will take appropriate precautions to prevent the spread of infectious disease.

B. The Department shall offer immunizations at no cost to the employee. No employee shall be forced to participate in an immunization program if the employee has a medical condition which would be adversely affected by the immunization. A statement from a health care provider (as defined in Article 35 Section 16 E (6) (d)) that an immunization would adversely affect the employee's medical condition is sufficient evidence of such a medical condition. An employee may also receive an exemption based upon their religious beliefs. An employee's written statement that he/she has a religious belief that conflicts with the immunization is sufficient to establish evidence of a religious belief. In either exception, any statements or records shall be kept confidential by the Department.

C. Employees shall be issued appropriate individual PPE as recommended by recognized authorities such as OSHA. There shall be sufficient equipment so that employees are neither expected to reuse the equipment unless it is designed for reuse nor shall they share such equipment.

D. If respirators are required for safety and health, each employee will be fit-tested and trained on the proper care of the respirator.

E. The employee who is ill as a result of a pandemic will be granted sick leave or leave without pay upon request.

F. If the employee is suspected to have contracted a communicable disease, and is sent home from the worksite without valid verification of the illness, there will be no charge to leave. In such instances the employee must be available to return to duty upon request, unless the employee requests to use sick or other leave.

G. Temporary telework arrangements are appropriate for those employees who cannot report to work due to illness, providing the position held is conducive to telework. During pandemic, the usual requirements for

845

telework may be waived in order to benefit both the Department and the employee.

### Section 8 - Local Bargaining

Local bargaining on this article is appropriate so long as it does not conflict or interfere with, or impair implementation of, this Master Agreement.

# ARTICLE 31 - SILENT MONITORING

## Section 1 - Purpose

A. The primary purpose of monitoring public telephone conversations is not for evaluating performance but to ensure that complete and accurate information is courteously provided to the calling public and to determine training requirements.

B. However, when monitoring is used to evaluate performance, the employee will be notified in advance of the period during which monitoring will occur. This period shall not exceed one week. In all cases immediate feedback to the employee will be provided.

## Section 2 - Task Force

The parties agree to establish a Labor-Management Task Force to examine alternatives to silent monitoring which follow the best practices of public and private sector organizations on this issue.

847

# ARTICLE 32 - STAFF LOUNGES

### Section 1

Recognizing that the health and well-being of employees are necessary to the successful accomplishment of the Department's mission, local management will provide staff lounges, break rooms, or other similar space for employee use.

### Section 2

Local bargaining to implement this provision is appropriate and will include, but not be limited to, arrangements in facilities where there is insufficient space for dedicated lounges.  Other topics appropriate for local bargaining include, but are not limited to, access to microwaves, refrigerators, storage, coffee pots, and furniture.  However, local agreements must be consistent with authorized use of appropriated funds.

### Section 3

Staff lounges shall be reasonably accessible to the employees' work areas.

### Section 4

The staff lounge should be of sufficient size to accommodate the number of employees reasonably expected to use the space at any given time.

### Section 5

Any current collective bargaining agreements and/or past practices shall remain in effect, until and unless changed through bargaining.

848

# ARTICLE 33 - TEMPORARY, PART-TIME, AND PROBATIONARY EMPLOYEES

### Section 1 - General

A. This article sets forth the different provisions applicable to temporary, part-time, and probationary employees for Title 5, Title 38 Hybrid (Hybrid), and Title 38 employees.  Temporary, part-time and probationary employees are also covered by the terms of other articles in this Agreement to the extent consistent with applicable laws and regulations.

B. A counseling session or other routine meeting about performance is generally remedial and discipline is not anticipated.  The right to representation does not apply to such meeting/session.

C. If during the course of any meeting/session, such meeting/session becomes an examination of an employee in the unit by a representative of the Department in connection with an investigation, the employee is entitled to union representation if:

   1. The employee reasonably believes the examination may result in disciplinary action (such as separation) against the employee; and,

   2. The employee requests representation.

D. The Department agrees that the local union has the right to be represented at formal discussions between management and a probationary employee of the bargaining unit, where such discussions deal with personnel policies and practices and/or matters affecting working conditions.

### Section 2 - Title 5 and Hybrid Employees

A. Temporary Employees

   Temporary employees may be separated at any time upon notice in writing from the Department.  When it is determined that a temporary employee is to be separated, the employee will be given two weeks notice except in egregious circumstances as demonstrated by an appropriate fact-finding, or when loss of funding or Full Time Equivalent Employee (FTEE) authority requires that notice be shortened.

B. Probationary Employees

   1. All probationary periods will be established in accordance with 5 CFR Parts 315.801 and 315.802, and any other applicable Federal law.  Probationary periods will also be governed by government-wide regulations in existence at the time this Agreement was approved.

A Title 5 or Hybrid employee who has completed a competitive or excepted service probationary period and moves to another Title 5 or Hybrid position, but does not successfully perform in the current position, can be offered another Title 5 or Hybrid position for which the employee is qualified, provided such position is not a promotion. In this case, the employee must meet qualification and licensure requirements of the position.

2. Title 5 and Hybrid employees serve a one-year probationary period unless otherwise specified in applicable Federal law. Probationary periods will also be governed by government-wide regulations in existence at the time this Agreement was approved. During that time, employees will have the opportunity to develop and to demonstrate their proficiency. To that end, the Department agrees that probationary employees will be advised in writing of applicable critical and non-critical elements, performance standards, and general conduct expectations at the beginning of their probationary period (normally 30 days). The supervisor will explain the requirements of the probationer's position and answer any questions the employee may have.

3. From the beginning of the probationary period, the supervisor will communicate with the employee frequently, will observe the employee closely, and assist in resolving any performance and/or conduct problems. In the event that there are repeated deficiencies in the employee's conduct and/or performance that progress to a point that the deficiencies may affect the employee's continued employment, the supervisor will counsel the employee in a timely manner and document the meeting, with a copy given to the employee.

4. After the employee has completed at least 90 days in the assignment, HR staff will contact the supervisor about the employee's performance and adjustment to the job, and any training or other needs or outstanding work that warrants attention for further placement consideration. The Department will consider employees' specific requests for assistance to improve his/her performance. Where performance deficiencies are reported, the employee and the Department will explore the courses of action that may be taken to overcome them and the Department will provide appropriate assistance. Any form used to document deficiencies will be shared with the employee. These procedures are minimum requirements and, where possible, extension of follow-up interviews is encouraged.

5. The Department may terminate an employee on a probationary or trial period because of his/her performance or conduct. The employee shall be notified in writing as to why he/she is being terminated and the effective date of the action. The information in the notice shall, at

850

a minimum, consist of the conclusions as to the inadequacies of the employee's performance or conduct.

6. The Department shall utilize the probationary period as fully as possible to determine the fitness of the employee and may terminate his/ her services during this period if the employee fails to demonstrate qualifications for continued employment.  In keeping employees informed throughout the probationary or trial period, the supervisor will explain expectations and requirements as they specifically relate to the employee's position (e.g., excessive absence, training needs, standards of practice, etc.).

7. If a probationary employee is removed for conditions arising before appointment, the employee has a right to advance notice of the separation, the reason for the separation, an opportunity to provide an answer and supporting affidavits, and any applicable appeal rights, in accordance with 5 CFR 315.805.  The Department shall consider the answer in reaching its decision, which shall be provided to the employee prior to the effective date of the decision.

C. Part-time Employees

1. To be considered part-time for purposes of this section, an employee must have a regularly scheduled tour of duty, set in advance, of at least 16 hours but not more than 32 hours in an administrative workweek.  As an exception, the Department may employ an employee on a regularly scheduled tour of duty of 1 to 15 hours per week, but not more than 32 hours, in order to meet mission requirements.

2. An employee's hours may be extended beyond the 32 hour limitation for short periods of time to accommodate unexpected workloads or to provide necessary training.  The Department should not assign extra hours for more than four pay periods without considering whether to establish a temporary or permanent full time position in lieu of such assignment.

3. When a holiday falls on a part-time employee's regularly scheduled workday, the employee will be paid for the number of hours he/she was scheduled for that day.

4. The Department will give full consideration to employee requests regarding part-time employment consistent with the Department's resource and mission requirements.  Full consideration includes weighing the employee's reasons and the staffing needs of the Department.

5. The Department recognizes that part-time employment may be particularly appropriate for the following employees:

    a. Employees seeking gradual transition into retirement;

    b. Employees with disabilities or others who require a reduced workweek;

    c. Parents who must balance family responsibilities with the need for additional income;

    d. Students who must finance their own education and/or vocational training; or,

    e. Employees pursuing further education.

6. Requests to change from full time employment to part-time, or from part-time employment to full time, will be discussed with the employee. If an employee submits a written request and the request is denied, the employee will be provided with written reasons for the denial.

7. If the Department proposes to convert any full time positions to part-time, that will be a subject for negotiations in accordance with 5 USC 7106(b)(2) or (3).

8. A full time employee shall not be required to accept part-time employment as a condition of continued employment.

9. An employee may request a temporary or permanent adjustment of an established part-time work schedule based on personal need or to permit participation in Department approved details, other assignments, or training, and the Department will give full consideration to such request.

10. The Department agrees to provide part-time and full time employees on the same tour of duty equivalent access to employee activities, e.g., health facilities, and not to deny opportunities for attendance at Department approved training courses solely because of part-time status.

11. Consistent with applicable laws and regulations, a permanent part-time employee receives a full year of service credit for each calendar year worked (regardless of tour of duty) for the purpose of computing service for retention, retirement, career tenure, completion of probationary period, within-grade increases, leave category rate, and time-in-grade restrictions on advancement.

12. Prior to an employee accepting conversion to part-time status, the Department will advise the employee in writing of the effects of converting to part-time employment as it relates to employee benefits.

852

13. Employees who accept or convert to part-time positions have no guarantee that they will subsequently be converted to full time employment, but the Department agrees to fully consider the employee's request based on the employee's circumstances and the needs of the Department.

## Section 3 - Title 38

A. Temporary Employees

Temporary employees may be separated at any time upon notice in writing from the Department. When it is determined that a temporary employee is to be separated, the employee will be given two weeks notice except in egregious circumstances as demonstrated by an appropriate fact-finding, or when loss of finding or FTEE authority requires that notice be shortened.

B. Probationary Employees

1. Title 38 employees serve a two year probationary period. During that time, employees will have the opportunity to develop and to demonstrate their proficiency. To that end, the Department agrees that each probationary employee will be advised in writing of the applicable functional statement and general conduct expectations at the beginning of the probationary period (normally 30 days). The supervisor will explain the requirements of the probationer's position and answer any questions the employee may have.

2. Throughout the probationary period, the supervisor will communicate with the employee frequently and will observe the employee closely and assist in resolving any performance and/or conduct problems. In the event that there are repeated deficiencies in the employee's conduct and/or performance that progress to a point that the deficiencies may affect the employee's continued employment, the supervisor will counsel the employee in a timely manner and document the meeting, with a copy given to the employee.

3. When the employee has had an opportunity to learn what is expected, the supervisor should give consideration to any inadequacies in performance or conduct. The employee's weak points should be discussed objectively and suggestions made for improvement. If the employee's performance is considered good or outstanding in some aspect, this fact should be made known to the employee.

4. If the employee's adjustment and performance are not satisfactory, the employee's immediate or higher supervisor will submit a written request for formal or summary review through channels to the official authorized to approve further review of the employee's services. This request will describe the employee's deficiencies, and the supervisor's efforts, such as training, modification of assignments, use of preceptors,

853

etc., to assist the employee. The request may be initiated any time during the probationary period, and may be made notwithstanding past or pending proficiency ratings or the results of any previous probationary review. If the immediate supervisor is the authorizing official, the same information is to be forwarded in writing to the Chairperson of the appropriate Professional Standards Board for consideration as a part of the summary review.

5. Probationary Title 38 employees may be terminated after a Summary Board Review is conducted. The employee will normally be given 15 calendar days notice, but the notice period may be shortened if necessary to effect the separation before completion of the probationary period. The employee, on request, will be furnished a copy of the summary report of the Professional Standards Board proceedings, along with a transcript of any verbatim recording.

6. An employee who is subject to Summary Board Review may be represented by the representative of his/her choice; the representative's role is limited to assisting the employee in exercising the right to reply orally and/or in writing to the reasons for the review. Because summary reviews deal with issues related to professional competence or conduct and peer review, a union representative is not entitled to be present at a summary review except when serving as the employee's personal representative.

C. Part-time Employees

1. Part-time employees are those who perform duties on less than a full time basis, and have a regularly scheduled tour of duty that is less than 80 hours in a biweekly pay period.

2. When a holiday falls on a part-time employee's regularly scheduled workday, the employee will be paid for the number of hours he/she was scheduled for that day.

3. The Department will give full consideration to employee requests regarding part-time employment consistent with the Department's resource and mission requirements. Full consideration includes weighing the employee's reasons and the staffing needs of the Department.

4. The Department recognizes that part-time employment may be particularly appropriate for the following employees:

    a. Employees seeking gradual transition into retirement;

    b. Employees with disabilities or others who require a reduced workweek;

854

    c. Parents who must balance family responsibilities with the need for additional income;

    d. Students who must finance their own education and/or vocational training; or,

    e. Employees pursuing further education.

5. Requests to change from full time employment to part-time, or from part-time employment to full time, will be discussed with the employee. If an employee submits a written request and the request is denied, the employee will be provided with written reasons for the denial.

6. A full time employee shall not be required to accept part-time employment as a condition of continued employment.

7. If the Department proposes to convert any full time positions to part-time, that will be a subject for negotiations in accordance with 5 USC 7106(b)(2) or (3).

8. An employee may request a temporary or permanent adjustment of an established part-time work schedule based on personal need or to permit participation in Department-approved details, other assignments, or training, and the Department will give full consideration to such request.

9. The Department agrees to provide part-time and full time employees on the same tour of duty equivalent access to employee activities, e.g., health facilities, and not to deny opportunities for attendance at Department approved training courses solely because of part-time status.

10. Consistent with applicable laws and regulations, a permanent part-time employee receives a full year of service credit for each calendar year worked (regardless of tour of duty) for the purpose of computing service for retention, retirement, career tenure, completion of probationary period, within-grade increases, leave category rate, and time-in-grade restrictions on advancement.

11. Prior to an employee accepting conversion to part-time status, the Department will advise the employee in writing of the effects of converting to part-time employment as it relates to employee benefits.

12. Employees who accept or convert to part-time positions have no guarantee that they will subsequently be converted to full time employment, but the Department agrees to fully consider the employee's request based on the employee's circumstances and the needs of the Department.

855

# ARTICLE 34 - JOB SHARING

## Section 1 - General

A.  Job sharing is a form of part-time employment in which the tours of duty of two employees are arranged in such a way as to cover a single full-time position.

B.  Job sharing can provide the Department and employees with considerable work scheduling flexibility.

## Section 2 - Procedures

A.  The Department agrees that entry into job sharing is strictly voluntary, initiated by the employee, and without coercion by the Department. Job sharing will be considered when traditional part-time employment is not practical or feasible.

B.  The Department shall give bona fide consideration to employees' requests regarding part-time job sharing employment, including requests for reassignment from a non-job sharing arrangement to a job sharing arrangement and from a job sharing arrangement to non-job sharing arrangement, consistent with the Department's resources and mission requirements. Employees working in positions of the same occupational series, position description, or in the same line of work may request the opportunity to enter a job sharing arrangement. Employees must qualify for the position for which they are applying.

C.  Potential job sharing participants shall submit a written proposal to the immediate supervisor. The job sharers are expected to seek the Department's assistance and approval in drawing up the job sharing plan so that the work will be properly divided. Potential participants will receive a written response from the Department within a reasonable amount of time from the date of submission of their written proposal informing them of acceptance or rejection of their job sharing proposal. If rejected, the reasons will be stated. The participants may revise their written proposal to accommodate the reasons given for rejection and resubmit it for reconsideration.

D.  Although they share the duties of a full-time position, job sharers are considered to be individual part-time employees for all personnel and employment purposes.

E.  Each employee shall be informed of his/her regularly scheduled work hours, as agreed to by the employer, employees, and the other job sharer. The Department will make every reasonable effort to avoid scheduling additional hours not contiguous with the established tour of duty The

856

Department agrees that statutory, regulatory, and contractual provisions shall apply in any situation in which overtime may be worked. Additional hours will not be assigned to employees engaged in job sharing for the purpose of eliminating the need to schedule qualified, full-time employees for overtime. Such overtime hours will be assigned and accomplished according to contractual obligations.

F. A variety of different work scheduling arrangements can be used as long as each job sharer works no less than 16 hours and no more than 32 hours each week. For example, split days (one job sharer works mornings and the other afternoons), alternate days (one job sharer works Monday and the other Tuesday, etc.), or split weeks (one job sharer works from Monday morning through noon Wednesday and the other works noon Wednesday through Friday). Although most job sharers split the hours of a full-time position in half, this is not a requirement. The work schedules of job sharers may overlap (one job share may work from 10 am to 2 pm every day and the other from noon to 4 pm). This arrangement can provide the Department with extra coverage during heavy workload periods. A certain amount of overlap may also be desirable to enable job sharers to attend staff meetings or familiarize each other with work developments.

G. The employment of an individual in a part-time position shall not be a basis for exclusions from participation in job sharing.

H. Those individuals currently engaged in a job sharing arrangement shall be covered under this article.

I. Each employee entering into a job sharing arrangement shall be given a written explanation of his/her work schedule and an explanation of the impact of conversion to part-time on his/her rights and benefits. The job sharing agreement shall incorporate the understanding that in the event one of the job sharing participants leaves and the Department concludes that the needs of the position requires full-time staffing, the Department shall make every reasonable effort to assist the remaining job sharing partner in finding another partner. The remaining participant will be given a reasonable amount of time to find another partner.

J. Leave requests by employees in a job sharing situation shall be approved or denied in accordance with Article 35 - Time and Leave of this Agreement.

K. Performance appraisals for job sharing participants will be handled in accordance with Article 27 - Performance Appraisal of this Agreement. Throughout the tenure in a part-time position, the employee's appraisal will not reflect the performance of the job sharing partner.

857

# ARTICLE 35 - TIME AND LEAVE

## Section 1 - General

A.  Employees will accrue and use sick and annual and other types of leave in accordance with applicable statutes, OPM regulations, and this Agreement.

B.  All leave charges shall be in increments of one-quarter hour, except in the case of Title 38 physicians, dentists, chiropractors and optometrists, who accrue and use leave in full-day increments.

C.  For clearly compassionate and appropriate reasons, the Department may increase the stated limits applicable to all forms of leave in accordance with applicable government-wide regulation and law.

D.  Employees will not be denied leave based solely on their leave balance.

E.  No arbitrary or capricious restraints will be established to restrict when leave may be requested.

F.  Changes to the Department's automated time and attendance system shall be negotiated in accordance with government-wide law, regulations and this Agreement.

G.  Employees should request, in advance, approval of anticipated leave.

H.  When the employee is present on duty, the employee can use the electronic time and attendance system or SF-71 to request leave.

I.  Leave will be denied only for appropriate reasons and not as a form of discipline.  No approved leave or approved absence will be a basis for disciplinary action except when it is clearly established that the employee submitted fraudulent documentation or misrepresented the reasons for the absence.

J.  Employees will not be adversely affected in any employment decision solely because of their leave balances.

## Section 2 - Annual Leave

A.  Annual leave is provided to allow employees extended leave for rest and recreation and to provide periods of time off for personal and unscheduled purposes.  All employees may request at least two consecutive weeks of annual leave per year and take such leave subject to the Department's approval.

858

B. The use of accrued annual leave is an absolute right of the employee, subject to the right of the Department to approve when leave may be taken.

C. Employees should submit requests for annual leave as far in advance as possible. The Department will render timely decisions on employees' leave requests. The Department will make every effort to accommodate the employees' requests, consistent with valid operational needs.

1. Vacation - Employees should submit requests for vacation leave as far in advance as possible. The Department will render timely decisions on employees' leave requests. The vacation plan for the next leave year will be completed by the end of the current calendar year. The procedures for vacation leave will be appropriate for local negotiations; where current practices are acceptable to the local parties, such negotiations need not occur.

2. Unplanned Leave - When needs arise and the employee requests annual leave, employees must contact their supervisor or designee to request the leave. During operational hours of the facility/service, there will always be someone available who is authorized to receive and act on the request. The procedures for unplanned annual leave other than vacation leave will be appropriate for local negotiations; where current practices are acceptable to the local parties, such negotiations need not occur.

3. Serious Personal Needs Situations - If the leave is requested to begin immediately, employees must contact their supervisor or designee to request the leave. The employee will be informed whether leave is approved or disapproved at the time it is requested. During operational hours of the facility/service, there will always be someone available who is authorized to receive and act on the request.

D. If scheduling conflicts arise among employees' annual leave requests, they shall be resolved consistent with past practices or as otherwise negotiated in local supplemental agreements/MOUs insofar as they do not conflict with the Master Agreement.

E. When an employee requests annual leave in conjunction with scheduled days off at the beginning and/or end of the leave period, the Department will not change that employee's days off except where necessary to meet valid operational needs.

F. The Department recognizes the needs of employees to plan vacation and personal time off. However, previously approved annual leave may be cancelled if necessary to meet valid operational needs.

G. The parties recognize that additional procedures for requesting and granting annual leave are appropriate for negotiation at the local level.

H. Carryover (restored) leave will be addressed in accordance with applicable rules and regulations.

I. All employees shall be excused or receive appropriate pay for all holidays prescribed by Federal law, and that may be added by Federal law, or that may be designated by Executive Order.

J. Employees will be notified four times during each leave year of the maximum amount of annual leave that can be carried over by employees in each leave category (doctors, nurses, Title 5, etc.) and advise the employees they should request to use any amount the employee has accrued and will earn during the rest of the leave year that is over the maximum amount. This will include advising employees of the consequences of forfeiture and the law and regulations relating to forfeiture.

K. Upon request, an employee will be provided, in writing, with the reason for a denial of annual leave. It is the responsibility of the Department to initiate action to reschedule annual leave that was denied. The times at which such rescheduled leave is used must be by concurrence of the employee and the Department.

L. The Department will allow the maximum number of employees to use leave in accordance with coverage requirement.

M. Where vacation schedules are used, the approved vacation schedule will be conspicuously posted and remain posted and be kept up-to-date for the leave year. Upon request, changes in the vacation schedule will be provided to the local union on a monthly basis.

## Section 3 - Excused Absence

Supervisors should excuse, without charge to leave, tardiness/absences which are brief, infrequent, and for a good cause.

## Section 4 - Sick Leave

A. It is the responsibility of the employee who is incapacitated for duty to notify the immediate supervisor or designee (or to have any responsible person make the notification for the employee) at the work site as soon as possible but no later than two hours after the employee is scheduled to report for duty unless mitigating circumstances exist. The Department will assure a designated number is established for the supervisor or designee to receive such notifications; the employee's obligation is to complete one phone call, to either the established number, or to an alternate number the employee was notified to use. In the event that the supervisor or designee

860

is not available, employees may use voice mail to notify the supervisor or designee of the type of leave requested.

B. An employee who expects to be absent more than one day will inform the supervisor or designee of the expected date of return to duty and notify the supervisor of any change. In the case of extended illness, daily reports will not be required.

C. Sick leave is an employee's earned benefit and will be granted to the employee for appropriate absences.

D. Title 5 and hybrid employees are entitled to sick leave when the employee:

1. Receives medical, dental or optical examination or treatment;

2. Is incapacitated for the performance of duties by physical or mental illness, injury, pregnancy, or childbirth;

3. Provides care for a family member who is incapacitated by a medical or mental condition, or attends to a family member receiving medical, dental, or optical examination or treatment, or provides care for a family member with a serious health condition;

4. Makes arrangements necessitated by the death of a family member or attends the funeral of a family member (this includes use of sick leave to make arrangements for and attend a funeral or memorial service; necessary travel, pre-funeral and after-funeral/burial gatherings or ceremonies, memorial services; and reading of the will);

5. Would, as determined by the health authorities having jurisdiction or by a health care provider, jeopardize the health of others by being present on duty after exposure to a contagious disease; or,

6. Must be absent from duty for purposes relating to the adoption of a child, including appointments with adoption agencies, social workers, and attorneys, court proceedings, required travel, and any other activities necessary to allow the adoption to proceed.

E. Sick leave shall be granted to Title 38 employees when:

1. They are incapacitated for the performance of their duties because of personal illness, disease, injury, pregnancy and confinement;

2. For necessary medical, dental, or optical examination or treatment;

3. When a member of the immediate family of the employee is afflicted with a contagious disease and requires the care and attendance of the employee; or,

861

4.   When through exposure to contagious disease, the presence of the employee at the post of duty would jeopardize the health of others.

F.   The Department should make an effort to accommodate employees who request in advance, a change in work schedule to meet medical, optical or dental appointments.

G.   If an employee has insufficient sick leave accrued, the employee can request Leave Without Pay (LWOP) or other available leave instead of sick leave for an absence for which sick leave would otherwise be appropriate, subject to approval of the absence by the supervisor.

H.   Employees will not be required to reveal the nature of the illness as a condition for approval of sick leave.

### Section 5 - Documentation for Sick Leave

A.   Where an employee requests sick leave, or annual leave, or LWOP in lieu of sick leave, for periods of illness exceeding three consecutive workdays of the employee's work schedule, the employee must make an appropriate request and may be required to furnish evidence of the need for sick leave upon return to duty.  An employee may support the request for sick leave:

1.   By medical certificate from the Department's employee health care provider or the employee's health care provider that is administratively acceptable; or,

2.   By the employee's self-certification in instances where the illness was not treated by a health care provider.  The statement will indicate why a health care provider was not seen; for example, remoteness of area, general condition of the illness, or other specific reasons.  The supervisor may request clarification should the employee's written statement not be sufficient to support the request.

B.   An employee with a chronic medical condition that does not require medical treatment but does result in periodic absences from work will not be required to furnish a health care provider certificate on a continuing basis if the employee is:

1.   Not on leave restriction; and,

2.   Provides, if requested, an administratively acceptable medical certificate every six months which clearly states the continuing need for periodic absences.

C.   Unless there is reasonable evidence to doubt the required information, administratively acceptable evidence for medical certification is a statement that says the employee was incapacitated for work and date(s) of incapacitation.  This information will generally be considered sufficient for

862

medical certification purposes. However, employees will not be required to reveal the nature of the illness as a condition for approval of sick leave. This applies to sick leave of more than three consecutive workdays or certification for sick leave restrictions.

D. Documents regarding employee absence for sick leave purposes are highly sensitive. The Department will ensure that they are maintained in a secure and confidential manner.

E. Where there is substantial reason to believe that an employee is abusing sick leave entitlement, medical certificates may be required for any period of absence provided the employee has been formally notified in writing that such a requirement has been established for that person.

  1. If an employee has not used sick leave for three months after the notification in Paragraph E, the employee may request that the requirement be reviewed. If it is determined that a medical certificate is no longer warranted for sick leave of three consecutive workdays or less, the employee shall be so notified in writing.

  2. The requirement for medical certification must be reviewed six months after such requirement is imposed. If the requirement is not lifted, the employee may request a review of the certification requirement three months after a previous review. If it is determined that a medical certificate is no longer warranted for sick leave of three consecutive workdays or less, the employee shall be formally notified in writing.

  3. Frequency or amount of leave used will not be the sole factor for determining sick leave abuse, nor will leave for which acceptable medical documentation has been provided.

  4. When the Department determines that the sick leave abuse has ceased, the Department will remove the restriction and notify the employee in writing of this action.

  5. The employee will also be notified of the reasons in writing if the restriction is to be continued beyond six months.

## Section 6 - Sick Out

Employees may be required to furnish evidence of illness to support approval of sick leave for periods of less than three consecutive workdays when the Department has reasonable evidence that a "sick- out" has occurred. Under these circumstances, before the Department requires the employees' evidence, the Union will be provided with the reasonable evidence for the Department's allegations that a "sick-out" has occurred.

863

## Section 7- Registration and Voting

The Department agrees that when the voting polls are not open at least three hours before or after employees' regular hours of work, employees will be granted an amount of excused leave to vote, or to register to vote, which will permit them to report to work three hours after the polls open or leave work three hours before the polls close, whichever requires the lesser amount of time, so long as the absence does not seriously interfere with valid operational needs.  Where release of an employee at the beginning or end of the day would seriously interfere with valid operational needs, the supervisor to the extent possible shall make other arrangements to allow the employee a reasonable amount of time during the workday to vote or register to vote.  Under unusual circumstances an employee may be excused up to the full day.

## Section 8 - Unavoidable Delay While on Official Business

A. When employees are unable to return to their home station through no fault of their own while away on official government business, the employees will notify their supervisors as soon as possible and obtain appropriate instructions.  In such instances, the employees will be paid overtime or approved compensatory time, as appropriate, for any time beyond normal duty hours that they are determined to be performing official duties.  If the employees are unable to return to their duty stations and must stay overnight at some other location, per diem expenses will be paid when appropriate.

B. Employees also will be entitled to compensatory time for time spent in travel, in accordance with the Workforce Flexibility Act of 2004, as amended.

## Section 9 - Employee Absences for Court or Court-Related Services

A. In accordance with applicable law, government-wide regulations or other outside authority binding on the Department, an employee summoned or subpoenaed in connection with a judicial proceeding by a court or other authority responsible for the conduct of that proceeding shall be authorized to attend the judicial proceeding without charge to leave or loss of VA salary in the following instances:

1. For jury duty;

2. To appear as a witness on behalf of the Federal, District of Columbia, state, or local government;

3. To appear as a witness on behalf of a private party in an official and job-related capacity or to produce official records; or,

864

4. To appear as a witness on behalf of a private party in an unofficial capacity and one of the parties to the proceeding is either the United States, District of Columbia, or a state, or local government.

B. Even though no compensation is received for serving on jury duty in a federal court, employees may keep expense money received for mileage, parking, or required overnight stay. Money received for performing jury duty in state or local courts is indicated on the pay voucher or check as either "fees for services rendered" or "expense money." "Expense money" may be retained by the employee; "fees for services rendered" must be submitted to the appropriate financial office.

C. It is agreed that days off and/or schedules will not be changed to avoid granting absence for court or court-related services.

D. An employee who is granted court leave and is excused or released by the court for any day or substantial portion of a day is expected to return to the employee's regular Departmental duties except when:

1. Only a small portion of the work day would be involved and thus no appreciable amount of Department service would be rendered;

2. The distance from the court to the place of duty is such that this would be an unreasonable requirement; or,

3. The employee is regularly scheduled to work on a tour any part of which includes 6:00 pm - 6:00 am.

E. An employee who is granted court leave and serves for a full day or substantial portion of a day is not expected to report for the next tour of duty if that tour occurs within twenty-four hours of the court leave and if any or all of it occurs during 6:00 pm - 6:00 am.

## Section 10 - Leave Without Pay (LWOP)

A. Requests for LWOP will be given serious, bona fide consideration.

B. LWOP may be requested in the same manner and for the same purposes as annual leave and sick leave. LWOP may be granted even though the employee has a sick or annual leave balance.

C. Upon written request from the appropriate Union office, an employee may be granted LWOP to engage in Union activities on the national, district or local level or to work in programs sponsored by the Union or the American Federation of Labor - Congress of International Organizations (AFL-CIO). Such requests will be referred to the appropriate Department official. Such employees shall continue to accrue benefits in accordance with applicable OPM regulations. LWOP for this purpose is limited to one year but may be extended or renewed upon proper application.

D. Employees granted LWOP for more than 30 calendar days will be notified that they can usually expect to return to their former position. However, it may become necessary in the interest of the service to reassign them to other positions at the same grade and pay within the commuting area of the employee's current duty station during their absence or upon their return.

E. Employees may request LWOP for educational purposes.

F. LWOP is granted at the discretion of the Department, except in the following cases:

1. When a disabled veteran requests LWOP for medical treatment;

2. When requested by a reservist or National Guard member for military duties in accordance with appropriate military orders and/or documentation. Employees may request such leave after their military leave has been exhausted (38 USC 4316(d));

3. When requested by an employee who has suffered an incapacitating job-related injury or illness and is waiting adjudication of a claim for employee compensation by the OWCP; or,

4. When an employee makes a request pursuant to the Family and Medical Leave Act (FMLA) and meets the criteria for that program.

### Section 11 - Hazardous Weather/Emergency Conditions

A. The Department and local union at each facility will jointly plan the procedures for hazardous weather/emergency conditions and will annually communicate these procedures to employees.

B. The local union shall be informed by the appropriate Department official at the time the facility declares hazardous weather/emergency conditions. The method for such notification will be appropriate for local negotiations.

C. When hazardous conditions (e.g., extreme weather conditions, serious interruptions in public transportation, earthquake, and disasters such as flood, fire or other natural phenomena) arise, the Department will determine whether all or part of the facility should be closed or whether the facility should be open as usual. If the Department decides to close all or part of the facility during periods the facility would otherwise be open, the Department will notify employees whether liberal leave or authorized absence will be authorized. Employees who are prevented from reporting to work due to the closure of all or part of a facility should be granted authorized absence in accordance with OPM guidance and/or government-wide regulations.

866

D. Excused absence during emergency situations does not generally apply to employees who provide critical services because of the need to assure continuity of essential patient care operations. However, in extreme situations, where employees who provide critical services make reasonable efforts to get to work and are unable to do so, excused absence is appropriate except in rare circumstances.

E. Facilities under emergency conditions should provide meals and accommodations for employees who are required to remain on duty.

F. The VA Incentive Awards Program is an appropriate vehicle and will be utilized for recognizing exceptional services rendered by employees during emergency/hazardous weather conditions.

G. Whenever employees are unable to leave the facility at the end of their shift, and the employee is assigned work, the employee will be paid in accordance with established policy for the payment of premium rates.

H. In accordance with government-wide regulations, the Department will fully implement the provisions of any approved program designed to provide inter-agency leave donation for employees affected by natural disasters.

## Section 12 - Accommodation for Religious Observances

A. An employee whose personal religious beliefs require abstention from work during certain periods of time may elect to engage in overtime work to compensate for time lost by meeting those religions requirements.

B. To the extent that such modifications in work schedules do not interfere with the efficient accomplishment of the Department mission, the Department shall in each instance, afford the employee the opportunity to work compensatory overtime and shall in each instance grant compensatory time off to an employee requesting such time off for religious observances when the employee's personal religious beliefs require that the employee abstain from work during certain periods of the workday or workweek.

C. For the purpose stated in Paragraph B of this section, the employee may work such compensatory time before or after the granting of compensatory time off. Advanced compensatory time off should be repaid with the appropriate amount of compensatory time worked within a reasonable amount of time. Compensatory overtime shall be credited on an hour-for-hour basis or authorized fractions thereof. Appropriate records will be kept of compensatory overtime earned and used.

## Section 13 - Military Leave

A. Military leave will be granted consistent with government-wide rules and regulations.

867

B. Full-time permanent and part-time permanent employees who are members of the National Guard or the Armed Forces Reserves are entitled to 15 calendar days of regular military leave in a fiscal year for active duty or active duty for training.

C. The Department will not arbitrarily deny an employee's request for military leave.

D. For part-time employees, military leave is prorated based on the number of hours in the employee's work week.

E. Employees who do not use the entire 15 days can carry any unused military leave (not to exceed 15 days) over to the next fiscal year. Military leave may never exceed 30 days in any one calendar year.

F. The Department will take into consideration the schedules of employees who work off-tours and will, when possible, arrange schedules to allow such employees to have scheduled days off immediately preceding and following the required military leave

G. Those employees on 24/7 schedules will continue to be charged military leave on a daily basis for duty days.

H. Employees Returning From Active Duty. In accordance with the Presidential Memorandum dated November 14, 2003, as a welcome home, returning Federal civil servants who were called to active duty in the Global War on Terrorism will be granted 5 days of excused absence for every deployment.

## Section 14 - Advanced Annual/Sick Leave

A. An employee may be advanced all annual leave that will accrue up to the end of the leave year. However, advanced annual leave may not be granted to a temporary employee beyond the date set for the expiration of the employee's temporary appointment, or to any employee if there is a likelihood that the employee will retire, be separated, or resign from the Department before the date the employee will have earned the leave. Upon separation, employees must repay the balance of any remaining advanced annual leave; however, an employee may request a waiver in writing.

B. Advanced sick leave may be combined with annual leave or LWOP when necessary to cover one continuous period of absence.

C. Denials of requests for advance leave will be conveyed to the employee promptly and will contain an explanation of the reasons for the denial.

D. Advanced leave may be approved in accordance with the employee's type of appointment. The employee will not be required to utilize any annual leave prior to utilizing the advanced sick leave.

868

E. It is agreed that advance leave, including both sick and annual, will be fairly and equitably administered.

## Section 15 - Voluntary Leave Transfer Program

A. As authorized by 5 CFR 630, Subpart I, as extended to Title 38 employees and consistent with this Agreement, employees are entitled to donate and receive leave for medical emergencies.

B. The Leave Transfer Program allows an employee to transfer annual leave to an approved leave recipient (excluding the employee's supervisor) up to one-half of the amount of annual leave the employee will accrue during the leave year.

C. The minimum amount of annual leave that may be transferred to and from a Title 5 employee, or Title 38 employee who is charged leave in hours, is four hours.

D. Title 5 employees may transfer to Title 38 employees and Title 38 employees may transfer to Title 5 employees.

E. The minimum amount of annual leave that may be transferred from a Title 38 employee who is charged leave in whole day increments is one day. For a leave transfer between an employee who is charged leave in hours and an employee who is charge leave in whole days, the number of hours transferred for each whole day is eight hours. For a leave transfer between employees who are each charged leave in whole day increments, the recipient will be credited with one whole day for each whole day donated.

F. Annual leave may not be transferred to an employee's immediate supervisor.

G. The Department will assist employees in preparing or will prepare the employee's solicitation memorandum which is directed to employees whom the employee designates. The Department will advise employees of how and where to receive such assistance.

H. When an employee receives donated leave, it may be used only for the medical emergency for which it was donated.

I. If an employee has use or lose annual leave at the end of the leave year and would like to donate it, the employee should contact an appropriate Department official.

J. The method of communicating the needs of employees who may want to participate in leave transfer is an appropriate subject for local negotiation.

K. The parties are in the best position to determine whether donated annual leave is needed by its employees in disaster situations and can quickly

facilitate the transfer of donated annual leave among administrations. They are responsible for:

1.  Determining whether, and how much, donated annual leave is needed by affected employees;

2.  Approving leave donors and/or leave recipients within the Department; and,

3.  Facilitating the distribution of donated annual leave.

L.  Forms for donating and receiving annual leave under the inter-agency Emergency Leave Transfer Program can be accessed on OPM's web site at http://www.opm.gov/forms/html/emerg.htm.

## Section 16 - Family and Medical Leave Act (FMLA)

A.  Maternity and Paternity Leave

1.  Under FMLA and this Agreement, bargaining unit employees are entitled to 16 weeks of LWOP during any 12 month period for the following reasons:

    a.  Birth of a son or daughter and the care of such son or daughter; and,

    b.  Placement of a son or daughter for adoption or foster care.

2.  Supervisors are encouraged to approve additional leave as circumstances warrant.

B.  Other family medical leave under FMLA and this Agreement, bargaining unit employees are entitled to 12 weeks of LWOP during any 12 month period for one or more of the following reasons:

1.  The care of a family member of the employee with a serious health condition. Family member is defined as:

    a.  Spouse and parents of spouse;

    b.  Children, including adopted children; and,

    c.  Parents.

2.  A serious health condition of the employee that makes the employee unable to perform the functions of the position of such employee.

C.  Substitution of Paid Leave - For either Paragraphs A or B of this Section, the employee may elect to substitute annual leave, sick leave, compensatory time off, or credit hours for unpaid family or medical leave for any part of the applicable period consistent with governing laws and regulations. Employees may also combine annual leave, compensatory time, sick

870

leave, or credit hours with unpaid family or medical leave for any period of approved leave. An employee may not retroactively substitute paid time off for unpaid family and medical leave.

D. Notice of Leave

 1. The employee will make an appropriate request for use of family and medical unpaid leave.

 2. When the need for unpaid family and medical leave is foreseeable and the employee fails to give 30 days notice with no reasonable excuse for the delay of notification, the Department may delay the taking of family and medical unpaid leave until at least 30 days after the date the employee provides notice of his/her need for family and medical leave.

 3. If the need for leave is not foreseeable, the employee shall provide notice within a reasonable period of time appropriate to the circumstances involved. If necessary, notice may be given by an employee's personal representative (e.g., a family member or other responsible party). If the need for leave is not foreseeable and the employee is unable, due to circumstances beyond his/her control to provide notice of his/her need for leave, the leave may not be delayed or denied.

 4. The time frame in Paragraph 2 above will be waived for good cause.

E. Medical Certification (when requesting leave for serious health conditions)

 1. An employee shall provide written medical certification to the Department in a timely manner.

 2. The written medical certification shall include:

    a. The date the serious health condition commenced;

    b. The probable duration of the serious health condition;

    c. The appropriate medical facts within the knowledge of the health care provider regarding the serious health condition including a statement as to the incapacitation, examination, or treatment that may be required; and,

    d. A statement that the employee is unable to perform the functions of his/her position.

 3. The Department shall not require any personal or confidential information in the written medical certification other than that required by Paragraph E 2 of this section.

4.  If the Department doubts the validity of the original certification, the Department may require, at the Department's expense, that the employee obtain the opinion of a second health care provider designated or approved jointly by the Department and the employee concerning the information certified under Paragraph E 2 of this section.

5.  If the opinion of the second health care provider differs from the original certification, the Department may require, at the Department's expense, that the employee obtain the opinion of a third health care provider designated or approved jointly by the Department and the employee concerning the information certified under Paragraph E 2 above.  The opinion of the third health care provider shall be binding on the Department and the employee.

6.  "Health Care Provider" is defined as any of the following individuals:

    a.  A licensed Doctor of Medicine or Doctor of Osteopathy or a physician who is serving on active duty in the uniformed services and is designated by the uniformed service to conduct examinations;

    b.  Podiatrists, dentists, clinical psychologists, optometrists, and chiropractors (limited to treatment consisting of manual manipulation of the spine to correct a subluxation as demonstrated by x-ray to exist) who are authorized to practice by state law;

    c.  Nurse practitioners and nurse midwives who are authorized to practice by state law or Christian Science practitioners listed with the First Church of Christ Scientist, in Boston, Massachusetts;

    d.  Any health care provider recognized by the Federal Employees Health Benefits Program or who is licensed or certified under federal or state law to provide the service in question;

    e.  A health care provider as defined in Paragraph d of this definition who practices in a country other than the United States, who is authorized to practice in accordance with the laws of that country, and who is performing within the scope of his/her practice as defined under such law;

    f.  A Christian Science practitioner listed with the First Church of Christ Scientist, in Boston, Massachusetts; or,

    g.  A Native American, including an Eskimo, Aleut, or Native Hawaiian, who is recognized as a traditional healing practitioner by native traditional religious leaders and who practices traditional healing methods as believed, expressed, and exercised in Indian religions of the American Indian, Eskimo, Aleut, or Native Hawaiians, consistent

872

with Public Law 95-314, August 11, 1978 (692 Stat. 469), as amended by Public Law 103-344, October 6, 1994 (108 Stat. 3125).

7. To remain entitled to leave under FMLA, an employee or the employee's spouse, son, daughter, or parent must comply with any requirement from the Department that he/she submit to examination (not treatment) to obtain a second or third medical certification from a health care provider other than the individual's health care provider.

8. If the employee is unable to provide the requested medical certification before leave begins or the Department questions the validity of the original certification provided by the employee and the medical treatment requires the leave to begin, the Department shall grant provisional leave pending final written medical certification.

9. An employee must provide the written medical certification required by this section, signed by the health care provider, no later than 15 calendar days after the date the Department requests such medical certification. If it is not practicable under the particular circumstances to provide the requested medical certification not later than 15 calendar days after the date requested by the Department despite the employee's diligent, good faith efforts, the employee must provide the medical certification within a reasonable period of time under the circumstances involved, but no later than 30 calendar days after the date the Department requests such medical certification.

10. If, after the leave has commenced, the employee fails to provide the requested medical certification, the Department may:

   a. Charge the employee as AWOL, unless:

      1) The reason for not providing the medical certification was beyond the control of the employee;

      2) The employee made a good faith effort to provide the certification.

   Prior to being placed on AWOL, an employee will be provided written advance notice of at least 10 working days and given the reasons why AWOL is being charged. During this period, the employee may comply with the Department's request for certification, and the AWOL charges will be rescinded.

   b. Or allow the employee to request that the provisional leave be charged to leave without pay or charged to the employee's annual and/or sick leave account, as appropriate.

11. Any health care provider designated or approved by the Department shall not be employed by the Department or be under the administrative oversight of the Department on a regular basis unless the employee's official duty station is located in an area where access to health care is extremely limited.

F. Medical Recertification - While an employee is using leave under FMLA, the Department may require, at the Department's expense, subsequent medical recertification from the health care provider only if the circumstances described in the original medical certification change significantly or if the Department receives bona fide information that casts doubt upon the continuing validity of the medical certification. Such requests for medical recertification shall not occur more frequently than every six weeks.

G. An employee eligible under the Department's Family Medical Leave Program may request to participate in the telework program consistent with Article 20 - Telework of this Agreement.

H. Protection of Employment and Benefits - Upon return from family and medical leave, the employee will be restored to the same position as occupied before the leave or to an equivalent position in the same commuting area with equivalent benefits, pay, status, and other terms and conditions of employment.

I. The Department shall inform its employees of their entitlements and responsibilities under FMLA, including the requirements and obligations of employees.

J. An employee who meets the criteria for leave and has complied with the requirements under this section may not be denied leave, consistent with all applicable rules governing annual or sick leave, as appropriate.

### Section 17 - Blood, Bone Marrow and Organ Donor Leave

A. Donor leave will be granted consistent with government-wide rules and regulations.

B. Employees will be granted up to four hours of excused absence to donate blood to a Department sponsored or endorsed blood program. Additional excused absence will be granted to employees who donate blood platelets through Department endorsed Hemophoresis Programs. Time spent in necessary travel for such purposes shall also be administrative leave. The Department may require available documentation of blood donation when there is a basis to verify the donation.

C. Upon request, subject to certification by a health care provider, leave-approving officials shall approve excused absence for employees who serve as living donors for bone marrow, organ, and tissue donation and

874

transplantation. The use of excused absence can cover time off for activities such as donor screening, the actual medical procedure, and recovery time. Leave-approving officials shall approve:

1. Up to seven workdays of absence without charge to leave or loss of pay for each donation by employees participating as living bone marrow donors; or,

2. Up to 30 workdays of absence without charge to leave or loss of pay for employees participating as living organ and tissue donors.

The length of absence from work can vary depending on the medical procedure involved in the donation. Therefore, for longer periods of incapacitation, leave-approving officials shall approve annual and/or sick leave or LWOP in combination with the maximum amounts of excused absence specified as above in this section.

### Section 18 - Leave for Bereavement

A. Upon request, subject to any documentation requirements, leave-approving officials shall approve up to five days of annual leave, sick leave, and/or LWOP for employees to mourn the death of the following family members:

1. Spouse;

2. Children, including adopted and step-children;

3. Parents, including stepparents;

4. Siblings, including step-brother/sister; or,

5. Any individual related by affinity, i.e., whose association with the employee is the equivalent to one of the family relationships identified above.

B. Upon request, subject to any documentation requirements, leave approving officials shall approve one day of annual leave, sick leave, and/or LWOP for employees to mourn the death of a grandparent or parent of their spouse.

C. The supervisor has discretion to require documentation (e.g., obituary, death certificate) prior to final approval of bereavement leave. However, this documentation will normally be required only in unusual circumstances.

### Section 19 - Funeral Leave

A. Funeral leave is granted to allow an employee to make arrangements for, or to attend, the funeral or memorial service for an immediate relative who

875

died as the result of a wound, disease, or injury incurred while serving as a member of the armed forces in a combat zone.  The Department shall grant employees such funeral leave as is needed and requested, not to exceed three workdays of excused absence, without loss of or reduction in pay.  The three days need not be consecutive but if not, the employee shall furnish the approving authority satisfactory reasons justifying a grant of funeral leave for nonconsecutive days.

B.  The Department may grant funeral leave only from a prescribed tour of duty, including regularly scheduled overtime, from a period during which, except for absence on funeral leave, the employee would have worked.

### Section 20 - Rest and Relaxation Title 38 Physicians, Dentists, Podiatrists, and Optometrists

The Under Secretary for Health and facility directors or the professional person acting for them, are authorized to approve absence for a period not to exceed 24 consecutive hours for rest and relaxation for full-time physicians, dentists, podiatrists, and optometrists who have been required to serve long hours in the care and treatment of patients.

### Section 21 - Excused Absence (Administrative Leave)

 Excused absence (sometimes referred to as administrative leave) is absence from assigned duties without charge to leave or loss of pay.  Excused absence may be granted for activities which are in the government's interest.

876

# ARTICLE 36 - TIMELY AND PROPER COMPENSATION

## Section 1 - Timely Receipt

A. Employees are entitled to timely receipt of all wages earned for the applicable pay period. Employees shall receive their leave and earning statements in a secure manner and no later than payday, when available. The options (Electronic Funds Transfer (EFT) or check) available to the employee will be communicated to existing employees within 30 days from the effective date of this Agreement and to new employees prior to choosing a method to receive wages.

B. Employees will receive their salary payments through EFT unless they submit a written request for a waiver. An employee who has requested a waiver shall receive a check. The waiver request will be signed and dated, and state: "I request a waiver from EFT because I have determined EFT would impose a hardship." No employee will be required to justify his/her request for waiver.

## Section 2 - Errors in Payment

Employees will review their leave and earnings statements and notify their supervisors of any unexplained changes. When there is an error in payment, the Department will advise employees of the procedures available. Upon the employee's request, the Department will provide the necessary forms for filing a request for waiver of all overpayment of pay and allowances received in good faith.

## Section 3 - Emergency Payments

A. Whenever a Department error results in the failure of an employee to receive full salary payment on time, the Department will take immediate action to promptly pay the employee. An emergency payment will be issued not later than three working days following the date the payment should have been received. Emergency payments will be made in the same form normally issued to an employee (i.e., EFT or check) or in other forms of payment in effect at the employee's facility. This would not apply to nominal errors that are routinely corrected through payroll adjustments.

B. The amount of the emergency payment will be the employee's normal net salary (excluding overtime) as shown on the most recent leave and earnings statement.

# ARTICLE 37 - TRAINING AND CAREER DEVELOPMENT

### Section 1 - General Provisions

A.  The Department and the Union agree that the training and development of employees is of critical importance in carrying out the mission of the Department.  In recognition of this, the Department will provide training and career development opportunities to employees of the bargaining unit. The Department is responsible for ensuring that all employees receive the training necessary for the performance of the employees' assigned duties.

B.  The parties agree that there may be reorganization, technological changes, RIFs, or other major actions which could have an impact on job security. In recognition of this, the Department will make every effort to provide training which would allow employees to move into existing or projected vacancies, consistent with budget and staffing restrictions.

C.  Nothing in this section is intended to interfere with applicable merit promotion requirements or Title 38 career advancement procedures.

### Section 2 - Local Training Committees

A.  There shall be a joint local level Training and Career Development Committee which will be authorized to reach joint agreements and make joint recommendations regarding training and career development programs.

B.  The committee will consist of Department and local union representatives. The committee will meet as needed to address training issues such as:

1.  Orientation sessions for new employees;

2.  In-service or on-the-job training to improve the employees' capability to perform their current jobs;

3.  Training for career enhancement;

4.  Cross-training and rotational assignments;

5.  Funding for training;

6.  Upward mobility; and,

7.  Tuition Support.

### Section 3 - Training Costs

A.  The Department will pay all expenses, including tuition and travel, in connection with training required by the Department to perform the duties

878

of an employee's current position or a position to which an employee has been assigned.

B. Depending upon the availability of funds and training priorities, the Department will also pay appropriate expenses for work-related training that will:

1. Improve an employee's ability to perform his/her current job or a job the employee has been selected to fill through merit promotion;

2. Increase an employee's knowledge or skills in connection with career growth or advancement opportunities; or,

3. Approval of such training may also be contingent upon an agreement by the employee to share any costs with the Department.

C. When resources for training are limited, approval for training funds will be based on fair criteria that are equitably applied.

## Section 4 - Reassignments and New Assignments

When employees are reassigned to new positions or assigned new duties in connection with their current positions, the Department will provide the training necessary to enable employees to perform all required duties.

## Section 5 - Scheduling Training

A. When training required by the Department is conducted during an employee's regularly scheduled work hours, he/she will be granted excused absence to attend.

B. When training is approved under Section 3(B) of this article, the Department will make a good faith effort to grant excused absences from work or make schedule adjustments to accommodate an employee's training or educational program.

## Section 6 - Training Information

A. The Department shall inform employees, at least annually, about Department training opportunities, policies, and nomination procedures. Upon request, the Department will advise individual employees of training opportunities that meet identified educational or career objectives.

B. The Department will maintain up to date information about training courses, programs, and seminars conducted or sponsored by the Department or available from some other source. This information shall be accessible to employees and publicized in such a way as to provide adequate notice to interested employees.

## Section 7 - Notification

Employees will be notified of approval or disapproval of training requests as soon as possible but in every case prior to the starting date of the training. Should an employee's request for training be disapproved solely for lack of funds, the employee may resubmit a request for training as funds become available. That request will be given first consideration but may be disapproved due to higher training priorities. If not selected for training, the employee will be notified of the reasons.

## Section 8 - Educational Programs and Continuing Education

A. As resources permit, the Department shall work with educational institutions and other training sources to develop opportunities for employees to participate in long term educational programs.

B. The parties recognize that a block of time for pursuing continuing education is beneficial to the Department. Each facility is therefore encouraged to grant a minimum block of time to employees for pursing continuing education opportunities.

## Section 9 - Local Negotiations

Procedures which ensure fair and equitable training opportunities are appropriate subjects for local bargaining.

## Section 10 - Tuition Support

A. Employees who are eligible for receiving tuition support shall be informed of the availability of reimbursement funds and shall be given the opportunity to apply for the reimbursement funds.

B. When a change in qualifications for a position mandates an additional requirement for an employee already holding that position, the Department will pay for the education needed for the employee to meet the new qualifications unless the employee is grandfathered in or taken out of the position.

C. Tuition support for upward mobility is a proper subject for local bargaining.

D. Bargaining unit employees shall have an equitable opportunity to compete for the receipt of available tuition support funds.

E. All employees will be timely provided with information on the availability of funds for tuition support and on the processes by which an employee may apply for any available funds.

880

# ARTICLE 38 - UNIFORMS

### Section 1 - General

This article establishes policies, procedures, and responsibilities for acquiring, wearing, maintaining, and exchanging of official Department uniforms.  An employee who is required by the Department to wear a uniform shall receive either an allowance for uniforms or be issued uniforms but not both.  The Department shall issue uniforms in accordance with law, government-wide regulation, and VA policy.  Nothing will prevent local negotiations on uniform issues.

### Section 2 - Purpose

The objective is to enhance employee and public pride and to project an image of the organization.  Further, employees shall be provided with functional, durable, and comfortable uniforms appropriate for the assigned duties and climates.  Employees shall be assured the highest possible degree of consistency in uniform appearance that is commensurate with the diversity of tasks and climates confronting employees that will enhance and clearly identify the role of the employee.

### Section 3 - Police Uniforms

The Department will provide Police Officers in the Department with certain items and their replacements, in accordance with Handbook 0730.  The Department will provide an allowance for items not issued by the Department, in accordance with 38 USC 903.  The Police Officer will not be required to use personal funds for mandated uniform items.  The Department agrees to establish a system that provides for the expeditious acquisition of uniforms.

### Section 4 - Firefighter Uniforms

The Department will provide an allowance for items not issued by the Department, in accordance with 5 USC 5901-5903, VHA Handbook 1850.04, and government-wide regulation.  The Firefighter will not be required to use personal funds for mandated uniform items.  The Department agrees to establish a system that provides for the expeditious acquisition of uniforms.

### Section 5 - Repairs and Alterations

The Department shall repair or alter government-issued uniforms including required patches and emblems.

881

### Section 6 - Lab Coats

All full time employees who wear lab coats shall be issued a minimum of seven lab coats.  Pathology and Laboratory shall be issued non-permeable lab coats.  For other employees, the minimum number of lab coats issued to each employee must be the number required to ensure that a clean lab coat is available each workday.

### Section 7 - Number of Uniform Items

All full time employees who wear uniforms that must be laundered between uses shall be issued a minimum of seven uniforms.  For other employees, the minimum number of such uniforms issued to each employee must be the number required to ensure that a clean uniform is available each workday.

### Section 8 - Changes

Any proposed changes in the current style, color, texture, or design of uniforms currently in existence shall be forwarded to the Union at the affected level for bargaining.

### Section 9 - Distribution of Uniforms

The Department shall provide a consistent and equitable distribution system that will allow for a convenient exchange of laundered Department issued uniforms.

### Section 10 - Replacement

All Department issued uniforms and accessories shall be replaced when rendered unserviceable.

### Section 11 - Time to Change In and Out of Uniforms

This section is addressed in Article 21 - Hours of Work and Overtime, Section 3 L.

882

# ARTICLE 39 - UPWARD MOBILITY

### Section 1 - Goals and Objectives

The goal of Upward Mobility is to provide maximum opportunity for employees to advance so as to perform at their highest potential. An objective of Upward Mobility is to support the advancement of underrepresented minorities and women and to meet other special emphasis program goals. The Department's wide range of occupations will be considered in developing Upward Mobility opportunities.

### Section 2 - Program Penetration

The extent of any installation's Upward Mobility endeavors will depend on, among other things:

A.  The number of lower-graded employees having the requisite potential;

B.  The number and type of target positions available which would link employee potential with positions in support of the facility's operations;

C.  Available training resources; and

D.  Ceiling or budget constraints.

Efforts will be made to create alternate ways to support Upward Mobility such as collaborative efforts with schools having different academic and vocational programs.

### Section 3 - Identifying Positions

Each facility will design an Upward Mobility Program, consistent with Section 2 above, that is responsive both to employee career advancement and to the facility's staffing needs. There will be joint labor/management involvement in the design of such a program. As part of this program, the parties will identify positions which may be appropriate for upward mobility. If the Department determines that a position should be filled as upward mobility, the position will be specifically described and announced as such. It will be filled at a grade level which is lower than the target level and will permit the consideration of employee potential as a factor in evaluating candidates for selection.

### Section 4 - Creating Training Positions

It is understood that upward mobility may also be achieved by:

A.  Evaluating situations where vacant positions can be filled at lower-grade, trainee levels;

883

B.  Identifying areas where bridge positions could be established in order to provide opportunities for employees to enhance their careers; and,

C.  Skills upgrading to supplement the existing skills of employees so that they may fully qualify for positions in other career ladders.  The consideration of positions for upward mobility will not be limited to any particular occupational series.

The Department will review promotion announcements to ensure that the qualifications sought of applicants are necessary for successful performance in the position (e.g., not all secretarial positions require the ability to take dictation).

## Section 5 - Employee Initiatives

Employees are encouraged to seek guidance from their immediate supervisor(s) or from the appropriate administrative office if they are interested in learning about available career opportunities.  These employees will be furnished information about lines of career progression, education requirements, available job opportunities, etc.  Upward Mobility announcements will be well communicated throughout the facility by such means as: e-mail, bulletin boards, newsletters, and staff meetings.

## Section 6 - Specialized Training

The Department also agrees that the Upward Mobility Program can be enhanced by providing tailored guidance and training in instances where it may be beneficial to help employees adjust.  These special efforts may be made consistent with the requirements of the position, the selectee's talents and aptitudes, and within available resources.

## Section 7- Cross-Training

The parties recognize that cross-training, where this approach is feasible, can provide a valuable opportunity for employees to broaden their experience.  Each facility will review the possibility of increasing the amount of cross-training conducted within its services or divisions.

884

# ARTICLE 40 - WITHIN-GRADE INCREASES AND PERIODIC STEP INCREASES

## Section 1 - Within-Grade Increases For Title 5, Hybrid, and Veterans Canteen Service (VCS) Employees

A. Applicability

1. This section applies to all General Schedule, Federal Wage System, and non-appropriated fund employees in the unit of recognition. This includes Hybrid Title 38 employees appointed on a full time, part-time, or intermittent basis under 38 USC 7401(3) or 7405(a)(1)(B). It will be used in conjunction with Article 27 - Performance Appraisal. Periodic step increases for Title 38 employees are discussed in Section 2 below.

2. It is noted that the general authority for Within-Grade Increases (WIGI) currently is contained in 5 USC 5335 and 5 CFR part 531, subpart D.

B. Definitions

1. Acceptable Level of Competence - An employee will be considered to have attained an acceptable level of competence when he/she is currently performing at the fully successful or better level under the performance appraisal system, and such performance is documented by a rating of at least fully successful/satisfactory.

2. Waiting Period - The term waiting period refers to the minimum time requirement of creditable service to become eligible for a WIGI.

3. Within-Grade Increase - The term WIGI means a periodic increase in an employee's rate of basic pay from one step of the grade of his/her position to the next higher step.

4. Equivalent Increase - This term means an increase in an employee's rate of basic pay which is equal to or greater than the amount of one WIGI An equivalent increase is based on the step rate held by the employee before his/her advancement to the next step of the grade of his/her position. An equivalent increase does not include:

   a. A statutory pay adjustment;

   b. The periodic adjustment of a wage schedule;

   c. The establishment of an above-minimum entrance rate or special salary rates;

   d. A quality step increase or other incentive award;

885

e.  A temporary or term promotion when returned to the permanent grade or step; or,

f.  An increase resulting from placement of an employee in a supervisory or management position who does not satisfactorily complete a probationary period under 5 USC 3321(a)(2) and is returned to a position at the same grade and step held by the employee before such placement.

C.  Within-Grade Increases

1.  The determination to grant or withhold a WIGI will be based on the employee's appraisal of record and his/her current performance under a performance plan for 90 days or more.

2.  The WIGI will be granted as soon as the employee is eligible if he/she has met an acceptable level of competence.

D.  Performance/Competence Determination

1.  Communication of Performance Requirements - Employees shall be informed of the specific performance requirements that constitute an acceptable level of competence within the time frames and means of communication of performance standards established under the performance appraisal system.

2.  Acceptable Level of Competence Determinations:

a.  An acceptable level of competence determination shall be based on the current rating of record.  This rating used as the basis for an acceptable level of competence determination must have been assigned no earlier than at the end of the most recently completed annual appraisal period.  If the most recent rating is more than 90 days old, the current performance will be reviewed to ensure that the rating of record reflects current performance.

b.  When it is determined that current performance is not at an acceptable level, a special rating must be prepared to document current performance.

3.  Notification - Employees shall be provided with an acceptable level of competence determination as soon as possible after the completion of the required waiting period.

a.  Favorable Determination - The SF-50-B, Notification of Personnel Action, shall be used to advise employees that they have achieved an acceptable level of competence and will receive a within-grade increase.

886

b. Negative Determination - When it is determined that the employee's performance is not at an acceptable level of competence, the employee shall be given a written notice which includes the following:

1) The reasons for the negative determination and the respect in which the employee must improve his/her performance; and,

2) Information on the employee's right to request reconsideration of the negative determination.

E. Reconsideration

1. Procedures for WIGI Determinations

a. Where an employee has been assigned to a present supervisor for less than 90 days, and that supervisor cannot adequately assess the employee's performance, he/she shall secure the written views of the employee's prior supervisor before making a performance determination. A copy of this document will be given to the employee.

b. Except in rare and unusual circumstances, the WIGI will be granted as soon as the employee is eligible unless the employee was informed in writing:

1) During the most recent progress review; or,

2) In no event later than at least 60 calendar days before the end of the statutory waiting period for eligibility for a WIGI that his/her performance is below an acceptable level of competence and, unless his/her performance improves, the WIGI will be denied.

2. In those rare and unusual circumstances when the supervisor does not give 60 calendar days advance notice and the WIGI is delayed, the supervisor will reconsider the employee's level of competence not later than 60 calendar days after the date on which the employee completed the required waiting period, If the employee's level of competence is acceptable, the WIGI will be made retroactively effective on its original due date.

3. If at the end of the 60 calendar days, the employee's performance is not at an acceptable level of competence for the purpose of approving the WIGI, the employee will be given a written notice which will include:

a. An indication that the employee's work has been reviewed;

b. A statement that the employee's work has been determined to be of a less than acceptable level of competence;

    c. An identification of those elements where the employee's performance has resulted in denial of the WIGI;

    d. A statement that the employee has a right to request, in writing, a reconsideration of the negative determination, provided the request is made within 15 days of the employee's receipt of the negative determination;

    e. The name of the reconsideration official to whom the employee may submit a request;

    f. A statement that the employee may have a local union representative when presenting a request to the reconsideration official;

    g. A statement that the employee may appeal via the appropriate procedure the basis for the negative determination in person and/or in writing; and,

    h. An explanation that the employee may be considered for a WIGI at any time during the next 26 calendar weeks if the employee demonstrates an acceptable level of competence.

F. Exceptions

    1. Delays of Acceptable Level of Competence Determinations - The employee shall be informed in writing whenever his/her acceptable level of competence determination is being delayed in accordance with OPM regulations. The employee shall be informed of the reasons for delay and the specific requirements for performance at the acceptable level of competence.

    2. Waiver of Requirement to Make Acceptable Level of Competence Determinations - An acceptable level of competence determination shall be waived and a WIGI granted when an employee had not served for at least 90 days in any position under an applicable agency appraisal system during the final 52 weeks of the waiting period for the reasons specified in 5 CFR 531.409(d).

G. Redeterminations

After a WIGI has been withheld, the Department may grant a WIGI at any time after it determines that the employee has demonstrated performance at an acceptable level of competence. In such cases, the WIGI will be effective the first day of the first pay period after the acceptable determination is made.

888

**Section 2 - Periodic Step Increases For Personnel Appointed Under 38 USC 7401(1) and 38 USC 7405(a)(1)(A):**

A.  Applicability

This section applies to any physician, dentist, optometrist, podiatrist, Registered Nurse (RN), Physicians Assistant (PA), Expanded Function Dental Auxiliary (EFDA), or chiropractor, who is receiving less than the maximum rate of his/her grade.  Within-grade increases for Title 5, Hybrid, and VCS employees are discussed in Section 1 above.

B.  Governing Law

Under Department regulations set forth in VA Handbook 5007, Part III, Chapter 5, Section 1, and VA Handbook 5013, Part II, Paragraph 12, the employees listed in subsection 1 A will be advanced to the next higher step rate within such grade if they meet the eligibility requirements and waiting periods set forth in the regulations.  Any reference to a Handbook in this section is to the document cited, or as found in the successor document.

C.  Eligibility

Pursuant to VA Handbook 5007, Part III, Chapter 5, Section l.b., a periodic step increase will be granted when:

1.  An employee's work is of an acceptable level of competence;

2.  No "equivalent increase" in compensation was received during the period under consideration; and,

3.  The benefit of successive increases shall be preserved for any person whose continuous service is interrupted by active military duty.

D.  Waiting Periods

Pursuant to VA Handbook 5007, Part III, Chapter 5, Section 1 c, the minimum time requirement of creditable service without an equivalent increase is either 52 weeks or 104 weeks of creditable service, depending upon the employee's occupation and grade.  Please see the Department regulations for specific waiting period requirements and applicable exceptions.

E.  Disapproval and Reconsideration

Procedures for disapproval and reconsideration of periodic step increases are set forth in VA Handbook 5013, Part H, Paragraph 12.  Those regulations provide that if disapproval is recommended, the rating official shall prepare

889

a written justification and forward it, through the local HRM Office, to the approving official for decision.  If disapproved:

1.  The employee will be notified in writing of:

    a.  The reason(s) for disapproval;

    b.  The fact that the employee will be reconsidered within 52 weeks (time to be specified); and,

    c.  The right to ask for a review of the decision under Paragraph 2 below.

2.  An employee may request reconsideration of a decision to deny a periodic step increase or rate of adjustment within 15 calendar days of receipt of the notification required under c above.  The reconsideration decision will be rendered by the next higher level professional/administrative supervisor at the health care facility or, if there is no higher level professional/administrative supervisor at the facility, the file is to be submitted to the appropriate Network Director for decision.  All reconsideration decisions are final.  If, on reconsideration, it is determined that an employee was performing at an acceptable level of competence, the employee shall be given the periodic step increase retroactive to the original due date.

890

# ARTICLE 41 - WORKERS' COMPENSATION

## Section 1 - General

The Office of Workers' Compensation Program (OWCP) is administered by the U.S. Department of Labor (DOL). Employees should consult the DOL for guidance on applicable laws, DOL regulations, and precedents if issues arise that are not covered herein.

## Section 2 - Counseling

A. The Department agrees that when an employee sustains an injury or an alleged acquired illness or exposure, in the performance of duties, and reports it to the Department, the supervisor and/or the appropriate Department official will immediately inform the affected employee of his/her rights under the Federal Employees Compensation Act (FECA). These rights include the following:

   1. The employee's right to file for compensation benefits;

   2. The types of benefits available;

   3. The written procedure for filing claims at each station or workplace;

   4. The option to use compensation benefits if approved in lieu of sick or annual leave; and,

   5. The option to use continuation of pay for traumatic injuries in lieu of sick or annual leave.

B. The Department will review and respond to an employee's complaint of the mishandling of his/her Workers' Compensation claim. The response will be provided to the employee in writing in a timely fashion. The review and response will be completed no later than 30 days from the receipt of the complaint. If the review and response will not be completed in 30 days, the employee will be given a written response no later than the 30th day and the reasons for the delay, including an estimate of how much more time it will take to complete.

## Section 3 - Procedure for Filing Claims for Workers' Compensation Benefits

A. As soon as possible after experiencing a job-related injury or illness, the employee should contact his/her supervisor.

B. The Department shall, at that time, assure the employee is provided the proper forms and assist the employee in filling them out. The CA-16, CA-17, CA-7, and CA-20 must be in hard copy; for other forms, the employee will be

891

permitted to choose whether to use electronic or paper forms. The forms include:

1. CA-1 is the appropriate form for reporting a traumatic injury. A traumatic injury is a wound or other condition of the body caused by external force, including stress or strain. The injury must be identifiable by time and place of occurrence and member of the body affected; it must be caused by a specific event or incident or series of events or incidents within a single day or work shift. A traumatic injury also includes damage to or destruction of prosthetic devices or appliances.

2. CA-2 is the appropriate form for reporting an occupational disease or illness. An occupational disease is defined as a condition produced in the work environment over a period longer than one workday or shift. It may result from systemic infection, repeated stress or strain, exposure to toxins, poisons, or fumes, or other continuing conditions of the work.

3. CA-2A is the appropriate form for recording a recurrence of disability. A recurrence of disability is defined as a spontaneous return or increase of disability due to a previous injury or occupational disease without intervening cause or a return or increase of disability due to a consequential injury.

4. CA-16 authorizes an injured employee to obtain immediate examination and/or treatment from a physician for an on-the-job injury. An employee has the initial right to select a physician of his/her choice to provide necessary treatment. The physician must be listed by name on the CA-16. The term 'physician' includes doctors of medicine (MD), surgeons, osteopathic practitioners, podiatrists, dentists, clinical psychologists, optometrists, and chiropractors within the scope of their practice as defined by state law. Whenever possible, the employee will be provided CA-16 (Authorization for Examination and/or Treatment) within four hours after requesting the CA-16. When it is not possible, the Department will authorize medical treatment by telephone and send the completed form to the medical facility within 48 hours. The Department will provide the employee with information about accessing DOL's online medical provider search tool and will assist the employee in obtaining the list. The fact that a provider is listed in no way constitutes an endorsement of the provider, or the provider's services, by the Department.

5. CA-17 is the form used to report the duty status of the employee. The supervisor must fill out the left hand portion of the form describing the physical requirements of the position. The physician or

892

practitioner completes the CA-17, Duty Status Report, as appropriate, to provide information such as the date the employee can return to work or any restrictions on work the employee will be able to perform.

6. CA-7 is the form used to claim compensation (wage loss) when the employee cannot return to work after Continuation of Pay (COP) ends, or when the employee is not entitled to receive COP, and claims compensation for wage loss. CA-7 is filed in occupational exposure or recurrence cases. In controverted cases, where pay is terminated, form CA-7 is submitted with form CA-1. CA-7 is also used to claim a schedule award for permanent impairment as a result of traumatic injury.

7. CA-20 is a Medical Report Form. This report may be made on CA-20, which is a form attached to CA-7. The Department will provide form CA-20 to the employee as often as needed.

8. The employee's PD.

C. The appropriate sections of these forms should be filled out by the employee and given to the supervisor as soon as possible, but not later than 30 calendar days from the date the employee notifies the Department of the injury or illness. If the employee is incapacitated, this action may be taken by someone acting on behalf of the employee. Supervisory action on CA-1 and CA-2 forms shall be completed within five working days after the employee completes his/her portion of the form. For all forms, the Department must complete the appropriate parts of the form(s) and transmit them to the DOL, OWCP, within the time limits set out by the DOL.

D. The Department will not request an employee to release the employee's medical records or other personally identifiable information, except to the extent required to adjudicate the employee's claim. This release will be specific to the injury/illness claimed. An employee will be informed of and afforded the opportunity to discuss the release of records with the Union prior to submitting the release.

E. All records relating to claims for benefits filed under FECA are covered by the government-wide Privacy Act system of records (DOL\Govt 1). (See 20 CFR 10.11) The employee will be informed in writing of the employee's privacy entitlements/rights afforded by DOL under Title 20, System of Records.

F. At the time the employee files a claim, the employee will be asked to designate whether he/she wishes a representative of the Union to be notified that the employee has filed a claim, and/or to receive a copy of the claim.

## Section 4 - Posting of Employee Rights

The Department agrees to post a notice on all Department controlled bulletin boards advising employees of the appropriate HR office room/building location for filing Workers' Compensation claims. The notice will also include HR office telephone numbers and/or the Department's OWCP Specialists office telephone number for obtaining information/assistance relevant to Worker's Compensation claims. The Department further agrees to distribute annual notice to all employees providing them the same information.

## Section 5 - Election of Benefits Options

A. As a rule, three years is the time limit for initially filing an OWCP claim. It is to the employee's advantage to file a claim immediately after becoming aware of a medical condition that was caused by work.

B. OWCP (DOL), not the Department, decides if an employee has a compensable injury and what benefits he/she is entitled to under FECA. OWCP will notify the employee in writing when the claim has been received and OWCP has assigned a claim number.

C. Pending the approval of the compensation claim, an employee with a job-related traumatic injury/illness or occupational disease may elect to be placed on sick or annual leave instead of leave without pay. If the employee's claim is approved, the employee shall have the option of buying back any leave used and having it reinstated to the employee's account.

D. An employee with a job-related traumatic injury/illness may elect to receive 45 days of COP if the claim is filed within 30 days of the injury. The entitlement to COP is not available to employees who file an occupational disease claim.

E. If the employee's claim for compensation is disallowed by the DOL, OWCP, any of the 45 days of COP that were previously granted will be converted to sick leave, annual leave, and/or LWOP. The employee shall be responsible for advising the Department as to which form(s) of leave is/are requested and for completing an SF-71, Application for Leave, or its electronic equivalent.

## Section 6 - Placement of Workers' Compensation Claimants

A. When an employee requests and supports his/her request with appropriate medical information, the Department, will make a serious effort to assign the employee on a temporary basis to duties consistent with the employee's medical needs, pending resolution of his/her claim.

B. Where the employee requests and supports his/her request with an approved OWCP claim and appropriate medical information, the

894

Department will take prompt action with regard to all job related injuries or illnesses so that employees receive the appropriate benefits expeditiously, and are returned to duty as soon as possible.  Employees will be informed about their rights and responsibilities related to job incurred illnesses or injuries.

C.  Employees will be provided transitional (light) duty assignments consistent with their qualifications and medical limitations.  Light duty assignments must be in writing, of limited duration, and not to be considered indefinite or permanent in nature.  Transitional (light) duty may also include reduced hours or changing the employee's scheduled tour of duty without loss of pay.  Any such action will be consistent with the negotiated Article 23 - Merit Promotion.

D.  Form CA-17, Duty Status Report, is the designated form to be used by the agency to have the attending physician list any work limitations or restrictions.  Light duty is work that has been modified to meet physical restrictions of an employee.  These requested restrictions are designed to protect the health and safety of the affected employee or others.  These assignments may involve physical activities, environmental aspects of an assignment (e.g., exposure to dust or fumes), scheduling (e.g., no shift work for an unstable diabetic), travel equipment usage (e.g., respirators, ladder climbing, driving), communication abilities (e.g., inability to speak), sensory impairments (e.g., visual deficits, color blindness or other similar condition, diminished ability to sense heat or cold or other similar condition, etc.).  Form CA-17 must specify, as shown in the PD, the physical and or mental capabilities required, e.g., lift — pounds, repetitive motions of certain body parts, squatting or bending, scheduling or environmental demands, or other restrictions, which must be considered.

895

No. 19-16395

**Court of Appeals for the 9th Circuit**

Tatyana Evgenievna Drevaleva

*Plaintiff-Appellant Pro Se*

v.

1) The U.S. Department of Veterans Affairs

2) Mr. Robert Wilkie, Esq. in his capacity as an acting Secretary of the U.S. Department of Veterans Affairs

*Defendants-Appellees*

*The District Court for Northern California,*

*case No.3:18-cv-03748, Hon. Judge William Alsup*

# EXERPTS OF THE RECORD,

# VOLUME 4.

**Docket No. 54** – Plaintiff's Reply to Defendants' Opposition to my Motion for Preliminary Injunction, November 09, 2018, the end of the document (**pages 896-1068**)

**Docket No. 55** - Plaintiff's Motion for Leave to File a Motion for Reconsideration of the Court's Order denying my Request for Supplemental Brief as a response to Defendants' Reply to my Opposition to Defendant's Motion to Dismiss, the Civil Local Rule 7-9; November 10, 2018 (**pages 1069-1074**)

**Docket No. 56** – Judge Alsup's Order Denying Motion for Reconsideration, November 14, 2018 (**pages 1075-1077**)

**Docket No. 57** – Judge Alsup's ORDER RE PLAINTIFF'S INQUIRIES. (denying my request to transfer the lawsuit to the District Court of New Mexico and denying my request to appoint a Counsel), November 19, 2018 (**pages 1078-1080**)

**Docket No. 58** – Drevaleva's Notice of Appeal No. 18-17241 of the November 19, 2018 Order that denied an appointment of a Counsel, November 20, 2018 (**pages 1081-1082**)

**Docket No. 59** – a joint Case Management Statement, November 21, 2018 (**pages 1083-1102**)

**Docket No. 60, beginning** – Drevaleva's Notice of Motion; Motion to Transfer my Complaint to the U.S. Supreme Court under Article III, Section 2 of the U.S. Constitution; Memorandum of Points and Authorities; Declaration; Exhibits, November 22, 2018 (**pages 1103-1184**.)

I declare under the penalty of perjury and under the Federal laws that all foregoing is true and correct. Executed at San Francisco, CA on April 11, 2021.

Respectfully submitted,

s/ Tatyana Drevaleva

Petitioner Pro Se

3015 Clement St., Apt. 204, San Francisco, CA, 94121

415-806-9864; tdrevaleva@gmail.com

Date: April 11, 2021.

**Docket No. 54.**

November 09, 2018.

Plaintiff's Reply to Defendants' Opposition to my Motion for Preliminary Injunction,

The end of the document.



**UNION RIGHTS AND PRIVILEGES**



# ARTICLE 42 - AFFILIATIONS

A. The Department will honor the Union's rights as the exclusive representative regardless of any relationship between the Department and an affiliate body.

B. The Department agrees that officials of an affiliate acting in a supervisory capacity over unit employees shall be bound by applicable law, regulation, the terms of this Agreement, and any applicable supplemental agreements in their supervisory relationships with bargaining unit employees.

# ARTICLE 43 - GRIEVANCE PROCEDURE

### Section 1 - Purpose

The purpose of this article is to provide a mutually acceptable method for prompt and equitable settlement of grievances.  This is the exclusive procedure for Title 5, Title 38 Hybrids and Title 38 bargaining unit employees in resolving grievances that are within its scope, except as provided in Sections 2 and 3.

### Section 2- Definition

A. A grievance means any complaint by an employee(s) or the Union concerning any matter relating to employment, any complaint by an employee, the Union, or the Department concerning the interpretation or application of this Agreement and any supplements or any claimed violation, misinterpretation or misapplication of law, rule, or regulation affecting conditions of employment.  The Union may file a grievance on its own behalf, or on behalf of some or all of its covered employees.

B. This article shall not govern a grievance concerning:

1. Any claimed violation relating to prohibited political activities (Title 5 Chapter 73 Subchapter III);

2. Retirement, life insurance, or health insurance;

3. A suspension or removal in the interest of national security under 5 USC 7532;

4. Any examination, certification or appointment;

5. The classification of any position which does not result in the reduction in grade or pay of an employee.

C. Under 38 USC 7422, the following exclusions also apply only to pure Title 38 bargaining unit employees:

1. Any matter or question concerning or arising out of professional conduct or competence such as direct patient care or clinical competence;

2. Any matter or question concerning or arising out of peer review; and/or,

3. Any matter or question concerning or arising out of the establishment, determination, or adjustment of employee compensation under 38 USC 7422.

Note 1:  The language in the above paragraph shall only serve to preclude a grievance where the Secretary, or a lawfully appointed designee of the Secretary (currently the Under-Secretary for Health), determines in accordance with 38 USC 7422 that the grievance concerns or arises out of one or more of

the three items listed above.  Any determination under this language by the Secretary or his/her designee is subject only to judicial review pursuant to 38 USC 7422(c).

### Section 3 - Other Applicable Procedures

A.  As provided for in 5 USC 7121, the following actions may be filed either under the statutory procedure or the negotiated grievance procedure but not both:

1.  Actions based on unsatisfactory performance (5 USC 4303),

2.  Adverse actions (5 USC 7512),

3.  Discrimination (5 USC 2302(b)(1)).

B.  Nothing in this Agreement shall constitute a waiver of any further appeal or review rights permissible under Title 5, Chapter 71.

C.  An employee shall be deemed to have exercised his/her option under this section when he/she timely initiates an action under the applicable statutory procedure or files a timely grievance in writing under the negotiated grievance procedure, whichever event occurs first.  Discussions between an employee and an EEO (ORM) counselor would not preclude an employee from opting to select the negotiated grievance procedure if the grievance is otherwise timely.  For purposes of an EEO action, the time limit for filing a grievance will be extended by 30 days, beginning with the employee's receipt of a notice of the Right to File a Formal Discrimination Complaint.

### Section 4 - Jurisdiction

If either party considers a grievance non-grievable or non-arbitrable, the original grievance will be considered amended to include this issue.  The Department must assert any claim of non-grievability or non-arbitrability no later than the Step 3 decision.

### Section 5 - Representation

The only representation an employee may have under this procedure is representative(s) approved in writing by the Union, in accordance with Section 7.  An employee may pursue a grievance without union representation, but the Union may elect to attend each grievance step.  The Union will be provided notice immediately when any grievance is filed as well as given advance notice of each meeting.

901

## Section 6 - Informal Resolutions

Most grievances arise from misunderstandings or disputes, which can be settled promptly and satisfactorily on an informal basis. The use of ADR is encouraged. The parties agree that every effort will be made to settle grievances at the lowest possible level. Inasmuch as dissatisfactions and disagreements arise occasionally among people in any work situation, the filing of a grievance shall not be construed as reflecting unfavorably on an employee's good standing, performance, loyalty, or desirability to the Department. Reasonable time during work hours will be allowed for employees and Union representatives to discuss, prepare for, and present grievances including attendance at meetings with management officials concerning the grievances, consistent with Article 48 - Official Time and local supplemental agreements.

## Section 7 - Procedure

A. Grievance meetings under this procedure will be face-to-face at the location of the grievant. By mutual agreement, the parties to the grievance may agree to teleconference the grievance meeting. The Union is entitled to have an equal number of representatives at all steps of the grievance procedure as the Department.

B. Employees and/or their representatives are encouraged to informally discuss issues of concern to them with their supervisors at any time. Employees and/or their representatives may request to talk with other appropriate officials about items of concern without filing a formal grievance if they choose. In the event of a formal filing of a grievance, the following steps will be followed.

Step 1.

An employee and/or the Union shall present the grievance to the immediate or acting supervisor, in writing, within 30 calendar days of the date that the employee or Union became aware, or should have become aware, of the act or occurrence; or, anytime if the act or occurrence is of a continuing nature. The immediate or acting supervisor will make every effort to resolve the grievance immediately but must meet with the employee/representative and provide a written answer within 14 calendar days of receipt of the grievance. If there is to be more than one Department official involved in the grievance meeting, the Union will be so notified in advance.

Step 2.

If the grievance is not satisfactorily resolved at Step 1, it shall be presented to the Service/Division Chief, or other equivalent Department official or designee within seven calendar days of the Step 1 supervisor's written decision letter. The recipient of the grievance shall sign and date the grievance. The Step 2 grievance must state, in detail, the basis for the grievance and the corrective action desired. If there is to be more than one

Department official involved in the grievance meeting, the Union will be so notified in advance. The Step 2 official will provide the Step 2 answer within 10 calendar days from receipt of the grievance.

Step 3.

If no mutually satisfactory settlement is reached as a result of the second step, the aggrieved party or the Union shall submit the grievance to the Director within seven calendar days of receipt of the decision of Step 2. The recipient of the grievance shall date and sign the grievance. The Step 3 grievance must state, in detail, the basis for the grievance and the corrective action desired. The Director or designee shall meet with the aggrieved employee(s) and their Union representative(s) within seven calendar days from receipt of the Step 3 grievance to discuss the grievance. The Director or designee will render a written decision letter to the aggrieved employee(s) and the Union within 10 calendar days after the meeting.

Step 4.

If the grievance is not satisfactorily resolved in Step 3, the grievance may be referred to arbitration as provided in Article 44 - Arbitration. Only the Union or the Department can refer a grievance to arbitration.

Note 1:  For Veterans Canteen Service (VCS) employees, Step 2 will be eliminated at those facilities where two levels of supervision are not present. In Step 3, the VCS Regional Manager, or his/her designee, will be the deciding official. The meeting will be at the duty station of the aggrieved employee and with an official higher than the Canteen Chief. By mutual agreement, the parties to the grievance may agree to teleconference the grievance meeting.

Note 2:  For National Cemetery Administration (NCA) employees, where there are two levels of supervision, Step 1 will be the immediate supervisor. Step 2 will be an Assistant Cemetery Director where one exists and Step 3 will be the Cemetery Director. Where there is only one level of supervision, Step 1 will be the Cemetery Director and Step 1 time limits will apply; Step 2 will be eliminated and Step 3 will be the MSN Director or designee.

Note 3:  For VA Headquarters unit employees, the officials listed below will replace those mentioned in the respective steps. If the local union requests, the Department shall advise the local union of the proper recipient of the grievance at each step.

Step 1 - Immediate supervisor

Step 2 - Service Director (or equivalent), or designee

Step 3 - Administration or Staff Office Head, or designee.

903

Note 4:  At any step of the negotiated grievance procedure, when any management deciding official designates someone to act on his/her behalf, that designee will have the complete authority to render a decision at that step and will render the decision.  The designee will never be someone who decided the issue at any previous step.

Note 5:  It is agreed that grievances should normally be resolved at the lowest level possible.  However, there will be times when a grievance may be more appropriately initiated at the second or third step of the procedure, for example, when a disciplinary action is taken by a Service Chief or higher level, when the supervisor at the lower level clearly has no authority to resolve the issue, or when the Union grieves an action of a management official other than a Step 1 supervisor.  When a grievance is initiated at a higher step, the time limits of Step 1 will apply.

Note 6:  Grievances over actions taken by VA Headquarters officials against field station employees may be grieved directly to arbitration in accordance with Article 44 - Arbitration.  The request for arbitration in such cases should be made by the local union President or designee to the facility Director, clearly setting forth the basis for the grievance and the corrective action being requested.  The parties may coordinate an effort for informal resolution prior to the actual arbitration.

Note 7:  Local management-initiated grievances shall be filed with the local union president or designee and shall constitute Step 3 of the negotiated grievance procedure.  Such grievance must be filed within 30 calendar days of the act or occurrence or when the Department became aware of, or should have become aware of, the act or occurrence.  The time limits for the meeting and response will be 14 calendar days.

Note 8:  The Union shall be provided a copy of all employee-filed grievances at all steps and all responses to those grievances.  Copies of such grievances must be provided to the Union as soon as practicable, no later than two workdays after receipt.  Copies of grievance responses must be provided to the Union when they are issued.  When a grievance has been filed, the Department shall not discuss the grievance with the grievant unless the Union is given notice and an opportunity to be present.  Any resolution of a grievance must be consistent with and not conflict with the terms of a collective bargaining agreement.

## Section 8 - Extensions

Time limits at any step of the grievance procedure may be extended by mutual consent of all parties.

904

## Section 9 - Failure to Respond in Timely Manner

Should the Department fail to comply with the time limits at any step in Section 7 above, the grievance may be advanced to the next step.

## Section 10 - Multiple Grievances

Multiple grievances over the same issue may be initiated as either a group grievance or as single grievances at any time during the time limits of Step 1. Grievances may be combined and decided as a single grievance at the later steps of the grievance procedure by mutual consent.

## Section 11 - National Level Grievances

A national level grievance is one that is filed by the Union or by the Department. Grievances between the Department and the Union at the national level shall be filed by the aggrieved party as follows:

A. Within 30 calendar days of the act or occurrence or within 30 days of the date the party became aware or should have become aware of the act or occurrence or at any time if the act or occurrence is continuing, the aggrieved party (the Department or the Union) may file a written grievance with the other.

B. Upon receipt of a grievance, the parties will communicate with each other in an attempt to resolve the grievance. A final written decision, including any position on grievability or arbitrability, must be rendered by the respondent within 45 days of receipt of the grievance. If a decision is not issued in 45 days, or if the grieving party is dissatisfied with the decision, the grieving party may proceed to arbitration in accordance with Article 44 - Arbitration. The time limits may be extended by mutual agreement.

905

# ARTICLE 44 - ARBITRATION

## Section 1 - Notice to Invoke Arbitration

Only the Union or the Department may refer to arbitration any grievance that remains unresolved after the final step under the procedures of Article 43 - Grievance Procedures.  A notice to invoke arbitration shall be made in writing to the opposite party within 30 calendar days after receipt of the written decision rendered in the final step of the grievance procedure.

## Section 2 - Arbitration Procedure

A. On or after the date of the notice to invoke arbitration, the moving party will request the Federal Mediation and Conciliation Service (FMCS) to provide a list of seven impartial persons to act as an arbitrator.  The parties shall meet within 10 calendar days after receipt of such list to select an arbitrator (this may be done by telephone for national level grievances).  If the parties cannot mutually agree on one of the listed arbitrators, then the Department and the Union will alternatively strike one potential arbitrator's name from the list of seven and will then repeat this procedure until one name remains.  The remaining person shall be the duly selected arbitrator.  The parties will choose lots to determine who strikes the first name.  Following the selection, the moving party will, within 14 calendar days, notify the FMCS of the name of the arbitrator selected.  A copy of the notification will be served on the other party.  The time limits may be extended by mutual consent.

B. The arbitration hearing date must be scheduled (not held) within six months from the date the arbitrator was selected or the grievance will be considered terminated.  An exception to this time period will be made by mutual consent to extend the timeframes.  Additionally, an exception will be made for inability on the part of the arbitrator to provide a hearing date.  Should the Department refuse to participate in scheduling the arbitration within the time frames set forth in this article, the Union may unilaterally schedule the arbitration hearing date.

C. The procedures used to conduct an arbitration hearing shall be determined by the arbitrator.  Both parties shall be entitled to call and cross-examine witnesses before the arbitrator.  All witnesses necessary for the arbitration will be on duty time if otherwise in a duty status.  On sufficient advance notice from the Union, the Department will rearrange necessary witnesses' schedules and place them on duty during the arbitration hearing whenever practical.  Such schedule changes may be made without regard to contract provisions on Article 21 - Hours of Duty.  A reasonable amount of preparation time for arbitration will be granted in accordance with the provisions of Article 48 - Official Time and local supplemental agreements.

906

D.  The arbitrator's fees and expenses shall be borne equally by the parties. If either party requests a transcript, that party will bear the entire cost of such transcript.

E.  For single station local grievances, the site normally will be the facility where the grievance exists.  At the local union's request, another site may be designated upon mutual agreement.  If another site is used, the local union will pay the cost of the site.  For grievances at the national level, the Department and the NVAC President will communicate to work out a mutually agreeable site for the arbitration.

F.  The parties will attempt to submit a joint statement of the issue or issues to the arbitrator.  If the parties fail to agree on a joint submission, each shall make a separate submission.  The arbitrator shall determine the issue or issues to be heard.

G.  The arbitrator's decision shall be final and binding.  However, either party may file an exception to the arbitrator's award in accordance with applicable law and regulations.  The arbitrator will be requested to render a decision within 60 days.  Any dispute over the interpretation of an arbitrator's award shall be returned to the arbitrator for settlement, including remanded awards.

H.  An arbitrator's award shall have only local application unless it was a national level grievance or the matter was elevated to the national level.  Where it is mutually agreed between the NVAC President and the Department within 30 days after a local union has filed a notice for arbitration, an arbitration dispute will be elevated to the national level. The arbitrator has full authority to award appropriate remedies including reasonable legal fees pursuant to the provisions of Section 702 of the Civil Service Reform Act, in any case in which it is warranted.

907

# ARTICLE 45 - DUES WITHHOLDING

### Section 1 - Eligibility - Bargaining Unit Employees

Any bargaining unit employee may have dues deducted through payroll deductions. Such deductions will be discontinued only when the employee leaves the unit of recognition, ceases to be a member in good standing of AFGE, or submits a timely revocation form under the procedures of this article.

### Section 2 - Union Responsibilities for Bargaining Unit Employees

A. The Union agrees to inform the Department, in writing, of the following:

   1. The dues amount(s) or changes in the dues amount(s);

   2. The names of the local union officials responsible for certifying each employee's authorization form, the amount of dues to be withheld, and changes in allotments; and,

   3. The name and address of the payee to whom the remittance should be made.

B. The local union agrees to promptly forward completed and certified form(s) to the appropriate administrative office.

### Section 3 - Department Responsibilities for Bargaining Unit Employees

A. It is the responsibility of the Department to:

   1. Process voluntary allotments of dues in accordance with this article and in amounts certified by the local union;

   2. Withhold employee dues on a bi-weekly basis;

   3. Transmit remittance to the local allottee designated by the Union in accordance with this article, as expeditiously as possible at the end of each pay period, together with two copies of a listing containing the following information:

      a. The name of the employee and the anniversary date of the effective date of the dues withholding; and,

      b. Identification of active employees for whom allotments have been temporarily stopped and identification of those which are a final deduction because of termination.

B. Electronic transfer of funds is authorized for the transmittal of Union dues. Local unions who use this option shall continue to receive a hard copy of

908

the current membership listing, dues deductions, and anniversary date each pay period.

C.  The Department will ensure that bargaining unit employees on dues withholding, who are reassigned from one VA facility to another but remain in the consolidated unit of recognition will continue on dues withholding. Upon arrival at the new station, the dues withholding will be remitted to the new local at the receiving station at the rate being withheld in the prior station until the appropriate office at the new station receives a notification of a change of rate from the designated local union official as described in the Section 2.

D.  In the event of a transfer or reassignment of a dues-paying member of the nationwide bargaining unit, within two weeks of entrance on duty (EOD) date, the Department will inform the receiving local union in writing of that employee's arrival and prior station.

E.  The Department agrees to withhold the union dues from a back pay award granted to an employee who was terminated and was on dues withholding at the time of a termination. The amount withheld from the back pay award will be calculated from the date of termination until the next anniversary date for dues withholding consistent with Section 6 of this article, unless the employee agrees in writing to authorize the dues withholding for the full period of termination. This authorization must be received before payment of the back pay award to the employee.

F.  The Department agrees to withhold union dues from a back pay award to an employee who was on dues withholding at the time of a suspension.

### Section 4 - Procedures for Withholding for Bargaining Unit Employees

Bargaining unit members wishing to have their dues withheld by payroll deduction will submit their completed SF-1187 to the local union-designated officials. These officials will certify the form and include the amount of dues to be withheld. The certified SF-1187 will be forwarded to the appropriate administrative office for processing. The deduction will become effective at the beginning of the first pay period that begins three or more workdays after the SF-1187 was submitted to the appropriate administrative office. Questions concerning whether an employee is in the unit of recognition and eligible for payroll deduction of union dues as a bargaining unit employee will be resolved through consultations between the Human Resource Manager or designee and local union officials and/or through a unit clarification petition. In the event a clarification of unit petition is filed, the employee's dues will be withheld pending a decision on the petition.

909

## Section 5 - Changes in Dues Amount for Bargaining Unit Employees

At any time there is a change in dues structure, the local will send a memorandum to the appropriate Department official noting the amount of the change. The new amounts will be deducted starting the next pay period following receipt by the appropriate administrative office at least three workdays prior to the beginning of that pay period unless a later date is specified. The memorandum must be signed by one of the local union officials designated to certify dues withholding forms.

## Section 6 - Revocation for Bargaining Unit Employees

A. The local union is the authorized party that may provide an SF-1188, and must provide it to a union member upon request. The SF-1188 is also available on the OPM website. An employee may revoke dues withholding only once a year, by submitting a timely SF-1188 to the local union representative designated for such purpose. In order for the SF-1188 to be timely, it must be submitted to the local union during the 10 calendar days ending on the anniversary date of his/her original allotment. The local union representative must certify by date and signature the date the SF-1188 is given to the local union representative or by some other appropriate date stamping device.

B. The local union official will, by reference to the remittance listing, determine the anniversary date of the allotment. The ending date of the pay period in which the anniversary date occurs will be entered in Item 6 on the SF-1188. The entry will be initiated by the local union official, who will then deliver the form to the appropriate administrative office prior to the close of business of the Friday following the date entered in Item 6. If, through error of the Union, an SF-1188 is received in the appropriate administrative office later than the agreed-to date, the administrative office will process the form at the earliest possible time, but no later than the first pay period following receipt. Local union representatives will be on official time while receiving and processing the SF-1188.

### Section 7 - Continuation of Dues for Bargaining Unit Employees

A. When an employee is detailed or temporarily promoted out of the bargaining unit, local union dues withholding will restart automatically when the employee returns to the bargaining unit.

B. When an employee is detailed or by other personnel action placed in a bargaining unit position, the employee shall have all the rights of the bargaining unit, including the right of dues withholding.

C. Any time Department officials request the appropriate administrative office in writing to discontinue an employee's dues withholdings because the employee has left the unit of recognition (e.g., promotion or reassignment), a copy of such request shall be provided to the local union. Where a dispute arises over whether or not the person has left the unit, the procedures outlined in Section 4 will be used.

### Section 8 - Position Determination

When there is a dispute regarding a position being in or out of the bargaining unit that affects an employee who is on dues withholding, then the employee will remain on dues withholding. The parties will discuss the issue until a decision is reached, either through mutual agreement or the formal clarification of unit petition process.

### Section 9 - Costs

All payroll deductions and transmittals will be made at no cost to the Union.

911

# ARTICLE 46 - LOCAL SUPPLEMENT

## Section 1 - General

Contract provisions contained in Local Contracts/Supplements in existence prior to the Master Agreement will continue in effect insofar as they do not conflict with the Master Agreement. Whenever any subject is addressed in the Master Agreement, the terms of the Master Agreement shall prevail over the provisions of the Local Agreement concerning the same subject. Recognizing that the Master Agreement cannot cover all aspects or provide definitive language for local adaptability on each subject addressed, it is understood that Local Supplements may include substantive bargaining on all subjects covered in the Master Agreement so long as they do not conflict, interfere with, or impair implementation of the Master Agreement. However, matters that are excluded from Local Supplemental bargaining will be identified within each article.

## Section 2 - Procedures for Local Supplemental Agreement

A. The parties agree that any time after this Agreement has been in effect for 30 days, the parties, upon the request of either local party, may negotiate a Local Supplement to this Master Agreement. The Local Supplemental Agreement may cover all negotiable matters regarding conditions of employment insofar as they do not conflict with the Master Agreement as defined in Section 1. The Local Supplement may include a provision for reopening. This is not intended to preclude local bargaining of items that are not covered by the Master Agreement, i.e., policies, procedures, and directives initiated at the facility level or national level.

B. It is agreed that prior to implementation of any Local Supplement, the respective parties shall forward their agreement to VA Headquarters and the Union for review. The national parties shall review the Local Supplement within 30 calendar days of its receipt. In the event either of the national parties determines there exists a conflict with the Master Agreement, they shall forward a written document to the respective local union and the other national party identifying the conflict for resolution at the local level.

## Section 3 - Ground Rules For Negotiating Local Supplemental Agreements

In an effort to assist the local bargaining process, ground rules for bargaining Local Supplemental Agreements will include, but not be limited to, the following:

A. Upon mutual agreement of the parties, bargaining over local supplements will be held utilizing an interest-based-bargaining (IBB) process. However,

912

prior to initiating IBB, all bargaining team members must be trained in the IBB process. In the event the parties fail to mutually agree to utilize IBB, traditional bargaining will be used.

B.  The parties agree to establish a local negotiating committee consisting of an equal number of representatives of the local union and Department. Each party shall be represented by a Chief Negotiator. The parties further agree that all members of the Local Negotiating Committee will have the requisite authority to negotiate on behalf of their respective party. The negotiation process is the establishment of ground rules, face-to-face bargaining, preparation, facilitation, approved travel time, mediation, impasse, and third-party proceedings. The parties agree that all local union members of the negotiating committee will be on official time for the previously described negotiation process. Employee participation in this process will not in any way adversely affect their performance nor will they be held accountable for their full range of duties in addition to these activities. Neither party waives any legal rights.

C.  Each Chief Negotiator may approve attendance of alternates at Local Negotiating Committee sessions. The alternate will have the full rights, responsibilities, and authority of the Local Negotiating Committee member for whom they are substituting.

D.  The Department agrees to pay the travel and per diem for all local members of the Local Negotiating Committee pursuant to the Federal Travel Regulations.

E.  The Local Negotiating Committee will establish its bargaining schedule. The Department will ensure the availability of all Local Negotiating Committee team members

F.  In the event either party desires a facilitator, the parties must mutually agree upon the individual to serve as facilitator. When IBB is used, a facilitator will be used.

G.  If the Local Negotiating Committee has not reached agreement on a Local Supplement at the conclusion of the bargaining schedule, either party may use ADR or other methods, or elect to initiate impasse procedures. Moreover, neither party waives any rights regarding statutory impasse procedures.

H.  The parties agree that it is appropriate in establishing ground rules to include, among other things, physical location of bargaining, caucuses, subject matter experts, start date, official time, prep time, observers, IBB or traditional bargaining, number of people on each team, and administrative matters and materials.

913

# ARTICLE 47 - MID-TERM BARGAINING

## Section 1 - General

A. The purpose of this article is to establish a complete and orderly process to govern mid-term negotiations at all levels. The parties are encouraged to use an IBB approach in all mid-term negotiations and will ensure that negotiators are trained in this approach prior to the inception of bargaining.

B. Recognizing that the Master Agreement cannot cover all aspects or provide definitive language on each subject addressed, it is understood that mid-term agreements at all levels may include substantive bargaining on all subjects covered in the Master Agreement, so long as they do not conflict, interfere with, or impair implementation of the Master Agreement. However, matters that are excluded from mid-term bargaining will be identified within each article.

C. As appropriate, the Union may initiate mid-term bargaining at all levels on matters affecting the working conditions of bargaining unit employees.

## Section 2 - National

A. The Department will forward all proposed changes for which there is a bargaining obligation to the President of the NVAC or designee(s) along with copies of all necessary and relevant documents relied upon. When a new law is enacted and the Department decides not to issue a national policy, the Union will be notified prior to implementation.

B. If either party initiates a demand to bargain, briefings will occur within 20 workdays of the demand to bargain. Proposals will be submitted 20 workdays after the briefing. Any Union demand to bargain must be received by the designated Department official within 20 workdays from the date the NVAC President or designee receives the proposed change. The date of receipt shall be documented on a simple form agreed upon by both parties. Extensions or reductions of the 20 workday time period will be by mutual agreement..

C. The Department's bargaining obligation is triggered when the Union submits a bargaining demand. When the Union's bargaining demand is submitted, the parties will discuss the proposed change and share their interests and concerns.

D. The parties may first attempt to reach agreement by conducting telephone negotiations. In addition the parties will meet face-to-face quarterly. Such negotiations should normally begin no later than 10 workdays after the Department chairperson receives the Union's demand to bargain.

914

Telephone negotiations shall normally be for up to three hours per day, commencing at a mutually agreeable time on consecutive days unless concluded sooner.

E.   If the parties are unable to reach agreement, negotiations will normally proceed to face-to-face bargaining.  When traditional bargaining is used, the Union's written proposal(s) will be submitted prior to bargaining.  The parties retain the right to modify, withdraw, or add to any interests, concerns, or proposals they may have discussed or exchanged earlier.

F.   Bargaining sessions will be for 8-½ hour days at mutually agreeable times which include a break for lunch.  However, the parties, by mutual agreement, may extend or shorten such bargaining sessions as necessary.  The parties agree to utilize ADR mechanisms, as appropriate, without waiving either party's statutory rights.

G.   Each party may have up to four negotiators which by mutual agreement may be increased based on the complexity and/or number of issues to be negotiated.  The parties will exchange the names of the bargaining team members for the specific issue(s) to be negotiated.  This does not preclude the attendance of experts by mutual consent of the parties.  Travel and per diem will be paid by the Department pursuant to the Federal Travel Regulations for bargaining team members.  These members will be allowed official time to complete the bargaining obligation.  An automated data base for existing and future memorandums of understanding will be established and maintained by the Department.  This data base will be made accessible to both the national and local Union officials.

## Section 3 - Intermediate

The President of the NVAC or designee will provide the names of the bargaining team members for the specific issue(s) to be negotiated when the Union delegates national bargaining to the intermediate level.  Ground rules for intermediate bargaining shall be established by the parties at that level.  The parties will make every effort to use bargaining team members from the geographic area of concern with travel and per diem for team members being paid by the Department.

## Section 4 - Local

A.   On all policies and directives or other changes for which the Department meets its bargaining obligation at the national level, appropriate local bargaining shall take place at individual facilities and may include substantive bargaining that does not conflict with negotiated national policy and agreements.  Upon request, the Union will be briefed on the proposed subject prior to the demand to bargain.

915

B.  Proposed changes in personnel policies, practices, or working conditions affecting the interests of one local union shall require notice to the President of that local.  Proposed changes in personnel policies, practices, or working conditions affecting the interests of two or more local unions within a facility shall require notice to a party designated by the NVAC President with a copy to the affected local unions.

C.  Upon request, the parties will negotiate as appropriate.  The Union representative shall receive official time for all time spent in negotiations as provided under 5 USC 7131(a).

D.  Ground Rules for local bargaining shall be established by the parties at the local level.

# ARTICLE 48 - OFFICIAL TIME

## Section 1 - Purpose

A. Official time as a necessary part of collective bargaining and related activities is in the public interest.  The parties recognize that good communications are vital to positive and constructive relationships between the Union and the Department.  These communications should facilitate and encourage the amicable settlement of disputes between employees and the Department involving conditions of employment and should contribute to the effective and efficient conduct of public business.  They further recognize that this consolidated unit is very large and complex and requires Union coordination of its representational activities at several levels.

B. As provided in 5 USC 7131, official time shall be granted as specified in law and in any additional amount the Department and the Union agree to be reasonable, necessary, and in the public interest.  Official time shall be granted for activities as specified in law and in amounts specified by this Agreement or otherwise negotiated.  Official time shall be used for:

1. Handling grievances and other complaints;

2. Handling other representational functions; or,

3. Engaging in appropriate lobbying functions.

## Section 2 - Designated Union Officials/Representatives

A. Official time in the following amounts is authorized for each of these Union officials:

1. National VA Council President - 100%

2. Three National VA Council Executive Vice Presidents - 100%

3. National Treasurer - 50%

4. Fifteen District Representatives - 50%

5. Twelve Appointed National Representatives - 50%

6. Five Appointed National Safety and Health Representatives - 50%

These national Union representatives may designate a Union representative at their home station and transfer unused official time to that representative to perform the duties of the position for which official time is authorized.

917

B. When the Union assigns individual(s) who are not subject to a national or local 100% official time allocation to participate on a national task force or committee, the Department will afford such individual(s) official time for preparation, travel, and participation related to such assignment. VA Central Office (VACO) LMR will work with local facilities to obtain the time as needed. This time will come from the bank of hours described below, if the employee is not otherwise on 100% official time. Should the bank of hours become unavailable, the Department will authorize the time to participate.

C. Two members of the VA Mid-Term Bargaining Committee and two members of the VBA Mid-Term Bargaining Committee will be on 100% official time. VACO LMR will work with local facilities to obtain the time as needed for three other members of each committee, who will be allowed official time while preparing for, traveling and participating in activities related to each mid-term bargaining issue.

D. The Union will provide the Department with a listing of the National Union Officers, District Representatives, National Representatives, and National Safety and Health Representatives so that each local facility may be informed. The Union will also provide a timely notice of any change in National Union representatives.

E. Travel and per diem is authorized for National Union Officers, District Representatives, National Representatives, and National Safety and Health Representatives in connection with the semiannual meetings described in Article 5 - Labor Management Committee. Travel and per diem is also authorized as provided elsewhere in this Agreement or where otherwise agreed to by the parties or where required by law, rule, or regulation.

F. When Union officials visit a facility other than where they are employed for the purpose of engaging in representational activities, they will notify the Department prior to their visit. The Department will notify the Union of any scheduling problems connected with the visit and the parties will attempt to work out a suitable arrangement.

G. In addition to the above official time, the Union shall have a bank of hours from which to draw in order to have subject matter experts, administrative support during negotiations, support for national grievances, labor-management collaboration support, special projects and Department initiatives, etc. The President of the NVAC shall assign the time in no less than one hour increments. There shall be a one-time 25,000 hours for the first calendar year in which this agreement is in effect. Any hours remaining at the end of that calendar year shall carry-over until depleted. Prior to the use of this official time, VACO LMR and the Union will develop a tracking accountability system for the bank of hours within 30 days after the effective date of this Master Agreement. VACO LMR and the NVAC President may arrange for additional hours to be added to the bank after the first contract year.

918

### Section 3 - Accumulated Official Time

Official time authorized for National Union representatives may be used as needed; however, upon request, the Union representatives will be advanced official time from future time accrual for that leave year. Any time not used during any pay period will be accumulated for the remainder of the leave year. Any time that was not used as needed by the end of the leave year will not be carried over to the next leave year.

### Section 4 - Additional Time Allotted

Time spent in connection with national bargaining and LMR Committee meetings shall not be charged against other official time allotted.

### Section 5 - Travel to Other Locations

A. Once official time is authorized for a specific function that requires travel outside a Union representative's duty station, the representatives will be permitted to leave the facility to discharge their functions after notifying their respective supervisor of their destination, expected return date/time, and the category of representational activity involved. The categories are:

   1. Negotiation of term collective bargaining agreements;

   2. Negotiating changes to conditions of employment;

   3. Dispute resolution; and/or,

   4. General labor-management relations.

B. Where travel to another location within the jurisdiction of a local union is necessary for representational activities consistent with the provisions of this Agreement, and the transportation is otherwise being provided to the location for official business, the Union will be allowed access to the transportation on a space-available basis and also authorized official time for travel. Personal transportation expenses (POV, mileage, etc.) will be reimbursed to the extent permitted by Federal Travel Regulations.

### Section 6 - Other Activities

A. For the following matters, union representatives will be on official time:

   1. All activities related to Labor-Management Committees (Forums);

   2. Quality Program;

   This official time will not be counted against any allocated official time as described in this agreement.

919

B. A union official who is designated as an employee's personal representative will be on duty time when preparing or presenting appeals to the MSPB and handling discrimination claims under EEOC procedures.

### Section *7* - Performance Evaluation

The use of official time, in accordance with this Agreement, will not adversely affect an employee's performance evaluation.

### Section 8 - Substitutions

The Union may substitute a retired VA employee for the designees at national LMR meetings or Department initiatives.  The Department will provide travel and per diem, in advance, for that retired employee if they do not have a Department-issued credit card.

### Section 9 - Allegations of Abuse

Alleged abuses of official time shall be brought to the attention of an appropriate Union official and to an appropriate Department official on a timely basis by supervisors and Department officials.  The Department official will then discuss the matter with the Local or NVAC president as appropriate.

### Section 10 - Local

A. Every local union will receive an allotment of hours equal to 4.25 hours per year for each bargaining unit position represented by that local union.  Each VHA and VBA local union is entitled to a minimum of 50% official time.  Each NCA local union is entitled to a minimum of 25% official time.  Where a local represents employees at a CBOC, Consolidated Mail Out Pharmacy (CMOP), clinic, service center, or successor, at a duty station greater than 50 miles from the facility, that local union will be allotted 25% official time at that duty station.

B. There shall be no reduction in the official time allocation due to a merger.  When mergers occur, the official time carried over from the local union's allocation shall not be less than the combined total of the local union's allocation prior to the merger.

C. For local unions already above the minimum amount of official time described above, existing local agreements and past practices regarding official time on the effective date of this Master Agreement shall continue in full force and effect.

    1. Local unions that are above the 4.25 will not be able to receive an increase in official time until the number of bargaining unit employees has increased to the level where they are entitled to have an allocation equal to the 4.25 per bargaining unit employee

    2.   Local unions that are below the 4.25 minimum shall receive their increase in official time allocation no later than 60 days after this Agreement is effective.  The allocation shall be based on the number of bargaining unit employees represented by the local union on the date this Agreement is effective.

    3.   The calculation period to determine the number of bargaining unit members represented by a local union is every six months after this Agreement is in effect.

D.   The minimum amounts of official time described in Paragraph A in this Section are not intended to limit the amount of official time that can be negotiated by the parties locally.

E.   Where arrangements for transfers of official time among Union representatives are not in effect, they can be negotiated locally.

921

# ARTICLE 49 - RIGHTS AND RESPONSIBILITIES

## Section 1- Introduction

The Parties recognize that a new relationship between the Union and the Department as full partners is essential for reforming the Department into an organization that works more efficiently and effectively and better serves customer needs, employees, Union representatives, and the Department.

## Section 2 - Rights and Responsibilities of the Parties

A. In all matters relating to personnel policies, practices, and other conditions of employment, the parties will have due regard for the obligations imposed by 5 USC Chapter 71 and this Agreement, and the maintenance of a cooperative labor-management working relationship.

B. Each party shall recognize and meet with the designated representative(s) of the other party at mutually agreeable times, dates, and places that are reasonable and convenient.

C. The Department supports and will follow statutory and contractual prohibitions against restraint, coercion, discrimination, or interference with any Union representative or employee in the exercise of their rights.

## Section 3 - Union Representation

The Union will be provided reasonable advance notice of, be given the opportunity to be present at, and to participate in any formal discussion between one or more representatives of the Department and one or more employees in the unit or their representatives concerning any grievance, personnel policy or practice, or other general condition of employment. The Union will also be allowed to be present and represent a unit employee at any examination by a representative of the Department in connection with an investigation if the employee reasonably believes that the examination may result in disciplinary/adverse action/ major adverse action against the employee and the employee requests representation.

## Section 4 - Notification of Changes in Conditions of Employment

A. The Department shall provide reasonable advance notice to the appropriate Union official(s) prior to changing conditions of employment of bargaining unit employees. The Department agrees to forward, along with the notice, a copy of any and all information and/or material relied upon to propose the change(s) in conditions of employment. All notifications shall be in writing by U.S. mail, personal service, or electronically to the appropriate Union official with sufficient information to the Union for the

922

purpose of exercising its full rights to bargain. The Department will work with the Union to identify and provide specific training and equipment to address concerns related to the use of technology, to include the sending and receiving of electronic communications.

B. The Department will provide the Union specific training and equipment to address concerns related to the sending and receiving of electronic communications. This will include the following:

1. Use of technology;

2. The sending and receiving of encrypted and unencrypted electronic communications;

3. Validating date send receipt;

4. E-signature date;

5. Read receipt; and,

6. Setting up printer capability(ies).

The parties agree that they will not utilize technological features that allow messages to expire.

C. For the purposes of this section, the following definitions will apply:

1. <u>Electronic Record</u> means a record created, generated, sent, communicated, received, or stored by electronic means.

2. <u>Electronic Signature</u> means an electronic sound, symbol, or process attached to or logically associated with a record and executed by a designated person with the intent to sign the record upon receipt.

D. The electronic record will be able to be retained, printed, accurately reflect the date, time and information set forth in the record when it was first generated, and must remain accessible for later reference for compliance with this Agreement.

E. Each Union official/representative and current local union President or a local union President upon assuming office may designate Union representatives to receive face-to-face training. Designated Union representatives may request and receive additional training. U.S. Mail or personal service shall be the method used by the parties as the form of communication until the training has been successfully completed.

F. For the purposes of this section, signature or e-signature is considered the time frame for receipt by either party.

923

## Section 5 - Information

If the Union makes a request under 5 USC 7114(b)(4), the Department agrees to provide the Union, upon request, with information that is normally maintained, reasonably available, and necessary for the Union to effectively fulfill its representational functions and responsibilities. This information will be provided to the Union within a reasonable time and at no cost to the Union.

## Section 6 - Notification of Union Officials

The Union will annually provide the Department at each facility with an updated list of the names, titles, and work telephone numbers of all Union officials along with the room/location of the Union office and representatives as well as changes as they occur. The Department agrees to disseminate the list to all bargaining unit employees within 30 days after its receipt. The Department agrees to provide all new hires with a copy of the list when they enter on duty.

## Section 7 - Union-Employee Communication

The Department will not alter or censor the content of any direct communications between the Union and employees. However, Department facilities may not be used for posting or distribution of libelous or defamatory material directed at Department or Union officials or programs.

## Section 8 - Surveys and Questionnaires

A. The Department will not communicate directly with bargaining unit employees through verbal or written surveys and questionnaires regarding conditions of employment without prior notification to the Union and bargaining where appropriate. This includes all questionnaires and surveys from all other agencies. Nothing in this section precludes the Union from the right to bargain over conditions of employment under the 5 USC Chapter 71.

B. Participation in surveys will be voluntary, unless the parties agree to require participation. Employees will be assured that their responses will be confidential and their anonymity protected, unless the parties agree otherwise.

C. The results of surveys conducted by either party regarding conditions of employment will be shared. If a third party conducts a survey and the results are distributed to the Department, the results will be shared with the Union.

## Section 9 - New Employee Orientation

The parties are encouraged to make a joint presentation to new employees to orient them about the Department and the Union. If the Union desires to make a presentation on its own, the Union will be afforded the opportunity to make

924

a 30 minute presentation during each orientation session for new employees. The Union will be provided the same respect and dignity as other presenters and will not be subjected to intimidation or censure. The Department will provide the Union with notice of the date, time, and place of the orientation. The scheduled starting time of the Union presentation will be a subject for local negotiations. The Union official making the presentation will be allowed official time to make the presentation. This official time will not be counted against any allocated official time as described in this agreement. Stewards or Union officers may introduce themselves to new employees at the worksite and inform them of their availability for representation functions so long as there is no undue disruption of work activities.

### Section 10 - Voluntary Programs

The parties shall provide each other reasonable advance notice of the initiation or discontinuance of all voluntary programs such as bond campaigns, blood programs, fund drives, etc. When requested, appropriate bargaining will be held. The parties agree that employee participation in the Combined Federal Campaign, blood donor drives, bond campaigns and other worthy projects will be on a voluntary basis. This does not preclude publicizing such projects and encouraging employees to contribute.

### Section 11 - Exit

A.  The local union will be on the clearance check list in use at each facility for bargaining unit employees who are leaving employment at the facility.

B.  All information from exit interviews shall be provided to the Union. This information will be provided on a quarterly basis nationally, and if aggregated on a local level (that is, ten or more employees' data is collected), the local union is also entitled to this specific information.

C.  The Union will be provided a copy of Gains and Losses (G and L) for each pay period for bargaining unit employees.

925

# ARTICLE 50 - SURVEILLANCE

A.  The parties recognize that surveillance is conducted for safety and internal security reasons.

B.  If the Department uses "covert" or "hidden" electronic camera surveillances during an investigation, the following shall apply if a disciplinary/adverse action is proposed against an employee represented by the Union:

    1.  The Union will be given a copy of all relevant evidence collected;

    2.  The Union will be provided a copy of the pertinent video tapes; and,

    3.  The Union will be allowed to represent affected employees in any subsequent discussions or proceedings involving them.

C.  The local union is not precluded from any further negotiations on the impact and implementation of covert or hidden electronic camera surveillances.

# ARTICLE 51 - USE OF OFFICIAL FACILITIES

### Section 1 - Union Office Space

A.  The Department recognizes the importance and value of the Union's mission and purpose.  Accordingly, the Department agrees to furnish office space to the Union appropriate for carrying out its representational and partnership duties in locations easily accessible to employees and private citizens and of size, furnishings, and decor commensurate with other administrative offices within the facility.  Office space shall be sufficiently private to ensure confidentiality to the maximum extent possible.  The office(s) shall be of sufficient size for necessary storage of confidential materials.

B.  Each office shall be equipped with adequate telecommunication lines for most advanced telecommunications technology used by the Department, fax, and computer capabilities equal to those used in the top-level administrative offices in the facility.  The Department shall authorize and thereafter install or permit the installation of private data lines (high speed internet) and private phone lines.

C.  The Department shall provide to National Union Officers, District Representatives, National Representatives, National Safety and Health Representatives, and other Union representatives, separate space, equipment, etc., as provided in this article.

### Section 2 - Meeting Space

The Department will, on an as-needed basis, provide conference rooms as available for discussions between employees and Union officials.  The Department will also provide suitable space for regular Union meetings.  The Union agrees to exercise reasonable care in use of such space.

### Section 3 - Telephone

The Department will make internal telephones and government long distance service available to the Union for handling representational duties and conducting labor-management relations.  The Union will use government long distance service in a reasonable, prudent, and cost-conscious manner.  Telephones provided to the Union shall have voice mail and speaker phone capabilities for representational and labor-management activities.  In no instance will government long distance service be used for internal Union business.

927

## Section 4 - Equipment and Technology

A.  The Department will provide to each Union office the following:

1.  Fax machine;

2.  Personal computer with standard software, programs, and capabilities compatible with the Department's technology (examples of capabilities to be included are the ability to write to storage media, to host net meetings, and to run programs on storage media that contain audio and video files);

3.  Color printer;

4.  Remote access to the local area network (LAN);

5.  Remote access to the Department intranet;

6.  Access to e-mail, internet, intranet, and Departmental administrative functions (such as mail distribution lists, employee time and leave menu, etc.) in the Union office;

7.  Photocopier equal to administrative office level in the Union office and access to high-volume production equipment in the facility;

8.  Additional equipment may be negotiated locally;

9.  Additional equipment can be provided consistent with VA Handbook 6500 and current MOU.

B.  It is understood that technology is being provided with an expectation that increased efficiencies will be realized for both the Department and the Union. It is expected that the Union will utilize such equipment and technology to communicate with and receive notices from the Department as provided elsewhere in this Agreement.  The above list of equipment is not intended to be all-inclusive.  As new technology becomes available, equipment/software/ programs used by administrative office level officials shall be made available to the Union in a time frame consistent with availability with other administrative offices.  Within 90 days after receipt of technology or equipment, the Department will work with the Union to identify and provide specific training to address concerns related to the use of technology to include security, reliability, and appropriateness of use.  Nothing herein is intended to impact or change the provisions of any other article in this Agreement.

C.   Maintenance, shuttle service (where available), and other customary and routine services and equipment, such as the telephone conferencing (currently Veterans Affairs National Telecommunications System (VANTS)) shall be provided to the Union office.  Video conferencing/Live Meeting or successor systems shall be provided to the NVAC President's Office.  The Department will make the public address system available to the Union for appropriate use.

928

D. The Department agrees to provide, if requested, a link to the AFGE National Office, Union, and local union websites on the LMR pages of both the Department's intranet and the internet sites.

## Section 5 - Bulletin Boards

At each facility, the Union shall be provided bulletin boards in areas normally used to communicate with employees. Numbers and location of bulletin boards will be negotiated locally.

## Section 6 - Interoffice Mail System

The local and its representatives may use the interoffice mail system for regular representational communications (e.g., grievances, correspondence or memos to the Department).

## Section 7 - Metered Mail

Consistent with postal regulations, the Union shall have use of Department metered mail limited to representational matters. Mass mailings are inappropriate under this Section. Mass mailings by the Union on representational matters to the local unions and other Union national representatives is appropriate.

## Section 8 - Membership Drives

The Department agrees to provide adequate facilities for membership drives at locations that will provide access to unit employees during break and lunch periods. Detailed arrangements will be negotiated at the local level. At a minimum, the Union will be given the use of facilities at least equal to that provided to other organizations/vendors or Department sponsored functions. The Department agrees that the Union may access employee meal or break areas during membership drives.

## Section 9 - Personnel Regulations and Policies

A. The Department shall timely furnish the NVAC President and each local union a bound copy of 5 USC, 38 USC, 5 CFR, and 38 CFR, and access to or copies of Department Directives, Circulars, Handbooks, and equivalent successor documents. These publications shall be updated when such changes are reissued. Local Presidents will be advised of the Uniform Resource Locator (URL) to obtain the same information annually and when the URLs change.

B. The Department shall provide the local union access to or hard copies of all labor management materials that do not constitute internal labor-management guidance and that are currently provided to HR and LR at each facility.

929

C. The Union and each local union shall be provided access to or copies of, at no charge, Department personnel manuals, including classification standards.

## Section 10 - Transportation

A. Where travel to another location within the jurisdiction of a local union is necessary for representational activities consistent with the provisions of this Agreement, the local union will be provided transportation on a space-available basis.

B. When a Union representative uses a POV because of the unavailability of a government owned vehicle, travel reimbursement will be pursuant to travel regulations if the activity is pre-approved.

C. Associated per diem and other matters concerning transportation are appropriate subjects for local bargaining.

## Section 11 - Literature

A. The Department will provide space for the purpose of distributing Union material.  The space will be in prominent locations as agreed upon locally.

B. The distribution of literature will be permitted provided it is done during non-duty hours of the distributor and does not interfere with the mission of the Department.

## Section 12 - Access to Agreement

A. The Department will provide to each employee on duty as of the date of this Agreement and to all unit employees entering on duty after that date at no cost, booklet copies of this Agreement, printed in type that can be read easily.

B. The Department will initially provide the Council with 250 additional copies and each local with 20 additional copies of the Agreement.

C. The Department will provide, at no cost to the Union, copies of supplemental agreement(s) sufficient to distribute to each employee in the unit covered by the supplemental agreement(s).

D. The parties will survey the need to translate the Agreement into other languages and take appropriate action.

E. The contract will be made available to employees on disc, compatible with the Department's computer system.

F. The Department will provide sufficient advance copies of this Agreement for ratification purposes.

G. This Agreement will be made available online on VACO LMR website.

930



**PLACEHOLDER**

**TILE 18**



932

# ARTICLE 52 - TITLE 38 ADVANCEMENT

A.  Compensation for all advancements will be made within two pay periods from the effective date of the advancement.

B.  Notice of decisions on advancement shall be communicated in writing within 10 workdays of the action taken.

C.  Supervisors shall monitor and review performance in order to determine progress or problems and to provide employees with information concerning performance.  Discussions about performance will be held as often as needed, as determined by the employee and the supervisor.

933

# ARTICLE 53 - CLINICAL RESEARCH

A.  The parties recognize the benefits of participation in clinical research projects.

B.  The Union will be notified prior to implementation of any clinical research that impacts working conditions of bargaining unit employees.

C.  Participation in research projects will be voluntary, consistent with staff rights/policy and the Department's right to assign work.  Employees will receive training and written instructions regarding the intent and requirements of the research project prior to implementation.

D.  Staff involved in clinical research may be recognized for their participation/contribution to the project by the annual performance evaluation and other means; for example, monetary awards, acknowledgment in papers.

934

# ARTICLE 54 - TITLE 38 NURSE PAY/SURVEY

## Section 1 - Nurse Pay Survey

A. The Union will have a mutually agreed upon representative on each Title 38 nurse pay survey team.

B. The selection of the discretionary facilities to be surveyed will be a subject for partnership.

C. In accordance with 38 USC 7451 and Department regulations, Title 38 nurse pay surveys shall be limited to the labor market area or other areas as authorized by regulations.

D. Surveys shall be done consistent with the provisions of 38 USC 7451 and Department regulations.

E. In gathering data in accordance with 38 USC 7451, and wherever feasible, survey data for Title 38 nurse pay surveys shall be collected based on on-site visits.

## Section 2 - Adjustments to Pay

A. In accordance with 38 USC 7451 and Department regulations, any adjustments in Title 38 nurse pay shall be examined on an annual basis whenever adjustments are made in General Schedule pay.

B. Whenever an adjustment in Title 38 nurse pay is delayed due to administrative error, a nurse shall be retroactively compensated for any lost salary.

## Section 3 - Premium Pay

A. Evening - In accordance with 38 USC 7453(b), a nurse performing service, any part of which is within the period beginning at 6 pm and ending at 6 am, shall receive additional pay for each hour of service at a rate equal to 10 percent of the nurse's hourly rate of basic pay if at least four hours fall between 6 pm and 6 am.  When less than four hours fall between 6 pm and 6 am, the nurse shall be paid the differential for each hour of service performed between those hours.

B. Weekend - In accordance with 38 USC 7453(c), a nurse performing service, any part of which is within the period commencing at midnight Friday and ending at midnight Sunday, shall receive additional pay for each hour of service at a rate equal to 25 percent of such nurse's hourly rate of basic pay.

935

C.  Federal Holiday - In accordance with 38 USC 7453(d), a nurse performing service on a holiday designated by Federal statute or Executive Order shall receive for each hour of such service the nurse's hourly rate of basic pay, plus additional pay at a rate equal to such hourly rate of basic pay, for that holiday service, including overtime service.  Any service required to be performed by a nurse on such a designated holiday shall be deemed to be a minimum of two hours in duration.

D.  Overtime -  In accordance with 38 USC 7453(e)(l), a nurse performing officially ordered or approved hours in excess of 40 hours in an administrative work week, or in excess of 8 hours in a day, shall receive overtime pay for each hour of such additional service.  The overtime rates shall be one and one-half times such nurse's hourly rate of basic pay.  For further clarification, see Article 20 - Hours of Work and Overtime (Alternative Work Schedules).

E.  Compensatory Time - In accordance with 38 USC 7453(e)(3), compensatory time off in lieu of pay for service performed under the overtime provisions of Title 38 shall not be permitted unless voluntarily requested in writing by the nurse in question.

F.  On-Call Duty - In accordance with 38 USC 7453(h), a nurse who is officially scheduled to be on call outside such nurse's regular hours or on a holiday designated by Federal statute or Executive Order shall be paid for each hour of such on-call duty, except for such time as such nurse may be called back to work, at a rate equal to 10 percent of the hourly rate for overtime service (i.e., 15 percent of the hourly rate of basic pay).

# ARTICLE 55 - VHA PHYSICIAN AND DENTIST PAY

### Section 1 - General

A. Compensation is excluded from negotiation under 38 USC 7422.  Physician and dentist pay in the VHA is governed by Title 38 of the United States Code and VA Handbook 5007, Part IX.  The Handbook is available by accessing the following link on the VA intranet and clicking on Directives and Handbooks: http://vaww1.va.gov/ohrm/HRLibrary/HRLibrary.htm

B. The following language in Sections 2 through 3 is purely for informational purposes and is not itself subject to collective bargaining or grievable under the negotiated grievance procedure.  The Secretary's pay policies will control this matter.

### Section 2 - Definitions

For informational purposes the Department provides the following references for definitions related to physician pay.  It should be noted that the entirety of the definitions are found in VA Handbook 5007 Part IX:

A. Aggregate Pay:

   The sum of all payments made to a physician or dentist in a calendar year exclusive of lump sum annual leave, reimbursement of travel, backpay, and severance.  Physicians and dentists appointed under 38 USC 7305, 7306, 7401(1), and 7405(a)(l)(A) may not be paid aggregate compensation in a calendar year higher than the annual pay (excluding expenses) received by the President of the United States.

B. Annual Pay:

   The sum of base pay rate and market pay.  Annual pay is basic pay only for purposes of computing:

   1. Civil service retirement benefits;

   2. Lump sum annual leave payments;

   3. Life insurance;

   4. Thrift savings plan;

   5. Work injury compensation claims;

   6. Severance pay;

   7. Recruitment;

937

8. Relocation;

9. Retention incentives;

10. Continuation of pay; and,

11. Advances in pay.

C. <u>Base and Longevity Pay:</u>

A table consisting of 15 rates designated as steps 1 though 15. Physicians and dentists advance on the table at the rate of one step for every two years of VHA service.

D. <u>Basic Pay:</u>

The rate of pay fixed by law or administrative action for the position held by an employee before any deductions and exclusions of additional pay of any kind (e.g., market pay, performance pay, recruitment incentive etc.) as prescribed under 38 USC 7431. However, annual pay is basic pay only for purposes of computing:

1. Civil service retirement benefits;

2. Lump sum annual leave payments;

3. Life insurance;

4. Thrift savings plan;

5. Work injury compensation claims;

6. Severance pay;

7. Recruitment;

8. Relocation;

9. Retention incentives;

10. Continuation of pay; and,

11. Advances in pay.

E. <u>Longevity Step Increase:</u>

Advancement to the next higher step of the grade based upon completing the required waiting period of two years (104 weeks) of creditable service,

F. <u>Market Pay:</u>

A component of basic pay intended to reflect the recommitment and retention needs for the specialty, or assignment of a particular VHA physician or dentist.

938

G. <u>Performance Pay:</u>

A component of compensation paid to recognize the achievement of specific goals and performance objectives prescribed on a fiscal year basis by an appropriate management official.  Performance pay is paid as a lump sum.

H. <u>Tier:</u>

A level within the annual pay range for an assignment or specialty.

## Section 3 - Pay Components

A. <u>Base Pay:</u>

The Longevity pay schedule contains 15 rates of base pay, designated as steps 1 through 15.  The rates of pay that correspond to each step are published annually on the Labor-Management Relations web site.  The location is http://www1.va.gov/lmr/.  The base pay rate payable to a physician or dentist is determined by the number of total years of service the physician or dentist has worked in VHA as reflected by his/her VA service date.  At the same time as rates of basic pay are increased for a year under 5 USC 5303, the Secretary shall increase the amount of base pay payable under this subsection for that year by a percentage equal to the percentage by which rates of basic pay are increased under such section for that year.  Longevity step increases (LSI) will be granted to physicians and dentists that are receiving less than the maximum step (Step 15).  If such an increase would cause the employee's annual pay (sum of base and market pay) to exceed the amount of annual pay (excluding expenses) received by the President of the United States as specified in 3 USC 102, the employee will only receive the portion of the increase that does not exceed the annual limitation.

B. <u>Effective Date:</u>

Longevity step increases are effective on the first day of the first pay period following completion of the required waiting period.  When a step increase is delayed beyond its proper effective date solely through an administrative error or oversight, the step increase shall be made retroactively effective as of the date it was properly due.

C. <u>Market Pay:</u>

Each VHA physician and dentist is eligible for market pay.  Market pay is intended to reflect the recruitment and retention needs for the specialty or assignment of a particular physician or dentist at a Department facility.

D. At least once every two years, the Secretary prescribes nationwide minimum and maximum amounts of annual pay (base pay and market pay).  These amounts are published in the Federal Register for not less than

939

60 days prior to the effective date. In determining pay ranges at least two or more national surveys of pay for physicians and dentists are consulted. National surveys consulted include data that describes overall physician and dentist income by specialization or assignment and benefits in broad geographic scope. Annual pay ranges approved by the Secretary are available on the Office of Human Resources Management (OHRM) web site, http://vaww1.va.gov/ohrm/Classification/Classification.htm

E. For informational purposes, when the Department increases the nationwide minimum and/or maximum amounts of annual pay under this paragraph, physicians and dentists are not automatically entitled to a corresponding increase in their individual annual pay rates. Only physicians and dentists whose existing rate of annual pay falls below the newly prescribed nationwide minimum for their designated pay range will automatically receive an increase in market pay to make their annual pay rate equivalent to the new nationwide minimum.

F. There may be up to four tiers of annual pay for each specialty or assignment for which a separate range of pay has been approved. Each tier reflects different professional responsibilities, professional achievements, or administrative duties. The two tier definitions, that are typically designed for bargaining unit positions for the annual pay ranges established for individual clinical specialty schedules are as follows:

1. Tier 1 Staff

2. Tier 2 Service chiefs, section chiefs and other supervisors or program managers.

G. Compensation Panels recommend the appropriate pay table, tier level and market pay amount for individual physicians and dentists. The Compensation Panel(s) are also responsible for evaluating the market pay and tier of each physician and dentist under its jurisdiction at least once every 24 months and at such other times deemed necessary by the appropriate Department official. A change in duty basis (i.e., to/from full-time, part-time, or intermittent) will also require a re-evaluation of the market pay and tier by the Compensation Panel. Additionally, if it is anticipated that a change in assignment may result in a market pay or tier change, the Compensation Panel must be consulted.

H. The Compensation Panel recommendations are taken into consideration by the appropriate approving official. The approving official determines the amount of market pay to be paid a physician or dentist after consideration of the range and tier recommended by the Panel. The approving official's decision is final.

I.  The Compensation Panel will recommend the following to the approving official in regard to the pay for individual physicians or dentists:

1.  The appropriate specialty or assignment pay schedule;

2.  The appropriate tier for the physician or dentist using the tier definitions;

3.  A rate or an appropriate range of market pay for a physician or dentist, considering the nationwide minimum and maximum amounts of annual pay prescribed by the Secretary for the specialty or assignment.

J.  Compensation Panels:

1.  Composition of Panels - Each panel is comprised of at least three physicians one of whom is designated as chairperson.  Compensation Dentists Panels are comprised of two dentists.  Panel members must be in a tier equal to or higher than the tier for which the physician or dentist is being considered.

    a.  Pursuant to 38 USC 7431(c)(4)(B)(iii):
        "The Secretary should, to the extent practicable, ensure that a panel or board consulted under this subparagraph includes physicians or dentists (as applicable) who are practicing clinicians and who do not hold management positions in the medical facility of the Department at which the physician or dentist subject to the consultation is employed."

    b.  When the Network Director or Facility Director solicits physicians to serve on the Compensation Panel, the Director should also include written notice for recommendations from the local union or VISN labor-management forums.

    c.  Upon request, the local union will receive notification and information on who currently serves on the local and network physician Compensation Panels and the expected term.

    d.  If the Facility or Network Director denies a physician eligibility to be a member based on the physician being a union representative, he/she should do so in writing.  The notice shall include the rationale.

2.  At least once every 24 months, the market pay of each physician and dentist is reviewed by the appropriate Compensation Panel in accordance with the criteria noted in VHA Handbook 5007 and Title 38 such as:

    a.  Experience in assignment or specialty;

941

    b.  The need for the specialty;

    c.  Health care labor market for the specialty;

    d.  Board certifications;

    e.  Accomplishments; etc.

3.  Each physician and dentist will be provided a written notice of the results of the review, even if the review does not result in a pay adjustment.  The VA Compensation Panel form VA 10-0432A will serve as the written notice.

K.  <u>Reconsideration:</u>

1.  If a physician or dentist believes that his/her tier determination is improper based on the nature of his/her assignment, the employee may submit a request for reconsideration to the official that approved the tier recommendation.  The market pay amount authorized by the approving official is a final decision.  However, employees may request reconsideration of a tier determination.

2.  The request for reconsideration must be submitted in writing within 30 days of the end of the pay period in which the notice was received.  The request must cite why the employee believes that his/her tier determination is inappropriate.  If the request is referred to a Compensation Panel, the approving official will consider and record his/her decision and copy the employee.  If the approving official determines that review by the Compensation Panel is not necessary, the employee will be notified of the decision in writing.

L.  <u>Changes in Assignment:</u>

1.  <u>Same facility or to a different facility:</u>

If an assignment is involuntary, the Department may offer retention of market pay if a reduction would be against equity and good conscience or against the public interest.

2.  <u>Temporary Assignments and Details:</u>

Pursuant to VHA Handbook 5007, individuals temporarily assigned to a position with a different pay range or tier may receive a market pay adjustment after serving in the assignment for 90 days or more.  Temporary assignments and details that result in a change in market pay must be documented and may not result in a reduction of an individual's existing market pay rate.  Upon termination of a temporary assignment or detail, an individual's market pay is returned to the amount payable prior to the temporary assignment or detail.

M.  Underline{Change in Duty Status:}

When a physician converts from part-time to full-time, or from full-time to part-time he/she will retain his/her step on the base and longevity pay scale.  However, the market pay and tier are re-evaluated by the Compensation Panel.  The employee who contemplates such voluntary decision shall have the right to have a written advisory opinion from the Compensation Panel of the possibility of such market reduction, prior to making this personnel decision.

N.  <u>Notice Requirements:</u>

Physicians and dentists must be notified in writing when an involuntary assignment in connection with a disciplinary action will result in a reduction in market pay.  The notice must be provided at least 30 days in advance of the effective date of the reduction, and include the amount of the reduction, and any appropriate appeal rights with regard to the new assignment.  The local union will be notified of any involuntary assignments as related to reduction of market pay and local union representation.

O.  <u>Performance Pay:</u>

Physicians and dentists must be advised of the specific goals and objectives that will be measured in determining their eligibility for performance pay and the maximum monetary value associated with those goals and objectives.  These goals and objectives and the maximum amount of performance pay available in connection with achieving the specified goals and objectives should be communicated by an appropriate Department official to the individual physician or dentist within 90 days of the beginning of the fiscal year.  For the fiscal year that starts on October 1st, this date is July 3rd.  Physicians and Dentists hired after July 1st are not eligible for performance pay per the Department's regulations.  The amount is determined solely at the discretion of the approving official based on the achievement of the specified goals and objectives and is paid annually as a lump sum.  Performance goals and objectives are generally developed locally and will differ from performance standards used for the Executive Career Field or proficiency rating systems.

P.  As related to their representational duties, required under 38 USC 7433(a), the local union, upon request, will be forwarded copies of sanitized versions of performance pay goals and objectives and associated pay amounts.  For informational purposes, performance pay for a physician is not construed as "award" monies designated under Article 16 - Employee Awards and Recognition.

943

Q. Title 38 employees covered by this chapter are entitled to back pay under this chapter if an appropriate authority finds that an unjustified or unwarranted personnel action resulted in the withdrawal, reduction or denial of all or a part of pay, allowances or differentials otherwise due the employee. This includes, among other things, basic pay for physicians and dentists. Basic pay includes the market pay component, additional pay, premium pay, leave, cost-of-living allowances, and post differentials. The appropriate authority is typically the official having authority to approve the applicable personnel action. Network Directors and VHA equivalents may authorize backpay for employees occupying non-centralized positions in their organizations.

### Section 4 - Labor Input into Biennial Review of Pay Ranges

In accordance with 38 USC 7431(e)(1)(A), the Secretary must prescribe minimum and maximum amounts of annual pay for VHA physicians and dentists not less than every two years. VHA will provide the Union with the data and other information prepared for the analysis of the biennial review which relates to the bargaining unit employees. VHA will then facilitate a meeting with three designated representatives to solicit timely comments and input regarding the physician and dentist pay system.

### Section 5 - Availability of Data Regarding VHA Physician and Dentist Average Salaries

Any data concerning bargaining unit physicians and dentists obtained by VHA for general distribution or posted on websites will also be made available to the Union upon request.

# ARTICLE 56 - TITLE 38 HYBRIDS

### Section 1 - General

The authority to promote and advance Title 38 Hybrid employees is subject to 38 USC 7403 and VA Handbook 5005.

### Section 2 - Promotion and Reconsideration

A. The promotion eligibility and subsequent reconsideration process for hybrid personnel appointed under 38 USC 7401(3) and 38 USC 7405(a)(1)(B) are made under the Department's promotion and reconsideration process under VHA Handbook 5005 Part III, Chapter 4 and the provisions of 38 USC 7403. The Department's promotion and reconsideration process may be found at http://vaww1.va.gov/ohrm/HRLibrary/Dir-Policy.htm. Changes to this policy will be accomplished through collaboration pursuant to 38 USC 7403.

B. Promotion actions will be taken without regard to race, color, religion, sex, national origin, disability, age, sexual orientation, labor affiliation or non-affiliation, status as a parent, or any other non-merit factor, and shall be based solely on job-related criteria.

C. Qualification standards for individuals appointed under 38 USC 7401(3) are based primarily on the rank-in-person concept, where the combination of individuals' accomplishments, performance and qualifications determine their grade level. For positions above the full-performance level (journey level), the complexity of the assignment and scope of responsibility are also considered in establishing grade levels and must be completed 25% of the time or to the extent required within the standard.

D. The Department will issue copies of their respective occupation qualification standards to hybrid employees at the time of initial appointment and at the time of a newly published standard. The local union will receive written copies of:

    1. A current and/or revised published copy of a qualification standard;

    2. The Professional Standards Board organizational location; and,

    3. Copies of the Department's full performance level for all respective hybrid occupations.

Sections 3, 4, 5, and 6 below are portions of VA Handbook 5005 and are provided for informational purposes.

945

## Section 3 - Promotion Eligibility At and Below the Full Performance Level

A.  For occupations covered by these guidelines, the full performance (journey) level may vary depending on the complexities of the assignment or the competencies possessed by the individual and are not dependent on the entry level grade of the occupation.  In this rank-in- person system, the promotion potential of positions may not be limited to grades below the full performance level as identified in the qualification standard.  This is also called the journey level.  All individuals who perform successfully and acquire the required competencies may progress without competition to the full performance level.

B.  The employee shall be notified of the eligibility and be given 30 days to submit to his/her supervisor a self-assessment of his/her qualifications for promotion consideration.  Employees may also notify their supervisor in writing that they are declining to submit a self-assessment during this 30 day period.

C.  Upon receipt of the employee's self-assessment, the supervisor will make a recommendation on promotion that is to be acted upon by the approving official within 30 days of the self-assessment being received.  Promotions will become effective on the first day of the first full pay period following approval by the second level supervisor.  In no case will the promotion be effected later than the first day of the first full pay period commencing 60 days after the employee's anniversary date.  Employees who have not demonstrated such capability will be informed in writing by the supervisor that they are not being recommended for promotion.  The written notice will state the reason(s) why the employee does not meet the criteria for promotion.

D.  If an employee will not be recommended to the Board for promotion, the employee will be advised in writing which of the following aspects of the specific occupation's qualification standards are not met:

   1.  Year(s) of specialized experience at the lower grade;

   2.  As noted in the specific occupation's qualification standard, if applicable, the level of licensure, certification, and/or professional distinction recognized by the occupation's professional body.

   In addition, the employee will be given a written explanation that details why the employee is not considered to meet a criterion, and if appropriate, how the employee can improve his or her likelihood of meeting it in the future.

E.  It is understood the employee must also be performing at or above the fully satisfactory level, consistent with Article 27 - Performance Appraisal.

946

## Section 4 - Promotion Eligibility Above the Full Performance Level

A. Employees who are eligible for promotion consideration to a grade that requires a combination of personal qualifications and assignment characteristics are to be considered for promotion to such grades on the first anniversary date of their last promotion, provided they meet the administrative requirements.  In addition, employees who are selected for assignments that warrant consideration for a higher grade based on complexity will be considered for promotion on a date other than the anniversary date of last promotion.  The employee's anniversary date is the date of appointment or date of last promotion.  If an employee is unable to access their anniversary date by their respective service screen, it will be provided to the employee in writing by the Department.

B. If an employee will not be recommended to the Board for promotion, the employee will be advised in writing which of the following aspects of the specific occupation's qualification standards are not met:

   1. Year(s) of specialized experience at the lower grade;

   2. Delineation of duties;

   3. As noted in the specific occupation's qualification standard, if applicable, the required level of licensure, certification, and/or professional distinction recognized by the occupation's professional body; or

   4. Performance of grade controlling duties at least 25% of the time.

   In addition, the employee will be given a written explanation that details why the employee is not considered to meet a criterion, and if appropriate, how the employee can improve his/her likelihood of meeting it in the future.

C. It is understood the employee must also be performing at or above the fully satisfactory level, consistent with Article 27 - Performance Appraisal.

D. The Union and affected employees will be provided access to all materials that describe how the criteria are to be applied.  The Union will have access to educational materials available to Professional Standards Board members.

E. When a revised qualification standard is implemented that gives a facility discretion to fill or not fill a position(s) under position management, it shall be done under the requirement to keep functional statements accurate and in accordance with Article 23 - Merit Promotion in which all employees in the facility who are qualified for the position(s) will have equal consideration for promotion.  Furthermore, Union notification should occur under Article 49 - Rights and Responsibilities when:

947

5. The facility chooses to noncompetitively promote incumbents of positions rather than post a vacancy; or,

6. The facility chooses to limit the number of positions to be filled compared to those who are eligible and already performing grade controlling work, which would result in breaking up grade controlling assignments.

## Section 5 - Reconsideration Process

A. Notice of Decision - Employees are to be advised by their supervisors in writing of any decision not to promote them, of the reason(s) for the decision, of their right to request reconsideration, and that reconsideration must be preceded by an informal discussion with their supervisor.

B. Reconsideration to Grades at or Below the Full Performance Level:

1. If promotion to a grade at or below the full performance level is involved, the employee may, within 30 days of being notified of the decision, submit a written request through the immediate supervisor to the second level supervisor. The employee's written request for reconsideration must indicate when the informal discussion was held with the immediate supervisor and cite the specific reason(s) why the employee believes the decision was not proper. The approving official or designee may extend the 30 day period at the written request of the employee if the employee is unable to submit the information for reasons beyond the employee's control.

2. Second level supervisors are to review the employee's request within 30 days and determine whether to promote the employee. If a second level supervisor determines that a promotion is not warranted, the supervisor will provide the reasons for this decision to the employee in writing.

3. If the employee is not satisfied with the explanation of the determination to not promote, the employee can request within 30 days to have the determination reviewed by the next higher level board. The employee's request for reconsideration and the supervisor's explanation will be forwarded to the higher level board within 30 days.

4. The higher level board will make a recommendation within 30 days to the appropriate approving official, who will make a final decision within 30 days.

5. If the promotion is approved, the employee is to be promoted on the first day of the first pay period following a decision by the approving official. In no case will the promotion be effected later than the first day of the first full pay period commencing 180 days after the employee

submits a written request for reconsideration, unless the employee requested an extension to the 30 day period to submit a written request for reconsideration. In such cases, the number of additional days taken by the employee to submit a request will be added to the 180 day time limit. If the promotion is denied, the employee will be provided with a copy of the board action.

### Section 6 - Reconsideration for Promotions to Grades Above the Full Performance Level

A. An employee may submit a written request for reconsideration through the supervisor to the next higher level Professional Standards Board for review within 30 calendar days of the non- promotion decision. The approving official or designee may extend the 30 day period at the written request of the employee if the employee is unable to submit the information for reasons beyond the employee's control. The employee's written request for reconsideration must indicate when the informal discussion was held with the immediate supervisor and cite the specific reason(s) why the employee believes the decision was not proper. Supervisors are to review and comment on the employee's request in writing, and provide copies of those comments to the employee within 30 days.

B. The appropriate Professional Standards Board will review the information submitted by the employee, along with the supervisor's comments, and make a recommendation to the approving official within 30 days. Its recommendation may be extended up to the number of days it took the employee to provide the Board with the appropriate information. Upon completing its review, the Professional Standards Board is to forward its recommendation to the approving official for action.

C. Upon review of the reconsideration file, the approving official shall request any additional information needed to make a decision. This includes, but is not limited to, meeting with representatives of the Professional Standards Board, the employee, and/or the employee's supervisor prior to making a decision under paragraph 1 or 2 below. The approving official shall then take one of the following actions within 30 days:

1. Approve the employee's promotion. Promotions will be made effective on the first day of the first full pay period following approval. In no case will the promotion be effected later than the first day of the first full pay period commencing 120 days after the employee submits a written request for reconsideration, unless the employee requested an extension of the 30 day period to submit a written request for reconsideration. In such cases the number of additional days taken by the employee to submit a request will be added to the 120 day time limit.

949

2. Disapprove the promotion and notify the employee of the decision and the reasons for it, in writing.

### Section 7 - Effective Date

The promotion will be made effective by the Human Resources Management Officer on the first day of the pay period following the date of approval of the promotion by the approving official, but in no case earlier than the date on which all administrative requirements are met. A promotion may also be made effective at a future date set by the approving authority that does not violate law or negotiated agreement when doing so would benefit the employee. Promotion recommendations and actions that are administratively delayed beyond the time limits specified in paragraphs above will be made retroactively.

### Section 8 - Professional Standards Boards

A. The employees selected for the initial Board will serve either a 1 year, 2 year, or 3 year term. At the end of each of these initial terms, all new members will be selected to serve a 2 year term. Thus, members will rotate off the Board on a staggered basis and there will always be at least one member remaining on the Board from the previous year. Any revisions to this procedure will be accomplished through collaboration.

B. Professional Standards Board organizational location(s) (local, regional and national), Board composition, and member training requirements are found in VA Handbook 5005 Part II Chapter 3.

### Section 9 - Vacancy Announcements

A. For the purposes of this Agreement, grades below the full performance level are the Department established career ladders and pathways. Announcements for vacancies at the full performance level and below must span all grade levels in the qualification standards from the full performance level to the entry level. The application of competitive procedures is made for vacancies above the full performance level and must meet Article 23 - Merit Promotion, Section 8 vacancy announcement information and posting requirements. Additionally, the provisions of Article 23 - Merit Promotion, Sections 13, 15 and 16 apply to this article. Vacancy announcements and the auditing of promotion packages for Title 38 Hybrids shall be controlled by Article 23 - Merit Promotion.

B. Vacancy announcement(s) will not be posted until the Department assures that they are appropriately authorized, properly described, and that the PD/functional statement reflects the appropriate assignment and qualification for grade. Details, reassignments and temporary promotions of an employee performing grade controlling duties above the full performance level (at least 25% of his/her time) shall be done in accordance with Article

950

12 - Details and Temporary Promotions and Article 13 - Reassignment, Shift Changes and Relocations and the requirements of the Departments procedures for hybrid employees.  All employees' who are qualified shall have equal access to training opportunities for grade controlling work above the full performance level.  Title 38 Hybrid temporary promotions in excess of 60 calendar days shall be made using competitive procedures.

## Section 10 - Eligibility for Temporary Promotion, Detail, and Reassignment

Consistent with Article 12 - Details and Temporary Promotions and Article 13 - Reassignment, Shift Changes and Relocations, if an employee believes he/she is performing work that warrants a promotion, the employee will provide as much information as he/she is able to provide concerning his/her position or individual qualifications, to include, but not limited to, the changed duties as compared to the employee's qualification standards as the employee understands them, and time spent in the assignment-driven work above the full performance level, when the request for boarding is made.  If the Department determines an employee is not qualified or eligible for a detail, a reassignment, or recommendation to the Professional Standards Board for consideration of temporary promotion, the Department will inform the employee of the reason in writing, upon request.  The reason will include how the work does not match the qualification standard and performance standards of the employee's higher graded work above the full performance level.  Additionally, the employee and the Union will receive, upon request, any instruction and/or other materials relied upon in the calculation method of time requirements needed for grade-controlling work.  The Union will receive notification of the determination, when the Union represents the employee. When the Department makes the determination not to fill a position above the full performance level, via the Department's position management authority, and subsequently directs and assigns the employee above the full performance work (at least 25% of time), the employee shall retain the right to request boarding for the time assigned to the higher-graded duties.

## Section 11 - Requesting Boarding

An employee may request boarding, and the Department will consider it, when the employee believes the duties of the position have changed significantly since any previous boarding.  The employee will provide as much information as he/she is able to provide concerning those changes, to include but not limited to, the changed duties as compared to the employee's qualification standards as the employee understands them, and time spent in the assignment driven work above the full performance level, when the request for boarding is made.

951

## Section 12 - Training

Training availability will be made known to all similarly situated employees and selections for training will be made fairly and equitably.

## Section 13 - Position Descriptions/Functional Statements

A. At the time of initial assignment and upon request, employees will be furnished a current, accurate copy of the description of the position to which they are assigned. The PD/functional statement will have the date evaluated and the signature of the supervisor. The option will be given to the employee to sign the PD/functional statement upon receipt. The local union will be provided the opportunity to review proposed changes in all PD/functional statements and receive copies of updated PD/functional statements and organizational charts.

B. Whenever possible, employees will be afforded the opportunity to assist in the preparation of their PD/functional statements; however, supervisors and/or managers are responsible for assigning work to positions and insuring they are accurate. For positions which are identified in the Department's career ladders below the full performance level, a complete PD/functional statement needs to be established only for the target, full performance position.

C. Copies of current PDs for bargaining unit positions will be provided to the local union upon request. PD/functional statements will be kept current and accurate, and positions will be graded properly. PD/functional statements shall be subject to periodic review.

## Section 14 - Erosion of Grade

A. Before the Department reduces the grade, the employee has the right to discuss with his/her supervisor whether grade-controlling duties have changed as reflected in the nature of the assignment, either by erosion or planned management action. During the discussion, the Department will identify for the employee how the nature of the assignment is perceived to have changed and how such change renders the employee's grade inappropriate under the applicable Secretary's classification processes and standards.

B. The employee will be afforded the opportunity to describe and/or present evidence showing what the job consisted of historically and how it changed or remained the same, with respect to grade-controlling duties.

C. The employee will be advised in writing which of the following aspects of the specific occupation's qualification standards are not met:

    1. Delineation of duties; or,

2. Performance of grade-controlling duties at least 25% of the time.

D.  An employee whose grade is reduced is entitled to grade and pay retention under 5 CFR Part 536.

### Section 15 - Special Salary Surveys at the National and Local Level

The Union will be involved predecisionally before the Department initiates a survey to determine a special salary rate.  The predecisional process will include all elements related to the survey.

953

# ARTICLE 57 - PHYSICAL STANDARDS BOARD

### Section 1 - General

This Article applies only to Title 38 employees and is provided for informational purposes only.  The Physical Standards Board (PSB) process, and/or the examination and evaluation process for Title 38 employees, is governed by 38 USC and VA Handbook 5019.

In the event that the Department believes that a Title 38 employee is physically or mentally incapable of performing their duties, the Department will give a specific reason to the employee in writing.  The employee shall be entitled to meet with the recommending medical official and to provide any oral and written evidence from his/her own physician/counselor before a recommendation is made.  In any such meeting, the employee is entitled to Union representation and shall be provided notification of such entitlement.

### Section 2 - Notification

When the Department orders or offers a medical examination under the provisions of the prevailing regulations, it shall inform the employee in writing of its reasons for ordering or offering the examination and the consequences of failure to cooperate.  The Department shall designate the examining physician but shall offer the employee the opportunity to submit medical documentation from his/her personal physician which the Department shall review and make part of the file.

### Section 3 - Guidelines for Physicians

A.   The Department shall provide the examining physician with a copy of any approved medical evaluation protocol, applicable standards and requirements of the position, and/or a detailed functional statement of the duties of the position including critical elements, physical demands, and environmental factors.

B.   The Department shall order or offer a psychiatric evaluation to an employee only when the employee first provides results of a general medical or psychiatric examination or the Department has first conducted a nonpsychiatric medical examination and, after review of the documentation or examination report, the Department's physician concurs that a psychiatric evaluation is warranted for medical reasons.

C.   All medical examinations ordered or offered pursuant to Paragraphs 3A and 3B in this section shall be at no cost to the employee and performed on duty time at no charge to leave.

954

D. An employee can be directed to undergo a fitness for duty examination only if the employee's position is one that has established essential functions, either mental or physical.  Such essential functions must have wording to clearly support them, by being objective.  Essential functions are those that are so fundamental to the position that a person cannot do the job without performing them.  A function is "essential" if, among other things, the position exists specifically to perform that function, there are a limited number of other employees who could perform the function, or, the function is specialized and the individual is hired based on his/her ability to perform them.  Determination of the essential functions of a position must be done on a case-by-case basis so that it reflects the job as actually performed, and not simply the components of a generic PD.

E. When the Department orders a medical examination or questions an employee or a potential employee's abilities to meet a specific job qualification, the Department will provide the essential functions of the employee's position to the examining physician (the Department's or a private physician).  The Union shall receive answers on how the Department came to the conclusions of the "essential functions", both physical and mental, of a specific PD or functional statement, upon request.

## Section 4 - Procedures

In seeking a fitness-for-duty examination which may or may not lead to a disability application, the following rules and procedures shall apply:

A. In all discussions with any Department official, the employee shall be entitled to Union representation.  Prior to any discussion, the employee shall be notified of this right, given an opportunity to contact and discuss the matter with his/her Union representative, and permitted the right of representation in such discussion.

B. During these procedures, the employee will be apprised of his/her rights and, where supported by appropriate medical evidence, given the opportunity for suitable interim adjustments in his/her work assignments.

C. When the results of the medical examination reveal that the employee:

1. Cannot satisfactorily perform useful and efficient service in his/her regularly assigned job;

2. Retains the capacity to do other work at the same grade or pay level within the work location or the commuting area; and,

3. Otherwise meets the minimum qualifications for an available position that the Department seeks to fill;

The Department will ordinarily offer the employee a reassignment to this position.

D.   When the Department determines that the medical evidence reveals:

   1.   The employee is totally disabled for service in their current position; and,

   2.   Reasonable accommodation for another position cannot be made,

   The Department will so advise the employee and provide appropriate counseling.


## Section 5 - Appeals Procedure

Once any decision is made that removes an employee from their position or duties for physical or mental inability to perform, the employee, consistent with Title 38, shall be able to use the appropriate appeals procedure as listed in VA Handbook 5019, Part III.  When a disabled employee meets existing disability retirement requirements, the Department will counsel the employee concerning disability retirement and explain the procedures for voluntarily applying for disability retirement.


## Section 6 - Counseling

A.   When a disabled employee meets existing disability retirement requirements, the Department will counsel him/her concerning disability retirement and explain the procedure for voluntarily applying for disability retirement.  In the event that such an employee is unable to file on his/her own behalf, the Department may initiate, with notice to the employee, an application for the employee in accordance with applicable laws and regulations.

B.   If the medical evidence and performance records establish that the employee retains the capacity to perform satisfactorily in a vacant lower graded position which the Department seeks to fill within the employee's commuting area, the employee will be informed of his/her option to request such a demotion.


## Section 7 - Confidentiality

Confidentiality must be maintained throughout the review process.  All records pertaining to the employee's examination and any subsequent personal information included with an application for disability retirement are confidential and may be disclosed only to those with an administrative need to know or specifically authorized by the employee.  There will be a written statement to the employee of any disclosure.

956

# ARTICLE 58 - PROFESSIONAL STANDARDS BOARD

A. The Union may submit names of candidates for Professional Standards Boards. The Department will give serious consideration to appointing from the candidates recommended by the Union.

B. Employees normally will be reviewed annually by the Professional Standards Board.

957

# ARTICLE 59 - PROFICIENCY

A.  The Department will involve employees actively in the promotion/ evaluation process.  Employees will be notified 90 days prior to the due date for proficiency.

B.  Employees will be given 60 days to provide information that will be used in the proficiency.

C.  When employees meet time-in-grade requirements for promotion to the next grade, the employee will be evaluated for promotion at the next scheduled boarding.

D.  Employees will receive current copies of criteria for promotion and special advancement on initial employment.  Employees will receive updated copies of promotion and special advancement criteria when changes are made.

E.  Where employees are not promoted, they will receive an explanation regarding those specific elements in which they are deficient.

F.  Proficiencies will be done timely to prevent delays in the boarding cycle. Employees whose proficiencies have been unduly delayed without good cause will be made whole.

958

# ARTICLE 60 - TITLE 38 REPRESENTATION AT BOARDS OR HEARINGS

A.  The Union will be allowed to represent any unit employee at any hearing before a Title 38 Disciplinary Board or whenever a probationary employee appears before a Professional Standards Board in a termination proceeding. A representative in a Professional Standards Board hearing may do those things an employee is entitled to do under regulations.

B.  If the employee does not choose to have Union representation, the Union may be permitted to have an observer present at hearings described in Paragraph A.  The Union observer may attend the Professional Standards Board hearing only during the employee's presentation.  Consistent with applicable laws and regulations, Union representatives and observers must protect the confidentiality of any information to which they have access in connection with a Board Hearing.

959

# ARTICLE 61 - TITLE 38 VACANCY ANNOUNCEMENTS

### Section 1 - General

All Title 38 bargaining unit positions will be announced facilitywide with posting and/or distribution a proper subject for local bargaining. If facilities are consolidated, positions will be posted at each geographic location. These announcements must be readily available for review by employees. The posting/application period will run for a minimum of 14 calendar days.

### Section 2 - Contents of Vacancy Announcement

The qualifications for the position and educational/certification level will be kept current and clearly defined on the vacancy announcement. If the requirements of the job/position change, the vacancy announcement will be reposted reflecting the changes.

### Section 3 - Vacancy

A. All employees will have a fair and equitable opportunity to compete for selection for a posted vacancy. All applicants will be asked the same questions during an interview.

B. At the request of the employee, the Department will supply the employee with an explanation of why they were not selected for the position.

### Section 4 - Title 38 Position Qualifications

A. The Union will be predecisionally involved and may submit recommendations for criteria to be used in the development of all bargaining unit position qualifications.

B. The Union will be provided copies of all position qualifications for vacant positions.

C. Current employees will receive first consideration when filling position vacancies.

# ARTICLE 62 - VETERANS CANTEEN SERVICE

## Section 1 - Compensation

A.  Pay Adjustments:

1.  Upon the effective date of this Agreement, all Veterans Canteen Service (VCS) schedule employees shall receive pay raises equal to or greater than the uncapped pay line for each Non-Appropriated Fund (NAF) survey area in effect at that time. Pay will be set annually thereafter in accordance with the NAF pay survey. In no case shall any negative pay line be implemented by the Department.

2.  VCS bargaining unit employees will receive awards in accordance with Article 16 - Employee Awards and Recognition and Article 27 - Performance Appraisal.

B.  Benefits Programs:

VCS employees shall receive the same discretionary benefits as Title 5 employees.

C.  Leave and Holidays:

VCS employees will accrue and use all categories and programs for absence, leave, and holidays as are applicable under this Agreement.

## Section 2 - Canteen Prices and Meal Allowances

A.  The parties agree that for the duration of this Agreement the Department will set canteen prices and such prices will not be subject to negotiations. The Department agrees to notify the Union prior to the implementation of price increases.

B.  Meal allowances for VCS employees will be provided to permit employees one complete meal per day (entrée and beverage) valued at no more than six dollars; or, a 60% discount per day on a meal of any value. The six dollar amount will be increased each January 1 to reflect Consumer Price Index increases.

## Section 3 - Internal Promotions in the VCS

To provide promotional opportunities for all VCS employees, internal candidates will be given first consideration for vacancies prior to hiring outside applicants. If a VCS employee is not selected, it shall be for bona fide reasons, and the employee will be given a written explanation of reasons for non-selection.

961

## Section 4 - Storage and Personal Belongings

The availability of employee lockers or secure storage space for personal belongings is a subject for local negotiations. The supervisor will provide locks or other security devices to secure personal belongings.

## Section 5 - Appointment to Competitive Status Positions

A. A VCS employee shall be considered for appointment to a Department position in the competitive service in the same manner that any other Department employee is considered for transfer to such position, in accordance with Article 23 - Merit Promotion and 38 USC 7802(e).

B. When a VCS employee is appointed to a position in the competitive service, the Department shall credit the length of any previous period of employment in the VCS toward the time-in-service requirement for career appointment.

C. The service computation date for all purposes of an employee moving from a NAF position to a competitive service position shall be adjusted to include all previous periods of employment in the VCS.

## Section 6 - Counseling Prior to Separation

A. If a non-probationary VCS employee is being considered for termination for conduct, the employee will be allowed to provide his/her version of the events and, if appropriate, the Department will provide the employee the opportunity to correct the behavior. This provision does not create a new right of appeal for the employee.

B. If a non-probationary VCS employee is being considered for termination for performance, the employee will be given notification of the performance deficiency that is perceived and provided guidance and an opportunity to correct it prior to separation.



# GENERAL PROVISIONS PLACEHOLDER



964

# ARTICLE 63 - RESEARCH GRANTS

A. Employees who have made funding or other project applications will be immediately notified of the approval/disapproval. The notification will include the project ranking.

B. Any employee in the Department Research Program whose status and/or employment rights are altered or jeopardized, for example due to a change in funding, will be fully advised of the possible impact of such change at the time a change to their status is considered.

965

# ARTICLE 64 - RESEARCH PROGRAMS AND DEMONSTRATION PROJECTS

## Section 1 - Definitions

A. Research Program

Means a planned study of the manner in which public management policies and systems are operating, the effects of those policies and systems, the possibilities for change, and comparisons among policies and systems.

B. Demonstration Project

Means a project conducted by the OPM or under its supervision to determine whether a specified change in personnel management policies or procedures would result in improved federal personnel management.

## Section 2 - Project Initiation

A. When a demonstration project is considered, the Union and the Department are encouraged to jointly request demonstration authority from OPM and jointly develop the details of the demonstration project.

B. When the Department receives notification from OPM, another federal agency, or some other public or private organization that a research and demonstration project will be conducted, the Department will notify the Union.

C. The Department agrees not to enter into any research or demonstration project affecting unit employees without first meeting its obligation to consult or negotiate with the Union.

D. The Union will receive the following without cost on a semiannual basis:

   1. Information concerning research programs or demonstration projects proposed to OPM by the Department; and,

   2. Data and reports of research provided to the Department by OPM or other federal agencies which concern research projects affecting unit employees.

E. Employees participating in any activity covered by this article shall have their participation noted and placed in their eOPF.

966

### Section 3 - Comments on Reports

Whenever the Department submits an evaluation report to OPM concerning a research or demonstration project affecting unit employees, the Union will be provided an opportunity to submit its views in an accompanying report. After implementation of the program, the Union will be kept informed of the progress on a continuing basis.

967

# ARTICLE 65 - WAGE SURVEYS

### Section 1 - Membership Survey Teams

Survey teams will consist of one member nominated by the local facility and one member nominated by the labor member of the local wage survey committee.  Each will be selected on the basis of qualifications set forth under FWS procedures.  The number of teams needed to complete the survey will be determined by the local committee.

### Section 2 - Office Space

The host installation designated by the lead agency will provide office space and telephone capability to local committee members and survey teams for the purpose of conducting the survey.  The Department will provide such facilities where necessary.

### Section 3 - Transportation

The Department will make every effort to provide official vehicles for the use of survey teams and, if necessary, for committee members involved in the survey. In the event such vehicles are unavailable, the Department will explore all other alternatives to provide transportation for the survey team.

968

# ARTICLE 66 - TECHNOLOGY FOR ADMINISTERING, TRACKING, AND MEASURING VBA WORK

### Section 1 - Scope

A. The provisions of this article shall apply to the application of the technology that may be used to administer, track, and/or measure the work of VBA bargaining unit employees.

B. The application of such technology is governed by established policy of the Department as contained in the Department's notification to the affected employees and the Union. It is also governed by this Agreement and by applicable requirements under law and government-wide regulations.

C. If the Department decides to modify or change its application of technology in a manner that triggers a duty to bargain, it will meet its contractual and statutory obligations.

D. Pursuant to 5 USC 7106(b)(1), technology is not a mandatory subject of bargaining. Under Executive Order 13522, employees and their Union representatives shall have predecisional involvement in all workplace matters to the fullest extent practicable, without regard to whether those matters are negotiable subjects of bargaining under 5 USC 7106(b)(1).

### Section 2 - Application of the Technology

To the extent consistent with Section 1, such technology shall be applied in a manner that ensures validity, reliability, and attainability by most similarly situated employees.

A. General - The application of the technology will be fair, equitable, consistent, and take into account matters beyond the control of the employee.

B. Where the selection of certain work of an employee is to be random, the Department will provide the employee and the Union with the methodology that was used to assure randomness.

### Section 3 - Contesting Results

At any time an employee disagrees with a record of his/her work that was obtained through or by technology, the employee may seek corrective action in accordance with Article 43 - Grievance Procedure.

969

### Section 4 - Annual System Review

A. The application of the technology will be evaluated annually by the parties to identify systemic problems and positive outcomes associated with it (in relation to its stated purpose, unintended effects on work product, and impact on employees' conditions of employment).

B. Recommendations for improvement of the technology and/or its application may be made by the Union at any time. The recommendations should address employees' positive and/or negative experiences, and will be addressed by the Department whether they are adopted or not.

C. The application of technology is an appropriate subject for bargaining at the local union level, on aspects not in conflict with this article.

970



# DURATION OF AGREEMENT PLACE OF AGREEMENT



# Duration of Agreement

### Section 1 - Effective Date

This Agreement will be implemented and become effective when it has been approved, ratified, and signed by the parties, including review pursuant to 5 USC 7114(c). The effective date of this Agreement is March 15, 2011.

### Section 2 - Duration of Agreement

This Agreement shall remain in full force and effect for a period of three years after its effective date. It shall be automatically renewed for one year periods unless either party gives the other party notice of its intention to renegotiate this Agreement no less than sixty nor more than one hundred twenty days prior to its termination date. Negotiations shall begin no later than 30 days after these conditions have been met. If renegotiation of an Agreement is in progress but not completed upon the terminal date of this Agreement, this Agreement will be automatically extended until a new agreement is negotiated.

### Section 3 - Reopener

Negotiations initiated by either party during the term to add to, amend, or modify this Agreement may be conducted only by mutual consent of the parties. If mutual consent is reached, such notice to renegotiate must be accompanied by the revised proposals for the article(s) the party wishes to renegotiate. The parties will meet for the purpose of negotiating the amendments or modifications within 30 days of receipt of the proposals from the moving party.

### Section 4 - Negotiation Schedule

Arrangements for negotiating both the reopener or renegotiation under Section 2 or 3 above shall be in accordance with Article 47 - Mid-term Bargaining.

### Section 5 - Amendments and Modifications

This Agreement may only be amended, modified, or renegotiated in accordance with the provisions of this Agreement.

973

For the Department of Veterans Affairs:

Eric K. Shinseki
Secretary of Veterans Affairs

Leslie B. Wiggins
Chief Negotiator

Mark Frassinelli
Alternate Chief Negotiator

Meghan Serwin-Flanz
Member

Carl Hawkins
Member

Brian McVeigh
Member

Karen Kormelink
Member

Robert H. Kline
Member

Ryan Fulcher
Recorder

Date: March 15, 2011

For the American Federation of Government Employees

John Gage
National President, AFGE

Alma L. Lee
Chief Negotiator

Mary Jean Burke
Member

Oscar L. Williams, Jr.
Member

William Wetmore
Member

David Mollett
Member

Sandra Eggleston
Member

Anthony McCray
Member

Valorie Reilly
Member

Charles Rodriguez
Member

Pamela Newlon
Member

William D. Dawkins
Member

975



**PLACEHOLDER**

**INDEX**



# Index

## A

**Abatement**: 145, 146, 148, 149, 150, 152, 153, 154, 155, 156

**Administrative Leave**: 142, 203, 205

**Advanced Annual Leave**: 197

**Advanced Sick Leave**: 197

**Advance Notice**: 27, 42, 48, 80, 82, 88, 129, 152, 180, 202, 216, 229, 234, 250, 253

**Adverse Actions**: 50, 51, 52, 54, 55, 60, 63, 64, 120, 229, 250, 254
appeal rights: 51, 52, 140, 180, 271
counseling: 54, 55, 64, 70, 75
demotion: 46, 75, 138, 284
furlough: 50, 137, 138
grievance: 3, 12, 19, 48, 52, 64, 94, 114, 115, 136, 140, 167, 228, 229, 230, 231, 232, 233, 234, 235, 250, 265
part-time employees: 88, 90, 185, 197
progressive discipline: 51
removal: 50, 82, 135, 228
reprimand: 50, 51
union notification: 30, 41, 84, 113, 137, 275
union representation: 19, 51, 52, 53, 61, 64, 74, 95, 96, 134, 178, 229, 271, 282, 283, 287

**Affirmative Action**: 66, 70, 71

**Alcoholism**: 54

**Allocated Official Time**: 10–32, 36–224, 253–258

**Alternative Work Schedule**: 81, 84, 85, 105, 264. *See also* AWS
lunch breaks: 90

**Anniversary Date**: 236, 237, 238, 274, 275

**Annual Leave**: 36, 83, 92, 94, 187, 188, 189, 191, 194, 197, 198, 199, 204, 220, 223, 265, 266
advanced: 197
extended: 187
part-time employees: 88, 90, 185
scheduling conflicts: 188
unplanned leave: 188

**Appeal Rights**: 51, 52, 140, 180, 271

**Appointments**: 100, 103

**Appraisals**: 28, 127, 128, 141, 186. *See also* Performance Appraisal

**Arbitrability**: 229, 233

**Arbitration**: 19, 231, 232, 233, 234, 235
awards: 235
expedited: 9, 95
invoking: 234
official time for: 10, 11, 36, 71, 119, 128, 144, 234, 238, 241, 243, 244, 245, 246, 247, 248, 249, 253
panels: 57, 108, 268, 269, 270, 271
procedures: 72, 136, 228–233

**Areas of consideration**: 105

**Asbestos**: 153, 154, 155, 172

**Assessment Criteria**: 104, 105

**Assistance plan**: 24, 29, 54, 55, 60, 61, 69, 76, 99, 125, 134, 135, 140, 158, 159, 179, 185, 198, 223

**Assistive Devices**: 68

**Audit**: 37, 114, 168, 169, 278

**Awards**: 23, 28, 56, 56–58, 57, 58, 59, 109, 110, 120, 121, 125, 128, 131, 132, 133, 196, 214, 222, 235, 237, 262, 271, 289, 293
award amount: 12, 56, 57, 59, 121, 162, 196, 206, 214, 234, 236, 237, 238, 245, 248, 249, 267, 268, 270, 271, 289
criteria: 56, 57, 269
funding: 27, 28, 121, 293
group: 28, 56, 57, 58, 124
individual: 13, 56, 57, 59
nomination procedures: 59
number of: 56, 59
Suggestion: 57, 58
types of: 57, 58

**Awards Panel**: 57

**AWS**: 84, 85, 89, 90, 105, 264. *See also* Alternative Work Schedule

979

**B**

**Bargaining**: 3, 4, 5, 9, 10, 11, 12, 12–16, 21, 21–31, 22, 26, 28, 29, 30, 36, 40, 41, 46, 46–48, 48, 50, 57, 60, 61, 71, 84, 85, 88, 89, 89–95, 90, 91, 92, 94, 95, 96, 97, 103, 105, 107, 108, 114, 119, 120, 122, 123, 129, 130, 132, 137, 140, 144, 144–145, 144–145, 144–145, 144–145, 144–145, 145, 146, 147, 153, 156, 157, 161, 164, 175, 175–178, 177, 178, 199, 207, 209, 211, 227, 228, 232, 236, 236–239, 236–239, 236–239, 237, 238, 239, 240, 241, 242, 242–244, 243, 243–244, 244, 245, 246, 246–249, 247, 248, 249, 251, 252, 253, 258, 262, 265, 268, 272, 280, 288, 289, 297, 298, 301, 301–302
Ground Rules: 240, 241, 244
interest-based: 12, 240, 241, 242
proposals: 13, 78, 185, 243, 301
supplemental agreements: 61, 188, 227, 234, 240, 240–241, 241

**Bulletin Boards**: 61, 70, 95, 213, 223, 257

**C**

**Career Development**: 60, 207, 207–209

**Career Ladder**: 97, 98, 99, 101, 102, 105, 107, 111, 130, 131, 213, 278, 280
suspension of: 50–52

**Certification**: 3, 5, 40, 44, 49, 80, 157, 161, 162, 191, 192, 200, 201, 202, 203, 228, 274, 275, 288

**Child Care**: 35–36
committees: 11, 35–36

**Civil Service Reform Act**: 235

**Classification**: 37, 37–39, 38, 39, 42, 44, 97, 100, 101, 102, 107, 115, 139, 167, 168, 228, 258, 268, 280

**Classification Appeal**: 38–39

**Committees**: 10, 10–11, 11, 13, 17, 19, 36, 36–37, 71, 84, 144, 145, 147, 148, 149, 150, 166, 169, 168–170, 169–171, 170, 207, 241, 246, 246–247, 247, 296

**Communicable Disease**: 168–224

**Communications**: 9, 9–10, 10, 12, 13, 14, 16, 21, 21–22, 25, 29, 64, 124, 132, 134, 145, 146, 215, 224, 245, 251, 251–252, 252, 255–257, 256, 257

bulletin boards: 61, 70, 95, 213, 223, 257
email: 141
formal discussions: 3, 178
internet: 255, 256, 257
intranet: 256, 257, 265
mobile technology: 94
surveys: 90, 252, 258, 263, 268, 281, 289, 296
telecommunications: 255–256, 256
telephones: 70, 78, 79, 81, 82, 105, 111, 120, 141, 156, 176, 189, 221, 223, 234, 242, 252, 255, 256, 296
videoconferencing: 78, 256
with employees: 124, 179, 182, 252, 256, 257

**Compensation**: 45, 48, 61, 73, 88, 92, 117, 151, 153, 155, 163, 173, 194, 195, 206–209, 214–215, 218, 220, 220–223, 222, 223, 228, 261, 265, 266, 267, 268, 269, 270, 271, 289

**Compensatory Time**: 89, 92, 93, 117, 118, 193, 196, 199, 264

**Competitive Actions**: 100, 108

**Compressed Work Schedules**: 84, 85, 86. *See also* CWS
4-10: 86
5-4-9: 86
6-12-8: 86
Headquarters (Central Office): 87
provisions: 86, 87, 89
suspension of: 89

**Conditions of Employment**: 3, 4, 9, 42, 62, 85, 144, 203, 228, 240, 245, 247, 250, 252, 298

**Counseling**: 35, 54, 55, 64, 65, 70, 75, 82, 116, 122, 134, 140, 141, 165, 178, 220, 284

**Counselors**: 70

**Court Leave**: 117, 190, 193–194

**CPR**: 157

**Credit Hours**: 85–90, 86, 87, 88, 89, 199, 200
Fied: 89
Field: 89, 90
provisions: 89

**Critical Element**: 74, 125, 126, 127, 128, 130, 131, 132, 133, 134, 135, 136, 139, 179

**CWS**: 86, 86–90, 87, 88, 89, 90. *See also* Compressed Work Schedules

## D

**Demonstration Project**: 294, 295

**Demotion**: 46, 75, 138, 284

**Disability**: 60, 66, 67, 67–69, 68, 69, 70, 71, 73–75, 74, 75, 76, 80, 97, 103, 173, 181, 183, 195, 221, 224, 273, 283, 284

**Disability Retirement**: 73, 75, 173, 284

**Disabled Veterans**: 66, 70, 103, 195

**Disciplinary Action**: 48, 50, 50–54, 51, 52, 53, 54, 55, 60, 63, 64, 95, 116, 125, 178, 187, 232, 250, 254, 271, 287

**Discussions**: 3, 5, 9, 10, 27, 30, 31, 37, 52, 64, 74, 83, 89, 107, 108, 130, 133, 134, 159, 178, 181, 182, 184, 214, 218, 222, 230, 231, 232, 239, 242, 243, 248, 250, 254, 255, 276, 277, 280, 283

**Drug Abuse**: 54, 173

**Dues Withholding**: 236–239, 237

**Duty Time**: 11–32, 12–32, 13–32, 21–32, 36–224, 43–224, 61–224, 63–224, 71–224, 74–224, 91–224, 133–224, 144–224, 145–224, 234–258, 248–258, 282–290

## E

**Early Dismissal**: 79, 83

**EEO**: 61, 66, 67, 69, 70, 71, 72, 114, 115, 229, 248. *See also* Equal Employment Opportunity

**Emergencies**: 36, 82, 83, 89, 93, 121, 122, 148, 153, 154, 155, 156, 157, 165, 171, 172, 173, 195, 196, 198, 199, 206

**Emergency Preparedness Plan**: 157

**Employee Rights**: 33, 33–224, 60–64, 96, 223
  fair and equitable treatment: 43, 57, 58, 85, 89, 91, 92, 124, 209, 288
  privacy: 60, 62, 79, 110, 127, 167, 222
  to union representation: 19, 53, 61, 95, 282, 283

**Equal Employment Opportunity**: 61, 66–72, 114, 115, 229, 248. *See also* EEO
  applicable regulations: 62, 66, 69, 70, 72, 115
  assistive devices: 68
  complaints: 22, 70, 72, 228–233, 229, 245
  counselors: 70

disabled veterans: 66, 70, 103
discovery: 70, 96
grievance procedure: 3, 12, 22, 66, 70, 72, 228, 229, 230, 232, 233, 234, 235, 245, 246, 257
information: 5, 9, 10, 12, 14, 18, 20, 21, 35, 37, 41, 51, 52, 53, 54, 55, 57, 62, 63, 70, 72, 75, 90, 96, 104, 105, 107, 109, 111, 113, 114, 115, 116, 118, 120, 127, 129, 132, 133, 138, 139, 140, 142, 152, 153, 154, 155, 156, 158, 159, 161, 166, 169, 170, 172, 173, 176, 179, 183, 191, 200, 201, 203, 208, 209, 213, 221, 222, 223, 236, 250, 251, 252, 253, 257, 261, 269, 272, 276, 277, 278, 279, 284, 286, 287
interpreter service: 68, 69
job restructuring: 67
leave without pay: 36, 55, 83, 163, 174, 191, 194, 195, 197–199, 199, 202–204, 204, 223
official time: 10, 11, 12, 13, 17, 21, 25, 27, 28, 36, 71, 119, 128, 144, 238, 241, 243, 244, 245, 246, 247, 248, 249, 253
reasonable accommodations: 44, 49, 66, 67, 69, 75
reassignments: 44, 46, 47, 48, 49, 50, 74, 101, 103, 135, 137, 138, 141, 159, 185, 237, 239, 278, 279, 284
sexual harassment: 60, 66, 97, 273
training: 10, 12, 13, 14, 15, 16, 23, 25, 27, 28, 29, 30, 35, 40, 41, 63, 68, 69, 70, 72, 81, 89, 97, 98, 99, 100, 101, 105, 106, 109, 117, 130, 133, 134, 135, 145, 148, 151, 152, 154, 156, 158, 164, 167, 168, 176, 179, 180, 181, 182, 184, 197, 207, 208, 209, 212, 213, 251, 256, 262, 278, 279, 280
union officials: 15, 236, 237, 238

## F

**Family and Medical Leave**: 195, 199
  adoption: 199

**Fitness for Duty**: 73–75, 283

**Fixed Shift**: 85, 88

**Flexible Band**: 86

**Flextime**: 36, 85, 86, 87, 88, 89, 92

**Flextime/CWS**
  Headquarters: 89

**Furlough**: 50, 137, 138

981

## G

**Good Standing**: 230, 236

**Grievability**: 229, 233

**Grievance**: 3, 12, 19, 22, 48, 52, 64, 94, 114, 114–116, 115, 136, 140, 167, 228, 228–233, 229, 230, 231, 232, 233, 234, 235, 245, 246, 250, 257, 265
EEO: 70, 231, 233
exclusions: 228
meetings: 64, 70, 229, 230, 231, 232, 233, 247, 255
part-time employees: 3
representative: 217, 227, 229, 230, 231, 238, 241, 244, 250, 252, 254
time limits: 30, 44, 50, 52, 67, 82, 86, 114, 116, 119, 129, 132, 134, 135, 136, 137, 148, 149, 152, 183, 195, 197, 202, 216, 219, 222, 223, 229, 229–231, 230, 231, 232, 233, 234, 238, 240, 277, 279, 288
withdrawal: 30, 243

**Ground Rules**: 240, 241. *See also* Bargaining: Ground Rules

## H

**Hazardous Weather**: 195, 196

**Health/Safety**: 63, 73, 74, 80, 120, 121, 123, 144, 145, 146, 147, 148, 149, 150, 151, 152, 156, 158, 159, 165, 166, 167, 169, 170, 174, 180, 190, 199, 200, 224, 254, 283
abatement: 145, 146, 148, 149, 150, 152, 153, 154, 155, 156
abatement plan: 146, 148, 149, 153, 154, 156
asbestos: 153, 154, 155, 172
committees: 144, 145, 146, 147, 148, 149, 150, 166, 169, 170
CPR: 157
emergency numbers: 156
emergency preparedness plan: 157
inspections: 80, 145, 152, 153, 159
on-the-job injury: 44, 49, 145, 147, 149, 151, 152, 165, 166, 167, 171, 171–173, 195, 220, 221, 222, 223
reports: 145, 146, 148, 150, 151, 158, 161, 166, 167
smoking: 157, 165
stress: 164, 165, 166, 221
temperature: 153, 163
training: 35, 151, 152, 157, 174, 207–209

union representative: 17, 144, 145, 146, 147, 148, 151, 153, 154, 156, 245, 246, 255

**Holidays**: 90, 91, 180, 183, 189, 264, 289

**Hours of Work**: 80, 85–95, 105, 117, 118, 193, 211, 264

## I

**Indoor Air Quality**: 163

**Infectious Disease**: 147, 168, 171–174, 172, 173, 174, 221

**Inspections**: 80, 123, 140, 144–145, 145, 146, 147, 149, 150, 152, 153, 155, 159, 163

**Interest-based Bargaining**: 12, 240, 240–242, 241, 242

**Internal Union Business**: 12

**Interpreter Services**: 68, 69, 258

## J

**Job Applications**: 97, 102, 103, 105, 106, 108, 111, 141, 278, 288
time limits: 42–44, 46–48, 106, 114, 143, 286

**Job Restructuring**: 67

**Job Sharing**: 36, 185, 185–187, 186

## L

**Labor Relations**: 3, 3–5, 4, 5, 12, 12–16, 13, 14, 15, 16, 64, 77, 101
in the public interest: 57, 245

**Laws and Regulations**: 6, 54, 75, 137, 178, 181, 184, 199, 284, 287

**Leave**: 36, 83, 92, 94, 187, 188, 189, 191, 194, 197, 198, 199, 204, 220, 223, 265, 266. *See also* Time and Leave
extended: 37, 85, 130, 134, 163, 180, 187, 190, 194, 198, 229, 232, 233, 234, 277, 301

**Leave Transfer Program**: 198, 199

**Leave Without Pay**: 36, 83, 174, 202, 223. *See also* LWOP
for adoption: 199

**LWOP**: 55, 163, 191, 194, 195, 197, 199, 204, 223. *See also* Leave Without Pay

## M

**Medical Evidence**: 73, 74, 75, 283, 284

**Medical Examination**: 73, 74, 154, 282, 283

**Memorandum of Understanding**: 188, 243, 256

**Merit Promotion**: 43, 44, 46, 48, 54, 57, 97, 98, 99, 100, 101, 102, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 125, 179, 207, 208, 213, 215, 239, 273, 274, 275, 276, 277, 278, 279, 286
  assessment criteria: 57, 97–99, 98, 99, 104, 105–109, 107, 108, 109, 143, 269, 270, 273, 273–275, 274, 275, 286, 288
  audits: 114–115, 278
  career ladder: 97–101, 105, 107, 111, 213
  competitive actions: 100, 103, 108, 108–109, 114
  details: 42–44, 100, 101–102, 106, 270
  part-time employees: 268, 271
  reassignments: 46, 101, 101–104, 102, 103, 104, 278, 279
  temporary promotion: 42–44, 101–103

**Military Leave**: 195, 196, 197
  part-time employees: 197

**Monetary Awards**: 56, 56–58, 57, 58, 59, 262
  Instant: 57

## N

**Negotiations**: 3, 4, 9, 12, 19, 22, 30, 40, 41, 43, 45, 47, 48, 51, 57, 79, 84, 87, 89, 91, 93, 94, 122, 123, 136, 147, 148, 158, 166, 167, 170, 181, 184, 187, 187–189, 188, 189, 195, 198, 209, 210, 224, 229, 232, 240, 240–247, 241, 242, 243, 244, 245, 246, 247, 249, 253, 254, 256, 257, 265, 278, 289, 290, 294, 297, 301
  Ground Rules: 240–241, 244
  levels: 13, 14, 22, 23, 26, 41, 45, 69, 70, 130, 132, 144, 145, 148, 158, 189, 194, 207, 233, 234, 235, 240, 242, 243, 244, 246, 248, 253, 256, 257, 298
  reduction-in-force: 46, 48, 102, 137, 137–138, 138, 139, 140, 141, 142, 143
  supplemental agreements: 61, 188, 227, 230, 234, 240, 241

## O

**Official Time**: 10, 10–13, 11, 12, 13, 17, 21, 25, 26, 27, 28, 36, 61, 71, 119, 128, 144, 230, 234, 238, 241, 243, 244, 245, 245–249, 246, 247, 248, 249, 253
  EEO: 61, 71, 72, 248

**Official Travel**: 117–118, 142, 157, 241, 243, 246, 247, 248, 258, 265
  advance: 117, 118, 119, 248
  compensation: 117, 118, 120, 228, 264, 265
  for employees with disabilities: 69
  per diem: 11, 15, 17, 71, 118, 119, 120, 121, 142, 144, 145, 193, 241, 243, 246, 248, 258
  privately owned vehicle: 120, 247, 258
  reimbursement: 69, 119, 120, 121, 142, 247, 258, 265
  return trips: 119, 120, 157, 247

**Overtime**: 25, 28, 80, 81, 85, 87, 89, 91, 92, 85–95, 93, 94, 117, 185, 186, 193, 196, 205, 206, 211, 264
  and credit hours: 85, 87–89
  and travel: 11, 15–16, 17, 28–31, 29–31, 43–44, 55–58, 69–72, 71–72, 89–95, 117–118, 118, 119–123, 120–123, 121–123, 142–145, 144–145, 145, 190–209, 193–209, 203–209, 207–209, 224, 241, 243–244, 246–249, 247–249, 248–249, 258, 265–272
  compensation: 81, 89, 92, 93, 118, 264
  extended shift: 85, 85–95
  Fair Labor Standards Act: 92, 117
  increments: 85, 86, 91, 92
  mandatory: 92
  notice: 30–31, 42–44, 48, 85, 91, 91–95, 92, 149–173, 150–173, 189, 192–209, 195–209, 200–209, 219–223, 234–235, 237–239, 252–253, 269–272, 275–281, 279–281, 282–284, 290, 293, 294–295, 297–298
  regular: 92, 93, 117, 205
  roster: 93
  voluntary: 93

**OWCP**: 151, 153, 155, 163, 173, 195, 220, 222, 223. *See also* Workers' Compensation

983

## P

**Parking**: 122, 122–123, 123, 194
  shuttle: 122, 256

**Partnership**: ix, 9, 24, 40, 64, 88, 89, 122, 145, 255, 263

**Part-time Employees**: 86, 88, 90, 178, 180, 181, 182, 183, 184, 214

**Past Practices**: 22, 177, 188, 248

**Payroll Deductions**: 236, 237, 239

**Performance**: 28, 50, 54, 78, 108, 124, 124–125, 125, 127, 128, 131, 132, 133, 135, 141, 186, 214, 215, 274, 275, 289
  assistance: 54, 55, 97, 99, 125, 134, 135, 158
  good standing: 230, 236
  successful: 78, 82, 97, 98, 108, 125, 126, 127, 129, 131, 132, 134, 135, 213, 214, 274
  unacceptable: 50, 125, 127, 129, 135, 136, 179, 229

**Performance Appraisal**: 28, 50, 78, 124, 124–125, 125, 127, 128, 131, 132, 133, 141, 186, 214, 215, 274, 275, 289

## S

**Sexual Harassment**: 66

**SF-71**: 187, 223

**Shuttle Service**: 122, 256

**Sick Leave**: 69, 163, 174, 187, 189, 190, 191, 192, 194, 197, 199, 202, 203, 204, 223
  for adoption: 58
  for counseling: 190, 220
  restrictions: 163, 187, 191, 192

## T

**Telework**: 69, 76, 76–84, 77, 78, 79, 80, 81, 82, 83, 84, 174, 175, 203

**Telework Agreements**: 79

**Time and Leave**: 187, 256
  hours of work: 80
  job sharing: 186

**Training**: 10, 12, 12–16, 13, 14, 15, 16, 23, 25, 27–31, 28, 29, 30, 35, 40, 41, 63, 68, 69, 70, 72, 81, 89, 97–100, 98, 99, 100, 101, 105, 106, 109, 117, 130, 133, 134, 135, 145, 148, 151, 152, 154, 156, 158, 164, 167, 168, 176, 179–184, 180, 181, 182, 184, 197, 207, 207–209, 208, 209, 212, 213, 251, 256, 262, 278, 279, 280

**Transfer**: 50, 100, 101, 102, 104, 118, 137, 138, 141, 142, 143, 237, 290

**Travel**: 11, 15, 17, 28, 29, 43, 55, 69, 71, 89, 117, 117–118, 118, 119, 120, 121, 142, 144, 145, 190, 193, 203, 207, 224, 265. *See also* Official Travel

## U

**Union Officials**: 15, 236, 237, 238

**Union Representative**: 9, 10, 11, 19, 21, 25, 26, 27, 28, 29, 36, 41, 44, 51, 52, 53, 61, 64, 71, 74, 89, 95, 96, 111, 114, 119, 134, 144, 145, 150, 167, 178, 183, 207, 217, 229, 230, 231, 238, 244, 245, 246, 247, 249, 250, 251, 255, 258, 269, 271, 279, 282, 283, 287, 297

**Upward Mobility**: 71, 207, 209, 212, 212–213, 213

## V

**Vacancy Announcements**: 102–108, 103, 105, 106, 107, 108, 111, 278, 288

## W

**Warrant**: 60, 62, 117

**WIGI**: 214–215. *See also* Within-Grade Increase

**Within-Grade Increase**: 131, 181, 184, 214, 214–215, 215. *See also* WIGI
  administrative error: 267
  reconsideration: 26, 185, 216, 217, 218, 219, 270, 270–272, 273, 276, 277

**Workers' Compensation**: 48, 151, 220, 220–223, 223. *See also* OWCP

984

985

986



# Master Agreement
## between the
## Department of Veterans Affairs
## and the
## American Federation of
## Government Employees

**Department of Veterans Affairs**
Office of Labor Management Relations (LMR)
810 Vermont Avenue, NW
Washington, DC  20420

**AFGE National VA Council,**
**VA Medical Center**
Building 76, Room 106,
1970 Roanoke Boulevard
Salem, VA  24153

Contact:

Office of Labor Management Relations
**Phone:  202-461-4122**

AFGE National VA Council
**Phone: 540-345-6301**
afgenvac@aol.com

To access or download Master Agreement:

**http://www.va.gov/LMR/**

**www.afgenvac.org**

How to Order:

Place your order through your station's PCO (Forms/Publication Supply Officer).

**MARCH 2011**

**VA Pamphlet  05-68**
**P704**

988

**Exhibit 2.**

Handbook on Leave and Workplace Flexibilities for Childbirth, Adoption, and Foster Care of the Office of the Personnel Management (OPM) of the VA system.



UNITED STATES OFFICE OF PERSONNEL MANAGEMENT



# Handbook on Leave and Workplace Flexibilities for Childbirth, Adoption, and Foster Care

**April 2015**

*a New Day for Federal Service*

990

**A Message from the Director of the U.S. Office of Personnel Management**

On January 15, 2015, President Obama issued a memorandum entitled: "Modernizing Federal Leave Policies for Childbirth, Adoption and Foster Care to Recruit and Retain Talent and Improve Productivity." In his January 20, 2015 State of the Union address, the President mentioned this memorandum and his belief that all employers, including the Federal Government, should support parents to ensure that they can contribute fully in the workplace, while also meeting the needs of their families. The President's memorandum aligns the Federal Government with the parental leave policies of leading private sector companies and other industrialized countries.

As part of his effort to ensure that all employees have paid time off available for childbirth, adoption and foster care, the President has directed all Federal agencies, to the extent permitted by law, to ensure that discretionary benefits are used to the maximum extent practicable, including advancement of sick or annual leave, donated annual leave under the voluntary leave transfer and leave bank programs, and leave without pay. Further, to the extent permitted by law, the President has directed all Federal agencies to (1) offer 240 hours of advanced sick leave, at the request of an employee and in appropriate circumstances, in connection with the birth or adoption of a child or for other sick leave eligible uses, and (2) offer the maximum amount of advanced annual leave, at the request of an employee, for foster care placement in their home or bonding with a healthy newborn or newly adopted child. Agencies have been directed to provide this advanced leave for purposes specified in law and regulation irrespective of existing leave balances. All Federal agencies must update their advanced sick and annual leave policies to be in compliance with the President's memorandum by no later than Monday, June 15, 2015.

The President's memorandum also requires that by April 15, 2015, the U.S. Office of Personnel Management (OPM) provide guidance to all Federal agencies to help them implement the revised advanced leave policies, including how to apply these policies to part-time employees.

To meet the President's requirement, OPM held a series of interagency working group meetings with representatives from more than 40 agencies. These working group meetings revealed that many agencies believe that their employees are simply unaware of the wide array of leave and workplace flexibilities available for childbirth, adoption, and foster care purposes. Agency working group representatives requested that OPM's forthcoming guidance focus on all current existing leave flexibilities that employees could use for childbirth, adoption, and foster care purposes (including advanced sick and annual leave policies).

As a result, OPM determined that a new Handbook focusing on leave and workplace flexibilities available to employees for childbirth, adoption, and foster care purposes would be the most appropriate guidance to provide to the agencies. OPM's Handbook contains guidance to the agencies on advanced sick and annual leave policies as required by the President's memorandum while emphasizing the various leave entitlements and flexibilities available to assist employees.

The Handbook is divided into three distinct sections to fully assist agencies depending on the specific circumstance of the employee. The sections are: (1) Pregnancy and Childbirth, (2) Adoption and Foster Care, and (3) Interaction of the Various Leave Programs and Workplace

1

991

Flexibilities. OPM believes that this new Handbook will allow agencies to be in a better position to assist employees or their family members who are experiencing childbirth, adoption, and foster care. In doing so, the Federal Government will continue to support parents to ensure they can both contribute fully in the workplace and also meet the needs of their families.


Katherine Archuleta
Director

2

992

# Handbook on Leave and Workplace Flexibilities for Childbirth, Adoption and Foster Care

## Contents

I: Introduction ............................................................................................................ **6**

*History of the Evolution and Expansion of Federal Leave Programs Related to Childbirth, Adoption and Foster Care* ......................................................................... 6

*Roles and Responsibilities* ........................................................................................ 7

*Employee Checklist for Planning for Time Off for Childbirth, Adoption, and Foster Care* ...... 7

II: Leave and Workplace Flexibilities for Pregnancy and Childbirth ................... **9**

   **A. Sick Leave** ......................................................................................................... **9**

     *Sick Leave for Employee's Own Care* ...................................................................... 9

     *Sick Leave to Care for a Family Member* ............................................................... 10

     *Sick Leave to Care for Birth Mother* ...................................................................... 11

     *Sick Leave to Care for the Newborn* ....................................................................... 11

   **B. Advanced Sick Leave** .................................................................................... **12**

     *Repayment of Advanced Sick Leave* ....................................................................... 12

   **C. Annual Leave** ................................................................................................. **13**

     *Scheduling of Annual or Advanced Annual Leave* ................................................. 13

   **D. Advanced Annual Leave** .............................................................................. **13**

     *Repayment of Advanced Annual Leave* .................................................................. 13

   **E. Family and Medical Leave** ........................................................................... **14**

     *FMLA for Employee's Own Care* ........................................................................... 14

     *FMLA to Care for Birth Mother* ............................................................................ 14

     *FMLA to Care for a Newborn* ................................................................................ 16

     *Intermittent Use of FMLA Leave or Use on a Reduced Leave Schedule* ............... 16

     *Parents' Eligibility* ................................................................................................. 17

     *FMLA Facts Related to Pregnancy and Childbirth* ............................................... 17

     *Substitution of Paid Leave under FMLA* ................................................................ 18

     *Effect of Unpaid FMLA Leave on Leave Accrual and other Benefits* .................... 18

   **F. Leave Sharing Programs** ............................................................................... **18**

     *Medical Emergency* ................................................................................................ 19

     *Voluntary Leave Transfer Program* ....................................................................... 19

3

*Voluntary Leave Bank Program* ............................................................................ 20

*Definition of Family Member for VLTP and VLBP* ............................................... 20

*Retroactive Substitution of Donated Annual Leave* ........................................... 20

*Set-Aside Accounts* ............................................................................................. 20

*Leave Sharing Facts Related to Pregnancy and Childbirth* ............................... 21

**G.  Leave Without Pay** ....................................................................................... **21**

*Effect of LWOP on Leave Accrual and Other Benefits* ........................................ 22

**H. Compensatory Time Off** ............................................................................... **22**

*Compensatory time off in lieu of overtime pay.* ................................................. 22

*Compensatory time off for travel.* ...................................................................... 22

*Religious compensatory time off* ......................................................................... 23

**I. Alternative Work Schedules** .......................................................................... **23**

*Alternative Work Schedule Facts Related to Pregnancy and Childbirth* ............ 24

**J.  Telework** ........................................................................................................ **24**

*Expectations to Consider in a Telework Agreement for Childbirth* .................... 24

*Telework Facts Related to Childbirth* .................................................................. 25

**K. Part-time Employment and Job Sharing Arrangements** .............................. **25**

*Part-time* ............................................................................................................. 25

*Job Sharing* ......................................................................................................... 26

**III. Leave and Workplace Flexibilities for Adoption and Foster Care** ................ **27**

**A. Sick Leave** ....................................................................................................... **27**

*Sick Leave for Adoption* ...................................................................................... 27

*Facts Related to Sick Leave for Adoption* ........................................................... 28

**B. Advanced Sick Leave** ...................................................................................... **28**

*Repayment of Advanced Sick Leave* .................................................................... 29

**C. Annual Leave** ................................................................................................. **29**

*Scheduling of Annual or Advanced Annual Leave* .............................................. 29

**D.  Advanced Annual Leave** ............................................................................... **29**

*Repayment of Advanced Annual Leave* ............................................................... 30

**E. Family and Medical Leave** ............................................................................. **30**

*Intermittent Use of FMLA Leave or Leave on a Reduced Leave Schedule* .......... 31

*FMLA Facts Related to Adoption and Foster Care* ............................................. 32

*Substitution of Paid Leave under FMLA* ............................................................. 32

*Effect of Unpaid FMLA Leave on Leave Accrual and other Benefits* .................. 33

4

994

**F. Leave Sharing Programs** ......................................................................................... **33**

*Medical Emergency* ......................................................................................... 33

*Voluntary Leave Transfer Program* ................................................................ 34

*Voluntary Leave Bank Program* ..................................................................... 34

*Definition of Family Member for VLTP and VLBP* ......................................... 35

*Retroactive Substitution of Donated Annual Leave* ....................................... 35

*Set-Aside Accounts* ........................................................................................ 35

*Leave Sharing Facts Related to Adoption and Foster Care* ........................... 35

**G. Leave Without Pay** ................................................................................................. **36**

*Effect of LWOP on Leave Accrual and other Benefits* .................................... 36

**H. Compensatory Time Off** ........................................................................................ **36**

*Compensatory time off in lieu of overtime pay* ............................................... 36

*Compensatory time off for travel.* ................................................................... 37

*Religious compensatory time off* .................................................................... 37

**I. Alternative Work Schedules** ................................................................................... **37**

*Alternative Work Schedule Facts Related to Adoption and Foster Care* ........... 38

**J. Telework** ................................................................................................................. **38**

*Expectations to Consider in a Telework Agreement for Adoption or Foster Care* ............. 39

*Telework Facts Related to Adoption or Foster Care* ....................................... 39

**K. Part-time Employment and Job Sharing Arrangements** ....................................... **40**

*Part-time* ......................................................................................................... 40

*Job Sharing* ..................................................................................................... 40

**IV. Interaction of Leave Programs and Workplace Flexibilities** ........................................... **42**

**A. Leave for Family Care: Differences between Sick Leave/Leave Transfer and FMLA** **42**

**B. Summary of Leave Programs Available for Childbirth** ................................................. **43**

**C. Sample Leave Calendars for Childbirth Purposes** ...................................................... **45**

**D. Summary of Leave Programs Available for Adoption or Foster Care** ......................... **66**

**E. Sample Leave Calendars for Adoption and Foster Care** .............................................. **67**

995

# Introduction

In order to attract and retain a talented, engaged, and productive workforce, the Federal Government must ensure that Federal employees are provided an opportunity to use workplace flexibilities that will enable them to thrive both at work and at home. The Federal Government recognizes the importance of family and is committed to assisting Federal employees in balancing their work and family responsibilities. When an agency permits an employee to use leave and other workplace flexibilities for purposes of childbirth, adoption, and foster care, the agency is fostering goodwill that can improve recruitment of new employees and strengthen retention of the existing workforce. Providing employees with the support they need to balance their professional and personal responsibilities is not only good for employees and their families, it is also good for agencies and the integrity of the Federal workforce. As a result, OPM is committed to working with our agency partners to encourage the full utilization of leave flexibilities, including advanced sick and annual leave, to the maximum extent practicable.

## *History of the Evolution and Expansion of Federal Leave Programs Related to Childbirth, Adoption and Foster Care*

The Federal leave system is a dynamic system that has evolved over the years to better meet the needs of employees as well as those of Federal agencies. Combined with other workplace flexibilities, the program has progressed to serve the contemporary workforce in a manner that meets the needs of employees and is responsive to agency mission requirements. The Federal leave system dates back to 1893, with our current leave system enacted in 1951 that included annual leave, sick leave, and leave without pay (LWOP). Over the years, the leave system has evolved and expanded in a variety of ways, all of which have focused on responding to changing needs of both employees and agencies. The following provides a brief history of the Federal leave programs as they relate to childbirth, adoption and foster care:

- **Federal Leave Sharing Act of 1988.** Authorized Federal agencies to participate in pilot voluntary leave transfer and leave bank programs allowing employees to donate their annual leave to an employee with a personal or family medical emergency who had exhausted their available paid leave. The Federal Employee Leave Sharing Amendments Act of 1993 made the program permanent.

- **Family and Medical Leave Act (FMLA) of 1993.** Entitled an employee to a total of up to 12 workweeks of unpaid leave during any 12-month period for the following purposes: the birth of a son or daughter of the employee and the care of such son or daughter; the placement of a son or daughter with the employee for adoption or foster care; a serious health condition of the employee; or for the employee to care for a spouse, son, daughter, or parent with a serious health condition.

- **Federal Employees Family-Friendly Leave Act of 1994.** Authorized up to 13 days of sick leave per leave year to care for a family member and to make arrangements necessitated by

996

the death of, or attend the funeral of, a family member.  Prior to 1994, employees were only able to use sick leave to care for themselves.

- **Sick Leave for Adoption (1994).**  Authorized an employee to use sick leave for purposes related to the adoption of a child.

- **Implementation of *U.S. v. Windsor* (2013).**  Supreme Court decision (*United States v. Windsor)* determined Section 3 of the Defense of Marriage Act (DOMA) to be unconstitutional, thereby allowing Federal employees with same-sex spouses to use FMLA leave in the same manner as Federal employees with opposite-sex spouses.

## Roles and Responsibilities

- **OPM's Role.**  OPM provides leadership on Federal leave policies and programs by developing and maintaining Governmentwide rules and regulations on annual leave, sick leave, the Family and Medical Leave Act, Federal leave sharing programs, and other leave and workplace flexibilities and programs.

- **Agencies' Role.**  Federal agencies are responsible for complying with the law and OPM's Governmentwide regulations and guidance.  Agencies are also responsible for developing agency-specific policies dealing with the administration of leave programs, including any discretionary benefits, in accordance with any applicable collective bargaining agreements.

- **Employees' Role.**  Employees must review both OPM and agency-specific rules and regulations on leave and workplace flexibilities to understand the options available for childbirth, adoption, or foster care.  It is equally important for employees to consult with their agency's servicing human resources office.

This handbook provides various tools for employees to use in preparing and planning for time off for childbirth, adoption, and foster care.  It must be read in conjunction with agency and component-specific leave policies and any applicable collective bargaining agreements.

## Employee Checklist for Planning for Time Off for Childbirth, Adoption, and Foster Care

The following checklist should be used as an organizational tool before meeting with your manager or servicing human resource office.  (Note: Check with your servicing human resource office to confirm what flexibilities are available at your agency.)

**Things to Do:**
   Read the OPM Handbook on Leave and Workplace Flexibilities for Childbirth, Adoption, and Foster Care
   Review relevant OPM fact sheets using the links in the Handbook

7

997

Know your internal agency policies and guidelines for requesting and using leave and workplace flexibilities
Determine the amount of time off you would like to take
- o Hours needed:_____
Determine your projected leave/paid time off balances at the time leave will be needed
- o Available sick leave hours: _____
- o Available annual leave hours:_____
- o Other available paid time off (compensatory time, credit hours): _____
- o Amount of unpaid time off (LWOP) you wish to take: _____
Determine the gap, if any, between the amount of leave/paid time off you would like to take, versus the amount of leave/paid time off you will have available at the time leave will be needed
- o Hours of leave/paid time off hours wanted minus hours of leave/paid time off accrued: _____
Ask questions of your coworkers
- o How much time did you take off and how did you structure that time off?
- o How did you transition back to work afterward?
- o Is there anything you would have done differently?

**Know Your Options:**

*Advanced Sick Leave and Advanced Annual leave* –
- o What options does my agency provide to repay advanced leave?
- o How will I repay the advanced leave?
- o Can I apply for donated annual leave to repay advanced leave?
- o How long will it take to repay my advanced leave?

*Voluntary Leave Transfer or Voluntary Leave Bank Programs* – familiarize yourself with your agency's policies and rules for participation well in advance of needing donated/transferred annual leave
- o Will I be eligible to become a leave recipient?  If so, how/when should I apply?
- o If your agency has a leave bank, when is the open enrollment period?
    Will you use donated annual leave to repay any potential advanced leave indebtedness?

*Family Medical Leave Act (FMLA) leave* –
- o Are you eligible for FMLA? If so, when will you be invoking it?
- o Will you be substituting paid leave for unpaid FMLA leave? If so, what type and how much?
- o Do you want to use your FMLA leave intermittently? If so, speak with your manager about your work schedule.

*Telework*
- o Is situational telework an option?  Discuss with your HR office and your manager.

*Work Schedules*
- o Is an alternative work schedule (AWS) an option?
- o If your agency offers AWS, what type of schedule do they offer (flexible work schedules versus compressed work schedules)?
- o Does your agency allow part-time employment or job sharing?

8

998

# II: Leave and Workplace Flexibilities for Pregnancy and Childbirth

The Federal Government offers various leave and work scheduling flexibilities to assist employees in meeting their work and family obligations. This chapter explains the available leave options that can be used separately or in combination to help an employee balance his or her work and family life related to pregnancy and childbirth. An employee who is pregnant needs time off from work for her own pregnancy-related issues and recovery from childbirth, or to care for and bond with her baby. An employee may need time off from work to care for a spouse who is pregnant or has just given birth, or to care for and bond with his or her baby. Note that an employee may also want to take leave to care for a variety of family members who are birth mothers—not just spouses—including a same or opposite sex domestic partner, a daughter or daughter-in-law, a mother, sister, or granddaughter, or also to care for new babies such as grandchildren.

## A. Sick Leave

An employee is entitled to use sick leave for personal medical needs while pregnant or recovering from childbirth, to care for a family member who is pregnant or recovering from childbirth, to care for a family member with a serious health condition, or for general family care purposes such as well-baby doctor visits or illnesses. An agency may request administratively acceptable evidence indicating the duration of the employee's or family member's recovery from childbirth. Most health care providers certify that the recovery period following childbirth is about 6-8 weeks.

> **Tip:** Sick leave is an entitlement that may be used without invoking leave under the Family Medical Leave Act (FMLA). See Section E. for information on FMLA.

*Sick Leave for Employee's Own Care*

An employee who is the birth mother is entitled to use any accumulated or accrued sick leave for prenatal care, any period of incapacity due to her pregnancy—including periods of morning sickness or medically prescribed bed rest—childbirth, and recovery from childbirth. There is no limit on the amount of sick leave that an employee may use for her own personal medical needs, however an employee has no entitlement to use sick leave except for authorized sick leave purposes.

> **Scenario:** Jody has given birth and has requested 12 weeks of sick leave. Is she entitled to use 12 weeks of sick leave?
>
> Jody is only entitled to use sick leave for her period of incapacitation following childbirth. In most cases, this is 6-8 weeks for a normal pregnancy, unless complications arise.

For more information, see our fact sheets on Sick Leave (General Information) and Sick Leave for Personal Medical Needs.

999

*Sick Leave to Care for a Family Member*

An employee is entitled to a total of 12 weeks (480 hours) of sick leave each leave year to care for a family member with a serious health condition.

The individual for whom the employee is providing care must meet the definition of *family member* used for sick leave, voluntary leave transfer program (VLTP), and voluntary leave bank program (VLBP) purposes.

> A *family member* is an individual with any of the following relationships to the employee:
>
> 1) Spouse, and parents thereof;
> 2) Sons and daughters, and spouses thereof;
> 3) Parents, and spouses thereof;
> 4) Brothers and sisters, and spouses thereof;
> 5) Grandparents and grandchildren, and spouses thereof;
> 6) Domestic partner and parents thereof, including domestic partners of any individual in 2 through 5 of this definition; and
> 7) Any individual related by blood or affinity whose close association with the employee is the equivalent of a family relationship.

The agency determines whom they consider to be an "individual related by blood or affinity whose close association with the employee is the equivalent of a family relationship." For important associated definitions, please see our fact sheet entitled Definitions Related to Family Member and Immediate Relative.

For more information on the definition of *serious health condition,* which has the same meaning as used in OPM's regulations for administering the Family and Medical Leave Act (FMLA) of 1993, please see our fact sheet entitled Sick Leave to Care for a Family Member with a Serious Health Condition. Examples of authorized sick leave uses for a serious health condition are caring for the birth mother for prenatal care, any period of morning sickness or medically prescribed bed rest, childbirth, and recovery from childbirth, and care of the baby if the baby has a serious health condition. The employee may also use 13 days (104 hours) of sick leave for general family care—including well-baby visits or minor illnesses. If the employee previously has used any portion of the 13 days of sick leave for general family care or bereavement purposes in a leave year, that amount must be subtracted from the 12-week entitlement. An employee is entitled to no more than a combined total of 12 weeks of sick leave each leave year for all family care purposes.

When an employee requests sick leave to care for a family member, the agency may require the employee to document his or her relationship with that family member. Agencies should establish consistent rules and follow the same documentation requirements for all relationships, but agencies have authority to request additional information in cases of suspected leave abuse.

10

*Sick Leave to Care for Birth Mother*

An employee caring for a family member who is a birth mother is entitled to use sick leave for the mother's prenatal care, any period of incapacity due to her pregnancy—including severe morning sickness or medically prescribed bed rest—childbirth, or for the mother's recovery from childbirth.   As mentioned above, most health care providers certify that the recovery period is about 6-8 weeks.

---

**Scenario:** Demont's wife, Sharise, is hospitalized because she is experiencing an extremely high risk pregnancy.  Demont wants to use some of his 600 hours of sick leave to be with her in the hospital.  His supervisor denies his request for sick leave for the period of hospitalization, stating that since Demont's wife will be in the hospital, Demont will not be "caring for her" and is not entitled to sick leave for that period.  Can Demont's supervisor deny Demont's invocation of his sick leave entitlement?

OPM's sick leave regulations allow sick leave to be used if the family member of the employee requires psychological comfort and the family member would benefit from the employee's care or presence, therefore, Demont's sick leave request cannot be denied.  However, the agency could request certification from the health care provider concerning the family member's need for psychological comfort and that the family member would benefit from the employee's care or presence.

---

*Sick Leave to Care for a Newborn*

Employees may not use sick leave to be absent from work to bond with or care for a healthy newborn.  There is no provision in law or regulation that permits the use of sick leave to care for a healthy newborn, bond with a healthy child, or for other child care responsibilities.  However, an employee is entitled to use sick leave for general family care purposes, i.e., to care for a child who has a routine illness or to take a child to medical, dental, or optical appointments or well-baby doctor visits, or if the baby has a serious health condition.  See previous discussion of the time limits on use of sick leave for family care purposes. An agency may request administratively acceptable evidence of a child's illness or treatment.

The child must meet the definition of *family member* (see above), or if applicable, the definition of *son or daughter* for sick leave, VLTP, and VLBP purposes.

> *Son or daughter* means:
>
> 1) A biological, adopted, step, or foster son or daughter of the employee;
> 2) A person who is a legal ward or was a legal ward of the employee when that individual was a minor or required a legal guardian;
> 3) A person for whom the employee stands *in loco parentis* or stood *in loco parentis* when that individual was a minor or required someone to stand *in loco parentis;* or
> 4) A son or daughter, as described in paragraphs (1) through (3) of this definition, of an employee's spouse or domestic partner.

11

1001

> **Tip:** Based on the definition of *family member,* an employee could take sick leave to care for a grandchild. Or based on the definition of *son or daughter,* a same-sex domestic partner could care for the son or daughter of his or her partner for whom the employee will stand *in loco parentis*, even if the employee is not the child's genetic parent or is not adopting the child.

For more information, see our fact sheets on Sick Leave (General Information), Sick Leave for Family Care and Bereavement, and Sick Leave to Care for a Family Member with a Serious Health Condition.

## B. Advanced Sick Leave

Upon an employee's request, an employee must be granted advanced sick leave to the maximum extent practicable, in accordance with sick leave laws and regulations and consistent with mission needs. Employees are eligible for a maximum of 240 hours (30 days) of advanced sick leave for purposes of a *serious health condition* and a maximum of 104 hours (13 days) for general family care purposes (see previous discussion of what types of activities are covered). An agency may grant advanced sick leave for the same reason it grants sick leave as specified in law and regulation, irrespective of the employee's existing annual leave balance.

> **Tip:** Advanced sick leave may be especially beneficial to new employees within their first year of Federal service who have little or no sick leave accumulated.

### *Repayment of Advanced Sick Leave*

An employee is required to repay advanced sick leave, except in very limited circumstances—e.g., disability retirement or death. Therefore, an employee requesting advanced sick leave should think carefully about whether he or she wants to incur this debt and how the debt will be repaid. Note that generally advanced sick leave is repaid by subsequently earned sick leave, so if an employee were to use 13 days of advanced sick leave, it would take him or her a full year without using another hour of sick leave to repay the sick leave debt. Because advanced sick leave must be repaid, an agency should not advance sick leave when it is known (or reasonably expected) that the employee will not return to duty.

> **Tip:** Donated annual leave under the Voluntary Leave Transfer Program (VLTP) or Voluntary Leave Bank Program (VLBP) may be used to liquidate an indebtedness incurred by the leave recipient for advanced sick leave used because of a *medical emergency*, such as medically prescribed bed rest or recovery from childbirth. Before using donated annual leave, however, the employee must first exhaust all his or her own annual and sick leave. See Section F. on Leave Sharing Programs.

For more information, including information on repayment options, see our fact sheet on Advanced Sick Leave.

12

1002

## C. Annual Leave

Annual leave may be used for any purpose, subject to the right of the supervisor to approve a time when the annual leave may be taken.  Annual leave may be used for pregnancy, childbirth and recovery from childbirth, bonding with or caring for a baby, or for other child care responsibilities including taking the child to medical, dental, or optical appointments or well-baby doctor visits, or any other purpose.

### Scheduling of Annual or Advanced Annual Leave

Employees have the right to request annual leave, subject to the right of the supervisor to approve the time when the employee takes the annual leave.  For pregnancy and childbirth, agencies are encouraged to grant the leave to the maximum extent practicable consistent with mission needs.

> **Tip:**  An employee has an entitlement to substitute annual leave for any unpaid FMLA leave during any period approved under FMLA. See section E. on Family and Medical Leave.

## D. Advanced Annual Leave

Advanced annual leave should be granted to the maximum extent practicable, in accordance with annual leave laws and regulations and consistent with mission needs.  An agency may advance the amount of annual leave an employee would accrue during the remainder of the leave year.  Note that this means that the later in the leave year the employee requests advanced annual leave, the smaller the amount that may be advanced.  Agencies are advised to advance annual leave to the maximum extent practicable for purposes related to pregnancy and childbirth.  An agency may grant advanced annual leave for the same reasons it grants annual leave as specified in law and regulation, irrespective of the employee's existing annual leave balance.  New employees are eligible to receive advanced annual leave.

> **Tip:**  Advanced annual leave may be especially beneficial to new employees, within their first year of Federal service, who have little or no leave accumulated.

### Repayment of Advanced Annual Leave

An employee is required to repay advanced annual leave, except in very limited circumstances— e.g., disability retirement or death.  Therefore, an employee requesting advanced annual leave should think carefully about whether he or she wants to incur this debt and how the debt will be repaid. Note that generally advanced annual leave is repaid by subsequently earned annual leave, although there are other options for repayment.

> **Tip:**  Donated annual leave under the Voluntary Leave Transfer Program (VLTP) or Voluntary Leave Bank Program (VLBP) may be used to liquidate an indebtedness incurred by the leave recipient for advanced annual leave used because of a *medical emergency*, such as medically prescribed bed rest or recovery from childbirth.  Before using donated annual leave, however, the employee must first exhaust all his or her own annual and sick leave.  See

13

1003

Section F. on Leave Sharing Programs.

Because advanced annual leave must be repaid, an agency should not advance annual leave when it is known (or reasonably expected) that the employee will not return to duty. For more information, including information on repayment options, see our fact sheet on Advanced Annual Leave.

## E. Family and Medical Leave

Under the Family and Medical Leave Act (FMLA), Federal employees are entitled to a total of up to 12 workweeks of unpaid leave during any 12-month period for **one or more** of these purposes related to childbirth:

- the birth of a son or daughter of the employee and the care of such son or daughter;
- the care of spouse, son or daughter, or mother of the employee who has a *serious health condition*; or
- a *serious health condition* of the employee that makes the employee unable to perform the essential functions of his or her position.

> **Tip:** An employee must have completed at least 12 months of service (not required to be consecutive and not required to be at the same agency) as a covered Federal employee (generally, an employee at an executive agency) in order to be entitled to FMLA leave. However, an agency may still provide a new employee not eligible for FMLA with a FMLA-like benefit.

### *FMLA for Employee's Own Care*

An employee who must be absent from work because of a *serious health condition* is entitled to unpaid FMLA leave for prenatal care or any period of incapacity due to pregnancy, childbirth, or recovery from childbirth. This is because, according to the definition of *serious health condition* (see discussion of *serious health condition* under Section A. on Sick Leave), any period of incapacity due to pregnancy or childbirth, or for prenatal care, is considered a *serious health condition*, even if the employee does not receive active medical treatment from a health care provider during the period of incapacity or the period of incapacity does not last more than 3 consecutive calendar days.

> **Tip:** Since sick leave and FMLA leave are two separate entitlements, an employee does not need to invoke FMLA to use sick leave for her period of recovery from childbirth. She can use 6-8 weeks of sick leave for recovery from childbirth, then later invoke FMLA to bond with her baby.

### *FMLA to Care for Birth Mother*

An employee is entitled to use FMLA leave to care for a wife, daughter (generally under 18 years of age, see definition of *son or daughter* used for FMLA below), or mother for prenatal care or any period of incapacity due to pregnancy, childbirth, or recovery from childbirth. Note

14

1004

that the broad definition of *family member* used for sick leave, VLTP and VLBP purposes does **not** apply to the FMLA, therefore an employee can only use FMLA leave to provide care for the individuals specified in law.

**Spouse.**  The definition of *spouse* currently found in OPM's FMLA regulations is being amended in response to the Supreme Court's June 26, 2013 decision in *United States v. Windsor*, which determined Section 3 of the Defense of Marriage Act (DOMA) to be unconstitutional.  In OPM's CPM 2013-14 entitled "Family and Medical Leave Act (FMLA) Coverage of Same-Sex Spouses" we explained that the ruling provides employees with same-sex spouses the same FMLA entitlements as those with opposite-sex spouses.  *Spouse* now means a partner in any legally recognized marriage, regardless of the employee's State of residency.

> **Tip:**  The definition of *spouse* for FMLA purposes is not as broad as the definition of *family member* for sick leave and leave sharing purposes.  Therefore, an employee cannot take FMLA leave to care for a same-sex or opposite-sex domestic partner who gives birth to a child unless the domestic partner is a common law spouse according to the State of residence.

**Son or Daughter**.  An employee may not invoke FMLA leave to care for a daughter over 18 years of age who has given birth unless she is incapable of self-care due to a mental or physical disability.  That definition reads as follows—

> *Son or daughter* means a biological, adopted, or foster child; a step child; a legal ward; or a child of a person standing *in loco parentis* who is:
>
> 1) Under 18 years of age; or
> 2) 18 years of age or older and incapable of self-care because of a mental or physical disability.  A son or daughter incapable of self-care requires active assistance or supervision to provide daily self-care in three or more of the "activities of daily living" or "instrumental activities of daily living."  Activities of daily living include adaptive activities such as caring appropriately for one's grooming and hygiene, bathing, dressing, and eating.  Instrumental activities of daily living include cooking, cleaning, shopping, taking public transportation, paying bills, maintaining a residence, using telephones and directories, using a post office, etc.  A "physical or mental disability" refers to a physical or mental impairment that substantially limits one or more of the major life activities of an individual as defined in 29 CFR 1630.2 (h), (i) and (j).

> **Scenario:**  Marguerite is a Federal employee whose healthy 22-year old daughter Rose is pregnant.  The daughter's husband has been called up for active duty in the Middle East.  Marguerite has requested 6 weeks of unpaid leave under the FMLA to care for Rose after she gives birth because her son-in-law will not be there to care for Rose.  Is Marguerite entitled to this leave?
>
> No.  The FMLA regulations provide entitlement to care for a *son or daughter* who is 18 years

15

1005

of age or older and incapable of self-care because of a mental or physical disability. Based on this description, Rose does not meet this definition. However, Marguerite may use sick leave to care for Rose during the daughter's period of recovery from childbirth, since the sick leave regulations do not include any age restrictions on use of sick leave to care for a son or daughter.

### FMLA to Care for a Newborn

Each parent is entitled to use FMLA leave for the birth of a child and care of the newborn. An employee may elect to substitute annual leave and/or sick leave for any or all of the leave without pay used under the FMLA, consistent with the laws and regulations for using annual and sick leave. (See Sections A. on Sick Leave and C. on Annual Leave.) An employee's entitlement to FMLA leave expires 12 months following the date of birth of a child.

**Scenario:** Jonathan used 6 weeks of sick leave to care for his wife after she gave birth to their son. He then invokes his FMLA entitlement, and requests unpaid FMLA leave, but the supervisor says that Jonathan is not entitled to FMLA leave because Jonathan's baby is not sick and his wife has recovered. What leave is Jonathan entitled to take?

Jonathan is entitled to use both sick leave and FMLA leave. He does not need to invoke FMLA to use sick leave; they are separate entitlements. Jonathan is entitled to invoke FMLA as he requested for the birth of and care for his son. The 12 weeks must be concluded by the end of the 12-month period following the baby's birth. If he wants to substitute paid leave for unpaid leave, he may only substitute annual leave, not sick leave, since he is not using the FMLA leave for a serious health condition of his wife or son.

### Intermittent Use of FMLA Leave or Use on a Reduced Leave Schedule

An employee is entitled to take FMLA leave on an intermittent basis or on a reduced leave schedule for absences in connection with a serious health condition. A reduced leave schedule is a special kind of intermittent leave that amounts to a change in an employee's usual number of working hours in a workweek or workday, in many cases reducing an employee's full-time schedule to a part-time schedule for the period of FMLA leave. Therefore, an employee is entitled to take FMLA leave for her own or an eligible birth mother's prenatal appointments, for any period of incapacity due to pregnancy, childbirth, or recovery from childbirth (including for "morning sickness"), or to care for his or her child with a serious health condition. Eligibility and medical certification for the serious health condition are established only at the time of the employee first invokes FMLA for a serious health condition—a medical note is not required for each absence related to the serious health condition.

Upon mutual agreement between the agency and the employee, an employee may use FMLA leave intermittently or on a reduced leave schedule to bond with or care for his or her healthy baby. Agencies are encouraged to approve requests for intermittent FMLA leave for bonding to the maximum extent practicable. In fact, it may be to the benefit of the agency to have the employee take FMLA leave intermittently or on a reduced leave schedule basis and return to work sooner rather than being away from the job for the full 12-week block. It is important for employees to consult with their supervisors regarding scheduling requests in order to minimize

16

1006

the impact on agency operations. In other words, employees should schedule intermittent FMLA leave in advance and be flexible about their intermittent or reduced work schedule in consideration of agency needs.

> **Scenario:** Eduardo and his wife are having a baby and he would like to take time off to care for his wife and new baby. His job provides the sole source of income for the family; therefore, Eduardo needs to return to work soon after the baby is born. He first uses sick leave to care for his wife during her recovery from childbirth. Eduardo would like to return to work, but wants to know if he can he take FMLA leave intermittently on Tuesdays and Thursdays to continue to bond with his baby.
>
> Eduardo would have to discuss his work schedule with his manager in advance to minimize the impact of his absence on agency operations. However, subject to the agency's policy and any applicable collective bargaining agreement, Eduardo may request the use of FMLA on an intermittent basis. This would allow Eduardo to use FMLA intermittently for bonding.

### *Parents' Eligibility*

For FMLA purposes, a *parent* means a biological parent or an individual who stands or stood *in loco parentis* to an employee when the employee was a son or daughter. This term does not include parents "in law." *In loco parentis* refers to the situation of an individual who has day-to-day responsibility for the care and financial support of a child or, in the case of an employee, who had such responsibility for the employee when the employee was a child. A biological or legal relationship is not necessary. See OPM's CPM 2010-15 entitled, "Interpretation of "Son or Daughter" Under the Family and Medical Leave Act," dated August 31, 2010, for more information and examples.

> **Tip:** Any employee who will stand *in loco parentis* (see definition above) to a baby is considered a *parent* for FMLA purposes and is entitled to use FMLA leave to bond with or care for the child, even if the employee is not the child's biological parent (see FMLA definition of *parent* above). For example, an employee whose same or opposite sex domestic partner is having a child, but the employee is not the child's biological parent, or a grandparent who will raise a child, is entitled to use FMLA leave to bond with the child or to care for the child if the employee will stand *in loco parentis* to the child. For more examples, please see the OPM memo cited above.

### *FMLA Facts Related to Pregnancy and Childbirth*

- An employee must invoke his or her entitlement to FMLA leave—an agency may not place an employee on FMLA leave. Generally, an employee may not retroactively invoke FMLA.
- An employee taking FMLA leave based on an expected birth of a child should provide not less than 30 calendar days' notice to the agency of his or her intention to take FMLA leave—or as much notice as is practicable if the leave is to begin sooner.
- The 12-month period begins on the date an employee first takes FMLA leave for any purpose and continues for 12 months.

17

- An employee's entitlement to FMLA leave based on the birth of a son or daughter and care of the child expires 12 months after the child's birth.

### Substitution of Paid Leave under FMLA

> **Tip:** When one hears the word "leave" generally people think that means a type of paid leave. But did you know that FMLA leave is actually a type of leave without pay? The main purpose of FMLA leave is to provide a period of job-protected time away from the agency for employees for certain purposes. FMLA leave ensures that an employee's job is protected even if he or she does not have enough paid leave to cover his or her absence.

FMLA leave is unpaid leave. However, in order to remain in a pay status during FMLA leave, an employee may elect to substitute accrued, accumulated, or advanced annual or sick leave or annual leave donated under the VLTP or VLBP, for any unpaid leave under the FMLA, consistent with current laws and OPM's regulations for using such leave.

> **Note:** "*Consistent with current laws and regulations*" means that sick leave and donated annual leave under the VLTP or VLBP may only be substituted for *medical emergencies*, such as the birth mother's recovery from childbirth or care of a baby with a serious health condition. Annual leave may be substituted for any period of unpaid FMLA leave. Agencies are encouraged to grant advanced sick and advanced annual leave to an employee with no available paid leave who has invoked FMLA so the employee can receive pay by substituting advanced leave for unpaid FMLA leave.

### Effect of Unpaid FMLA Leave on Leave Accrual and other Benefits

Being in a leave without pay (or unpaid FMLA leave) status affects various employee entitlements, including the accrual of annual and sick leave. For example, when a full-time employee with an 80-hour biweekly tour of duty accumulates a total of 80 hours of nonpay status (either in one pay period, or over the course of several pay periods), the employee will not earn annual and sick leave in the pay period. If the employee again accumulates 80 hours of nonpay status, he or she will again not earn leave in the pay period in which that new 80-hour total is reached. Employees who will be on FMLA LWOP or other LWOP should consult our Effect of Extended Leave Without Pay (LWOP) (or Other Nonpay Status) fact sheet for important information.

## F. Leave Sharing Programs

An employee may be eligible to apply for and receive donated annual leave under an agency's leave sharing programs if the employee or the employee's family member is experiencing a *medical emergency* and if the employee will exhaust his or her own annual and sick leave (referred to as the employee's "available paid leave"). Donated annual leave may be provided to the birth mother or a family member caring for the birth mother during her period of incapacitation. There are two leave sharing programs that can be used during a birth mother's period of incapacitation or to care for a child with a medical emergency—the Voluntary Leave Transfer Program (VLTP) and Voluntary Leave Bank Program (VLBP).

1008

## Medical Emergency

The term *medical emergency* means a medical condition of either the employee or the employee's family member that is likely to require an employee to be absent or expected to be absent from duty for a prolonged period and to result in a substantial loss of income (expected absence without available paid leave of at least 24 work hours for a full-time employee) because of the employee's lack of available paid leave. An employee's or family member's incapacity of at least 24 hours due to pregnancy and/or recovery from childbirth would therefore constitute a *medical emergency* for purposes of the VLTP or VLBP.  Care of an employee's child with a serious health condition would also constitute a *medical emergency*.

> **Tip:**  The *medical emergency* related to pregnancy and childbirth is for the birth mother's period of incapacitation related to the birth of the child.   Donated annual leave under the VLTP and VLBP cannot be used for bonding with a newborn.

> **Scenario:** Amina, an employee of the African Development Foundation, is pregnant and has 60 hours of sick leave.  Her doctor has informed her that she will need to be off from work at least 6 weeks.  Does Amina's routine maternity leave qualify as a *medical emergency* under the leave sharing regulations?
>
> Yes.  A *medical emergency* for the purposes of the leave sharing programs means a medical condition of an employee or family member that is likely to require an employee's absence from duty for a prolonged period of time (i.e., at least 24 work hours) and to result in a substantial loss of income to the employee because of the unavailability of paid leave.

## Voluntary Leave Transfer Program

The VLTP allows an employee to donate annual leave *directly* to another employee who has a personal or family *medical emergency.*  Generally, employees receive donated annual leave under the VLTP from other employees in their agency.  However, family members are entitled to donate annual leave to an approved federal recipient who works at another Federal agency. The agency may allow donations from Federal employees at other agencies if it believes that the employee may not otherwise receive enough donated annual leave to meet his or her needs.

> **Scenario:** Amina's husband works at the Department of Commerce and wants to donate 40 hours of annual leave to her.  A coworker has volunteered to donate 80 hours of sick leave to her.  In addition, two other carpool members have volunteered to donate annual leave to her, one works for the U.S. Postal Service and the other for OPM.  How much leave may Amina's husband and the carpool members donate to Amina?
>
> Sick leave may not be donated under the VLTP or VLBP.  Generally, leave recipients may receive donations of annual leave only from employees of the same agency.  However, any *family member* employed by another agency covered by the leave sharing programs in chapter 63 of title 5, of the United States Code is entitled to donate annual leave to a leave recipient, so Amina may receive donated annual leave from her husband.  If the African Development

19

> Foundation believes Amina may not receive enough donations from coworkers in her agency, it may decide to allow donations from employees at other agencies covered by the leave sharing programs. Since the U.S. Postal Service is not covered by the title 5 leave system, Amina may not receive donated annual leave from the carpool member who is an employee of the U.S. Postal Service.

### Voluntary Leave Bank Program

Each agency may establish a voluntary leave bank program (VLBP) under which an employee may contribute unused annual leave for use by a leave bank member who is experiencing a personal or family *medical emergency.* Agencies are strongly encouraged to establish a leave bank program. The agency's leave bank board operates the leave bank and determines how much donated annual leave an employee may receive from the leave bank. Any unused donated annual leave is returned to the leave bank.

> **Tip:** Every agency is required to have a voluntary leave transfer program. To ensure employees are eligible for the maximum benefits possible, agencies are also encouraged to establish a voluntary leave bank program.

### Definition of Family Member for VLTP and VLBP

The definition of *family member* is the same for VLTP and VLBP purposes as it is for sick leave. See Section A. on Sick Leave.

### Retroactive Substitution of Donated Annual Leave

Donated annual leave may be—

- Substituted retroactively by the employee for any period of leave without pay used because of a *medical emergency*; or
- Used by the employee to liquidate an indebtedness incurred by the leave recipient for advanced annual or sick leave used because of a medical emergency.

### Set-Aside Accounts

While using donated leave, a leave recipient accrues annual and sick leave into what are called "set-aside accounts" so that the employee has some available leave when the medical emergency is over. An employee may accrue no more than 40 hours of annual leave and 40 hours of sick leave in the set-aside accounts. The leave in these accounts will be transferred to the employee's regular leave accounts **either** when the medical emergency ends **or** if the employee exhausts all donated annual leave but the employee or his or her family member is still experiencing the *medical emergency*. Leave in set-aside accounts is not available for use by the employee until transferred to the employee's regular leave accounts.

> **Scenario:** How does Amina, whom we met earlier, accrue annual and sick leave while using donated leave?

20

> Amina may accrue up to a maximum of 40 hours of sick leave and 40 hours of annual leave in set-aside accounts. Annual leave and sick leave in the set-aside accounts will become available for use after it is transferred to Amina's regular leave accounts when the *medical emergency* terminates or when she exhausts all donated leave but still needs more time to recover from childbirth.

***Leave Sharing Facts Related to Pregnancy and Childbirth***

- Donated annual leave may be used only for a *medical emergency*—e.g., any period of incapacitation of the mother or illness of the baby that will last at least 24 work hours— and may not be used to care for a healthy child.
- There is no limit on the amount of donated annual leave a leave recipient may receive from the leave donor(s)/bank. However, any unused donated annual leave must be returned to the leave donor(s)/bank when the *medical emergency* ends.
- Donated annual leave may not be used to bond with or care for a healthy newborn, to care for a child with a routine illness, or to take the child to medical, dental, or optical appointments or well-baby doctor visits.
- An employee who returns to work part-time and who uses donated leave part-time to care for a family member recovering from childbirth accrues leave in his or her regular annual and sick leave accounts for the time spent in work status and in his or her set-aside annual and sick leave accounts when using donated leave.

> **Tip:** An employee is not required to use advanced annual leave or advanced sick leave before receiving donated annual leave under the leave transfer programs.

For more information, see our fact sheets on the Voluntary Leave Transfer Program and the Voluntary Leave Bank Program.

## G. Leave Without Pay

An employee may request leave without pay (LWOP) to be absent from work for purposes related to pregnancy and childbirth. An employee may request LWOP without invoking FMLA, even if he or she has available paid leave. Supervisors should refer to agency internal policy and collective bargaining and/or union agreements prior to granting approval. However, agencies are encouraged to offer leave without pay for a longer period than what is provided for under the FMLA, to the maximum extent practicable for pregnancy and childbirth.

LWOP can be used in addition to the flexibilities that are already available, subject to agency policy and any applicable collective bargaining agreement.

> **Tip:** For new employees who are not yet eligible for FMLA, an agency can provide the employee with a LWOP benefit that would mirror a FMLA benefit.

1011

***Effect of LWOP on Leave Accrual and Other Benefits***

Being in a leave without pay (or unpaid leave) status affects various employee entitlements, including the accrual of annual and sick leave. For example, when a full-time employee with an 80-hour biweekly tour of duty accumulates a total of 80 hours of nonpay status (either in one pay period, or over the course of several pay periods), the employee will not earn annual and sick leave in the pay period. If the employee again accumulates 80 hours of nonpay status, he or she will again not earn leave in the pay period in which that new 80-hour total is reached.

For more information on leave without pay and the impact it has on Federal benefits, see our fact sheets on Leave Without Pay and the Effect of Extended Leave Without Pay (LWOP) (or Other Nonpay Status) on Federal Benefits and Programs.

## H. Compensatory Time Off

Three types of compensatory time off may be earned and used: compensatory time off in lieu of overtime pay; compensatory time off for travel; and religious compensatory time off.

***Compensatory time off in lieu of overtime pay.*** This is time off with pay for (1) irregular or occasional overtime work; or (2) regularly scheduled or irregular or occasional overtime work, when permitted under agency flexible work schedule programs. It is subject to agency policy and the premium pay limitation, and there are separate Fair Labor Standards Act (FLSA) rules for employees who are covered (i.e., FLSA non-exempt) or not covered (i.e., FLSA exempt). Accrued compensatory time off must generally be used by the end of the 26th pay period after the pay period during which it was earned. One hour of compensatory time off is granted for each hour of overtime work.

> **Scenario:** Vivek and his wife Sunita are expecting a baby in October. Vivek works as a FLSA exempt Budget Analyst, and it is near the end of the fiscal year. His office is short-handed and his supervisor asks if he could work extra time to make sure they close out all fiscal year end tasks on time. They agree that Vivek will work this time as compensatory time that he can take off once the baby is born and have more paid time off with his new baby.

***Compensatory time off for travel.*** This type of compensatory time may be earned by an employee for time spent in a travel status away from the employee's official duty station when such time is not otherwise compensable, and be used as paid time off during an expected future absence. There is no limitation on the amount of compensatory time off for travel an employee may earn, but it is generally forfeited if not used by the end of the 26th pay period after the pay period during which it is earned.

> **Scenario:** Noor is helping with agency efforts to recruit STEM students to come work at NASA. It is January, and she is in her first trimester of pregnancy. She is traveling a lot to campus recruiting fairs and earning a lot of comp time for travel. She and her supervisor have discussed how she can use this time once she gives birth because she will not have enough sick leave to cover her full period of recovery from childbirth.

*Religious compensatory time off.* This authority permits an employee to rearrange work hours to fulfill his or her religious obligations. Employees may earn and use religious compensatory time off to the extent that doing so does not interfere with the efficient carrying out of agencies' missions. Employees interested in earning compensatory time off should speak with their supervisors.

> **Scenario:** Aaron and Rachel's son is due next month. Aaron has gotten approval to work some religious compensatory time that he will take for his son's "bris," a Jewish religious circumcision ceremony for an infant male.

For more information, see our fact sheets on compensatory time off in lieu of overtime pay, compensatory time off for travel, and religious compensatory time off.

# I. Alternative Work Schedules

Alternative Work Schedules (AWS) permit an employee to complete an 80-hour biweekly pay period in less than 10 days. Employees have a right to request an alternative work schedule without fear of retaliation in accordance with agency policy and any collective bargaining agreements. These schedules enable managers and supervisors to meet their program goals while, at the same time, helping employees to better balance work, personal, and family responsibilities. There are two categories of Alternative Work Schedules–compressed work schedules and flexible work schedules.

*Compressed Work Schedules.* These are fixed work schedules that enable full-time employees to complete the basic 80-hour biweekly work requirement in less than 10 workdays. These schedules must be negotiated through collective bargaining or, when not applying to a bargaining unit, voted on by a majority of the employees to be covered by the schedule.

> **Example:** An employee is required to work 4 days a week, 10-hours each day. This is a fixed schedule that cannot be changed without taking leave.

*Flexible Work Schedules.* These are flexible work schedules that enable employees to select and alter their work schedules to better fit their personal needs and help balance work, personal, and family responsibilities. There are various types of flexible work schedules that provide different degrees of flexibility within the 80-hour biweekly work requirement:

- **Flexitour** – employees elect start/stop times, which then become fixed.
- **Gliding** – employees may vary start/stop times daily.
- **Variable Day** – employees may vary the length of the workday.
- **Variable Week** – employees may vary the number of hours worked each week.
- **Maxiflex** – employees may work less than 10 workdays biweekly.

*Credit Hours*. Some agencies permit employees who work under a flexible work schedule to earn credit hours, which can assist employees in better managing family responsibilities, including childbirth. Based on agency policy and any applicable collective bargaining agreement, employees may request to work additional hours to use at a later time. A total of 24

23

1013

credit hours may be carried over to be used in a later pay period. For more information, see our fact sheet on Credit Hours Under a Flexible Work Schedule.

***Alternative Work Schedule Facts Related to Pregnancy and Childbirth***

- Alternative Work Schedules may permit employees to work fewer than 10 days in a pay period, freeing up a day or more for family responsibilities, medical appointments, and bonding.
- Employees who work under Flexible Work Schedules often may adjust working hours to accommodate medical appointments, saving earned leave for other times when needed.
- Flexible work schedules can help parents arrange work hours in line with daycare hours.

## J. Telework

Telework provides employees the flexibility to better manage their work, family, and personal responsibilities. Under an agency's telework policy, an employee may be permitted to work at home or other worksites geographically convenient to the employee's residence. Telework is a valuable tool that can be used when an employee transitions back to work after the birth of a child. Telework is often used in conjunction with paid leave during the transition period between childbirth and the return to full time official duties.

Telework must be approved by the employee's supervisor based on the agency telework policy and the ability of the employee to accomplish his or her work.

---

**Tip:** It is important to remember that an employee may not care for a newborn while engaged in the performance of official duties. However, when making a determination about telework eligibility following childbirth, the focus should remain on the work and the ability of the employee to perform official duties, not on the proximity of the newborn in the home. Decisions should be made on a case-by-case basis.

---

***Expectations to Consider in a Telework Agreement for Childbirth***

Requests for telework related to an employee's recovery from childbirth or care for a family member recovering from childbirth and transition back to work should be accompanied by a formal written telework agreement that spells out expectations. Such telework agreements should, for example, outline a work schedule that indicates the days and hours of the week the employee will be working, outline any additional requirements (e.g., technology needs) beyond requisites laid out by law, clarify any assumptions regarding the frequency and modes of communication (e.g., email vs. telephone, core hours for contact, or speed or expected timeframe for returning calls and emails) and establish terms under which the agreement can be modified or terminated.

It is important for the manager and the employee to establish a dialogue to determine whether the employee can accomplish at least some part of his or her duties from home while caring for a

1014

newborn.  The focus should remain on the work, while striking a balance with the employee's caregiving responsibilities.  The open dialogue should occur throughout the transition period.

> **Scenario:** Mason's son Mahlon was born several months ago.  He and his wife have a nanny caring for Mahlon at home each day.  Mason discussed with his supervisor the fact that he has a home office on the third floor, and that the nanny cares for the baby on the first and second floors.  So his supervisor has approved Mason to telework on Tuesdays.  As a sleep deprived young parent, Mason appreciates the extra sleep he can get on Tuesdays when he is not commuting, and also enjoys the extra time he has to decompress after work and prepare a nice dinner for the family on Tuesday evenings.

### *Telework Facts Related to Childbirth*

- Telework can provide employees with valuable additional time to spend with family members by reducing commuting time.
- Telework is not a substitute for dependent care and an employee may not care for a newborn while working from the home or an alternative worksite.  To support work accomplishment, the employee cannot be expected to effectively accomplish work while actively caring for a newborn.
- Telework is a valuable tool that can be used when the employee transitions back to work following the birth of a child.

For more information, please see OPM's telework webpage at www.telework.gov.

## K. Part-time Employment and Job Sharing Arrangements

Agencies are encouraged to offer part-time schedules to employees who are pregnant or have given birth, or to care for a newborn, to the maximum extent practicable.  Agencies are also encouraged to develop job sharing programs in partnership with their unions and other stakeholders.  Furthermore, when job sharing programs are planned for organizations where employees are represented by a labor organization with exclusive recognition, by law, agencies must notify the union and bargain in good faith on any negotiable proposals the union submits.

### *Part-time*

A part-time employee works between 16 and 32 hours each week (or between 32 and 64 hours a pay period) on a prearranged schedule, and is eligible for benefits. Part-time employees are eligible, on a prorated basis, for the same benefits as full-time employees: leave, retirement, and health and life insurance coverage.

> **Scenario:** Anna and her husband, Corey, have recently had their second child and now have an infant and a toddler.  Anna started back to work full time, but her schedule is too stressful.  Anna discusses her situation with her supervisor, and he approves her to work a part-time schedule of 30 hours a week.  The extra ten hours are just what Anna needs to get both

25

1015

> children to their respective daycares.  The extra time also provides a cushion that allows Anna to be less rushed with breastfeeding the baby.

### *Job Sharing*

Job sharing is a form of part-time employment in which the schedules of two or more part-time employees are arranged to cover the duties of a single full-time position.  Generally, a job sharing team means two employees at the same grade level but other arrangements are possible. Job sharers are subject to the same personnel policies as other part-time employees.  Job sharing does not necessarily mean that each job sharer works half-time, or that the total number of hours is 40 per week.

> **Tip:**  Employees should carefully consider all the personal issues involved in switching to a part-time or job sharing schedule, such as a reduction in pay, increased share of health insurance premiums, and the change in leave earnings. Although procedures for requesting such schedules vary from agency to agency, the first step is usually to discuss the idea with the immediate supervisor.

For more information, see our Part-time and Job Sharing fact sheet.

26

# III. Leave and Workplace Flexibilities for Adoption and Foster Care

The Federal Government offers various leave and work scheduling flexibilities to assist employees in meeting their work and family obligations. This chapter explains the available leave options that can be used separately or in combination to help the employee balance his or her work and family life for adoption and foster care.

**Note:** Guidance must be read in conjunction with agency and component-specific leave policies and any applicable collective bargaining agreements.

## A. Sick Leave

*Sick Leave for Adoption*

An employee is entitled to use sick leave when he or she must be absent from work for purposes related to his or her adoption of a child.

Examples of such adoption-related purposes may include but are not limited to:
- Appointments with adoption agencies, social workers, and attorneys;
- Court proceedings;
- Required travel;
- Any periods of time during which the employee is *ordered or required* by the adoption agency or by the court to take time off from work to care for the adopted child; and
- Any other activities *necessary to allow the adoption to proceed.*

*Sick Leave for Care of the Child*

Employees may not use sick leave to be absent from work to bond with or care for a healthy child. There is no provision in law or regulation that permits the use of sick leave to care for a healthy newborn, bond with a healthy child, or for other child care responsibilities. An employee is also entitled to 12 weeks of sick leave each leave year to care for his or her adopted or foster child with a serious health condition. For more information on the definition of *serious health condition,* which has the same meaning as used in OPM's regulations for administering the Family and Medical Leave Act of 1993 (FMLA), please see our fact sheet entitled Sick Leave to Care for a Family Member with a Serious Health Condition. The employee may also use up to 13 days of the 12 weeks of sick leave for general family care purposes, i.e., to care for a child who has a routine illness or to take a child to medical, dental, or optical appointments or well-baby doctor visits. An employee is entitled to no more than a combined total of 12 weeks of sick leave each leave year for all family care purposes.

The child must meet the definition of *son or daughter* for sick leave, VLTP, and VLBP purposes:

> *Son or daughter* means:
> 1) A biological, adopted, step, or foster son or daughter of the employee;
> 2) A person who is a legal ward or was a legal ward of the employee when that individual was a minor or required a legal guardian;

27

3) A person for whom the employee stands *in loco parentis* or stood *in loco parentis* when that individual was a minor or required someone to stand *in loco parentis;* or

4) A son or daughter, as described in paragraphs (1) through (3) of this definition, of an employee's spouse or domestic partner.

> **Tip:** Based on the definition of *son or daughter,* an employee with a domestic partner could care for the son or daughter of his or her partner for whom the employee will stand *in loco parentis*, even if the employee is not adopting or fostering the child.

*Facts Related to Sick Leave for Adoption*

- An employee who is fostering a child is not entitled to use sick leave for adoption-related purposes, unless the employee is adopting the foster child.
- An employee who is accompanying a family member to activities related to the placement of a child for adoption is not entitled to use sick leave for adoption.

> **Example:** If the employee's spouse or domestic partner is adopting a child, but the employee is not adopting the child, the employee would not be entitled to use sick leave for adoption-related purposes to accompany the spouse or domestic partner to appointments with adoption agencies, social workers, and attorneys, even if the employee will help raise the child, because the entitlement to sick leave for adoption is limited to purposes related to the **employee's** adoption of a child.

- An employee may not use sick leave to bond with his or her healthy adopted child unless ordered or required by the adoption agency or by the court.
- An agency may request administratively acceptable evidence for the use of sick leave for adoption-related purposes, general family care, or care of the child if the child has a serious health condition.
- There is no limitation on the amount of sick leave that may be used for adoption-related purposes. Sick leave for adoption-related purposes does not count towards the 104-hour (13 days) limit of sick leave each leave year for family care and bereavement purposes or the overall limit of 12 weeks of sick leave each leave year for all family care purposes.

For more information, see our fact sheets on Sick Leave (General Information), Sick Leave for Adoption, Sick Leave for Family Care and Bereavement, and Sick Leave to Care for a Family Member with a Serious Health Condition.

# B. Advanced Sick Leave

Upon an employee's request, an employee must be granted advanced sick leave to the maximum extent practicable, in accordance with the sick leave laws and regulations and consistent with mission needs. An employee is eligible for a maximum of 240 hours (30 days) of advanced sick leave for purposes related to his or her adoption of a child or to care for his or her adopted or foster child with a serious health condition, and a maximum of 104 hours (13 days) to care for his or her adopted or foster child with a routine illness or to take the child to medical, dental, or

optical appointments or well-baby doctor visits (if applicable). Two hundred forty (240) hours is the maximum amount of advanced sick leave a full-time employee may have to his or her credit at any one time. An agency may grant advanced sick leave for the same reason it grants sick leave as specified in law and regulation, irrespective of the employee's existing annual leave balance.

> **Tip:** Advanced sick leave may be especially beneficial to new employees who may have little or no sick leave accumulated.

### Repayment of Advanced Sick Leave

An employee is required to repay advanced sick leave, except in very limited circumstances— e.g., disability retirement, or death. Therefore, an employee requesting advanced sick leave should think carefully about whether he or she wants to incur this debt and how the debt will be repaid. Note that generally advanced sick leave is repaid by subsequently earned sick leave, so if an employee were to use 13 days of advanced sick leave, it would take a full year without using another hour of sick leave to repay the sick leave debt. Because advanced sick leave must be repaid, an agency should not advance sick leave when it is known (or reasonably expected) that the employee will not return to duty.

For more information, including information on repayment options, see our fact sheet on Advanced Sick Leave.

## C. Annual Leave

Annual leave may be used for any purpose, subject to the right of the supervisor to approve a time when the annual leave may be taken. Annual leave may be used for adoption or foster care purposes, for bonding with or caring for an adopted or foster child, or other child care responsibilities including taking the child to medical, dental, or optical appointments or well-baby doctor visits (if applicable), or any other purpose**.**

### Scheduling of Annual or Advanced Annual Leave

Employees have the right to request annual leave, subject to the right of the supervisor to approve the time when the employee takes the annual leave. For adoption or foster care, agencies are encouraged to grant annual leave to the maximum extent practicable consistent with mission needs.

> **Tip:** An employee has an entitlement to substitute annual leave for any unpaid FMLA leave during any period approved under FMLA. See section E. on Family and Medical Leave.

## D. Advanced Annual Leave

Advanced annual leave should be granted to the maximum extent practicable, in accordance with annual leave laws and regulations and consistent with mission needs. An agency may advance the amount of annual leave an employee would accrue during the remainder of the leave year.

Note that this means that the later in the leave year the employee requests advanced annual leave, the smaller the amount that may be advanced. Agencies are advised to advance annual leave to the maximum extent practicable for purposes related to adoption or foster care. An agency may grant advanced annual leave for the same reasons it grants annual leave as specified in law and regulation, irrespective of the employee's existing annual leave balance. New employees are eligible to receive advanced annual leave.

> **Tip:** Advanced annual leave may be especially beneficial to new employees who may have little or no leave accumulated.

### Repayment of Advanced Annual Leave

An employee is required to repay advanced annual leave, except in very limited circumstances—e.g., disability retirement or death. Therefore, an employee requesting advanced annual leave should think carefully about whether he or she wants to incur this debt and how the debt will be repaid. Because advanced annual leave must be repaid, an agency should not advance annual leave when it is known (or reasonably expected) that the employee will not return to duty. For more information, including information on repayment options, see our fact sheet on Advanced Annual Leave.

## E. Family and Medical Leave

Under the Family and Medical Leave Act (FMLA), Federal employees are entitled to a total of up to 12 workweeks of unpaid leave during any 12-month period for **one or more** of these purposes related to adoption and foster care:

- the placement of a son or daughter with the employee for adoption or foster care; or
- the care of a son or daughter of the employee who has a *serious health condition.*

> **Tip:** An employee must have completed at least 12 months of service (not required to be consecutive and not required to be at the same agency) as a covered Federal employee (generally, an employee at an executive agency) in order to be entitled to FMLA leave. However, an agency may still provide a new employee not eligible for FMLA with a FMLA-like benefit.

An employee is entitled to FMLA leave for purposes of adoption or placement of a child with the employee for adoption or foster care and care of the child.

> **Scenario:** Ralph is a Federal employee working for the Department of Veterans Affairs. He and his wife are adopting a baby from Kazakhstan. Ralph plans to use sick leave for "activities necessary for the adoption to proceed," including travel to and from Kazakhstan and time spent there. When he returns home, he plans to invoke his entitlement to unpaid leave under the FMLA and spend 12 weeks with his new daughter. His supervisor maintains it is critical that Ralph return to work as soon as possible. May the supervisor count the time spent in Kazakhstan towards Ralph's 12-week entitlement?

No.  Ralph is entitled to use his sick leave, independent of his FMLA entitlement, for his time in Kazakhstan.  Congress was very specific that, for Federal employees, FMLA leave is in addition to any other paid or unpaid leave granted by the agency.  Therefore, Ralph is entitled to use his sick leave for adoption-related activities and then to invoke his entitlement to unpaid leave under FMLA for an additional 12 weeks.

**Scenario:** Upon their return to the U.S., the baby spikes a high fever and is diagnosed with a blood infection.  What type of leave is Ralph now entitled to use?

Ralph is entitled to use up to 12 administrative workweeks (480 hours) of sick leave to provide care for his daughter because of her serious health condition.  In addition, he still has an entitlement to any unused portion of the 12 weeks of unpaid leave under the FMLA to care for his daughter because of her serious health condition.

### Intermittent Use of FMLA Leave or Leave on a Reduced Leave Schedule

An employee is entitled to take FMLA leave on an intermittent basis or on a reduced leave schedule for absences in connection with a serious health condition.  A reduced leave schedule is a special kind of intermittent leave that amounts to a change in an employee's usual number of working hours in a workweek or workday, in many cases reducing an employee's full-time schedule to a part-time schedule for the period of FMLA leave.  Therefore, an employee is entitled to take FMLA leave to care for his or her adopted or foster child if the child has a serious health condition.  Eligibility and medical certification for the serious health condition are established only at the time the employee first invokes FMLA for a serious health condition—a medical note is not required for each absence related to the serious health condition.

Upon mutual agreement between the agency and the employee, an employee may use FMLA leave intermittently or on a reduced leave schedule for the placement of a son or daughter with the employee for adoption or foster care.  Agencies are encouraged to approve requests for intermittent FMLA leave for placement of an adopted or foster child to the maximum extent practicable.  In fact, it may be to the benefit of the agency to have the employee take FMLA leave intermittently or on a reduced leave schedule basis and return to work sooner rather than being away from the job for the full 12-week block.

It is important for an employee to consult with his or her supervisor regarding scheduling requests in order to minimize the impact on agency operations.  In other words, employees should schedule intermittent FMLA leave in advance and be flexible about their intermittent or reduced work schedule in consideration of agency needs.

**Scenario:** Anna is a becoming a foster parent to two sisters.  She is a single-mother and has no other source of income besides her Federal job.  Anna would like to take some time to bond with her daughters but cannot afford to skip a full paycheck.  How can she use intermittent FMLA to return to work on a reduced schedule?

Anna would have to discuss her work schedule with her manager in advance to minimize the impact of her absence on agency operations. She could use intermittent FMLA to work a reduced schedule. For example, Anna could work 4 hours in the morning when the girls are at school and use intermittent FMLA to take off 4 hours in the afternoon. Anna could work this reduced schedule throughout her 12-week FMLA bonding period and would still receive a full paycheck by substituting annual leave or advanced annual leave for unpaid intermittent FMLA leave.

### *FMLA Facts Related to Adoption and Foster Care*

- An employee who is accompanying a family member to activities related to the placement of a child for adoption is not entitled to unpaid leave under FMLA.
- An employee must invoke his or her entitlement to FMLA leave—an agency may not place an employee on FMLA leave.
- Generally, an employee may not retroactively invoke his or her entitlement to FMLA leave. The 12-month period begins on the date an employee first takes FMLA leave for any purpose and continues for 12 months.
- Leave may begin prior to or on the actual date of placement for adoption or foster care, and the 12-month period begins on that date.
- An employee's entitlement to FMLA leave based on adoption or foster care expires 12 months after the placement of the child with the employee.
- An employee taking FMLA leave based on an expected placement of a child should provide not less than 30 calendar day notice—or as much notice as is practicable if leave is to begin sooner—to the agency of his or her intention to take FMLA leave.
- If the need for leave is not foreseeable—for example, if a child is unexpectedly available for adoption or for emergency foster care—and the employee is unable to provide advance notice of his or her need for leave—the leave may not be delayed or denied.

**Scenario:** Carol has been absent from work for the past two days and has failed to call in. When her supervisor contacts her, she says she is invoking her entitlement to FMLA leave as an "emergency" foster care parent. She says she never knows when the courts will contact her to pick up a child, and she will therefore be unable to notify the agency in advance of her schedule. May the agency deny the FMLA leave?

Yes. Even though an employee can provide notice at the last minute because of an unexpected placement for foster care, the employee must still follow agency leave requesting procedures and contact her supervisor to invoke her FMLA entitlement. She cannot invoke her FMLA entitlement retroactively.

### *Substitution of Paid Leave under FMLA*

**Tip:** When one hears the word "leave" generally people think that means a type of paid leave. But did you know that FMLA leave is actually a type of leave without pay? The main purpose of FMLA leave is to provide a period of job-protected time away from the office for employees for certain purposes. FMLA leave ensures that an employee's job is protected even

> if he or she does not have enough paid leave to cover his or her absence.

FMLA leave is unpaid leave. However, in order to remain in a pay status during FMLA leave, an employee may elect to substitute accrued, accumulated, or advanced annual leave or sick leave or annual leave donated under the VLTP or VLBP, for any unpaid leave under the FMLA, consistent with the laws and regulations for using annual and sick leave. (See section A. on Sick Leave for Adoption of a Child, for the limitations on the use of sick leave for adoption and family care.)

"Consistent with current laws and regulations" means that sick leave may only be substituted for purposes necessary for an adoption to proceed or care of an adopted or foster child with a serious health condition. Annual leave may be substituted for any period of unpaid FMLA leave. Agencies are encouraged to grant advanced sick and advanced annual leave to an employee with no available paid leave who has invoked FMLA so the employee can receive pay by substituting advanced leave for unpaid FMLA leave. Donated annual leave may only be substituted for medical emergencies (e.g., care of an adopted or foster child with a serious health condition).

### *Effect of Unpaid FMLA Leave on Leave Accrual and other Benefits*

Being in a leave without pay (or unpaid leave) status affects various employee entitlements, including the accrual of annual and sick leave. For example, when a full-time employee with an 80-hour biweekly tour of duty accumulates a total of 80 hours of nonpay status (either in one pay period, or over the course of several pay periods), the employee will not earn annual and sick leave in the pay period. If the employee again accumulates 80 hours of nonpay status, he or she will again not earn leave in the pay period in which that new 80-hour total is reached. Employees who will be on FMLA LWOP or other LWOP should consult our Effect of Extended Leave Without Pay (LWOP) (or Other Nonpay Status) fact sheet for important information.

## F. Leave Sharing Programs

An employee may be eligible to apply for and receive donated annual leave under an agency's leave sharing programs if the employee's adopted or foster child experiences a *medical emergency* and if the employee will exhaust his or her own annual and sick leave (referred to as the employee's "available paid leave"). There are two leave sharing programs that can be used to care for an adopted or foster child with a *medical emergency*—the Voluntary Leave Transfer Program (VLTP) and the Voluntary Leave Bank Program (VLBP).

### *Medical Emergency*

The term *medical emergency* means a medical condition of either the employee or the employee's family member that is likely to require an employee to be absent or expected to be absent from duty for a prolonged period and to result in a substantial loss of income (expected absence without available paid leave of at least 24 work hours for a full-time employee) because of the employee's lack of available paid leave.

> **Tip:** Donated leave under the VLTP and VLBP cannot be used for purposes related to the

> adoption or foster placement of a child or for bonding with the child.

> **Scenario:** One of Anna's foster daughters will be in the hospital for two weeks to have surgery following a serious accident. Does this qualify as a *medical emergency* under the leave sharing regulations?
>
> Yes. A *medical emergency* for the purposes of the leave sharing programs means a medical condition of an employee's family member, such as a foster or adopted child, that is likely to require an employee's absence from duty for a prolonged period of time (i.e., at least 24 work hours) and to result in a substantial loss of income to the employee because of the unavailability of paid leave.

### *Voluntary Leave Transfer Program*

The VLTP allows an employee to donate annual leave *directly* to another employee who has a personal or family *medical emergency.* Generally, employees receive donated annual leave under the VLTP from other employees in their agency. However, family members are entitled to donate annual leave to an approved leave recipient who works at another Federal agency. The agency may allow donations from Federal employees at other agencies if it believes that the employee may not otherwise receive enough donated annual leave to meet his or her needs.

> **Scenario:** Anna's sister works at the Department of Commerce and wants to donate 40 hours of annual leave to her. A coworker has volunteered to donate 80 hours of sick leave to her. How much leave may Anna's sister and her coworker donate to Anna?
>
> Sick leave may not be donated under the VLTP or VLBP. Generally, leave recipients may receive donations of annual leave only from employees of the same agency. However, any *family member* employed by another agency covered by the leave sharing programs in chapter 63 of title 5, of the United States Code is entitled to donate annual leave to a leave recipient, so Anna may receive donated annual leave from her sister. If Anna's agency believes she may not receive enough donations from coworkers in her agency, it may decide to allow donations from employees at other agencies covered by the leave sharing programs.

### *Voluntary Leave Bank Program*

Each agency may establish a voluntary leave bank program (VLBP) under which an employee may contribute unused annual leave for use by a leave bank member who is experiencing a personal or family *medical emergency.* Agencies are strongly encouraged to establish a leave bank program. The agency's leave bank board operates the leave bank and determines how much donated annual leave an employee may receive from the leave bank. Any unused donated annual leave is returned to the leave banks.

> **Tip:** Every agency is required to have a voluntary leave transfer program. To ensure employees are eligible for the maximum benefits possible, agencies are also encouraged to establish a voluntary leave bank program.

34

1024

### Definition of Family Member for VLTP and VLBP

The definition of *family member* is the same for VLTP and VLBP purposes as it is for sick leave purposes.  See the definition in Section A. on Sick Leave.

### Retroactive Substitution of Donated Annual Leave

Donated annual leave may be—

- Substituted retroactively by the employee for any period of leave without pay used because of a *medical emergency*; or

- Used by the employee to liquidate an indebtedness incurred by the leave recipient for advanced annual or sick leave used because of a *medical emergency*.

### Set-Aside Accounts

While using donated annual leave, a leave recipient accrues annual and sick leave into what are called "set-aside" accounts so that the employee has some available leave when the *medical emergency* is over.  An employee may accrue no more than 40 hours of annual leave and 40 hours of sick leave in set-aside accounts. The leave in these set-aside accounts will be transferred to the employee's regular leave accounts **either** when the *medical emergency* ends **or** if the employee exhausts all donated annual leave but the employee's adopted or foster child is still experiencing the *medical emergency*. Leave in set-aside accounts is not available for use by the employee until transferred to the employee's regular leave accounts.

---

**Scenario:** How does Anna, whom we met earlier, accrue annual and sick leave while using donated leave?

Anna may accrue up to a maximum of 40 hours of sick leave and 40 hours of annual leave in special set-aside accounts.  Annual leave and sick leave in the set-aside accounts will become available for use after it is transferred to Anna's regular leave accounts when the *medical emergency* terminates or when she exhausts all donated leave but still needs more time to care for her foster daughter.

---

### Leave Sharing Facts Related to Adoption and Foster Care

- Donated annual leave may be used only for a *medical emergency*—e.g., any period of illness of the adopted or foster child that will last at least 24 work hours—and may not be used to care for a healthy child.
- There is no limit on the amount of donated annual leave a leave recipient may receive from the leave donor(s)/bank.  However, any unused donated leave must be returned to the leave donor(s)/bank when the *medical emergency* ends.
- Donated annual leave may not be used for activities related to the placement of a child for adoption or foster care purposes, to bond with or care for a healthy child, to care for a

35

1025

child with a routine illness, or to take the child to medical, dental, or optical appointments.
- An employee who returns to work part-time and who uses donated leave part-time accrues leave in his or her regular annual and sick leave accounts for the time spent in work status and in his or her set-aside annual and sick leave accounts when using donated leave.

> **Tip:** An employee is not required to use advanced annual or advanced sick leave before receiving donated annual leave under the leave transfer programs.

For more information, see our fact sheets on the Voluntary Leave Transfer Program and the Voluntary Leave Bank Program.

## G.  Leave Without Pay

An employee may request leave without pay (LWOP) to be absent from work for adoption or foster care purposes or to bond with or care for a newly-adopted child or newly-placed foster child.  An employee may request LWOP without invoking FMLA, even if he or she has available paid leave.  Supervisors should refer to agency internal policy and negotiated bargaining union agreements prior to approval.  However, agencies are encouraged to offer leave without pay for a longer period than what is provided for under the FMLA, to the maximum extent practicable for pregnancy and childbirth.

> **Tip:** For new employees who are not yet eligible for FMLA, an agency can provide the employee with a LWOP benefit that would mirror a FMLA benefit.

### *Effect of LWOP on Leave Accrual and other Benefits*

Being in a leave without pay (or unpaid leave) status affects various employee entitlements, including the accrual of annual and sick leave.  For example, when a full-time employee with an 80-hour biweekly tour of duty accumulates a total of 80 hours of nonpay status (either in one pay period, or over the course of several pay periods), the employee will not earn annual and sick leave in the pay period.  If the employee again accumulates 80 hours of nonpay status, he or she will again not earn leave in the pay period in which that new 80-hour total is reached.

For more information on leave without pay and the impact it has on Federal benefits, see our fact sheets on Leave Without Pay and the Effect of Extended Leave Without Pay (LWOP) (or Other Nonpay Status) on Federal Benefits and Programs.

## H. Compensatory Time Off

Three types of compensatory time off may be earned and used: compensatory time off in lieu of overtime pay, compensatory time off for travel, and religious compensatory time off.

***Compensatory time off in lieu of overtime pay.***  This is time off with pay for (1) irregular or occasional overtime work; or (2) regularly scheduled or irregular or occasional overtime work,

36

1026

when permitted under agency flexible work schedule programs.  It is subject to agency policy and the premium pay limitation, and there are separate Fair Labor Standards Act (FLSA) rules for employees who are covered (i.e., FLSA non-exempt) or not covered (i.e., FLSA exempt pay). Accrued compensatory time off must generally be used by the end of the 26th pay period after the pay period during which it was earned.  One hour of compensatory time off is granted for each hour of overtime work.

---

**Scenario:**  Donald and his husband Antony are adopting a two year old in October.  Donald works as a FLSA exempt Budget Analyst, and it is near the end of the fiscal year and his office is short-handed and his supervisor asks if he could work extra time to make sure they close out all fiscal year end tasks on time.  They agree that Donald will work this time as compensatory time that he can take off once the baby is placed with them so he can have more paid time off with his new child.

---

***Compensatory time off for travel.***  This type of compensatory time may be earned by an employee for time spent in a travel status away from the employee's official duty station when such time is not otherwise compensable, and be used as paid time off during an expected future absence.  There is no limitation on the amount of compensatory time off for travel an employee may earn, but it is generally forfeited if not used by the end of the 26th pay period after the pay period during which it is earned.

---

**Scenario**:  Noor and her husband Saad have just been approved to serve as foster parents. Noor is helping with agency efforts to recruit STEM students to come work at NASA and she is traveling a lot to campus recruiting fairs and earning a lot of comp time for travel.  She and her supervisor have discussed how she can use this time once a child is placed with them for foster care so she will not need to use as much annual leave to be able to stay home and bond with her new foster child.

---

***Religious compensatory time off.***  This authority permits an employee to rearrange work hours to fulfill his or her religious obligations.  Employees may earn and use religious compensatory time off to the extent that doing so does not interfere with the efficient carrying out of agencies' missions.  Employees interested in earning compensatory time off should speak with their supervisors.

---

**Scenario:**  Avram and Leah are adopting a baby girl next month.  Avram has gotten approval to work some religious compensatory time that he will take for his daughter's "b'rit bat," a Jewish religious naming ceremony for a girl.

---

For more information, see our fact sheets on compensatory time off in lieu of overtime pay, compensatory time off for travel, and religious compensatory time off.

# I. Alternative Work Schedules

Alternative Work Schedules (AWS) permit an employee to complete an 80-hour biweekly pay period in less than 10 days.  Employees have a right to request an alternative work schedule without fear of retaliation in accordance with agency policy and any collective bargaining

37

agreement. These schedules enable managers and supervisors to meet their program goals while, at the same time, helping employees to better balance work, personal, and family responsibilities. There are two categories of Alternative Work Schedules – compressed work schedules and flexible work schedules.

***Compressed Work Schedules.*** These are fixed work schedules that enable full-time employees to complete the basic 80-hour biweekly work requirement in less than 10 workdays. These schedules must be negotiated through collective bargaining or, when not applying to a bargaining unit, voted on by a majority of the employees to be covered by the schedule.

> **Example:** An employee is required to work 4 days a week, 10-hours each day. This is a fixed schedule that cannot be changed without taking leave.

***Flexible Work Schedules.*** These are flexible work schedules that enable employees to select and alter their work schedules to better fit their personal needs and help balance work, personal, and family responsibilities. There are various types of flexible work schedules that provide different degrees of flexibility within the 80-hour biweekly work requirement:

- **Flexitour** – employees elect start/stop times, which then become fixed.
- **Gliding** – employees may vary start/stop times daily.
- **Variable Day** – employees may vary the length of the workday.
- **Variable Week** – employees may vary the number of hours worked each week.
- **Maxiflex** – employees may work less than 10 workdays biweekly.

***Credit Hours.*** Some agencies permit employees who work under a flexible work schedule to earn credit hours, which can assist employees in better managing family responsibilities, including adoption and foster care. Based on agency policy and any applicable collective bargaining agreement, employees may request to work additional hours to use at a later time. A total of 24 credit hours may be carried over to be used in a later pay period. For more information, see our fact sheet on Credit Hours Under a Flexible Work Schedule.

***Alternative Work Schedule Facts Related to Adoption and Foster Care***

- Alternative Work Schedules may permit employees to work fewer than 10 days in a pay period, freeing up a day or more for family responsibilities, medical appointments, and bonding.
- Employees who work under Flexible Work Schedules often may adjust working hours to accommodate medical appointments, saving earned leave for other times when needed.
- Flexible work schedules can help parents arrange work hours in line with daycare hours.

## J. Telework

Telework provides employees the flexibility to better manage their work, family, and personal responsibilities. Under an agency's telework policy, an employee may be permitted to work at home or other worksites geographically convenient to the employee's residence. Telework is a

valuable tool that can be used when an employee transitions back to work after the adoption of a child or placement of a child in foster care. Telework is often used in conjunction with other forms of paid leave during the transition period between placement of the child for adoption or foster care and the return to full-time official duties.

Telework must be approved by the employee's supervisor based on the agency telework policy and the ability of the employee to accomplish his or her work.

> **Tip:** It is important to remember that an employee may not care for a child while engaged in the performance of official duties. However, when making a determination about telework eligibility following an adoption or placement of a child in foster care, the focus should remain on the work and the ability of the employee to perform official duties, not on the proximity of the child in the home. Decisions should be made on a case-by-case basis.

### *Expectations to Consider in a Telework Agreement for Adoption or Foster Care*

Requests for telework related to an employee transitioning back to work following the placement of a child with the employee for adoption or foster care should be accompanied by a formal written telework agreement that spells out expectations. Such telework agreements should, for example, outline a work schedule that indicates the days and hours of the week the employee will be working, outline any additional requirements (e.g., technology needs) beyond requisites laid out by law, clarify any assumptions regarding frequency and modes of communication (e.g., email vs. telephone, core hours for contact, or speed for expected timeframe for returning calls and emails) and establish terms under which the agreement can be modified or terminated.

It is important for the manager and the employee to establish a dialogue to determine whether the employee can accomplish at least some part of his or her duties from home while caring for a newly-placed adopted or foster child. The focus should remain on the work, while striking a balance with the employee's caregiving responsibilities. The open dialogue should occur throughout the transition period.

> **Scenario:** Mark and his wife adopted a new baby, Doris, several months ago. They have a live-in au pair caring for Doris at home each day. Mark discussed with his supervisor the fact that he has a home office on the third floor, and that the au pair cares for Doris on the first and second floors. His supervisor has approved Mark to telework on Wednesdays. As a new parent adjusting to life with an infant and the demands of parenthood, Mark appreciates the extra sleep he can get on Wednesdays when he is not commuting, and also enjoys the extra time he has to prepare a nice dinner for the family on Wednesday evenings.

### *Telework Facts Related to Adoption or Foster Care*

- Telework can provide employees with valuable additional time to spend with family members by reducing commuting time.

- Telework is not a substitute for dependent care and an employee may not care for a child while working from the home or an alternative worksite. To support work accomplishment, the employee cannot be expected to effectively accomplish work while actively caring for a young child.
- Telework is a valuable tool that can be used when the employee transitions back to work following the placement of a child with the employee for adoption or foster care.

> **Scenario:** Ed becomes a foster parent to Ricardo, who is in the 5th grade, in the winter. The adjustment has been a little difficult. Ricardo has little league games in the afternoon on Wednesdays, so Ed has asked for and been approved to switch his telework days from Fridays to Wednesdays so he can take Ricardo to little league games after he comes home from school. Spending this weekly time together this spring is significantly helping with the bonding process between foster father and foster son.

For more information, please see OPM's telework webpage at www.telework.gov.

## K. Part-time Employment and Job Sharing Arrangements

Agencies are encouraged to offer part-time schedules to employees who are adopting or fostering a child, to the maximum extent practicable. Agencies are also encouraged to develop job sharing programs in partnership with their unions and other stakeholders. Furthermore, when job sharing programs are planned for organizations where employees are represented by a labor organization with exclusive recognition, by law, agencies must notify the union and bargain in good faith on any negotiable proposals the union submits.

### *Part-time*

A part-time employee works between 16 and 32 hours each week (or between 32 and 64 hours a pay period) on a prearranged schedule, and is eligible for benefits. Part-time employees are eligible, on a prorated basis, for the same benefits as full-time employees: leave, retirement, and health and life insurance coverage.

> **Scenario:** Tonya and her husband, David, have recently adopted their second child and now have an infant and a toddler. Tonya started back to work full time, but her schedule is too stressful. Tonya discusses her situation with her supervisor, and he approves her to work a part-time schedule of 30 hours a week. The extra ten hours are just what Tonya needs to balance her work and family life.

### *Job Sharing*

Job sharing is a form of part-time employment in which the schedules of two or more part-time employees are arranged to cover the duties of a single full-time position. Generally, a job sharing team means two employees at the same grade level but other arrangements are possible. Job sharers are subject to the same personnel policies as other part-time employees. Job sharing

1030

does not necessarily mean that each job sharer works half-time, or that the total number of hours is 40 per week.

> **Tip**:  Employees should carefully consider all the personal issues involved in switching to a part-time or job sharing schedule, such as a reduction in pay, increased share of health insurance premiums, and the change in leave earnings.  Although procedures for requesting such schedules vary from agency to agency, the first step is usually to discuss the idea with the immediate supervisor.

For more information, see our Part-time and Job Sharing fact.

41

# IV. Interaction of Leave Programs and Workplace Flexibilities

Sections II and III of this Handbook provide information regarding the leave programs and workplace flexibilities available for childbirth, adoption, and foster care. This section provides a brief summary of benefits and is designed to demonstrate interactions among the various leave programs and other workplace flexibilities to help employees understand how these options can be used together.

## A. Leave for Family Care: Differences between Sick Leave/Leave Transfer and FMLA

The following chart highlights the key differences in the individual for whom an employee may provide care for purposes related to sick leave, leave transfer and FMLA. The sick leave and leave transfer programs entitle an employee to care for anyone who meets the definition of *family member*. The definition of *family member* is shown in the chart below. The term *family member* is not used in the FMLA regulations. Under FMLA, an employee can only care for the individuals mentioned in the FMLA statute, as shown in the chart below. It is important to consider the employee's relationship to the individual for whom he or she will be providing care in order to properly advise the employee which program or programs he or she can use to care for that individual.

| An employee may care for the following individuals using these leave programs | |
|---|---|
| **Sick Leave/Leave Transfer** | **FMLA** |
| An individual with any of the following relationships to the employee:<br><br>• Spouse, and parents thereof;<br>• Sons and daughters, and spouses thereof;<br>• Parents, and spouses thereof;<br>• Brothers and sisters, and spouses thereof;<br>• Grandparents and grandchildren, and spouses thereof;<br>• Domestic partner and parents thereof, including domestic partners of any individual in the 2nd to 5th bullets of this definition; or<br>• Any individual related by blood or affinity whose close association with the employee is the equivalent of a family relationship | An individual with any of the following relationships to the employee:<br><br>• Spouse (same-sex or opposite-sex);<br>• Son or daughter (under the age of 18 or incapable of self-care because of a mental or physical disability); or<br>• Parent |

**Note:** The definition of *spouse* for FMLA purposes is not as broad as the definition of *family member* for sick leave, voluntary leave transfer (VLTP), and voluntary leave bank (VLBP)

42

purposes, and does not include unmarried domestic partners, unless they meet the requirements of being spouses in a common-law marriage in States where such marriages are recognized. Therefore, an employee cannot take FMLA leave to care for a same-sex or opposite-sex domestic partner who gives birth to a child or who has a serious health condition unless the domestic partner is a common law spouse.  This means employees must pay close attention to whom they want to care for, and only choose the program(s) applicable to care for that family member.

## B.    Summary of Leave Programs Available for Childbirth

The following provides a quick summary of the various leave programs available for childbirth purposes, broken out by programs used specifically because of pregnancy, childbirth, and recovery from childbirth, and programs used to bond with a healthy baby.  Leave programs to care for the health needs of the baby and other workplace flexibilities are not shown here, but are discussed throughout the handbook text.  An employee may be able to use some or all of these leave programs, depending on his or her leave balances, family association, and interests and needs of the individual employee.

| A new employee who is pregnant and is *not eligible* for FMLA may: |
| --- |
| For prenatal care and any period of incapacity during pregnancy, and/or recovery from childbirth (usually 6-8 weeks) (Note:  incapacity lasting at least 24 work hours meets the requirements for use of donated annual leave under VLTP and VLBP): <br><br> • Use **sick leave** entitlement <br> • Request **advanced sick leave** <br> • Request **donated annual leave** under VLTP/VLBP—may only be used if employee has exhausted her annual and sick leave (her available paid leave).  Donated annual leave may be used to repay advanced sick or advanced annual leave taken during a medical emergency once the employee is approved for a leave sharing program <br> • Request **annual leave** <br> • Request **advanced annual leave** <br> • Request **leave without pay** outside of FMLA <br><br> To bond with her baby after her period of recovery from childbirth: <br><br> • Request **annual leave** <br> • Request **advanced annual leave** <br> • Request **leave without pay** outside of FMLA |
| An employee who is pregnant and *is* FMLA eligible may: |
| For prenatal care and any period of incapacity during pregnancy, and/or recovery from childbirth (usually 6-8 weeks) (Note:  these purposes all meet the requirements for FMLA leave for a serious health condition, and, if an incapacity lasts at least 24 work hours, meet the requirements for use of donated annual leave under VLTP and VLBP): |

43

1033

- Use **sick leave** entitlement
- Request **advanced sick leave** (agency may require invocation of FMLA)
- Request **donated annual leave** under VLTP/VLBP—may only be used if employee has exhausted her annual and sick leave (her available paid leave) and if period of incapacity lasts at least 24 work hours; agency may require invocation of FMLA). Donated annual leave may be used to repay advanced sick or advanced annual leave taken during the medical emergency once the employee is approved for a leave transfer sharing program
- Request **annual leave** (agency may require invocation of FMLA)
- Request **advanced annual leave** (agency may require invocation of FMLA)
- Invoke **FMLA** entitlement for up to 12 weeks—unpaid leave
  - May substitute sick leave for unpaid FMLA leave
  - May substitute advanced sick leave for unpaid FMLA leave
  - May substitute annual leave for unpaid FMLA leave
  - May substitute advanced annual leave for unpaid FMLA leave
  - May substitute donated annual leave for unpaid FMLA leave
  - May take on an intermittent basis
- Request **leave without pay** outside of FMLA

To bond with baby after period of recovery from childbirth:

- Request **annual leave** (agency may require invocation of FMLA)
- Request **advanced annual leave** (agency may require invocation of FMLA)
- Invoke **FMLA** entitlement for remainder of the 12 week period—unpaid leave
  - May substitute annual leave for unpaid FMLA leave
  - May substitute advanced annual leave for unpaid FMLA leave
  - May take on an intermittent basis, if approved
- Request **leave without pay** outside of FMLA

| An employee who will care for a family member who is pregnant, during recovery from childbirth, and to bond with the baby may: |
| --- |

Accompany a family member to prenatal care appointments and care for her during any period of incapacity during pregnancy, and/or recovery from childbirth (usually 6-8 weeks) (Note that these purposes all meet the requirements for sick leave and FMLA leave for a serious health condition):

- Use **sick leave** entitlement—limited to 12 weeks per leave year to care for a family member with a serious health condition and a total of 12 weeks per leave year for all family care purposes
- Request **advanced sick leave** (agency may require invocation of FMLA if employee is FMLA eligible and caring for a wife, mother, or daughter under 18 or over 18 but incapable of self-care because of a mental or physical disability)
- Request **donated annual leave** under VLTP—may only be used if employee has exhausted his or her annual and sick leave (his or her available paid leave) (agency may require invocation of FMLA if employee is FMLA eligible and caring for a wife,

44

mother, or daughter under 18 or over 18 but incapable of self-care because of a mental or physical disability). Donated annual leave may be used to repay advanced sick or advanced annual leave taken during the medical emergency once the employee is approved for the leave transfer program in question

- Request **annual leave** (agency may require invocation of FMLA if employee is FMLA eligible and caring for a wife, mother, or daughter under 18 or over 18 but incapable of self-care because of a mental or physical disability)
- Request **advanced annual leave** (agency may require invocation of FMLA if employee is FMLA eligible and caring for a wife, mother, or daughter under 18 or over 18 but incapable of self-care because of a mental or physical disability)
- Invoke **FMLA** if employee is FMLA eligible and caring for a wife, mother, or daughter under 18 or over 18 but incapable of self-care because of a mental or physical disability for up to 12 weeks—unpaid leave
  - May substitute sick leave for unpaid FMLA leave
  - May substitute advanced sick leave for unpaid FMLA leave
  - May substitute annual leave for unpaid FMLA leave
  - May substitute advanced annual leave for unpaid FMLA leave
  - May substitute donated annual leave for unpaid FMLA leave
  - May take on an intermittent basis
- Request **leave without pay** outside of FMLA

To bond with baby after period of recovery from childbirth:

- Request **annual leave** (agency may require invocation of FMLA if employee is FMLA eligible and is the parent or standing *in loco parentis*)
- Request **advanced annual leave** (agency may require invocation of FMLA if employee is FMLA eligible and is the parent or standing *in loco parentis*)
- Invoke **FMLA** entitlement to bond with baby for the remainder of the 12-week period if employee is FMLA eligible and is the parent or standing *in loco parentis*—unpaid leave
  - May substitute annual leave for unpaid FMLA leave
  - May substitute advanced annual leave for unpaid FMLA leave
  - May take on an intermittent basis, if approved
- Request **leave without pay** outside of FMLA

## C.     Sample Leave Calendars for Childbirth Purposes

An employee planning to be absent from the workplace for childbirth purposes may find it helpful to prepare a calendar indicating the amount of time he or she wishes to be absent from the workplace. The calendar should reflect the type of leave and work scheduling flexibilities the employee wishes to use each day. Having a well-thought-out calendar will facilitate a meaningful discussion with the employee's manager. We encourage employees to review all of the following calendars, which provide various examples of how leave and workplace flexibilities may be used in combination to meet employees' specific needs.

45

## Scenario 1

### *Childbirth - Self, New Employee, not FMLA-Eligible, Limited Leave*

Jordan is a new Federal employee who has 6 months of service and, therefore, does not qualify for FMLA. She would like to stay home with her baby for 3 months before returning to work. She has 40 hours of sick leave and 40 hours of annual leave.

Jordan is put on medically-prescribed bed rest for two weeks prior to the birth of her child. She uses 40 hours of sick leave for bed rest and prenatal appointments from March 9 through March 13. Jordan then requests and is granted 40 hours of annual leave which she uses from March 16 through March 20.

On March 23, Jordan gives birth to her baby boy. Following the birth of her son, Jordan requests and is granted 240 hours of advanced sick leave to cover her period of recovery from childbirth from March 23 through May 1.

> **Tip:** As soon as Jordan can demonstrate that she will exhaust her available paid leave (sick and annual leave), she may apply to receive donated annual leave under the VLTP/VLBP for her period of her recovery from childbirth. She can use the donated annual leave to repay the advanced sick leave taken during her recovery from childbirth.

Next, Jordan requests and is granted 64 hours of advanced annual leave (the amount of annual leave she would accrue through the remainder of the leave year) for bonding with her son between May 4 and May 13.

Finally, Jordan requests and the agency approves Jordan's request for LWOP for bonding with her baby from May 14 through June 23. She is not in a pay status the workday before or after the Memorial Day holiday so she will not be paid for the holiday.

**In Summary:**

- March 9 – March 13: SICK LEAVE for bed rest/prenatal appointments (5 days)
- March 16 – March 20: ANNUAL LEAVE for bed rest/prenatal appointments (5 days)
- March 23: BABY BORN
- March 23 – May 1: ADVANCED SICK LEAVE for recovery from childbirth (30 days maximum)
- May 4 – May 13: ADVANCED ANNUAL LEAVE for bonding with baby (8 days)
- May 14 – June 23: LWOP for bonding with baby, if approved. Employee would not be in a pay status on the day before or after the Memorial Day holiday (May 25) so will not be paid for the holiday.

| March | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

| April | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

| May | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

| June | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |



Sick Leave

Annual Leave

Advanced Sick Leave and/ or Donated Annual Leave

Advanced Annual Leave

Leave without Pay

Holiday

47

### Scenario 2

#### *Childbirth - Self, Sufficient Leave*

Amina is pregnant and, after her baby is born, would like to stay home with her baby for 5 months before returning to work. She has been a Federal employee for 1½ years, so she qualifies for FMLA. She has 160 hours of sick leave and 40 hours of annual leave.

Amina is put on medically prescribed bed rest for two weeks prior to the birth of her child. She uses 80 hours of sick leave for bed rest and prenatal appointments from March 9 through March 20.

On March 23, Amina gives birth to her baby girl and her healthcare provider certifies that she will need 6 weeks to recover from childbirth. Amina uses 80 hours of sick leave towards her recovery from March 23 through April 3. Then, since she has no more available sick leave, she invokes her FMLA entitlement on April 6. She substitutes 40 hours of annual leave for unpaid FMLA leave to cover the week of April 6 through April 10. She requests and is granted 120 hours (the maximum number she can request is 240 hours) of advanced sick leave to cover the remainder of her of recovery from childbirth. Amina substitutes the advanced sick leave for unpaid FMLA leave for recovery from childbirth from April 13 through May 1.

> **Tip:** As soon as Amina can demonstrate that she will exhaust her available paid leave (sick and annual leave), she may apply to be a leave recipient under the VLTP (and/or VLBP if applicable) for the remainder of the 6 weeks she will need to recover from childbirth. She can use the donated annual leave to repay the advanced sick leave taken for recovery from childbirth from April 13 through May 1.

Next, Amina requests and is granted 64 hours (the amount of annual leave she would accrue through the remainder of the leave year) of advanced annual leave for bonding with her baby. She substitutes the advanced annual leave for unpaid FMLA leave from May 4 through May 13.

Beginning on May 14, Amina remains on FMLA but no longer substitutes paid leave for unpaid FMLA leave. She is on FMLA leave without pay (LWOP) throughout the remainder of her 12-week FMLA entitlement, which expires on June 29. (Her FMLA period is extended by one day because Federal holidays are excluded from the 12-week calculation.)

> **Tip:** Employees must be in a pay status or a paid time off status on their scheduled workday either before or after a holiday in order to be paid for the holiday, so Amina can choose to use paid leave on May 22 or May 26 in order to be paid for the Memorial Day holiday. (She chooses May 22.)

1038

> **Tip:** Amina has exhausted her FMLA entitlement but, if approved, can take off more time from work by requesting LWOP outside of FMLA.

Finally, the agency approved Amina's request for LWOP outside of FMLA for bonding with her baby from June 30 through August 21. Amina would not be in a pay status or paid time off status on July 2 or July 6, so she is not entitled to be paid for the Independence Day holiday, which falls on July 3. Amina returns to work on August 24.

**In Summary:**

- March 9 – March 20: SICK LEAVE for bed rest/prenatal appointments (10 days)
- March 23: BABY BORN
- March 23 – April 3: SICK LEAVE for recovery from childbirth (10 days)
- April 6 – April 10: FMLA w/ substitution of ANNUAL LEAVE for recovery from childbirth (5 days)
- April 13 – May 1: FMLA w/ substitution of ADVANCED SICK LEAVE or DONATED ANNUAL LEAVE for recovery from childbirth (15 days)
- May 4 – May 13: FMLA w/ substitution of ADVANCED ANNUAL LEAVE for bonding with baby (8 days)
- May 14 – June 29: FMLA LWOP for bonding with baby (31 days)
- May 22: FMLA w/ substitution of ANNUAL LEAVE for bonding with baby (1 day). Uses annual leave accrued while on paid leave to be in a pay status on the day prior to the Memorial Day holiday so will be paid for the holiday.
- June 30 – August 21: LWOP for bonding with baby (38 days). Will not be in a pay status on workday before or after Independence Day holiday so will not be paid for the holiday.

49

1039

**March**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

**April**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

**May**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

**June**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

**July**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

**August**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

**Sick Leave**

**FMLA – Substitution of Annual Leave**

**FMLA – Substitution of Advanced Sick Leave and/or Donated Annual Leave**

**FMLA – Substitution of Advanced Annual Leave**

**FMLA – LWOP**

**Leave without Pay**

**Holiday**

50

## Scenario 3

### *Childbirth - Self, Limited Leave*

Isabelle is pregnant and would like to stay home with her baby for her full 12-week period of FMLA entitlement before returning to work on a reduced schedule. She has been a Federal employee for four years and qualifies for FMLA. She has 40 hours of sick leave and 8 hours of annual leave.

Isabelle is put on medically-prescribed bed rest for two weeks prior to the birth of her child. She uses 40 hours of sick leave for bed rest and prenatal appointments from March 9 through March 13. At this time, she no longer has any more sick leave, so Isabelle invokes her FMLA entitlement on March 16. She chooses to substitute 8 hours of annual leave for unpaid FMLA leave to cover one day of bed rest. She requests and is granted 240 hours of advanced sick leave to cover her expected needs. Isabelle substitutes advanced sick leave for unpaid FMLA leave for the period of her bed rest from March 17 through March 20.

On March 23, Isabelle gives birth to her baby girl. Her healthcare provider certifies she will need up to 6 weeks to recover from childbirth. Following the birth of her daughter, Isabelle continues to take FMLA leave to cover her full period of recovery from childbirth. She substitutes the remaining 208 hours of advanced sick leave for unpaid FMLA leave for the period of recovery from childbirth from March 23 through April 27.

> **Tip:** As soon as Isabelle can demonstrate that she will exhaust her available paid leave (sick and annual leave), she may apply to be a leave recipient under her agency's VLTP and/or VLBP ( if applicable) for the period of her medically prescribed bed rest and recovery from childbirth. She can use the donated annual leave to repay the advanced sick leave taken during these periods.

Next, Isabelle requests and is granted 80 hours of advanced annual leave for the last three days of her recovery from childbirth and bonding with her baby. She substitutes 72 hours of advanced annual leave for unpaid FMLA leave from April 28 through May 8 and keeps the remaining 8 hours for a potential future need.

Beginning on May 11, Isabelle remains on FMLA but no longer substitutes paid leave for unpaid FMLA leave. She is on FMLA leave without pay (LWOP) throughout the remainder of her 12-week FMLA entitlement, which expires on June 9. (Her FMLA period is extended by one day because Federal holidays are excluded from the 12-week calculation.)

> **Tip**: Employees must be in a pay status or a paid time off status on their scheduled workday either before or after a holiday in order to be paid for the holiday, so Isabelle can choose to use paid leave on May 22 or May 26 in order to be paid for the Memorial Day holiday. She chooses to use annual leave on May 22.

1041

Isabelle returns to work on June 9. She has been approved, on a permanent basis, to work an alternative work schedule, specifically a fixed 5-4/9 schedule, and to telework on Mondays while Isabelle's parents watch the baby at their home. With this schedule, Isabelle would have a fixed AWS day off every other Friday.

**In Summary:**

- March 9 – March 13: SICK LEAVE for bed rest/prenatal appointments (5 days)
- March 16: FMLA w/ substitution of ANNUAL LEAVE for bed rest/prenatal appointments (1 day)
- March 17 – March 20: FMLA w/substitution of ADVANCED SICK LEAVE and/or DONATED ANNUAL LEAVE for bed rest/prenatal appointments (4 days)
- March 23: BABY BORN
- March 23 – April 27: FMLA w/ substitution of ADVANCED SICK LEAVE and/or DONATED ANNUAL LEAVE for recovery from childbirth (26 days)
- April 28 – May 8: FMLA w/substitution of ADVANCED ANNUAL LEAVE for bonding with baby (9 days)
- May 11 – June 9: FMLA LWOP for bonding with baby (21 days)
- May 22: FMLA w/substitution of ANNUAL LEAVE for bonding with baby (1 day). Uses annual leave accrued while on paid leave to be in a pay status on the day prior to the Memorial Day holiday so will be paid for the holiday.
- June 10 and on: Returns to work. Approved to work a fixed 5-4/9 schedule and telework on Mondays. Fixed AWS day off every other Friday.

## March

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

## April

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

## May

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

## June

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

## July

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

## August

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

**Sick Leave**

**FMLA – Substitution of Annual Leave**

**FMLA – Substitution of Advanced Sick Leave and/or Donated Annual Leave**

**FMLA – Substitution of Advanced Annual Leave**

**FMLA – LWOP**

**AWS Day Off**

**Telework Day**

**Holiday**

53

## Scenario 4

### *Childbirth - Self, Using Intermittent FMLA Leave to Extend Bonding Time*

Latonya is a Federal employee who is having a baby and would like to use intermittent FMLA leave (for as long as she is eligible) once she returns to work so that she can have a reduced schedule and still have time to bond with her baby. She has been a Federal employee for more than 4½ years and qualifies for FMLA.  She has 320 hours of sick leave and 80 hours of annual leave.

On March 23, Latonya gives birth to a healthy baby girl.  Following the birth of her daughter, Latonya uses 6 weeks of sick leave for her recovery from childbirth from March 23 through May 1.

At this time, since she is now recovered from childbirth, she no longer has an entitlement to take sick leave, so Latonya invokes her FMLA entitlement on May 4.  Latonya returns to work on a part-time basis—not as a part-time employee, but using FMLA intermittently to work part time and be on FMLA leave part time to bond with her baby.  She also has been approved to telework on Friday mornings. Because Latonya lives very close to her job and since her husband can care for their daughter in the mornings, Latonya works for 4 hours each morning and uses FMLA intermittently to take off for 4 hours each afternoon.  She substitutes annual leave for unpaid intermittent FMLA leave from May 4 through May 29.  Then she remains on intermittent FMLA but no longer substitutes paid leave for unpaid leave.  Latonya is on intermittent FMLA leave without pay (LWOP) for the period of June 1 through the expiration of her 12-week FMLA entitlement, on October 22.

Latonya is eligible for the holidays as she is in a pay status either before or after each holiday.

**In Summary:**

- March 23: BABY BORN
- March 23 – May 1:  SICK LEAVE for recovery from childbirth (6 weeks)
- May 4 – May 29: Intermittent FMLA w/ substitution of ANNUAL LEAVE to take off 4 hours per day to bond with baby.  Employee would work 4 hours in the morning and have 4 hours off in the afternoon each day. Employee approved to Telework on Friday mornings.
- June 1 – October 22:  Intermittent FMLA LWOP to take off 4 hours per day to bond with baby.  Employee would work 4 hours in the morning and have 4 hours off in the afternoon each day through the expiration of the FMLA period, which is October 22. FMLA is extended by 3 days because Federal holidays do not count towards the 12 weeks of FMLA leave.

| March | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

| April | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

| May | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

| June | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

| July | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

| August | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

| September | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | | | |

| October | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

**Sick Leave**

**Intermittent FMLA – Substitution of Annual Leave**

**Intermittent FMLA - LWOP**

**Holiday**

55

1045

## Scenario 5

### *Childbirth - Family Member, Using Intermittent FMLA and Annual Leave to Extend Bonding Time*

Eduardo is in a senior-leader position at his agency and has a 720-hour annual leave carryover ceiling. He and his wife are having a baby boy. He would like time off to care for his wife during her recovery from childbirth and to care for his baby on an intermittent basis during the first year. He has been a Federal employee for seven years and so qualifies for FMLA. Eduardo has 700 hours of sick leave and 520 hours of annual leave.

On March 23, Eduardo's wife gives birth. Eduardo takes sick leave from March 23 through May 15 to care for his wife, whose healthcare provider has certified that she will need 8 weeks to recover from her cesarean section.

Eduardo returns to work on May 18. On May 19, he invokes his FMLA entitlement to bond with his baby and takes FMLA intermittently two days a week, on Tuesdays and Thursdays, through his 12-week FMLA entitlement, which ends on December 15. Eduardo works on Mondays, Wednesdays, and Fridays. Beginning on May 19 through December 15, Eduardo substitutes his annual leave for unpaid intermittent FMLA leave.

> **Tip:** Eduardo has exhausted his FMLA entitlement but, if approved, can take off more time from work by requesting LWOP outside of FMLA or annual leave.

Between December 17 through March 23 of the next year, Eduardo requests and is approved to take annual leave every Tuesday and Thursday to bond with his son.

Eduardo would be eligible for all holidays as he is in a pay status either before or after each holiday.

**In summary:**

- March 23: BABY BORN
- March 23 – May 15: SICK LEAVE for recovery from childbirth (8 weeks)
- May 19 – December 15: Intermittent FMLA w/substitution of ANNUAL LEAVE on Tuesdays and Thursdays to bond with baby. Employee would work on Mondays, Wednesdays and Fridays.
- December 17 – December 31: ANNUAL LEAVE on Tuesdays and Thursdays
- January 5 – March 18: ADVANCED ANNUAL LEAVE on Tuesdays and Thursdays

## March

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

## April

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

## May

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

## June

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

## July

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

## August

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

## September

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 15 | 15 | 16 | 17 | 18 | 19 |
| 20 | 22 | 22 | 23 | 24 | 25 | 26 |
| 27 | 29 | 29 | 30 | | | |

## October

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

## November

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

## December

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

57

**January**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

**February**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | | | | | | |

**March**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | | | | | | |

**Sick Leave**

**Intermittent FMLA – Substitution of Annual Leave**

**Annual Leave**

**Advanced Annual Leave**

**Holiday**

58

## Scenario 6

### *Childbirth - Family Member, Limited Leave*

Karina is a Federal employee whose same-sex spouse is having a baby. Karina would like to take time off to care both for her wife and her baby on an intermittent basis after the baby is born. She has been a Federal employee for more than one year and qualifies for FMLA. She has 128 hours of sick leave and 24 hours of annual leave.

---

**Note:** In accordance with an OPM Memorandum dated October 21, 2013, Federal employees are entitled to use FMLA leave to care for a same-sex spouse with a serious health condition, including care for a same-sex spouse who gives birth to a child. This stems from the June 26, 2013, Supreme Court decision that Section 3 of the Defense of Marriage Act is unconstitutional. As a result of the decision, OPM is now able to extend certain benefits to Federal employees and annuitants who have legally married a spouse of the same sex, regardless of the employee's or annuitant's State of residency.

---

Karina's wife is put on medically prescribed bed rest for two weeks prior to the birth of her child. Karina uses 80 hours of sick leave to care for her wife during her period of medically prescribed bed rest and prenatal appointments from March 9 through March 20.

On March 23, Karina's wife gives birth to their baby girl. Following the birth of her daughter, Karina remains on sick leave from March 23 through March 31 to care for her wife who is recovering from childbirth. Thereafter, Karina no longer has an entitlement to time off because she does not have any more sick leave available, so Karina invokes her FMLA entitlement to care for her spouse during recovery from childbirth on April 1. From April 1 through April 3, she substitutes annual leave for unpaid FMLA leave.

Next, Karina is granted 160 hours of advanced sick leave to cover her wife's full period of recovery from childbirth (6 weeks). Karina substitutes the advanced sick leave for unpaid FMLA leave to care for her wife during recovery from childbirth from April 6 through May 1.

---

**Tip:** Since Karina has used up all her available paid leave (sick and annual leave), she may apply to receive donated annual leave under the VLTP/VLBP for the period of her wife's recovery from childbirth (6 weeks). She can use the donated annual leave to repay advanced sick leave taken to care for her wife during recovery from childbirth.

---

Karina returns to work on a reduced schedule the week of May 4. She requests and is approved for 88 hours (the amount of annual leave she would accrue through the remainder of the leave year) of advanced annual leave for bonding with her baby. Karina takes FMLA intermittently

three days a week, on Mondays, Wednesdays, and Fridays. She works on Tuesdays and Thursdays. Karina substitutes the advanced annual leave for unpaid intermittent FMLA leave from May 4 through May 29.

Beginning June 1, Karina remains on her intermittent FMLA schedule but no longer substitutes paid leave for unpaid leave. She is on intermittent FMLA leave without pay (LWOP) for the period of June 1 through the expiration of her 12-week FMLA entitlement, July 31.

Karina receives pay for the Memorial Day and Independence Day holidays as she is in a pay status either before or after the holidays.

**In Summary:**

- March 9 – March 20: SICK LEAVE to care for a spouse who is on bed rest/pre-natal appointments (10 days)
- March 23: BABY BORN
- March 23 – March 31: SICK LEAVE to care for a spouse who is recovering from childbirth (8 days)
- April 1 – April 3: FMLA w/ substitution of ANNUAL LEAVE to care for a spouse who is recovering from childbirth (3 days)
- April 6 – May 1: FMLA w/ substitution of ADVANCED SICK LEAVE or DONATED LEAVE to care for a spouse who is recovering from childbirth (20 days)
- May 4 – May 29: Intermittent FMLA w/ substitution of ADVANCED ANNUAL LEAVE on Mondays, Wednesdays and Fridays (11 days) for bonding with baby. Employee would work on Tuesdays and Thursdays. Employee would be in a pay status on the day after the Memorial Day holiday so will be paid for the holiday.
- June 1 – July 31: Intermittent FMLA LWOP on Mondays, Wednesdays and Fridays (26 days) for bonding with baby. Employee would work on Tuesdays and Thursdays. Employee would be working and in a pay status on the day prior to the Independence Day holiday so will be paid for the holiday.

60

### March

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

### April

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

### May

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

### June

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

### July

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

Sick Leave

FMLA – Substitution of Annual Leave

FMLA – Substitution of Advanced Sick Leave and/or Donated Leave

Intermittent FMLA – Substitution of Advanced Annual Leave

Intermittent FMLA – LWOP

Holiday

1051

## Scenario 7

### *Childbirth - Family Member, Using Intermittent FMLA, Telework, and AWS*

Tom is in a scientific position at NASA and has a 720-hour annual leave carryover ceiling. He and his wife are expecting a baby. He would like time off to care for wife during her recovery from childbirth and to care for his baby on an intermittent basis for the first year after the baby's birth. He has been a Federal employee for ten years and so qualifies for FMLA. Tom has 800 hours of sick leave and 720 hours of annual leave.

Tom takes sick leave on March 9 and 16 to take his wife to prenatal appointments. On March 23, Tom's wife Sarah gives birth to their baby boy. Following the birth of his son, Tom remains on sick leave from March 23 through April 17 to care for his wife who is recovering from childbirth.

Between April 20 through May 1, Tom uses sick leave only on Mondays and Fridays to continue caring for his wife who is recovering from childbirth. During this time, he returns to work on a reduced schedule to complete a project he has been working on and has approval to telework every Wednesday on a permanent basis.

Tom is entitled to use sick leave only through his wife's period of recovery from childbirth (6 weeks), which ends on May 1. Thereafter, he invokes his FMLA entitlement on May 4 to bond with his baby. Between May 4 through July 31, Tom takes FMLA intermittently two days a week, on Mondays and Fridays. When Monday or Friday is a holiday, Tom takes his FMLA day off on the day before or after the holiday. He substitutes his annual leave for unpaid FMLA leave. He continues to telework every Wednesday.

> **Tip:** Employees must be in a pay status or a paid time off status on their scheduled workday either before or after a holiday in order to be paid for the holiday. Since Tom is in a pay status before and after the Memorial Day (May 25) and Independence Day (July 3) holidays, he will be paid for the holidays.

Beginning on August 3 through March 22 of the next year, Tom continues to work a reduced schedule, continues to telework, and has been approved to work an alternative work schedule on a permanent basis, specifically a fixed 5-4/9 schedule. During this period, Tom uses FMLA intermittently on Mondays to bond with his son through the expiration of his 12-month FMLA period, which expires on March 22 of the next year. Tom substitutes his annual leave for unpaid FMLA leave during this time. He continues to telework every Wednesday and now works a fixed 5-4/9 work schedule that permits him a fixed AWS Day Off on the second Friday of each pay period.

> **Tip:** Employees, including those on flexible or compressed work schedules, are entitled to an "in lieu of" holiday when a holiday falls on a nonworkday. In such cases, the employee's holiday is the basic workday immediately preceding the nonworkday. Therefore, in Tom's case, when the December 25 holiday falls on a Friday, Tom's nonworkday, his "in lieu of" holiday is December 24.

## In summary:

- March 9 and March 16: SICK LEAVE to care for spouse during prenatal appointments (2 days)
- March 23: BABY BORN
- March 23 – April 17: SICK LEAVE to care for a spouse who is recovering from childbirth (20 days)
- April 20 – May 1: SICK LEAVE on Mondays and Fridays to care for a spouse who is recovering from childbirth (4 days). Returns to work on April 21 and works on Tuesdays, Wednesdays, and Thursdays. Employee is approved to Telework on Wednesdays on a permanent basis.
- May 4 – July 31: Intermittent FMLA w/ substitution of ANNUAL LEAVE on Mondays and Fridays (if those days fall on a holiday, employee can take off the day before or after) (26 days) for bonding with baby. Employee would be in a pay status on the day prior to the May 25 and July 3 holidays so will be paid for the holidays.
- August 3 – March 22: Intermittent FMLA w/ substitution of ANNUAL LEAVE on Mondays (Tuesdays if Monday is a Holiday) (34 days) for bonding with baby. Employee would work the rest of the week. Employee would be able to have Mondays off through the expiration of the FMLA 12-month bonding period, which expires on March 22, one year after the birth of his baby. Fixed AWS Day Off on the second Friday of each pay period. Employee remains in a pay status prior to and after all holidays, so will be paid for the holidays.

1053

| March | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

| April | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

| May | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

| June | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

| July | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

| August | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

| September | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | | | |

| October | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

| November | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

| December | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | R | F | S |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

64

**January**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
|  |  |  |  |  | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 |  |  |  |  |  |  |

**February**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 |  |  |  |  |  |  |

**March**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 21 |
| 28 | 29 | 30 | 31 |  |  |  |

Sick Leave

Intermittent FMLA – Substitution of Annual Leave

Holiday

Telework Day

AWS Day Off

65

1055

## D.    Summary of Leave Programs Available for Adoption or Foster Care

The following provides a quick summary of the various leave programs available for adoption and foster care purposes, broken out by programs used specifically prior to the placement of the child for adoption or foster care, and those to bond with the child post-placement.  Leave programs to care for the health needs of the child and other workplace flexibilities are not shown here, but are discussed throughout the handbook text.  An employee may be able to use some or all of these leave programs, depending on his or her leave balances, interests, and needs.

FMLA leave is in addition to other paid time off available to an employee. For adoption purposes, this means that an employee can invoke his or her sick leave entitlement first.  Then, after all activities necessary for the adoption to proceed are completed, he or she can invoke his or her FMLA entitlement to bond with the adopted child.

---

**An Employee Adopting a Child May:**

Planning for adoption of child.  For adoption-related purposes such as appointments with adoption agencies, social workers, and attorneys; court proceedings; required travel; and any other activities necessary for the adoption to proceed:

- Use **sick leave** entitlement
- Request **advanced sick leave**
- Request **annual leave**
- Request **advanced annual leave**
- Invoke **FMLA** entitlement for up to 12 weeks if employee is FMLA eligible—unpaid leave
  - May substitute sick leave for unpaid FMLA leave
  - May substitute advanced sick leave for unpaid FMLA leave
  - May substitute annual leave for unpaid FMLA leave
  - May substitute advanced annual leave for unpaid FMLA leave
  - May take on an intermittent basis, if approved
- Request **leave without pay** outside of FMLA

To bond with child after child is adopted:

- Use **sick leave** entitlement only if bonding period is ordered by a court or adoption agency
- Request **advanced sick leave** only if bonding period is ordered by a court or adoption agency
- Request **annual leave**
- Request **advanced annual leave** (agency may require invocation of FMLA if employee is FMLA eligible)
- Invoke **FMLA** entitlement for any remainder of the 12-week period to bond with child—unpaid leave
  - May substitute sick leave for unpaid FMLA leave only if a bonding period is

---

66

1056

| |
|---|
| ordered by a court or adoption agency |
|     o  May substitute advanced sick leave for unpaid FMLA leave only if a bonding period is ordered by a court or adoption agency |
|     o  May substitute annual leave for unpaid FMLA leave |
|     o  May substitute advanced annual leave for unpaid FMLA leave |
|     o  May take on an intermittent basis, if approved |
| • Request **leave without pay** outside of FMLA |

**An Employee Fostering a Child May:**

Planning for the placement of a foster child or after child is placed for foster care:

- Request **annual leave**
- Request **advanced annual leave**
- Invoke 12-week **FMLA entitlement for up to 12 weeks** (if eligible for FMLA)—unpaid leave
  - o May substitute annual leave for unpaid FMLA leave
  - o May substitute advanced annual leave for unpaid FMLA leave
  - o May take on an intermittent basis, if approved
- Request **leave without pay** outside of FMLA

## E.    Sample Leave Calendars for Adoption and Foster Care

An employee planning to be absent from the workplace for adoption or foster care purposes may find it helpful to prepare a calendar indicating the amount of time he or she wishes to be absent from the workplace.  The calendar should reflect the type of leave and work scheduling flexibilities the employee wishes to use each day.  Having a well-thought-out calendar will facilitate a meaningful discussion with the employee's manager.  We encourage employees to review all of the following calendars, which provide various examples of how leave and workplace flexibilities may be used in combination to meet employees' specific needs.

67

1057

## Scenario 1

### *Adoption- Limited Leave*

Tammy is a Federal employee who plans to adopt a one-year old girl from China. She has been a Federal employee for more than one year and qualifies for FMLA. She has 80 hours of sick leave and 48 hours of annual leave.

Tammy uses 8 hours of sick leave on March 9 to meet with an attorney for adoption-related purposes. Tammy uses 24 hours of sick leave from March 17 through March 19 to travel to China and meet with the adoption agency. Tammy requests and is approved to use 8 hours of annual leave for personal time in China on March 20.

> **Tip:** Employees are entitled to use sick leave for adoption-related purposes which may include but are not limited to:
> - Appointments with adoption agencies, social workers, and attorneys;
> - Court proceedings;
> - Required travel;
> - Any periods of time the employee is *ordered* or *required* by the adoption agency or by the court to take time off from work to care for the adopted child; and
> - Any other activities *necessary to allow the adoption to proceed*.

On March 23, Tammy officially adopts her daughter. Tammy uses sick leave from March 23 through March 30 for adoption-related purposes to travel from China and to care for her daughter. Because the adoption agency is concerned about attachment disorder, they are requiring that Tammy have a 30-day bonding period before returning to work. The 30-day period required by the adoption agency runs through April 21. On March 31, because she no longer has any more sick leave, Tammy invokes her FMLA entitlement to continue to bond with her daughter. She requests and is granted 128 hours of advanced sick leave to cover the remainder of the required 30-day bonding period. Tammy substitutes advanced sick leave for unpaid FMLA leave from March 31 through April 21.

> **Note:** Tammy cannot receive donated annual leave under the VLTP/VLBP because adoption-related purposes do not involve a medical emergency.

Next, Tammy remains on FMLA and substitutes her annual leave for unpaid FMLA leave for the period of April 22 through April 28. She then requests and is granted 64 hours (the amount of annual leave she would accrue through the remainder of the leave year) of advanced annual leave to bond with her daughter. She substitutes the 64 hours of advanced annual leave for unpaid FMLA leave for the time period of April 29 through May 8. Beginning on May 11, Tammy

68

1058

remains on FMLA in an LWOP status through the remainder of her 12-week FMLA entitlement, which expires on June 23.

> **Tip:** Employees must be in a pay status or a paid time off status on their scheduled workday either before or after a holiday in order to be paid for the holiday, so Tammy can choose to use paid leave on May 22 or May 26 in order to be paid for the Memorial Day holiday. (She chooses May 22.)

**In Summary:**

- March 9: SICK LEAVE for adoption-related purposes to meet with attorney (1 day)
- March 17 – 19: SICK LEAVE to travel to China for adoption of child and to meet with adoption agency (3 days)
- March 20: ANNUAL LEAVE for personal time in China (1 day)
- March 23: ADOPTION OF CHILD
- March 23 – March 30: SICK LEAVE for adoption-related purposes to travel from China and required 30-day bonding (6 days)
- March 31 – April 21: FMLA w/substitution of ADVANCED SICK LEAVE for required 30-day bonding (16 days)
- April 22 – April 28: FMLA w/substitution of ANNUAL LEAVE for bonding with child (5 days)
- April 29 – May 8: FMLA w/substitution of ADVANCED ANNUAL LEAVE for bonding with child (8 days)
- May 11 – June 23: FMLA LWOP for bonding with child (60 days). FMLA is extended by 1 day because Federal holidays do not count towards the 12 weeks of FMLA leave
- May 22: FMLA w/ substitution of ANNUAL LEAVE for bonding with baby (1 day). Uses annual leave accrued while on paid leave to be in a pay status on the day prior to the Memorial Day holiday, so will be paid for the holiday.

1059

**March**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

**April**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

**May**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

**June**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

Sick Leave

Annual Leave

FMLA – Substitution of Advanced Sick Leave

FMLA – Substitution of Annual Leave

FMLA – Substitution of Advanced Annual Leave

FMLA - LWOP

Holiday

70

## Scenario 2

### *Foster Care—Limited Leave Balances*

Jane is a Federal employee who plans to become the foster parent of a young boy and would like to take as much time off from work as she can to bond with her foster son. She has been a Federal employee for three years and qualifies for FMLA. She has 80 hours of sick leave and 24 hours of annual leave.

Jane requests and is approved to use 8 hours of annual leave on March 2, 11, and 20 for foster care meetings and home visits.

On March 23, the young boy is placed into foster care with Jane. Since she no longer has any annual leave, Jane invokes her FMLA entitlement for bonding with her foster son on March 23. She requests and is granted 80 hours of advanced annual leave to substitute for unpaid FMLA leave from March 23 through April 3.

> **Note:** While employees are entitled to sick leave for adoption-related purposes, an employee cannot use sick leave for purposes related to foster care.

Beginning on April 6, Jane remains on FMLA in an LWOP status throughout the remainder of her 12-week FMLA entitlement, which expires on June 15. She does not receive pay for the Memorial Day holiday (May 25) because she is not in a pay status on the workday before or after the holiday. Jane returns to work on June 16.

**In Summary:**

- March 2, March 11, March 20: ANNUAL LEAVE for foster care meetings and home visits
- March 23: PLACEMENT OF FOSTER CHILD
- March 23 – April 3: FMLA w/ substitution of ADVANCED ANNUAL LEAVE for bonding with child (10 days)
- April 6 – June 15: FMLA LWOP for bonding with child. FMLA is extended by 1 day because Federal holidays do not count towards the 12 weeks of FMLA leave.
- May 25: HOLIDAY – MEMORIAL DAY. Employee would not be in a pay status on the workday before or after the Memorial Day holiday so will not be paid for the holiday.

1061

**March**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

**April**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

**May**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

**June**

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

**Annual Leave**

**FMLA – Substitution of Advanced Annual Leave**

**FMLA – LWOP**

**Holiday**

72



UNITED STATES
OFFICE OF PERSONNEL MANAGEMENT
Employee and Services
Pay and Leave
1900 E Street, NW
Washington, DC 20415

**Exhibit 3.**

The information about the FMLA on the web-site of the Department of Labor.

**U.S. Department of Labor**
Wage and Hour Division



# Fact Sheet # 28D:  Employer Notification Requirements under the Family and Medical Leave Act

Effective communication is a key component of a successful Family and Medical Leave Act (FMLA) program. Covered employers must provide employees with certain critical notices about the FMLA. An employer generally will be covered under the FMLA if it is a private employer with 50 or more employees, a public agency, or a public or private elementary or secondary school.

All covered employers must display a general notice about the FMLA (an FMLA poster).  Additionally, covered employers who have employees who are eligible for FMLA leave must:

- Provide employees with general notice about the FMLA;

- Notify employees concerning their eligibility status and rights and responsibilities under the FMLA; and

- Notify employees whether specific leave is designated as FMLA leave and the amount of time that will count against their FMLA leave entitlement.

This fact sheet provides general guidance concerning each of these employer notification requirements.

## GENERAL NOTICE REQUIREMENTS

To meet the general notice requirements of the FMLA, covered employers must display a poster in plain view for all workers and applicants to see, notifying them of the FMLA provisions and providing information concerning how to file a complaint with the Wage and Hour Division.  A covered employer must display this poster even if it has no eligible employees.  An employer who willfully violates this posting requirement may be subject to a civil money penalty. For current penalty amounts, see www.dol.gov/whd/fmla/applicable_laws.htm. Employers may post the Wage and Hour Division's FMLA Poster, which is available at no cost from the WHD website at *www.dol.gov/whd/fmla,* to satisfy this requirement, or may use another format so long as the information provided includes, at a minimum, all the information contained in the FMLA Poster.

In addition to displaying a poster, a covered employer who has any eligible employees also must provide a general notice containing the same information that is in the poster in its employee handbook (or other written material about leave and benefits).  If no handbook or written leave materials exist, the employer must distribute this general notice to new employees upon hire.  Employers may meet this general notice requirement by either duplicating the general notice language found on the FMLA Poster or by using another format so long as the information provided includes, at a minimum, all the information contained in the FMLA Poster.

The poster may be posted electronically and the general notice may be distributed electronically provided all other requirements are met.

FS 28D

**ELIGIBILITY AND RIGHTS AND RESPONSIBILITIES NOTICE REQUIREMENTS**

Employee eligibility is determined, and notice of eligibility status must be provided, the first time the employee takes leave for an FMLA-qualifying reason in the employer's designated 12-month leave year.

The eligibility notice may be either oral or in writing and **must**:

- Be provided within **five business days** of the initial request for leave or when the employer acquires knowledge that an employee leave may be for an FMLA-qualifying reason;

- Inform the employee of his or her eligibility status; and

- If the employee is determined to be *not* eligible for FMLA leave, state at least one reason why.

The eligibility notice is not required for FMLA absences for the same qualifying reason during the same leave year or for FMLA absences for a different qualifying reason where the employee's eligibility status has not changed. If the employee requests leave for a different qualifying reason in the same leave year and the employee's eligibility status has changed, the employer must notify the employee of the change in eligibility status within five business days.

**Each time** employers are required to provide the eligibility notice, they must also provide employees with a rights and responsibilities notice, notifying employees of their obligations concerning the use of FMLA leave and the consequences of failing to meet those obligations.

The rights and responsibilities notice must be **in writing** and **must include**, as applicable:

- Notice that the leave may be counted as FMLA leave;
- The employer's designated 12-month period for counting FMLA leave entitlement;
- Any requirement for the employee to furnish a certification and the consequences for failing to do so;
- Information regarding the employee's right or the employer's requirement for substitution of paid leave and conditions relating to any substitution, and the employee's right to take unpaid FMLA leave if the conditions for paid leave are not met;
- Instructions for making arrangements for any premium payments for maintenance of health benefits that the employee must make during leave (and potential employee liability if the employee fails to return to work after FMLA leave);
- Notice of designation as "key" employee and what that could mean; and
- The employee's right to job restoration and maintenance of benefits.

The rights and responsibilities notice may be distributed electronically provided all other requirements are met. Employers may use Form WH-381, which is available at no cost from the WHD website at *www.dol.gov/whd/fmla*, to provide notice of eligibility and rights and responsibilities.

Employers must be responsive to answer questions from employees concerning their FMLA leave.

1066

## DESIGNATION NOTICE REQUIREMENTS

The employer is responsible in all circumstances for designating leave as FMLA-qualifying and giving notice of the designation to the employee. This notice **must**:

- Be provided in writing **within five business days** of having enough information to determine whether the leave is FMLA-qualifying;

- Be provided for each FMLA-qualifying reason per applicable 12-month period (additional notice is required for any changes in the designation information);

- Include the employer's designation determination, and any substitution of paid leave and/or fitness for duty requirements; and

- Provide the amount of leave that is designated and counted against the employee's FMLA entitlement, if known. If the amount of leave is not known at the time of the designation, the employer must provide this information to the employee upon request, but no more often than once in a 30-day period and only if leave was taken in that period.

If the requested leave is not FMLA-qualifying, the notice may be a simple written statement that the leave does not qualify and will not be designated as FMLA leave.

If an employer is unable to determine whether a leave request should be designated as FMLA-protected because a submitted certification is incomplete or insufficient, the employer is required to state in writing what additional information is needed. The employer may use the designation notice to inform the employee that the certification is incomplete or insufficient and identify what information is needed to make the certification complete and sufficient.

Employers may use Form WH-382, which is available at no cost from the WHD website at *www.dol.gov/whd/fmla*, to provide this designation notice.

---

**ALL NOTICES**

*Employers also may be required to provide notices in languages other than English where a significant portion of the employer's workforce is not literate in English.*

*Employers are also required to comply with all applicable requirements under Federal or State law for notices provided to sensory-impaired individuals.*

---

## CONSEQUENCES OF FAILURE TO PROVIDE NOTICE

Failure to follow the notice requirements may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights. *See* Fact Sheet #77B: Protections for Individual under the FMLA. An employer may be liable for compensation and benefits lost by reason of the violation, for other actual monetary losses sustained as a direct result of the violation, and for appropriate equitable or other relief, including employment, reinstatement promotion, or any other relief tailored to the harm suffered.

1067

For additional information, visit the Wage and Hour Division Website, *http://www.wagehour.dol.gov* and/or call our toll-free helpline, 1-866-4-USWAGE (1-866-487-9243) available 8 a.m. to 5 p.m. in your time zone.

This publication is for general information and is not to be considered in the same light as official statements of position contained in the regulations.

**U.S. Department of Labor**                                    **1-866-4-USWAGE**
Frances Perkins Building                                        TTY: 1-866-487-9243
200 Constitution Avenue, NW                                    **Contact Us**
Washington, DC  20210

1068

**Docket No. 55.**

November 10, 2018.

Plaintiff's Motion for Leave to File a Motion for Reconsideration of the Court's Order denying my Request for Supplemental Brief as a response to Defendants' Reply to my Opposition to Defendant's Motion to Dismiss,

the Civil Local Rule 7-9.

1    Tatyana Evgenievna Drevaleva

2    No current home postal address

3    Currently residing in California

4    415-806-9864, tdrevaleva@gmail.com

5    Plaintiff in Pro Per

6

7                    THE UNITED STATES DISTRICT COURT

8                    NORTHERN DISTRICT OF CALIFORNIA

9

10

11                                                    )
                                                      )
12   Tatyana E. Drevaleva                             )    Case No. 3:18-cv-03748
                                                      )
13                                                    )
                      Plaintiff,                      )
14                                                    )
                      vs.                             )
15                                                    )
        1) The U.S. Department of Veterans            )    Motion for Leave to File a Motion for
16         Affairs                                    )
                                                      )    Reconsideration, the Civil Local Rule
17      2) Mr. Robert Wilkie, Acting United           )
           States Secretary of Veterans Affairs      )    7-9.
18         810    Vermont    Avenue,    NW)
           Washington, DC 20420                       )    Judge: Hon. William Alsup
19                                                    )
     Facility: New Mexico VA Healthcare System )
20          1501 San Pedro Drive, S.E.                )
            Albuquerque, NM 87108                     )
21                                                    )
                      Defendant.                      )
22                                                    )
     _____)
23

24          Plaintiff Tatyana Drevaleva herein submits her Motion for Leave to File a Motion for

25   Reconsideration of the Court's Order denying my Request for Supplemental Brief as a response

26   to Defendants' Reply to my Opposition to Defendant's Motion to Dismiss.

27          This Motion is submitted pursuant the Civil Local Rule 7-9.

28          **Introduction.**

Motion for Leave to File a Motion for Reconsideration, case No. 3:18-cv-03748

1070

1   On November 11, 2018, Hon. Judge William Alsip issued the Order denying my request

2   for leave to file a supplemental brief. The Judge reasoned that 1) I already had a chance to

3   present my arguments, 2) I didn't provide new pieces of evidence and a new Opinion of the

4   highest Court which is relevant to my current litigation, and 3) I didn't explain what I wanted to

5   say in my supplemental brief. In this Motion, I will address all these issues.

6   **Statement of Facts.**

7   On November 09, 2018, Defendants filed a Motion to Dismiss which didn't make any

8   sense. In that Motion, Defendants claimed that the District Court doesn't have jurisdiction to

9   judge the Title VII cause of action, that Age is within the scope of Title VII, that I didn't state the

10  claim upon which relief could be granted, etc. I filed both a Motion to Strike and the Opposition.

11  I am sorry for filing a Motion to Strike and mixing up the definition of "a pleading" with the

12  definition of "a motion." English is my second language, and I am not an Attorney. I hope the

13  Court will forgive me for this mistake.

14  However, in their Reply to my Opposition to the Motion to Dismiss, Defendants sounded

15  more reasonable and discussed the issues that they didn't discuss in their original Motion to

16  Dismiss. According to the Civil Local Rule 7-3(d), I didn't have a right to file a response to the

17  reply without the Court's leave. However, I did my research on the case law cited by the

18  Defendants in their Reply, and I feel that I need to discuss the following issues:

19      1)  The Secretary of the Department of Veterans Affairs as a proper Defendant in the
20          ADEA and the Rehab. Act causes of action

21      2)  The Department of Veterans Affairs as a Defendant

22      3)  Why I should not name the United States as a Defendant

23      4)  Whether I have a right to sue the Department of Veterans Affairs (or the United
24          States) under the laws of the State of New Mexico along with the Federal laws

25      5)  Why the Libel cause of action should not be dismissed or preempted, and whether I
26          have a right to sue for Libel under the laws of the State of New Mexico

27      6)  Why my Constitutional claims (the *Bivens* actions) should not be preempted by Title
28          VII, the ADEA, the Rehab. Act, and why I should ask the Court to transfer my

Constitutional claims to the U.S. Court of Federal Claims instead of processing them in the District Court

7) Whether the United States can claim Sovereign immunity for Constitutional violations

8) When the United States can claim Sovereign immunity and when they can not

9) Why the Court should process separately my Pregnancy discrimination cause of action despite the *Brown* rule

10) Why the Court should allow separate damages that have punitive effect for Pregnancy discrimination

11) Whether the District Court should have separate trials for separate causes of action

12) To discuss why the FTCA is not an exclusive remedy for tort claims

13) To present the facts and explanations why Defendants harassed me, and whether I should obtain the Court's leave to file a claim with the Merit Systems Protection Board for harassment (which is Tort) within 2 years

14) My position as a Federal Employee for the purpose of the FMLA

15) Whether I have a right to sue the Agency for the FMLA violation if I am not eligible for the FMLA

16) Whether Attorney General shall certify that Ms. Dunkelberger, Ms. Prince, and Mr. Johnson were Federal employees at the time of the violation for the purpose of substituting them by Defendant the United States

17) Why the Agency violated the AFGE Master Agreement by terminating my probationary employment without a 15 day notice and without giving me the opportunity to be heard

18) Also, I want to provide a new piece of evidence which is a copy of Ms. Dunkelberger's June 2017 letter that she sent to my home postal address in Albuquerque, NM. At my request, a copy of that letter was mailed to my previous address in Monterey, CA.

Motion for Leave to File a Motion for Reconsideration, case No. 3:18-cv-03748

1072

I am sorry that I didn't explain to the Court about these reasons when I filed a Request for Leave to File a Supplemental Brief. To the best of my understanding, I should have obtained the Court's leave and afterwards to present my arguments. However, the Judge didn't understand why I requested the Supplemental brief. I hope I gave my explanations in this Motion.

**Legal Standard**.

Read the Civil Local Rule 7-9(b),

**"Form and Content of Motion for Leave**. A motion for leave to file a motion for reconsideration must be made in accordance with the requirements of Civil L.R. 7-9. The moving party must specifically show reasonable diligence in bringing the motion and one of the following:

(1) That at the time of the motion for leave, a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought. The party also must show that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the interlocutory order; or

(2) The emergence of new material facts or a change of law occurring after the time of such order; or

(3) A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order."

My argument.

1) At the time when I submitted my Request for Leave to File a Supplemental Brief, the Parties didn't submit pieces of evidence. Now, the Parties submitted evidence in their responses to General Order 71, the Opposition to the Motion for Preliminary Injunction, and the Reply to that Opposition

2) When I submitted my Opposition to Defendants' Motion to Dismiss, I didn't know about the case law cited by Ms. Cormier in that Opposition. I am a Plaintiff Pro Se, and I am not an Attorney. After I did my research, I feel that Ms. Cormier put me into the situation when I need to say a lot to the Court but I can't. Therefore, I am

respectfully asking the Court's permission to present my arguments on the issues
stated above. Obviously, Ms. Cormier didn't act in good faith

3) I disagree with Hon. Judge Alsup's reading of the Civil Local Rule 7-3. I understood
that Rule that the Party may file a Supplemental Brief and present new legal
arguments only with the permission of the Judge after the opposing Party filed a
Reply. However, if there are new pieces of evidence in the Reply, the Party may file
a Supplemental Brief without the Court's leave, and the Party may present 5 pages of
objections on the new evidence without presenting new legal arguments. Also, the
Party may file a new Opinion of the highest Court that was published after the Reply
was filed, but the Party can't present any new legal arguments

4) I want to present new legal arguments in my Supplemental Brief. I explained what
these arguments are above. It is up to the Judge to allow me to present my reasoning
before our November 29, 2018 Case Management Conference in order to find the
most effective way to manage my case

5)  According to the Civil Local Rule 7-9(d), no response to my Motion for Leave
should be filed and no hearing should be held. The Judge could decide himself
whether to grant my Motion for Leave.

**Conclusion.**

I am respectfully asking Hon. Judge William Alsup for the permission to file a
Supplemental Brief.

I declare under the penalty of perjury under the Federal laws and the laws on the State of
California that the foregoing is true and correct. Executed at City of San Francisco, CA, on
November 10, 2018.


Respectfully submitted,

Date: November 10, 2018          Sign Name:

                                 Print Name:  Tatyana E. Drevaleva

Motion for Leave to File a Motion for Reconsideration, case No. 3:18-cv-03748

**Docket No. 56.**

November 14, 2018.

ORDER DENYING MOTION FOR RECONSIDERATION.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TATYANA EVGENIEVNA DREVALEVA,

        Plaintiff,

  v.

U. S. DEPARTMENT OF VETERANS
AFFAIRS, and ROBERT WILKIE, Secretary,
U. S. Department of Veteran's Affairs,

        Defendants.

_____/

No. C 18-03748 WHA

**ORDER DENYING MOTION
FOR RECONSIDERATION**

In this *pro se* employment discrimination action, plaintiff moves for reconsideration of the November 2 order denying her request to file supplemental briefing. This order finds no grounds for reconsideration.

Under Civil Local Rule 7-9(b), a party moving for leave to file a motion for reconsideration must show one of the following:

(1) That at the time of the motion for leave, a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought. The party also must show that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the interlocutory order; or

(2) The emergence of new material facts or a change of law occurring after the time of such order; or

(3) A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order.

1       Here, plaintiff has not shown that any of the above three grounds applies in this matter.

2  Instead, plaintiff alleges that defendants' counsel "didn't act in good faith" and that plaintiff did

3  not previously have the chance to review the case law defendants cited in their motion to dismiss

4  prior to filing her opposition.  Moreover, plaintiff already made most of the arguments put forth

5  in her opposition to defendants' motion to dismiss.  Thus, allowing plaintiff to repeat her

6  arguments would violate Local Rule 7-9(c), which states that "[n]o motion for leave to file a

7  motion for reconsideration may repeat any oral or written argument made by the applying party."

8  To the extent plaintiff raises new arguments in this motion, plaintiff is advised that a motion for

9  leave to file a motion for reconsideration is an improper vehicle.

10       Accordingly, plaintiff's motion is **DENIED**.

11

12     **IT IS SO ORDERED.**

13

14  Dated:  November 14, 2018.

15                        WILLIAM ALSUP
                           UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court

For the Northern District of California

2

**Docket No. 57.**

November 19, 2018.

ORDER RE PLAINTIFF'S INQUIRIES.

(denying my request to transfer the lawsuit to the District Court of New Mexico and denying my request to appoint a Counsel.)

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TATYANA EVGENIEVNA DREVALEVA,

          Plaintiff,

  v.

U.S. DEPARTMENT OF VETERANS
AFFAIRS, et al.,

          Defendants.

                               /

No. C 18-03748 WHA

**ORDER RE PLAINTIFF'S
INQUIRIES**

In this *pro se* employment discrimination action, plaintiff has included the following inquiries in her opposition to defendants' motion to dismiss. *First*, plaintiff has inquired as to whether or not it would be proper to transfer her action to "the District Court of New Mexico." *Second*, plaintiff asks whether she should have "free of charge" counsel appointed on her behalf (Dkt. No. 40 at 18). This order addresses each inquiry in turn.

*First*, plaintiff asks for guidance as to whether this action should be maintained in this Court, or whether it should be transferred to the district court in New Mexico. Plaintiff is advised that this inquiry is better suited for the initial case management conference on November 29, however, absent a stipulation, this issue needs to be litigated on a motion basis.

*Second,* plaintiff requests appointment of counsel pursuant to 42 U.S.C. Section 2000e-5(f)(1)(B) (Dkt. No. 40 at 14). Under *Mallard v. United States District Court*, 490 U.S. 296, 304–05 (1989), there is no constitutional right to appointment of counsel in civil

**United States District Court**
For the Northern District of California

1    cases. To determine whether plaintiff is entitled to appointment of counsel under Title VII,

2    the Court must assess: (1) plaintiff's financial resources; (2) plaintiff's efforts to secure

3    counsel; and (3) whether plaintiff's claims have merit. *Bradshawe v. Zoological Soc. of*

4    *San Diego*, 662 F.2d 1301, 1318 (9th Cir. 1981). Plaintiff has not produced evidence of her

5    efforts to secure counsel.

6        Plaintiff is also advised that helpful information is available online at:

7    http://cand.uscourts.gov/proselitigants and also in person at the legal help center.

8    An appointment with the legal help center may be made by calling 415-782-9000,

9    extension 8657. At this time, plaintiff's request for appointment of counsel must be **DENIED**.

10

11        **IT IS SO ORDERED.**

12

13    Dated: November 19, 2018.

                         WILLIAM ALSUP

14                          UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Docket No. 58.**

November 20, 2018.

Drevaleva's Notice of Appeal No. 18-17241

(of the November 19, 2018 Order denying my request to appoint a Counsel.)

Name  Tatyana E. Drevaleva
Address  No current address
City, State, Zip  California
Phone  415-806-9864
Fax
E-Mail  tdrevaleva@gmail.com
☐ FPD  ☐ Appointed  ☐ CJA  ☒ Pro Per  ☐ Retained

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

Tatyana E. Drevaleva

PLAINTIFF(S),

v.

1) The U.S. Department of Veterans Affairs
2) Secretary of the U.S. Department of Veterans Affairs
DEFENDANT(S).

CASE NUMBER:

3:18-cv-03748-WHA

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that _____ Tatyana Evgenievna Drevaleva _____ hereby appeals to
*Name of Appellant*
the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☒ Order (specify):
Denial of Request to Appt a Counsel

☐ Judgment (specify):

☐ Other (specify):

Imposed or Filed on ____November 19, 2018____. Entered on the docket in this action on __November 19, 2018__.

A copy of said judgment or order is attached hereto.

____November 20, 2018____
Date

Tatyana Evgenievna Drevaleva
Signature
☒ Appellant/ProSe  ☐ Counsel for Appellant  ☐ Deputy Clerk

**Note:**  The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party.  Also, if not electronically filed in a criminal case,  the Clerk shall be furnished a sufficient number of copies of the Notice of Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

**NOTICE OF APPEAL**  1082

**Docket No. 59.**

November 21, 2018.

A joint Case Management Statement.

ALEX G. TSE (CABN 152348)
United States Attorney
SARA WINSLOW (DCBN 457643)
Chief, Civil Division
KIMBERLY A. ROBINSON (DCBN 999022)
Assistant United States Attorney

      450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
      Telephone: (415) 436-7298
      FAX: (415) 436-6748
      kimberly.robinson3@usdoj.gov

Attorneys for Defendant U.S. Department of Veterans Affairs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TATAYANA DREVALEVA | No. 3:18-cv-03748-WHA |
| Plaintiff, | JOINT CASE MANAGEMENT STATEMENT |
| v. | Date: November 29, 2018 |
| | Time: 8:00 a.m. |
| U.S. DEPARTMENT OF VETERANS AFFAIRS et al., | Place: Courtroom 12, 19th Floor |
| Defendants. | Honorable William H. Alsup |

The parties submit this JOINT CASE MANAGEMENT STATEMENT & PROPOSED ORDER

pursuant to the _Standing Order for All Judges of the Northern District of California_ and Civil Local

Rule 16-9 and Federal Rule of Civil Procedure 26(f).

The parties note that neither party is adopting any section that is designated as being either plaintiff's or

defendants' (hereafter referred to as "Defendant") views.

1. **JURISDICTION & SERVICE**

Plaintiff's Position

The District Court has jurisdiction over my Complaint because I was retaliated and unlawfully terminated from my job at the Raymond G. Murphy VAMC because:

a) I am a woman and I wanted to have a child (Title VII of the Civil Rights Act of 1964)

b) I was discriminated against my age 50 yo (the Age Discrimination in Employment Act)

c) I was not given reasonable accommodations (Rehabilitation Act of 1973).

Also, the Agency violated my Constitutional rights such as:

a) deprived me liberty and property without the Due Process of law because the Agency had failed to notify me that my request for LWOP was denied under the FMLA, and the Agency didn't give me the opportunity to be heard (the Due Process clause of the Fifth Amendment to the U.S. Constitution)

b) deprived me liberty and property without the Due Process of law because the Agency had failed to give me a 15 day notice and the opportunity to be heard while the Agency terminated my probationary employment thus breaking the AFGE Master Agreement (the Due Process clause of the Fifth Amendment to the U.S. Constitution)

c) The Agency deprived me a Constitutional right to be a parent (First, Fifth, and Ninth Amendments to the U.S. Constitution).

Also, the District Court has jurisdiction because there are two Defendants:

1) The U.S. Department of Veterans Affairs

2) Secretary of the Department of Veterans Affairs.

The venue is proper because, as a Title VII, the ADEA, and the Rehab. Act Plaintiff, I have a right to sue Defendants in any judicial district of the United States.

The Plaintiff is raising the question whether my Title VII, the ADEA, and the Rehab. Act claims should be transferred to the District Court of New Mexico for a Jury trial because all acts of discrimination occurred in that district, and all people who have a personal knowledge of the events and who can testify at the trial as witnesses reside in Albuquerque, NM.

The Plaintiff is also raising the issue of transferring my Constitutional claims to the U.S. Court of Federal Claims because the amount of controversy exceeds $10 thousand U.S. dollars.

The following defendants were timely served:

1) The U.S. Department of Veterans Affairs

2) Secretary of the U.S. Department of Veterans Affairs

3) Attorney General

4) The U.S. Attorney.

Defendant's Position

As set forth in Defendant's Motion to Dismiss (Doc. 34), Defendant believes this Court lacks jurisdiction to consider a number of Plaintiff's claims. Defendant knows of no issues regarding personal jurisdiction or venue, or parties remaining to be served.

**2. FACTS**

Plaintiff's Position

I was hired as a full time Medical Instrument Technician (EKG) at the Raymond G. Murphy VAMC. I started to work on April 02, 2017. I was informed that I would be a probationary employee for one year. On April 18, 2017, Manager of 5D Ms. Dunkelberger informed me about the general policies of leave. I informed her that I would need to go to Russia to perform an IVF procedure. Ms. Dunkelberger said that I would not be eligible to be absent from work under the FMLA because I didn't complete 12 months of service. She also said that I would need to provide her with medical documentation translated into English (I didn't have a right to translate myself) prior to the departure. Also, Ms. Dunkelberger said that she would not be authorized to approve the leave, and the higher Managers would do it.

On approximately May 10, 2017, I approached Ms. Dunkelberger and said that I was running out of hormonal pills that were unavailable in the United States. At that time, I had 10 pills left. I informed Ms. Dunkelberger that I needed to go to Russia to refill a prescription for the pills, and I needed to perform an IVF procedure because I was in registry for a free of charge IVF procedure in Russia, and I couldn't afford to pay $15 thousand U.S. dollars for one IVF attempt in the United States. On that day, I contacted with my Russian OB/GYN and requested medical documentation. I obtained it only in the late

1  evening on May 17, 2017 or in the early morning on May 18, 2017 when I had only three hormonal pills

2  left. I was taking one pill a day, and I couldn't afford to stay in the U.S. for a longer time in order to find

3  a certified translator. I needed 37 hours to get from Albuquerque, NM to Novosibirsk, Russia.

4  On May 17, 2017, Assistant Manager Mr. Johnson verbally allowed me to go to Russia. His exact words

5  were, "If you need to go – go!" He gave me a request form for LWOP which I filled out and put under

6  the door of his office. I notified Mr. Johnson that I authorized my Russian speaking co-worker Mrs.

7  Nadya Das to translate the document while I was looking for a certified translator. I also informed Mrs.

8  Das that Mr. Johnson had verbally allowed me to go to Russia for the IVF procedure.

9  According to the AFGE Master Agreement, I was entitled to Sick Leave for the purpose of pregnancy.

10  However, both Ms. Dunkelberger and Mr. Johnson never informed me about it.

11  I emailed a Russian version of the document on May 18, 2017 at 9.02 AM to Ms. Dunkelberger and Mr.

12  Johnson. On the same day, Mr. Johnson submitted my request for LWOP to Dr. Prince with his

13  comment (which was a Libel) that I didn't provide medical documentation, and he didn't recommend

14  Allean Bonin and Dr. Prince to approve my request for LWOP. Both Allean Bonin and Dr. Prince

15  disapproved my request for LWOP and didn't state the reason why they did it.

16      On May 30, 2017, I emailed a translated version of my medical document to both Ms.

17  Dunkelberger and Mr. Johnson. I never heard back from them.

18  Also, Ms. Dunkelberger claimed that I came to her office on May 25, 2017 to discuss my trip to Russia

19  for the IVF procedure. This was a Libel because on that day I was in Russia.

20  On June 12, 2017, Ms. Dunkelberger mailed me a letter to my home postal address in Albuquerque, NM

21  saying that I didn't provide medical documentation (which was a Libel) and informing me that Dr.

22  Prince denied my request for LWOP. Ms. Dunkelberger asked me to return to work immediately,

23  otherwise she threatened to fire me. Ms. Dunkelberger knew very well that I would not be able to

24  receive that letter because I was in Russia. Ms. Dunkelberger never requested my home postal address in

25  Russia, never informed me via email that Dr. Prince had denied my request for LWOP, and never

26  requested my phone number to call me. Both Ms. Dunkelberger and Mr. Johnson never answered my

27  emails where I described what I was doing in Russia for the purposes of medical examination and the

28  actual IVF attempt.

JOINT CASE MANAGEMENT STATEMENT                    4
3:18-cv-03748-WHA

1087

On June 30, 2017, Ms. Dunkelberger fired me. Ms. Dunkelberger broke the AFGE Master Agreement because she didn't provide me with a 15 day notice and didn't give me an opportunity to be heard.

During the September 07, 2017 Mediation, Ms. Dunkelberger acknowledged that she had fired me with Dr. Prince's recommendation. She said that she had fired me because I didn't respond her June 12, 2017 letter and didn't return back to work.

To substitute me, Ms. Dunkelberger hired two young (30 and 35 yo) male Monitor Technicians who will not have problems with pregnancy.

The Agency lied to the Employment Development Department that I had been fired for cause, and I didn't receive Unemployment Insurance benefits.

The Agency lied to the Minneapolis VAMC that I had negligently failed to request LWOP, and my full time employment offer `at the Minneapolis VAMC was cancelled in 2018.

Now, the Agency denies retaliation and claims that it fired me for my failure to request LWOP.

The Agency opposed my Motion for Preliminary Injunction where I asked the Court to immediately reinstate me back to work. The Agency attempted to justify its retaliatory activity and said that I was a probationary employee, that I would not work for the Agency because I would request multiple absences from work for my attempts to have a baby, and it is in the best interest of the Agency not to reinstate me back to work because the public consequences could be significant.

Defendant's Position

Plaintiff was hired by the Raymond G. Murphy Veterans Affairs Medical Center ("VAMC") in Albuquerque, New Mexico to serve as a medical technician. Her status at all relevant times was probationary. After working at the VAMC for about a month and a half, Plaintiff requested leave without pay ("LWOP") and travelled to Russia. Plaintiff planned to undergo an In-Vitro Fertilization ("IVF"). Plaintiff was informed by her supervisor about the LWOP procedures, including that she needed to obtain documentation in English of the reason for her departure to Russia. She did not provide this documentation prior to her departure.

While in Russia, Plaintiff emailed a translated document from her Russian OB/GYN explaining that she was in the Russian registry to receive an IVF procedure. Plaintiff updated her supervisors on

1  her IVF procedure by email and informed them that she was staying in Russia a month longer than

2  originally predicted.  Plaintiff requested additional time off, and her supervisor replied stating that

3  Plaintiff had been let go.  Notification of her dismissal had been sent to her home address, per agency

4  procedures.  Plaintiff returned to the United States after remaining in Russia for another month.

5       In a mediation proceeding, Plaintiff learned that her supervisor submitted her LWOP request to

6  the Director of Nursing Services, who denied her request under the Family Medical Leave Act

7  ("FMLA"), because she did not qualify for leave under the FMLA, which requires the employee to have

8  worked for the employer for at least one year.  The supervisor explained that a letter stating Plaintiff's

9  leave was denied was mailed to her home and could not be emailed to Plaintiff in Russia because it was

10 against VAMC policy.  After the VAMC refused to reinstate her, Plaintiff alleges that she learned that

11 the VAMC hired two younger male monitor technicians. This led Plaintiff to file claims for pregnancy

12 discrimination, sex discrimination, age discrimination, and disability discrimination against the VAMC.

13      Plaintiff moved from New Mexico to California, where she allegedly applied for Unemployment

14 Insurance benefits.  She did not receive the benefits because the Employment Development Department

15 ("EDD") learned that Plaintiff was let go for cause.  Plaintiff alleges the VAMC committed libel when

16 her supervisor told the EDD that she was discharged for cause because she traveled to Russia without

17 approved leave.  Plaintiff alleges the VAMC intentionally caused her emotional distress by relieving her

18 of her position at the VAMC and depriving her of the opportunity to have children.  Finally, Plaintiff

19 alleges the VAMC deprived her of liberty or property in violation of the Fifth Amendment of the United

20 States Constitution.  She claims the VAMC deprived her of the liberty to work and of any property she

21 would have purchased if she was still employed at the VAMC.

22 3. **LEGAL ISSUES**

23 Plaintiff's Position

24     1)  Title VII – sex discrimination

25     2)  I am proposing to have a separate cause of action Pregnancy discrimination despite the *Brown*

26         rule

27     3)  The ADEA – age discrimination

28     4)  The Rehab. Act of 1973 – failure to provide me with reasonable accommodations

1089

5) IIED - Intentional Infliction of Emotional Distress

6) Libel under *Vidrine v. United States*

7) Constitutional violations:

Defendant's Position

   Plaintiff has asked this Court to determine whether her discharge from the VAMC constitutes a violation of: Title VII, the Age Discrimination Employment Act, the Rehabilitation Act, and her constitutional due process rights. She has also asked this Court to determine if the Defendant committed the tort of libel and whether she has stated a claim for intentional infliction of emotional distress. As discussed in Defendant's motion to dismiss, Defendant believes that Plaintiff's complaint should be dismissed for failure to comply with Rule 10. Further, Defendant believes that Plaintiff's fifth, sixth, and seventh causes of action (claims of libel, intentional infliction of emotional distress, and constitutional due process violations, respectively) should be dismissed without leave to amend because Title VII of the Civil Rights Act is Plaintiff's exclusive remedy for the conduct about which she complains. Defendant also believes that Plaintiff's Federal Tort Claims Act ("FTCA") claims are barred because the government has not waived sovereign immunity. Defendant also moves to dismiss the Department of Veterans Affairs as a defendant because the agency cannot itself be sued. Finally, Defendant moves to strike Plaintiff's prayer for punitive damages, which are unrecoverable under Title VII or the FTCA. If Defendant's motion is granted and Plaintiff files a proper amended complaint, the only remaining claims will be those brought under Title VII, the Age Discrimination in Employment Act, and the Rehabilitation Act.

4. **MOTIONS**

Plaintiff's Position

Plaintiff filed:

a) an Opposition to Defendants' Motion to Dismiss - pending

b) a Motion for Preliminary Injunction and a Reply to Defendants' Opposition - pending

c) A Motion to Strike and the Reply to Defendants' Opposition - pending

d) A Request for Supplemental Brief and a Reply to Defendants' Opposition - denied

e) A Motion for Leave to File a Motion for Reconsideration – denied.

1    Plaintiff anticipates to file the following Motions:

2       a) Motion for Judgment on the pleadings

3       b) Certification for obtaining a temporary restraining Order under FRCP Rule 65(b) to prohibit

4           Defendants to distribute a Libel that I was fired for cause

5       c) Motion to transfer my Constitutional claims to the U.S. Court of Federal Claims.

6    <u>Defendant's Position</u>

7        Plaintiff has filed a number of motions now pending before the Court.  These include a Motion to

8    Strike Defendants' Motion to Dismiss (Doc. 38); a Motion for Preliminary Injunction (Doc. 39); a

9    Motion for Leave to File Supplement Brief (Doc. 42); and a Motion for Leave to File a Motion for

10   Reconsideration. (Doc. 55).   The Court has denied the latter two motions, Docs. 42 and 55.  Defendant

11   has filed a Motion to Dismiss (Doc. 34), an opposition to Plaintiff's Motion to Strike (Doc. 44), and an

12   opposition to Plaintiff's Motion for Preliminary Injunctive Relief (Doc. 50).  Defendant anticipates

13   filing a motion for summary judgment after some discovery.

14   5. **<u>AMENDMENT OF PLEADINGS</u>**

15   <u>Plaintiff's Position</u>

16        The Plaintiff respectfully asks the Court to strike the FTCA allegation and the ADA allegation

17   from the Complaint. During the Case Management Conference, the Plaintiff will ask the Court to

18   determine whether I am eligible to sue Defendants for Libel under the law of the State of New Mexico.

19   During the Case Management Conference, the Plaintiff will ask for the Court's leave to file a claim with

20   the Merit Systems Protection Board for Harassment (which is a Tort). After being fired, the Plaintiff was

21   given an opportunity to file just one claim, and I elected to proceed with the EEO. However, Harassment

22   is outside of the scope of EEO, and it should be processed separately.  Possibly, the Plaintiff will also

23   ask for the Court's leave to file a claim with the Merit Systems Protection Board for Libel.

24    <u>Defendant's Position</u>

25        There has been no amendment to date.

26   6. **<u>EVIDENCE PRESERVATION</u>**

27   <u>Plaintiff's Position</u>

28

1  The Parties submitted their responses to General Order 71.  The Plaintiff believes that the

2  Defendant has the Electronically Stored Information that the Plaintiff would need additionally to

3  Defendant's response to General Order 71. This information includes copies of emails between the

4  VAMC officials regarding terminating of my employment. To the best of my knowledge, I don't possess

5  the Electronically Stored Information that the Defendant would need additionally to my response to

6  General Order 71.  The Plaintiff certifies that the Party met and conferred over the phone on November

7  08, 2018.

8  Defendant's Position

9  Defendant certifies that it has reviewed the Guidelines Relating to the Discovery of

10  Electronically Stored Information and hereby confirms that it has met and conferred pursuant to Fed. R.

11  Civ. P. 26(f) regarding reasonable and proportionate steps taken to preserve evidence relevant to issues

12  reasonably evident in this action.

13  7. **DISCLOSURES**

14  Plaintiff's Position

15  The Parties timely submitted their responses to General Order 71 which supersedes the

16  requirements for the initial disclosures set forth in FRCP Rule 26.

17  The Plaintiff submitted the following documents:

18  a)  A full time employment offer from the Raymond G. Murphy VAMC

19  b)  The documentation from EDD about my Unemployment Insurance claim

20  c)  The copy of Plaintiff's correspondence with the Minneapolis VAMC and the Los Angeles

21  VAMC about the denial of job opportunities

22  d)  Copies of Plaintiff's earnings

23  e)  Copies of Plaintiff's time sheets while working as a Janitor at Monterey County

24  f)  Job search efforts

25  g)  Plaintiff's current Resume, Letters of Reference, and Performance Evaluation

26  Defendant's Position

27  The parties produced their GO 71 disclosures on November 8, 2018.

28  8. **DISCOVERY**

JOINT CASE MANAGEMENT STATEMENT                    9
3:18-cv-03748-WHA

1092

1  Plaintiff's Position

2  The Plaintiff anticipates the following Discovery:

3      1)  Depositing Mr. Johnson and asking him whether he gave me his verbal permission to go

4          to Russia for IVF

5      2)  Depositing Mrs. Das and asking whether she confirms that she witnessed that I received

6          my medical documentation only late evening on May 17, 2017 or early morning on May

7          18, 2017. Also, asking Mrs. Das whether I told her that Mr. Johnson had verbally allowed

8          me to go to Russia for IVF

9      3)  Depositing Mrs. Chelsea Casey and asking her whether I told her that Mr. Johnson had

10         verbally allowed me to go to Russia for IVF. Also, asking Mrs. Casey to confirm the fact

11         that Ms. Dunkelberger called her five times when she wanted to hire and retain her. In

12         contrast, Ms. Dunkelberger didn't call me even one time when she was considering to

13         terminate my employment because I wanted to have a baby

14     4)  Depositing Mrs. Michele Tirado and asking whether I told her that Mr. Johnson had

15         verbally allowed me to go to Russia for IVF. Also, asking Mrs. Tirado to confirm that I

16         had an email exchange with her when I was in Russia

17     5)  Depositing Melanie (I don't know her last name) and asking her whether Ms.

18         Dunkelberger allowed her to work at 5D once a month while Melanie was studying to

19         become a Registered Nurse. In contrast, Ms. Dunkelberger fired me for being absent for

20         more than one month because I wanted to have a baby

21     6)  Obtaining copies of all emails within the VAMC regarding the termination of my

22         employment.

23  Defendant's Position

24         Defendant believes that a discovery schedule is best discussed after Defendant's motion to

25  dismiss has been decided, as the issues in this case will potentially be narrowed following this

26  Court's ruling.  Accordingly, Defendant reserves the right to revisit scheduling issues at that later

27  date.  Once the case proceeds, Defendant expects to conduct written discovery and to take

28  depositions—both within the limits of the Federal Rules of Civil Procedure.

9. **CLASS ACTIONS**

Not applicable.

10. **RELATED CASES**

Plaintiff's Position

     An EEO claim is pending against the Minneapolis VAMC for cancelling my full time employment offer.

An EEO claim is pending against the Los Angeles VAMC for failure to hire me.

Defendant's Position

     There is no known related federal district court case.

11. **RELIEF**

Plaintiff's Position

**Part 1**. IMMEDIATE reinstatement to work for a full time permanent position with all benefits (medical, dental, vision, thrift savings plan 401k, flexible spending account, life insurance, sick leave, paid vacation, eligibility under the FMLA, and other benefits I am eligible to as a permanent full time employee) at any VAMC.

**Part 2.** Promotion – hiring for a higher paying position.

**Part 3.** Waiving my probationary period.

**Part 4.** Ordering the VA to pay for my education. When Ms. Dunkelberger hired me, she said that the VA would pay for my education after I work for more than one year. Because Ms. Dunkelberger discriminated me and fired me, the VA must pay for my education without waiting for one year because I've been unemployed for 1.5 years since I was fired.

**Part 5. Back Pay** is available under Title VII, the ADEA, and the Rehab. Act. Once the plaintiff establishes that unlawful discrimination caused her loss, she is entitled to back pay. See *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 417-18 (1975) (holding that back pay should be denied only in unusual circumstances where the award would frustrate the statutory purpose of eradicating discrimination and making victims whole).

**Elements of the Back Pay award.**

    1)  Wages and Salary.

The plaintiff bears the burden of establishing the value of her lost salary, but the plaintiff is not required to establish the exact dollar amount. See *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 156 (3d Cir. 1999) (holding that "uncertainties [in the calculation of back pay] are resolved against a discriminating employer"). The plaintiff may also recover overtime, <u>shift differentials</u>, commissions, tips, <u>cost-of-living increases</u>, <u>merit increases</u>, and <u>raises due to promotion</u> by showing that she would have earned those items absent discrimination. See, e.g., *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1563 (11th Cir. 1986).

2) <u>Fringe benefits.</u>

Similarly, the plaintiff bears the burden of proof for claims for fringe benefits, such as vacation pay, pension and retirement benefits, stock options and bonus plans, savings plan contributions, cafeteria plan benefits, profit-sharing benefits, and medical and life insurance benefits. The plaintiff must demonstrate her entitlement to and the value of such benefits with reasonable certainty. *Vaughn v. Sabine Cnty.*, 104 F. App'x. 980, 985 (5th Cir. 2004) (a jury may consider the value of employee benefits in making a back pay determination so long as evidence in the record supports a calculation). When the employee would have been obligated to pay part of the cost of benefits, that portion of the cost may reduce the back pay award.

3) <u>Pre-Judgment Interest.</u>

The Supreme Court established a strong presumption that prejudgment interest on back-pay awards should be granted in employment discrimination cases. See *Loeffler v. Frank*, 486 U.S. 549, 557-58 (1988) ("Prejudgment interest may be awarded in a suit against the Postal Service brought under Title VII.").

4) <u>Negative Tax Consequences.</u>

To receive additional back pay to compensate the increased tax liability of a lump-sum back pay in a single year, the plaintiff need to prove the amount of increased income tax burden. See *O'Neill v. Sears, Roebuck & Co.*, 108 F. Supp. 2d 443, 447 (E.D. Pa. 2000) (allowing the recovery of the increased tax liability from the lump sum award of back pay and front pay where expert testimony was provided specifying the award's tax consequences).

The period of recovery for back pay awards. Back pay is generally awarded from the occurrence of the alleged discrimination until the harm suffered by the plaintiff is redressed. See *Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986). The plaintiff must demonstrate the amount of economic harm she has suffered as a result of the alleged discrimination. I am requesting the back pay award from May 18, 2017 to the moment when I am reinstated back to work.

**Part 6. Front Pay.**

Front pay compensates the plaintiff for the future effects of discrimination when reinstatement would be an appropriate, but not feasible, remedy or for the estimated length of the interim period before the plaintiff could return to her former position. See *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 850 (2001); see, e.g., *Donlin v. Philips Lighting N. Am. Corp.,* 581 F.3d 73, 87-88 (3d Cir. 2009) (affirming the award of 10-year front-pay to a temporary employee who was not offered a permanent position because of unlawful sex discrimination). I am requesting the Front Pay at the amount of the Jury's discretion.

**Part 7. Compensatory damages.**

1) Title VII.

I am requesting $300,000.00 00 for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses" as described in 42 U.S. Code § 1981a(b)(3). The cap on damages recoverable under Title VII does not limit front pay, which is not compensatory damages, or recovery under state antidiscrimination statutes. See *Pollard*, 532 U.S. at 852).

2) The ADEA.

I am requesting liquidated damages in the amount of both back pay, front pay, and benefits.

Under the ADEA, the court must award liquidated damages once the plaintiff established that the employer's willful violations. See *Tyler v. Union Oil Co. of Cal.,* 304 F.3d 379, 398 (5th Cir. 2002). The ADEA allows an award of damages only for pecuniary benefits connected to the job, but not for compensatory damages for mental anguish, pain, suffering, humiliation, and loss of employment. *Collazo v. Nicholson*, 535 F.3d 41, 44-45 (5th Cir. 2008).

3) The Rehabilitation Act of 1973.

1    Damages for emotional distress are available under *Sheely v. MRI Radiology Network*, P.A., 2007

2    WL 3087215, at *18 (11th Cir. Oct. 24, 2007). I am asking the Court to impose damages for

3    emotional distress at the amount of the Jury's discretion.

4    Damages for emotional distress must be supported by competent evidence of genuine injury, but

5    medical evidence is not necessary. *Heaton v. Weitz Co*., 534 F.3d 882, 891 (8th Cir. 2008); see

6    *Rodriguez-Torres v. Caribbean Forms Mfr., Inc*., 339 F.3d 52, 63-64

7    (1st Cir. 2005) (noting that expert medical testimony is not a prerequisite for an emotional distress

8    award). The plaintiff's testimony may be sufficient so long as she offers specific facts as to the

9    nature of her claimed emotional distress and as to the causal connection to the employer's alleged

10   violation. Id.; *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 546-47 (4th Cir. 2003).

11   The employer is liable for all harms it inflicted upon an eggshell plaintiff. See *EEOC v. AIC Sec.*

12   *Investigations,* Ltd., 55 F.3d 1276, 1286 (7th Cir. 1995)

13   **Part 8. Five million U.S. dollars for future medical expenses for Pregnancy discrimination despite**

14   **the *Brown* rule.** The Agency put me into the situation where I don't know whether I still have fertile eggs

15   at the age of 53 yo. The Agency put me into the situation where I need to think about purchasing donor's

16   sperm, donor's eggs, and to hire surrogate Moms. I also need money for my own medical examination

17   and treatment if I still have fertile eggs and I am eligible for future IVF attempts.

18   **Part 9. "Damages awards that may have a punitive effect"** under *Molzof v. United States,* The U.S.

19   Supreme Court, No. 90-838 (1992) in the amount determined by the Jury for pregnancy discrimination.

20   The VAMC deprived me an opportunity to work in my professional field, to earn money, to purchase a

21   car, a house, to get education and a higher paid job, to hire a surrogate Mom for my embryo, and to go to

22   Russia for other IVF attempts. Now, I am at the age of 52 yo. I don't know whether I have eggs that are

23   fertile. I feel that the VAMC committed the most horrible crime ever possible – deprived me an

24   opportunity to have children using my own genetic material. Therefore, I am requesting this amount of

25   money additionally to the damages described above.

26   **Part 10. "Damages for reputation, emotional distress, mental anguish, loss of enjoyment of life, and**

27   **humiliation; loss of consortium as results of Libel"** under *Vidrine v. United States* in the amount of 2

28   million U.S. dollars. This amount is close to the amount awarded in *Vidrine*.

**Part 11. Attorney's Fees** available under Title VII.

**Part 12. Costs.** The VA must pay all costs related to this litigation including the cost of relocation to my new place of work and the cost of renting a place of living for a few months after I am reinstated back to work.

**Part 13.** If the Jury finds that I was discriminated against my sex and against my desire to have a baby, I will request the Trial Court to put Defendants in prison according to Title XI of the Civil Rights Act of 1964 for more than six months.

Defendant's Position

 According to the prayer for relief in her Complaint, Plaintiff seeks the following relief: Reinstatement, back pay, compensatory damages of five million dollars, attorney's fees, and punitive damages for libel in the amount of two million dollars. Defendant asserts that Plaintiff is not entitled to any relief whatsoever.

12. **SETTLEMENT AND ADR**

Plaintiff's Position

 The Parties agreed to have ADR with a Magistrate Judge. Currently, the Parties are waiting for the Honorable Judge Alsup's Order regarding VA's Motion to Dismiss. If my Complaint survives this Motion, the Parties will schedule an ASDR session with the Magistrate Judge.

Defendant's Position

 Though Defendant doubts the utility of ADR for this case, if ADR is required, Defendant believes that the most effective form of ADR is likely to be a settlement conference with a Magistrate Judge.

13. **CONSENT TO MAGISTRATE JUDGE FOR ALL PURPOSES**

Plaintiff's Position

The Plaintiff does not and will not consent to the Magistrate jurisdiction.

Defendant's Position

Defendant would consent to a magistrate judge but has not yet done so due to Plaintiff's declination.

14. **OTHER REFERENCES**

Plaintiff's Position

The case is not suitable to binding arbitration because the Plaintiff is entitled to a speedy Jury trial according to Title VII and to the Seventh Amendment to the U.S. Constitution. The Plaintiff is unaware whether the case is suitable for a special master or the Judicial Panel on Multidistrict Litigation.

Defendant's Position

None at this time.

15. **NARROWING OF ISSUES**

Plaintiff's Position

I want to bifurcate my Complaint:

1) I want to transfer my Constitutional claims to the U.S. Court of Federal Claims
2) I want to obtain the Court's leave to undergo a process with the Merit Systems Protection Board for Harassment
3) I want to obtain the Judge's Order whether I am eligible to sue the Defendants under the laws of the State of New Mexico for Libel
4) To the best of my knowledge, Defendants want to dismiss my Complaint by filing a Motion for Summary Judgment. Currently, they are seeking to imbed Age within Title VII, to deny my Rehabilitation Act claim, and they are seeking to dismiss my Libel, IIED, and Constitutional claims without leave to amend.

The issues that could be narrowed by an agreement are – copies of all emails between the VA executives regarding the termination of my employment. These emails will demonstrate who exactly was responsible for termination of my employment and when.

Defendant's Position

Defendant's pending motion to dismiss is likely to narrow the issues. Defendant does not anticipate further narrowing of issues until its anticipated motion for summary judgment.

16. **EXPEDITED TRIAL PROCEDURE**

Plaintiff's Position

This is the type of case that requires a Jury trial ASAP. I don't believe that Defendants will agree to stipulate with me regarding the Expedited Trial Procedure of General Order 64, Attachment A now because they are ultimately seeking to dismiss my Complaint in its entirety. If my Complaint survives

1  the Motion to Dismiss and a Motion for Summary Judgment, I will attempt to stipulate with the

2  defendants regarding the Expedited Trial Procedure of General Order 64, Attachment A.

3  <u>Defendant's Position</u>

4      Defendant does not believe the Expedited Trial Procedure Order No. 64 Attachment A is

5  appropriate for this case.

6  17. **SCHEDULING**

7  <u>Plaintiff's Position</u>

8      Defendants want to escape from liability, and they want to dismiss my Complaint. Let us wait for

9  the Case Management Conference and for the Court's Orders on the pending Motions.

10  <u>Defendant's Position</u>

11      Defendant believes that scheduling is best determined after the ruling on the motion to dismiss

12  for the reasons stated above.  Nevertheless, if the Court wishes to set a schedule now, Defendant

13  proposes the following:

| Event | Date |
|---|---|
| Fact Discovery Cut-off | July 19, 2019 |
| Designation of Expert Witnesses | August 16, 2019 |
| Rebuttal Expert Disclosures | September 13, 2019 |
| Expert Discovery Cut-off | September 27, 2019 |
| Last Day to Hear Dispositive Motions | November 20, 2019 |
| Pretrial Conference | To be determined |
| Trial Date | January 2020 |

23  18. **TRIAL**

24  <u>Plaintiff's Position</u>

25      I am entitled to a Jury trial according to Title VII and the Seventh Amendment to the U.S.

26  Constitution. I don't know what the length of the trial will be.

27  <u>Defendant's Position</u>

28

JOINT CASE MANAGEMENT STATEMENT         17
3:18-cv-03748-WHA

1100

Plaintiff has requested a jury trial. Defendant believes that this case will be disposed of on a motion for summary judgment. However, should any jury issues survive, Defendant believes the trial would take approximately two court days.

19. **DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS**

Plaintiff's Position

I don't have interested entities or persons.

The Civil Local Rule 3-15 doesn't apply to any governmental entity or its agencies.

Defendant's Position

As a governmental agency, Defendant is exempt from the disclosure requirements of Civil Local Rule 3-15.

**20. PROFESSIONAL CONDUCT**

Plaintiff's Position

I am not a lawyer but I got familiarized with the Guidelines for Professional Conduct for the Northern District of California.

Defendant's Position

Defendant's counsel has reviewed the Guidelines for Professional Conduct for the Northern District of California.

21. **OTHER**

Plaintiff's Position

The Defendants failed to issue the Determination and refused to conduct Arbitration. The Defendants filed a Motion to Dismiss my Complaint, and they are anticipating to file a Motion for Summary Judgment. Before we get the Court's Order on these Motions, it is early to talk about a speedy trial.

Defendant's Position

No other issues at this time.

Dated: 11/21/18

/s/ Tatyana Drevaleva
Plaintiff

** Pursuant to Civ. L.R. 5-1(i)(3), the filer of the document has obtained approval from this signatory.

Dated: 11/21/18

/s/ Kimberly Robinson
Counsel for Defendant

## **CASE MANAGEMENT ORDER**

The above JOINT CASE MANAGEMENT STATEMENT & PROPOSED ORDER is approved as the Case Management Order for this case and all parties shall comply with its provisions. [In addition, the Court makes the further orders stated below:]

IT IS SO ORDERED.

Dated:

_____

UNITED STATES DISTRICT COURT JUDGE

**Docket No. 60.**

November 22, 2018.

Drevaleva's Notice of Motion; Motion to Transfer my Complaint to the U.S. Supreme Court under Article III, Section 2 of the U.S. Constitution; Memorandum of Points and Authorities; Declaration;

Exhibits,

Beginning.

1   Tatyana Evgenievna Drevaleva

2   No current home postal address, no mailing address

3   Currently residing in California

4   415-806-9864, tdrevaleva@gmail.com

5   Plaintiff in Pro Per

6

7                 THE UNITED STATES DISTRICT COURT

8                 NORTHERN DISTRICT OF CALIFORNIA

9

10

11                                              )
                                                )
12   Tatyana E. Drevaleva                        )      Case No. 3:2018cv03748
                                                )
13                                              )
                Plaintiff,                       )
14                                              )      Notice of Motion; Motion to Transfer my
                  vs.                            )
15                                              )      Complaint to the U.S. Supreme Court
      1) The U.S. Department of Veterans)
16        Affairs                                )      under Article III, Section 2 of the U.S.
                                                )
17      2) Mr. Robert Wilkie, Acting United)      Constitution; Memorandum of Points and
          States Secretary of Veterans Affairs   )
18        810    Vermont    Avenue,    NW)        Authorities; Declaration.
          Washington, DC  20420                  )
19                                              )
      Facility: New Mexico VA Healthcare System )
20        1501 San Pedro Drive, S.E.             )      Date: January 17, 2019
          Albuquerque, NM 87108                  )
21                                              )      Time: 8.00 AM
                Defendant.                        )
22                                              )      Location: Courtroom 12, 19th Floor
                                                )
23                                              )      Judge: Hon. William Alsup
                                                )
24                                              )
                                                )
25   _____)

26            TO THE HONORABLE COURT, ALL PARTIES, AND COUNSEL ON RECORD.

27

28                                   Page **1** of **7**

     Motion to Transfer my Complaint to the U.S. Supreme Court, case No. 3:2018cv03748

1104

1. NOTICE IS HEREBY GIVEN that on 01/17/2018 at 8.00AM or as soon thereafter as the matter may be heard in Courtroom 12, the 19th Floor of The United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA, 94102, Plaintiff Tatyana E. Drevaleva will move the Court to transfer my Complaint to the U.S. Supreme Court under Article III, Section 2 of the U.S. Constitution

2. Said Motion shall be based on this Notice, the attached Motion to Strike Defendants' motion to Dismiss, the attached Memorandum of Points and Authorities, the attached Declaration, the pleadings and papers on file, and on such additional maters as may be presented to the Court prior to or at the hearing.

Dated: November 22, 2018           Signed: Tatyana Drevaleva

## MEMORANDUM OF POINTS AND AUTHORITIES

**3. Introduction.**

4. The Legislature still hasn't passed any law that directs the U.S. Courts to rule on Pregnancy Discrimination in Federal employment. Plaintiff Tatyana Drevaleva is suffering from unemployment, Libel, emotional distress, the absence of money, and the absence of an opportunity to get employment in my field. Plaintiff is seeking for the quickest resolution of my Complaint, and therefore is asking to transfer my Complaint to the U.S. Supreme Court under Article III, Section 2 of the U.S. Constitution.

**5. Statement of Facts.**

6. I was discriminated and unlawfully terminated from my full time job at the Raymond G. Murphy VAMC for my sex (I am a female), my desire to have a child (Pregnancy

Motion to Transfer my Complaint to the U.S. Supreme Court, case No. 3:2018cv03748

1105

discrimination), for my age 50 yo, and for my disability (I was temporarily unable to perform my job as a Medical Instrument Technician because I needed to take a time off for my trip to Russia to perform an IVF procedure.) I alleged that the U.S. Department of Veterans Affairs violated Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e-16), The Age Discrimination in Employment Act (29 U.S. Code § 633a), and The Rehabilitation Act of 1973 (29 U.S.C. § 701.) I asked the Court to allow me to maintain my Pregnancy Discrimination cause of action despite the *Brown* rule. Also, I asked the Court to figure it out whether to maintain my Complaint in Northern California or to transfer it to the District Court of New Mexico where the discrimination occurred. Hon. Judge William Alsup issued an Order asking the Parties to discuss the possibility of transferring the case to New Mexico on a Motion basis.

7. **Legal Standard**.

8. Defendants moved to dismiss my Complaint, cited both *Brown v. General Servs. Admin.*, 425 U.S. 820, 828-829, 835 (1976) and *White v. General Services Administration*, 652 F.2d 913, 916-17 (9th Cir. 1981), and said that Title VII is an exclusive remedy for the discrimination complaints. Defendants asked the Court to strike all other causes of action excepting Title VII.

9. However, defendants are incorrect. In *Brown*, a Negro Plaintiff alleged racial discrimination and untimely filed a Complaint under Section 717(c). In *Brown*, the U.S. Supreme Court held, "Section 717 provides the exclusive judicial remedy for claims of discrimination in federal employment."

10. In *White,* the Plaintiff also alleged racial discrimination. Read *White* (9th Circuit), "In addition to his Title VII claim, White asserted claims under 42 U.S.C. § 1981, 1983, 1985, 1986, 1988, 2000d and the Constitution. Before trial the magistrate ruled that Title VII was the exclusive remedy available to a federal employee alleging job-

Motion to Transfer my Complaint to the U.S. Supreme Court, case No. 3:2018cv03748

related racial discrimination. He therefore recommended that the district court dismiss all claims other than those based on 42 U.S.C. § 2000e-16."

11. However, I realized that neither *Brown* nor *White* apply to my Complaint. Read the Opinion expressed by the Chief Justice of the U.S. Supreme Court Hon. William Rehnquist in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 63–64 (1986), "The prohibition against discrimination based on sex was added to Title VII at the last minute on the floor of the House of Representatives. 110 Cong.Rec. 2577-2584 (1964). The principal argument in opposition to the amendment was that "sex discrimination" was sufficiently different from other types of discrimination that it ought to receive separate legislative treatment. See id. at 2577 (statement of Rep. Celler quoting letter from United States Department of Labor); id. at 2584 (statement of Rep. Green). This argument was defeated, the bill quickly passed as amended, and we are left with little legislative history to guide us in interpreting the Act's prohibition against discrimination based on "sex."

12. Source: https://supreme.justia.com/cases/federal/us/477/57/

13. I found an Opinion of the U.S. Supreme Court (Hon. Justice W. Rehnquist) that Pregnancy Discrimination does not fall into the scope of Title VII.

14. In 1976, in *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), the Supreme Court confronted the question of whether pregnancy discrimination qualified as discrimination "because of sex" under Title VII of the 1964 Civil Rights Act. The Court concluded that "[t]he legislative history of Title VII's prohibition of sex discrimination[,] . . . notable primarily for its brevity," shed little light on this question. In place of legislative history, the Court turned to "tradition" for guidance in interpreting the statute. "Traditionally," the Court asserted, discrimination was defined as the division of individuals into two groups on the basis of a protected trait — as when Jim Crow laws reserved some water fountains for whites and others for blacks. Thus, the Court reasoned that an employment practice would not have been

Motion to Transfer my Complaint to the U.S. Supreme Court, case No. 3:2018cv03748

considered discrimination "because of sex," circa 1964, unless it divided men and women into two groups, perfectly differentiated along biological sex lines. The Court suggested that to interpret Title VII's sex provision in any other way would be "to depart from the longstanding meaning of 'discrimination,'" which must have guided Congress when it passed the Civil Rights Act. Pledging deference to the legislature, and fidelity to tradition, the Court held in *Gilbert* that pregnancy discrimination did not constitute discrimination "because of sex" because it did not fall within the longstanding parameters of that term."

Source: https://web.law.columbia.edu/sites/default/files/microsites/law-theory-workshop/files/FranklinInventing.pdf

15. Read *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), "*Geduldig* established the proposition that a pregnancy classification [429 U.S. 125, 149]  standing alone cannot be said to fall into the category of classifications that rest explicitly on "gender as such," 417 U.S., at 496 n. 20."

16. Source: https://caselaw.findlaw.com/us-supreme-court/429/125.html

17. Also, see *Geduldig v. Aiello*, 417 U.S. 484 (1974), "Disabilities caused by pregnancy, however, like other physically disabling conditions covered by the Code, require medical care, often include hospitalization, anesthesia and surgical procedures, and may involve genuine risk to life. Moreover, the economic effects [417 U.S. 484, 501] caused by pregnancy-related disabilities are functionally indistinguishable from the effects caused by any other disability: wages are lost due to a physical inability to work, and medical expenses are incurred for the delivery of the child and for postpartum care."

18. Footnote 8. "However, "[i]t is important to remember, especially in the cost context, that if an employee is being paid his regular pay while disabled, he cannot collect disability pay. Therefore, it follows that any alleged financial burden on the State will be greatly diminished when employers adhere to Title VII and treat pregnancy-related

Motion to Transfer my Complaint to the U.S. Supreme Court, case No. 3:2018cv03748

1108

disabilities the same as other disabilities by allowing women to use accumulated sick leave and possibly annual leave as well." Brief for United States Equal Employment Opportunity Commission as Amicus Curiae 21 n. 12."

Source: https://caselaw.findlaw.com/us-supreme-court/417/484.html

19. However, I didn't find case law that described Pregnancy Discrimination such as firing a Federal employee who wanted to become pregnant. I believe that my case will be the first impression.

**20. The right for a Jury trial.**

21. I demanded a Jury trial because I was eligible under Title VII. I still demand a Jury Trial under the Seventh Amendment to The U.S. Constitution for the Pregnancy Discrimination, the Age Discrimination, the Disability Discrimination, and the IEDD causes of action.

22. Read the Seventh Amendment to the U.S. Constitution, "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."

23. I am also respectfully asking the Court whether Pregnancy discrimination and unlawful termination is considered as a crime. If this is a crime, I am entitled to a Jury trial in the State of New Mexico under Article III, Section 2 of the U.S. Constitution, "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed."

**24. The U.S. Supreme Court has original jurisdiction over my Complaint.**

Motion to Transfer my Complaint to the U.S. Supreme Court, case No. 3:2018cv03748

1109

25. I am respectfully asking the District Court to transfer my case to the Supreme Court of the United States under Article III, Section 2 of the U.S. Constitution which says, "In all Cases affecting Ambassadors, other public Ministers and Consuls, <u>and those in which a State shall be Party</u>, the supreme Court shall have original Jurisdiction."

**26. Conclusion.**

27. Because Pregnancy Discrimination is outside of the scope of Title VII, and there is no any provision of the law that describes Pregnancy Discrimination in Federal Employment, I am respectfully asking Hon. Judge William Alsup to transfer my case to the U.S. Supreme Court which has original jurisdiction over my Complaint under Article III, Section 2 of the Unites States Constitution.

I declare under the penalty of perjury and under the Federal laws that everything foregoing is true and correct. Executed at the city of Rancho Murieta, CA on November 22nd, 2018.

Respectfully submitted,

Date: November 22nd, 2018          Sign Name:

Print Name:  Tatyana E. Drevaleva

Motion to Transfer my Complaint to the U.S. Supreme Court, case No. 3:2018cv03748

1  Tatyana Evgenievna Drevaleva

2  No current home postal address, no mailing address

3  Currently residing in California

4  415-806-9864, tdrevaleva@gmail.com

5  Plaintiff in Pro Per

6

7               THE UNITED STATES DISTRICT COURT

8              NORTHERN DISTRICT OF CALIFORNIA

9

10

11                              )
                               )
12   Tatyana E. Drevaleva      )    Case No. 3:2018cv03748
                               )
13                             )
              Plaintiff,       )
14                             )    Declaration to Motion to Transfer my
              vs.              )
15                             )    Complaint to the U.S. Supreme Court
    1) The U.S. Department of Veterans )
16      Affairs                )    under Article III, Section 2 of the U.S.
                               )
17   2) Mr. Robert Wilkie, Acting United )  Constitution.
        States Secretary of Veterans Affairs )
18      810 Vermont Avenue, NW )
        Washington, DC 20420   )
19                             )    Date: January 17, 2019
    Facility: New Mexico VA Healthcare System )
20      1501 San Pedro Drive, S.E. )  Time: 8.00 AM
        Albuquerque, NM 87108  )
21                             )    Location: Courtroom 12, 19th Floor
              Defendant.       )
22                             )    Judge: Hon. William Alsup
                               )
23

24   _____

25         I, Plaintiff Tatyana E. Drevaleva, hereby declare:

26         1)  I am a Plaintiff Pro se and a party in this action

27

28                    Page **1** of **3**

    Declaration to Motion to Transfer to the U.S. Supreme Court, case No. 3:2018cv03748

1111

2) I have personal knowledge of the facts stated herein, which are known by me to be true and correct, and I will testify competently thereto

3) I mistakenly believed that Pregnancy Discrimination falls within the scope of Title VII

4) Defendants mislead the Court by citing *Brown v GSA* and *White v. GSA* which have no common with Pregnancy discrimination

5) Under *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), Pregnancy discrimination falls outside of the scope of Title VII

6) As a Plaintiff, I can't sue the federal Government under the Pregnancy Discrimination Act because the Federal Government is excluded from the definition of the Defendant

7) There is no both the Legislative act or the case law that directs the U.S. District Courts to rule on the Pregnancy Discrimination in Federal Employment

8) Plaintiff was discriminated and unlawfully terminated from the Raymond G. Murphy VAMC for my desire to get pregnant

9) Plaintiff is severely suffering from unemployment, Libel, the emotional distress, the absence of educational opportunities, the inability to find a job (because Defendants lied about the reasons of terminating of the Plaintiff's employment), and the absence of money. The Plaintiff is 52 yo, doesn't have children, and wants to have children. The Plaintiff has an embryo which is frozen in Russia and which needs a surrogate Mom

10) Plaintiff is seeking for a quickest resolution of my Complaint

11) Plaintiff is asking the District Court to transfer my Complaint to the U.S. Supreme Court which has original jurisdiction over my Complaint under Article III, Section 2 of the U.S. Constitution.

I declare under the penalty of perjury and under the Federal laws that everything foregoing is true and correct. Executed at the city of Rancho Murieta, CA on November 22nd, 2018.

Declaration to Motion to Transfer to the U.S. Supreme Court, case No. 3:2018cv03748

1112

Date: November 22nd, 2018                    Sign Name:

                                             Print Name:  Tatyana E. Drevaleva

Declaration to Motion to Transfer to the U.S. Supreme Court, case No. 3:2018cv03748

1113

**Exhibit 1**.

Articles about Title VII.

# INVENTING THE "TRADITIONAL CONCEPT" OF SEX DISCRIMINATION

*Cary Franklin*[*]

## INTRODUCTION

In 1976, in *General Electric Co. v. Gilbert*,[1] the Supreme Court confronted the question of whether pregnancy discrimination qualified as discrimination "because of sex" under Title VII of the 1964 Civil Rights Act.[2] The Court concluded that "[t]he legislative history of Title VII's prohibition of sex discrimination[,] . . . notable primarily for its brevity,"[3] shed little light on this question. In place of legislative history, the Court turned to "tradition" for guidance in interpreting the statute. "Traditionally,"[4] the Court asserted, discrimination was defined as the division of individuals into two groups on the basis of a protected trait — as when Jim Crow laws reserved some water fountains for whites and others for blacks.[5] Thus, the Court reasoned that an employment practice would not have been considered discrimination "because of sex," circa 1964, unless it divided men and women into two groups, perfectly differentiated along biological sex lines. The Court suggested that to interpret Title VII's sex provision in any other way would be "to depart from the longstanding meaning of 'discrimination,'"[6] which must have guided Congress when it passed the Civil Rights Act.[7] Pledging deference to the legislature, and fidelity to tradition, the Court held in *Gilbert* that pregnancy discrimination did not

---

[*] Assistant Professor, University of Texas School of Law.

[1] 429 U.S. 125 (1976).

[2] Pub. L. No. 88-352, 78 Stat. 255 (1964) (codified as amended at 42 U.S.C. §§ 2000e to 2000e-17 (2006)).

[3] *Gilbert*, 429 U.S. at 143.

[4] *Id.* at 145.

[5] *See id.* ("The concept of 'discrimination,' of course, was well known at the time of the enactment of Title VII, having been associated with the Fourteenth Amendment for nearly a century, and carrying with it a long history of judicial construction.")

[6] *Id.* at 140 n.18.

[7] *Id.* at 145 ("When Congress makes it unlawful for an employer to 'discriminate . . . because of . . . sex . . . ,' without further explanation of its meaning, we should not readily infer that it meant something different from what the concept of discrimination has traditionally meant. There is surely no reason for any such inference here." (omissions in original) (citations omitted)).

1

2                          *HARVARD LAW REVIEW*                   [Vol. 125:1

constitute discrimination "because of sex" because it did not fall within the longstanding parameters of that term.[8]

   This narrow, anticlassificationist understanding of Title VII's prohibition of sex discrimination was not cabined in the 1970s to cases involving pregnancy. Courts rejected some of the earliest sexual harassment claims on the ground that this practice targeted some but not all members of the relevant class and thus did not constitute discrimination "because of sex."[9] Here too, courts commonly cited the lack of legislative history attending Title VII's sex provision as a reason for interpreting the statute narrowly.[10] Sex-based Title VII claims by sexual minorities triggered a similar response. Courts uniformly rejected such claims on the ground that "Congress has not shown any intent other than to restrict the term 'sex' to its traditional meaning."[11] "Congress had a narrow view of sex in mind when it passed the Civil Rights Act,"[12] courts asserted, and that narrow view did not encompass discrimination against gay and transgender employees.[13] Reject-

---

   [8] *Id.* at 134–35 (explaining that pregnancy discrimination does not constitute discrimination "on the basis of sex" because it divides workers "into two groups — pregnant women and non-pregnant persons. While the first group is exclusively female, the second includes members of both sexes.," *id.* at 135 (quoting Geduldig v. Aiello, 417 U.S. 484, 496–97 (1974) (internal quotation mark omitted)).

   [9] *See, e.g.*, Barnes v. Train, No. 1828-73, 1974 WL 10628, *1 (D.D.C. Aug. 9, 1974) (asserting that "[t]he substance of plaintiff's complaint is that she was discriminated against, not because she was a woman, but because she refused to engage in a sexual affair with her supervisor," and that "[r]egardless of how inexcusable the conduct of plaintiff's supervisor might have been, it does not evidence an arbitrary barrier to continued employment based on plaintiff's sex"); *cf.* Williams v. Saxbe, 413 F. Supp. 654, 657 (D.D.C. 1976) (employer argued that because "the primary variable in the claimed class is willingness *vel non* to furnish sexual consideration, rather than gender, the sex discrimination proscriptions of the Act are not invoked").

   [10] *See, e.g.*, Miller v. Bank of Am., 418 F. Supp. 233, 235–36 (N.D. Cal. 1976) (noting that the "Congressional Record fails to reveal any specific discussions as to the amendment's intended scope or impact," *id.* at 235, and concluding that Congress could not have intended to invite "a federal challenge based on alleged sex motivated considerations of the complainant's superior in every case of a lost promotion, transfer, demotion or dismissal," *id.* at 236); Tomkins v. Pub. Serv. Elec. & Gas Co., 422 F. Supp. 553, 556–557 (D.N.J. 1976) (finding that a claim of sexual harassment by a supervisor is "clear[ly] . . . without the scope of the Act," *id.* at 556, and that if such claims were permitted "we would need 4,000 federal trial judges instead of some 400," *id.* at 557); Corne v. Bausch & Lomb, Inc., 390 F. Supp. 161, 163 (D. Ariz. 1975) (stating that "[t]here is little legislative history surrounding the addition of the word 'sex' to the employment discrimination provisions of Title VII," and that it would "be ludicrous to hold that the sort of activity involved here [persistent sexual advances by a supervisor that forced female employees to resign] was contemplated by the Act").

   [11] Holloway v. Arthur Andersen & Co., 566 F.2d 659, 663 (9th Cir. 1977).

   [12] Ulane v. E. Airlines, Inc., 742 F.2d 1081, 1086 (7th Cir. 1984).

   [13] *Id.* ("[W]e decline in behalf of the Congress to judicially expand the definition of sex as used in Title VII beyond its common and traditional interpretation."); *see also* Straley v. Happy Times Nursery Sch., Inc., 608 F.2d 327, 329–30 (9th Cir. 1979) (consolidated on appeal with DeSantis v. Pacific Tel. & Tel. Co.) (concluding "that Congress had only the traditional notions of 'sex' in mind," *id.* at 329 (quoting *Holloway*, 566 F.2d at 662), when it enacted Title VII and rejecting the

ing one of the first sex-based claims by a transgender plaintiff, the Seventh Circuit stated: "The total lack of legislative history surrounding the sex amendment coupled with the circumstances of the amendment's adoption clearly indicates that Congress never considered nor intended that this 1964 legislation apply to anything other than the traditional concept of sex."[14]

Although Title VII doctrine has evolved over the past few decades,[15] the "traditional concept" of sex discrimination, as expounded by courts in the 1970s, continues to exert a regulative influence over the law. Most notably, it fuels courts' ongoing demand that sex discrimination plaintiffs produce opposite-sex comparators — individuals who are similarly situated to themselves in all salient respects aside from biological sex. Only by demonstrating that such comparators were not subject to the same adverse treatment, courts hold, can plaintiffs prove it was their biological sex that triggered the alleged discrimination.[16] This requirement has a devastating effect on plaintiffs' ability to win sex-based Title VII claims, as adequate comparators are very rarely available in the contemporary workplace.[17]  In some cases —

---

notion that the law should "be judicially extended" beyond this traditional conception, *id.* at 329–30).

[14] *Ulane*, 742 F.2d at 1085; *see also Holloway*, 566 F.2d at 662 (concluding "that Congress had only the traditional notions of 'sex' in mind" when it prohibited sex discrimination in employment and that courts are bound to adhere to "this narrow definition").

[15] In 1978, Congress enacted the Pregnancy Discrimination Act (PDA), which overturned *Gilbert* and specified that Title VII's prohibition of sex discrimination encompasses discrimination on the basis of pregnancy. Pub. L. No. 95-555, 92 Stat. 2076 (1978) (codified as amended at 42 U.S.C. § 2000e(k) (2006)). By the late 1970s, courts had begun to recognize sexual harassment as a form of sex discrimination, even though harassment did not necessarily sort employees into two perfectly sex-differentiated groups. *See, e.g.*, Barnes v. Costle, 561 F.2d 983, 990 (D.C. Cir. 1977); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986); *but see* Reva B. Siegel, *Introduction: A Short History of Sexual Harassment*, *in* DIRECTIONS IN SEXUAL HARASSMENT LAW 1, 11-26 (Catharine A. MacKinnon & Reva B. Siegel eds., 2004) (noting that although the recognition of sexual harassment as sex discrimination was a significant development in Title VII law, courts in sexual harassment cases have often employed forms of reasoning that preserve the formalism of the early cases). Likewise, in 1989, the Court held in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), that a firm which discriminated against a female employee on the basis of sex stereotypes violated Title VII, opening the door to a broader range of claims than courts in the 1970s had recognized. For a discussion of the expansive potential of *Price Waterhouse*, see Katherine M. Franke, *The Central Mistake of Sex Discrimination Law: The Disaggregation of Sex from Gender*, 144 U. PA. L. REV. 1, 95–97 (1995).

[16] *See, e.g.*, Martinez v. N.B.C. Inc., 49 F. Supp. 2d 305, 309 (S.D.N.Y. 1999) ("Title VII forbids gender discrimination in employment, but gender discrimination by definition consists of favoring men while disadvantaging women or *vice versa*. The drawing of distinctions among persons of one gender on the basis of criteria that are immaterial to the other, while in given cases perhaps deplorable, is not the sort of behavior covered by Title VII. This was made clear more than twenty years ago in *General Electric Co. v. Gilbert*.").

[17] *See* Suzanne B. Goldberg, *Discrimination by Comparison*, 120 YALE L.J. 728, 734, 751–64 (2011) (demonstrating that the comparator requirement "sharply narrow[s] . . . the possibility of success for individual litigants," *id.* at 734, because individuals who are, inter alia, uniquely situ-

particularly those involving reproductive differences between men and women — they will never be available.[18]  Sex discrimination claims by sexual minorities also continue to run aground on the shoals of "tradition."  As in the 1970s, courts today often insist, when confronted with Title VII claims by gay and transgender plaintiffs, "that Congress did not intend the legislation to apply to anything other than 'the traditional concept of sex,'"[19] and "that if the term 'sex' as it is used in Title VII is to mean more than biological male or biological female, the new definition must come from Congress."[20]

This Article argues that the "traditional concept" of sex discrimination, as articulated by courts, is an "invented tradition."  The historian Eric Hobsbawm famously used that term to refer to social practices that purport to be old, or imply continuity with the past, but are actually quite recent in origin.[21]  By claiming to be deeply rooted in history, these practices seek "to give any desired change (or resistance to innovation) the sanction of precedent, social continuity, and natural law."[22]  Hobsbawm explained, for instance, "that a village's claim to some common land or right 'by custom from time immemorial' often

---

[18] ated in their jobs or work in small or sex-segregated workplaces — a group that constitutes a large percentage of the American workforce — will only rarely have access to comparator evidence).

[18] For instance, no plaintiff in the American legal system has ever persuaded a court that breastfeeding discrimination violates Title VII's sex provision.  *See, e.g.*, Derungs v. Wal-Mart Stores, Inc., 374 F.3d 428, 439 (6th Cir. 2004) ("[N]o judicial body thus far has been willing to take the expansive interpretive leap to include rules concerning breast-feeding within the scope of sex discrimination."); EEOC v. Houston Funding II, Ltd., No. Civ. H-11-2442 (S.D. Tex. Feb. 2, 2012) ("Firing someone because of lactation or breast-pumping is not sex discrimination."); *Martinez*, 49 F. Supp. 2d at 310–11 ("In this case, there is and could be no allegation that Martinez was treated differently than similarly situated men.  To allow a claim based on sex-plus discrimination here would elevate breast milk pumping — alone — to a protected status.  But if breast pumping is to be afforded protected status, it is Congress alone that may do so." (footnote omitted)); *cf. In re* Union Pac. R.R. Emp't Practices Litig., 479 F.3d 936, 944–45 (8th Cir. 2007) (holding that exclusion of contraception from employee health insurance plan does not violate Title VII because contraception coverage was denied to both men and women and therefore "the coverage provided to women [was] not less favorable than that provided to men").  For more on the continuing influence of *Gilbert*'s narrow formalistic conception of sex discrimination in contemporary employment discrimination law, see Deborah A. Widiss, *Shadow Precedents and the Separation of Powers: Statutory Interpretation of Congressional Overrides*, 84 NOTRE DAME L. REV. 511, 551–56 (2009).

[19] *In re* Estate of Gardiner, 22 P.3d 1086,, 1104 (Kan. Ct. App. 2001) (quoting Ulane v. E. Airlines, Inc., 742 F.2d 1081, 1085 (7th Cir. 1984)); *see also* Oiler v. Winn-Dixie La., Inc., No. Civ.A. 00-3114, 2002 WL 31098541, at *4 n.52 (E.D. La. Sept. 16, 2002) (asserting that "Congress never considered nor intended that this 1964 legislation apply to anything other than the traditional concept of sex" (quoting *Ulane*, 742 F.2d at 1085)).

[20] *Gardiner*, 22 P.3d at 1104 (quoting *Ulane*, 742 F.2d at 1087) (internal quotation mark omitted)).

[21] Eric Hobsbawm, *Introduction: Inventing Traditions*, *in* THE INVENTION OF TRADITION 1, 1–2 (Eric Hobsbawm & Terence Ranger eds., 1983).

[22] *Id.* at 2.

expresses not a historical fact, but the balance of forces in the constant struggle of village against lords or against other villages."[23]   This Article contends that the "traditional concept" of sex discrimination, as it was articulated in the 1970s, is just such a tradition.   Courts claimed that their narrow, formalistic conception of sex discrimination was deeply rooted in history, but in fact, it was quite new.   It did not express a historical claim — not, in this case, about the boundaries of a particular plot of land but about the limits of Title VII's prohibition of sex discrimination.

"[A]ll invented traditions, so far as possible, use history as a legitimator of action,"[24] and the "traditional concept" of sex discrimination is no exception.   Its authority derives primarily from the contention that it is deeply rooted in the American legal tradition.   When courts focus on the formal characteristics of challenged employment practices, requiring plaintiffs to demonstrate that an employer has sorted employees precisely along biological sex lines before labeling its actions discriminatory, they purport to be deferring to a longstanding and shared consensus about what it means to discriminate "because of sex."   They contend that this understanding has all the weight of history behind it.   Yet when courts constructed this account of Title VII, they started from the premise that the historical record, as it pertained to sex discrimination, was exceedingly sparse.   The "traditional concept" of sex discrimination was therefore developed without any actual inquiry into the meaning that had historically been ascribed to this practice.

This Article seeks to recover that history.   By 1976, the year the Court decided *Gilbert*, Americans had been debating, interpreting, and making claims on Title VII's sex provision for over a decade.   Congress took up the question of sex discrimination in employment not only in 1964, but also in 1972, when it voted to extend Title VII's protections to state and local government employees.[25]   The Equal Employment Opportunity Commission (EEOC) — the agency charged with implementing Title VII — and numerous federal district and appellate courts elaborated the scope of the law's protections in dozens of administrative rulings and legal decisions.   Outside the three branches of government, the business community, union representatives, and members of the women's movement testified at administrative and congressional hearings, filed briefs, and issued public statements about the law's meaning.   Workers flooded the EEOC with sex dis-

---

[23]  *Id.*
[24]  *Id.* at 12.
[25]  Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, 86 Stat. 103 (codified as amended in scattered sections of 42 U.S.C.).

crimination claims and made arguments about the protections accorded them under the new law.[26]

The picture that emerges from this historical record undermines the notion that the concept of sex discrimination was traditionally understood to refer — always and only — to practices that divide men and women into two groups perfectly differentiated along biological sex lines. In fact, there was great uncertainty in 1964, and in the decade after, about the basic parameters of Title VII's prohibition of sex discrimination. It was not at all clear, for instance, that employment practices that sorted men and women into two perfectly sex-differentiated groups automatically constituted "discrimination" within the meaning of the law. It took years for the EEOC and federal courts to determine whether "protective" labor legislation and sex-segregated help-wanted advertisements discriminated "because of sex," and the conventional wisdom in this era was certainly not that *all* sex-differentiated employment practices did so. Nor was it clear that an employment practice had to divide employees along the axis of biological sex in order to count as sex discrimination. In the 1960s, members of all-female flight attendant corps charged that policies terminating their employment when they married or reached their early thirties violated Title VII, even though such policies did not divide workers along biological sex lines; the EEOC determined in the late 1960s that these policies discriminated "because of sex" even in the absence of male comparators. Likewise, it was not until the mid-1970s that the Court held that pregnancy discrimination was not sex discrimination — a proposition that had not been at all clear prior to that point.

Recovering this history reveals how deeply contested and fluid the meaning of sex discrimination was at the time Title VII was passed. It also reveals the extent to which determinations about what constitutes sex discrimination have always turned on judgments about the normative desirability, or acceptability, of employment practices that enforce conventional understandings of sex and family roles. When legal actors in the 1960s debated whether Title VII should bar discrimination "because of sex," how vigorously this prohibition should be enforced, and what kinds of employment practices it should reach, their discussion was framed by concerns about sexual relations and the family. It was clear, in this period, that Title VII had intervened in a powerful set of practices governing the gendered organization of

---

[26] *See* EQUAL EMP'T OPPORTUNITY COMM'N, 1ST ANNUAL REPORT 6, 64 (1967) (expressing surprise that 2432, or thirty-seven percent, of the complaints received by the agency in its first year in existence alleged discrimination on the basis of sex); NANCY MACLEAN, FREEDOM IS NOT ENOUGH: THE OPENING OF THE AMERICAN WORKPLACE 123–27 (2006) (discussing the importance of American workers in shaping the content of Title VII's legal protections in the context of sex).

work and family in the United States, but there was little consensus, and much debate, about which of these practices the law should disrupt and which it should leave in place.

This Article shows that the "traditional concept" of sex discrimination — the idea that employer conduct is discriminatory only and whenever it bifurcates employees along biological sex lines — emerged out of these debates. When Title VII was first enacted, opponents argued that its prohibition of sex discrimination should be stricken, or simply unenforced, because it threatened to weaken the conventional regulation of sex roles, sexual relations, and the American family. When plaintiffs began to file sex discrimination claims in court, employers argued that the statute's BFOQ exception — which permits discrimination in cases where sex is "reasonably necessary to the normal operation" of a business[27] — should be interpreted broadly, to preserve longstanding forms of sex-based regulation. As these strategies faltered, employers increasingly began to argue that the concept of sex discrimination itself was quite narrow, and referred only to practices that formally sorted employees along biological sex lines. The employers who made this argument in the late 1960s were quite explicit about their desire to cabin Title VII's reach. They urged the EEOC and courts to adopt that this narrow, formalistic conception of sex discrimination because it would permit businesses to continue enforcing conventional gender norms and help to preserve the traditional organization of the American family.

*Gilbert*, and other decisions in the 1970s, obscured this history. These decisions adopted the narrow, formalistic arguments made by employers in the 1960s, but asserted that this method of reasoning about the meaning of sex discrimination lacked any normative underpinnings. Talk of legislative deference and fidelity to tradition replaced discussion of the need to preserve the traditional family and women's role within it. Recovering the history of the "traditional concept" of sex discrimination reminds us that this narrow form of reasoning did not stand outside normative debates about how far Title VII's protections should extend, but was instead a part of those debates. This remains true today. Courts' continued adherence to the "traditional concept" of sex discrimination significantly limits Title VII's scope and insulates from judicial scrutiny various forms of regulation that maintain social stratification. As we shall see, these limitations are not simply the product of judicial deference: they represent ongoing normative judgments about how forcefully antidiscrimination law should seek to combat employment practices that reinforce traditional gender norms.

---

[27] Civil Rights Act of 1964 § 703(e), 42 U.S.C. § 2000e-2(e) (2006).

*HARVARD LAW REVIEW* [Vol. 125:1

Part I of this Article examines the legislative history and early reception of Title VII's sex provision in the mid-1960s. Conventional wisdom suggests that legislative history sheds no light on the meaning of Title VII's prohibition of sex discrimination. In fact, legislative history demonstrates quite strikingly how indefinite the contours of Title VII's sex provision were at the time it was enacted. Proponents and opponents of the statute — inside and outside of Congress — argued that the legislation would disrupt the enforcement of traditional sex and family roles. But there was considerable debate in this period about which particular employment practices the statute barred and how deeply the law should intervene in the longstanding regulation of men and women in the workplace.

Part II examines the largely forgotten history of sex-based employment discrimination law in the years before the Supreme Court heard its first Title VII case. The widely varying and frequently shifting interpretations of Title VII's sex provision offered by the EEOC and courts in this period dramatically illustrate that the determination of whether an employment practice qualified as discrimination "because of sex" did not always hinge on the formal characteristics of the practice. Debate over the scope of Title VII's prohibition of sex discrimination in the 1960s focused explicitly on the normative question of how deeply, or even whether, the law should intervene in a set of practices that reflected and reinforced conventional gender norms. This Part shows that the "traditional concept" of sex discrimination emerged in this period as an answer to that question.

Part III begins by examining how *Gilbert* effaced the history of Title VII's sex provision and constructed a new account of what that provision "traditionally meant."[28] The Court claimed in *Gilbert* that its narrow, formalistic conception of sex discrimination, which eschewed any concern about the social meaning of contested employment practices, was deeply rooted in the American legal tradition. This claim disguised both the recent provenance of this conception and the normative judgments embedded in the notion that Title VII's prohibition of sex discrimination did not apply to practices such as pregnancy discrimination. This Part ends by examining the formidable influence that the "traditional concept" of sex discrimination still exerts over contemporary employment discrimination law, and the normative judgments about sex and family roles that it continues to obscure.

---

[28] Gen. Elec. Co. v. Gilbert, 429 U.S. 125, 145 (1976).

## I. RECOVERING THE LEGISLATIVE HISTORY
## OF TITLE VII'S SEX PROVISION

Conventional wisdom dictates that Title VII's prohibition of sex discrimination has no legislative history.[29]  When President Kennedy decided in the summer of 1963, in the wake of the Birmingham riots, to pursue civil rights legislation, his aim was to secure legal protections against race discrimination.[30]  By the time Virginia Representative Howard W. Smith offered an amendment proposing to add "sex" to Title VII,[31] the legislative debate over the bill was almost over. Smith's amendment triggered only a few hours of discussion, and legal commentators have generally characterized his intervention as nothing more than a last-ditch, if ultimately unsuccessful, attempt to derail a piece of legislation to which he was fiercely opposed.[32]

---

[29] DIANNE AVERY ET AL., EMPLOYMENT DISCRIMINATION LAW 331 (8th ed. 2010) (discussing the lack of legislative history attending Title VII's sex provision); JOEL WM. FRIEDMAN, THE LAW OF EMPLOYMENT DISCRIMINATION 375–77 (6th ed. 2007) (same); GEORGE A. RUTHERGLEN & JOHN J. DONOHUE III, EMPLOYMENT DISCRIMINATION 222 (2005) (same); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 63–64 (1986) ("The prohibition against discrimination based on sex was added to Title VII at the last minute . . . and we are left with little legislative history to guide us in interpreting [this prohibition].").

[30] *See* President John F. Kennedy, Radio and Television Report to the American People on Civil Rights (June 11, 1963), *available at* http://www.jfklibrary.org/Research/Ready-Reference/JFK-Speeches/Radio-and-Television-Report-to-the-American-People-on-Civil-Rights-June-11-1963.aspx ("Next week I shall ask the Congress of the United States to act, to make a commitment it has not fully made in this century to the proposition that race has no place in American life or law. . . . The old code of equity law under which we live commands for every wrong a remedy, but in too many communities, in too many parts of the country, wrongs are inflicted on Negro citizens and there are no remedies at law.  Unless the Congress acts, their only remedy is in the street.").

[31] 110 CONG. REC. 2577 (1964) (statement of Rep. Smith).

[32] Representative Smith had been a committed opponent of civil rights legislation throughout his career and was a signatory of the *Southern Manifesto*, which famously decried the Court's decision in *Brown v. Board of Education* and pledged "to use all lawful means to bring about [its] reversal."  102 CONG. REC. 4460 (1956).  Smith's background, and his ongoing, outspoken opposition to civil rights legislation designed to benefit racial minorities, led many to conclude that his late-breaking amendment was motivated by a desire to disrupt the smooth passage of the civil rights bill.  For accounts suggesting Smith's eleventh-hour intervention was an attempt to kill the civil rights bill by introducing a provision he knew would be unpopular with his colleagues, see, for example, WILLIAM N. ESKRIDGE, JR. ET AL., CASES AND MATERIALS ON LEGISLATION: STATUTES AND THE CREATION OF PUBLIC POLICY 14–15 (4th ed. 2007); SANDRA DAY O'CONNOR, THE MAJESTY OF THE LAW 161–62 (2003); CHARLES WHALEN & BARBARA WHALEN, THE LONGEST DEBATE: A LEGISLATIVE HISTORY OF THE 1964 CIVIL RIGHTS ACT 115–18 (1985); Catharine A. MacKinnon, *Reflections on Sex Equality Under Law*, 100 YALE L.J. 1281, 1283–84 (1991).  Some commentators have suggested that Smith's motivations were more complex than the standard account allows.  For accounts suggesting that Smith was acting at the behest of women's rights advocates and wanted to ensure that, if the legislation passed, white women would be entitled to all the legal protections afforded racial minorities, see Robert C. Bird, *More Than a Congressional Joke: A Fresh Look at the Legislative History of Sex Discrimination of the 1964 Civil Rights Act*, 3 WM. & MARY J. WOMEN & L. 137, 150–53, 156–58 (1997); Carl M. Brauer, *Women Activists, Southern Conservatives, and the Prohibition of Sex Discrimination in Title VII of the 1964 Civil Rights Act*, 49 J. S. HIST. 37, 41–50

The circumstances under which "sex" was added to Title VII raise questions about the value of an "archeological"[33] expedition into the statute's legislative history.  The documentary record is meager: one afternoon of debate, no committee reports or legislative hearings. Moreover, the values and requirements of American society have evolved substantially since the mid-1960s, and so has the American workplace.  For these reasons, Title VII seems particularly suited to a dynamic form of interpretation,[34] which considers not only text and legislative history, but "also what [a statute] ought to mean in terms of the needs and goals of our present day society."[35]  Indeed, given the piecemeal manner in which Title VII was drafted,[36] the fact that the statutory text never defines the words "discriminate" or "sex," and the enormous social changes that have occurred in this context since 1964, the "historical perspective" seems unlikely to "provide[] . . . decisive[] guidance for solving the interpretive puzzle[s]"[37] in contemporary sex discrimination law.

This Part argues that there is nonetheless much to be gained by recovering the largely forgotten legislative history of Title VII's prohibition of sex discrimination.[38]  In revisiting the debate that transpired over Title VII's prohibition of sex discrimination in the winter of 1964, this Part does not aim to develop an account of original meaning or legislative intent capable of resolving current dilemmas in employ-

---

(1983); Jo Freeman, *How "Sex" Got into Title VII: Persistent Opportunism as a Maker of Public Policy*, 9 LAW & INEQ. 163, 174–76 (1991).

[33] *See* WILLIAM N. ESKRIDGE, JR., DYNAMIC STATUTORY INTERPRETATION 13 (1994) (referring to interpretative approaches that look to the past — and particularly to contemporaneous legislative materials — to discover the original meaning or intent of a statute).

[34] William N. Eskridge, Jr., *Dynamic Statutory Interpretation*, 135 U. PA. L. REV. 1479, 1554–55 (1987) (explaining that "[d]ynamic interpretation is most appropriate when the statute is old yet still the source of litigation, is generally phrased, and faces significantly changed societal problems or legal contexts").

[35] *Id.* at 1480 (quoting Arthur W. Phelps, *Factors Influencing Judges in Interpreting Statutes*, 3 VAND. L. REV. 456, 469 (1950)); *id.* at 1554 (arguing that because statutes "have different meanings to different people, at different times, and in different legal and societal contexts . . . federal courts should interpret statutes in light of their current as well as historical context").

[36] *Id.* at 1490 & n.42 (describing the many stages involved in transforming President Kennedy's proposed job discrimination provision into Title VII of the 1964 Civil Rights Act).

[37] *Id.* at 1490.

[38] Although judicial decisions and employment discrimination casebooks have rarely taken the legislative history of Title VII's sex provision seriously, it has not been entirely dismissed in academic literature. *See, e.g.*, Mary Anne Case, *Reflections on Constitutionalizing Women's Equality*, 90 CALIF. L. REV. 765, 767–69 (2002) (rejecting the notion that Smith's amendment was simply a joke); *see also* Serena Mayeri, *Constitutional Choices: Legal Feminimism and the Historical Dynamics of Change*, 92 CALIF. L. REV. 755, 771 (2004) (noting that the amendment was strongly supported by a number of feminist legislators in the House); Franke, *supra* note **Error! Bookmark not defined.**, at 14–25 (arguing that there is "a rich congressional legislative history concerning the equal rights of women," *id.* at 15, which includes the brief legislative history of Title VII's sex amendment but also encompasses debates extending back over several decades).

ment discrimination law. On the contrary, it aims to deconstruct such accounts. Over the past five decades, claims about the narrow mindset and goals of the Eighty-Eighth Congress have exerted a regulative influence over the interpretation of Title VII's prohibition of sex discrimination. Courts have routinely invoked legislative history — or, rather, the lack thereof — to explain why certain claims fall outside the statute's scope and why plaintiffs need to satisfy particular evidentiary burdens in order to prove they have truly been discriminated against "on the basis of sex." Although the boundaries of Title VII's sex provision have shifted dramatically over the past half-century, courts have consistently asserted that the absence of legislative history and the "traditional" understandings that must have been prevalent at the time the statute passed establish narrow "bounds beyond which a court cannot go without transgressing the prerogatives of Congress."[39]

These assertions about the outer limits of Title VII's prohibition of sex discrimination are couched in terms of legislative deference and fidelity to history and tradition. But courts making such assertions have rarely consulted the historical record.[40] In fact, they have typically been incurious at best about the legislative history attending Title VII's sex provision and about the broader debates about sex discrimination occurring in the 1960s. This inattentiveness has obscured both the deep uncertainty, at the time Title VII was enacted, about which employment practices the statute barred, and the fact that the legislative debate treated sex discrimination as "a social phenomenon encased in a social context."[41] Contrary to what courts have suggested, there was no consensus among legislators in the mid-1960s that the question of what constituted sex discrimination could be answered simply by determining whether an employer had divided employees into two groups perfectly differentiated along biological sex lines. Legislators, both for and against adding "sex" to Title VII, focused on the social meaning of sex discrimination, and their disagreement hinged primarily on the question of whether employers should be permitted to engage in practices that reflected and reinforced conventional understandings of men's and women's roles. Recovering this history may not provide definitive answers to hard cases in Title VII law today. But it should prompt us to think critically about the assertion that fidelity to "tradition" compels courts to adhere to a narrow conception of what it means to discriminate "because of sex."

---

[39] Ulane v. E. Airlines, Inc., 742 F.2d 1081, 1086 (7th Cir. 1984).

[40] See, e.g., id. at 1085–86 (citing the "total lack of legislative history supporting the sex amendment coupled with the circumstances of the amendment's adoption," id. at 1085, as proof that "Congress had a narrow view of sex in mind," id. at 1086, when it decided to bar sex discrimination in employment).

[41] Gen. Elec. Co. v. Gilbert, 429 U.S. 125, 159 (1976) (Brennan, J., dissenting).

12 *HARVARD LAW REVIEW* [Vol. 125:1

### A. The Case Against Adding "Sex" to Title VII

One of the many strange features of the legislative debate over the addition of "sex" to Title VII is the fact that the strongest opposition came from the legislators who were most committed to the project of civil rights. Indeed, the most vocal opponent of the sex amendment was Representative Emanuel Celler, a Democrat from New York who served as the Chairman of the House Judiciary Committee throughout the civil rights era and was a major champion of legislation designed to expand the rights of racial minorities. In part, Celler and his allies were wary of the sex amendment because it was introduced by Representative Smith and was therefore perceived as a distraction from, or even an assault on, the primary agenda of the civil rights bill. But the concerns fueling opposition to the sex amendment were not wholly unconnected to its substance. The leading congressional proponents of the civil rights bill shared the view, common among progressives in this period, that "mores have set off women from men,"[42] and that workplace law and policy should acknowledge women's special role in the family. From this perspective, a proposal to bar sex discrimination in the workplace looked like a threat to a hard-won set of employment practices premised on the notion that women "were marginal participants in labor markets . . . [a]nd . . . were especially deserving of public protection as actual or potential mothers."[43]

Disagreements about how the law ought to regulate women's roles as wives and mothers framed the congressional debate over adding "sex" to Title VII.[44] Those who opposed the amendment repeatedly cited, as evidence of the amendment's undesirability, the documented opposition of leading members of the labor and women's rights communities to any law that would undermine legal "protections" de-

---

[42] CYNTHIA HARRISON, ON ACCOUNT OF SEX: THE POLITICS OF WOMEN'S ISSUES, 1945–1968, at 122 (1988) (quoting Rep. Emanuel Celler) (internal quotation mark omitted).

[43] THEDA SKOCPOL, PROTECTING SOLDIERS AND MOTHERS: THE POLITICAL ORIGINS OF SOCIAL POLICY IN THE UNITED STATES 374 (1992). For more on the history of "protective" labor legislation and the ways in which these laws reflected and reinforced traditional conceptions of men's and women's sex and family roles, see JUDITH A. BAER, THE CHAINS OF PROTECTION: THE JUDICIAL RESPONSE TO WOMEN'S LABOR LEGISLATION 42–69 (1978); ALICE KESSLER-HARRIS, IN PURSUIT OF EQUITY: WOMEN, MEN, AND THE QUEST FOR ECONOMIC CITIZENSHIP IN 20TH-CENTURY AMERICA 19–63 (2001); ALICE KESSLER-HARRIS, OUT TO WORK: A HISTORY OF WAGE-EARNING WOMEN IN THE UNITED STATES 180–214 (1982); SUSAN LEHRER, ORIGINS OF PROTECTIVE LABOR LEGISLATION FOR WOMEN, 1905–1925, at 41–93 (1987).

[44] By calling attention to the central role that concerns about gender and the family played in the debate over Title VII's sex provision, this Part in no way seeks to minimize the role that race played in this debate. Opponents of the sex amendment were undoubtedly concerned about the possibility that this amendment would derail their efforts to combat racial inequality, and proponents of the amendment also invoked race, often in regressive ways, to explain why the amendment was necessary. For more on the uses of race in the debate over Title VII's sex provision, see Mayeri, *supra* note 38, at 770–73.

signed to accommodate women's special responsibilities in the home.[45]  The most important of these documents was the 1963 report by the President's Commission on the Status of Women (PCSW),[46] a body convened by President Kennedy chaired by Eleanor Roosevelt.[47]  The PCSW supported the principle that women had a right to work outside the home and should receive equal pay for equal work,[48] but generally adhered to the view that women's primary calling remained in the home.[49]  The Committee on Home and Community reported:

> Over and above whatever role modern women play in the community . . . the care of the home and the children remain their unique responsibility.  No matter how much everyday tasks are shared . . . the care of the children is primarily the province of the mother.  This is not debatable as a philosophy.  It is and will remain a fact of life.[50]

In instances where expanded opportunity in employment seemed to threaten women's commitment to home and family, the PCSW argued against expanded opportunity.  Thus although it "identified a number of outmoded and prejudicial attitudes and practices"[51] among American employers, it did not advocate a law prohibiting sex discrimination in the workplace.[52]  The PCSW feared that such a prohibition would jeopardize regulations that shielded women from the harshest de-

---

[45]  *See, e.g.*, 110 CONG. REC. 2577 (1964) (statement of Rep. Celler) (quoting letter from the Women's Bureau of the Department of Labor opposing the addition of "sex" to Title VII); *id.* at 2578 (noting the opposition of the President's Commission on the Status of Women); *id.* at 2582 (statement of Rep. Green) (quoting a letter from the American Association of University Women opposing the addition of "sex" to Title VII).

[46]  *See* PRESIDENT'S COMM'N ON THE STATUS OF WOMEN, AMERICAN WOMEN (1963), *reprinted in* AMERICAN WOMEN: THE REPORT OF THE PRESIDENT'S COMMISSION ON THE STATUS OF WOMEN AND OTHER PUBLICATIONS OF THE COMMISSION 7–95 (Margaret Mead & Frances Balgley Kaplan eds., 1965) [hereinafter AMERICAN WOMEN].  The Executive Order establishing the PCSW charged it with "responsibility for developing recommendations for overcoming discriminations in government and private employment on the basis of sex and for developing recommendations for services which will enable women to continue their role as wives and mothers while making a maximum contribution to the world around them."  Exec. Order No. 10,980, 26 Fed. Reg. 12,059 (Dec. 14, 1961), *reprinted in* AMERICAN WOMEN, *supra*, at 207.  The PCSW's Report reflected the tensions inherent in this charge.  *See also* 110 CONG. REC. 2584 (statement of Rep. Celler) (inviting Representative James Roosevelt, son of Eleanor Roosevelt, to introduce into the *Congressional Record* "some of the names of the women members and the organizations that are represented on th[e] President's Commission of which [his] late lamented mother was Chairman").

[47]  *See* Margaret Mead, *Introduction*, *in* AMERICAN WOMEN, *supra* note 46, at 1, 3–4.

[48]  *See* HARRISON, *supra* note 42, at 142–51.

[49]  *Id.* at 159 (noting that "the commission . . . resolved to remain firmly within the framework of traditional family roles").

[50]  PRESIDENT'S COMM'N ON THE STATUS OF WOMEN, REPORT OF THE COMMITTEE ON HOME AND COMMUNITY 9 (1963).

[51]  AMERICAN WOMEN, *supra* note 46, at 20.

[52]  *See id.* at 48–49.

14 *HARVARD LAW REVIEW* [Vol. 125:1

mands of the workplace[53] and enabled them to fulfill their "day-to-day responsibility in the home."[54]

Legislators who opposed adding "sex" to Title VII shared the PCSW's fears about the effect that a law prohibiting sex discrimination in employment would have on the regulation of traditional sex and family roles. If the sex amendment became law, Emanuel Celler asked:

> Would male citizens be justified in insisting that women share with them the burdens of compulsory military service? What would become of traditional family relationships? What about alimony? Who would have the obligation of supporting whom? Would fathers rank equally with mothers in the right of custody to children? What would become of the crimes of rape and statutory rape? Would the Mann Act be invalidated? Would the many State and local provisions regulating working conditions and hours of employment for women be struck down?[55]

Celler argued that nobody, least of all women, would benefit from attempts to dismantle the legal foundation that supported the traditional sex-role structure. Barring employers from discriminating "because of sex," he claimed, would have negative "repercussions . . . throughout . . . all facets of American life,"[56] and family life in particular.[57] He and other opponents of the amendment suggested that Congress should "say 'vive la difference'"[58] in matters pertaining to sex and continue to legislate in a manner that supported men and women in their conventional roles.

To this end, Representative Robert Griffin of Michigan offered an amendment to the sex amendment. The Griffin amendment would bar workers from filing a claim of sex discrimination under Title VII unless they also filed a sworn statement that their spouse was unemployed.[59] Griffin explained that if his amendment were adopted, "it would not prevent or prohibit any married woman from working because her husband also has a job."[60] As a practical matter, however, it would permit employers to prefer male workers over married women, and thereby ensure that a woman who enjoyed the financial support of a husband could not lay claim to a job that might otherwise go to "an unemployed man with a family to support."[61] In offering this amendment, Griffin was not inventing new social policy, but seeking to preserve the advantages that employment regulation had always ac-

---

[53] *See* HARRISON, *supra* note 42, at 151–54.
[54] AMERICAN WOMEN, *supra* note 46, at 35; *see also* HARRISON, *supra* note 42, at 140.
[55] 110 CONG. REC. 2577 (1964) (statement of Rep. Celler).
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *See id.* at 2731 (statement of Rep. Griffin).
[60] *Id.*
[61] *Id.*

corded men — particularly in periods of economic downturn.[62]   In fact, his proposal was modeled on a law enacted early in the Great Depression, which mandated that the first federal employees to lose their jobs in the event of layoffs would be those whose spouses were also employed by the federal government.[63]   "Virulent campaigns to eliminate [married women] from the labor force persisted" throughout the 1930s, as public and private employers adopted policies restricting or completely barring the employment of married women.[64]   Underlying these policies — and the Griffin amendment — was a deeply rooted belief "that women's access to wage work should be conditioned by family needs."[65]   On this view, men, women, and children would all be better off if workplace regulation encouraged, or even compelled, women to elevate their roles as wives and mothers above their roles as wage-earners.

Griffin's amendment vividly illustrates the extent to which the debate over Title VII's prohibition of sex discrimination was a debate about men's and women's roles in the family.[66]   Legislators who opposed adding "sex" to Title VII argued that it would alter laws and customs governing wife- and motherhood, and in so doing wreak havoc on the institution of the family.   In this way, the debate over Title VII's sex provision closely resembled earlier debates over women's suffrage.   As Reva Siegel has shown, the debate over enfranchising women "was, from surface to core, an argument about the family."[67]   Women's customary (and legal) obligations to their husbands and children served as a central justification for their exclusion from the public sphere, and women's disenfranchisement was considered essential to the preservation of family harmony.   Opponents of women's suffrage "depicted the prospect of women voting as an expression of . . . a misplaced individualism that betrayed a selfish disregard for a

---

[62] *See id.* (arguing that "[t]he fact that many heads of families are out of jobs poses a serious problem for this Nation").

[63] *See* KESSLER-HARRIS, OUT TO WORK, *supra* note 43, at 257 (noting that over 1600 people were discharged pursuant to this law, the vast majority of whom were women).

[64] *Id.*

[65] *Id.* at 254.

[66] In 1975, conservative activist Phyllis Schlafly revived Griffin's efforts, calling on Congress to amend Title VII to "authorize employers to give job preference in hiring and promotions, and retentions during layoffs, to the . . . Principal Wage Earner in each family." *Unemployment — Causes and Solutions*, PHYLLIS SCHLAFLY REP., Nov. 1975, at 1 (on file with the Schlesinger Library, Radcliffe Institute for Advanced Study, Harvard University).   Echoing Griffin, Schlafly argued that employment policies favoring male breadwinners were socially beneficial because they "encourag[ed] homemakers to stay in the home, rather than competing in the labor market for the scarce available jobs." PHYLLIS SCHLAFLY, THE POWER OF THE POSITIVE WOMAN 166 (1977).

[67] Reva B. Siegel, *She the People: The Nineteenth Amendment, Sex Equality, Federalism, and the Family*, 115 HARV. L. REV. 947, 981 (2002).   *See generally* AILEEN S. KRADITOR, THE IDEAS OF THE WOMAN SUFFRAGE MOVEMENT, 1890–1920 (1965).

16 *HARVARD LAW REVIEW* [Vol. 125:1

woman's responsibilities in sustaining family life. Women's assertion of individuality appeared socially problematic . . . precisely because it called into question the traditional distribution of authority and division of labor in the family."[68] To permit women to vote, antisuffragists argued, would run counter to conceptions of the family that had governed Anglo-American law for centuries.

Legislators who opposed adding "sex" to Title VII framed their opposition in similarly family-centric terms. They argued, as antisuffragists had fifty years earlier, that granting women equal access to the public sphere would disrupt understandings of the family that had long structured American life. They depicted women who would compete for jobs in a nation where "many heads of families are out of jobs"[69] as selfish individualists heedless of the needs of their fellow citizens. They claimed that the smooth functioning of American society depended on the subordination of women's career ambitions to the needs of their families. Opponents of the sex provision also shared the antisuffragist view that the legal regulation of women's sex and family roles benefitted women themselves. They argued that laws and practices that restricted women's access to the workplace affirmed the sacrosanct principle that women were mothers first and workers second, and that it was men's responsibility to ensure that their families were safe and financially sound.[70]

It is not surprising that legislators in 1964 should have viewed the issue of sex discrimination in employment through this lens. Sex-based regulation of the labor market, no less than sex-based regulation of other facets of citizenship, had traditionally been understood as a critical means of regulating men's and women's sex and family roles. Alice Kessler-Harris has shown, for instance, that sex-based pay differentials were long understood and explicitly justified as a means of steering men and women onto different life paths. Traditionally, she writes, the wages men and women were paid "reflected a rather severe set of injunctions about how [they] were to live. . . . [P]art of the function of the female wage was to ensure attachment to family.

---

[68] Siegel, *supra* note 67, at 996.

[69] 110 CONG. REC. 2731 (1964) (statement of Rep. Griffin).

[70] The legislators who opposed adding "sex" to Title VII did not argue, as antisuffragists had earlier in the twentieth century, that granting women equal access to the public sphere would infringe on male dominance. In fact, legislators in 1964 were quite anxious to deny that laws restricting women's access to the workforce were a product of men's authority over women. Yet their repeated claims that women were the true authority figures in American families were themselves rooted in an old and sexist rhetorical tradition. *See, e.g.*, *id.* at 2577 (statement of Rep. Celler) (reporting that when he argued with his wife, he "usually ha[d] the last two words, and those words are, 'Yes, dear,'" and noting that when George Bernard Shaw wrote his famous play, *Man and Superman*, "man was not the superman, the other sex was"); *id.* at 2582 (statement of Rep. Thompson) (noting that men currently permit women to board lifeboats first during aquatic disasters and warning that prohibiting sex discrimination might rob women of this valuable advantage).

function of the female wage was to ensure attachment to family. The male wage, in contrast, provided incentives to individual achievement."[71]

These observations are true not only of the wage, but also of the constellation of other laws and practices that have historically regulated men's and women's participation in the labor market. As opponents of adding "sex" to Title VII recognized, such regulation provided individuals with instructions for living. It did not simply define the tasks men and women performed during the workday. It dictated how they lived, and with whom; it profoundly shaped their identity in both public and private settings.[72] Thus, Celler and his colleagues argued, it may seem "[a]t first blush . . . fair, just, and equitable" to prohibit sex discrimination in employment, "[b]ut when you examine carefully what the import . . . [of equal rights would be for] American life you run into a considerable amount of difficulty."[73] To prohibit sex discrimination in employment, opponents argued, would be to reject the basic organizing principles governing relations between men and women and the institution of the family. Such an act, Celler warned, could have "unlimited" consequences for American society.[74]

### B. Support for the Sex Amendment

It was a sign of the changes that would soon rock the American political and cultural landscape that proponents of the sex amendment did not deny accusations that adding "sex" to Title VII would threaten the enforcement of traditional sex and family roles. In fact, the chief proponents of the sex amendment argued that this was its core purpose. In response to the claims of Representative Celler and his colleagues, a succession of female legislators from both political parties argued that, in fact, employment practices that enforced the traditional sex-role structure were detrimental to women and their families, and that adding "sex" to Title VII would help to combat persistent inequalities in American society.

To illustrate this point, proponents of the sex amendment endeavored to show that "[m]ost of the so-called protective legislation" did not actually serve to protect women.[75] Representative Martha Griffiths, a Democrat from Michigan, noted for example that employers

---

[71] ALICE KESSLER-HARRIS, A WOMAN'S WAGE: HISTORICAL MEANINGS AND SOCIAL CONSEQUENCES 19 (1990).

[72] For an eloquent description of how work can be "constitutive of citizenship, community, and even personal identity," see Vicki Schultz, Essay, *Life's Work*, 100 COLUM. L. REV. 1881, 1886–92 (2000); *see also* Kenneth L. Karst, *The Coming Crisis of Work in Constitutional Perspective*, 82 CORNELL L. REV. 523, 530–33 (1997).

[73] 110 CONG. REC. 2577 (statement of Rep. Celler).

[74] *Id.* at 2578.

[75] *Id.* at 2580 (statement of Rep. Griffiths).

were likely to refuse to hire women to drive haulaway trucks on the ground that they were physically incapable of the work.[76]  Yet women were employed as schoolbus drivers — and, Griffiths pointed out, they drove streetcars during the Second World War.[77]  Thus, she intimated, it was not the size of the truck that determined which jobs women were permitted to do, but the size of the paycheck and the cultural connotations of the job.[78]  Employers reserved for male drivers the high-paying jobs that involved travel and funneled women into low-paying jobs that involved children.

Griffiths's Republican colleague, Representative Katharine St. George, echoed these arguments.  She noted that under current law, women "cannot run an elevator late at night and that is when the pay is higher.  They cannot serve in restaurants and cabarets late at night — when the tips are higher — and the load . . . is lighter."[79]  Thus, she argued, the chief effect of "protective" laws was to prevent women "from going into the higher salary brackets."[80]  If legislators were truly concerned about protecting women, St. George asserted, they would have extended "protective" legislation to the women most in need of it, such as those who cleaned offices "every morning about 2 or 3 o'clock in the city of New York and . . . quite early here in Washington, D.C."[81]  But, she declared, "I have never heard of anybody worrying about the women who do that work,"[82] implying that "protective" legislation had more to do with enforcing conventional notions of (white) women's sex and family roles than shielding them from actual hazards in the workplace.[83]

Proponents of the sex amendment agreed with their opponents that the debate over Title VII implicated forms of legal regulation that were deeply rooted in American history.  They asserted, however, that this was not a proud legal tradition; they argued that the myriad discriminatory employment practices plaguing female workers in the 1960s were part of a long and extensive history of subordination of

---

[76]  *Id.* at 2579.
[77]  *Id.*
[78]  *See id.* at 2579–80.
[79]  *Id.* at 2580 (statement of Rep. St. George).
[80]  *Id.*
[81]  *Id.* at 2581.
[82]  *Id.*
[83]  Representative St. George's comments called attention to the fact that "protective" labor policies were generally applied to jobs performed by white women.  Black women were excluded from many of the Progressive and New Deal–era policies designed to "protect" women and enable them to spend more time with their children.  For more on this topic, see JACQUELINE JONES, LABOR OF LOVE, LABOR OF SORROW: BLACK WOMEN, WORK, AND THE FAMILY FROM SLAVERY TO THE PRESENT 199–200 (1985).  *See generally* GWENDOLYN MINK, THE WAGES OF MOTHERHOOD: INEQUALITY IN THE WELFARE STATE, 1917–1942 (1995) (examining racial differences in the regulation of women through welfare policy in the interwar period).

women in the American legal system.  Representative St. George
claimed that to appreciate fully the harm that laws enforcing tradi-
tional conceptions of sex and family roles had visited on women, one
would have "to go back to the days of the revolution when women
were chattels."[84]  Women, she noted, "were not mentioned in the Con-
stitution."[85]  Under the common law tradition of coverture, "[t]hey be-
longed, first of all, to their fathers; then to their husbands or to their
nearest male relative.  They had no command over their own property.
They were not supposed to be equal in any way, and certainly they
were never expected to be . . . equal intellectually."[86]  She suggested
that "protective" legislation and other regulations that restricted wom-
en's opportunities in the labor market reflected the same set of gender
norms that animated the law of coverture.

Representative St. George pointed out that "[t]here are still many
States where women cannot serve on juries[,] . . . do not have equal
educational opportunities[,] . . . [and] do not get equal pay for equal
work."[87]  She implied that these practices too reflected stereotyped
conceptions of men's and women's roles that extend "back, frankly to
the Dark Ages."[88]  Representative Griffiths argued that the best con-
temporary illustration of this tradition was *Goesaert v. Cleary*,[89] in
which the Supreme Court upheld a Michigan law permitting women to
bartend only in establishments owned by their fathers or husbands.
The Court held in *Goesaert* that the state had a legitimate reason for
wanting to ensure that female bartenders would receive the "protect-
ing oversight" of a male family member.[90]  The Court explained that "a
man's ownership provides control" in a situation that might otherwise
threaten a woman's sexual purity, or the morals of her customers.[91]
Griffiths argued that adding "sex" to Title VII would strike a much-
needed blow against this "vulgar and insulting"[92] ideology and liberate
women from the confines of these outmoded conceptions of sex and
family roles.[93]  "[W]e have fought our way a long way since those days
of the Revolution,"[94] St. George argued, and adding "sex" to Title VII

---

[84]  110 CONG. REC. 2581 (statement of Rep. St. George).
[85]  *Id.*  For an argument suggesting that feminist claims made during the debate over Title VII
influenced the subsequent development of constitutional sex discrimination law, see Case, *supra*
note 38, at 769.
[86]  110 CONG. REC. 2581 (statement of Rep. St. George).
[87]  *Id.* at 2580.
[88]  *Id.* at 2581.
[89]  335 U.S. 464 (1948).
[90]  *Id.* at 466.
[91]  *Id.* at 467.
[92]  110 CONG. REC. 2580 (statement of Rep. Griffiths).
[93]  *Id.* at 2580–81.
[94]  *Id.* at 2581 (statement of Rep. St. George).

20                                HARVARD LAW REVIEW                        [Vol. 125:1

would help to advance women's ongoing struggle to overcome stereotyped conceptions of their place in American society.[95]

Twelve years after this debate transpired, the Court concluded in *Gilbert* that the legislative history of Title VII's sex provision was "notable primarily for its brevity."[96]  But in fact, the legislative debate over Title VII's sex provision emphasized the most distinctive feature of sex discrimination, in 1964 and throughout American history: namely, that it was defined by reference to conventional sex and family roles.  Historically, laws restricting women's right to vote, own property, and enter into contracts were justified by reference to their status as wives and mothers.  In the century before Title VII was enacted, courts consistently upheld such laws *because* they reinforced gender norms dictating that "[t]he paramount destiny and mission of woman are to fulfil the noble and benign offices of wife and mother," and the primary role of men is to act as "woman's protector and defender."[97]  Sex-based employment regulation formed a central part of this tradition.  Such regulation was long understood as a means of affirming the notion that men and women play complementary roles in the family, and of ensuring that women's domestic roles trumped their roles outside the home.  Legislators in 1964 disagreed about the normative valence of this tradition, but those most vocal on the topic appeared to share Representative Celler's view that Title VII constituted an "entering wedge"[98] in the campaign to dismantle it.

### C. Uncertainty Regarding the Applications of Title VII's Sex Provision

In the fall of 1965, one hundred days after Title VII went into effect, EEOC Chairman Franklin D. Roosevelt, Jr., reported to President Johnson that "[i]mplementation of Title VII's prohibition against discrimination on account of sex has been a particularly challenging assignment for the Commission."[99]  Roosevelt acknowledged that "[c]ertain traditional ideas" about women's sex and family roles would need to be "drastically revised" in response to the new law.[100]  But, he explained, the EEOC was having tremendous difficulty "translat[ing]

---

[95] *See id.*
[96] Gen. Elec. Co. v. Gilbert, 429 U.S. 125, 143 (1976).
[97] Bradwell v. Illinois, 83 U.S. (16 Wall.) 130, 141 (1873) (Bradley, J., concurring in the judgment).  One exception to this rule is *Adkins v. Children's Hospital of the District of Columbia*, 261 U.S. 525 (1923), in which the Court struck down regulations limiting women's working hours after finding that the recently enacted Nineteenth Amendment signaled a change in the way that Americans thought about the regulation of women's sex and family roles.  *See id.* at 553.
[98] 110 CONG. REC. 2578 (statement of Rep. Celler).
[99] *EEOC Reports to President on First 100 Days of Activity*, [1965–1968 Transfer Binder] Empl. Prac. Dec. (CCH) ¶ 8024, at 6036 (Nov. 12, 1965) [hereinafter *EEOC Reports*].
[100] *Id.*

this broad but general mandate into comprehensive and comprehensible standards for employer conduct."[101]

The difficulty for the EEOC was that, as Representative Celler noted, the potential consequences of Title VII's prohibition of sex discrimination seemed "unlimited."[102]  The statute appeared to "change the whole social concept upon which this country was built of the stability of the family."[103]  Yet what this change would mean in practice was unclear.  Roosevelt frequently lamented during his tenure at the EEOC that the text of Title VII's sex provision and its legislative history offered "little guidance" regarding the question of which employment practices the statute had rendered illegal.[104]  The statute did not define the terms "sex" or "discriminate," and Congress did not discuss in any systematic way how its prohibition of sex discrimination would apply on the ground.

In fact, when Congress did discuss particular employment practices, during its brief debate over the sex amendment, it did not reach any consensus about their postenactment viability.  Congress's discussion of "protective" labor legislation is a case in point.  Representative Celler and other opponents of the sex amendment argued during the legislative debate that prohibiting sex discrimination in employment would do away with "protective" labor laws.  Proponents of the amendment tended to agree with this assessment.  Yet in practice, the question of whether Title VII outlawed "protective" labor legislation was far more complicated than this superficial — and momentary — agreement suggested.

Congressional advocates of the sex amendment did not argue that prohibiting sex discrimination would preclude employers from making any distinctions between men and women.  They claimed that adding "sex" to Title VII would bar employers from making "invidious distinctions of the sort drawn by the statute [in *Goesaert*]."[105]  Thus, they ar-

---

[101]  *Id.*

[102]  110 CONG. REC. 2578 (statement of Rep. Celler).

[103]  White House Transcript, White House Conference on Equal Employment Opportunity, Panel 3: Discrimination Because of Sex 127 (August 19–20, 1965) [hereinafter White House Transcript] (on file with the EEOC Library, Washington, D.C.).

[104]  *EEOC Reports, supra* note 99, at 6036; *see also Administration of Sex Discrimination Provisions of Title VII Discussed by EEOC Chairman*, [1965–1968 Transfer Binder] Empl. Prac. Dec. (CCH) ¶ 8005, at 6010 (Aug. 1965) (explaining that the EEOC was "starting out with very few guidelines" to assist in its interpretation of Title VII's "complex and controversal [sic]" prohibition of sex discrimination (quoting Franklin D. Roosevelt, Jr.); *Sex Discrimination in Employment Discussed by EEOC Chairman*, [1965–1968 Transfer Binder] Empl. Prac. Dec. (CCH) ¶ 8022, at 6033 (Oct. 12, 1965) (noting that the EEOC "must develop guidelines as we go along" in the context of sex, and that, as a result, the agency did "not have all the answers" about the practical applications of Title VII's sex provision).

[105]  110 CONG. REC. 2580 (statement of Rep. Griffiths) (quoting Goesaert v. Cleary, 335 U.S. 464, 468 (Rutledge, J., dissenting).

gued that Title VII's prohibition of sex discrimination would outlaw "protective" labor legislation not because it differentiated between the sexes, but because the effect of "[m]ost of the so-called protective legislation has really been to protect men's rights in better paying jobs."[106]  This argument left open a very real possibility that sex-based legislation that was genuinely protective of women's interests would be permissible under Title VII.  In fact, one vocal congressional proponent of the sex amendment explicitly stated that adding "sex" to Title VII would not automatically overturn differential legislation designed to benefit women.[107]  This assessment was bolstered by an influential memorandum circulated in Congress by lawyer and civil rights activist Pauli Murray in the weeks before the final vote on the civil rights bill.  Murray's memo noted that state law in New York and Wisconsin already prohibited sex discrimination in employment, but that this prohibition was not understood, in either state, to apply to "protective" labor legislation.[108]

"Protective" labor legislation could coexist in 1964 with laws barring sex discrimination in employment due to a distinction, well-entrenched in legal doctrine and popular consciousness, between "differentiation" and "discrimination."  Labor feminists routinely relied on this distinction when discussing the regulation of women in the workplace.  The PCSW, a body that included a number of leading labor feminists, declared its support "for equal employment opportunity without discrimination of any kind,"[109] while also championing some forms of "protective" labor legislation.  Laws that differentiated between men and women constituted "discrimination," the PCSW argued, only when they deprived women of advantages that were given to men.  James Roosevelt, a Democratic Representative from California and son of the esteemed chair of the PCSW, drew on this distinction during the legislative debate over Title VII.  Roosevelt expressed full support for efforts to "eliminate . . . discriminations" against women while simultaneously advocating the preservation of "protective" labor legislation.[110]

---

[106] *Id.*

[107] *Id.* at 2583 (statement of Rep. Kelly) ("I believe in equality for women, and am sure the acceptance of the amendment will not repeal the protective laws of the several States.").

[108] Pauli Murray, Memorandum in Support of Retaining the Amendment to H.R. 7152, Title VII (Equal Employment Opportunity) to Prohibit Discrimination in Employment Because of Sex 24–25 (Apr. 14, 1964) (on file with the Schlesinger Library, Radcliffe Institute, Harvard University). For more on Pauli Murray's strategic efforts to promote legal protections against sex discrimination in the early 1960s, see SERENA MAYERI, REASONING FROM RACE 14–23 (2011).

[109] AMERICAN WOMEN, *supra* note 46, at 49; *see also id.* at 19–21 (advocating the removal of all "discriminatory provisions," *id.* at 19, from American law).

[110] 110 CONG. REC. 2582 (statement of Rep. Roosevelt).

This distinction, between laws that discriminate on the basis of sex and those that simply differentiate between the sexes, was not confined to the arguments of those who opposed the sex amendment. Pauli Murray, whose advocacy helped to ensure the amendment's passage, argued in a prominent 1965 law review article (coauthored by Mary Eastwood) that there was a distinction between "social policies that are genuinely protective . . . and those that unjustly discriminate against women."[111] Murray asserted that "society has a legitimate interest in the protection of women's maternal and familial functions,"[112] and that laws that genuinely served to protect these functions did not violate Title VII. Differentiation becomes discrimination, Murray explained, only when it "gives men a preferred position by accepted social standards" and "regulates the conduct of women in a restrictive manner."[113] Thus, Murray argued, the aim of Title VII was not to eradicate all formal sex classifications from the law,[114] but to invalidate employment practices "built upon the myth of the stereotyped 'woman.'"[115] Representative Griffiths echoed this sentiment in a 1966 speech on the House floor, in which she praised Murray's "thoughtful article."[116] Griffiths declared that Title VII's prohibition of sex discrimination barred employment practices that reflected "outmoded and prejudiced concepts"[117] of women's roles and reinforced "prejudicial attitudes limiting women to the less rewarded and less rewarding types of work."[118]

Employment practices need not sort men and women along biological sex lines in order to run afoul of this prohibition. Representative Ross Bass of Tennessee made this point during the legislative debate over Title VII's sex provision when he criticized airline policies terminating the employment of stewardesses when they married.[119] As Part II will show, the airlines attempted to defend these policies in the late 1960s by arguing that they did not violate Title VII because they did not sort men and women along biological sex lines.[120] As Representative Bass understood the law, however, it was not the formal sorting operation that defined an employment practice as dis-

---

[111] Pauli Murray & Mary O. Eastwood, *Jane Crow and the Law: Sex Discrimination and Title VII*, 34 GEO. WASH. L. REV. 232, 239 (1965).

[112] *Id.* at 238.

[113] *Id.* at 239.

[114] Murray argued that in addition to genuinely protective laws, Title VII permitted sex classifications in the form of separate dormitories and bathrooms for men and women, because these practices carried "no implication of inferiority." *Id.* at 240.

[115] *Id.* at 239.

[116] 112 CONG. REC. 13,692 (1966) (statement of Rep. Griffiths).

[117] *Id.* at 13,693.

[118] *Id.* at 13,691.

[119] 110 CONG. REC. 2578 (1964) (statement of Rep. Bass).

[120] *See infra* TAN 246–247.

criminatory, but the fact that it reflected and reinforced traditional conceptions of women's roles. He declared on the House floor that he intended to vote for the sex amendment on behalf of "both the unmarried and the married women."[121]

Comments of this kind reflected an understanding of Title VII's sex provision as a check on employment practices that reflected and reinforced traditional conceptions of men's and women's roles. These comments did not, however, yield any clear insight into how "drastically"[122] Congress intended its prohibition of sex discrimination to interfere with such practices. To Franklin D. Roosevelt, Jr., this lack of clarity rendered the legislative history of Title VII's sex provision useless; he frequently complained that Congress had provided the EEOC with no formula for determining whether a particular employment practice violated the statute. In retrospect, however, Congress's uncertainty and disagreement about the scope of Title VII's prohibition of sex discrimination is illuminating. It reminds us that there was no consensus in the mid-1960s about which forms of regulation qualified as discrimination "because of sex." The answer to that question was a matter of judgment, and much to Roosevelt's chagrin, Congress left that judgment to the two other branches.

## II. DETERMINING WHAT COUNTS
## AS DISCRIMINATION "BECAUSE OF SEX"

The EEOC was ill prepared for the avalanche of sex discrimination claims filed by American workers in the years after Title VII went into effect. Aileen Hernandez, the only female Commissioner at the time of the EEOC's founding, recalled that "[m]any of the staff members and several of the Commissioners (including myself) had long histories of work in civil rights and our understanding of (and commitment to) eliminating race discrimination surfaced in our earliest discussions . . . ."[123] Nobody at the EEOC in its early years had comparable experience in the field of women's rights, and nobody joined the EEOC expecting to work in this area.[124] The agency was therefore caught off-guard when more than a third of the claims it received in its first year pertained to sex discrimination.[125] Sonia Pressman, a young law-

---

[121] 110 CONG. REC. 2578 (statement of Rep. Bass).

[122] *EEOC Reports*, *supra* note 99, at 6036.

[123] Aileen C. Hernandez, *The Women's Movement: 1965–1975*, in A SYMPOSIUM IN OBSERVANCE OF THE TENTH ANNIVERSARY OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION 1, 7 (1975) (on file with the EEOC Library, Washington, D.C.).

[124] *See* SONIA PRESSMAN FUENTES, EAT FIRST — YOU DON'T KNOW WHAT THEY'LL GIVE YOU 131–32 (1999).

[125] *Id.* at 131.

yer who joined the EEOC's General Counsel's Office in the fall of 1965,[126] recalled:

> [T]hese complaints raised a host of new issues that were more difficult than those raised by the complaints of race discrimination. Could employers continue to advertise in classified advertising columns headed "Help Wanted — Male" and "Help Wanted — Female"? Did they have to hire women for jobs traditionally reserved for men? Could airlines continue to ground or fire stewardesses when they married or reached the age of thirty-two or thirty-five? What about state protective laws that prohibited the employment of women in certain occupations, limited the number of hours they could work and the amount of weight they could lift, and required certain benefits for them, such as seats and rest periods? Did school boards have to keep teachers on after they became pregnant? What would students think if they saw pregnant teachers? . . . Did employers have to provide the same pensions to men and women even though women as a class outlived men?[127]

The EEOC "was responsible for deciding these questions," Pressman observed, but "no one really knew how to resolve them."[128]

This Part examines how the EEOC, and subsequently federal courts, began to resolve these questions in the years after Title VII was enacted. Scholars have typically portrayed these years as a period of massive resistance, in which the government refused to take the issue of sex discrimination seriously.[129] Indeed, EEOC commissioners routinely expressed concern in this period that the law's prohibition of sex discrimination would "interfere with its main concern, racial discrimination."[130] Aileen Hernandez recalled that "Commission meetings produced a sea of male faces, nearly all of which reflected atti-

---

126 *See id.* at 124.

127 *Id.* at 131.

128 *Id.*

129 *See, e.g.,* HUGH DAVIS GRAHAM, CIVIL RIGHTS AND THE PRESIDENCY: RACE AND GENDER IN AMERICAN POLITICS 1960–1972, at 106 (1992) (noting "that in 1965 the American public mind at large, as mirrored in press coverage and political discourse, did not take the new issue of sex discrimination seriously" and that "EEOC chairman Franklin Roosevelt instinctively played to this gallery"); IRENE PADAVIC & BARBARA RESKIN, WOMEN AND MEN AT WORK 63 (2d ed. 2002) ("The regulatory agencies did not take seriously the prohibition of sex segregation until the 1970s . . . so the level of sex segregation remained essentially the same in 1970 as in 1960."); Gerald N. Rosenberg, *The 1964 Civil Rights Act: The Crucial Role of Social Movements in the Enactment and Implementation of Anti-Discrimination Law,* 49 ST. LOUIS U. L.J. 1147, 1152 (2005) (asserting that the EEOC "decided to treat the prohibition on sex discriminations as a joke," and that "[t]he result of this attitude was inaction on the part of the federal government. For the . . . four years [after Title VII went into effect], the Justice Department did not file a single sex discrimination suit.").

130 John Herbers, *Women Fighting for Job Rights,* N.Y. TIMES, Mar. 27, 1966, at 53; *see also* GRAHAM, *supra* note 129, at 107 (noting that one of the EEOC's early internal studies complained that the agency was "inundated by complaints about sex discrimination that diverted attention and resources from the more serious allegations by members of racial, religious, and ethnic minorities" (quoting FRANCES REISSMAN COUSENS, PUBLIC CIVIL RIGHTS AGENCIES AND FAIR EMPLOYMENT 13 (1969) (internal quotation marks omitted)).

tudes that ranged from boredom to virulent hostility whenever the issue of sex discrimination was raised."[131]  In the summer of 1965, Luther Holcomb, Vice Chairman of the EEOC, went so far as to request that Congress remove the prohibition of sex discrimination from the law.[132]  These tales of resistance, though true, tend to obscure the fact that the second half of the 1960s was also a deeply formative period in sex discrimination law.  Congress's addition of "sex" to Title VII had raised new questions about the legality of longstanding employment practices governing men's and women's roles in the workplace.  In the absence of any guidelines about how this provision would apply in practice, employers as well as members of the emerging women's movement and workers themselves offered a range of arguments about what should qualify as sex discrimination.  These arguments, and the normative visions underlying them, would play a major role in determining the meaning and scope of Title VII's prohibition of sex discrimination.

### A.  "The Sex Provision of Title VII Is
### Mysterious and Difficult to Understand and Control"[133]

Approximately two months after Title VII went into effect, six hundred representatives from the business, labor, government, and civil rights communities gathered at the White House for a two-day conference on the EEOC's plans for implementing the statute.[134]  In the panels devoted to race discrimination, the EEOC found that "conferees were eager to move beyond the letter of the law to a sympathetic discussion of those affirmative actions required to make the legal requirement of equal opportunity an operating reality."[135]  Conferees who attended the panel on sex discrimination were eager to discuss a different topic — namely, how to ensure that the law's prohibition of sex discrimination did not interfere too deeply with traditional forms of sex-based employment regulation.

If the concept of discrimination "because of sex" were interpreted too broadly, employers informed the EEOC, Title VII would destroy the "family structure."[136]  They pointed out that demanding jobs were reserved to men in order to preserve marital harmony and ensure that

---

[131]  Hernandez, *supra* note 123, at 6.
[132]  FUENTES, *supra* note 124, at 132.
[133]  *Federal Mediation Service to Play Role in Implementing Title VII*, [1965–1968 Transfer Binder] Empl. Prac. Dec. (CCH) ¶ 8046, at 6074 (Feb. 7, 1966) (quoting an EEOC respondent) (internal quotation marks omitted).
[134]  *Educating the Public About Employment Discrimination*, EEOC 35TH ANNIVERSARY, http://www.eeoc.gov/eeoc/history/35th/1965-71/educating.html (last visited Feb. 25, 2012).
[135]  EEOC, REPORT OF THE WHITE HOUSE CONFERENCE ON EQUAL EMPLOYMENT OPPORTUNITY: AUGUST 19–20, at 7 (1965) (on file with the Lyndon Baines Johnson Library, Austin, TX).
[136]  White House Transcript, *supra* note 103, at 125.

women were available to provide care to their husbands and children. Jobs in management, for instance, often required employees to relocate across the country — sometimes multiple times in the course of training.[137] If women were permitted to enter such jobs, employers argued, it would have a devastating effect on the stability and wellbeing of the American family. A female manager might ask her husband to quit his job so that she could move to a new location. Alternatively, she might tell her husband "no, you cannot move" when he "had an opportunity in another state."[138] Employers who attended the White House conference urged the EEOC to keep such dystopian scenarios in mind when determining what would count as sex discrimination under the law.[139]

Participants were also concerned about the effect that a broad interpretation of Title VII's sex provision would have on the regulation of sexuality in the workplace. Substantial numbers of women employed outside the home in the 1960s performed jobs that resembled the tasks they performed inside the home: they worked as caregivers, cleaners, teachers, nurses, waitresses, and secretaries.[140] In these roles, "female wage-earners . . . [were often] expected not only to perform gender on the job but to perform gender *as* the job"[141] — as when secretaries served as "office wives" to their male bosses, tending to their emotional needs and performing various forms of personal service.[142] Thus, when Title VII threatened to disrupt these gendered social arrangements, mild but widespread homosexual panic ensued. At his first press conference as Executive Director of the EEOC, Herman Edelsberg declared that there are those "who think that no man should be required to have a male secretary — and I am one of them."[143] A manager at the U.S. Chamber of Commerce echoed this

---

[137] *Id.* ("We tell any young person who comes with us on the management-trainee program that he may be expected to move at least five times across the United States during the first fifteen years that he is employed with us.").

[138] *Id.* at 126.

[139] Preserving "family harmony" was not employers' only concern; they also argued that "girls" have a habit of leaving the workforce when they marry, and that no manager "wish[es] to incur training expense on which he is unlikely to realize a return." *Id.* at 73.

[140] *See* Kim A. Weeden, *Profiles of Change: Sex Segregation in the United States, 1910–2000*, *in* OCCUPATIONAL GHETTOS 131, 162–76 (Maria Charles & David B. Grusky eds., 2004) (using U.S. census data to show the concentration of men and women in various job categories throughout the twentieth century).

[141] KATHLEEN M. BARRY, FEMININITY IN FLIGHT: A HISTORY OF FLIGHT ATTENDANTS 7 (2007).

[142] *See* ROSABETH MOSS KANTER, MEN AND WOMEN OF THE CORPORATION 89–91 (1977) (describing the work of an "office wife" and her relationship with her male boss).

[143] HARRISON, *supra* note 42, at 187 (quoting Herman Edelsberg) (internal quotation marks omitted); *see also* 112 CONG. REC. 13,689 (1966) (statement of Rep. Griffiths); HARRISON, *supra* note 42, at 189 (reporting that Edelsberg allegedly circulated a memo at the EEOC suggesting that the agency should adopt an official seal depicting a brown rabbit with a white rabbit "couchant" and a legend reading "Vive la différence").

sentiment at the White House conference. "I have a very attractive secretary," he declared; "I doubt that I would want a wavy-haired, blond male as my secretary."[144]  Also making an appearance at the conference was the male Playboy bunny — the corseted, cotton-tailed specter that loomed over almost all discussions of Title VII's sex provision in the mid-1960s.[145]  Lest this specter become a reality, employers urged the EEOC to take into account the value of workplace policies that respected basic heterosexual norms when interpreting the term discriminate "because of sex."[146]

Attendees at the White House Conference offered a range of suggestions about how the EEOC might interpret the statute in a manner consistent with these underlying normative concerns.  A number of panelists suggested that the agency, and eventually federal courts, should consult "national mores"[147] in determining what counts as sex discrimination, allowing sex-based employment policies to stand when they reflect deeply rooted cultural norms regarding gender and sexuality.  Others argued that the EEOC should look to "socially desirable objectives as a standard in interpreting" the law.[148]  They noted that the advantage of this interpretation is that it would enable legal decisionmakers to distinguish between "differential legislation that is socially desirable" and "true discrimination."[149]  On this interpretation,

---

[144] White House Transcript, *supra* note 103, at 80.

[145] *Id.* at 16–17.  Shortly after Title VII went into effect, the *Wall Street Journal* invited its readers to imagine lounging in a Playboy Club and being served drinks by a "shapeless, knobby-kneed male 'bunny.'"  *Sex & Employment*, WALL ST. J., June 22, 1965, at 1.  Likewise, an editorial in the *New York Times* asked whether the specter of men serving drinks in skimpy corsets with cotton-tails meant that it was no longer safe to "advertise for a wife."  *De-Sexing the Job Market*, N.Y. TIMES, Aug. 21, 1965, at 20.

[146] The fact that the term "sex" was used to refer both to the categorization of individuals as men and women and to sexual intercourse meant that Title VII's sex provision routinely triggered concerns about sexuality.  In fact, slippage between these two conceptions of "sex" was constant in discussions of Title VII's sex provision in the 1960s.  When a reporter at the EEOC's first press conference asked Franklin D. Roosevelt, Jr., "What about sex?," the EEOC Chairman replied with a laugh, "I'm all for it."  John Herbers, *Bans on Job Bias Effective Today*, N.Y. TIMES, July 2, 1965, at 32 (quoting Franklin D. Roosevelt, Jr.) (internal quotation marks omitted).  When Sonia Pressman began to advocate that the EEOC more actively enforce Title VII's prohibition of sex discrimination, her male colleagues dubbed her a "sex maniac."  FUENTES, *supra* note 124, at 132 (quoting Charles T. Duncan) (internal quotation marks omitted).  This history makes it particularly curious that courts in Title VII cases have so often cited the "plain meaning" or dictionary definition of the word "sex" as proof that sexuality-based discrimination falls outside the scope of the statute.  *See, e.g.*, Holloway v. Arthur Andersen & Co., 566 F.2d 659, 662 & n.4 (9th Cir. 1977) (citing the definition of "sex" in *Webster's Dictionary* as, inter alia, "sexually motivated phenomena or behavior" and "sexual intercourse," *id.* at 662 n.4 (quoting WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY (1970)) (internal quotation mark omitted), as evidence that "sex" must "be given [its] traditional definition based on anatomical characteristics" when interpreting Title VII, *id.* at 662).

[147] *See, e.g.*, White House Transcript, *supra* note 103, at 134.

[148] *Id.* at 126.

[149] *Id.* at 105.

panelists suggested, Title VII's sex provision would not apply either to "protective" labor legislation or to employer-based retirement and benefit plans that (ostensibly) favored women by recognizing their financial dependence on their husbands. A lawyer for a firm in Washington, D.C., advised the EEOC that the federal government's own conduct in regard to retirement and benefits plans offered "a basis whereby the Commission could consider these . . . plans as not being discriminatory."[150]  He explained that "discrimination" was illegal in the federal civil service "under basically the same standards set up in Title VII,"[151] but that this prohibition was not understood to apply to sex-differentiated benefit plans that favored women. Thus, he argued, the government's own practices militated in favor of defining Title VII's sex provision in a manner that preserved benign forms of sex-based regulation.

EEOC Commissioner Samuel Jackson observed in the mid-1960s that "the sex provision of Title VII is mysterious and difficult to understand and control."[152]  This observation captures the anxiety that Title VII's prohibition of sex discrimination generated in this period. The notion that business practices long taken for granted or even valued might now be defined as discriminatory was unsettling, particularly as the oddly truncated manner in which the proposal to bar sex discrimination became law meant that the "intent and reach of the amendment were shrouded in doubt."[153]  There was still "a good deal of talk at various high levels in Washington about taking sex *out* of Title VII" in the mid-1960s,[154] and the concept of sex discrimination still triggered laughter in many corners.[155]  But it was nonetheless important to the business community and other proponents of the status quo to exert some "control" over the statute, lest the EEOC and courts be influenced by some of the more robust critiques of sex-based regulation that had begun to emerge in this period.

Betty Friedan's bestselling book, *The Feminine Mystique*, published in 1963, contained a stark indictment of the male breadwinner–female homemaker model on which American ideals concerning work and

---

150  *Id.* at 46.

151  *Id.*

152  *Federal Mediation Service to Play Role in Implementing Title VII*, [1965–1968 Transfer Binder] Empl. Prac. Dec. (CCH) ¶ 8046, at 6074 (Feb. 7, 1966) (quoting an EEOC respondent) (internal quotation marks omitted).

153  *See* EQUAL EMP'T OPPORTUNITY COMM'N, *supra* note 26, at 5.

154  BETTY FRIEDAN, *"The First Year": President's Report to NOW, Washington, D.C., 1967, in* "IT CHANGED MY LIFE": WRITINGS ON THE WOMEN'S MOVEMENT 123, 124 (Harvard Univ. Press 1998) (1976).

155  FUENTES, *supra* note 124, at 129 (noting that in 1965, "[w]ords like 'sex discrimination' and 'women's rights' hadn't yet become part of our national vocabulary" and that "[i]n [her] early speeches for the EEOC, any reference to women's rights was greeted with laughter").

family had been constructed.[156]  In 1964, Representatives Griffiths and St. George launched a similarly overarching critique of the nation's gender trouble during the debate over Title VII's sex provision, asserting that this trouble was pervasive and deeply rooted.  Their colleague, Representative Bass, suggested during the same debate that to be responsive to these problems, the law would have to interrogate practices such as the airlines' practice of firing stewardesses upon marriage — not because this practice sorted men and women along biological lines,[157] but because it forced women to adopt conventional sex and family roles.  This way of thinking about discrimination had the potential to generate far-reaching, antistereotyping interpretations of Title VII's sex provision.

Yet employers leaving the White House Conference in the summer of 1965 had reason to be optimistic that the EEOC might instead adopt a narrow interpretation of the statute.  Deputy General Counsel Richard Berg had been quick to assure employers that the agency would take their interests into account when deciding which employment practices qualified as sex discrimination; he assured them, for instance, "that the Commission is not going to take the position that all state protective legislation for women goes out the window."[158]  How far Title VII's prohibition of sex discrimination would reach, it was too early to say.  But Berg promised the assembled crowd that the EEOC would determine the statute's scope by "balancing"[159] the law's egalitarian commitments against the interests of employers and the mores of American society.

### B.  A Women's Movement Enters the Debate

One of the first questions the EEOC confronted after the White House Conference was whether Title VII required the desegregation of job advertisements, which were generally segregated by sex and sometimes still segregated by race in the mid-1960s.[160]  In one of his first acts as Chairman of the EEOC, Franklin D. Roosevelt, Jr., announced that Title VII barred the segregation of help-wanted ads by

---

[156] *See* Louis Menand, *Books as Bombs*, NEW YORKER, Jan. 24, 2011, at 76.

[157] *See* BARRY, *supra* note 141, at 159 (noting that "more and more airlines in the 1950s and 1960s had stopped hiring male flight attendants" and that "[a]s of 1967, a federal court found, no airline in the United States was hiring male candidates as stewards").

[158] White House Transcript, *supra* note 103, at 115; *see also Administration of Sex Discrimination Provisions of Title VII Discussed by EEOC Chairman, supra* note 104, at 6012 (explaining that the EEOC would seek to "avoid punitive requirements for employers" in establishing guidelines for interpreting Title VII's sex provision).

[159] White House Transcript, *supra* note 102, at 62; *see also id.* at 124 (arguing that in interpreting Title VII's sex provision you have to ask "how much inconvenience can reasonably be demanded from an employer").

[160] GRAHAM, *supra* note 129, at 108.

race, and that the practice was now illegal.[161]  Whether the segregation of help-wanted ads by sex constituted "discrimination" was a more difficult question.  Roosevelt announced that he had appointed a seventeen-member advisory committee to study the issue.[162]

One month later, in September of 1965, the EEOC announced the results of its study.[163]  The agency determined that the practice of dividing job advertisements into male and female columns did not qualify as sex discrimination because "[c]ulture and mores, personal inclinations, and physical limitations will operate to make many job categories primarily of interest to men or women."[164]  Thus, the EEOC concluded, segregating ads by sex simply helped applicants and employers find what they were looking for.  The EEOC initially required employers who advertised in sex-segregated columns to "specifically state[] that the job is open to males and females,"[165] but upon reflection, determined that this requirement constituted too onerous a burden.  In the spring of 1966, the agency withdrew its initial guideline and issued a new guideline which permitted employers to place job advertisements in "male" or "female" columns without "stat[ing] specifically that both sexes may apply."[166]

The EEOC's stance on sex-segregated classified advertising underscored the extent to which judgments about the normative desirability or value of a particular employment practice influenced the agency's determination of whether it constituted "discrimination."[167]  For this reason, Aileen Hernandez and Sonia Pressman concluded "the country needed an organization to fight for women like the NAACP fought for African Americans."[168]  Without such an organization, employers and

---

[161] John Herbers, *U.S. Bars Race Designation in Job Ads*, N.Y. TIMES, Aug. 19, 1965, at 16.

[162] *Id.*; *see also* Hernandez, *supra* note 123, at 10 (noting that almost all of the committee's members were men, and that a majority of them represented newspapers and advertising agencies).

[163] Press Release, Equal Emp't Opportunity Comm'n (Sept. 22, 1965) (on file with the EEOC Library, Washington, D.C.).

[164] GRAHAM, *supra* note 129, at 111 (quoting Franklin D. Roosevelt, Jr.) (internal quotation marks omitted).

[165] Press Release, Equal Emp't Opportunity Comm'n, *supra* note 163.

[166] Press Release, Equal Emp't Opportunity Comm'n (Apr. 27, 1966) (on file with the EEOC Library, Washington, D.C.).

[167] EEOC Chairman Franklin D. Roosevelt, Jr., announced in the fall of 1965 that "common sense" would be the rule guiding the agency's interpretation of Title VII's sex provision.  Thus, Roosevelt informed the press that the new law would not require employers to hire men or women in cases where it would be inappropriate, and that "he did not foresee any 'revolution in job patterns,' such as more male nurses and secretaries, as a result of the [EEOC's] interpretations."  Elizabeth Shelton, *Commission Will Enforce Sex Clause in Title VII with "Common Sense"*, WASH. POST & TIMES-HERALD, Nov. 24, 1965, at C3 (quoting Franklin D. Roosevelt, Jr.).

[168] FUENTES, *supra* note 124, at 135; *see also* Hernandez, *supra* note 123, at 7–9 (discussing her recognition, after the White House Conference, of "the need for an outside activist organization to

32                          *HARVARD LAW REVIEW*                    [Vol. 125:1

the organizations representing them were the dominant voices in dis-
cussions about how to interpret Title VII's sex provision,[169] and they
urged the EEOC to interpret the statute in a manner that disrupted the
status quo as little as possible.  The EEOC, occupied with what it per-
ceived as more serious forms of discrimination, was happy to oblige.
Most of the Commissioners shared the view of employers in the mid-
1960s that sex discrimination was simply not a problem[170]  Sex-
segregated help-wanted advertisements did not seem "discrimina-
tory"; they seemed convenient.[171]  Likewise, "protective" labor laws
still struck many government officials as "in no way violative of Title
VII of the 1964 Civil Rights Act," because these laws "were not enacted
for the purpose of discriminating against women, but were enacted in
order to prevent women from being . . . injured to the detriment of
themselves, their families and society in general."[172]  Absent any un-
derstanding of the ways in which employment practices that enforced
conventional sex and family roles injured American workers, the EEOC
saw no reason to classify as "discrimination" practices that had long
been regarded as socially advantageous.[173]

---

force the Commission to pay serious attention to the problems facing women in the job market,"
*id.* at 8).

[169] *See* Hernandez, *supra* note 123, at 8–9 (noting that "[t]he Commission had felt the pressure
from organizations like the . . . American Newspaper Publishers Association [and] from the Asso-
ciation of Employment Agencies — each lobbying to influence the Commission's policies and pro-
cedures[,] [b]ut there was no national women's group capable of quick, direct and varied action
to pressure the Commission").

[170] *See* Deborah L. Rhode, *The "No-Problem" Problem: Feminist Challenges and Cultural Change*,
100 YALE L.J. 1731, 1731 (1991); *see also id.* at 1734 ("For feminists, a central problem remains
the lack of social consensus that there is in fact a problem.  To the public in general, and lawmak-
ers in particular, sex-based disparities have often appeared natural, functional, and, in large
measure, unalterable.").

[171] Edith Evans Asbury, *Protest Proposed on Women's Jobs*, N.Y. TIMES, Oct. 13, 1965, at 32
(quoting Franklin D. Roosevelt, Jr., who claimed in defense of the EEOC's ruling that segregating
help-wanted ads by sex was "for the convenience of readers, so they don't have to hunt through
all the ads" (internal quotation marks omitted)).

[172] *Maryland Law on Women's Working Hours Not in Conflict with Title VII or Federal Equal Pay
Act*, [1965–1968 Transfer Binder] Empl. Prac. Dec. (CCH) ¶ 8044, at 6069 (Jan. 19, 1966) (noting,
in a Maryland Attorney General's opinion upholding the legality of "protective" labor legislation,
that "[t]he functions of women as wives and mothers was a major consideration" in both the pas-
sage and the maintenance of these laws).  This understanding of "protective" labor legislation was
not exclusive to employers and government officials in the mid-1960s.  Some labor feminists con-
tinued to argue, even after Title VII was enacted, that "protective" labor legislation constituted
"necessary and socially desirable and differential legislation," rather than "true discrimination" of
the sort the statute was designed to combat.  *See* White House Transcript, *supra* note 103, at 105–
06 (statement of Olya Margolin, Washington Rep., Nat'l Council of Jewish Women).

[173] The EEOC's own stance in regard to "protective" labor legislation remained equivocal in this
period.  The agency asked Congress and the states to reexamine their "protective" laws to deter-
mine whether they were still supported by solid rationales, but did not issue a ruling finding such
laws discriminatory on their face.  Shelton, *supra* note 167.

In the late spring of 1966, Betty Friedan, Pauli Murray, and a number of other feminists dismayed by the EEOC's interpretation of Title VII's sex provision, founded the National Organization for Women (NOW).[174]  Their aim was to create the sort of organization the feminist lawyers at the EEOC believed was necessary to persuade the government and the American public that not all forms of sex-based regulation were benign and that discrimination "because of sex" was a substantial social problem.[175]  These efforts had already begun in an uncoordinated way in response to the EEOC's early rulings on sex discrimination.  In a widely publicized speech in the fall of 1965, Pauli Murray blasted the agency's determination that sex-segregated job advertisements did not qualify as discrimination within the meaning of Title VII.[176]  Representative Martha Griffiths followed Murray's lead in the spring of 1966 with a scathing speech in Congress.[177]  These public condemnations of the EEOC catalyzed the formation of NOW,[178] as feminists recognized the need to project a broader and more sustained critique of the way in which the agency charged with enforcing Title VII had decided to interpret its prohibition of sex discrimination.

Among the arguments feminists used in the mid-1960s to persuade the EEOC and the American public of the perniciousness of sex discrimination was an analogy to race discrimination, which was generally regarded as a more serious social problem.  In her speech condemning the EEOC's ruling on job advertisements, Murray argued that sex discrimination was no less detrimental to society than race discrimination and declared that women might decide to march on Washington if that was what was required to alter the EEOC's stance on sex discrimination.[179]  Murray expanded on this argument in her influential law review article on "Jane Crow," which emphasized "parallel[s] between antifeminism and race prejudice"[180] and asserted that "[w]omen have experienced both subtle and explicit forms of discrimination comparable to the inequalities imposed upon minorities."[181]  Representative Griffiths also sounded this theme during the speech she gave on the House floor condemning the EEOC's ruling on

---

[174] For a brief account of the founding of NOW, see BETTY FRIEDAN, *Introduction — Part II: The Actions, in* "IT CHANGED MY LIFE," *supra* note 154, at 104–08.

[175] *Id.* at 99–100 (noting that Sonia Pressman's entreaties about the need for a national organization to combat sex discrimination helped to spur the foundation of NOW).

[176] Asbury, *supra* note 171.

[177] *See* 112 CONG. REC. 13,689–13,694 (1966) (statement of Rep. Griffiths).

[178] FRIEDAN, *supra* note 174, at 96, 103; HARRISON, *supra* note 42, at 191.

[179] Asbury, *supra* note 171.

[180] Murray & Eastwood, *supra* note 111, at 234.

[181] *Id.* at 233.  For more on Murray's use of the race-sex analogy in the mid-1960s, see generally Serena Mayeri, *"A Common Fate of Discrimination": Race-Gender Analogies in Legal and Historical Perspective,* 110 YALE L.J. 1045 (2001).

34                          *HARVARD LAW REVIEW*                          [Vol. 125:1

sex-segregated help-wanted ads.[182]  Griffiths argued that the "long standing tradition [of listing jobs by sex] exerts enormous power" over women's employment opportunities, relegating them to second-class jobs just as surely as "white only" signs had confined black people to segregated railcars.[183]

It is not surprising that the women's movement should have invoked race-sex analogies in its campaign to alter the EEOC's interpretation of Title VII's sex provision.  "Sex" was listed alongside "race" in the text of the statute; it was natural to argue that they should be treated as equally weighty concerns.[184]  But feminists also focused on the family, and the way in which ideas about women as wives and mothers had limited their opportunities in the workplace.  In her "Jane Crow" article, Pauli Murray focused on the same long history of discrimination that Representatives Griffiths and St. George had invoked during the legislative debate over Title VII's sex provision.[185]  Murray noted that laws restricting women's opportunities in the workplace had historically been, and still were, justified by reference to traditional conceptions of their sex and family roles.[186]  In light of this history, she contended, it would be a mistake to assume that "equal rights for women" meant "identical treatment with men.  This is an oversimplification."[187]  What women sought in the context of employment, she argued, was "equality of opportunity . . . without barriers built upon the myth of the stereotyped 'woman.'"[188]  Thus, Murray claimed, policies that were genuinely beneficial to women or truly benign did not constitute discrimination "on the basis of sex," regardless of how they

---

[182] 112 CONG. REC. 13,692 (statement of Rep. Griffiths).

[183] *Id.* at 13,691.

[184] Murray and Griffiths also emphasized that "race" and "sex" were not mutually exclusive forms of discrimination and often overlapped in ways that injured black women in particular. *See, e.g., id.* at 13,689 (arguing that vigorous enforcement of Title VII's sex provision "is especially important to Negro women since they are victims of both race discrimination and sex discrimination, and have the highest unemployment rate and the lowest average earnings"); Pauli Murray, *The Negro Woman's Stake in the Equal Rights Amendment*, 6 HARV. C.R.-C.L. L. REV. 253, 255 (1971) (noting that "[w]hen racial and sexual stereotypes operate simultaneously, they are formidable barriers to economic advancement" and that protections against sex discrimination are therefore particularly necessary for black women); Murray & Eastwood, *supra* note 111, at 243 (noting that "[w]ithout the addition of 'sex,' Title VII would have protected only half the potential Negro work force").

[185] *See* Murray & Eastwood, *supra* note 111, at 236–41.

[186] *See id.* at 236–37 & n.30–31 (citing, inter alia, *Muller v. Oregon*, 208 U.S. 412 (1908), in which the Court upheld a maximum hour law for women in part because it protected their maternal functions, and *Goesaert v. Cleary*, 355 U.S. 464 (1948), in which the Court upheld a law prohibiting women from tending bar in the absence of "protecting oversight" from their fathers or husbands, *id.* at 466).

[187] *Id.* at 239.

[188] *Id.*

formally classified individuals.[189]  Regulation became "discriminatory" when it forced individuals to conform to traditional conceptions of sex and family roles or "relegate[d] an entire class to inferior status"[190] — which, Murray noted, almost, but not all, formal sex classifications did in the mid-1960s.[191]

NOW's founding documents, written the year after Murray's article, expressed similar concerns about the way in which sex-role stereotypes, particularly those concerning men's and women's roles in the family, impeded equal employment opportunity.[192]  NOW's *Statement of Purpose*, published in the fall of 1966, rejected the assumption "that marriage, home and family are primarily woman's world and responsibility" and that the work of providing financial support fell primarily to men.[193]  In the domain of employment, NOW argued, "the traditional assumption that a woman has to choose between marriage and motherhood, on the one hand, and serious participation in industry or the professions on the other"[194] perpetuated long-standing inequalities.  With these concerns in mind, NOW's Task Force on Equal Opportunity in Employment concluded that the organization should launch a "campaign for rigorous enforcement of Title VII of the Civil Rights Act."[195]  The Task Force advocated using Title VII to eliminate "protective" labor legislation and sex-segregated job advertisements and to eradicate pregnancy discrimination,[196] which enforced conventional understandings of women's family responsibilities in a particularly powerful way.[197]

By the end of the 1960s, NOW's campaign to effect "a public redefinition of discrimination based on sex"[198] had begun to achieve concrete legal results.  As a result of pressure from the women's movement, the EEOC had begun "to rule almost as aggressively on

---

[189] *Id.* at 240.

[190] *Id.* at 239.

[191] *Id.* at 240.

[192] For a more extensive discussion of the role of antistereotyping arguments by the women's movement in the 1960s, see Cary Franklin, *The Anti-Stereotyping Principle in Constitutional Sex Discrimination Law*, 85 N.Y.U. L. REV. 83, 105–14 (2010).

[193] Statement of Purpose, Nat'l Org. for Women (Oct. 29, 1966), *reprinted in* FEMINIST CHRONICLES 1953–1993, at 159, 162 (Toni Carabillo et al. eds., 1993).

[194] *Id.*

[195] Statement of Goals, Task Force on Equal Opportunity in Emp't (1967), *reprinted in* FEMINIST CHRONICLES, *supra* note 193, at 174, 174.

[196] *Id.* at 174–75.

[197] Statement of Purpose, Nat'l Org. for Women, *supra* note 193, at 159–60 (identifying, as one of the organization's chief concerns the fact that "childbearing . . . continues to be a most important part of most women's lives . . . [but] still is used to justify barring women from equal professional and economic participation and advance").

[198] NAT'L ORG. FOR WOMEN, THE FIRST FIVE YEARS 1966–71, at 16 (1971) (on file with the Schlesinger Library, Radcliffe Institute, Harvard University).

36                      *HARVARD LAW REVIEW*                      [Vol. 125:1

gender as it had from the beginning on race."[199]   In 1969, the EEOC issued revised guidelines, which finally determined that sex-segregated job advertising violated Title VII's prohibition of sex discrimination.[200] In 1972, it issued a new set of guidelines — also revising an earlier determination — stating that pregnancy discrimination constituted discrimination "because of sex" under Title VII.[201]   The agency also adopted a tougher stance toward "protective" labor legislation,[202] and courts began to invalidate such laws.[203]

Congress too responded to pressure from the women's movement with an unprecedented burst of lawmaking designed to further the campaign for sex equality.[204]   In March 1972, Congress passed the Equal Rights Amendment (ERA) and sent it to the states for ratifica-

---

[199] GRAHAM, *supra* note 129, at 115.

[200] Hernandez, *supra* note 123, at 14 (noting that it was a close vote, 3–2, and that the ruling did not take effect for many months because a group of newspapers attempted to enjoin the EEOC from issuing it).  For a detailed account of the EEOC's prolonged wavering on the question of whether sex-segregated job advertisements constituted discrimination "on the basis of sex," see Nicholas Pedriana, *Help Wanted NOW: Legal Resources, the Women's Movement, and the Battle Over Sex-Segregated Job Advertisements*, 51 SOC. PROBS. 182 (2004).

[201] *See* EEOC Employment Policies Relating to Pregnancy and Childbirth, 29 C.F.R. § 1604.10 (2011) (first adopted on April 5, 1972).

[202] Nicholas Pedriana, *Discrimination by Definition: The Historical and Legal Paths to the Pregnancy Discrimination Act of 1978*, 21 YALE J.L. & FEMINISM 1, 6 (2009) (noting that the EEOC in the early 1970s "unequivocally ruled — in yet another update of its interpretive guidelines — that state protective laws violated Title VII and . . . [w]ithin a few years, nearly all state protective policies disappeared").

[203] *See, e.g.*, Bowe v. Colgate-Palmolive Co., 416 F.2d 711 (7th Cir. 1969); Weeks v. S. Bell Tel. & Tel. Co., 408 F.2d 228 (5th Cir. 1969); Rosenfeld v. S. Pac. Co., 293 F. Supp. 1219 (C.D. Cal. 1968).

[204] *See, e.g.*, State and Local Fiscal Assistance Act of 1972, Pub. L. No. 92-512, § 122, 86 Stat. 919, 932 (prohibiting sex discrimination in the disbursement of federal funds for fiscal assistance to state and local governments); Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92-500, § 13, 86 Stat. 816, 903 (prohibiting sex discrimination in any program that receives federal funds under the Federal Water Pollution Control Act or the Environmental Financing Act); Act of Oct. 14, 1972, Pub. L. No. 92-496, § 3, 86 Stat. 813, 813–14 (expanding the mandate of the U.S. Commission on Civil Rights — a bipartisan group charged with studying problems facing minorities — to include sex discrimination); Act of Dec. 15, 1971, Pub. L. No. 92-187, §§ 1–3, 85 Stat. 644, 644 (amending sections 2108, 5924, and 7152 of Title 5 of the United States Code to provide equal employment benefits to married female federal employees); Comprehensive Health Manpower Training Act of 1971, Pub. L. No. 92-157, § 110, 85 Stat. 431, 461, and Nurse Training Act of 1971, Pub. L. No. 92-158, § 11, 85 Stat. 465, 479–80 (amending Titles VII and VIII of the Public Health Service Act to prohibit sex discrimination in admissions to training programs for health professionals funded under these Titles); Act of Aug. 5, 1971, Pub. L. No. 92-65, §§ 112, 214, 85 Stat. 166, 168, 173 (prohibiting sex discrimination in access to programs funded under the Public Works and Economic Development Act of 1965 or the Appalachian Regional Development Act of 1965).  For more on these and other legislative initiatives taken by the Ninety-Second Congress to combat sex discrimination, see JO FREEMAN, THE POLITICS OF WOMEN'S LIBERATION 202–04 (Longman 1975) (1975); Robert C. Post & Reva B. Siegel, *Legislative Constitutionalism and Section Five Power: Policentric Interpretation of the Family and Medical Leave Act*, 112 YALE L.J. 1943, 1994–96 (2003).

tion.[205]  In the same session, Congress passed Title IX of the Education Amendments of 1972,[206] which prohibited sex discrimination in all education programs receiving funds from the federal government.[207] The Ninety-Second Congress also passed the Comprehensive Child Development Act (CCDA), which was intended to fund Head Start, day care and supportive education programs, and was directly responsive to movement claims that women would not experience equality in the workplace as long as they were expected to bear sole responsibility for childcare.[208]

In this period, Congress also reaffirmed and expanded on its commitment to the eradication of sex discrimination in the workplace.  In 1972, Congress amended Title VII of the 1964 Civil Rights Act by passing the Equal Employment Opportunity Act,[209] which enabled the EEOC to bring enforcement litigation in federal court and extended the law's coverage to public employers.  Unlike in 1964, Congress in 1972 devoted substantial attention and resources to the issue of sex discrimination and produced a weighty legislative record documenting its commitment to eradicating this form of discrimination.  The House Committee Report on the 1972 Amendments explained that reform was necessary because "[d]espite the efforts of the courts and the [EEOC], discrimination against women continues to be widespread, and is regarded by many as either morally or physiologically justifiable."[210]  The Report insisted that "[d]iscrimination against women is no less serious than other forms of prohibited employment practices and is to be accorded the same degree of social concern given to any type of unlawful discrimination."[211]  It noted that Title VII's promise had not been realized in the context of sex, and that the aim of the 1972 Amendments was to revive "the hopeful prospects that Title VII

---

[205]  The Senate passed the ERA by a vote of 84–8 and sent it on to the states for ratification on March 22, 1972.  *See* 118 CONG. REC. 9598 (1972); *see also* JANE J. MANSBRIDGE, WHY WE LOST THE ERA 12 (1986).

[206]  Pub. L. No. 92-318, 86 Stat. 373  (1972) (codified as amended at 20 U.S.C. § 1681–1688 (2006))

[207]  *See id.* § 901, 86 Stat. at 373-74.  Title IX was enacted to expand the protections of both Titles VI (access to educational opportunities) and VII (employment) of the 1964 Civil Rights Act.  Title IX extended Title VI's antidiscrimination protections to cover discrimination on the basis of sex and extended Title VII's protections against sex discrimination in employment to educational facilities receiving federal funds.  *Id.*

[208]  The Comprehensive Child Development Act, S. 1512, 92d Cong. (1971), was added as a new title to the Economic Opportunity Amendments of 1971, S. 2007, 92d Cong. (1971).  President Nixon ultimately vetoed the CCDA and it never went into effect.  For more on the CCDA and its relation to the women's movement's demands for equality in the workplace, see Franklin, *supra* note 192, at 110–11; Post & Siegel, *supra* note 204, at 2008–12.

[209]  Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, 86 Stat. 103.

[210]  H.R. REP. NO. 92-238, at 5 (1971), *reprinted in* 1972 U.S.C.C.A.N. 2137, 2141; *see also* S. REP. NO. 92-415, at 7–8 (1971).

[211]  H.R. REP. NO. 92-238, at 5, *reprinted in* 1972 U.S.C.C.A.N. 2137, 2141.

offered millions of Americans in 1964."[212]  The debate on the House floor echoed these commitments.[213]  By the mid-1970s, courts had begun to cite the legislative history of the 1972 Amendments as evidence that Congress intended Title VII's prohibition of sex discrimination to be interpreted broadly to bring an end to the enforcement of "sexual stereotypes" in the workplace.[214]

As the next section shows, these developments altered the legal justifications and forms of argument employers might persuasively offer in defense of practices challenged under Title VII's sex provision. When Title VII first went into effect, employers routinely defended sex-based employment practices by arguing that such practices helped to preserve conventional sex roles and maintain the traditional family structure.  By the late 1960s, these forms of argument had grown less persuasive to the EEOC and, increasingly, to courts.  An employer that offered such arguments ran the risk of being informed that "Title VII rejects just this type of romantic paternalism as unduly Victorian."[215]  Thus, if employers wished to preserve practices challenged under Title VII's sex provision, after the emergence of the women's movement, they would have to rely on an alternative form of argument.

### C. The Emergence of Formalism as a Limitation on the Law's Reach

That alternative form of argument emerged in the battle over airline policies that terminated the employment of stewardesses when they married or reached their early thirties.  Whether these policies violated Title VII's prohibition of sex discrimination was one of the most fiercely contested questions in employment discrimination law in the 1960s.  Stewardesses arrived at the door of the EEOC to file complaints about these policies on the morning that Title VII went into ef-

---

[212] *Id.*

[213] *See* Harriss v. Pan Am. World Airways, Inc., 437 F. Supp. 413, 426–27 (N.D. Cal. 1977) (discussing the deep commitment to ending sex discrimination in employment expressed not only by the House Committee on Education and Labor, but also by Congress itself during the legislative debate over the 1972 Amendments).

[214] *See id.*; *see also, e.g.*, Barnes v. Costle, 561 F.2d 983, 987 (D.C. Cir. 1977) (noting that for "an eight-year period following its original enactment, there was no legislative history" to guide interpretation of Title VII's sex provision, but that in 1972 "there was considerable discussion on the topic" and "[n]ot surprisingly, it then became evident that Congress was deeply concerned about employment discrimination founded on gender, and intended to combat it as vigorously as any other type of forbidden discrimination"); Melani v. Bd. of Higher Educ., No. 73 Civ. 5434, 1976 WL 589, at *17 (S.D.N.Y. June 23, 1976) (noting that the "legislative history [of the 1972 Amendments] indicates very clearly that Congress intended Title VII to become a powerful tool to eliminate sex discrimination").

[215] Weeks v. S. Bell Tel. & Tel. Co., 408 F.2d 228, 236 (1969); *see also* Seidenberg v. McSorleys' Old Ale House, Inc., 317 F. Supp. 593, 606 (S.D.N.Y. 1970) (stating that "[o]utdated images of bars as dens of coarseness and iniquity and of women as peculiarly delicate and impressionable creatures in need of protection from the rough and tumble of unvarnished humanity" will no longer serve to justify the exclusion of women from bars).

fect.[216]   Partly as a result of stewardesses' tenacity in challenging these policies, the EEOC found in its first year that complaints of "loss of jobs due to marriage or pregnancy" outnumbered any other type of sex-based complaint.[217]  Because the airlines viewed such regulation as an essential component of their business, they defended these policies with equal tenacity.  As a result, the battle over sex discrimination in the airline industry persisted for years at the EEOC, in the courts, and the media.

Part of the attraction for the media was that legal issues involving stewardesses were sexier than those involving, for example, "protective" labor legislation.[218]   In the 1950s, airlines had increasingly stopped hiring men to work as flight attendants, and by 1967, no airline in the United States hired men for this job.[219]  For decades, airlines had been marketing to their mostly male clientele a fantasy centered on the sexual availability of female flight attendants.  Thus, while age and marital termination policies had disappeared from almost all other industries by the mid-1960s, the airlines steadfastly maintained these policies.[220]  They viewed young, unmarried stewardesses as an essential part of the service they offered, and they encouraged customers to take the same view.  In the 1950s, American Airlines partnered with Metro-Goldwyn-Mayer to produce the movie *Three Guys Named Mike*, in which a stewardess has romantic dalliances with three men she meets onboard and then happily leaves her job to settle down with the humblest of the three.[221]  United Airlines held out the same promise with its 1967 advertising slogan: "Everyone gets warmth, friendliness and extra care — and someone may get a wife."[222]  Initially, this marketing strategy focused on care, depicting stewardesses as pleasantly domestic, able to soothe, comfort, and fix drinks for weary business travelers, but as the 1960s progressed, the focus shifted to sex.  Airlines began to outfit stewardesses in miniskirts and hot pants; Braniff choreographed an "air strip" in which stewardesses shed layers of their Pucci uniforms during the course of the flight; National inaugurated its infamous "Fly Me" campaign.[223]  As the airlines saw it, older or married women would spoil the fantasy — for cus-

---

[216] BARRY, *supra* note 141, at 144–45.

[217] DOROTHY SUE COBBLE, THE OTHER WOMEN'S MOVEMENT 215 (2004).

[218] BARRY, *supra* note 141, at 135–36 (noting that the media's obsession with stewardesses in the 1960s did not stem wholly from an interest in their legal claims).

[219] *See id.* at 159; Diaz v. Pan Am. World Airways, Inc., 311 F. Supp. 559, 564 (S.D. Fla. 1970).

[220] *See* CLAUDIA GOLDIN, UNDERSTANDING THE GENDER GAP: AN ECONOMIC HISTORY OF AMERICAN WOMEN 174–75 (1990) (noting that after 1950, stewardesses were among the only American workers who still faced marriage bars in the workplace).

[221] THREE GUYS NAMED MIKE (Metro-Goldwyn-Mayer 1951).

[222] BARRY, *supra* note 141, at 179 (internal quotation marks omitted).

[223] *Id.* at 174–84.

40                          *HARVARD LAW REVIEW*                          [Vol. 125:1

tomers, and also for potential employees.  The airlines recruited "girls"
to work as stewardesses by portraying the job as a "bride school," in
which they would learn everything they needed to know to become
exemplary hostesses, wives, and mothers.[224]

Because the work of a stewardess was so deeply gendered, the air-
lines argued that their age and marital termination policies fit squarely
within Title VII's BFOQ exception,[225] as did their practice of hiring
only women to work as flight attendants.[226]  The crux of the airlines'
argument was that hiring young, single women for the job of steward-
ess was a legitimate business requirement because male passengers
preferred to be served by such people.  Airline executives asserted
that flight attending was "a young and pretty girl's job"[227] because no-
body could "convey the charm, the tact, the grace, the liveliness that
young girls can — particularly to men, who comprise the vast majority
of airline passengers."[228]  The airlines also claimed that allowing mar-
ried women into the ranks of stewardesses would disrupt administra-
tive operations, because husbands would constantly call to inquire
about their wives' flight schedules; degrade customer service, because
some women would be unable "to handle the competing demands of
home and job"; and "put a strain on family harmony," because the de-
mands of the job would prevent women from fulfilling their daily
homemaking and childcare responsibilities.[229]  Thus, the airlines ar-
gued, preserving the industry's age and marriage policies would bene-
fit society as a whole.  Jesse Freidin, who represented the Air Trans-
port Association at a public hearing before the EEOC in 1966,
concluded his defense of the airlines' employment practices by assert-
ing that, "[a]s an acceptable and useful job for young girls [and] as a
training ground for future wives and mothers . . . the stewardess corps
serves an important social purpose and is universally recognized
throughout the nation as being a very good thing."[230]  United Airlines
adopted    a    more    succinct    defense,    declaring    simply    that

---

[224] *Id.* at 36.

[225] 42 U.S.C. § 2000e-2(e)(1) (2006).

[226] For further discussion of the airlines' shifting reliance on the statute's BFOQ exception, see
*infra* TAN 241–246.

[227] Transcript of Testimony Heard Before the Equal Employment Opportunity Commission, on
September 12, 1967, on the Subject of "Occupational Qualifications for Position of Flight Cabin
Attendant Within Meaning of Section 703(e) of the Civil Rights Act" (with Corrections), at 203,
Diaz v. Pan Am. World Airways, Inc., 311 F. Supp. 559 (S.D. Fla. 1970) (No. 69-206-Civ-CF), at 31
(on file with the National Archives, Atlanta, Ga.) [hereinafter Flight Attendant Transcript] (state-
ment of Herbert Levy, counsel for Air Line Pilots Association).

[228] BARRY, *supra* note 141, at 158 (quoting United Airlines' brief in the first Title VII lawsuit
brought by a stewardess).

[229] Neal v. Am. Airlines, Inc., EEOC Decision No. 6-6-5759, [1968–1969 Transfer Binder] Empl.
Prac. Dec. (CCH) ¶ 8002, at 6009 n.11 (June 20, 1968); *see also id.* at 6009–11.

[230] BARRY, *supra* note 141, at 157 (quoting Jesse Freidin).

"[s]tewardesses should discontinue flying upon marriage and raise families."[231]

To the women's movement, the airlines' age and marital termination policies embodied precisely the type of prejudiced and outmoded attitudes about women's sex and family roles that Title VII was designed to combat.[232]  In testimony before the EEOC, Betty Friedan characterized these policies as "the most flagrant kind of sex discrimination."[233]  She and other feminists who testified on the airlines' employment practices argued that these practices robbed women of the ability to support their families by depriving them of the higher pay, pensions, and other benefits that accrue to long-term employees.[234]  Friedan argued that these policies offered a particularly "blatant[]"[235] illustration of the way in which employers push women out of the workforce and compel them to assume dependent roles in marriage. She claimed that such activity was illegal under Title VII, and that if the EEOC "were going to enforce the law" even minimally, it "must tell the airlines to cease and desist from this practice."[236]

EEOC Commissioner Aileen Hernandez agreed.  Hernandez had been pressuring the agency to issue rulings on both the airlines' policy of excluding men from flight attendant jobs and their age and marital termination policies from the beginning of her tenure at the EEOC.[237] After a full year of delay, Hernandez sent her colleagues a memo lambasting their "callous disregard"[238] of female workers.  She argued that the airlines' defense of their policies rested on "all the limiting stereotypes (benevolent or gallant as they may appear) which dictate the second class status of women workers."[239]  By rejecting this defense, she asserted, "we will have begun the long uphill road to equality of opportunity for women and will indicate that our Commission recognizes the multiple roles women may and should play in our society."[240]  Much to Hernandez's relief, the EEOC finally voted in November of 1966 that sex was not a BFOQ for the job of flight attendant.[241] That relief was short lived, however: the Air Transport Association

---

[231]  GEORGIA PANTER NIELSEN, FROM SKY GIRL TO FLIGHT ATTENDANT: WOMEN AND THE MAKING OF A UNION 87 (1982) (quoting United) (internal quotation marks omitted).

[232]  NOW actively supported the stewardesses' campaign to eradicate age and marital termination policies from the start.  Statement of Goals, Task Force on Equal Opportunity in Emp't, *supra* note 195, at 175 (discussing plans to support the airline stewardesses' campaign).

[233]  Flight Attendant Transcript, *supra* note 227, at 39 (statement of Betty Friedan).

[234]  *See, e.g., id.*, at 127–28 (statement of Esther F. Johnson).

[235]  *Id.* at 200 (statement of Betty Friedan).

[236]  *Id.* at 202.

[237]  *See* Hernandez, *supra* note 123, at 22–24.

[238]  *Id.* at 23.

[239]  *Id.* at 24.

[240]  *Id.*

[241]  BARRY, *supra* note 141, at 159.

42                             *HARVARD LAW REVIEW*                        [Vol. 125:1

(ATA) immediately obtained a restraining order forbidding the EEOC from issuing its decision until a court determined whether Hernandez's participation had tainted the impartiality of the proceedings.[242] The ATA argued that because Hernandez was involved with NOW, an organization that had recently passed a resolution in support of the stewardesses' cause, she could not be an impartial judge of the airlines' policies.[243] In February of 1967, a federal court in Washington, D.C., granted the ATA's request for a preliminary injunction and permanently enjoined the EEOC from releasing its decision.[244]

Although the airlines succeeded in preventing the EEOC's November 1966 ruling from going into effect,[245] the fact that the agency had voted as it did signaled to the airlines that its strategy of relying on the BFOQ exception might not prevail in the long run.  Thus, in the ongoing contest over age and marital termination policies, the airlines increasingly began to rely on a different argument.  When making the BFOQ argument, the airlines had implicitly acknowledged that these policies constituted sex discrimination, but claimed that such discrimination was justified by legitimate business requirements.  Now, the airlines argued that *these policies did not constitute sex discrimination at all.*[246]  Because they affected only some women, the airlines argued, these policies could not logically be categorized as discrimination "because of sex."   Rather, the airlines argued, these policies

---

[242]  Air Transp. Ass'n of Am. v. Hernandez, Civil Action No. 3096-66, 1966 WL 190 (D.D.C. Nov. 21, 1966).

[243]  Air Transp. Ass'n of Am. v. Hernandez, 264 F. Supp. 227, 230–31 (D.D.C. 1967).

[244]  *Id.* at 232.  The judge noted that "[s]ometime during the period between October 14 to October 29, Mrs. Hernandez had a conversation in her office with Pauli Murray concerning the formation of a women's civil rights group called the National Organization of Women," *id.* at 230–31, and that NOW had elected Hernandez "Executive Vice-President 'subject to her consent'" before the EEOC voted in the airlines' case, *id.* at 231.

[245]  Indeed, the EEOC's ruling that sex was not a BFOQ for the job of flight attendant was only temporarily thwarted.  *See* Sprogis v. United Air Lines, Inc., 444 F.2d 1194, 1197 (7th Cir. 1971) ("After extended hearings, the Commission ruled on February 23, 1968, that female sex was not a bona fide qualification for the position of flight cabin attendant . . . .").

[246]  During testimony before the EEOC, a lawyer for one of the stewardesses' unions called attention to the fact that the airlines had radically altered their position.  He noted that "[i]n looking over the transcript of the hearing that this Commission held a year ago . . . [he found] one principal difference."  Flight Attendant Transcript, *supra* note 227, at 202 (statement of Herbert Levy). In the previous year's hearing, the airlines had argued "that there is a bona fide occupational qualification which supports the limitation based upon age or marital status upon flight attendants," *id.* at 203, arguments which took for granted that these limitations constituted sex discrimination.  The lawyer noted that "[n]ow, in this hearing, [they] ha[ve] taken the position that the Commission lacks jurisdiction to d3al [sic] with" these issues because they do not constitute sex discrimination. *Id.*

discriminated on the basis of age and marital status — grounds that were not covered by Title VII.[247]

If age and marriage policies fell outside the scope of Title VII's protections, the airlines pointed out, the EEOC and the federal courts would have no jurisdiction over these matters. This result was not a side effect of categorizing age and marriage policies as something other than sex discrimination, but the central — and explicit — purpose of doing so. Indeed, the airlines tried to persuade the EEOC and courts to adopt their narrow definition of sex discrimination for explicitly normative reasons. They argued that policies terminating the employment of stewardesses when they married benefitted American families by ensuring that women fulfilled their "homemaking and child-drearing" responsibilities.[248] They also urged legal decisionmakers to take account of "[w]hat is best for the public"[249] when determining the scope of Title VII's sex provision. Customers preferred "extremely young" and "attractive" flight attendants,[250] the airlines argued, and to survive in a competitive industry, airline companies needed to be able to supply "what the American public wants."[251] "[O]ur product must be attractive," a Vice President for American Airlines informed the EEOC: "[W]e . . . can not afford to have gray packaging. We must have a glamorous product. Our product must be wanted by people."[252] Moreover, the airlines argued, "[i]t is a free-enterprise system";[253] the United States was not, and should not be, the kind of country that tried to micromanage the employment practices of private companies.

Because the argument that Title VII should be interpreted formalistically, to apply only to practices that separate all men from all women, was designed for the same purpose as the BFOQ argument (namely, limiting the law's reach), airlines in the 1960s often made these arguments simultaneously and interchangeably. When federal courts became involved in disputes over sex-based employment practices, they too sometimes treated these arguments as fungible. In *Cooper v. Delta Airlines, Inc.*,[254] the first federal case involving the legality of the airlines' marriage policies, Delta mounted an extensive BFOQ defense, "with psychological experts and airline personnel officials tes-

---

[247] *Id.* at 22 (statement of Jesse Freidin) (noting that the EEOC "has no authority to act in respect to complaints which are in fact based upon considerations of anything other than race, creed, color, nationality [sic] origin and sex").

[248] Neal v. Am. Airlines, Inc., EEOC Decision No. 6-6-5759, [1968–1969 Transfer Binder] Empl. Prac. Dec. (CCH) ¶ 8002, at 6009 n.11 (June 20, 1968); *see also id.* at 6009–11.

[249] Flight Attendant Transcript, *supra* note 227, at 78 (statement of Walter Rauscher).

[250] *Id.* at 81.

[251] *Id.* at 91.

[252] *Id.* at 75.

[253] *Id.* at 109 (statement of Frank Sharp).

[254] 274 F. Supp. 781 (E.D. La. 1967).

44                          *HARVARD LAW REVIEW*                    [Vol. 125:1

tifying that successful passenger service required young, single female attendants."[255]   A Louisiana district court found that Delta's evidence had shown "that 'single women' are better stewardesses than 'married women' for various reasons *viz*: better passenger acceptance, change flight schedules easier, less likelihood of pregnancy."[256]   Yet rather than finding that Delta's marriage policy fell into the BFOQ exception, the court found that it did not constitute sex discrimination at all because it did not divide men and women along biological lines.   The court was candid about the fact that its decision rested on a normative foundation.   It noted that "'sex' . . . just sort of found its way into the equal employment opportunities section of the Civil Rights Bill,"[257] and that many government officials, including Representative Emanuel Celler, had argued against its inclusion.[258]   The court then asserted that "Delta has a right to employ single females and to refuse to employ married females,"[259] and that it had no intention of interpreting an unpopular law to infringe that right.

*Cooper v. Delta* was one of the first instances in which a court adopted a formalistic or anticlassificationist approach to limit the reach of antidiscrimination law.   This practice would become widespread in the 1970s, reaching its apotheosis, in the context of Title VII law, in *Gilbert*.   Yet formalism as it was practiced by courts and other legal actors in the 1960s differed significantly from the practice the Court would later describe.   By the mid-1970s, the Court had begun to depict formalism as "an objective and determinate rule" that "define[s] discrimination solely with reference to the structure of a social practice" and "can be applied without additional value judgments."[260]   But as the battles over sex-based employment practices in the 1960s show, courts' decisions about when and how to apply formalistic approaches were largely dependent on value judgments about the practices they were analyzing.   The court in *Cooper* adopted a formalistic approach explicitly in order to limit Title VII's reach and preserve employers' "right" to implement hiring and retention policies that reflected and reinforced conventional sex roles.   In the same period, courts and other legal actors often declined to adopt a formalistic approach in cases involving practices such as "protective" labor legislation and sex-segregated job advertising, where doing so would have disrupted the enforcement of traditional sex and family roles.   Analysis

---

[255] BARRY, *supra* note 141, at 162–63.

[256] *Cooper*, 274 F. Supp. at 782.

[257] *Id.* at 783.

[258] *Id.*

[259] *Id.*

[260] Jack M. Balkin & Reva B. Siegel, *The American Civil Rights Tradition: Anticlassification or Antisubordination?*, 58 U. MIAMI L. REV. 9, 15 (2003) (critiquing this account of formalism).

of the formal characteristics of employment practices was not the decisive factor in courts' determination of whether these practices ran afoul of Title VII's prohibition of sex discrimination; social judgments about the desirability of these practices played a substantial role in such determinations.

Because formalism functioned not as an objective rule for determining the reach of Title VII, but as a tool for implementing more substantive commitments, feminists in the 1960s were just as likely as employers to adopt formalist arguments when these arguments furthered their normative ends. In her impassioned 1966 speech attacking the EEOC's ruling on sex-segregated job advertisements, for instance, Representative Griffiths analogized the practice to racially segregated waiting rooms in railway stations; she argued that Title VII prohibited such classifications.[261] Yet, Griffiths also argued that segregating help-wanted ads by sex violated the law because this practice perpetuated deeply entrenched forms of inequality and "condone[d] the continuation of outmoded and prejudiced conceptions of restricting women to 'women's work.'"[262] Similar concerns motivated feminists in this period to argue that practices such as terminating the employment of stewardesses when they married and discriminating on the basis of pregnancy violated Title VII's sex provision, though these practices did not formally classify employees on the basis of sex — an understanding that was evidently shared by the hundreds of workers who brought Title VII claims challenging these practices in the 1960s. Formalism, in the hands of feminists, was a tool for disrupting practices that perpetuated traditional conceptions of women's sex and family roles, but it did not define the concept of discrimination "because of sex"; to determine whether an employment practice fell into this category, it was necessary to consider its social meaning and effects.

As we have seen, the use of formalism by employers and courts sympathetic to their interests was also guided by social concerns. They adopted formalistic approaches when doing so limited the statute's reach and preserved forms of regulation they considered desirable; in cases where formalism would have disrupted such regulation, they disregarded it. Formalism did not serve in any of these instances as an objective or absolute rule for determining which employment practices qualified as discrimination "on the basis of sex"; it served instead as a vehicle for realizing more substantive judgments about which forms of workplace regulation the law ought to prohibit — or preserve.

---

[261] 112 Cong. Rec. 13,691 (1966) (statement of Rep. Griffiths).
[262] *Id.* at 13,693.

46                              *HARVARD LAW REVIEW*                          [Vol. 125:1

### D.  Non-Formalistic Ways of Reasoning About Sex Discrimination

After the court in *Cooper v. Delta* deployed formalistic reasoning to limit the reach of Title VII's sex provision, other courts began to follow suit, particularly in the Fifth Circuit.[263]  In 1969, in *Phillips v. Martin Marietta Corp.*,[264] the Fifth Circuit relied on formalistic reasoning to uphold a policy that barred mothers but not fathers of preschool-age children from working on assembly lines.  The court explicitly noted that its holding was motivated by a strong conviction that employers should not be compelled to ignore "the differences between the normal relationships of working fathers and working mothers to their pre-school age children."[265]  The court admitted that its own inclination would be to hold that this "seeming difference in treatment"[266] was justified under Title VII's BFOQ exception.  It noted, however, that the EEOC had "rejected this possible reading of the statute."[267]  Because the EEOC had rejected the possibility of a BFOQ, the court concluded that its only option for preserving the policy was to hold that it did not discriminate "because of sex."  If the only "permissible" way to limit the statute's reach was to "conclud[e] that the seeming discrimination here involved was not founded upon 'sex,'" the court explained, it would have "no hesitation" in reaching that conclusion.[268]

The court in *Martin Marietta* did not attempt to conceal the normative judgments about men's and women's sex and family roles that motivated its decision; nor did it seek to disguise its view that there was something overly formalistic and unnatural about requiring that an employment practice divide all men from all women in order to count as discrimination "because of sex."[269]  Dissatisfaction with this form of reasoning was not confined to the majority.  The Chief Judge, joined by two of his colleagues, wrote a stinging dissent from the denial of rehearing en banc in *Martin Marietta* attacking the court's formalistic interpretation of the statute.[270]  The dissenters argued that

---

[263]  *See, e.g.*, Lansdale v. United Air Lines, Inc., No. 68-1458-CIV-CA, 1969 WL 139, at *2 (S.D. Fla. 1969) (finding that United's practice of terminating the employment of stewardesses upon marriage does not violate Title VII's sex provision because it does not discriminate "on the basis of sex," but rather on the basis of marital status).

[264]  411 F.2d 1 (5th Cir. 1969).

[265]  *Id.* at 4; *see also id.* (arguing that it would be absurd to suggest that Congress could have intended Title VII to outlaw forms of discrimination that were rooted in such fundamental differences between men's and women's roles in the family).

[266]  *Id.*

[267]  *Id.*

[268]  *Id.*

[269]  *See id.* (repeatedly referring to the company's policy as "discrimination" and concluding only in order to reach its preferred result that "the seeming discrimination here involved was not founded upon 'sex' as Congress intended that term to be understood").

[270]  Phillips v. Martin Marietta Corp., 416 F.2d 1257 (5th Cir. 1969) (Brown, C.J., dissenting from denial of rehearing en banc).

when Congress enacted Title VII, "mothers, working mothers, and working mothers of pre-school children were the specific objectives of governmental solicitude,"[271] and that "one of the reasons repeatedly stressed for legislation forbidding sex discrimination was the large proportion of married women and mothers in the working force whose earnings are essential to the economic needs of their families."[272]  The dissenters argued that these fundamental commitments should guide the determination of what qualifies as discrimination "because of sex."  They also noted that working mothers account for a substantial percentage of the American workforce, that mothers continue to confront significant obstacles to workplace equality, and that President Nixon had recently championed "greatly expanded day-care center facilities" to help mothers overcome these very obstacles.[273]  Thus, the dissenters argued, it ran directly contrary to the government's objectives to permit employers "to deny employment to those who need the work most."[274]

In the late 1960s, the EEOC itself adopted this antistereotyping approach to Title VII's sex provision in a landmark series of rulings concerning the airlines' age and marriage policies.[275]  As noted above, the airlines increasingly began to argue in this period that their age and marriage policies did not discriminate on the basis of sex because they did not distinguish between men and women, but only between two groups of women.[276]  In the summer of 1968, the EEOC categorically

---

[271] *Id.* at 1260.

[272] *Id.* at 1261.

[273] *Id.* at 1261 n.13.  The Chief Judge cited approvingly the EEOC's argument that "it is the policy of the Administration to encourage unemployed women on public assistance, who have children, to enter the labor market by providing for the establishment of day care centers to enable them to accept offers of employment," *id.*, and argued that Title VII should be interpreted to further this project, *id.* at 1261–62.

[274] *Id.* at 1262.  In the early 1970s, Congress repeatedly reaffirmed its own commitment to enabling women to pursue motherhood and paid work with a series of laws designed to increase the availability of childcare.  *See, e.g.,* Revenue Act of 1971, Pub. L. No. 92-178, § 210, 85 Stat. 497, 518–20 (instituting a progressive childcare tax deduction for working parents); Comprehensive Child Development Act, S. 1512, 92d Cong. (1971) (authorizing $2 billion for Head Start, day care, and supportive education programs, but vetoed by President Nixon, who changed his mind about daycare in the early 1970s).  In the same session, Congress amended and broadened the scope of Title VII, in part because it found that working women continued to face widespread discrimination in the workplace that deprived them of the ability to support their families.  *See* Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, 86 Stat. 103; S. REP. NO. 92-415, at 7–8 (1971).  For more on the Ninety-Second Congress's concerted efforts to combat sex discrimination, see *supra* TAN 204–214.

[275] *See* Colvin v. Piedmont Aviation, Inc., EEOC Decision. No. 6-8-6975, [1968–1969 Transfer Binder] Empl. Prac. Dec. (CCH) ¶ 8003, at 6011 (June 20, 1968); Dodd v. Am. Airlines, Inc., EEOC Decision No. 6-6-5762, [1968–1969 Transfer Binder] Empl. Prac. Dec. (CCH) ¶ 8001, at 6001 (June 20, 1968); Neal v. Am. Airlines, Inc., EEOC Decision No. 6-6-5759, [1968–1969 Transfer Binder] Empl. Prac. Dec. (CCH) ¶ 8002, at 6006 (June 20, 1968).

[276] *See supra* TAN 246–247.

rejected this interpretation, holding that these policies constituted discrimination "because of sex" because they reflected and reinforced conventional understandings of women's sex and family roles. The EEOC noted that the airlines had defended their policies in precisely these terms, arguing that they were necessary "to avoid the stress on home and family life which would be caused by the absence of married stewardesses from their homes."[277] In the agency's view, such arguments merely confirmed that these policies constituted sex discrimination. It did not matter that there was no "actual disparity of treatment among male and female employees"[278]: What defined these policies as discriminatory was that they were based on stereotyped "assumptions about married women"[279] that curtailed their access to the workplace.

In 1971, Justice Thurgood Marshall became the most prominent advocate of this way of reasoning about sex discrimination when he embraced it in *Martin Marietta Corp.*,[280] which by then had reached the Supreme Court. The Court in *Martin Marietta* overruled the Fifth Circuit's determination that barring mothers, but not fathers, of young children from assembly line jobs did not qualify as discrimination "because of sex."[281] But what the Court gave, it then took away: it suggested that "family obligations, if demonstrably more relevant to job performance for a woman than for a man,"[282] could justify a BFOQ in these circumstances.[283] Rejecting this suggestion in a concurring opinion, Justice Marshall argued that "the Court has fallen into the trap of assuming that the Act permits ancient canards about the proper role of women to be a basis for discrimination."[284] In fact, he argued, Congress "sought just the opposite result. By adding the prohibition against job discrimination based on sex to the 1964 Civil Rights Act Congress intended to prevent employers from refusing 'to hire an individual based on stereotyped characterizations of the sexes.'"[285] Marshall cited the EEOC's recent decisions regarding the airlines' age and marriage policies as evidence that Title VII did not permit the en-

---

[277] *Colvin*, [1968–1969 Transfer Binder] Empl. Prac. Dec. (CCH) at 6014.

[278] *Neal*, [1968–1969 Transfer Binder] Empl. Prac. Dec. (CCH) at 6010.

[279] *Colvin*, [1968–1969 Transfer Binder] Empl. Prac. Dec. (CCH) at 6014.

[280] 400 U.S. 542, 544 (1971) (Marshall, J., concurring). *Martin Marietta* was the first sex-based Title VII case to reach the Supreme Court.

[281] *Id.* at 544 (per curiam).

[282] *Id.*

[283] *Id.* (remanding the case to the lower court to determine whether Martin Marietta Corp. could establish that sex was a BFOQ).

[284] *Id.* at 545 (Marshall, J., concurring).

[285] *Id.* (footnote omitted) (quoting EEOC Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604.1(a)(1)(ii) (1971)).

forcement of traditional sex and family roles, regardless of what form that enforcement took.[286]

Several months later, the Seventh Circuit endorsed this reasoning in *Sprogis v. United Air Lines, Inc.*,[287] which held that United's practice of terminating the employment of stewardesses upon marriage violated Title VII.[288]  The Court in *Sprogis* rejected the airline's argument that its marriage policy did not discriminate "because of sex," but merely differentiated between two groups of women on the basis of a characteristic unprotected by the law.  United cited *Cooper v. Delta* for this proposition, but the Seventh Circuit adopted a critical stance toward that case; it characterized *Cooper*'s approach as a departure from congressional intent and a betrayal of the statute's ideals.  The court asserted in *Sprogis* that Title VII was intended to counteract discrimination "resulting from sex stereotypes" and to "eliminate . . . irrational impediments to job opportunities and enjoyment which have plagued women in the past.[289]

Surveying the legal developments in this period, the author of a 1970 law review article concluded that a new day was dawning in sex discrimination law.[290]  He claimed that when Title VII went into effect, the EEOC failed to grasp "[t]he importance of the sex provision";[291] the commissioners seemed "oblivious to sex discrimination"[292] and hostile toward the idea of trying to combat it.  Five years later, however, the agency and federal courts had begun to enforce the law.  In cases involving "protective" labor legislation and the BFOQ exception, he noted, "Title VII has been interpreted to . . . reject[] . . . policies based on old-fashioned assumptions and myths about the sexes."[293]  He predicted that in the future, Title VII would increasingly be used to eradi-

---

[286] *Id.* at 545 & n.2 (citing Colvin v. Piedmont Aviation, Inc., EEOC Decision No. 6-8-6975, [1968–1969 Transfer Binder] Empl. Prac. Dec. (CCH) ¶ 8003, at 6011 (June 20, 1968); Neal v. Am. Airlines, Inc., EEOC Decision No. 6-6-5759, [1968–1969 Transfer Binder] Empl. Prac. Dec. (CCH) ¶ 8002, at 6006 (June 20, 1968)).  Marshall also cited Representative Ross Bass's declaration during the legislative debate over Title VII that the law would cover both single and married women as evidence that Congress intended this statute as a bar against the enforcement of traditional sex roles in the workplace.  *Id.* at 545 n.2 (citing 110 CONG. REC. 2578 (1964) (statement of Rep. Bass)).

[287] 444 F.2d 1194 (7th Cir. 1971).

[288] *Id.* at 1197–98.

[289] *Id.* at 1198.  In *Sprogis*, the plaintiffs were able to produce male comparators, because United Airlines employed both male and female flight attendants but applied its marriage policy to females.  In the airline cases decided by the EEOC in 1968, which struck down the same policy at issue in *Sprogis*, the plaintiffs were not able to produce male comparators because the airlines in those cases employed only women as flight attendants.  In both cases, the legal decisionmakers cited the social meaning and effects of these policies as a reason for striking them down.

[290] *See* Richard A. McDaniel, *Sex Discrimination*, 2 RUTGERS-CAMDEN L.J. 267, 267 (1970).

[291] *Id.* at 268.

[292] *Id.* at 269.

[293] *Id.* at 284.

cate employment policies that denied women "opportunities to use their talents and fulfill their potential"[294] and reinforced "traditional sex roles and family structure."[295]  As for *Cooper* and the Fifth Circuit's holding in *Martin Marietta*, the author asserted that "[s]ome judges seem as insensitive to the real meaning of sex discrimination as did the early members of the EEOC."[296]  He predicted that judicial resistance to the enforcement of Title VII's sex provision would fade, as the EEOC's had, and that the "overly narrow"[297] and formalistic understanding of sex discrimination adopted by these recalcitrant courts would soon be rejected in favor of a "deeper understanding."[298]

He was wrong.

### III. The Invention of a Tradition

In 1976, the Court held in *General Electric v. Gilbert* that discrimination on the basis of pregnancy did not qualify as discrimination "because of sex" under Title VII.  In many ways, this decision was a direct descendant of decisions like *Cooper* and the Fifth Circuit's holding in *Martin Marietta*.  *Gilbert* relied on the same narrow, formalistic reasoning as these earlier decisions, holding that the term "discriminate . . . on the basis of sex"[299] refers only to practices that sort men and women into two groups perfectly differentiated on the basis of biological sex.  Yet courts in the earlier decisions explicitly acknowledged that form followed function in the interpretation of Title VII.  They did not claim that the formalistic approach was the only legitimate way to interpret the law;[300] they claimed it was the best way, because it helped to realize a set of broader normative commitments, which generally involved shielding various forms of sex-based regulation from legal interrogation.

*Gilbert* did not speak in this register.  It studiously avoided the kind of "gender talk" that had permeated discussion of Title VII's sex provision over the past decade.  In fact, the Court managed to compose an entire opinion on the subject of discrimination against pregnant women without once using the words "mother" or "family."  Instead, the Court spoke of values such as deference and fidelity, asserting that its

---

[294] *Id.* at 283.
[295] *Id.*
[296] *Id.* at 270.
[297] *Id.* at 269.
[298] *Id.* at 273.
[299] *Gilbert*, 429 U.S. 125, 145 (1976).
[300] Indeed, the Fifth Circuit would have been perfectly willing, even pleased, to adopt a broader definition of the term discriminate "because of sex," if it could have used the law's BFOQ exception to preserve sex-based regulationsit considered benign or normatively appealing.  *See supra* TAN 266–268.

its narrow interpretation of the law was mandated by "tradition." Briefs filed in *Gilbert* argued that discrimination against pregnant workers reflected stereotyped assumptions about the incompatibility of work and motherhood and reinforced women's secondary status in the workplace.[301]  But the Court rejected the notion that normative concerns should influence the determination of what counts as discrimination "because of sex."  Traditionally, the Court asserted, the term discrimination was defined objectively, by reference to the formal characteristics of a policy or practice.  The Court declared itself bound, by its status as interpreter rather than creator of the law, to adhere to this traditional understanding.

Yet as Part II showed, formalism did not function in the 1960s as an objective or neutral rule for determining whether or not a given employment practice ran afoul of Title VII's sex provision.  In the decade after Title VII was enacted, courts and other legal actors applied formalistic reasoning inconsistently and in the service of more substantive judgments about how forcefully the law should constrain workplace practices that reflect and reinforce conventional gender norms.  Part III shows that this was no less true in the era of *Gilbert*.  The Court's decision to view the issue in *Gilbert* through a formalistic lens was itself dependent on the very social considerations the Court disavowed in its opinion.  However, by claiming to disavow such considerations and turning to "tradition" to justify its narrow interpretation of Title VII, the Court obscured the value judgments that have continued to influence what qualifies as discrimination "because of sex."

### A. Pregnancy and the "Traditional" Understanding of Sex Discrimination

Historically, women's capacity to become pregnant and their status as mothers have served as the central justifications for their exclusion from the workforce.  Many of the discriminatory practices condemned by congressional proponents of Title VII's sex provision in 1964 — from "protective" labor legislation to the exclusion of women from juries — were justified by reference to women's roles as mothers.[302]

---

[301]  *See, e.g.*, Brief of the American Civil Liberties Union as Amicus Curiae Supporting Petitioner, Phillips v. Martin Marietta Corp., 400 U.S. 542 (1971) (No. 73); Brief of the National Organization for Women as Amicus Curiae Supporting Petitioner, Phillips v. Martin Marietta Corp., 400 U.S. 542 (1971) (No. 73).

[302]  *See, e.g.*, Hoyt v. Florida, 368 U.S. 57, 62–63 (1961) (upholding a Florida law excusing women from jury service because women are "still regarded as the center of home and family life," *id.* at 62, and will often have "family responsibilities," *id.* at 63, incompatible with full participation in the public sphere); Muller v. Oregon, 208 U.S. 412, 421–22 (1908) (upholding a "protective" labor law on the ground that "healthy mothers are essential to vigorous offspring," *id.* at 421, and

52                          *HARVARD LAW REVIEW*                    [Vol. 125:1

Even workplace policies that did not explicitly refer to pregnancy and motherhood were often motivated by such concerns: the battle over the airlines' age and marriage policies was, at its core, a battle about women's right to continue working when they became mothers. Defenders of these policies routinely cited pregnancy — and the maternal responsibilities that ensued — as the primary justification for "grounding" stewardesses when they reached the maternal stage of their lives.[303]

The women's movement in the 1960s was quite vocal in its opposition to employment discrimination premised on stereotypes about women's special responsibilities in the home. In 1967, NOW observed that stereotyped conceptions of motherhood were "still [being] used to justify barring women from equal professional and economic participation and advance,"[304] and demanded an end to "discrimination based on maternity."[305] Stewardesses echoed these claims in their campaign against the airlines' age and marriage policies. They argued that these policies reflected precisely the kind of outmoded ideas about work and motherhood that Title VII was designed to counteract. During the monumental Women's Strike for Equality organized by NOW in the summer of 1970,[306] a contingent of stewardesses led a march in Washington, D.C., bearing signs that read "Storks Fly, Why Can't Mothers?," "We Want Our Babies and Our Wings," and "Mothers Are Still FAA Qualified."[307]

By the early 1970s, thousands of women had joined in the campaign to end employment practices that discriminated against pregnant women and mothers. Among the chief targets of this campaign were policies that exempted pregnancy from otherwise comprehensive disability insurance plans. Defenders of these policies argued that such exemptions were critical to preserving the traditional organiza-

---

421, and ensuring "the proper discharge of [women's] maternal functions," *id.* at 422, justifies the restriction on their right to work).

[303] *See, e.g.*, Frederic C. Appel, *Woman Pilot Deplores Airlines' Bar Because of Sex*, N.Y. TIMES, May 23, 1965, at 66 (quoting a United Air Lines spokesman's observation that "[m]arriage and possible pregnancy preclude women from being considered as long-term employes [sic]" (internal quotation mark omitted)).

[304] Statement of Purpose, Nat'l Org. for Women, *supra* note 193, at 159–60.

[305] Statement of Goals, Task Force on Equal Opportunity in Emp't *supra* note 193, at 174–75.

[306] For more on the Women's Strike, see FRIEDAN, *supra* note 154, at 180–95; Robert C. Post & Reva B. Siegel, *Legislative Constitutionalism and Section Five Power: Polycentric Interpretation of the Family and Medical Leave Act*, 112 YALE L.J. 1943, 1988–89 (2003). The Women's Strike, which drew tens of thousands of women, was designed "to publicize three core movement claims: '(1) free abortion on demand, (2) free 24-hour childcare centers, and (3) equal opportunity in jobs and education.'" *Id.* at 1989. The strikers made these three demands to illustrate the central role that the regulation of women's sex and family roles played in depriving them of equal opportunity in the workplace.

[307] BARRY, *supra* note 141, at 188 (internal quotation marks omitted).

tion of the American family. The *Wall Street Journal* editorial board, for instance, opposed extending disability coverage to pregnant women on the ground that it would "weaken the family unit," in part by providing women with "economic protection for bearing children out of wedlock."[308]  In 1966 — a period in which the EEOC remained openly hostile to Title VII's prohibition of sex discrimination — the agency issued an opinion letter stating that a "benefit plan may simply exclude maternity as a covered risk, and such an exclusion would not in our view be discriminatory."[309]  By the early 1970s, however, the idea that pregnancy discrimination did not constitute sex discrimination was increasingly a minority view.[310]  In 1972, the EEOC retracted its initial ruling and issued a new guideline stating that Title VII barred the exclusion of pregnancy-related disability from employer benefit plans.[311]  That same year, the Department of Health, Education, and Welfare issued nearly identical guidelines[312] interpreting Title IX of the Education Amendments of 1972.[313]  By 1975, numerous federal courts had ruled that pregnancy discrimination was discrimination "because of sex" within the meaning of Title VII.[314]  All six of the fed-

---

[308] Editorial, *Examining Sex Discrimination*, WALL ST. J., April 12, 1974, at 6.

[309] Gen. Elec. Co. v. Gilbert, 429 U.S. 125, 143 (1976) (quoting letter) (internal quotation mark omitted).

[310] MAYERI, *supra* note 108, at 67.

[311] Guidelines on Discrimination Because of Sex, 37 Fed. Reg. 6835, 6837 (Mar. 31, 1972) (codified as amended at 29 C.F.R. § 1604.10 (2011)) ("Disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth, and recovery therefrom are, for all job-related purposes, temporary disabilities and should be treated as such under any health or temporary disability insurance or sick leave plan available in connection with employment.").

[312] OFFICE FOR CIVIL RIGHTS, U.S. DEP'T OF HEALTH, EDUC., & WELFARE, HIGHER EDUCATION GUIDELINES: EXECUTIVE ORDER 11246, at 12–13 (1972) (prohibiting discrimination against pregnant women).

[313] Pub. L. No. 92-318, 86 Stat. 373 (1972) (codified as amended at 20 U.S.C. § 1681–1688 (2006)).  Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

[314] *See, e.g.*, Tyler v. Vickery, 517 F.2d 1089, 1097–99 (5th Cir. 1975); Commc'ns Workers of Am. v. Am. Tel. & Tel. Co., 513 F.2d 1024, 1031 (2d Cir. 1975); Satty v. Nashville Gas Co., 384 F. Supp. 765, 771 (M.D. Tenn. 1974), *aff'd*, 522 F.2d 850 (6th Cir. 1975); Hutchison v. Lake Oswego Sch. Dist., 374 F. Supp. 1056, 1065 (D. Or. 1974), *aff'd*, 519 F.2d 961 (9th Cir. 1975); Gilbert v. Gen. Elec. Co., 375 F. Supp. 367, 381–82 (E.D.A. Va. 1974), *aff'd*, 519 F.2d 661 (4th Cir. 1975); Wetzel v. Liberty Mut. Ins. Co., 372 F. Supp. 1146, 1162 (W.D. Pa. 1974), *aff'd*, 511 F.2d 199 (3d Cir. 1975); Healen v. E. Airlines, Inc., No. 18097, 1973 U.S. Dist. LEXIS 11973, at *24 (N.D. Ga. Dec. 26, 1973); Dessenberg v. Am. Metal Forming Co., No. C 72-48 T, 1973 U.S. Dist. LEXIS 11650, at *4 (N.D. Ohio Oct. 3, 1973); Lillo v. Plymouth Local Bd. of Educ., No. C 73-184-Y, 1973 U.S. Dist. LEXIS 11651, at *2–3 (N.D. Ohio Oct. 3, 1973); Vick v. Tex. Emp't Comm'n, No. 70-H-1164, 1973 U.S. Dist. LEXIS 12104, at *7 (S.D. Tex. Aug. 30, 1973); Doe v. Osteopathic Hosp. of Wichita, Inc., 333 F. Supp. 1357, 1362 (D. Kan. 1971).

54 *HARVARD LAW REVIEW* [Vol. 125:1

eral appellate courts that had considered the issue reached the same conclusion.[315]

This trajectory came to an abrupt halt in 1974, when the Supreme Court rejected an equal protection challenge to a provision of the California insurance code that exempted pregnancy from the state's otherwise comprehensive disability insurance program.[316] The lower court found that the provision violated equal protection because it was based on "sexual stereotypes,"[317] but the Supreme Court rejected this finding. It held, in *Geduldig v. Aiello*,[318] that pregnancy discrimination was not sex discrimination because it did not divide men and women along the axis of biological sex, but merely differentiated between two groups of women.[319] Two years later, the Court endorsed this formalistic approach in *Gilbert*, which extended the holding in *Geduldig* into the context of Title VII. In *Gilbert*, however, the Court offered a new justification for its holding. Whereas the Court in *Geduldig* simply asserted that pregnancy discrimination was not sex discrimination, the Court in *Gilbert* claimed that this understanding was deeply rooted in history and tradition. Citing the "long history of judicial construction"[320] of the term discrimination in cases involving race, the Court asserted that this term had "traditionally"[321] been understood to refer only to practices that formally classified on the basis of a protected trait.

This was a formative moment in contemporary antidiscrimination law. The mid-1970s marked the end of the long Warren Court era, in which the Court had worked to dismantle racial stratification in a diverse array of social institutions, regardless of whether that stratification resulted from overt racial classification or less formal means of maintaining racial hierarchy.[322] The Court began in the mid-1970s to

---

[315] *See* Gen. Elec. Co. v. Gilbert, 429 U.S. 125, 147 (1976) (Brennan, J., dissenting) (citing *Commc'ns Workers of Am.*, 513 F.2d 1024; *Wetzel*, 511 F.2d 199, *vacated on jurisdictional grounds*, 424 U.S. 737 (1976); *Gilbert*, 519 F.2d 661; *Tyler*, 517 F.2d at 1097–99; *Satty*, 522 F.2d 850; *Hutchison*, 519 F.2d 961).

[316] Geduldig v. Aiello, 417 U.S. 484 (1974).

[317] Aiello v. Hansen, 359 F. Supp. 792, 798 (N.D. Cal. 1973).

[318] 417 U.S. 484.

[319] *Id.* at 496–97 & n.20.

[320] *Gilbert*, 429 U.S. at 145.

[321] *Id.*

[322] In the late 1970s, Alan David Freeman identified 1974 as the year in which the Court adopted colorblindness as its primary approach to questions in race discrimination law. Alan David Freeman, *Legitimizing Racial Discrimination Through Antidiscrimination Law: A Critical Review of Supreme Court Doctrine*, 62 MINN. L. REV. 1049, 1102 (1978); *cf.* MAYERI, *supra* note 108, at 76–105 (discussing the conservative turn in the Court's race discrimination jurisprudence in the mid-1970s and its effects on the way that feminist litigators approached sex discrimination cases). *See generally* LAURA KALMAN, RIGHT STAR RISING: A NEW POLITICS, 1974–1980 (2010) (dating the emergence of the modern conservative movement to the mid-1970s and examining its substantial effects on Supreme Court personnel and race discrimination doctrine).

identify formal classification, rather than racial subordination or substantive inequality, as the evil that constitutional and statutory antidiscrimination law was intended to prevent.[323]  Under this new regime, busing and affirmative action became problems to remedy,[324] and laws and practices that helped to maintain de facto segregation in schools, neighborhoods, and workplaces ceased to register as legal concerns.[325]  *Geduldig* extended the Court's turn toward formalism into the context of sex.  But it was *Gilbert*, two years later, that consolidated the idea that discrimination "because of sex" referred only to practices that divided men and women into two groups along the axis of biological sex.[326]  *Gilbert* constructed a history and a pedigree for this idea, suggesting that courts had no choice but to interpret Title VII in a formalistic manner if they wished to remain faithful to the American legal tradition.

For an opinion that purports to be grounded in a longstanding interpretive tradition, *Gilbert* contains notably few historical citations. Of the cases it does cite, some seem to undermine its claim that the term "discrimination" has been understood throughout American history in exclusively formalistic terms.  One of these cases, *Morton v. Mancari*,[327] involved a Title VII challenge to the Bureau of Indian Affairs' longstanding practice of granting explicit employment preferences to qualified Indians.  The Court rejected this challenge.  It held that the "preference [wa]s a longstanding, important component of the Government's Indian program," and that historically, this program had not been understood to constitute the kind of racial discrimination that Title VII was designed to counteract.[328]  Asserting the importance of analyzing the concept of "discrimination" in a context-specific and historically sensitive manner, the Court declared:

---

[323]  *See generally* Ian F. Haney López, *"A Nation of Minorities": Race, Ethnicity, and Reactionary Colorblindness*, 59 STAN. L. REV. 985 (2007) (examining the development of "reactionary colorblindness" and its emergence in the Court's race discrimination jurisprudence in the 1970s).

[324]  *See, e.g.*, Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265 (1978); Milliken v. Bradley, 418 U.S. 717 (1974); DeFunis v. Odegaard, 416 U.S. 312 (1974).

[325]  *See, e.g.*, Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977); *Milliken*, 418 U.S. 717.

[326]  *See Gilbert*, 429 U.S. at 145.

[327]  417 U.S. 535 (1974).

[328]  *Id.* at 550.  Although it had characterized American Indians in racial terms in previous cases — and the lower court had done so in this case — the Court in *Mancari* decided to characterize the BIA's employment policy as a political preference.  *Id.* at 553–54.  The Court's shifting understanding of what counts as a racial classification provides a further demonstration of the ways in which formalistic approaches to questions involving discrimination are inherently dependent on value judgments about the practices at issue.  For a more detailed examination of the Court's determination that the BIA's preference for Indians did not constitute discrimination "on the basis of race," see generally Carole Goldberg, *What's Race Got to do With It?: The Story of* Morton v. Mancari, *in* RACE LAW STORIES 237 (Rachel F. Moran & Devon Wayne Carbado eds., 2008).

> A provision aimed at furthering Indian self-government by according an employment preference within the BIA for qualified members of the governed group can readily co-exist with a general rule prohibiting employment discrimination on the basis of race. Any other conclusion can be reached only by formalistic reasoning that ignores both the history and purposes of the preference . . . .[329]

In this case, the Court portrays formalistic reasoning about discrimination as an overly rigid approach to a concept that is necessarily defined in terms of social meaning and practical effects.

*Mancari* was not the only case cited in *Gilbert* in which the Court had recently rejected a formalistic approach to the concept of discrimination. In his dissenting opinion in *Gilbert*,[330] Justice Brennan noted that the Court had also rejected such an approach in another 1974 case, *Lau v. Nichols*.[331] In *Lau*, the Court held that San Francisco's failure to provide special language instruction to Chinese-speaking students in its public schools violated Title VI's prohibition of race, color, and national origin discrimination, despite the fact that the city had not formally classified any students on these bases. The Court held in *Lau* that given the broad social objectives underlying the statute, its antidiscrimination provisions should be interpreted to require the school district to "take affirmative steps to rectify the language deficiency in order to open its instructional program to these students."[332] The Court noted that the school district's failure to do so had "all [the] earmarks of the discrimination banned by the regulations,"[333] suggesting that the term "discrimination" did not necessarily entail classification.

In his dissent in *Gilbert*, Justice Brennan noted that in *Lau*, "a unanimous Court recognized that discrimination is a social phenomenon encased in a social context and, therefore, unavoidably takes its meaning from the desired end products of the relevant legislative enactment, end products that may demand due consideration to the uniqueness of 'disadvantaged' individuals."[334] Brennan accused the Court in *Gilbert* of adopting a mindlessly formalistic approach to the concept of sex discrimination — one that obscured legally salient questions about the social meaning and effects of pregnancy discrimination and the ways in which it reflected and reinforced traditional conceptions of women's sex and family roles.[335]

---

[329] *Mancari*, 417 U.S. at 550.
[330] *Gilbert*, 429 U.S. at 159 (Brennan, J., dissenting).
[331] 414 U.S. 563 (1974).
[332] *Id.* at 568 (quoting the Department of Health, Education, and Welfare's 1970 guidelines requiring school receiving federal funds to take such measures).
[333] *Id.*
[334] *Gilbert*, 429 U.S. at 159 (Brennan, J., dissenting).
[335] *See id.* at 148–49 & n.1.

This was not a bug, but a feature of the Court's new formalist rhetoric. In the 1960s, employers and courts were explicit about the normative concerns motivating their adoption of a narrow, anticlassificationist approach to Title VII. They argued that interpreting the law to apply only to employment practices that divided men and women into two perfectly sex-differentiated groups would limit the statute's reach and help to maintain the traditional gendered organization of the family. By the mid-1970s, however, justifications for employment practices that explicitly relied on stereotyped conceptions of men's and women's roles had become increasingly less persuasive in the legal arena.[336] Concerted efforts by the women's movement had convinced courts, at least in some cases, that regulations enforcing such stereotypes violated antidiscrimination law.[337] Formalism provided a "cooler" way of approaching such issues[338]: It enabled the Court to respond to charges that it was upholding employment practices that "fostered [sexually] stratified job environments to the disadvantage of [women]"[339] by asserting that it was simply deferring to congressional intent and remaining faithful to tradition.

Eric Hobsbawm observes that "traditions" are often invented for the purpose of "establishing or legitimizing institutions . . . or relations of authority."[340] By the 1970s, arguments based explicitly on gender stereotypes had lost some of their power to legitimate narrow interpretations of Title VII's sex provision. The argument that "tradition" compelled courts to interpret the statute narrowly sounded in far more anodyne notions of deference and fidelity. These notions

---

[336] *See* Franklin, *supra* note 192.

[337] In 1961, the Supreme Court upheld a Florida law excusing women from jury service on the ground that "woman is still regarded as the center of home and family life" — a role that entailed "special responsibilities" and was presumably incompatible with full participation in civic life. Hoyt v. Florida, 368 U.S. 57, 62 (1961). By the early 1970s, the Court had begun to reject stereotyped conceptions of men's and women's roles as a justification for sex-based state action. *See, e.g.,* Frontiero v. Richardson, 411 U.S. 677 (1973) (invalidating a federal law requiring husbands, but not wives, of service members to prove dependency in order to qualify for benefits); Reed v. Reed, 404 U.S. 71 (1971) (striking down an Idaho statute that preferred men to women in the appointment of estate executors).

[338] *Cf.* Goldberg, *supra* note 17, at 794 (noting that "[t]he comparator heuristic, as it is used by most courts . . . gives the appearance that the facts of differential treatment, rather than the courts' own assumptions and judgments, are doing the work to show that trait-based discrimination has occurred and that, as required by the applicable discrimination law, the court must intervene").

[339] *Gilbert,* 429 U.S. at 160 (Brennan, J., dissenting) (alterations in original) (quoting McDonell Douglas Corp. v. Green, 411 U.S. 792, 800 (1973)) (internal quotation marks omitted).

[340] Hobsbawm, *supra* note 21, at 9. Hobsbawm notes that the invention of tradition "occur[s] more frequently when a rapid transformation of society weakens or destroys the social patterns for which 'old' traditions had been designed . . . or when such old traditions and their institutional carriers and promulgators no longer prove sufficiently adaptable and flexible" to suit current needs. *Id.* at 4–5. This may be especially true in a legal context, where claims of obedience to precedent or original understanding carry special weight and may be particularly useful in justifying revolutionary interpretations of the law.

58                    *HARVARD LAW REVIEW*                    [Vol. 125:1

more anodyne notions of deference and fidelity. These notions appeared to have nothing to do with concerns about gender and the family. Yet the adoption of formalism here and not elsewhere suggests that social judgments about the practice of pregnancy discrimination influenced the Court's determination that Title VII's sex provision did not reach this far. In other words, *Gilbert* did not transcend the debate over how strictly Title VII should regulate employment practices that enforced traditional gendered conceptions of the family: it took a side in that debate.

### B. The Persistent Demand for Opposite-Sex Comparators

Ostensibly, *Gilbert* is no longer good law. When Congress enacted the PDA, it rejected the Court's interpretation of Title VII and declared that pregnancy discrimination was a form — perhaps the iconic form — of discrimination "because of sex."[341] Numerous legislators in 1978 expressed surprise that it was necessary to clarify this point, as it seemed obvious that "the assumption that women will become pregnant and leave the labor force . . . is at the root of the discriminatory practices which keep women in low-paying and dead-end jobs."[342] In fact, the consensus in both the House and Senate was that the PDA simply restored the understanding of Title VII's sex provision held by Congress, "the EEOC and the overwhelming majority of the Federal courts which addressed this issue prior to the Gilbert decision."[343]

The Court has since acknowledged on numerous occasions that "[w]hen Congress amended Title VII in 1978, it unambiguously expressed its disapproval of both the holding and the reasoning of the Court in . . . *Gilbert*."[344] In other words, the PDA "not only overturned

---

[341] *See* AT&T Corp. v. Hulteen, 129 S. Ct. 1962, 1974–80 (2009) (Ginsburg, J., dissenting) (discussing the passage of the PDA and its swift and wholehearted repudiation of *Gilbert*).

[342] H.R. REP. NO. 95-948, at 3 (1978), *reprinted in* 1978 U.S.C.C.A.N. 4749, 4751; *see also* 124 CONG. REC. 21,442 (1978) (statement of Rep. Tsongas) (explaining that the PDA would "put an end to an unrealistic and unfair system that forces women to choose between family and career — clearly a function of sex bias in the law, which no longer reflects the conditions of women in our society").

[343] 124 CONG. REC. 21,440 (statement of Rep. Thompson); *see also* S. REP. NO. 95-331, at 7–8 (1977) ("[T]he bill is merely reestablishing the law as it was understood prior to *Gilbert* . . . ."); 124 CONG. REC. 36,819 (statement of Sen. Stafford) ("Congress in 1964 . . . intended to prohibit discrimination in employment on the basis of pregnancy when it enacted the original Civil Rights Act."); *id.* at 21,442 (statement of Rep. Myers) ("This legislation will clarify the original intent of Congress that sex discrimination in title VII includes pregnancy-based discrimination."); *id.* at 21,440 (statement of Rep. Thompson) ("H.R. 6075 seeks only to clarify what most feel was the original intent of Congress in enacting the Civil Rights Act — that the title VII prohibitions against sex discrimination in employment include discrimination based on 'pregnancy, childbirth, or related medical conditions.'").

[344] Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 678 (1983); *see also* Cal. Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 284–85 (1987) (explaining that "the first clause of the PDA reflects Congress' disapproval of the reasoning in *Gilbert*," *id.* at 284, while "the second

the specific holding" in *Gilbert*, it "also rejected the test of discrimination employed by the Court in that case."[345]  Despite this seemingly categorical rejection, however, *Gilbert*'s reasoning about what it means to discriminate on the basis of sex — and the "test of discrimination" it established — continues to limit the protections available to workers under Title VII.

The most formidable obstacle confronting employment discrimination plaintiffs today is courts' ongoing demand for comparator evidence.  In most circumstances, courts in Title VII cases continue to require that sex discrimination plaintiffs adduce opposite-sex comparators — individuals similarly situated to themselves in all relevant respects aside from biological sex.[346]  Only by comparing the plaintiff to such a comparator, courts hold, is it possible to determine that the alleged discrimination was truly based on "sex."

This requirement expresses in doctrinal terms *Gilbert*'s formalistic conception of discrimination: it is not concerned with the social meaning or practical effects of a challenged employment practice, but only with whether it divides men and women into two groups along the axis of biological sex.  In fact, courts applying the comparator requirement often describe sex discrimination in explicitly mathematical terms.  A passage oft-quoted in sex discrimination decisions suggests a married woman can show that she has suffered sex discrimination only by comparing herself to a married man because when one "cancel[s] out the common characteristics of the two classes being compared ([e.g.,] married men and married women), as one would do in solving an algebraic equation, the cancelled-out element proves to be that of married status, and *sex remains the only operative factor in the equation*."[347]

---

clause . . . illustrate[s] how discrimination against pregnancy is to be remedied," *id.* at 285); *Newport News*. 462 U.S. at 679 ("Proponents of the [PDA] repeatedly emphasized that the Supreme Court had erroneously interpreted congressional intent and that amending legislation was necessary to reestablish the principles of Title VII law as they had been understood prior to the *Gilbert* decision.").

[345] *Newport News*, 462 U.S. at 676.

[346] Goldberg, *supra* note 17, at 750 (noting that comparators "constitute, to many courts, a threshold requirement of a discrimination claim and, in that sense, part of discrimination's very definition.  On this view, discrimination occurs only when an actor has differentiated between two groups of people because of a protected trait, which means that the absence of a comparator signals the absence of discrimination." (footnote omitted)).

[347] Coleman v. B-G Maint. Mgmt. of Colo., Inc., 108 F.3d 1199, 1203 (10th Cir. 1997) (alteration and emphasis in original) (quoting LEX K. LARSON, EMPLOYMENT DISCRIMINATION § 40.04, at 40-12 (2d ed. 1996)); *see also* Philipsen v. Uni. of Mich. Bd. of Regents, No. 06-CV-11977-DT, 2007 WL 907822, at *8 (E.D. Mich. Mar. 22, 2007) (same); Gee-Thomas v. Cingular Wireless, 324 F. Supp. 2d 875, 882 (M.D. Tenn. 2004) (same); Martinez v. N.B.C. Inc., 49 F. Supp. 2d 305, 310 (S.D.N.Y. 1999) (same).

60          *HARVARD LAW REVIEW*          [Vol. 125:1

This requirement sharply curtails plaintiffs' ability to prove they have been discriminated against "because of sex." People who work in small or sex-segregated workplaces or who are uniquely situated in their jobs will often be unable to produce comparators, meaning that they effectively reside outside the scope of Title VII's protection.[348] The comparator requirement also excludes from protection workers who face discrimination on the basis of capacities that are unique to one sex, such as breast-feeding. For this reason, no plaintiff in the American legal system has ever persuaded a court that breast-feeding discrimination violates Title VII's sex provision.[349] Courts have universally concluded in such cases that:

> [D]rawing distinctions among women . . . on the basis of their participation in breast-feeding activity, simply is not the same as drawing distinctions between women and men . . . . A prohibition against breast-feeding merely divides people into two groups: (1) women who breast-feed . . . ; and (2) individuals who do not breast-feed . . . . [A]lthough the first group includes exclusively women . . . the second group includes members of both sexes . . . . If anything, such classifications establish "breast-feeding discrimination," which . . . is not discrimination on the basis of sex . . . under the law.[350]

This reasoning closely tracks the Court's reasoning in *Gilbert*. In fact, courts applying the opposite-sex comparator requirement in cases involving reproductive differences between men and women often cite *Gilbert* as authority for their formalistic interpretation of the law.[351]

There are some exceptions to courts' otherwise pervasive insistence that plaintiffs in sex discrimination cases produce opposite-sex comparators. When Congress enacted the PDA, it implicitly rejected

---

[348] *See* Goldberg, *supra* note 17, at 751–64 (discussing the many "circumstances in which courts' insistence on the production of comparators inhibits or precludes discrimination claims," *id.* at 751); *see also* JOAN WILLIAMS, *UNBENDING GENDER* 66 (2000) (noting that "[m]ost women work with other women" and that "[t]hree-fourths of all working women still work in predominantly female occupations).

[349] *See, e.g., supra* note 18. The Patient Protection and Affordable Care Act amended Section 7 of the Fair Labor Standards Act to require employers to provide breastfeeding mothers with break time and a private space in which express milk, but it did not amend Title VII's prohibition of sex discrimination. *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 577–78 (codified at 29 U.S.C. § 207(r)(1)–(4) (2010)).

[350] Derungs v. Wal-Mart Stores, Inc., 141 F. Supp. 2d 884, 893 (S.D. Ohio 2000).

[351] *See, e.g., Martinez*, 49 F. Supp. 2d at 309 ("Title VII forbids gender discrimination in employment, but gender discrimination by definition consists of favoring men while disadvantaging women *or vice versa*. The drawing of distinctions among persons of one gender on the basis of criteria that are immaterial to the other, while in given cases perhaps deplorable, is not the sort of behavior covered by Title VII. This was made clear more than twenty years ago in *General Electric Co. v. Gilbert*"); Wallace v. Pyro Mining Co., 789 F. Supp. 867, 869 (W.D. Ky. 1990) (finding that "under the principles set forth in *Gilbert*," the plaintiff could not establish that she had been discriminated against "on the basis of sex"). For more on courts' continuing reliance on *Gilbert* in such cases, see Widiss, *supra* note 18, at 551–56.

the Court's suggestion in *Gilbert* that comparators are definitionally required to establish discrimination "because of sex." Plaintiffs alleging pregnancy discrimination do not need to produce opposite-sex comparators to win sex-based Title VII claims. Likewise, in 1989, the Court held in *Price Waterhouse v. Hopkins*[352] that Title VII barred employers from taking adverse employment actions based on an assumption or insistence that employees "match[] the stereotype associated with their group."[353] This holding permits plaintiffs to prove sex discrimination without producing comparator evidence, as the Court suggested that evidence of sex stereotyping alone may be sufficient to show "that gender played a part" in an employer's decision.[354]

In the past decade, a number of courts have held that evidence of sex stereotyping is sufficient to establish a claim of sex discrimination in the absence of comparator evidence. In 2009, the First Circuit held that a woman who was told she had been denied a promotion not because of anything she "did or didn't do," but because she "had a lot on [her] plate" with four children at home had established a claim of sex discrimination sufficient to survive summary judgment,[355] even though she produced no evidence that she was treated differently than

---

[352] 490 U.S. 228 (1989).

[353] *Id.* at 251 (plurality opinion).

[354] *Id.* (emphasis omitted). However, in practice, it has often proven difficult, even after *Price Waterhouse*, to establish sex-based Title VII claims in the absence of comparator evidence. *See* Claire-Therese D. Luceno, *Maternal Wall Discrimination: Evidence Required for Litigation and Cost-Effective Solutions for a Flexible Workplace*, 3 HASTINGS BUS. L.J. 157, 162–68 (2006) (discussing courts' continued insistence on comparator evidence in Title VII cases involving claims of sex stereotyping). Sexual harassment doctrine provides another means of establishing a sex-based Title VII claim without producing an opposite-sex comparator, but here too, plaintiffs face significant obstacles to proving their claims. *See* Sandra F. Sperino, *Rethinking Discrimination Law*, 110 MICH. L. REV. 69, 86–87 (2011) (arguing that the doctrinal framework courts have developed in the context of sexual harassment screens out many cases that should be covered under Title VII by imposing evidentiary burdens not warranted by the statutory language).

[355] Chadwick v. Wellpoint, Inc., 561 F.3d 38, 42 (1st Cir. 2009) (quoting Nanci Miller, plaintiff's immediate supervisor); *see also, e.g.*, Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 57 (1st Cir. 2000) (holding that a supervisor's questioning remarks about whether a female employee "would be able to manage her work and family responsibilities" after having a second child supported a finding of discriminatory animus when she was fired shortly thereafter); Sheehan v. Donlen Corp., 173 F.3d 1039, 1044–45 (7th Cir. 1999) (holding that a jury in a PDA case could have concluded that "a supervisor's statement to a [pregnant] woman . . . that she was being fired so that she could 'spend more time at home with her children' reflected unlawful motivations because it invoked widely understood stereotypes the meaning of which is hard to mistake"); Plaetzer v. Borton Auto., Inc., No. Civ.02-3089 JRT/JSM, 2004 WL 2066770, at *6 n.3 (D. Minn. Aug. 13, 2004) (evidence of more favorable treatment of fathers is not needed to show sex discrimination against mothers where an "employer's objection to an employee's parental duties is actually a veiled assertion that mothers, because they are women, are insufficiently devoted to work, or that work and motherhood are incompatible"). For further discussion of such cases, see generally Joan C. Williams & Stephanie Bornstein, *The Evolution of "FReD": Family Responsibilities Discrimination and Developments in the Law of Stereotyping and Implicit Bias*, 59 HASTINGS L.J. 1311 (2008).

male employees with young children.[356]  In 2004, the Second Circuit held that a school psychologist whose employer denied her tenure after repeatedly remarking on the incompatibility of work and motherhood and suggesting that "ha[ving] little ones at home"[357] would prevent her from adequately performing her job stated a claim under Title VII.[358]  The court held that the plaintiff need not produce a comparator because "the notions that mothers are insufficiently devoted to work, and that work and motherhood are incompatible, are properly considered to be, themselves, gender-based."[359]

The fact that these decisions were hailed as significant developments or even new departures in employment discrimination law[360] illustrates how powerfully *Gilbert*'s formalistic reasoning has influenced courts' understanding of what it means to discriminate "because of sex."  The Court claimed in *Gilbert* that the concept of sex discrimination had always been defined in exclusively formalistic terms.  Yet as Part II showed, "discrimination" was never defined solely in these terms: The EEOC determined as early as 1968 that comparators were not necessary to establish a claim of sex discrimination under Title VII.[361]  In three major cases involving the airlines' age and marriage policies, the agency declared that "[t]he concept of discrimination based on sex does not require an actual disparity of treatment among

---

[356] *Chadwick*, 561 F.3d at 45–46 (rejecting the district court's conclusion that the plaintiff's stereotyping evidence established only that the employer had discriminated against caregivers, not that it had discriminated "on the basis of sex"); *see also id.* at 42–43 & n.4 (rejecting the employer's argument that its decision to award the promotion to another woman with children effectively foreclosed the plaintiff from making a sex discrimination claim).

[357] Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 115 (2d Cir. 2004).

[358] *See id.* at 113.

[359] *Id.* at 121. In 2007, the EEOC adopted this interpretation in a guidance document specifying that discrimination against workers with caregiving responsibilities may constitute sex discrimination under Title VII "regardless of whether the employer discriminates more broadly against all members of the protected class," EQUAL EMP'T OPPORTUNITY COMM'N, ENFORCEMENT GUIDANCE: UNLAWFUL DISPARATE TREATMENT OF WORKERS WITH CAREGIVING RESPONSIBILITIES 10 (2007), *available at* http://www.eeoc.gov/policy/docs/caregiving.pdf, or regardless of whether the employee can show that he or she was treated differently than a similarly situated member of the opposite sex, *see id.* at 8 ("[I]nvestigators faced with a charge alleging sex-based disparate treatment of female caregivers should examine the totality of the evidence to determine whether the particular challenged action was unlawfully discriminatory.  All evidence should be examined in context.  The presence or absence of any particular kind of evidence is not dispositive.  For example, while comparative evidence is often useful, it is not necessary to establish a violation.").

[360] *See, e.g.*, Noreen Farrell & Genevieve Guertin, *Old Problem, New Tactic: Making the Case for Legislation to Combat Employment Discrimination Based on Family Caregiver Status*, 59 HASTINGS L.J. 1463, 1476 (2008) (describing *Back* as a "landmark development"); Carmel Sileo, *Second Circuit Tears Down "Maternal Walls,"* TRIAL, July 2004, at 95, 95 (characterizing *Back* as "stunning," *id.* (quoting Joan Williams, director of the Worklife Program at American University's Washington College of Law) (internal quotation marks omitted), and a "landmark" case).

[361] *See supra* TAN 275–279.

1176

male and female employees."[362]   The airlines had argued in these cases that a plaintiff could not prove sex discrimination without producing an opposite-sex comparator.[363]  Because many carriers refused to employ male flight attendants in this period,[364] the airlines hoped that requiring stewardesses to produce comparator evidence would insulate their age and marriage policies from scrutiny under Title VII. The EEOC categorically rejected this approach.  In the agency's view, it was "sufficient" for a finding of sex discrimination "that a company policy or rule" — such as those that reinforced stereotyped conceptions of women's sex and family roles — "is applied to a class of employees because of their sex."[365]

   The EEOC's holdings in the airline cases were based on an understanding (shared by the Court in *Mancari* and *Lau*) that discrimination was "a social phenomenon encased in a social context,"[366] rather than simply a matter of formal line-drawing.  Indeed, the EEOC in 1968 rejected the airlines' argument that if their policy of firing stewardesses upon marriage were found to constitute "discrimination . . . it [could] be remedied by applying the no-marriage rule to male flight attendants."[367]   Even without engaging in any formal classification, the EEOC suggested, such a policy would continue to push women out of the workplace and perpetuate the notion that after a woman married, her place was in the home.  This, in the agency's view, rendered the policy impermissible under Title VII.[368]   As we have seen, the EEOC was not the only legal decisionmaker in this period to adopt a broad view of Title VII's prohibition of sex discrimination.  Twice in the 1970s, Congress amended Title VII in ways that affirmed its commitment to expansive and nonformalistic understandings of the law's sex provision.[369]

362 Neal v. Am. Airlines, Inc., EEOC Decision No. 6-6-5759, [1968–1969 Transfer Binder] Empl. Prac. Dec. (CCH) ¶ 8002, at 6010 (June 20, 1968); *see also* cases cited *supra* note 275.

363 *See* Dodd v. Am. Airlines, Inc., EEOC Decision No. 6-6-5762, [1968–1969 Transfer Binder] Empl. Prac. Dec. (CCH) ¶ 8001, at 6004 (June 20, 1968) ("The [Air Transport Association's] argument is premised on the fact that if all the incumbents in a job classification are members of one sex, any conditions of employment relating to that job cannot be based on sex."); *Neal*, [1968–1979 Transfer Binder] Empl. Prac. Dec. (CCH) at 6010 n.20 (same).

364 Earlier in the twentieth century, stewards were common, but by 1967, no airline in the United States was hiring male candidates for the job.  *See* Diaz v. Pan Am. World Airways, Inc., 311 F. Supp. 559, 564 (S.D. Fla. 1970).

365 *Neal*, [1968–1969 Transfer Binder] Empl. Prac. Dec. (CCH) at 6010.  The EEOC noted that opposite-sex comparator evidence could be used to "buttress[]" claims of sex discrimination, but rejected the airlines' contention that comparators were a required element of such claims.  *Id.* at 6011.

366 Gen. Elec. Co. v. Gilbert, 429 U.S. 125, 159 (1976) (Brennan, J., dissenting).

367 *Neal*, [1968–1969 Transfer Binder] Empl. Prac. Dec. (CCH) at 6011.

368 *Id.*

369 *See supra* TAN 209–214, 341–343.

When courts today hold that sex discrimination cannot be shown without recourse to opposite-sex comparators, they often suggest that they are simply deferring to congressional intent and remaining faithful to the traditional conception of what it means to discriminate "because of sex."[370]  But the rule that plaintiffs cannot win Title VII claims in the absence of comparator evidence is not compelled by history. The original proponents of this rule, in the 1960s, were employers explicitly seeking to limit the reach of Title VII's sex provision.  Originally, this rule was conceived as a means of shielding a variety of employment practices from judicial scrutiny by shifting the focus away from the social meaning and practical implications of these practices and toward questions about their formal characteristics.  Courts' ongoing demand that plaintiffs produce opposite-sex comparators in order to prove that they have been discriminated against "because of sex" continues to have this effect today.  It reinscribes *Gilbert*'s formalistic reasoning about sex discrimination in the law decades after Congress rejected that reasoning.

### C.  Ongoing Departures from Formalism

Courts employing formalistic reasoning in ways that limit the scope of Title VII's sex provision — whether in *Gilbert* or in more recent decisions requiring opposite-sex comparators — begin from the premise that formalism provides an objective and determinate rule for deciding when discrimination has occurred.  Yet as this section will show, courts have never consistently adhered to a formalistic conception of sex discrimination.  Courts in the 1970s routinely abandoned formalism when it yielded legal results inconsistent with social norms and their own judgments about the practices that plaintiffs were seeking to disestablish.  It was this set of norms and judgments — and not a neutral, mathematical formula — that ultimately determined the parameters of Title VII's prohibition of sex discrimination.  Indeed, socially inflected judgments continue to determine the law's parameters today.

One reason courts have applied formalism inconsistently is that it does not reliably constrain what counts as discrimination "because of sex."  Requiring women in all-female workplaces to produce male comparators precludes them from demonstrating that they have been discriminated against "because of sex" and shields the regulation of such women from scrutiny under Title VII.  In this context, formalism limits the law's scope.  In other contexts, however, formalism gener-

---

[370] *See, e.g.,* Derungs v. Wal-Mart Stores, Inc., 374 F.3d 428, 439 (6th Cir. 2004) (noting "that no judicial body thus far has been willing to take the expansive interpretive leap to include rules concerning breast-feeding within the scope of sex discrimination"); Martinez v. N.B.C., Inc., 49 F. Supp. 2d 305, 311 (S.D.N.Y. 1999) (declaring that "if breast pumping is to be afforded protected status, it is Congress alone that may do so").

ates far-reaching and expansive results — it ostensibly outlaws *all* differential treatment of men and women in the workplace unless an employer can show that such treatment is justified by a BFOQ.  Thus, although the formalistic approach to Title VII shuts the door to some claims, it opens the door to others.

It opens the door, for instance, to claims regarding the vast array of sex-based clothing and grooming regulations that govern the typical American workplace.  Workers began to challenge these regulations under Title VII's sex provision in the 1970s.[371]  From a formalistic standpoint, their claims were strong.  Women were permitted to wear long hair and dresses, men were not; employers who implemented these policies were clearly sorting men and women into two groups perfectly differentiated along biological sex lines.  The Court in *Gilbert* had identified this method of sorting as the defining characteristic of sex discrimination.  Yet when plaintiffs challenged such regulations, courts almost always held that they did not violate Title VII's prohibition of sex discrimination.  To hold otherwise, courts suggested, would "have significant and sweeping implications"[372] for social relations and the American workplace.  Courts noted that "[e]mployers, like employees, must be protected,"[373] and opined that no employer should "be coerced into countenancing, regardless of the consequences to his business, what society may frown upon" unless "fundamental human rights" were at stake.[374]  Even after the Court's declaration in *Price Waterhouse* that "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group,"[375] courts have continued to hold that sex-differentiated grooming requirements do not qualify as sex discrimination under Title VII.[376]  In order to explain this line of cases, it seems clear that "we would have to seek an explanation in the domain of social, not formal, logic."[377]

---

[371] For more on the early clothing and grooming cases, see ROBERT C. POST ET AL., PREJUDICIAL APPEARANCES: THE LOGIC OF AMERICAN ANTIDISCRIMINATION LAW 36–39 (2001); Siegel, *supra* note **Error! Bookmark not defined.**, at 13–15.

[372] Willingham v. Macon Tel. Publ'g Co., 507 F.2d 1084, 1090 (5th Cir. 1975) (en banc).

[373] Willingham v. Macon Tel. Publ'g Co., 352 F. Supp. 1018, 1021 (M.D. Ga. 1973).

[374] *Id.*  Often in these early cases, courts equated sex-differentiated grooming regulations with sex-segregated bathrooms, a practice they regarded as obviously beyond the reach of Title VII's prohibition of sex discrimination.  *See, e.g.*, Dodge v. Giant Food, Inc., 488 F.2d 1333, 1337 (D.C. Cir. 1973); Boyce v. Safeway Stores, Inc., 351F. Supp 402, 403 (D.D.C. 1972).  Here too, courts relied on normative judgments, and not on the application of a formal, antidifferentiation principle, to define the concept of discrimination "on the basis of sex."

[375] Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989) (plurality opinion).

[376] *See, e.g.*, Jespersen v. Harrah's Operating Co., 444 F.3d 1104, 1110 (9th Cir. 2006) (holding that a grooming policy requiring female but not male employees to wear make-up and style their hair does not constitute sex discrimination under Title VII).

[377] Siegel, *supra* note **Error! Bookmark not defined.**, at 15.

66                    *HARVARD LAW REVIEW*                    [Vol. 125:1

Courts' treatment of Title VII claims by sexual minorities is similarly difficult to explain on the basis of formal logic alone. "Sex-plus" doctrine, which originated in the early 1970s, enables plaintiffs to demonstrate that they have been discriminated against on the basis of sex by showing that they have been treated differently than members of the opposite sex with whom they share a particular, ostensibly non-sex-related characteristic. *Martin Marietta* can be understood as a "sex-plus" case, as the employer in that case discriminated against mothers but not fathers of school-age children. Under the logic of *Martin Marietta*, gay and transgender employees who face discrimination can also state claims of sex discrimination. In fact, sexual minorities began to make such claims in the 1970s. They argued that an employer discriminates "because of sex" when it punishes male but not female employees who date men, or when it punishes people born male who present as women, but not people born female who do the same. The Court in *Gilbert* suggested that the social meaning of a practice was irrelevant to the question of whether it constituted discrimination "because of sex." Courts claimed that the determining factor in sex-based Title VII cases was whether the plaintiff could satisfy the opposite-sex comparator requirement. Unlike women employed in all-female workplaces, gay and transgender plaintiffs could often adduce opposite-sex comparators.[378] Yet, when courts in the 1970s saw the results that the formalistic approach to Title VII yielded in this context, they quickly abandoned it. Judges uniformly rejected Title VII claims by sexual minorities in this period, even though these plaintiffs seemed to satisfy the test courts had established, in the context of pregnancy and elsewhere, for proving discrimination. But this gave rise to a difficult question: Why was comparator evidence insufficient to prove sex discrimination when the plaintiffs who brought it were gay or transgender? In explaining their departure from formalism in these cases, courts revealed a great deal about the larger social concerns animating sex-based employment discrimination law in this period.

In *Smith v. Liberty Mutual Insurance Co.*,[379] a Georgia district court confronted a question of first impression: Did Title VII's sex provision

---

[378] Of course, it is possible to frame the comparator equation differently and show that there is no sex discrimination in these cases because gay and transgender employees of both sexes are being treated the same. But it is possible to frame the equation differently and find no sex discrimination in almost any case: consider an employer who defends a mandatory, female-only, parental-leave policy by arguing that it is discriminating against both men and women who fail to conform to traditional gender norms. Formal logic alone cannot tell us which way of looking at the problem is the right one. To make that determination, we need to rely on independent judgments about whether particular employment practices entrench traditional gender norms and about how far Title VII should go in disrupting such practices.

[379] 395 F. Supp. 1098 (N.D. Ga. 1975).

protect a plaintiff whose application for a job was rejected due to his "affectional or sexual preference" for men?[380] The court began its analysis by contrasting the United States with "the German Third Reich."[381] In Nazi Germany, the court explained, the government dictated the choices of its citizens in all matters. In the United States, however, the law's reach was limited, and it was "the duty of the courts to protect"[382] employers' freedom of choice outside those limited areas where the law has restricted it. After this preamble, the court acknowledged that the plaintiff could prove sex discrimination in a technical sense, by producing opposite-sex comparators who shared his sexual preference for men. The court concluded, however, that the comparator test was simply "a 'shorthand' way"[383] of implementing the statute's prohibition of sex discrimination, and should not be used to extend that prohibition in socially detrimental ways. Interpreting the statute's antidiscrimination mandate more broadly, the court argued, would impinge on employers' "freedom of action."[384]

The Fifth Circuit echoed this reasoning in its analysis of Smith's claim. It suggested that Congress probably did not intend "to include *all* sexual distinctions in its prohibition of discrimination," and that the role of courts was to determine "whether a line [could] legitimately be drawn beyond which employer conduct is no longer within the reach of the statute."[385] The court concluded that a line could be drawn in this case, on prudential grounds: to extend Title VII's protections to sexual minorities would be too disruptive of traditional gender norms and not respectful enough of employers' interests. Every other court that confronted a sex-based Title VII claim brought by a gay or transgender plaintiff in the 1970s and 1980s reached the same conclusion.[386] They asserted that "Congress never considered nor intended

---

[380] *Id.* at 1099.

[381] *Id.* at 1100.

[382] *Id.* at 11001.

[383] *Id.*

[384] *Id.*

[385] Smith v. Liberty Mut. Ins. Co., 569 F.2d 325, 326 (5th Cir. 1978) (quoting Willingham v. Macon Tel. Publ'g Co., 507 F.2d 1084, 1090 (5th Cir. 1975) (en banc)) (internal quotation mark omitted).

[386] *See, e.g.*, Ulane v. E. Airlines, Inc., 742 F.2d 1081, 1085 (7th Cir. 1984) ("The phrase in Title VII prohibiting discrimination based on sex, in its plain meaning . . . do[es] not outlaw discrimination against a person who has a sexual identity disorder . . . ."); Sommers v. Budget Mktg., Inc., 667 F.2d 748, 750 (8th Cir. 1982) (per curiam) (rejecting a male-to-female preoperative transsexual's sex discrimination claim because "for the purposes of Title VII the plain meaning must be ascribed to the term 'sex'"); Holloway v. Arthur Andersen & Co., 566 F.2d 659, 663 (9th Cir. 1977) ("Congress has not shown any intent other than to restrict the term 'sex' to its traditional meaning."); Terry v. EEOC, No. 80-C-408, 1980 U.S. Dist. LEXIS 17289, at *8 (E.D. Wis. Dec. 10, 1980) (denying relief to a preoperative male-to-female transsexual because Title VII "does not protect males dressed or acting as females and vice versa"); Powell v. Read's, Inc., 436 F. Supp. 369, 371 (D. Md. 1977) (holding that to grant relief to a male-to-female transsexual

1181

that this 1964 legislation apply to anything other than the traditional concept of sex,"[387] and that they were not authorized "to judicially expand the definition of sex as used in Title VII beyond its common and traditional interpretation."[388]

As society's views about sexual minorities have changed, courts have begun haltingly to rescind some of the limitations imposed on sex-based Title VII doctrine in the 1970s. In the past decade, a few courts have determined that discrimination against transgender workers violates Title VII's prohibition of sex discrimination because it punishes these individuals for failing to "match[] the stereotype associated with their group."[389] In 2008, a district court in Washington, D.C., found that the Library of Congress had violated the rights of a transgender job applicant when it withdrew an offer of employment after learning of the applicant's impending male-to-female transition.[390] The court found "that the Library's hiring decision was infected by sex stereotypes,"[391] and that by refusing to employ the plaintiff "because her appearance and background did not comport with . . . sex stereotypes about how men and women should act and appear," the Library had violated Title VII's sex provision.[392] This ruling echoed an earlier pair of cases in which the Sixth Circuit held that "discrimination against a plaintiff who is transsexual — and therefore fails to act and/or identify with his or her gender" — constitutes sex discrimination, and that "[s]ex stereotyping based on a person's gender nonconforming behavior is impermissible discrimination, irrespective of the cause of that behavior."[393] Some courts have also held — in theory at least — that discrimination against gay and lesbian workers may constitute sex discrimination if it is motivated by their failure to conform to traditional gender norms.[394]

---

(D. Md. 1977) (holding that to grant relief to a male-to-female transsexual waitress would be "inconsistent with the plain meaning of the words" of Title VII).

[387] *Ulane*, 742 F.2d at 1085.

[388] *Id.* at 1086.

[389] Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989) (plurality opinion).

[390] Schroer v. Billington, 577 F. Supp. 2d 293, 299–300 (D.D.C. 2008).

[391] *Id.* at 305.

[392] *Id.* at 308.

[393] Smith v. City of Salem, 378 F.3d 566, 575 (6th Cir. 2004); *see also* Barnes v. City of Cincinnati, 401 F.3d 729, 737–38 (6th Cir. 2005) (upholding a jury verdict in favor of a transgender plaintiff who argued that he had been discriminated against on the basis of his failure to conform to sex stereotypes); Lopez v. River Oaks Imaging & Diagnostic Grp., Inc., 542 F. Supp. 2d 653, 660 (S.D. Tex. 2008) (holding that transgender individuals may bring discrimination claims based on sex stereotyping because Title VII's sex stereotyping doctrine does "not make any distinction between a transgendered litigant who fails to conform to traditional gender stereotypes and an 'effeminate' male or 'macho' female" who fails to do so).

[394] Although courts have recognized that gay and lesbian plaintiffs may prevail on sex stereotyping claims, they have often rejected such claims on the ground that the plaintiffs failed to prove that it was truly their biological sex and not their sexual orientation that motivated the

These decisions have inspired passionate criticism from judges who continue to adhere to the notion that "Congress had a narrow view of sex in mind when it passed the Civil Rights Act,"[395] and that the statute's protections should not extend to sexual minorities, even by way of sex stereotyping doctrine. These judges have accused their colleagues of "mak[ing] a moral judgment" that discrimination against homosexuals is wrong, rather than honestly "constru[ing] a statute" that was enacted in 1964.[396] They have asserted that "[i]n the social climate of the early sixties, sexual identity and sexual orientation related issues remained shrouded in secrecy and individuals having such issues generally remained closeted."[397] They argue that it is ludicrous to suggest that a law that emerged from this historical context could fairly be read to apply to gay and transgender individuals. Judge Richard Posner has been particularly vocal in his criticism of these developments. In fact, Posner argues that Title VII law has completely "gone off the tracks in the matter of 'sex stereotyping,'"[398] because it has departed from the "traditional concept" of sex discrimination, which refers only to practices that evince hostility toward men or women as a class. To suggest that Title VII creates "a federally protected right for male workers to wear nail polish and dresses and speak in falsetto and mince about in high heels"[399] is ridiculous, Posner asserts; and it is no less ridiculous to suggest that the law protects gay men — unless they can show that the employer who discriminated against them was motivated by hostility to men in general. Posner claims that to attribute any other interpretation of the term sex discrimination "to the authors of Title VII is to indulge in a most extravagant legal fiction."[400]

This Article argues that the "traditional concept" of sex discrimination, as courts have articulated it over the past three and a half dec-

---

stereotyping. Thus, although some courts have moved beyond the biological conception of sex discrimination in theory, they often continue to apply it in fact. *See, e.g.*, Bibby v. Phila. Coca Cola Bottling Co., 260 F.3d 257, 261–65 (3d Cir. 2001) (accepting that harassment based on sex stereotyping may violate Title VII, but rejecting the individual plaintiff's claim); Spearman v. Ford Motor Co., 231 F.3d 1080, 1085–86 (7th Cir. 2000) (same); Simonton v. Runyon, 232 F.3d 33, 37 (2d Cir. 2000) (same); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260–61 (1st Cir. 1999) (same).

[395] *In re* Estate of Gardiner, 42 P.3d 120, 136 (Kan. 2002) (quoting Ulane v. E. Airlines, Inc., 742 F.2d 1081, 1082 (7th Cir. 1984)).

[396] Rene v. MGM Grand Hotel, Inc., 305 F.3d 1061, 1078 (9th Cir. 2002) (en banc) (Hug, J., dissenting) (quoting *Higgins*, 194 F.3d at 259).

[397] Oiler v. Winn-Dixie La., Inc., No. Civ.A. 00-3114, 2002 WL 31098541, at *4 (E.D. La. Sept. 16, 2002).

[398] Hamm v. Weyauwega Milk Prods., Inc., 332 F.3d 1058, 1066 (7th Cir. 2003) (Posner, J., concurring).

[399] *Id.* at 1067.

[400] *Id.*

ades, is itself a legal fiction.  When courts began in the 1970s to argue that the term discrimination "because of sex" referred only to practices that divided workers into two groups perfectly differentiated along the axis of biological sex, they claimed that this understanding was deeply rooted in the American legal tradition.  They claimed that the framers of the Fourteenth Amendment had understood the concept of discrimination in these terms, and that when Congress enacted the 1964 Civil Rights Act, it too understood the concept in this way.  Given this history, courts contended they had no choice but to interpret Title VII's sex provision in narrow, formalistic terms.  They argued that this was the only neutral reading of the statute, and that interpreting its prohibition of sex discrimination in any other way would constitute judicial activism.

Yet, as we have seen, the notion that sex discrimination refers only, and always, to practices that divide workers into two perfectly sex-differentiated groups was not deeply rooted in American history — it emerged in response to the passage of the 1964 Civil Rights Act.  In the 1960s, employers and sympathetic legal decisionmakers were concerned that the statute would have sweeping implications for the way that gender and the family were regulated in the United States.  They were concerned that it would upend traditional gender norms and sexual conventions, and disrupt forms of regulation that defined what it meant to be a man or a woman.  They developed an arsenal of arguments for limiting the statute's reach, and among them was the argument that Title VII's prohibition of sex discrimination should be interpreted in narrow, formalistic terms.

Today, that argument is deeply embedded in Title VII doctrine, and it continues to serve the purposes for which it was designed.  It constrains the law's understanding of what constitutes discrimination "because of sex," and makes it difficult for plaintiffs to prove that they have been victims of such discrimination.  Today, however, the justifications for this argument are not framed in normative terms.  They are framed in terms of history, or, more often, "tradition."  My aim in this Article has been to recover the "traditional concept" of sex discrimination and to understand that concept for what it is: an argument in a long-standing, and ongoing, debate about how hard Title VII should press against the social norms that prescribe distinct sex and family roles for men and women.

1184

**Exhibit 367.**

My Certificate of an EKG Technician that I earned at City College of San Francisco in 2009.

# City College of San Francisco

Upon recommendation of the faculty and under authorization of the Board of Trustees

the

## Certificate of Accomplishment

in

### EKG Technician

Is hereby presented unto

### Tatyana Drevaleva

With all Rights, Benefits and Privileges pertaining thereto.

Given at City College of San Francisco, in the State of California, this twenty-second day of May, 2009

_Margarita Buchard_
Department Chair/Advisor

_Alice Murillo_
Vice Chancellor, Academic Affairs

_Don Q. Griffin_
Chancellor, San Francisco Community College District

**Exhibit 368.**

Mr. David Williams,

His Standard Form 10-2850c and his Resume.

Use TAB key or Mouse to move between data fields

Approved Exception To SF 171
OMB No. 2900-0205
Estimated burden: 30 minutes

**VA** Department of Veterans Affairs | **APPLICATION FOR ASSOCIATED HEALTH OCCUPATIONS**

SEE LAST PAGE FOR PAPERWORK REDUCTION ACT, PRIVACY ACT AND INFORMATION ABOUT DISCLOSURE OF YOUR SOCIAL SECURITY NUMBER

INSTRUCTIONS: Please submit this application furnishing all information in sufficient detail to enable the Department of Veterans Affairs to determine your eligibility for appointment in Veterans Health Administration.
Type, or print in ink. If additional space is required, please attach a separate sheet and refer to items being answered by number.

**1. OCCUPATION FOR WHICH APPLYING**

A ☐ CERTIFIED RESPIRATORY THERAPY TECHNICIAN
B ☐ REGISTERED RESPIRATORY THERAPIST
C ☐ LICENSED PHYSICAL THERAPIST
D ☐ LICENSED PRACTICAL/VOCATIONAL NURSE

E ☐ LICENSED PHARMACIST
F ☐ PHYSICIAN ASSISTANT
G ☐ EXPANDED-FUNCTION DENTAL AUXILIARY
H ☐ OCCUPATIONAL THERAPIST

☒ OTHER (Specify)
Medical Instrument
Technician

**2. NAME (Last, First, Middle)**
Williams JR    David    E

**3. APPLICATION FOR (Check one)**
☐ GENERAL PRACTICE    ☒ SPECIALTY (Identify Below)
MIT

**4. PRESENT ADDRESS (Include ZIP Code)**   STREET ADDRESS 2   APT NO.

CITY    STATE  ZIP CODE    COUNTRY

**5. TELEPHONE NUMBER (Include Area Code)**
5A. RESIDENCE | 5B. BUSINESS
347-346

**6. DATE OF BIRTH**
01/  /1987

**7. PLACE OF BIRTH (City)**    STATE   COUNTRY

**8. SOCIAL SECURITY NUMBER**

**9A. CITIZENSHIP**
☒ U.S CITIZEN BY BIRTH  ☐ NATURALIZED U.S. CITIZEN  ☐ NOT A U.S. CITIZEN (Complete item 9B)

**9B. COUNTRY OF WHICH YOU ARE A CITIZEN**

**10A. HAVE YOU EVER FILED APPLICATION FOR APPOINTMENT IN THE VA**
☒ YES  ☐ NO   (If "YES" complete items 10B and 10C)

**10B. NAME OF OFFICE WHERE FILED**
MD, PA, CA, NC

**10C. DATE FILED**
Unknown

**11 WHEN MAY INQUIRY BE MADE OF YOUR PRESENT EMPLOYER**

**12. DATE AVAILABLE FOR EMPLOYMENT**
ASAP

**I - ACTIVE MILITARY DUTY**

| 13A. DATE FROM | 13B. DATE TO | 13C. SERIAL OR SERVICE NO. | 13D. BRANCH OF SERVICE | 13E. TYPE OF DISCHARGE |
|---|---|---|---|---|
| | | | | ☐ HONORABLE  ☐ OTHER (Explain on separate sheet) |

**II - LICENSURE, DEA CERTIFICATION, REGISTRATION AND CLINICAL PRIVILEGES (As applicable)**

| 14A. LIST ALL STATES/TERRITORIES IN WHICH YOU ARE NOW OR HAVE EVER BEEN LICENSED (If not held now, explain on separate sheet) | 14B. LICENSE NO. | 14C. CURRENT REGISTRATION (If "NO" explain on separate sheet) YES | NO | NOT REQUIRED | 14D. EXPIRATION DATE |
|---|---|---|---|---|---|
| BLS | | ☒ | | | 06/2018 |
| ACLS ( passed class/ test in 08/2017) | waiting on | ☒ | | | |
| CNA-pa | | | ☒ | | 11/14 |
| CNA-MD | | | ☒ | | 01/17 |
| CNA-NM | | | ☒ | | 11/16 |

**15A. ARE YOU FULLY LICENSED IN EVERY STATE IN WHICH YOU RECEIVED A LICENSE** (If restricted, limited or probational in any State(s), explain on separate sheet)
☐ YES  ☒ NO  ☐ NOT APPLICABLE

**15B. DO YOU HAVE PENDING OR HAVE YOU EVER HAD A STATE LICENSE OR LICENSE TO PRACTICE REVOKED, SUSPENDED, DENIED, RESTRICTED, LIMITED, OR ISSUED/REPLACED ON A PROBATIONAL STATUS OR VOLUNTARILY RELINQUISHED**
☐ YES  ☒ NO  (If "YES" explain on separate sheet)

**15C. HAVE YOU EVER HAD A REGISTRATION TO PRACTICE THAT IS NO LONGER HELD OR CURRENT**
☒ YES  ☐ NO  (If "YES" explain on separate sheet)

**16A. NAME THE CERTIFYING BODY FOR YOUR HEALTH OCCUPATION**
Raymond G Murphy VA

**16B. DATE OF MOST RECENT REGISTRATION/CERTIFICATION (Give Month and Year)**
08/2017

**16C. WHAT IS YOUR REGISTRY/ CERTIFICATION NUMBER**
unkown

**16D. HAS ACTION EVER BEEN TAKEN AGAINST YOUR CERTIFICATION OR REGISTRATION**
☐ YES  ☒ NO  (If "YES" explain on separate sheet)

**17A. DO YOU CURRENTLY HAVE OR HAVE YOU EVER HAD CLINICAL PRIVILEGES AT ANY HEALTH CARE INSTITUTION, AGENCY OR ORGANIZATION**
☒ YES  ☐ NO  (If "YES" complete Item 17B)

**17B. NAME OF CURRENT OR MOST RECENT INSTITUTION, AGENCY OR ORGANIZATION WHERE HELD**
UPMC, pres, UNM, Lovelace

**17C. HAVE ANY OF YOUR STAFF APPOINTMENTS OR CLINICAL PRIVILEGES EVER BEEN DENIED, REVOKED, SUSPENDED, REDUCED, LIMITED, OR VOLUNTARILY RELINQUISHED**
☐ YES  ☒ NO  (If "YES" explain on separate sheet)

**III - THIS SECTION TO BE COMPLETED BY FACILITY DIRECTOR OR DESIGNEE**

▶ CERTIFICATION: **I certify that I have verified licensure and registration with State boards, and cited visa or evidence of citizenship. Board certification has been verified (if appropriate).**

**18. EVIDENCE HAS BEEN CITED IN REGARDS TO.**
☐ CERTIFICATION OR REGISTRATION
☐ NATURALIZED CITIZENSHIP
☐ LICENSURE/REGISTRATION FOR ALL STATES LISTED BY APPLICANT

☐ VISA
☐ CURRENT OR MOST RECENT CLINICAL PRIVILEGES
☐ NO CURRENT OR PREVIOUS CLINICAL PRIVILEGES

| 19A. SIGNATURE OF AUTHORIZED OFFICIAL | 19B. TITLE | 19C. DATE (MONTH, DAY, YEAR) |
|---|---|---|
| | | |

VA FORM
NOV 2018 (R)    **10-2850c**    EXISTING STOCK OF VA FORM 10-2850c, JUN 2006, WILL BE USED.    PAGE 1

| REFERENCES (Continued) | | | |
|---|---|---|---|
| 27A. NAME | 27B. ADDRESS (Number, Street, City, State and ZIP Code) | 27C. AREA CODE/PHONE NO. | 27D. BUSINESS OR OCCUPATION |
| | | | |

| ITEM NO. | PLACE AN "X" IN APPROPRIATE SPACE. IF "YES" EXPLAIN DETAILS ON SEPARATE SHEET | YES | NO |
|---|---|---|---|
| 28. | Do you receive or do you have a pending application for retirement or retainer pay, pension, or other compensation based upon military, Federal civilian, or District of Columbia service? | ☐ | ☒ |
| 29. | Does the Department of Veterans Affairs employ any relative of yours (by blood or marriage)? If "YES" give separately such relative's (1) full name; (2) relationship; (3) VA position and employment location. | ☐ | ☒ |
| 30. | ARE YOU NOW, OR HAVE YOU EVER BEEN, INVOLVED IN ADMINISTRATIVE OR JUDICIAL PROCEEDINGS IN WHICH MALPRACTICE ON YOUR PART IS OR WAS ALLEGED? (If "YES" give details including name of action or proceedings, date filed, court or reviewing agency, and the status or disposition of case concerning allegations, together with your explanation of the circumstances involved.) <br><br> (As a provider of health care services, the VA has an obligation to exercise reasonable care in determining that applicants are properly qualified. It is recognized that many allegations of malpractice are proven groundless. Any conclusion concerning your answer as it relates to your qualifications will be made only after a full evaluation of the circumstances involved.) | ☐ | ☒ |

NOTE: A conviction or a discharge does not necessarily mean you cannot be appointed. The nature of the conviction or discharge and how long ago it occurred is important. Give all the facts so that a decision can be made. If your answer to question 33, 34 or 35 is "YES" give for each offense: (1) date; (2) charge; (3) place; (4) court and (5) action taken. When answering item 33 or 34, you may omit (1) traffic fines for which you paid a fine of $100.00 or less; (2) any offense committed before your 18th birthday which was finally adjudicated in a juvenile court or under a youth offender law; (3) any conviction the record of which has been expunged under Federal or State law; and (4) any conviction set aside under the Federal Youth Corrections Act or similar State authority.

| 31. | Within the last five years have you been discharged from any position for any reason? | ☐ | ☒ |
|---|---|---|---|
| 32. | Within the last five years have you resigned or retired from a position after being notified you would be disciplined or discharged, or after questions about your clinical competence were raised? | ☐ | ☒ |
| 33. | Have you ever been convicted, forfeited collateral, or are you now under charges for any felony or any firearms or explosives offense against the law? (A felony is defined as any offense punishable by imprisonment for a term exceeding one year, but does not include any offense classified as a misdemeanor under the laws of a State and punishable by a term of imprisonment of two years or less.) | ☐ | ☒ |
| 34. | During the past seven years have you been convicted, imprisoned, on probation or parole, or forfeited collateral, or are you now under charges for any offense against the law not included in 33 above? | ☐ | ☒ |
| 35. | While in the military service were you ever convicted by a general court-martial? | ☐ | ☒ |
| 36. | If you were in the military service in one of these health occupations, did you ever receive a non-judicial punishment (Article 15)? | ☐ | ☒ |
| 37. | Are you delinquent on any Federal debt? (Include delinquencies arising from Federal taxes, loans, overpayment of benefits, and other debts to the U.S. Government, plus defaults on any Federally guaranteed or insured loans such as student and home mortgage loans.) <br><br> If "Yes" explain on a separate sheet the type, length, and amount of the delinquency or default and steps you are taking to correct errors or repay the debt. Give any identification numbers associated with the debt and the address of the Federal agency involved. | ☐ | ☒ |

| IX - SIGNATURE OF APPLICANT | |
|---|---|

NOTE: A false statement on any part of your application may be grounds for not hiring you, or for terminating you after you begin work. Also, you may be punished by fine or imprisonment (U.S. Code, Title 18, Section 1001).

▶ CERTIFICATION: I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF, ALL OF MY STATEMENTS ARE TRUE, CORRECT, COMPLETE, AND MADE IN GOOD FAITH.

| 38A. SIGNATURE OF APPLICANT | 38B. DATE (Month, Day, Year) |
|---|---|
| *David C. Williams Jr* | 02/27/2018 |

VA FORM
NOV 2016 (R)    **10-2850c**                                                                 PAGE 3

HOME: ███████████     **DAVID E. WILLIAMS JR.**

EMAIL ███████████████████

*[handwritten: Interviewed very well]*

*[handwritten: selected 3rd c̄ Ref.]*

PROFILE  To obtain a healthcare position within a growth oriented, progressive hospital. I want to apply my vast healthcare skills to an environment where they will make a significant impact and change.

EXPERIENCE  **MEDICAL INSTRUMENT TECHNICIAN**
**ALBUQUERQUE VA HEALTH SYSTEM: 06/12 /2017 -Present**
**4500 S. LANCASTER, DALLAS TX 75146**
Salary: 39143, GS6-3 40 hours' a week
Supervisor: ██████████████

- Monitor patient's electrocardiogram (ekg) waves in a centralized station and notifying the appropriate clinical staff as directed. Receives and interprets physician requests for diagnostic procedure and/ or treatment. Documents all findings (abnormalities) in patient's electronic records.
- Responsible for but not limited to the following: continuously monitors electrocardiogram tracing, Interprets a variety of normal and abnormal EKG tracing and communicates information appropriately, recognizes changes in patient's condition and is astute in identifying the need for intervention, Travel hospital wide to perform 12 lead EKGs, Maintains patients ekg records and other accompanying documentation for the duration of their inpatient visit, Edits and selects appropriate sample portion of ekg tracing for provider, Evaluates patients for discharge from telemetry in collaboration with providers/ care team,  Adhere to all standard of care policies, procedures, and algorithms for telemetry.
- Works with nurses on a consistent basis to coordinate telemetry for new patients and making sure VA Telemetry guidelines are followed, authenticates telemetry boxes with correct patient every shift, Programs the monitor based off the parameters of the individual patient per provider, Documents atrial rate, ventricular rate, PR interval, QRS interval, and regularity of patient's rhythm and record in the medical record (CPRS),  Educate patients and family on the purpose and use of the telemetry monitor, Operates sterilize and inventory ekg equipment.

**HEALTHCARE TECH/ MONITOR TECH**
**PITTSBURGH VA HEALTH SYSTEM: 07/11/2016-04/16/2017**
**University Drive, Pittsburgh PA 15240**

Salary: 36,759, GS6-1 40 hours' a week
Supervisor: ███████████

Provided direct patient care to patients on a MED/SURG unit. Assisted with ambulatory care, collect specimens, monitored intake and output, bladder scan/ post void residuals, and assist nurse with wound dressing changes, apply 12 lead cardiac monitoring on patient and telemetry monitors, empty JP drains, hemovac, NG Tubes, do point of care Glucose testing on patients, as well as vital signs

- Daily, I communicate any patient condition changes to nurse and provide and participate in a team support system for my fellow co-workers.

- Expert in venipuncture blood draws (including blood cultures) using two types of patient identifiers, as well as replacing ileostomy's and colostomy bags, collecting samples from along with the proper draining of all types of drains (JP Drains, Abscess drains, perk drains, hemovac) and picking up blood products such as plasma, RBC, Platelets. I'm able to utilize CPRS to read orders and obtain the necessary information to do the tasks expected of me. Experienced with vista access making labels,

- **Monitor Tech Duties:** Provides assistance of a technical, specialized and supportive nature; to medical personnel in the determination of Cardiac rhythms and rates. Adhere to all standard of care, policies, procedures, and algorithms for telemetry. Works with nurses on a consistent basis to coordinate the assigning of telemetry boxes. Authenticates telemetry boxes with correct patient every shift. Interprets cardiac rhythm and rates of a 6-sec strip every shift or every hour based off floor policy and CPRS orders. Successfully communicates all rhythm changes to the nurse. Instructs patients on the purpose and use of the telemetry monitor. Programs the monitor based off the parameters of the individual patient. Inputs all data into the computer system upon admission and discharge. Obtains vital signs with rhythm change and documents in CPRS. Obtains 12 lead EKG's when ordered by physician, using proper EKG equipment. Observes the cardiac rhythm and recognizes dysrhythmias. Collects rhythm strips and places in the paper medical record every day. Documents atrial rate, ventricular rate, PR interval, QRS interval, and regularity of patient's rhythm and record in the medical record (CPRS), Operates, sterilize and inventory ekg equipment.

CERTIFIED NURSING ASSISTANT
Raymond G. Murphy Va: 04/19/2015 -07/11/2016
**1501 San Pedro Dr. SE, Albuquerque, NM 87108**
Salary: 32,219, GS5-1 intermittent (more than 24 hours a pay period)
Supervisor: ███████████

- Provided direct patient care to patients on the General Surgery Unit(3A). Taking BP's, Temperatures, Respirations and O2 saturations.

- Assisted with ambulatory care, collect specimens, monitored intake and output, bladder scan/ post void residuals, and assist nurse with wound dressing changes, apply 12 lead cardiac monitoring on patient and telemetry monitors, empty JP drains, hemovac, NG Tubes, and do point of care Glucose testing on patients.

- Daily, I successfully communicate any patient condition changes to nurse and provide and participate in a team support system for my fellow co-workers.

PATIENT CARE ASSISTANT/ TELEMETRY MONITOR TECH
UNM Hospitals: 09/15/2014 -02/22/2016
**2211 Lomas blvd NE, Albuquerque, NM 87106**
Salary: ████████ 36 hr. a week

000202

Supervisor: ███████

- Provided direct patient care to patients on the General Surgery Unit (6s). Taking BP's, Temperatures, Respirations and O2 saturations, and point of care Glucose monitoring on patients as well as hemocult stool testing. Assisted with ambulatory care, collect specimens, monitored intake and output, assist nurse with wound dressing changes and wound vac placement.
- Experienced in placing Foley catheters in male and female patients, venipuncture blood draws (including blood cultures) using two types of patient identifiers, as well as replacing ileostomy's and colostomy bags, collecting samples from along with the proper draining of all types of drains (JP Drains, Abscess drains, perk drains, hemovac) and picking up blood products such as plasma, RBC, Platelets.
- Experience with cardiac rate, rhythm, and pattern interpretation as well as continuous cardiac monitoring lead placement. I can detect abnormal rhythm changes, communicate all changes to appropriate nurse, interpret standard 6 second strip per patient and record a baseline for each patient.
- Daily, I successfully communicate any patient condition changes to nurse and provide and participate in a team support system for my fellow co-workers.

**PATIENT CARE ASSISTANT/ SECRETARY**
Presbyterian Hospital: 02/15/2014 -07/06/2016
**1100 Central Ave SE, Albuquerque, NM 87106**
Salary: ████  20+ hours a week
Supervisor: ███████

- Provided direct patient care to patients on the General Surgery Unit. Taking BP's, Temperatures, Respirations and O2 saturations, and point of care Glucose monitoring on patients as well as hemocult stool testing.
- Experienced in placing Foley catheters in male and female patients, placing NG tubes and doing PH testing to make sure they are in the proper place, as well as replacing ileostomy's and colostomy bags, collecting samples from along with the proper draining of all types of drains (JP Drains, Abscess drains, perk drains, hemovac) and picking up blood products such as plasma, RBC, Platelets
- Assisted with ambulatory care, monitored intake and output and assist with wound dressing changes.
- Daily, I successfully communicate any patient condition changes in to nurse and provide a team like support system for my fellow co-workers.
- **Secretary:** Answering Multi line phone system, Admitted/Transferred/discharged patient with in The Epic computer operation system, Ordered supplies for three units from central supply, Filed patient related documents in the appropriate place, Provided excellent customer service to visitors, venders and patients. Assigned patients, based on their level of care, to 3 different units on the surgical service line. Worked directly with the charge nurse and House supervisor to ensure accurate flow of the units, Floated to other units like the ICU, Progressive Care, Med Surgery in same secretarial capacity.

**PATIENT CARE ASSISTANT/ CNA**
Lovelace Medical Center: 03/01/2013 -08/2014
**601 DR. MLK JR Ave, Albuquerque, NM 87102**
Salary: ████  36 hr a week
Supervisor: ███████

- Provided direct patient care to patients who need 1:1 care while in hospital. Taking BP's, Temperatures, Respirations and O2 saturations and point of care Glucose monitoring on patients as well as hemocult stool testing.
- Experienced in placing Foley catheters in male and female patients, along with replacing ileostomy's and colostomy bags, collecting samples from drains as well as the proper draining of all types of drains (JP Drains, Abscess drains, perk drains, hemovac) and picking up blood products such as plasma, RBC, Platelets
- Known as the go to person for venipuncture blood draws on an inpatient basis (especially hard sticks). Experienced with drawing Blood Cultures from two different sites, order of tube collection, tests such as type and cross screening, electrolyte panels, CMP's, Ammonia, lactates, as well as nares swabs to test for MRSA. Also, experienced with both straight stick needles along with butterflies and using two types of patient identifiers to insure proper patient is being tested.
- Assisted with ambulatory care, monitored intake and output and work with nurse on wound care including wound vacs, and drains. On the regular basis, I performed 12 lead EKG'S, connected patients to cardiac monitoring and occasionally started IV's
- I successfully communicate all changes in condition or behavior of patients to nurse and provide as well as participated in a team like support system for my fellow co-workers.

**PATIENT CARE ASSISTANT/CNA**
Temple University Hospital: 5/2010- 08/2012
3400 N Broad St Phila, Pennsylvania
Salary: ████ 40+ hours a week
Supervisor: ████████ may contact

- Provided direct patient care to patients. Taking BP's, Temperatures, Respirations and O2 sats.
- Assisted with ambulatory care, collect specimens, monitored intake and output and work with nurse on wound cleaning and dressing changes, changed ostomy bags, and assisted with wound vac, also have experience with washing and treating the wounds of 3rd /4th degree burn victims. Communicate all changes in condition or behavior to RN. Provided a team like support system for my fellow co-workers.

**HEALTHCARE TECHNICIAN/ CNA**
Central Regional hospital (mental Health); 4/2009 - 5/2010
300 Veazey Rd Butner, North Carolina
Salary: ████ 40+ Hours a week
Supervisor: ████████ may contact

- Assuring well being of patients are intact. Participation in patients' habilitation & implementing a course of action to help with treatment.
- Direct care services to individuals with developmental disabilities & behavioral problems per psych diagnosis.
- Trained to venipuncture blood draws on an inpatient basis (especially hard sticks) on all patients. Experienced with order of tube collection, electrolyte panels, CMP's, Ammonia, lactates, Hep Panels, and Post Exposure panels. Experienced with drawing blood with straight needles as well as butterfly's and using two types of patient identifiers to insurance proper patient is being tested

000204

- Assisted in leading Therapeutic Group activities and was on the Crisis Team (experienced and performed therapeutic holds to insure patient safety in an urgent situation)
- Maintain patient safety, assist & encourage independent activities like washing clothes, cleaning room, socializing with peers. Also, assisted in EKG's, collect specimen's, performed blood draws. Provided a team like support system for my fellow co-workers and communicated effectively to the nurse the need of the patients

9/2007 - 12/2008

CERTIFIED NURSING ASSISTANT (Per diem then Floor)
UNC Healthcare
101 manning Dr, Chapel Hill North Carolina
Salary: ▮▮▮ 36 + Hours a week
Supervisor: ▮▮▮▮▮▮

CERTIFIED NURSING ASSISTANT
Alamance Regional Hospital
1240 Huffman Mill Rd Burlington, NC 27215
Salary: ▮▮▮▮ 36 + Hours a week

- Provided direct patient care to patients. Taking BP's, Temperatures, Respirations and O2 sats.
- Assisted with ambulatory care, collect specimens, monitored intake and output and work with wounds including ostomy bags, vacs, 3rd /4th degree burn victims. Communicate all changes in condition or behavior to RN.
- Monitoring post operative Ortho patients before/after surgery.
- Cleans, sterilizes, stores, prepares, and issues dressing packs, treatment trays, and other supplies. Provided a team like support system for my fellow co-workers.

HEALTH UNIT COORDINATOR
UNC Healthcare: 3/2006 - 9/2007
101 Manning Dr. Chapel Hill, North Carolina
Salary: ▮▮▮▮ 40 Hours a week
Supervisor: ▮▮▮▮▮▮

- Responsible for the daily activities of a pulmonary/ Infectious disease ward. Admitted patients to medical service. Organized and gather information for chart. Maintain patient information during admission. Processed transfers and discharges.
- Called in consults to participating clinics.
- Transcribed physician orders and implemented stat protocols. Ordered procedures and tests for acute and critical care patients.
- Requisitioned office supplies. Assisted during code blue. Acquired knowledge on hospital protocol and regulation.
- Maintained phone lines.

EDUCATION    CHESTER COUNTY HIGH SCHOOL
DOWNINGTOWN PA – DIPLOMA ▮▮▮▮

COMMUNITY COLLEGE OF PHILADELPHIA
PHILADELPHIA, PA

CENTRAL NEW MEXICO COMMUNITY COLLEGE (present)

Skills        **CPR (BLS) and ACLS**

REFERRALS        UPON REQUEST

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

_____,

                Plaintiff,

vs.                                         CIVIL NO. _____

_____,

                Defendant.

## JOINT STATUS REPORT AND PROVISIONAL DISCOVERY PLAN

Pursuant to FED. R. CIV. P. 26(f), a meeting was held on _____ at

_____ and was attended by:

_____ for Plaintiff(s)

_____ for Defendant(s)

_____ for other parties.

## NATURE OF THE CASE

## AMENDMENTS TO PLEADINGS AND JOINDER OF PARTIES

Plaintiff intends to file:

Plaintiff(s) should be allowed until _____ to move to amend the pleadings and until

_____ to join additional parties in compliance with the requirements of Fed. R. Civ.

P. 15(a).

Defendant intends to file:

Defendants(s) should be allowed until _____ to move to amend the pleadings and

until _____ to join additional parties in compliance with the requirements of Fed. R.

Civ. P. 15(a).

*Version 3: December 2009*

## STIPULATIONS

The parties hereto stipulate and agree that venue is properly laid in this District; that the United States District Court for the District of New Mexico has jurisdiction of the parties and the subject matter.

The parties are willing to further stipulate to the following facts:

The parties further stipulate and agree that the law governing this case is:

## PLAINTIFF'S CONTENTIONS:

## DEFENDANT'S CONTENTIONS

## PROVISIONAL DISCOVERY PLAN

The parties jointly propose to the Court the following discovery plan:  *(Use separate paragraphs or subparagraphs as necessary if parties disagree.)*

List all witnesses who, at this time, you think will either testify or be deposed, giving their name, title, address and a brief summary of their testimony.  It is insufficient to list witnesses' addresses, save for clients, "in care of counsel."

List all documents which you believe, at this time, will be exhibits at the trial.

List all experts who you believe, at this time, will testify at the trial, giving their name, address, area of expertise, and a brief summary of the anticipated testimony.

Discovery will be needed on the following subjects:  *(Brief description of subjects on which discovery will be needed.)*

Maximum of _____ interrogatories by each party to any other party.  (Responses due _____ days after service).

Maximum of _____ requests for admission by each party to any other party.  (Response due _____ days after service).

*Version 3: December 2009*

Maximum of _____ depositions by Plaintiff(s) and _____ by Defendant(s).

Each deposition (other than of _____) limited to maximum of _____ hours unless extended by agreement of parties.

Reports from retained experts under Rule 26(a)(2) due:

from Plaintiff(s) by _____

from Defendant(s) by _____

Supplementation under Rule 26(e) due _____ *(set time(s) or interval(s)).*

All discovery commenced in time to be complete by _____. Discovery on *(issue for early discovery)* to be completed by _____.

Other Items:  *(Use separate paragraphs or subparagraphs as necessary if other parties disagree.)*

## PRETRIAL MOTIONS

Plaintiff intends to file:

Defendant intends to file:

## ESTIMATED TRIAL TIME

The parties estimate trial will require _____ days/weeks.

_____ This is a non-jury case.

_____ This is a jury case.

The parties request a pretrial conference in _____.

*Version 3: December 2009*

## SETTLEMENT

The possibility of settlement in this case is considered (likely) (unlikely) (cannot be evaluated prior to _____) (may be enhanced by use of the following alternative dispute resolution procedure: _____).  The parties request a settlement conference in _____.

## EXCEPTIONS

(Where counsel cannot agree to any recitation herein, exceptions shall be listed.)

APPROVED WITH/WITHOUT EXCEPTIONS
(note exceptions above)

_____
For Plaintiff

_____
For Defendant

_____
Other Party

*Version 3: December 2009*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**TATYANA EVGENIEVNA
DREVALEVA,**

       **Plaintiff,**

      **vs.**                     **Civ. No. 21-761  WJ/JFR**

**UNITED STATES DEPARTMENT OF
VETERANS AFFAIRS, ET AL.,**

       **Defendants.**

## INITIAL SCHEDULING ORDER

This case is assigned to me for scheduling, case management, discovery and other non-dispositive motions.  The Federal Rules of Civil Procedure, as amended, as well as the Local Civil Rules of the United States District Court for the District of New Mexico will apply to this lawsuit.

The parties, appearing through counsel or *pro se*, will "meet and confer" no later than **Thursday, October 14, 2021,** to discuss the nature and basis of their claims and defenses, the possibility of a prompt resolution or settlement, and to formulate a provisional discovery plan. Fed. R. Civ. P. 26(f).  The parties will cooperate in preparing a *Joint Status Report and Provisional Discovery Plan* ("JSR") which follows the sample JSR available at the Court's website, www.nmd.uscourts.gov.  The parties will fill in the proposed dates, bearing in mind that the time allowed for discovery is generally 120 to 150 days from the date of the Rule 16 Initial Scheduling Conference.  The Court will determine actual case management deadlines after considering the parties' requests.  Plaintiff, or Defendant in removed cases, is responsible for filing the JSR by **Monday, October 25, 2021**.

Good cause must be shown and the Court's express and written approval obtained for any

modification of the case management deadlines that the Court will establish at the scheduling

conference.

Initial disclosures under Fed. R. Civ. P. 26(a)(1) must be made within fourteen (14) days

of the meet-and-confer session.

A Rule 16 Initial Scheduling Conference will be held telephonically on **Thursday,

November 4, 2021,** at **10:00 a.m.** Five minutes prior to the start of the Conference, the parties

shall call the **AT&T Conference line at 888-363-4735, Access Code 2387395,**[1] to connect to

the proceedings. At the Rule 16 scheduling conference, counsel must be prepared to discuss

initial disclosures; discovery needs and scheduling; the process for resolving discovery disputes;[2]

all claims and defenses; the use of scientific evidence and whether a *Daubert*[3] hearing is needed;

and the timing of expert disclosures and reports under Fed. R. Civ. P. 26(a)(2). We will also

discuss settlement prospects and alternative dispute resolution possibilities. Client attendance is

not required. All parties should review the Court's webpage at:

https://www.nmd.uscourts.gov/content/honorable-john-f-robbenhaar, particularly noting the

Procedures Tab and linked Guidelines for Proposed Protective Orders, Phone Conference

Procedures and Procedures for Civil Discovery and Settlement Matters.

---

[1] **REMINDER: Recording or broadcasting of this conference is strictly prohibited. See D.N.M.LR-Civ. 83.1**

[2] The Court will not entertain any motion to resolve a discovery dispute pursuant to Fed. R. Civ. P. 26 through 37, or a motion to quash or modify a subpoena pursuant to Fed. R. Civ. P. 45(c), unless the attorney for the moving party has conferred or has made reasonable effort to confer with opposing counsel concerning the matter in dispute prior to the filing of the motion. Every certification required by Fed. R. Civ. P. 26(c) and 37 and this rule related to the efforts of the parties to resolve discovery or disclosure disputes must describe with particularity the steps taken by all attorneys to resolve the issues in dispute. A "reasonable effort to confer" means more than mailing or faxing a letter to the opposing party. It requires that the parties in good faith converse, confer, compare views, consult, and deliberate, or in good faith attempt to do so. Absent exceptional circumstances, parties should converse in person or telephonically.

[3] *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

Plaintiff shall serve a copy of this order on any parties that have been served but have not yet entered an appearance and shall file a certificate of service with the Court documenting such service. Plaintiff shall serve a copy of this order on any parties not yet served along with the summons and complaint.

**IT IS SO ORDERED.**

JOHN F. ROBBENHAAR
United States Magistrate Judge

# PROOF OF SERVICE.

I am Tatyana Drevaleva, and I am a Pro Se Plaintiff in case No. **1:21-cv-00761-WJ-JFR**.

On September 25, 2021, I served Assistant U.S. Attorney for the Office of the U.S. Attorney for the District of New Mexico Ms. Christine Lyman electronically with the following documents (case No. **1:21-cv-00761-WPJ**) pursuant to the California Senate Bill No. 1146 that mandates the represented Parties to accept the electronic service during the COVID-19 pandemy:

1) The September 17, 2021 Order of the Hon. Judge John Robbenhaar
2) Joint Status Report and Provisional Discovery Plan – template
3) Plaintiff's Statement of Facts, Part 1
4) Exhibits 367 and 368
5) Excerpts of the Record in Appeal No. 19-16395 after case No. 3:18-cv-03748-WHA, Volumes 1, 2, 3, and 4
6) Defendants' Objections to Plaintiff's Statement of Facts, Part 1 – template.

On September 25, 2021, I emailed the mentioned above documents from my email address tdrevaleva@gmail.com to Ms. Lyman's email address Christine.Lyman@usdoj.gov

I declare under the penalty of perjury and under the Federal laws that all foregoing is true and correct. Executed at San Francisco, CA on September 25, 2021.

Respectfully submitted,

s/ Tatyana Drevaleva

Plaintiff Pro Se

Date: September 25, 2021.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

Tatyana Evgenievna Drevaleva

     *Plaintiff*                             Case No. 1:21-cv-00761-WJ-JFR

           v.

1) The U.S. Department of Veterans Affairs

2) Mr. Denis Richard McDonough as a Secretary of

  the U.S. Department of Veterans Affairs

     *Defendants*

**ERRATA TO PLAINTIFF'S STATEMENT OF FACTS. <u>Part 1</u>.**

Plaintiff Tatyana Drevaleva is submitting an Errata to my September 25. 2021 Plaintiff's Statement of Facts, Part 1. I made some typos in Fact No. 43. In this Errata, I am correcting these typos.

The sentence with the typographical errors in **<u>Fact No. 43</u>** in my September 25, 2021 Plaintiff's Statement of Facts, Part 1:

- 1 -

During the night shifts prior to May 17, 2017, I told Ms. Das a story about my long time efforts to have a child including my two unsuccessful marriages, my history of sleeping with other guys, my **In0Utero** Inseminations attempts at Kaiser Permanente in California, **my 2.5 stay** in Russia from 2014 to 2016 for the purpose of a complete medical examination, and a history of my IVF attempts in Russia.

Please, read **the corrected Fact 43** as follows:

During the night shifts prior to May 17, 2017, I told Ms. Das a story about my long time efforts to have a child including my two unsuccessful marriages, my history of sleeping with other guys, my **In-Utero** Inseminations attempts at Kaiser Permanente in California, **my 2.5 year stay** in Russia from 2014 to 2016 for the purpose of a complete medical examination, and a history of my IVF attempts in Russia.

I declare under the penalty of perjury, under the Federal laws, under the laws of the State of California, and under the laws of the State of New Mexico that all foregoing is true and correct. Executed at San Francisco, CA on September 26, 2021.

Respectfully submitted,

s/ Tatyana Drevaleva

Plaintiff Pro Se

September 26, 2021.

## PROOF OF SERVICE.

I am Tatyana Drevaleva, and I am a Pro Se Plaintiff in case No. **1:21-cv-00761-WJ-JFR**.

On September 26, 2021, I served Assistant U.S. Attorney for the Office of the U.S. Attorney for the District of New Mexico Ms. Christine Lyman electronically with the following document (case No. **1:21-cv-00761-WJ-JFR**) pursuant to the California Senate Bill No. 1146 that mandates the represented Parties to accept the electronic service during the COVID-19 pandemy:

ERRATA TO PLAINTIFF'S STATEMENT OF FACTS. Part 1.

On September 26, 2021, I emailed the mentioned above document from my email address tdrevaleva@gmail.com to Ms. Lyman's email address Christine.Lyman@usdoj.gov

I declare under the penalty of perjury and under the Federal laws that all foregoing is true and correct. Executed at San Francisco, CA on September 26, 2021.

Respectfully submitted,

s/ Tatyana Drevaleva

Plaintiff Pro Se

Date: September 26, 2021.

**Ashley Kittrell**

| | |
|---|---|
| **From:** | Tatyana Drevaleva <tdrevaleva@gmail.com> |
| **Sent:** | Sunday, September 26, 2021 5:19 PM |
| **To:** | Lyman, Christine (USANM); NMDdb_Proposed Text Johnson; NMDml_Magistrate Judge Robbenhaar's Chambers |
| **Subject:** | Case No. 1:21-cv-00761-WJ-JFR. ERRATA TO PLAINTIFF'S STATEMENT OF FACTS. Part 1. |
| **Attachments:** | Drevaleva__Errata to Plaintiff's Statement of Facts__Part 1__00761__September 26, 2021.pdf; PES__Lyman__Errata__00761__September 26, 2021.pdf |

**CAUTION - EXTERNAL:**

Electronic service.
I am sending a copy to the Hon. Judges Johnson and Robbenhaar for their attention.

--
Respectfully,
Tanya.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.